1  JENNER & BLOCK LLP
   Richard L. Stone (Bar No. 110022)
2  Andrew J. Thomas (Bar No. 159533)
   David R. Singer (Bar No. 204699)
3  Amy M. Gallegos (Bar No. 211379)
   633 West 5th Street, Suite 3600
4  Los Angeles, CA 90071
   rstone@jenner.com
5  ajthomas@jenner.com
   dsinger@jenner.com
6  agallegos@jenner.com

7  Attorneys for Plaintiffs
   Fox Broadcasting Company, Twentieth
8  Century Fox Film Corp., and
   Fox Television Holdings, Inc.

9

10

11          **UNITED STATES DISTRICT COURT**

12          **CENTRAL DISTRICT OF CALIFORNIA**

13              **WESTERN DIVISION**

14

| | |
|---|---|
| 15 FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM 16 CORP., and FOX TELEVISION HOLDINGS, INC. 17 | Case No. CV-12-04529 DMG (SHx) **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| 18                                    Plaintiffs, | Hearing Date:     Sept. 21, 2012 |
| 19 v. | Hearing Time:    9:30 a.m. Courtroom:        7 (2nd Floor) |
| 20 DISH NETWORK L.L.C. and DISH NETWORK CORP., | [Notice of Motion and Motion; |
| 21                                    Defendants. | Supporting Declarations with Exhibits; Notice of Lodging; and |
| 22 | Proposed Order filed concurrently] |
| 23 | **PUBLIC REDACTED VERSION** |

24        Plaintiffs Fox Broadcasting Company, Inc., Twentieth Century Fox Film

25  Corp., and Fox Television Holdings, Inc. (collectively, "Fox") respectfully submit

26  the following Memorandum of Points and Authorities in support of their Motion

27  for Preliminary Injunction against defendants DISH Network L.L.C. and DISH

28  Network Corp. (collectively, "Dish").

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................... 1

II.   FACTUAL BACKGROUND ..................................................................... 2

      A.   Fox Distributes Its Programs To Consumers In Numerous
           Ways ............................................................................................... 2

      B.   Fox's Limited And Conditional Grant Of Rights To Dish ..................... 4

      C.   Dish's PrimeTime Anytime Video On Demand Service ........................ 4

      D.   In Violation Of Dish's License, PrimeTime Anytime Strips
           Commercials From Fox's Programs And Delivers The
           Programs To Mobile Devices ................................................................ 7

IIII.  ARGUMENT ............................................................................................ 8

      A.   Fox Is Likely To Succeed On Its Breach Of Contract Claim ................. 8

      B.   Fox Is Likely To Succeed On Its Direct Infringement Claim ................ 9

           1.   Dish's PrimeTime Anytime And AutoHop Exceed The
                Scope Of Dish's Retransmission License And Constitute
                Copyright Infringement .......................................................... 9

           2.   PrimeTime Anytime Infringes Fox's Copyrights .......................... 10

                a.   Dish infringes the Section 106(1) reproduction right .............. 10

                b.   Dish also infringes the Section 106(3) distribution
                     right ......................................................................... 13

           3.   The AutoHop Service Unlawfully Copies Fox's Programs. ............ 14

      C.   Alternatively, Fox Is Likely To Prove Secondary
           Infringement By Dish ........................................................................ 15

           1.   Dish Is Liable For Inducing Copyright Infringement ..................... 15

           2.   Dish Is Liable For Vicarious Infringement .................................... 16

           3.   Dish's Is Liable for Contributory Infringement ............................. 17

           4.   Dish's Conduct Is Not Protected By The Fair Use Doctrine ........... 17

      D.   Fox Will Suffer Irreparable Harm In The Absence Of An
           Injunction ........................................................................................ 19

           1.   Dish's Conduct Harms Fox's Right To Exclusive Control ............. 20

           2.   Dish's Conduct Disrupts Fox's Ability To Distribute Its
                Programs ............................................................................... 22

3. Dish's Conduct Threatens Fox's Ad-Supported Business Model ............................................................................. 23

E. The Balance Of Hardships Weighs Decidedly In Favor Of Fox ................................................................................. 24

F. Public Policy Favors The Issuance Of An Injunction Against Dish ................................................................................ 25

IV. CONCLUSION ............................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001)...........................................................passim

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)....................................................................8

*Arista Records LLC v. Lime Group LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011) ............................................16, 17

*Arista Records LLC v. Myxer Inc.*,
    Case No. CV 08–3935–GAF (JCx),
    2011 U.S. Dist. LEXIS 109668 (C.D. Cal. April 1, 2011) ...................11

*Arista Records LLC v. Usenet.com, Inc.*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009)...............................................13, 17

*Atlantic Rec'g Corp. v. XM Satellite Radio, Inc.*,
    2007 WL 136186 (S.D.N.Y. Jan. 19, 2007)......................................13, 14

*Berster Tech, LLC v. Christmas*,
    2012 WL 33031 (E.D. Cal. Jan. 6, 2012).................................................20

*Cadence Design Sys., Inc. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997).....................................................................24

*California v. Tahoe Regional Planning Comm'n*,
    766 F.2d 1319 (9th Cir. 1985)...................................................................25

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) .................................................................................19

*Capitol Records, Inc. v. MP3Tunes, LLC*,
    821 F. Supp. 2d 627 (S.D.N.Y. 2011)......................................................17

*Cartoon Network LP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008).....................................................................11

*Columbia Pictures Indus., Inc. v. Fung*,
    2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) .......................................16

*Dielsi v. Falk*,
    916 F. Supp. 985 (C.D. Cal. 1996) .........................................................11

*eBay, Inc. v. Bidder's Edge, Inc.*,
    100 F. Supp. 2d 1058 (N.D. Cal. 2000) ..................................................20

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ................................................................................ 19

*Eldred v. Ashcroft*,
    537 U.S. 186 (2005) ................................................................................ 25

*Elvis Presley Enter., Inc. v. Passport Video*,
    349 F.3d 622 (9th Cir. 2003) .................................................................. 19

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) .................................................................... 17

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    772 F.2d 505 (9th Cir. 1985) .................................................................. 10

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ................................................................................ 19

*John Goyak & Assocs. v. Terhune*,
    299 Fed. App'x 739 (9th Cir. 2008) ........................................................ 8

*LGS Architects, Inc. v. Concordia Homes of Nev.*,
    434 F.3d 1150 (9th Cir. 2006) ................................................................ 10

*Los Angeles News Serv. v. CBS Broad., Inc.*,
    305 F.3d 924 (9th Cir. 2002) .................................................................. 19

*Los Angeles New Service v. Tullo*,
    973 F.2d 791 (9th Cir. 1992) .................................................................. 15

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928 (9th Cir. 2010) .................................................................. 10

*MGM Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................. 19, 20

*MGM Studios, Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ........................................................................ passim

