1  WILLIAM A. MOLINSKI (SBN 145186)
   wmolinski@orrick.com
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street, Suite 3200
3  Los Angeles, California 90017
   Tel: +1-213-629-2020 / Fax: +1-213-612-2499
4
   ANNETTE L. HURST (SBN 148738)
5  ahurst@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
6  405 Howard Street
   San Francisco, California 94105-2669
7  Tel: +1-415-773-5700 / Fax: +1-415-773-5759
8  E. JOSHUA ROSENKRANZ (pro hac vice)
   jrosenkranz@orrick.com
9  PETER A. BICKS (pro hac vice)
   pbicks@orrick.com
10 ELYSE D. ECHTMAN (pro hac vice)
   eechtman@orrick.com
11 LISA T. SIMPSON (pro hac vice filed)
   lsimpson@orrick.com
12 ORRICK, HERRINGTON & SUTCLIFFE LLP
   51 West 52nd Street
13 New York, New York 10019-6142
   Tel: +1-212-506-5000 / Fax: +1-212-506-5151
14 MARK A. LEMLEY (SBN 155830)
   mlemley@durietangri.com
15 MICHAEL PAGE (SBN 154913)
   mpage@durietangri.com
16 DURIE TANGRI LLP
   217 Leidesdorff Street
17 San Francisco, California 94111
   Tel: +1-415-362-6666
18
   Attorneys for Defendants DISH Network
19 Corporation and DISH Network L.L.C.

## UNITED STATES DISTRICT COURT

20

## CENTRAL DISTRICT OF CALIFORNIA

21

| | |
|---|---|
| 22  FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS. INC., | Case No. CV12-04529 DMG (SHx) |
| 23 | **DECLARATION OF WILLIAM A. MOLINSKI IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 24  Plaintiffs, | |
| 25  v. | |
| 26  DISH NETWORK L.L.C. and DISH NETWORK CORP., | Date: September 21, 2012 |
| 27 | Time: 9:30 a.m. |
| 28  Defendants. | Ctrm: 7 (2nd Floor) |

## DECLARATION OF WILLIAM A. MOLINSKI

I, William A. Molinski, declare and state as follows:

1. I am a member of the bar of the State of California, admitted to practice before this Court, and am a partner with the law firm of Orrick, Herrington & Sutcliffe LLP ("Orrick"), attorneys of record for Defendant DISH Network L.L.C. and DISH Network Corp. I am familiar with the events, pleadings and discovery in this action and, if called upon as a witness, I could and would testify competently to the matters stated herein of my own personal knowledge.

2. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction.

3. Attached hereto as **Exhibit 1** is a true and correct copy of the August 3, 2012 scheduling order issued by Judge Laura Taylor Swain in *Dish Network L.L.C. et al v. American Broadcasting Companies, Inc. et al*, 12-CV-04155 (LTS).

4. Attached hereto as **Exhibit 2** is a true and correct copy of an email exchange between William A. Molinski and Counsel, ending with an e-mail from Patricia Benson, counsel for CBS and NBCU, to Mr. Molinski, dated August 9, 2012.

5. Attached hereto as **Exhibit 3** is a true and correct copy of an e-mail from David Singer, counsel for Fox, to Counsel, sent on August 29, 2012.

6. Attached hereto as **Exhibit 4** is a true and correct copy of certain documents Fox has produced, FOX000096-99.

7. Attached hereto as **Exhibit 5** is a true and correct copy of the text of Brief for Petitioners in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). This version of the brief, obtained from the website of the Electronic Freedom Foundation and available at http://w2.eff.org/legal/cases/betamax/betamax_petition_brief.pdf, reproduces the notes to the text but not official page numbers.

1     8.     Attached hereto as **Exhibit 6** is a true and correct copy of the text of

2   the Brief for Petitioners in *Sony Corp. of America v. Universal City Studios, Inc.*,

3   464 U.S. 417 (1984).  This version of the brief was obtained from Lexis Advance

4   and contains official page numbers but not the contents of the notes to the text,

5   which are in Exhibit 5.

6     9.     Attached hereto as **Exhibit 7** is a true and correct copy of the text from

7   the Brief for Respondents in *Sony Corp. of America v. Universal City Studios, Inc.*,

8   464 U.S. 417 (1984).  This version of the brief, obtained from the website of the

9   Electronic Freedom Foundation and available at

10  http://w2.eff.org/legal/cases/betamax/betamax_petition_brief.pdf, reproduces the

11  notes to the text but not official page numbers.

12    10.    Attached hereto as **Exhibit 8** is a true and correct copy of the text from

13  the Brief for Respondents in *Sony Corp. of America v. Universal City Studios, Inc.*,

14  464 U.S. 417 (1984).  This version of the brief was obtained from Lexis Advance

15  and contains official page numbers but not the contents of the notes to the text,

16  which are in Exhibit 7.

17    11.    Attached hereto as **Exhibit 9** is a true and correct copy of a printout

18  from Sling Media's website, available at http://www.slingmedia.com/go/about, last

19  accessed on August 31, 2012.

20    I declare under penalty of perjury under the laws of the United States that the

21  foregoing is true and correct.

22    Executed this 31st day of August, 2012, at Los Angeles, CA.

23

24

25                                 William A. Molinski
                                   Orrick, Herrington & Sutcliffe LLP
26                                 Attorneys for Defendants
                                   DISH Network Corporation and
27                                 DISH Network L.L.C.

28

Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DISH NETWORK,

Plaintiff(s),

No. 12 Civ. 4155 (LTS) (KNF)
PRE-TRIAL
SCHEDULING ORDER NO._____

-against-

ABC et al.,

Defendant(s).

_____

LAURA TAYLOR SWAIN, DISTRICT JUDGE:

A pre-trial conference was last held in this matter on August 3, 2012. The Court hereby makes the following provisions for scheduling and trial in this matter. To the extent copies of this Order were not distributed to all parties in open court or posted on ECF in an ECF case, Plaintiff's counsel must serve a copy of this Pre-Trial Scheduling Order on counsel for each other party and must also serve a copy on each unrepresented party, within fourteen (14) days from the date hereof.  A copy of this Pre-Trial Scheduling Order shall be served with any subsequent process that brings in additional parties. Proof of such service must be filed promptly with the Court.

1.      Amendments to Pleadings, Additional Parties

        All applications to amend pleadings or join parties, or amendments or joinders as of right, must be made by **November 30, 2012,  except that applications regarding amendments identifying new copyrighted works alleged to have been infringed may be made up to 30 days before the close of fact discovery**.

2.      Discovery

        a.      The discovery procedures set forth in the Pilot Project description annexed to the Court's October 31, 2011 Standing Order (11 Misc. 00388) (the "Pilot Project Description") apply unless otherwise ordered.

EXHIBIT 1 - PAGE 3

b.      Rule 26(a)(1) disclosures

___ are not required, OR
Must be made by **August 24, 2012.**

c.      All non-expert witness discovery in this matter must be completed by **March 29, 2013**.

d.      Each party must make its expert witness disclosures described in Rule 26(a)(2) of the Federal Rules of Civil Procedure concerning expert(s), if any, to be offered on issues as to which such party has the burden of proof or otherwise in support of the party's case, no later than **60 days before the date set forth in paragraph 2.e. below**. Rebuttal disclosures must be made no later than **30 days before the date set forth in paragraph 2.e. below.** Such disclosures must be made in writing, signed and served, but must not be filed with the Court.

e.      All expert witness discovery must be completed by **June 21, 2013**.

f.      (If applicable) All class certification-related discovery must be completed by **N/A**

g.      Additional limitations or provisions: **Expedited phase discovery per Exhibit A to Initial Conference report (including CBS/NBCU as applicable).**

3.   Class Certification Motion Practice

**N/A**

4.   Joint Preliminary Trial Report

The Joint Preliminary Trial Report covering the matters enumerated in subdivision IV.A. of the Pilot Project Description must be filed, with one courtesy copy provided for Chambers, within 14 days after the completion of fact discovery, unless otherwise ordered. At the time the Report is filed, the parties must make a written request to the Court to schedule a Case Management Conference.

5.   Dispositive Pre-Trial Motions

Dispositive motions, if any, seeking resolution, in whole or in part, of the issues to be raised at trial must be served and filed on or before **July 19, 2013**. Section B.3 of the undersigned's Individual Practices Rules governs pre-motion procedures. If the movant believes the motion, if granted, would obviate entirely the necessity of a trial in this matter, the movant may so state in a separate MOTION FOR STAY, which must be served and filed with the moving papers, and may in such stay motion request that the Court defer the remaining requirements of this Order pending its decision on the dispositive motion.  Unless the Court grants such stay

EXHIBIT 1 - PAGE 4

motion, the filing of a dispositive motion <u>does</u> <u>not</u> affect the parties' obligations under this Order.

6.      Other Pre-Trial Motions

    a.      Any <u>Daubert</u> motion practice must be initiated no later than sixty (60) days before **the date set forth in paragraph 9 below**.

    b.      Other motions, including but not limited to non-<u>Daubert</u> motions <u>in</u> <u>limine</u> relating to evidentiary issues, must be filed and served no later than thirty (30) days before **the date set forth in paragraph 9 below**.

7.      Joint Final Trial Report

The Joint Final Trial Report covering the matters enumerated in subdivisions IV.C. and IV.D. of the Pilot Project Description must be filed, with one courtesy copy provided for Chambers, no later than twenty-eight (28) days **before the date set forth in paragraph 9 below**.

    a.      The Joint Final Trial Report must also state clearly the parties' positions as to whether the case is to be tried, in whole or in part, to a jury, and must state whether all parties consent to trial of the case by a magistrate judge (without identifying which parties have or have not so consented.

    b.      The format of the exhibit list presented in the Joint Final Trial Report must be substantially as illustrated below.

| Exhibit Number or Letter | Description | Objection(s), if any | Status |
|---|---|---|---|
|  |  |  |  |

        i.      If there is more than one Plaintiff or Defendant, the parties must coordinate their designations so as to avoid duplication.

        ii.      In the "Objection(s)" column of the table, any objections must be explained briefly, with citation to the relevant Federal Rule of Evidence or other legal authority.

        iii.      The "Status" column should be left blank, for later use by the Court.

    c.      The Joint Final Trial Report should also be submitted to Chambers on a CD-Rom in WordPerfect or Microsoft Word format.

EXHIBIT 1 - PAGE 5

d.  One copy of each documentary exhibit to be offered at trial should be provided to the Court at the time the Joint Final Trial Report is filed. Such exhibits must be pre-marked. In the event that a party intends to offer more than 15 documentary exhibits at the trial, the exhibits should be tabbed and included in a binder, or otherwise organized for easy reference and access. On the day of trial, counsel must bring additional pre-marked copies for use by witnesses, the courtroom deputy, the court reporter, opposing parties and (if applicable) the jury.

e.  Proposed verdict forms (with any objections noted) must also be provided to the Court at the time that the Joint Final Trial Report is filed. Courtesy copies and electronic versions in WordPerfect or Microsoft Word format must be provided.

8.  Requests to Charge

Requested final jury instructions must be filed as a single document, captioned Joint Requests to Charge and including the full text of the parties' proposed jury instructions and a brief explanation (with legal citations) of the objections, if any, to disputed requests to charge, must be filed (and a courtesy copy provided for Chambers) **with the Joint Final Trial Report.**

The Joint Requests to Charge must also be submitted to Chambers on a CD-Rom in WordPerfect or Microsoft Word format.

9.  Final Pre-Trial Conference

The parties are directed to appear before the undersigned in Courtroom No. 11C[1], 500 Pearl Street, New York, NY 10007, for a final pre-trial conference on **December 6, 2013**, at **10:00 a.m**. The parties must be trial-ready by this conference date. The conference will cover the matters enumerated in subdivision IV.E. of the Pilot Project Description. The trial date will be set at the conference if one has not previously been designated.

The Court will not adjourn the final pre-trial conference or excuse the appearance of a party or its counsel unless a stipulation of settlement is on file prior to the pre-trial conference date set forth in this paragraph 9.

10.  No Adjournment of Deadlines

The deadlines set forth in this Pre-Trial Scheduling Order will not be adjourned except in the Court's discretion upon good cause as shown in a written application signed by both counsel and counsel's client and served upon all parties. "Good cause," as used in this paragraph, does not include circumstances within the control of counsel or the client.

---

[1]On the day of the conference, check the electronic board in the lobby to be certain of the proper courtroom.

EXHIBIT 1 - PAGE 6

11.    Non-Compliance with This Order

In the event that any party fails to comply with this Pre-Trial Scheduling Order, or is not prepared to go forward with trial on the date scheduled, the Court may impose sanctions or take other action as appropriate. Such sanctions and action may include assessing costs and attorney's fees, precluding evidence or defenses, dismissing the action, granting judgment by default, and/or other appropriate penalties.

12.    Other Matters

a.    Trial witnesses not previously deposed _X_ will ___ will not be made available for deposition before the commencement of trial.

b.    The parties must begin meeting with Magistrate Judge Fox for settlement purposes by **January 31, 2013.**

c.    The parties must use their best efforts to agree on e-discovery protocols by **October 26, 2012**. If no joint protocol proposal has been submitted to the Court by that date, the parties must submit the disputed issues to Judge Fox by **November 14, 2012.**

d.    Liability and damages discovery will proceed on the same timetable.

e.    The parties must continue to use their best efforts to coordinate discovery activities in the New York and California proceedings, including notifying judges in both proceedings of problems that implicate both proceedings.

f.    ABC's preliminary injunction motion practice must be commenced within 30 days following the completion of the expedited discovery schedule.


IT IS SO ORDERED.


Dated: New York, New York
       August 3, 2012

                              ____/s/LTS_____
                              LAURA TAYLOR SWAIN
                              United States District Judge

EXHIBIT 1 - PAGE 7

Exhibit 2

**From:** Benson, Patricia [mailto:PHB@msk.com]
**Sent:** Thursday, August 09, 2012 3:27 PM
**To:** Molinski, William A.; Singer, David R.; rstone@jenner.com; Rotstein, Robert
**Cc:** Bicks, Peter A.; Echtman, Elyse D.; Hurst, Annette L.
**Subject:** RE: Fox v. DISH and related actions

Dear Bill,

Our clients, CBS and NBCU, have not yet decided whether to seek a preliminary injunction, and certainly do not intend to file such a motion before August 13.  We can work out a discovery schedule when and if they decide to make such a motion. In light of the foregoing, should Dish make the  ex parte application you describe below as to CBS and NBCU, we will oppose it as unnecessary and premature – especially as to CBS since Dish has filed a motion to dismiss or transfer that case – and we reserve the right to ask the Court to sanction Dish for misusing the ex parte process.

Please feel free to contact me, Bob or Jean if you would like to discuss the matter further (although if you want to have a discussion today, please call Bob or Jean, as I will be out of the office this afternoon).


Regards,
Pat


**From:** Molinski, William A. [mailto:wmolinski@orrick.com]
**Sent:** Thursday, August 09, 2012 9:22 AM
**To:** Singer, David R.; rstone@jenner.com; Benson, Patricia; Rotstein, Robert
**Cc:** Bicks, Peter A.; Echtman, Elyse D.; Hurst, Annette L.
**Subject:** Fox v. DISH and related actions


Dear Counsel:

We write pursuant to Local Rule 7-19 and Judge Gee's Standing Order Rule 9 to request a meet and confer over DISH's intention to move ex parte for a scheduling conference before Judge Gee and/or Judge Hillman so that the Court may establish a schedule for expedited discovery, as well as a hearing and briefing schedule, for a motion for

EXHIBIT 2 - PAGE 8

preliminary injunction to be filed with Judge Gee by any of the networks.

We request that you provide us with a time today that you are available as it is our intention to file the application with the Court today if agreement cannot be reached on this issue. If, however, you will confirm in writing that you will not be filing a motion for a preliminary injunction prior to next Monday, August 13, then we are willing to delay our filing to tomorrow to allow for any scheduling issues you may have in meeting and conferring on this issue today.

We look forward to hearing from you.

Regards,
Bill Molinski
================================================================

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication, unless expressly stated otherwise, was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein.
================================================================
NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT FOR ONLY THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E- MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM. THANK YOU IN ADVANCE FOR YOUR COOPERATION.
For more information about Orrick, please visit http://www.orrick.com/
================================================================

EXHIBIT 2 - PAGE 9

# Exhibit 3

**From:** Singer, David R. [mailto:DSinger@jenner.com]
**Sent:** Wednesday, August 29, 2012 5:52 PM
**To:** Molinski, William A.; Hurst, Annette L.; Bicks, Peter A.; Echtman, Elyse D.
**Cc:** Stone, Richard L.; Thomas, Andrew J.; Gallegos, Amy M.
**Subject:** Fox v. Dish

Counsel,

Your representation to the court in today's filing was inaccurate. Fox said it was no longer willing to agree to the briefing schedule that Dish rejected last week. But we did not rule out the possibility of a FRCP 30(b)(6) depo going forward. Fox will make its witness available tomorrow at 1pm, Friday from 9am to 1pm, or Tuesday from 9am to 3:30 pm.

Please let us know as soon as possible if these dates and times work.

David

**David R. Singer**
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel (213) 239-2206
Fax (213) 239-2216
DSinger@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

EXHIBIT 3 - PAGE 10

# Exhibit 4

| From: | Peggie Li |
|---|---|
| Sent: | Friday, January 06, 2012 5:52 PM |
| To: | Julie Simon |
| Cc: | BJ Elias |
| Subject: | RE: DISH: Primetime ANytime |

Hi Julie,

Below is the quick updates that I found on Google about Dish's Primetime Anytime with its new DVR XiP 813. Also, please see the below pictures that I found about this product.

**About Dish Primetime Anytime**

- Primetime Anytime is a feature integrated into Dish's new DVR named XiP 813.

- Primetime Anytime is considered as a DVR "catch up" feature. Basically, one of the three tuners appears to be co-opted to record local affiliate programming (ABC, CBS, FOX, NBC) between 8PM – 11PM with programming retained for about a week. But, it is concerned that the automated solution will raise the ire of broadcasters – who'd rather license "catch up" services.

**Additional Info about XiP 813**

- EchoStar's next generation XiP satellite whole home DVR hardware will be branded as the DISH Network "Hopper" (XiP 813).

- The DISH XiP 813 appears much more svelte than prior oversized EchoStar DVR hardware.

- Echostar's new whole-home DVR solution XiP 813 is tethered via a MoCA coaxial cable system to the "Hopper" to share live and recorded TV programs in up to three additional rooms.

- Slingbox/SlingLoaded functionality as seen from the ViP922 is integrated into XiP 813 as well.

1

FOX000096

EXHIBIT 4 - PAGE 11





Dish's Next Generation DVR named XiP 813

2

FOX000097

EXHIBIT 4 - PAGE 12



**DISH To Unveil "Hopper" Whole Home DVR – How It Works**

FOX000098

EXHIBIT 4 - PAGE 13



Online Banner for Dish's New Product – Hopper will be released on January 9

Please let me know if you would like me to get into more details.

Best,
Peggie

**From:** Julie Simon
**Sent:** Friday, January 06, 2012 3:48 PM
**To:** Peggie Li
**Cc:** BJ Elias
**Subject:** DISH: Primetime ANytime

Please pull any info you can find about this product. Thanks

Julie Simon | Fox Networks ⋅ Senior Vice President  Distribution  Advanced Services | julie.simon@fox.com | 310 369 0113

4

FOX000099

EXHIBIT 4 - PAGE 14

# Exhibit 5

**SONY** CORPORATION OF AMERICA, et al., Petitioners, vs. UNIVERSAL CITY STUDIOS, INC. and WALT DISNEY PRODUCTIONS, Respondents. No. 81-1687

OCTOBER TERM, 1982

August 27, 1982

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit.

BRIEF FOR THE PETITIONERS.


DEAN C. DUNLAVEY, (Counsel of Record), DONALD E. SLOAN, GIBSON, DUNN & CRUTCHER, 515 South Flower Street, Los Angeles, Calif. 90071, (213) 488-7000, Attorneys for Petitioners Sony Corporation of America, et al.

Of Counsel: MARSHALL RUTTER, RUTTER, EBBERT & O'SULLIVAN, Suite 2200, 1900 Avenue of the Stars, Los Angeles, Calif. 90067, (213) 879-9494.

TABLE OF AUTHORITIES

Cases

Albuquerque Broadcasting Company v. Regents of N.M. College, 70 F. Supp. 198 (D.N.M. 1945), aff'd 158 F.2d 900 (10th Cir. 1947)

Allen B. Dumont Laboratories v. Carroll, 184 F.2d 153 (3d Cir. 1950)

Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476 (1964)

Baldridge v. Shapiro, 50 U.S.L.W. 4227 (1982) Columbia Broadcasting v. Democratic Comm., 412 U.S. 94 (1973)

Dawson Chemical Co. v. Rohm & Hass Co., 448 U.S. 176 (1980), reh. den. 448 U.S. 917 (1980)

Folsom v. Marsh, 9 Fed. Cas. 342, No. 4901 (C.C.D. Mass. 1841)

Fortnightly Corp. v. United Artists, 392 U.S. 390 (1968)

Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159 (2d Cir. 1971)

Goldstein v. California, 412 U.S. 546 (1973)

Henry v. A.B. Dick Co., 224 U.S. 1 (1912); overruled on other grounds by Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502 (1917)

Inwood Labs. v. Ives Labs., 50 U.S.L.W. 4592 (1982)

Kalem Co. v. Harper Bros., 222 U.S. 55 (1911)

1

EXHIBIT 5 - PAGE 15

Kleindienst v. Mandel, 408 U.S. 753 (1972)

Lawrence v. Dana, 15 Fed. Cas. 26, No. 8136 (C.C.D. Mass. 1869)

MCA v. Wilson, 677 F.2d 180 (2nd Cir. 1981)

Meeropol v. Nizer, 560 F.2d 1061 (2d Cir. 1977), cert. denied, 434 U.S. 1013 (1978)

National Broadcasting Co. v. United States, 319 U.S. 190 (1942)

NLRB v. Fruit Packers, 377 U.S. 58 (1964)

Paris Adult Theatre I v. Slaton, 413 U.S. 49 (1973)

Red Lion Broadcast Co. v. FCC, 395 U.S. 367 (1969)

Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966), cert. denied, 385 U.S. 1009 (1967)

Rupp & Wittgenfeld v. Elliott, 131 F. 730 (6th Cir. 1904)

Schwegman Bros. v. Calvert Distillers Corp., 341 U.S. 384 (1951)

Sheldon v. Metro-Goldwyn-Mayer Corp., 309 U.S. 390 (1939)

Simpson v. United States, 435 U.S. 6 (1978)

Stanley v. Georgia, 394 U.S. 557 (1969)

Ted Browne Music Co. v. Fowler, 290 F. 751 (2d Cir. 1923)

Teleprompter Corp. v. CBS, 415 U.S. 394 (1974)

Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978)

Thomson-Houston Elec. Co. v. Ohio Brass Co., 80 F. 712 (6th Cir. 1897)

Train v. Colorado Public Interest Research Group, 426 U.S. 1 (1976)

Triangle Publications v. Knight-Ridder Newspapers, 626 F.2d 1171 (5th Cir. 1980)

Twentieth Century Music Corp. v. Aiken, 422 U.S. 151 (1975)

United States v. American Trucking Associations, 310 U.S. 534 (1940)

 United States v. United States Gypsum Co., 333 U.S. 364 (1948)

Universal City Studios v. Sony Corp. of America, 480 F. Supp. 429 (C.D. Cal. 1979), 659 F.2d 963 (9th Cir. 1981)

Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S.

EXHIBIT 5 - PAGE 16

748 (1976)

Wallace v. Holmes, 29 F. Cas. 74 (No. 17,100) (C.C. Conn. 1871)

Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973), aff'd by an equally divided court, 420 U.S. 376 (1975)

Zuber v. Allen, 396 U.S. 168 (1969)

Constitutional Provisions

United States Constitution

Article 1, § 8, Cl. 8

First Amendment

Statutes

Copyright Act of 1909, 35 Stat. 1075 - 17 U.S.C.

§ 1

§ 101(b)

§ 112

Sound Recordings Act of 1971, P.L. 92-140, 85 Stat. 391

Copyright Revision Act of 1976, P.L. 94-533, 90 Stat. 2541 - 17 U.S.C.

§ 101

§ 102

§ 106

§ 107

§ 108(h)

§ 111

§ 118(d)(3)

§ 301

§ 302(a)

§ 408

§ 411

EXHIBIT 5 - PAGE 17

§ 501

§ 502

§ 504

Trans. & Suppl.  § 112

Judicial Code and Judiciary - 28 U.S.C.

§ 1254(1)

§ 1338(a)

Patent Act of 1952 - 35 U.S.C.

§ 271(c)

Communications Act of 1934 - 47 U.S.C.

§ 153(b)

§ 153(o)

§ 303(g)

§ 307(a)

§ 309(a)

§ 605

Rules

Fed. Rules Civ. Proc.

Rule 52(a)

Miscellaneous

House Judiciary Committee Report No. 94-1476, 94th Cong., 2d Sess. (1976) - "1976 House Report"

House Judiciary Committee Report No. 92-487, 92nd Cong., 1st Sess. (1971) - "1971 House Report"

H.R. Rep. No. 2222, 60th Cong., 2d Sess. (1909)

Senate Judiciary Committee Report No. 94-473, 94th Cong., 1st Sess. (1975) - "1975 Senate Report"

Senate Judiciary Committee Report No. 92-72, 92nd Cong., 1st Sess. (1971) - "1971 Senate Report"

EXHIBIT 5 - PAGE 18

Senate House Conference Committee Report, No. 94-1733, 94th Cong., 2d Sess. (1976) - "Conference Report"

Second Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law (1975) - "Register's 1975 Report"

Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill - "Register's 1965 Report"

Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law (1961) - "Register's 1961 Report"

H.R. 6927 (92d Cong.)

S. 646 (92d Cong.)

S. 644 (92d Cong.)

S. 4592 (91st Cong.)

Hearings, Subcommittee No. 3 of the House Judiciary Committee

92d Cong., 1st Sess

89th Cong., 1st Sess

127 Cong. Rec. No. 145, E4751, daily ed., Oct. 14, 1981

117 Cong. Rec. 34748-49 (Oct. 4, 1971)

Copyright Office Circular R-99 (1977)

27 Iowa L. Rev. (1942)

31 Stan. L. Rev. (1979)

OPINIONS BELOW

The Opinion of the Court of Appeals rendered October 19, 1981 is reported at 659 F.2d 963 (9th Cir. 1981) -- Appendix A to the Petition for Writ of Certiorari (cited herein as "Pet. App. 1 et seq.").  The Opinion of the United States District Court for the Central District of California entered October 2, 1979 is reported at 480 F. Supp. 429 (C.D. Cal. 1979) -- Appendix B to the Petition (cited herein as "Pet. App. 31 et seq.").

JURISDICTION

The Judgment of the Court of Appeals was entered on October 19, 1981.  A Petition for Rehearing with a Suggestion for Rehearing in Banc was timely filed on November 2, 1981 and was denied by order dated January 12, 1982 -- Appendix C to the Petition (Pet. App. 118).  The Petition for Writ of Certiorari was filed on March 12, 1982 and was granted on June 14, 1982.  The jurisdiction of this Supreme Court

5

EXHIBIT 5 - PAGE 19

is invoked pursuant to 28 U.S.C.  § 1254(1).

CONSTITUTIONAL PROVISIONS AND STATUTES INVOLVED

This case involves Article I, § 8, Cl. 8 of the United States Constitution and several sections of the Copyright Act of 1909 (the "1909 Act") and of the Copyright Revision Act of 1976 (the "1976 Act" -- effective January 1, 1978), n1 respectively, each of which is printed in full in Appendix D to the Petition (Pet. App. 119 et seq.).  The pertinent sections of the 1976 Act are 17 U.S.C. §§ 101 (portions), 106, 107, 411, 501, 502(a) and 504.  The pertinent section of the 1909 Act is former 17 U.S.C.  § 1 (portions).


n1 Under Trans. & Suppl.  § 112, "All causes of action that arose under title 17 before January 1, 1978, shall be governed by title 17 as it existed when the cause of action arose."


QUESTIONS PRESENTED.

1.  Is reception at home by videotape recorder (followed only by private viewing at home) of free off-the-air television programming an infringement of statutory copyright on such programming?

2.  If the answer to Question No. 1 is "Yes", does the manufacture, sale and/or advertisement of a home videotape recorder per se constitute contributory infringement whenever that videotape recorder is used for such reception at home?

3.  Is "fair use" of a copyrighted work (17 U.S.C.  § 107) limited to a "productive use", and precluded from being an "intrinsic use"?

4.  Can a federal court impose a compulsory license on a copyright owner, and impose continuing royalties on an infringer, as a remedy for statutory copyright infringement?

5.  By totally ignoring the findings of fact of the district court, and by holding retailers liable for contributory infringement when they never were alleged to have such liability, did the Court of Appeals so far depart from the accepted and usual course of judicial proceedings as to call for an exercise of this Court's power of supervision?

The parties to the proceedings below are UNIVERSAL CITY STUDIOS, INC., a corporation ("Universal"), and WALT DISNEY PRODUCTIONS, a corporation ("Disney"), Respondents herein, Plaintiffs-Appellants below, v. SONY CORPORATION OF AMERICA, a corporation ("Sonam") -- distributor in America of a home videotape recorder called Betamax, SONY CORPORATION, a corporation ("Sony") -- manufacturer of Betamax; CARTER HAWLEY HALE STORES, INC., a corporation, ASSOCIATED DRY GOODS CORPORATION, a corporation, FEDERATED DEPARTMENT STORES, INC., a corporation, HENRY'S CAMERA CORPORATION, a corporation -- retailers of Betamax; DOYLE DANE BERNBACH, INC., a corporation ("DDBI") -- Sonam's former national advertising agency for Betamax; and WILLIAM GRIFFITHS, an individual: Petitioners herein (except Griffiths, who has no interest in the outcome of this petition or this case), Defendants-Appellees below. below.

6

EXHIBIT 5 - PAGE 20

A listing naming all parent companies, subsidiaries (except wholly-owned subsidiaries) and affiliates of each corporate petitioner has been included in the Petition; it currently is still accurate (Sup. Ct. Rule 28.1).

STATEMENT OF THE CASE n2

n2 The district court's opinion constituted its findings of fact (Pet. App. 35; Rule 52(a), Fed. R. Civ. P.). The Statement of the Case is based on these findings, which should be accepted as true on certiorari (United States v. United States Gypsum Co., 333 U.S. 364, 394-5 (1948)).

The Court of Appeals did not even mention any finding, let alone suggest it was "clearly erroneous" or disturb it (nor did respondents Universal or Disney, collectively "U/D", ask it to do so); instead, the Court of Appeals substituted ipse dixit statements of fact, based on assumptions or treatise references and contrary to the district court's findings of fact, and thereby laid part of the foundation for Question Presented No. 5 (see Petition, pp. 26-28; Inwood Labs. v. Ives Labs., 50 U.S.L.W. 4592, 4595-6 (1982)).  See ns. 31, 53 and 55, infra.

This is an action for alleged infringement of statutory copyright -- alleged to have occurred under Section 1(a) and (c) of the 1909 Act, and under Section 106(1) of the 1976 Act, by virtue of the tape recording made when (1) a home videotape recorder was used (2) to receive a free off-the-air television broadcast of a copyrighted work owned by a respondent (3) for the purpose of home play-back and viewing.  No infringement exists by virtue of home play-back and viewing of such a recording (17 U.S.C.  § 106(4)).  Jurisdiction of the district court was invoked under 28 U.S.C.  § 1338(a).

The basic issues in the case are (1) whether such a tape recording is a non-infringing "fair use", and (2) whether the mere supply of a VTR per se constitutes contributory infringement if such a tape recording constitutes direct infringement.

The home videotape recorder ("VTR" -- sometimes called a videocassette recorder or "VCR") and the household TV set are similar in that both receive free off-the-air television broadcasting.  They are different in that the household TV set receives the broadcast electromagnetic signals by converting them into sights and sounds simultaneously with the reception; in contrast, the home VTR receives these signals by recording the video and audio components thereof on tape for play-back through the TV set, and thereby for viewing and listening, at a later time.  n3 Home use off-the-air videotape recording has been going on continuously in the United States since 1965 using home VTRs made by Sony and others n4 (Pet. App. 40, 43-44; R. 564, 575-6, 636, 638-40, 670, 677-8, 738-40, 745-54, 756, 782-3, 790-2, 862-4, 955, 1567, 1668, 1684-5, 1791, 2061).

n3 The integrated home VTRs in issue, such as Betamax, consist of three components -- a tuner, a video tape recorder, and an RF adaptor.  The tuner separates out the video and audio signals from the carrier RF signal (VHF, channels 2-13; UHF, channels 14-83) transmitted by the television station -- "tuners have been marketed long before videotape machines have been around" (R. 914).  The video tape recorder (by definition) (1) records these video and audio signals on

EXHIBIT 5 - PAGE 21

magnetic tape, and (2) regenerates and plays back those same video and audio signals from the tape.  The RF adaptor reincorporates the regenerated video and audio signals back into the same kind of RF signal which was transmitted by the television station and which is needed by the TV set. All three components long have been made and sold as separate devices, for various usages, by Sony and others (Pet. App. 33, 39-40; R. 564, 581-2, 590, 639, 647, 677-8, 722-3, 734-5, 750-1, 760-1, 913-4).

In fact, the regenerated video and audio signals from the recorder component of the VTR can be turned directly into the sights and sounds of the program by use of a "monitor".

Home VTRs, including Betamax, have various manual control buttons, including a "pause control" and a "fast forward".  The pause control is a commonplace tape recorder (audio or video) control used to interrupt momentarily the machine's function without having to turn it off, whether it is recording or playing back -- for example, to prevent recording of something that is not desired, or to stop the play-back while the user momentarily leaves the recorder (Pet. App. 41; R. 698-9, 763-5, 1962-3).  The fast forward is another commonplace tape recorder control used to reach a position within the body of the tape at a faster rate than simply by playing back everything that comes before it (Pet. App. 41; R. 765-7).

Unless the user interferes, Betamax records the program exactly as broadcast.

All home VTRs use reusable tape -- that is, new programs can be recorded over old programs already on the tape, the old programs thereby being erased (R. 728-9, 746-7, 759, 1867).

n4 There were statements physically affixed to home VTRs for some years after their introduction by Sony in 1965 to the effect that recording of copyrighted material might constitute infringement or should be avoided; Betamax operating instructions always have stated "CAUTION Television programs, films, video tapes and other materials may be copyrighted.  Unauthorized recording of such material may be contrary to the provisions of the copyright laws." (Pet. App. 42; R. 711; PX [plaintiffs' exhibit] 94 - R. 713); and similar statements have appeared in some ads (e.g., PX 149 - R. 670-1).  Such statements have cautioned the consumer about the differences in opinion as to whether some off-the-air VTR home recording constitutes copyright infringement.  When Betamax was introduced, petitioners' opinion was that no such recording was infringement (Pet. App. 94; R. 1997, 2714); even if it were, petitioners could not have known (Pet. App. 96).

Free off-the-air television is broadcast by at least 986 stations (another 1000-1500 low power "neighborhood" stations are coming) for the purpose of furthering "the public interest, convenience, and necessity" (47 U.S.C.  §§ 153(b), 307(a), 309(a)); the public receives it lawfully because it "is broadcast... for the use of the general public..." (47 U.S.C.  §§ 153(o), 605). There are 727 commercial television stations (supported by advertising), and 259 public/educational television stations (supported by individual and governmental contributions), in the United States (Pet. App. 50-54, 79-80).

The fact (shown hereinafter) perhaps most crucial to the ultimate practical resolution of this case is that there is a wealth of television material broadcast by

EXHIBIT 5 - PAGE 22

these 986 stations which is free for unchallenged home use videotape recording -- including (a) programming which is registered for copyright by owners who do not object to home use recording, (b) programming which could be registered for copyright but which is not, and (c) programming which cannot be copyrighted -- and all of which programming actually is recorded for home use.  The amount of programming available for unchallenged home recording far exceeds that which is challenged.

   "Time shift" is home recording for the purpose of home viewing of the broadcast soon thereafter, following which the tape is erased in the course of recording something else -- it is the primary kind of home recording at issue herein n5 (Pet. App. 47-8, 107-112).  As shown by surveys, it is the predominant use of home VTRs. Time shift enables members of the public to view programs which they otherwise would miss -- e.g., workers on a "night shift" now can view "prime time" TV the next day n6 (Pet. App. 82, 108).  The VTR thus provides the "societal benefit" of furthering the "public interest, convenience, and necessity".


   n5 VTR usages other than for home recording -- e.g., for swapping tapes, duplicating tapes, recording off cable TV or pay TV, play-back outside the home, etc. -- present other differing and intersting legal questions (theoretical or actual), but they are not this case (Pet. App. 34, 55-6, 81-2, 115).  No evidence of such activities was before the court.

   n6 Any contention that the home VTR owner does not see the program at exactly the day or time intended by U/D is negated by the fact that U/D could not pick the day or time of the telecast anyhow -- that prerogative belongs to each individual television station (Albuquerque Broadcasting Company v. Regents of N.M. College, 70 F. Supp. 198 (D.N.M. 1945), aff'd 158 F.2d 900 (10th Cir. 1947)).


   A secondary kind of home recording, viz., "librarying", is retention of the recording for the purpose of repeat home viewing (Pet. App. 107, 112).  There was no evidence of any librarying of any work of respondents, who could have probed the subject but elected not to do so.  Moreover, the kinds of movies and other works in libraries (e.g., entertainment, documentary, home movies, pre-recorded, etc.) were not delineated, nor was the length of time a recording needed to be retained in order to qualify as librarying or the number of repeat viewings.  Even in generalities, "it has not been proven that many persons will 'library' to any significant extent" (Pet. App. 112).  The expense of tying-up tape in a library, and the availability of unedited and superior quality pre-recorded cassettes for rental or sale, all led the district court to downplay librarying of any kind of programming and to reject respondents' "fear" of damage therefrom.

   The district court felt that survey evidence of Betamax usage in general would be of interest to the appellate courts (R. B 89-90, B 129-31). Accordingly, Sonam provided Universal and Disney (collectively "U/D") with a list of 17,000 Betamax owners -- a list from which the Field Research survey (PX 730 -- R. 1120) was made for U/D and the Crossley survey (DX [defendants' exhibit] OT -- R. 2308-9) was made for petitioners.  n7


   n7 Neither survey showed any recording of any U/D motion picture.

EXHIBIT 5 - PAGE 23

First and foremost, both surveys showed that Betamax is being used primarily for time shift.  n8

n8 (a) 55% of the owners used it mostly for time shift and another 21% used it half of the time for that purpose (Pet. App. 47-8; PX 730, Question 9; R. 1102-3, 1150);

(b) 96% of the owners used Betamax to record programs they otherwise would have missed (Pet. App. 48; R. 2323; DX OT, Table 1);

(c) 82% of all recordings are played back soon after being made (DX OT, Table 88);

(d) 90% of Betamax owners viewed most play-backs just within the family (Pet. App. 48; R. 2334; DX OT, Table 55); only 9% of Betamax recordings are viewed by more than two persons in addition to the Betamax owner, less than 1% are viewed by more than five such persons (DX OT, Tables 49, 59);

(e) 70% of recorded programs were watched only once or not at all before being crased by another recording (DX OT, Tables 25, 26);

(f) A March 15, 1980 post-trial report prepared for the Corporation for Public Broadcasting showed home recording from Public Broadcasting Service ("PBS") educational stations was highest during fringetime periods (the three hours before prime time) when MacNeil/Lehrer, Washington Week, Wall Street Week, etc. were broadcast.  At least 68% of PBS recordings are played back within two days. (Respondents' programming does not appear on PBS.)

(g) A "Home Video" post-trial study prepared for the FCC dated 1 November 1979 synopsized "five major studies of VCR use", finding "it is clear that the principal use of the VCR to date is for time-shift viewing".  Also, "Because rating services are prepared to report such time-shifting, broadcasters should actually be helped by this consumer convenience.  An audience that was previously unavailable to them is now viewing, and the viewing is properly attributed in audience reports... Most [play-back] occurs relatively quickly after the recording [almost all within a week].  Most of such recordings are viewed only once (usually only by members of that household)...." (pp. 61-62).

The Crossley survey showed that 49% of Betamax owners record professional baseball, football and/or hockey games (R. 2328; DX OT, Table 4).  Major League Baseball (R. 2436-7, 2442-8), the National Football League (R. 2481-7), the National Basketball Association (R. 2511-16), the National Hockey League (R. 2531-34), and the National Collegiate Athletic Association (R. 2540-52) each testified it had no objection to home use videotape recording of its copyrighted broadcasts.

The Crossley survey showed that 10% of Betamax owners record religious programs (R. 2328; DX OT, Table 4).  National Religious Broadcasters (25 of whose members own religious television stations -- R. 2564-76) and Faith Center (with religious television stations in Los Angeles, San Francisco and Hartford -- R. 2577-

10

EXHIBIT 5 - PAGE 24

87) each testified it had no objection to home use videotape recording of its copyrighted broadcasts.

The Crossley survey showed that 63% of Betamax owners record educational programs (R. 2329; DX OT, Table 4-1).  The Bureau of Mass Communications of the New York State Education Department (with nine educational television stations reaching 92% of the population of New York State -- R. 2593-2606, 2615-6; DX PD, PE -- R. 2606), the Center for Library Media and Telecommunications of the Board of Education of the City of New York (channel 25 in New York -- R. 2623-40; DX PF -- R. 2640), the New Jersey Public Broadcasting Authority (with four educational television stations reaching 85% of the population of New Jersey -- R. 2823-44; DX PG -- R. 2844) and the Los Angeles City School Board of Education (channel 58 in Los Angeles -- R. 2863-2902; DX PI -- R. 2902) each testified it had no objection to home use videotape recording of its copyrighted material and its broadcasts.  Respondent Universal even agreed expressly to recent "voluntary guidelines" outlining still additional areas of available educational off-the-air programming n9 (127 Cong. Rec. No. 145, E4751, daily ed.  October 14, 1981).

n9 Moreover, the 1976 Act expressly authorizes various VTR off-the-air recording -- e.g., by educators and libraries (17 U.S.C.  §§ 108(h), 118(d)(3)).

The Crossley survey showed that 42% of Betamax owners recorded programs of the National Broadcasting Company (R. 2329; DX OT, Table 4-1).  NBC is a wholly-owned subsidiary of RCA (R. 2980, 3008) and RCA sells its own brand of home VTR called SelectaVision (R. 2978-80).  NBC owns the copyrights in many programs it broadcasts (R. 2984-3004; DX PM -- R. 2986).  An NBC corporate planning staff made a study and reported in 1967 that the impact of home VTRs on commercial television broadcasting would be minuscule.  In May 1978 the same NBC planning staff made an up-dated report which had no substantial variance as to home VTRs from the 1967 report.  NBC believes that home video recording will expand television viewing rather than subtract from it, that such additional viewing will be measured, and that home VTRs will not significantly detract from television's mass audience.  NBC believes there is no reason why it and the home VTR industry cannot grow prosper alongside of each other n10 (R. 3007-18; DX PH -- R. 3016-7).

n10 The American Broadcasting Company recently announced it was inaugurating Home, View Network broadcasts over its owned and affiliated stations from 2 a.m. to 6 a.m. -- especially intended to be recorded at home, for play-back and viewing at the viewer's convenience.  The Washington Post, April 30, 1982.

Examples of entertainment-type programming available for home use Betamax recording with the owner's blessing included Mr. Rogers' Neighborhood, a television series produced for families with pre-school children and having a daily audience exceeding three million families (R. 2912-23; DX PK -- R. 2923), and a television series entitled Spider Man -- based on the comic strip character (R. 2929-39).  There also are entertainment motion pictures broadcast on television as to which the copyright has expired, for example, the motion picture of Universal entitled My Man Godfrey (R. 2300-1).

In view of the facts (1) that any television program which is transmitted from tape,

11

EXHIBIT 5 - PAGE 25

or which is taped while being transmitted live, can be registered for statutory copyright (17 U.S.C. §§ 101-2, 302(a), 408), (2) that any program which can be registered for statutory copyright cannot be the subject of any other kind of protection (17 U.S.C. § 301) and (3) that no action for infringement can be brought under the 1976 Act without prior registration and deposit of the tape (17 U.S.C. § 411), petitioners engaged Trendex, Incorporated to make a survey of the copyright practices of television stations (commercial, public/educational, and cable) concerning their self-produced (taped) local programming -- DX OV -- R. 2767-8. The results showed substantial local programming (including news, documentaries and public events -- kinds of programming recorded by 74% of Betamax owners -- R. 2328; DX OT, Table 4; DX OV, question 1; Pet. App. 52) which could have been copyrighted but which never could be the subject of an action for infringement because the tapes of such programming are soon erased and re-used (R. 1740-1; DX OV, question 6), thus making deposit and registration (and any action for infringement) impossible. Such programming is free for home recording.  n11

   n11 Channel 47 in Fresno, California, owned by Disney, is an example of a station that could copyright its local taped programming but that does not -- and that does not even object to Betamax recording of its originated programs if play-back occurs during nonbroadcast time (R. 1740-3, 1769).

   Based on the aforesaid overwhelming evidence, inter alia, the district court made a first set of critical factual findings -- that "The videotape recorder, like a[n] [audio] tape recorder, is a staple item of commerce.  Its uses are varied"; that the VTR is "used for purposes where no infringement could be alleged (e.g., recording material which is not copyrighted or where permission to record is given)" (Pet. App. 92, 97, 104, 106-7, 114).

   Respondents Universal and Disney interject themselves into the aforesaid custom and practice of extensive and legal home VTR recording by licensing their programming to commercial stations, for broadcast at times to be chosen by the stations.  U/D desire that each broadcast of their programming be viewed by the maximum possible number of viewers, because U/D believe that larger audiences mean larger license fees (Pet. App. 36-39, 50-54, 110; R. 333, 341, 348, 498-9, 508-9, 997, 1253, 1266-7, 1281, 1309-10, 1441, 1447, 1717).  But U/D then disrupt the custom and practice by being the only copyright owners ever to bring an infringement action against home recording (television or radio).

   Disney's percentage of total commercial television broadcast time is de minimis, consisting of only one hour a week on network and one syndicated series that is out of production and tailing out of exhibition (Pet. App. 38-39; R. 314-5).  And Universal's percentage in the Los Angeles market on commercial stations during one week at the time of trial was under 5% (R. 532-3, 549-50). There was no evidence that U/D's works appear on public/educational stations at all.

   U/D did not seek to hold anyone liable for direct infringement by home recording n12 (see Appendices A, B hereto).  U/D sought to hold petitioners Sony, Sonam and DDBI liable for contributory infringement re home recording based on nothing more than the manufacture, sale and advertisement of Betamax. U/D sought to hold the four VTR retailers-petitioners liable only as direct infringers for demonstration recording they did in their stores.  n13

EXHIBIT 5 - PAGE 26

n12 Defendant Griffiths was a Betamax owner, alleged to have infringed by home recording but granted immunity (Pet. App. 43-4; R.A 88, A 158-9).  The other home VTR owners in issue (Wielage, Lowe and Soule) were not made defendants.

n13 Store demonstration recording is not an issue in this certiorari inasmuch as both the district court and the Court of Appeals held it was not infringement (Pet. App. 29, 48-49, 87-9).  The four retailers-petitioners entered the Ninth Circuit defending only against direct infringement by demonstration recording, and left being held liable as contributory infringers for home recording -- which laid part of the foundation for Question Presented No. 5 (see Petition, pp. 26-28).  (Griffiths' sons bought a Betamax from retailer-petitioner Henry's Camera; none of Wielage, Lowe or Soule got his Betamax from any retailer-petitioner -- Pet. App. 94.)

During a five week trial, U/D introduced evidence of 32 instances n14 f home recording of free off-the-air TV, by four Betamax owners.  n15 This was the only evidence of infringement.  U/D knew of no other home recording of their works (R. 392-5, 1212) and expressly disclaimed seeking a finding of copyright infringement as to any other motion pictures (R.B 175).

n14 Viz., 18 copyrighted motion pictures of Universal, 14 copyrighted motion pictures of Disney.

n15 Viz., defendant Griffiths, non-defendants Wielage.  Lowe and Soule.  All instances of recording were prior to the 1976 Act, except for Wielage's recording of one Universal and one Disney motion picture (see n. 1, supra ).

As to these four Betamax owners, Griffiths is a time shifter who had recorded five Universal films (as well as documentaries and news, sport and political programs) and had erased, or intended to erase, all of them; his practice is "to record, to watch and erase and reuse" (Pet App. 43-44; R. 1695-6).  Soule is a time shifter who recorded two Universal films and had intended to erase them without viewing at all; normally he watches once and then erases (Pet. App. 46-47; R. 1596, 1600).  Lowe was selected by U/D as an extremist because he publishes a home VTR magazine, but still he is just a time shifter as to the films in issue; he or his son had recorded one Universal film, and six Disney cartoons to watch together after his work and then to erase (Pet. App. 46; R. 1653, 1665-7).  Wielage also was selected by U/D as an extremist in that Betamax is his primary hobby and he writes for Lowe's magazine; even so, his recordings are for his own personal use, he watches them alone or with a few friends, and he erases when he is finished (pet. App. 44-45; R. 837, 866).

Based on the evidence pertaining to these home recordings in issue, the district court made a second set of critical factual findings -- "that there was no evidence at trial that any advertisements or other statements by [petitioners] in any way induced or caused to be made any of the copies at issue"; and petitioners "have neither the right nor the ability to control Betamax purchasers' use of the machine in their homes" (Pet. App. 93-4, 96-7, 98; R. 810-11, 866-70, 1567-70, 1576, 1578-79, 1582, 1586, 1593-4, 1616, 1651-3, 1675, 1680-1, 1686, 1696, 1939).  Moreover, petitioners did nothing (by way of advertisement or otherwise) that caused any of

13

EXHIBIT 5 - PAGE 27

these Betamax owners to believe that home use off-the-air recording of U/D's works was lawful (Pet. App. 43-7; R. 810-11, 869, 1576, 1586, 1593-4, 1616, 1651-3, 1686; see n. 4, supra ).

The only damage alleged to have been incurred by U/D as a result of home Betamax recording was to the specific 32 motion pictures in issue (J.A. 64, 98, 110; R.A 237-9, B 175).  But at trial U/D admitted that actually there had been no damage to date to any of these 32 motion pictures (R. 1284-5, 2241, 2251, 2269, 2281-9, 3260, 3268); in fact, U/D's counsel admitted that petitioners "have proven that [the specific dollar amount lost by virtue of the infringements we have found] has been none" (R. 2269-70).  Moreover, U/D offered no evidence of any future detrimental effect to be caused by home recording upon the potential market for, or value of, any of these 32 motion pictures; in fact, petitioners proved that the rating services (e.g., Nielsen, Arbitron) could and would measure Betamax recording and viewing, so that respondents could be fully compensated in the usual manner in the marketplace (Pet. App. 54, 109; R. 2963-4, 2968-9, 2971; DX PH -- R. 3016-7).

U/D further admitted at trial that they had suffered no damage of any kind to date (not just to the 32 motion pictures in issue but to anything else) because of home Betamax recording (R. 288-94, 542-4, 1055, 1206-7, 1233, 2241, 2281-9).  However, over petitioners' continued objection (R. 3212, B 129, B 173-5, B 202, B 205), respondents proceeded to testify about future effects in the abstract which they speculated could result to copyrighted works in the abstract from home recording in the abstract -- e.g., that live TV viewing and theater attendance would decrease because people would be spending their time watching Betamax recordings, that librarying would lead to ad nauseam viewing of a work and detract from its re-run value, n16 that rentals and sales of films and pre-recorded tapes and discs would suffer.  n17 Such speculation involved only hypothetical copyrighted works, and generally entailed an effect on one hypothetical work supposedly to be caused by home recording of another hypothetical work.  The district court weighed these speculations against other evidence and rejected them (Pet. App. 107-115).


n16 Universal's syndication and re-run expert testified that he knows every television programming buyer in the country, that the subject of Betamax never has come up during license negotiations and that Betamax is not affecting syndication (re-run) fees (R. 1464, 1474-5, 1479, 1493-5) -- nor has the subject arisen during network license negotiations (R. 1286).

n17 No witness as to such speculative abstract effects had any knowledge of Betamax usage as revealed by the surveys, and each witness' assumptions were at odds with the survey findings (Pet. App. 76-7; R. 393-5, 510-11, 517, 1021-3, 1268-9, 1347-55, 1474, 1487, 1745).


U/D argue often about "large libraries" of tapes, but there is not one iota of evidence in their Field survey nor in petitioners' Crossley survey that there was so much as a single copyrighted work of either of U/D in anyone's library. n18


n18 In fact, both surveys downplay librarying of any kind.  Twenty-four percent of Betamax owners had no library at all (PX 730, Question 10); 43% had no movies at all in a library (PX 730, Question 10A); and the average number of cassettes in a

14

EXHIBIT 5 - PAGE 28

library with movies on them which the owner expects to keep was less than four -- with 69% of the owners expecting to keep none (PX 730, Question 10B).

U/D also argue often about "deleting", "skipping" and "regularly avoiding commercials" during recording and play-back.  Yet, the surveys downplay this also. n19

n19 Since the pause button was used to avoid recording commercials only 8% of the time (Pet. App. 48; R. 2335; DX OT, Table 16), and since the fast forward was used to skip commercials during play-back of only 25% of the remaining 92% of recordings that contained them (Pet. App. 113; DX OT, Table 38), 69% of playbacks necessarily included commercials.  By somewhat different routes, both surveys agreed that over 60% of Betamax play-backs included commercials (see docket entry 91-5/15/79, pp. 11-12).  Neither survey (or other evidence) probed how many owners watched commercials during live viewing (R. 1152, 1372-3) or during play-back.

Neither the Field nor Crossley survey touched trading or duplicating of tapes.

Counsel for U/D conceded "we have not proved any actual damage, that is correct" -- not even "a penny" (R. 2241, 2251); and also conceded no proof of petitioners' profits (R. 2252, 3260, 3265).  This is not a case where proof of damages was difficult, or where the burden of proof as to damages was misplaced or was of any consequence.  This is a case where the unequivocal absence of damage not only was admitted but also was affirmatively proved.

The district court's third set of critical factual findings made repeated reference to the absence of any harm or damage caused, or to be caused, to either Universal or Disney by home use Betamax recording -- e.g., U/D "admitted that no actual harm to their copyrights had occurred to date"; "testimony at trial... did not establish even a likelihood of harm"; in fact, the evidence showed that home use recording "does not reduce the market for plaintiffs' works" (Pet. App. 50, 76, 87, 102, 107, 108, 115, 116).

The district court's opinion recognized the "strong competing claims" between the "private motivation" of copyright owners and the public interest in receiving "material broadcast on public airwaves" (Pet. App. 32-3, 67-8); and followed the resolution made by Congress and this Court that "copyright is '[n]ot primarily for the benefit of the author, but primarily for the benefit of the public'" (Pet. App. 68).  The district court limited its opinion to "'home use' recording" of programs "broadcast free to the public over the public airwaves" (Pet. App. 55, 74), and found that such home recording was fair use and not infringement (Pet. App. 56-7, 87, 117) -- e.g., such use increased access to information voluntarily broadcast by plaintiffs over public airwaves, consistent with First Amendment policy (Pet. App. 79-80, 82), and did not reduce the market for plaintiffs' works (Pet. App. 87).   The district court also noted that legislative history included a House Judiciary Committee Report plus "committee hearings, floor debates and reports from the Office of Copyrights" (Pet. App. 61-2), and that "when the issue was discussed by Congress, all indications were that Congress did not intend to give monopoly power over this use" (Pet. App. 57, 65, 117).  Finally, the district court concluded there could have been no contributory

15

EXHIBIT 5 - PAGE 29

infringement by any petitioner merely in supplying a "staple article of commerce" like Betamax, which is "capable of non-infringing uses... where no infringement could be alleged" (Pet. App. 97, 104, 106-7); and petitioners had not otherwise contributed where they had no control over consumers' use of Betamax in the privacy of their homes, they did not induce or cause any recording of U/D's works, they did not believe recording of U/D's works was unlawful and yet they had not led any consumer to believe it was lawful (Pet. App. 92, 93-4, 43-7).

The Court of Appeals complimented the district court on its "elaborate, painstaking, and thoughtful opinion" which "carefully outlined the facts" (Pet. App. 3); then ignored those facts totally and reversed with a broadside.  As between copyright owner and the public, the Court of Appeals favored the former, saying "it is clear that the real purpose of the copyright scheme is to encourage works of the intellect" (Pet. App. 4).  The court held that home recording was precluded from being fair use because "intrinsic use" never could be fair use (Pet. App. 14-18); also, ignoring and overruling the district court's critical findings as to absence of harm, it said "it seems clear that it [home recording] tends to diminish the potential market for appellants' works" (Pet. App. 25).  The court declined to look for any legislative history as to fair use, and looked only for a home recording exemption "in ways not specified in U.S.C.  §§ 107-118" -- and found none (Pet. App. 6-7).  The court found contributory infringement by again ignoring and overruling the district court's critical findings, saying "videotape recorders are not 'suitable for substantial noninfringing use'" (Pet. App. 25-26) and "there is no doubt that appellees have met the other requirements for contributory infringement -- inducing, causing, or materially contributing to the infringing conduct of another" n20 (Pet. App. 27).

n20 Within weeks after the Court of Appeals issued its opinion.  Universal sued 50 other manufacturers, distributors and advertisers engaged in home VTR supply, including RCA, General Electric, Zenith, Sears.  Panasonic, Sanyo and Toshiba and representing essentially the entire balance of the home VTR industry -- again, in the Central District of California (the "RCA et al. case" -- No. 81-5723 FW).  That case has been stayed by stipulation and order pending this certiorari.

Two weeks after this Court granted certiorari, Universal again sued all petitioners herein, again in the Central District of California (the "Betamax II case" -- No. 82-3271 FW).  The complaint does not allege even a single instance of known home recording; instead it alleges, on information and belief, that "each" motion picture ever licensed by Universal to network television, local television, pay teleision and/or cable television has been recorded at home by one unknown Betamax owner or another, and that petitioners are liable therefor.

In each of these new cases, Universal expressly seeks no relief against any VTR user, but seeks an injunction, inter alia, as to defendants.  Universal's goal is to use such injunctions as leverage in forcing new legislation to impose a "royalty" on VTRs and tape -- e.g., Amendment No. 1333 to S. 1758 (the Mathias bill) and H.R. 5705 (the Edwards bill), 97th Cong., 2d Sess.

SUMMARY OF ARGUMENT

Normally, making a "copy" of a copyrighted work is the first step in making some use of the work opposed by the copyright owner.  However, in this case, making a

EXHIBIT 5 - PAGE 30

"copy" is a necessary and first step in making exactly that use of the work which the copyright owner intended -- viz., home reception and viewing of a free off-the air TV broadcast.

The recording made in the course of reception by home VTR of free off-the-air TV programming is not an infringement, but rather is a "fair use", of any such programming which is copyrighted.  The public policy underlying free TV broadcasting is that any member of the population who has the "means" of receiving such broadcasts at home has the right to do so, and to view them privately at home, without charge -- the recording is merely a mechanical step employed by the VTR "means" of reception.  Home VTR recording no more than enhances TV reception by the intended audience.

Legislative history of the 1976 Act literally extends from 1955-1976. Between 1955 and 1971 there was considered review, inter alia, of (a) whether unauthorized performance of motion pictures in the privacy of the home should be deemed infringement, and (b) whether sound recordings (viz., phonograph records) were to be given copyright protection against off-the-air home recording.  In the course of reviewing and answering these questions ("no" to each), Congress clearly manifested its belief and intent (while passing a "1971 Amendment" to the 1909 Act) that off-the-air home recording from radio or TV was not infringement -- viz., that it was fair use.  After 1971, and prior to passage of the 1976 Act (which incorporated the 1971 Amendment), there was no further consideration of any of these issues, since they had been resolved.

The home VTR is a staple item of commerce, used for home recording of TV programming whose owners consent (or cannot object) thereto far more often than for home recording of TV programming whose owners do object.  It provides a great societal benefit.  Moreover, petitioners did not induce or cause any of the home recording in issue; nor did they cause any VTR owner to believe it was legal.  Hence, even if home recording of respondents' work were direct infringement, there is no legal basis upon which to hold any petitioner liable for contributory infringement.

There is neither statutory provision nor decisional precedent for judicial imposition of a compulsory license and continuing royalties as a remedy for copyright infringement.

TEXT: ARGUMENT

I.
HOME VTR RECEPTION OF FREE OFF-THE-AIR TV, FOR HOME VIEWING, IS FAIR USE.

Congress is empowered, but not required, by the Constitution to give copyright protection to authors.  Under Article I, § 8, Cl. 8 of the United States Constitution, the constitutional goal is "To promote the Progress of Science and useful Arts..." and the constitutional means is "by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries".  The Constitution, per se, confers no copyright rights on anyone.  What kinds of works will be protected, and what types of protection any particular kind of work will receive, is limited to what Congress can grant and does grant; in fact, neither the 1909 Act nor the 1976 Act gives any copyright owner exclusive rights as to all uses of his work.  Also, as a general premise, copyright is "[n]ot primarily for the benefit of the author,

17

EXHIBIT 5 - PAGE 31

but primarily for the benefit of the public"; each copyright Act "must be construed in light of this basis purpose".  n21

n21 H.R. Rep. No. 2222, 60th Cong., 2d Sess. 9 (1909); Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156 (1975).  Copyright exclusivity may even be limited to precluding others from usage for commercial purposes (Goldstein v. California, 412 U.S. 546, 555 (1973)).

Respondents' claim of infringement is no more sophisticated than (a) that home VTR tape recording fits a literal dictionary definition of the copyright owner's exclusive right to "copy" or to make "any transcription or record" under § 1(a), (d) of the 1909 Act (Pet. App. 127) and "to reproduce... in copies" under § 106(1) of the 1976 Act (Pet. App. 122-3), and (b) that there is no statutory exception from such exclusive right expressly mentioning home use videotape recording.  (Focusing on the "copy", instead of on how and why it came to be made, is like focusing on the hole instead of one the doughnut.)

However, beginning with Folsom v. Marsh, 9 Fed. Cas. 342, No. 4901 (C.C.D. Mass. 1841) and Lawrence v. Dana, 15 Fed. Cas. 26, No. 8136 (C.C.D. Mass. 1869), and culminating with Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973), aff'd. by an equally divided court, 420 U.S. 376 (1975), the lower federal courts have recognized that literal enforcement of the exclusive rights provided by copyright statutes would not produce a fair result in some cases and therefore devised the doctrine of "fair use" -- a doctrine which created a "privilege in other than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner...." Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 306 (2d Cir. 1966), cert. denied, 385 U.S. 1009 (1967). Fair use always has been a doctrine without rigid definition.  "The line which must be drawn between fair use and copyright infringement depends on an examination of the facts in each case.  It cannot be determined by resort to any arbitrary rules or fixed criteria." Meeropol v. Nizer, 560 F.2d 1061, 1068 (2d Cir. 1977), cert. denied, 434 U.S. 1013 (1978). Common sense and fairness spawned the doctrine, and common sense and fairness are still the best criteria in its application.

Fair use never has been adjudicated by this Court.

The 1976 Act did not change fair use.  It did, however, codify the doctrine for the first time -- in 17 U.S.C.  § 107 (Pet. App. 123).  In doing so, both the House and the Senate left a sufficiently clear trail as to the intent of the codification.  n22 Section 107 is as follows:

n22 E.g., Senate Report No. 92-72, 92nd Cong., 1st Sess. -- the "1971 Senate Report"; House Report No. 92-487, 92nd Cong., 1st Sess. -- the "1971 House Report"; Senate Report No. 94-473, 94th Cong., 1st Sess. -- the "1975 Senate Report"; House Report No. 94-1476, 94th Cong., 2d Sess. -- the "1976 House Report"; Senate-House Conference Committee Report, No. 94-1733, 94th Cong., 2d Sess. -- the "Conference Report".

18

EXHIBIT 5 - PAGE 32

"Sec. 107.  Limitations on Exclusive Rights: Fair Use

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include --

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes:

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work."

The 1975 Senate Report termed fair use "one of the most important and well-established limitations on the exclusive right of copyright owners"; "an equitable rule of reason" where "no generally applicable definition is possible, and each case raising the question must be decided on its own facts" (pp. 61-2).

Both the 1975 Senate Report and the 1976 House Report state that there was no intention to "freeze" the doctrine, no intent to "change, narrow, or enlarge it in any way".  n23

n23 "The statement of the fair use doctrine in section 107 offers some guidance to users in determining when the principles of the doctrine apply. However, the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute.  The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change.  Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis.

"Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way."

1976 House Report, 66; 1975 Senate Report, 62.

The fact that off-the-air home recording (audio or video) is not one of the express exceptions or limitations as to the copyright owner's exclusive rights under the 1976 Act's sections 108-118 is irrelevant to its being found a fair use -- section 107 is independent of, and in addition to, sections 108-118.  n24

n24 E.g., the 1976 House Report states at p. 78:

EXHIBIT 5 - PAGE 33

"Nothing in section 108 impairs the applicability of the fair use doctrine...."

Section 107 provides, inter alia, that "reproduction in copies" can be fair use "notwithstanding the provisions of section 106".  In testing whether any particular use is a fair use, section 107 sets forth four factors or criteria which "shall [be] include[d]" among "the factors to be considered".  But none of these four factors is "definitive or determinative" n25 (1975 Senate Report, 62).

n25 The 1975 Senate Report stated (p. 63):

"The statements in this report with respect to each of the criteria of fair use are necessarily subject to qualifications, because they must be applied in combination with the circumstances pertaining to other criteria, and because new conditions arising in the future may alter the balance of equities.  It is also important to emphasize that the singling out of some instances to discuss in the context of fair use is not intended to indicate that other activities would or would not be beyond fair use."

The touchstone in testing for fair use as to the recordings in issue, even before applying these four factors, is an understanding of the extent of the public's right to receive free off-the-air TV.  Under the Communications Act of 1934 (47 U.S.C.  § 301 et seq. ), Congress has preempted control over use of the spectrum of electromagnetic frequencies for communication (see National Broadcasting Co. v. United States, 319 U.S. 190, 210-4 (1942)).  Limited portions of that spectrum have been allocated to free off-the-air radio and to free off-the-air TV.  "Broadcast frequencies are a scarce resource; they must be portioned out among applicants." (Columbia Broadcasting v. Democratic Comm., 412 U.S. 94, 101 (1973)).  "No one has a First Amendment right to a license or to monopolize a radio frequency...."; broadcasting is a "privilege" (Red Lion Broadcast Co. v. FCC, 395 U.S. 367, 389, 394 (1969)).  Any broadcaster given the privilege of using such frequencies must serve the "public interest, convenience and necessity" (47 U.S.C.  §§ 307(a), 309(a)).

As this Court has recognized, program owners like Universal and Disney are well paid indirectly by the public for allowing their programs to be "broadcast... for the use of the general public...." (47 U.S.C.  §§ 153(o), 605 -- Pet. App. 80; see Appendix C hereto).  And U/D's programming, once broadcast, thereby has been "released to the public" (Fortnightly Corp. v. United Artists, 392 U.S. 390, 400 (1968); Teleprompter Corp. v. CBS, 415 U.S. 394, 410 (1974)). U/D have "no control over the segment of the population which may view the program"; "The privilege of receiving the broadcast electronic signals and of converting them into the sights and sounds of the program inheres in all members of the public who have the means of doing so" (Teleprompter, supra, pp. 412, 408).  Such consequences of broadcasting manifestly cut across copyright to some extent -- U/D cannot eat their cake and have it too; they cannot broadcast and then interfere with reception.

Home VTRs "no more than enhance the viewer's capacity to receive the broadcaster's signal" (as did CATV in Fortnightly, supra, p. 399, and Teleprompter, supra, p. 401); they do not increase the number of viewers within range of the signal (as did CATV in Teleprompter, supra ).

20

EXHIBIT 5 - PAGE 34

The importance of free off-the-air TV to the American way of life, coupled with various pronouncements of this Court over the years, suggest that the public's entitlement today to receive TV for personal use in the privacy of the home approaches, if in fact does not attain, the status of a First Amendment right.  n26

n26 The First Amendment provides "Congress ahll make no law... abridging the freedom of speech...." and this Court repeatedly has held that the freedom of speech guaranteed by the First Amendment "necessarily protects the right to receive" communications.  Kleindienst v. Mandel, 408 U.S. 753, 762-3 (1972); see also Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 756-7 (1976).

"[T]he people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment...  It is the right of the people to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here.  That right may not constitutionally be abridged either by Congress or by the FCC." (Red Lion Broadcast Co., supra, pp. 388, 390).

As stated in Paris Adult Theatre I v. Slaton, 413 U.S. 49, 66 (1973), Stanley v. Georgia, 394 U.S. 557 (1969) was a reaffirmation that "'a man's home is his castle.'"

Considering that the recording in issue is only a necessary mechanical step by which the home VTR receives free off-the-air TV broadcasts, such recording should be recognizable immediately as fair use (using nothing more than the "equitable rule of reason" on which fair use was founded).  When a copyright owner voluntarily elects to commercially exploit his work by participating in the "privilege" of free off-the-air TV broadcasting, which by definition is "for the use of the general public", his copyright monopoly should not be extended so as to allow him to eliminate or control a "means" (whose reception mechanism entails recording) by which the public receives any and all free television broadcasts.  Otherwise, contrary to the intent of the Copyright Clause, the benefit to a few "Authors" would impede free speech and "the Progress of Science" to the detriment of the public.  n27 U/D's "privilege" to broadcast must be subordinate to the public's constitutional "right" to receive that (or any other) broadcast; statutory copyright cannot reverse this order of priority.  The balancing factor is fair use.  n28

n27 Both "respondents-authors" herein have had substantial interests in a home TV entertainment device called Discovision, which they regard as competitive to the home VTR.

n28 Triangle Publications v. Knight-Ridder Newspapers, 626 F.2d 1171, 1174 (5th Cir. 1980).

"Since the issue of fair use is one of fact... the clearly erroneous standard of review is appropriate." (MCA v. Wilson, 677 F.2d 180, 183 (2nd Cir. 1981)).  The district court reviewed the specific home recording presented to it, made findings of fact using each of the four statutory "factors", and made an ultimate finding that the

EXHIBIT 5 - PAGE 35

home use recording in issue was fair use (Pet. App. 56, 66-87).

Taking the factors ad seriatim, the district court found that the "purpose and character of the use" is to "increase access to the material U/D choose to broadcast", by only the audience U/D intended to view the material (Pet. App. 81-2). "This increase in access" provides the larger audiences which U/D want, and "is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves" (Pet. App. 82; Columbia Broadcasting, supra, p. 102).

47 U.S.C. § 303(g) recognizes our country's policy to "generally encourage the larger and more effective use of radio in the public interest" -- and "radio" includes television (47 U.S.C. § 153(b); Allen B. Dumont Laboratories v. Carroll, 184 F.2d 153, 155 (3rd Cir. 1950)).

In National Broadcasting Co., supra, p. 216, Mr. Justice Black wrote:

"The 'public interest' to be served under the Communications Act is thus the interest of the listening public in 'the larger and more effective use of radio.' § 303(g). The facilities of radio are limited and therefore precious, they cannot be left to wasteful use without detriment to the public interest."
There is no more obvious "wasteful use" of broadcasting facilities than that which occurs when a program is transmitted at a time when those for whom it is intended and who wish to receive it cannot sit in front of their TV sets. Betamax provides a means of helping to reduce that waste.

In Williams & Wilkins Co., supra, the Court of Claims held that "intrinsic" use (viz., use of a copy for the same purpose as the original would be used) could be (and was) fair use. The court there was dealing with Xerox reproductions of medical journal articles.

The Solicitor General's brief to the Supreme Court in Williams & Wilkins Co., supra, said:

"[T]he copying of a material for private use may well be outside the scope of the Copyright Act ab initio; at least, the fact that the copy is made for personal use and not for commercial benefit is strong support for the conclusion that it is a non-infringing fair use." (p. 26).

In contrast, the Court of Appeals below held that home recording of off-the-air TV was precluded, per se, from being fair use because it was "intrinsic use". n29 The Court of Appeals recited that, except for two cases -- viz., Williams & Wilkins Co. and the district court opinion herein -- fair use "has always had to do with the use by a second author of a first author's work." (Pet. App. 14-15, 19); it added, "the fair use doctrine does not sanction home video recording. Without a 'productive use', i.e., when copyrighted material is reproduced for its intrinsic use, the mass copying of the sort involved in this case precludes an application of fair use." (Pet. App. 18) and "Since the copies made by home videorecording [U/D's motion pictures or anything else] are used for the same purpose as the original, a finding of fair use is not justified" (Pet. App. 23) -- viz., no other fair use "factor" need be considered.

n29 Pet. App. 15. In fact, the premise of the holding literally is erroneous. The

22

EXHIBIT 5 - PAGE 36

"original" is used commercially to gain revenue by licensing; the "copies" are used non-commercially merely to consummate the private home viewing contemplated by such licensing.

   The Court of Appeals' rejection of any copying for purposes of "convenience" or "increased access" also was ill-taken (Pet. App. 14).  After citing an example where copying for convenience and increased access would be fair use (viz., off-the-air recording by a school for delayed viewing in the classroom), the 1975 Senate Report, pp. 65-6, cautioned that not all copying for such purposes necessarily would be fair use by making a statement often quoted out-of-context by respondents -- viz., "The Committee does not intend to suggest, however, that off-the-air recording for convenience would under any circumstances, be considered 'fair use'".

   This inflexible holding of the Court of Appeals is completely contrary to the spirit of § 107 -- which is not intended to "freeze" fair use to any "exact rules" but rather is to enable adaptation on a "case-by-case basis".

   As to the factor of "nature of the copyrighted work" (which encompasses more than just "subject matter" nature -- e.g., "out-of-print" nature, 1975 Senate Report, 64), the district court found that the "most important aspect" was that the case involves only works "which plaintiffs voluntarily choose to have telecast over public air waves to individual homes free of charge" (Pet. App. 79-80).  U/D voluntarily exploit their works by commingling them with all the other programming on free off-the-air TV -- programming whose "subject matter" nature runs the gamut, and 95 + % of which programming has been available for unchallenged home reception by home VTR.  U/D have "no control over the segment of the population which may view the program" (Teleprompter, supra, p. 412); and they should have no control over "how" the population "receive" the program nor over when they view it.

   "[A] court should... allow temporary taping for delayed viewing purposes... Temporary copying simply achieves the access the copyright owner wants viewers to have anyway...." (31 Stan. L. Rev. 243, 263, 255 (1979)).

   The fact that the works of U/D (and of their supporting amici curiae ) may be "entertainment" in subject matter nature (which is all the Court of Appeals focused on -- Pet. App. 14, 20) is no determinant in generalized testing for fair use re home recording.  Many other televised works may inform or educate; all may provoke thought, comment and reaction.

   "The line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such line can be drawn at all." Stanley v. Georgia, supra, p. 566.

   The factor of "effect [if any] of the use upon the potential market for or value of the copyrighted work" often has been described as the most important test for fair use.  In short, does the use harm the value of the copyrighted work?  The details on this issue of the case have not been understood nor accurately portrayed by the Court of Appeals or by any commentator.

   Beneath all the trappings and embellishments, this still is a case founded on alleged copyright infringement of 32 works -- no more, no less.  The district court found that home recording had caused no damage to these to date and did not

23

EXHIBIT 5 - PAGE 37

reduce their market.  Even when the evidence proceeded from these 32 works to the abstract, the district court still found no damage to date and no likelihood of future damage (Statement of the Case, supra, p. 15).

Arguments of theoretical "mass" recording (e.g., Pet. App. 24-25) overlook that "mass" viewing is exactly the purpose of free TV.  The home VTR enables nobody to record the broadcast who was not intended to see it.  Any theoretical "mass reproduction" necessarily would be limited to those members of the public to whom U/D's programs were broadcast; and any theoretical "cumulative effect" of home recording could be nothing more than a contribution to the home viewing intended when the program was broadcast.  n30

n30 Congress has exempted from infringement cable systems which enhance viewing only within the local geographical service area of the broadcast station, because there is no harm to the copyright owner (17 U.S.C.  § 111; 1976 House Report, 90); this Court had done similarly in Fortnightly, supra; the same reasoning supports Congress' manifested intent that home VTR usage, which does only the same, was fair use (infra, part II).

The evidence showed that the increase in viewing would be measured and paid for under existing practice.  But even if VTR viewing required some modification in "existing economic arrangements", the copyright law affords no protection against such modification (Teleprompter, supra, p. 414 n. 15).

The Court of Appeals totally ignored all the district court's critical and well supported findings as to the absence of damage, substituting therefor several of its recurrent "it seems clear"-type ipse dixit statements -- e.g., "it seems clear that it [home recording] tends to diminish the potential market for appellants' works" n31 (Pet. App. 25).

n31 The Court of Appeals acknowledged that the district court's elaborate, painstaking, and thoughtful opinion... carefully outlined the facts" -- but then unbelievably said "it would be a complete waste of judicial time and effort and of no benefit to the Bench or bar to here [in the Court of Appeals' opinion] repeat those facts...." (Pet. App. 3).

The factor of "amount and substantiality of the portion used" was recognized by the district court as "inextricably bound with the issue of harm" or "effect" (Pet. App. 82); manifestly, in the normal commercial case, the greater the "amount" used, the greater the likelihood of an "effect".  However, in this case, there is no "harm" or "effect" from time shifting.  And there is no "amount" of copying which, per se, is determinative of fair use.  n32

n32 "It has sometimes been suggested that the copying of an entire copyrighted work, any such work, cannot ever be 'fair use', but this is an overbroad generalization, unsupported by the decisions and rejected by years of accepted practice." Williams & Wilkins Co., supra, p. 1353.

EXHIBIT 5 - PAGE 38

Moreover, the brief duration of the VTR recording counterbalances its "amount and substantiality".

II.

LEGISLATIVE HISTORY CONFIRMS HOME RECORDING TO BE A "FAIR USE" LIMITATION ON THE COPYRIGHT MONOPOLY.

There is an obvious constitutional question as to whether Congress could empower U/D to prevent reception of public broadcasts of their copyrighted works with a home VTR.  But that question is not reached in this case, because Congress did not consider the 1909 Act to do so, and did not intend the 1976 Act to do so.

Legislative history of the 1976 Act shows that Congress did not intend or regard home use recording to be copyright infringement.  The rebuttal to any assertion that Congress did not give "considered review" to a specific or express exemption or limitation (as in §§ 108-118) for home audio or video recording (Pet. App. 11) is that such a review was not necessary -- there was no diversity of opinion.  By 1971, Congress, the record industry and the movie industry all were well aware of the existence of home audio and video recording and, in the course of considering other related matters, Congress had manifested clearly its belief and intention that all such home recording was fair use. All the hallmarks of legislative intent are present -- a Committee report, floor debates, statements of a sponsor of the 1976 Act, and interpretations of the Copyright Registers who drafted the 1976 Act.  n33

n33 Dawson Chemical Co. v. Rohm & Hass Co., 448 U.S. 176, 224, 236 (1980), reh. den. 448 U.S. 917 (1980); Tennessee Valley Authority v. Hill, 437 U.S. 153, 178 (1978); Simpson v. United States, 435 U.S. 6, 13 (1978); Zuber v. Allen, 396 U.S. 168, 192 (1969); NLRB v. Fruit Packers, 377 U.S. 58; 66 (1964); Schwegman Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-5 (1951).

The District Court examined legislative history of the 1976 Act at length (Pet. App. 56-65).  In contrast, the Court of Appeals said that the 1976 Act "is clear and unequivocal on its face" and hence that legislative history "is entirely beside the point" and "is not relevant" -- and that resort to it "is entirely unnecessary" (Pet. App. 11-12).  The Court of Appeals said that "our concern must be whether Congress has exhibited the intent to limit the rights of copyright owners in ways not specified in §§ 107-118." (Pet. App. 7).  But even an abridged review of legislative history shows that Congress regarded and intended home recording, video and audio, to be fair use and thus to be precisely within the exceptions or limitations specified in § 107 -- and therefore never made a particular express statutory exception as to either.

Revision of the 1909 Act into the 1976 Act commenced with the Legislative Appropriations Act of 1955; n34 legislative history of the 1976 Act literally spans "the 20 year copyright revision process" (Pet App. 11; just as the 1952 patent law revision legislative history spanned several Congresses -- see Dawson, supra, pp. 204-12).

n34 Fortnightly Corp., supra, p. 396 n. 17.

25

EXHIBIT 5 - PAGE 39

In 1961, the Register of Copyrights (Abraham L. Kaminstein) reported to Congress n35 that unauthorized performances of motion pictures in the home should not constitute copyright infringement because, inter alia:

n35 Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law (1961) -- the "Register's 1961 Report".

"As a practical matter, unauthorized private performances could rarely be discovered or controlled...."; and

"New technical devices will probably make it practical in the future to reproduce television motion pictures in the home.  We do not believe the private use of such a reproduction can or should be precluded by copyright." (p. 30) (see Appendix D hereto).

In 1965, the Register of Copyrights further reported to Congress about "the imminent development of home video tape recordings." n36

n36 Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill -- the "Register's 1965 Report".

On June 16, 1965 Adolph Schimel, Vice President and General Counsel of Universal's predecessor in interest, Universal Pictures Co., Inc., and Chairman of the Law Committee of the MPAA (composed of the general counsel for the principal member companies of MPAA), presented to the House Judiciary Committee a statement of the Copyright Committee of the MPAA which showed full awareness of the fact that Sony was about to place a consumer VTR on the market -- and which made no assertion that home use recording or playback should be infringement:

"... home video tape recordings are an imminent development.  The New York Times for June 9, 1965 confirms that in a few weeks Sony Corporation will be selling for $995 a Videocorder which is a portable home video recorder." n37

n37 Hearings before Subcommittee No. 3 of the House Judiciary Committee, 89th Cong., 1st Sess., Serial No. 8, Part 2, p. 1033.  Another witness at the House Committee hearing was Spencer C. Olin, then a vice president and general attorney of Disney, who stated on behalf of his company:

"We are fully in accord with and adopt:

"The statement filed on June 16, 1965, in behalf of the member companies of the Motion Picture Association of America, particularly the statements of Mr. Schimel...." Id. p. 1545.

In 1971 the 92nd Congress took a "fragment" (S. 646, previously S. 4592 in the

26

EXHIBIT 5 - PAGE 40

91st Congress) from the over-all pending copyright revision bill (S. 644), and
enacted the fragment into law in October as the "1971 Amendment" to the 1909 Act.
n38 The purpose was to give copyright protection against commercial piracy to
sound recordings (phonograph records), which theretofore had no copyright
protection at all, in advance of passage of the entire revision bill.

   n38 Sound Recordings Act of 1971, Public Law 92-140, 85 Stat. 391 (see Appendix
E hereto).

   Prior to passage of the 1971 Amendment, at a hearing held on the House
counterpart "fragment" bill (H.R. 6927) in June 1971, Ms. Barbara A. Ringer,
Assistant Register of Copyrights for Examining who became Register of Copyrights in
1971, stated that the 1971 Amendment was not intended to preclude home off-the-
air recording.  n39

   n39 "MR. (EDWARD) BEISTER (R. Penn.): ...  I can tell you I must have a small
pirate in my own home.

   "My son has a cassette tape recorder, and as a particular record becomes a hit, he
will retrieve it onto his little set.

   "Now, he may retrieve in addition something else onto his recording, but
nonetheless, he does retrieve the basic sound, and this legislation, of course, would
not point to his activities, would it?

   "MISS RINGER: I think the answer is clearly, 'No, it would not.'

   "I have spoken at a couple of seminars on video cassettes lately, and this question
is usually asked: 'What about the home recorders?'

   "The answer I have given and will give again is that this is something you cannot
control.  You simply cannot control it.

   "...  I do not see anybody going into anybody's home and preventing this sort of
thing, or forcing legislation that would engineer a piece of equipment not to allow
home taping." (emphasis added)
Hearings before Subcommittee No. 3 of the House Judiciary Comm., 92nd Cong., 1st
Sess. on S. 646 and H.R. 6927, June 9 and 10, 1971, pp. 22-23.

   The witness who followed Ms. Ringer at the same hearing was Stanley M. Gortikov,
who appeared on behalf of the Record Industry Association of America, Inc.  He
differentiated between commercial piracy recording and home recording, agreeing
that home recording could not be and was not intended to be controlled. n40

   n40 Gortikov stated: "[T]he pirate also argues that granting a copyright may raise
questions about the individual who in his home may duplicate a commercial
performance on home-recording equipment. We in the industry certainly have known
that such amateur practices go on in the home, and we realistically recognize that no

27

EXHIBIT 5 - PAGE 41

such enforcement is possible, and certainly none is intended." (emphasis added) Id. p. 26.

The full House Committee on the Judiciary, in the 1971 House Report, made it clear that sound recording copyright owners were not to get any broader protection under the 1971 Amendment than other copyright owners (i.e., motion picture owners) already had under the 1909 Act -- viz., the motion picture owners did not have, and the sound recording owners were not getting, the right to restrain home recording for private use.  n41

n41 The 1971 House Report stated:

"Home Recording.

"In approving the creation of a limited copyright in sound recordings it is the intention of the Committee that this limited copyright not grant any broader rights than are accorded to other copyright proprietors under the existing title 17. Specifically, it is not the intention of the Committee to restrain the home recording, from broadcasts or from tapes or records, of recorded performances, where the home recording is for private use and with no purpose of reproducing or otherwise capitalizing commercially on it.  This practice is common and unrestrained today, and the record producers and performers would be in no different position from that of the owners of copyright in recorded musical compositions over the past 20 years." (emphasis added)
1971 House Report, p. 7.

Infringement is the unauthorized use of copyrighted material in a way inconsistent with the "exclusive rights" of the copyright owner as defined by the copyright act (17 U.S.C.  § 501(a); Teleprompter, supra, p. 398 n. 2; Fortnightly, supra, p. 395 n. 10). Since the exclusive rights are a matter of joint intendment by both the Senate and the House, the lack of intendment by either legislative body as to any particular right is relevant.

That the grant of the exclusive right to reproduce was not intended to preclude non-commercial home recording was further shown in an exchange between Representative Kazen (D. Tex.) and Representative Kastenmeier (D. Wis. -- Chairman of the House Judiciary Committee since 1969) on the House floor just a few days prior to passage of the 1971 Amendment.  n42

n42 "MR. KAZEN.  Am I correct in assuming that the bill protects copyrighted material that is duplicated for commercial purposes only?

"MR. KASTENMEIER.  Yes.

"MR. KAZEN.  In other words, if your child were to record off a program which comes through the air on the radio or television, and then used it for her own personal pleasure, for listening pleasure, this would not be included under the penalties of this bill?

28

EXHIBIT 5 - PAGE 42

"MR. KASTENMEIER: This is not included in the bill. I am glad the gentleman raises the point.

"On page 7 of the report, under 'Home Recordings', Members will note that under the bill the same practice which prevails today is called for; namely, this is considered both presently and under the proposed law to be fair use. The child does not do this for commercial purposes.  This is made clear in the report." (emphasis added)
117 Cong. Rec. 34748-49 (October 4, 1971).

The 1971 Senate and House Reports and other legislative history of the 1971 Amendment clearly are an integral part of the legislative history of the 1976 Act, as shown by a letter dated January 19, 1971 from the Librarian of Congress to the Chairman of the Senate Judiciary Committee n43 (Dawson, supra, p. 204; Baldridge v. Shapiro, 50 U.S.L.W. 4227, 4230 n.10 (1982)).  The 1971 House Report likewise shows that the 1971 Amendment was intended to become a part of what ultimately proved to be the 1976 Act (see Appendix F hereto).  And attached to the 1971 House Report was another letter from the Librarian of Congress, this time to the House Judiciary Committee, dated May 25, 1971, stating that the 1971 Amendment would be merged into the ultimate general revision (viz., the 1976 Act -- see Appendix G hereto).

n43 "In general, we also support the amendatory language adopted in the bill [S. 4592] which draws heavily upon the language of the bill for general revision of the copyright law. ...

"The most fundamental question raised by the bill is its relationship to the program for general revision of the copyright law.  The revision bill before your committee this past session and which Senator McClellan proposes to reintroduce, has parallel provisions, and if general revision were on the threshold of enactment S. 4592 would be unnecessary...  Upon enactment of the revision bill, they [the amendments proposed in S. 4592] would, of course, be merged into the larger pattern of the revised statute as a whole." (emphasis added)
1971 Senate Report, pp. 7-8.

Barbara Ringer, as Register of Copyrights, was requested by the House Judiciary Committee to testify at the 1975 hearings on the House general copyright revision bill and to submit the comments of the Copyright Office in writing, which she did. n44

n44 Second Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law (1975) -- the "Register's 1975 Report".

The Register's 1975 Report states that what Ms. Ringer sought to do for Congress in respect of the bill then pending for the general revision of the copyright law was:

"... to identify what I considered the main issues remaining after a decade of sporadic legislative considerations of the general revision bill...."

29

EXHIBIT 5 - PAGE 43

Thus, questions which theretofore had been resolved were not the subject of discussion in 1975 when the bill soon to be enacted as the 1976 Act was being considered.  Since the matter of the right of the public to reproduce programs off-the-air had been resolved in 1971, there was no reason to discuss it in 1975 -- and Ms. Ringer did not do so.  It was not one of the main issues remaining. So also, neither the 1976 House Report nor the 1975 Senate Report mentions the subject of the right of the public to reproduce programs off-the-air, because that subject already had been settled.  n45

n45 The Copyright Office's Circular R-99: "Highlights of the New Copyright Law", Aug. 1977, reprinted in Copyright Law Reporter (CCH) P15,494, recognizes that the 1976 Act incorporates the operative provisions of the 1971 Amendment. It states:

"The new law retains the provisions added to the present copyright law in 1972, which accords protection against the unauthorized duplication of sound recordings."

The pertinent provisions of the 1976 Act, signed into law October 19, 1976, are virtually identical in substance to the 1971 Amendment.

The legislative history thus shows, beyond question, that Congress, in granting "the exclusive right... to reproduce" to copyright owners in the 1971 Amendment and in the 1976 Act, did not intend thereby to bar recordings (audio or video) off-the-air in the home for private use -- even though home recording was not among the express exemptions contained in § 1(f) of the 1909 Act or in §§ 108-118 of the 1976 Act.  Congress regarded such recording as fair use.  As stated by the Court of Appeals, fair use is "'the most troublesome [doctrine] in the whole law of copyright.'" (Pet. App. 12-13).  Since unequivocal aid to the construction of § 107 vis-a-vis home recording is available in the legislative history, such resort should have been made by the Court of Appeals.  n46

n46 Train v. Colorado Public Interest Research Group, 426 U.S. 1, 9-10 (1976); United States v. American Trucking Associations, 310 U.S. 534, 544 (1940).

III.

THE MANUFACTURE, SALE AND/OR ADVERTISEMENT OF A STAPLE ITEM OF COMMERCE (THE VTR) PER SE SHOULD NOT CONSTITUTE CONTRIBUTORY INFRINGEMENT EVEN IF SOME HOME RECORDING WERE DIRECT COPYRIGHT INFRINGEMENT.  n47

n47 If home recording of free off-the-air television is not direct copyright infringement then, of course, there can be no contributory infringement (Dawson, supra, p. 216; Aro Mfg. Co. v. Convertible Top Co., 377 U.S. 476, 483 (1963) ("Aro II" )).

Contributory infringement is the question of the most importance to, and impact upoin, the public.  This is the question of whether two copyright owners (or even a

30

EXHIBIT 5 - PAGE 44

limited group of copyright owners), who provide a very small portion of free off-the-air TV programming, can prevent home VTR reception of their programming by depriving the entire nation of home VTRs and thereby ending free off-the-air home VTR reception of any and all programming.  (An analogous question was answered negatively by this Court in Aiken, supra, p. 162.)

If each home VTR owner were held accountable for his own use of the home VTR, then suppliers could continue to make home VTRs available.  But if suppliers are held accountable as contributory infringers in lieu of the home VTR owners, over whom they have no control, then the supply of home VTRs (and home VTR reception) will terminate.

The factual findings and uncontradicted evidence crucial to the issue of contributory infringement are that: the home VTR is a staple item of commerce which is used for substantial free off-the-air TV reception where no infringement could be alleged (e.g., recording material which is not copyrighted or where permission to record is given); in fact, the amount of free off-the-air TV programming available for unchallenged home VTR reception far exceeds that which is challenged; no petitioner in any way induced or caused to be made any home VTR recording of any U/D work; no petitioner had the right or the ability to control any purchaser's use of Betamax at home; no petitioner did anything to cause any Betamax owner to believe that home recording of U/D's works was lawful; petitioners warned each Betamax owner of the copyright infringement potential in unauthorized recording, although they believed all off-the-air home VTR recording was lawful and could not have known otherwise.  (Statement of the Case, supra, 10, 4, 12, 3 n.4).

Another relevant fact, established since the Court of Appeals' decision and since the Petition for Certiorari herein was filed, is that U/D have represented to the public, obviously in consideration of anticipated good will, that no suit or action ever will be brought against individual Betamax owners for any home VTR recording of U/D's works -- a representation that encompasses not only past recordings but all future recordings without limit (see Appendices A, B hereto).

Copyright infringement, like patent infringement, is a tort.  n48 A contributory infringer is a species of joint-tort-feaser, who is held liable because he has contributed with another to the causing of a single harm to the plaintiff.  n49 The question is -- what must that "contribution" be?


n48 Ted Browne Music Co. v. Fowler, 290 F. 751, 754 (2nd Cir. 1923): Thomson-Houston Elec. Co. v. Ohio Brass Co., 80 F. 712, 721 (6th Cir. 1897).

n49 Dawson, supra, p. 186; Aro II, supra, p. 500; Thomson-Houston Elec. Co., supra, p. 721.


One kind of potential "contribution" long recognized in patent law has been supplying the direct infringer of a "combination" patent with an "article" which is comprised of some, but less than all, of the "elements" of that combination -- following which, the direct infringer adds the missing "elements" and thereby completes the infringing combination.  After years of judicial and legislative consideration of such contribution and its corollaries -- as early as Wallace v.

EXHIBIT 5 - PAGE 45

Holmes, 29 F. Cas. 74 (No. 17, 100) (C.C. Conn. 1871); as recently as 35 U.S.C. § 271(c) (1952) and Dawson Chemical Co. v. Rohm & Hass Co., 448 U.S. 176 (1980) -- the patent law today is that the supply of "a staple article or commodity of commerce suitable for substantial non-infringing use" does not, per se, constitute contributory infringement when a consumer uses that article or commodity for direct infringement.  The definitions of the adjectives "staple" and "substantial" are not precise, n50 but their combined requirements have been satisfied wherever there was any genuine and significant non-infringing use. Wherever the line is drawn, Betamax obviously would be well on the non-infringing side of it.  The reason for such a doctrine is self-evident -- any other conclusion would extend the patentee's monopoly beyond his patent claims and would "block the wheels of commerce".  n51

   n50 Dawson, supra, p. 186, n.6.

   n51 Henry v. A.B. Dick Co., 224 U.S. 1, 48 (1912); overruled on other grounds by Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 518 (1917). Also, if a product is suitable for substantial non-infringing use, its supply per se cannot imply any knowledge, intent or inducement on the part of the supplier that the consumer will use it for an infringing purpose (Rupp & Wittgenfeld v. Elliott, 131 F. 730, 733 (6th Cir. 1904)).

   An analogous doctrine in copyright contributory infringement was suggested by Justice Holmes in Kalem Co. v. Harper Bros., 222 U.S. 55, 62 (1911): n52

   n52 Kalem Co. is the only Supreme Court case to consider the issue of copyright contributory infringement.  Resolution of copyright infringement questions by resort to patent infringement analogies is well precedented -- e.g., Sheldon v. Metro-Goldwyn-Mayer Corp., 309 U.S. 390 (1939); see 27 Iowa Law Review 250 (1942).

   "The most innocent objects... may be used for unlawful purposes...

   "In some cases where an ordinary article of commerce is sold nice questions may arise as to the point at which the seller becomes an accomplice in a subsequent illegal use by the buyer.  It has been held that mere indifferent supposition or knowledge on the part of the seller that the buyer... is contemplating such unlawful use is not enough to connect him [seller] with the possible unlawful consequences...."
In Kalem Co., "no such niceties [were] involved" -- the "ordinary article of commerce" was a motion picture which, together with its exhibition, constituted an infringing dramatization of the copyrighted book "Ben Hur".  However, no suggestion was made by the parties or the Court that the suppliers of the cameras and blank film, by which the motion picture was made, should even be contemplated as contributory infringers.

   If supplying Betamax, per se, were to be held contributory infringement, then the supplier of every camera, typewriter, pen, Xerox machine, etc. used in copyright infringement likewise would be a contributory infringer.  Such never has been, and should not now be made, the law.  n53

32

EXHIBIT 5 - PAGE 46

n53 The Court of Appeals said the district court's "reliance on the "staple article of commerce' theory was inappropriate" (Pet. App. 25-6) -- apparently meaning "factually", since no review of the law was made.  Again contravening the district court's critical and well supported findings, the Court of Appeals found VTRs "are not 'suitable for substantial noninfringing use'" based on its ipse dixit factual statement that "Virtually all television programming is copyrighted material".  This latter erroneous and misleading factual statement ignores the findings and evidence of substantial uncopyrighted programming and copyrighted programming whose owners consent to home recording.

The other kind of potential "contribution" to copyright infringement obviously can be intentionally causing or inducing it.  The Second Circuit has rendered a widely quoted test for such contributory copyright infringement:

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." n54

n54 Gershwin Publishing Corp. v. Columbia Artists Management Inc., 443 F.2d 1159, 1162 (2d Cir. 1971).

But even if such a broad test is accepted, the findings and the evidence are that petitioners lacked knowledge (aside from their "indifferent supposition or knowledge" that consumers would be recording TV broadcasts in general) and did not induce, cause or materially contribute.  n55 In fact, U/D never claimed petitioners made any such contribution -- other than U/D's claim that mere supply of the VTR per se constituted doing so.

n55 The Court of Appeals again ran rough-shod over the district court's critical and well supported findings by saying, without explaining.  "There is no doubt that [petitioners] have met the other requirements for contributory infringement -- inducing, causing, or materially contributing to the infringing conduct of another. The corporate appellees are sufficiently engaged in the enterprise to be held accountable." (Pet. App. 27).

There are a myriad of cases on this kind of contributory copyright infringement, many or most being considered in briefs to the district court, n56 but not one of them is sufficiently in point to warrant citation to this Court -- none of them even proposes liability on the supplier of a device used by a direct infringer to accomplish an infringement.

n56 E.g., see docket entries 87-4/17/79, pp. 60-9, and 91-5/15/79, pp. 24-8.

In summary, if the findings and the evidence are to be respected, and if existing law is to be followed, there is no basis whatsoever for holding any petitioner to be a contributory infringer as to any alleged infringement in issue.

33

EXHIBIT 5 - PAGE 47

Finally, U/D's public representation to Betamax owners that they never will be sued for recording may be a "release" of the public as to past recordings which would not also release petitioners if they were contributory infringers (Aro II, supra, pp. 500-2); but that part of U/D's representation which encompasses future recordings is a "future license" to the public as a matter of law, which not only negates direct infringement but also inescapably negates contributory infringement by petitioners, whether U/D so intended or not (Aro II, supra, pp. 493-500).  By their blatant and crass afforts to curry public favor while they try to shut down the home VTR industry, U/D have hoisted themselves with their own petard.  Moreover, equity should not allow U/D to encourage direct infringement by publicly immunizing it, and then to hold petitioners liable therefor as contributory infringers.

IV.

NEITHER THE 1909 ACT NOR THE 1976 ACT ENABLES A FEDERAL COURT TO IMPOSE A COMPULSORY LICENSE ON A COPYRIGHT OWNER, AND TO IMPOSE CONTINUING ROYALTIES ON AN INFRINGER, AS A REMEDY FOR STATUTORY COPYRIGHT INFRINGEMENT.

An injunction is a discretionary remedy for copyright infringement n57 -- a remedy which respondents not only seek in this action but also continue to seek in the RCA et al. case and the Betamax II case (see Appendix H hereto). Statutory damages are available under the 1909 Act "in lieu of", and under the 1976 Act "instead of", actual damages and profits; n58 respondents also seek statutory damages in this action (R. 3260).

n57 § 112 of the 1909 Act, § 502(a) of the 1976 Act; 1976 House Report p. 160; Senate Study on Copyright Law Revision, Committee on the Judiciary Pursuant to S. Res. 240, Studies 22-25, 86th Cong. 2d Sess., p. 127.

n58 § 101 (b) of the 1909 Act; § 504 of the 1976 Act.

Apparently sensing that either an injunction or the imposition of statutory damages on manufacturers, distributors, retailers and advertisers would bring the supply of home VTR's to a halt, the Court of Appeals lent its authority to an unsupported suggestion in a treatise and told the district court that "a judicially created compulsory license" with a "reasonable" and "continuing royalty... may very well be an acceptable resolution" (Pet. App. 28-9).

However, there is no statutory provision or decisional precedent for compulsory licensing as a judicial remedy for any copyright infringement. Unlike the Court of Claims in Williams & Wilkins Co., supra, p. 1360, the Court of Appeals did not recognize that "Intermediate or compromise solutions are not within our authority". Moreover, no meaningful license could be created between the suppliers of only one brand of home VTR and only two copyright owners; and no federal court in this case has jurisdiction to include anyone else in such a license.

CONCLUSION

First, U/D seek to make this case the first in American legal history to find as copyright infringement either (a) conduct taking place entirely in the privacy of the

EXHIBIT 5 - PAGE 48

home or (b) making a copy of anything solely for private personal use.

Second, U/D seek to make this case the first in American legal history to hold a manufacturer, distributor or advertiser of a staple article of commerce strictly "liable for such use" as a contributory infringer when the consumer uses that article in the course of direct infringement -- even though these parties did not induce, did not cause, did not and could not control, did not profit from, in no way were associated with, and warned the consumer against the possibility of, the direct infringement.

Third, U/D seek to elevate their profit motivation in commercial exploitation of the public airwaves over and above the public's interest, convenience and necessity in, and right to receive, those airwaves.

Any one such result would be groundbreaking; all three results in one case would be extraordinary and devastating -- not just to petitioners herein but to millions of consumers and businessmen across the country.

The case presented by U/D obviously merits no such decision.  People are seeing U/D's broadcast programs just as U/D intended and expected they would -- nothing more.  U/D are not being hurt; to the contrary, they are reaping a financial harvest through exploitation of air waves that belong to the public -- as well as getting a windfall from pre-recorded VTR cassette rentals and sales.

The facts, the law, and equity all are in petitioners' favor.  Petitioners pray the Court to reverse the Court of Appeals' opinion and to adopt the learned and well-reasoned opinion and judgment of the district court: viz., that home VTR reception of free off-the-air TV broadcasts, for home viewing, is not an infringement of respondents' copyrights; but even assuming, arguendo, that respondents' copyrights thereby were infringed, there was no contributory infringement by any petitioner.

Respectfully submitted,

DEAN C. DUNLAVEY, (Counsel of Record), DONALD E. SLOAN, Attorneys for Petitioners Sony Corporation of America, et al.

Of Counsel: MARSHALL RUTTER.

August 28, 1982.

APPENDIX A.

"... in the six years that this case has been pending no suits have been brought against individual VTR owners for VTR copying, and respondents have stated publicly that no such actions will ever be instituted".

Resp. Br. Opp. Cert. p. 6 (circa May 6, 1982)

"... I believe we have the authority not to proceed against people [VTR owners] who might otherwise be tort feasors of some sort.

"... I am the president and the chief operating officer of MCA, Inc., and if I really tell you that we are not going to proceed against any of those three million people [VTR owners], I really think that binds our company."

35

EXHIBIT 5 - PAGE 49

Sidney Sheinberg -- witness before the Senate Committee on the Judiciary re S 1758, Monday, November 30, 1981.

"10.  NOTE: [Universal] does not seek relief herein against any homeowners who have purchased videotape recorders and video cassettes and used them only in their own homes to make off-the-air recordings of televised motion pictures for private non-commercial playback in their own homes.  [Universal] contends that such recordings constitute infringements of its copyrights in such motion pictures, but [Universal] seeks relief herein with respect to such recordings only against the manufacturers, distributors, sellers and advertisers of such videotape recorders and video cassettes."

Complaint, the Betamax II case, filed July 2, 1982.

APPENDIX B.

WALT DISNEY PRODUCTIONS.

DISNE Y WS

For Release:

November 2, 1981

In response to numerous inquiries from the news media, Walt Disney Productions' chairman, E. Cardon Walker, issued the following statement related to the recent ruling by the United States Court of Appeals for the Ninth Circuit, on the subject of infringement of copyright laws:

"Walt Disney Productions welcomes and will support appropriate and meaningful legislation to eliminate any liability for individuals videotaping copyrighted television programming for personal use off their home TV sets, as long as safeguards are also provided to prohibit mis-use of creative product.

"Millions of families in the United States and around the world are now involved in videotaping programming in their own homes for their own private use.  We have no intention, in this or any other litigation, of pursuing individuals to interfere with this practice.

"We first initiated this case in 1976, more than five years ago, when there were relatively few tape recorders in homes.  Since that time we have come to realize that the interests of all concerned can be better accommodated by passage of new laws.

"We feel there is compelling justification for legislation to insure that specific limits be placed on the dissemination and distribution of copyrighted videotape materials beyond use in the home where it was recorded.

"Disney will continue to pursue the current litigation against the Sony Corporation, its distributors, retailers and advertisers, until an acceptable solution can be reached.

APPENDIX C.

EXHIBIT 5 - PAGE 50

"... holders of copyrights for television programs or their licensees are not paid directly by those who ultimately enjoy the publication of the material -- that is, the television viewers -- but by advertisers who use the drawing power of the copyrighted material to promote their goods and services.  Such advertisers typically pay the broadcasters a fee for each transmission of an advertisement based on an estimate of the expected number and characteristics of the viewers who will watch the program.  While, as members of the general public, the viewers indirectly pay for the privilege of viewing copyrighted material through increased prices for the goods and services of the advertisers, they are not involved in a direct economic relationship with the copyright holders or their licensees.

"By extending the range of viewability of a broadcast program, CATV systems thus do not interfere in any traditional sense with the copyright holders' means of extracting recompense for their creativity or labor.  When a broadcaster transmits a program under license from the copyright holder he has no control over the segment of the population which may view the program -- the broadcaster cannot beam the program exclusively to the young or to the old, only to women or only to men -- but rather he gets paid by advertisers on the basis of all viewers who watch the program.  The use of CATV does not significantly alter this situation.  Instead of basing advertising fees on the number of viewers within the range of direct transmission plus those who may receive 'local signals' via a CATV system, broadcasters whose reception ranges have been extended by means of 'distant' signal CATV rechannelling will merely have a different and larger viewer market. From the point of view of the broadcasters, such market extension may mark a reallocation of the potential number of viewers each station may reach, a fact of no direct concern under the Copyright Act. From the point of view of the copyright holders, such market changes will mean that the compensation a broadcaster will be willing to pay for the use of copyrighted material will be calculated on the basis of the size of the direct broadcast market argmented by the size of the CATV market.

"While securing compensation to the holders of copyrights was an essential purpose of that Act, freezing existing economic arrangements for doing so was not."

Teleprompter Corp. v. CBS, 415 U.S. 394, 411-13, 414 n. 15 (1974)

"The petitioners have not demonstrated that they cannot receive from a broadcaster adequate royalties based upon the total size of the broadcaster's audience.  On the contrary, the respondent points out that generally copyright holders can and do receive royalties in proportion to advertising revenues of licensed broadcasters, and a broadcaster's advertising revenues reflect the total number of its listeners, including those who listen to the broadcasts in public business establishments."

Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 163 n. 14 (1975).

APPENDIX D.

The Register's 1961 Report stated (pp. 28-30):

"a.  The Present Law.

"The present statute does not provide explicitly for the right to perform (i.e., to exhibit) a copyrighted motion picture.  Motion pictures were not mentioned in the act

EXHIBIT 5 - PAGE 51

of 1909.  By an amendment in 1912, they were added to the classes or works enumerated in section 5, but no corresponding amendment was made in section 1 to provide for the right to perform motion pictures.

"The courts have attempted to fill this gap by applying the terms of section 1 to the performance of motion pictures.  In several decisions the courts have held that dramatic motion pictures (photoplays) are a species of dramatic works and are therefore accorded the right of public performance given to dramatic works by section 1(d).  The more difficult problem of nondramatic motion pictures was presented to the Second Circuit Court of Appeals in Patterson v. Century Productions (93 F.2d 489 (1937)), in which an infringing copy of a documentary (nondramatic) motion picture had been made and exhibited publicly in a theater.  The court held that the exhibitor had infringed the copyright, on the ground that the projection of the motion picture on the theater's screen constituted the making of a 'copy' under section 1(a).  We believe this last decision is an example of the maxim that 'hard cases make had law.' In reaching what was no doubt a just result, and apparently seeing no other provision in the statute that would fit the case, the court stretched the concept of 'copying' to new lengths.  While that case involved a public exhibition, the theory of 'copying' on which the decision was based, if followed to its logical conclusion, would have a far-reaching effect: any unauthorized projection of a motion picture, private as well as public, would be an infringement of the copyright. Whether the court would so hold in a case involving a private projection is still a matter of conjecture."

"d.  Private Performances.

"Motion picture producers and distributors have urged that the performance right in motion pictures should extend to what are clearly private performances, including performances given in private homes.  They point to Patterson v. Century Productions, and its concept that exhibition is a form of 'copying,' to support their position.  Motion picture films are commonly leased for exhibition at specified places and dates.  Most leases are for commercial exhibitions, but many films are also leased for home use.  It is argued that in either case private exhibitions beyond the terms of the lease should constitute an infringement of copyright.

"This argument may have some theoretical plausibility, but we would question it for several reasons:

"Injury to a copyright owner from private performances beyond the terms of a lease would be minimal.  He may be entitled to the usual license fee as damages for a breach of contract, but the statutory damages for copyright infringement would be grossly excessive.

"As a practical matter, unauthorized private performances could rarely be discovered or controlled.

"Many motion picture films are sold for use in homes, schools, libraries, and the like.  The purchaser should not be subjected to the risk of liability for private performances that the copyright owner might contend are not authorized.

"New technical devices will probably make it practical in the future to reproduce televised motion pictures in the home.  We do not believe the private use of such a reproduction can or should be precluded by copyright." (emphasis added)

38

EXHIBIT 5 - PAGE 52

APPENDIX E.

The 1971 Amendment added subsection 5(n), "sound recordings".

The 1971 Amendment also added subsection 1(f), providing that the owner of copyright:

"shall have the exclusive right:

"(f) To reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording: Provided, That the exclusive right of the owner of a copyright in a sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form that directly or indirectly recaptures the actual sounds fixed in the recording: Provided further, That this right does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording; or to reproductions made by transmitting organizations exclusively for their own use."

The 1971 Amendment further added the following definitions to § 26:

"For the purposes of this section and sections 10, 11, 13, 14, 21, 101, 106, 109, 209, 215, but not for any other purpose, a reproduction of a work described in subsection 5(n) shall be considered to be a copy thereof.  'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture.  'Reproductions of sound recordings' are material objects in which sounds other than those accompanying a motion picture are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device, and include the 'parts of instruments serving to reproduce mechanically the musical work', 'mechanical reproductions,' and 'interchangeable parts, such as discs or tapes for use in mechanical music-producing machines' referred to in sections 1(e) and 101(e) of this title."
As amended Oct. 15, 1971, Pub. L. 92-140, § 1(e), 85 Stat. 391.

APPENDIX F.

The 1971 House Report (pp. 3-4) said:

"The creation of a limited copyright in sound recordings has been under active consideration by the Congress for a number of years in connection with the program for general revision of the copyright law.  The Library of Congress recommended the granting of such copyright protection in its recommendations for the general revision of the copyright law.

"The Committee regrets that action on the bill for general revision of the copyright law has been delayed, and that the problem of record piracy has not been dealt with as part of a broad reform of the Federal copyright statute.  We are persuaded that the problem is an immediate and urgent one, and that legislation to deal with it is needed now.  The seriousness of the situation with respect to record piracy, both

39

EXHIBIT 5 - PAGE 53

nationally and internationally, is unique, and our favorable action in this instance should not be interpreted as precedent for the enactment of separate legislation on other matters involved in copyright law revision.  On the contrary, we would be opposed to any effort to convert the general revision program into a program for revising the statute on a piecemeal basis."

APPENDIX G.

The May 25, 1971 letter from the Librarian of Congress to the House Judiciary Committee stated, in part:

"The most fundamental question raised by the bill is its relationship to the program for general revision of the copyright law.  As noted above, the revision bill now pending in the Senate has parallel provisions, and if general revision were on the threshold of enactment, S. 646 would be unnecessary.  However, some fundamental problems impeding the progress of general revision of the copyright law, notably the issue of cable television, have not yet been resolved.  We agree that the national and international problem of record piracy is too urgent to await comprehensive action on copyright law revision, and that the amendments proposed in S. 646 are badly needed now.  Upon enactment of the revision bill they would, of course, be merged into the larger pattern of the revised statute as a whole." (emphasis added)

APPENDIX H.

"But, of course, we are not going to be able -- the plaintiffs can't go chasing Sony for statutory damages for every copy made of every motion picture of theirs from here until the end of time.

"And that is really what this case is all about, that is, an injunction."

U/D's counsel of record -- R. 70-1

"Certainly at the very least we think that the Court should issue an injunction prohibiting the sale of Betamax...."

U/D's counsel of record -- R. 3278

"... plaintiffs submit that the Court should order defendants to make diligent effort to recall all Betamax VTR's previously sold in order to disable them from further recording."

U/D's Opening Post-Trial Memorandum, p. 71

"WHEREFORE, plaintiff prays for judgment against defendants, and each of them, jointly and severally, as follows:

"1.  That an injunction issue against defendants, and each of them, to protect plaintiff's copyrighted motion pictures from recording and copying on the aforesaid VTR's and video-cassettes."

Prayer excerpt, Complaint, the RCA, et al. case, filed November 6, 1981.

"WHEREFORE, plaintiff prays for judgment against defendants, and each of them,

40

EXHIBIT 5 - PAGE 54

jointly and severally, as follows:

   "1.  That an injunction issue against defendants, and each of them, to protect plaintiff's copyrighted motion pictures from recording and copying on the aforesaid VTR's and video-cassettes."

   Prayer excerpt, Complaint, the Betamax II case, filed July 2, 1982.

EXHIBIT 5 - PAGE 55

# Exhibit 6



# SONY CORP. OF AMERICA v. UNIVERSAL CITY STUDIOS, INC.

No. 81-1687
Supreme Court of the United States
October Term, 1982
August 27, 1982

**Reporter:** 1982 U.S. S. Ct. Briefs LEXIS 566

SONY CORPORATION OF AMERICA, et al., Petitioners, vs. UNIVERSAL CITY STUDIOS, INC. and WALT DISNEY PRODUCTIONS, Respondents.

**Type:** Brief

**Prior History:** [*1] On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit.

---

| Table of Authorities |
|---|

Cases

*Albuquerque Broadcasting Company v. Regents of N.M. College, 70 F. Supp. 198 (D.N.M. 1945),* aff'd *158 F.2d 900 (10th Cir. 1947)*

*Allen B. Dumont Laboratories v. Carroll, 184 F.2d 153 (3d Cir. 1950)*

*Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476 (1964)*

*Baldridge v. Shapiro, 50 U.S.L.W. 4227 (1982)* *Columbia Broadcasting v. Democratic Comm., 412 U.S. 94 (1973)*

*Dawson Chemical Co. v. Rohm & Hass Co., 448 U.S. 176 (1980),* reh. den. *448 U.S. 917 (1980)*

*Folsom v. Marsh, 9 Fed. Cas. 342,* No. 4901 (C.C.D. Mass. 1841)

*Fortnightly Corp. v. United Artists, 392 U.S. 390 (1968)*

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159 (2d Cir. 1971)* [*4]

*Goldstein v. California, 412 U.S. 546 (1973)*

*Henry v. A.B. Dick Co., 224 U.S. 1 (1912);* overruled on other grounds by *Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502 (1917)*

*Inwood Labs. v. Ives Labs., 50 U.S.L.W. 4592 (1982)*

*Kalem Co. v. Harper Bros., 222 U.S. 55 (1911)*

*Kleindienst v. Mandel, 408 U.S. 753 (1972)*

EXHIBIT 6 - PAGE 56

1982 U. S. S. Ct. Briefs LEXIS 566, *4

*Lawrence v. Dana, 15 Fed. Cas. 26,* No. 8136 (C.C.D. Mass. 1869)

MCA v. Wilson, 677 F.2d 180 (2nd Cir. 1981)

*Meeropol v. Nizer, 560 F.2d 1061 (2d Cir. 1977),* cert. denied, *434 U.S. 1013 (1978)*

*National Broadcasting Co. v. United States, 319 U.S. 190 (1942)*

*NLRB v. Fruit Packers, 377 U.S. 58 (1964)*

*Paris Adult Theatre I v. Slaton, 413 U.S. 49 (1973)*

*Red Lion Broadcast Co. v. FCC, 395 U.S. 367 (1969)*

*Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966),* cert. denied,
*385 U.S. 1009 (1967)*

*Rupp & Wittgenfeld v. Elliott, 131 F. 730 (6th Cir. 1904)*

*Schwegman Bros. v. Calvert Distillers Corp., 341 U.S. 384 (1951)*

*Sheldon v. Metro-Goldwyn-Mayer Corp., 309 U.S. 390 (1939)*

*Simpson v. United States, 435 U.S. 6 (1978)*

*Stanley v. Georgia, 394 U.S. 557 (1969)*

*Ted Browne Music Co. v. Fowler, 290 F. 751 (2d Cir. 1923)*

*Teleprompter Corp. v. CBS, 415 U.S. 394 (1974)*

Tennessee *Valley Authority v. Hill, 437 U.S. 153 (1978)*

*Thomson-Houston Elec. Co. v. Ohio Brass Co., 80 F. 712 (6th Cir. 1897)*

*Train v. Colorado Public Interest Research Group, 426 U.S. 1 (1976)*

*Triangle Publications v. Knight-Ridder Newspapers, 626 F.2d 1171 (5th Cir. 1980)*

*Twentieth Century Music Corp. v. Aiken, 422 U.S. 151 (1975)*

*United States v. American Trucking Associations, 310 U.S. 534 (1940)*

*United States v. United States Gypsum Co., 333 U.S. 364 (1948)*

*Universal City Studios v. Sony Corp. of America, 480 F. Supp. 429 (C.D. Cal. 1979), 659 F.2d
963 (9th Cir. 1981)*

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748 (1976)*

*Wallace v. Holmes, 29 F. Cas. 74* (No. 17,100) (C.C. Conn. 1871)

*Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973),* aff'd by an equally di-
vided court, *420 U.S. 376 (1975)*

*Zuber v. Allen, 396 U.S. 168 (1969)*

EXHIBIT 6 - PAGE 57

1982 U. S. S. Ct. Briefs LEXIS 566, *4

Constitutional Provisions

United States Constitution

Article 1, § 8, Cl. 8

First Amendment

Statutes

Copyright Act of 1909, 35 Stat. 1075 - 17 U.S.C.

§ 1

§ 101(b)

§ 112 **[*6]**

Sound Recordings Act of 1971, P.L. 92-140, 85 Stat. 391

Copyright Revision Act of 1976, P.L. 94-533, 90 Stat. 2541 - 17 U.S.C.

§ 101

§ 102

§ 106

§ 107

§ 108(h)

§ 111

§ 118(d)(3)

§ 301

§ 302(a)

§ 408

§ 411

§ 501

§ 502

§ 504

Trans. & Suppl. § 112

Judicial Code and Judiciary - 28 U.S.C.

§ 1254(1)

§ 1338(a)

EXHIBIT 6 - PAGE 58

Patent Act of 1952 - 35 U.S.C.

§ 271(c)

Communications Act of 1934 - 47 U.S.C.

§ 153(b)

§ 153(o)

§ 303(g)

§ 307(a)

§ 309(a)

§ 605

Rules

Fed. Rules Civ. Proc.

Rule 52(a)

Miscellaneous

House Judiciary Committee Report No. 94-1476, 94th Cong., 2d Sess. (1976) - "1976 House Report"

House Judiciary Committee Report No. 92-487, 92nd Cong., 1st Sess. (1971) - "1971 House Report"

H.R. Rep. No. 2222, 60th Cong., 2d Sess. (1909)

Senate Judiciary Committee Report No. 94-473, 94th Cong., 1st Sess. (1975) - "1975 Senate Report"

Senate Judiciary Committee Report No. 92-72, 92nd Cong., 1st Sess. (1971) - "1971 Senate Report"

Senate House Conference Committee Report, No. 94-1733, 94th Cong., 2d Sess. (1976) - "Conference Report"

Second Supplementary Report of the Register of **[*7]** Copyrights on the General Revision of the U.S. Copyright Law (1975) - "Register's 1975 Report"

Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill - "Register's 1965 Report"

Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law (1961) - "Register's 1961 Report"

H.R. 6927 (92d Cong.)

S. 646 (92d Cong.)

EXHIBIT 6 - PAGE 59

1982 U. S. S. Ct. Briefs LEXIS 566, *7

S. 644 (92d Cong.)

S. 4592 (91st Cong.)

Hearings, Subcommittee No. 3 of the House Judiciary Committee

92d Cong., 1st Sess

89th Cong., 1st Sess

127 Cong. Rec. No. 145, E4751, daily ed., Oct. 14, 1981

117 Cong. Rec. 34748-49 (Oct. 4, 1971)

Copyright Office Circular R-99 (1977)

27 Iowa L. Rev. (1942)

31 Stan. L. Rev. (1979)

---

**Counsel**

DEAN C. DUNLAVEY, (Counsel of Record), DONALD E. SLOAN, GIBSON, DUNN &
CRUTCHER, 515 South Flower Street, Los Angeles, Calif. 90071, (213) 488-7000, Attorneys
for Petitioners Sony Corporation of America, et al.

Of Counsel: MARSHALL RUTTER, RUTTER, EBBERT & O'SULLIVAN, Suite 2200, 1900
Avenue of the Stars, Los Angeles, Calif. 90067, (213) 879-9494.

---

**Title**

BRIEF FOR THE PETITIONERS.

---

**Text**

## QUESTIONS PRESENTED.

1. Is reception at home by videotape recorder (followed only by private viewing at home) of
free off-the-air television programming an infringement of statutory copyright on such program-
ming?

2. If the answer to Question No. 1 is "Yes", does the manufacture, sale and/or advertisement of a
home videotape recorder per se constitute contributory infringement whenever that videotape re-
corder is used for such reception at home?

3. Is "fair use" of a copyrighted work (17 U.S.C. § 107) limited to a "productive use", and pre-
cluded from being an "intrinsic use"?

4. Can a federal court impose a compulsory license on a copyright owner, and impose continu-
ing royalties on an **[\*2]**  infringer, as a remedy for statutory copyright infringement?

EXHIBIT 6 - PAGE 60

5. By totally ignoring the findings of fact of the district court, and by holding retailers liable for contributory infringement when they never were alleged to have such liability, did the Court of Appeals so far depart from the accepted and usual course of judicial proceedings as to call for an exercise of this Court's power of supervision?

The parties to the proceedings below are UNIVERSAL CITY STUDIOS, INC., a corporation ("Universal"), and WALT DISNEY PRODUCTIONS, a corporation ("Disney"), Respondents herein, Plaintiffs-Appellants below, v. SONY CORPORATION OF AMERICA, a corporation ("Sonam") -- distributor in America of a home videotape recorder called Betamax, SONY CORPORATION, a corporation ("Sony") -- manufacturer of Betamax; CARTER HAWLEY HALE STORES, INC., a corporation, ASSOCIATED DRY GOODS CORPORATION, a corporation, FEDERATED DEPARTMENT STORES, INC., a corporation, HENRY'S CAMERA CORPORATION, a corporation -- retailers of Betamax; DOYLE DANE BERNBACH, INC., a corporation ("DDBI") -- Sonam's former national advertising agency for Betamax; and WILLIAM GRIFFITHS, an individual: Petitioners herein (except Griffiths, **[*3]** who has no interest in the outcome of this petition or this case), Defendants-Appellees below. below.

A listing naming all parent companies, subsidiaries (except wholly-owned subsidiaries) and affiliates of each corporate petitioner has been included in the Petition; it currently is still accurate (Sup. Ct. Rule 28.1).

## OPINIONS BELOW

The Opinion of the Court of Appeals rendered October 19, 1981 is reported at *659 F.2d 963 (9th Cir. 1981)* -- Appendix A to the Petition for Writ of Certiorari (cited herein as "Pet. App. 1 et seq."). The Opinion of the United States District Court for the Central District of California entered October 2, 1979 is reported at *480 F. Supp. 429 (C.D. Cal. 1979)* -- Appendix B to the Petition (cited **[*8]** herein as "Pet. App. 31 et seq.").

## JURISDICTION

The Judgment of the Court of Appeals was entered on October 19, 1981. A Petition for Rehearing with a Suggestion for Rehearing in Banc was timely filed on November 2, 1981 and was denied by order dated January 12, 1982 -- Appendix C to the Petition (Pet. App. 118). The Petition for Writ of Certiorari was filed on March 12, 1982 and was granted on June 14, 1982. The jurisdiction of this Supreme Court is invoked pursuant to *28 U.S.C. § 1254*(1).

CONSTITUTIONAL PROVISIONS AND STATUTES INVOLVED

This case involves Article I, § 8, Cl. 8 of the United States Constitution and several sections of the Copyright Act of 1909 (the "1909 Act") and of the Copyright Revision Act of 1976 (the "1976 Act" -- effective January 1, 1978), n1 respectively, each of which is printed in full in Appendix D to the Petition (Pet. App. 119 et seq.). The pertinent sections of the 1976 Act are *17 U.S.C. §§ 101* (portions), 106, 107, 411, 501, 502(a) and 504. The pertinent section of the 1909 Act is former 17 U.S.C. § 1 (portions).  **[*9]**

## STATEMENT OF THE CASE n2

This is an action for alleged infringement of statutory copyright -- alleged to have occurred under Section 1(a) and (c) of the 1909 Act, and under Section 106(1) of the 1976 Act, by virtue of the tape recording made when (1) a home videotape recorder was used (2) to receive a free

EXHIBIT 6 - PAGE 61

off-the-air **[\*10]** television broadcast of a copyrighted work owned by a respondent (3) for the pur-
pose of home play-back and viewing. No infringement exists by virtue of home play-back and
viewing of such a recording *(17 U.S.C. § 106*(4)). Jurisdiction of the district court was invoked un-
der *28 U.S.C. § 1338*(a).

The basic issues in the case are (1) whether such a tape recording is a non-infringing "fair use",
and (2) whether the mere supply of a VTR per se constitutes contributory infringement if such a tape
recording constitutes direct infringement.

The home videotape recorder ("VTR" -- sometimes called a videocassette recorder or "VCR")
and the household TV set are similar in that both receive free off-the-air television broadcasting.
They are different in that the household TV set receives the broadcast electromagnetic signals
by converting them into sights and sounds simultaneously with the reception; in contrast, the home
VTR receives these signals by recording the video and audio components thereof on tape for play
-back through the TV set, and thereby for viewing and listening, at a later time. n3 Home use off
-the-air videotape recording has been **[\*11]** going on continuously in the United States since 1965
using home VTRs made by Sony and others n4 (Pet. App. 40, 43-44; R. 564, 575-6, 636, 638-
40, 670, 677-8, 738-40, 745-54, 756, 782-3, 790-2, 862-4, 955, 1567, 1668, 1684-5, 1791, 2061).
 **[\*12]**

Free off-the-air television is broadcast by at least 986 stations (another 1000-1500 low power
"neighborhood" stations are coming) for the purpose of furthering "the public interest, conve-
nience, and necessity" *(47 U.S.C. §§ 153*(b), 307(a), 309(a)); the public receives it lawfully be-
cause it "is broadcast… for the use of the general public..." *(47 U.S.C. §§ 153*(o), 605). There are
727 commercial television stations (supported by advertising), and 259 public/educational televi-
sion stations (supported by individual and governmental contributions), in the United States
(Pet. App. 50-54, 79-80).

The fact (shown hereinafter) perhaps most crucial to the ultimate practical resolution of this case
is that there is a wealth of television material broadcast by these 986 stations which is free for un-
challenged home use videotape recording -- including (a) programming which is registered for copy-
right by owners who do not object to home use recording, (b) programming which could be reg-
istered for copyright but which is not, and (c) programming which cannot be copyrighted --
and all of which programming actually is recorded for home use. The amount **[\*13]** of program-
ming available for unchallenged home recording far exceeds that which is challenged.

"Time shift" is home recording for the purpose of home viewing of the broadcast soon thereaf-
ter, following which the tape is erased in the course of recording something else -- it is the pri-
mary kind of home recording at issue herein n5 (Pet. App. 47-8, 107-112). As shown by sur-
veys, it is the predominant use of home VTRs. Time shift enables members of the public to view
programs which they otherwise would miss -- e.g., workers on a "night shift" now can view
"prime time" TV the next day n6 (Pet. App. 82, 108). The VTR thus provides the "societal ben-
efit" of furthering the "public interest, convenience, and necessity". **[\*14]**

A secondary kind of home recording, viz., "librarying", is retention of the recording for the pur-
pose of repeat home viewing (Pet. App. 107, 112). There was no evidence of any librarying of
any work of respondents, who could have probed the subject but elected not to do so. Moreover,
the kinds of movies and other works in libraries (e.g., entertainment, documentary, home mov-
ies, pre-recorded, etc.) were not delineated, nor was the length of time a recording needed to be re-
tained in order to qualify as librarying or the number of repeat viewings. Even in generalities,
"it has not been proven that many persons will 'library' to any significant extent" (Pet. App. 112).
The expense of tying-up tape in a library, and the availability of unedited and superior quality pre

EXHIBIT 6 - PAGE 62

-recorded cassettes for rental or sale, all led the district court to downplay librarying of any kind of programming and to reject respondents' "fear" of damage therefrom.

The district court felt that survey evidence of Betamax usage in general would be of interest to the appellate courts (R. B 89-90, B 129-31). Accordingly, Sonam provided Universal and Disney (collectively "U/D") with a list of 17,000 Betamax owners **[\*15]** -- a list from which the Field Research survey (PX 730 -- R. 1120) was made for U/D and the Crossley survey (DX [defendants' exhibit] OT -- R. 2308-9) was made for petitioners. n7

First and foremost, both surveys showed that Betamax is being used primarily for time shift. n8
 **[\*16]**

The Crossley survey showed that 49% of Betamax owners record professional baseball, football and/or hockey games (R. 2328; DX OT, Table 4). Major League Baseball (R. 2436-7, 2442-8), the National Football League (R. 2481-7), the National Basketball Association (R. 2511-16), the National Hockey League (R. 2531-34), and the National Collegiate Athletic Association (R. 2540-52) each testified it had no objection to home use videotape recording of its copyrighted broadcasts.

The Crossley survey showed that 10% of Betamax owners record religious programs (R. 2328; DX OT, Table 4). National Religious Broadcasters (25 of whose members own religious television stations -- R. 2564-76) and Faith Center (with religious television stations in Los Angeles, San Francisco and Hartford -- R. 2577-87) each testified it had no objection to home use videotape recording of its copyrighted broadcasts.

The Crossley survey showed that 63% of Betamax owners record educational programs (R. 2329; DX OT, Table 4-1). The Bureau of Mass Communications of the New York State Education Department (with nine educational television stations reaching 92% of the population of New York State -- R. 2593-2606, 2615-6; **[\*17]** DX PD, PE -- R. 2606), the Center for Library Media and Telecommunications of the Board of Education of the City of New York (channel 25 in New York -- R. 2623-40; DX PF -- R. 2640), the New Jersey Public Broadcasting Authority (with four educational television stations reaching 85% of the population of New Jersey -- R. 2823-44; DX PG -- R. 2844) and the Los Angeles City School Board of Education (channel 58 in Los Angeles -- R. 2863-2902; DX PI -- R. 2902) each testified it had no objection to home use videotape recording of its copyrighted material and its broadcasts. Respondent Universal even agreed expressly to recent "voluntary guidelines" outlining still additional areas of available educational off-the-air programming n9 (127 Cong. Rec. No. 145, E4751, daily ed. October 14, 1981).

The Crossley survey showed that 42% of Betamax owners recorded programs of the National Broadcasting Company (R. 2329; DX OT, Table 4-1). NBC is a wholly-owned subsidiary of RCA (R. 2980, 3008) and RCA sells its own brand **[\*18]** of home VTR called SelectaVision (R. 2978 -80). NBC owns the copyrights in many programs it broadcasts (R. 2984-3004; DX PM -- R. 2986). An NBC corporate planning staff made a study and reported in 1967 that the impact of home VTRs on commercial television broadcasting would be minuscule. In May 1978 the same NBC planning staff made an up-dated report which had no substantial variance as to home VTRs from the 1967 report. NBC believes that home video recording will expand television viewing rather than subtract from it, that such additional viewing will be measured, and that home VTRs will not significantly detract from television's mass audience. NBC believes there is no reason why it and the home VTR industry cannot grow prosper alongside of each other n10 (R. 3007-18; DX PH -- R. 3016-7).

EXHIBIT 6 - PAGE 63

Examples of entertainment-type programming available for home use Betamax recording [*19] with the owner's blessing included Mr. Rogers' Neighborhood, a television series produced for families with pre-school children and having a daily audience exceeding three million families (R. 2912-23; DX PK -- R. 2923), and a television series entitled Spider Man -- based on the comic strip character (R. 2929-39). There also are entertainment motion pictures broadcast on television as to which the copyright has expired, for example, the motion picture of Universal entitled My Man Godfrey (R. 2300-1).

In view of the facts (1) that any television program which is transmitted from tape, or which is taped while being transmitted live, can be registered for statutory copyright (17 U.S.C. §§ 101-2, 302(a), 408), (2) that any program which can be registered for statutory copyright cannot be the subject of any other kind of protection *(17 U.S.C. § 301)* and (3) that no action for infringement can be brought under the 1976 Act without prior registration and deposit of the tape *(17 U.S.C. § 411),* petitioners engaged Trendex, Incorporated to make a survey of the copyright practices of television stations (commercial, public/educational, [*20] and cable) concerning their self-produced (taped) local programming -- DX OV -- R. 2767-8. The results showed substantial local programming (including news, documentaries and public events -- kinds of programming recorded by 74% of Betamax owners -- R. 2328; DX OT, Table 4; DX OV, question 1; Pet. App. 52) which could have been copyrighted but which never could be the subject of an action for infringement because the tapes of such programming are soon erased and re-used (R. 1740-1; DX OV, question 6), thus making deposit and registration (and any action for infringement) impossible. Such programming is free for home recording. n11

Based on the aforesaid overwhelming evidence, inter alia, the district court made a first set of critical factual findings -- that "The videotape recorder, like a[n] [audio] tape recorder, is a staple item of commerce. Its uses are varied"; that the VTR is [*21]  "used for purposes where no infringement could be alleged (e.g., recording material which is not copyrighted or where permission to record is given)" (Pet. App. 92, 97, 104, 106-7, 114).

Respondents Universal and Disney interject themselves into the aforesaid custom and practice of extensive and legal home VTR recording by licensing their programming to commercial stations, for broadcast at times to be chosen by the stations. U/D desire that each broadcast of their programming be viewed by the maximum possible number of viewers, because U/D believe that larger audiences mean larger license fees (Pet. App. 36-39, 50-54, 110; R. 333, 341, 348, 498-9, 508-9, 997, 1253, 1266-7, 1281, 1309-10, 1441, 1447, 1717). But U/D then disrupt the custom and practice by being the only copyright owners ever to bring an infringement action against home recording (television or radio).

Disney's percentage of total commercial television broadcast time is de minimis, consisting of only one hour a week on network and one syndicated series that is out of production and tailing out of exhibition (Pet. App. 38-39; R. 314-5). And Universal's percentage in the Los Angeles market on commercial stations during [*22]  one week at the time of trial was under 5% (R. 532-3, 549-50). There was no evidence that U/D's works appear on public/educational stations at all.

U/D did not seek to hold anyone liable for direct infringement by home recording n12 (see Appendices A, B hereto). U/D sought to hold petitioners Sony, Sonam and DDBI liable for contributory infringement re home recording based on nothing more than the manufacture, sale and advertisement of Betamax. U/D sought to hold the four VTR retailers-petitioners liable only as direct infringers for demonstration recording they did in their stores. n13  [*23]

During a five week trial, U/D introduced evidence of 32 instances n14 f home recording of free off-the-air TV, by four Betamax owners. n15 This was the only evidence of infringement. U/D

EXHIBIT 6 - PAGE 64

knew of no other home recording of their works (R. 392-5, 1212) and expressly disclaimed seeking a finding of copyright infringement as to any other motion pictures (R.B 175).

As to these four Betamax owners, Griffiths is a time shifter who had recorded five Universal films (as well as documentaries and news, sport and political programs) and had erased, or intended to erase, all of them; his practice is "to record, to watch and erase and reuse" (Pet App. 43 -44; R. 1695-6). Soule is a time shifter who recorded two Universal films and had intended to erase them without viewing at all; normally he watches once and then erases (Pet. App. 46-47; R. 1596, 1600). Lowe was selected **[*24]** by U/D as an extremist because he publishes a home VTR magazine, but still he is just a time shifter as to the films in issue; he or his son had recorded one Universal film, and six Disney cartoons to watch together after his work and then to erase (Pet. App. 46; R. 1653, 1665-7). Wielage also was selected by U/D as an extremist in that Betamax is his primary hobby and he writes for Lowe's magazine; even so, his recordings are for his own personal use, he watches them alone or with a few friends, and he erases when he is finished (pet. App. 44-45; R. 837, 866).

Based on the evidence pertaining to these home recordings in issue, the district court made a second set of critical factual findings -- "that there was no evidence at trial that any advertisements or other statements by [petitioners] in any way induced or caused to be made any of the copies at issue"; and petitioners "have neither the right nor the ability to control Betamax purchasers' use of the machine in their homes" (Pet. App. 93-4, 96-7, 98; R. 810-11, 866-70, 1567-70, 1576, 1578 -79, 1582, 1586, 1593-4, 1616, 1651-3, 1675, 1680-1, 1686, 1696, 1939). Moreover, petitioners did nothing (by way of advertisement or otherwise) **[*25]** that caused any of these Betamax owners to believe that home use off-the-air recording of U/D's works was lawful (Pet. App. 43-7; R. 810-11, 869, 1576, 1586, 1593-4, 1616, 1651-3, 1686; see n. 4, supra).

The only damage alleged to have been incurred by U/D as a result of home Betamax recording was to the specific 32 motion pictures in issue (J.A. 64, 98, 110; R.A 237-9, B 175). But at trial U/D admitted that actually there had been no damage to date to any of these 32 motion pictures (R. 1284-5, 2241, 2251, 2269, 2281-9, 3260, 3268); in fact, U/D's counsel admitted that petitioners "have proven that [the specific dollar amount lost by virtue of the infringements we have found] has been none" (R. 2269-70). Moreover, U/D offered no evidence of any future detrimental effect to be caused by home recording upon the potential market for, or value of, any of these 32 motion pictures; in fact, petitioners proved that the rating services (e.g., Nielsen, Arbitron) could and would measure Betamax recording and viewing, so that respondents could be fully compensated in the usual manner in the marketplace (Pet. App. 54, 109; R. 2963-4, 2968-9, 2971; DX PH -- R. 3016-7).

U/D further admitted **[*26]** at trial that they had suffered no damage of any kind to date (not just to the 32 motion pictures in issue but to anything else) because of home Betamax recording (R. 288-94, 542-4, 1055, 1206-7, 1233, 2241, 2281-9). However, over petitioners' continued objection (R. 3212, B 129, B 173-5, B 202, B 205), respondents proceeded to testify about future effects in the abstract which they speculated could result to copyrighted works in the abstract from home recording in the abstract -- e.g., that live TV viewing and theater attendance would decrease because people would be spending their time watching Betamax recordings, that librarying would lead to ad nauseam viewing of a work and detract from its re-run value, n16 that rentals and sales of films and pre-recorded tapes and discs would suffer. n17 Such speculation involved only hypothetical copyrighted works, and generally entailed an effect on one hypothetical work supposedly to be caused by home recording of another hypothetical work. The district court weighed these speculations against other evidence and rejected them (Pet. App. 107-115). **[*27]**

EXHIBIT 6 - PAGE 65

U/D argue often about "large libraries" of tapes, but there is not one iota of evidence in their
Field survey nor in petitioners' Crossley survey that there was so much as a single copyrighted
work of either of U/D in anyone's library. n18

U/D also argue often about "deleting", "skipping" and "regularly avoiding commercials" during re-
cording and play-back. Yet, the surveys downplay this also. n19  **[\*28]**

Neither the Field nor Crossley survey touched trading or duplicating of tapes.

Counsel for U/D conceded "we have not proved any actual damage, that is correct" -- not even
"a penny" (R. 2241, 2251); and also conceded no proof of petitioners' profits (R. 2252, 3260, 3265).
This is not a case where proof of damages was difficult, or where the burden of proof as to dam-
ages was misplaced or was of any consequence. This is a case where the unequivocal absence
of damage not only was admitted but also was affirmatively proved.

The district court's third set of critical factual findings made repeated reference to the absence of
any harm or damage caused, or to be caused, to either Universal or Disney by home use Beta-
max recording -- e.g., U/D "admitted that no actual harm to their copyrights had occurred to date";
"testimony at trial… did not establish even a likelihood of harm"; in fact, the evidence showed
that home use recording "does not reduce the market for plaintiffs' works" (Pet. App. 50, 76, 87,
102, 107, 108, 115, 116).

The district court's opinion recognized the "strong competing claims" between the "private moti-
vation" of copyright owners and the public interest in receiving **[\*29]** "material broadcast on pub-
lic airwaves" (Pet. App. 32-3, 67-8); and followed the resolution made by Congress and this Court
that "copyright is '[n]ot primarily for the benefit of the author, but primarily for the benefit of
the public'" (Pet. App. 68). The district court limited its opinion to "'home use' recording" of pro-
grams "broadcast free to the public over the public airwaves" (Pet. App. 55, 74), and found that
such home recording was fair use and not infringement (Pet. App. 56-7, 87, 117) -- e.g., such use
increased access to information voluntarily broadcast by plaintiffs over public airwaves, consis-
tent with First Amendment policy (Pet. App. 79-80, 82), and did not reduce the market for plain-
tiffs' works (Pet. App. 87). The district court also noted that legislative history included a
House Judiciary Committee Report plus "committee hearings, floor debates and reports from the Of-
fice of Copyrights" (Pet. App. 61-2), and that "when the issue was discussed by Congress, all in-
dications were that Congress did not intend to give monopoly power over this use" (Pet. App.
57, 65, 117). Finally, the district court concluded there could have been no contributory infringe-
ment by any **[\*30]** petitioner merely in supplying a "staple article of commerce" like Beta-
max, which is "capable of non-infringing uses… where no infringement could be alleged" (Pet.
App. 97, 104, 106-7); and petitioners had not otherwise contributed where they had no control over
consumers' use of Betamax in the privacy of their homes, they did not induce or cause any re-
cording of U/D's works, they did not believe recording of U/D's works was unlawful and yet they
had not led any consumer to believe it was lawful (Pet. App. 92, 93-4, 43-7).

The Court of Appeals complimented the district court on its "elaborate, painstaking, and thought-
ful opinion" which "carefully outlined the facts" (Pet. App. 3); then ignored those facts totally
and reversed with a broadside. As between copyright owner and the public, the Court of Appeals fa-
vored the former, saying "it is clear that the real purpose of the copyright scheme is to encour-
age works of the intellect" (Pet. App. 4). The court held that home recording was precluded from
being fair use because "intrinsic use" never could be fair use (Pet. App. 14-18); also, ignoring
and overruling the district court's critical findings as to absence of harm, it said "it **[\*31]** seems
clear that it [home recording] tends to diminish the potential market for appellants' works"
(Pet. App. 25). The court declined to look for any legislative history as to fair use, and looked

EXHIBIT 6 - PAGE 66

only for a home recording exemption "in ways not specified in U.S.C. §§ 107-118" -- and found
none (Pet. App. 6-7). The court found contributory infringement by again ignoring and overrul-
ing the district court's critical findings, saying "videotape recorders are not 'suitable for substan-
tial noninfringing use'" (Pet. App. 25-26) and "there is no doubt that appellees have met the
other requirements for contributory infringement -- inducing, causing, or materially contributing
to the infringing conduct of another" n20 (Pet. App. 27).  **[*32]**

## SUMMARY OF ARGUMENT

Normally, making a "copy" of a copyrighted work is the first step in making some use of the
work opposed by the copyright owner. However, in this case, making a "copy" is a necessary and
first step in making exactly that use of the work which the copyright owner intended -- viz.,
home reception and viewing of a free off-the air TV broadcast.

The recording made in the course of reception by home VTR of free off-the-air TV program-
ming is not an infringement, but rather is a "fair use", of any such programming which is copy-
righted. The public policy underlying free TV broadcasting is that any member of the population
who has the "means" of receiving such broadcasts at home has the right to do so, and to view
them privately at home, without charge -- the recording is merely a mechanical step employed by
the VTR "means" of reception. Home VTR recording no more than enhances TV reception by
the intended audience.

Legislative history of the 1976 Act literally extends from 1955-1976. Between 1955 and 1971
there was considered review, inter alia, of (a) whether unauthorized performance of motion pic-
tures in the privacy of the home should be deemed infringement,  **[*33]**  and (b) whether sound re-
cordings (viz., phonograph records) were to be given copyright protection against off-the-air
home recording. In the course of reviewing and answering these questions ("no" to each), Con-
gress clearly manifested its belief and intent (while passing a "1971 Amendment" to the 1909 Act)
that off-the-air home recording from radio or TV was not infringement -- viz., that it was fair
use. After 1971, and prior to passage of the 1976 Act (which incorporated the 1971 Amend-
ment), there was no further consideration of any of these issues, since they had been resolved.

The home VTR is a staple item of commerce, used for home recording of TV programming whose
owners consent (or cannot object) thereto far more often than for home recording of TV program-
ming whose owners do object. It provides a great societal benefit. Moreover, petitioners did
not induce or cause any of the home recording in issue; nor did they cause any VTR owner to be-
lieve it was legal. Hence, even if home recording of respondents' work were direct infringe-
ment, there is no legal basis upon which to hold any petitioner liable for contributory infringe-
ment.

There is neither statutory provision nor decisional **[*34]**  precedent for judicial imposition of a com-
pulsory license and continuing royalties as a remedy for copyright infringement.

## ARGUMENT

I.
HOME VTR RECEPTION OF FREE OFF-THE-AIR TV, FOR HOME VIEWING, IS FAIR
USE.

Congress is empowered, but not required, by the Constitution to give copyright protection to au-
thors. Under Article I, § 8, Cl. 8 of the United States Constitution, the constitutional goal is
"To promote the Progress of Science and useful Arts..." and the constitutional means is "by secur-

EXHIBIT 6 - PAGE 67

ing for limited Times to Authors and Inventors the exclusive Right to their respective Writings
and Discoveries″. The Constitution, per se, confers no copyright rights on anyone. What kinds of
works will be protected, and what types of protection any particular kind of work will receive,
is limited to what Congress can grant and does grant; in fact, neither the 1909 Act nor the 1976
Act gives any copyright owner exclusive rights as to all uses of his work. Also, as a general prem-
ise, copyright is ″[n]ot primarily for the benefit of the author, but primarily for the benefit of
the public″; each copyright Act ″must be construed in light of this basis purpose″. n21  **[*35]**

Respondents' claim of infringement is no more sophisticated than (a) that home VTR tape record-
ing fits a literal dictionary definition of the copyright owner's exclusive right to ″copy″ or to
make ″any transcription or record″ under § 1(a), (d) of the 1909 Act (Pet. App. 127) and ″to re-
produce… in copies″ under § 106(1) of the 1976 Act (Pet. App. 122-3), and (b) that there is no statu-
tory exception from such exclusive right expressly mentioning home use videotape recording. (Fo-
cusing on the ″copy″, instead of on how and why it came to be made, is like focusing on the
hole instead of one the doughnut.)

However, beginning with *Folsom v. Marsh, 9 Fed. Cas. 342,No. 4901 (C.C.D. Mass. 1841) and
Lawrence v. Dana, 15 Fed. Cas. 26,* No. 8136 (C.C.D. Mass. 1869), and culminating with *Wil-
liams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973),* aff'd. by an equally di-
vided court, *420 U.S. 376 (1975),* the lower federal courts have recognized that literal enforce-
ment of the exclusive rights provided by copyright statutes would not produce a fair result in some
cases and therefore devised the doctrine of ″fair use″ -- a doctrine **[*36]** which created a ″privi-
lege in other than the owner of a copyright to use the copyrighted material in a reasonable man-
ner without his consent, notwithstanding the monopoly granted to the owner....″ *Rosemont Enter-
prises, Inc. v. Random House, Inc., 366 F.2d 303, 306 (2d Cir. 1966),* cert. denied, *385 U.S.
1009 (1967).* Fair use always has been a doctrine without rigid definition. ″The line which must
be drawn between fair use and copyright infringement depends on an examination of the facts
in each case. It cannot be determined by resort to any arbitrary rules or fixed criteria.″ *Meeropol
v. Nizer, 560 F.2d 1061, 1068 (2d Cir. 1977),* cert. denied, *434 U.S. 1013 (1978).* Common
sense and fairness spawned the doctrine, and common sense and fairness are still the best crite-
ria in its application.

Fair use never has been adjudicated by this Court.

The 1976 Act did not change fair use. It did, however, codify the doctrine for the first time -- in
*17 U.S.C. § 107* (Pet. App. 123). In doing so, both the House and the Senate left a sufficiently
clear trail as to the intent of the codification. n22 Section 107 is as follows:  **[*37]**

″Sec. 107. Limitations on Exclusive Rights: Fair Use

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including
such use by reproduction in copies or phonorecords or by any other means specified by that sec-
tion, for purposes such as criticism, comment, news reporting, teaching (including multiple cop-
ies for classroom use), scholarship, or research, is not an infringement of copyright. In determin-
ing whether the use made of a work in any particular case is a fair use the factors to be
considered shall include --

(1) the purpose and character of the use, including whether such use is of a commercial nature
or is for nonprofit educational purposes:

(2) the nature of the copyrighted work;

EXHIBIT 6 - PAGE 68

(3) the amount and substantiality of the **[\*38]** portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work."

The 1975 Senate Report termed fair use "one of the most important and well-established limitations on the exclusive right of copyright owners"; "an equitable rule of reason" where "no generally applicable definition is possible, and each case raising the question must be decided on its own facts" (pp. 61-2).

Both the 1975 Senate Report and the 1976 House Report state that there was no intention to "freeze" the doctrine, no intent to "change, narrow, or enlarge it in any way". n23 **[\*39]**

The fact that off-the-air home recording (audio or video) is not one of the express exceptions or limitations as to the copyright owner's exclusive rights under the 1976 Act's sections 108-118 is irrelevant to its being found a fair use -- section 107 is independent of, and in addition to, sections 108-118. n24

Section 107 provides, inter alia, that "reproduction in copies" can be fair use "notwithstanding the provisions of section 106". In testing whether any particular use is a fair use, section 107 sets forth four factors or criteria which "shall [be] include[d]" among "the factors to be considered". But none of these four factors is "definitive or determinative" n25 (1975 Senate Report, 62). **[\*40]**

The touchstone in testing for fair use as to the recordings in issue, even before applying these four factors, is an understanding of the extent of the public's right to receive free off-the-air TV. Under the Communications Act of 1934 (_47 U.S.C. § 301_ et seq.), Congress has preempted control over use of the spectrum of electromagnetic frequencies for communication (see _National Broadcasting Co. v. United States, 319 U.S. 190, 210-4 (1942))._ Limited portions of that spectrum have been allocated to free off-the-air radio and to free off-the-air TV. "Broadcast frequencies are a scarce resource; they must be portioned out among applicants." ( _Columbia Broadcasting v. Democratic Comm., 412 U.S. 94, 101 (1973))._ "No one has a First Amendment right to a license or to monopolize a radio frequency...."; broadcasting is a "privilege" ( _Red Lion Broadcast Co. v. FCC, 395 U.S. 367, 389, 394 (1969))._ Any broadcaster given the privilege of using such frequencies must serve the "public interest, convenience and necessity" (_47 U.S.C. §§ 307(a), 309(a)_).

As this Court has recognized, program owners like Universal **[\*41]** and Disney are well paid indirectly by the public for allowing their programs to be "broadcast... for the use of the general public...." (_47 U.S.C. §§ 153(o), 605_ -- Pet. App. 80; see Appendix C hereto). And U/D's programming, once broadcast, thereby has been "released to the public" ( _Fortnightly Corp. v. United Artists, 392 U.S. 390, 400 (1968);Teleprompter Corp. v. CBS, 415 U.S. 394, 410 (1974))._ U/D have "no control over the segment of the population which may view the program"; "The privilege of receiving the broadcast electronic signals and of converting them into the sights and sounds of the program inheres in all members of the public who have the means of doing so" ( _Teleprompter, supra, pp. 412, 408)._ Such consequences of broadcasting manifestly cut across copyright to some extent -- U/D cannot eat their cake and have it too; they cannot broadcast and then interfere with reception.

Home VTRs "no more than enhance the viewer's capacity to receive the broadcaster's signal" (as did CATV in _Fortnightly, supra, p. 399,_ and _Teleprompter, supra, p. 401);_ they do not increase the number of viewers **[\*42]** within range of the signal (as did CATV in _Teleprompter, supra)._

EXHIBIT 6 - PAGE 69

1982 U. S. S. Ct. Briefs LEXIS 566, *42

The importance of free off-the-air TV to the American way of life, coupled with various pronounce-ments of this Court over the years, suggest that the public's entitlement today to receive TV for per-sonal use in the privacy of the home approaches, if in fact does not attain, the status of a First Amendment right. n26  **[\*43]**

Considering that the recording in issue is only a necessary mechanical step by which the home VTR receives free off-the-air TV broadcasts, such recording should be recognizable immediately as fair use (using nothing more than the "equitable rule of reason" on which fair use was founded). When a copyright owner voluntarily elects to commercially exploit his work by partici-pating in the "privilege" of free off-the-air TV broadcasting, which by definition is "for the use of the general public", his copyright monopoly should not be extended so as to allow him to elimi-nate or control a "means" (whose reception mechanism entails recording) by which the public re-ceives any and all free television broadcasts. Otherwise, contrary to the intent of the Copy-right Clause, the benefit to a few "Authors" would impede free speech and "the Progress of Science" to the detriment of the public. n27 U/D's "privilege" to broadcast must be subordinate to the pub-lic's constitutional "right" to receive that (or any other) broadcast; statutory copyright cannot re-verse this order of priority. The balancing factor is fair use. n28  **[\*44]**

"Since the issue of fair use is one of fact... the clearly erroneous standard of review is appropri-ate." ( *MCA v. Wilson, 677 F.2d 180, 183 (2nd Cir. 1981)).* The district court reviewed the spe-cific home recording presented to it, made findings of fact using each of the four statutory "fac-tors", and made an ultimate finding that the home use recording in issue was fair use (Pet. App. 56, 66-87).

Taking the factors ad seriatim, the district court found that the "purpose and character of the use" is to "increase access to the material U/D choose to broadcast", by only the audience U/D in-tended to view the material (Pet. App. 81-2). "This increase in access" provides the larger audi-ences which U/D want, and "is consistent with the First Amendment policy of providing the full-est possible access to information through the public airwaves" (Pet. App. 82; *Columbia Broadcasting, supra, p. 102).*

*47 U.S.C. § 303(g)* recognizes our country's policy to "generally encourage the larger and more ef-fective use of radio in the public interest" -- and "radio" includes television (*47 U.S.C. § 153(b)*; *Allen B. Dumont Laboratories v. Carroll, 184 F.2d 153, 155 (3rd Cir. 1950)).* **[\*45]**

In *National Broadcasting Co., supra, p. 216,* Mr. Justice Black wrote:

"The 'public interest' to be served under the Communications Act is thus the interest of the listen-ing public in 'the larger and more effective use of radio.' § 303(g). The facilities of radio are lim-ited and therefore precious, they cannot be left to wasteful use without detriment to the public in-terest."

There is no more obvious "wasteful use" of broadcasting facilities than that which occurs when a program is transmitted at a time when those for whom it is intended and who wish to receive it cannot sit in front of their TV sets. Betamax provides a means of helping to reduce that waste.

In *Williams & Wilkins Co., supra,* the Court of Claims held that "intrinsic" use (viz., use of a copy for the same purpose as the original would be used) could be (and was) fair use. The court there was dealing with Xerox reproductions of medical journal articles.

The Solicitor General's brief to the Supreme Court in *Williams & Wilkins Co., supra,* said:

"[T]he copying of a material for private use may well be outside the scope of the Copyright Act ab initio; at least, the fact **[\*46]**  that the copy is made for personal use and not for commer-cial benefit is strong support for the conclusion that it is a non-infringing fair use." (p. 26).

EXHIBIT 6 - PAGE 70

In contrast, the Court of Appeals below held that home recording of off-the-air TV was precluded, per se, from being fair use because it was "intrinsic use". n29 The Court of Appeals recited that, except for two cases -- viz., Williams & Wilkins Co. and the district court opinion herein -- fair use "has always had to do with the use by a second author of a first author's work." (Pet. App. 14-15, 19); it added, "the fair use doctrine does not sanction home video recording. Without a 'productive use', i.e., when copyrighted material is reproduced for its intrinsic use, the mass copying of the sort involved in this case precludes an application of fair use." (Pet. App. 18) and "Since the copies made by home videorecording [U/D's motion pictures or anything else] are used for the same purpose as the original, a finding of fair use is not justified" (Pet. App. 23) -- viz., no other fair use "factor" need be considered.  **[*47]**

This inflexible holding of the Court of Appeals is completely contrary to the spirit of § 107 -- which is not intended to "freeze" fair use to any "exact rules" but rather is to enable adaptation on a "case-by-case basis".

As to the factor of "nature of the copyrighted work" (which encompasses more than just "subject matter" nature -- e.g., "out-of-print" nature, 1975 Senate Report, 64), the district court found that the "most important aspect" was that the case involves only works "which plaintiffs voluntarily choose to have telecast over public air waves to individual homes free of charge" (Pet. App. 79-80). U/D voluntarily exploit their works by commingling them with all the other programming on free off-the-air TV -- programming whose "subject matter" nature runs the gamut, and 95 + % of which programming has been available for unchallenged home reception by home VTR. U/D have "no control over the segment of the population which may view the program" ( *Teleprompter, supra, p. 412);* and they should have no control over "how" the population "receive" the program nor over when they view it.

"[A] court should… allow temporary taping for delayed viewing purposes.  **[*48]**  … Temporary copying simply achieves the access the copyright owner wants viewers to have anyway...." (31 Stan. L. Rev. 243, 263, 255 (1979)).

The fact that the works of U/D (and of their supporting amici curiae) may be "entertainment" in subject matter nature (which is all the Court of Appeals focused on -- Pet. App. 14, 20) is no determinant in generalized testing for fair use re home recording. Many other televised works may inform or educate; all may provoke thought, comment and reaction.

"The line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such line can be drawn at all." *Stanley v. Georgia, supra, p. 566.*

The factor of "effect [if any] of the use upon the potential market for or value of the copyrighted work" often has been described as the most important test for fair use. In short, does the use harm the value of the copyrighted work? The details on this issue of the case have not been understood nor accurately portrayed by the Court of Appeals or by any commentator.

Beneath all the trappings and embellishments, this still is a case founded on alleged copyright infringement **[*49]**  of 32 works -- no more, no less. The district court found that home recording had caused no damage to these to date and did not reduce their market. Even when the evidence proceeded from these 32 works to the abstract, the district court still found no damage to date and no likelihood of future damage (Statement of the Case, supra, p. 15).

Arguments of theoretical "mass" recording (e.g., Pet. App. 24-25) overlook that "mass" viewing is exactly the purpose of free TV. The home VTR enables nobody to record the broadcast who was

EXHIBIT 6 - PAGE 71

not intended to see it. Any theoretical "mass reproduction" necessarily would be limited to those members of the public to whom U/D's programs were broadcast; and any theoretical "cumulative effect" of home recording could be nothing more than a contribution to the home viewing intended when the program was broadcast. n30  **[*50]**

The evidence showed that the increase in viewing would be measured and paid for under existing practice. But even if VTR viewing required some modification in "existing economic arrangements", the copyright law affords no protection against such modification ( *Teleprompter, supra, p. 414 n. 15).*

The Court of Appeals totally ignored all the district court's critical and well supported findings as to the absence of damage, substituting therefor several of its recurrent "it seems clear"-type ipse dixit statements -- e.g., "it seems clear that it [home recording] tends to diminish the potential market for appellants' works" n31 (Pet. App. 25).

The factor of "amount and substantiality of the portion used" was recognized by the district court as "inextricably bound with the issue of harm" or "effect" (Pet. App. 82);  **[*51]**  manifestly, in the normal commercial case, the greater the "amount" used, the greater the likelihood of an "effect". However, in this case, there is no "harm" or "effect" from time shifting. And there is no "amount" of copying which, per se, is determinative of fair use. n32

II.
LEGISLATIVE HISTORY CONFIRMS HOME RECORDING TO BE A "FAIR USE" LIMITATION ON THE COPYRIGHT MONOPOLY.

There is an obvious constitutional question as to whether Congress could empower U/D to prevent reception of public broadcasts of their copyrighted works with a home VTR. But that question is not reached in this case, because Congress did not consider the 1909 Act to do so, and did not intend the 1976 Act to do so.

Legislative history of the 1976 Act shows that Congress did not intend or regard home use recording **[*52]**  to be copyright infringement. The rebuttal to any assertion that Congress did not give "considered review" to a specific or express exemption or limitation (as in §§ 108-118) for home audio or video recording (Pet. App. 11) is that such a review was not necessary -- there was no diversity of opinion. By 1971, Congress, the record industry and the movie industry all were well aware of the existence of home audio and video recording and, in the course of considering other related matters, Congress had manifested clearly its belief and intention that all such home recording was fair use. All the hallmarks of legislative intent are present -- a Committee report, floor debates, statements of a sponsor of the 1976 Act, and interpretations of the Copyright Registers who drafted the 1976 Act. n33  **[*53]**

The District Court examined legislative history of the 1976 Act at length (Pet. App. 56-65). In contrast, the Court of Appeals said that the 1976 Act "is clear and unequivocal on its face" and hence that legislative history "is entirely beside the point" and "is not relevant" -- and that resort to it "is entirely unnecessary" (Pet. App. 11-12). The Court of Appeals said that "our concern must be whether Congress has exhibited the intent to limit the rights of copyright owners in ways not specified in §§ 107-118." (Pet. App. 7). But even an abridged review of legislative history shows that Congress regarded and intended home recording, video and audio, to be fair use and thus to be precisely within the exceptions or limitations specified in § 107 -- and therefore never made a particular express statutory exception as to either.

EXHIBIT 6 - PAGE 72

Revision of the 1909 Act into the 1976 Act commenced with the Legislative Appropriations Act of 1955; n34 legislative history of the 1976 Act literally spans "the 20 year copyright revision process" (Pet App. 11; just as the 1952 patent law revision legislative history spanned several Congresses -- see *Dawson, supra, pp. 204-12).* [*54]

In 1961, the Register of Copyrights (Abraham L. Kaminstein) reported to Congress n35 that unauthorized performances of motion pictures in the home should not constitute copyright infringement because, inter alia:

"As a practical matter, unauthorized private performances could rarely be discovered or controlled...."; and

"New technical devices will probably make it practical in the future to reproduce television motion pictures in the home. We do not believe the private use of such a reproduction can or should be precluded by copyright." (p. 30) (see Appendix D hereto).

In 1965, the Register of Copyrights further reported to Congress about "the imminent development of home video tape recordings." n36

On June 16, 1965 Adolph Schimel, Vice President and General Counsel of Universal's predecessor in interest, Universal Pictures Co., Inc., and Chairman of the Law Committee of the MPAA [*55] (composed of the general counsel for the principal member companies of MPAA), presented to the House Judiciary Committee a statement of the Copyright Committee of the MPAA which showed full awareness of the fact that Sony was about to place a consumer VTR on the market -- and which made no assertion that home use recording or playback should be infringement:

"... home video tape recordings are an imminent development. The New York Times for June 9, 1965 confirms that in a few weeks Sony Corporation will be selling for $ 995 a Videocorder which is a portable home video recorder." n37

In 1971 the 92nd Congress took a "fragment" (S. 646, previously S. 4592 in the 91st Congress) [*56] from the over-all pending copyright revision bill (S. 644), and enacted the fragment into law in October as the "1971 Amendment" to the 1909 Act. n38 The purpose was to give copyright protection against commercial piracy to sound recordings (phonograph records), which theretofore had no copyright protection at all, in advance of passage of the entire revision bill.

Prior to passage of the 1971 Amendment, at a hearing held on the House counterpart "fragment" bill (H.R. 6927) in June 1971, Ms. Barbara A. Ringer, Assistant Register of Copyrights for Examining who became Register of Copyrights in 1971, stated that the 1971 Amendment was not intended to preclude home off-the-air recording. n39 [*57]

The witness who followed Ms. Ringer at the same hearing was Stanley M. Gortikov, who appeared on behalf of the Record Industry Association of America, Inc. He differentiated between commercial piracy recording and home recording, agreeing that home recording could not be and was not intended to be controlled. n40

The full House Committee on the Judiciary, in the 1971 House Report, made it clear that sound recording copyright owners were not to get any broader protection under the 1971 Amendment than other copyright owners (i.e., motion picture owners) already had under the 1909 Act -- viz., the motion picture owners did not have, and the sound recording owners were not getting, the right to restrain home recording for private use. n41 [*58]

EXHIBIT 6 - PAGE 73

That the grant of the exclusive right to reproduce was not intended to preclude non-commercial home recording was further shown in an exchange between Representative Kazen (D. Tex.) and Representative Kastenmeier (D. Wis. -- Chairman of the House Judiciary Committee since 1969) on the House floor just a few days prior to passage of the 1971 Amendment. n42  **[*59]**

The 1971 Senate and House Reports and other legislative history of the 1971 Amendment clearly are an integral part of the legislative history of the 1976 Act, as shown by a letter dated January 19, 1971 from the Librarian of Congress to the Chairman of the Senate Judiciary Committee n43 ( *Dawson, supra, p. 204;Baldridge v. Shapiro, 50 U.S.L.W. 4227, 4230 n.10 (1982)).* The 1971 House Report likewise shows that the 1971 Amendment was intended to become a part of what ultimately proved to be the 1976 Act (see Appendix F hereto). And attached to the 1971 House Report was another letter from the Librarian of Congress, this time to the House Judiciary Committee, dated May 25, 1971, stating that the 1971 Amendment would be merged into the ultimate general revision (viz., the 1976 Act -- see Appendix G hereto).  **[*60]**

Barbara Ringer, as Register of Copyrights, was requested by the House Judiciary Committee to testify at the 1975 hearings on the House general copyright revision bill and to submit the comments of the Copyright Office in writing, which she did. n44

The Register's 1975 Report states that what Ms. Ringer sought to do for Congress in respect of the bill then pending for the general revision of the copyright law was:

″… to identify what I considered the main issues remaining after a decade of sporadic legislative considerations of the general revision bill….″

Thus, questions which theretofore had been resolved were not the subject of discussion in 1975 when the bill soon to be enacted as the 1976 Act was being considered. Since the matter of the right of the public to reproduce programs off-the-air had been resolved in 1971, there was no reason to discuss it in 1975 -- and Ms. Ringer did not do so. It was not one of the main issues remaining. So also, neither the 1976 House Report nor the 1975 Senate Report mentions the **[*61]** subject of the right of the public to reproduce programs off-the-air, because that subject already had been settled. n45

The pertinent provisions of the 1976 Act, signed into law October 19, 1976, are virtually identical in substance to the 1971 Amendment.

The legislative history thus shows, beyond question, that Congress, in granting ″the exclusive right… to reproduce″ to copyright owners in the 1971 Amendment and in the 1976 Act, did not intend thereby to bar recordings (audio or video) off-the-air in the home for private use -- even though home recording was not among the express exemptions contained in § 1(f) of the 1909 Act or in §§ 108-118 of the 1976 Act. Congress regarded such recording as fair use. As stated by the Court of Appeals, fair use is **[*62]** ″'the most troublesome [doctrine] in the whole law of copyright.'″ (Pet. App. 12-13). Since unequivocal aid to the construction of § 107 vis-a-vis home recording is available in the legislative history, such resort should have been made by the Court of Appeals. n46

III.
THE MANUFACTURE, SALE AND/OR ADVERTISEMENT OF A STAPLE ITEM OF COMMERCE (THE VTR) PER SE SHOULD NOT CONSTITUTE CONTRIBUTORY INFRINGEMENT EVEN IF SOME HOME RECORDING WERE DIRECT COPYRIGHT INFRINGEMENT. n47

Contributory infringement is the question of the most importance to, and impact upoin, the public. This is the question of whether two copyright owners (or even a limited group of copy-

EXHIBIT 6 - PAGE 74

right owners), who provide a very small portion of free off-the-air [*63] TV programming, can pre-
vent home VTR reception of their programming by depriving the entire nation of home VTRs
and thereby ending free off-the-air home VTR reception of any and all programming. (An analo-
gous question was answered negatively by this Court in _Aiken, supra, p. 162.)_

If each home VTR owner were held accountable for his own use of the home VTR, then suppli-
ers could continue to make home VTRs available. But if suppliers are held accountable as con-
tributory infringers in lieu of the home VTR owners, over whom they have no control, then the sup-
ply of home VTRs (and home VTR reception) will terminate.

The factual findings and uncontradicted evidence crucial to the issue of contributory infringe-
ment are that: the home VTR is a staple item of commerce which is used for substantial free off-
the-air TV reception where no infringement could be alleged (e.g., recording material which is
not copyrighted or where permission to record is given); in fact, the amount of free off-the-air TV
programming available for unchallenged home VTR reception far exceeds that which is chal-
lenged; no petitioner in any way induced or caused to be made any home VTR recording of any
 [*64]  U/D work; no petitioner had the right or the ability to control any purchaser's use of Be-
tamax at home; no petitioner did anything to cause any Betamax owner to believe that home re-
cording of U/D's works was lawful; petitioners warned each Betamax owner of the copyright in-
fringement potential in unauthorized recording, although they believed all off-the-air home VTR
recording was lawful and could not have known otherwise. (Statement of the Case, supra, 10,
4, 12, 3 n.4).

Another relevant fact, established since the Court of Appeals' decision and since the Petition for
Certiorari herein was filed, is that U/D have represented to the public, obviously in consider-
ation of anticipated good will, that no suit or action ever will be brought against individual Beta-
max owners for any home VTR recording of U/D's works -- a representation that encompasses
not only past recordings but all future recordings without limit (see Appendices A, B hereto).

Copyright infringement, like patent infringement, is a tort. n48 A contributory infringer is a spe-
cies of joint-tort-feasor, who is held liable because he has contributed with another to the caus-
ing of a single harm to the plaintiff. n49 The question [*65]  is -- what must that "contribution" be?

One kind of potential "contribution" long recognized in patent law has been supplying the di-
rect infringer of a "combination" patent with an "article" which is comprised of some, but less than
all, of the "elements" of that combination -- following which, the direct infringer adds the miss-
ing "elements" and thereby completes the infringing combination. After years of judicial and leg-
islative consideration of such contribution and its corollaries -- as early as _Wallace v. Holmes,
29 F. Cas. 74_ (No. 17, 100) (C.C. Conn. 1871); as recently as _35 U.S.C. § 271(c)_ (1952) and _Daw-
son Chemical Co. v. Rohm & Hass Co., 448 U.S. 176 (1980)_ -- the patent law today is that the sup-
ply of "a staple article or commodity of commerce suitable for substantial non-infringing use"
does not, per se, constitute [*66]  contributory infringement when a consumer uses that article or
commodity for direct infringement. The definitions of the adjectives "staple" and "substantial"
are not precise, n50 but their combined requirements have been satisfied wherever there was any
genuine and significant non-infringing use. Wherever the line is drawn, Betamax obviously
would be well on the non-infringing side of it. The reason for such a doctrine is self-evident --
any other conclusion would extend the patentee's monopoly beyond his patent claims and would
"block the wheels of commerce". n51

An analogous doctrine in copyright contributory infringement was suggested by Justice Holmes

EXHIBIT 6 - PAGE 75

[*67]  in *Kalem Co. v. Harper Bros., 222 U.S. 55, 62 (1911):* [52]

"The most innocent objects... may be used for unlawful purposes...

"In some cases where an ordinary article of commerce is sold nice questions may arise as to the point at which the seller becomes an accomplice in a subsequent illegal use by the buyer. It has been held that mere indifferent supposition or knowledge on the part of the seller that the buyer... is contemplating such unlawful use is not enough to connect him [seller] with the possible unlawful consequences...."

In Kalem Co., "no such niceties [were] involved" -- the "ordinary article of commerce" was a motion picture which, together with its exhibition, constituted an infringing dramatization of the copyrighted book "Ben Hur". However, no suggestion was made by the parties or the Court that the [*68] suppliers of the cameras and blank film, by which the motion picture was made, should even be contemplated as contributory infringers.

If supplying Betamax, per se, were to be held contributory infringement, then the supplier of every camera, typewriter, pen, Xerox machine, etc. used in copyright infringement likewise would be a contributory infringer. Such never has been, and should not now be made, the law. n53

The other kind of potential "contribution" to copyright infringement obviously can be intentionally [*69] causing or inducing it. The Second Circuit has rendered a widely quoted test for such contributory copyright infringement:

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." n54

But even if such a broad test is accepted, the findings and the evidence are that petitioners lacked knowledge (aside from their "indifferent supposition or knowledge" that consumers would be recording TV broadcasts in general) and did not induce, cause or materially contribute. n55 In fact, U/D never claimed petitioners made any such contribution -- other than U/D's claim that mere supply of the VTR per se constituted doing so. [*70]

There are a myriad of cases on this kind of contributory copyright infringement, many or most being considered in briefs to the district court, n56 but not one of them is sufficiently in point to warrant citation to this Court -- none of them even proposes liability on the supplier of a device used by a direct infringer to accomplish an infringement.

In summary, if the findings and the evidence are to be respected, and if existing law is to be followed, there is no basis whatsoever for holding any petitioner to be a contributory infringer as to any alleged infringement in issue.

Finally, U/D's public representation to Betamax owners that they never will be sued for recording may be a "release" of the public as to past recordings which would not also release petitioners if they were contributory infringers ( *Aro II, supra, pp. 500-2);* but that part of U/D's representation which encompasses future recordings is a "future license" to the public as a matter of law, which not only negates direct infringement but also inescapably negates contributory infringement by petitioners, whether U/D [*71] so intended or not ( *Aro II, supra, pp. 493-500).* By their blatant and crass afforts to curry public favor while they try to shut down the home VTR indus-

---

[52]   Kalem Co. is the only Supreme Court case to consider the issue of copyright contributory infringement. Resolution of copyright infringement questions by resort to patent infringement analogies is well precedented -- e.g., *Sheldon v. Metro-Goldwyn-Mayer Corp., 309 U.S. 390 (1939);* see 27 Iowa Law Review 250 (1942).

EXHIBIT 6 - PAGE 76

try, U/D have hoisted themselves with their own petard. Moreover, equity should not allow U/D to encourage direct infringement by publicly immunizing it, and then to hold petitioners liable therefor as contributory infringers.

IV.
NEITHER THE 1909 ACT NOR THE 1976 ACT ENABLES A FEDERAL COURT TO IMPOSE A COMPULSORY LICENSE ON A COPYRIGHT OWNER, AND TO IMPOSE CONTINUING ROYALTIES ON AN INFRINGER, AS A REMEDY FOR STATUTORY COPYRIGHT INFRINGEMENT.

An injunction is a discretionary remedy for copyright infringement n57 -- a remedy which respondents not only seek in this action but also continue to seek in the RCA et al. case and the Betamax II case (see Appendix H hereto). Statutory damages are available under the 1909 Act "in lieu of", and under the 1976 Act "instead of", actual damages and profits; n58 respondents also seek statutory damages in this action (R. 3260). **[*72]**

Apparently sensing that either an injunction or the imposition of statutory damages on manufacturers, distributors, retailers and advertisers would bring the supply of home VTR's to a halt, the Court of Appeals lent its authority to an unsupported suggestion in a treatise and told the district court that "a judicially created compulsory license" with a "reasonable" and "continuing royalty... may very well be an acceptable resolution" (Pet. App. 28-9).

However, there is no statutory provision or decisional precedent for compulsory licensing as a judicial remedy for any copyright infringement. Unlike the Court of Claims in *Williams & Wilkins Co., supra, p. 1360,* the Court of Appeals did not recognize that "Intermediate or compromise solutions are not within our authority". Moreover, no meaningful license could be created between the suppliers of only one brand of home VTR and only two copyright owners; and no federal court in this case has jurisdiction to include anyone else in such a license.

## CONCLUSION

First, U/D seek to make this case the first in American legal history to find as copyright infringement either (a) conduct taking place entirely in the privacy **[*73]** of the home or (b) making a copy of anything solely for private personal use.

Second, U/D seek to make this case the first in American legal history to hold a manufacturer, distributor or advertiser of a staple article of commerce strictly "liable for such use" as a contributory infringer when the consumer uses that article in the course of direct infringement -- even though these parties did not induce, did not cause, did not and could not control, did not profit from, in no way were associated with, and warned the consumer against the possibility of, the direct infringement.

Third, U/D seek to elevate their profit motivation in commercial exploitation of the public airwaves over and above the public's interest, convenience and necessity in, and right to receive, those airwaves.

Any one such result would be groundbreaking; all three results in one case would be extraordinary and devastating -- not just to petitioners herein but to millions of consumers and businessmen across the country.

The case presented by U/D obviously merits no such decision. People are seeing U/D's broadcast programs just as U/D intended and expected they would -- nothing more. U/D are not being

EXHIBIT 6 - PAGE 77

hurt;  **[\*74]**  to the contrary, they are reaping a financial harvest through exploitation of air waves that belong to the public -- as well as getting a windfall from pre-recorded VTR cassette rentals and sales.

The facts, the law, and equity all are in petitioners' favor. Petitioners pray the Court to reverse the Court of Appeals' opinion and to adopt the learned and well-reasoned opinion and judgment of the district court: viz., that home VTR reception of free off-the-air TV broadcasts, for home viewing, is not an infringement of respondents' copyrights; but even assuming, arguendo, that respondents' copyrights thereby were infringed, there was no contributory infringement by any petitioner.

Respectfully submitted,

DEAN C. DUNLAVEY, (Counsel of Record), DONALD E. SLOAN, Attorneys for Petitioners Sony Corporation of America, et al.

Of Counsel: MARSHALL RUTTER.

August 28, 1982.

APPENDIX A.

"... in the six years that this case has been pending no suits have been brought against individual VTR owners for VTR copying, and respondents have stated publicly that no such actions will ever be instituted".

Resp. Br. Opp. Cert. p. 6 (circa May 6, 1982)

"... I believe we have the authority **[\*75]**  not to proceed against people [VTR owners] who might otherwise be tort feasors of some sort.

"... I am the president and the chief operating officer of MCA, Inc., and if I really tell you that we are not going to proceed against any of those three million people [VTR owners], I really think that binds our company."

Sidney Sheinberg -- witness before the Senate Committee on the Judiciary re S 1758, Monday, November 30, 1981.

"10. NOTE: [Universal] does not seek relief herein against any homeowners who have purchased videotape recorders and video cassettes and used them only in their own homes to make off -the-air recordings of televised motion pictures for private non-commercial playback in their own homes. [Universal] contends that such recordings constitute infringements of its copyrights in such motion pictures, but [Universal] seeks relief herein with respect to such recordings only against the manufacturers, distributors, sellers and advertisers of such videotape recorders and video cassettes."

Complaint, the Betamax II case, filed July 2, 1982.

APPENDIX B.

WALT DISNEY PRODUCTIONS.

DISNE Y WS

EXHIBIT 6 - PAGE 78

1982 U.S. S. Ct. Briefs LEXIS 566, *75

For Release:

November 2, 1981

In response to numerous inquiries **[*76]** from the news media, Walt Disney Productions' chairman, E. Cardon Walker, issued the following statement related to the recent ruling by the United States Court of Appeals for the Ninth Circuit, on the subject of infringement of copyright laws:

″Walt Disney Productions welcomes and will support appropriate and meaningful legislation to eliminate any liability for individuals videotaping copyrighted television programming for personal use off their home TV sets, as long as safeguards are also provided to prohibit mis-use of creative product.

″Millions of families in the United States and around the world are now involved in videotaping programming in their own homes for their own private use. We have no intention, in this or any other litigation, of pursuing individuals to interfere with this practice.

″We first initiated this case in 1976, more than five years ago, when there were relatively few tape recorders in homes. Since that time we have come to realize that the interests of all concerned can be better accommodated by passage of new laws.

″We feel there is compelling justification for legislation to insure that specific limits be placed on the dissemination and distribution **[*77]** of copyrighted videotape materials beyond use in the home where it was recorded.

″Disney will continue to pursue the current litigation against the Sony Corporation, its distributors, retailers and advertisers, until an acceptable solution can be reached.

APPENDIX C.

″… holders of copyrights for television programs or their licensees are not paid directly by those who ultimately enjoy the publication of the material -- that is, the television viewers -- but by advertisers who use the drawing power of the copyrighted material to promote their goods and services. Such advertisers typically pay the broadcasters a fee for each transmission of an advertisement based on an estimate of the expected number and characteristics of the viewers who will watch the program. While, as members of the general public, the viewers indirectly pay for the privilege of viewing copyrighted material through increased prices for the goods and services of the advertisers, they are not involved in a direct economic relationship with the copyright holders or their licensees.

″By extending the range of viewability of a broadcast program, CATV systems thus do not interfere in any traditional sense with **[*78]** the copyright holders' means of extracting recompense for their creativity or labor. When a broadcaster transmits a program under license from the copyright holder he has no control over the segment of the population which may view the program -- the broadcaster cannot beam the program exclusively to the young or to the old, only to women or only to men -- but rather he gets paid by advertisers on the basis of all viewers who watch the program. The use of CATV does not significantly alter this situation. Instead of basing advertising fees on the number of viewers within the range of direct transmission plus those who may receive 'local signals' via a CATV system, broadcasters whose reception ranges have been extended by means of 'distant' signal CATV rechannelling will merely have a different and larger viewer market. From the point of view of the broadcasters, such market extension may mark a reallocation of the potential number of viewers each station may reach, a fact of no direct concern under the Copyright Act. From the point of view of the copyright holders, such market changes

EXHIBIT 6 - PAGE 79

will mean that the compensation a broadcaster will be willing to pay for the use of copyrighted material **[*79]** will be calculated on the basis of the size of the direct broadcast market argmented by the size of the CATV market.

″While securing compensation to the holders of copyrights was an essential purpose of that Act, freezing existing economic arrangements for doing so was not.″

*Teleprompter Corp. v. CBS, 415 U.S. 394, 411-13, 414 n. 15 (1974)*

″The petitioners have not demonstrated that they cannot receive from a broadcaster adequate royalties based upon the total size of the broadcaster's audience. On the contrary, the respondent points out that generally copyright holders can and do receive royalties in proportion to advertising revenues of licensed broadcasters, and a broadcaster's advertising revenues reflect the total number of its listeners, including those who listen to the broadcasts in public business establishments.″

*Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 163 n. 14 (1975).*

APPENDIX D.

The Register's 1961 Report stated (pp. 28-30):

″a. The Present Law.

″The present statute does not provide explicitly for the right to perform (i.e., to exhibit) a copyrighted motion picture. Motion pictures were not mentioned in the act **[*80]** of 1909. By an amendment in 1912, they were added to the classes or works enumerated in section 5, but no corresponding amendment was made in section 1 to provide for the right to perform motion pictures.

″The courts have attempted to fill this gap by applying the terms of section 1 to the performance of motion pictures. In several decisions the courts have held that dramatic motion pictures (photoplays) are a species of dramatic works and are therefore accorded the right of public performance given to dramatic works by section 1(d). The more difficult problem of nondramatic motion pictures was presented to the Second Circuit Court of Appeals in *Patterson v. Century Productions (93 F.2d 489 (1937)),* in which an infringing copy of a documentary (nondramatic) motion picture had been made and exhibited publicly in a theater. The court held that the exhibitor had infringed the copyright, on the ground that the projection of the motion picture on the theater's screen constituted the making of a 'copy' under section 1(a). We believe this last decision is an example of the maxim that 'hard cases make bad law.' In reaching what was no doubt a just result, and apparently seeing **[*81]** no other provision in the statute that would fit the case, the court stretched the concept of 'copying' to new lengths. While that case involved a public exhibition, the theory of 'copying' on which the decision was based, if followed to its logical conclusion, would have a far-reaching effect: any unauthorized projection of a motion picture, private as well as public, would be an infringement of the copyright. Whether the court would so hold in a case involving a private projection is still a matter of conjecture.″

″d. Private Performances.

″Motion picture producers and distributors have urged that the performance right in motion pictures should extend to what are clearly private performances, including performances given in private homes. They point to Patterson v. Century Productions, and its concept that exhibition is a form of 'copying,' to support their position. Motion picture films are commonly leased for exhibition at specified places and dates. Most leases are for commercial exhibitions, but many

EXHIBIT 6 - PAGE 80

films are also leased for home use. It is argued that in either case private exhibitions beyond the terms of the lease should constitute an infringement of copyright.

"This **[*82]**  argument may have some theoretical plausibility, but we would question it for several reasons:

"Injury to a copyright owner from private performances beyond the terms of a lease would be minimal. He may be entitled to the usual license fee as damages for a breach of contract, but the statutory damages for copyright infringement would be grossly excessive.

"As a practical matter, unauthorized private performances could rarely be discovered or controlled.

"Many motion picture films are sold for use in homes, schools, libraries, and the like. The purchaser should not be subjected to the risk of liability for private performances that the copyright owner might contend are not authorized.

"New technical devices will probably make it practical in the future to reproduce televised motion pictures in the home. We do not believe the private use of such a reproduction can or should be precluded by copyright." (emphasis added)

APPENDIX E.

The 1971 Amendment added subsection 5(n), "sound recordings".

The 1971 Amendment also added subsection 1(f), providing that the owner of copyright:

"shall have the exclusive right:

"(f) To reproduce and distribute to the public by sale or other **[*83]**  transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording: Provided, That the exclusive right of the owner of a copyright in a sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form that directly or indirectly recaptures the actual sounds fixed in the recording: Provided further, That this right does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording; or to reproductions made by transmitting organizations exclusively for their own use."

The 1971 Amendment further added the following definitions to § 26:

"For the purposes of this section and sections 10, 11, 13, 14, 21, 101, 106, 109, 209, 215, but not for any other purpose, a reproduction of a work described in subsection 5(n) shall be considered to be a copy thereof. 'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture. 'Reproductions of sound recordings'  **[*84]**  are material objects in which sounds other than those accompanying a motion picture are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device, and include the 'parts of instruments serving to reproduce mechanically the musical work', 'mechanical reproductions,' and 'interchangeable parts, such as discs or tapes for use in mechanical music-producing machines' referred to in sections 1(e) and 101(e) of this title."
As amended Oct. 15, 1971, Pub. L. 92-140, § 1(e), 85 Stat. 391.

EXHIBIT 6 - PAGE 81

1982 U. S. S. Ct. Briefs LEXIS 566, *84

APPENDIX F.

The 1971 House Report (pp. 3-4) said:

"The creation of a limited copyright in sound recordings has been under active consideration by the Congress for a number of years in connection with the program for general revision of the copyright law. The Library of Congress recommended the granting of such copyright protection in its recommendations for the general revision of the copyright law.

"The Committee regrets that action on the bill for general revision of the copyright law has been delayed, and that the problem of record piracy has not been dealt with as **[\*85]** part of a broad reform of the Federal copyright statute. We are persuaded that the problem is an immediate and urgent one, and that legislation to deal with it is needed now. The seriousness of the situation with respect to record piracy, both nationally and internationally, is unique, and our favorable action in this instance should not be interpreted as precedent for the enactment of separate legislation on other matters involved in copyright law revision. On the contrary, we would be opposed to any effort to convert the general revision program into a program for revising the statute on a piecemeal basis."

APPENDIX G.

The May 25, 1971 letter from the Librarian of Congress to the House Judiciary Committee stated, in part:

"The most fundamental question raised by the bill is its relationship to the program for general revision of the copyright law. As noted above, the revision bill now pending in the Senate has parallel provisions, and if general revision were on the threshold of enactment, S. 646 would be unnecessary. However, some fundamental problems impeding the progress of general revision of the copyright law, notably the issue of cable television, have not yet been resolved. **[\*86]** We agree that the national and international problem of record piracy is too urgent to await comprehensive action on copyright law revision, and that the amendments proposed in S. 646 are badly needed now. Upon enactment of the revision bill they would, of course, be merged into the larger pattern of the revised statute as a whole." (emphasis added)

APPENDIX H.

"But, of course, we are not going to be able -- the plaintiffs can't go chasing Sony for statutory damages for every copy made of every motion picture of theirs from here until the end of time.

"And that is really what this case is all about, that is, an injunction."

U/D's counsel of record -- R. 70-1

"Certainly at the very least we think that the Court should issue an injunction prohibiting the sale of Betamax...."

U/D's counsel of record -- R. 3278

"… plaintiffs submit that the Court should order defendants to make diligent effort to recall all Betamax VTR's previously sold in order to disable them from further recording."

U/D's Opening Post-Trial Memorandum, p. 71

"WHEREFORE, plaintiff prays for judgment against defendants, and each of them, jointly and severally, as follows:

EXHIBIT 6 - PAGE 82

1982 U.S. S. Ct. Briefs LEXIS 566, *86

″1. That an injunction issue **[\*87]**  against defendants, and each of them, to protect plaintiff's copyrighted motion pictures from recording and copying on the aforesaid VTR's and video-cassettes.″

Prayer excerpt, Complaint,the RCA, et al. case, filed November 6, 1981.

″WHEREFORE, plaintiff prays for judgment against defendants, and each of them, jointly and severally, as follows:

″1. That an injunction issue against defendants, and each of them, to protect plaintiff's copyrighted motion pictures from recording and copying on the aforesaid VTR's and video-cassettes.″

Prayer excerpt, Complaint, the Betamax II case, filed July 2, 1982.

EXHIBIT 6 - PAGE 83

Exhibit 7

**SONY** CORPORATION OF AMERICA, et al., Petitioners, vs. UNIVERSAL CITY
STUDIOS, INC. and WALT DISNEY PRODUCTIONS, Respondents.
No. 81-1687

OCTOBER TERM, 1982

October 27, 1982

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit.

BRIEF FOR RESPONDENTS, UNIVERSAL CITY STUDIOS, INC. AND WALT DISNEY
PRODUCTIONS.

STEPHEN A. KROFT, (Counsel of Record ), JOHN G. DAVIES, SONDRA E. BERCHIN,
9601 Wilshire Boulevard, Suite 444, Beverly Hills, Calif. 90210, (213) 858-7700,
Attorneys for Respondents, Universal City Studios, Inc. and Walt Disney Productions.

Of Counsel: ROSENFELD, MEYER & SUSMAN.

TABLE OF AUTHORITIES

Cases

Aluminum Extrusion Co. v. Saule Steel Co., 260 F.Supp. 221 (C.D. Cal. 1966)

Aro Mfg. Co. Inc. v. Convertible Top Replacement Co., 377 U.S. 476 (1964)

Benny v. Loew's Inc., 239 F.2d 532 (9th Cir. 1956), aff'd by equally divided court,
356 U.S. 43 (1958)

Berlin v. E.C. Publications, Inc., 329 F.2d 541 (2d Cir. 1964)

BMI v. Marshall, 201 U.S.P.Q. 30 (E.D. Mich. 1978)

Broadcast Music, Inc. v. CBS, Inc., 441 U.S. 1 (1979)

Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348 (9th Cir. 1964), cert. denied, 379
U.S. 989 (1965)

CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. 94 (1973)

CBS, Inc. v. Documentaries Unltd., Inc., 248 N.Y.S.2d 809, 42 Misc.2d 723 (1964)

Chess Music, Inc. v. Sipe, 442 F.Supp. 1184 (D. Minn. 1977)

City of Harrisonville, Mo. v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334 (1933)

Costello Publishing Co. v. Rotelle, 670 F.2d 1035 (D.C. Cir. 1981)

Dallas Cowboys Cherrleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184 (5th
Cir. 1979)

EXHIBIT 7 - PAGE 84

Dawson Chem. Co. v. Rohm And Haas Co., 448 U.S. 176 (1980)

Diamond v. Chakrabarty, 447 U.S. 303 (1980)

Eastern Microwave, Inc. v. Doubleday Sports, Inc., 534 F.Supp. 533 (N.D.N.Y. 1982)

Elcktra Records Co. v. Gem Elec. Distribs., Inc., 360 F.Supp. 821 (E.D.N.Y. 1973)

Elsmere Music v. NBC, 623 F.2d 252 (2d Cir. 1980)

Encyclopaedia Britannica Educational Corp. v. Crooks, 447 F.Supp. 243 (W.D.N.Y. 1978) (I)

Encyclopaedia Britannica Educational Corp. v. Crooks, 542 F.Supp. 1156 (W.D.N.Y. 1982) (II)

Famous Music Corp. v. Bay State Harness Horse Racing etc., 554 F.2d 1213 (1st Cir. 1977)

F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, 214 U.S.P.Q. (BNA) 409 (7th Cir. Mar. 25, 1982)

Filmvideo Releasing Corp. v. Hastings, 668 F.2d 91 (2d Cir. 1981)

Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390 (1968)

Fox Film Corp. v. Doyal, 286 U.S. 123 (1932)

Fromberg, Inc. v. Thornhill, 315 F.2d 407 (5th Cir. 1963)

Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159 (2d Cir. 1971)

Ingersoll-Rand Co. v. Rockwell Int'l. Corp., 420 F.Supp. 277 (S.D. Fla. 1976)

Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 102 S.Ct. 2182 (1982)

Iowa State University Research Foundation v. ABC, 621 F.2d 57 (2d Cir. 1980)

Jerome H. Remick & Co. v. General Electric Co., 16 F.2d 829 (S.D.N.Y. 1926)

Jones v. RCA, 131 F.Supp. 82 (S.D.N.Y. 1955)

Kalem Co. v. Harper Bros., 222 U.S. 55 (1911)

Kleindienst v. Mandel, 408 U.S. 753 (1972)

Leon v. Pacific Tel. & Tel. Co., 91 F.2d 484 (9th Cir. 1937)

Libby Rod & Gun Club v. Poteat, 594 F.2d 742 (9th Cir. 1979)

EXHIBIT 7 - PAGE 85

Loew's Inc. v. CBS, Inc., 131 F.Supp. 165 (S.D. Cal. 1955), aff'd sub. nom. Benny v. Loew's Inc., 239 F.2d 532 (9th Cir. 1956) aff'd by equally divided court, 356 U.S. 43 (1958)

Loretto v. Teleprompter Manhattan CATV Corp., 102. S.Ct. 3164 (1982)

MCA INC. v. Wilson, 677 F.2d 180 (2d Cir. 1981)

Meeropol v. Nizer, 560 F.2d 1061 (2d Cir. 1977), cert. denied, 434 U.S. 1013 (1978)

Meredith Corp. v. Harper & Row Publishers, Inc., 378 F.Supp. 686 (S.D.N.Y. 1974), aff'd 500 F.2d 1221 (2d Cir. 1974)

MGM, Inc. v. Showcase Atlanta Coop. Prods., Inc., 479 F.Supp. 351 (N.D. Ga. 1979)

NBC v. United States, 319 U.S. 190 (1943)

New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc., 2 Copyrt. L. Rep. (CCH) P25,293, pp. 16,625, 16,626-27 (D. Mass. Aug. 3, 1981)

North Haven Bd. of Ed. v. Bell, 102 S.Ct. 1912 (1982)

Ortho-O-Vision, Inc. v. Home Box Office, 474 F.Supp. 672 (S.D.N.Y. 1979)

Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969)

Reynolds Metals Co. v. Aluminum Co. of America, 457 F.Supp. 482 (N.D. Ind. 1978)

Rice v. American Program Bureau, 446 F.2d 685 (2d Cir. 1971)

Richards v. United States, 369 U.S. 1 (1962)

Roe v. Wade, 410 U.S. 113 (1973)

Rohauer v. Killiam Shows, Inc., 379 F.Supp. 723 (S.D.N.Y. 1974), rev'd on other grounds, 551 F.2d 484 (2d Cir. 1977), cert. denied, 431 U.S. 949 (1977)

Rohm And Haas Co. v. Dawson Chem. Co., 599 F.2d 685 (5th Cir. 1979), aff'd, 448 U.S. 176 (1980)

Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966)

Roy Export Company v. CBS, 672 F.2d 1095 (2d Cir., cert. denied, 51 U.S.L.W. 3254 (U.S. Oct. 5, 1982) No. 81-2111

Rubin v. Boston Magazine Co., 645 F.2d 80 (1st Cir. 1981)

Russell v. Price, 612 F.2d 1123 (9th Cir. 1979), cert. denied, 446 U.S. 952 (1980)

Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384 (1951)

EXHIBIT 7 - PAGE 86

Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 256 F.Supp. 399
(S.D.N.Y. 1966) (I)

Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 327 F.Supp. 788
(S.D.N.Y. 1971), rev'd on other grounds, 453 F.2d 552 (2d Cir. 1972)

Shapiro, Bernstein & Co., Inc. v. H.L. Green Co., 316 F.2d 304 (2d Cir. 1963)

Shumaker v. Gem Mfg. Co., 311 F.2d 273 (7th Cir. 1962)

Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157 (9th
Cir. 1977)

Silver King Mines, Inc. v. Cohen, 261 F.Supp. 666 (D. Utah 1966)

SPEE-FLO Mfg. Corp. v. Gray Co., Inc., 255 F.Supp. 618 (S.D. Tex. 1964)

Stanley v. Georgia, 394 U.S. 557 (1969)

Teleprompter Corp. v. CBS, Inc., 415 U.S. 394 (1974)

Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978)

Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171 (5th
Cir. 1980)

Twentieth Century Music Corp. v. Aiken, 422 U.S. 151 (1975)

Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851 (2d Cir. 1967)

United States Fidelity etc. Co. v. Royal Nat'l Bank, 545 F.2d 1330 (2d Cir. 1976)

United States v. Grayson County State Bank, 656 F.2d 1070 (5th Cir. 1981)

United States Gypsum Co. v. National Gypsum Co., 440 F.2d 510 (7th Cir. 1971),
cert. denied, 403 U.S. 923

United States v. International Union, etc., 352 U.S. 567 (1957)

United States v. Loew's, Inc., 371 U.S. 38 (1962)

United States v. Mississippi Valley Generating Co., 364 U.S. 520 (1961)

 United States v. NBC, 449 F.Supp. 1127 (C.D. Cal. 1978)

Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council Inc., 425 U.S.
748 (1976)

Walt Disney Prods. v. Air Pirates, 581 F.2d 751 (9th Cir. 1978) cert. denied, 439
U.S. 1132 (1979)

Walt Disney Prods. v. Alaska Television Network, Inc., 310 F.Supp. 1073 (W.D.

EXHIBIT 7 - PAGE 87

Wash. 1969)

Wainwright Secs. Inc. v. Wall Street Transcript Corp., 558 F.2d 91 (2d Cir. 1977), cert. denied 434 U.S. 1014 (1978)

Wells v. Universal Pictures Co., 166 F.2d 690 (2d Cir. 1948)

Weyerhaeuser Timber Co. v. Bostich, Inc., 178 F.Supp. 457 (D.R.I. 1959)

WGN Continental Broadcasting Co. v. United Video, Inc., 685 F.2d 218 (7th Cir. 1982)

Wihtol v. Crow, 309 F.2d 777 (8th Cir. 1962)

Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct.Cl. 1973) aff'd by equally divided court, 420 U.S. 376 (1975)

Zacchini v. Scripps-Howard Broadcasting Co., 422 U.S. 562 (1977)

Zuber v. Allen, 396 U.S. 168 (1969)

Constitution

United States Constitution, First Amendment

Miscellaneous

Amendment No. 1242 to S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S15723-24 (daily ed. Dec. 16, 1981)

Amendment No. 1331 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S1287-90 (daily ed. Mar. 1, 1982)

Amendment No. 1333 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S1675 (daily ed. Mar. 4, 1982)

Assembly Bill No 3483, 1981-82 Reg. Sess., Ch. 574 (Aug. 25, 1982)

Baumgarten, "Private Audio Recording of Copyrighted Music" 1-9 (Apr. 21, 1982) to be reprinted in April 21, Senate Committee Hearings   , 97th Cong., 2d Sess. (1982) (Memo for Nat'l Music Publishers' Ass'n, Mar. 8, 1982)

California Legislative Service (1982), p. 3508 (West)

CATV, Second Report & Order, Nos. 14895, 15233, 15591, 2 F.C.C.2d 725 (1966)

128 Cong. Rec. H.322 (daily ed., Feb. 9, 1982)

General Revision of Copyright Law, Pub. L. No. 94-553, 90 Stat. 2541 (17 U.S.C. §§ 101 et seq.)

1967 House Report 35

EXHIBIT 7 - PAGE 88

1967 House Report 61

1971 House Report 1-2

1976 House Report 52

1976 House Report 57-58

1976 House Report 61

1976 House Report 63

1976 House Report 65

1976 House Report 66-67

1976 House Report 72-73

1976 House Report 77

1976 House Report 78

1976 House Report 86-101

1976 House Report 87

1976 House Report 93-94

1976 House Report 98

1976 House Report 101

1976 House Report 103

1976 House Report 106

1976 House Report 148

1976 House Report 162, P1

H.R. 4783, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981)

H.R. 4794, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981)

H.R. 4808, 97th Cong., 1st Sess., 127 Cong. Rec. H7591 (daily ed. Oct. 21, 1981)

H.R. 5250, 97th Cong., 1st Sess., 127 Cong. Rec. H9928 (daily ed. Dec. 16, 1981)

H.R. 5488, 97th Cong., 2d Sess., 128 Cong. Rec. H333 (daily ed. Feb. 9, 1982)

H.R. 5705, 97th Cong., 2d Sess., 128 Cong. Rec. H664 (daily ed. Mar. 3, 1982)

H.R. Rep. No. 83, 90th Cong., 1st Sess. 31 (1967)

EXHIBIT 7 - PAGE 89

H.R. Rep. No. 2237, 89th Cong., 2d Sess. 64 (1966)

H.R. Rep. No. 92-487, 92d Cong., 1st Sess. 5-6 (1971), reprinted in [1971] U.S. Code Cong. & Ad. News 1566, 1570-71

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 134 (1976), reprinted in [1976] U.S. Code Cong. & Ad. News 5659 (1976 House Report)

H.R. Rep. No. 94-1733, 94th Cong., 2d Sess. 75 (1976)

Media Statistics, Inc., Mediastat: Third Annual Diary of VCR Homes (Fall, 1981) 8120 Fenton Street, Silver Spring, Maryland

Public Law No. 92-140, 85 Stat. 391 (1971)

Register's House Statement, 4-7

Register's House Statement, 18-19

Register's House Statement, 19, 22, 25

Register's House Statement, 23

Register's Senate Statement, 4-7

Register's Senate Statement, 18-19

Register's Senate Statement, 19, 22, 25

Register's 1965 Supplementary Report 132

S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S11810 (daily ed. Oct. 21, 1981)

S. Rep. No. 94-473, 94th Cong., 1st Sess. 71 (1975) (1975 Senate Report)

1975 Senate Report 57

1975 Senate Report 61-62, 64, 65, 66

1975 Senate Report 66

Statement of Bruce L. Christensen, President of National Association of Public Television Stations 1 (Sept. 22, 1982) to be reprinted in Hearings on Home Video Legislation before Subcommittee on Courts, Civil Liberties and Administration of Justice of the House Judiciary Comm., 97th Cong., 2d Sess.     (1982)

Statement of David Ladd, Register of Copyright and Assistant Librarian of Congress for Copyright Services 25, 29 (Apr. 21, 1982) to be reprinted in Hearings on S. 1758 before Senate Comm. on Judiciary, 97th Cong., 2d Sess.     (1982)

Statement of David Ladd, Register of Copyrights and Assistant Librarian of Congress for Copyright Services 25, 29 (June 24, 1982) to be reprinted in Hearings

EXHIBIT 7 - PAGE 90

on Home Video Legislation before Subcomm. on Courts, Civil Liberties and
Administration of Justice of House Judiciary Comm., 97th Cong., 2d Sess.    (1982)

Statement of David Ladd, United States Register of Copyright to the American Bar
Association, Patent, Trademark and Copyright Law Section (Aug. 10, 1982) reprinted
in Patent, Trademark & Copyright Journal (BNA), Vol. 24, No. 593, at 421-22 (Aug.
26, 1982)

Statement of Francis S. M. Hodsall, Chairman, National Endowment for the Arts 4-
5 (June 24, 1982) to be reprinted in June 24 House Committee Hearings    , 97th
Cong., 2d Sess.    (1982)

Statement of Jack Valenti, President, Motion Picture Association of America, Inc.
(Apr. 21, 1982) to be reprinted in April 21 Senate Committee Hearings    , 97th
Cong., 2d Sess.    (1982)

Statement of Jay Eliasberg, Reseach, CBS Broadcast Group 4-5 (April 21, 1982), to
be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess.
(1982)

Statement of Joan Gantz Cooney, President, Children's Television Workshop 2-3
(Apr. 21, 1982) to be reprinted in April 21, Senate Committee Hearings    , 97th
Cong., 2d Sess.    (1982)

Statement of MPAA, March 2, 1962 in Copyright Law Revision, Part 28 Discussion
and Comments on Report of the Register of Copyrights 345, 351, 88th Cong, 1st
Sess. (House Comm. Reprint) (1963)

Supplementary Report of the Register of Copyrights on the General Revision of
U.S. Copyright Law: 1965 Revision Bill, Copyright Law Revision, Part 6 at 16-17,
89th Cong., 1st Sess. (1965)

Testimony of Sidney Sheinberg, President and Chief Operating Officer of MCA INC.
92-93 (Nov. 30, 1981) to be reprinted in Hearings on S. 1758 before the Senate
Comm. on the Judiciary, 97th Cong., 1st Sess.    (1981)

Publications

20 Television Digest, No. 27, July 7, 1980, at 13

Wall Street Journal, Apr. 30, 1982

Rules

Federal Rules of Civil Procedure, Rule 52

Federal Rules of Civil Procedure, Rule 52(a)

Rules of Superior Court, Rule 28.1

Rules of Superior Court, Rule 34.5

Statutes

EXHIBIT 7 - PAGE 91

California Civil Code, Sec. 980

Copyright Act of 1909, Pub. L. No. 60-349, Ch. 320, 35 Stat. 1075 (17 U.S.C. §§ 1 et seq.)

United States Code, Title 17, Sec. 1(f)

United States Code, Title 17, Sec. 26

United States Code, Title 17, Sec. 101

United States Code, Title 17, Sec. 101(b)

United States Code, Title 17, Sec. 102

United States Code, Title 17, Sec. 103

United States Code, Title 17, Sec. 106(1)

United States Code, Title 17, Sec. 106(4)

United States Code, Title 17, Sec. 107

United States Code, Title 17, Secs. 107-118

United States Code, Title 17, Sec. 107(2)

United States Code, Title 17, Sec. 108

United States Code, Title 17, Sec. 108(h)

United States Code, Title 17, Sec. 110

United States Code, Title 17, Secs. 110(1), (2), (3), (4), (6), (7), (8), (9)

United States Code, Title 17, Sec. 110(5)

United States Code, Title 17, Sec. 111

United States Code, Title 17, Sec. 111(c)(3)

United States Code, Title 17, Sec. 111(e)

United States Code, Title 17, Sec. 112

United States Code, Title 17, Sec. 112(a)

United States Code, Title 17, Sec. 114(a)

United States Code, Title 17, Sec. 114(b)

United States Code, Title 17, Sec. 118

EXHIBIT 7 - PAGE 92

United States Code, Title 17, Sec. 118(f)

United States Code, Title 17, Sec. 302(a)

United States Code, Title 17, Sec. 405(b)

United States Code, Title 17, Sec. 408(a)

United States Code, Title 17, Sec. 411(a)

United States Code, Title 17, Sec. 502(a)

United States Code, Title 17, Sec. 504(c)

United States Code, Title 35, Sec. 271

United States Code, Title 35, Sec. 271(b)

United States Code, Title 35, Sec. 271(c)

United States Code, Title 47, Secs. 151 et seq.

United States Code, Title 47, Sec. 414

Treatises

Nimmer, "The Legal Status of Home Audio Recording of Copyrighted Works" 1-2, 16-26 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings , 97th Cong., 2d Sess.    (Statement of Recording Industry Ass'n of America, et al.)

1 Nimmer on Copyright, Sec. 3.04, at 3-12 - 3-14

2 Nimmer on Copyright, Sec. 7.16[A][1], at 7-111, 7-129-30

3 Nimmer on Copyright, Sec. 12.04[A], at 12-34

3 Nimmer on Copyright, Sec. 13.05[A][2], at 13-63 (1982)

3 Nimmer on Copyright, Sec. 13.05[B], at 13-65 - 13-71

3 Nimmer on Copyright, Sec. 13.05[E][4][c], at 13-84

3 Nimmer on Copyright, Sec. 13.05[F], at 13-96, n. 159

Seltzer, L., Exemptions and Fair Use in Copyright, 24, 33-34 (1978)

Counterstatement of Questions Presented.  *

* Respondent Universal City Studios, Inc. ("Universal") is a wholly-owned subsidiary of MCA INC. ("MCA").  MCA and/or Universal have the following partially owned subsidiaries and/or affiliates within the meaning of Supr. Ct. Rule 28.1: Two-

EXHIBIT 7 - PAGE 93

Beat Music Corp., MCA New Ventures, Inc., Discovision Associates, Saticoy Technology, Inc., Mood Music Company, Inc., Fontaine Music Corp., Roncom Films, Inc., Supreme Music Corporation, Western Costume Co., MPD Leasehold Corp., Afram Films, Inc., American Motion Picture Export Company (Africa), Inc., Motion Picture Export Association of America, Inc., Cinema International Corporation N.V., CIC International B.V., Pincus-Gil Music Pty. Limited, Leeds Music Hans Gerig GmbH & Co. KG, Spoone Music Pty. Limited, Tangerine Music Pty. Limited, Eugene Music Limited, Evita Music Limited, Jeeves Music Limited, Rawlou Music Limited, Spoone Music Limited, Valley Music Limited, Academy Investments No. I Pty. Ltd., United Video International N.V., Regent Investments Pty. Limited, Town Cinema Investments Pty. Ltd., United International Pictures B.V., Universal-RKO, Oak Industries Joint Venture, Hotel Two Associates, T.E.M. Programs International, USA Network, Optical Programming Associates, Overland State, Inc., Thoremea Productions, Inc. and MCA Foundation, Ltd. Universal and MCA also partially own many companies and/or partnerships formed for the purpose of producing individual motion pictures and/or television programs.  These entities are not listed here because of Universal's understanding that they do not fall within the term "affiliates" as used in Rule 28.1.

Respondent Walt Disney Productions' only partially owned subsidiary or affiliate within the meaning of Rule 28.1 is Vista-United Telecommunications, Inc.

1.  Whether the fair use doctrine excuses unlimited home videotape recorder copying solely for purposes of entertainment and convenience of entire copyrighted motion pictures.

2.  Whether those who manufacture, market and sell videotape recorders intending, expecting and encouraging that they be used primarily to copy entire copyrighted motion pictures are liable for such copying as contributory infringers.

3.  Whether this Court should determine the appropriate remedy to be imposed in this case before the district court has had an opportunity to fashion a remedy on remand, and, if so, whether the district court's traditional equitable power to deny an injunction against unauthorized use of property on condition that the defendant pay compensation for such continued use is constricted in this copyright case.

4.  Whether reversal of a district court for failing properly to apply settled legal principles violates the clearly erroneous rule of Fed. Rule Civ. Proc. 52(a).

COUNTERSTATEMENT OF THE CASE.

A.  Prefatory Statement.

This is an action by two leading motion picture copyright owners, supported by virtually the entire motion picture industry and many others, n1 to protect their televised motion pictures from unlimited videotape recorder copying ("VTR copying") without compensation.  n2 Respondents simply seek protection against the permanent loss of control over their property and the concomitant erosion of their copyrights that will necessarily result as millions of VTRs are sold and hundreds of millions of unauthorized VTR copies of respondents' works are made.

EXHIBIT 7 - PAGE 94

n1 In addition to respondents, virtually all other producers and distributors of televised entertainment programs as well as many major producers and distributors of documentary, educational, children's and public television programming have filed objections in this action to home video recording.  See Brief Amicus Curiae of Creators and Distributors of Programs in Support of Respondents; Clerk's Record ("C.R.") docket sheet p. 18, entry 190 ("18/190"), 19/191-2, 19/208.

n2 These motion pictures are very costly to produce.  In 1979 respondents spent between $2,000,000 and $25,000,000 per picture to produce televised feature length motion pictures and between $400,000 and $1,500,000 per episode to produce one hour television series episodes (Reporter's Transcript ("R.") 203, 440, 1167, 1424-25).  These costs have increased substantially since 1979.

Notwithstanding this inevitable detrimental impact, petitioners assert that respondents' property rights should be completely disregarded ostensibly for one overriding reason: to ensure that the public is not deprived of a new technological convenience that allegedly increases access to copyrighted material broadcast on television.  n3 The premise which underlies this argument, however, is spurious.

n3 Behind this assertion -- at the heart of the case -- is petitioners' desire to reap tremendous profits from the sale of a device whose primary consumer appeal lies in its ability to reproduce copyrighted works without compensation to copyright owners (Appendix to Petition ("P.A.") 19 n. 9; see text accompanying notes 114 & 118, infra ).

Contrary to what petitioners would have this Court believe, to protect respondents' property, the sale of VTRs need not come to a halt.  There are several possible remedies that could accommodate the interests of copyright owners, VTR manufacturers and the public, which, ironically, petitioners have eschewed and in fact have sought to suppress.  n4 Thus, the social benefits that some segments of the public may derive from use of these machines are not necessarily jeopardized by protecting respondents' property rights.  n5

n4 For example, an order requiring petitioners to pay respondents a continuing royalty for VTR sales rather than permanently enjoining such sales would accomplish this purpose (P.A. 28-29).  So too would an order requiring a technological modification of VTRs which prevents recording of respondents' copyrighted programs (and those of other objecting program owners) but permits recording of all other programs (P.A. 103; R. 3159-71; Appellants' Opening Ninth Circuit Brief 58-59).

Rather than support a continuing royalty, petitioners assert that this Court should prohibit such a remedy (Brief for Petitioners ("P.B.") 45-46). Similarly, after learning of a technological system which would prevent VTR copying of copyrighted programs, Sony immediately studied and discovered a method of overcoming this system and objected to introduction of evidence of the system at trial (R. 1781-84, 1802-03, 3159-71; Plaintiffs' Exhibit ("PX") 986-87 *).

EXHIBIT 7 - PAGE 95

* Each trial exhibit referred to herein is listed in numerical order in Appendix A hereto.  The pages in the record at which each exhibit was identified and admitted are also set forth in the Appendix pursuant to Supr. Ct. Rule 34.5.

n5 Given the expense of VTRs ($875 to $1000 at the time of trial, P.A. 40), not all members of the public can afford to purchase these devices.  Thus, the persons most likely to benefit from the use of VTRs are primarily the affluent. See PX 730 (Table 19); Defendants' Exhibit ("DX") OT (Table 77).

In contrast, if petitioners are permitted to continue their activities without compensating respondents and others similarly situated, public access to television programming, far from increasing, will actually diminish.  For, without some mechanism to compensate copyright owners for the unlimited taking and unsupervised use of their creative property, the economic incentive to risk enormous sums to produce high-quality television programming will be substantially undermined.  n6 This in turn will result in the production of cheaper, lower-quality television programs and a refusal to license popular, top-quality theatrical motion pictures for exhibition and "free" viewing on commercially sponsored television, thereby prejudicing the entire television viewing public, VTR and non-VTR owners alike.  n7

n6 Statement of David Ladd, Register of Copyrights and Assistant Librarian of Congress for Copyright Services 25, 29 (June 24, 1982), to be reprinted in Hearings on Home Video Legislation before the Subcomm, on Courts, Civil Liberties and Administration of Justice of the House Judiciary Comm., 97th Cong., 2d Sess. (1982) ("June 24 House Committee Hearings") ("Register's House Statement"); Statement of David Ladd, Register of Copyrights and Assistant Librarian of Congress for Copyright Services 25, 29 (Apr. 21, 1982), to be reprinted in Hearings on S. 1758 before the Senate Comm. on the Judiciary, 97th Cong., 2d Sess.     (1982) ("April 21 Senate Committee Hearings") ("Register's Senate Statement"); Statement of Jack Valenti, President, Motion Picture Association of America, Inc. 3 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess. (1982) ("Valenti Statement"); Statement of Francis S.M. Hodsall, Chairman, National Endowment for the Arts 4-5 (June 24, 1982), to be reprinted in June 24 House Committee Hearings    , 97th Cong., 2d Sess.     (1982) ("Hodsall Statement"); Testimony of Sidney Sheinberg, President and Chief Operating Officer of MCA INC. 92-93 (Nov. 30, 1981) (unofficial transcript), to be reprinted in Hearings on S. 1758 before the senate Comm. on the Judiciary, 97th Cong., 1st Sess.     (1981).

n7 R. 263-67, 1200-01; H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 134 (1976), reprinted in [1976] U.S. Code Cong. & Ad. News 5659 ("1976 House Report") ("[i]n some cases the lack of copyright protection actually restrains dissemination of the work, since publishers and other users cannot risk investing in the work unless assured of exclusive rights."); Statement of Bruce L. Christensen, President of the National Association of Public Television Stations 1 (Sept. 22, 1982), to be reprinted in Hearings on Home Video Legislation before the Subcomm. on Courts, Civil Liberties and Administration of Justice of the House Judiciary Comm., 97th Cong., 2d Sess.     (1982); Valenti Statement, supra note 6, at 15-16; Statement of Joan Ganz Cooney, President, Children's Television Workshop 2-3 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess.     (1982);

EXHIBIT 7 - PAGE 96

Hodsall Statement, supra note 6, at 4-5.


B.  The Parties and the Products at Issue.

Respondents produce, own and license for television exhibition thousands of motion pictures.  n8 Petitioners manufacture, advertise and sell VTRs under the brand name Betamax for the primary purpose of making copies of copyrighted television programming, especially copyrighted motion pictures owned by respondents and amici. n9 This use is advertised, intended, expected and encouraged by petitioners, and is the source of the VTR's consumer appeal.  n10


n8 (P.A. 37-39).  Respondents produce two types of motion pictures, those made initially for theater exhibition ("theatrical motion pictures") and those made for initial television exhibition, including television series episodes. After theater exhibition, most of respondents' theatrical motion pictures are licensed for exhibition on pay television, then on network television and finally on local stations.  Respondents' motion pictures made for television are first exhibited on prime time network television, and if successful are re-licensed to the networks and then licensed for exhibition on local stations (P.A. 36-39).

Petitioners also sell and rent to the public copies of many of their motion pictures on pre-recorded video cassettes and video discs which can be viewed on a home television screen with the aid of a video cassette or video disc player. In addition, petitioners rent prints and sell excerpts of their motion pictures to the public (P.A. 36-39; 20 Television Digest, No. 27, July 7, 1980, at 13).

Since motion pictures rarely recoup their costs from initial theatrical or network exhibition, the subsequent markets in which those works are exploited -- the very markets most seriously threatened by VTR copying -- are essential to the continued health of the motion picture industry (P.A. 37, 39); R. 204-05, 250-58, 260-62, 274-77, 323-24, 440-41, 451-55, 539, 991-1002, 1169-70; Valenti Statement, supra, note 6, at 11-12.

n9 P.A. 26, 27; R. 1776-79, 1820-21, 1852-53, 1966, 1968, 2077-80, 2094-95; PX 143, 648-49, 716 (p. 8), 723 (p. 2), 1063, P5.  Most Betamax models have a built-in television tuner that permits Betamax to record off-the-air. Petitioners also sell some models without built-in tuners that can record off-the-air with a separate outboard tuner and that can make home movies with a video camera (P.A. 40; R. 735-37).  In addition, petitioners sell other models which cannot record, but can only play back prerecorded cassettes (PX 552). Respondents do not object to the sale of models without built-in tuners, but do object to the sale without compensation to copyright owners of separate outboard tuners for off-the-air recording of their property.

n10 P.A. 27, 41-42, 96-97; PX 454, 460, 461, 463, 466, 519, 546, (pp. 2-3), 548, 554 (p. 8); see note 9, supra. Petitioners err in stating that VTRs have been sold for home recording continuously since 1965 (P.B. 3).  Indeed, Sony's officers admitted that prior to introducing Betamax in late 1975, all attempts to sell home use VTRs failed (R. 1777, 1789-92, 1840, 2018-19, 2058-61, 2140-41; PX 109-14, 716 (p. 4); Pre-Trial Conference Order, C.R. 22/68, p. 9, PPT, U).

EXHIBIT 7 - PAGE 97

VTR owners engage in several types of recording and playback activities. First, the majority collect large libraries of VTR recordings, including recordings of motion pictures owned by respondents, which are saved indefinitely for unlimited repeat viewings (P.A. 43-48).  In fact, at the time of trial the average Betamax owner owned approximately 30 Betamax tapes (P.A. 47).  n11 Second, Betamax owners time-shift, i.e., they record for later viewing television programs which they do not watch at the time of broadcast.  n12 Third, because VTR copies do not self-erase, many Betamax owners view time-shift recordings several times before erasure, thereby effectively using these recordings for library purposes.  n13 Fourth, Betamax owners regularly delete commercials from their recordings.  n14

n11 Petitioners' statements that "[t]here was no evidence of any librarying of any work of respondents" and that "this case is only time shift" (P.B. 5; Petition 17) are grossly inaccurate.  The district court expressly found pervasive librarying activities, and the uncontroverted survey evidence established that 69% to 75% of all Betamax owners maintain large libraries of off-the-air recordings and that the vast majority of programs in those libraries are copyrighted motion pictures (P.A. 43-48; PX 717 (pp. 0619, 0636, 0637), PX 730 (Tables 6A, 10), DX OS (Tables 4, 6, 7).  See DX OT (Table 60).  If Betamax were merely a "time-shift" machine, consumers would need only a handful of tapes -- not 30 -- because tapes are eraseable and reusable.

n12 The time-shift concept assumes that Betamax owners voluntarily erase time-shift recordings immediately after they are played back and viewed once (P.A. 111; P.B. 4-5).  Subsequent erasure of these recordings does not, however, alter the fact that they -- like library recordings -- constitute illegal copies under the Copyright Act.

n13 P.A. 111; DX OT (Table 43).

n14 P.A. 48; P.B. 14 n. 19.  Deletion of commercials is accomplished with either Betamax' pause control, which petitioners admit is designed primarily to avoid recording commercials, or the fast forward control, which permits Betamax owners to skip over recorded commercials on playback (P.A. 41; R. 822-26, 1779, 1795-96, 1827-29; PX 559 (P51), 1063 (P6(b)); see P.B. 3 n. 3).

Deleting commercials is a very significant activity.  The surveys unanimously show that from 40% to 85% of all VTR recordings are viewed without commercials (PX 717 (pp. 0391, 0515, 0630, 0713), PX 730 (Tables 11, 12), DX OT (Table 38); R. 2390-91; Media Statistics.  Inc., Mediastat: Third Annual Diary of VCR Homes, Fall, 1981, 8120 Fenton Street, Silver Spring, Maryland.

Petitioners mislead the Court in stating that over 95% of all television programming is "available for unchallenged home recording" (P.B. 4, 29, 40). n15 Virtually all programs broadcast on television are protected by federal or state law from unconsented VTR copying.  (See note 110, infra ).  Furthermore, over 80% of the material copied is entertainment programming, the bulk of which is owned by respondents and supporting amici, all of whom -- along with many educational producers, also amici -- object to such copying.  (See notes 112, 114, 116 & accompanying text, infra ).  Moreover, despite the contrary position taken by petitioners in this litigation, they have always believed that home video recording

EXHIBIT 7 - PAGE 98

violates the Copyright Act.  n16

n15 Petitioners make these statements without any citation to supporting facts or authority and in total disregard of copyright law.  (See notes 110, 112, 114-16 & accompanying text, infra ).

n16 See note 95, infra. Indeed, the advertisements, brochures and operating instructions for VTRs sold by Sony prior to introducing Betamax stated: "THIS VIDEOTAPE RECORDER IS NOT TO BE USED TO RECORD COPYRIGHTED MATERIAL" (R.T. 638-44, 921-24; PX 147-52, 155-70, 228, 252, 253, 326, 328-30, 448-49, 452-53).

C.  The Proceedings Below.

Respondents brought this action alleging that VTR copying constitutes copyright infringement and that petitioners are liable for such infringement under the doctrines of contributory infringement, direct infringement, vicarious liability and unfair competition (P.A. 54, 101).  n17 Respondents sought equitable and monetary relief, electing prior to trial to recover statutory damages in lieu of actual out of pocket damages or petitioners' profits.  n18

n17 The action was brought pursuant to both the Copyright Act of 1909, Pub. L. No. 60-349, ch. 320, 35 Stat. 1075, 17 U.S.C.  §§ 1 et seq. (superseded 1978) ("1909 Act") and the General Revision of Copyright Law, Pub. L. No. 94-553, 90 Stat. 2541, 17 U.S.C.  §§ 101 et seq. ("1976 Act").

n18 See 1909 Act § 101(b); 1976 Act § 504(c); R. 69-70, 3265-68; C.R. 28/88, pp. 65-66.

Since respondents had the absolute statutory right to make this election (Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1178-79 (9th Cir. 1977); 17 U.S.C.  § 504(c); 1976 house Report 162, P1), they did not attempt to prove their actual out of pocket damages or petitioners' profits. Petitioners' statement that respondents "admitted at trial that they had suffered no damage of any kind to date... because of home Betamax recording" (P.B. 13) is incorrect.  Due to the small number of Betamax which had been sold by the time of trial (only 130,000 units representing less than 1/5 of 1% of the 73 million television households then in the United States, PX 124, 1068), respondents were unable to measure the amount of harm which they had suffered from unknown VTR copies. Respondents, however, adamantly maintained that such harm had in fact occurred through, among other things, loss of the value of each unauthorized VTR copy and loss of control over access to respondents' copyrighted works.  Respondents also vigorously urged that such harm will be extensive in the future (P.A. 76-77; R. 263, 288-94, 394, 513-15, 542-44, 1206-08, 1256-57, 1284-87, 1370-71, 1475, 1493-94, 2281-89).

The district court (Ferguson, J.) found for petitioners, holding that VTR copying for private viewing is impliedly excepted from the express statutory prohibition in the 1976 Act against unauthorized copying (P.A. 57-65) n19 and, alternatively, that such

EXHIBIT 7 - PAGE 99

copying is permitted by the fair use doctrine (P.A. 66-87).  The district court further concluded that even if VTR copying constitutes infringement, petitioners are not liable for such infringement (P.A. 89-102) and, even if they are liable, respondents are entitled to no relief (P.A. 102-15).  The latter two holdings were based primarily on the district court's analogy to the patent statute's staple article of commerce doctrine and the court's conclusion that VTRs are staple articles of commerce capable of some non-infringing uses (P.A. 92, 97, 104, 114).  Importantly, however, and contrary to petitioners' assertion (P.B. 19, 40), the court refused to find that VTRs are suitable for substantial non-infringing uses (P.A. 97, 114).

    n19 The district court did not find an implied statutory exemption in the 1909 Act (P.A. 14, 56-57).

    The Court of Appeals (Kilkenny, J.) unanimously reversed the district court in all respects, ruling that based on the facts found by the district court and petitioners' admissions, the district court's decision was incorrect as a matter of law.  The Ninth Circuit first held that under the unambiguous language and legislative history of the Copyright Act, VTR copying constitutes copyright infringement and that the district court contravened Congressional intent in finding -- separate and apart from the fair use doctrine -- an implied exception to the statutory prohibition against unauthorized copying (P.A. 4-12).  n20

    n20 Petitioners now concede that the 1976 Act does not contain such an implied statutory exemption (see P.B. 20-21, 23, 33, 39).  In this Court petitioners rely entirely on the fair use doctrine to support their contention that VTR copying does not constitute copyright infringement (P.B. 20-39).

    Relying on two independent grounds, the Court of Appeals next ruled that the district court erred in concluding that VTR copying constitutes fair use (P.A. 12-25).  The Court of Appeals initially held that since the fair use defense may be invoked only if an unauthorized use involves creation of new works, and VTR copying does not involve such independent creation, VTR copies do not qualify as fair use (P.A. 14-18).  Alternatively, the Court held that the district court erred in its application of the four fair use criteria set forth in § 107 of the 1976 Act, and concluded that, properly applied, these criteria require rejection of the fair use defense (P.A. 18-25).  n21

    n21 The Court of Appeals first held that the fact that VTR copies are made merely for convenience weighs against the fair use defense.  In so ruling, the Court rejected the district court's view that because VTR copying allegedly increases access to broadcast material this non-productive copying constitutes fair use (P.A. 19).  The Court of Appeals then ruled that the expense and the creative and entertainment nature of respondents' motion pictures tip strongly against the fair use defense, rejecting the district court's conclusion that VTR copying is justified because respondents' works are presented through the broadcast medium (P.A. 20-21).  The Court of Appeals next held that the fact that VTR copying generally involves copying the entire work weighs against the fair use defense (P.A. 21-22).  Finally, as to the effect of VTR copying on the potential market for or value of respondents' works, the Court held that the district court erred in (a) placing the burden of proving this

EXHIBIT 7 - PAGE 100

element of the defense on respondents rather than on petitioners, (b) applying an incorrect legal standard and (c) failing to recognize that under the correct standard, the requisite potential adverse impact exists as a matter of law (P.A. 22-25).

The Court of Appeals next ruled that the district court erred in concluding that petitioners are not liable as contributory infringers (P.A. 25-27). n22 In so ruling, the Ninth Circuit held that the district court misinterpreted the knowledge requirement of the contributory infringement doctrine and misapplied the staple article of commerce rationale. n23 The Court of Appeals then concluded that under the proper legal test, petitioners' admitted activities constitute contributory infringement as a matter of law (P.A. 27). n24

n22 The Court of Appeals did not consider respondents' contentions that petitioners are also liable under the doctrines of direct infringement, vicarious liability and unfair competition. These issues are therefore not before this Court. See Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 102 S.Ct. 2182, 2190 (1982).

n23 The Court of Appeals held that the district court erred in refusing to hold petitioners liable merely because VTRs may have some non-infringing uses, stressing that any such non-infringing uses can be accommodated in this copyright case by fashioning appropriate relief (P.A. 25-26, 28). The Court of Appeals further held that since any such uses are not substantial, the staple article doctrine is inapplicable (P.A. 25-26).

n24 In so ruling, the Court of Appeals relied on the district court's findings and petitioners' admissions that (a) Betamax is manufactured, advertised and sold for the primary purpose of reproducing television programming, (b) petitioners' advertisements exhort such copying, (c) Betamax in fact contributes to VTR copying, and (d) petitioners knew that Betamax would be used to copy copyrighted works, including works produced by respondents (P.A. 41-42, 96-97; see notes 91, 92, 95, 99 & accompanying text, infra ).

Finally, the Court of Appeals remanded the case to the district court to fashion an appropriate remedy, observing that a continuing royalty may be an appropriate "resolution in this context" (P.A. 28-29). In so doing, the Court of Appeals noted that the "district court is in a better position [than the Court of Appeals] to resolve, in an appropriate fashion, the relief question" and therefore declined to direct the entry of any particular type of relief on remand (P.A. 28).

D. Congressional Reaction to the Court of Appeals' Decision.

In response to the Court of Appeals' decision, several bills were introduced in Congress dealing with home video recording. The initial bills seek to exempt home video recording from copyright liability without compensating copyright owners. n25 These bills would essentially overturn the decision below. Several subsequent bills, while completely exempting VTR owners from liability, would exempt VTR manufacturers and distributors only if they pay compulsory royalty fees to copyright owners. n26 These latter bills, which are supported by the United States Copyright Office, n27 would modify the decision below and retain copyright protection against mass uncompensated VTR copying. Versions of all bills are expected to be re-introduced when the Ninety-eighth Congress convenes in January, 1983.

EXHIBIT 7 - PAGE 101

n25 S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S11810 (daily ed. Oct. 21, 1981); H.R. 4783, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981); H.R. 4794, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981); H.R. 4808, 97th Cong., 1st Sess., 127 Cong. Rec. H7591 (daily ed. Oct. 21, 1981); H.R. 5250, 97th (Cong., 1st Sess., 127 Cong. Rec. H9928 (daily ed. Dec. 16, 1981).

n26 Amendment No. 1242 to S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S15723-24 (daily ed. Dec. 16, 1981); Amendment No. 1331 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S. 1287-90 (daily ed. Mar. 1, 1982); Amendment No. I333 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S1675 (daily ed. Mar. 4, 1982); H.R. 5488, 97th Cong., 2d Sess., 128 Cong. Rec. H333 (daily ed. Feb. 9, 1982); H.R. 5705, 97th Cong., 2d Sess., 128 Cong. Rec. H664 (daily ed. Mar. 3, 1982).

n27 Register's House Statement, supra note 6, at 4-7; Register's Senate Statement, supra note 6, at 4-7.


SUMMARY OF ARGUMENT.

The Ninth Circuit correctly held that home VTR copying violates the Copyright Act and that petitioners are contributory infringers.  This result is compelled by the language, structure and legislative history of the Act and time-honored principles protecting copyrighted works.

I.

The purpose of the fair use doctrine is to promote creativity in areas of universal social concern such as criticism, scholarship or research by permitting authors to make limited use of the works of others in creating new works.  The fair use defense thus may be invoked only where the unauthorized activity results in the creation of new works.  Since home VTR copying involves no independent creativity and therefore does not meet the fundamental justification for the fair use defense, the defense is inapplicable.

Even if this lack of independent creation were overlooked, home VTR copying would not satisfy the four statutory criteria used to determine whether a given use is fair (17 U.S.C.  § 107).  This copying is merely for the convenience of the viewer, is not for a traditionally accepted purpose such as criticism, comment, news reporting, teaching, scholarship or research, involves taking entire works which are entertainment -- rather than informational -- in nature, and results in the making of an unlimited number of copies (often without the accompanying broadcast commercials) which serve the same function as and compete with the copyrighted originals.  Under established case law interpreting the four fair use criteria, these characteristics individually and collectively require rejection of the fair use defense.

Nor does federal communications policy support petitioners' central argument that because VTR copying increases access to works broadcast on the public airwaves, settled fair use principles should be disregarded.  This argument, which would essentially override all statutory copyright protection for televised works, has been categorically rejected by Congress as well as by this Court.

EXHIBIT 7 - PAGE 102

Moreover, the overall statutory scheme and legislative history of the 1976 Act demonstrate special concern for the protection of motion pictures and overwhelmingly refute petitioners' contention that Congress intended home VTR copying of these works to be fair use.  Accordingly, the Court of Appeals' rejection of the fair use defense was proper in all respects.

II.

A contributory infringer is one who knowingly induces, causes, furthers or materially contributes to the infringing activity of another.  This test is satisfied here. Given the district court's findings and petitioners' admissions that petitioners manufacture, advertise and sell Betamax for the primary purpose of reproducing programming from television, especially copyrighted motion pictures, that Betamax sales contribute to such copying, that petitioners know and intend that Betamax will be used to copy copyrighted works owned by respondents and others, and that petitioners actively encourage such infringing activity through their advertisements, brochures and instruction manuals, the Court of Appeals was compelled under established authority to hold petitioners liable as contributory copyright infringers.

Petitioners' reliance on the patent law's staple article of commerce doctrine to shield them from contributory copyright infringement liability is misplaced. Petitioners predicate their staple article argument on their belief that it would be difficult or impossible to devise a remedy in this case without unjustifiably inhibiting alleged non-infringing uses of VTRs.  However, once liability is established under accepted legal principles, it is impermissible to deny relief merely because the fashioning of an appropriate remedy may be difficult.  Moreover, there are remedies, such as a continuing royalty, that can accommodate any potential non-infringing uses.  The staple article of commerce theory is also inapposite because it is found in the patent statute -- not the copyright statute -- and represents a legislative balance of competing considerations unique to patent law.

Even if it were proper in a copyright case to analogize to the staple article doctrine, that doctrine would not absolve petitioners of liability here.  The staple article theory shields the seller of a staple article from contributory infringement liability only if (a) the seller does not actively cause, urge, encourage or aid purchasers to use the article for infringing purposes, and (b) the article is suitable and actually used for substantial non-infringing uses.  The uncontroverted evidence and the district court's findings establish both that petitioners cause, urge, encourage and aid infringing VTR copying and that VTRs do not have actual, substantial non-infringing uses. Accordingly, the Court of Appeals properly rejected the staple article argument.

III.

Since the district court has not yet considered the remedy question, it would be premature for this Court to do so without the benefit of a factual record. In any event, general equitable principles incorporated in the Copyright Act as well as specific provisions of that Act make clear that the district court has the authority to impose a continuing royalty in lieu of an injunction.

IV.

The "clearly erroneous" standard of Fed. Rule Civ. Proc. 52(a) does not apply to

EXHIBIT 7 - PAGE 103

review of a district court's legal conclusions drawn from facts found at trial. Since the Court of Appeals merely held that the facts found by the district court did not support the legal conclusions which the district court drew therefrom, Rule 52(a) is inapplicable.

TEXT: ARGUMENT.

I.

VTR COPYING DOES NOT CONSTITUTE FAIR USE.

The Court of Appeals relied on two independent grounds in ruling that VTR copying does not constitute fair use. First, it held that infringing activity such as VTR copying which does not involve a "productive use" -- i.e., a use of the copyrighted original to create a new work -- can never constitute fair use (P.A. 14-18). Alternatively, the Court held that even if the non-productive character of VTR copying were overlooked, a balancing of the traditional four fair use criteria codified in § 107 of the 1976 Act requires rejection of the fair use defense (P.A. 18-25).

Petitioners seek to overturn each of these holdings, asserting that independent creativity is not necessary to establish the fair use defense and that the Court of Appeals erred in its analysis of the traditional four fair use factors. However, the Ninth Circuit's determination that VTR copying is not fair use is fully consistent with all applicable statutory and judicial authorities. n28

n28 Section 107 of the 1976 Act is a codification of the judicially created fair use doctrine. 1976 House Report 65. The 1976 Act "endorses the purpose and general scope of the judicial doctrine" and does not "change, narrow, or enlarge it in any way." Id. at 66. The fair use question in this action therefore must be resolved according to settled principles of fair use case law.
A. VTR Copying Is Not Fair Use Because It Does Not Involve Independent Creation.

The district court found that "in this case there is no independent use. Betamax owners use the copy for the same purpose as the original. They add nothing of their own" (P.A. 81). The Court of Appeals called this use "intrinsic use," meaning that it does not result in the creation of new intellectual works (P.A. 15-18). The Court of Appeals correctly reasoned that such non-productive use does not qualify as fair use because it does not fulfill the underlying purpose of the fair use doctrine (P.A. 15-18).

Petitioners' characterization of this holding as "inflexible" and "contrary to the spirit of § 107" (P.B. 29) manifests a fundamental misconception of the limited purpose and scope of fair use. The doctrine is not an omnibus defense applicable in all contexts. It is available only in those few situations where rigid application of the copyright statute "would stifle the very creativity which that law is designed to foster." n29 Thus, application of the fair use doctrine is limited to uses by subsequent authors who build on the works of others to create new works. n30 Without some independent creation, there can be no fair use. n31

n29 Iowa State University Research Foundation v. ABC, 621 F.2d 57, 60 (2d Cir. 1980); Rubin v. Boston Magazine Co., 645 F.2d 80, 83 (1st Cir. 1981).

EXHIBIT 7 - PAGE 104

n30 Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 307 (2d Cir. 1966); L. Seltzer, Exemptions and Fair Use in Copyright 24 (1978) ("Seltzer").  See Elsmere Music v. NBC, 623 F.2d 252, 253 n. 1 (2d Cir. 1980) (per curiam).

n31 Wainwright Secs. Inc. v. Wall Street Transcript Corp., 558 F.2d 91, 94, 96-97 (2d Cir. 1977), cert. denied, 434 U.S. 1014 (1978); Benny v. Loew's, Inc., 239 F.2d 532, 536 (9th Cir. 1956), aff'd by equally divided court, 356 U.S. 43 (1958); Seltzer, supra, at 24.


In holding that VTR copies do not constitute fair use, the Court of Appeals correctly recognized the limits of the fair use doctrine.  n32 Since VTR copies involve no independent creation, they simply do not fall within "the fundamental justification for the [fair use] privilege... to wit, 'to promote the progress of science and the useful arts.'" Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d at 307; Rubin v. Boston Magazine Co., supra, 645 F.2d at 83.  Where, as here, this fundamental purpose is not fulfilled, the fair use defense may not be invoked (P.A. 15-18).


n32 Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973), aff'd by equally divided court, 420 U.S. 376 (1975), relied upon by petitioners, did not expand application of the fair use doctrine beyond these limits.  In Williams & Wilkins, the Court of Claims held that library photocopying by the Government of individual articles from copyrighted medical journals was fair use.  Despite petitioners' contrary assertion (P.B. 27), this copying was not an intrinsic use. Although nothing new was added to the copies at the time they were made, they were subsequently used for medical research purposes and thus constituted a permissible productive use.  For this reason, the Court of Appeals found Williams & Wilkins "clearly distinguishable" from the instant case (P.A. 16-17).  The district court agreed, stating that Williams & Wilkins "has little precedential value" and is "specifically limited to its unique factual situation" (P.A. 73).  Accord, S. Rep. No. 94-473, 94th Cong., 1st Sess. 71 (1975) ("1975 Senate Report").

B.  Under a Balancing of the Four Fair Use Criteria VTR Copying Is Not Fair Use.

The Court of Appeals did not, as petitioners suggest (P.B. 28-29), end its fair use analysis after concluding that VTR copying constitutes impermissible non-productive use.  Rather, the Court went on to consider each of the four fair use factors listed in § 107 (P.A. 18-25).  Its conclusion that each of these factors requires rejection of petitioners' fair use defense is correct in all respects.

1.  Purpose and Character of the Use.

The fair use doctrine was developed to promote the "public's interest in dissemination of information affecting areas of universal concern, such as art, science, history, or industry." n33 Accordingly, as recognized by both courts below, the purpose and character of the use factor has traditionally been analyzed by determining whether the copyrighted material is used for criticism, scholarship, news reporting or other utilitarian purposes (P.A. 19, 81).  n34 Because VTR copies do not involve a traditionally accepted purpose, the Court of Appeals determined that this factor weighs against a finding of fair use (P.A. 19).  This conclusion is further

EXHIBIT 7 - PAGE 105

necessitated by the fact -- conceded by petitioners and acknowledged by the district court (R. 965; PX 113, P3; P.A. 82) -- that VTR copies are made for entertainment and convenience.  Congress made clear in passing the 1976 Act that off-the-air recording merely for convenience cannot under any circumstances be fair use.  n35

   n33 Meeropol v. Nizer, 560 F.2d 1061, 1068 (2d Cir. 1977), cert. denied, 434 U.S. 1013 (1978); Wainwright Secs. Inc. v. Wall Street Transcript Corp., supra, 558 F.2d at 94.

   n34 Indeed, the defense has previously been allowed only when the unauthorized use is for a purpose such as criticism, comment, news reporting, scholarship or research.  E.g., Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171 (5th Cir. 1980) (use for comparative advertising); Williams & Wilkins Co. v. United States, supra, 487 F.2d 1345 (use for medical research); Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d 303 (use for preparation of biography); Berlin v. E.C. Publications, Inc., 329 F.2d 541 (2d Cir. 1964) (use for parody); see H.R. Rep. No. 83, 90th Cong., 1st Sess. 31 (1967) ( § 107 is intended "to characterize a fair use as generally being 'for purposes such as criticism, comment, news reporting, teaching scholarships or research'") ("1967 House Report").

   n35 1975 Senate Report 66 ("[t]he Committee does not intend to suggest however, that off-the-air recording for convenience would under any circumstances, be considered 'fair use'").  Cf.  F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, 214 U.S.P.Q. (BNA) 409, 415 (7th Cir. Mar. 25, 1982) ("[a] copyright owner is not required to market its copyrights in a form most convenient to its customers").

   The district court disregarded the foregoing authorities based on its findings that VTR copying (1) takes place in the home, (2) for non-commercial purposes, (3) allegedly to increase access to television broadcasts (P.A. 81-82).  In reversing, the Court of Appeals correctly held that these attributes do not render VTR copying fair use.

   That VTR copies are generally made in the home has no relevance in assessing the first fair use factor.  The purpose, character and effect of VTR copying by an individual in the home are no different from the purpose, character and effect of copying by the same individual outside the home.  Moreover, as the Court of Appeals ruled, any privacy concerns raised by the "in home" locus of VTR copying may appropriately be considered in fashioning the remedy; but these concerns do not justify a blanket fair use exemption from liability (P.A. 19). For, it is settled that Congress may validly prohibit the unauthorized taking and retention of property, including films and tapes, in homes.  n36

   n36 (P.A. 65); Stanley v. Georgia, 394 U.S. 557, 568 n. 11 (1969).  This Court has made clear that the constitutional right of privacy encompasses "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty'...." Roe v. Wade, 410 U.S. 113, 152 (1973).  The making of unauthorized recordings of copyrights works obviously is not such a fundamental right.

EXHIBIT 7 - PAGE 106

Similarly, the fact that VTR copies may be used generally for non-commercial private playbacks (i.e., private performances) does not render VTR copying permissible (P.A. 19).  It is true that private performances do not constitute copyright infringement.  See 17 U.S.C.  § 106(4).  However, the right to perform a copyrighted work privately "contemplates that the... work is performed from memory or from legal copies.  Neither the [in home] element nor the non-profit element of a performance will protect illegal copying...." n37

n37 F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, supra, 214 U.S.P.Q. at 411 (emphasis added).  As both courts below recognized, a non-profit motive, although relevant, is not sufficient in and of itself to establish fair use (P.A. 19 n. 9, 81; see 1976 House Report 66).

Petitioners' additional claim that VTR copying is immune from liability because it is merely a mechanical step for later viewing is also unpersuasive. All unauthorized reproductions are for subsequent viewing or reading.  Thus, this characteristic actually highlights that VTR copying is no different from any other infringing copying.

Finally, that VTR copying purportedly increases access to broadcast works does not justify such copying as fair use.  n38 In the courts below, petitioners based their access argument primarily on the First Amendment, contending that the First Amendment guarantees the greatest possible access to reception of ideas even if this reception involves taking entire copyrighted works (P.A. 19, 82).  The Court of Appeals rejected this argument, reasoning that "'[t]he first amendment is not a license to trammel on legally recognized rights in intellectual property'" (P.A. 19) (quoting Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184, 1188 (5th Cir. 1979)).  In so ruling, the Court of Appeals followed an unbroken line of authority holding that the First Amendment is no defense to copying of entire copyrighted works, including works broadcast on television.  n39 This result obviously is correct if the Copyright Act is to have any vitality whatsoever: copyright protection by definition inhibits access.  n40

n38 The assumption underlying the increased access argument -- that VTRs are used exclusively to permit viewing of broadcasts of copyrighted works which would otherwise be missed -- is factually inaccurate. According to petitioners' own survey, 17.6% of Betamax recordings are made while Betamax owners are watching the live broadcast of the show being recorded (P.A. 48; DX OT (Table 16)).  Since those owners view the original broadcast, they obviously do not need to make simultaneous recordings to obtain "access." The survey also shows that over 41% of Betamax recordings have been or will be viewed more than once (DX OT (Table 43)). Other surveys in evidence establish that most Betamax owners retain off-the-air recordings in home video libraries (see note 11, supra ).  Multiple replays and retention of library recordings are certainly not necessary for "access." Thus, despite petitioners' contrary suggestion (e.g., P.B. 5), this case involves far more than simply time-shifting for purposes of increased access.

n39 Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 577 n. 13 (1977) ("Zacchini"); Roy Export Co. v. CBS, 672 F.2d 1095, 1099-1100 (2d Cir.), cert. denied, 51 U.S.L.W. 3254 (U.S. Oct. 5, 1982) (No. 81-2111); Walt Disney Prods, v. Air Pirates, 581 F.2d 751, 758-59 (9th Cir. 1978), cert. denied, 439 U.S. 1132

EXHIBIT 7 - PAGE 107

(1979); Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., supra, 562 F.2d at 1171; Wainwright Secs. Inc. v. Wall Street Transcript Corp., supra, 558 F.2d at 95; Encyclopaedia Britannica Educational Corp. v. Crooks, 542 F.Supp. 1156, 1180-81 (W.D.N.Y. 1982) ("Encyclopaedia Britannica II").  See Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., supra, 626 F.2d at 1178-82 (Brown, J., concurring in part and dissenting in part).

   n40 E.g., Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932) ("[t]he owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property"); Iowa State University Research Foundation, Inc. v. ABC, Inc., supra, 621 F.2d at 62.


   Apparently recognizing the futility of their First Amendment argument, petitioners now contend that their increased access justification for the fair use defense, although carrying First Amendment overtones, lies primarily in the national public policy underlying the Communications Act of 1934, 47 U.S.C.  §§ 151 et seq. (P.B. 24-27).  In short, petitioners argue that national communications policy overrides statutory copyright protection against unauthorized copying of copyrighted works. The argument lacks merit.  n41


   n41 The argument is based on a patchwork of statements by this Court having nothing to do with the effect of federal, communications policy on copyright law. Most of the cases relied upon by petitioners do not even involve copyright.  Virtinia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976); CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. 94 (1973); Kleindienst v. Mandel, 408 U.S. 753 (1972); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969); NBC v. United States, 319 U.S. 190 (1943).

   Furthermore, the few copyright cases mentioned by petitioners (Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390 (1968); Teleprompter Corp. v. CBS, Inc., 415 U.S. 394 (1974); Twentieth Century Music Corp. v. Aiken, 422 U.S. 151 (1975)) all involve public performance of copyrighted works, not copying, and with one exception (see note 42 & accompanying text, infra ) do not address the interrelationship between copyright law and federal communications policy.  These cases -- none of which involves the fair use doctrine -- merely hold that certain retransmissions of broadcast television and radio signals did not constitute public performances under the 1909 Act.  Congress, however, overruled or severely restricted application of each of these cases in the 1976 Act. 17 U.S.C.  §§ 110(5), 111; 1976 House Report 63, 87, 86-101; H.R. Rep. No. 94-1733, 94th Cong., 2d Sess. 75 (1976) ("Conference Report").  Moreover, these cases were all based on the fact that the retransmissions at issue merely permitted simultaneous viewing and hearing of broadcast television and radio signals by the public.  392 U.S. at 399-400; 415 U.S. at 408; 422 U.S. at 157-61.  In contrast, VTRs interrupt the instantaneous process of broadcasting and simultaneous viewing and replace it with a system of copying, storage, retrieval and multiple playbacks.  Thus, contrary to petitioners' assertion (P.B. 18, 25), VTRs do not simply "enhance television reception." VTRs make copies, an activity neither considered nor condoned by Fortnightly and its progeny.  This important distinguishing characteristic has been held to make the Fortnightly rationale inapplicable to VTR use.  Walt Disney Prods. v. Alaska Television Network, Inc., 310 F.Supp. 1073 (W.D. Wash. 1969).

EXHIBIT 7 - PAGE 108

The issue raised by petitioners was specifically addressed and unequivocally set to rest by Congress when it enacted the Communications Act of 1934.  That Act states:

"Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

47 U.S.C.  § 414.
In view of this clear expression of Congressional intent, this Court, the lower courts and the Federal Communications Commission have unanimously concluded that nothing in the Communications Act curtails the rights of copyright owners.  n42

n42 E.g., Teleprompter Corp. v. CBS, Inc., supra, 415 U.S. at 406 n. 11 ("[t]he FCC has consistently contended that it is without power to alter rights emanating from other sources, including the Copyright Act...  This position is consistent with the terms of the Communications Act of 1934...."); Id. at 419 (Burger, C.J., dissenting) ("[t]here is nothing in the Communications Act that qualifies, limits, modifies or makes exception to the Copyright Act"); Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348, 349 (9th Cir. 1964), cert. denied, 379 U.S. 989 (1965) ("Congress ha[s] not pre-empted the adjustment of property rights in the communication field by passage of the Communications Act of 1934"); CATV, Second Report & Order, Nos. 14895, 15233, 15971, 2 F.C.C.2d 725, 768-69 (1966).  Cf.  Loretto v. Teleprompter Manhattan CATV Corp., 102 S.Ct. 3164 (1982) (increasing the public's access to television programs transmitted by cable does not justify even a minimal taking of an apartment owner's property without fair compensation).

The 1976 Act also dispels any notion that federal communications policy somehow precludes copyright liability for unauthorized videotaping of motion pictures from the public airwaves.  Congress stated plainly that videotaping from the public airwaves merely for convenience can never be fair use (see note 35, supra ).  Moreover, in the rare situations in which Congress determined that videotaping from the public airwaves is justified, it provided specific statutory exemptions permitting such activity.  n43 These statutory exemptions obviously would have been unnecessary had Congress believed that national communications policy provided an overriding non-statutory justification for videotaping from public airwaves.  Thus, all courts which have considered the issue under the 1976 Act have held that the fair use doctrine does not permit unauthorized off-the-air videotaping -- even for educational or news reporting purposes -- merely because it increases the public's access to broadcast material.  n44

n43 17 U.S.C.  §§ 108, 111(e), 112.  With one limited exception not applicable to home VTR copies (17 U.S.C.  § 111(e)), none of these exemptions permits videotape recording of motion pictures from public airwaves.  (See 17 U.S.C.  §§ 108(h), 111(e), 112(a); 1976 House Report 78, 98, 101, 103; § I.C.I., infra ).

n44 New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc., 2 Copyrt. L. Rep. (CCH) P25,293, p. 16,625, at pp. 16,626-27 (D. Mass. Aug. 3, 1981) ("New Boston Television"); Encyclopaedia Britannica II, supra, 542 F.Supp. at 1175-77, 1179-81.  See Zacchini, supra, 433 U.S. at 574-78.

EXHIBIT 7 - PAGE 109

Petitioners' increased access argument proves too much.  If accepted, it would logically also permit VTR owners to steal VTR tapes from petitioners to obtain increased access to television broadcasts.  Neither the First Amendment nor federal communications policy condones either result.  The purpose and character of VTR copies thus weight heavily against a finding of fair use.

   2.  Nature of the Copyrighted Works at Issue.

   Under this factor, an unauthorized use is more appropriately characterized as "fair" if the nature of the copied material is primarily informational and therefore "serve[s] the public interest in the free dissemination of information" (P.A. 20).  n45 Conversely, characterization of an unauthorized use as "fair" is less appropriate if the copied work is primarily entertainment in nature (P.A. 20).  n46 The availability of the fair use defense is additionally constricted if the copyrighted work is "creative, imaginative, and original" and "represent[s] a substantial investment of time and labor made in anticipation of a financial return." MCA INC. v. Wilson, 677 F.2d 180, 182 (2d Cir. 1981).  n47

   n45 Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d at 307. Accord, 3 Nimmer on Copyright, § 13.02[A][2], at 13-63 (1982) ("Nimmer"); Seltzer, supra, at 33-34.

   n46 Rohauer v. Killiam Shows, Inc., 379 F.Supp. 723, 733 (S.D.N.Y. 1974), rev'd on other grounds, 551 F.2d 484 (2d Cir. 1977), cert. denied, 431 U.S. 949 (1977); Register's Senate Statement, supra note 6, at 2o; 3 Nimmer, supra, § 13.05[A][2], at 13-63.  See Zacchini, supra, 433 U.S. at 573-78 (state law protection under right of publicity greater for entertainment than informational works).

   n47 Petitioners simply overlook these uncontroverted fair use principles in asserting that it is impermissible to distinguish between entertainment and informational works as § 107(2) requires (P.B. 29-30).

   Petitioners concede that respondents' works are primarily "entertainment" in subject matter (P.B. 29).  It is also undisputed that respondents' works are highly creative, imaginative and original and represent a large investment made in anticipation of financial return.  n48 Applying the established authorities to these undisputed facts, the Court of Appeals properly concluded that the nature of respondents' works weighs against a finding of fair use.

   n48 See notes 2 & 8, supra; Register's Senate Statement, supra note 6, at 23; Register's House Statement, supra note 6, at 23.

   Petitioners argue that the foregoing attributes of respondents' motion pictures should be disregarded because they are voluntarily telecast over public airwaves (P.B. 29).  However, use of the broadcast medium to exhibit respondents' motion pictures does not qualify VTR copies as fair use (P.A. 20-21).  The proper focus obviously is on the intrinsix qualities of the infringed work, not on the medium of its

EXHIBIT 7 - PAGE 110

presentation.  n49


n49 Encyclopaedia Britammica II, supra, 542 F.Supp. at 1180 ("[t]he plaintiffs' choice of media... does not abrogate their rights as copyright holders' even if they "knew and expected that the broadcasts would be received free of charge").  See United States v. Loew's, Inc., 371 U.S. 38, 48 (1962) ("a copyrighted feature film does not lose its legal or economic uniqueness because it is shown on a television rather than a movie screen").


3.  Amount and Substantiality of Taking.


It is undisputed, and the district court found, that VTR recording "usually involves copying the entire work" (P.A. 83).  Virtually every fair use case had held that such entire taking can never be fair use because it exceeds the bounds of "reasonableness" required by the fair use defense.  n50 Under these authorities, the substantiality of the taking involved in VTR copying tips decidedly against the fair use defense (P.A. 21-22).  n51


n50 E.g., Walt Disney Prods. v. Air Pirates, supra, 581 F.2d at 756; Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d at 310; Wihtol v. Corw, 309 F.2d 777, 780 (8th Cir. 1962); Leon v. Pacific Tel. & Tel. Co., 91 F.2d 484, 486 (9th Cir. 1937); Loew's, Inc. v. CBS, Inc., 131 F.Supp. 165, 184-85 (S.D. Cal. 1955), aff'd sub. nom. Benny v. Loew's, Inc., 239 F.2d 532 (9th Cir. 1956), aff'd by equally divided court, 356 U.S. 43 (1958).  See Zacchini, supra, 433 U.S. at 574-78. Even in the case of historical and scholarly works, as distinguished from entertainment works, fair use is restricted to the copying of small excerpts.  See, e.g., Meeropol v. Nizer, supra, 560 F.2d at 1068-71; 1975 Senate Report 61-62, 64.


Only two appellate decisions have ever intimated that copying an entire work can in any circumstance be fair use.  However, these statements are mere dictum because neither decision involved the taking of entire copyrighted works. Williams & Wilkins Co. v. United States, supra, 487 F.2d at 1353 (copying of individual articles from copyrighted medical journals); Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., supra, 626 F.2d at 1177 n. 15 (quoting Williams & Wilkins ) (copying of cover page of copyrighted magazine).  Moreover, it has been expressly held that this dictum does not justify off-the-air videotaping of entire motion pictures, even for educational purposes, because such copying exceeds the bounds of reasonableness required by the fair use defense.  Encyclopaedia Britannica II, supra, 542 F.Supp. at 1179; Encyclopaedia Britannica Educational Corp. v. Crooks, 447 F.Supp. 243, 251 (W.D.N.Y. 1978) ("Encyclopaedia Britannica I" ).  The House and Senate Reports also state that the fair use provisions of § 107 do not permit unauthorized reproductions of entire motion pictures.  1976 House Report 72-73; 1975 Senate Report 64.


n51 Notwithstanding this clear line of authority, petitioners assert that copying an entire copyrighted work should be fair use unless the copyright owner demonstrates actual past or future damage from the unauthorized taking (P.B. 31).  However, there is no authority whatever to support this novel approach (see P.A. 21-22). Indeed, such an approach would essentially render the substantiality factor meaningless by completely subordinating it to the fourth fair use factor -- the effect

EXHIBIT 7 - PAGE 111

of the use upon the value of the copyrighted work. See Loew's, Inc. v. CBS, Inc., supra, 131 F.Supp. at 184 ("[t]he mere absence of competition or injurious effect upon the copyrighted work will not make a use fair.").

4.  Effect of the Use on the Potential Market for or Value of the Copyrighted Work.

   Given the excessive taking and lack of independent creation involved in VTR copying, any one of which requires rejection of the fair use defense, see supra, at §§ I.A, I.B. 3, it was unnecessary for the Court of Appeals even to consider the effect of VTR copies on the potential market for or value or respondents' motion pictures (P.A. 22).  Nevertheless, the Court examined this factor and concluded that it does not support the fair use defense.

   In analyzing this factor, the Court of Appeals noted that in copyright infringement cases, irreparable harm to the copyright owner is presumed unless adequately rebutted by the defendant.  n52 It also recognized that to overcome this presumption, petitioners had the burden of proving that the unauthorized use would not tend to affect any potential market for or value of respondents' copyrighted works.  n53


   n52 (P.A. 23 n. 11); Encyclopaedia Britannica I, supra, 447 F.Supp. at 251. Accord, Rice v. American Program Bureau, 446 F.2d 685, 688 (2d Cir. 1971); Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851, 582 n. 1 (2d Cir. 1967).

   n53 (P.A. 23, 24); Meeropol v. Nizer, supra, 560 F.2d at 1069; Meredith Corp. v. Harper & Row Publishers, Ind., 378 F.Supp. 686, 689 (S.D.N.Y. 1974) (quoting 3 Nimmer, supra ), aff'd, 500 F.2d 1221 (2d Cir. 1974).


   Applying these legal principles to VTR copying, the Court of Appeals first ruled that the presumption of harm compelled the conclusion that the effect factor weighs against a finding of fair use (P.A. 23 n. 11).  This conclusion was required because the district court did not, and indeed, based on the record rationally could not, find that petitioners had carried their burden of proving that VTR copying will not tend to affect any potential market for or value of respondents' copyrighted works.  n54 To the contrary, the district court ignored the presumption of harm and sustained the fair use defense because it was "hesitant" to find that respondents had proved that future harm from VTR copying was "probable" (P.A. 75-78).  n55 As the Court of Appeals ruled, the district court thus applied the wrong legal test in failing to recognize that a "probability" of harm is unnecessary and further erred by imposing the burden of proof on respondents, thereby placing them in the novel and onerous position of having to disprove a defense raised by petitioners (P.A. 23, 75-79).  n56


   n54 (P.A. 23 & n. 11, 24); see Encyclopaedia Britannica I, supra, 447 F.Supp. at 247, 251.

   Petitioners presented evidence on the issue from two expert witnesses.  One, Mr. Blay, conceded that Betamax recordings of a copyrighted motion picture will cause respondents to lose revenue from sales of that motion picture on pre-recorded video cassettes.  The other witness conceded that his testimony about the future effect of VTRs on television ratings way "just a guess" (R. 2975-76, 3054-55, 3059-61; see

EXHIBIT 7 - PAGE 112

note 8, supra ).

Despite this negligible evidence, petitioners unbelievably assert that "[t]he
evidence showed that [VTR] viewing would be measured and paid for under existing
practice" (P.B. 31).  There was no such evidence.  Indeed, respondents' seven expert
witnesses testified to the contrary (R. 250-58, 260-62, 274-77, 451-55, 539, 991-
1002, 1051-52, 1182-1200, 1312-38, 1379-80, 1448-70, 1721-30).  Nor did the
district court find that such viewing will be measured or that, if measured, such
measurements will prevent a reduction in respondents' television licensing revenues
(P.A. 109).  Moreover, the district court could not have made any such findings
because there was no evidence from the ratings services that they are capable of
measuring, or that they will measure, VTR playback activity (as distinguished from
VTR recording activity).  See Statement by Jay Eliasberg, former vice president,
Research, CBS Broadcast Group 4-5 (April 21, 1982), to be reprinted in April 21
Senate Committee Hearings    , 97th Cong., 2d Sess.    (1982) (meters used for
audience measurement indicate that a TV set is turned on to a particular channel but
cannot ascertain VTR play-backs or the extent to which commercials have been
deleted).

n55 The district court acknowledged that the issue is not whether the infringement
has caused past damage (P.A. 75).  As Professor Nimmer explains: "Far from this
justifying a defense of fair use, failure to prove damages will in the usual case give
rise to a minimum statutory damages liability." 3 Nimmer, supra, § 13.05[E][4][c],
at 13-84.  It is therefore difficult to understand the relevance of petitioners'
discussion of alleged lack of evidence of past harm (P.B. 30, 31).

n56 As with any defense, the burden of proving each element of the fair use
defense was on defendants (P.A. 18, 23 & n. 11); Rubin v. Boston Magazine Co.,
supra, 645 F.2d at 84; Encyclopaedia Britannica I, supra, 447 F.Supp. at 251.

In addition to relying on the legal presumption of harm, the Court of Appeals
properly ruled that the district court's fact findings established that VTR copying will
tend to have the requisite potential adverse impact (P.A. 23-25). First, because VTR
copies are undisputably made as complete substitutes for the viewing of licensed
broadcasts of respondents' works, the district court found that VTR copies are used
"for the same purpose as the original" (P.A. 81). Under settled judicial authority,
whenever the copyrighted work and the infringing copy have the same function, the
fourth fair use factor must be resolved against the infringer.  n57 Accordingly, the
Court of Appeals held that the district court's finding that VTR copies serve the same
purpose as the original required that the effect factor be resolved against petitioners
(P.A. 23 & n. 13).

n57 MGM, Inc. v. Showcase Atlanta Coop. Prods., Inc., 479 F.Supp. 351, 361 (N.D.
Ga. 1979); 3 Nimmer, supra, § 13.05[B], at 13-65-13-71.  See Iowa State
University Research Foundation, Inc. v. ABC, Inc., supra, 621 F.2d at 61. Indeed,
because the function of a VTR copy is the same as the copied original, petitioners'
own expert conceded that a VTR owner is not likely to purchase a pre-recorded
cassette of the original from respondents (see notes 8 & 54, supra ).  In addition,
petitioners' survey shows that Betamax has caused 10.5% of all Betamax owners to
decrease theater attendance and 31.4% of Betamax owners who had previously
rented or purchased licensed motion pictures to decrease such activities (DX OT

EXHIBIT 7 - PAGE 113

(Tables 6 & 9); see note 8, supra ).

Second, the district court repeatedly found that respondents will have to compete in the marketplace with VTR copies of their works (e.g., P.A. 78, 116). Since respondents obviously will not always prevail in such competition, the Court of Appeals ruled that this finding required the conclusion that VTR copies will tend to affect the value of or market for respondents' works (P.A. 23-24).

Third, the Court of Appeals recognized the obvious: the licensing of the right to make VTR reproductions is itself a potential market for respondents' copyrighted works (P.A. 24). Uncontrolled and uncompensated VTR copies interfere with respondents' ability to grant and secure a fee for licenses to copy their works off-the-air (P.A. 24). n58 That respondents have not yet attempted to exploit this potential market does not permit petitioners "to appropriate [respondents'] copyrighted material and effectively preclude such efforts in the future." n59

n58 This is neither a hypothetical nor unreal market. The ABC television network recently announced that it intends to exploit this market in late night and early morning hours through the use of new technology. Wall Street Journal, Apr. 30, 1982.

n59 New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc., supra, 2 Copyrt. L. Rep. (CHH) at p. 16,627; Iowa State University Research Foundation, Inc. v. ABC, Inc., supra, 621 F.2d at 62. See Fox Film Corp. v. Doyal, supra, 286 U.S. at 127. The Register of Copyrights recently stressed the importance of preventing the fair use defense from swallowing such emerging markets: "[T]he specific reference [in § 107] to 'potential' underscores the need to secure future markets from pre-emption, and leaves their exploitation to the designs of the copyright owner. The import is that potential markets may be as valuable as those presently exploited. Too narrow a view of adverse market impact may simply have the effect of destroying future markets... Unauthorized off-air taping prejudices the integrity of other emerging markets. " Remarks of David Ladd, United States Register of Copyrights, to the American Bar Association, Patent, Trademark & Copyright Law Section (Aug. 10, 1982), reprinted in Patent, Trademark & Copyright Journal (BNA), Vol. 24, No. 593, at 421-22 (Aug. 26, 1982) (emphasis added).

Fourth, the unlimited number of unauthorized VTR copies which Betamax makes possible also establishes the requisite potential adverse effect as a matter of law. n60 Congress stated on numerous occasions during consideration of the bills which evolved into the 1976 Act that mass proliferation of minor infringements constitutes a major inroad on the value of copyrights which cannot be justified as fair use. n61 The massive scope of VTR copying activity thus requires rejection of the fair use defense (P.A. 24-25).

n60 The Electronic Industries Association estimates that 20 million VTRs will be sold in this country by 1986. Brief Amicus Curiae In Support Of Petition 6. Armed with an average of 30 cassettes per machine (P.A. 47), the owners of these devices will have approximately 600 million cassettes available for infringing copies.

EXHIBIT 7 - PAGE 114

n61 E.g., "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented. " (Emphasis added.)
1975 Senate Report 65; 1967 House Report 35; H.R. Rep. No. 2237, 89th Cong., 2d Sess. 64 (1966).  Accord, 1976 House Report 77.  The reason for Congress' concern is obvious: the economic effect of millions of individuals making VTR copies is identical to the effect of those same individuals acquiring millions of copies from a film pirate.  In both cases the unauthorized copies supplant a substantial potential market for licensed copies of respondents' works.

Finally, the consistency with which VTR owners delete commercials from their VTR copies (see note 14, supra ) also requires the conclusion that VTR copying will tend to affect a market for respondents' works -- the television licensing market. Congress explicitly recognized throughout its deliberations of the bill which became the 1976 Act that owners of televised motion pictures suffer harm when commercials telecast with such pictures are deleted without permission. n62

n62 E.g., under § 111(c)(3) of the 1976 Act cable television systems cannot retransmit copyrighted television programs pursuant to the compulsory license provisions of the Act if they alter or delete the commercial messages broadcast therewith.  The 1976 House Report explains that § 111(c)(3) is necessary to prevent harm to the advertiser "and, in turn, the copyright owner, whose compensation for the [copyrighted] work is directly related to the size of the audience that the advertiser's message is calculated to reach." 1976 House Report 93-94.

A potential adverse impact on any one of the existing or potential markets for respondents' motion pictures would be sufficient for rejection of the fair use defense. n63 Thus, the cumulative potential impact on the various markets demonstrated by the district court's findings overwhelmingly establishes that the effect factor of the fair use equation weighs heavily against the defense (P.A. 23-25).

n63 Meeropol v. Nizer, supra, 560 F.2d at 1070; see MGM, Inc. v. Showcase Atlanta Coop. Prods., Inc., supra, 479 F.Supp. at 360-61.

C.  The Overall Statutory Scheme and Legislative History of Section 107 Confirm That VTR Copying Is Not Fair Use.

The overall statutory scheme of the 1976 Act n64 as well as its legislative history make clear that Congress did not intend § 107 to permit as fair use the massive and uncontrolled VTR copying at issue here.

n64 In interpreting a statutory provision, courts must be guided by the legislative intent evidenced by the overall scheme of the statute taken as a whole, Richards v. United States, 369 U.S. 1, 11 (1962).

1.  The Overall Statutory Scheme Compels the Conclusion That VTR Copying Is Not Fair Use.

EXHIBIT 7 - PAGE 115

The 1976 Act sets forth the copyright owner's exclusive rights in broad terms, subject only to narrowly-defined limitations, qualifications and exemptions contained in §§ 107-118.  Thus, unless the Act expressly exempts from liability a particular use of a copyrighted work, the use falls within the copyright owner's exclusive rights. n65

n65 1976 House Report 61; 1975 Senate Report 57; Register's House Statement, supra note 6, at 18-19; Register's Senate Statement, supra note 6, at 18-19.

This carefully drawn statutory scheme demonstrates special Congressional concern for the protection of motion pictures, a concern which contradicts petitioners' contention that Congress intended a blanket fair use exemption for VTR copying of those works.  Indeed, with one narrow exception (see note 69 & accompanying text, infra ), Congress refused to permit reproduction of motion pictures for any purpose. n66

n66 The statutory scheme also requires the conclusion, now conceded by petitioners, that the 1976 Act contains no implied statutory home use exemption (P.A. 4-12; P.B. 20-21, 23, 33, 39).  Not only does the Act confer a higher degree of protection to motion pictures than to all other works, but none of the express exemptions in §§ 107-118 permits the copying of any work for private use.  It is therefore clear that Congress did not intend a statutory home copying exemption for motion pictures or any other works.  See Diamond v. Chakrabarty, 447 U.S. 303, 30, (1980); Tennessee Valley Authority v. Hill, 437 U.S. 153, 188 (1978); Appellants' Opening Ninth Circuit Brief 11-17.

The most graphic example of Congress' desire to protect motion pictures is found in the ephemeral recording exemption, 17 U.S.C.  § 112.  Section 112 permits copying of some copyrighted works so long as the copies are destroyed within a specified time period.  However, that provision does not allow copying of motion pictures under any circumstances.  This intentional exclusion of motion pictures from the scope of § 112 represents a change from prior bills. Congress explained this change as follows:

"Very strong criticism was leveled at the 1965 bill because it would have permitted the making of ephemeral recordings of all types of works, including motion pictures and other audiovisual works.  The producers of these materials argued that bootlegging of illegal copies is already a serious problem, and that a provision allowing duplication by an indefinite number of transmitters and without permission from the copyright owner would greatly aggravate the situation.  The committee concluded that the special nature of motion pictures and audiovisual works makes them exceptionally vulnerable to copyright impairment under an ephemeral recording exemption, and therefore removed them from the scope of Section 112. ""

1967 House Report 61 (emphasis added).  n67

n67 Congress thus did not intend to excuse unauthorized copying of motion pictures merely because the copies are later erased.  The Register of Copyrights

EXHIBIT 7 - PAGE 116

expressed similar sentiments in his 1965 Report, noting that the exclusive § 106(1) right to reproduce embraces all copies, whether or not they are later erased: "reproduction on magnetic tape would come within clause (1) even though the tape is later erased." Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, Copyright Law Revision, Part 6 at 16-17, 89th Cong., 1st Sess. (1965) ("Register's 1965 Supplementary Report") (emphasis added).  Time-shift recordings are thus on no different footing than other unauthorized copies merely because they are erased after they are made.

   Similarly, although § 108 permits reproduction of certain copyrighted works for library and archival purposes, motion pictures are specifically excluded from the exemption.  17 U.S.C.  § 108(h).

   Section 111 shows a like concern for the protection of motion pictures, particularly televised motion pictures.  Under § 111, cable television retransmission of motion pictures is permitted, but only if royalties are paid to the copyright owner and no portion of the motion pictures or the commercial messages transmitted therewith is deleted during the retransmission.  n68 Furthermore, § 111(e), the sole exemption for VTR copying of motion pictures in the Act, permits such copies only for limited use by off-shore cable television systems, and, again, only if royalties are paid and commercials are not deleted. n69

   n68 In a similar vein, the other performance exemptions contained in the Act ( §§ 110, 118) have only limited application to unauthorized uses of motion pictures. Sections 110(2), (3), (4), (6), (7), (8) and (9) apply only to musical works and literary works -- not to motion pictures.  And, although §§ 110(1) and (5) permit limited unlicensed performances of copyrighted works, including motion pictures, they do not permit unauthorized reproductions. Furthermore, while § 118 permits public broadcasting entities, upon paying a royalty, to broadcast copyrighted works without permission of the copyright owner, § 118(f) expressly excludes audiovisual works -- including motion pictures -- from the exemption.

   n69 17 U.S.C.  § 111(e); 1976 House Report 98.

   Given Congress' special solicitude for the protection of motion pictures and its recognition of the unusual vulnerability of such works to copyright impairment, it is clear that Congress never intended a blanket fair use exemption for unlimited home VTR copying of motion pictures.  This conclusion is compelled by the legislative history of § 107.
2.  The Legislative History of Section 107 Compels the Conclusion That VTR Copying Is Not Fair Use.

   The legislative history of § 107 demonstrates the same concern for motion pictures found in all other provisions of the Act.  n70 Indeed, Congress stressed that applicability of the fair use doctrine is "narrowly circumscribed" and must "be applied strictly to" unauthorized uses of motion pictures.  1975 Senate Report 65, 64. Consistent with this special concern for motion pictures, Congress emphasized that it did not intend off-the-air tape recordings to have any special status under the fair use doctrine.  n71

EXHIBIT 7 - PAGE 117

n70 Petitioners' representation that the Court of Appeals refused to consider the legislative history of § 107 (P.B. 16, 32-33) is irresponsible.  In rejecting the fair use defense, the Court thoroughly considered the legislative history of the 1976 Act in general and § 107 in particular (P.A. 4-12, 14, 20, 24 & n. 14).

n71 "[T]he reference to fair use [in § 107] 'by reproduction in copies or phonorecords or by any other means' is mainly intended to make clear that the doctrine has as much application to photocopying and taping as to older forms of use; it is not intended to give these kinds of reproduction any special status under the fair use provision or to sanction any reproduction beyond the normal and reasonable limits of fair use."
1976 House Report 66.

Definitive proof that Congress did not intend a blanket fair use exemption for VTR copying is found in the 1976 House Report's specific rejection of a similar exemption for reproductions made "for educational and scholarly purposes." 1976 House Report 66-67.  Since Congress rejected a blanket exemption for educational and scholarly use (a far more salutary use than home use), it follows that Congress did not intend a blanket fair use exemption for home VTR copying of motion pictures.

Finally, Congress' recognition that "[i]solated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented," and its unequivocal statement that "[t]he committee does not intend to suggest... that off-the-air recording for convenience would under any circumstances, be considered 'fair use'" (1975 Senate Report 65, 66) conclusively illustrate that Congress did not intend § 107 to provide a blanket exemption for the making of millions of VTR copies for convenience.

Post-enactment history of § 107 also demonstrates that the Ninth Circuit properly rejected the fair use defense.  n72 Several bills were introduced in response to the Court of Appeals' decision (see notes 25, 26 & accompanying text, supra).  During hearings on those bills, David Ladd, the Register of Copyrights who is charged with administration of the 1976 Act, stated emphatically that the Ninth Circuit correctly interpreted the fair use provisions of the 1976 Act.  n73 At these same hearings, several Congressmen, Jon A. Baumgarten, General Counsel of the Copyright Office at the time the 1976 Act was enacted, and Professor Melville B. Nimmer, the country's leading copyright expert, also expressed their unqualified agreement with the Ninth Circuit's interpretation of the fair use doctrine.  n74

n72 Although not accorded the same weight as pre-enactment legislative history, post-enactment history is relevant in determining the intended scope of legislation. North Haven Bd. of Ed. v. Bell, 102 S.Ct. 1912, 1923-25 (1982).

n73 "Making a copy of an audio visual work under copyright through the use of a videorecorder infringes the reproduction right of Section 106.

At the time of passage of the 1976 Copyright Act, videotaping was a known technology, yet no specific exemption was included in the legislation to exempt the practice in the home.

EXHIBIT 7 - PAGE 118

Despite the absence of an explicit exemption for home videotaping, proponents of unrestricted videotaping have often cited the fair use provision of section 107 in support of their views.  Yet the terms of that provision and its legislative history do not support such a sweeping interpretation.

None of the purposes articulated in [ § 107] fits home videotaping...  [T]he four factors listed in Section 107 would not excuse unrestricted videotaping, as the Ninth Cicuit held in the Betamax case." Register's House Statement, supra note 6, at 19, 22, 23, 25 (emphasis added); Register's Senate Statement, supra note 6, at 19, 22, 23, 25 (emphasis added).

n74 E.g., 128 Cong. Rec. H322 (daily ed. Feb. 9, 1982) (Statement of Rep. Edwards); Baumgarten, "Private Audio Recording of Copyrighted Music" 1-9 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess.    (1982) (Memo for Nat'l Music Publishers' Ass'n, Mar. 8, 1982); Nimmer. "The Elegal Status of Home Audio Recording of Copyrighted Works" 1-2, 16-26 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess. (1982) (Statement of Recording Industry Ass'n of America, et al.).

In the face of this overwhelming expression of legislative intent, petitioners' attempt to divine from legislative history a blanket fair use exemption for VTR copying is unpersuasive.  Petitioners do not base their analysis on any legislative history of § 107.  Rather, they focus entirely on legislative history concerning the performance right granted in § 106(4), the ephemeral recording exemption contained in § 112 and the rights granted to sound recordings in the 1971 Sound Recording Act.  n75 More importantly, the result which petitioners seek to deduce from this history clashes head-on with Congress' expressed intention (a) to grant special protection to motion pictures under the Act as a whole and § 107 in particular and (b) to refrain from granting special fair use status to VTR copies.

n75 Pub. L. No. 92-140, 85 Stat. 391 (1971).

Petitioners' reliance on the 1961 Report of the Register of Copyrights concerning the scope of a copyright owner's performance right is particularly inapposite (P.B. 33-34).  The report advocates only that the 1976 Act, like the 1909 Act, not grant copyright owners the right to control private performances of copyrighted works. The report does not suggest that unauthorized private VTR copying be permitted as a necessary adjunct of the private performance right. To the contrary, such private performances presuppose the use of lawfully made copies.  n76 Thus, the public's right privately to perform copyrighted works cannot possibly encompass unconsented copying such as VTR copying.  Were the law otherwise, it would be legal to steal a print of a motion picture or to make an unauthorized reproduction in a movie theater so long as the sole purpose of the theft or reproduction were to allow a subsequent private performance by the offender.  Such activities are, of course, prohibited.  n77

n76 See note 37 & accompanying text, supra.

n77 See Elektra Records Co. v. Gem Elec. Distribs., Inc., 360 F.Supp. 821 (E.D.N.Y. 1973).

EXHIBIT 7 - PAGE 119

Petitioners' citation to statements of respondents at Congressional hearings in 1965 is also unavailing.  Petitioners note that while referring to the prospective development of home use VTRs respondents "made no assertion that home use recording... should be infringement" (P.B. 34).  However, petitioners overlook that as early as 1962 the Motion Picture Association of America ("MPAA"), the representative of respondents and supporting amici, had already registered respondents' strong objections to such activities.  Statement of MPAA, March 2, 1962, in Copyright Law Revision, Part 2, Discussion and Comments on Report of the Register of Copyrights 345, 351, 88th Cong., 1st Sess. (House Comm. Reprint) (1963) (App. B hereto).

The legislative history of the Sound Recording Act of 1971 also fails to support petitioners' fair use argument (P.B. 34-39).  The Sound Recording Act and accompanying House Report unequivocally state that the Act did not apply to motion pictures and therefore did not limit or alter the rights in motion pictures in any way. n78 Accordingly, even if Congress in 1971 intended home copying of sound recordings -- a practice which unlike video recording was common and unrestrained for over 20 years -- to be fair use, Congress did not also intend such an exception to apply to the incipient practice of making VTR copies of televised motion pictures. n79

n78 The Act defined sound recordings as "works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture. " 1909 Act § 26 (emphasis added).  The 1971 House Committee Report explained: "In excluding 'the sounds accompanying a motion picture' from the scope of this legislation the Committee does not intend to limit or otherwise alter the rights that exist currently in such works." H.R. Rep. No. 92-487, 92d Cong., 1st Sess. 5-6 (1971), reprinted in [1971] U.S. Code Cong. & Ad. News 1566, 1570-71 ("1971 House Report").  Accord, 1976 Act § 101.

n79 This distinction between the protection afforded motion pictures and sound recordings is consistent with the disparate treatment of these different classes of works throughout the history of the Copyright Act.  Whereas motion pictures were granted copyright protection in 1912 (P.A. 11 n. 7), sound recordings did not receive such protection until 1971 when the immediate threat of commercial record piracy made interim protection imperative.  1971 House Report 1-2.  Moreover, although the Copyright Act has always prevented imitation of all copyrighted works, including motion pictures, the Sound Recording Act prohibited only complete duplication, and specifically allowed imitation.  (17 U.S.C.  § 1(f), Accord, 17 U.S.C.  § 114(b).)  Similarly, although the proprietors of all copyrighted works have always enjoyed an exclusive performance right, no such right was granted to proprietors of sound recordings (1976 House Report 106.  Accord, 17 U.S.C.  § 114(a)).  Thus, if the 1971 Sound Recording Act contained a home recording exemption it was merely another example of the differing treatment of motion pictures and sound recordings under the 1909 Act.

Furthermore, assuming arguendo that Congress had intended to impose a home recording limitation on the rights granted in the 1971 Sound Recording Act, Congress clearly did not intend to carry forward that exemption in the 1976 Act. In contrast to the 1971 House Report relied upon by petitioners (P.B. 36 n. 41), the 1976 House

EXHIBIT 7 - PAGE 120

Report makes no reference to a home recording exemption, even for sound recordings.  Indeed, the Report makes clear that subject only to the narrow exceptions contained in §§ 107-118, the 1976 Act precludes all off-the-air recording of sound recordings whether or not done in the home.  n80 As the Court of Appeals recognized, it would therefore be improper to imply Congressional intent for a fair use home recording exemption in the 1976 Act from the history of an entirely different bill, i.e., the Sound Recording Act of 1971.  n81 It is Congress' intention in 1976, not in 1971, that is signifcant in interpreting the 1976 Act.  See North Haven Board of Education v. Bell, supra, 102 S.Ct. at 1922.

   n80 "Thus, infringement takes place whenever all or any substantial portion of the actual sounds that go to make up a copyrighted sound recording are reproduced in phonorecords by repressing, transcribing, recapturing off the air, or any other method, or by reproducing them in the soundtrack or audio portion of a motion picture or other audiovisual work."
1976 House Report 106 (emphasis added).

   n81 (P.A. 10 n. 5); 3 Nimmer, supra, § 13.05[F], at 13-96 n. 159; see Schwegmann Bros. v Calvert Distillers Corp., 341 U.S. 384, 390-94 (1951).

   Finally, the isolated references to video recording made between 1961 and 1971 by individual witnesses and legislators fall far short of establishing a Congressional intent to bring VTR copies within the fair use doctrine.  The unequivocal statements in the 1976 House Report and the 1975 Senate Report, which indicate that Congress did not intend VTR copying to be fair use, are undeniably the most persuasive indicia of Congressional intent, and take precedence over isolated comments made in committee hearings or floor debates more than five years prior to passage of the 1976 Act.  n82 That these comments were made extemporaneously during discussion of issues unrelated either to the copying of televised motion pictures or to fair use highlights their unreliability.  It is settled that such isolated statements cannot form the basis for statutory interpretation when Congress as a whole did not engage in a considered review of the issue at hand.  n83

   n82 Zuber v. Allen, 396 U.S. 168 (1969); United States v. International Union, etc., 352 U.S. 567, 585 (1957).

   n83 Tennessee Valley Authority v. Hill, supra, 437 U.S. at 191-93; Libby Rod & Gun Club v. Poteat, 594 F.2d 742, 746 (9th Cir. 1979).  It is obvious that the comments relied upon the petitioners do not represent a considered review by Congress as a whole of the complex home video recording issue.  Petitioners feebly respond that there was no need for a considered review because "there was no diversity of opinion" on the issue (P.B. 32).  It is difficult to understand how petitioners can conclude that there was no diversity of opinion among Congress as a whole when only three Congressmen (P.B. 35 n. 39, 37 n. 42) and no Senators ever expressed any thoughts on the subject, and those thoughts were expressed during consideration of a bill that did not affect the rights in motion pictures in any way (see note 78 & accompanying text, supra ).  Moreover, petitioners' claim that the home videotape recording issue was resolved in their favor in 1971 is belied by their continued warnings to VTR purchasers after that date that VTRs were "not to be used to record copyrighted works" (see note 16, supra; PX 166, 167, 170; R. 638-44).

EXHIBIT 7 - PAGE 121

II.
PETITIONERS ARE LIABLE AS CONTRIBUTORY INFRINGERS FOR UNAUTHORIZED
VTR COPYING.
A.  The Court of Appeals' Application of Contributory Copyright Infringement
Principles Was Correct in All Respects.

From a practical standpoint, contributory infringement is the most important issue
in this case.  If petitioners are absolved of liability as contributory infringers, to
obtain adequate relief respondents will be faced with the prospect of bringing suits
against each of the millions of VTR owners who have copied respondents' works,
virtually an impossible task.  n84 Such a result would deprive respondents of a
realistic remedy n85 and would be contrary to law.

n84 Respondents brought this action against only the manufacturers, advertisers
and sellers of VTRs because they -- not individual VTR owners -- are the ones
profiting from unauthorized copying of respondents' motion pictures. Despite the
contrary implications in petitioners' brief (P.B. 17 n. 20, 40-41), respondents have
the absolute right to sue these contributory infringers alone without joining the
primary infringers, i.e., individual VTR owners, as defendants.  Costello Publishing
Co. v. Rotelle, 670 F.2d 1035, 1043 (D.C. Cir. 1981); Wells v. Universal Pictures Co.,
166 F.2d 690, 692 (2d Cir. 1948). See Kalem Co. v. Harper Bros., 222 U.S. 55
(1911) ("Kalem") (contributory copyright infringer sued without joining direct
infringers).  There is no authority for petitioners' assertion (P.B. 44) that merely by
publicly announcing their intention to excercise this right, respondents have granted
a "license" to VTR owners for future VTR copying.  Indeed, such a result would
render meaningless respondents' right to sue only the contributory infringers.
Petitioners' reliance on Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., 377
U.S. 476 (1964) is unavailing.  In Aro, unlike here, plaintiff executed a written
license agreement expressly permitting the alleged direct patent infringers to engage
in the infringing activity.

n85 A similar consideration recently influenced the Seventh Circuit to reject
arguments which would have absolved a supplier of infringing technology from
copyright liability and thereby would have required the copyright owner to bring "a
thousand or more copyright infringement suits" against the suppliers' customers.
WGN Continented Broadcasting Co. v. United Video, Inc., 685 F.2d 218, 221 (7th Cir.
1982).

Both courts below agreed that a contributory infringer is "one who, with knowledge
of the infringing activity, induces, causes, or materially contributes to the infringing
conduct of another." n86 Under this established standard, a contributory infringer
need not have actual knowledge of the infringing activity; constructive knowledge is
sufficient.  n87 Further, actual "inducement" of the infringing activity is not required;
conduct which "furthers" or "materially contributes to" the infringing activity will
suffice. n88 Nor is direct contact between the contributory infringer and the ultimate
infringer necessary; indirect contact or participation in a chain of distribution
resulting in the infringement in sufficient.  n89

EXHIBIT 7 - PAGE 122

n86 Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971) ("Gershwin" ).  Accord, 3 Nimmer, supra, § 12.04[A], at 12-34.  The contributory infringement doctrine in the copyright context is predicated on the "basic common law doctrine that one who knowingly participates in or furthers the tortious act is jointly and severally liable with the prime tort feasor." Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 256 F.Supp. 399, 403 (S.D.N.Y. 1966) ("Screen Gems I") (Weinfeld, J.).  Accord, Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 327 F.Supp. 788, 791-92 (S.D.N.Y. 1971), rev'd on other grounds, 453 F.2d 552 (2d Cir. 1972). See Kalem, supra, 222 U.S. at 62-63 (seller who knows and expects that its product will be used to assist in copyright infringement "contribute[s] to the infringement... [and] is liable on principles recognized in every part of the law").

n87 E.g., Screen Gems I, supra, 256 F.Supp. 399 (contributory defendant who "should have been aware" of infringing activities because of suspicious nature of primary infringers' conduct had sufficient constructive knowledge).  See Inwood Laboratories, Inc. v. Ives Laboratories Inc., supra, 102 S.Ct. at 2188 (one who supplies a product to another with "reason to know" that the other is using the product in an infringing manner may be held liable as a contributory trademark infringer).

n88 Kalem, supra, 222 U.S. at 62-63; Gershwin, supra, 443 F.2d at 1162; Screen Gems I, supra, 256 F.Supp. at 403 (non-infringing advertisements which "further" the sale of infringing recordings sufficient to hold advertiser contributorily liable).

n89 Kalem, supra, 222 U.S. at 62 (producer who sells film to jobbers for resale to exhibitors contributorily liable for infringing performances by exhibitors).  See Inwood Laboratories, Inc. v. Ives Laboratories, Inc., supra, 102 S.Ct. at 2188 ("[e]ven if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their [trademark] infringing activities...."); Jerome H. Remick & Co. v. General Electric Co., 16 F.2d 829 (S.D.N.Y. 1926).


Applying these principles to the instant case, the Court of Appeals correctly concluded that petitioners are liable as contributory copyright infringers.  n90 First, the Court of Appeals ruled that petitioners had the requisite knowledge, noting that reproduction of copyrighted materials is the most conspicuous use of Betamax and is the use intended, expected and encouraged by petitioners (P.A. 27).  This holding was mandated by petitioners' stipulation that Betamax is manufactured, advertised and sold for the primary purpose of reproducing television programming, as well as by the district court's finding that petitioners' advertisements "exhort" Betamax purchasers to record "favorite shows," "movies," "classic movies" and "novels for television" and to "build a library."  n91 It was also required by petitioners' uncontroverted admissions, alluded to by the district court, that petitioners knew the main use of Betamax would be to record copyrighted material.  n92 Given these clear admissions of actual knowledge and intent, petitioners far exceed the minimum requirements of constructive knowledge necessary to establish contributory infringement.  n93


n90 Petitioners and many of their amici confuse the contributory infringement doctrine with the "vicarious liability" theory.  Under the latter theory, liability is predicated on the defendants' right and ability to supervise, control or influence the

EXHIBIT 7 - PAGE 123

direct infringer's activities coupled with a financial interest in those activities. Neither an ability to control nor a financial interest is necessary to find contributory infringement.  Gershwin, supra, 443 F.2d at 1162.  Thus, the district court's finding that petitioners could not control the use of VTRs in homes (P.A. 98; P.B. 12, 40) is irrelevant to the contributory infringement analysis.

   n91 P.A. 41-42; R. 1778-79; PX 87, 90-99, 454, 460, 461, 463, 466, 504-06, 511, 519, 544 (p. 4), 546 (pp. 2-3), 547 (p. 2), 548, 550, 554 (p. 8), 555-56, 1063, P5.

   n92 P.A. 27, 90, 94; see note 9, supra. For example:

   "Q.  And therefore you knew that the majority of the uses of the Betamax to record television programs off-the-air would be to record copyrighted television programs off-the-air; isn't that also right?

   A.  You mean the majority use of the copying of programs off-the-air would be of copyrighted material?

   Q.  That's right.

   A.  Yes."
(Testimony of Harvey Schein, President, Sony Corp. of America ("Sonam"), R. 1821).

   "Q.  And you knew the motion pictures produced by [respondents] were copyrighted?

   A.  Yes.

   "Q.  Is it a fact, Mr. Gallaghter, that you knew that the main use of the Betamax by consumers would be to record copyrighted television programs off-the-air? (Testimony of Daniel Gallaghter, Vice President, Advertising, Sonam, R. 2078, 2094-95).

   n93 See Inwood Laboratories, Inc. v. Ives Laboratories, Inc., supra, 102 S.Ct. at 2188 & n. 13; id., at 2191-92 (White, J., concurring); Kalem, supra, 222 U.S. at 62-63.


   Contrary to petitioners' assertion (P.B. 43), the district court did not dispute that petitioners knew and intended that Betamax would be used primarily to record copyrighted works, especially motion pictures such as those owned by respondents. The district court merely concluded that this knowledge was insufficient because in its view a finding of contributory infringement requires not only knowledge of the challenged activity but also knowledge that the activity violates copyright law. Acknowledging that petitioners knew of the challenged activity, the district court held that as a matter of law petitioners "could not" also have known that VTR copying is infringement because the issue is allegedly one of first impression (P.A. 94, 96, 97-98).

   However, knowledge of the illegal status of the infringing activity is not a prerequisite of contributory copyright infringement, much less an absolute bar to liability whenever the legality issue is allegedly one of first impression (P.A. 26-27). n94 Accordingly, the Court of Appeals properly rejected as an erroneous

EXHIBIT 7 - PAGE 124

interpretation of the law the district court's conclusion that petitioners' knowledge
was insufficient.  n95


   n94 No court has ever held that in addition to knowing of the activity itself, a
contributory copyright infringer must also know that such activity is a copyright
violation.  To the contrary, courts have consistently rejected such an approach (e.g.,
Famous Music Corp. v. Bay State Harness Horse Racing, etc., 554 F.2d 1213 (1st Cir.
1977); BMI v. Marshall, 201 U.S.P.Q. 30, 33 (E.D. Mich. 1978); Chess Music, Inc. v.
Sipe, 442 F.Supp. 1184, 1185 (D. Minn. 1977); Screen Gems I, supra, 256 F.Supp.
at 403), and for good reason.  Arguably, no person sued as a contributory copyright
infringer could ever "know" that an activity violates copyright law prior to a final
adjudication as to the legality of such activity, particularly where, as here, the issue
is allegedly one of first impression.  If such knowledge were required, the doctrine of
contributory infringement would become meaningless, since a defendant could
virtually always evade liability by asserting his belief that the activity is non-
infringing.  As explained in Famous Music, supra, 554 F.2d at 1215, a defendant
"could otherwise reap the benefits of countless violations... by merely claiming
ignorance that any violation would take place." Accord, Shapiro, Bernstein & Co.,
Inc. v. H.L. Green Co., 316 F.2d 304, 309 (2d Cir. 1963).

   n95 Even if knowledge of the illegal nature of the activity were required, the
uncontroverted evidence overwhelmingly establishes such knowledge.  From 1964 to
1975 petitioners consistently received legal advice concerning the illegality of off-
the-air recording (R. 921-24, 960-61, 964-65, 2017, 2108, 2116-22).  During this
period, petitioners' advertisements, brochures and operating instructions warned
purchasers of Sony's pre-Betamax VTRs that those VTRs could not be used to record
copyrighted material (P.A. 42, 94; see note 16, supra ).  With the advent of
Betamax, Sonam and DDBI constantly admonished each other that VTR copying,
especially for library purposes, is illegal (R. 1852-53, 1923, 1961-62, 2017, 2108,
2116-18; PX 143, 648, 649, 716 (p. 8), 723 (p. 2)). Indeed, petitioner DDBI secured
a written indemnity agreement from Sonam (P.A. 90) because, in the words of the
agreement, "our legal counsels were concerned about the risks of advertising a video
recording product which can be used to record copyrighted material" (PX 143)
(emphasis added).  Moreover, in September, 1976, two months prior to
commencement of this action, respondents advised petitioners that their sale of
VTRs infringes respondents' copyrights (R. 2723-25).  Petitioners thus have always
believed that VTR copying violates copyright law.


   With respect to the second element of contributory infringement, there can be no
doubt that the manufacture, advertisement, demonstration and sale of Betamax
induce, cause, further and materially contribute to the unauthorized copying of
copyrighted motion pictures.  To repeat, petitioners stipulated that that is the
primary use for which Betamax is designed and marketed.  As the district court
found, such copying is also the precise conduct that petitioners both encourage with
their Betamax advertisements, brochures and operating instructions and contribute
to through their sales and marketing activities (P.A. 41-42, 97). n96


   n96 Despite petitioners' contrary assertion (P.B. 12, 43), the district court did not
find that petitioners did not induce or cause to be made VTR copies of respondents'
motion pictures.  It merely found that "[i]t is... doubtful" whether petitioners'

EXHIBIT 7 - PAGE 125

admitted conduct met the "inducement" or "contribution" requirement because (a) the record did not show that any particular Betamax advertisement induced or caused the recording of any of the specific copies of the copyrighted motion pictures identified by title in the complaint, and (b) no petitioner (except petitioner Henry's Camera (P.A. 43) had any direct contact or involvement with the VTR owners who testified at trial (P.A. 93-94, 96-97) (emphasis added). However, inducing infringement of specifically identified works, as opposed to copyrighted works in general, is unnecessary to sustain copyright infringement liability. See Shapiro, Bernstein Co., Inc. v. H.L. Green Co., supra, 316 F.2d at 309; Famous Music Corp. v. Bay State Harness Horse Racing, etc., supra, 554 F.2d at 1215; Chess Music, Inc. v. Sipe, supra, 442 F.Supp. at 1185; Elektra Records Co. v. Gem Elec. Distribs., Inc., supra, 360 F.Supp. 821. Direct contact between the manufacturer/distributors and the ultimate infringers is also unnecessary. See note 89 & accompanying text, supra.

Given petitioners' undisputed activities, the Court of Appeals properly held that petitioners' conduct was overwhelmingly sufficient to satisfy the contribution requirement, reasoning that reproduction of copyrighted works "is the most conspicuous use of [Betamax]. That use is intended, expected, encouraged, and the source of the product's consumer appeal" (P.A. 27). n97 This holding is in complete harmony with this Court's decision in Kalem Co. v. Harper Bros., supra, 222 U.S. 55. In Kalem, the Court held the seller of an unauthorized film version of a copyrighted story contributorily liable for subsequent infringing exhibitions of the film by others. The Court rejected the argument that the seller could not be held liable because it had not exhibited the film itself (i.e., Kalem like Sony had not committed the final act of infringement) and specifically made clear that suppying the means to accomplish an infringing activity and encouraging that activity through advertisement are sufficient to establish liability:

n97 See notes 9, 10 & 91, supra. Not only did petitioners blatantly foster VTR copying, but they affirmatively sought to counteract attempts to discourage such behavior. For example, when Sony learned that television broadcasters could broadcast a jamming signal to prevent VTR copying, Sony immediately studied and discovered a method to override the jamming signal (see note 4, supra ). Moreover, despite the recommendations of their own lawyers and one network to place warning on Betamax advertisements advising that VTR copying might be illegal, petitioners refused to do so because Sonam's president felt that such warnings might decrease Betamax sales (P.A. 42; R. 1818-19, 1970, 2023-26, 2108, 2116-18; PX 648, 649, 681 and 682).

Petitioners mislead the Court by stating that they clearly warned potential purchasers against Betamax copying (P.B. 3 n. 4, 40, 46). A purchaser receives no warning before he buys his Betamax (P.A. 42). In fact, the only "warning" he receives appears at the end of an 18-page booklet of operating instructions which is delivered with his Betamax in a sealed carton (P.A. 42, PX 98, p. 17). Moreover, the warning -- which differs markedly from pre-Betamax warnings, P.A. 42; note 16, supra -- is so vague that one Betamax owner who testified at trial thought it meant that "you couldn't use this machine to distribute and make a business out of taping people's movies and selling them" (R. 1579).

EXHIBIT 7 - PAGE 126

"The defendant not only expected but invoked by advertisement the use of its films for dramatic reproduction [i.e., exhibition] of the story.  That was the most conspicuous use for which they could be used, and the one for which especially they were made." 222 U.S. at 62-63.

Accord, Elektra Records Co. v. Gem Electronic Distributors, Inc., supra, 360 F.Supp. 821 (retail store that furnished its customers with a duplicating machine to copy copyrighted sound recordings held liable for the infringing copies).  The Court of Appeals' decision thus fully adheres to settled principles of contributory copyright infringement.

B.  The Staple Article of Commerce Argument Does Not Immunize Petitioners From Contributory Copyright Infringement Liability.

In arguing that they are not liable as contributory infringers, petitioners -- as did the district court -- analogize VTRs to "staple articles of commerce" under the patent statute and rely on the staple article of commerce doctrine from patent law to avoid contributory copyright infringement liability.  n98 This reliance on the staple article rationale is improper for several reasons. First, petitioners' analysis is based primarily on a perceived difficulty in fashioning appropriate relief rather than on any assertion that petitioners lack culpability under established contributory copyright infringement principles.  n99 Second, analogies to this statutory patent doctrine are inappropriate in the copyright context.  Third, even if such an analogy were proper, the doctrine would not shield petitioners from liability here.

n98 This doctrine is codified in 35 U.S.C.  § 271(c) as follows:

"(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

n99 Indeed, petitioners candidly admit that their sale of Betamax contributes to VTR copying.  (Appellees' Ninth Circuit Brief and Cross-Appellants' Brief 70).

Petitioners predicate their staple article analysis primarily on their view that to hold them liable for VTR copying would require an injunction which would unjustifiably inhibit possible non-infringing uses of VTRs.  The district court engaged in an identical analysis, absolving petitioners of liability simply because the court assumed that it would be impossible to devise a remedy which would both protect respondents' works and at the same time permit possible non-infringing uses to continue.  n100 This approach was manifestly improper. As the Court of Appeals noted, where, as here, liability is established under accepted legal principles, it is impermissible to deny relief merely because it may be difficult to fashion an appropriate remedy (P.A. 25-26, 28).  n101

n100 The district court stated that a finding of liability would expand the theory of contributory infringement "arguably beyond judicial management," that under such a finding "[c]ommerce would indeed be hampered" and "an injunction which seeks to deprive the public of the very tool or article of commerce capable of some

EXHIBIT 7 - PAGE 127

noninfringing use would be an extremely harsh remedy" (P.A. 97, 114; see P.B. 39-40).

n101 Cf.  Silver King Mines, Inc. v. Cohen, 261 F.Supp. 666, 674-75 (D. Utah 1966).


Moreover, contrary to the district court's belief, appropriate relief can be devised to accommodate any non-infringing uses.  One example is the continuing royalty suggested by the Court of Appeals (P.A. 28-29).  A continuing royalty instead of a permanent injunction would permit non-infringing uses, if any, to continue unabated. n102 Such uses could also continue if petitioners were directed to devise a technological means to prevent VTR copying only of programs owned by respondents and others who object to such copying.  n103 Accordingly, the district court could have resolved its dilemma without issuing a sweeping decree absolving petitioners of all liability.


n102 Similarly, an award of statutory damages (17 U.S.C.  § 504(c)) would require payment only for infringing recordings of respondents' copyrighted works, not recordings of unprotected works.

n103 See notes 4 & 97, supra.


The staple article of commerce theory is also inapposite because it is found in the patent statute -- not the copyright statute -- and represents a legislative accommodation of competing considerations arising from the unique nature of patents.  n104 Analgies to this statutory defense are therefore inappropriate in a copyright case.


n104 Dawson Chem. Co. v. Rohm And Haas Co., 448 U.S. 176 (1980).  Unlike copyrights, patented products and processes consist, as petitioners have noted, of many elements or components, the unique combination of which is protected by the patent (P.B. 41).  As the very language of § 271(c) demonstrates ("[w]hoever sells a component of a patented [product]... or a material... for use in practicing a patented process, constituting a material part of the invention...."), the staple article defense is predicated on this unique characteristic of patents.  See, Jones v. RCA, 131 F.Supp. 82, 83 (S.D.N.Y. 1955).


Even if such an analogy were proper, petitioners would nevertheless be liable here.  First, because § 271 must be read in its entirety (see note 64, supra ), an analogy to § 271(c) also calls § 271(b) into play.  Section 271(b), which provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer," would proscribe petitioners' conduct even if § 271(c) would not.

Section 271(b) forbids any conduct which "causes," "urges," "encourages" or "aids" another to infringe a patent.  n105 Significantly, § 271(b) contains no staple article of commerce limitation.  Therefore, if the seller of an article causes, urges, encourages or aids another to use the article to infringe, the seller is liable for the infringement under § 271(b) regardless of whether the article is a "staple" and

EXHIBIT 7 - PAGE 128

regardless of whether it meets the "substantial non-infringing use" test of § 271(c). n106 The reason for this rule is clear: while there may be a societal interest in permitting the sale of articles capable of a variety of non-infringing uses, there is obviously no legitimate social interest in permitting a seller of those articles to encourage their use in an infringement.  Since petitioners' advertisements, brochures and instruction manuals unquestionably cause, urge, encourage and aid VTR purchasers to infringe respondents' copyrights (see notes 9, 10, 91, 96 & accompanying text, supra ), petitioners are liable by analogy to § 271(b) notwithstanding their claim that VTRs are staple articles of commerce.

   n105 Fromberg, Inc. v. Thornhill, 315 F.2d 407, 411 (5th Cir. 1963) ("inducement has connotation of active steps knowingly taken -- knowingly at least in the sense of purposeful, intentional, as distinguished from accidental or inadvertent.  But with that qualifying approach, the term is as broad as the range of actions by which one in fact causes, or urges, or encourages or aids another to infringe a patent"). Accord, Ingersoll-Rand Co. v. Rockwell Int'l, Corp., 420 F.Supp. 277, 281 (S.D. Fla. 1976); Aluminum Extrusion Co. v. Saule Steel Co., 260 F.Supp. 221, 224 (C.D. Cal. 1966).

   n106 Rohm And Haas Co. v. Dawson Chem. Co., 599 F.2d 685, 700 (5th Cir. 1979), aff'd, 448 U.S. 176 (1980) (the seller of a staple article is liable for infringements by his customers if he "actively induc[es] infringement (as by advertising or giving detailed instructions for practicing the invention with his products -- conduct prohibited by paragraph (b))" (emphasis added); Fromberg, Inc. v. Thornhill, supra, 315 F.2d at 410-12; see SPEE-FLO Mfg. Corp. v. Gray Co., Inc., 255 F.Supp. 618, 620 (S.D. Tex. 1964); Weyerhaeuser Timber Co. v. Bostitch, Inc., 178 F.Supp. 757, 760 (D. R.I. 1959).

   Second, even if § 271(b) were disregarded, the requirements of § 271(c) would not be satisfied in this case.  Under subsection (c) a seller of a staple article can avoid contributory infringement liability only if the article is "suitable for substantial non-infringing use." 35 U.S.C.  § 271(c) (emphasis added).  Importantly, the district court refused to find that Betamax meets the substantial non-infringing use requirement (P.A. 97, 114).  The district court found only that VTRs are capable of some potential non-infringing uses (P.A. 97, 106-7, 114).  n107 The Court of Appeals likewise concluded that the record did not establish that VTRs are capable of substantial non-infringing uses (P.A. 26).

   n107 Petitioners' and supporting amici's repeated assertions that the district court found substantial non-infringing uses (e.g., P.B. 40, 43 n. 53) are false.  In fact, the district court determined to apply the staple article rationale regardless of the substantiality of such uses (P.A. 97) ("[w]hether or not... Betamax is capable of 'substantial' noninfringing use....").

   The refusal of both courts below to find VTRs suitable for substantial non-infringing uses was entirely proper.  To meet the substantiality test, proof of minor non-infringing uses will not suffice, nor will a showing of a mere possibility of such uses. n108 Rather, petitioners had the burden of proving that any non-infringing uses were both actual (not merely possible) and substantial.  n109 Petitioners did not satisfy

EXHIBIT 7 - PAGE 129

this test.

    n108 United States Gypsum Co. v. National Gypsum Co., 440 F.2d 510, 516 (7th Cir. 1971), cert. denied, 403 U.S. 923; Slumaker v. Gem Mfg. Co., 311 F.2d 273, 276 (7th Cir. 1962); Reynolds Metals Co. v. Aluminum Co. of America, 457 F.Supp. 482, 509-10 (N.D. Ind. 1978).

    n109 Fromberg, Inc. v. Thornhill, supra, 315 F.2d at 415; Reynolds Metals Co. v. Aluminum Co. of America, supra, 457 F.Supp. at 507-10.

    As petitioners concede, the primary function of VTRs is to reproduce copyrighted television programming.  Petitioners' claim (P.B. 4, 29, 40) that the vast majority of this programming is available for non-infringing reproduction lacks any legal or factual support.  First, virtually all of this programming is protected by federal or state law from unconsented copying, including VTR copying.  n110 Accordingly, VTRs are simply incapable of substantial non-infringing uses.

    n110 All television programs are protected by copyright if, as is usually the case, they are filmed (i.e., "fixed") prior to telecast.  1976 House Report 52. Even live events such as concerts and live news coverage are protected by copyright if they are fixed simultaneously with the live broadcast.  Id. And, live programs not simultaneously fixed are protected by state law.  Id.; Cal. Civ. Code § 980, as amended, A.B. No. 3483, 1981-82 Reg. Sess., ch. 574 (Aug. 25, 1982), 1982 Cal. Legis. Serv. p. 3508 (West); CBS, Inc. v. Documentaries Unltd., Inc., 248 N.Y.S.2d 809, 42 Misc.2d 723 (1964); see Zacchini, supra, 433 U.S. 562.  Thus, the Court of Appeals' conclusion that virtually all television programming is protected from unconsented copying (P.A. 26) is inescapably correct, notwithstanding petitioners' criticism of the authority relied upon by the Court (P.B. 43 n. 53).

    Nor does the fact that a few television stations may not be able to meet the deposit requirements necessary for copyright registration of some of their locally produced programs render these programs available for unconsented VTR copying, as petitioners assert (P.B. 9).  Statutory copyright protection subsists continuously from the moment a work is first fixed in a tangible medium of expression, whether or not the work is ever registered.  17 U.S.C.  § 302(a); 2 Nimmer, supra, § 7.16[A][I], at 7-111.  Registration and deposit are merely prerequisites to filing an infringement action (17 U.S.C.  § 411(a)).  As the very language of the statute makes clear, "such registration is not a condition of copyright protection." 17 U.S.C. § 408(a); see 2 Nimmer, supra, § 7.16[A][I], at 7-111, 7-129-30.  Thus, VTR copying is no less a copyright violation merely because the program copied has not been registered.

    Petitioners attempt to avoid this inescapable conclusion by arguing that some alleged program owners testified that they did not object to VTR copying and that this somehow renders VTRs suitable for substantial non-infringing use (P.B. 40-43).  However, the testimony of the few witnesses upon which petitioners rely is both uniformly inconclusive n111 and legally insufficient.  Indeed, even in the rare cases where program owners might consent to VTR copying (see note 116, infra ), under basic precepts of copyright law reproduction of these programs will nevertheless

EXHIBIT 7 - PAGE 130

usually constitute infringement unless the consent of many others is also obtained. n112 For example, virtually all programs contain copyrighted music, see Broadcast Music, Inc. v. CBS, Inc., 441 U.S. 1 (1979), and are normally based on underlying written works (e.g., books, plays and television scripts) which are protected by a copyright distinct from the copyright in the broadcst television program.  See 17 U.S.C.  §§ 102, 103; 1976 House Report 57-58; 1 Nimmer, supra, § 3.04, at 3-12 - 3-14.  Without the consent of the owners of these musical and underlying written works, the television programs incorporating this material cannot be legally copied. n113

   n111 Some of the deficiencies in this testimony are described in note 116, infra. Space considerations, however, preclude a thorough analysis of this testimony in this brief.  For such an analysis, see Plaintiffs' Opening Post-Trial Memorandum, C.R. 28/88, pp. 79-107.

   n112 Despite petitioners' contrary assertion (P.B. 8), NBC does not consent to VTR copying.  Indeed, NBC broadcasts a prohibition against off-the-air recording of its programs (R. 3004-06, 3159; PX 1070).  In any event, NBC obviously has no power to consent to the copying of programs which are owned by others (such as respondents) and merely licensed to NBC for television exhibition (see, e.g., PX 890, P21; United States v. NBC, 449 F.Supp. 1127, 1134-36 (C.D. Cal. 1978).

   n113 Filmvideo Releasing Corp. v. Hastings, 668 F.2d 91, 92-93 (2d Cir. 1981); Russell v. Price, 612 F.2d 1123, 1128 (9th Cir. 1979), cert. denied, 446 U.S. 952 (1980).  For example, the testimony of the owner of the Spider Man series that he did not object to VTR copying does not render that copying legal. There is no evidence that the owners of the copyrighted music contained in the series or the owners of the copyrights in the underlying Spider Man comic books (R. 2932-34; P.B. 9) ever consented to such copying.  Similarly, petitioners did not present such evidence with respect to the works allegedly owned by their other witnesses.

   Second, there is no consent by anyone to the vast majority of VTR copying. Petitioners' own survey shows that over 80% of all Betamax recordings consists of protected entertainment programs, nearly all of which are owned by respondents and supporting amici, all of whom object to such copying (see note 1, supra ).  n114 This same survey shows that less than 9% of all recordings consists of religious (0%), educational (1.6%), and sports (7.3%) programs -- the type of material purportedly owned by most of the limited number of witnesses who testified that they did not object to VTR copying.  n115 Even as to this 9%, petitioners did not establish that the copied material is owned by program owners who do not object to VTR copying.  n116

   n114 See DX OT, Tables 20, 40 and Questionnaire 14, 26.

   n115 (DX OT, Tables 20, 40).  Petitioners' statements that 49% of Betamax owners records sports, 10% record religious and 63% record educational programs are gross mischaracterizations of the evidence (P.B. 7).  The survey on which these statements are based asked Betamax owners merely "Have you ever used the Betamax to record" such programs (DX OT, Questionnaire 9).  Affirmative answers to this question allow only the inference that the respondents recorded sports, religious

EXHIBIT 7 - PAGE 131

and educational programs once, not that they make a regular practice of doing so.

n116 This showing was necessary because so few owners of such protected material consent to VTR copying.  Petitioners presented testimony from only a few educational and religious program owners (R. 2564-87, 2593-2640, 2823-44, 2863-2902).  But they clearly do not speak for all owners of educational and religious programs.  Indeed, both in this Court and below many major producers and distributors of educational and religious programs have registered strong objection to VTR copying (R. 3173-3200; Brief Amicus Curiae of Creators and Distributors of Programs in Support of Respondents; see Encyclopaedia Britannica I, supra, 447 F.Supp. 243; Encyclopaedia Britannica II, supra, 542 F.Supp. 1156) (objection by 3 large educational program producers to VTR copying for educational purposes).

Similarly, petitioners presented testimony from representatives of the commissioners of five sports leagues.  However, none of these witnesses purported to speak either for the leagues as a whole or for individual team members (R. 2460-63, 2468, 2491-94, 2511-12, 2517, 2520-21, 2526-28, 2532, 2537-38, 2545, 2550, 2554-56, 2561-62).  Moreover, each witness' testimony was addressed only to the copying of network broadcasts, not the thousands of local station broadcasts owned by individual teams.  Even many network broadcasts may not be copied without permission of individual teams (R. 2509).  No individual team has expressed its consent to VTR copying (R. 2454-55, 2468, 2491-93). Indeed, three teams (New York Mets, Boston Red Sox and Boston Bruins) recently indicated that they object to unauthorized viewing of their televised games. See Eastern Microwave, Inc. v. Doubleday Sports, Inc., 534 F.Supp. 533 (N.D.N.Y. 1982) ("Eastern Microwave"); New Boston Television, supra, 2 Copyrt. L. Rep. (CCH) P25,293.

It should also be noted that all of the testimony upon which petitioners rely was given four to five years ago when the VTR industry was in its infancy. There is no indication that the witnesses who testified continue to adhere to their previously expressed views.  See Eastern Microwave, supra; New Boston Television, Inc., supra.

Thus, petitioners' evidence does not support, and indeed refutes, their claim that non-infringing uses of Betamax are both actual and substantial.  n117 Since both courts below refused to find on this evidence that VTRs are suitable for substantial non-infringing uses, and since such a finding is required to invoke the staple article of commerce argument, petitioners' reliance on the district court's conclusion that VTRs are theoretically capable of some non-infringing uses is unavailing.

n117 Contrary to the contentions of petitioners' amici, the use of VRTs to make home movies with a video camera and to play back licensed, pre-recorded videocassettes is not relevant to the issue of possible non-infringing uses. Those uses do not involve Betamax' off-the-air recording capability and can be accomplished with machines (not challenged in this action) that cannot record off-the-air (see note 9, supra ).

Because VTRs are advertised and sold for the primary purpose of infringement, petitioners' additional claim that imposition of liability in this case would be tantamount to imposing liability on the suppliers of cameras, typewriters and Xerox machines is spurious (P.B. 43).  Unlike cameras, typewriters and Xerox machines,

EXHIBIT 7 - PAGE 132

whose primary market is derived from non-infringing uses, there would be little, if any, market for VTRs if they could not be used for infringing purposes (see notes 114, 115 & accompanying text, supra ).  Petitioners' unwillingness to devise a technological means of preventing copying of copyrighted works makes plain that without the ability to make unconsented copies of the copyrighted motion pictures owned by respondents and amici, there would be little if any market for VTRs.  The Court of Appeals correctly held that petitioners should not be allowed to build an industry based on this unconsented copying merely because VTRs may also be capable of some non-infringing uses (P.A. 25-29).  n118


   n118 See Ortho-O-Vision, Inc. v. Home Box Office, 474 F.Supp. 672, 686 n. 14 (S.D.N.Y. 1979).  Accord, United States v. Loew's, Inc., supra, 371 U.S. at 53.


   III.
IT WOULD BE PREMATURE FOR THIS COURT TO DETERMINE AT THIS TIME WHETHER A CONTINUING ROYALTY IS AN APPROPRIATE REMEDY.  IN ANY EVENT THE DISTRICT COURT CLEARLY HAS THE POWER TO ORDER SUCH A REMEDY.

   The question whether the district court, after remand, may order the payment of a continuing royalty as a condition to denying a permanent injunction is premature.  The Court of Appeals did not direct the district court to enter such a remedy.  Rather, recognizing the difficulties posed by the remedy question, the Court of Appeals simply remanded the case for the fashioning of an appropriate remedy, noting that the district court might consider whether a continuing royalty would be "an acceptable resolution in this context" (P.A. 28-29).  Since the district court has not yet considered the remedy question, any pronouncement by this Court concerning the issue would be wholly advisory and without the benefit of a factual record.

   Not only is the remedy issue premature, but petitioners' analysis of the issue is defective.  Petitioners assert that there is no statutory or decisional authority for imposition of a continuing royalty in lieu of a permanent injunction (P.B. 45).  To the contrary, 17 U.S.C.  § 502(a) authorizes the district court to issue "final injunctions on such terms as it may deem reasonable." This is simply "a reaffirmation of the usual power of courts to grant injunctions...." Register's 1965 Supplementary Report 132.  Under this power, courts have the unquestioned authority in appropriate cases to withhold an injunction against unauthorized use of property on the condition that the defendant adequately compensate the plaintiff for continued use of the property. n119 A continuing royalty in lieu of a permanent injunction would accomplish precisely this result.  That the district court has power under the Copyright Act to impose a continuing royalty pursuant to its general equitable powers is further confirmed by 17 U.S.C.  § 405(b) which expressly authorizes courts, in cases where copyright notice has been omitted from the infringed work, to permit the infringing activity to continue "on condition that the copyright owner be paid a reasonable license fee." House Report 148.


   n119 City of Harrisonville, Mo. v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 339-40 (1933).


   It is evident from the foregoing that a continuing royalty is authorized by law.

EXHIBIT 7 - PAGE 133

Moreover, such a remedy could accommodate the interests of all parties and the public by ensuring fair compensation to respondents for the use of their works while avoiding a total ban against future VTR sales.  For this latter reason alone, this Court should not decide whether such a remedy is appropriate until the district court has had an opportunity to evaluate the ramifications of a continuing royalty and to develop a full record upon which an informed review by this Court can be based.  n120

   n120 The sincerity of petitioners' countrary position is questionable since Sonam's president suggested such a remedy early in this litigation (Depo. of Harvey L. Schein, May 12, 1977, pp. 375-76, App. Chereto).  Petitioners' resistance to a compulsory royalty is also difficult to understand in view of their continued expressions of concern over the harshness of the alternate equitable remedy of an injunction against VTR sales (e.g., P.B. 39-40).


   IV.
THE COURT OF APPEALS' DECISION FULLY COMPORTS WITH THE "CLEARLY ERRONEOUS" STANDARD OF APPELLATE REVIEW.

   Petitioners accuse the Court of Appeals of violating the clearly erroneous standard of reiview (Fed. Rule Civ. Proc. 52(a)) by substituting its own findings of fact for those of the district court without holding the district court's findings clearly erroneous.  The argument lacks merit.

   It is settled that the clearly erroneous limitation does not apply to review of legal conclusions drawn by a district court from facts found at trial, and that a reviewing court is therefore free to make an independent determination as to those legal conclusions.  n121 Consistent with this rule the Court of Appeals merely held that the facts found by the district court did not support the legal conclusions which it drew therefrom, and that these findings and petitioners' admissions required a holding of liability on both the fair use and contributory infringement issues as a matter of law.  See discussion at §§ I.A., I.B. & II, supra. n122 In so doing, the Court of Appeals neither substituted its own findings for those of the district court nor made new findings based on disputed evidence.  Thus, the decision below comports with Rule 52 in all respects.


   n121 United States v. Mississippi Valley Generating Co., 364 U.S. 520, 526 (1961); United States v. Grayson County State Bank, 656 F.2d 1070, 1975 (5th Cir. 1981); United States Fidelity etc. Co. v. Royal Nat'l. Bank, 545 F.2d 1330, 1333 (2d Cir. 1976); see Inwood Laboratories, Inc. v. Ives Laboratories, Inc., supra, 102 S.Ct. at 2189 n. 15 (clearly erroneous limitation inapplicable where, as here, the district court's findings are based on an erroneous view of the law).

   n122 On the fair use issue, the Court of Appeals held that the district court's findings that VTR copies involve no independent creation, usually involve copying the entire copyrighted work, serve the same purpose as the original, have economic value which petitioners -- rather than respondents -- currently receive from VTR owners, require respondents to compete with such copies in the marketplace and involve frequent deletion of commercial messages from the television broadcasts thereof necessitate rejection of the fair use defense as a matter of law.  The Court of

EXHIBIT 7 - PAGE 134

Appeals further held that the district court's findings that VTR copies are made (1) in the home (2) from the public ariwaves (3) for non-commercial purposes (4) allegedly to increase access to respondents' broadcast copyrighted works and that (5) respondents did not prove any damages to date nor a "probability" of such damages in the future are insufficient as a matter of law to qualify, such copies as fair use. (See §§ I.A. & I.B, supra ).

On the issue of contributory infringement, the Court of Appeals held that the district court's findings, and the stipulations and admissions by petitioners, that Betamax is manufactured, advertised and sold for the primary purpose of reproducing television programs, that petitioners know that such reproductions include copyrighted works, including works produced by respondents, that petitioners' advertisements exhort such copying and that Betamax contributes to the making of such reproductions establish contributory infringement as a matter of law.

The Court of Appeals further held that the district court's finding that petitioners "could not" know that VTR copies violate copyright law does not preclude contributory infringement liability because knowledge of the legal consequences of the infringing activity is unnecessary.  The Court of Appeals also discounted the finding that petitioners' advertisements did not induce copying of the specific titles alleged in the complaint because neither inducement nor the singling out of specific titles for copying is a necessary element of contributory infringement.  Finally, the Court of Appeals ruled that the district court's findings that VTRs are staple articles of commerce capable only of some non-infringing uses cannot as a matter of law preclude contributory infringement liability because the staple article doctrine requires a finding -- which the district court refused to make -- that VTRs are suitable for substantial non-infringing use and because application of the doctrine here improperly absolved petitioners of liability merely because the district court assumed that fashioning a remedy would be difficult.  (See § II, supra ).


V.

CONCLUSION.

For all of the foregoing reasons, the decision of the Court of Appeals should be affirmed.

Respectfully submitted,

STEPHEN A. KROFT, (Counsel of Record), JOHN G. DAVIES, SONDRA E. BERCHIN, Attorneys for Respondents, Universal City Studios, Inc. and Walt Disney Productions.

Of Counse: ROSENFELD, MEYER & SUSMAN.

APPENDIX A.

The following Table sets forth in numerical order each exhibit referred to in Respondents' Brief.  The page numbers in the Reporter's Transcript ("R.") at which each exhibit was identified and admitted are also set forth pursuant to Supr. Ct. Rule 34.5.

| Exhibit No. | Identified | Admitted |
| --- | --- | --- |
| 87 | R. 684 | R. 684 |

EXHIBIT 7 - PAGE 135

| | | |
|---|---|---|
| 90 | 577 | 579, 713 |
| 91 | 577 | 579, 713 |
| 92 | 577 | 579, 713 |
| 93 | 710 | 713 |
| 94 | 710 | 713 |
| 95 | 710 | 713 |
| 96 | 710 | 713 |
| 97 | 710 | 713 |
| 98 | 710 | 713 |
| 99 | 710 | 713 |
| 110 | 1925 | 1925 |
| 111 | 1925 | 1925 |
| 113 | 1925 | 1925 |
| 114 | 1925 | 1925 |
| 124 | 1297 | 1299 |
| 143 | 1869 | 1869 |
| 147 | 670 | 671 |
| 148 | 670 | 671 |
| 149 | 670 | 671 |
| 150 | 1944 | 1944 |
| 151 | 672 | 673 |
| 152 | 672 | 673 |
| 155 | 674 | 675 |
| 156 | 674 | 676 |
| 157 | 678 | 679 |
| 158 | R. 926 | R. 926 |
| 159 | 926 | 926 |
| 160 | 926 | 926 |
| 161 | 926 | 926 |
| 162 | 926 | 926 |
| 163 | 926 | 926 |
| 164 | 926 | 926 |
| 165 | 926 | 926 |
| 166 | 926 | 926 |
| 167 | 644 | 644 |
| 168 | 644 | 644 |
| 169 | 644 | 644 |
| 170 | 644 | 644 |
| 228 | 670 | 670 |
| 252 | 670 | 670 |
| 253 | 670 | 670 |
| 326 | 678 | 679 |
| 328 | 674 | 677 |
| 329 | 674 | 677 |
| 330 | 674 | 677 |
| 448 | 645-46 | 646 |
| 449 | 645-46 | 646 |
| 452 | 642 | 642 |
| 453 | 642 | 642 |
| 454 | 1937-38 | 1938 |
| 460 | 1937-38 | 1938 |
| 461 | 1937-38 | 1938 |

EXHIBIT 7 - PAGE 136

| | | |
|---|---|---|
| 463 | 1937-38 | 1938 |
| 466 | 597 | 616 |
| 504 | 1932-33 | 1933 |
| 505 | 631 | 635 |
| 506 | 1932-33 | 1933 |
| 511 | 1932-33 | 1933 |
| 519 | 1942-43 | 1943 |
| 544 | R. 1847 | R. 1847 |
| 546 | 1847 | 1847 |
| 547 | 685-86 | 686 |
| 548 | 685-86 | 686 |
| 550 | 685-86 | 686 |
| 552 | 685-86 | 686 |
| 554 | 685-86 | 686 |
| 555 | 682 | 684 |
| 556 | 682 | 684 |
| | | |
| 559 | 1814 | 1819 |
| 648 | 1929 | 1929 |
| 649 | 1929 | 1929 |
| 681 | 1814 | 1819 |
| 682 | 1814 | 1819 |
| 716 | 1854 | 1854 |
| 717 | 1830 | 1831 |
| 723 | 1930 | 1931 |
| 730 | 1082 | 1120 |
| 890 | 1165 | 1166 |
| 986 | 973 | 974 |
| 987 | 973 | 974 |
| 1063 | 1771-80 | 1780 |
| 1068 | 2945 | 2945 |
| 1070 | 3006 | 3006 |
| OS | 2650 | 2680 |
| OT | 2308 | 2309 |

APPENDIX B.

   "We do not think our copyrighted motion pictures in whole or in part, should be physically copied in homes, in libraries, for private research, entertainment, or otherwise, without our permission, if new technologies were to permit the easy duplication of our works by taking the same off a television screen onto a tape or wire recorder, or by duplicating a rented film, tape, or wire."

   "We have no present comment as to photocopying by libraries, other than to be sure that any such right does not extend to permit our motion picture films to be duplicated in whole or in part for any purpose. "
Statement of MPAA, March 2, 1962, in Copyright Law Revision, Part 2, Discussion and Comments on Report of the Register of Copyrights 345, 351, 88th Cong., 1st Sess. (House Comm. Reprint) (1963) (emphasis added).

   APPENDIX C.

EXHIBIT 7 - PAGE 137

"Q.  Now, Mr. Schein, you attended the International Tape Association Seminar or Convention in Hilton Head, South Carolina last month, did you not?

A.  That's correct.

Q.  And at that convention you made the statement in substance that Sonam would not oppose a law or a judicial decision which required the sellers of videotape recording machines with off-the-air recording capabilities to pay a -- I don't know if it was a tax, but some kind of a fee, some amount of money to the owners of television, copyrighted television shows.

Do you remember saying that?

A.  In substance.

Q.  Is one of the reasons that you made that statement because you believe that the payment of a fee such as that would in part reimburse the owners of the copyrighted television programs for revenue that they would lose because of off-the-air recording of their programs?

MR. DOSKOW: I object to that question.  It's totally irrelevant.  His reasons for saying that he would advocate a particular type of legislative program has no bearing on this case.

THE WITNESS: Not advocate.  I believe I said I would not object to it."

(Deposition of Harvey L. Schein, May 12, 1977, pp. 375-76).

EXHIBIT 7 - PAGE 138

Exhibit 8





No. 81-1687
Supreme Court of the United States
October Term, 1981
May 10, 1982

EOWXIOX 1982 U.S. S. Ct. Briefs LEXIS 261

SONY CORPORATION OF AMERICA, et al., Petitioners, vs. UNIVERSAL CITY STUDIOS,
INC. and WALT DISNEY PRODUCTIONS, Respondents.

GcWO Brief

GMNSO VP 5 ] [QVXRRTOY

Cases

*American Construction Co. v. Jacksonville, Tampa & Key West Ry. Co., 148 U.S. 372 (1893)*

*Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476 (1964)*

*Benny v. Loew's, Inc., 239 F.2d 532 (9th Cir. 1956)* aff'd *356 U.S. 43 (1958)*

*Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook R.R. Co., 389 U.S. 327 (1967)*

*Cook v. Hudson, 429 U.S. 165 (1976)*

*District of Columbia v. Sweny, 310 U.S. 631 (1940)*

*Gemsco v. Walling, 324 U.S. 244 (1945)*

*General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175 (1938)*

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159 (2d Cir. 1971)*

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251 (1916)*

*Henry v. A.B. Dick Co., 224 U.S. 1 (1912)* overruled on oth. grds., *Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502 (1917)*

*Kalem Co. v. Harper Brothers, 222 U.S. 55 (1911)*

*Libby Rod & Gun Club v. Poteat, 594 F.2d 742 (9th Cir. 1979)*

*Meeropol v. Nizer, 560 F.2d 1061 (2d Cir. 1977),* cert. denied, *434 U.S. 1013 (1978)*

*Meredith Corp. v. Harper & Row Publishers, Inc., 378 F.Supp. 686,* (S.D.N.Y.),aff'd, *500 F.2d 1221 (2d Cir. 1974)*

EXHIBIT 8 - PAGE 139

1982 U.S. S. Ct. Briefs LEXIS 261, *261

*Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Cooperative Prods., Inc., 479 F.Supp. 351 (N.D. Ga. 1979)*

*Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966),* cert. denied, *385 U.S. 1009*

*Sanks v. Georgia, 401 U.S. 144 (1971)*

*T.V.A. v. Hill, 437 U.S. 153 (1978)*

*United States v. Johnston, 268 U.S. 220 (1925)*

*United States v. Loew's, Inc., 371 U.S. 38 (1962)*

*Wainwright Securities Inc. v. Wall Street Transcript Corp., 558 F.2d 91 (2d Cir. 1977),* cert. denied, *434 U.S. 1014 (1978)*

*Walt Disney Prods. v. Air Pirates, 581 F.2d 751 (9th Cir. 1978),* cert. denied, *439 U.S. 1132 (1979)*

*Wihtol v. Crow, 309 F.2d 777 (8th Cir. 1962)*

*Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973),* aff'd *420 U.S. 376 (1975)*

Constitution

United States Constitution, Art. I, Sec. 8, cl. 8

Miscellaneous

Amendment No. 1242 to S. 1758, 97 Cong., 1st Sess., 127 Cong. Rec. S15723-24 (daily ed. Dec. 16, 1981)

Amendment No. 1333 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S1675 (daily ed. March 4, 1982)

Copyright Act of 1909, Public Law No. 60-349, ch. **[*5]**  320.35 Stat. 1075 (17 U.S.C. § 1 et seq.)

127 Cong. Rec. E5148 (daily ed., Nov. 4, 1981)

128 Cong. Rec. H322 (daily ed. Feb. 9, 1982)

General Revision of Copyright Law, Public Law No. 94-553, 90 Stat. 2541 *(17 U.S.C. §§ 101* et seq.)

Hearings on Home Video and Audio Recording Legislation Before House Subcommittee on Courts, Civil Liberties and Administration of Justice of House Judiciary Committee, 97th Cong., 2d Sess. (April 12, 1982) p. 32

Hearings on Home Video and Audio Legislation Before the Senate Committee on the Judiciary, 97th Cong., 2d Sess. (April 21, 1982) pp. 6, 19, 23, 25

Hearings on S. 1758 Before Senate Committee on Judiciary, 97th Cong., 1st Sess. (Nov. 30, 1981) p. 109

EXHIBIT 8 - PAGE 140

1982 U. S. S. Ct. Briefs LEXIS 261, *5

1976 House Report 61, [1976] U.S. Code Cong. & Ad. News, p. 5674

1976 House Report 77, [1976] U.S. Code Cong. & Ad. News, pp. 5690-5691

H.R. Rep. No. 83, 90th Cong., 1st Sess. 61 (1967)

H.R. Rep. No. 92-487, 92d Cong., 1st Sess. 5-6 (1971), [1971] U.S. Code Cong. & Ad. News, pp. 1570-71

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 161 (1976), [1976] U.S. Code Cong. & Ad. News, p. 5777

H.R. 4783, 97th Cong., 1st Sess., 127 Cong.  **[*6]**  Rec. H7504 (daily ed. Oct. 20, 1981)

H.R. 4794, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981)

H.R. 4808, 97th Cong., 1st Sess., 127 Cong. Rec. H7591 (daily ed. Oct. 21, 1981)

H.R. 5250, 97th Cong., 1st Sess., 127 Cong. Rec. H9928 (daily ed. Dec. 16, 1981)

H.R. 5488, 97th Cong., 2d Sess., 128 Cong., Rec. H333 (daily ed. Feb. 9, 1982)

H.R. 5705, 97th Cong., 2d Sess., 128 Cong. Rec. H664 (daily ed. March 3, 1982)

S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S11810 (daily ed. Oct. 21, 1981)

S. Rep. No. 94-473, 94th Cong., 1st Sess. 71 (1975)

1975 Senate Report 65

1975 Senate Report 66

1975 Senate Report 71

Rules

Rules of Court, Rule 28.1

Federal Rules of Appellate Procedure, Rule 8(a)

Federal Rules of Civil Procedure, Rule 61(c)

Statutes

United States Code, Title 17, Sec. 101 et seq.

United States Code, Title 17, Sec. 106

United States Code, Title 17, Secs. 107-118

United States Code, Title 17, Sec. 107

United States Code, Title 17, Sec. 108

United States Code, Title 17, Sec. 111(e)

EXHIBIT 8 - PAGE 141

1982 U. S. S. Ct. Briefs LEXIS 261, *6

United States Code, Title 17, Sec. 501

United States Code, Title 17, Sec 502(a)

United States Code, Title 17, Sec. 504

United States **[*7]**  Code, Title 17, Sec 504(c)(2)

United States Code, Title 28, Sec. 1254(1)

United States Code, Title 28, Sec. 2101(f)

Treatises

Nimmer, Photocopying & Record Piracy: Of Dred Scott and Alice in Wonderland, 22 U.C.L.A.
Law Rev., pp. 1052, 1054 (1975)

Seltzer, L., Exemptions and Fair Use in Copyright (1978), p. 24

Stern, R. & E. Gressman, Supreme Court Practice, p. 298 (5th ed. 1978)

---

| **Counsel** |
| --- |

STEPHEN A. KROFT, (Counsel of Record), JOHN G. DAVIES, SONDRA E. BERCHIN, 9601
Wilshire Boulevard, Suite 444, Beverly Hills, Calif. 90210, (213) 858-7700, Attorneys for
Respondents, Universal City Studios, Inc. and Walt Disney Productions.

Of Counsel ROSENFELD, MEYER & SUSMAN

---

| **Title** |
| --- |

BRIEF FOR RESPONDENTS UNIVERSAL CITY STUDIOS, INC. AND WALT DISNEY
PRODUCTIONS IN OPPOSITION.

---

| **Text** |
| --- |

Counterstatement of Questions Presented. *  **[*2]**

---

*   Respondent Universal City Studios, Inc. (″Universal″) is a wholly-owned subsidiary of MCA INC. (″MCA″). MCA and/or
Universal have the following partially owned subsidiaries and/or affiliates within the meaning of Supr. Ct. Rule 28.1: Two-Beat Mu-
sic Corp., JDJN Music Corp., MCA New Ventures, Inc., Discovision Associates, Saticoy Technology, Inc., Universal Pioneer Cor-
poration, Mood Music Company, Inc., Fontaine Music Corp., Roncom Films, Inc., Supreme Music Corporation, Western Cos-
tume Co., MPD Leasehold Corp., Afram Films, Inc., American Motion Picture Company (Africa), Inc., Motion Picture Export
Association of America, Inc., Cinema International Corporation N.V., CIC International B.V., Pincus-Gil Music Pty. Limited, Leeds
Music Hans Gerig KG, Spoone Music Pty. Limited, Tangerine Music Pty. Limited, Leeds Musieck Holland B.V., MCA Music Lim-
ited, Eugene Music Limited, Evita Music Limited, Jeeves Music Limited, Rowlou Music Limited, Spoone Music Limited, Val-
ley Music Limited, Academy Investments No. 1 Pty., Ltd., United Video International N:, MCA (Paris) Ltd., Regent Investments
Pty. Limited, Town Cinema Investments Pty. Ltd., United International Pictures B.V., Universal-RKO, Oak Industries Joint Ven-
ture, Hotel Two Associates, T.E.M. Programs International, USA Network and Optical Programming Associates. Universal and MCA
also partially own many companies and/or partnerships formed for the purpose of producing individual motion pictures and/or tele-
vision programs. These entities are not listed here because of Universal's understanding that they do not fall within the term ″af-
filiates″ as used in Rule 28.1.

EXHIBIT 8 - PAGE 142

1982 U. S. S. Ct. Briefs LEXIS 261, *2

1. Whether the Court should at this time rrview a nonfinal decision of the Court of Appeals inter-
preting provisions of the Copyright Act, 17 U.S.C. § 101 et seq., which Congress is in the pro-
cess of amending.

2. Whether the statutory prohibition against copying entire copyrighted motion pictures is subject
to an implied exception for home videotape recorder ("VTR") copying from television transmis-
sions.

3. Whether the fair use doctrine excuses mass home VTR copying of entire copyrighted motion pic-
tures for purposes of convenience.

4. Whether those who manufacture, market and sell VTR's with the intention and expectation
that they will be used primarily for copying entire copyrighted motion pictures are liable for such
copying as contributory copyright infringers.

5. Whether this Court should render an advisory opinion concerning the remedy to be impoed by
the district court before that court has had an opportunity to fashion a remedy on remand.

6. Whether this Court should review the record below to determine whether the Court of Ap-
peals ignored findings of the district court.

Opinions Below.

The non-final decision of the Court of Appeals (Pet. App. 1-30) is reported at _659 F.2d 963 (9th
Cir. 1981)._ The opinion of the district court (Pet. App. 31-117) is reported at _480 F.Supp. 429
(C.D. Cal. 1979)._

Jurisdiction.

The judgment of the Court of Appeals was entered on October 19, 1981. A petition for rehearing
was denied on January 12, 1982 (Pet. App. 118). The petition for writ of certiorari was filed on
March 12, 1982. n1 The jurisdiction of this Court is invoked under _28 U.S.C. § 1254_(1).

Constitutional [*8] Provisions and Statutes Involed.

This case involves Article I, § 8, cl. 8 of the United States Constitution and several provisions of
the Copyright Act of 1909, Pub. L. No. 60-349, ch. 320, 35 Stat. 1075, 17 U.S.C. § 1 et seq. (su-
perseded 1978) ("1909 Act") and the General Revision of Copyright Law, Pub. L. No. 94-553, 90
Stat. 2541, _17 U.S.C. §§ 101_ et seq. ("1976 Act"). The pertinent provisions of the 1976 Act are
_17 U.S.C. §§ 101_, 106-07, _501_, _502(a)_ and _504_. The pertinent provision of the 1909 Act is 17 U.S.C.
§ 1. These constitutional and statutory provisions are set forth in Appendix D to the petition
(Pet. App. 119-28).

**Counterstatement of the Case.**

The non-final decision of the Court of Appeals is neither remarkable nor unique. Applying estab-
lished copyright principles to the circumstances surrounding VTR sale and use, the Court of Ap-
peals merely reaffirmed that unauthorized copying of entire copyrighted motion pictures, particu-
larly the type of mass copying made possible by VTR's, constitutes copyright infringement and

---

Respondent Walt Disney Productions' only partially owned subsidiary or affiliate within the meaning of Rule 28.1 is Vista-
United Telecommunications, Inc.

EXHIBIT 8 - PAGE 143

that those who induce, cause or materially contribute to such [*9] copying are liable therefor. This case thus involves no unsettled question of federal law. It simply involves uncontroverted copyright principles applied to ordinary copying, the most commonplace type of infringement encountered in copyright law.

Respondents own thousands of copyrighted motion pictures, many of which are licensed for television exhibition. Petitioners manufacture, advertise and sell to consumers VTR's under the brand name ✂Betamax✂for the primary purpose of making copies of copyrighted television programming, including copyrighted motion pictures owned by respondents (Pet. App. 25-27). These copies are made generally in the homes of VTR purchasers from television transmissions. n2

Respondents brought this action against petitioners n3 alleging that VTR copying constitutes copyright infringement n4 and that petitiners are liable for such infringement under the doctrines of contributory infringement, direct infringement, vicarious liability and unfair competition (Pet. App. 54, 101). All other major producers and distributors of televised motion pictures, [*10] amici curiae here and in the Court below, joined in respondents' objections to petitioners' activities. n5

The district court (Ferguson, J.) found for petitioners, holding that VTR copying for private viewing does not violate the Copyright Act because (1) such copying is impliedly excepted from the express statutory prohibition against unauthorized copying (Pet. App. 57-65) and, alternatively, (2) such copying is permitted by the fair use doctrine (Pet. App. 66-87). The district court further concluded that even if VTR copying constitutes infringement, (3) petitioners are not liable for such infringement (Pet. [*11] App. 89-102), and (4) even if they are liable, respondents nevertheless are entitled to no relief (Pet. App. 102-15). The latter two holdings were based primarily on the court's conclusion that Betamax is a staple article of commerce.

The Court of Appeals (Kilkenney, J.) unanimously reversed the district court in all respects. The Court of Appeals first held that under the unambiguous language of the Copyright Act VTR copying constitutes copyright infringement and that the district court contravened congressional intent in finding an implied exception to the express, stastutory prohibition against unauthorized copying contained in Section 106 of the Act (Pet. App. 4-12). The Court next held that VTR copying of entire copyrighted motion pictures does not constitute fair use (Pet. App. 12-25). The Court further ruled that petitioners are liable as contributory infringers for VTR copying, concluding thqt the staple article of commerce theory does not shield petitioners from liability for marketing VTR's (Pet. App. 25-27).

Finally, the Court of Appeals held that respondents are entitled to appropriate relief for petitioners' infringing activities (Pet. App. 27-29). In so holding, the [*12] Court noted that ✂the relief question is exceedingly complex✂and that ✂the district court is in a better position [than the Court of Appeals] to resolve, in an appropriate fashion, the relief question✂(Pet. App. 28). The Court of Appeals therefore declined to direct the entry of any particular type of relief, but rather remanded the matter to the district court to fashion an appropriate remedy. Responding to a cross-appeal by petitioners, the Court of Appeals also ruled that before fashioning a final remedy, the district court must conduct further proceedings concerning three affirmative defenses which it did not consider at trial (Pet. App. 30). n6

In response to the Court of Appeals' decision, several bills were introduced in both Houses of Congress dealing with home video recording. [*13] The initial bills seek simply to exempt home video recording from copyright liability without compensating copyright owners. n7 These bills would essentially overturn the decision below. Several subsequent bills, while completely exempting VTR owners from liability, exempt VTR manufacturers and distributors only if they pay com-

EXHIBIT 8 - PAGE 144

1982 U. S. S. Ct. Briefs LEXIS 261, *13

pulsory royalty fees to copyright owners. n8 These latter bills modify the decision below and re-
tain copyright protection against mass uncompensated VTR copying. Consideration of these
bills is moving forward expeditiously. The Senate Committee on the Judiciary commenced hear-
ings on S. 1758 and Amendment 1333 on November 30, 1981, and concluded these hearings
on April 21, 1982. Similarly, the Subcommittee on Courts, Civil Liberties and the Administration
of Justice of the House Judiciary Committee conducted hearings on all House bills on April 12-
14, 1982, and is expected to conclude these hearings in June, 1982. **[*14]**

In the meantime, neither the VTR industry nor the use of VTR's has ground to a halt. Petition-
ers and all other VTR manufacturers are still selling VTR's and have announced that they will con-
tinue such sales as long as they are permitted to do so. Furthermore, in the six years that this
case has been pending no suits have been brought against individual VTR owners for VTR copy-
ing, and respondents have stated publicly that no such actions will ever be instituted. n9

REASONS FOR DENYING THE WRIT.

The petition should be denied for several reasons: (1) the Court of Appeals' decision is not final
and therefore not ripe for review; (2) Congress is currently addressing the issues raised by peti-
tioners; (3) the issues raised in the petition **[*15]** are neither novel, unsettled nor worthy of con-
sideration by this Court; and, (4) the Court of Appeals' decision does not conflict with the deci-
sions of this or any other Court. Indeed, the Register of Copyrights and several members of Congress
have expressed their complete agreement with the Court of Appeals' interpretation of the Copy-
right Act n10 -- and for good reason: the Court of Appeals' decision carefully follows settled law
and is correct in all respects. **[*16]**

I.
BECAUSE THE COURT OF APPEALS REMANDED THE CASE TO THE DISTRICT
COURT TO CONSIDER THREE AFFIRMATIVE DEFENSES AND TO FASHION A REM-
EDY THE DECISION BELOW IS NOT FINAL AND THEREFORE NOT RIPE FOR RE-
VIEW.

This Court has stated repeatedly that except in "extraordinary" circumstances it will decline to re-
view non-final decisions because they often "become quite unimportant by reason of the final re-
sult or intervening matters." n11 Since the Court of Appeals remanded this case to the district
court to consider three unresolved affirmative defenses and to fashion an appropriate remedy, the de-
cision below is not final and therefore is not ripe for review. Indeed, the reasons for application
of the normal rule against review of nonfinal decrees are particularly strong here. **[*17]**

First, if upheld by the district court, petitioners' three remaining affirmative defenses would bar re-
spondents' statutory infringement claims. These affirmative defenses could also have applica-
tion to similar potential litigation involving other parties. n12 Thus, if petitioners prevail on their re-
maining defenses, it may never become necessary for this Court to consider the issues presented
by the current pletition.

Second, the remedy which the district court will fashion on remand could adequately accommo-
date the interests of all parties so that none will thereafter seek review by this Court. More-
over, as petitioners appear to recognize (Pet. 9, 11, 23), such a remedy would likely provide an ac-
ceptable resolution to similar potential lawsuits. More importantly, the issues raised **[*18]** by
petitioners are integrally connected to the remedy questions which remain to be addressed on re-
mand. n13 If considered at all by this Court, these interrelated issues should be addressed after re-
mand in a single proceeding rather than piecemeal.

EXHIBIT 8 - PAGE 145

Third, as discussed more fully in Section II, infra, it is likely that before this case becomes ripe for decision by this Court after remand, Congress will pass legislation disposing for the future of the issues now raised by petitioners. **[*19]** In this event, it would be unnecessary for this Court to consider those issues.

Not only is this case not ripe for review, but petitioners have failed to demonstrate that "extraordinary" circumstances exist which compel departure from the normal rule against review of non-final decrees. Petitioners claim that immediate review is necessary here for two reasons: to prevent countless suits against individual VTR owners and to avoid destruction of the entire VTR industry (Pet. 2, 9, 11, 13, 23). This misleading parade of horribles does not provide an adequate basis for interlocutory review.

During the six years that this case has been pending, neither respondents nor any other copyright owner has sued any individual VTR owner for VTR copying. Nor is there any intention of doing so (see supra, at p. 6, lines 14-17). Thus, intervention by this Court is unnecessary to protect the interests of individual VTR owners.

It is also inaccurate to presage the demise of the VTR industry before the district court fashions a remedy. Petitioners' own actions conclusively demonstrate that the VTR industry will not be destroyed during the pendency of a remand in this case. They are marketing VTR's **[*20]** and have announced that they will continue to do so unless enjoined on remand by the district court (see supra, at p. 6, lines 10-14). n14 Moreover, if the district court orders payment of continuing royalties instead of a permanent injunction (Pet. App. 28-29), VTR sales will continue after remand without interruption. Such sales will also continue unabated if, as is likely. Congress passes any one of the pending bills.

Thus, the reasons advanced by petitioners for immediate review are neither reliable nor accurate and afford no basis for treating the decision below differently from any other ordinary non-final decree.

II.
PENDING CONGRESSIONAL LEGISLATION WILL LIKELY DISPOSE OF THE ISSUES BEFORE THIS COURT.

This Court has routinely refused to review cases where congressional modification of the statutory scheme in issue makes consideration by the Court unnecessary or minimizes the future importance of the question presented. n15 Here, Congress has not yet enacted **[*21]** new legislation. However, the Senate has already concluded its hearings, and it seems clear from Congress' expeditious and serious consideration of the pending bills that such legislation is imminent. n16 It is also clear that any one of the bills, if enacted, would dispose of the issues raised in the petition for the future and render a decision by this Court unnecessary and of virtually no general effect. n17

Given the imminence of congressional action, this Court should defer to the legislative process already underway and deny review at this time. Such judicial restraint is particularly appropriate here because even if Congress fails to act, this Court will have adequate opportunity to review after remand the precise issues currently raised **[*22]** by petitioners.

III.
THE COURT OF APPEALS' DECISION IS CORRECT, IS IN HARMONY WITH DECISIONS OF ALL OTHER COURTS, AND RAISES NO ISSUES WORTHY OF REVIEW BY

EXHIBIT 8 - PAGE 146

1982 U.S. S. Ct. Briefs LEXIS 261, *22

THIS COURT.

A. The Court of Appeals Correctly Interpreted the Statutory Provisions of the Copyright Act to Prohibit Home Video Recording.

Petitioners do not dispute the Court of Appeals' conclusion that on its face the language of both the 1909 and 1976 Acts unambiguously proscribes home video recording of copyrighted motion pictures (Pet. App. 4-12; Pet. 14). Rather, they assert that review is warranted because the Court of Appeals erred in refusing to find in the legislative history of the 1976 Act an implied exemption permitting such recording (Pet. 14-16). n18 As the following discussion demonstrates, this refusal to imply an exemption to clear statutory language (Pet. App. 6-12) was correct.

The only exemptions from liability contained in the 1976 Act are set forth in Sections 107-118. See _17 U.S.C. § 106_; 1976 House Report 61, [1976]  **[*23]**  U.S. Code Cong. & Ad. News 5674. Significantly, none of these exemptions permits uncompensated reproduction of copyrighted works for "private use." Indeed, with one narrow exception, none permits reproduction of copyrighted motion pictures for any purpose. n19 This carefully constructed statutory scheme in and of itself demonstrates that Congress did not intend, expressly or impliedly, to exempt VTR copying from statutory copyright liability. The legislative history of the 1976 Act further supports this conclusion. n20 Indeed, as the Court of Appeals noted (Pet. App. 8-9), this history underscores Congress' special concern for the protection of motion pictures in all circumstances. n21  **[*24]**

This ordinary issue of statutory construction does not warrant review by this Court. n22

 **[*25]** B. The Court of Appeals' Holding That Home Video Recording Does Not Constitute Fair Use Is Correct and Does Not Conflict With Any Other Decision.

The Court of Appeals relied on two independent grounds in ruling that VTR copying does not constitute fair use. First, following established case law, it held that an unauthorized use -- such as VTR copying -- which does not involve independent creativity for purposes such as criticism, comment, news reporting, teaching, scholarship or research, i.e., a "productive use," can never constitute fair use (Pet. App. 15-18). n23 Alternatively, the Court held that under a balancing of the traditional four fair use criteria (see _17 U.S.C. § 107_), VTR copying is not fair use even if under some circumstances other nonproductive uses could constitute fair use (Pet. App. 18-25). Petitioners seek review of each of these holdings, recognizing that review of both is necessary to alter the result below.  **[*26]**

In an attempt to elevate the "productive use" requirement of the fair use doctrine to a status worthy of review by this Court, petitioners assert that in applying this established requirement, the Court of Appeals rendered a decision in conflict with the decision of the Court of Claims in _Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973),_ aff'd by equally divided court, _420 U.S. 376 (1975)_ (library photocopying by the United States government from medical journals for medical research purposes) (Pet. 22-23). In particular, petitioners assert that unlike the decision below, Williams & Wilkins refused to require a productive use as a necessary basis for the fair use defense (Pet. 22). As the following discussion demonstrates, there is no conflict between these decisions.

Although the Court of Appeals criticized Williams & Wilkins -- as have many others n24 -- it correctly found Williams & Wilkins "clearly distinguishable" (Pet. App. 16-17), thus avoiding the "head-on clash" which petitioners perceive (Pet. 22) between the Court of Appeals and the Court of Claims. As the Court of Appeals noted, in Williams & Wilkins, the purpose of the  **[*27]**  unauthorized use -- library photocopying by the United States Government -- was to advance science, medicine and medical research, and thus was the type of productive use required by the

EXHIBIT 8 - PAGE 147

1982 U. S. S. Ct. Briefs LEXIS 261, *27

fair use doctrine. See note 23, supra. VTR copying does not further either science, research or scholarship. Hence, on its facts this case is distinguishable from, and does not conflict with, Williams & Wilkins. n25

Moreover, Williams & Wilkins, which was decided under the 1909 Act, has little, if any, application under the 1976 Act under which the instant case was decided. The Court in Williams & Wilkins recognized that its decision was a "holding operation" designed to protect library photocopying by the United States Government until "Congress enacted its preferred solution." S.Rep. No. 94-473, 94th Cong., 1st Sess. 71 (1975) (hereinafter "1975 Senate Report") (quoting Williams & Wilkins, supra, 487 F.2d at 1363). [*28]  In response to Williams & Wilkins, and because "the several opinions in the Wilkins case [gave] the Congress little guidance as to the [then] current state of the law on fair use," Congress included a specific provision in the 1976 Act (*17 U.S.C. § 108*) dealing with library photocopying. In so doing, Congress sharply limited the permissible scope of such activities and resolved the confusion created by Williams & Wilkins under the 1909 Act. 1975 Senate Report 71. When Congress acted on this issue in 1976, the "holding operation" of Williams & Wilkins came to an end and the Court of Claims' approach to the fair use doctrine lost its vitality.

Petitioners next assert that this Court should grant review to correct the Court of Appeals' alleged improper application of the four traditional fair use criteria to VTR copying (Pet. 17-21). Petitioners do not claim that the Court below rested its decision on incorrect legal principles. They merely ask this Court to reapply the undisputed legal principles to the facts of this case. In particular, petitioners claim that the Court of Appeals ignored several findings of the district court and that this Court should correct [*29]  this error. These issues are not worthy of review. This Court does not customarily grant certiorari to correct the improper application of settled rules of law to individual cases. R. Stern & E. Gressman, Supreme Court Practice 298 (5th ed. 1978). Petitioners have shown no reason to depart from the Court's customary practice in this case. Moreover, the Court of Appeals correctly applied the fair use criteria and did not ignore any relevant findings. n26

 [*30] C. The Court of Appeals' Conclusion That Petitioners Are Contributory Infringers Is Correct and Does Not Conflict With Any Decision of This Court.

In holding petitioners liable as contributory infringers, the Court of Appeals applied uncontroverted copyright doctrine (Pet. 24; Pet. App. 27). n27 Petitioners do not ask this Court to overturn that doctrine. They assert that review is warranted because the Court of Appeals' application of the contributory infringement doctrine allegedly conflicts with decisions of this Court (Pet. 23 -25) and ignores the district court's conclusion that VTR's are staple articles of commerce. n28 These assertions are not well taken.  [*31]

The decisions relied upon by petitioners are not only consistent in all respects with the Court of Appeals' decision, they dramatically underscore its validity. In *Kalem Co. v. Harper Brothers, 222 U.S. 55 (1911),* the only copyright case cited by petitioners, this Court held that the seller of an unauthorized film version of a copyrighted story was contributorily liable for his customers' infringing exhibitions of the film. In so holding, the Court reasoned:

"The defendant not only expected but invoked by advertisement the use of its films for dramatic reproduction of the story. That was the most conspicuous use for which they could be used, and the one for which especially they were made." *Id. at 62-63.*

Similarly, in *Henry v. A.B. Dick Co., 224 U.S. 1, 48-49 (1912),* overruled on oth. grds. in *Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 517 (1917),* a case interpreting pat-

EXHIBIT 8 - PAGE 148

ent law, the Court held that the seller of an article capable of both infringing and non-infringing uses is liable for contributory patent infringement if he ″intends and expects″ that article to be used for infringing purposes, particularly **[\*32]** when the infringing use is the ″most conspicuous use″ of the product and the one for which it is advertised.

The Court of Appeals in the instant case engaged in an analysis virtually identical to Kalem and Henry, finding petitioners liable for infringing VTR recordings because, as stipulated by petitioners (R.T. 1778-79), Betamax is ″manufactured, advertised, and sold for the primary purpose of reproducing [copyrighted] television programming″ and because petitioners

″'know' that the Betamax will be used to reproduce copyrighted materials. In fact, that is the most conspicuous use of the product. That use is intended, expected, encouraged, and the source of the product's consumer appeal. The record establishes that [petitioners] knew and expected that Betamax's major use would be to record copyrighted programs off-the-air″ (Pet. App. 25-26, 27).
The court below thus fully adhered to this Court's decisions in Kalem and Henry.

The Court of Appeals' decision is also consistent with the final case cited by petitioners, *Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476 (1964).* Interpreting the patent statute, this Court held in Aro that the **[\*33]** seller of a staple article of commerce cannot be liable for contributory patent infringement if the staple article ″is suitable for substantial non-infringing uses.″ *Id. at 485-88.* In the instant case, the Court of Appeals, citing Aro, merely held that the district court's reliance on the staple article of commerce theory was inappropriate because, among other reasons, VTR's are not suitable for substantial non-infringing uses (Pet. App. 25 -26). Despite the inferences in the petition to the contrary, the district court did not find otherwise (Pet. App. 97, 114). n29 Accordingly, the Court of Appeals' decision is in complete harmony with Aro.  **[\*34]**

It is thus clear that contrary to petitioners' unexplained assertion (Pet. 23-25), the Court of Appeals did not hold petitioners liable ″per se″ as contributory infringers for the mere marketing of alleged staple articles of commerce. Rather, it imposed liability based on a standard application of the doctrine of contributory copyright infringement. n30

D. It Would Be Premature for This Court to Determine the Remedy to Be Imposed in This Case Before the District Court Has Ordered a Remedy on Remand.

The fourth question presented for review -- whether the district court, after remand, may order as a remedy in this case the payment of a continuing royalty in lieu of a permanent injunction (Pet. 26) -- is premature. Indeed, at this point the issue posed is purely hypothetical. The Court of **[\*35]** Appeals did not order the district court to enter such a remedy. Rather, recognizing the difficulties posed by the remedy question, the Court of Appeals simply remanded the case for the fashioning of an appropriate remedy, noting that the district court might consider whether a continuing royalty would be ″an acceptable resolution in this context″ (Pet. App. 28-29). n31 Since the district court has not yet considered the remedy question, any pronouncement by this Court concerning the issue would be wholly advisory and without the benefit of a factual record. This issue therefore is not ripe for review.

E. The Question Whether the Court of Appeals Ignored Relevant Findings of the District Court Is Not Worthy of Review.

The last issue presented for review is whether this Court should exercise its power of supervision to **[\*36]** correct the Court of Appeals' alleged disregard of the district court's findings of fact

EXHIBIT 8 - PAGE 149

(Pet. 26-28). As previously discussed, the Court of Appeals did not disregard any relevant find-
ings. See notes 26, 28 and 29 & accompanying text, supra. Moreover, petitioners in essence ask this
Court to review the evidence contained in 3350 pages of trial transcript and in hundreds of ex-
hibits to determine whether the Court of Appeals did, in fact, ignore relevant fact findings which
were not clearly erroneous. However, as this Court frequently has noted, it "do[es] not grant a cer-
tiorari to review evidence and discuss specific facts." *United States v. Johnston, 268 U.S. 220, 227
(1925);* Accord, *General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 178
(1938).* Petitioners have demonstrated no reason to depart from this rule in this case.

IV.**CONCLUSION.**

The Petition for Writ of Certiorari should be denied.

Respectfully submitted,

STEPHEN A. KROFT, (Counsel of Record), JOHN G. DAVIES, SONDRA E. BERCHIN, Attor-
neys for Respondents Universal City Studios, Inc. and Walt Disney Productions.

Of Counsel: ROSENFELD, MEYER & SUSMAN.

APPENDIX **[*37]**  1.

OFFICE OF THE CLERK, SUPREME COURT OF THE UNITED STATES, WASHINGTON,
D.C., 20543.

March 22, 1982.

Sondra E. Berchin, Esq., Rosenfeld, Meyer & Susman, 9601 Wilshire Boulevard, Beverly Hills,
California 90210.

RE: Sony Corporation of America, et al. v. Universal City Studios, Inc., etc., et al. No. 81-1687.

Dear Ms. Berchin:

Your request of March 19, 1982 for an extension of time within which to file a response to the pe-
tition for a writ of certiorri in the above-entitled case has been grnted, and your time has been ex-
tended to and including May 10, 1982.
Very truly yours,
ALEXANDER L. STEVAS, Clerk
By /s/ Francis J. Lorson
Francis J. Lorson, Chief Deputy Clerk

rjb
cc: Dean C. Dunlavey, Esq.

EXHIBIT 8 - PAGE 150

Exhibit 9



Placeshifting    Solutions    Products    News & Media    About Us

Search Sling Media

Home > About Sling Media

## About Sling Media

**About Sling Media**    Executive Team    Contact Us    Job Opportunities    Legal Information

Founded in 2004, Sling Media, Inc. is the leading provider of video placeshifting products and services for consumers and television service providers.

Sling Media's flagship product, the internationally-acclaimed, Emmy award-winning Slingbox®, transforms the way consumers watch television—allowing consumers to watch their home TV on any Internet-connected PC, Mac, tablet or smartphone—from virtually anywhere in the world!

Sling Media's innovative SlingPlayer™ software connects consumers on all types of computing platforms to their Slingbox, giving them complete control over their living room TV. The Slingbox also gives consumers the ability to control practically any audio/video device including, a digital cable box, satellite receiver, digital video recorder (DVR), DVD player, gaming system or even a still video camera.

Sling Media Highlights

- In June 2005, the first Slingbox is launched to critical acclaim in the US retail market.
- The following year, in August of 2006, the Slingbox product line expands with the launch of the Slingbox PRO. International expansion also begins - with the opening of offices in the UK - signaling the introduction of the Slingbox to the European market.
- Also in 2006, Sling Media unveils SlingPlayer Mobile™—and for the first time ever, consumers can now enjoy watching all of their home TV content on a mobile phone.
- The third generation of the Slingbox is launched in September 2007 with the introduction of the Slingbox SOLO. Sling Media and the Slingbox and SlingPlayer product families receive numerous awards and recognition over the years, spanning innovation, engineering and design.
- In October of 2007, Sling Media is acquired by EchoStar Corporation (NASDAQ: SATS) and becomes a wholly owned subsidiary of the Colorado based television technology provider.
- Sling Media launches its fourth generation Slingbox, the PRO-HD, in September 2008, bringing true HD streaming to customers who have a high-definition TV source at home.
- In 2009, Sling Media launches SlingPlayer Mobile for iPhone, triggering a massive growth in consumers watching television on mobile devices with larger screens.
- In January 2010, Sling Media unveils the Sling Receiver 300 and the Slingbox 700U, both designed to help television service providers deliver "TV Anywhere" to their customers. The Slingbox 700U—the smallest Slingbox ever—is awarded a Gold Award and Best in Show at the 2010 International Design Excellence Awards (IDEA®) competition.
- The following year, in June 2010, Sling Media continues to expand the SlingPlayer Mobile product line, introducing SlingPlayer Mobile for Android, and later that year SlingPlayer Mobile for iPad and Windows Phone 7 smartphones, rapidly increasing the numbers of consumers able to enjoy their home TV on new mobile platforms with unmatched quality.
- The Sling Media product line continues to rapidly expand and today is distributed direct to consumers in over 5,000 retail stores in 20 countries, and to several television service providers in North America, Europe and Asia.

**CORPORATE CONTACT INFO**

**Corporate Headquarters**

**Sling Media, Inc.**
1051 E. Hillsdale Blvd, Suite 500
Foster City, CA 94404

+1 650 293 8000
+1 650 293 8800 fax

**Research and Development**

**Sling Media Pvt. Ltd.**
PSS Plaza, #6 Wind Tunnel Road
Murugesh Palya
Bangalore 560 017
India



About Sling Media | Contact Us | News & Media | Buy a Slingbox | Job Opportunities | Terms of Use | Privacy Policy

© 2005-2012 Sling Media. All rights reserved.