WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California  90017
Tel:  +1-213-629-2020 / Fax:  +1-213-612-2499

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105-2669
Tel:  +1-415-773-5700 / Fax:  +1-415-773-5759

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
ELYSE D. ECHTMAN (*pro hac vice*)
eechtman@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York  10019-6142
Tel:  +1-212-506-5000 / Fax:  +1-212-506-5151

MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL PAGE (SBN 154913)
mpage@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California  94111
Tel:  +1-415-362-6666

Attorneys for Defendants DISH Network L.L.C. and
DISH Network Corp.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS, INC., | Case No. CV12-04529-DMG (SHx) |
| Plaintiffs, | **DISH'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| v. | **[CORRECTED PUBLIC VERSION]** |
| DISH NETWORK L.L.C. and DISH NETWORK CORP., | |
| Defendants. | |

1

## TABLE OF CONTENTS

2  INTRODUCTION ..................................................................................................I

3  STATEMENT OF FACTS .....................................................................................2

4          A.  DISH Pays For Content Watched By Its Subscribers. ......................2
5          B.  History Of Time-Shifting And Ad Skipping Devices.......................3
          C.  Consumer Viewing Patterns..............................................................4
6          D.  The Accused Devices:  The Hopper Whole Home DVR,
7              PrimeTime Anytime And AutoHop. ..................................................5
               1.  The Hopper, PrimeTime Anytime, And AutoHop.....................5
8              2.  How PTAT And AutoHop Work. .............................................7

9  ARGUMENT ..........................................................................................................8

10 I.  FOX IS NOT LIKELY TO SUCCEED ON ITS CONTRACT CLAIM........8

11         A.  DISH Is Not Breaching The 2002 Agreement. ..................................9
           B.  DISH Is Not Breaching The 2010 Letter Agreement........................10
12              1.  DISH Is Not Expressly Required To Market *FOX* VOD.........10
13              2.  No Obligation To Exploit Can Be Implied. .............................11
14              3.  DISH Is Not Breaching The Anti-Circumvention
                   Provision...................................................................................12
15 II.  FOX IS NOT LIKELY TO SUCCEED ON ITS SECONDARY
    INFRINGEMENT CLAIM. ..........................................................................14
16
           A.  Time-Shifting By Consumers Remains Fair......................................15
17              1.  Time-Shifting Is Functionally Transformative. .......................16
18              2.  Fox Cannot Take Away The Consumer's Right To Time
19                 Shift By Offering Video On Demand Programming. ..............17
           B.  Ad Skipping By Consumers During Time-Shifting Remains
20             Fair. ...................................................................................................20
21              1.  Ad Skipping, By Itself, Implicates No Copyright Interest. ......20
               2.  Ad Skipping As Part Of Time-Shifting Is Fair. ......................20
22         C.  Ad Skipping Is Privileged Under The Family Movie Act.................22
23         D.  Distribution Of A Dual-Use Device With Substantial
               Noninfringing Uses Is Lawful...........................................................22
24         E.  Advertising Commercial Skipping Is Not Unlawful
25             "Inducement."...................................................................................23
    III.  FOX IS NOT LIKELY TO SUCCEED ON ITS DIRECT
26        INFRINGEMENT CLAIM. ........................................................................24

27         A.  Consumers Are Making The PTAT Copies, Not DISH.....................24
28         B.  DISH Is Not Infringing The Distribution Right................................25

C.    The Quality Control Copies Are Fair. ................................27

IV.   FOX HAS NOT DEMONSTRATED A LIKELIHOOD OF
      IRREPARABLE HARM BETWEEN NOW AND TRIAL.......................27

      A.    There Is No Irreparable Harm On The Contract Claim.....................27

      B.    Fox Has Not Shown Likely Irreparable Harm On Its Copyright
            Claim. ........................................................................28

      C.    Any Assertion Of Irreparable Harm Has Been Rebutted. ................31

      D.    Fox's Delay Undercuts Any Claim of Irreparable Harm. ................33

V.    THE OTHER FACTORS ALSO FAVOR DISH. ...................................34

      A.    DISH Will Suffer Far More Hardship Than Fox. ............................34

      B.    The Public Interest Will Be Disserved By An Injunction. ................35

VI.   THE OLD PTAT/AUTOHOP SYSTEM IS MOOT. ................................35

CONCLUSION ................................................................................35

## TABLE OF AUTHORITIES

Page(s)

### FEDERAL CASES

*ABC, Inc. v. Aereo, Inc.,*
   No. 12 Civ. 1540, 2012 WL 2848158 (S.D.N.Y. July 11, 2012)...........................16

*ABC v. AEREO, Inc.,*
   2012 U.S. Dist. LEXIS 96309 (S.D.N.Y. July 11, 2012) ..........................................7

*ActiveVideo Networks, Inc. v. Verizon Comms., Inc.,*
   No. 2011-1538, 2012 WL 3636908 (Fed. Cir. Aug. 24, 2012) .......................29, 33

*Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.,*
   579 F. Supp. 2d 554 (D. Del. 2008) ..........................................................................30

*Atari Games Corp. v. Nintendo of Am., Inc.,*
   975 F.2d 832 (Fed. Cir. 1992).....................................................................................27

*Atlantic Recording Corp. v. Howell,*
   554 F. Supp. 2d 976 (D. Ariz. 2008)..........................................................................26

*BP W. Coast Prods. LLC v. Takhar Bros. Inc.,*
   No. CV-07-1807, 2007 U.S. Dist. LEXIS 86006 (D. Ariz. Nov. 8, 2007)..........35

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994) ......................................................................................................17

*Caribbean Marine Servs. Co. v. Baldrige,*
   844 F.2d 668 (9th Cir. 1988).......................................................................................30

*Cartoon Network LP v. CSC Holdings, Inc.,*
   536 F.3d 121 (2d Cir. 2008) (hereafter *"Cablevision"*) ....................................15, 24

*Castle Rock Entertainment v. Carol Publishing Group,*
   150 F.3d 132 (2d Cir. 1998) ........................................................................................19

*Christopher Phelps & Assocs. LLC v. Galloway,*
   492 F.3d 532 (4th Cir. 2007).......................................................................................30

*ConWest Resources, Inc. v. Playtime Novelties, Inc.,*
   No. C 06-5304, 2006 WL 3346226 (N.D. Cal. Nov. 17, 2006) .............................28

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*,
  606 F.3d 612 (9th Cir. 2010) ........................................................................ 14

*CoStar Group, Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) ........................................................................ 25

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
  356 F.3d 1256 (10th Cir. 2004) .................................................................... 27

*Dotster, Inc. v. Internet Corp. for Assigned Names and Numbers*,
  296 F. Supp. 2d 1159 (C.D. Cal. 2003) ....................................................... 30

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ........................................................................... 8, 27, 29

*Ellison v. Robertson*,
  189 F. Supp. 2d 1051 (C.D. Cal. 2002) ....................................................... 25

*Elvis Presley Enter., Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003) ........................................................................ 17

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ...................................................................................... 14

*Field v. Google, Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) .......................................................... 25

*Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*,
  654 F.3d 989 (9th Cir. 2011) ............................................................. 27, 30, 34

*Flynt Distrib. Co v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984) ...................................................................... 28

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ......................................................................... 27

*Fromson v. Western Litho Plate & Supply Co.*,
  853 F.2d 1568 (Fed. Cir. 1988) .................................................................... 35

*FTC v. Evans Prods. Co.*,
  775 F.2d 1084 (9th Cir. 1985) ...................................................................... 35

*Givemepower Corp. v. Pace Compumetrics, Inc.*,
  No. 07cv157, 2007 U.S. Dist. LEXIS 20886 (S.D. Cal. Mar. 23, 2007) ............ 34

*GMC v. Harry Brown's, LLC,*
    563 F.3d 312 (8th Cir. 2009) ........................................................................ 35

*Hansen Beverage Co. v. N2G Distrib., Inc.,*
    No. 08-CV-1613, 2008 U.S. Dist. LEXIS 105442 (S.D. Cal. Dec. 30,
    2008) .............................................................................................................. 34

*Huntsman v. Soderbergh,*
    2005 WL 1993421 (D. Colo. Aug. 17, 2005) .............................................. 22

*Hustler Magazine Inc. v. Moral Majority Inc.,*
    796 F.2d 1148 (9th Cir. 1986) ...................................................................... 17

*Johnson & Johnson Vision Care v. CIBA Vision Corp.,*
    712 F. Supp. 2d 1285 (M.D. Fla. 2010) ....................................................... 30

*Kardios Sys. Corp. v. Perkin-Elmer Corp.,*
    645 F. Supp. 506 (D. Md. 1986) ................................................................... 12

*Keep A Breast Foundation v. Seven Group,*
    No.11-cv-00570, 2011 U.S. Dist. LEXIS 78373 (S.D. Cal. July 19, 2011) ........ 35

*Kelly v. Arriba Soft Corp.,*
    336 F.3d 811 (9th Cir. 2003) ........................................................................ 17

*Kerr Corp. v. North Am. Dental Wholesalers, Inc.,*
    No. SACV 11-0313, 2011 U.S. Dist. LEXIS 61779 (C.D. Cal. June 9,
    2011) .............................................................................................................. 34

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.,*
    964 F.2d 965 (9th Cir. 1992) ................................................................. 15, 27

*Los Angeles News Serv. v. CBS Broad., Inc.,*
    305 F.3d 924 (9th Cir. 2002) ........................................................................ 17

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
    571 F.3d 873 (9th Cir. 2009) ........................................................................ 34

*Matthew Bender & Co., Inc. v. West Pub. Co.,*
    158 F.3d 693 (2d Cir. 1998) ......................................................................... 15

*MercExchange, LLC v. eBay, Inc.,*
    500 F. Supp. 2d 556 (E.D. Va. 2007) ........................................................... 29

- v -

*MGM Studios, Inc. v. Grokster*,
   545 U.S. 913 (2005) ("*Grokster*") .............................................................. 15, 22, 23, 24

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
   16 F.3d 1032 (9th Cir. 1994)........................................................................ 35

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985)....................................................................... 33

*Perfect 10, Inc. v. Google, Inc.*,
   653 F.3d 976 (9th Cir. 2011)......................................................................... 34

*Perfect 10, Inc. v. Megaupload Ltd.*,
   2011 U.S. Dist LEXIS 81931 (S.D. Cal. July 27, 2011)........................................ 25

*Perfect 10 v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007)................................................................. 14, 17, 26

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
   55 F. Supp. 2d 1070 (S.D. Cal. 1999) .............................................................. 34

*Polymer Technologies, Inc. v. Bridwell*,
   103 F.3d 970 (Fed. Cir. 1996)........................................................................ 29

*Praxair, Inc. v. ATMI, Inc.*,
   479 F. Supp. 2d 440 (D. Del. 2007) ................................................................ 30

*Programmed Tax Sys., Inc. v. Raytheon Co.*,
   419 F. Supp. 1251 (S.D.N.Y. 1976) ................................................................ 34

