1  JENNER & BLOCK LLP
   Richard L. Stone (Bar No. 110022)
2  Andrew J. Thomas (Bar No. 159533)
   David R. Singer (Bar No. 204699)
3  Amy M. Gallegos (Bar No. 211379)
   633 West 5th Street, Suite 3600
4  Los Angeles, CA 90071
   rstone@jenner.com
5  ajthomas@jenner.com
   dsinger@jenner.com
6  agallegos@jenner.com

7  Attorneys for Plaintiffs
   Fox Broadcasting Company,
8  Twentieth Century Fox Film Corp., and
   Fox Television Holdings, Inc.

9

10              **UNITED STATES DISTRICT COURT**

11            **CENTRAL DISTRICT OF CALIFORNIA**

12

13  FOX BROADCASTING COMPANY,        Case No.  12-CV-04529-DMG (SH)
    INC., TWENTIETH CENTURY FOX
14  FILM CORP., and FOX TELEVISION
    HOLDINGS, INC.
15                                   **PLAINTIFFS' REPLY IN SUPPORT**
            Plaintiffs,              **OF MOTION FOR PRELIMINARY**
16                                   **INJUNCTION**

    v.                               **[PUBLIC REDACTED VERSION]**
17
    DISH NETWORK L.L.C. and
18  DISH NETWORK CORP.,              Hearing Date:   Sept. 21, 2012
                                     Hearing Time:   9:30 a.m.
19          Defendants.              Courtroom:      7 (2nd Floor)

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................1

II.     THE AUTOHOP SERVICE INFRINGES FOX'S COPYRIGHT.............2

        A.      Dish Makes Illegal Copies .............................................................2

        B.      Dish Miscites The Family Movie Act Which Does Not Apply........2

III.    THE RTC AGREEMENT PROHIBITS PRIMETIME ANYTIME
        WITH AUTOHOP.....................................................................................3

IV.     FOX HAS ESTABLISHED LIKELY SUCCESS ON ITS DIRECT
        INFRINGEMENT CLAIMS .....................................................................7

        A.      The PTAT Copies Infringe The Reproduction Right ......................8

        B.      The PTAT Copies Infringe The Distribution Right..........................10

        C.      Dish Ignores That Its Activities Exceed the Scope
                Of Its License ...............................................................................11

V.      FOX IS LIKELY TO SUCCEED ON ITS SECONDARY
        INFRINGEMENT CLAIMS .....................................................................11

        A.      PTAT Copying Is Not Protected Under The Fair Use Doctrine.......11

                (1)     PTAT Copying Is Not Transformative ...................................12

                (2)     The Second And Third Factors Indisputably Favor Fox ........12

                (3)     The Fourth Factor, Market Harm, Decidedly Favors Fox......13

        B.      Dish is Liable For Vicarious Infringement .....................................17

        C.      Dish Is Liable For Inducing Copyright Infringement......................17

        D.      Dish Is Liable For Contributory Infringement................................17

VI.     DISH FAILS TO REBUT THE LIKELIHOOD OF
        IRREPARABLE HARM............................................................................19

        A.      Fox Has Shown Likely Harm To Its Ad-Supported Business..........19

        B.      Fox Has Shown Likely Harm To Its Non-Broadcast Businesses .....20

        C.      Fox Is Not Required To Prove Actual Damages .............................21

        D.      Dish's Experts Confuse And Conceal The Obvious
                Threat of Harm ...............................................................................22

        E.      Fox Did Not Unreasonably Delay....................................................25

VII.    Dish Faces No Cognizable Harm From A Preliminary Injunction.............25

i

# TABLE OF AUTHORITIES

**Cases**

*A&M Records v. Abdallah,*
  948 F. Supp. 1449 (C.D. Cal. 1996) .................................................. 18

*A&M Records, Inc. v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001) ...................................................passim

*Aimster Copyright Litig.,* 334 F.3d 643 (7th Cir. 2003) ....................... 15

*American Geophysical Union v. Texaco Inc.,*
  60 F.3d 913 (2d Cir. 1994) ..........................................2, 14, 15

*Atari Games Corp. v. Nintendo of Am., Inc.,*
  975 F.2d 832 (Fed. Cir. 1992) ......................................................2

*Arista Records LLC v. Usenet.com, Inc.,*
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) .................................... 9, 18

*Basic Books v. Kinko's Graphics Corp.,*
  758 F. Supp. 1522 (S.D.N.Y. 1991) ............................................8

*Blackwell Publ'g, Inc. v. Excel Research Group, LLC,*
  661 F. Supp. 2d 786 (E.D. Mich. 2009) ......................................8

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) ...........................................................12, 16

*Capitol Records v. MP3Tunes,*
  821 F. Supp. 2d 627 (S.D.N.Y. 2011) ....................................... 18

*Cartoon Network, LP v. CSC Holdings, Inc.,*
  536 F.3d 121 (2d Cir. 2008) .......................................................8

*Castle Rock Entm't v. Carol Pub. Group,*
  150 F.3d 132 (2d Cir. 1998) ..................................................... 15

*Columbia Pictures Television v. Krypton Broadcasting,*
  259 F.3d 1186 (9th Cir. 2001) .................................................. 10

*Diamontiney v. Borg,*
  918 F.2d 793 (9th Cir. 1990) .................................................... 21

*Elvis Presley Enters. v. Passport Video,*
  349 F.3d 622 (9th Cir. 2003) .............................................. 12, 25

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
  76 F.3d 259 (9th Cir. 1996) ..................................................... 17

*Gilder v. PGA Tour, Inc.,*
  936 F.2d 417 (9th Cir. 1991) ............................................. 22, 25

*Harper & Row Publishers, Inc. v. Nation Enters.,*

471 U.S. 539 (1985) ................................................................16

*Kaiser Trading Co. v. Associated Metals & Minerals Corp.,*
321 F. Supp. 923 (N.D. Cal. 1970)...........................................7

*Kelly v. Arriba Soft Corp.,*
336 F.3d 811 (9th Cir. 2003)...................................................13

*LGS Architects, Inc. v. Concordia Homes of Nev.,*
434 F.3d 1150 (9th Cir. 2006) .........................................11, 25

*London Sire Records, Inc. v. Doe 1,*
542 F. Supp. 2d 153 (D. Mass. 2008) .....................................11

*Los Angeles News Service v. Tullo,*
973 F.2d 791 (9th Cir. 1992)....................................................8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
545 U.S. 913 (2005) ..................................................................

*Muze, Inc. v. Digital On-Demand, Inc.,*
123 F. Supp. 2d 118 (S.D.N.Y. 2000).......................................7

*Neumann. v. Metro Med. Group, P.C.,*
557 N.Y.S.2d 663 (N.Y. App. Div. 3d Dep't 1990) ...................6

*New York Times Co. v. Tasini,*
533 U.S. 483 (2001) ................................................................10

*Oracle America v. Google,*
2012 WL 1189898 (N.D. Cal. Jan. 4, 2012) ...........................10

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007)........................................11, 12, 13

*Perfect 10, Inc. v. Megaupload, Ltd.,*
2011 WL 3203117 (S.D. Cal. July 27, 2011),...........................9

*Princeton Univ. Press v. Michigan Document Servs.,*
99 F.3d 1381 (6th Cir. 1996)....................................................8

*Register.com, Inc. v. Verio, Inc.,*
356 F.3d 393 (2d Cir. 2004).....................................................7

*RCA Records v. All-Fast Sys., Inc.,*
594 F. Supp. 335 (S.D.N.Y. 1984) .........................................18

*Richlin v. MGM Pictures, Inc.,*
531 F.3d 962 (9th Cir. 2008) ....................................................3

*Sega Enters. Ltd. v. Accolade, Inc.,*
977 F.2d 1510 (9th Cir. 1992)...................................................2

*Sony Computer Enters., Inc. v. Connectix Corp.,*
203 F.3d 596(9th Cir. 2000)......................................................2

iii

*Sony Corp. of Am. v. Universal City Studios,*
    464 U.S. 417 (1984). ................................................................ 1, 16, 18

*Twin Peaks Prod'ns, Inc. v. Publications Int'l,*
    996 F.2d 1366 (2d Cir. 1993) ............................................................ 7

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
    667 F.3d 1022 (9th Cir. 2011) ........................................................... 8

*Vault Corp. v. Quaid Software Ltd.,*
    847 F.2d 255 (5th Cir. 1988) ........................................................... 18

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.,*
    447 F.3d 769 (9th Cir. 2006) ..................................................... 12, 13

*Walt Disney Prod'ns v. Filmation Assocs.,*
    628 F. Supp. 871 (C.D. Cal. 1986) .................................................... 2

*Warner Bros. Entm't v. WTV Systems,*
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ......................................... 21

*WPIX, Inc. v. ivi, Inc.,*
    -- F.3d --, 2012 WL 3645304 (2nd Cir. Aug. 27, 2012) ...................... passim

**Statutes**

17 U.S.C. § 101 ...................................................................................... 3

17 U.S.C. § 110(11) ........................................................................... 2, 3

17 U.S.C. § 119 ................................................................................... 11

iv

# I.   **Introduction**

Dish's opposition is a study in populist hyperbole and misdirection.  Fox is not seeking to take anything away from consumers, or to overturn the consumer time shifting allowed by *Sony*.[1]  Dish admits its PrimeTime Anytime ("PTAT") and AutoHop services can be shut down with a routine software update that will have no effect on its subscribers' personal DVR use.

Fox is only trying to stop Dish from making and distributing unauthorized copies of its programs to create, in Dish's words, "[a]n on demand library of approximately 100 hours of primetime shows" that in conjunction with AutoHop becomes, again in Dish's words, "commercial-free TV" in violation of Dish's license and copyright laws.  This case is not about a "souped-up" personal DVR.  These are commercial services created by Dish to give it a competitive advantage that meet all of the elements of a video-on-demand ("VOD") service as defined by Dish's own expert and executive, which is why Dish represented under oath to the Trademark Office that PTAT was indeed a VOD service.  Dish would not have spent tens of millions of dollars marketing itself as the creator of "commercial-free TV" – which its president refers to as the "Holy Grail of television" – for an allegedly improved personal DVR timer setting.  Nor would Dish's Vice President claim a simple, improved DVR scheduler would displace Hulu, nor would its Chairman admit a mere timer was harmful to the entire television "ecosystem."

Dish uses two experts to try to convince the Court that, contrary to all of Dish's statements and marketing, a commercial-skipping, commercial-free, on demand library of shows will somehow lead to *more* commercial watching.  Dish then claims Fox is stifling "innovation," but misappropriating programming, breaching contracts and violating copyright laws to supplant licensed services, like Hulu, is not "innovation" – it is tantamount to piracy.  Dish should be enjoined.

---

[1] *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984).

**II.      The AutoHop Service Infringes Fox's Copyrights**

     **A.      Dish Makes Illegal Copies.**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ These copies are plainly infringing.  Dish does not deny making these copies for a commercial purpose, and offers no legal analysis to justify its copying.  Instead, it misdirects with a string cite to computer software reverse engineering cases that plainly do not apply to Dish's copying.

     In *Sega*, the Ninth Circuit actually held that "intermediate" copies generally *are* infringing, regardless of their purpose.  *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992) ("[o]n its face, [the Copyright Act] unambiguously encompasses and proscribes intermediate copying"); *accord American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 921 (2d Cir. 1994); *Walt Disney Prod'ns v. Filmation Assocs.*, 628 F. Supp. 871, 876 (C.D. Cal. 1986) (intermediate copies in the form of storyboards were infringing).  *Sega* only recognized a narrow, fact-specific exception for "reverse engineering" of computer software, where the copying was necessary to read the software itself and examine embedded unprotected ideas and functional concepts.  977 F.2d at 1520-26.[2]  Dish is doing no such thing with the Fox Programs ████████████████, and can cite no case that has excused the making of "intermediate" copies of creative, expressive works for commercial purposes.

     **B.      Dish Miscites The Family Movie Act Which Does Not Apply.**

     Dish's assertion that Congress "expressly privileged" commercial-skipping in the Family Movie Act ("FMA"), 17 U.S.C. § 110(11), is demonstrably false.

---

[2] Similarly, the *Sony Computer* and *Atari* cases cited by Dish involved copying that was an essential step in the reverse engineering process because it was necessary to enable the defendant to actually *read* the copyrighted work to gain access to the uncopyrightable ideas.  *See Sony Computer Enters., Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000); *Atari Games Corp. v. Nintendo of Am., Inc.*, 975 F.2d 832, 843 (Fed. Cir. 1992).

1   The statute says nothing about commercial-skipping and, indeed, Congress

2   expressly designed the statute *not to apply* to commercial-skipping technologies.

3   Senator Orrin Hatch, the original sponsor of the legislation, noted in his statement

4   introducing the bill that "a product or service that enables the skipping of an entire

5   advertisement, in any media, would be beyond the scope of the exemption."  151

6   Cong. Rec. S495 (daily ed. Jan. 25, 2005) (statement of Sen. Hatch).

7          The FMA provides an exemption to copyright infringement for "the making

8   imperceptible ... of *limited portions* of audio or video content of a motion picture

9   ...."  17 U.S.C. § 110(11) (emphasis added).  "Motion pictures" are "audiovisual

10  works consisting of a series of related images which, when shown in succession,

11  impart an impression of motion, together with accompanying sounds, if any."  17

12  U.S.C. § 101.  Under this broad definition, each commercial is a "motion picture."

13  The Copyright Register explained to the House Judiciary Committee that the FMA

14  "*would not exempt from liability* a technology that skips past an entire commercial"

15  because the exemption "extends only to skipping past 'limited portions' of a motion

16  picture."  The Committee "concur[red] with the Register's determination that this

17  Act has *no bearing* on either the legality or illegality" of "automated television

18  commercial-skipping devices."  *See* H.R. Rep. 109-33(I) (emphasis added).[3]

19  **III.   The RTC Agreement Prohibits PrimeTime Anytime With AutoHop**

20          The RTC Agreement states that Dish "████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████.  In 2010, Fox agreed to a narrow

23  exception allowing Dish to distribute Fox Programs via video on demand ("VOD")

24  as long as it "████████████████████████████████████

25  ████████████████████████████████████████████

26          To circumvent those limitations on the distribution of Fox Programs, Dish

27  —————————————————

28  [3] *See Richlin v. MGM Pictures, Inc.*, 531 F.3d 962, 973 (9th Cir. 2008) (courts
    generally should defer to Register of Copyright's interpretation of copyright laws).

3

1    relies on Fox's unremarkable acknowledgement that the contract does not "███

2    ████

3    ███. This is a straw man argument. Fox is not trying to restrict Dish employees

4    from installing customer DVRs, nor is it claiming these home installations have

5    anything to do with Dish's infringement in this case. Instead, Fox seeks to enjoin

6    two discrete Dish services: the PrimeTime Anytime VOD service ("PTAT") and the

7    AutoHop feature that eliminates commercials on playback. Dkt. 41-16.

8         Next, Dish tries to escape liability by relying on Section 9(a) of the RTC

9    Agreement: ████

10   ████

11   ████. As

12   discussed below and in Fox's motion, Dish is the one making the nightly,

13   unauthorized copies of every Fox Program as part of its PTAT and AutoHop

14   services – a clear violation of Section 9(a)'s prohibition on direct copying. Dish

15   claims the "████" (italicized above) permits Dish to authorize

16   "████." Opp. 10. But Fox is *not* suing Dish for authorizing

17   consumers to use their personal DVRs. Fox is suing Dish for operating the

18   commercial-free VOD services known as PTAT and AutoHop.

19        Next, to evade the RTC Agreement's prohibition on VOD or similar services,

20   Dish takes the untenable position that PTAT is not even similar to VOD, claiming it

21   is merely a "DVR feature that simplifies timers" for recording programs. Opp. 13.

22   Dish's characterization of PTAT as just another DVR "timer" is completely at odds

23   with its multi-million dollar PTAT marketing campaign, its own Hopper user guide,

24   admissions by its senior management, and its under-oath submission to the U.S.

25   government. Dish's argument that all personal DVR recordings are "on demand"

26   also contradicts its prior admissions and its own definition of VOD.

27        According to Dish's expert, VOD is a "████

28   ████

4

████████████████████████████████████████

████ . PTAT squarely fits that definition because it provides Dish subscribers with a library of pre-recorded, primetime content that the user can select from and watch on demand.[4]  Indeed, before this motion was filed, that is exactly how Dish described the service.  Dish's press release touted that PTAT "creates an *on-demand library of approximately 100 hours primetime TV shows.*"  Singer, Ex. E at 199 (emphasis added).  Dish spent tens of millions of dollars advertising that PTAT was "new," "only" available from Dish, and different than a traditional DVR because it "gives you instant On Demand access to your favorite primetime shows ... and doesn't take up any of your personal DVR space."  *Id.*, Ex. E at 199, Ex. A at 18.  Dish's message to consumers is that PTAT is *not* a DVR scheduling feature; instead, it "gives you *On Demand* access for 8 days to all HD programming that airs during primetime hours on ABC, CBS, FOX and NBC, *without* needing to schedule individual recordings."  *Id.*, Ex. A at 22-23 (emphasis added).

The Hopper User Guide discusses PTAT separately from personal DVR timers and refers to PTAT as "*on-demand* access" to all primetime programs broadcast on ABC, CBS, FOX and NBC.  Singer, Ex. B at 109 (emphasis added).  By contrast, the User Guide separately explains that "[a] timer is your instruction telling the satellite TV receiver the programs you want to watch in the future ... you select a specific program on a specific channel, and tell the receiver how often you want to record that program."  *Id.* at 111.

---

[4] Dish's Senior Vice President David Shull similarly defines VOD as a service that "provides subscribers with 'on demand' access to a catalog of content that is determined not by the subscribers, but by the MVPDs and content providers such as Fox.  Additionally, the particular programs in the VOD service are available to subscribers for 'on demand' access for a period of time determined by the MVPD and content provider, not by the subscriber."  Shull ¶ 27.  That is precisely how PTAT works:  Dish selects the particular programs to be recorded as well as the networks that are available with the service (the current networks are ABC, CBS, NBC, and Fox), Dish unilaterally decides which programs are available commercial-free, and Dish controls the parameters for how long the PrimeTime Anytime library is available for on demand viewing (the default is 8 days).  Singer, Ex. A at 14-17, ███████████████████████ .

1       In its trademark application to the U.S. Trademark Office, Dish – under oath

2  – repeatedly referred to PTAT as a "video-on-demand service." Singer, Ex. F at

3  207, 210, 212, 224, 226. Last week, after being caught red handed with this sworn

4  admission, Dish responded with yet another cosmetic cover-up by asking the

5  Trademark Office to amend its application and delete the description of PrimeTime

6  as a VOD service. Saffer ¶ 4.[5]

7       In short, no matter how many pages of excuses, amendments and

8  qualifications Dish now comes up with, it cannot credibly deny that PTAT is a

9  VOD or similar on demand service. Therefore, PTAT is either (1) prohibited by the

10  RTC Agreement (which prohibits such services generally), or (2) subject to the

11  VOD Clause (which narrowly permits VOD on the condition of no commercial-

12  skipping). Either way, Dish is breaching the contract.

13       At the very least, Dish's PTAT and AutoHop services violate Section 5 of the

14  2010 amendment to the RTC Agreement, which states that Dish █████████████

15  ███████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████

17  ███ Yet PTAT and AutoHop render the VOD Clause pointless and completely

18  frustrates the "████████████████" of no commercial-skipping during VOD

19  playback. Dish claims it did nothing wrong because the contract "contemplated"

20  Dish distributing DVRs and "everyone knows" DVRs can record primetime

21  programs and skip commercials. Opp. 14. But Fox is *not* challenging Dish's

22  distribution of DVRs to customers, nor is it challenging the traditional functions of

23  a DVR; it is challenging PTAT and AutoHop.[6]

---

[5] The sworn statements that PrimeTime Anytime is a VOD service were made by Max Gratton, a Dish employee. Singer, Ex. F at 226. Curiously, to explain its about face, Dish submits the declaration of outside counsel Ian Saffer (who has no personal knowledge of Gratton's original statements or intentions). Saffer ¶¶ 2-3.

[6] *Neumann. v. Metro Med. Group, P.C.*, 557 N.Y.S.2d 663, 664 (N.Y. App. Div. 3d Dep't 1990), cited by Dish (Opp. at 14) is far off point. That case dealt with the separate legal doctrine of "frustration of purpose," not the express breach of a contract restriction like the one at issue here.

1    Dish sets up another straw man argument by spending three pages arguing it

2    is not "required" to market the Fox Programs under the parties' VOD Clause.  Opp.

3    10-12.  Fox has never claimed Dish has an affirmative obligation to implement the

4    VOD service agreed upon by the parties.  Fox is suing Dish because, instead of

5    implementing the authorized VOD service with no commercial-skipping, Dish

6    developed a competing, *unauthorized* VOD service that eliminates commercials.  If

7    Dish turned off PTAT and AutoHop, it would not be in breach of the VOD Clause.

8    Finally, Dish's claim that injunctive relief for a contract claim is "unheard

9    of" under California law (Opp. 28) can be rejected out of hand.  Courts in this

10   Circuit "look to state law to determine if a preliminary injunction is permissible."

11   *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F. Supp. 923, 931

12   n.14 (N.D. Cal. 1970), *aff'd*, 443 F.2d 1364 (9th Cir. 1971).  Dish admits the RTC

13   Agreement is governed by New York law (Opp. 10), which permits injunctive relief

14   for breach of contract claims.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393,

15   404 (2d Cir. 2004); *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118,

16   131-32 (S.D.N.Y. 2000).

17   **IV.   Fox Has Established Likely Success On Its Direct Infringement Claims**

18   Fox's motion attached the Copyright Office registration certificates for all the

19   works at issue, establishing a presumption of valid copyright ownership.  *See* 17

20   U.S.C. § 410(c).[7] Such registration provides a sufficient basis to assert claims for

21   copyright infringement based on copying the broadcast programs.  *See Twin Peaks*

22   *Prod'ns, Inc. v. Publications Int'l*, 996 F.2d 1366, 1371 (2d Cir. 1993).

23   Dish offers only a token response to Fox's direct infringement claims based

24   on the copies Dish makes every night in operating the PTAT service.  While Dish

25   makes fair use and the *Sony* decision the centerpiece of its Opposition, those

26   arguments are relevant *only* as defenses to Fox's claims for *secondary* copyright

27   _____

28   [7] Because Fox could not register the episodes of its programs as audiovisual works
until after the programs aired, it initially registered the scripts.

1  infringement.[8]  They do not provide Dish with any defense to Fox's direct

2  infringement claims – all of which are based on Dish's own copying as part of its

3  commercial business operations.  Accordingly, if the Court finds that Fox has

4  shown a likelihood of success on its direct infringement claims, it need not even

5  address secondary infringement, fair use, or *Sony*.

6        **A.**     **The PTAT Copies Infringe The Reproduction Right.**

7        Dish contends that, because its customers must press a button to turn on the

8  PTAT service, it cannot be liable for direct infringement based on the PTAT

9  copying that ensues on a nightly basis (Opp. at 24).  Dish's formalistic view of

10  direct infringement finds no support in the case law.[9]

11        Dish seeks refuge in the "volitional conduct" requirement adopted by some

12  courts, including the Second Circuit in *Cartoon Network, LP v. CSC Holdings, Inc.*,

13  536 F.3d 121 (2d Cir. 2008) ("*Cablevision*").  This argument fails for two reasons.

14  ***First***, contrary to Dish's suggestion, the Ninth Circuit has not adopted this

15  requirement, and the *Shelter Capital* ("*Veoh*") case on which it relies did not once

16  mention *Cablevision* or the standard for proving direct infringement.[10]

17        ***Second***, even if such a requirement did apply, courts in this circuit and

18  elsewhere that have adopted the "volitional conduct" test have made clear that the

19  _____

20  [8] As Fox demonstrated in its opening brief – citing a number of decisions that Dish makes no effort to address – a commercial business may not justify its unauthorized copying by attempting to assert fair use claims on behalf of its downstream

21  customers.  *See, e.g., Los Angeles News Service v. Tullo*, 973 F.2d 791, 797-98 (9th Cir. 1992); *see also* Motion at 15.

22  [9] It is well established that a business that makes unauthorized copies of copyrighted works is liable for direct infringement, even if it does so at the request

23  of a customer.  *See Princeton Univ. Press v. Michigan Document Servs.*, 99 F.3d 1381, 1389 (6th Cir. 1996); *Blackwell Publ'g, Inc. v. Excel Research Group, LLC*,

24  661 F. Supp. 2d 786, 791-92 (E.D. Mich. 2009); *Basic Books v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1531-32 (S.D.N.Y. 1991); Motion at 13 n.7.

25  [10] Instead, the *Veoh* case addressed an entirely separate question – namely, the meaning of statutory language in the DMCA regarding an Internet service

26  provider's storage of user-uploaded content "at the direction" of the user.  *See UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1035 (9th

27  Cir. 2011).  For purposes of direct infringement, even assuming a volitional conduct requirement applied, the question is who actively participates in the

28  copying, not who directs or requests it.

1    standard is not difficult to meet, and that Dish's conduct in operating the PTAT

2    service would easily satisfy any court's volition requirement.  In *Perfect 10, Inc. v.*

3    *Megaupload, Ltd.*, 2011 WL 3203117 (S.D. Cal. July 27, 2011), for example, the

4    court found the volition requirement clearly satisfied where the defendant

5    participated in the copying as more than a mere "passive conduit" or "storage"

6    service.  *Id.* at *4.  Volition also has been found satisfied where the defendants were

7    shown to be "*active participants* in *the process* of copyright infringement."  *Arista*

8    *Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009)

9    (emphasis added) (citations omitted).

10         Dish says nothing in response to the numerous examples cited by Fox of

11   Dish's participation in and control over the copying performed by the PTAT

12   service.  Dish's own user guides, promotional materials, and deposition witness

13   confirm that Dish's participation in the PTAT copying is active and ongoing, and

14   that Dish exerts extensive control over the process.  Dish (not the customer) selects

15   the particular programs PTAT records; Dish (not the customer) determines when

16   those programs can be accessed; Dish (not the customer) chooses which networks

17   are recordable by PTAT; Dish (not the customer) selects the recording start times

18   and stop times for each network; Dish (not the customer) controls when the copied

19   programs are available in a commercial-free format; Dish (not the customer)

20   controls the minimum and maximum lengths of time they are available for viewing

21   (currently 2 to 8 days); and, beginning 15 minutes before the start of primetime,

22   Dish *locks the customer out* of PTAT completely so that none of the settings can be

23   changed.  *See* Motion at 11-12.  The only act of "volition" by the user is to activate

24   the service.  That trivial "flip of the switch" does not absolve Dish of its pervasive,

25   ongoing role in the PTAT service's nightly copying of Fox's primetime programs.[11]

26

27   [11] At least one court has explicitly rejected Dish's view.  In *Blackwell, supra*, the
     court held a business liable for direct infringement where it made copyrighted
28   materials available to students to copy on its premises using machines under its

9

Dish attempts to buttress its argument by citing to cosmetic changes that it made to the PTAT service (Opp. 24) ███████████████████████ ███████████████████████[12] Dish's own declarant, however, confirms ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

**B.      The PTAT Copies Infringe The Distribution Right.**

Dish asserts – without citing any authority – that there can be no distribution "when no physical copy changes hands."  This antiquated view was rejected by the Supreme Court in *New York Times Co. v. Tasini*, 533 U.S. 483 (2001), which squarely held that distribution of copies may be accomplished through the transfer of electronic files.  *Id.* at 498; *see also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013-14 (9th Cir. 2001).

Dish also seeks to hide behind the illusion that its subscribers are the ones making the nightly, automatic PTAT copies, when in fact Dish is directly and actively participating in that process.  Contrary to Dish's suggestion (Opp. 26), Fox is not claiming Dish violates the distribution right merely by making content "available for copying by the consumer."  Instead, Fox claims that Dish, through its operation of the PTAT service, is *causing* copies of the Fox Programs to be made

---

control.  It rejected the argument that the business had no liability merely because students actually "press[ed] the start button." *See* 661 F. Supp. 2d at 791-92.

[12] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

Dish's explanation for these changes in its Opposition should be disregarded.

on the Hopper DVRs of its subscribers.[13]  And contrary to Dish's unsupported assertions, it plainly is *not* authorized – either by its RTC Agreement with Fox or the statutory compulsory license under 17 U.S.C. § 119 – to disseminate *copies* of the Fox Programs.  *See* Motion 4, 8, 10 n.5.  Perhaps the best evidence that Dish is responsible for the PTAT copies of the Fox Programs is that when ██████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████[14]

### C.    Dish Ignores That Its Activities Exceed The Scope Of Its License.

Dish ignores Fox's authorities establishing that, by exceeding the scope of its license in the RTC Agreement, Dish has engaged in copyright infringement.  *See, e.g.*, *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1154-57 (9th Cir. 2006) (granting preliminary injunction).  *See generally* Motion 9-10.  This concession alone supports a finding of likelihood of success on the merits.

## V.    Fox Is Likely To Succeed On Its Secondary Infringement Claims

Even if the Court were to accept Dish's attempt to shift to its subscribers the responsibility for the massive copying accomplished by the PTAT service, Dish still would be secondarily liable for copyright infringement.

### A.    PTAT Copying Is Not Protected Under The Fair Use Doctrine.

Dish's primary response to secondary infringement is that copying by its subscribers using PTAT and AutoHop constitutes "time shifting" that is protected under the fair use doctrine – an affirmative defense on which Dish bears the burden of proof at the preliminary injunction stage.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).  Because the copying done by Dish's

---

[13] This also violates Fox's reproduction right.  *See London Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 174 n. 28 (D. Mass. 2008) ("[a] single action can infringe more than one right held under § 106").

[14] Under the RTC Agreement, Fox granted Dish only a limited license to retransmit public performances of the Fox Programs embodied Fox's broadcast signal. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

PTAT service is nothing like the "time-shifting" of individual programs addressed by the Supreme Court in *Sony*, Dish cannot establish a likelihood of success on a fair use defense.

### (1)    PTAT Copying Is Not Transformative.

Dish's claim that *Sony* held "the Betamax served a transformative purpose" (Opp. 16) is preposterous.  Contrary to what Dish says, in its 1984 *Sony* decision, the Supreme Court had no occasion to analyze whether time-shifting was transformative because it did not adopt the "transformative use" analysis *until 9 years later* in *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994).  Indeed, the *Campbell* Court cited *Sony* as an example of fair use that did *not* involve a transformative use of the copyrighted work. *Id.* at 579.[15]  A use is transformative if the new work "adds something new, with a further purpose or different character," thereby "altering" the original work "with new expression, meaning or message." *Id.*  Where, as here, the copier is using the entire work for the same entertainment purpose as originally intended, the use is not transformative. *E.g.*, *Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (uses that "serve the same intrinsic entertainment value" as the copied work are not transformative).

### (2)    The Second And Third Factors Indisputably Favor Fox.

Dish ignores and thus concedes the second and third fair use factors.  The second factor – the nature of the copyrighted works at issue – plainly favors Fox.  Creative comedies and dramas like the Fox Programs are "within the core of copyright's protective purposes." *Campbell*, 510 U.S. at 586.  The third factor – the amount and substantiality of the portion copied – also favors Fox because PTAT copies primetime programs in their entirety. *See Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 780 (9th Cir. 2006) ("verbatim

---

[15] *Sony* also made clear that the "time-shifting" activity at issue did *not* qualify as a "productive" use (a precursor to the transformative test). *See* 464 U.S. at 455 n.40; *see also* Molinski, Ex. 5 at 31 (Sony brief arguing that time-shifting involved "making exactly the use of the work which the copyright owner intended").

1    copying of the entire copyrighted work ...weighs against" fair use).[16]

2    **(3)    The Fourth Factor, Market Harm, Decidedly Favors Fox.**

3    Contrary to Dish's suggestion, *Sony* did not hold that all personal or in-home

4    use of a VCR or DVR is *per se* legal or fair, nor did it recognize an inherent "right"

5    to eliminate commercials from the playback of recorded programs.  Rather, the

6    Supreme Court found the film studio plaintiffs had not established a likelihood of

7    market harm under the fourth fair use factor based on the Court's consideration of

8    narrowly defined conduct involving a specific product with limited capabilities.[17]

9    Specifically, the Court considered "time-shifting" of individual television

10   programs, which it defined as "the practice of recording a program *to view it once*

11   *at a later time, and thereafter erasing it*."  464 U.S. at 423 (emphasis added).  The

12   Court did not endorse the creation of libraries of copyrighted content, and certainly

13   did not approve the copying effected by PTAT – the recording each night of four

14   networks' entire primetime lineups.  To the contrary, *Sony* implied that such

15   "library-building" would not constitute a fair use.  *Id.* at 423-24 & nn. 3-4.

16   PTAT is not necessary for true "time-shifting" by consumers.  Without

17   PTAT, Dish subscribers still can record individual programs to view later – a

18   practice Fox *does not challenge* here.[18]  But under its default settings, PTAT copies

19   12-24 shows per night (easily more than 100 per week) – regardless of whether the

20   user ever intends to watch a particular program.  PTAT thus creates a storehouse of

---

22   [16] The "wholesale copying" cases Dish cites (Opp. 17) are distinguishable in that
     both involved (i) reproduction of "thumbnail" images that did not substitute for the
23   original works and (ii) copying for a purpose – namely, facilitating the operation of
     an Internet search engine – that was wholly distinct from the purpose for which the
24   works were created. *See Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1165 (9th
     Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-21 (9th Cir. 2003).
25   [17] The other basis for the *Sony* decision was that the plaintiffs' works were only "a
     small portion of the total use" of VCRs. *Id.* at 434, 456.  Here, PTAT and AutoHop
26   operate *only* on the primetime programs of the four broadcast networks, and all four
     networks – 100% of those affected – have sued Dish.
27   [18] The only claim in this case that the sky is falling is found in Dish's constant
     mantra that Fox is seeking to "attack" *Sony* and to "take away" consumers' ability
28   to engage in time-shifting (Opp. at 1, 17, 19).  As its motion makes clear, Fox only
     seeks to enjoin PTAT and AutoHop, not any other function of the Hopper.

1    recorded programs for the user to browse and choose from another day.  By

2    creating a library of shows available for on-demand viewing, PTAT far exceeds the

3    time-shifting activity at issue in *Sony*.[19]

4         The *Sony* Court also had no occasion to consider the effect of consumer

5    copying on other markets for the licensed distribution of television programs to

6    consumers – both with and without commercials – through VOD or Internet

7    transmissions, since no such competing markets (and no Internet) existed in 1984.

8    Here, by contrast, it is undisputed that these markets now exist, and Fox has shown

9    they will be negatively affected if Dish is allowed to offer the Fox primetime

10   programs on a commercial-free on-demand basis.  *See* Motion at 20-24.  Dish's

11   argument that the growing market for Internet distribution of television programs is

12   a "complement, not a replacement, for TV viewing" contradicts admissions by

13   Dish's Chairman that PTAT and AutoHop will harm the advertising-supported TV

14   "ecosystem" and by Dish's Vice President that with PTAT and AutoHop the

15   consumer would not "ever need Hulu or Hulu Plus after this."  Motion 2, 7.

16        That these markets are relatively new does not justify discounting them.  As

17   the Ninth Circuit has explained, lack of present harm to an established market

18   "cannot deprive the copyright holder of the right to develop alternative markets" for

19   its works.  *See Napster*, 239 F.3d at 1017 (the availability of free downloads on

20   Napster's system "necessarily harms" the record labels' efforts to develop markets

21   for Internet sales and licensing of digital downloads of the same songs); *Am.*

22   *Geophysical*, 60 F.3d at 929 ("indisputable" that "the impact on potential licensing

23

24   ─────────────────

25        [19] Dish also distorts the *Sony* district court's findings (Opp. 19) regarding the
     VCR's effect on studio sales of movies on videocassette.  The court discounted the
26   harm based on a finding that consumers were unlikely to build a library of recorded
     shows because it "will be very expensive" to do so (each Betamax tape cost $20)
27   and few Betamax owners "will have ... the income to maintain a library."  480 F.
     Supp. 429, 467 (C.D. Cal. 1979).  These constraints obviously are not present when
28   PTAT automatically creates a VOD library by copying a hundred shows a week at
     no additional cost to the user.

1   revenues is a proper subject for consideration in assessing the fourth factor").[20]

2   Furthermore, to the extent Dish subscribers follow Dish's encouragement to

3   use PTAT and AutoHop together, the copies are *not* being made solely for the

4   purpose of time-shifting.  Instead, they are made for the purpose of watching

5   programs *without commercials* – a qualitatively different purpose that was not

6   present to any significant degree in *Sony*, and which threatens to seriously harm the

7   market for broadcast television advertising.  In discounting the potential harm

8   associated with the skipping of commercials by Betamax users, the *Sony* Court

9   explicitly tied its analysis to the "tedious" and cumbersome nature of the extant

10  1980s technology:

> It must be remembered, however, that to omit commercials, Betamax owners must view the program, including the commercials, while recording.  To avoid commercials during playback, *the viewer must fast-forward and, for the most part, guess as to when the commercial has passed*.  For most recordings, either practice may be too tedious.

14  464 U.S. at 453 n.36 (emphasis added).

15  Here, by contrast, Dish subscribers who use PTAT with AutoHop do not

16  need to fast-forward at all, and AutoHop automatically eliminates entire

17  commercial breaks without any guesswork.  AutoHop is designed and marketed so

18  that 100% of AutoHop users see no commercials.  This is qualitatively different

19  from the blind fast-forwarding Betamax users experienced in the late 1970s and

20  early 1980s, a difference that necessarily alters the fair use calculus.  *E.g.*, *In re*

21  *Aimster Copyright Litig.*, 334 F.3d 643, 647 (7th Cir. 2003) (Posner, J.) (copying

---

[20] Dish's claim that Fox is trying to "preempt" a "transformative market" (Opp. 19-20) is untenable.  Dish's authorities refer to theoretical situations where a plaintiff attempts to develop or license a market for inherently transformative uses like parody, news reporting or criticism.  *Castle Rock Entm't v. Carol Pub. Group*, 150 F.3d 132 (2d Cir. 1998), cited by Dish, recognized that "secondary users may not exploit markets that original copyright owners would in general develop or license others to develop, even if those owners had not actually done so."  *Id.* at 146 n.11.  Here, the market harm relates entirely to natural, legitimate markets for the exploitation of the Fox Programs – all of which *predate* Dish's introduction of PTAT and AutoHop.  Indeed, the VOD market has existed at least *since 2002.  See* Biard Ex. A.  Even Dish's economist recognizes ███████████████████████████.

with commercial-skipping is "unquestionably infringing").[21]

Dish boasts about this difference in its public relations and marketing materials, characterizing AutoHop as an unprecedented development – "the Holy Grail of television" (Rapp, Ex. 3 at 80-81) – far beyond the mere incremental improvement in fast-forwarding that Dish attempts to portray in its Opposition. Dish's instruction manual confirms that AutoHop is "not like fast-forwarding" because "[o]nce you have chosen AutoHop for your show, you can put the remote control down; you've enabled AutoHop's patented technology to skip the commercials during your show automatically." Singer Ex. D. Dish further highlights the differences between AutoHop and fast-forwarding in its frequent claims that it has "created commercial-free TV." *Id.*, Exs. G, H.

Finally, Dish's strained argument and "evidence" purporting to show that Fox has not suffered crippling harm to date ignores the relevant standard under the fourth factor. Market harm is established merely by showing that "some meaningful likelihood of future harm exists." *Sony*, 464 U.S. at 451. Fox need only show that "*if the challenged use should become widespread*, it would adversely affect the *potential* market for the copyrighted work." *E.g.*, *Campbell*, 510 U.S. at 587-89 (emphasis added).[22]

---

[21] Dish fails to offer any meaningful data on how frequently its subscribers actually use AutoHop to skip commercials during PTAT recordings – the only situation in which AutoHop functions – let alone how frequently subscribers use AutoHop with the primetime Fox Programs. *See infra* at p. 23-24.

[22] Dish argues (Opp. at 17) that PTAT copying is "noncommercial" and that Fox therefore bears the burden of establishing a threat of market harm. Dish cannot cite any authority for the proposition that copying an entire slate of television programs for the purpose of watching them without advertisements is "noncommercial." Because such copying substitutes for consumption that the user otherwise would have to pay for – by paying a fee to Amazon or iTunes or by watching commercials – it in fact is a commercial use. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561-562 (1985) (exploitation of a copyrighted work "without paying the customary price" is commercial use).

**B.     Dish Is Liable For Vicarious Infringement.**

Aside from its misplaced reliance on the fair use defense, Dish offers no response whatsoever to Fox's vicarious infringement argument (Motion at 16-17), thereby conceding the elements of vicarious liability are satisfied.  Moreover, Dish's self-serving statements that it respects copyrights and did not intend to infringe (Opp. at 24 n.10) are irrelevant to this claim, as the defendant's knowledge or state of mind have no bearing on the question of vicarious liability.  *E.g.*, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996).

**C.     Dish Is Liable For Inducing Copyright Infringement.**

Dish's reliance on the Supreme Court's *Grokster* decision, in response to Fox's inducement argument, grossly misreads that ruling.  *Grokster* held that a defendant could be liable for inducing copyright infringement where it intended and encouraged customers to use its services for infringement.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005).  That is precisely what Dish has done through its nationwide advertising campaign urging consumers to use PTAT to copy all networks primetime programming every night and watch those programs commercial-free – to "watch shows, not commercials," as its billboards beckon.  The Supreme Court has found such advertisements to be "[t]he classic instance of inducement." *Id.* at 937.

**D.     Dish Is Liable For Contributory Infringement.**

Dish does not deny that the elements of contributory infringement are satisfied here.  It does not dispute that it "knows or has reason to know" of the unauthorized copying of its subscribers or that it "materially contributes" to that copying by providing essential equipment and services.  *Napster*, 239 F.3d at 1019-20; *Fonovisa*, 76 F.3d at 264.  Dish plainly knows that its customers are using PTAT and AutoHop in the manner Dish designed them to be used.[23]

---

[23] ███████████████████████████████████████████

17

1   Instead, Dish attempts to invoke the "staple article of commerce doctrine"
2   applied to copyright law in the *Sony* case, by arguing that its distribution of a "dual-
3   use" device is "lawful."  Once again, Dish ignores controlling case law and grossly
4   exaggerates the sweep of this rule.  As an initial matter, the doctrine could
5   potentially apply *only* to Fox's claim for contributory infringement.  It provides no
6   defense whatsoever to claims for inducement or vicarious infringement.  *See*
7   *Grokster*, 545 U.S. at 934 (inducement liability not affected by *Sony* doctrine);
8   *Napster*, 239 F.3d at 1022 (*Sony* doctrine does not apply to vicarious infringement
9   claim); *Lime Group*, 784 F. Supp. 2d at 435 (same).[24]

10   Furthermore, Dish's PTAT service is not shielded even from contributory
11   infringement liability by the *Sony* "staple article" doctrine for two independent
12   reasons.  **First**, the doctrine does not apply where, as here, the challenged conduct
13   is not the sale of a physical product but rather the defendant's provision of a *service*
14   (*i.e.*, PTAT) as part of an ongoing relationship with its customers.  *See Capitol*
15   *Records v. MP3Tunes*, 821 F. Supp. 2d 627, 649 (S.D.N.Y. 2011); *Usenet*, 633 F.
16   Supp. 2d at 155.  In *Sony* the Court emphasized that Sony's *only* contact with VCR
17   users "occurred at the moment of sale." 464 U.S. at 438.  **Second**, the doctrine does
18   not apply where, as here, the defendant exercises control over the copying process.
19   *See A&M Records v. Abdallah*, 948 F. Supp. 1449, 1457 (C.D. Cal. 1996); *RCA*
20   *Records v. All-Fast Sys., Inc.*, 594 F. Supp. 335, 339 (S.D.N.Y. 1984).

21   Thus, Dish's assertion (Opp. 23) that Fox must demonstrate a "lack of
22   substantial noninfringing uses" is exactly backwards:  because the staple article of
23   commerce doctrine does not apply, contributory infringement may be established
24   based on *any* infringing uses by Dish's subscribers.

25

---

26   [24] Even if the doctrine applied, the question would be whether PTAT and AutoHop
27   have significant noninfringing uses, not whether the Hopper DVR overall may have
     noninfringing uses. *See Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 263-64
28   (5th Cir. 1988) (analyzing particular feature of computer program in applying *Sony*
     "substantial noninfringing use" test).

## VI.  **Dish Fails To Rebut The Likelihood of Irreparable Harm**

### A.  **Fox Has Shown Likely Harm To Its Ad-Supported Business.**

The threat to Fox's broadcast television business is simple:  because PTAT with AutoHop completely eliminates commercials upon playback – unlike any prior form of fast-forwarding – the value of Fox's commercial air time is diminished, threatening the main source of financing for the Fox Programs.  Indeed, less than two weeks ago, the Second Circuit analyzed a near-identical threat in *WPIX* where the defendant, without authorization, streamed the broadcasters' copyrighted programming over the Internet to paying subscribers. *WPIX, Inc. v. ivi, Inc.*, -- F.3d --, 2012 WL 3645304, *1 (2nd Cir. Aug. 27, 2012).  This resulted in local viewers watching television broadcasts from other cities, causing local ads to be seen by the wrong audiences. *Id.* at *9.  Finding a threat of irreparable harm, the court held that "[b]roadcast television stations and networks earn most of their revenues from advertising" and when ads are not seen by the intended audience, this would "weaken plaintiffs' negotiating position with advertisers and reduce the value of [plaintiffs'] local advertisements." *Id. at* *9.  These threats "would be difficult to measure and monetary damages would be insufficient to remedy the harms," further supporting the need for a preliminary injunction. *Id.* at *10 (also,  recognizing that "because the harms affect the operation and stability of the entire industry, monetary damages could not adequately remedy plaintiffs' injuries").

Here, the harm faced by Fox is far more pronounced than in *WPIX* because the commercials are not being viewed by the wrong audience, they are being *eliminated altogether*.  To prove this, Fox submitted the following unrebutted evidence: ***First***, Dish's own Chairman, Charlie Ergen, admitted that AutoHop was "not necessarily good for the broadcaster" or the broadcast television "ecosystem." Singer, Ex. I at 235. ***Second***, Fox executives with decades of experience in the broadcast television business have explained that Dish's unauthorized, commercial-free VOD service will reduce the value of Fox's product (*i.e.*, commercial

advertising on the Fox Network) in the eyes of advertisers and threaten Fox's primary source of financing for primetime programs. Haslingden ¶¶ 7-9, 17-22; Brennan ¶¶ 34-35.[25] ***Third***, the Association of National Advertisers – which represents "400 companies and 10,000 brands that collectively spend over $250 billion in marketing and advertising" – confirms that "[i]f Dish's AutoHop service is not stopped, it will impact advertisers' buying decisions and negotiating positions during the next year" and will impact what advertisers are willing to pay for air time on broadcast television networks. Liodice ¶¶ 7-8. ***Fourth***, Journal Communications, an independent owner of 13 broadcast television stations in eight states, agrees that PTAT and AutoHop "pose a serious threat to Journal's broadcast television stations and the entire ad-supported business model of broadcast television." Smith ¶ 6. ***Fifth***, Starcom, one of the largest advertising agencies, has publicly blasted Dish's AutoHop service, saying that Dish is "trashing the ad model." Haslingden ¶ 19. ***Sixth***, Moody's – a "Big Three" credit rating agency – warned that if AutoHop is widely adopted, it "will have broad negative credit implications across the entire television industry," could destabilize the entire television eco-system," and would result in "serious disruptions and negative credit implications for all stakeholders." *Id.*, Ex. D at 17.

### B.   Fox Has Shown Likely Harm To Its Non-Broadcast Businesses.

In addition to threatening the ad-supported business model of broadcast television, Dish's unauthorized, commercial-free VOD service also threatens to disrupt and harm Fox's non-linear (*i.e.*, non-television) distribution of its primetime programs. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[25] AutoHop also harms Fox because it eliminates Fox's own advertisements that are used to promote and inform consumers about new programs. Biard ¶ 42.

1  ████████████████████████. At the same time, Dish's Vice

2  President of Product Management, Vivek Khemka – the person in charge of

3  marketing PTAT and AutoHop – publicly confirmed that Dish's services compete

4  directly with Fox's existing digital distribution business when he said: "*I don't*

5  *think you'd ever need Hulu Plus or Hulu after this*." Notice of Lodging (Hopper

6  Demo Video at 5 min. 10 sec.). Khemka does not deny this admission.

7       Dish's unauthorized distribution of commercial-free Fox Programs will

8  disrupt Fox's business relations and negotiations with legitimate digital licensees

9  (*e.g.*, Apple, Amazon) who typically pay for the right to distribute commercial-free

10 Fox Programs. Biard ¶ 41. Fox's VOD licensing business is also threatened. If

11 Dish is allowed to continue with its *unauthorized*, commercial-free VOD service,

12 other cable and satellite television providers will perceive Fox's *authorized* VOD

13 license as less valuable or adopt their own competing services, hurting Fox's

14 negotiation leverage. *Id.* Biard ¶¶ 39-40; Haslingden ¶¶ 14-15; Brennan ¶ 26.

15 None of this evidence has been rebutted.

16      Like the defendant in *WPIX*, Dish's unauthorized exploitation of the Fox

17 Programs "dilute[s]" Fox's "control over [its] product," and encourages competitors

18 to "follow" Dish's lead. *Id.* at *10. As a result, "[t]he strength of plaintiffs'

19 negotiating platform and business model would decline." *Id.* Absent an injunction,

20 this would "drastically change" and "destabilize" the entire industry. *Id.*; *see also*

21 *Warner Bros. Entm't v. WTV Systems*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011)

22 (irreparable harm where unauthorized DVD "rental" business that streamed movies

23 over the Internet interfered with plaintiffs' ability to negotiate VOD licenses).

24      **C.    Fox Is Not Required To Prove An Actual Damages Case.**

25      Contrary to what Dish claims, Fox is *not* required to prove that it already has

26 suffered "actual injury" in the form of measurable harm. *Diamontiney v. Borg*, 918

27 F.2d 793, 795 (9th Cir. 1990). "Requiring a showing of actual injury would defeat

28 the purpose of the preliminary injunction, which is to prevent an injury from

1    occurring." *Id.* at 795. "[T]he injury need not have been inflicted when application

2    is made or be certain to occur; a strong threat of irreparable injury before trial is an

3    adequate basis." *Id.* (citation omitted). Nor is Fox required to "precisely" prove a

4    damages case at this stage. Opp. 30; *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423

5    (9th Cir. 1991) (difficulty in quantifying injuries does not make them speculative).

6    As the district court in *WPIX, Inc. v. ivi, Inc.* found "obvious," the absence of

7    quantifiable injuries is precisely what makes them irreparable. 765 F. Supp. 2d

8    594, 620 (S.D.N.Y. 2011).

9         **D.**    **Dish's Experts Confuse And Conceal The Clear Threat Of Harm.**

10        In response to Fox's straightforward evidence, Dish submits more than 142

11   eye-glazing paragraphs of expert *ipse dixit* and 168 pages of exhibits from

12   economist Richard Rapp and marketing professor John Hauser, neither of whom

13   has ever worked a day in the television business. It is telling that Dish resorts to

14   hundreds of pages replete with a modern history of television, an unqualified

15   analysis of copyright law, stock market event studies, figures, pie charts, graphs,

16   and algebraic equations to supposedly demonstrate that *eliminating* commercials

17   results in *more* commercials being viewed, even though Dish, Fox, and other

18   executives who actually work in the business (not to mention common sense), say

19   the opposite is true.

20        Most of Dish's expert materials have nothing to do with this lawsuit. Rapp

21   spends many pages discussing general economics, the history of television and

22   DVRs, his irrelevant opinion that networks have stalled technology in America, and

23   his non-lawyer analysis of copyright cases. Rapp ¶¶ 37-58. He wastes time trying

24   to rebut claims of "actual" harm to network revenues, stock price, and credit ratings

25   that Fox never asserted (*id.* ¶¶ 19-2, 30-35) and needlessly tries to reconstruct Fox's

26   revenues and expenses from public sources, even though Fox provided the *actual*

27   data in this case and it is undisputed that the sale of commercial advertising

28   accounts for "90 percent of Fox's revenues" (*id.* ¶¶ 59-64; Haslingden ¶ 7). Rapp

1   goes on and on about DVR usage trends (not at issue), the effectiveness of

2   television advertising (not at issue), and commercial-watching behavior over the

3   past three decades (not at issue), all of which culminates with the ridiculous

4   proposition that Dish's heavily-promoted, commercial-skipping service somehow

5   causes people to watch *more* commercials.  Rapp ¶¶ 65-85.[26]

6        Similarly, after spending most of his time opining on traditional DVR usage

7   and fast-forward technologies *not* at issue, Hauser concludes that AutoHop – which

8   Dish CEO Joe Clayton refers to as "the Holy Grail of television" – █████████

9   ██████████████████████████████████████████████████████████████████████

10  ██████.  Hauser further opines that Fox's legitimate VOD and digital distribution

11  businesses are not threatened because █████████████████████████████████████

12  ███████████████████████████████████████████████████████████████████████.

13       Dish's experts are detached from reality.  Dish would not have spent

14  and "████████████████████████" developing and marketing PTAT and AutoHop if

15  Dish did not expect them to be used by its subscribers.  Khemka ¶ 11; ███████████

16  ███████████.  Nor would Dish be crowning itself as the creator of "commercial-free

17  TV," plastering billboards that shout "WATCH SHOWS NOT COMMERCIALS,"

18  and complaining (falsely) that an injunction against those services would cause

19  "massive" disruptions if the new services were duds.  Singer ¶¶ 37, 42; Opp. 34.

20       Rapp concludes that AutoHop is not a threat to Fox's ad-supported business

21  because it is ███████████████████████████████████████████████████████████

22  ███████████████.[27]  However, his entire premise

23

---

24  [26] Rapp's analysis is particularly absurd because he fails to compare a world with
    AutoHop to a world where Dish subscribers use a VOD service that disables fast-
25  forwarding through commercials.  All things being equal, it does not take an
    economist to understand that subscribers who watch VOD *with* commercials are
26  going to see more commercials than those who watch VOD *without* commercials.
    [27] Rapp's supporting materials tell another story.  *See, e.g.,* Rapp, Ex. 3 at 81
27  (*Wall Street Journal* 5/11/2012) ("The notion that viewers [with AutoHop] won't
    see even a whirr of fast-forwarded ads threatens billions of dollars in broadcast
28  television advertising").

1    ███████████████████████████████████ is meaningless.

2    Taking AutoHop usage as a percentage of *all* recorded programs is misleading and

3    irrelevant because "all recorded programs" include all sorts of non-primetime and

4    non-broadcast recordings for which AutoHop is not available.  (Dish – for now –

5    only offers the commercial-free service with select primetime programs on Fox,

6    ABC, NBC, and CBS.)  Dish is silent about the more informative (and no doubt

7    larger) percentage of people using AutoHop when AutoHop is actually available.[28]

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ██████████████████████████████████  And, finally, given that DirecTV –

11   with 20 million subscribers –also plans to launch a competing commercial-free TV

12   service depending on what happens here, many millions of subscribers will soon

13   have access to these infringing services if Dish is not enjoined.  Haslingden ¶ 15.

14       In any event, to the extent PTAT and AutoHop are not yet widespread, that is

15   grounds for *granting* the preliminary injunction, not denying it because the whole

16   point of a preliminary injunction is to prevent the harm before it occurs.  In *WPIX*,

17   the defendant made the same argument as Dish, claiming "ivi is far too small" to

18   destroy the value of broadcast television content.  *WPIX*, 765 F. Supp. 2d at 619.

19   The court rejected this "faulty" argument, holding that being "small" does not allow

20   a plaintiff to "steal plaintiffs' programming for personal gain until a resolution of

21   this case on the merits. Such a result leads to an unacceptable slippery slope." *Id.*[29]

22   _____

23   [28] In addition, this conclusion is based only on data from a subset of subscribers
     who connect their Hopper to the Internet, ████████████████████████████

24   ██████████████████████████████████████████████████████████.

25   [29] Dish claims Fox's damages are calculable because it licenses to third parties the
     rights Dish now exploits without permission.  Opp. 29.  Dish is wrong for
     numerous reasons.  ***First***, Fox does not have a so-called "licensing program" that

26   allows for commercial-free VOD by cable and satellite distributors.  Brennan ¶ 14.
     ***Second***, in the two cases cited by Dish (Opp. 29), the copyright owner

27   demonstrated a willingness to grant the license to defendant, which never happened
     here.  ***Third***, as explained in *WPIX*, "[d]efendants cannot seriously argue that the

28   existence of thousands of companies who legitimately use plaintiffs' programming

24

1      **E.    Fox Did Not Unreasonably Delay.**

2           Dish concedes Fox timely sued over AutoHop, which was introduced for the

3      first time on May 10, 2012, a mere two weeks before Fox filed this lawsuit.  Singer,

4      Ex. H at 232.  Dish claims unreasonable delay only with respect to PTAT – which

5      hit the market two months earlier than AutoHop.  *Id.*, Ex. E at 199.  On a

6      preliminary injunction, courts are "loath to withhold relief solely on [the] ground"

7      of unreasonable delay.  *Gilder*, 936 F.2d at 423.  Importantly, the clock does not

8      start ticking when a plaintiff "learns" of possible copyright infringement where the

9      plaintiff cannot assess whether defendant's use is a fair use until the work is

10     publicly released.  *Elvis Presley Enters.*, 349 F. 3d at 626.  Dish announced PTAT

11     in January 2012, but only released it on March 15, 2012.  Singer, Ex. E at 199.

12     This action was filed two and a half months later.[30]

13     **VII.   Dish Faces No Cognizable Harm From A Preliminary Injunction**

14          Dish's "product recall" analogy and its claim that a "massive campaign" and

15     "numerous attendant steps" are required to turn off PTAT and AutoHop are false.

16     Dish already testified ████████████████████████████████████████████████████

17     ████████████████████████████████████████████████████████████████████████████

18     ████████████████████████████████████████████████████████████████████████████

19     ██████████████████████████████████████  Finally, Dish's complaint about the

20     difficulty of notifying PTAT and AutoHop users not only contradicts Dish's

21     argument that no one is using them, it could easily be solved with a bill-stuffer,

22     letter or email, or on-screen message, to all affected customers.[31]

23

---

24     and pay full freight means that ivi's illegal and uncompensated use does not
       irreparably harm plaintiffs."  765 F. Supp. 2d at 619.

25     [30] Even if Dish had begun offering PrimeTime Anytime in January 2012, Fox
       filed its complaint only four and a half months later.  That hardly constitutes an

26     unreasonably delay.  *See Gilder*, 936 F.2d at 423 (7 months not unreasonable).

27     [31] All past iterations of PTAT and AutoHop should also be enjoined. ███████████
       ███████████████████████████  A defendant's mere claim it has changed its conduct does

28     not "moot" a preliminary injunction request.  *See LGS*, 434 F.3d at 1553-54.

Dated:     September 7, 2012                    JENNER & BLOCK LLP

                                               By: _____/s/_____
                                                    Richard L. Stone
                                                    Attorneys for Plaintiffs