1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10
11  FOX BROADCASTING COMPANY    ) Case No. CV 12-04529 DMG (SHx)
12  INC., TWENTIETH CENTURY FOX  ) **ORDER RE PLAINTIFFS' MOTION**
                                 ) **FOR PRELIMINARY INJUNCTION**
13  FILM CORP., and FOX TELEVISION )
14  HOLDINGS, INC.,              ) **[REDACTED VERSION]**
                                 )
15                    Plaintiffs, )
                                 )
16          v.                   )
                                 )
17  DISH NETWORK, L.C.C. and     )
                                 )
18  DISH NETWORK CORP.,          )
                                 )
19                    Defendants. )
                                 )
    _____ )
20
21          This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction
22  [Doc. #41].  Defendants filed an opposition to the Motion on September 4, 2012 [Doc.
23  #71].  Plaintiffs filed their reply on September 7, 2012 [Doc. # 79].  The Court held a
24  hearing on the Motion on September 21, 2012 and, thereafter, took the matter under
25  submission.
26          The parties ask this Court to fast-forward *Sony Corp. of America v. Universal City*
27  *Studios, Inc*., 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984), to consider whether
28  "PrimeTime Anytime" and "Auto Hop" are merely technological innovations as

-1-

innocuous as the Betamax video tape recorder ("VCR") of yore or are instruments of infringement causing Defendants to suffer irreparable harm.  On the current record, Plaintiffs have not borne their burden of showing that the technologies at issue are the latter such that a preliminary injunction is warranted.  For the reasons set forth below, Plaintiff's Motion is **DENIED**.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc. ("Fox"), own the copyrights to the television programs that air on the Fox Network during the primetime window each night, including *Glee*, *The Simpsons*, *Family Guy*, *Touch*, and *Bones* ("the Fox Programs").  *See* Declaration of Sherry Brennan, ¶¶ 2-3, Exh. A [Doc. # 41-12].[1]  Fox is one of four network broadcasting companies that offers television programming over the airwaves by local television stations free of charge to viewers.  *Id.* at ¶¶ 4, 8.  Fox also enters into Retransmission

---

[1] Dish submitted abundant objections to nearly every piece of evidence filed by Fox [Doc. #65].  "[I]n the preliminary injunction context, the Court is not strictly bound by all rules of evidence." *Ticketmaster L.L.C. v. RMG Technologies*, 507 F. Supp. 2d 1096, 1102 n.2 (C.D. Cal. 2007) (citing *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).  The Court has considered Dish's evidentiary objections and will address them where necessary.  *See also Rosen Entm't Sys., LP v. Icon Enters, Inc.*, 359 F. Supp. 2d 902, 904 (C.D. Cal. 2005) (exercising discretion to consider inadmissible but reliable evidence in the context of a preliminary injunction).  Dish objects to Exhibit A of the Brennan Declaration for lack of personal knowledge (Fed. R. Evid. 602) and lack of proper authentication (Fed. R. Evid. 901).  The objections are DENIED because Brennan, as Fox's Senior Vice President of Distribution and Development, is an adequate custodian of Fox's records of copyright ownership.  Moreover, given that the parties do not seriously dispute Fox's ownership of the copyrights of the Fox Programs, the Court is satisfied that Exhibit A to Brennan's declaration, which contains copies of Certificates of Registration for a sampling of Fox program scripts, is reliable to establish Fox's copyright ownership for purposes of the present motion.  *See Twin Peaks Prod'ns, Inc. v. Publications Int'l*, 996 F.2d 1366, 1371 (2d Cir. 1993) (finding that the court's disposition of copyright issues regarding popular television show *Twin Peaks* was "ultimately unaffected" by whether the copyright registrations applied to the program's teleplays, televised episodes, or both); Reply at 7 (Fox could not obtain copyright registration of programs as audiovisual works until after they aired, so it obtained registration of the scripts).  Given Brennan's background and position with Fox, she is also qualified to discuss Fox's contractual relationships with other companies in the television market and the market for Fox's programs.

Consent ("RTC") contracts with multichannel video programming distributors ("MVPDs"), such as cable, telco, and satellite television providers, which grant the MVPDs a license to retransmit the Fox broadcast to consumers through their own systems. *See* Brennan Decl., ¶ 12. Some of Fox's RTC contracts also grant MVPDs access to video-on-demand ("VOD") programs selected by Fox. *Id.* at ¶ 14. In addition, Fox enters into separate licensing agreements with companies like Hulu, Apple, Netflix, and Amazon that allow consumers to view Fox programs via Internet streaming on their computers and mobile devices, either with or without commercials depending on the nature of the licensing agreement and the user's subscription. *Id.*

Defendants, Dish Network L.L.C. and Dish Network Corp. ("Dish"), are the third largest pay-television service provider in the United States. Declaration of David Shull, ¶ 2 [Doc. # 61]. Dish provides satellite cable services to over 14 million American households. Declaration of Vivek Khemkha, ¶ 8 [Doc. # 62]. Dish retransmits the Fox broadcast to its subscribers via satellite pursuant to an RTC Agreement with Fox. *See* Shull Decl., ¶ 11, Exh. 3. Since 1999, Dish has also offered subscribers Digital Video Recording ("DVR"), which "allows a subscriber to digitally record television content for watching at a later time, which is commonly known as 'time-shifting.'" Declaration of Dan Minnick, ¶¶ 5, 8 [Doc. # 59].

## A.   The RTC Agreement and the 2010 Letter Agreement

Dish's right to retransmit the Fox broadcast is governed by the RTC Agreement, which Fox entered into in 2002 with EchoStar Satellite Corporation, Dish's former parent company and current technology provider. *See* Shull Decl., ¶ 11, Exh. 3. For a substantial fee, the RTC Agreement grants Dish a non-exclusive right to retransmit the Fox broadcast to its subscribers. *Id.* at ¶ 2. Dish's rights under the RTC Agreement are limited in several ways. First, the RTC Agreement states that Dish

> shall have no right to distribute all or any portion of the programming contained in any Analog Signal on an interactive, time-delayed, video-on-demand or similar basis; <u>provided</u> that Fox acknowledges that the foregoing

shall not restrict [Dish's] practice of connecting its Subscribers' video replay equipment . . . .

*Id.* at ¶ 3(d) (emphasis in original).  Second, the RTC Agreement provides that Dish may not, "for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of any Station's Analog Signal without prior written consent of the Station, except as is specifically permitted by this agreement." *Id.* at ¶ 9(a).

The parties have amended and supplemented their agreement several times since 2002 to account for developing technologies and changes in the television market.  *See* Declaration of Michael Biard, ¶ 18 [Doc. # 41-15].[2]  Most recently, their 2010 Letter Agreement addresses, among other things, the parties' rights and obligations with respect to VOD offerings.  Shull Decl., ¶ 14, Exh. 5.  The 2010 Letter Agreement states, "In all cases VOD content shall be made available by DISH solely to DISH subscribers of the corresponding linear service," and it lists four specific types of VOD programming.  *Id.*, Attach. A, ¶ 9.  Each VOD sub-clause contains a term requiring Dish to "disable fast-forward functionality during all advertisements."  *Id.*  In particular, the 2010 Letter Agreement gives Dish the ability to offer "Fox VOD" to subscribers at no additional licensing fee, which would allow users to watch primetime programming in a VOD format.  *Id.*  This term contains the added proviso that "Dish acknowledges and agrees that . . . fast-forward disabling is a necessary condition to distribution of the Fox broadcast content via VOD."  *Id.*  According to David Shull, Dish Senior Vice President of Programming, Dish "has not been able to" make Fox VOD available to its subscribers for largely technical reasons unrelated to the subjects of this litigation.  *See* Shull Decl., ¶ 23-24.

---

[2] Dish objects to this statement based on the doctrine of completeness.  The complete 2004 agreement and 2010 Letter Agreement appear in the record at Shull Decl., ¶¶ 13-14, Exhs. 4, 5.  The Court is satisfied that Biard, as Fox Executive Vice President of Distribution and a signator to the 2010 Letter Agreement, is qualified to make a statement as to the agreement's purpose.

**B.      The Hopper, PrimeTime Anytime, and AutoHop**

In January 2012, Dish announced the Hopper Whole Home High Definition Digital Video Recorder ("the Hopper") to its subscribers.  Minnick Decl., ¶ 13.  The Hopper is a set-top box ("STB") with both DVR and VOD capabilities.  *Id.* at ¶¶ 14, 51.  The Hopper is currently only available for consumer use, but it is unique in that subscribers may use up to three "Joeys," or additional boxes, to access programs saved on the Hopper on additional televisions in their homes.  *Id.* at ¶ 14.  The Hopper also works with the "Sling Adapter," which allows subscribers to view Hopper content on their computers and mobile devices via the Internet.  *Id.* at ¶ 83.  The Hopper arrived on the market for consumers in March 2012 and, as of August 2012, ██████████████████████ ██████████████████████████████████████ out of a total of approximately 13.5 million Dish accounts that use STBs.  *Id.* at ¶¶ 8-9.

Because the Hopper was designed to service multiple televisions, it has three tuners and a two-terabyte hard drive, which together allow the user to record and save more programming at any given time.  Minnick Decl., ¶ 16.  The three tuners permit Hopper users to watch or record on three different television stations at once.  *Id.*  The Hopper has the additional unique capability of streaming all four of the major television networks on a single satellite transponder, which allows a user to watch or record all four network broadcasts while leaving the other two tuners available for recording non-network programs or watching them on other television sets equipped with a Joey.  *Id.* at ¶ 17.

In January 2012, Dish also announced a feature called "PrimeTime Anytime" ("PTAT"), which became available to Hopper subscribers in March 2012.[3]  Shull Decl., ¶ 9.  PTAT allows subscribers to set a single timer on the Hopper to record all primetime

---

[3] ████████████████████████████████████████
████████████████████████████████

programming on any of the four major broadcast networks, including Fox, each night of the week.[4]   Minnick Decl., ¶ 20.   Dish determines the start- and end-time of the primetime block each night and, for certain types of programming, may alter the total length of the PTAT recording.[5]   *Id.* at ¶ 31.   In order to use PTAT, the user must enable it from the main menu by clicking "*" on his or her remote control.[6]   *Id.* at ¶ 22.   The user is led to a set-up screen, where he or she must select "Enable" to activate PTAT.   *Id.* at ¶ 23.   Once PTAT is enabled, a new screen appears, and the user may choose to disable recordings of certain networks on certain days of the week.   *Id.*   If the user does not select otherwise, the default settings cause the Hopper to record the entire primetime window on all four of the major networks, including Fox, every day of the week.[7]   *Id.* at ¶ 24.   A user may begin watching the recorded programs immediately after PTAT starts recording.   Minnick Decl., ¶ 28.   The user may cancel a particular PTAT recording on a given day until 20 minutes before the primetime programming begins; at that time, the

---

[4]   The Hopper is only able to record all four network broadcasts through the same transponder during prime time hours. ███████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████

[5]   For example, during the Olympics in July and August 2012, Dish altered the PTAT start- and end-times to accommodate certain Olympics programming on NBC.   Minnick Depo., 217:11-21. Additionally, Dish designates as primetime any program at least 50% of which falls within the prime time window, and that program is then included in that network's PTAT recording for that evening.   *Id.* at 216:10-18.

[6]   The parties devote much argument to the significance of a series of changes to the Hopper features that took place on July 20, 2012, including certain default settings.   *See Demery v. Arpaio*, 378 F.3d 1020, 1025-26 (9th Cir. 2004) ("Although a suit for injunctive relief is normally moot upon the termination of the conduct at issue, such a claim is not moot if there is a likelihood of recurrence.").   The Court has considered these arguments, but for purposes of the Motion, the Court need only examine the propriety of the Hopper features in their current form, as Dish has stated that it has no plans to return to its pre-July 20, 2012 practices.   Minnick Decl., ¶ 47.   *See Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996) (noting that, in an infringement action, a preliminary injunction is unnecessary where "the non-movant has or will soon cease the allegedly infringing activities").

[7]   Dish considers Primetime to include programs aired between 8 p.m. and 11 p.m. Monday through Saturday, and between 7 p.m. and 11 p.m. on Sunday, for the coastal television markets. Minnick Decl., ¶ 26.   Primetime airs one hour earlier in the Central and Mountain time zones.   *Id.*

user can no longer cancel the recording for that day but must instead delete it after it is completed.  Declaration of David R. Singer, ¶ 45, Exh. L, Deposition of Dan Minnick, 224:19-225:14 ("Minnick Depo.") [Doc. # 55].[8]  According to Minnick, Vice President of Software Engineering for EchoStar Technologies, Dish's technology vendor, the decision to limit users' recording ability in this manner was based on "usability": because cancelling a recording could result in the user inadvertently cancelling an entire night of recordings rather than just one program, Dish reasoned that the anti-cancel feature would improve users' experience by protecting against accidental cancellations.  *Id.* at 193:14-194:13.

All PTAT recordings are stored locally on the Hopper in users' homes, and users may access PTAT-recorded shows from a special "PTAT" folder in the "Graphical User Interface" ("GUI").[9]  Minnick Decl., ¶ 28.  Programs recorded manually by the user via DVR are stored in a separate folder called "My Recordings."  *Id.* at ¶ 29.  The user may select how many days he or she wants to save the PTAT recordings before they are automatically deleted.  Minnick Decl., ¶ 24.  Unless the user selects otherwise, PTAT recordings are automatically deleted after eight days.  *Id.* at ¶ 24.  During that period, the PTAT recordings are "protected," so they are not subject to automatic deletion for lack of space as are other DVR recordings stored in the "My Recordings" folder.  *Id.* at ¶ 33.  If a user wishes to "delete" a PTAT recording earlier than the pre-selected date, the icon for that recording will no longer appear in the PTAT folder and will be unavailable for playback; however, the actual recording will remain on the Hopper hard drive until the pre-selected deletion date.  *Id.* at 35.  Similarly, if a user wishes to save a particular program for more than eight days, he or she may elect to save a duplicate copy of that program in the "My Recordings" folder.  *Id.* at ¶ 34.  The duplicate copy is not actually

---

[8] On August 7, 2011, Fox deposed Minnick, who appeared on behalf of Dish pursuant to Fed. R. Civ. P. 30(b)(6).  *See* Declaration of David R. Singer, ¶ 45, Exh. L [Doc. #41-2].

[9] From the user's perspective, a GUI functions like a menu page, where the user can select what he or she wants to do by selecting the corresponding icon.  *See* Minnick Decl., ¶ 28 n.1.

created until the time for automatic deletion; until then, the icon for the program in the "My Recordings" folder is merely a link to the original PTAT recording. *Id.*

Although the Hopper has three "partitions," or areas of the hard drive where data can be stored, all of the audio-visual recordings, both PTAT and traditional DVR, are stored in the same partition. *Id.* at ¶¶ 43-45. If a user enables PTAT, the programs take up the remaining memory space as they are recorded until it becomes necessary to delete previously recorded programs. Minnick Depo., 170:21-172:10. At that point, the Hopper deletes previously recorded programs in the same manner that a traditional DVR would to make room for the new PTAT recordings. *Id.* According to Minnick, prior to July 20, 2012, Dish "reserved" 231 gigabytes of memory for the PTAT recordings, so the user could never use any portion of that memory for other DVR recordings. *Id.* at 172:20-6. After July 20, 2012, PTAT no longer receives this preferential memory treatment. *Id.* at 172:5-8. The same partition also contains 329 gigabytes of "reserved" space for "File-Based Video-On-Demand," which consists of pay-per-view movies, selected by Dish, which Dish anticipates the user might want to order and watch. Minnick Decl., ¶ 51.

In May 2012, Dish announced the AutoHop, an additional feature that allows users to "skip" commercials in PTAT recordings with the click of their remote control. *See* Shull Decl., ¶ 10. If AutoHop is available for a particular PTAT program, the user has the option to enable it for that show. Minnick Depo., 49:18-23. If the user enables AutoHop, the Hopper automatically skips commercial breaks during that program. Minnick Decl., ¶ 54. Although the user may see the first few seconds and last few seconds of the commercial break, the bulk of the commercials are replaced by a kangaroo icon telling the user that the AutoHop is skipping the commercials. *Id.* AutoHop is available only for PTAT recordings, but users can use the standard "30-second skip" feature on other DVR recordings to fast-forward. *Id.* at ¶ 58.

These copies remain at the uplink facility and are used for quality assurance ("QA") only. *Id.* at 38:16-17. A technician views the recording, fast-forwarding through the program itself to the commercial breaks, to ensure that the marking announcement is accurate and no portion of the program is cut-off. *Id.* at 47:12-49:22. If the QA copies reveal an error in the marking process, technicians can correct the error on a later broadcast to ensure that AutoHop functions properly for users who enable it. *Id.* at 50:1-10. If there is not enough time to correct a marking error before the last broadcast ends, then AutoHop will not be available for that particular show. *Id.* at 50:12-14. Unlike PTAT, AutoHop does not become available to the user until 3:00 A.M. Eastern Standard Time. *Id.* at 52:22-23.

On May 24, 2012, Fox filed a Complaint against Dish in this Court alleging that PTAT and AutoHop infringe on Fox's copyrights and constitute a breach of the RTC Agreement and the 2010 Letter Agreement [Doc. #1]. Fox filed a motion for a preliminary injunction to enjoin Dish from operating, distributing, selling, or offering to sell any version of PTAT or AutoHop or any comparable features [Doc. #41].

## II.

## <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. The purpose of such injunctive relief is to preserve the rights and relative positions of the parties, i.e., the status quo, until a final judgment issues. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)). An injunction is an exercise of a court's equitable authority, which should not be invoked as a matter of course, and "only after taking into account all of the circumstances that bear on the need

for prospective relief." *Salazar v. Buono*, __ U.S. __, 130 S. Ct. 1803, 1816, 176 L. Ed. 2d 634 (2010).

A plaintiff seeking injunctive relief must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 55 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)).  An injunction may also be appropriate when a plaintiff raises "serious questions going to the merits" and demonstrates that "the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2010) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

### III.

### DISCUSSION

#### A.    Likelihood of Success on the Merits

Fox contends that it is likely to succeed on the merits of its claims against Dish for breach of contract, direct copyright infringement, and derivative copyright infringement.[10]  At the outset, the Court notes that the parties' relationship is primarily a contractual one, governed by the RTC Agreement and the 2010 Letter Agreement.  "A licensee infringes the owner's copyright if its use exceeds the scope of its license." *Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086, 1092 (N.D. Cal. 2000) (quoting *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989)).  Indeed, Fox's contract claims overlap substantially with the issues raised by its copyright claims, and therefore a breach of contractual terms governing Dish's rights to use the copyrighted

---

[10] Fox's Complaint also raises a claim for breach of contract involving Dish's Sling Adapter, as well as a claim for breach of the implied covenant of good faith and fair dealing.  *See* Complaint, ¶¶ 80, 82-85.  Notwithstanding these alternative theories of liability, the Court focuses its present analysis solely on the issues briefed by the parties on this Motion.

1    works also constitutes infringement.  *See Sun Microsystems, Inc. v. Microsoft Corp.*, 81

2    F. Supp. 2d 1026, 1031 (N.D. Cal. 2000).  Nevertheless, due to the unique juxtaposition

3    of the contract and copyright claims in this motion for preliminary injunction and the

4    importance of the *Sony* case to the Court's analysis, the Court will examine PTAT and

5    AutoHop through the lens of copyright law before proceeding to the contract claims.

6    **1.  The Derivative Copyright Infringement Claims**

7    Fox contends that Dish induces, contributes to, or is vicariously liable for the

8    infringing acts of its subscribers.  "One infringes contributorily by intentionally inducing

9    or encouraging direct infringement, and infringes vicariously by profiting from direct

10   infringement while declining to exercise a right to stop or limit it."  *Metro-Goldwyn-*

11   *Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776, 162 L.

12   Ed. 2d 781 (2005).  To establish liability on a derivative-infringement theory, then, Fox

13   must first establish that "there has been a direct infringement by third parties."  *See*

14   *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) (citing *A&M*

15   *Records, Inc. v. Napster*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)).  Absent a third-party

16   act of infringement, a defendant cannot be liable for derivative infringement.  *Id.*

17   The Court's analysis of Fox's derivative claim is guided by the United States

18   Supreme Court's seminal decision in *Sony*.  In *Sony*, owners of television and film

19   copyrights brought derivative—not direct—infringement claims against Sony following

20   its release of the Betamax VCR.  464 U.S. at 420.  The copyright owners alleged that

21   individual consumers' use of the VCR to record their works from broadcast television

22   constituted direct copyright infringement and rendered Sony liable under a derivative

23   infringement theory.  *Id.*  The Supreme Court rejected the plaintiffs' claims.  *Id.* at 456.

24   The Court noted that secondary liability was appropriate only if the defendants had "sold

25   equipment with constructive knowledge of the fact that their customers may use that

26   equipment to make unauthorized copies of copyrighted material."  *Id.* at 439.  The Court

27   noted that "the sale of copying equipment . . . does not constitute contributory

28   infringement if the product is widely used for legitimate, unobjectionable purposes."  *Id.*

at 789.  The vast majority of VCR users made copies for private time-shifting purposes, and there was no evidence that this practice decreased television viewing or adversely impacted the value of the copyrighted works.  *Id.* at 423-24, 454-55.  The Court concluded that the VCR's primary application—time-shifting for private home use—was a fair use and therefore Sony was not liable for derivative infringement.  *Id.* at 454-56.  Importantly, *Sony* addressed only derivative claims; the plaintiffs in that case did not claim that Sony directly infringed any of their exclusive rights.  *See id.* at 434.

Here, the parties agree that the Hopper is only available to private consumers and the evidence does not suggest that consumers use the PTAT copies for anything other than time-shifting in their homes or on mobile devices.  In fact, Fox has identified no specific theory under which individual PTAT users could themselves be liable for copyright infringement without circumventing *Sony*.  In the absence of any evidence of such direct infringement on the part of PTAT users, Dish cannot be responsible for "intentionally inducing or encouraging direct infringement," or for "profiting from direct infringement while declining to exercise a right to stop or limit it."  *Grokster*, 545 U.S. at 930.  In *Grokster*, unlike this case, owners of a peer-to-peer file-sharing program were liable for derivative copyright infringement because they knowingly and intentionally induced users to copy and distribute copyrighted works over the network, which indisputably constituted infringement on the part of the users.  *Id.* at 939-41.  Here, the record is devoid of any facts suggesting direct infringement by PTAT users.  Fox has therefore failed to establish a likelihood of success or to raise serious questions on the merits of its derivative infringement claims.

## 2.  The Direct Copyright Infringement Claims

Having determined that Dish cannot be liable for infringement on a derivative theory, the Court turns next to Fox's direct infringement claims.  To establish a claim for copyright infringement, Fox must demonstrate (1) ownership of a valid copyright and (2) infringement of one of the exclusive rights granted to copyright holders under 17 U.S.C. § 106.  *See Perfect 10, Inc.*, 508 F.3d at 1159 (quoting *Napster*, 239 F.3d at 1013).  Direct

infringement does not require intent or any particular state of mind.  *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, 907 F. Supp. 1361, 1367 (N.D. Cal. 1995) ("*Netcom*").  At issue here are the exclusive rights of reproduction and distribution.  *See* 17 U.S.C. §§ 106(1), (3).

### a.   The Reproduction Right

To establish infringement by reproduction, the plaintiff must show (1) ownership of the copyright and (2) a copying by the defendant.  *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir. 2002).  A plaintiff need not demonstrate the defendant's intent to infringe the copyright to establish infringement, *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006), but it must establish that the defendant "actively engage[s]" in the copying, *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1168 (C.D. Cal. 2002).  Here, Fox has established ownership in at least some of the copyrighted programs by submitting copyright registrations for the scripts of sixteen episodes of programs that air in Fox's primetime window.  *See* Brennan Decl., ¶ 3, Exh. A.  Moreover, Dish concedes that copies of the Fox Programs are made in furtherance of both PTAT and AutoHop.

### i.   The PTAT Copies

First, when enabled, PTAT makes copies of the Fox primetime broadcast each night.  Dish asserts that the user, not Dish itself, is responsible for these copies just as the user of a VCR or traditional DVR is responsible for the copies he makes at home on his personal machine.  If this is true, then Dish cannot be liable for direct infringement.  *See Sony*, 464 U.S. at 455; *Netcom*, 907 F. Supp. 1361, 1372 (N.D. Cal. 1995).  If this is not true, and Dish in fact makes the copies, then the copies are infringing unless they are subject to an exception.  *See Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986).  Thus, the Court turns to the threshold question:  Who makes the copies?

In *Netcom*, a disgruntled former member of the Church of Scientology posted portions of the church's copyrighted works on an online forum to which he gained access

through Netcom, then a large Internet access provider in the United States.  907 F. Supp. at 1366.   The messages were stored on the online forum operator's computer, automatically copied onto Netcom's computer, and then distributed to users' computers. *Id.* at 1367.  Netcom did not monitor or control the content or postings, although it could have done so.  *Id.* at 1368.  Finding that Netcom was not liable for direct infringement of the church's copyrights, the court stated, "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party."  *Id.* at 1370.  The court analogized to a copying machine, reasoning that Netcom's act of designing a system that allows users to copy materials "is not unlike that of the owner of a copying machine who lets the public make copies with it."  *Id.* at 1369.  The owner, reasoned the Court, does not infringe by merely making his machine available, even though some of his customers use it for infringing purposes.  *Id.*  The court concluded that, while it was clear that the former church member engaged in infringement, Netcom's involvement in the copying by acting as a conduit did not expose it to direct liability.  *Id.* at 1372.

Importantly, the *Netcom* court found that Netcom was subject to the "usual strict liability scheme that exists for copyright," but it acknowledged that the unique characteristics of the technology at issue required deeper inquiry into who caused the copies to be made.  *See id.* at 1369 n.12.  Several courts have adopted this causation test to determine whether various types of Internet service providers and computer programs are directly liable for infringing activities carried out on their systems or programs.  *See, e.g.*, *CoStar Group v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (Internet service provider not directly liable for providing system by which users could upload some copyrighted photographs to its website);  *Field v. Google*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006) (Internet search engine not directly liable for automatic copying made during the engine's "caching" process); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d at 1168-69 (Internet age-verification website not directly liable where affiliate websites engaged in infringement); *Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923, 932

-14-

1   (N.D. Cal. 1996) (electronic bulletin-board operator not directly liable where users made

2   infringing copies by uploading to or downloading from the bulletin board).  In *LoopNet*,

3   the Fourth Circuit read *Netcom* as setting forth the rule that, in cases where the identity of

4   the copier is at issue, there must be "a nexus sufficiently close and causal to the illegal

5   copying" to conclude that the owner of a machine used by others for illegal copying

6   directly infringes.  *LoopNet*, 373 F.3d at 550.

7          Most recently, the Second Circuit applied this causation test to a "remote-storage

8   DVR system" ("RS-DVR") that allowed customers to record cable programming on

9   central hard drives housed and maintained remotely by the defendant, Cablevision.

10  *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 124 (2d Cir. 2008)

11  ("*Cablevision*").   In simple terms, users could request that a particular program be

12  recorded, and Cablevision's system created a data store that the user could access later to

13  view the requested program at home.  *Id.* at 124-25.  Cablevision's service, according to

14  the court, bore similarities to both VOD and DVR.  *Id.* at 125 ("RS-DVR . . . closely

15  resembles a VOD service, whereby a cable subscriber uses his remote and cable box to

16  request transmission of content, such as a movie, stored on computers at the cable

17  company's facility.  But unlike a VOD service, RS-DVR users can only play content that

18  they previously requested to be recorded.").   The court also noted that Cablevision

19  maintained some control over the content available for recording, because customers

20  could "only record programs on the channels offered by Cablevision," and because

21  Cablevision could "modify the system to limit the number of channels available and

22  considered doing so."  *Id.*

23         Acknowledging that Cablevision's system undoubtedly resulted in copies being

24  made, the court began its analysis with this inquiry:  "The question is *who* made this

25  copy.  If it is Cablevision, plaintiffs' theory of direct infringement succeeds; if it is the

26  customer, plaintiffs' theory fails because Cablevision would then face, at most, secondary

27  liability."  *Cablevision*, 536 F.3d at 130 (emphasis in original).  Relying on *Netcom*, the

28

court looked to "the volitional conduct that causes the copy to be made." *Id.* at 131. To make this determination, the court noted that

> a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct.

*Id.* at 131. The latter is similar to the proprietor of a copy shop, who does not infringe by merely making his copy machines available to the public for private, perhaps infringing, copying. *Id.* at 132 (citing *Princeton Univ. Press v. Mich. Document Servs.,* 99 F. 3d 1381, 1384 (6th Cir. 1996)). The court analogized its own inquiry to the doctrine of causation-based liability in tort, which places liability on the actor "whose 'conduct has been so significant and important a cause that [he or she] should be legally responsible.'" *Id.* at 132 (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 42 at 273 (5th ed. 1984)).

The court concluded that Cablevision was not directly liable for copyright infringement because its involvement in the copying did not pass this causation-based test. *Cablevision*, 536 F.3d at 132. In doing so, it found that Cablevision's "continuing relationship" with its customers, its control over recordable content, and its development of the instrumentality used for copying was secondary to the fact that the user, and not Cablevision, actually initiated the copies. *Id.*

In this case, Fox asks this Court to find that, through PTAT, Dish crosses the direct-infringement line that Cablevision's RS-DVR merely approached. *See Cablevision*, 536 F.3d at 133. Fox draws the Court's attention to several characteristics of PTAT that it contends accord Dish an impermissible degree of control over the copying process, rendering Dish the copier. The Court examines each of these PTAT features in turn.

First, Dish decides which networks are available on PTAT and has defaulted the PTAT settings to record all four networks. *See* Minnick Decl.,¶ 24. These decisions,

while undoubtedly discretionary authority that Dish maintains, are similar to Cablevision's "unfettered discretion" in selecting the programming available for recording. *See Cablevision*, 536 F.3d at 132 (internal quotation omitted).  As the *Cablevision* court found, these factors are not "sufficiently proximate to the copying to displace the customer as the person who 'makes' the copies" for liability purposes. *Id.* Like Cablevision, Dish has no control over what programs Fox and the other networks choose to make available during primetime.  If Fox chooses to change its primetime line-up on a particular night, Dish may allow or disallow the PTAT recording, but it cannot control which programs will be broadcast. *See id.* at 132 (declining to find liability in part because "Cablevision has no control over what programs are made available on individual channels or when those programs will air, if at all").  Moreover, Dish records the programs only if the user makes the initial decision to enable PTAT.  Therefore, the default settings do not support Fox's contention that Dish, rather than its users, makes the copies.

Dish also decides the length of time each copy is available for viewing:  PTAT recordings are automatically deleted after expiration of a certain number of days, and a user may neither delete nor preserve the original PTAT copy before that time.  Minnick Depo., 224:19-225:14; Minnick Decl., ¶ 24.  In this respect, Dish exercises more control over the copies than did the defendant in *Cablevision*, where the RS-DVR merely saved the copies until they were deleted by the user or overwritten automatically to make room for a later-recorded program. *See Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607, 612 (S.D.N.Y. 2007), *reversed in part, vacated in part by Cablevision*, 536 F.3d at 140.  Nevertheless, it is not clear to the Court that this control, being exercised *after the creation of the copies*, is relevant to whether Dish *causes* the copies to be made in the first place.  In *LoopNet*, the Fourth Circuit found insignificant an Internet service provider's ability to delete or "accept" copies of photographs uploaded to a website before linking them to a corresponding page. *See* 373 F.3d at 547.  Instead, the court focused its analysis on the "volitional" conduct that caused the copying to be made;

the defendant's subsequent control over the copy did not interrupt the initial chain of causation. *Id.* The court noted that the many parties involved in the "storage and transmission of data" on the Internet are not truly "'copying' as understood by the Act; rather, they are conduits from or to would-be copiers and have no interest in the copy itself.'" *Id.* at 551. A similar relationship appears to exist between Dish and its subscribers: Dish exercises some control and discretion over the copies, but the copies themselves are made by the users who choose to enable PTAT. Accordingly, the Court finds that this factor also does not support Fox's contention that Dish makes the copies. *See id.* at 555 (holding that "the automatic copying, storage, and transmission of copyrighted materials, when instigated by others" does not constitute direct infringement).

On the other hand, Dish decides when primetime recordings start and end each night, and it maintains the authority to modify those times according to the particular programs airing that night. Minnick Decl., ¶ 31. Additionally, the user cannot stop a copy from being made during the copying process, but must wait until the recording ends before disabling the link. In this regard, Dish exercises more control over the copying process than did Cablevision over the RS-DVR. *Cf. Cablevision*, 536 F.3d at 132 (users could request a recording of a program or programs airing at any time of day on any station, provided that Cablevision had chosen to provide that station to subscribers). Unlike the other indicia of control discussed above, these limitations on user choice evince Dish's greater participation in the copying process. Still, the Court does not find that this involvement is materially different from an Internet service provider that copies a file in "automatic response to the user's request," *LoopNet*, 373 F.3d at 550, or a DVR system that "automatically obeys commands" to copy programs selected by the user, *Cablevision*, 536 F.3d at 131. Although Dish defines some of the parameters of copying for time-shifting purposes, it is ultimately the user who causes the copy to be made by enabling PTAT. Accordingly, while this factor undoubtedly brings Dish closer to the line

than its predecessors in *Cablevision* and *LoopNet*, it does not push Dish into infringing territory.

As the *Cablevision* court noted, "*Sony* warns us that 'the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn.'" 536 F.3d at 133 (quoting *Sony*, 464 U.S. at 435 n.17).  It is clear that Dish exercises a degree of discretion over the copying process beyond that which was present in *Cablevision*.  Nevertheless, at this stage of the proceedings, the Court is not satisfied that PTAT has crossed over the line that leads to direct liability.  Despite Dish's involvement in the copying process, the fact remains that the user, not Dish, must take the initial step of enabling PTAT after deciding that he or she wants to initiate the recording.  The user, then, and not Dish, is the "most significant and important cause" of the copy.  *Prosser and Keeton on Torts* § 42.  Accordingly, the Court finds that Fox has not established a likelihood of success on the merits of its claim that PTAT directly infringes on its exclusive right to reproduction.

### ii.     The AutoHop Copies

Dish also makes QA copies of the primetime line-ups to ensure that AutoHop, when enabled, functions properly on PTAT recordings.  These copies are indisputably initiated by Dish, but the parties dispute whether they are a "fair use" under 17 U.S.C. § 107 because they are "intermediate" to the user's ultimately fair time-shifting.  *See Sega Enter. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992) (finding that intermediate copying of protected works not ultimately incorporated into an end product may be infringing, but concluding that the intermediate copies at issue were a fair use) (quoting *Walker v. University Books*, 602 F.2d 859, 863-64 (9th Cir. 1979)).  The "fair use" exception "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Kelly*, 336 F.3d at 817 (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997)).  Courts consider four factors in the "fair use" analysis: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the

amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.

First, Dish urges the Court to find that, under *Sega* and its progeny, the QA copies are a fair use because they are ultimately used for noninfringing purposes.  In *Sega*, the court examined whether the unauthorized disassembly of a copyrighted computer program "in order to gain an understanding of the unprotected functional elements of the program" constituted a fair use.  977 F.2d at 1514.  Sega owned the copyrights to its "Genesis" video-game console and games that could be played on it.  *Id.*  Defendant, Accolade, developed a process to render its own games compatible with the Genesis console.  *Id.*  This process included "reverse engineer[ing]" of Sega's video game programs to discover the compatibility requirements for the Genesis.  *Id.*  The reverse-engineering process required a form of copying, called "disassembly," which Sega contended was not a fair use.  *Id.* at 1517.

Like the QA copies here, the disassembly copies were not used in the end product or for any purpose beyond ascertaining the object code, which was not entitled to copyright protection.  *See id.* at 1526.  The court noted, "[w]here there is good reason for studying or examining the unprotected aspects of a copyrighted computer program, disassembly for purposes of such study or examination constitutes a fair use."  *Id.* at 1520.  In that case, the "good reason" for the copying was to allow Accolade to create unique works that could compete in the same market as Sega, and the court noted that disassembly was "the only means of gaining access to [the] unprotected aspects of the program."  *Id.* at 1520, 1523.  Central to the court's conclusion in *Sega* was that branding disassembly an unfair use would have allowed Sega to monopolize the entire market for works of the type created by Accolade.  *Id.* at 1523-24 (noting that "an attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine").  That Accolade

copied the unprotected aspects for the purpose of gaining information to create a new, competing product rather than to supplant the original work was a significant factor in finding fair use. *See also Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000) (finding that disassembly copying was a fair use where employed to create a virtual game console on which users could play the plaintiff's games because the end-product was transformative and did not "merely supplant" the plaintiff's protected work).

Here, Dish makes the QA copies for a purpose fundamentally different than did the plaintiff in *Sega*. Dish makes copies of protected works and it does not do so in order to create unique, transformative works that compete with the Fox Programs. Furthermore, by restricting the use of its copyrighted works, Fox is not exercising an effective monopoly over the television-program market.[11]  *See Sega*, 977 F.3d at 1523-24. Therefore, the Court is not persuaded that *Sega* resolves the fair use inquiry. Accordingly it will examine the four factors set forth in 17 U.S.C. § 107.

### (1)    Purpose and Character of the Use

First, although commercial use of the copyrighted material is not dispositive of the fair use inquiry, it can counsel against a finding of fair use, particularly where the work is not transformative. *See Kelly*, 336 F.3 at 818; *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-79, 114 S. Ct. 1164, 1177, 127 L. Ed. 500 (1994). Dish makes the AutoHop QA copies to ensure that the marking announcement is correct so that AutoHop accurately skips over commercials for PTAT viewers. While the copies themselves are not sold or otherwise monetized, they are undoubtedly made for the commercial purpose of providing a high-quality commercial skipping product that more users will want to activate. Moreover, the copies are not transformative because they do

---

[11] The *Sega* court also recognized the unique nature of object code in computer programming, noting, "[i]f disassembly of copyrighted object code is per se an unfair use, the owner of the copyright gains a de facto monopoly over the functional aspects of his work—aspects that were expressly denied copyright protection by Congress." 977 F.3d at 1526. These unique characteristics are not at play here.

not alter their originals "with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. The commercial purpose of the AutoHop copies, although not dispositive, weighs against a finding of fair use.

### (2)    Nature of the Copyrighted Work

Second, "[w]orks that are creative in nature are closer to the core of intended copyright protection than are more fact-based works." *Napster*, 239 F.3d at 1016. While some of the programs recorded in the QA process may certainly be fact-based, the sample registrations provided by Fox suggest that the programs, which include fictional works like *Glee* and *The Family Guy*, are primarily creative works. *See* Brennan Decl., ¶ 3, Exh. A. Thus, the creative nature of the copyrighted works entitles them to heightened protection and also cuts against a finding of fair use. *See Kelly*, 336 F. 3d at 820.

### (3)    Amount and Substantiality of Use

Third, "copying an entire work" also militates against a finding of fair use. *Kelly*, 336 F.3d at 820. Where the ultimate use is very limited, however, the factor is given little weight. *See Sega*, 977 F.2d at 1526-27 (citing Sony, 464 U.S. at 449-50). Here, the QA copies duplicate the Fox Programs in their entirety; indeed, partial copies of the primetime broadcast would do little to aid Dish in creating an accurate "marking" announcement. On the other hand, the copies are used for the limited purpose of ensuring that the marking data is correct. Only the marking announcement, and not the copies themselves, are distributed to the users. Thus, while this factor also weighs against Dish, it is of considerably less weight than the other factors due to the limited nature of the ultimate use. *See id.*

### (4)    Effect of the Use on the Market

Finally, the fourth factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (citing 3 M. Nimmer & D. Nimmer, Nimmer on Copyright

§ 13.05[A][4] (1993)); *see also Monge v. Maya Magazines Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012) ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work.").  The Supreme Court has called this factor "undoubtedly the most important element of fair use."  *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566, 105 S. Ct. 2218, 2234, 85 L. Ed. 2d 588 (1985).  In *Hustler Magazine*, the Ninth Circuit found that this factor focuses on whether the infringing use "tends to diminish or prejudice the potential sale of [the] work, tends to interfere with the marketability of the work, or fulfills the demand for the original work."  796 F.2d at 1155-56 (internal citations and numbering omitted).  Additionally, courts consider the effect of the defendant's use on the owner's ability to enter into licensing agreements for the use of the protected work.  *See Campbell*, 510 U.S. at 592 (rejecting the argument that parody causes cognizable harm to the market for the original work, but noting that "the market for potential derivative uses includes . . . those that creators of original works would in general develop or license others to develop"); *see also Harper & Row Publishers, Inc.*, 471 U.S. at 568 (noting that the fourth factor "must take account not only of harm to the original but also of harm to the market for derivative works").

Here, the QA copies are used to perfect the functioning of AutoHop, a service that, standing alone, does not infringe.  The record shows, however, that a market exists for the right to copy and use the Fox Programs:  Fox licenses copies of its programs to companies including Hulu, Netflix, iTunes, and Amazon to offer viewers the Fox Programs in various formats.  *See* Brennan Decl., ¶ 13.  In fact, the record suggests that Dish chose to offer AutoHop to its subscribers in order to compete with other providers who pay for the rights to use copies of the Fox Programs through licensing agreements.  *See* Singer Decl., Exh. G (Joe Flint, *Dish says Hulu is an issue too*, <u>Los Angeles Times</u>, May 24, 2012, http://www.latimes.com ("[T]he networks' growing willingness to offer their content on . . . Hulu and iTunes . . . makes the programming that Dish is paying for less valuable, Shull said, and that was one of the reasons that it pushed its AutoHop

-23-

device.")); *see also* Notice of Lodging, Exh. 1 at 5:10 (Vivek Khemkha, Dish Vice President of Product Management, describing the benefits of AutoHop in a promotional spot stating, "I don't think you'd ever need Hulu Plus or Hulu after this") [Doc. # 42].[12] Unlike these providers, however, Dish does not pay for the right to copy the Fox Programs for any purpose. By making an unauthorized copy for which it has not paid and using it for AutoHop, Dish harms Fox's opportunity to negotiate a value for those copies and also inhibits Fox's ability to enter into similar licensing agreements with others in the future by making the copies less valuable. Therefore, the Court finds that the fourth factor also militates against finding that the QA copies constitute a "fair use" under the Copyright Act.

Having considered the fair use factors, the Court finds that, on balance, the QA copies do not constitute a fair use under the Copyright Act. Although they are "intermediate" copies not ultimately used in any end product, they threaten to reduce the value of the right to copy the Fox Programs and undermine Fox's relationships with licensees who pay for that right. The fact that consumers ultimately use AutoHop in conjunction with PTAT for private home use, a fair use under *Sony*, does not render the intermediate copies themselves a fair use as well. *See Los Angeles News Service v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992) (emphasizing that the defendant's unauthorized commercial copying was not necessarily a fair use merely because his clients used the copies for "research, scholarship, and private study," which themselves are fair uses). Therefore, the Court finds that Fox has shown a likelihood of success on the merits of its

---

[12] Dish objects to these Exhibits as irrelevant, misleading, mischaracterizing the evidence, and hearsay. Neither quoted statement is hearsay as both are statements of an opposing party. Fed. R. Evid. 801(d)(2). The Court finds that the news article and videos themselves, while hearsay, are admissible for the limited purpose of showing that the topic itself—the potential effect of AutoHop on both Fox and Dish's relationships with Hulu and iTunes—has been discussed by Dish representatives in the media as a potential consequence of AutoHop. *See Ticketmaster*, 507 F. Supp. 2d at 1114-15 (considering newspaper articles in the context of a preliminary injunction).

-24-

claim that, unlike the intermediate copies at issue in *Sega*, the QA copies are not a fair use and are an infringement upon Fox's exclusive reproduction right.

### b.    The Distribution Right

Infringement of the distribution right requires "actual dissemination of a copy" by sale or other transfer of ownership, or by rental, lease, or lending.  *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d at 1162 (internal citation omitted); 17 U.S.C. § 106(3).  In the electronic context, copies may be distributed electronically.  *See N.Y. Times Co. v. Tasini*, 533 U.S. 483, 498, 121 S. Ct. 2381, 2390, 150 L. Ed. 2d 500 (2001).  Unless a copy "changes hands" in one of the designated ways, a distribution has not taken place. *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 983 (D. Ariz. 2008).

Here, although Dish is substantially involved in the PTAT copying that takes place on users' individual Hoppers, it does not appear that any actual copies of the copyrighted works "changes hands."  *Atlantic Recording Corp.*, 554 F. Supp. 2d at 983.  A PTAT-enabled Hopper records primetime programming locally and, at most, that local copy is disseminated within a single household through the use of Joeys.  *See id.* (noting that the infringer must distribute an unauthorized copy to a member of the *public*).  The only data that changes hands in connection with PTAT and AutoHop is the marking announcement, which instructs AutoHop when to begin skipping the commercial breaks.  According to Minnick, this announcement does not contain any PTAT recording, but it merely tells the Hopper when the commercials, which are not alleged to be protected works, begin and end.  Minnick Depo., 24:10-14.  Therefore, because PTAT and AutoHop do not involve any actual distribution of unauthorized copies, the Court finds that Fox has not established a likelihood of success on the merits of its distribution claim.

### 3. Breach of Contract Claims

Fox also contends that it is likely to succeed on the merits of its claims against

Dish for breach of contract.[13]   The 2002 RTC Agreement grants Dish a nonexclusive

right to retransmit the Fox broadcast while prohibiting Dish from copying or distributing

the copyrighted works, Shull Decl., ¶ 11, Exh. 3 at ¶ 3(a).   The 2010 Letter Agreement

requires Dish to disable fast-forward functioning during the playback of certain VOD

features. *Id.*, ¶ 14, Exh. 5, Attach. A at ¶ 9.[14]

A written contract must be read and interpreted as a whole.[15]   *See Westmoreland
Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 357 (N.Y. 2003).   A contract must be
construed to effectuate the parties' intent, *MBIA Ins. Corp. v. Patriarch Partners VIII,
L.L.C.*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012), but the Court looks to the "objective
examination of the reasonable meaning of the text" rather than rely on a party's
"subjective expectations or assumptions," *Sea Shipping Inc. v. Half Moon Shipping,
L.L.C.*, 848 F. Supp. 2d 448, 457 (S.D.N.Y. 2012).   Additionally, contracts should be
interpreted   according   to   "reasonable   expectation   and   purpose   of   the   ordinary

---

[13] The Court notes that, because contract breach is generally compensable by money damages, a preliminary injunction will rarely issue on the basis of an alleged breach of contract absent evidence of intangible injuries that may stem from such breach.  *See Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (noting that "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award," but intangible injuries that may also arise out of a contractual breach may constitute irreparable harm).  With that stricture in mind, the Court will examine Fox's likelihood of success on the breach of contract claims.

[14] Fox also alleges that Dish's conduct violates the anti-circumvention provision of the 2010 Letter Agreement, which provides that neither party shall "take any action whatsoever intended to frustrate or circumvent, or attempt to frustrate or circumvent" the parties' contractual obligations.  Shull Decl., ¶ 14, Exh. 5, Attach. A at ¶ 5.  The parties devote minimal argument to this claim in their briefs and the record lacks substantial evidence addressing this particular provision.  In any event, on the current record, Fox has failed to show, even if serious questions exist as to Dish's potential breach of this clause, that any irreparable harm would result.  *See Pyro Speculators North, Inc. v Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) (economic injury alone will not support a finding of irreparable harm).

[15] According to Clause 30 of the parties' 2004 Agreement, the parties' contractual relationship is governed by New York law.  *See* Shull Decl., Exh. 4, ¶ 30.

-26-

business[person] when making an ordinary business contract." *Uribe v. Merchants Bank of N.Y.*, 91 N.Y.S.2d 393, 396 (N.Y. 1998).

### a.     The RTC Agreement

Fox asserts that PTAT violates two provisions of the RTC Agreement.  Shull Decl., Exh 3, ¶ 3(d) ("[Dish] shall have no right to distribute all or any portion of the programming . . . on an interactive, time-delayed, [VOD] or similar basis; <u>provided</u> that Fox acknowledges that the foregoing shall not restrict [Dish's] practice of connecting its Subscribers' video replay equipment . . . ."); ¶ 9(a) ("[Dish] shall not, for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) . . . of any portion of" the broadcast.).  As discussed above, *see* § III.A.2.b., *supra*, Fox has not established that Dish engages in any distribution because the PTAT copies are made by users, remain in private homes, and do not change hands.  Nevertheless, to the extent that both of these provisions may apply to PTAT, it seems clear to the Court that this language invokes the long-recognized rule, set forth in *Sony*, 464 U.S. at 454-55, that in-home copying by private consumers for the purpose of "time-shifting" is a fair use under the Copyright Act.  As discussed above, although Dish exercises some discretion over the PTAT recording feature, it is ultimately the user who causes each copy to be made.  For the same reasons that Dish does not make the PTAT copies under copyright standards, the Court finds that Dish does not make the copies within the meaning of sections 3(d) and 9(a) of the RTA Agreement.  *See* Shull Decl., Exh. 3, ¶¶ 3(d), 9(a).  Although PTAT makes copying for private home use faster, easier, and more expansive, it is ultimately user-initiated copying that is permissible under the contract.

On the other hand, as discussed above, the AutoHop QA copies unquestionably do constitute copies—made by Dish.  The fact that the copies are not used for any purpose other than quality assurance does not subject them to any exception in the RTC Agreement, because the Agreement prohibits copying "for pay or otherwise."  Shull Decl., Exh. 3, ¶ 9(a).  A plain reading of this section in the context of the contract as a

whole suggests that the QA copies constitute a breach of the contract by the plain fact that they are Dish-initiated copies.  *See Brad H. v. City of New York*, 17 N.Y.3d 180, 185 (N.Y. 2011) ("A written contract that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties.").   Thus, the Court finds that Fox has established a likelihood of success on the merits that the AutoHop QA copies violate the RTC Agreement.

### b.    The 2010 Letter Agreement

Additionally, the 2010 Letter Agreement lists several types of VOD services that correspond to several Fox stations:  FX, National Geographic Channel (NGC), National Geographic *en Español* (NGE), and Fox VOD.  Shull Decl., ¶ 14, Exh. 5, Attach. A at ¶ 9.  The sub-clause corresponding to each station grants Dish a license to provide VOD content at no additional fee or charge, subject to the limitation that "Dish will disable fast-forward functionality during all advertisements."  *Id.*  This limitation applies to the VOD license for all four stations contemplated in the VOD section.  *Id.*

AutoHop indisputably constitutes ad-skipping.  In fact, evidence in the record shows that Dish's marketing campaign highlights the Hopper's ad-skipping abilities to distinguish it from other STBs.  *See* Singer Decl., ¶ 42, Exh. J (noting Dish's AutoHop tagline, "Watch shows, not commercials").[16]  Dish maintains that AutoHop does not breach the contract for two reasons.  First, Dish argues that PTAT is not VOD but rather is akin to traditional DVR, and therefore AutoHop is permitted under the contract much like fast-forwarding and 30-second skip in traditional user-initiated DVR recordings.  *See* Shull Decl., Exh 3, ¶¶ 3(d), 9(a) (allowing private home recording without restriction on fast-forward functioning).  Second, Dish submits that the VOD provision was an option of which Dish was unable to take advantage due to technological and logistical

---

[16] See Footnote 13, *supra*.

-28-

limitations, *see* Shull Decl., ¶ 23, and therefore the restriction on fast-forwarding does not apply to PTAT.

If PTAT is, as Fox asserts, a VOD offering, then Dish's breach seems clear:  every mention of VOD content involving the Fox Programs in the Agreement includes the express prohibition on fast-forwarding through commercials.  Shull Decl., ¶ 14, Exh. 5, Attach. A at ¶ 9; *see also Uribe v. Merchants Bank of N.Y.*, 91 N.Y.S.2d 393, 396 (1998) (contracts should be interpreted according to the "reasonable expectation and purpose of the ordinary business[person]  when  making  an  ordinary business contract")  (internal quotation omitted).  The parties devote much argument to the proper definition of VOD.  According to Richard Rapp, an economist at NERA Economic Consulting, VOD is

> a licensed service that allows viewers to select and watch video programs whenever they request them.  It is a service where the content is not broadcast, but stored in a library, which users can access on-demand.  Typical VOD content offerings include recently aired television programs (as in catch-up TV), popular series, selected categories of thematic programming (e.g. music, children's programs), and movies.

Declaration of Richard Rapp, ¶ 94 [Doc. # 64].  Brennan describes the VOD that Fox separately licenses to MVPD service providers like Dish as "a library of previously-aired television programs for immediate, 'on demand' viewing on standard television . . . distributed after a short-window following a program's original air date and time . . . ."  Brennan Decl., ¶ 14(a).  Other definitions in the record suggest that the essence of VOD is that its content is controlled by the provider, not the user:  the provider selects what programs will be available, when, and for how long.  *See, e.g.*, Khemkha Decl., ¶ 12 (offering three descriptions of VOD, all of which involve content offered by the supplier).

The parties' dispute over the VOD provision is especially challenging because PTAT is, in some ways, a hybrid of DVR and VOD likely not contemplated by either party when the 2010 Agreement was drafted.  As the Court concluded in its copyright

-29-

analysis, however, at its core, PTAT is little more than a faster, more streamlined way for users to engage in the time-shifting privileges that they have enjoyed since the days of the Betamax.[17]   As discussed above, Dish does not decide what programs are available in the PTAT "library"; rather, if the user chooses to enable PTAT, then the recording includes whatever happened to air during that particular primetime window.  Unlike VOD, a user cannot decide on Wednesday that he or she wants to view a program that aired on Monday; if the user did not enable PTAT for that night, the recording does not exist.  The PTAT recording also differs from VOD insofar as it resides on the user's local DVR and is not transmitted from a remote supplier's library of collected works.  Accordingly, the Court finds that the current record does not support a likelihood of success on the merits of Fox's claim that AutoHop breaches the 2010 Letter Agreement.  Because none of the parties' agreements purport to limit fast-forwarding on DVR recordings, and because the Court has found that PTAT is more akin to DVR than to VOD, the Court cannot find that AutoHop violates the VOD provisions of the 2010 Agreement.  *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d at 357 ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole.") (internal quotation omitted).

**B.**   **Fox Has Not Established That It Will Suffer Irreparable Harm As a Result of the QA Copies**

Although historically a showing of a reasonable likelihood of success on a copyright infringement claim raised a presumption of irreparable harm, that presumption no longer exists.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) (rejecting the rule that "an injunction automatically follows a determination that a copyright has been infringed" and finding

---

[17] That former Dish attorney, Max Gratton, represented PTAT as VOD in Dish's trademark "Intent to Use" application on February 4, 2011, does not alter the Court's finding.  *See* Singer Decl., ¶ 28, Exh. F at 207 [Doc. # 41-2].  As the above analysis demonstrates, the exact meaning of the term "VOD" is subject to reasonable dispute.  The Court's conclusion in this regard is based on PTAT's actual characteristics and functionality, not on how PTAT has been described in the media or otherwise.

1  that the circuit court's application of that "categorical rule" to grant an injunction was

2  improper); *see also Winter*, 555 U.S. at 22 (emphasizing that a party seeking a

3  preliminary injunction must demonstrate that irreparable injury is *likely*); *Flexible*

4  *Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995-996 (9th Cir. 2011)

5  ("presuming irreparable harm in a copyright infringement case is inconsistent with, and

6  disapproved by, the Supreme Court's opinions in *eBay* and *Winter*").  Therefore, Fox

7  must make an independent showing that it is likely to suffer irreparable harm as a result

8  of the infringement via the QA copies if an injunction does not issue.  *See Flexible*

9  *Lifeline*, 654 F.3d at 998.

10  Fox has demonstrated a likelihood of success on the merits of its claims that

11  AutoHop's QA copies infringe its exclusive reproduction right and breach the anti-

12  copying terms of the RTC Agreement.  Importantly, as discussed above, neither the

13  marking announcements nor the ad-skipping effect of AutoHop implicates any copyright

14  interest or breach of contract on the current record.[18]  Therefore, Fox must establish that it

15  faces a likelihood of irreparable harm if Dish is not enjoined from making and using the

16  QA copies.

17  As discussed above, *see* § III.A.2.b.ii.d., *supra*, the record shows that the QA

18  copies have an inherent value for which other providers pay through licensing agreements

19  with Fox.  *See* Singer Decl., ¶ 34, Exh. G ("[T]he networks' growing willingness to offer

20  their content on . . . Hulu and iTunes . . . makes the programming that Dish is paying for

21  less valuable, Shull said, and that was one of the reasons that it pushed its AutoHop

22  device.").  By making the copies without such a licensing agreement, Dish has reserved

23  for itself the benefits that flow from the copies, in this case, the functioning of AutoHop,

24

_____

25  [18] Fox does not argue that ad-skipping, standing alone, constitutes copyright infringement, and

26  the Court cannot find any case that has addressed such a technology.  *Cf. Paramount Pictures Corp. v.*
*ReplayTV*, 298 F. Supp. 2d 921, 927 (C.D. Cal 2004) (dismissing declaratory suit by private users of

27  DVR with commercial-skipping technology after copyright owners signed a covenant not to sue on that
basis).  Moreover, the Court is persuaded that, to the extent ad-skipping may implicate any copyright

28  concerns, Dish is not liable for that potential infringement under *Sony*, 544 U.S. at 455-56.

while depriving Fox of its ability to negotiate terms and cost of use in a licensing agreement for those copies. *See Campbell*, 510 U.S. at 592 (explaining that the relevant market for potential derivative uses "includes only those that creators of original works would in general *develop or license others to develop*") (emphasis added). Accordingly, the Court finds that, on the current record, Dish's impermissible copying of the Fox Programs causes Fox some degree of harm.

An injunction will not issue, however, unless the record establishes that this harm is irreparable. *See Perfect 10, Inc. v. Amazon.com*, 508 F.3d at 1158. Economic injury alone will not support a finding of irreparable harm because it can generally be remedied by money damages. *See Pyro Speculators North, Inc. v Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal, 2012) (citing *Rent-A-Center, Inc.*, 944 F.2d at 603). Although "intangible injuries, such as damages to ongoing recruitment efforts and goodwill, qualify as irreparable harm," *id.*, the current record does not support a finding of such injuries. Instead, the record suggests that the extent of harm caused by the QA copies is calculable in money damages. The fact that Fox has licensing agreements with other companies shows that *copies* of the Fox Programs have a market value that other companies already pay in exchange for the right to use the copies. Although Fox has submitted evidence that some irreparable harms, such as loss of control over its copyrighted works and loss of advertising revenue, may stem from the ad-skipping use to which the QA copies are put, the record does not show that those harms flow from the QA copies themselves. *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1306 n.3 (C.D. Cal. 2007) (noting that the irreparable harm inquiry is dependent on "the harm suffered as a result of the defendant's allegedly unlawful actions"). Rather, if those harms were to materialize, they would be a result of the ad-skipping itself, which does not constitute any copyright or contract breach. Because the alleged harms that Fox will suffer as a result of the QA copies is essentially contractual in nature, the Court finds that the injury is compensable with money damages and does not support a finding of irreparable harm. *See Pyro Speculators*, 861 F. Supp. 2d at 1092.

Having determined that Fox has failed to establish that it is likely to suffer irreparable harm in the absence of an injunction, the Court need not determine whether the balance of hardships tips in Fox's favor or whether an injunction is in the public interest. *See Winter*, 55 U.S. at 20.

### IV.

### CONCLUSION

In light of the foregoing, Fox's Motion for Preliminary Injunction is **DENIED.** Given that this Order quotes from the parties' confidential agreements, which have been filed under seal, within five days from the date of this Order, the parties will meet and confer regarding which portions of this Order, if any, they propose to be redacted such that the Court may issue a redacted version of the Order. The parties shall file a joint report with the Court by no later than November 12, 2012 regarding the proposed redacted version of the Order.

**IT IS SO ORDERED**.

DATED:     November 7, 2012

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE