JENNER & BLOCK LLP
Richard L. Stone (Bar No. 110022)
Andrew J. Thomas (Bar No. 159533)
David R. Singer (Bar No. 204699)
Amy M. Gallegos (Bar No. 211379)
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
rstone@jenner.com
dsinger@jenner.com
ajthomas@jenner.com
agallegos@jenner.com
(213) 239-5100

Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C. *et al.*,<br><br>              Defendants. | Case No.  CV-12-04529 DMG (SHx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST DISH'S NEW 2013 SERVICES**<br><br>Hearing Date:    March 22, 2013<br>Hearing Time:    2:00 p.m.<br>Courtroom:       7 (2nd Floor)<br><br>**[PUBLICLY REDACTED]** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................1

II.    FACTUAL BACKGROUND .....................................................................5

    A.     Fox's License Agreement With Dish Prohibits Internet
        Retransmission. ................................................................................5

    B.     Dish Is Openly Retransmitting Fox's Signal Over The
        Internet .............................................................................................5

    C.     The RTC Agreement Bars Dish From Authorizing The
        Copying Of Fox Programs For Viewing Outside The Home. .............8

    D.     With Hopper Transfers, Dish Is Authorizing Its Subscribers To Copy
        Programs For Use Outside The Home. ……………………………9

III.   FOX IS ENTITLED TO A PRELIMINARY INJUNCTION........................9

    A.     Fox Will Succeed On Its Breach Of Contract Claims .......................10

        1.     Dish Is Obviously Breaching The No-Internet Clause.............10

        2.     Dish Is Obviously Breaching The No-Copying Clause...........11

    B.     Fox Will Succeed On Its Copyright Infringement Claim ..................12

        1.     Dish Is Infringing The Public Performance Right...................12

        2.     Dish Cannot Claim Its Subscribers Are "Doing"
            The Transmitting....................................................................13

        3.     Dish Cannot Claim Its Internet Retransmissions Are
            Private ...................................................................................14

        4.     Dish Is Exceeding The Scope Of Its License ...........................15

        5.     Fox Was Not Obligated To Sue In 2005 In Order To
            Prevent Dish From Trampling On Its Rights In 2013 .............16

    C.     Fox Will Suffer Irreparable Harm Absent An Injunction...................17

    D.     The Balance Of Harms Decidedly Favors An Injunction...................21

    E.     The Public Interest Favors An Injunction.........................................21

IV.    CONCLUSION ........................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C. Aukerman Co. v. R.I. Chaides Constr. Co.,*
   960 F.2d 1020 (Fed. Cir. 1992) ...........................................................16

*Alliance for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................................10

*Cadence Design Sys., Inc. v. Avant! Corp.,*
   125 F.3d 824 (9th Cir. 1997) ..............................................................21

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003)............................................................................21

*Fox Television Stations, Inc. v. BarryDriller Content Systems,*
   PLC, --- F. Supp. 2d ---, 2012 WL 6784498 (C.D. Cal. 2012) .................passim

*John Goyak & Assocs. v. Terhune,*
   299 F. App'x 739 (9th Cir. 2008) ........................................................10

*Lotus Dev. Corp. v. Borland Int'l, Inc.,*
   831 F. Supp. 202 (D. Mass. 1993)........................................................17

*MDY Indus., LLC v. Blizzard Entm't, Inc.,*
   629 F.3d 928 (9th Cir. 2010) ..............................................................10

*Novell, Inc. v. Unicom Sales, Inc.,*
   2004 WL 1839117 (N.D. Cal. 2004)....................................................16

*On Command Video Corporation v. Columbia Pictures Indus.,*
   777 F. Supp. 787 (N.D. Cal. 1991)...................................................... 14

*Rent-a-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,*
   944 F.2d 597 (9th Cir. 1991) ..............................................................10

*Sun Microsystems, Inc. v. Microsoft Corp.,*
   188 F.3d 1115 (9th Cir. 1999) ............................................................15

*Triad Sys. Corp. v. Se. Express Co.,*
   64 F.3d 1330 (9th Cir. 1995) ..............................................................21

*Warner Bros. Entm't v. WTV Systems, Inc.,*
  824 F. Supp. 2d 1003 (C.D. Cal. 2011) ......................................................passim

*Winter v. Natural Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ................................................................................... 10

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co. Ltd.,*
  339 F.3d 101 (2d Cir. 2003) ................................................................ 10

*WPIX, Inc. v. ivi, Inc.,*
  691 F.3d 275 (2d Cir. 2012) ...........................................................passim

**STATUTES**

17 U.S.C. § 101 ..............................................................................12

17 U.S.C. § 106(4) ..........................................................................12

**OTHER AUTHORITIES**

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A] (2012) ................15

# I. Introduction

This motion asks the Court to issue a preliminary injunction enjoining Dish from retransmitting Fox's live broadcast signal over the Internet to its subscribers' PCs and mobile devices via its brand new, second-generation Hopper set-top box. It also asks the Court to issue a preliminary injunction enjoining Dish from offering its Hopper Transfers feature, which allows subscribers to copy recorded programs from their DVRs to iPads, so that they can be viewed "on the go." Both of these services breach Dish's license agreement with Fox, and Dish's Internet retransmission service also independently infringes Fox's copyrights.

As acknowledged in the RTC Agreement, Fox has not conveyed any ownership interest in its programming to Dish. Rather, Dish's license agreement with Fox gives Dish only the limited right to retransmit Fox's live broadcast signal over Dish's satellite television distribution system. It explicitly prohibits Dish from retransmitting or authorizing anyone to retransmit Fox's signal over the Internet. It also explicitly prohibits Dish from authorizing anyone to copy Fox's programming other than for private, *in-home use*. Paying Dish for a satellite television subscription does not buy anyone the right to receive Fox's live broadcast signal over the Internet or to make copies of Fox programs to watch "on the go," because Dish does not have the right to offer these services to its subscribers in the first place. Thus, any attempt by Dish to pitch this motion as an attack on consumers' purported "fair use rights" to watch content they paid for anywhere must fail.

Dish's license agreement with Fox could not be clearer that: ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[1]  Yet Dish is apparently now emboldened to ignore any terms in its license agreement

---

[1] Declaration of Michael Biard ("Biard Decl.") ¶ 20 and Ex. B.

1

1  that it finds inconvenient.  Just last month, amidst much fanfare at the Consumer

2  Electronics Show ("CES"), Dish unveiled "Dish Anywhere," a revamped mobile

3  access application that, according to Dish, allows subscribers with Dish's second-

4  generation Hopper set-top box to *"watch live and recorded television anywhere on*

5  *Internet-connected tablets, smartphones and PCs at no additional charge.*"[2]  Dish's

6  press release admits Dish is retransmitting live broadcast television signals over the

7  Internet.  It states that the new Hopper set-top box uses what Dish refers to as

8  "Sling technology" to *"encod[e] and redirect[] . . . [the] live . . . TV signal from the*

9  *Hopper to Internet-connected . . . tablets and smartphones.*"[3]

10      Moreover, the license agreement not only prohibits Dish from retransmitting

11  Fox's signal over the Internet, it *also* prohibits Dish from *"authoriz[ing] . . . the*

12  *. . . retransmission" of Fox's signal.*"[4]  So even if, contrary to the facts and

13  controlling law, Dish's subscribers were deemed to be retransmitting Fox's signal

14  to themselves, then Dish is plainly authorizing them to do it.  No matter how one

15  examines this issue, Dish is violating the express terms of its license agreement

16  with Fox.

17      In addition to being a breach of the license agreement, this is also copyright

18  infringement.  Two weeks before Dish announced its new service, another court in

19  this district confirmed in a published decision that retransmitting copyrighted

20  broadcast television over the Internet without permission is copyright infringement,

21  and enjoined another service from doing almost exactly what Dish is doing now.

22  *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, --- F. Supp. 2d ---,

23  2012 WL 6784498 at *2-5 (C.D. Cal. 2012) (Wu, J.).  Retransmitting copyrighted

24  broadcast television over the Internet without permission is copyright infringement

25  because it violates the copyright owner's exclusive right to publicly perform the

26  _____

27  [2] Declaration of David Singer ("Singer Decl.") ¶ 3 and Ex. A.

   [3] *Id.* (emphasis added).

28  [4] Biard Decl. ¶ 16, Ex. A .

1    programs, which are copyrighted works. *Id.* The company that provides the
2    service that retransmits live broadcast signals is publicly performing the
3    copyrighted works because it is transmitting the same work (i.e., an episode of a
4    television program such as *Glee* or *Bones*) to members of the public (i.e., people
5    who subscribe to the service). *Id.*

6         As in *BarryDriller*, this case is not about a product consumers are using; it is
7    about an Internet streaming service being provided by Dish to subscribers who pay
8    a monthly fee. The set-top box is just an instrumentality used to provide the
9    service. If a subscriber stops paying monthly subscription fees to Dish, she will no
10   longer be able to watch live television over the Internet on Dish Anywhere
11   regardless of how many Hopper set-top boxes she owns. Any purported right that
12   Dish believes consumers have to "place shift" live broadcast programming does not
13   apply here because Dish is not a consumer. It is not "consumer place-shifting"
14   when Dish retransmits Fox's signal over the Internet, in violation of its license
15   agreement, to get more people to subscribe to Dish Network. It is piracy.

16        This isn't Dish's only recent breach of the license agreement. At the same
17   time it announced its new Internet streaming service, Dish also launched a feature
18   called Hopper Transfers, which allows Dish subscribers to take programs they
19   recorded on their DVRs and copy those programs onto iPads. Once a program is
20   copied to an iPad, the subscriber can watch it on the iPad without being connected
21   to the Internet. Dish advertises Hopper Transfers as a way for subscribers to take
22   copies of programs "on the go" and watch them in places with no Internet
23   connection, such as an airplane.[5] Dish's license agreement with Fox prohibits Dish
24   from authorizing the copying of Fox programs "other than by consumers for private
25   home use."[6] Because the express, advertised purpose of Hopper Transfers is to
26   copy programs for use "on the go," such as on airplanes, which are necessarily uses

27   _____
     [5] Singer Decl. ¶ 4, Ex. B.
28   [6] Biard Decl. ¶ 16, Ex. A.

3

*outside the home*, the Hopper Transfers copies are not for "private home use." Thus, Dish is breaching its license agreement by authorizing subscribers to copy the programs for a use that is not a private home use.

Dish will argue that subscribers with Dish subscriptions have the "right" to watch "their" programs anywhere. But Dish does not have an ownership right in the Fox programs, and so obviously it cannot convey any ownership right in the programs to its subscribers. Moreover, Dish's residential service agreement warns subscribers that "DISH Network provides Services to you solely for viewing, use, and enjoyment *in your private home*."[7] Fox granted Dish a limited right to retransmit Fox's signal over its satellite system, and Dish grants its subscribers the limited right to watch the programs retransmitted by Dish in their private homes. That is all. There is no tenable argument that by paying Dish for satellite television service, Dish subscribers somehow acquired the additional right to copy Fox Programs onto iPads in order to view them outside the home.

Fox will be irreparably harmed if Dish is not enjoined. Courts have repeatedly held that streaming live broadcast television over the Internet without authorization – what Dish is doing here – irreparably harms the broadcaster. For example, in *BarryDriller*, Judge Wu found that the defendants' illegal streaming service would irreparably harm Fox's relationships and negotiations with advertisers, and with licensees who have to compete with the unauthorized streaming service, and would compete with Fox's own Internet distribution channels. 2012 WL 6784498 at *6. And Hopper Transfers will, among other things, irreparably harm Fox's relationships with authorized digital download services that now must compete with Hopper Transfers. Fox is entitled to a preliminary injunction.

---

[7] Singer Decl. ¶ 18, Ex. H.

1   **II. Factual Background**

2       **A.**    **Fox's License Agreement With Dish Prohibits Internet**

3                **Retransmission.**

4          As the Court is aware, Fox and Dish are parties to a July 1, 2002 license

5   agreement (the "Retransmission Consent" or "RTC" Agreement). Biard Decl. ¶ 14,

6   Ex. A. In a 2010 Amendment to the RTC Agreement, Dish unequivocally agreed

7   not to retransmit or distribute Fox's signal over the Internet. The 2010 Amendment

8   states:



16   *Id.* ¶ 20, Ex. B (emphasis added) (the "No-Internet Clause").

17          Dish also unequivocally agreed not to authorize *others* to retransmit Fox's

18   signal. The RTC Agreement states that Dish "shall not, for pay or otherwise, . . .

19   *authorize* the recording, copying, duplication (other than by consumers for private

20   *home* use) or *retransmission* of any portion any [Fox-owned] Station's Analog

21   Signal without prior written permission." Biard Decl. ¶¶ 14, 16, Ex. A.

22       **B.**    **Dish Is Openly Retransmitting Fox's Signal Over The Internet.**

23          On January 7, 2013 at CES in Las Vegas, Dish announced its new service for

24   streaming live broadcast television over the Internet, which it refers to as the "Dish

25   Anywhere Experience." The centerpiece of Dish Anywhere is the second

26   generation Hopper set-top box, called "Hopper with Sling." Singer Decl. ¶ 3, Ex.

27   A. Dish's January 7, 2013 press release says that subscribers will now be able to

28   "[w]atch live and recorded television anywhere on Internet-connected tablets,

smartphones and PCs at no additional charge using the Hopper's built-in Sling capabilities and the new Dish Anywhere app." *Id.* Ex. A.  According to Dish, the technology works by "encoding and redirecting . . . a live or recorded TV signal from the Hopper to Internet-connected iOS and Android tablets and smartphones." *Id.* This means Dish is retransmitting Fox's live broadcast signal over the Internet.

Television over the Internet or on a mobile device is not new and was not innovated by Dish.  Fox and its licensees offer a wide array of options for people who prefer to watch television programs online or on mobile devices.  Declaration of Sherry Brennan ("Brennan Decl.") ¶ 10. The percentage of people who watch television on PCs or mobile devices has historically been small.  Dish believes that because many people now have smartphones and/or tablets, demand for television "on the go" is on the verge of exploding – and Dish is not going to let its contractual obligations or copyright law prevent it from cashing in.  Rather than even attempt to negotiate a license for additional uses of Fox's programming, Dish has once again decided to misappropriate Fox's programming, use it to compete unfairly against Fox and legitimate licensees, and ask for forgiveness, not permission.

In a slew of over-the-top videos promoting Dish Anywhere, Dish executives patted themselves on the back for jumping on this hot new trend. *E.g.*, Singer Decl. ¶¶ 10-17, Lodged DVD, Videos 1-6.  For example, Dish CEO Joe Clayton opened one video by highlighting these recent changes in the marketplace:

> The average American family today – husband, wife, two kids – is rapidly moving beyond two or three televisions in the home to a household with TVs, plus four smartphones, four tablets, four PCs.  The consumer is demanding their video content anywhere.

*Id.* ¶ 11, Lodged DVD, Video 1.

1    In another video, Mr. Clayton emphasized: "the consumer is not making a
2    gradual shift to mobile – it's a full-blown sprint." Singer Decl. ¶ 17, Lodged DVD,
3    Video 6.   In yet another video, Dish's Vice-President of Product Management
4    Vivek Khemka bragged that Dish "s[aw] the trend to mobile and tablets" and
5    "wanted to take that experience from in your home and take it outside your home."
6    *Id.* ¶ 12, Lodged DVD, Video 2.

7    Though Dish had offered streaming devices before (including the standalone
8    Sling Adapter and a discontinued Sling-enabled DVR), they were niche products
9    that Mr. Clayton admitted Dish "really didn't tell a lot of people about."   Singer
10   Decl. ¶ 16, Lodged DVD, Video 5.  Now, Mr. Clayton explained, Dish is "trying to
11   commercialize our technology at a much higher level than we've done in the past."
12   *Id.*

13   In video after video, Dish emphasized that its new service was not the same
14   as previous streaming devices.  Instead, according to Dish, the second-generation
15   Hopper is "an amazing new product."  Singer Decl. ¶ 13, Lodged DVD, Video 2.
16   Mr. Clayton bragged that "this new Dish Anywhere capability is now much easier
17   to use" than Dish's earlier Sling devices.  *Id.* ¶ 11, Lodged DVD, Video 1.  Mr.
18   Khemka differentiated Dish's new service from other streaming services that
19   require "extra hardware," "separate apps," or are limited to "in-home viewing
20   only." *Id.* ¶ 15, Lodged DVD Video 4.  According to Mr. Khemka, Dish Anywhere
21   is better because it is "one app and very simple." *Id.*

22   Dish also intends to spend millions of dollars on nationwide advertising
23   hyping its new live-television-over-the-Internet offering.   At CES, Dish's Chief
24   Marketing Officer promised to "kick off a massive marketing campaign promoting
25   how the incredible platform continues to redefine the in-home, and the out-of-home
26   entertainment experience."  Singer Decl. ¶ 13, Lodged DVD, Video 2.  And in a
27   February 2013 press release announcing "the nationwide consumer availability of
28   its all-new Hopper with Sling," Dish confirmed that consumers "will be introduced

1    to the latest Hopper via a new multimillion-dollar national marketing campaign"
2    including "a series of television, radio, print and digital advertisements"
3    highlighting "the Hopper's new built-in Sling capabilities and the new Dish
4    Anywhere app." *Id.* ¶ 9, Ex. G.

5        **C.**    **The RTC Agreement Bars Dish From Authorizing The Copying**
6                **Of Fox Programs For Viewing Outside The Home.**

7          The RTC Agreement bars Dish from *authorizing* the recording of Fox
8    programs, other than by consumers for private *home* use:

9               EchoStar shall not, for pay or otherwise, record, copy,
10              duplicate and/or *authorize* the recording, copying,
11              duplication (other than by consumers for private *home*
12              use) or retransmission of any portion of any Station's
13              Analog Signal without prior written permission.

14   Biard Decl. ¶¶ 14, 16, Ex. A (the "No-Copying Clause") (emphasis added).

15         Consistent with its agreement with Fox, Dish's Residential Subscriber
16   Agreement makes clear that subscribers do not have the right to copy programs for
17   use outside their homes:

18              <u>Private Home Viewing Only</u>.  DISH Network provides
19              Services to you *solely for viewing, use and enjoyment in*
20              *your private home*.  You agree that no Services provided
21              to you will be viewed in areas open to the public,
22              commercial establishments or other residential locations.
23              Services may not be rebroadcast or performed, and
24              admission may not be charged for listening to or viewing
25              any Services.  *If your Services are viewed in an area open*
26              *to the public, a commercial establishment or another*
27              *residential location, we may disconnect your Services . . .*

28   Singer Decl. Ex. H (emphasis added).

1      **D.**    **With Hopper Transfers, Dish Is Authorizing Its Subscribers To**
2              **Copy Programs For Use Outside The Home.**

3      At CES, Dish also announced the launch of Hopper Transfers.  Hopper

4  Transfers is a feature that allows subscribers to copy recordings that are saved on

5  their DVRs to their iPads.  Singer Decl. Ex. B.  Once a new copy of a program is

6  saved locally to the subscriber's iPad, the subscriber can watch it even if she is

7  someplace there is no Internet connection, like an airplane.  In Dish's press release,

8  Mr. Khemka is quoted saying:

9          Hopper Transfers completes the TV Everywhere equation

10          by giving DISH customers the ability to *take their*

11          *recorded television programs and watch them even when*

12          *no Internet connection is available, such as on a plane* . . .

13          . For the first time, customers can truly enjoy their DISH

14          service anytime, *anywhere.*

15  *Id.* (emphasis added).

16      Likewise, Dish's website advertises that with Hopper Transfers you can

17  "simply transfer your recorded TV programs to your iPad with our free app *before*

18  *you leave the house* and *you can enjoy your favorite movies or shows on flights or*

19  *keep your kids entertained during a long road trip*."  *Id.* Ex. C (emphasis added).  A

20  person who has left the house and is watching a copy of a Fox program on an

21  airplane or on a long road trip is, by definition, *not at home*.  Thus, the copy Dish is

22  authorizing that person to make with Hopper Transfers is not limited to "private

23  home use," as the No-Copying Clause requires.

24  **III.  Fox is Entitled To A Preliminary Injunction**.

25      Fox is entitled to a preliminary injunction if it establishes that it "is likely to

26  succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of

27  preliminary relief, that the balance of equities tips in [its] favor, and that an

28  injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555

1    U.S. 7, 20 (2008).   Alternatively, an injunction should issue if Fox can show

2    "serious questions going to the merits" and a "balance of hardships that tips sharply

3    towards the plaintiff," so long as Fox "also shows that there is a likelihood of

4    irreparable injury and that the injunction is in the public interest."   *See Alliance for*

5    *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

6        These standards apply to injunction motions based on copyright or breach of

7    contract claims.   *See, e.g.*, *Warner Bros. Entm't v. WTV Sys., Inc.*,  824 F. Supp. 2d

8    1003, 1008 (C.D. Cal. 2011) (copyright); *John Goyak & Assocs. v. Terhune*, 299 F.

9    App'x 739, 740 (9th Cir. 2008) (contract).   There is no blanket rule against

10    enjoining a breach of contract.   To the contrary, a preliminary injunction is an

11    appropriate remedy where, as here, the breach will cause irreparable harm.   *Rent-a-*

12    *Center, Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th

13    Cir. 1991).   Moreover, the contract that Dish is breaching is governed by New York

14    law, which permits injunctive relief for breach-of-contract claims.   *Wisdom Import*

15    *Sales Co., L.L.C. v. Labatt Brewing Co. Ltd.*, 339 F.3d 101, 107-08, 115 (2d Cir.

16    2003).

17    **A.**     **Fox Will Succeed On Its Breach Of Contract Claims.**

18        **1.**     **Dish Is Obviously Breaching The No-Internet Clause.**

19    As noted above, the No-Internet Clause bars Dish from █████████████

20    ██████████████████████████████████████████████████

21    ██████████████████████████████████████████████████

22    ██████████████████████████████ " Biard Decl. ¶ 20, Ex. B.

23        Dish admits it is retransmitting Fox's signal over the Internet and by means

24    of wireless or cellular technology to cell phones and tablets.   *See* Singer Decl.

25    Ex. A (Dish admitting that its technology works by "encoding and redirecting . . . a

26    live or recorded TV signal from the Hopper to Internet-connected iOS and Android

27    tablets and smartphones.").

28

1    Dish cannot take refuge in the part of the No-Internet Clause stating that

2    ███████████████████████████████████████████████████████████

3    Biard Decl. Ex: B.  Dish has no "right" to retransmit Fox's signal over the Internet

4    without authorization from Fox.    *BarryDriller*, 2012 WL 6784498 at *2-5

5    (enjoining service that streamed live broadcast television signals over the Internet

6    without authorization); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278-79 (2d

7    Cir. 2012) (same).   Nor can Dish excuse its infringement by claiming that its

8    subscribers are really the ones doing the retransmitting from their set top boxes.

9    Although wrong as a matter of law, even if that were accepted arguendo, then it just

10   means that Dish is breaching the provision of the license agreement that bars Dish

11   from authorizing others to retransmit Fox's signal.  Biard Decl. Ex. A.

12         **2.    Dish Is Obviously Breaching The No-Copying Clause.**

13   The No-Copying Clause bars Dish from *authorizing* subscribers to copy Fox

14   Programs, except for private home use.  Biard Decl. Ex. A.  Dish is authorizing

15   subscribers to copy Fox programs to their iPads using Hopper Transfers.  *See*

16   Singer Decl. Ex. F (explaining how Hopper Transfers copies programs).  As noted

17   above, the express, advertised purpose of Hopper Transfers is to allow subscribers

18   to make copies for use *outside the home*.  Accordingly, Dish is breaching the No-

19   Copying Clause.

20   Dish has suggested in the media that consumers who pay for Dish

21   subscriptions own the programs they receive, and therefore have the right to copy

22   them onto mobile devices to watch outside the home.  This is wrong.  The license

23   agreement between Fox and Dish makes clear that Dish does not have any

24   ownership right in the programming.    Biard Decl. ¶ 15, Ex. A ████████

25   ███████████████████████████████████████████████████████████

26   ███████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████ (emphasis

28   added).   Therefore, legally, Dish cannot convey any ownership right to its

1   subscribers. And Dish's Residential Customer Agreement, which warns subscribers

2   that Dish's satellite service provides programming *"solely for viewing, use and*

3   *enjoyment in your private home,"* shows that Dish knows perfectly well that the

4   only thing it can offer its subscribers with respect to Fox's signal is the right to

5   watch Fox programming at home.   *See* Singer Decl. Ex. H (emphasis added).

6   Regardless of what Dish is claiming in the media or saying in its advertisements,

7   paying Dish for a subscription does not buy consumers copies of Fox programs that

8   they can take "on the go" and watch "anywhere."

9       **B.**    **Fox Will Succeed On Its Copyright Infringement Claim.**

10           **1.**    **Dish Is Infringing The Public Performance Right.**

11       As a copyright owner, Fox has the exclusive right to perform its copyrighted

12   work publicly.[8]   17 U.S.C. § 106(4).   In the case of an audiovisual work like a

13   television show, to "perform" the work means "to show its images in any sequence

14   or to make the sounds accompanying it audible."   17 U.S.C. § 101.   As is relevant

15   here, to perform a work "publicly" means to "transmit or otherwise communicate a

16   performance of the work . . . to the public, by means of any device or process."   *Id.*

17       A service that retransmits live broadcast television signals to subscribers over

18   the Internet is publicly performing the programs contained in the signal.   *ivi*, 691

19   F.3d at 278; *BarryDriller*, 2012 WL 6784498 at \*2-5; *see also WTV Sys.*, 824 F.

20   Supp. 2d at 1008-09 (streaming movies to subscribers over the Internet is a public

21   performance).   In *BarryDriller*, Judge Wu explained why this is.   The Copyright

22   Act protects copyrighted works, such as episodes of copyrighted television

23   programs.   *BarryDriller*, 2012 WL 6784498 at \*4.   When a broadcast signal is

24   retransmitted over the Internet so that the programs contained in that signal can be

25   viewed by members of the public, this is a public performance.   *Id.*; *see also WTV*

26   *Sys.*, 824 F. Supp. 2d at 1010.   Thus, if a service streams live broadcast

27   _____

28   [8] Fox owns valid copyrights in the programs at issue.  *See* Brennan Decl. ¶¶ 2-3, Ex. A.

1   programming over the Internet into homes or to mobile devices without permission

2   from the company that owns the copyrights to the programs, the service is

3   infringing the copyright owner's exclusive right to perform its works publicly.

4   *E.g.*, *ivi*, 691 F.3d at 278-79; *BarryDriller*, 2012 WL 6784498 at *2; *see also WTV*

5   *Sys.*, 824 F. Supp. 2d at 1009.

6         Because Dish is undisputedly retransmitting Fox's live broadcast signal over

7   the Internet without Fox's permission, it is committing copyright infringement. *See*

8   Singer Decl. Ex. A (Dish admitting it is offering live broadcast programming over

9   the Internet); *BarryDriller*, 2012 WL 6784498 at *2-4 (holding that retransmitting

10  live broadcast programming over the Internet without permission is copyright

11  infringement, and enjoining the defendant's Internet television service).

12             **2.**    **Dish Cannot Claim Its Subscribers Are "Doing" The**

13                   **Transmitting.**

14         Dish will argue that, under *Cartoon Network LP, LLLP v. CSC Holdings,*

15  *Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), it cannot be a direct infringer

16  because its subscribers are actually the ones who "do" the retransmitting when they

17  log onto Dish Anywhere and select programs to view live.  Dish will claim that

18  under *Cablevision*'s "volitional conduct" rule, the subscriber who presses the

19  button to watch a Fox program live over the Internet is the one who is

20  retransmitting Fox's broadcast signal. This argument fails.

21         It is well-settled in this circuit that when the issue is the public performance

22  right, it does not matter who presses the button.  Multiple courts have held that

23  when a service delivers video content over a wire (such as the Internet) that

24  consumers can access by turning on a device (such as a computer) and selecting

25  something to watch, the service – not the consumer – is doing the transmitting. Just

26  because a consumer must press a button to turn on the device and/or select

27  something to watch does not mean that she is transmitting the program to herself.

28  *See WTV Sys.*, 824 F. Supp. 2d at 1009-1010 (service that streamed movies over the

1   Internet to subscribers' computers was transmitting the movies, and the fact that its

2   customers "initiate the transmission by turning on their computers and choosing

3   which of plaintiffs' [c]opyrighted [w]orks they want to watch is immaterial");

4   *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 789-90

5   (N.D. Cal. 1991) (system that transmitted movies from a central VCR to hotel room

6   televisions was transmitting the movies, and "the fact that hotel guests initiate this

7   transmission by turning on the television and choosing a video is immaterial"); *see*

8   *also BarryDriller*, 2012 WL 6784498 at *1-2 (where defendants retransmitted

9   broadcast programming via miniature antennas individually assigned to subscribers,

10  court gave no credence to defendants' characterization of the system as merely

11  offering "user-directed private viewing[s]").  The Court should reject out of hand

12  any attempt by Dish to claim that it cannot be directly liable for violating Fox's

13  exclusive public performance rights because its subscribers are allegedly doing the

14  transmitting.[9]

15       **3.    Dish Cannot Claim Its Internet Retransmissions Are "Private."**

16       Dish will also argue that it is not publicly performing the Fox programs

17  because its Internet retransmissions must be viewed as separate, private streams

18  from each user's set-top box to her computer or mobile device.   This is the

19  argument Judge Wu rejected in *BarryDriller*.

20       In *BarryDriller*, the defendants, like Dish here, offered a service that allowed

21  customers to watch live broadcast television over the Internet.  2012 WL 674498 at

22  *1-3.  The *BarryDriller* defendants argued that there was no public performance

23  because each customer watching television over the Internet was receiving a signal

24  streamed from her personal miniature antenna-and-DVR setup.   *Id*.   The only

25  difference between this case and *BarryDriller* is that the *BarryDriller* defendants

26  _____

27  [9]  In any event, as discussed above, authorizing others to retransmit Fox's
    programming over the Internet would still constitute a breach of the license

28  agreement.

1  used personal antennas, and Dish is using set-top boxes it leases to its subscribers.
2  In a carefully-reasoned published opinion, Judge Wu analyzed the language and
3  history of the Copyright Act and concluded that it did not matter how many
4  separate transmissions were involved or whether the transmissions came from
5  separate sources – if the service is transmitting a single copyrighted work (i.e., a
6  television program) to members of the public, then it is publicly performing that
7  work. *Id.* at *4.

8      Importantly, Judge Wu's analysis comports with the plain language of the
9  Copyright Act, which states that to perform a work publicly is to "transmit or
10 otherwise communicate a performance of the work . . . to the public, *by means of*
11 *any device or process.*" 17 U.S.C. § 101 (emphasis added).  Here, Dish is offering
12 a service where, for a monthly subscription fee, subscribers receive broadcast
13 television signals over the Internet.  The "device or process" Dish uses to transmit
14 those signals consists of Dish-provided set-top boxes that encode the television
15 signals and send them over the Internet.  By means of this "device or process," Dish
16 is transmitting copyrighted Fox programs to its subscribers, who are members of
17 the public.  And, as Judge Wu explained, "[t]he statute provides that the right to
18 transmit is exclusive 'whether the members of the public capable of receiving the
19 performance or display receive it in the same place or in separate places and at the
20 same time or at different times.'" *Id.* at *4 (quoting 17 U.S.C. § 101).  Accordingly,
21 Dish is publicly performing the programs.

22          **4.    Dish Is Exceeding The Scope Of Its License.**

23      Because Dish's license agreement prohibits Internet retransmission, and
24 prohibits Dish from authorizing others to retransmit Fox's signal, Dish is infringing
25 Fox's copyrights by exceeding the scope of its license.  *Sun Microsystems, Inc. v.*
26 *Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) ("[i]f . . . a license is limited
27 in scope and the licensee acts outside the scope, the licensor can bring an action for
28 copyright infringement"); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*

1   § 10.15[A] (2012) (same); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928,

2   939-41 (9th Cir. 2010) (breach of contractual conditions that limit scope of license

3   is copyright infringement).

4        **5.**     **Fox Was Not Obligated To Sue In 2005 In Order To Prevent**

5            **Dish From Trampling On Its Rights In 2013.**

6        Finally, Dish previously has suggested that Fox is not entitled to enforce its

7   right to prevent Dish from streaming Fox programs because "Sling technology" has

8   existed since 2005. *See* Dkt. 71, p. 7 n.4 (Dish Opp. to Fox's Motion for a

9   Preliminary Injunction). But until Dish unveiled Dish Anywhere last month, and

10   announced a national, multimillion-dollar marketing blitz directed at putting its new

11   Sling-enabled Hopper in millions of homes, Sling was a niche product that Dish

12   admits it barely marketed. *See, e.g.*, Singer Decl. ¶ 16, Lodged DVD, Video 5 (Mr.

13   Clayton, Dish's CEO, publicly conceding that Dish "really didn't tell a lot of

14   people" about Sling, and explaining that, with Dish Anywhere, "we're trying to

15   commercialize our technology at a much higher level than we've done in the past").

16   As of late 2012, less than ██████ of Dish subscribers were using Dish's earlier (now

17   apparently discontinued) version of a Sling-enabled DVR. *Id.* ¶ 21, Ex. K.

18        The fact that Fox did not race to court to stop a product that was not in

19   widespread use, was not catching on, and was not being aggressively marketed does

20   not mean that Fox now must sit helpless as Dish blankets the country with ads for

21   its new and improved unauthorized Internet streaming service. *See, e.g.*, *A.C.*

22   *Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992)

23   (patent owner who initially opted not to sue infringer because infringer was a small

24   business with limited resources was not barred from suing later when the infringer

25   because successful due to its continued infringement); *Novell, Inc. v. Unicom Sales,*

26   *Inc.*, No. 03-2785, 2004 WL 1839117, *5-6 (N.D. Cal. Aug. 17, 2004) (finding it

27   reasonable for the plaintiff "to defer bringing a lawsuit against Unicom until it

28   learned that the infringement was of a scope sufficient to justify the cost of the

1   litigation"); *Lotus Dev. Corp. v. Borland Int'l., Inc.*, 831 F. Supp. 202 (D. Mass.

2   1993), *rev'd on other grounds*, 49 F.3d 807 (1st Cir. 1995) ("delay to determine

3   whether the scope of proposed infringement will justify the cost of litigation may

4   be permissible.").

5         **B.**    **Fox Will Suffer Irreparable Harm Absent An Injunction.**

6         In the past two years, at least three separate courts – including two courts in

7   this district and the Second Circuit Court of Appeals – have considered the question

8   of whether a copyright owner is irreparably harmed when a service provider

9   streams its video content over the Internet without authorization. All three said yes.

10   *See ivi*, 691 F.3d at 285-86 (broadcast networks would be irreparably harmed by

11   unauthorized Internet streaming service); *BarryDriller*, 2012 WL 6784498 at *6

12   (same); *WTV Sys.*, 824 F. Supp. 2d at 1012 (movie studio plaintiffs would be

13   irreparably harmed by unauthorized service that streamed movies over the Internet).

14   This case is no different.

15         In copyright cases, irreparable harm is established where an infringing

16   defendant's activities threaten to impair a copyright owner's control over its

17   copyrighted works, threaten the goodwill and business reputation of the plaintiff, or

18   threaten to cause loss of business or business opportunities. *See*, *e.g.*, *ivi*, 691 F.3d

19   at 285-87; *BarryDriller*, 2012 WL 6784498 at *6; *WTV Sys.*, 824 F. Supp. 2d at

20   1012-13. As further detailed in the accompanying declaration of Sherry Brennan,

21   Dish's unauthorized Internet streaming of the Fox programs threatens to irreparably

22   harm Fox in at least the following ways, all of which have been recognized by

23   multiple courts to constitute irreparable harm.

24         ***First***, Dish's unauthorized streaming service will irreparably harm Fox's

25   relationships with other cable, satellite and telecommunications providers that

26   distribute Fox's signal, since these companies will now have to compete with Dish,

27   which is offering its subscribers an unlicensed streaming service. *See BarryDriller*,

28   2012 WL 6784498 at *6 (citing Sherry Brennan declaration and holding that Fox's

1   ability to negotiate favorable retransmission consent agreements will be irreparably

2   harmed by unauthorized Internet streaming service, because "existing and

3   prospective licensees will demand concessions to make up the loss of

4   viewership."); *ivi*, 691 F.3d at 285 (unauthorized streaming service would

5   irreparably harm broadcasters by devaluing the live programming and thereby

6   "undermining existing and prospective retransmission fees, negotiations and

7   agreements); *see also* Brennan Decl. ¶¶ 21-22.

8     ***Second***, Dish's unauthorized streaming service retransmits a large volume of

9   programming that Fox makes available (for next-day and later viewing) on its own

10   websites and through other Internet and mobile television offerings.  Brennan Decl.

11   ¶ 10.  In addition, Fox and NBC Universal have, as part of a joint venture (with

12   others) called Dyle.tv, launched their own mobile television application which

13   allows viewers to watch live broadcast programming on their mobile devices,

14   including iPads.  Brennan Decl. ¶ 23.  Fox has invested substantial financial

15   resources, marketing, demographic research, and goodwill into this emerging

16   market, all of which will be harmed by Dish's unauthorized, competing service.

17   *Id.*; *see also BarryDriller*, 2012 WL 6784498 at *6 (citing Sherry Brennan

18   Declaration and holding that Fox will be irreparably harmed by unauthorized

19   streaming service that unfairly competes with Fox's "proprietary internet

20   distribution websites and mobile applications"); *WTV Sys.*, 824 F. Supp. 2d at 1013

21   ("if customers watch the Copyrighted Works through Defendants' service instead

22   of the services of authorized licensees, it significantly decreases the amount of

23   revenue received by Plaintiffs and their licensees").

24     ***Third***, Hopper Transfers will cause unique injuries to Fox's relationships and

25   negotiations with companies like Amazon and iTunes that license the right to offer

26   digital downloads of Fox programs, which consumers can view on their mobile

27   devices without an Internet connection.  Brennan Decl. ¶ 24.  By offering a

28   competing service to its subscribers for free, Dish is devaluing the rights to Fox's

1   programming, which will negatively impact Fox's future negotiations with potential

2   licensees.   *Id.*; *see also BarryDriller*, 2012 WL 6784498 at \*6 (offering an

3   unauthorized service that is directly substitutable for the services offered by Fox's

4   legitimate licensees puts "pressure on those licensing relationships").

5          ***Fourth***, as the copyright owner, Fox has "the exclusive right to decide when,

6   where, to whom, and for how much [it] will authorize transmission of [its]

7   copyrighted works to the public." *WTV Sys.*, 824 F. Supp. 2d at 1013.   Fox

8   carefully orchestrates where and when its programs can be viewed, streamed,

9   downloaded and purchased in order to maximize consumer choice, broaden

10   exposure to the Fox Programs, and increase the size of each separate audience.

11   Brennan Decl. ¶¶ 9-11, 25-29.   Broadcast television is not analogous to a piece of

12   technology where a patent owner might license the same rights to all comers for a

13   set price.   The ability of a broadcaster to control the timing and manner in which its

14   programs are distributed is essential to the broadcast television business model,

15   because it is the way in which broadcasters generate multiple revenue streams from

16   their content.   *Id.* ¶¶ 25-29.   This maximizes the broadcaster's potential to recoup

17   the enormous, risky investment needed to produce high-quality television

18   programming.   *Id.*; *see also WTV Sys.*, 824 F. Supp. 2d at 1012 (finding irreparable

19   harm because unauthorized streaming service interfered with copyright owner's

20   right to control access to its content by granting licensees exclusive rights for

21   limited time periods, and explaining that unlawful service would harm plaintiffs'

22   relationships with its licensees, goodwill, and "overall ability to control the use and

23   transmission of their Copyrighted Works").

24          ***Fifth***, by retransmitting Fox's signal over the Internet and providing a service

25   that copies Fox programs to iPads, Dish is exposing Fox to increased piracy risks

26   (over and above the piracy already being committed by Dish).   Brennan Decl. ¶ 30.

27   Since Dish does not have the right to stream live Fox programming over the

28   Internet or create copies for iPads, Dish's contracts with Fox do not contain any

1    procedures or standards to protect Fox content from piracy when it is streamed or
2    copied in this fashion.  *Id.*  The increased risk of piracy caused by unauthorized
3    Internet streaming is yet another irreparable harm.  *WTV Sys.*, 824 F. Supp. 2d at
4    1013.

5          **Sixth**, Dish's unauthorized streaming service will undermine Fox's positions
6    in negotiations with television advertisers by siphoning viewers from traditional
7    distribution channels measured by Nielsen's "C3" ratings metric, which is the
8    measurement relied upon by advertisers in determining what to pay for advertising.
9    *See* Brennan Decl. ¶ 17.  This loss of measured viewers impacts both the value of
10   network advertising, and the willingness of major advertisers to invest in it.  *Id.*
11   ¶¶ 17-18.   Advertising is critical to Plaintiffs' ability to develop and acquire
12   programming.  *Id.* ¶ 19.  Indeed, "[b]roadcast television stations and networks earn
13   most of their revenues from advertising."  *ivi*, 691 F.3d at 285.   Given the
14   significance of advertising to network business models, the harm that unauthorized
15   streaming causes to broadcasters' ability to negotiate with advertisers has been
16   consistently recognized as irreparable.  *Id.*; *BarryDriller*, 2012 WL 6784498 at *6.

17         In *ivi*, the Second Circuit concluded, based on the multiple, irreparable harms
18   outlined above, that unauthorized Internet streaming of network broadcasts "would
19   drastically change the industry, to plaintiffs' detriment." *ivi*, 691 F.3d at 286.  The
20   Court explained:

21                The absence of a preliminary injunction would encourage
22                current and prospective retransmission rights holders, as
23                well as other Internet services, to follow ivi's lead in
24                retransmitting  plaintiffs'  copyrighted  programming
25                without  their  consent.    The  strength  of  plaintiffs'
26                negotiating platform and business model would decline.
27                The  quantity  and  quality  of  efforts  put  into  creating
28                television programming, retransmission and advertising

1          revenues, distribution models and schedules – all would
2          be adversely affected.   These harms would extend to
3          other copyright holders of television programming.
4          Continued live retransmission of copyrighted television
5          programming over the Internet without consent would
6          thus threaten to destabilize the entire industry.

7    *Id.*

8          All of this is true here too.  Dish's unauthorized streaming service threatens

9    Fox's intellectual property and its distribution and advertising models with

10   irreparable harm that is not compensable in damages, and it should be enjoined.

11         **D.     The Balance Of Harms Decidedly Favors An Injunction.**

12         Any claim by Dish that it will be harmed if it cannot continue retransmitting

13   Fox's live broadcast programming over the Internet should be disregarded.  Dish is

14   not supposed to be offering these services or offering Hopper Transfers in the first

15   place.  Not only that, Dish obviously assumed the risk that it would be enjoined

16   when it chose to launch an unauthorized Internet streaming service, and promote its

17   illegal service with a multimillion-dollar marketing blitz, *while it was already in*

18   *copyright litigation with Fox*.   The balance of harms weighs in favor of an

19   injunction. *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995)

20   (defendant "cannot complain of the harm that will befall it when properly forced to

21   desist from its infringing activities"); *see also Cadence Design Sys., Inc. v. Avant!*

22   *Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) (quoting *Triad Sys. Corp.*, 64 F.3d at

23   1338) ("[w]here the only hardship that the defendant will suffer is lost profits from

24   an activity which has been shown likely to be infringing, such an argument in

25   defense merits little equitable consideration").

26         **E.     The Public Interest Favors An Injunction**

27         The Supreme Court has made clear that upholding copyright protection is in

28   the public interest. *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003).   The *ivi*

1   court recently reaffirmed the strong public interest in protecting a copyright
2   holder's exclusive interests and a "public interest in rewarding and incentivizing
3   creative efforts."   691 F.3d at 287.   The "public has a compelling interest in
4   protecting copyright owners' marketable rights . . . and the economic incentive to
5   continue creating television programming" because, without these protections, the
6   "store of knowledge" may be diminished, and "encouraging the production of
7   creative work . . . ultimately serves the public's interest in promoting the
8   accessibility of such works."   *Id.*

9   In a holding directly applicable to this case, the *ivi* court concluded that
10   "Plaintiffs are copyright owners of some of the world's most recognized and
11   valuable television programming," concluded plaintiffs' works "provide[] a
12   valuable service to the public, including, *inter alia*, educational, historic and
13   cultural programming, entertainment, an important source of local news critical for
14   an informed electorate, and exposure to the arts," and cautioned that if their works
15   could be copied and streamed over the Internet against their will, their "desire to
16   create original television programming surely would be dampened."   *Id.* at 288.
17   Here, as in *ivi* and the other cases cited above where infringement has been
18   enjoined, the public interest strongly favors an injunction and protecting the
19   Plaintiffs' rights in their valuable television programming.

20   **IV.   Conclusion**

21   Fox respectfully requests that the Court grant its request for a preliminary
22   injunction, and enjoin Dish from (i) retransmitting, or authorizing its subscribers
23   to retransmit, Fox's live broadcast signal over the Internet; and (ii) authorizing its

24
25
26
27
28

subscribers to make copies of Fox programs for use outside the home through its Hopper Transfers feature.

DATED:  February 21, 2013                    JENNER & BLOCK LLP

                                             By:   /s/ _____
                                                       Richard L. Stone