WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California 90017
Tel: +1-213-629-2020 / Fax: +1-213-612-2499

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105-2669
Tel: +1-415-773-5700 / Fax: +1-415-773-5759

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
ELYSE D. ECHTMAN (*pro hac vice*)
eechtman@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019-6142
Tel: +1-212-506-5000 / Fax: +1-212-506-5151

MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL PAGE (SBN 154913)
mpage@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California 94111
Tel: +1-415-362-6666

Attorneys for Defendants DISH Network L.L.C.,
DISH Network Corp. and EchoStar Technologies
L.L.C.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C., *et al.*,<br><br>Defendants. | Case No. CV12-04529 DMG (SHx)<br><br>**[PUBLIC VERSION]**<br>**DISH'S OPPOSITION TO FOX'S MOTION FOR A PRELIMINARY INJUNCTION ON "DISH'S NEW 2013 SERVICES"** |

1

**TABLE OF CONTENTS**

2

**Page**

3 INTRODUCTION AND SUMMARY OF ARGUMENT ......................................... 1

4 STATEMENT OF FACTS .................................................................................... 3

  A. How Sling Technology Works ................................................................ 3

5  B. Sling's Critical And Commercial Success ............................................. 4

6  C. Hopper Transfers And Its Predecessors ............................................... 6

7  D. The Course Of Conduct Under The 2002 Agreement And
    Subsequent Negotiations Of The 2010 Agreement ............................... 7

8 ARGUMENT ...................................................................................................... 9

9 I. FOX IS NOT LIKELY TO SUCCEED ON ITS COPYRIGHT
   CLAIM ................................................................................................. 10

10  A. DISH Does Not "Perform" A Work When Subscribers Use
    Sling ............................................................................................ 11

11  B. DISH Anywhere/Sling Is Not A Public Performance ....................... 14

12  C. DISH Anywhere/Sling Is Fair Use ..................................................... 18

13   1. Sling Use Is Noncommercial And Transformative ................. 18

   2. Sling Transmissions By Subscribers Do Not Harm The
14     Value Of The Copyrighted Work .............................................. 20

  D. Fox's Copyright Claim Is Barred By Laches ..................................... 21
15

16 II. FOX IS NOT LIKELY TO SUCCEED ON ITS CONTRACT
   CLAIMS .............................................................................................. 23

17  A. DISH Anywhere/Sling Does Not Breach The Parties'
    Agreements ....................................................................................... 23

18  B. Hopper Transfers Does Not Breach The 2002 RTC Agreement ........ 27

19 III. THERE IS NO LIKELIHOOD OF IRREPARABLE HARM .................... 29

  A. Fox's Delay Precludes Any Notion Of Irreparable Harm ................. 29
20

21  B. Any Alleged Harm Is Compensable In Damages ............................... 30

  C. Fox's Claims of Harm Are Conclusory and Speculative .................. 32

22 IV. THE OTHER FACTORS ALSO FAVOR DISH ........................................ 34

  CONCLUSION ............................................................................................. 35
23

24

25

26

27

28

CV 12-04529-DMG(SHx)
DISH'S OPP. TO FOX'S MOT. FOR PRELIM. INJ. (2)

# TABLE OF AUTHORITIES

Page(s)

CASES

*A.V. v. iParadigms, LLC,*
    562 F.3d 630 (4th Cir. 2009)..................................................................... 19

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.,*
    694 F.3d 1312 (Fed. Cir. 2012).................................................................. 31

*American Passage Media Corp. v. Cass Commc'ns, Inc.,*
    750 F.2d 1470 (9th Cir. 1985).................................................................... 32

*American Broadcasting Cos., Inc. v. AEREO, Inc.,*
    874 F. Supp. 2d 373 (S.D.N.Y. 2012)............................................ 10, 15, 17

*Anderson v. United States,*
    612 F.2d 1112 (9th Cir. 1979).................................................................... 30

*Caribbean Marine Servs. Co. v. Baldridge,*
    844 F.2d 668 (9th Cir. 1988)...................................................................... 32

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
    536 F.3d 121 (2d Cir. 2008)...................................................... 12, 13, 15, 17

*Castle Rock Entm't v. Carol Publ'g Grp.,*
    150 F.3d 132 (2d Cir. 1998)....................................................................... 20

*Chicago United Indus., Ltd. v. City of Chicago,*
    445 F.3d 940 (7th Cir. 2006) ..................................................................... 31

*Cnty. of Suffolk v. Long Island Lighting Co.,*
    266 F.3d 131 (2d Cir. 2001)................................................................. 26, 27

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.,*
    866 F.2d 278 (9th Cir. 1989)................................................................*passim*

*CoStar Grp., Inc. v. LoopNet, Inc.,*
    373 F.3d 544 (4th Cir. 2004)...................................................................... 13

*Ctr. for Food Safety v. Schafer,*
    2010 WL 964017 (N.D. Cal. March 16, 2010) .......................................... 35

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001)................................................................21, 22

*Dotster, Inc. v. Internet Corp.*,
  296 F.Supp. 2d 1159 (C.D. Cal. 2003)..............................................29

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ........................................................................10, 33

*ExperExchange, Inc. v. Doculex, Inc.*,
  2009 WL 3837275 (N.D. Cal. Nov. 16, 2009)..................................22

*Fed. Ins. Co. v. Am. Ins. Co.*,
  258 A.D.2d 39 (N.Y. App. Div. 1st Dep't 1999)..................24, 26, 29

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
  654 F.3d 989 (9th Cir. 2011).......................................................29, 33

*Flynt Distrib. Co. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984).........................................................31

*Fox Broad. Co. v. DISH Network, L.L.C.*,
  __ F. Supp. 2d __, 2012 WL 5938563 (C.D. Cal. Nov. 7, 2012) ..............*passim*

*Fox Television Stations, Inc. v. BarryDriller Content System, PLC*,
  2012 WL 6784498 (C.D. Cal. Dec. 27, 2012) ...........................14, 17

*Fromson v. W. Litho Plate & Supply, Co.*,
  853 F.2d. 1568 (Fed. Cir. 1988), *overruled on other grounds,*........35

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d
  1337 (Fed. Cir. 2004) (en banc) .....................................................35

*Givemepower Corp. v. Pace Compumetrics, Inc.*,
  2007 WL 951350 (S.D. Cal. Mar. 23, 2007)...................................30

*GMC v. Harry Brown's LLC*,
  563 F.3d 312 (8th Cir. 2009)..........................................................35

*Green v. G. Heileman Brewing Co.*,
  755 F. Supp. 786 (N.D. Ill. 1991) ...................................................35

*Haas v. Leo Feist, Inc.*,
  234 F. 105 (S.D.N.Y. 1916) ............................................................22

- iii -

CV 12-04529-DMG(SHx)
DISH's Opp. to Fox's Mot. for Prelim. Inj. (2)

*Hansen Beverage Co. v. N2G Distib., Inc.,*
   2008 WL 5427602 (S.D. Cal. Dec. 30, 2008) ..................................................... 34

*Headwaters, Inc. v. Bureau of Land Mgmt.,*
   665 F. Supp. 873 (D. Or. 1987) .......................................................................... 35

*Hustler Magazine Inc. v. Moral Majority Inc.,*
   796 F.2d 1148 (9th Cir. 1986) ............................................................................ 20

*Jacobsen v. Katzer,*
   2009 WL 482302 (N.D. Cal. Dec. 10, 2009) ..................................................... 22

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*
   304 F.3d 829 (9th Cir. 2002) .............................................................................. 21

*Kelly v. Arriba Soft Corp.,*
   336 F.3d 811 (9th Cir. 2003) .............................................................................. 20

*Kerr Corp. v. North Am. Dental Wholesalers, Inc.,*
   2011 WL 2269991 (C.D. Cal. June 9, 2011) ..................................................... 30

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
   634 F.2d 1197 (9th Cir. 1980) ...................................................................... 31, 32

*Los Angeles News Serv. v. Reuters Television Int'l, Ltd.,*
   942 F. Supp. 1265 (C.D. Cal. 1996) ................................................................. 16

*LucasArts Entm't Co.v. Humongous Entm't Co.,*
   815 F. Supp. 332 (N.D. Cal. 1993) .................................................................... 34

*Mappa Music Co. v. Universal-Polygram Int'l Publ'g, Inc.,*
   2001 WL 1868083 (C.D. Cal. Dec. 17, 2001) .............................................. 22, 23

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir. 2009) .............................................................................. 30

*MercExchange, LLC v. eBay, Inc.,*
   500 F. Supp. 2d 556 (E.D. Va. 2007) ................................................................ 31

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.,*
   16 F.3d 1032 (9th Cir. 1994) .............................................................................. 35

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.,*
   762 F.2d 1374 (9th Cir. 1985) ............................................................................ 30

*On Command Video Corp. v. Columbia Pictures Indus.*,
   777 F. Supp. 787 (N.D. Cal. 1991) ....................................................... 14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007).............................................. 13, 14, 20

*Perfect 10, Inc. v. Google, Inc.*,
   653 F.3d 976 (9th Cir. 2011) ............................................................... 34

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
   55 F. Supp. 2d 1080 (S.D. Cal. 1999) ................................................ 30

*PlayMakers LLC v. ESPN, Inc.*,
   376 F.3d 894 (9th Cir. 2004) ............................................................... 34

*Polar Bear Prods., Inc. v. Timex Corp.*,
   384 F.3d 700 (9th Cir. 2004) ............................................................... 21

*Polymer Techs., Inc. v. Bridwell*,
   103 F.3d 970 (Fed. Cir. 1996) ............................................................ 31

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*,
   180 F.3d 1072 (9th Cir. 1999)....................................................passim

*S.O.S., Inc. v. Payday, Inc.*,
   886 F.2d 1081 (9th Cir. 1989) ............................................................ 21

*Sony Corp. of Am. v. Universal City Studios*,
   464 U.S. 417 (1984)  ............................................................... 18, 19, 20

*Stanley v. Univ. of S. Cal.*,
   13 F.3d 1313 (9th Cir. 1994) ............................................................... 31

*Sullivan v. Vallejo City Unified School Dist.*,
   731 F. Supp. 947 (E.D. Cal. 1990) ..................................................... 31

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
   __ F.3d __, 2013 U.S. App. LEXIS 5100 (9th Cir. Mar. 14, 2013) ........... 13, 14

*United States v. Bentson*,
   947 F.2d 1353 (9th Cir. 1991)............................................................. 11

*Valeo Intellectual Prop., Inc. v. Data Depth Corp.*,
   368 F. Supp. 2d 1121 (W.D. Wash. 2005) ......................................... 30

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
  824 F. Supp. 2d 1003 (C.D. Cal 2011)......................................................14, 17

*Watermark Publ'rs v. High Tech. Sys., Inc.*,
  1997 U.S. Dist. LEXIS 22512 (S.D. Cal. June 18, 1997)................................22

*Well Luck Co., Inc. v. F.C. Gerlach & Co., Inc.*,
  421 F. Supp. 2d 533 (E.D.N.Y. 2005)............................................................26

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...........................................................................9, 10, 29, 34

*Worldwide Church of God v. Phila. Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000)........................................................................21

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012) .....................................................................16, 17

STATE CASES

*Fed. Ins. Co. v. Am. Ins. Co.*,
  258 A.D.2d 39, 44 (N.Y. App. Div. 1999)..........................................24, 26, 29

STATUTES

17 U.S.C. § 101 .................................................................................................12, 15

17 U.S.C. § 106 ...................................................................................................1, 12

17 U.S.C. § 107 .................................................................................................18, 19

17 U.S.C. § 507 ........................................................................................................21

LEGISLATIVE REPORTS

*Satellite Home Viewer Extension and Reauthorization Act § 109*
  (June 30, 2008) .................................................................................2, 5, 10, 20

OTHER AUTHORITIES

Bryan A. Garner, Black's Law Dictionary 129 (7th ed. 1999)...............................24

Chicago Manual of Style § 5.22 (16th ed. 2010) ...................................................27

New Shorter Oxford English Dictionary 154 (5th ed. 1993) .................................24

1

2 Melvin B. Nimmer & David Nimmer, Nimmer on Copyright .....................*passim*

Webster's Third New Int'l Dictionary 1082 (1993)................................................. 27

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION AND SUMMARY OF ARGUMENT

In its latest preliminary injunction motion, Fox throws a lot of words at two features in DISH's next-generation Hopper DVR, called the "Hopper with Sling." Fox attacks DISH Anywhere and Hopper Transfers, two features that provide consumers the capability to enjoy network programming in places other than their living rooms.  Fox *says* DISH Anywhere violates copyright law and the parties' two retransmission consent agreements; Fox *says* that Hopper Transfers also violates one of those agreements.  But what did Fox actually *do* when DISH's predecessor first introduced the underlying technologies *seven years ago in 2005*?  Nothing. Fox slept while DISH and its competitors rolled out devices aimed at "space-shifting"—the ability to get away from the living room television and watch in other places.  *See Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999) (hereinafter, "*Diamond*") (equating space-shifting to time-shifting and calling it the "paradigmatic noncommercial use").

DISH Anywhere is based on "Sling" hardware and software.  Sling provides consumers, once they receive a broadcast signal in their homes, the capability to remotely view that signal from a single Internet-connected device.  Fox suddenly accuses seven-year-old Sling of violating its public performance right under Section 106(4) of the Copyright Act, and of breaching contracts.  But what did Fox tell the Second Circuit in November 2012?  The same law firm Fox hired to represent it here told that court the use of Sling "***would not be a public performance***."  Hurst Decl. Ex. 16 at 332-33.  And what did Fox executives say in their internal emails? "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"  *Id.* Ex. 29.  After signing the parties' 2010 Agreement, Fox and DISH issued a joint press release about that Agreement that included language touting the DISH ViP 922 DVR "with built-in Sling functionality."  Shull Decl. ¶21 & Ex. 2 at 67.  Fox News declared Sling a "legitimate" way to "watch any game" and repeatedly promoted Sling products— including in its January 2013 run-up to the Super Bowl.  Hurst Decl. Ex. 7.

And no wonder:  in 2008 the Copyright Office endorsed Sling, declaring that it made "existing licensed programming available to individuals for personal use in a controlled fashion and without the need for an additional license." *Id.* Ex. 2 at 220.  DISH does not infringe Fox's public performance right by providing the DISH Anywhere feature nor do the million other Sling-based devices already in consumers' homes.  Consumers—not DISH—make the transmissions using Sling. Those transmissions are private and controlled.  There is no infringement, the use is fair and in all events the seven-year-old copyright claim against Sling is barred by laches.  Part I, *infra*.

Neither of these space-shifting features breaches the parties' agreements. DISH does not "retransmit" or "copy" anything.  DISH does not "authorize" consumers to retransmit or copy.  Consumers do not "retransmit" as that term is used by the parties.  And, Fox expressly agreed that DISH could market devices consistent with "█████████████████"—namely, copyright law.  Since time-shifting and space-shifting are permitted under copyright law, there can be no breach.  Part II, *infra*.

Fox knew about this technology at all times.  Fox's knowing delay destroys the other necessary elements for a preliminary injunction.  Fox's inaction for the better part of a decade destroys any notion of irreparable harm, and its licenses in the meantime make clear that any damages for a purported breach of contract can be readily calculated.  Fox's knowing acquiescence while DISH spent hundreds of millions of dollars tips the balance of hardships decisively to DISH.  The public interest demands that the million consumers already in possession of Sling devices be permitted to enjoy this transformative technology.  Part III, *infra*.

Whether you look at actions *or* words, the result at the end of the day is the same:  Fox's latest motion fares no better than its last one.  It must be denied.

**STATEMENT OF FACTS**

A.   **How Sling Technology Works.**

Sling is "space-shifting" technology—it changes the place where a viewer can watch. *See Diamond*, 180 F.3d at 1079.  Using DISH Anywhere, which is based on Sling, children staying at their grandparents' house for the weekend can watch their home television on a smartphone, tablet, laptop or desktop computer. Alternatively, their parents, enjoying a weekend getaway, can do the same from their hotel room.

Sling Media, Inc. first introduced Sling technology in June 2005 with the launch of a product called Slingbox.  Kummer Decl. ¶8. The Slingbox, sold in retail outlets such as Best Buy and Amazon, connects to any audiovisual equipment, including TVs, set-top boxes, DVRs and DVD players.  *Id.*  When the associated software is loaded on an Internet-connected device, the consumer can remotely activate the Slingbox to view live or recorded content.  *Id.*

Sling technology involves both hardware and software.  *Id.* ¶16.  The hardware is a computer chip that "encodes" television content to a format that can be sent over the Internet.  *Id.*  For the Hopper with Sling, the encoder is built into the chip for the DVR.  *Id.*  The consumer also must then load the associated Sling software onto her personal computer, Internet-connected television, tablet or smart phone.  *Id.* ¶17; Horowitz Decl. ¶9.  The software creates a point-to-point connection through the Internet for the signal from the encoder chip in the home to the laptop or other mobile device.  Kummer Decl. ¶¶18-20; Horowitz Decl. ¶9. There are no central servers at DISH storing copies or routing signals.  Kummer Decl. ¶¶20-22.  The technology is entirely within the consumer's possession and control.  *Id*. ¶21.

The Sling technology is secure.  Before using it, a consumer must enter a password to verify that she has the right to access that particular Hopper with Sling—the same password a family uses for the entire DISH account.  *Id.* ¶24.

DISH Anywhere/Sling does not make or store copies of broadcast shows (although it can be used to remotely access the consumer's DVR recordings). *Id.*  It is for viewing only. *Id.*  Only a single receiving device can connect at a time. *Id.*  If that child staying at her grandparents' house for the weekend is watching the home television via DISH Anywhere/Sling on Saturday night, then her parents cannot watch from their hotel room at the same time.  A family cannot invite the entire neighborhood to log in and watch television with them.

DISH and Sling Media are not the only companies to offer space-shifting (also called "place-shifting") technology.  Vulkano from Monsoon Media, DirecTV Nomad, TiVo Stream, Sony's "LocationFree," and Elgato's "EyeTV" have all provided devices for the remote viewing of content.  Horowitz Decl. ¶¶11, 34-38. Even DISH's competitors have promoted Slingboxes—Time Warner offers a rebate to its New York City customers to subsidize purchase.  Khemka Decl. ¶7 & Ex. 2.

### B.    Sling's Critical And Commercial Success.

The Slingbox was not a secret, as Fox would have it.  Fox knew full well about Slingbox as early as 2005.  Hurst Decl. Exs. 17-20. ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. Ex. 21 at 412.  In January 2007, Slingbox won an Emmy in the category of Technology and Engineering, and it subsequently received numerous other awards.  Kummer Decl. ¶9; Hurst Decl. Ex. 1.

DISH purchased Sling Media in October 2007 for $380 million.  Kummer Decl. ¶4.[1]  After the Sling purchase, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Hurst Decl. Ex. 27

---

[1] In 2008, DISH spun off EchoStar Corporation as a separate entity, Hurst Decl. Ex. 8; Sling Media became part of EchoStar and is a subsidiary of EchoStar today. Kummer Decl. ¶4.

Meanwhile, in 2004, Congress had asked the Copyright Office for its view on whether the Copyright Act's existing scheme of compulsory statutory licenses was adequate to keep pace with emerging technology.  In 2007, the Office held hearings on the issue, in which content providers (like Disney) and their supporters (like the National Association of Broadcasters) participated.  *Id.* Ex. 1.  The office issued its report in 2008.  It concluded that, with respect to Internet-based technologies "such as Slingbox" that "make existing licensed programming available to individuals for personal use in a controlled fashion," the then-current licensing scheme was adequate.  *Id.* Ex. 2 at 220.  A television household had "no need for an additional license" to use Sling technology for remote television viewing.  *Id.*

In January 2009, DISH publicly announced at CES its ViP 922 DVR—the first "Slingloaded" DVR—which had the Sling hardware built inside.  Kummer Decl. ¶11 & Ex. 3.  The Slingloaded 922 won a "Best of CES Award" in the Home Video category.  *Id.* ¶11.  In November 2010, DISH introduced the Sling Adapter, a product similar to the Slingbox that DISH sold to its customers.  *Id.* ¶12.  The Sling Adapter connects to certain DISH DVRs to provide full Sling functionality.[2]  *Id.*; Horowitz Decl. ¶39.  Fox's internal documents show ████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████ Hurst Decl. Ex. 30.

In the nearly eight years since Slingbox came on the market, approximately ████████████████████████████████████████████████ Kummer Decl. ¶14.  In addition, DISH shipped ████████ ViP 922 DVRs with built-in Sling functionality.  *Id* ¶15.[3]  Fox News has been praising Sling's time-

---

[2] DISH customers have been able to use the Sling Adapter to add Sling functionality to their Hoppers since it was released in March 2012. Kummer Decl. ¶13.

[3] Fox argues that very few 922s are on the market, based on the number that are reporting in to EchoStar on a typical day via the internet.  MPA at 16.  The number of internet-connected boxes reporting in on a daily basis is not indicative of the number of 922 DVRs that DISH sold or that might currently be in use.  Kummer Decl. ¶15.

1    shifting and space-shifting capabilities for years.  Hurst Decl. Exs. 3-7.  Fox News

2    called Slingbox a "legitimate way" to "watch any show or game anywhere."  *Id.* Ex.

3    7.  In January 2013, during Fox's pre-game run-up to the Super Bowl, a Fox News

4    anchor suggested viewers use it for mobile watching.  "This is the Slingbox 350,"

5    he says, while cameras capture the device from various angles.  "Hook it up to your

6    home cable box, and you can watch [what's on your TV] on a tablet" or "other

7    screens."  *Id.* Ex. 6.

8               C.    **Hopper Transfers And Its Predecessors.**

9               With the Hopper Transfers feature, a DISH subscriber can move or duplicate

10   a Hopper DVR recording made by a subscriber to an iPad, and unlike DISH

11   Anywhere, no Internet connection is needed to watch it.  Kummer Decl. ¶25.

12   Consumers can mark their DVR recordings for Hopper Transfers either at the time

13   they first choose to make the recording, or later.  *Id.* ¶27.  It is a time consuming

14   process to make the iPad-compatible copy.  *Id.*  The consumer must link and

15   authenticate the iPad to the Hopper.  *Id.* ¶25.  Only a single copy of the DVR

16   recording can then be transferred to an iPad.  *Id.* ¶28.

17              This is nothing new.  From the beginning of time-shifting, consumers have

18   taken their Betamax and VHS tapes out of the house, to a friend's house or on

19   vacation.  Horowitz Decl. ¶46.  With home-recorded DVDs, consumers can carry

20   their recordings onto airplanes and commuter trains for playback on a laptop or

21   portable DVD player.  *Id.* ¶47.  Many cars driving along the highway have children

22   in the back seat watching DVDs on built-in players.  *Id.* ¶48.  A Hopper Transfer

23   recording is no different.  Fox's website acknowledges the portability of recordings

24   and, since at least 2006, has continuously encouraged sharing outside the home:

25               You could find a co-worker, friend, family or neighbor
             who may have made an analog tape or a digital copy (on a
26           DVD or DVR) of the show off-the-air so they could
             watch it later.  You could watch it with them (go on,
27           invite yourself over!) or maybe they will let you borrow
             their tape or DVD if you promise to return it.
28

---

- 6 -

Hurst Decl. Ex. 9; *see also id.* Ex. 10 at 297-98.

Prior to Hopper Transfers, from 2005 to 2007, DISH offered similar technology in the form of a product called PocketDISH.  Kummer Decl. ¶¶29-31. The PocketDISH is a handheld viewing device that a customer connects with a cable to a DVR to transfer recordings for mobile viewing.  *Id.* ¶29; Horowitz Decl. ¶53.  DISH rolled out PocketDISH with a big splash, and Fox knew all about it— acknowledging that it was an ██████████████████████████████ Hurst Decl. Ex. 25 at 433.  ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████████" *Id.* Ex. 21 at 409.  ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████ *Id.*

More recently, DirecTV and TiVo beat DISH to the market with technology to transfer DVR recordings to mobile devices such as iPads and iPods.  DirecTV offers Nomad, which provides customers the capability to transfer DVR content to as many as five devices.  Horowitz Decl. ¶52.  TiVo offers TiVo Desktop Plus (TiVo ToGo) for iPads, as well as TiVo Desktop, which facilitates transfer of a DVR recording to a DVD.  *Id.* ¶14; Rapp Decl. ¶15.  Consumer software facilitates copying of DVR recordings to iPads.  Horowitz Decl. ¶¶49-50.

**D.**     **The Course Of Conduct Under The 2002 Agreement And Subsequent Negotiations Of The 2010 Agreement.**

Fox claims that DISH Anywhere/Sling and Hopper Transfers breach what it calls the "No Copy" provision of the 2002 Agreement:

CV 12-04529-DMG(SHx)
DISH'S OPP. TO FOX'S MOT. FOR PRELIM. INJ. (2)

1 ████████████████████████████████

2 ████

3 Shull Decl. Ex. 1 at 14; *see* MPA at 11-12.  Fox also argues that DISH breaches the

4 "Other Technologies" clause of the October 2010 Agreement.  MPA at 10-11.

5 ████████████████████████████████

6 ████████████████████████████████

7 ████████████████████████████████

8 ████████████████████████████████

9 ████████████████████████████████

10 ████████████████ Hurst Decl. Ex. 29. ████████

11 ████████████████████████████████

12 ████████████████████████████████

13 ████████. *Id.*

14      Although Fox may have hoped to ban Sling in the new deal, that didn't

15 happen. ███████████████████████████

16 ████████. Shull Decl. ¶15. ██████████

17 ████████████

18 ████████████████████████████████

19 ████████████████████████████████

20 ████████████████████████████

21 *Id.* ¶15 & Ex. 3 at 69. ██████████████████

22 ████████ *Id.* ¶16. █████████████████

23 ████████████████████ *Id.* ¶15.  In other words,

24 from the very first draft of the 2010 Agreement, Fox acknowledged that the "Other

25 Technologies" provision did not ban Sling.

26      Fox never tried to expressly forbid Sling, and DISH made clear ████████

27 █████████████████████████████████, not to

28 mention its expenditure of nearly $400M for the technology just a few years earlier.

1  *Id.* ¶¶21-22. ████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████. *Id.* ¶16 & Ex. 4 at 91. ██████████████████

4  ████████████████████████████████████████████

5  ████████████████████████. *Id.* ¶¶16, 20, 22. ██████████

6  ████████████████████████████████████████████

7  ████████████████████████ *Id.* ¶¶18-20 & Ex. 2 at 30 (emphasis added).

8      Then, at the closing of the new deal, Fox and DISH issued a joint press

9  release that specifically referenced DISH's "ViP 922, the world's only DVR with

10  built-in Sling functionality and *PC Magazine*'s 'Editor's Choice.'" *Id.* ¶21 & Ex. 2

11  at 67.  DISH continued to provide the 922 to its customers and also began to sell the

12  Sling Adapter for use with other boxes.  Kummer Decl. ¶¶11-15.  In 2011, Fox met

13  with DISH ████████████████████████████████████████████.

14  Hurst Decl. Ex. 31 at 469, 471. ████████████████████████

15  ████████████████████████████████ *Id.* at 469.  Fox did not

16  claim a breach of contract nor a copyright violation.  Shull Decl. ¶23.  It did not

17  protest Sling in any way until May 2012, when it filed this suit in response to

18  DISH's announcement of AutoHop.[4]

19                          **ARGUMENT**

20      A preliminary injunction is an "extraordinary remedy that may only be

21  awarded upon a clear showing that the plaintiff is entitled to such relief," and is

22  "never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7,

23  22, 24 (2008).  To obtain preliminary injunctive relief, the movant must establish

24  each of the following: (1) "that he is likely to succeed on the merits," (2) "that he is

25  likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the

26  balance of equities tips in his favor," and (4) "that an injunction is in the public

27

28  _____
[4] AutoHop does not work with DISH Anywhere/Sling or Hopper Transfers.
Kummer Decl. ¶¶13, 25.

interest." *Id.* at 20; *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Fox cannot satisfy a single one of these requirements.

## I.     FOX IS NOT LIKELY TO SUCCEED ON ITS COPYRIGHT CLAIM.

Fox is not likely to succeed on its claim that the DISH Anywhere/Sling feature on the Hopper violates the public performance provision of the Copyright Act.  Both the courts and the U.S. Copyright Office have declared Sling technology lawful for use without a license. In 1999, the Ninth Circuit expressly approved of "space-shifting" in its decision in *Diamond*, 180 F.3d at 1079; *see* 2 Melvin B. Nimmer & David Nimmer, Nimmer on Copyright § 8B.07[C][4] (2012) (hereinafter, "Nimmer on Copyright").  Nearly a decade later in June 2008, the U.S. Copyright Office issued a report recognizing that the Slingbox technology made "existing licensed programming available to individuals for personal use in a controlled fashion and without the need for an additional license."  Hurst Decl. Ex. 2 at 220.

More recently, in *American Broadcasting Cos., Inc. v. AEREO, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012), the Southern District of New York implicitly adopted the view that Sling technology is lawful.  *Id.* at 386-87.  On November 30, 2012, when the appeal in that case was argued, Plaintiff Twentieth Century Fox Film Corp., represented by the very same law firm who represents it here, *admitted to the Second Circuit that Sling technology is not a public performance.*

> Judge Gleeson (sitting by designation):  Are you familiar with the device called the Slingbox?
>
> Mr. Smith (Jenner & Block partner Paul Smith):  I am, your Honor, yes.
>
> Judge Gleeson:  Now, if I were able to afford one, it would allow me to be able to take a broadcast and convert it to something on my laptop.
>
> Mr. Smith:  It would allow you to take a broadcast and send it on to the internet to one of your devices, yes.
>
> Judge Gleeson:  That wouldn't be a public performance, my viewing of it on my laptop would not be a public

1    performance?

2    Mr. Smith:  The use of a Slingbox may or may not
     involve some copyright infringement. ***It would not be a***
3    ***public performance, that's correct.***

4    Judge Gleeson:  The potential audience is just me.

5    Mr. Smith:  That's correct.

6    Hurst Decl. Ex. 16 at 332-33 (emphasis added).[5]

7    Fox admitted last November that Sling usage is not a public performance.

8    Here, Fox's counsel has expressly disavowed any intention of challenging

9    consumers' use of such technology in this suit.  *Id.* Ex. 11.  Having made these

10   concessions, Fox nonetheless wants to deprive consumers of the technology by

11   suing DISH for providing them what it admits they are entitled to use.  In Fox's

12   world, a consumer can only use space-shifting technology if she can hack it

13   together herself—or perhaps purchase on eBay one of the older versions of

14   Slingbox that have been on the market for nearly a decade.

15   There are numerous reasons why Fox's copyright claim against DISH

16   Anywhere/Sling will fail.  First, DISH is not an unlawful public performer because

17   consumers, not DISH, do the transmitting and, thus, the performing.  Second, as

18   Fox admitted to the Second Circuit, consumer transmissions using Sling technology

19   are not *public* performances.  Third, even were the transmissions by subscribers

20   public performances, they are fair use.  Finally, Fox's claim is barred by laches.

21   **A.     DISH Does Not "Perform" A Work When Subscribers Use Sling.**

22   The Copyright Act grants a copyright owner the exclusive right, "in the case

23   of . . . motion pictures and other audiovisual works, to perform the copyrighted

24   work publicly."  17 U.S.C. § 106(4).  Section 101 explains that "[t]o perform a

25   work 'publicly' means . . . to transmit . . . a performance . . . of the work . . . to the

26

---

27   [5] Unambiguous assertions by an attorney in open court can constitute judicial
     admissions that bind the party from arguing to the contrary.  *United States v.*
28   *Bentson*, 947 F.2d 1353, 1356 (9th Cir. 1991) (attorney statement made during
     closing arguments a binding judicial admission).

public." *Id.* § 101 (definition of "public performance").  DISH can only be held
*directly* liable for infringement if DISH itself transmitted and, therefore, performed,
Fox programming.  *See id.* §§ 101, 106(4); *Columbia Pictures Indus., Inc. v. Prof'l
Real Estate Investors, Inc.*, 866 F.2d 278, 280, 281-82 (9th Cir. 1989) (holding that
defendant was not transmitting the work and, thus, could not be liable for copyright
infringement).  Since it is DISH subscribers, rather than DISH, who do the
transmitting using DISH Anywhere/Sling, DISH cannot be held directly liable for
copyright infringement.

Under the statute, each separate transmission is, itself, an individual
"performance."  *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121,
134 (2d Cir. 2008) (hereinafter, "*Cablevision*") (finding "a transmission of a
performance is itself a performance").  The Sling technology at issue involves two
separate transmissions after the initial over-the-air broadcast.  Horowitz Decl. ¶¶8-
9.  The first occurs when DISH retransmits Fox over-the-air broadcast
programming by satellite to the receiver in the Hopper with Sling DVR.  *Id.* ¶8.
There is no dispute that this transmission is authorized by the Agreements.  A
further transmission using the Sling hardware and software then occurs *only* if the
DISH subscriber has activated the DISH Anywhere feature and has chosen to
remotely access that show.  *Id.* ¶9.  This optional further transmission is the one
attacked by Fox.

For reasons analyzed at length and opined upon by the Court in connection
with Fox's prior motion, the Copyright Act does not view DISH as the volitional
actor causing that additional transmission.  The hardware and software is within the
family home and entirely within the subscriber's control.  The "most significant and
important cause" of the transmission is undoubtedly the subscriber.  *Fox Broad. Co.
v. DISH Network, L.L.C.*, __ F. Supp. 2d __, 2012 WL 5938563, at *11 (C.D. Cal.
Nov. 7, 2012).  Just as DISH does not cause PTAT recordings, it does not cause
DISH Anywhere/Sling transmissions.

1    Rather, DISH sells or leases the Hopper with Sling to subscribers and
2    delivers the authorized programming to each of them.  At that point, DISH has no
3    further role in the process.  DISH can neither start nor stop a DISH Anywhere/Sling
4    remote viewing event.  Kummer Decl. ¶21.  DISH has no idea on any given day
5    what shows particular consumers will decide to view remotely using their Sling
6    devices.  That decision is entirely within the control of the consumer.  *Id.*

7    Since the end-user decides whether to access any particular program, it is
8    only that individual user who is in a position to be the direct infringer of the public
9    performance right.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160-
10   61 (9th Cir. 2007) (providing software instructions in the form of an HTML link in
11   order to access a copy is not the equivalent of a public display or distribution of that
12   underlying copy); *Cablevision*, 536 F.3d at 131 ("In determining who actually
13   'makes' a copy, a significant difference exists between making a request to a
14   human employee, who then volitionally operates the copying system to make the
15   copy, and issuing a command directly to a system, which automatically obeys
16   commands and engages in no volitional conduct"); *CoStar Grp., Inc. v. LoopNet,
17   Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) ("[A] person ha[s] to engage in volitional
18   conduct—specifically, the act constituting infringement—to become a direct
19   infringer"); *cf. UMG Recordings, Inc. v. Veoh Networks, Inc.*, __ F.3d __, 2013
20   U.S. App. LEXIS 5100 (9th Cir. Mar. 14, 2013) (even where defendant web service
21   took numerous steps to process user video uploads including breaking up and
22   transcoding the video files and extraction of metadata, the storage of copy was still
23   initiated "at the direction of a user"); *Columbia Pictures*, 866 F.2d at 281-82  (hotel
24   does not "otherwise communicate" a transmission when the guest initiates a movie
25   on the in-room equipment).

26   Fox again derides the volition requirement by sarcastically equating it with
27   "pushing a button"—as if consumers were mere automatons outsourced to do
28   DISH's bidding spreading the Fox signal across the planet.  This deliberate

1    misunderstanding of the volitional requirement does nothing to advance Fox's

2    arguments. Rather, each of the cases cited by Fox is distinguishable because the

3    defendants controlled either the transmission or the copy that was transmitted.[6] *See*

4    *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1006-07, 1009-

5    10, 1012 (C.D. Cal 2011); *On Command Video Corp. v. Columbia Pictures Indus.*,

6    777 F. Supp. 787, 788, 789-90 (N.D. Cal. 1991). To the extent these cases hold that

7    a cause other than an immediate, but-for cause of the transmission could result in

8    direct infringement liability, they are inconsistent with *Perfect 10* and *UMG* and

9    must be disregarded. The subscriber, rather than DISH, is the transmitter. Because

10   DISH does not cause subscriber remote viewings using DISH Anywhere/Sling, Fox

11   cannot prove a direct infringement claim.[7]

12            **B.    DISH Anywhere/Sling Is Not A *Public* Performance.**

13           Fox's copyright claim fails for the independent reason that remote viewing of

14   broadcast shows by consumers using DISH Anywhere/Sling are not public

15   performances. Transmissions could only be considered *public* performances if the

16   subscribers engage in one of two acts:

17                  **(1)** to perform or display it at a place open to the public or
                    at any place where a substantial number of persons
18                  outside of a normal circle of a family and its social
                    acquaintances is gathered; or
19
                    **(2)** to transmit or otherwise communicate a performance
20                  or display of the work to a place specified by clause (1) or
                    to the public, by means of any device or process, whether
21                  the members of the public capable of receiving the
                    performance or display receive it in the same place or in
22                  separate places and at the same time or at different times.

23   _____
     [6] Fox's reliance on *Fox Television Stations, Inc. v. BarryDriller Content System,*
24   *PLC*, 2012 WL 6784498 (C.D. Cal. Dec. 27, 2012) (hereinafter, "*BarryDriller*") for
     the proposition that DISH is a direct infringer of the public performance right is
25   entirely misplaced. In that case, unlike here, the defendants *admitted* that they were
     making the transmissions and the sole issue was whether those performances were
26   public or not. *Id.* at *1, 2.

27   [7] At most, DISH Anywhere/Sling could only be the subject of a claim for secondary
     liability. But Fox expressly disavows secondary liability theories. Hurst Decl. Ex.
28   11. In all events, a claim for secondary infringement would be barred for the same
     reasons set forth in Parts (I)B, C and D.

17 U.S.C. §101.  The first definition, called the "public place" clause, can only be met if the transmission occurs in a public place.  Fox does not rely upon this clause.  Rather, Fox relies upon the second definition, called the "transmit clause."

The transmit clause can only be met if the technology can make a multi-party transmission, that is, the potential audience for the transmission is multiple persons either simultaneously or seriatim—multiple people at either different places or different times.  *See Columbia Pictures*, 866 F.2d at 280; *Cablevision*, 536 F.3d at 139; *AEREO, Inc.*, 874 F. Supp. 2d at 387; 2 Nimmer on Copyright §8.14[C][2].  Additionally, these multiple people must be "the public."  The Sling technology meets neither of these conditions.

DISH Anywhere/Sling remote viewing involves a single transmission made by a subscriber to herself.  Horowitz Decl. ¶9; Kummer Decl. ¶17.  Thus, DISH Anywhere is a point-to-point unicast utilizing the hardware of a single device located in the home.  Horowitz Decl. ¶¶8-9, 32; Kummer Decl. ¶20.  The technology is capable of remote viewing by only one device at a time.  Kummer Decl. ¶24.  It is a way for a single family to change the location of viewing.  The potential audience is only one person.  This not a multi-party transmission with the sizeable potential audience of the type contemplated by the transmit clause.  *See Cablevision*, 536 F.3d at 139; *Columbia Pictures*, 866 F.2d at 280.  When Fox stood before the Second Circuit last fall, it admitted this.  *See* p. 10-11, *supra*.

Nor are the families who use DISH Anywhere/Sling to remotely view shows on their mobile devices "the public."  To understand the distinction between the size of the potential audience and its character, imagine a device, unlike Sling, that provides remote viewing by multiple devices at the same time.  The potential audience would be more than one person.  But if those multiple people were limited to members of the same family, they would not be "the public."

Here, the remote viewing is even more limited.  DISH specifically forbids its subscribers to publicly perform any transmissions or otherwise make the

- 15 -

CV 12-04529-DMG(SHx)
DISH's Opp. to Fox's Mot. for Prelim. Inj. (2)

transmission available to the public.  Singer Decl. ¶18 (citing DISH's Residential Customer Agreement).  The remote viewing can only be initiated after verification of a password that is the same one that controls the family's DISH account.  This is not "to the public."  *See Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 942 F. Supp. 1265, 1270 (C.D. Cal. 1996); *Columbia Pictures*, 866 F.2d at 281; 2 Nimmer on Copyright §8.14[C][2].

To avoid these defects in its position, Fox makes a blanket argument that any transmission utilizing the Internet must by definition be a public performance. MPA at 12-13.  In other words, Fox argues, because DISH Anywhere/Sling takes advantage of a publicly available device (the Internet), it must be a transmission to the public under the statute.  Fox thus changes the language of the statute from "to transmit  . . . to the public . . . by any device" and makes it "to transmit to anyone at all by means of any publicly available device."  This reading of the transmit clause has no support in the case law and is obviously wrong.  Any consumer using a web-based email account to check email would be engaging in a transmission "to the public" under Fox's interpretation of the statute.  Rather, because each transmission made using each Hopper with Sling is neither multicast nor to the public, no matter who is deemed to be making it, each such transmission is not a public performance.

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012), cited by Fox for the proposition that any use of the Internet is a public performance, says no such thing. In that case, defendants *admitted* that their multicast transmission technology made broadly available to any subscriber was a public performance.  *Id.*  There was no holding that any use of the Internet results in a public transmission.  The only issue was whether the statutory compulsory license was available—a point not relevant here. *Id.* at 277-78.[8]

Fox relies most heavily on *BarryDriller* for the proposition that use of the

---

[8] *Warner Brothers Entertainment Inc.*, 824 F. Supp. 2d at 1006-07, also cited by Fox, did not deal at all with the remote viewing of "live" television over the Internet.

1   Internet for remote viewing is a public performance.  MPA at 12-13.  But in

2   *BarryDriller*, Judge Wu expressly criticized any superficial conclusion that mere

3   use of the Internet results in a public performance.  2012 WL 6784498, at *2 n.9.

4   Indeed, Judge Wu expressly noted that the *BarryDriller* decision would not apply

5   to circumstances where a customer records a program in his den and later transmits

6   the recording to a television in his bedroom—exactly what we have here.  *Id.* at *5

7   & n.12.  The technology at issue in *BarryDriller* and *AEREO* is distinguishable

8   from the Sling technology, as Fox conceded in the *AEREO* argument in the Second

9   Circuit.

10        The systems in *BarryDriller* and *AEREO* involved the use of a centralized

11  repository of servers to make copies of shows they had captured using over-the-air

12  antennas.  These systems then use the Internet to transmit a copy to any member of

13  the public who signs up for the service and requests one.  Thus, unlike Sling-based

14  technology, where the device is in the home and the remote viewing audience is a

15  single family, the potential audience for the AEREO and BarryDriller technology is

16  the entire entertainment consuming public.  Unlike Sling, where the satellite

17  retransmission by DISH is licensed and paid-for, at no point in the *AEREO* process

18  was any transmission licensed by the networks.  *See AEREO, Inc.*, 874 F. Supp. 2d

19  at 377; *BarryDriller*, 2012 WL 6784498 at *6.  The rationale of *BarryDriller* does

20  not apply by its express terms, and is obviously factually distinguishable.[9]  The

21  DISH Anywhere/Sling performance is not public.

22        **C.    DISH Anywhere/Sling Is Fair Use.**

23        When subscribers use DISH Anywhere/Sling, that is a fair use.  This Court is

24  well acquainted with the fair use factors from the parties' prior briefing, so we will

25  not repeat them at length here.  Suffice to say that *Sony*'s first and fourth-factor

26

27  _____

28  [9] If *BarryDriller* is understood to govern here, then its reasoning cannot be
    sustained because it would vitiate the "to the public" limitation of the transmit
    clause.  *See Cablevision*, 536 F.3d at 135-36.

time-shifting rationale applies with equal force to space-shifting.[10]  *See Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 449-56 (1984); *Diamond*, 180 F.3d at 1079 (equating time-shifting and "space-shift[ing]").

As noted above, Fox tries to avoid any focus on consumers by limiting its theory to direct infringement.  But this is simply not possible under the language of Section 107, which requires the focus to be on the particular "use" that is claimed to be the infringement.  17 U.S.C. §107.  DISH doesn't use Sling to deliver Fox's signal, it sells or leases Sling devices to others to decide when and how they want to use them.  Kummer Decl. ¶¶8, 17, 21.  Fox admits people can use Sling technology lawfully, it just doesn't want DISH to provide it.  Fox's logic results in an interpretation of the Copyright Act that restricts fair use rights only to hackers.

### 1.   Sling Use Is Noncommercial And Transformative.

As noted, Section 107(1) asks the Court to consider "the purpose or character of the *use*."  17 U.S.C. § 107(1) (emphasis added).  The challenged use of the works here is the purported public performance—which occurs only when the subscribers initiate a remote viewing event.  Of course DISH sells or leases the Hopper with Sling, promotes it and hopes to make money.  The purpose of selling the device is commercial.  But DISH is not sitting down next to its subscribers watching the shows when they remotely view a broadcast in their bedrooms or offices or hotel rooms.  DISH Anywhere/Sling can only be used after the Hopper with Sling is installed in a private home.  The only way to understand the purpose of the use—the challenged performance—is to look at it from the consumers' perspective.  There is no doubt that the subscribers' purposes are private, noncommercial ones.  *See Sony*, 464 U.S. at 449 (finding time-shifting to be a noncommercial purpose); *Diamond*, 180 F.3d at 1079 ("space-shift[ing]" is a "paradigmatic noncommercial personal use").  Fox cannot just change the label on

---

[10] DISH does not concede the other two factors, but they are less pertinent.  The discussion in *Sony* is equally applicable to the second and third factors here.

1    its claims in order to avoid Section 107's focus.

2         The character of the use likewise cannot be tested without reference to what
3    consumers are doing.  Space-shifting is transformative.  DISH Anywhere/Sling
4    provides subscribers the capability to shift platforms, or location.  Space-shifting,
5    just like time-shifting, permits the subscriber to access programming she is already
6    entitled to view in a manner that is more convenient for that subscriber.  *See Sony*,
7    464 U.S. at 449-50, 454-55.  It is easy to conceive numerous "fair" reasons why
8    subscribers may wish the freedom to shift places.  The character of such uses may
9    range from accommodating family members with disabilities who cannot make it to
10   the living room, to limiting the frequency of children's access to television in their
11   bedrooms, to giving mom the ability to watch a show with the rest of the family
12   from her hotel room while she's on a business trip.

13        Consumers could space-shift with VCR tapes or DVDs as well—indeed, as
14   outlined above, Fox encourages them to do so.  Hurst Decl. Exs. 9-10.  There is no
15   meaningful distinction between a private copy watched with a neighbor and a signal
16   sent upstairs to the bedroom or down the hall to the computer in the den.  This
17   technology provides a substantial public benefit in a very modest way.  It provides
18   the ordinary among us the freedom to enjoy the same fair use rights as the
19   technologically gifted, with substantial controls such as unique IDs and passwords
20   coded to single machines controlled by individual families.  As the Copyright
21   Office noted with approval, Sling has made "existing licensed programming
22   available to individuals for personal use in a controlled fashion and without the
23   need for an additional license."  *Id.* Ex. 2 at 220; *see A.V. v. iParadigms, LLC*, 562
24   F.3d 630, 638-40 (4th Cir. 2009) (first factor weighed in favor of fair use when the
25   work "provide[d] a substantial public benefit").

26        The fact that DISH makes money, or that DISH Anywhere/Sling provides the
27   capability for remote viewing of an entire show, does not dispel the conclusion that
28   this private, socially beneficial place-shifting function is transformative.  *See*

*Perfect 10*, 508 F.3d at 1166 ("the significantly transformative nature of Google's search engine, particularly in light of its public benefit, outweighs Google's superseding and commercial uses of the thumbnails in this case"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) (finding conduct to be transformative because it was "improving access to information on the internet").

**2.   Sling Transmissions By Subscribers Do Not Harm The Value Of The Copyrighted Work.**

Because each transmission by a subscriber using DISH Anywhere/Sling is noncommercial, Fox bears the burden to show "by a preponderance of the evidence that some meaningful likelihood of future harm exists." *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986) ("when the use is noncommercial, the copyright owner must demonstrate by a preponderance of the evidence that there is 'some meaningful likelihood of future harm'") (quoting *Sony*, 464 U.S. at 451).  Fox did not even try to meet this burden, and loses the fourth factor for this reason alone.

Moreover, Fox is attempting to rely upon what it says are new markets in an effort to convert an existing fair use into an unfair use.  Courts and commentators have strongly cautioned against permitting a copyright owner to usurp a market that was previously considered fair.  *See Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 145 n.11 (2d Cir. 1998) (stating "copyright owners may not preempt exploitation of transformative markets, which they would not in general develop or license others to develop, by actually developing or licensing others to develop those markets" (internal quotation marks omitted); *see also* 4 Nimmer on Copyright §13.05[A][4] (recognizing "danger of circularity" where original copyright owner redefines "potential market" by developing or licensing others to develop that market).  Fox has offered no meaningful evidence that there is any separate market where people are willing to pay solely for family space-shifting, and indeed, it encourages consumers to accomplish this on their own on its website.  Fox has

1    given no evidence to suggest that consumer ability to remotely view single

2    transmissions on single devices will destroy the supposed market for Hulu, iTunes

3    or Amazon Unbox.  The best evidence indicates the contrary.  Rapp. Decl. ¶¶10-11,

4    35-81.[11]

5              **D.    Fox's Copyright Claim Is Barred By Laches.**

6          Laches bars a claim for copyright infringement where plaintiff's delay in

7    filing suit was unreasonable and prejudice results from that delay.  *Danjaq LLC v.*

8    *Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001); 3 Nimmer on Copyright §12.06.  A

9    "presumption of laches is triggered if any part of the claimed wrongful conduct

10   occurred beyond the [statute of] limitations period."  *Jarrow Formulas, Inc. v.*

11   *Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002).  The presumption acts to

12   bar claims by a party who "fails to file suit promptly when the defendant

13   commences the wrongful conduct."  *Id.* at 838.  This presumption applies here.

14         The statute of limitations for civil copyright infringement is three years from

15   when the infringement is discovered, or should have been discovered with

16   reasonable diligence. 17 U.S.C. §507(b); *Polar Bear Prods., Inc. v. Timex Corp.*,

17   384 F.3d 700, 705-07 (9th Cir. 2004).  Sling technology has been publicly available

18   since 2005, and Fox knew all about it.  It was not until May 2012 that Fox belatedly

19   brought a copyright claim.  Fox brought suit *seven years* after this open and

20   notorious marketing and reliance upon Sling. *Jacobsen v. Katzer*, 2009 WL

21   4823021, at *6 (N.D. Cal. Dec. 10, 2009) (barring copyright infringement claim

22   after twenty-seven-month delay); *Watermark Publ'rs v. High Tech. Sys., Inc.*, 1997

23   U.S. Dist. LEXIS 22512, at *19-20 (S.D. Cal. June 18, 1997) (barring copyright

24
    _____
25   [11] Fox argues that "DISH is infringing Fox's copyrights by exceeding the scope of
     its license."  MPA at 15-16.  This is wrong.  A license is a defense. *Worldwide*
26   *Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000).
     Breach of a license does not demonstrate infringement; rather, that is proven only
27   by the prima facie case of (1) ownership, and (2) invasion of one of the exclusive
     rights in Section 106. *Id.* at 1114-15; *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081,
28   1085, 1089 (9th Cir. 1989); 3 Nimmer on Copyright § 10.15[A][2] n.10 ("[t]o be
     actionable as infringement, the conduct must implicate one of the copyright
     owner's enumerated rights").

infringement claim after four-year delay).  It is beyond dispute that at least some of the purportedly unlawful conduct occurred outside of the three-year statute of limitations.  The presumption of laches applies.  *Jacobsen*, 2009 WL 4823021, at *6 (delay unreasonable where party waited twenty-seven months to bring suit despite knowledge of facts); *ExperExchange, Inc. v. Doculex, Inc.*, 2009 WL 3837275, at *3, 23 (N.D. Cal. Nov. 16, 2009) (seven-year delay unreasonable when plaintiff had knowledge of facts).

Fox recognized its laches problem in its Motion.  MPA at 16-17.  What Fox did not do, however, was rebut the presumption of undue delay.  Fox's excuse is that it supposedly was waiting to see whether the problem of Sling technology justified the cost of litigation.  *Id.*  But, while it may be acceptable to consider the costs of litigation in deciding whether to file, it is not acceptable to lie back and wait for a product to become popular and then decide to attack it.  *Danjaq LLC*, 263 F.3d at 951, 954.  As Learned Hand put it,

> It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success.

*Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916).  In *Danjaq*, the Ninth Circuit expressly quoted and adopted the rationale of *Haas*.  263 F.3d at 954.

Fox's purported concern for the cost of litigation is hogwash.  Sling was highly publicized and critically successful technology that sold hundreds of thousands of units—and Fox knew all about it.  *See Mappa Music Co. v. Universal-Polygram Int'l Publ'g, Inc.*, 2001 WL 1868083, at *6 (C.D. Cal. Dec. 17, 2001) (citing *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F. Supp. 531, 534 (S.D.N.Y. 1977)) (finding delay was unreasonable and was not due to consideration of cost of litigation where the allegedly infringing product was "popular" not "rest[ing] in oblivion").  Fox cannot plausibly argue financial hardship, and in all

1    events its potential remedies have always included statutory damages and attorneys'
2    fees.  Moreover, Fox is claiming that the Sling technology causes it *irreparable*
3    *harm from loss of control*.  MPA at 19.  That was true the moment the first
4    Slingbox device went onto the market in 2005, and it was certainly true in 2008
5    when the Copyright Office cited the device as an example of a lawful private
6    performance.  If Fox really thought that Sling was harmful to its control, the
7    expense of litigation was always justified.  Fox cannot have it both ways:  either its
8    excuse for delay is a pretext and its claim is barred, or it has no claim of irreparable
9    harm and it cannot get an injunction.

10          Indeed, Fox has offered no evidence that the anticipated "costs of litigation"
11   were *in fact* the reason it delayed.  Fox was aware of Sling at all times from 2005
12   through 2012, and disliked it.  Hurst Decl. Ex. 23.  Fox offers only lawyer argument
13   that the costs of litigation were too severe to justify attacking Sling.  Fox offers no
14   testimony or documents, no declaration of one of its executives, no evidence of its
15   own, at all.  The more appropriate inference to be drawn is that Fox didn't sue for
16   seven years, *because it didn't think it had a case.  Id.* Ex. 29 ("███████████
17   ████████████████████")  About that, at least, Fox's executives were right.

18   **II.    FOX IS NOT LIKELY TO SUCCEED ON ITS CONTRACT CLAIMS.**
19         **A.    DISH Anywhere/Sling Does Not Breach The Parties' Agreements.**
20         To reach the conclusion that DISH Anywhere/Sling breaches the RTC
21   Agreements, Fox misinterprets each of them and tries to charge DISH with breach
22   based on the actions of strangers to those Agreements.
23         ***2002 Agreement.***  Fox suggests that "Dish is breaching the provision of the
24   [2002] license agreement that bars Dish from authorizing others to retransmit Fox's
25   signal."  MPA at 11.  But Fox's internal documents show ████████████████
26   ████████████████████████████ *See* Hurst Decl. Ex. 29;
27   *see, e.g., Fed. Ins. Co. v. Am. Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999)
28   ("[T]he practical interpretation of a contract by the parties to it for any considerable

- 23 -

1   period of time before it comes to be the subject of controversy is deemed of great, if
2   not controlling, influence.").

3       Indeed, the text of the 2002 Agreement makes clear why it does not apply to
4   DISH Anywhere/Sling.  That Agreement explains that the type of unauthorized
5   ████████████████████████████████████████████████████████████████████
6   ████████████████████████████████████████████████████████████████
7   ████████   *See* Shull Decl. Ex. 1 at 12.  It does not touch upon subsequent
8   transmissions within a subscriber's network of personal entertainment devices—
9   which makes sense since the technology was not yet around in 2002.  When the
10  2002 agreement is "read and interpreted as a whole," *Fox Broad. Co.*, 2012 WL
11  5938563, at *17, it is apparent that remote viewing technology was not the object of
12  the 2002 Agreement's prohibition on DISH authorizing others to retransmit.

13      Nor does DISH, by selling a Hopper with Sling to a subscriber, breach a
14  clause that prohibits it from ████████████████████████████  To "authorize"
15  means "[t]o give legal authority."  Bryan A. Garner, Black's Law Dictionary 129
16  (7th ed. 1999).  Or, as the Oxford English Dictionary has it, "authorize" means to
17  "give formal approval to," to "give legal or formal warrant to a person to do, permit
18  authoritatively."  New Shorter Oxford English Dictionary 154 (5th ed. 1993).  In
19  other words, the plain meaning of "authorize" means to give an express permission
20  that one has the legal authority to grant.  *See Fox Broad. Co.*, 2012 WL 5938563, at
21  *16 (requiring "plain meaning"). In selling the Hopper with Sling, DISH does not
22  purport to grant its subscribers legal permission to retransmit a broadcast signal.  It
23  expressly prohibits them from engaging in public performances of the signal.
24  Singer Decl. ¶18 & Ex. H at 160.  The "legal authority" for subscribers to make
25  space-shifting private transmissions comes from *copyright law*.

26      ***2010 Agreement.***  When it came time in October 2010 for DISH and Fox to
27  renegotiate RTC terms, Sling remote viewing technology was everywhere.  In
28  2007, DISH had acquired Sling Media for the widely publicized sum of nearly $400

- 24 -

1  million.  Kummer Decl. ¶4 & Exs. 1-2.  In January 2009, DISH announced the ViP

2  922, a DVR that came with built-in Sling, trumpeting its capability for subscribers

3  to watch programming "from anywhere in the world via a broadband Internet

4  connection on their laptop or mobile phone." *Id.* ¶11 & Ex. 3.  Buzz hit a fever

5  pitch when the ViP 922 won the 2009 "Best of CES" award.  *Id.* ¶11 & Ex. 4.

6        The "Other Technologies" provision insists that ███████████████████

7  ██████████████████████████ Shull Decl. Ex. 2 at 135 (emphasis added).  Fox's

8  argument for breach by Sling is a complete non-starter because, as explained above,

9  DISH does not transmit Fox's signal when a subscriber uses her Hopper with Sling

10  to view remotely shows on one of her mobile devices.  The subscriber does.

11        Moreover, the negotiating history demonstrates this clause was never

12  intended to ban Sling.  █████████████████████████████████ Shull Decl.

13  ¶¶15-16.  ██████████████████████████████████████████████████

14  ██████████████████ *Id.*  D███████████████████████████████████

15  ██████████████████████████████████████████████████████████

16  ██████████████████████████████" *Id.* Ex. 2 at 35.  This language was a direct

17  result of the parties' bargaining over Sling.  *See id.* ¶¶15-20 & Exs. 3-10.

18        Sling is a right of consumers under copyright law.  But not only is this a

19  "██████████████████████" *today* (which would suffice to avoid breach), Fox

20  knew it was at the time of the deal in 2010.  Everyone in the industry knew, because

21  the Ninth Circuit had expressly approved the general concept of space-shifting in

22  *Diamond* more than a decade earlier, and because the Copyright Office had

23  endorsed Sling technology in particular.  Indeed, in the joint press release

24  announcing the 2010 Agreement (still found on Fox's website today), Fox and

25  DISH specifically mentioned DISH's award-winning "ViP 922, the world's only

26  DVR with built-in Sling functionality and *PC Magazine*'s 'Editor's Choice.'" *Id.*

27  ¶21 & Ex. 2 at 67; Hurst Decl. Ex. 15.  After the 2010 Agreement, DISH launched

28  a line of Sling Adapters that users could attach to certain DISH DVR models to

obtain Internet-based remote viewing functionality.  Shull Decl. ¶21; Kummer
Decl. ¶¶ 5-6.  There was not a peep from Fox.  *See, e.g., Fed. Ins. Co.*, 258 A.D.2d
at 44 ("[T]he practical interpretation of a contract by the parties to it for any
considerable period of time before it comes to be the subject of controversy is
deemed of great, if not controlling, influence.").

     *Now*, Fox says that the "Other Technologies" provision—the provision that
was negotiated against the backdrop of DISH's sizeable, widely publicized
investment in Sling, and that was never been invoked despite DISH's record of
continuously marketing and selling Sling-capable products—prohibits DISH
Anywhere/Sling.  Fox's argument is at odds with reality.  As this Court made clear
in rejecting Fox's first round of contract claims, "contracts should be interpreted
according to 'reasonable expectation and purpose of the ordinary business [person]
when making an ordinary business contract.'"  *Fox Broad. Co.*, 2012 WL 5938563,
at *15.  Forget "[un]reasonable."  It would've been *unthinkable* for DISH to sign a
contract nullifying a highly publicized almost-$400 million investment—its
purchase of Sling Media—made just a few years earlier.  *See, e.g., Well Luck Co.,
Inc. v. F.C. Gerlach & Co., Inc.*, 421 F. Supp. 2d 533, 540 (E.D.N.Y. 2005)
(parties' course of dealing prior to forming contract can "establish a party's
awareness of and consent to intended contractual terms").  It is equally unthinkable
for Fox to have issued a joint press release with DISH touting a product it now
claims is banned by the very Agreement it was announcing.[12]

---

[12] For the reasons expressed in Part A, the 2002 Agreement never purported to
govern transmission by the Internet.  ███████████████████████████████████
████████████████████████████  It therefore trumps the allegedly contrary more-
general language in the earlier 2002 agreement.  *See, e.g., Cnty. of Suffolk v. Long
Island Lighting Co.*, 266 F.3d 131, 139 (2d Cir. 2001) ("It is axiomatic that courts
construing contracts must give specific terms and exact terms … greater weight
than general language." (internal quotation marks omitted)) (applying New York
law); *see also* Shull Decl. Ex. 2 at 34 (providing that "[i]n the event of any conflict"
between the agreements, the 2010 Agreement "shall govern").

1

**B.    Hopper Transfers Does Not Breach The 2002 RTC Agreement.**

2      Fox argues that Hopper Transfers breaches the provision of the 2002

3   Agreement that states DISH ███████████████████████ of Fox

4   programs "███████████████████████."  Shull Decl. Ex. 1 at 14.

5   Fox says that DISH breaches this provision because the Hopper Transfers feature

6   "allows subscribers to copy recordings that are saved on their DVRs to their iPads,"

7   enabling them to watch recorded shows "on flights" or "during a long road trip."

8   MPA at 9.  Fox is again mistaken.

9      First, for the reasons expressed above, there is no breach because DISH is not

10  "authorizing" the Hopper Transfers recordings.  DISH is not purporting to grant an

11  express legal permission to its subscribers to make recordings.  Those rights depend

12  upon copyright law.

13     Moreover, Fox's entire argument hinges on a misinterpretation.  The network

14  assumes that ███████████ necessarily means *in*-home or *at*-home use, so that

15  subscribers can only watch their recordings when they are physically present within

16  the four walls that separate their primary living space from the outside world.  *See*

17  MPA at 1 (███████████████"), 3-4 (███████████████

18  ███████.  Fox is trying to re-write the contract from "███████████

19  ███████      Correct grammar tells us this is not what "███████████ means.

20     In the phrase "███████████ the word "█████ is used as an adjectival

21  noun.  *See* Chicago Manual of Style § 5.22 (16th ed. 2010).  The ordinary

22  understanding of "home" when used as an adjective "attributive noun," means

23  "*relating to* … a home."  Webster's Third New Int'l Dictionary 1082 (1993)

24  (emphasis added).  It doesn't refer narrowly just to activity physically *within* the

25  home.  "███████████ as a matter of proper grammar, means the type of

26  personal non-commercial use *such as would occur* at home.

27     Restaurants advertise "home cooking."  Parents shoot "home movies" on

28  camping trips.  And students do "homework" and complete "take-home" tests in the

- 27 -

library.  People who never leave Chicago can sleep on "California king beds," eat "Kansas City barbeque," and raise "Valley girls."  Los Angelenos can eat Chicago deep dish or New York thin crust pizza.  It's common to listen to "elevator music" in the car, use "kitchen knives" in the dining room, and fold "hospital corners" in the bedroom.  Similarly, there's nothing anomalous about a DISH user engaging in "███████████" outside of her actual home—when she watches in a hotel room, or the kids watch in the car or at Grandma's house.

Fox concurs.  On its website, Fox tells viewers—and has been continuously telling viewers since at least 2005—what to do if they miss an episode of their favorite primetime Fox show.  Hurst Decl. Exs. 9, 10 at 297-98.  Fox knows that its viewers will make portable copies and watch them outside the home, and there is no guarantee they will be watched in anyone's home.  Yet Fox endorses this practice—even when there's no guarantee that the viewer watching the recording indirectly pays Fox for the privilege (through DISH subscriber fees).  It therefore must also be permissible in the more limited scenario where the viewer watching the recording actually is a DISH subscriber and therefore actually does help line Fox's coffers.

The parties' course of conduct after signing the 2002 Agreement also dispels any notion that Fox held then the interpretation it claims today.  Fox's assertion that the 2002 Agreement prohibits Hopper Transfers cannot be credited in light of its failure to say anything when DISH in 2005 launched the functionally comparable PocketDISH product.  Subscribers could connect PocketDISH to their DVRs to obtain "the ability to take their favorite sitcoms, reality shows or even last night's game with them to watch anywhere" (Kummer Decl. Ex. 9)—exactly the functionality Fox now says breaches the 2002 Agreement.  *See* MPA at 9.

It's not like Fox didn't know about it.  █████████████████████ ████████████████████ Hurst Decl. Exs. 21 at 409, 25 at 433, 27 at 4, 28 at 45.  The whole technology industry knew about it.  *See, e.g., id.* Ex 12; Kummer Decl. Ex. 9.  Fox never said a word about copying for personal mobile use until this litigation

1    commenced seven years later.  The only conceivable explanation is that the 2002

2    Agreement doesn't prohibit (and never did prohibit) subscribers copying DVR

3    recordings to their personal mobile devices.  *See Fed. Ins.*, 258 A.D.2d at 44.

4    **III.    THERE IS NO LIKELIHOOD OF IRREPARABLE HARM.**

5         Fox's burden is to "demonstrate that irreparable harm is *likely* in the absence

6    of an injunction."  *Winter*, 555 U.S. at 22 (rejecting "possibility" of irreparable

7    harm standard as "too lenient").  "Irreparable injury is an injury that is not remote

8    or speculative, but actual and imminent and for which monetary damages cannot

9    adequately compensate."  *Dotster, Inc. v. Internet Corp.*, 296 F.Supp. 2d 1159,

10   1162 (C.D. Cal. 2003).  The movant, "[i]n each case," must establish—with facts—

11   that irreparable harm is likely without an injunction, and it may not be presumed.

12   *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 997 (9th Cir. 2011).

13        **A.    <u>Fox's Delay Precludes Any Notion Of Irreparable Harm.</u>**

14        Fox cannot dispute its seven year delay in taking action on Sling technology,

15   and its further delay even *after* this lawsuit was filed.  In its initial Complaint—

16   filed over nine months ago—Fox challenged Sling and claimed that DISH was

17   breaching the parties' agreements and infringing its copyrights by "stream[ing]

18   FOX's programming over the Internet."  Dkt. 1 ¶6.  At the deposition of DISH's

19   corporate designee—taken over seven months ago—Fox asked extensive questions

20   about Sling technology, Slingboxes, and the ability to use a Sling Adapter with the

21   Hopper.  Hurst Decl. Ex. 32.  But when Fox moved for an injunction a few weeks

22   later, it did not seek to enjoin Sling.  Fox also ignored PocketDISH for years, even

23   though it had the same functionality now provided by Hopper Transfers.

24        Fox's years-long, unjustified delay in filing suit, and its nine-month delay in

25   bringing this motion, belies any claim of irreparable harm.  *See Oakland Tribune,*

26   *Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long

27   delay before seeking a preliminary injunction implies a lack of urgency and

28

irreparable harm.").[13]  Fox offers the excuse that "Sling was a niche product" (MPA at 16), as if it were something hidden away in a closet covered with dust.  But DISH made its intent to exploit Sling technology known to Fox as early as 2007, and then again in 2010 and 2011.  Through February of this year, Sling Media has sold ████████████████████████████ *922 Slingloaded DVRs*—hardly "niche."  Kummer Decl. ¶14-15.  The laches cases Fox cites do not address the effect of a litigant's delay on seeking a preliminary injunction—delay negates the inference that any harm is irreparable.

There is another reason why Fox's delay prevents an injunction from issuing.  Sling technology has been purchased and used by DISH's subscribers for years.  Paragraph 6(a) of Fox's proposed injunction would therefore alter—not "preserve"—the "status quo" by requiring DISH to, in effect, rip Slingboxes and Sling Adapters out of its subscribers' homes.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009).  Such mandatory injunctions are "particularly disfavored," and Fox has not even attempted to meet the attendant heightened burden of proof.  *See Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1979) (mandatory injunctions "should not be issued unless the facts and law clearly favor the moving party" and "are not granted unless extreme or very serious damage will result").

## B.  Any Alleged Harm Is Compensable In Damages.

To obtain a preliminary injunction, Fox is "required to demonstrate that [its] remedy at law [is] inadequate."  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("The basis of injunctive relief in the federal courts

---

[13] Courts consistently find far shorter delays to negate irreparable harm.  *See, e.g., Kerr Corp. v. North Am. Dental Wholesalers, Inc.*, 2011 WL 2269991, at *3 (C.D. Cal. June 9, 2011) (five-month delay); *Givemepower Corp. v. Pace Compumetrics, Inc.*, 2007 WL 951350, at *7 (S.D. Cal. Mar. 23, 2007) (two-month delay); *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (three-month delay); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1080, 1090 (S.D. Cal. 1999) (five-month delay).

1    is irreparable harm and inadequacy of legal remedies.").  Fox has not

2    "demonstrate[d]" anything of the sort.

3          Fox's request for an injunction against Hopper Transfers is based exclusively

4    on its claim that DISH is breaching the 2002 Agreement, and its request for an

5    injunction against DISH Anywhere/Sling also is based in part on a contract claim.

6    In denying Fox's first motion, this Court recognized that "*a preliminary injunction*

7    *will rarely issue on the basis of an alleged breach of contract*."  *Fox Broad. Co.*,

8    2012 WL 5938563, at \*15 n.13 (emphasis added); *see Flynt Distrib. Co. v. Harvey*,

9    734 F.2d 1389, 1395-96 (9th Cir. 1984) (error to issue injunction based on contract

10   breach because "money damages" provide adequate remedy).  "The normal remedy

11   for breach of contract is an award of damages."  *Chicago United Indus., Ltd. v. City*

12   *of Chicago*, 445 F.3d 940, 945 (7th Cir. 2006) (Posner, J.).[14]

13         The "normal remedy" is plainly available here, on either a contract or a

14   copyright claim, where Fox's programming is licensed for distribution in every

15   conceivable manner.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,

16   694 F.3d 1312, 1339-40 (Fed. Cir. 2012) (damages "clearly quantifiable" where

17   VOD technology provider "sought to broadly and extensively license [its]

18   technology"); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996)

19   ("pattern of granting licenses" evidence of lack of irreparable harm);

20   *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 569-73 (E.D. Va. 2007)

21   ("willingness to license" undercuts irreparable harm).  As DISH's expert explains,

22   these agreements provide a means to quantify any potential harm from Hopper

23   Transfers and Sling.  Rapp Decl. ¶¶10, 35-81.

24         Fox has license agreements with companies providing digital download

25

26   [14] Fox's observation that New York law "permits injunctive relief for breach-of-
     contract claims" is of little moment.  MPA at 10.  Even if state law *allows* for a
27   preliminary injunction, federal law governs whether such relief is appropriate.  *See*
     *Sullivan v. Vallejo City Unified School Dist.*, 731 F. Supp. 947, 956-57 (E.D. Cal.
28   1990) ("[F]ederal law provides the standards governing plaintiff's motion for
     preliminary injunctive relief with respect to both her federal and state law claims.").

services.  *Id.* ¶53.  Fox grants other companies—including other pay-tv distributors and streaming services—licenses to stream its programming over the Internet.  *Id.* ¶¶45, 51-52.  The financial terms of those agreements make any alleged damages from either DISH Anywhere or Hopper Transfers readily calculable.  *Id.* ¶¶10, 45. This Court put it best a few months ago: "The fact that Fox has licensing agreements with other companies shows that *copies* of the Fox Programs have a market value that other companies already pay in exchange for the right to use the copies."  *Fox Broad. Co.*, 2012 WL 5938563, at \*18.

## C.    Fox's Claims of Harm Are Conclusory and Speculative.

The availability of damages aside, Fox offers nothing more than the unsupported say-so of Sherry Brennan, and another executive, Michael Biard, as the basis for its claim of irreparable harm.  *See* Brennan Decl. ¶¶15-30; Biard Decl. ¶¶23-26.  Their declarations fall far short of establishing a likelihood of imminent, irreparable injury.  *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (rejecting affidavits of movant's "own executives" as "conclusory and without sufficient support in facts"); *Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1201-02 (declaration of interested party lacking "factual basis" insufficient to establish irreparable harm).

Fox's assertion that Sling will damage its "relationships" with other pay-TV providers, and that Hopper Transfers will hinder its "negotiations" with digital download services, like iTunes, MPA at 17-18, is pure speculation.  *See Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury.").  Sling devices have been sold for seven years, and PocketDISH also was introduced years ago, but Fox has not offered any evidence of past harms to its "relationships" or "negotiations."

Time Warner subsidizes its subscribers' Slingboxes (Khemka Decl. ¶7 & Ex. 2), and TiVo and others offer similar Internet-based remote viewing capabilities (Horowitz Decl. ¶34; Rapp Decl. ¶32), but, tellingly, Fox only claims that the Sling

products used by DISH's subscribers will cause it harm.  DIRECTV Nomad and TiVo Desktop Plus provide consumers with the *exact* same ability to transfer recorded programs to mobile devices as Hopper Transfers (Horowitz Decl. ¶¶14-15; Rapp Decl. ¶¶15, 17 & Ex. 3), but if Fox is to be believed, only DISH's feature presents cause for concern.  If Fox were truly being harmed by Sling and Hopper Transfers, it would not be suing only DISH.  Rapp Decl. ¶45.

The claim that Sling will lower Fox's ratings is just as speculative.  MPA at 20.  As the broadcast networks have recognized, Internet viewing is "supplemental" to linear television, so Sling is unlikely to have an impact on the ratings for Fox's programming.  Rapp Decl. ¶¶71-75.  In any event, although Nielsen does not currently measure Sling viewership, it has "pledged" to do so in the future.  *Id.* ¶42.  There is no merit to Fox's contention that Sling will harm Dyle.tv, which is a *free* service.  *Id.* ¶65.  Any viewers using Sling instead of Dyle.tv will see the very same commercials, so there can be no harm.  *Id.*

Fox's pat assertion of "loss of control" is nothing more than an invitation to resurrect the presumption of irreparable harm rejected in *eBay* and *Flexible Lifeline*.  MPA at 19.  Fox's widespread licensing of its programming refutes any notion of control.  Rapp Decl. ¶¶77-78.  Fox has no control left to lose.

Finally, Fox's claim that DISH Anywhere/Sling and Hopper Transfers present "increased piracy risks" is pure *ipse dixit*.  MPA at 19.  There is no such risk.  Kummer Decl. ¶¶24, 28.  Indeed, it is difficult to comprehend how DISH Anywhere or Hopper Transfers could possibly increase piracy risk.  These features are limited, while Fox's programming is broadcast over the air for free, and can be copied and unlawfully distributed by anyone with a run-of-the-mill VCR, DVD burner, or numerous other widely available devices.  Horowitz Decl. ¶¶46-47, 50.

## IV.  THE OTHER FACTORS ALSO FAVOR DISH.

Fox is also required to establish the "balance of equities" is in its favor, *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011), and "that an

- 33 -

1   injunction is in the public interest." *Winter*, 555 U.S. at 20.  Neither is true.

2        As demonstrated above, Fox will not suffer any irreparable harm if its motion

3   is denied.  An injunction against DISH Anywhere/Sling and Hopper Transfers will,

4   on the other hand, cause DISH severe and immediate hardship in the form of lost

5   investments, loss of goodwill, and damaged customer relations.  *See PlayMakers*

6   *LLC v. ESPN, Inc.*, 376 F.3d 894, 898 (9th Cir. 2004) (potential loss of investment

7   tips balance in favor of defendant); *Hansen Beverage Co. v. N2G Distib., Inc.*, 2008

8   WL 5427602, at *5 (S.D. Cal. Dec. 30, 2008) (damage to goodwill weighs against

9   injunction); *LucasArts Entm't Co.v. Humongous Entm't Co.*, 815 F. Supp. 332, 338

10  (N.D. Cal. 1993) (potential loss of customer "trust and confidence" tips balance in

11  favor of defendant).

12       Over the past five and a half years, DISH has expended substantial amounts

13  of time, effort, and money developing and marketing its various Sling products,

14  including the Hopper with Sling, and has devoted similar resources to Hopper

15  Transfers.  Khemka Decl. ¶¶9-10.  Those investments will, to a large extent, go to

16  waste if an injunction is issued.  *Id.* ¶10.  More importantly, there are at least █

17  ████████████ with Sling technology, and many of them have had Sling for years.

18  Kummer Decl. ¶¶14-15.  If, as Fox requests, DISH is required to disable—in effect,

19  recall—all of its subscribers' Sling devices and functionality, DISH will lose untold

20  amounts of goodwill, and its relationships with consumers will be severely

21  damaged, perhaps irretrievably.  Khemka Decl. ¶¶9-10.

22       Fox does not deny that an injunction will impose significant hardship on

23  DISH; instead, it argues that DISH "obviously assumed the risk" by launching the

24  Hopper with Sling "while it was already in copyright litigation with Fox."  MPA at

25  21.  Why the pendency of litigation matters is unclear, but it is perfectly clear who

26  is to blame for the harms that will befall DISH.  Had Fox filed suit years ago, when

27  DISH first started offering Sling, or PocketDISH, the hardship to DISH would have

28  been avoided.  This decisively tips the balance of equities in DISH's favor.  *See*

1   *Ctr. for Food Safety v. Schafer*, 2010 WL 964017, at *5 (N.D. Cal. March 16,

2   2010) (equities favor defendant where "costly impacts from … injunction could

3   have been obviated if [p]laintiffs had diligently brought suit and moved for a

4   preliminary injunction earlier"); *Headwaters, Inc. v. Bureau of Land Mgmt.,*

5   *Medford Dist.*, 665 F. Supp. 873, 876 (D. Or. 1987) (same).

6        Fox observes that "upholding copyright protection is in the public interest."

7   MPA at 21.  That is true, so far as it goes, but "[p]ublic policy does not advocate

8   the liberal issuance of *preliminary* injunctions in copyright infringement actions."

9   *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir.

10  1994).  Enjoining Sling and Hopper Transfers will greatly disserve the public

11  interest in consumer autonomy and technological innovation.  *See Gen. Motors*

12  *Corp. v. Harry Brown's LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (public has an

13  interest in "consumer choice"); *Fromson v. W. Litho Plate & Supply, Co.*, 853 F.2d.

14  1568, 1574 (Fed. Cir. 1988) (recognizing "the public interest in technological

15  advancement"), *overruled on other grounds*, *Knorr-Bremse Systeme Fuer*

16  *Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (en banc).  It

17  will also unsettle the expectations of ███████████████████████ who

18  purchased Sling devices, and all other members of the public who have purchased

19  competitive television space-shifting devices.  *See Green v. G. Heileman Brewing*

20  *Co.*, 755 F. Supp. 786, 790 (N.D. Ill. 1991) ("frustrat[ion]" of consumer

21  "expectation[s]" against public interest).

22                          **CONCLUSION**

23       For the foregoing reasons, Fox's late(st) motion for preliminary injunction

24  should be denied in its entirety.

25

26

27

28

1

2      Dated:      March 15, 2013          Orrick, Herrington & Sutcliffe LLP

3

4                                          By: _____

                                              ANNETTE L. HURST

5                                       Attorneys for Defendants
                             DISH Network L.L.C. and DISH

6                                      Network Corp.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
LOS ANGELES