*Monge v. Maya Magazines, Inc.*,
    – F.3d –, 2012 WL 3290014 (9th Cir. Aug. 14, 2012) .......................... 19

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
    16 F.3d 1032 (9th Cir. 1994) .................................................................. 25

*Perfect 10, Inc. v. Megaupload, Ltd.*,
    2011 WL 3203117 (S.D. Cal. July 27, 2011) ............................. 11, 13, 18

*Playboy Enters. v. Russ Hardenburgh, Inc.*,
    982 F. Supp. 503 (N.D. Ohio 1997) ...................................................... 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Princeton Univ. Press v. Michigan Document Servs., Inc.,*
    99 F.3d 1381 (6th Cir. 1996)............................................................13, 15

*RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.,*
    845 F.2d 773 (8th Cir. 1988) ...............................................................13

*RCA Records v. All-Fast Sys., Inc.,*
    594 F. Supp. 335 (S.D.N.Y. 1984).........................................................13

*Religious Technol. Center v. Netcom On-Line Commc'n Servs., Inc.,*
    907 F. Supp. 1361 (N.D. Cal. 1995) .....................................................11

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
    944 F.2d 597 (9th Cir. 1991).................................................................20

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010).....................................................................19

*Satellite Broad. Commc'ns Ass'n v. FCC,*
    275 F.3d 337 (4th Cir. 2001).................................................................25

*Sony Corp. of America v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ..............................................................................17

*Stewart v. Wachowski,*
    574 F. Supp. 2d 1074 (C.D. Cal. 2005)................................................11

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
    240 F.3d 832 (9th Cir. 2001).................................................................20

*Sun Microsystems, Inc. v. Microsoft Corp.,*
    188 F.3d 1115 (9th Cir. 1999)...............................................................10

*Triad Sys. Corp. v. Southeast Express Co.,*
    64 F.3d 1330 (9th Cir. 1995).................................................................24

*Warner Bros. Entm't v. WTV Systems, Inc.,*
    824 F. Supp. 2d 1003 (C.D. Cal. 2011)..........................................passim

*Winter v. Natural Res. Defense Council,*
    555 U.S. 7 (2008) ....................................................................................8

*WPIX, Inc. v. ivi, Inc.,*
    765 F. Supp. 2d 594 (S.D.N.Y. 2011)..............................................20, 23

*Zomba Enters. v. Panorama Records, Inc.,*
    491 F.3d 574 (6th Cir. 2007).................................................................15

v

**Statutes**

17 U.S.C. § 106.................................................................................................9, 13

17 U.S.C. § 107......................................................................................................19

17 U.S.C. § 119......................................................................................................10

47 U.S.C. § 325(b)(1)(A) and (b)(3)(C) ...............................................................3

Fed. R. Civ. P. 65(c) .............................................................................................25

**Treatise**

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A] (2012) .........10

# I.  INTRODUCTION

In March 2012, Dish launched an unauthorized video on demand service for primetime broadcast television called PrimeTime Anytime in violation of the express terms and conditions of its contracts with Fox and federal copyright law. Dish's service makes an unauthorized copy of the entire primetime schedule for all four major broadcast networks every night, and then makes this nearly 100-hour library of programs available to subscribers for up to eight days.  Dish touts its new service as providing "unprecedented" "on demand access" to primetime television.

In May 2012, Dish began making these bootleg copies of the networks' primetime programs (including Fox's copyrighted programs) available to Dish subscribers with "AutoHop," a feature that strips out all of the networks' commercials from the PrimeTime Anytime copies of broadcast programs using a process that makes even further unauthorized copies of the programs.  In marketing its new video on demand service, Dish boasts to consumers that it has "created commercial-free TV."  Dish's conduct infringes Fox's exclusive copyrights and breaches the parties' contracts that *expressly prohibit* Dish from copying Fox's programs or providing a commercial-free video on demand service.

Last month, ████████████████, Dish forced on its subscribers a software update that made cosmetic changes to the PrimeTime Anytime settings in an attempt to camouflage the copyright infringement that Dish commits every night with its service.  While the software update effectively concedes that PrimeTime Anytime as originally distributed and operated by Dish was infringing, it does not solve the problem: PrimeTime Anytime still breaches the parties' contracts and infringes Fox's copyrights on a massive scale, night after night.

The need for a preliminary injunction could not be greater.  PrimeTime Anytime and AutoHop cut the legs out from under the advertiser-supported broadcast television business model, devalue Fox's commercial air time in the eyes of advertisers, usurp Fox's control over the timing and manner in which Fox has

chosen to exploit its copyrighted works, and threaten to disrupt Fox's ability to license its programs and recoup its massive investment. Dish's chairman admitted, in an interview after this lawsuit began, that PrimeTime Anytime and AutoHop are "not good" for broadcasters and put the entire television "ecosystem" in jeopardy.[1] A major credit rating agency agrees. In May 2012, Moody's issued an independent report warning that if AutoHop were deployed and widely used, it "will have broad negative credit implications across the entire television industry" and "could destabilize the entire television eco-system." Haslingden Decl. ¶¶ 23-24, Ex. D.

The Court should preliminarily enjoin Dish from offering or operating both the original and current iterations of PrimeTime Anytime and AutoHop.

## II. FACTUAL BACKGROUND

### A. Fox Distributes Its Programs To Consumers In Numerous Ways.

Fox owns the copyrights in numerous broadcast television programs, including popular and critically-acclaimed primetime series such as *Glee*, *The Simpsons*, *Family Guy*, *Touch*, and *Bones* (the "Fox Programs"). Brennan Decl. ¶¶ 2-3, Ex. A. The Fox Programs cost hundreds of millions of dollars to produce and acquire. Haslingden Decl. ¶ 6.

The main distribution channel for the Fox Programs is the Fox Network, a national broadcast television network. The Fox Network has more than 200 television station affiliates (some of which are owned by Fox) which broadcast television programming over the airwaves, free of charge, to virtually anyone with a working antenna and a television. Approximately 54 million Americans receive broadcast television over the air. Under this business model, Fox's programming costs are borne largely by advertisers who pay for the right to show advertisements during commercial breaks in the programs. Brennan Decl. ¶¶ 4-10.

Fox also makes its broadcast programming, including the commercials, available to consumers who receive their television through paid subscriptions to

---

[1] Singer Decl., Ex. I, "Dish Chief: TV Needs to Change," *Wall St. Journal*, 6/8/12.

cable, telco and satellite television distributors like Dish.  Brennan Decl. ¶ 12.  Fox grants these distributors the right to retransmit Fox's over-the-air broadcast signal to their subscribers.  In exchange for this "retransmission consent," Fox is entitled by federal law to charge cable and satellite distributors a retransmission consent fee or seek other consideration.  *Id.*; 47 U.S.C. § 325(b)(1)(A) and (b)(3)(C).  These fees, however, cover only a small fraction of Fox's programming costs as compared to commercial advertising revenues.  Haslingden Decl. ¶¶ 7-10.

After Fox Programs first air on primetime television, Fox makes them available to consumers through a variety of formats and media, with and without commercials, at different price points.  For example, eight days after a Fox Program first airs on television, users with a computer and high-speed Internet access can watch it "on demand" (*i.e.*, whenever they want) for free on websites licensed by Fox, such as fox.com and hulu.com.  Brennan Decl. ¶ 14(c).  Fox Programs distributed for free online contain fewer commercials than the television broadcast, but the ability to fast-forward through commercials is disabled.  *Id.*

Paying subscribers of certain cable and satellite providers have the added benefit of next-day video on demand ("VOD") access to the Fox Programs on television or via the Internet.  These versions also have commercials that cannot be skipped.  *Id.* ¶ 14(a-b).  Consumers who pay an additional $7.99 per month can subscribe to Hulu Plus, a premium online streaming service that provides next-day on-demand access to the Fox Programs, plus the ability to watch the programs on mobile devices such as iPhones, iPads and other smart phones and tablets.  *Id.* ¶ 14(b & d).  These versions also contain commercials that cannot be skipped.  *Id.*

Finally, consumers can pay for and download ultra-premium versions of the Fox Programs in a commercial-free format from online vendors such as the Apple iTunes Store and Amazon.com.  These versions are typically available the day after a Fox Program is initially broadcast, and they can be viewed, commercial-free, on mobile devices.  Brennan Decl. ¶ 14(e).

**B.    Fox's Limited And Conditional Grant Of Rights To Dish.**

Fox and Dish are parties to a July 1, 2002 license agreement (the "Retransmission Consent" or "RTC" Agreement).  Biard Decl. ¶ 14.  Pursuant to the RTC Agreement, Fox, on behalf of its owned and operated stations, has granted Dish the limited right to retransmit the Fox Network broadcast signal to Dish's satellite television subscribers.  *Id.* Ex. A, p. 18 (RTC Agreement § 2).  The RTC Agreement also imposes several restrictions and conditions on Dish's retransmission rights.  Significantly, it prohibits Dish from recording, copying or duplicating any portion of the Fox Network transmission (including the Fox Programs) without Fox's written permission.  *Id.* Ex. A, p. 22 (RTC Agreement § 9(a)).  It also requires that Dish retransmit Fox's broadcast "███████████████████████████████████████████████████████" *Id.*, p. 19 (RTC Agreement § 3(d)).

Between 2002 and 2010, the RTC Agreement strictly prohibited Dish from offering any Fox Programs to subscribers on a "██████████████████████████████████████" *Id.* (RTC Agreement § 3(d)).  In a 2010 amendment, however, Fox agreed to a narrow exception for its authorized VOD service as long as Dish agreed to "████████████████████████████████████████████████████████████████████████████████████████" *Id.* Ex. B, p. 60 (emphases added).

**C.    Dish's PrimeTime Anytime Video On Demand Service.**

Instead of exercising its rights under the narrow VOD Clause that restricts commercial-skipping, Dish created and launched its own unlicensed, commercial-free VOD service in the form of PrimeTime Anytime.  Brennan Decl. ¶¶ 17-18.  In March 2012, Dish began leasing to its subscribers a set-top box called the Hopper Whole-Home HD DVR System (the "Hopper"), described by Dish as "the most advanced set-top box in the industry."  Singer Decl. ¶ 5, Ex. A at 14.[2]  The Hopper

---

[2] Some 275,000 Dish customers currently have the Hopper with PrimeTime Anytime, and Dish projects the number will increase to 1.3 million customers by the end of 2013.  Singer Decl., ███████████████, Ex. M (8/9/12 article).

is no ordinary digital video recorder ("DVR").  The Hopper contains a "massive" 2-terabyte hard drive that, until Dish updated its software a few weeks ago, was "partitioned" into two recording systems.  *Id.* ¶ 6, Ex. A at 15.  Part of the hard drive functioned like a traditional DVR, allowing users to select and record television programs for playback at a later time.  *Id.* ¶ 6.  Dish has described this portion of the Hopper as the "personal DVR."  *Id.*¶ 6, Ex. A at 16-18.

The other part of the Hopper was "reserved" for PrimeTime Anytime, Dish's "New Must-Have Feature" that distinguishes the Hopper from a traditional DVR. *Id.* ¶ 7, Ex. E.  Dish has characterized PrimeTime Anytime as a "video on demand service" that gives subscribers "On Demand access for 8 days to all HD programming that airs during primetime hours on ABC, CBS, FOX, and NBC without needing to schedule individual recordings."  *Id.* ¶¶ 12 Ex. A at 22, Ex. F at 212.  Once the user turns on PrimeTime Anytime, all of the primetime programs from each network – including the Fox Programs – are "delivered to" and copied every night on the Hopper hard drive, and until a few weeks ago, did not even take up any of the "personal DVR" hard drive space  *Id.* ¶ 7, Ex. E, Ex. A at 18.

To implement PrimeTime Anytime, Dish changed the architecture of its satellite system by assigning the local broadcasts of the four major networks to the same satellite transponder, and it engineered the Hopper software to allow the four major broadcast networks to be captured by a single tuner and recorded simultaneously. █████████████████████████████████████████
██████████████████████████████████████████████████████

As Dish stated under oath when it registered the PrimeTime Anytime service mark with the U.S. Trademark Office, PrimeTime Anytime is "a video on demand service."  Singer Decl. ¶ 28, Ex. F at 212.  All significant aspects of this "service" are controlled by Dish, not the user.  Dish decides which channels are available for PrimeTime Anytime (currently FOX, ABC, CBS, and NBC); which programs to record each evening; where the programs are saved (*i.e.*, the portion of the Hopper

5

"reserved" for PrimeTime Anytime); what time to begin recording each network; what time to stop recording each network; the minimum and maximum length of time recordings are stored (currently two to eight days); and to record each program in high definition (which uses more hard drive space) instead of standard definition.  *Id.* ¶¶ 12-26, Exs. A and ███████████████████.

Unlike when a subscriber uses the Hopper's "personal DVR" function, users of the PrimeTime Anytime service do not select, schedule, or record the particular programs they want to watch.  In fact, once PrimeTime Anytime is enabled, users do not have the ability to *stop* the service from recording all primetime television broadcasts from that network or delete any PrimeTime Anytime program until after the recording is finished.  *Id.* Exs. A and ███████████████.  In short, PrimeTime Anytime takes the decision-making away from the user and, as Dish touts in an online promotional video, the Hopper with PrimeTime Anytime "does the work for you" providing on demand access to all primetime television programs "without needing to schedule individual recordings."  *Id.* ¶ 13.

On July 20, 2012, Dish distributed a software update (denominated S217) to all Hopper subscribers.  The update altered the PrimeTime Anytime settings so that the user can now de-select individual broadcast networks from inclusion in PrimeTime Anytime.[3]  The default settings, however, still record all four networks every night of the week. ███████████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

[3] ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

The recent software update –

– proves Dish can modify the operation of PrimeTime Anytime at will.

**D.      In Violation Of Dish's License, PrimeTime Anytime Strips Commercials From Fox's Programs And Delivers The Programs To Mobile Devices.**

On May 10, 2012, Dish "activated" the AutoHop feature of its PrimeTime Anytime service.  In its press release, Dish explained that "AutoHop is an extension of the Hopper's PrimeTime Anytime capability" and allows Dish subscribers to "watch many of those shows commercial-free."  Dish advertises its PrimeTime Anytime service as "commercial-free" and promotes itself as having "created commercial free TV."  Singer Decl. ¶¶ 35-37, Exs. G-H.

Dish decides which programs to offer in a commercial-free format and when to make them available to subscribers.  *Id.*;

Dish's Senior Vice President, David Shull, has complained publicly that, prior to launching PrimeTime Anytime, Dish was "frustrated" at having to compete with "digital platforms such as Hulu and iTunes" that are licensed by Fox to distribute broadcast television programs online, in commercial-free formats (iTunes) and to mobile devices (Hulu, iTunes).  *Id.* ¶ 34, Ex. G.  When combined with AutoHop and Dish's Sling Adapter (a device that transmits the Hopper's contents over the Internet), Dish's unlicensed, infringing PrimeTime Anytime service achieves Dish's goal of adding "value" to its satellite television service by reaping the benefits of a broad license for which it never paid.  Dish's Vice President, Mr. Khemka, revealingly boasted in a recent interview: "I don't think you'd ever need Hulu Plus or Hulu after this."  *Id.* ¶ 33.

7

# III.  ARGUMENT

Fox may obtain a preliminary injunction by establishing that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, *Inc.* 555 U.S. 7, 20 (2008).  Alternatively, an injunction also should issue if Fox can show "serious questions going to the merits" and a "balance of hardships that tips sharply towards the plaintiff," so long as Fox "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).  These standards apply to injunction motions based on copyright or breach of contract claims.  *See*, *e.g.*, *Warner Bros. Entm't v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003, 1008 (C.D. Cal. 2011) (copyright); *John Goyak & Assocs. v. Terhune*, 299 Fed. App'x 739, 740 (9th Cir. 2008) (contract).

## A.    Fox Is Likely To Succeed On Its Breach Of Contract Claim.

PrimeTime Anytime and AutoHop violate the RTC Agreement in multiple ways, and none of these breaches is affected, let alone cured, by Dish's recent software updates.  ***First***, by copying Fox's entire primetime schedule every night, both PrimeTime Anytime and AutoHop violate Section 9(a) of the RTC Agreement stating that Dish "███████████████████████████" any portion of the Fox broadcast television signal.  Biard Decl. Ex. A, p. 22.

***Second***, by allowing subscribers to use PrimeTime Anytime with AutoHop to watch the Fox Programs "on demand" without any commercials, Dish violates a key restriction of the VOD Clause.  The VOD Clause requires that Dish "████ ,███████████████████████████" and confirms that such fast-forward disabling "████████████████████████████████████████ ████████████" *Id.* Ex. B, p. 60 (VOD Clause § 4) (emphases added).[4]  Despite

---

[4] Even if PrimeTime Anytime somehow were not subject to the restrictions of the

8

these express conditions, Dish has made its breaches the centerpiece of its marketing campaign.  It boasts that PrimeTime Anytime "creates an on-demand library of approximately 100 hours of primetime TV shows."  Singer Decl. Ex. E.  Dish further brags PrimeTime Anytime with AutoHop provides the subscriber with "commercial-free TV" and uses large billboards urging users to "Watch Shows Not Commercials."  *Id.* Exs. A at 36-38 and J.

*Third*, when the parties amended the RTC Agreement in 2010 to add the VOD Clause, they included a provision expressly prohibiting Dish from taking or attempting to take "████████████████████████████████████████ ███████████████████" to Fox under the VOD Clause.  Biard Decl. Ex. B, p. 34 (2010 Amendment § 5).  By providing its subscribers with a "████████ ███████████████████████████████" Dish is breaching this provision.

**B.    Fox Is Likely To Succeed On Its Direct Infringement Claim.**

To establish copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) violation by the defendant "of at least one of the exclusive rights granted to copyright owners" under 17 U.S.C. § 106.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001); *WTV Systems*, 824 F. Supp. 2d at 1008.  Fox meets both of these requirements.  *First*, Fox owns valid copyrights in the programs at issue.  Brennan Decl. ¶¶ 2-3, Ex. A (registration certificates).  *Second*, Dish's conduct violates Fox's exclusive rights.

**1.    PrimeTime Anytime And Autohop Exceed The Scope Of Dish's Retransmission License And Constitute Copyright Infringement.**

Where a licensee exceeds the scope of its license in a manner that implicates one of the licensor's rights under copyright law – here, the reproduction and distribution rights in the Fox Programs – the licensee is liable for copyright

---

VOD Clause, it still would breach Section 3(d) of the RTC Agreement which prohibits Dish from distributing the Fox Programs on any "████████████████████ Biard Decl. Ex. A, p. 19.  PrimeTime Anytime is, at the very least, a "████████████████████████████

infringement.  *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999)  ("[i]f ... a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement"); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A] (2012) (same); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939- 41 (9th Cir. 2010) (breach of contractual conditions that limit scope of license is copyright infringement).

As described above, the RTC Agreement and 2010 amendment expressly limit the scope of Dish's license to retransmit Fox's broadcast signal.[5]  The agreement prohibits Dish from copying the Fox Programs; and while it permits Dish to offer VOD to its subscribers, the VOD rights are expressly conditioned on Dish disabling any fast-forwarding of commercials during VOD playback.  By ignoring these conditions and restrictions, Dish has committed both a breach of contract and copyright infringement.  *See, e.g.*, *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1154-57 (9th Cir. 2006) (preliminary injunction granted where licensee reproduced and displayed architectural plans for a project outside scope of license); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 511 (9th Cir. 1985) (hotel infringed copyright by publicly performing music with representations of movie scenes, where its license expressly prohibited the use of accompanying visual representations with the licensed music).

**2.     PrimeTime Anytime Infringes Fox's Copyrights.**

**a.     Dish infringes the Section 106(1) reproduction right.**

Fox has never authorized Dish to make copies of the Fox Programs.  To the contrary, the RTC Agreement forbids it.  *See* Section II.C, *supra*.  Accordingly, Dish's operation of its PrimeTime Anytime service to make unauthorized copies of all Fox primetime broadcast programs, on an eight-day rolling basis, manifestly

---

[5] Once a satellite television provider obtains retransmission consent to carry a broadcaster's signal under federal communications law, the Copyright Act provides a narrow statutory license to publicly perform the underlying copyrighted programs contained in the retransmission.  17 U.S.C. § 119.  This statutory public performance license is *not* a license to *reproduce* or *distribute* the works.

10

1    violates the reproduction right.

2          Because there is no state of mind or harm requirement, copyright

3    infringement is widely recognized as a "strict liability tort."  *E.g.*, *Stewart v.*

4    *Wachowski*, 574 F. Supp. 2d 1074, 1092 n.78 (C.D. Cal. 2005); *accord Dielsi v.*

5    *Falk*, 916 F. Supp. 985, 992 (C.D. Cal. 1996) ("a general claim for copyright

6    infringement is fundamentally one founded on strict liability").[6]

7          Dish engineered its PrimeTime Anytime service to accomplish the

8    wholesale, unauthorized recording of primetime programs en masse. ███████

9    ████████████████████████████████████████████████████████████

10   ████████████████████████████████   By its own admission, Dish

11   participates in and controls all relevant aspects of the copying process.  Singer

12   Decl., Ex. A at 1-4, █████████████████████████████████   The

13   customer does not select the particular programs PrimeTime Anytime records, nor

14   when those programs can be accessed.  Dish chooses which networks are

15   recordable by PrimeTime Anytime; Dish picks the recording start times and stop

16   times for each network; it controls when the copied programs are available in a

17   commercial-free format; and it controls the minimum and maximum lengths of

18   time they are available for viewing (currently two and eight days).  *Id.*  Once

19   PrimeTime Anytime starts recording a program, users cannot stop the copying

---

20   [6] Although some courts have held that a defendant nonetheless must engage in
     some "volitional" conduct to be liable for direct infringement, *e.g.*, *Cartoon*
21   *Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), those decisions do
     not help Dish for three reasons.  ***First***, two courts in this District recently declined
22   to adopt this additional requirement because the Ninth Circuit has not adopted it
     and because "copyright infringement is a strict liability offense."  *WTV Systems*,
23   824 F. Supp. 2d at 1011; *Arista Records LLC v. Myxer Inc.*, 2011 U.S. Dist. LEXIS
     109668 (C.D. Cal. April 1, 2011) (Feess, J.) (same).  ***Second***, courts in this Circuit
24   that have recognized a volition requirement have deemed it clearly satisfied where
     the defendant participates in the copying as more than a mere "passive conduit" or
25   "storage" service.  *Perfect 10, Inc. v. Megaupload, Ltd.*, 2011 WL 3203117, at * 4
     (S.D. Cal. July 27, 2011); *see also Religious Technol. Center v. Netcom On-Line*
26   *Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1369 & n.12 (N.D. Cal. 1995) (equating
     "volition" with "causation" and declining to find direct infringement where
27   operator of an Internet service "merely acts as a passive conduit for information,"
     akin to the "phone company").  ***Third***, Dish's ongoing and pervasive control over
28   the PrimeTime Anytime service easily satisfies any volition requirement.

11

process – even if they have no desire to watch a particular program.  Singer Decl., Exs. B at 109-110 and █████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████  Although Dish has tried to obscure its role in the copying by updating its software to have the user check off a few more settings at the outset, the updates do not alter the infringement analysis and only underscore Dish's pervasive control over all aspects of PrimeTime Anytime. ███████████████

███████████████████████████████████████████████████

Even if copyright infringement were not strict liability and Fox were required to show that Dish engaged in some volitional conduct to be liable for infringement of the reproduction right, Dish is so actively and extensively involved in copying copyrighted works that any such requirement is easily met. ████████

███████████████████████████████████████████████████████████

Indeed, the only act of supposed volition by the user was the mere one-time act of turning on the service. ████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████  Once enabled, the user need never touch the remote control's record button again: PrimeTime Anytime copies the entire primetime schedule every night – regardless of whether the user intends to watch all or any of the programs – and stores it on the portion of the Hopper hard drive allocated to PrimeTime Anytime for a period of time delimited by Dish.  From the moment the switch is flipped, Dish – as its website assures visitors – "do[es] the work for you."  *Id*. ¶ 13.

Dish's extensive and ongoing control over the copying process leaves no

doubt that it is liable for direct infringement.  *See Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1389 (6th Cir. 1996) (business that copied and assembled materials into coursepacks and sold them to students was liable for direct infringement, even though business did so at the request of professors); *see also Perfect 10, Inc. v. Megaupload Ltd.*, 2011 WL 3203117, at *4 (S.D. Cal. July 27, 2011) (holding that direct infringement can be shown where a website operator encourages infringement by its users, is aware of widespread infringement taking place through its service, and acts to "streamline users' access to different types of media").[7]

### b.     Dish also infringes the Section 106(3) distribution right.

Because Dish is actively and directly involved in the unauthorized distribution of digital copies of Fox's works, it is also liable for direct infringement of the distribution right under 17 U.S.C. 106(3).  *See Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009) (internet service operator was liable for direct infringement of distribution right where it "actively participated" in copying songs for use by its subscribers); *Atlantic Rec'g Corp. v. XM Satellite Radio, Inc.*, 2007 WL 136186, at *5-*7 (S.D.N.Y. Jan. 19, 2007).[8]

In *XM Satellite*, the court considered a satellite radio broadcaster's "XM + MP3" service, which automatically generated a copy of every broadcast song in the memory of the user's radio receiver, which the user could save and use interchangeably with other MP3 files.  *Id.* at *2-*3.  The court held XM was not immune from liability as the seller of a digital audio recording device, because XM

---

[7] *See generally RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 781 (8th Cir. 1988) (retailers who assisted customers in making copies on an audio tape recording machine were liable for direct infringement); *RCA Records v. All-Fast Sys., Inc.*, 594 F. Supp. 335, 338 (S.D.N.Y. 1984) (retail copy service that operated audio cassette copying machine was liable for direct infringement, even though copies were made at the request of customers).

[8] *See also Playboy Enters. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997) (Internet bulletin board service was liable as direct infringer where it encouraged users to upload copyrighted images and caused copies to be moved to an area where they could be downloaded by others).

controlled the copying and playback functions and thereby acted as a "music distributor" to its subscribers."  "*By broadcasting and storing this copyrighted music on [users' devices] for later recording by the consumer,* XM is both a broadcaster *and a distributor*, but is only paying to be a broadcaster."  *Id.* at *6.[9]

**3.    The AutoHop Service Unlawfully Copies Fox's Programs.**

In May 2012, Dish rolled out its AutoHop feature, which eliminates with the click of a button all commercials during playback of a program recorded by PrimeTime Anytime.



These unauthorized copies – made directly by Dish every night as

_____

[9]  *see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1011-14 (9th Cir. 2001) (Napster users who uploaded files to a central search index "for others to copy" violated the copyright owners' distribution rights).

part of its commercial service – are plainly infringing.[10]

\* \* \* \* \*

If the Court finds that Dish is directly infringing Fox's copyrights with its PrimeTime Anytime and AutoHop services, Dish cannot assert a fair use defense that might be asserted by one of its subscribers.  "[C]ourts have … properly rejected attempts by for-profit users to stand in the shoes of their customers making non-profit or noncommercial uses."  *Michigan Document Servs.*, 99 F.3d at 1389; *accord Los Angeles News Service v. Tullo*, 973 F.2d 791, 797-98 (9th Cir. 1992) (same); *see also Zomba Enters. v. Panorama Records, Inc.*, 491 F.3d 574, 582-83 (6th Cir. 2007) (for-profit, commercial maker of karaoke CDs could not stand in the shoes of its customers or benefit from fair use arguments they might have).

**C.     Alternatively, Fox Is Likely To Prove Secondary Infringement By Dish.**

Even if the Court were to accept Dish's attempt to shift responsibility to its customers – by claiming that the subscribers, and not Dish, make the PrimeTime Anytime copies – Dish nevertheless would be secondarily liable for its subscribers' unauthorized copying of the Fox Programs because (1) Dish actively encourages and induces massive infringement, (2) Dish derives a direct financial benefit from offering the PrimeTime Anytime service which it controls, and (3) Dish knows about and materially contributes to its subscribers' unauthorized copying.[11]

**1.     Dish Is Liable For Inducing Copyright Infringement.**

Dish is liable for inducement because it has actively encouraged and assisted its subscribers to infringe Fox's copyrights by using PrimeTime Anytime to copy

---

[10] ████████████████████████████████████████████████████

[11] Of course, Dish cannot blame its customers for Dish's own contract breaches or its admitted, unauthorized copying of Fox's programs during the AutoHop process.

the entire nightly schedule of primetime broadcast television.  In *Grokster*, the Supreme Court held that inducement of copyright infringement constitutes a distinct cause of action.  It is established where the defendant (1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to encourage such infringement.  *See MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37 (2005) ("one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting act of infringement by third parties"); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 422 (S.D.N.Y. 2011) (same); *Columbia Pictures Indus., Inc. v. Fung*, 2009 WL 6355911, at *6 (C.D. Cal. Dec. 21, 2009) (inducement shown by "purposeful acts aimed at assisting and encouraging others to infringe copyrights").

Through its nationwide advertising blitz to promote PrimeTime Anytime and AutoHop, Dish clearly "intended and encouraged" that its services be used to infringe.  *Grokster*, 545 U.S. at 940 n.13.  Dish promotes PrimeTime Anytime and AutoHop by emphasizing those features' ability to copy every primetime program of the four major broadcast networks every single night, and then make those programs available commercial-free to subscribers on demand.  *See* Section II.D, *supra*; Singer Decl., Ex. A at 14-15, 36-38.  As the Supreme Court explained in *Grokster*, "advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations [of copyright]" constitutes "[t]he classic instance of inducement."  *Id.* at 937.

## 2. Dish Is Liable For Vicarious Infringement.

A defendant is liable for vicarious copyright infringement if it (1) has the right and ability to control its subscribers' infringing activity and (2) derives a direct financial benefit from their activity – regardless of the defendant's knowledge or state of mind regarding the infringement.  *Grokster*, 545 U.S. at 930; *Fonovisa*, 76 F.3d at 262.  Here, Dish admittedly has launched its PrimeTime

16

Anytime service to obtain a competitive advantage over its competitors – to draw new customers to its satellite television service by offering an alternative to the licensed video on demand services available through Fox, Hulu, iTunes and Amazon.com.  Singer Decl. ¶¶ 33-34.  Furthermore, Dish's pervasive control over the operation of PrimeTime Anytime makes clear that it has the ability to stop all of the unauthorized copying at issue.  *See* Section II.C, *supra*.

### 3.    Dish Is Liable For Contributory Infringement.

A defendant is liable for contributory copyright infringement if it "knows or has reason to know" of direct infringement of another and "materially contributes to the infringing conduct."  *Napster*, 239 F.3d at 1019-20; *accord Lime Group*, 784 F. Supp. 2d at 432.  Dish plainly has "actual or constructive knowledge" that, once enabled for a broadcast network, PrimeTime Anytime copies the network's entire primetime broadcast television schedule every night – indeed, that is the very purpose for which Dish advertises the service.  Dish plainly makes a substantial contribution to the copying accomplished by PrimeTime Anytime because – by providing the Hopper with PrimeTime Anytime and enabling it to copy the entire primetime lineup of all four major broadcast networks every night – Dish provides the "site and facility" for infringing activity.  *Napster*, 239 F.3d at 1022.[12]

### 4.    Dish's Conduct Is Not Protected By The Fair Use Doctrine.

To the extent the Court finds that Dish's subscribers are responsible for some of the unauthorized copying at issue, Fox expects Dish will argue, in reliance on the Supreme Court's 1984 decision in *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984) ("*Sony-Betamax*"), that its subscribers have not engaged in direct copyright infringement by enabling the PrimeTime Anytime and

---

[12] *See also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (material contribution shown where operators of a swap meet provided essential support services); *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp. 2d 627, 648 (S.D.N.Y. 2011) (contributory liability established where defendants' system was "the sole instrumentality of their subscribers' infringement"); *Usenet*, 633 F. Supp. 2d at 155 (same); *Lime Group*, 784 F. Supp. 2d at 434 (same).

17

AutoHop features on the ground that any copying of television programs on a DVR automatically qualifies as a fair use.  Because this argument radically misreads *Sony-Betamax* and ignores the factual context of that decision, Dish cannot meet its burden to defeat a preliminary injunction under the fair use doctrine.[13]

In *Sony-Betamax*, the Supreme Court held 5-4 that the particular type of "time-shifting" at issue – user copying of individual television programs to view later and then erase – was a fair use because such conduct in the early 1980s did not harm existing or potential markets for the copyrighted works.  464 U.S. at 421. The Court relied on the fact that many copyright owners – including professional sports leagues and PBS – did not object to the recording of their programs and that, because of the cumbersome nature of the technology, very few consumers actually used VCRs to fast-forward through commercials.  *See id.* at 424, 453 n.36.

Here, by contrast, recording all Fox Programs every night, and eliminating all commercials on playback – thus creating a commercial-free VOD service that competes directly with other services licensed by Fox – is a fundamentally different use of copyrighted programming than *Sony-Betamax* considered, and compels a much different fair use analysis.  ***First***, PrimeTime Anytime facilitates the copying of a nightly library of programs *regardless* of whether the user desires to watch a particular program at a later time.  For programs the user has no intention of watching later, there is no time-shifting at all.  ***Second***, to the extent Dish subscribers follow Dish's encouragement that PrimeTime Anytime and AutoHop be used in tandem, the PrimeTime Anytime copies are *not* made solely for the purpose of time-shifting.  Instead, they are made for the purpose of viewing the programs later *without commercials* – a qualitatively different purpose that changes the analysis of the fourth fair use factor, market harm.  ***Third***, all four of

---

[13] To the extent Dish asserts fair use or any other affirmative defense, it bears the burden of proof on a motion for preliminary injunction, just as it would bear the burden of proof at trial.  *E.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).

the major broadcast networks – 100% of those affected by PrimeTime Anytime and AutoHop – clearly object to Dish's service and have sued Dish.

*Finally*, as explained in Section III.D below, PrimeTime Anytime and AutoHop threaten existing and potential markets for the licensed distribution of Fox's copyrighted works, especially if such conduct becomes widespread. Potential market harm – which the Ninth Circuit and Supreme Court have recognized as a critical and often determinative factor – compels the conclusion that using PrimeTime Anytime and AutoHop is not a fair use.[14]  *See Monge v. Maya Magazines, Inc.*, – F.3d –, 2012 WL 3290014 (9th Cir. Aug. 14, 2012) ("to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work") (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 568 (1985)); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587-89 (1994).

**D.    Fox Will Suffer Irreparable Harm In The Absence Of An Injunction.**

Injunctive relief "has nearly always" been issued upon a finding of likelihood of success on the merits in a copyright case.  *Salinger v. Colting*, 607 F.3d 68, 76 (2d Cir. 2010).  That is because the factual circumstances of a violation of a "right to *exclude*" plainly render monetary remedies inadequate in a wide range of circumstances.  *Id.* at 82 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006)); *accord MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1214-20 (C.D. Cal. 2007) (*Grokster II*).  Accordingly, irreparable harm is

---

[14] The remaining fair use factors are not addressed because they necessarily weigh against Dish. *First*, the wholesale copying of a complete library of primetime programs cannot seriously be characterized as a "transformative" use. *See Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938 (9th Cir. 2002) (rebroadcast of copyrighted news footage was not transformative); *Elvis Presley Enter., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (uses that "serve the same intrinsic entertainment value" as the copied work are not transformative). *Second*, the nature of the copyrighted works at issue – creative comedies and dramas that are "within the core of copyright's protective purposes" – weighs decidedly in favor of Fox. *Campbell*, 510 U.S. at 586. *Third*, the amount and substantiality of copying clearly favors Fox since PrimeTime Anytime copies primetime programs in their entirety. *See generally* 17 U.S.C. § 107.

19

established where an infringing defendant's activities threaten to impair a copyright owner's control over its copyrighted works, threaten the goodwill and business reputation of the plaintiff, or threaten to cause loss of business, loss of business opportunities, or consumer confusion.  *See*, *e.g.*, *Warner Bros. Entm't v. WTV Systems*, 824 F. Supp. 2d at 1012 (irreparable harm shown where defendant's DVD "rental" business that streamed movies over the Internet without authorization interfered with plaintiffs' ability to negotiate licenses for legitimate video on demand services); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617-20 (S.D.N.Y. 2011) (finding irreparable harm where defendant's unauthorized retransmission of broadcast television threatened to cause "destruction" of the "value of licensed programming" through unauthorized dissemination, to disrupt "advertising models," and to interfere with "plaintiffs' licensing of their own and other websites to perform their content").[15]  Dish's recent conduct threatens to visit all of these harms upon Fox.

### 1.    Dish's Conduct Harms Fox's Right To Exclusive Control.

The Copyright Act grants the copyright owner the exclusive right to control how, when, where, to whom, and for what price (if any) it will disseminate its copyrighted works.  *See WTV Systems*, 824 F. Supp. 2d at 1012; *Grokster II*, 518 F. Supp. 2d at 1218.  Fox's control over the timing and manner in which its programs are distributed is an essential and valuable right because it maximizes Fox's ability to recoup the enormous, risky investment needed to produce high-quality,

---

[15] *See also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (threatened loss of prospective customers or goodwill supports a finding of irreparable harm); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries, such as damages to … goodwill qualify as irreparable harm"); *Berster Tech, LLC v. Christmas*, 2012 WL 33031, at *10 (E.D. Cal. Jan. 6, 2012) (plaintiff's "inability to use its intellectual property completely" rises to the level of irreparable harm, which is also established by "intangible injuries" such as "damage to … goodwill … lost business opportunities, the loss of opportunities to negotiate other license agreements … and consumer confusion"); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) (lost customer goodwill is irreparable because it is "neither easily calculable nor easily compensable").

primetime programming.  Brennan Decl. ¶¶ 19-25.  It allows Fox to generate multiple revenue streams from different sets of advertisers (initial broadcast, VOD distribution, and Internet streaming).  *Id.*  It also allows Fox to provide advertising-supported versions of the programs to price-sensitive consumers, while giving other consumers a choice to pay a premium for commercial-free versions, thereby maximizing Fox's overall audience.  *Id.*; Biard Decl. ¶ 36.  Dish's PrimeTime Anytime and AutoHop services wrest this control away from Fox.

In *WTV,* the defendants operated an unauthorized website and service that transmitted plaintiffs' copyrighted motion pictures over the Internet.  824 F. Supp. 2d at 1005-1008.  The court observed that "[e]ach of the Plaintiffs has its own strategy for structuring their respective distribution windows" for when their motion pictures are released in theaters, on cable or satellite television, on VOD, online, or on DVD, and held that the defendants, by prematurely making plaintiffs' works available on the Internet without authorization, "interfere[d] with Plaintiffs' *ability to control the use and transmission of their Copyrighted Works*, thereby causing irreparable injury to Plaintiffs."  *Id.* at 1006, 1012 (emphasis added).

Here, Fox's loss of control over its programs is even more troubling because Dish's infringing service will likely be adopted by Dish's competitors if Dish is not enjoined.  Haslingden Decl. ¶¶ 14-16.[16]  This proliferation will amplify and accelerate Fox's loss of control over its copyrighted works.  Brennan Decl. ¶ 30.[17]

And, like the plaintiff film studios in *WTV Systems*, Fox's loss of control over how its programs are distributed creates confusion in the marketplace and changes consumer attitudes toward the cost and availability of high quality

---

[16] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[17] DirecTV – the largest satellite television provider in the United States with nearly 20 million subscribers – already "has access to technology that could allow millions of subscribers to automatically skip commercials" and is "waiting to see the outcome" of this lawsuit in deciding whether to use it.  Haslingden Decl. ¶ 15.

television programming.  Dish's services threaten "to confuse consumers about video on demand products, and to create incorrect but lasting impressions with consumers about what constitutes lawful video on demand exploitation" of Fox's copyrighted works, "including confusion or doubt regarding whether payment is required" for access to those works.  *WTV*, 824 F. Supp. 2d at 1013.  If Dish continues to provide its subscribers with PrimeTime Anytime and AutoHop, Dish subscribers will become accustomed to having free access to commercial-free on demand programming.  Brennan Decl. ¶¶ 39-40.  This will give consumers false impressions and expectations about what constitutes lawful exploitation of the Fox Programs.  *See Grokster*, 545 U.S. at 929 (holding that "the indications are that the ease of copying songs or movies using software like Grokster's and Napster's is fostering disdain for copyright protection").

## 2. Dish's Conduct Disrupts Fox's Ability To Distribute Its Programs.

Dish's conduct encroaches directly and ominously on existing licensed services for the digital streaming or download of the Fox Programs – with reduced commercials or no commercials – thereby undermining Fox's ability to distribute its copyrighted works through authorized, legitimate channels.

In *WTV*, this District found that defendants' unauthorized distribution of plaintiffs' motion pictures over the Internet – during a window of time when the films were not available online – irreparably harmed the plaintiff studios (1) by interfering with the studios' "grants of exclusivity to their licensees"; (2) by impairing the studios' "ability to negotiate similar agreements in the future"; (3) by injuring the studios' "relationships, including the goodwill developed with their licensees"; and (4) by depriving the studios of revenue and "jeopardiz[ing] the continued existence" of their licensees' businesses.  824 F. Supp. 2d at 1012-13.

The same is true here.  By making its bootleg, on-demand library of primetime programming available in a commercial-free format, Dish threatens to diminish the perceived value of Fox's legitimate VOD and digital licenses and the

appeal of VOD advertising.  Brennan Decl. ¶¶ 26-29.  Dish's infringement also threatens to disrupt Fox's ability to negotiate with third party licensees and advertisers.  Biard Decl. ¶¶ 40-41; *WPIX*, 765 F. Supp. 2d at 620 (defendants' unsanctioned service that allowed viewers to watch plaintiffs' television program online caused irreparable harm because "the ability of plaintiffs to profit from sanctioned sources would inevitably drop").[18]  In a video posted on Dish's website, Dish Vice President Vivek Khemka publicly predicts, "*I don't think you'd ever need Hulu Plus or Hulu after this*."  Singer Decl. ¶ 33.  Intentionally diverting customers in this manner will disrupt Fox's licensing relationships and devalue the licenses Fox grants.  Biard Decl. ¶¶ 40-41; *see, supra,* Section II.D.

### 3.    Dish's Conduct Threatens Fox's Ad-Supported Business Model

In a *Wall Street Journal* interview after this lawsuit was filed, Dish chairman Charlie Ergen admitted that the PrimeTime Anytime and AutoHop services were "not good" for broadcasters and threatened to harm the entire television "ecosystem."  Singer Decl. Ex. I.  If Dish's PrimeTime Anytime and AutoHop services are not enjoined, fewer viewers will see the commercials during Fox Programs, and the amount advertisers will be willing to pay for commercials inevitably will fall.  Brennan Decl. ¶¶ 31-35; *WPIX*, 765 F. Supp. 2d at 618 (noting that fewer viewers means advertisers will pay less for commercials and that the resulting harm is difficult to calculate and thus irreparable).  The Association of National Advertisers agrees that AutoHop will harm advertisers and affect what they are willing to pay for advertisements.  Liodice Decl. ¶¶ 5-8.  If Dish is not enjoined, and its competitors begin offering services similar to PrimeTime

---

[18] In *WPIX v. ivi,* the defendant captured over-the-air broadcasts of television programming and, without the copyright owners' consent, streamed those broadcasts to subscribers over the Internet.  The court found that because defendant's service allowed viewers to watch stations from other cities, "the amount local advertisers would be willing to pay to advertise during plaintiffs' broadcasts would fall."  *Id.* at 617.  Holding these losses were irreparable because they were "notoriously difficult to prove and nearly impossible to quantify," the court issued an injunction. *Id.*

Anytime and AutoHop, millions of television viewers will stop seeing commercials.  *Id.*; Brennan Decl. ¶¶ 31-35.  A massive reduction in viewer impressions would lead advertisers to pay less for or stop purchasing broadcast television commercials altogether, threatening incalculable harm to Fox.  *Id.*  Ultimately, if advertisers are no longer willing to finance broadcast programming, it will become economically infeasible to sustain the broadcast television business model that now exists in the United States.  *Id.*

Journal Communications, owner of 13 broadcast television stations (and affiliates of the major broadcast networks) faces many of the same threatened injuries if Dish's conduct is not enjoined.  Smith Decl. ¶¶ 4-8.  And, because Dish sells its own local television advertising for cable channels that are not subject to commercial skipping, Dish now competes unfairly with Journal in those markets.  *Id.*  Even worse, Mr. Ergen recently revealed that Dish is implementing a new technology on the Hopper that would not only block the networks' commercials, but replace them with Dish's own advertising.  Singer Decl. Ex. N.  Thus, Dish plans to divert Fox's commercial advertising revenue into its own pockets.

These looming injuries are not mere speculation.  In May, 2012, Moody's Investor Service issued an independent report warning that if Dish's new AutoHop service were deployed and widely used, it "*will have broad negative credit implications across the entire television industry*" and "*could destabilize the entire television eco-system.*"  Haslingden Decl. ¶¶ 23-24, Ex. D (emphasis added).

**E.     The Balance Of Hardships Weighs Decidedly In Favor Of Fox.**

Dish "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."  *Triad Sys. Corp. v. Southeast Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995); *see also Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration").

Moreover, the narrow injunction requested by Fox does not threaten to cause significant hardship to Dish's lawful business activities.

**F.    Public Policy Favors The Issuance Of An Injunction Against Dish.**

The Supreme Court has made clear that upholding copyright protection is in the public interest. *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2005); *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994) ("public policy favors the issuance of injunctions in intellectual property infringement lawsuits"). The viability of advertising-supported television is also a matter of public interest. *See Satellite Broad. Comm. Ass'n v. FCC*, 275 F.3d 337, 343 (4th Cir. 2001) (upholding the importance of "free television for those not served by satellite or cable"). By blocking television commercials, PrimeTime Anytime and AutoHop will cause fewer advertisers to buy commercials and erode the main source of financing for broadcast television. Haslingden Decl. ¶ 17-22.

**IV.  CONCLUSION**

Fox respectfully requests that the Court enter the proposed injunction.

DATED:  August 22, 2012                    JENNER & BLOCK LLP

                                           By: _____/s/_____
                                                         Richard L. Stone
                                           Attorneys for Plaintiffs