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*,
   180 F.3d 1072 (9th Cir. 1999)................................................................. 7, 15, 27

*Religious Tech. Ctr. v. Netcom Online Comms. Servs.*,
   907 F. Supp. 1361 (N.D. Cal. 1995)........................................................... 24, 25

*Righthaven LLC v. Democratic Underground, LLC*,
   2012 U.S. Dist LEXIS 31605 (D. Nev. Mar. 9, 2012)........................................... 25

*Rosen v. Hosting Servs., Inc.*,
   771 F. Supp. 2d 1219 (C.D. Cal. 2010) ............................................................ 25

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010)............................................................................ 30

*Sega Enters. Ltd v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1993)..................................................................... 27

*Sony Computer Enter., Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000)....................................................................... 27

*Sony Pictures, Inc. v. Universal Studios, Inc.*,
    464 U.S. 417 (1984) ............................................................................ passim

*T.J.Smith and Nephew Ltd. v. Consolidated Med. Equip, Inc.*,
    821 F.2d 646 (Fed. Cir. 1987)..................................................................... 29

*Telephia Inc. v. Cuppy*,
    No. C 04-03508, 2005 WL 588441 (N.D. Cal. Mar. 11, 2005)............................ 28

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
    No. 99CV7654, 2000 WL 1887522 (C.D. Cal. Aug. 10, 2000)........................... 28

*Todd v. Chase Manhattan Mortg. Corp.*,
    No CV 12-00129, 2012 WL 1906505 (D. Ariz. May 25, 2012) ......................... 28

*Ty, Inc. v. Publications Int'l Ltd.*,
    292 F.3d 512 (7th Cir. 2002)....................................................................... 19

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    667 F.3d 1022 (9th Cir. 2011)..................................................................... 25

*Vacuum Concrete Corp. v. Am. Mach. & Fdry. Co.*,
    321 F. Supp. 771 (S.D.N.Y. 1971)........................................................... 11, 12

*Valeo Intellectual Prop., Inc. v. Data Depth Corp.*,
    368 F. Supp. 2d 1121 (W.D. Wash. 2005)..................................................... 34

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988)....................................................................... 15

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*
    No. CV-92-4698, 1993 U.S. Dist. LEXIS 15075 (C.D. Cal. June 29,
    1993)....................................................................................................... 34

*Warner Bros. Entertainment Inc. v. WTV Systems, Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ................................................... 29, 30

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2006) ..................................................................................... 27

*Winter v. NRDC, Inc.*,
    129 S.Ct. 365 (2008) ......................................................................... 8, 29

### STATE CASES

*2632 Realty Dev. Corp. v. 299 Main St., LLC*,
    94 A.D.3d 743, 941 N.Y.S.2d 252 (N.Y. App. Div. 2d Dep't 2012).................. 11

*Contacare, Inc. v. Ciba-Geigy Corp.*,
    49 a.D.3d 1215, 853 N.Y.S.2d 783 (N.Y. App.Div 2d Dep't 2008)................... 12

*E-Z Eating 41 Corp. v. H.E. Newport LLC*,
    84 A.D.3d 401, 922 N.Y.S.2d 329 (N.Y. App. Div. 1st Dep't 2011)................. 13

*Goldman v. Metro. Life Ins. Co.*,
    5 N.Y.3d 561, 841 N.E.2d 742 (2005)........................................................ 10

*Israel v. Chabra*,
    12 N.Y.3d 158, 906 N.E.2d 374 (N.Y. 2009) ........................................... 13

*Kaplan v. Lippman*,
    75 N.Y.2d 320, 552 N.E.2d 151 (1990) .................................................. 11

*Neumann. v. Metro Med. Group, P.C.*,
    161 A.D.2d 1106, 557 N.Y.S.2d 663 (N.Y. App. Div. 3d Dep't 1990).............. 14

### FEDERAL STATUTES

17 U.S.C. § 101.......................................................................................... 26

17 U.S.C. § 106.......................................................................................... 20

17 U.S.C. § 106(3)...................................................................................... 26

17 U.S.C. § 107.......................................................................................... 17

17 U.S.C. § 107(1)...................................................................................... 16

17 U.S.C. § 110(11)..................................................................................... 22

17 U.S.C. § 119............................................................................................ 2

17 U.S.C. § 122............................................................................................ 2

17 U.S.C. § 411.......................................................................................... 14

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

1

OTHER AUTHORITIES

2

3

Ethan O. Notken, *Television Remixed: The Controversy over Commercial-Skipping* ................................................................................................................ 21

4

5

SHVERA Section 109 Report at 188 (2008), available at
http://www.copyright.gov/reports/section109-final-report.pdf. ............................. 7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

For nearly thirty years, the American consumer has had the right in the privacy of her home to record over-the-air television broadcasts and watch them at a time that suited her family.  The Supreme Court vindicated that right in *Sony Pictures, Inc. v. Universal Studios, Inc.*, 464 U.S. 417 (1984), when it held that "time-shifting" is a fair use recording of copyrighted broadcast content.  The Court recognized that the copyright clause in the Constitution exists not for the lucre of the motion picture industry, but to serve the goal of the broadest possible access to free expression for all American citizens.  And, despite the entertainment industry's predictions of doom and gloom, this holding proved to be an enormous boon to that industry and everyone else and had exactly the result that the copyright clause contemplated—promotion of greater access to expression (and not incidentally, privacy) while at the same time offering greater rewards to authors for their works.

The broadcast networks want to take this all away.  They once again attack any degree of consumer freedom they fear *might* impede their profits.  In this case Fox is seeking in effect to abrogate *Sony*, thus eliminating time-shifting in favor of a new distribution channel called "video on demand."  The vehicle for this agenda is (again) the claim that the sky is falling on their advertising-supported business model.  And (again) there is *no evidence whatsoever* that any such harm has occurred or will occur, and in fact all economic evidence is to the contrary.  Despite decades of increasing use of home recording devices to time-shift *and skip commercials*, and decades of declining consumer viewing of advertising, the networks continue to enjoy their most lucrative advertising sales ever.

DISH's introduction of its latest home recording device is not going to change this pattern of three decades for the worse, and Fox has presented no evidence that it has, or will.  Fox has not shown that DISH consumers will skip more advertisements, and the evidence is to the contrary.  Consumers are not infringing copyrights by using the DISH Hopper Whole Home DVR to record

primetime programming and skip commercials.  They are watching *more* television.
DISH is not infringing copyrights by selling or leasing the Hopper to them.  This
case has already been decided once, and Fox has given neither *evidence* nor good
reason to defy the Supreme Court.  Instead, all Fox has provided is unsubstantiated
fear-mongering.  That is not enough to abrogate Supreme Court precedent,
especially with the privacy and freedom of the nation's entire television viewing
audience at stake.  The motion for preliminary injunction should be denied.

## STATEMENT OF FACTS[1]

### A.    DISH Pays For Content Watched By Its Subscribers.

DISH is the nation's third-largest pay television service provider delivering
satellite services to millions of families nationwide.  Declaration of David Shull in
Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
("Shull Decl.") ¶2.  As of June 30, 2012, DISH had more than 14 million
subscribers in the United States.  *Id.*  DISH competes with other pay television
service providers delivering multiple channels of video programming services,
including all cable television and direct broadcast satellite entertainment providers,
such as Comcast, TimeWarner Cable, Cox Cable, and DirecTV, as well as some
internet-based delivery systems such as AT&T U-verse and Verizon FiOS.  *Id.* ¶3.

In order to retransmit content from over-the-air broadcasts of the major
television networks, DISH enters into retransmission consent agreements pursuant
to statutory licenses in the Copyright Act.  *See* 17 U.S.C. §§119, 122.  DISH
negotiates these consents with both the networks and their affiliates in order to
serve the various local television markets throughout the United States.[2]  If DISH
does not have an agreement with a local affiliate, then the viewing audience in that
area cannot obtain their local stations over the DISH satellite service.  Shull Decl.

---

[1] Fox's facts in its brief contain numerous inaccuracies.  Although space constraints prevent pointing them out in this brief, they are fully addressed in the declarations supplied by DISH herewith.

[2] The Declaration of David Kummer, filed herewith, describes the technical aspects of the satellite television process.

1  ¶5.  DISH is currently a party to retransmission agreements with each of the four

2  major commercial broadcast television networks, ABC, CBS, NBC and Fox.  *Id.*

3  ¶6.  In the past several years, DISH has paid ███████████dollars to Fox and

4  its affiliates to retransmit the signals of the network owned and operated Fox

5  affiliates.  *Id.*  2011 fees were more than ████████.  *Id.*  They are projected to be

6  more than █████████ in 2012.  *Id.*

7      The Fox retransmission agreements acknowledge DISH's right to offer its

8  subscribers digital video recorders ("DVRs").  *Id.* ¶12.  Fox expressly

9  acknowledged that DISH (then EchoStar) subscribers would connect "video replay

10  equipment."  *Id.* Ex. C at 31.  Fox further agreed that DISH could authorize its

11  subscribers to record content for private home use:

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  (emphasis added).

16  *Id.* Ex. C at 34.

17      **B.    History Of Time-Shifting And Ad Skipping Devices.**

18      The first consumer DVRs were publicly introduced in 1999.  Minnick Decl.

19  ¶7.  DISH first began offering DVRs to its subscribers that year, with an early

20  combined satellite receiver set-top-box ("STB") and DVR known as the

21  DISHPlayer.  *Id.* ¶5.  The first DISHPlayer gave DISH subscribers the ability to

22  pause live television, but did not have sufficient memory recording television

23  shows.  *Id.* ¶5.  In mid-1999 DISH was offering improved versions of the

24  DISHPlayer with greater storage capacity and full VCR-type functionality.  *Id.* ¶8.

25  The DISHPlayer was a huge success.  *Id.* ¶9.

26      Over time, the storage capacity and features of DVRs have steadily

27  increased.  The original DISHPlayer had an 8 gigabyte hard drive.  *Id.* ¶6.  The

28  newest DVRs on the market have hard drive storage many times greater, in the

- 3 -

1   range of two terabytes.  *Id.* ¶6.  More memory is needed to store high definition

2   format shows.  *Id.* ¶19.  DVRs also have ad skipping capability, giving users the

3   power to fast-forward past commercials.  *Id.* ¶8.  This includes a thirty-second skip

4   option, which allows viewers to skip ahead by the same amount of time as a typical

5   television commercial.  *Id.* ¶6.  Today, the thirty-second skip feature is available on

6   most DVRs, including those from DISH, TiVo, DirecTV, Comcast, and Verizon

7   FiOS, among others.  *Id.*

8           **C.      Consumer Viewing Patterns.**

9           In the early 1980s, the motion picture industry first objected that home

10  recording technology would decimate the industry.  Rapp Decl. ¶¶37-45.  During

11  Congressional hearings in 1982, MPAA President Jack Valenti famously claimed

12  that relationship of the VCR to entertainment industry was as the "Boston Strangler

13  to a woman at home alone."  *Id.* ¶49.  This was wrong in so many respects.  One

14  was that widespread adoption of the VCR turned out to be a huge boon for the

15  entertainment industry, providing it with a new and lucrative distribution channel

16  for content in the form of videocassette rentals and sales.  The VCR remains in 57%

17  of American households still today.  Hauser Decl. ¶14.

18          A decade ago, the networks similarly labeled the next generation of home

19  recording technology, the digital video recorder, or DVR, a threat to the

20  underpinnings of free television.  Rapp Decl. ¶¶46-47.  Yet, the advertising revenue

21  of the four major television networks has substantially increased over that time

22  period.  *Id.* ¶52.  Even while storage capacity and functionality of DVRs has

23  steadily increased, commercial advertising revenue has also increased.  *Id.* ¶54.

24          Thus, there has been no harm to the networks from DVR usage.  The

25  American love affair with television remains strong.  Rapp Decl. ¶50.  The average

26  Nielsen household watches almost 8-1/2 hours of television per day, up from 6-1/2

27  hours in 1980.  Rapp Decl. ¶50.  And, the overwhelming majority of television

28  viewing (90%) is done live on traditional television sets.  Rapp Decl. ¶95; Hauser

1   Decl. ¶12, 21.  For sports, 95% percent is viewed live.  Hauser Decl. ¶22.  These

2   statistics hold even though 41-43% of households with televisions have DVRs, 23.3

3   % have two DVRs, and 5.7% have three or more DVRs.  Rapp Decl. ¶¶72, 101;

4   Hauser ¶14.  Studies show that households with DVRs *consume more television*

5   than households without DVRs.  Like other households, DVR households continue

6   to watch most television live, not recorded, or they watch later the same day.  Rapp

7   Decl. ¶¶74, 89; Hauser Decl. ¶12, 21.  In DVR households, 76% of primetime

8   viewing by individuals aged 18 to 49 occurs live.  Rapp Decl. ¶74.

9         From the dawn of television, viewers have skipped ads.  Hauser Decl. ¶22.

10  Even while watching *live* television, they would change the channel, leave the room

11  or direct their attention elsewhere the moment an ad came on the screen.  *Id.*  With

12  recorded programming, viewers who prefer to avoid commercials have had the

13  option, since the introduction of the VCR, to skip by fast-forwarding.  With the

14  DVR, people can do the same.  And, the networks' business model has flourished.

15  **D.    The Accused Devices:  The Hopper Whole Home DVR,**
    **PrimeTime Anytime And AutoHop.**

16

17        Against this backdrop, DISH announced in January 2012 that it would carry

18  EchoStar's latest, greatest DVR called the "Hopper."  Khemka ¶3.

19              **1.    The Hopper, PrimeTime Anytime, And AutoHop.**

20      **The Hopper:**  The Hopper "Whole Home" High Definition DVR is currently

21  the most technologically advanced STB/DVR that DISH offers to its subscribers.

22  Minnick Decl. ¶13.  The Hopper was announced on January 9, 2012 at the

23  International Consumer Electronics Show ("CES") and is an award-winning DVR.

24  *Id.*  Among other awards, the Hopper won the "Best in Show" award at the CES

25  Line Shows in New York.  *Id.*; Khemka Decl. ¶7.  The primary distinguishing

26  feature of the Hopper is its "Whole Home" capability.  Khemka Decl. ¶3; Minnick

27  Decl. ¶14.  The Hopper can provide satellite television service, as well as DVR

28  functionality, to as many as four televisions in one home.  Minnick Decl. ¶14.  No

1    matter which television the subscriber may want to use at a particular time, the

2    subscriber's DVR recordings will be readily available.  *Id.* ¶15.

3         **PrimeTime Anytime**:  On January 9, 2012, PrimeTime Anytime ("PTAT")

4    was announced as a Hopper feature that allows a user, at his or her election, to

5    create a single timer on the Hopper to record all of the primetime programming

6    shown in high definition on any of the four major broadcast networks each or every

7    night of the week.  Minnick Decl. ¶20.  PTAT must be turned on by the user.  *Id.*

8    DISH and EchoStar *do not* activate the PTAT feature for the user.  *Id.*

9    ███████████████████████████████████████████████████████████████

10   ████████████████[3]  When enabling PTAT, the user has the choice to select

11   between 1 and 4 networks to record, and may select which days of the week to

12   make the recordings.  Minnick Decl. ¶24.  The user also selects how many days she

13   wants to save the recordings before they are automatically deleted, with the option

14   of storage from 2 to 8 days.  *Id.*  A specific recording can be saved for a longer

15   period of time.  *Id.* ¶34.  The recordings made with the PTAT features are

16   accessible for playback in a PTAT "folder" on the Hopper, and can also be removed

17   by the user.  *Id.* ¶28, 35.

18        **AutoHop:**  AutoHop is an ad skipping feature that works with the PTAT

19   feature, and permits Hopper users to choose to automatically skip commercials

20   while playing back certain recorded shows.  Minnick Decl. ¶53.  If AutoHop is

21   available for a particular show, a red kangaroo icon will appear and the Hopper will

22   query the viewer whether to "Enable AutoHop."  *Id.*  The default is "No, Thanks."

23   *Id.*  If the user selects "Yes" as the answer, she can put down the remote control and

24   watch the entire show without ads.  *Id.* ¶54.  At the end of each segment the DVR

25   software will automatically skip ahead to the beginning of the next segment.  *Id.*

26        AutoHop functions like a souped-up version of the 30-second skip feature

27   ─────────────────────

28   █████████████████████████████████████████████████████████████████

available on most DVRs.  Minnick Decl. ¶55.  With a succession of quick 30-second skips, most DVR users cans already skip over an entire two and one-half minute commercial break.  *Id.*  AutoHop has automated that process.  *Id.*  AutoHop is not immediately available for use with a recording that is in progress or even for same-day viewing of the recorded show; rather, it becomes active the following day.  *Id.* ¶56.[4]

### 2.   How PTAT And AutoHop Work.

**How PTAT Works:**  When the Hopper user configures the multitude of PTAT customization options to suit her individual tastes, a set of timers are set to record all primetime shows on each of the selected networks on each selected night.  Minnick Decl. ¶30.  The recordings are done in approximately three-hour blocks (four hours on Sunday).  *Id.*  The process is similar to using manual timers available on most DVRs, which allow a user to select a time period to record on a particular channel.  *Id.*  Basically, PTAT is a simplified set of timers.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* ¶62.

**How AutoHop Works:**  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] It is unclear whether Fox is attacking Sling with its motion.  Sling is a completely separate product that allows individuals to place-shift their personal television viewing through use of the internet.  Minnick Decl. ¶83.  Place-shifting means watching in a different location than the room in which your fixed television set is located—such as on a personal computer in the home office, on your mobile phone while riding on the bus, or on an iPad in a hotel room.  Sling technology is not new—it has been out since at least 2005.  Molinski Decl. Ex. 9.  "Space-shifting," *i.e.*, allowing content to be accessed on a device separate from where the original content is stored, is also recognized as a fair use.  *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1029 (9th Cir. 1999) (holding that the portable MP3 player at issue "merely makes copies in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive . . . Such copying is paradigmatic noncommercial personal use . . . .") (internal citation omitted); *ABC v. AEREO, Inc.*, 2012 U.S. Dist. LEXIS 96309, at *37 (S.D.N.Y. July 11, 2012) (identifying Sling technology as fair use).  Indeed, the Register of Copyrights has stated that, for Sling technology, "there is no need for an additional license."  SHVERA Section 109 Report at 188 (2008), available at http://www.copyright.gov/reports/section109-final-report.pdf.  There is no basis for finding copyright infringement based upon a subscriber's "paradigmatic noncommercial personal use" of Sling, and no basis for a preliminary injunction against a product on the market for seven years.

1  ████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ███████████████████████████████████████████████

4  █████████████████████████████████████████████████

5  ███████████████████████████████████████████

6  ██████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10  ████████████████████████████.

## ARGUMENT

Preliminary injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to seek such relief," and is "never awarded as of right." *Winter v. NRDC, Inc.*, 129 S.Ct. 365, 375-76 (2008). A plaintiff seeking a preliminary injunction must establish all of the following: (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury, (4) that the balance of hardships tips favors plaintiff, and (5) that an injunction is in the public interest. *Id.* at 374; *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Irreparable injury must be *likely* in the absence of an injunction. *Winter*, 129 S.Ct. at 375. These traditional equitable considerations must be satisfied; an injunction does *not* follow "automatically [from] a determination that a copyright has been infringed." *eBay*, 547 U.S. at 392-93. As set forth below, Fox has not and cannot satisfy these requisites for preliminary injunctive relief.

## I.   FOX IS NOT LIKELY TO SUCCEED ON ITS CONTRACT CLAIM.

Fox identifies three contractual provisions allegedly breached by PTAT and AutoHop: (1) Section 9(a) of the 2002 Agreement; (2) the Video-on-Demand

- 8 -

("VOD") provisions in Attachment A to the 2010 Letter Agreement; and (3) Section 5 of the 2010 Letter Agreement.  Fox's arguments depend upon blatant misquotation; they are incorrect as a matter of law and fact and should be rejected.

**A.     DISH Is Not Breaching The 2002 Agreement.**

As with any other home recording device, consumers, not DISH, are the ones using the Hopper and PTAT.  Consumers, not DISH, are recording the content of the retransmitted Fox broadcast television signal.  Fox argues that PTAT is a breach of Section 9(a) of the 2002 Agreement, quoting it as follows:  "▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MPA at 8.  Fox also argues breach of another provision of that agreement, Section 3(d).  MPA at 8 n.4.  Remarkably, Fox omits the key contractual language in both instances:

| Fox's Quotation | Full Relevant Provision |
|---|---|
| **Section 9(a) of the 2002 Agreement** | |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮. MPA at 8:18-21. | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Shull Decl. Ex. 3 at 34. |
| **Section 3(d) of the 2002 Agreement** | |
| ▮▮▮▮▮▮▮▮▮▮▮▮ MPA at 4:13-15. | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Shull Decl. Ex. 3 at 31. |

As the highlighted language demonstrates, Fox expressly acknowledged and agreed that DISH would authorize consumers to connect video replay equipment and make recordings for private home use—precisely what is at issue here.

Plainly DISH is not breaching provisions in a contract (governed by New York law) that expressly contemplate its authorization of consumer DVR usage. *See Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 571, 841 N.E.2d 742, 746 (2005) ("Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is [insufficient]").

**B.    DISH Is Not Breaching The 2010 Letter Agreement.**

**1.    DISH Is Not Expressly Required To Market *FOX* VOD.**

The 2010 Letter Agreement includes Attachment A which amends the Agreement and pertains to a wide variety of matters concerning the parties' relationship.  Section 9 of Attachment A is the "VOD" provision. ███████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████    This content is completely separate from an over-the-air broadcast signal.

Fox argues that DISH has breached clause 4 requiring ████████████ ██████████████    because PTAT and AutoHop are the "equivalent" of VOD without ads.  But DISH did not agree to ████████████████████    independent of any exploitation of the VOD content.  Section 9 merely *allows* for VOD for the *FOX* network—it does not *require* DISH to market *FOX* VOD.  Shull Decl. Ex. 5 at

- 10 -

124.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Nowhere does this "make available" provision state that DISH shall, must, or will distribute the VOD content—there is no such affirmative obligation. *Id.* For reasons that had nothing to do with the Hopper and PTAT, Fox never provided that content and this provision never became operable. Shull Decl. ¶22-25.

The 2010 VOD provision is an option for DISH to distribute the *FOX* VOD on a nonexclusive basis on a set of minimum terms, which included the term that fast-forwarding of ads is disabled. Options generally are not required to be exercised—that is the whole point. *Kaplan v. Lippman*, 75 N.Y.2d 320, 325, 552 N.E.2d 151, 153 (1990). Because DISH did not in fact ask for, receive, or distribute the *FOX* VOD content, it cannot have breached any of the conditions attached to that content.

### 2.   No Obligation To Exploit Can Be Implied.

Nor can any obligation to exploit this nonexclusive VOD content be implied in order to trigger the ████████████████ on the VOD content or otherwise. New York law, which governs this contract, strongly disfavors the implication of contractual obligations. *2632 Realty Dev. Corp. v. 299 Main St., LLC*, 94 A.D.3d 743, 745, 941 N.Y.S.2d 252, 255 (N.Y. App. Div. 2d Dep't 2012) ("A court should not imply a term which the parties themselves failed to include"). Obligations cannot be implied when inconsistent with other terms. *Vacuum Concrete Corp. v. Am. Mach. & Fdry. Co.*, 321 F. Supp. 771, 774 (S.D.N.Y. 1971). Here, there is an integration clause. 2010 Letter Agreement ¶13 ("entire understanding concerning

1   the subject matter"). To imply an obligation to exploit the VOD content where

2   none was expressly stated would be inconsistent with the parties' recitation that the

3   agreement constituted the parties' "entire understanding." *Vacuum Concrete*, 321

4   F. Supp. at 774. Nor is it necessary here to imply an obligation. There was much

5   other consideration flowing from DISH to Fox in these agreements.

6       New York law will not imply an obligation to exploit in a non-exclusive

7   license with no running royalty and an integration clause. *Id.* (rejecting implied

8   obligation to exploit as a matter of law) (emphasis added).[5] Courts generally only

9   imply such obligations when the license is exclusive and royalty-bearing—when

10   the licensor would be left with a worthless property. *See id.* at 773. That is

11   obviously not the case here. Fox has numerous other means of distributing its

12   content, including its VOD content, and in fact is being paid for its primetime

13   broadcast content by DISH and its subscribers. *Vacuum Concrete* is on point:

14   under New York law, ███████████████ applicable to PTAT can be implied.

15       **3.**     **<u>DISH Is Not Breaching The Anti-Circumvention Provision.</u>**

16       Finally, Fox argues that DISH is breaching paragraph 5 of the 2010 Letter

17   Agreement by circumventing the ██████████████ on VOD. There are

18   multiple problems with this argument. The first is fundamental: DISH is not

19   circumventing an obligation that it never had because it never chose to exploit the

20   *FOX* VOD license. Nor could it have frustrated this obligation by allowing fast

21   forwarding as to anything other than VOD content.

22       Nor are PTAT and *FOX* VOD "equivalent" as Fox would have it. Fox never

23   supplied VOD content to DISH, and DISH never offered it. Consumers enabling

24   PTAT to record retransmitted over-the-air broadcasts are paying the retransmission

25   license fee. Thus, they are paying a subscription fee for the content (unlike the

26   VOD license which is "free"). Moreover, the Hopper is a DVR that involves only

27
28   [5] *See also Contacare, Inc. v. Ciba-Geigy Corp.*, 49 a.D.3d 1215, 1216, 853 N.Y.S.2d 783, 784 (N.Y. App.Div 2d Dep't 2008) (non-exclusive license created no duty to exploit); *Kardios Sys. Corp. v. Perkin-Elmer Corp.*, 645 F. Supp. 506, 509-10 (D. Md. 1986) (same) (applying NY law).

1   copying by the consumer in the home.  Only those particular subscribers who have
2   purchased a Hopper can select to enable PTAT (as well as AutoHop).  Once the
3   multitude of options are configured, PTAT records a defined period of primetime
4   programming (in contrast to VOD, where the subscriber selects one specific show
5   for playback from a remote location).  Simply stated, PTAT is a DVR feature that
6   simplifies timers for the recording of statutorily retransmitted over-the-air broadcast
7   content.  VOD is a completely different kettle of fish.[6]

8        This leads to the third problem with Fox's argument, which is that it proves
9   far too much.  *All* of DISH's DVRs are capable of allowing consumers to record
10  Fox's entire primetime schedule every night and then fast-forward through ads
11  during playback, as are numerous other DVRs on the market.  Shull Decl. ¶30;
12  Minnick Decl. ¶¶41-42.  PTAT and AutoHop just simplify the process.  Under
13  Fox's interpretation, *all* of DISH's existing DVRs were suddenly prohibited as of
14  the October 2010 Letter Agreement.  Plainly DISH never agreed to such a term,
15  would not have done so (Shull Decl. ¶15), and Fox has never asserted otherwise.
16  To the contrary, as described above, the agreements expressly contemplate the
17  distribution by DISH of DVR recording and playback devices for private consumer
18  home use.  The general "anti-circumvention" term cannot be interpreted to prohibit
19  a specific practice that is elsewhere expressly allowed.  *Israel v. Chabra*, 12 N.Y.3d
20  158, 168, 906 N.E.2d 374, 380 (N.Y. 2009) ("[T]he more specific clause controls
21  the more general"); *E-Z Eating 41 Corp. v. H.E. Newport LLC*, 84 A.D.3d 401,
22  408, 922 N.Y.S.2d 329, 335 (N.Y. App. Div. 1st Dep't 2011) ("[I]n the event of a
23  conflict between two provisions, the specific should control over the general").

24  _____

25  [6] Fox argues that DISH "admitted" that PTAT is VOD because it used the phrase "on demand" in PTAT advertising
    and a trademark application.  MPA at 5, 8-9.  Not so.  The term "on demand" is frequently used in many contexts to
26  indicate that the consumer controls the *timing* of the viewing.  Shull ¶20.  DISH has used it for DVRs other than the
    Hopper, and other DVR manufacturers also use it.  Minnick Decl. ¶52.  As for the "video-on-demand" language in
27  the PTAT trademark application, it is common for intent-to-use applications to contain as many potential options as
    possible when filed, and this was a common term used in other DISH applications.  It has now been dropped from
28  this application in recognition of the fact that it is a term that can hold a particular meaning in the industry not
    applicable to PTAT.  Saffer Decl. Exs. 2-3.

- 13 -

1    New York law allows no claim for frustration of purpose when the contract

2    specifically contemplates the behavior at issue.  *Neumann. v. Metro Med. Group,*

3    *P.C.*, 161 A.D.2d 1106, 1107, 557 N.Y.S.2d 663, 664 (N.Y. App. Div. 3d Dep't

4    1990).  Since these agreements specifically contemplated DISH distribution of

5    DVRs, and everyone knows people are using DVRs to record primetime

6    programming and then play it back at a later time while skipping commercials, it is

7    plain that no breach of paragraph 5 can be found here.

8    **II.    FOX IS NOT LIKELY TO SUCCEED ON ITS SECONDARY**
     **INFRINGEMENT CLAIM.**
9

10    Fox argues that DISH is liable for vicarious and contributory copyright

11    infringement, including inducement to infringe, but it skips over two very important

12    steps.  As a threshold matter, Fox bears the burden of establishing copyright

13    infringement, by demonstrating "(1) ownership of a valid copyright, and (2)

14    copying of constituent elements of the work that are original."  *Feist Pubs., Inc. v.*

15    *Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Proof of registration of the work at

16    issue is also required.  17 U.S.C. §411; *see Cosmetic Ideas, Inc. v.*

17    *IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010).  Fox's motion does not identify

18    any specific registered works that it contends have been unlawfully copied by

19    anyone.  And the only evidence of registration Fox offers is a handful of

20    registrations—not for the audiovisual works it generally contends have been

21    copied—but rather for *teleplays* (*i.e.* scripts).  Brennan Decl. Ex. A.  There is no

22    allegation that anyone has copied scripts, and no evidence that any of the allegedly

23    copied works (shows) have been registered.

24    And, in order for DISH to be found liable for secondary infringement, the

25    Court first must find that there is a direct infringer of the unspecified, apparently

26    unregistered audiovisual works.  This is also a requirement for each and every type

27    of secondary infringement.  *See Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146,

28    1169 (9th Cir. 2007) ("As a threshold matter . . . Perfect 10 must establish that there

- 14 -

1    has been direct infringement by third parties" before we consider claims for

2    secondary infringement).  Fox barely addresses this point, because it is unwilling to

3    point the finger—as it must—at the American television viewer.

4              A.    **Time-Shifting By Consumers Remains Fair.**

5         In 1984, the Supreme Court held that the distribution of the so-called

6    "Betamax" home video recording and playback device did not render Sony

7    secondarily liable for contributing to the infringement of the networks' copyrights.

8    Consumers had the right, the Court held, to make recordings of over-the-air

9    network broadcasts for the purpose of watching at another time in the privacy of

10   their own homes; such right meant that there were substantial noninfringing uses

11   for the device.  *Sony*, 464 U.S. at 456.  The Court observed that "[o]ne may search

12   the Copyright Act in vain for any sign that the elected representatives of the

13   millions of people who watch television every day have made it unlawful to copy a

14   program for later viewing at home, or have enacted a flat prohibition against the

15   sale of machines that make such copying possible."  *Id.*

16        In the nearly three decades since, Congress has not altered this principle as it

17   applies to claims of contributory copyright infringement.  The pertinent principles

18   of *Sony* have been repeatedly recited and upheld by the Ninth Circuit and other

19   courts.  *See, e.g., Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*,

20   180 F.3d 1072, 1079 (9th Cir. 1999) (characterizing Sony as "holding that "time-

21   shifting' of copyrighted television shows with VCR's constitutes fair use under the

22   Copyright Act, and thus is not an infringement"); *Matthew Bender & Co., Inc. v.*

23   *West Pub. Co.*, 158 F.3d 693 (2d Cir. 1998); *Lewis Galoob Toys, Inc. v. Nintendo of*

24   *Am., Inc.*, 964 F.2d 965 (9th Cir. 1992); *Vault Corp. v. Quaid Software Ltd.*, 847

25   F.2d 255, 264 (5th Cir. 1988).  And, the Supreme Court recently reaffirmed *Sony* in

26   *MGM Studios, Inc. v. Grokster*, 545 U.S. 913 (2005) ("*Grokster*").

27        In short, home video recording equipment is legal.  *Sony*, 464 U.S. at 456;

28   *see Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)

1    (hereafter "*Cablevision*"); *see also ABC, Inc. v. Aereo, Inc.*, No. 12 Civ. 1540, 2012

2    WL 2848158 (S.D.N.Y. July 11, 2012).  Consumers using Hopper DVRs to record

3    primetime programming for later viewing cannot be distinguished from the

4    Supreme Court's holding in *Sony*.  Furthermore, even cursory examination of

5    subsequent precedent and evidence pertaining to the first and fourth factors of the

6    fair use test (the two most important factors) makes clear that *Sony*'s analysis holds

7    with respect to DVRs.[7]

8                    **1.    Time-Shifting Is Functionally Transformative.**

9           The first fair use factor is the "purpose and character of the use."  17 U.S.C.

10   §107(1).  This single factor has two components:  the purpose and the character of

11   the use.  The purpose of consumers here remains, as it was in *Sony*, a private

12   noncommercial one—indeed, here the consumer is even paying a subscription fee

13   for satellite retransmission.  Fox does not even attempt to show that the time-shifted

14   recordings created by a DISH subscriber using PTAT are for commercial or for-

15   profit activity.  Accordingly, this key component weighs wholly in favor of DISH.

16          As for the character of the use, it remains transformative.  A home video

17   recording machine allows users to record television programs to "time shift."  The

18   Supreme Court stated unequivocally that "time-shifting for private home use **must**

19   **be** characterized as noncommercial, non-profit activity."  *Id.* at 449 (emphasis

20   added).  The Court went on to emphasize that "time-shifting merely enables a

21   viewer to see a work which he has been invited to witness in its entirety free of

22   charge . . . ."  *Id.* at 449-50.  In other words, the Betamax served a transformative

23   purpose by allowing the user to record broadcast television programming and watch

24   it  at a later time even though the program content was not changed at all.

25          Fox argues summarily, in a footnote, that PTAT cannot be characterized as a

26   transformative use.  MPA at 19 n.14.  But subsequent precedent confirms

27   _____

28   [7] DISH does not concede the other two factors, but they are less pertinent and given space constraints are not
     discussed herein.  The discussion in *Sony* is equally applicable to the second and third factors here.

application of *Sony*'s analysis here.  PrimeTime Anytime on the Hopper DVR is an advance of time shifting technology, a less cumbersome vehicle for recording and playing back broadcast works that the subscriber is invited to see free of charge. Minnick Decl. ¶¶20, 38-42; Shull Decl. ¶30.  This argument was expressly rejected in *Sony* and since.  Not only did the Court find the Betamax's "wholesale copying" transformative, the Ninth Circuit has repeatedly found "wholesale copying" to be transformative.  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).[8]

## 2.     Fox Cannot Take Away The Consumer's Right To Time Shift By Offering Video On Demand Programming.

The fourth factor requires consideration of "the effect of the [defendant's] use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994).  Because the consumer's use is noncommercial, *Fox* bears the burden to show "by a preponderance of the evidence that some meaningful likelihood of future harm exists."  *Sony*, 464 U.S. at 451; *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986) ("when the use is noncommercial, the copyright owner must demonstrate by a preponderance of the evidence that there is 'some meaningful likelihood of future harm'").[9]

Just as in *Sony*, however, Fox "fail[s] to carry [its] burden . . ."  464 U.S. at 451.  In *Sony*, the content owners argued, in much the same vein as Fox here, that their economic advertising model was in severe danger and that a huge threat existed that, if the VCR were permitted, there would be an end to all television programming as we know it.  As set forth in the Rapp Declaration, the

---

[8] The two cases cited by Fox, *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938 (9th Cir. 2002) and *Elvis Presley Enter., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003), are wholly inapposite.  Both were cases of use with commercial purposes by commercial entities, with the character of the use being exactly the same as the original.

[9] It is particularly appropriate that Fox bear the burden to negate fair use on this motion, since it refused any meaningful discovery on the fair use issue.

1   entertainment industry has a habit of claiming that the sky is falling when new

2   technology is introduced.  Rapp Decl. ¶¶41-57.  As history now shows, the frantic

3   claims ("Boston Strangler") of doom were wrong.  The Court in *Sony* considered all

4   such arguments and concluded that Universal had failed to carry its burden.  It

5   endorsed the district court's view that Universal's evidence of harm in that case was

6   "speculative" and/or "minimal."  464 U.S. at 454.

7        The same is true here.  Fox recites all of the same arguments and none has

8   any more support than it did at the time of *Sony*.  Fox argues not only that its live

9   TV market will be harmed, but also that two developing markets will be harmed:

10  (1) VOD distribution and (2) internet streaming.  MPA at 22-23.  As set forth in

11  detail in the Declarations of Richard Rapp and John Hauser filed herewith, these

12  claims of harm are at best speculative and at worst demonstrably false.  Indeed, Fox

13  provides no evidence of actual harm in any of these categories.

14       *Sony* itself takes care of Fox's live TV market concern—there the Court

15  concluded that time-shifting by VCR would have no effect on advertising revenue,

16  and its prediction was quite correct.  In fact, the networks' advertising revenue has

17  risen over time since *Sony* and the widespread adoption of home recording

18  technology.  Rapp Decl. ¶54.  There is no reason to think that PTAT, which merely

19  allows a consumer to time-shift more efficiently, will cause harm where it has not

20  previously occurred.  As economist Rapp and consumer behavior expert Hauser

21  point out, most TV watching remains live and those who own a DVR, such as the

22  Hopper, often watch more television.  Rapp Decl. ¶76, 81; Hauser Decl. ¶12, 21.

23  Regardless, given the relatively small number of Hopper users, and particularly

24  those that activate PTAT, there is no expectation that their viewing behavior will be

25  included or reflected in the Nielsen ratings, which are what Fox and the rest of the

26  industry use to set advertising prices.  Rapp Decl. ¶88-90.

27       As for Fox's claims with respect to VOD, they are very similar to the claim

28  rejected by the Court in *Sony*.  There, Universal claimed that it had established a

new market for videotape cassettes; it provided evidence that it had begun marketing motion pictures on tape.  The district court, whose findings were embraced by the Supreme Court, concluded that this alleged market harm was too speculative to prevent a finding of fair use.  Here, Fox's VOD market is virtually nonexistent.  Hauser ¶¶ 28-29.  More importantly, there are no *FOX* VOD offerings on DISH, so there is no opportunity that a DISH customer will use PTAT instead of watching a *FOX* VOD program.  *Id*.  Fox simply provides no evidence that this market exists and will be harmed.  Indeed, Fox offered its VOD to DISH for free, strongly suggesting that the sole purpose of VOD is to try to abrogate *Sony* with these types of arguments.  Similarly, Fox provides no evidence whatsoever that PTAT has any effect on its alleged internet market.  Rather, evidence strongly suggests that the relatively small internet market serves as a complement, not a replacement, for TV viewing.  Rapp Decl. ¶105.  Complementary use does not harm the market for the work and is fair.  *See Ty, Inc. v. Publications Int'l Ltd*., 292 F.3d 512, 517 (7th Cir. 2002) ("Generalizing from this example in economic terminology that has become orthodox in fair-use case law, we may say that copying that is complementary to the copyrighted work . . . is fair use . . .").

Fox relies upon what it says are new markets in internet streaming and VOD content in an effort to convert a fair use into foul—or perhaps it is fowl, since Fox's claims certainly have the ring of Chicken Little.  Squawking the sky is falling, Fox seeks to take away from consumers the right to do something they have been doing for nearly three decades.  These two so-called markets cannot carry that kind of burden.  Factually, there is no evidence of harm as outlined in the Rapp and Hauser declarations.  And legally, courts and commentators alike have cautioned against permitting a copyright owner to usurp a market that was previously considered fair.  *See Castle Rock Entertainment v. Carol Publishing Group*, 150 F.3d 132, 145 n.11 (2d Cir. 1998) (copyright owners may not preempt exploitation of transformative markets, which they would not in general develop or license others to develop, by

1    actually developing or licensing others to develop those markets.).  *See also* 4

2    Nimmer § 13.05[A][4], at 13-181-13-182 (recognizing "danger of circularity"

3    where original copyright owner redefines "potential market" by developing or

4    licensing others to develop that market).  Fox's effort to undo almost 30 years of

5    consumer freedom and privacy using VOD and Hulu must be rejected.

6          **B.      Ad Skipping By Consumers During Time-Shifting Remains Fair.**

7          Implicitly recognizing that PTAT and the time-shifting it offers is fair, Fox

8    focuses on the commercial skipping enabled by AutoHop, as though this were some

9    brand new ability.  Commercial avoidance has been around since the dawn of the

10   broadcast television era; the very first remote control was advertised as an aid to

11   commercial skipping.  Hauser ¶22.  Current reports indicate that the ability to ad

12   skip by fast forwarding, 30-second skip and other methods, such as Verizon FiOS's

13   option for 30 second, 1 minute or 5 minute skip options, is a standard feature on

14   most home recording devices now in use for many years.  Minnick Decl. ¶6.  Fox

15   provides no evidence to establish that this common practice, exercised by millions

16   of DISH consumers in the privacy of their homes, in order to watch programs for

17   which they paid a fee, is no longer fair.

18            **1.      Ad Skipping, By Itself, Implicates No Copyright Interest.**

19         No copy of anything is made by a consumer when using the AutoHop

20   automatic ad skipping feature.  Skipping without copying does not implicate any of

21   the protected rights in the bundle of copyright—there is no reproduction, no

22   distribution, and no public performance by the consumer.  *See* 17 U.S.C. §106.

23   Moreover, Fox has no copyright interest in the commercials, which are owned by

24   the advertisers or ad agencies.  When users enable AutoHop to skip commercials,

25   they are not skipping or altering the programming content owned and asserted by

26   Fox.  Fox's claim as to AutoHop must fail for this reason alone.

27            **2.      Ad Skipping As Part Of Time-Shifting Is Fair.**

28         Fox therefore must attack PTAT, and argue that time shifting is unfair if done

for the purpose of commercial skipping.  This argument fails as well, because Fox cannot demonstrate that consumers are time shifting for the *sole* purpose of purportedly unfair commercial skipping, or that even if they are, doing so would be unfair.

> [I]t could be argued that time-shifting implies a broad swath of intentions for shifting prerecorded blocks of programming, both large and small.  Bathroom breaks must be taken, popcorn popped, and nudity skipped through – especially when young children watch an R rated movie with their parents.  All of these varied intentions fall under the umbrella of time-shifting, and it seems arbitrary to extract commercial-skipping from the umbrella and expose it to the cold rain of infringement.

Ethan O. Notken, *Television Remixed: The Controversy over Commercial-Skipping*, 16 FORDHAM INTEL. PROP. MEDIA & ENT. L.J. 899, 929.  AutoHop is available only on time-shifted programs the next day.  There is no evidence that consumers are using time-shifting solely for the purpose of ad skipping.  To the extent Fox locates the unfairness in skipping over an ad entirely rather than seeing a snippet, numbers strongly suggest that the vast majority of Hopper users are using the standard 30-second skip on playback instead of AutoHop.  Rapp Decl. ¶87.

While Fox would have the Court believe that the issue of ad skipping in the context of time-shifting is new, that is not the case.  This exact issue was presented squarely to the Court in *Sony*.  The parties in their briefs each argued about the effect of ad skipping, with Universal claiming that up to 85% of VCR playback was without commercials and that such deletion would affect the market for its works, and Sony arguing that 69% of playbacks actually included commercials.  *Compare* Molinski Decl. Ex. 5 (Brief for Pet.) at 27 n.19 *with id.* Ex. 7 (Brief for Resp.) at 23 n.14.  And the Court considered the issue.  It acknowledged that there was ad skipping, yet it found that the primary use was time-shifting, and the use was therefore fair.  *Sony*, 464. U.S. at 432.

Now, here we are again, nearly thirty years later.  And while the technology has evolved, the ad skipping is more efficient, the arguments and the evidence are

- 21 -

1  the same.  The outcome should be too.

2        **C.     Ad Skipping Is Privileged Under The Family Movie Act.**

3        Finally, even if commercial skipping could be considered unfair, Congress

4  has expressly privileged it.  The Family Movie Act ("FMA"), enacted in 2005, was

5  a response to directors' complaints that DVD players designed to edit out adult or

6  offensive content were creating infringing derivative works.  *See Huntsman v.*

7  *Soderbergh*, 2005 WL 1993421, at *2 (D. Colo. Aug. 17, 2005).  Under the FMA,

8  it is not copyright infringement for a family to "make imperceptible" "limited

9  portions of audio or video content of a motion picture" in the home for private use.

10 17 U.S.C. §110(11).  It also is not unlawful to sell devices that help them do so.  *Id.*

11 This is exactly how AutoHop functions.

12       **D.     Distribution Of A Dual-Use Device With Substantial**
         **Noninfringing Uses Is Lawful.**
13

14       In *Sony*, the Supreme Court set forth the standards for proving contributory

15 infringement.  A defendant contributes to infringement only if it knowingly makes

16 a substantial contribution to an act of direct infringement.  For liability to be

17 established, where the alleged contribution is the sale of a product, that product

18 must not have, or even be capable of, substantial noninfringing uses.  *Sony*, 464

19 U.S. at 442.  This limitation on contributory infringement doctrine serves an

20 important purpose.  It "absolves the equivocal conduct of selling an item with

21 substantial lawful as well as unlawful uses, and limits liability to instances of more

22 acute fault than the mere understanding that some of one's products will be

23 misused.  It leaves breathing room for innovation and a vigorous commerce."

24 *Grokster*, 545 U.S. at 933.

25       Because time-shifting with commercial skipping is fair, the Court cannot

26 enjoin PTAT or AutoHop.  Even were this Court to conclude that time shifting for

27 the *sole* purpose of skipping commercials is unfair, it still could not enjoin

28 AutoHop because it does not follow that Fox has demonstrated a lack of substantial

1   noninfringing uses.  Rather, Hopper usage evidence suggests that only a very small

2   portion of PTAT users are using AutoHop at all, let alone for a singularly unfair

3   purpose.  Fox has presented no survey or other evidence of Hopper users

4   demonstrating that any single one of them, let alone a predominant number, is time-

5   shifting for the *sole* allegedly unfair purpose of commercial skipping.  *Compare*

6   *Sony*, 484 U.S. at 442 (suggesting that a use engaged in by less than 10% of the

7   market might suffice to immunize the VCR from liability), *with id*. at 443 (rejecting

8   dissent's standard that would have required a majority of uses to be legal).

9            **E.    Advertising Commercial Skipping Is Not Unlawful "Inducement."**

10          In its final effort to persuade this Court to ignore *Sony*, Fox argues that DISH

11  is independently liable for "inducing" infringement.  Inducement is a judicially-

12  created offshoot of contributory infringement.  *Grokster*, 545 U.S. at 935-36.  To

13  induce infringement, a party must act to encourage direct infringement by another

14  with a specific intent to cause infringement.  *Id*. at 936.

15          But there is no evidence that anyone has purchased the Hopper for an

16  improper purpose.  The only evidence Fox cites in support of its inducement theory

17  is that DISH truthfully advertised the fact that consumers can use PTAT to record

18  network shows and use AutoHop to skip commercials in those shows.  This is not

19  sufficient to show inducement to infringe.  Rather, as the Supreme Court

20  recognized in *Grokster*, Sony advertised the same benefits of its VCR: "Sony's

21  advertisements urged consumers to buy the VCR to 'record favorite shows' or

22  'build a library' of recorded programs."  *Id*. at 931.  *Grokster*, like *Sony*, viewed

23  this as "no evidence" of unlawful intent to induce infringement, because neither of

24  those uses was "*necessarily infringing*."  *Id*. (emphasis added).  "On those facts,"

25  the *Grokster* Court explained, "the only conceivable basis for imposing liability

26  was on a theory of contributory infringement"—one that depended on proving that

27  the VCR had no substantial noninfringing use.  Just as in *Sony*, evidence that DISH

28  advertised the features of its DVR could not give rise to liability for inducement

1  absent evidence that those features were "necessarily infringing."[10]

2  **III.   FOX IS NOT LIKELY TO SUCCEED ON ITS DIRECT**
3  **INFRINGEMENT CLAIM.**

    **A.   Consumers Are Making The PTAT Copies, Not DISH.**
4

5  As set out above, PTAT is a DVR feature whereby the user views a setup

6  screen, selects (among other things) which networks and nights to record, and then

7  enables the recording.  Minnick Decl. ¶¶20, 21, 23-24.  This functionality exists in

8  more complex form as "timers" on numerous other DVRs sold by DISH and others.

9  *Id.* ¶38.  All DISH has done is to create the software for a simplified set of timers

10 and a user interface.  *Id.* ¶¶20-35.  ████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 The Court in *Sony* cautioned that it was especially important in cases

14 involving consumer welfare to make the correct distinctions between theories of

15 primary liability (direct infringement), and secondary liability (indirect

16 infringement).  464 U.S. at 441-42; *see also Cablevision*, 536 F.3d at 133 ("The

17 Supreme Court's desire to maintain a meaningful distinction between direct and

18 contributory copyright infringement is consistent with congressional intent").  In

19 *Cablevision*, the Second Circuit, relying on early district court precedent from

20 within the Ninth Circuit (*Religious Tech. Ctr. v. Netcom Online Comms. Servs.*, 907

21 F. Supp. 1361, 1368-69 (N.D. Cal. 1995)), adopted what has come to be termed the

22 "volitional conduct requirement"; that is, whoever exercises their volition to make

23

24  [10] Finally, even if advertising the features of DISH's product were thought to induce acts of actual infringement by
    consumers, Fox offers no evidence whatsoever suggesting that DISH's purpose in advertising its DVR was to
25  intentionally encourage infringement.  Not only does Fox offer no direct evidence of unlawful purpose, it cannot
    even offer indirect evidence of such a purpose.  The only evidence Fox offered is that DISH is selling a product that
26  contained features recognized by the Supreme Court as lawful nearly thirty years ago.  *Grokster* specifically rejected
    reliance on such sales as evidence of unlawful intent:  "*Sony*'s rule limits imputing culpable intent as a matter of law
    from the characteristics or uses of a distributed product."  Grokster, 545 U.S.at 788-89.  In all events, testimony from
27  DISH executives makes it clear that DISH respects copyrights and has no wish to encourage infringement.  Shull
    Decl. ¶35.  Far from pirating content, DISH has signed contracts with each of the TV networks and pays many
28  millions of dollars a year in royalties to those networks for content they broadcast over the air for free.

the copy is the party in the position to be considered a direct infringer:

> In determining who actually 'makes' a copy, a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to the system, which automatically obeys commands and engages in no volitional conduct. (*Id.* at 131)

Accordingly, enabling the exercise of a choice through technical means is not the same as making a copy yourself. *Id.*; *see also CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004). In fact, this is the only analysis consistent with *Sony*.

Fox incorrectly argues that the volitional conduct requirement has not been adopted by the Ninth Circuit. MPA at 11 n.6. The Ninth Circuit's decisions in cases interpreting the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA") make clear that the court *does* recognize a volitional conduct requirement. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1035-36 (9th Cir. 2011). In that case, the court held as follows:

> Veoh does not actively participate in or supervise file uploading . . . . Rather this 'automated process' for making files accessible 'is initiated entirely at the volition of Veoh's users.' We therefore hold that Veoh has satisfied the threshold requirement that the infringement be 'by reason of the storage at the direction of a user of material' residing on Veoh's system. (*Id.* at 1035.)

The question of *who was responsible* for placing the copies on the system under the DMCA safe harbor is exactly the same question as *who was responsible* for making the copies more generally in assessing the question of direct versus contributory infringement. The Ninth Circuit requires volitional conduct the same way as every other circuit that has addressed this issue, and it is error to conclude otherwise.[11]

## B.    DISH Is Not Infringing The Distribution Right.

Nor is DISH a direct infringer of the distribution right. Fox argues that the *same* PTAT copy purportedly violating the reproduction right also violates Fox's

---

[11] *See also Righthaven LLC v. Democratic Underground, LLC*, 2012 U.S. Dist LEXIS 31605 (D. Nev. Mar. 9, 2012) (volitional requirement for direct infringement); *Perfect 10, Inc. v. Megaupload Ltd.*, 2011 U.S. Dist LEXIS 81931 (S.D. Cal. July 27, 2011) (same); *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219 (C.D. Cal. 2010) (same); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) (same); *Ellison v. Robertson*, 189 F. Supp. 2d 1051 (C.D. Cal. 2002) (same).

1  exclusive right to *distribute* copies of its works under 17 U.S.C. § 106(3).  This

2  argument likewise fails for two reasons; (1) there is no distribution at all when no

3  physical copy changes hands; and (2) even if there were, there is no dispute that

4  DISH is licensed (both statutorily and via the Retransmission Agreement) to deliver

5  (i.e., *distribute*) Fox's content to its users.

6       Section 106(3) is quite specific as to what is—and is not—a "distribution" of

7  a copyrighted work.  Under that section, a copyright holder has the exclusive right

8  "to distribute copies or phonorecords of the copyrighted work to the public by sale

9  or other transfer of ownership, or by rental, lease or lending."  "Copies" are in turn

10  defined as "material objects . . . in which a work is fixed . . . ."  17 U.S.C. §101.

11  While courts in other circuits have occasionally misunderstood this section, as

12  evidenced by Fox's citations at MPA 6-7, "[t]he general rule, supported by the great

13  weight of authority, is that 'infringement of [the distribution right] requires an

14  actual dissemination of either copies or phonorecords."  *Atlantic Recording Corp. v.*

15  *Howell*, 554 F. Supp. 2d 976 (D. Ariz. 2008) (quoting *Nat'l Car Rental Sys. V.*

16  *Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993)); *see also Perfect*

17  *10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007) ("distribution requires

18  an 'actual dissemination' of a copy").

19       Moreover, even were this Court to accept the incorrect legal proposition that

20  all DISH has to do to violate the distribution right is to make the content available

21  for copying by the consumer, then the only distribution here cannot be the basis of a

22  claim because it is expressly *authorized*.  Fox does not contend—nor could it—that

23  DISH's delivery of Fox's broadcast content to DISH's customers is unauthorized.

24  To the contrary, that transmission is indisputably licensed under the agreement at

25  issue here, and subject to statutory license as well.  And, the agreements expressly

26  contemplate that DISH will authorize its subscribers to use video replay equipment

27  and to make recordings for private home use.  Fox does not challenge DISH's right

28  to make, or its users' right to receive, the retransmitted broadcasts.  Even if that

1   "dissemination" could be stretched to fit the statutory definition of "distribution," it

2   is authorized and paid for.  It is the user's *recording* of the broadcast that Fox

3   attacks:  but that is actionable, if at all, only under Section 106(1).

4        **C.**     <u>**The Quality Control Copies Are Fair.**</u>

5        The only copies of broadcast content that DISH is making in the entire PTAT

6   and AutoHop process are copies created for purposes of ████████████████

7   ████████████████████████████████████████████████████████

8   Minnick Decl. ¶¶73-76.  Because these copies are made solely for the purpose of

9   assisting consumers to exercise their fair use rights, they are intermediate copies

10  made for ultimately noninfringing purposes and are thus fair.  *See Sony Computer*

11  *Enter., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000); *Sega Enters. Ltd v.*

12  *Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993); *Atari Games Corp. v. Nintendo of*

13  *Am., Inc.*, 975 F.2d 832 (Fed. Cir. 1992); *see also Lewis Galoob Toys, Inc. .v*

14  *Nintendo of Am., Inc.*, 964 F.2d 965 (9th Cir. 1992).

15  **IV.**   **FOX HAS NOT DEMONSTRATED A LIKELIHOOD OF**
16         **IRREPARABLE HARM BETWEEN NOW AND TRIAL.**

17       Fox must "demonstrate that irreparable injury is *likely* in the absence of an

18  injunction."  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2006).

19  The mere "possibility" of irreparable harm will not suffice.  *Id.*  Thus, "irreparable

20  harm is the single most important prerequisite for the issuance of a preliminary

21  injunction."  *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d

22  1256, 1258 (10th Cir. 2004) (collecting cases); *Freedom Holdings, Inc. v. Spitzer*,

23  408 F.3d 112, 114 (2d Cir. 2005) (same).  Irreparable harm must be proven with

24  actual evidence; it may not be presumed.  *eBay, Inc. v. MercExchange LLC*, 547

25  U.S. 388 (2006); *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989

26  (9th Cir. 2011).  Fox has not proven it, and in all events DISH has disproven it.

27       **A.**     <u>**There Is No Irreparable Harm On The Contract Claim.**</u>

28       Fox claims that it is entitled to an injunction in part because DISH has

breached the retransmission agreement.  Historically, there is no irreparable harm associated with a breach of contract claim.  As this Court has observed, "a preliminary injunction to prevent a breach of contract is an almost unheard of thing, being the equivalent of specific enforcement by preliminary injunction." *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. 99CV7654, 2000 WL 1887522, at *5 (C.D. Cal. Aug. 10, 2000).[12]  And, it is plain that money damages can be calculated here, where Fox has a widespread licensing program.

## B.   Fox Has Not Shown Likely Irreparable Harm On Its Copyright Claim.

In the face of Fox's admissions in its papers that its primetime programming is extensively published and marketed in almost every imaginable venue, Fox cannot be heard to claim that it faces potential irreparable harm from a "loss of control" over its content.  MPA at 20-22.  Fox has already ceded control by licensing its content on such a widespread nonexclusive basis.  Moreover, Fox claims loss of control in markets to which the content has already been licensed—

---

[12] *See ConWest Resources, Inc. v. Playtime Novelties, Inc.*, No. C 06-5304, 2006 WL 3346226, at *8 (N.D. Cal. Nov. 17, 2006) ( "[A] preliminary injunction will not issue based on a breach of contract claim"); *Telephia Inc. v. Cuppy*, No. C 04-03508, 2005 WL 588441, at *3 (N.D. Cal. Mar. 11, 2005) (same).  Breach of contract claims do not support preliminary injunctions because "the relief available for a breach of contract—money damages—is an adequate remedy at law. *Todd v. Chase Manhattan Mortg. Corp.*, No CV 12-00129, 2012 WL 1906505, at *2 (D. Ariz. May 25, 2012); *see Flynt Distrib. Co v. Harvey*, 734 F.2d 1389, 1395-96 (9th Cir. 1984) (error to issue injunction based on breach of contract because "money damages" provide adequate remedy).

VOD and IPTV.  When an intellectual property holder readily licenses its content to all takers, there is no irreparable harm from supposed "loss of control."  Under such circumstances, the mantra "loss of control" is no more than a return to the presumption and lowered standard of proof discredited in *eBay* and *Winter*.

In post-*eBay* jurisprudence, a plaintiff with an established licensing program does not get a *permanent* injunction, let alone a preliminary one.  Such plaintiffs may get damages (if they have a claim), but not an injunction.  *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 560 (E.D. Va. 2007) ("willingness to license" undercuts irreparable harm) (denying permanent injunction on remand).[13]  Thus, the Federal Circuit recently held that the structure of the video-on-demand market would not support a showing of irreparable harm in a patent case.  *ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*, No. 2011-1538, 2012 WL 3636908 (Fed. Cir. Aug. 24, 2012).  The Court denied an injunction because damages were readily quantifiable:

> ActiveVideo sells VoD hardware and software to providers of video services; Verizon markets and sells video services to end users. . . ActiveVideo does not lose market share when Cablevision loses a subscriber to Verizon, it loses the Cablevision licensing fee. . . The harm to ActiveVideo due to Verizon's infringement is readily quantifiable. When Verizon pays ActiveVideo a per month royalty for each FiOS–TV subscriber, then ActiveVideo is adequately compensated. . . The losses to ActiveVideo due to Verizon's infringement are clearly quantifiable. Moreover, ActiveVideo sought to broadly and extensively license this technology (Cablevision, Grande, and TV Guide) including a campaign to secure a license from Verizon itself.  (*Id.* at *22-23.)

Here, it is the copyrighted content that is the relevant intellectual property, but it is operating in exactly the same market structure.  The outcome can be no different.  The injunction should be denied.[14]

---

[13] *See also Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996) (pre-*eBay* case recognizing that plaintiffs "have engaged in a pattern of granting licenses" as evidence of lack of irreparable harm); *T.J.Smith and Nephew Ltd. v. Consolidated Med. Equip, Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (an established history of granting licenses is "incompatible with . . . the right to exclude").

[14] Fox relies heavily on *Warner Bros. Entertainment Inc. v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011).  That case, however, found the presence of an *exclusive* licensing program established irreparable harm. There was specific evidence of exclusive licensing windows for major movies harmed by the DVD streaming

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

1      Fox tries to revive a presumption of irreparable harm by citing *Salinger v.*

2  *Colting*, 607 F.3d 68 (2d Cir. 2010) for the proposition that an injunction "has

3  nearly always" issued when a likelihood of success on the merits has been shown in

4  a copyright case.  MPA at 19.  Fox has not shown a likelihood of success on the

5  merits, but even if it had, *Salinger* says that post-*eBay* irreparable harm must be

6  proven and that there is no presumption.  *Salinger*, 607 F.3d at 76-80; *accord*

7  *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir.

8  2011) ("even in a copyright infringement case, the plaintiff must demonstrate a

9  likelihood of irreparable harm as a prerequisite for injunctive relief."); *see also*

10  *Christopher Phelps & Assocs. LLC v. Galloway*, 492 F.3d 532 (4th Cir. 2007)

11  (affirming denial of permanent injunction in copyright case).

12      The irreparable harm that the "plaintiff must *demonstrate*" must be

13  "immediate" and "imminent" and not remote or speculative.  *Caribbean Marine*

14  *Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Dotster, Inc. v.*

15  *Internet Corp. for Assigned Names and Numbers*, 296 F. Supp. 2d 1159, 1162 (C.D.

16  Cal. 2003) ("Irreparable injury is an injury that is not remote or speculative, but

17  actual and imminent").  Fox presents no reliable evidence of actual imminent

18  consequences from PTAT or AutoHop, and the declarations that it offers contain no

19  specifics, only speculation.  *See Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440,

20  443 (D. Del. 2007) ("Praxair has not provided or described any specific sales or

21  market data to assist the court, nor has it identified precisely what market share,

22  revenues, and customers Praxair has lost to ATMI") (denying injunction).[15]

23      Fox does not present any proof, such as a survey, that there is even any

---

business proposed by the defendant in that case.  *Id.* at 1006-1013.  No such evidence is present here.  Fox also cites *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011), which was recently affirmed, No. 11-788, 2012 WL 3645304 (2d Cir. Aug. 27, 2012).  The defendant in *WPIX* was, however, streaming network programming over the internet without paying retransmission fees, and the defendant's subscribers were not counted by Nielsen.  765 F. Supp. 2d. at 598-99, 619.  Those are two important facts not present here.  Shull Decl. ¶6.

[15] *See also Johnson & Johnson Vision Care v. CIBA Vision Corp.*, 712 F. Supp. 2d 1285, 1289 (M.D. Fla. 2010) (denying permanent injunction); *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 560 (D. Del. 2008) (denying permanent injunction).

1   incremental increase in ad skipping because of the AutoHop feature.  It merely
2   makes that assumption, and offers overblown predictions of dire consequences to
3   advertising revenues.  But, the only qualitative distinction between the longstanding
4   30-second skip feature and AutoHop is whether someone at home watching
5   television is holding a remote control in his or hand.[16]

6          **C.      Any Assertion Of Irreparable Harm Has Been Rebutted.**

7          Fox has failed to present any competent evidence of any incremental increase
8   in ad-skipping with AutoHop.  That is because there is no such evidence.  As set
9   forth in the opinions of DISH's two highly qualified experts Richard T. Rapp, an
10  economist who is the former Chairman of the international economics consulting
11  firm NERA, and John Hauser, a professor of marketing at MIT's Sloan School of
12  Management, there is no reason to believe that the AutoHop feature will cause any
13  meaningful increase in commercial-skipping behavior among the television-
14  viewing public during the pendency of this litigation.  Moreover, as shown in the
15  Rapp Declaration, financial analysts who follow and report on the networks have
16  opined that the PTAT and AutoHop features on the Hopper will have no real
17  impact.  For example, Doug Mitchelson of Deutsche Bank stated "We see minimal
18  risk from Aereo or the Hopper cases."  Rapp Decl. ¶23.  Brian Weiser, Senior Vice
19  President and Global Forecasting Director of MagnaGlobal, stated "DVRs have
20  never been a meaningful threat because the bulk of television consumption occurs
21  live (even in homes with DVRs)."  *Id.*  Ian Olgirson of SNL Kagan stated "the
22  actual impact of AutoHop on television advertising likely will be limited, even if
23  DISH weathers potential legal challenges."  *Id.* n.31.  Tony Wilbe of Janney Capital
24  Markets stated that "ad-skipping risks [are] overstated."  *Id.* ¶24.
25         Other financial metrics support this conclusion, such as the lack of reaction
26  in the marketplace to the introduction of these DVR features.  There were no

27  ───────────────
28  [16] Fox also asserts, based on hearsay in a newspaper article, that other MVPDs might adopt ad skipping technology
    while this case is pending.  But, the article that Fox relies upon contradicts the claim.  It reports that  DirecTV intends
    to  await the outcome of this litigation before adding any new ad skipping features.  Haslingden Decl. Ex. B.

1   changes in credit ratings for the senior unsecured debt of News Corp. or CBS. [17]

2   There was no stock price reaction.  The collective opinion is that the Hopper poses

3   no material risk to network television.  Indeed, the up-front ad sales that

4   immediately followed the announcement of AutoHop were a noted success for Fox.

5   Notwithstanding that the networks are losing audience to pay-television channels,

6   network advertising prices continue to rise.  The networks do not stand to lose any

7   audience as a result of PTAT and AutoHop.  Instead, those features are likely to

8   increase viewership of the networks' primetime shows.  It is only incremental ad

9   views lost to the networks as a result of these features that might matter, and there

10  is no evidence that there will be any extra lost impressions.  Rapp Decl. ¶82, 92.

11          There are close to 115 million television-viewing households in the United

12  States.  Rapp Decl. ¶66.  Approximately 57% of those households have VCRs, and

13  43% have DVRs.  Hauser Decl. ¶14.  Only 275,000 or so currently have a Hopper,

14  which translates to 0.2% of households with television sets.  ██████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████.  Gerhards Decl. ¶10.

18  At the same time, the overwhelming majority of television viewing occurs live or

19  same-day.  Fox has presented no evidence whatsoever that consumers will deviate

20  from their preexisting viewing patterns *because of* AutoHop.

21          Moreover, any existing VCR or DVR household already has the ability to

22  fast-forward through or 30-second skip over commercials.  ████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████  AutoHop is not creating ad skippers.  It is

25  a simplification of existing behavior for a minority of users.  Even taking into

26  account projected new Hopper sales during the litigation, there is no reasonable

---

[17]  Fox places near exclusive reliance for its irreparable harm argument on a Moody's Investor Service Issuer Comment.  As Rapp explains, the Issuer Comment provides no assessment of materiality and no Moody's credit rating revision has resulted from the launch of the AutoHop feature.  Rapp at ¶29.  *See also id.* at ¶¶19, 27-36, 54, 67.

1   basis to find that there will be any meaningful increase in ad skipping behavior.

2          Fox's claim that PTAT and AutoHop will impact its ability to license its

3   programming to VOD distributors stands up no better to the facts.  MPA at 22-24.

4   MVPD's VOD offerings are only accessible by their unique subscribers.  This

5   means that the value of a VOD service carried by another pay-television provider

6   will not be diminished by the availability of PTAT and AutoHop to DISH

7   subscribers—and Fox's ability to negotiate VOD licenses will not be affected.  *See*

8   *ActiveVideo*, 2012 WL 3636908, at *21-23.  Since DISH does not offer any

9   broadcast television network programming on a VOD basis, PTAT and AutoHop

10  cannot have an impact on Fox's VOD efforts.

11         Nor is there any merit to Fox's *ipse dixit* that its effort to exploit the internet

12  streaming market will be harmed.  MPA at 20-24.  Very little television is viewed

13  via the internet.  And internet streaming services do not directly compete with

14  television viewing; they are complementary of television viewing.  Hauser Decl.

15  ¶31; Rapp Decl. ¶105.  Indeed, at the same time DVRs have become more widely

16  available, and their recording capacity has improved, there has been growth in

17  internet streaming services.  Rapp Decl. ¶105.

18         **D.     Fox's Delay Undercuts Any Claim of Irreparable Harm.**

19         The Hopper with PrimeTime Anytime was publicly announced with great

20  fanfare on January 9, 2012 at CES, and Fox was there.  Khemka Decl. ¶3; Shull

21  Decl. ¶9.  In fact, Fox knew about it beforehand.  Molinski Decl. Ex. 4.  Despite

22  meeting regularly with DISH after January 9, no one at Fox or any of the other

23  networks objected in any way to PTAT.  Shull Decl. ¶9.  AutoHop was announced

24  on May 10, 2012, with advance notice to the networks.  *Id.* Ex. 2.  Only then did

25  Fox (and the other networks) file suit claiming PTAT and AutoHop would destroy

26  advertiser-supported television.  Fox's delay and lack of objection during the entire

27  first, and more than half of the second, quarters of 2012 precludes an injunction

28  against PTAT.  *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

1   (9th Cir. 1985) (delay "implies a lack of urgency and irreparable harm").[18]

2   **V.     THE OTHER FACTORS ALSO FAVOR DISH.**

3        Fox must also establish that the balance of hardships favors it, *Perfect 10,*

4   *Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011), and "that an injunction is in

5   the public interest." *Flexible Lifeline*, 654 F.3d at 994.  Neither is true.

6        **A.     <u>DISH Will Suffer Far More Hardship Than Fox.</u>**

7        As detailed above, there is no likelihood that Fox will suffer harm during the

8   litigation.  If, on the other hand, DISH is required to disable PTAT and AutoHop

9   for existing customers (akin to a recall),[19] or is enjoined from providing those

10  features to future subscribers, DISH will suffer severe, immediate hardship in the

11  form of damaged customer relations, lost goodwill, and other costs.  *See Hansen*

12  *Beverage Co. v. N2G Distrib., Inc.*, No. 08-CV-1613, 2008 U.S. Dist. LEXIS

13  105442, at *17 (S.D. Cal. Dec. 30, 2008) (damage to goodwill weighs against

14  injunction); *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.* No. CV-92-4698, 1993

15  U.S. Dist. LEXIS 15075, at *52 (C.D. Cal. June 29, 1993) (potential loss of

16  "valuable customer relations" tips balance of hardships to defendant).

17       An order to turn off PTAT and/or AutoHop would require a massive

18  campaign to notify subscribers that those features are no longer available, and

19  numerous attendant steps resulting in disruption, consumer confusion, and loss of

20  goodwill to DISH.  Khemka Decl. ¶10, 11.  DISH has invested time, effort, and

---

[18] *See Kerr Corp. v. North Am. Dental Wholesalers, Inc.*, No. SACV 11-0313, 2011 U.S. Dist. LEXIS 61779, at *7 (C.D. Cal. June 9, 2011) (five month delay shows lack of irreparable harm); *Givemepower Corp. v. Pace Compumetrics, Inc.*, No. 07cv157, 2007 U.S. Dist. LEXIS 20886, at *22 (S.D. Cal. Mar. 23, 2007) (two month delay shows lack of irreparable harm); *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) ("A three month delay in seeking injunctive relief is inconsistent with [plaintiff's] insistence that it faces irreparable harm."); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1180, 1089 (S.D. Cal. 1999) (five month delay in seeking injunction after retaining expert shows lack of irreparable harm); *Programmed Tax Sys., Inc. v. Raytheon Co.*, 419 F. Supp. 1251, 1255 (S.D.N.Y. 1976) (collecting cases where irreparable harm denied with between two and six month delay).

[19] Customers have been enabling PTAT since March and AutoHop since May.  Approximately 275,000 customers have purchased the Hopper and obtained these features; Fox's proposed injunction would deprive them of what they have already purchased and activated.  Fox has not acknowledged—let alone attempted to meet—the higher burden associated with a product recall.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).  A recall order is akin to a mandatory injunction and "particularly disfavored."  571 F.3d at 879.

1  millions of dollars conceiving of and developing the Hopper, PTAT and AutoHop.

2  DISH launched—at similarly great expense—a marketing campaign devoted to

3  promoting the Hopper, along with its PTAT and AutoHop features.  If DISH is

4  enjoined from offering them during the course of this litigation, its marketing

5  investment will be lost.  *Id.* ¶¶10, 11.

6  **B.   The Public Interest Will Be Disserved By An Injunction.**

7  Fox relies on boilerplate here, reciting the public's interest in "upholding

8  copyright protections" and in "advertising-supported television."  MPA at 25.

9  "Public policy does not advocate the liberal issuance of *preliminary* injunctions in

10  copyright infringement actions."  *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,

11  16 F.3d 1032, 1038 (9th Cir. 1994).  In this case those boilerplate recitations are not

12  *public* interests, but rather the private commercial interests of Fox.  In contrast, the

13  real public interests at stake here are privacy, consumer autonomy and

14  technological innovation.  *See Sony*, 464 U.S. at 783.  Enjoining PTAT and/or

15  AutoHop will disserve the public interest.  *See GMC v. Harry Brown's, LLC*, 563

16  F.3d 312, 321 (8th Cir. 2009) (public has an interest in "consumer choice");

17  *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1576 (Fed. Cir.

18  1988) (recognizing "the public interest in technological advancement").

19  **VI.   THE OLD PTAT/AUTOHOP SYSTEM IS MOOT.**

20  Fox seeks to enjoin both the "current iterations" of PTAT and AutoHop and

21  the "original" iterations.  MPA at 2.  The system has been changed, users are using

22  the new system, DISH has no intention of going back.  Minnick Decl. ¶47, 82.  The

23  old system is irrelevant to a request for injunctive relief.  *See FTC v. Evans Prods.*

24  *Co.*, 775 F.2d 1084, 1088 (9th Cir. 1985).[20]

25  **CONCLUSION**

26  For all of the foregoing reasons, Fox's motion should be denied.

27  _____

[20] *See also Keep A Breast Foundation v. Seven Group*, No.11-cv-00570, 2011 U.S. Dist. LEXIS 78373, at *8 (S.D.
28  Cal. July 19, 2011); *BP W. Coast Prods. LLC v. Takhar Bros. Inc.*, No. CV-07-1807, 2007 U.S. Dist. LEXIS 86006, at *3-4 (D. Ariz. Nov. 8, 2007)

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

1    Dated:  August 31, 2012                    Orrick, Herrington & Sutcliffe LLP

2

3                                               By: _/S/ William A. Molinski_
                                                    WILLIAM A. MOLINSKI
4                                                   Attorneys for Defendants
                                                 DISH Network L.L.C. and DISH
5                                                       Network Corp.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION