1

2
JENNER & BLOCK LLP
Richard L. Stone (Bar No. 110022)
3
Andrew J. Thomas (Bar No. 159533)
David R. Singer (Bar No. 204699)
4
Amy M. Gallegos (Bar No. 211379)
633 West 5th Street, Suite 3600
5
Los Angeles, CA 90071
rstone@jenner.com
6
dsinger@jenner.com
ajthomas@jenner.com
7
agallegos@jenner.com
(213) 239-5100

8

9
Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

10

11
**UNITED STATES DISTRICT COURT**

12
**CENTRAL DISTRICT OF CALIFORNIA**

13

14
FOX BROADCASTING COMPANY, et al.,

15
                    Plaintiffs,

16
v.

17
DISH NETWORK L.L.C., et al.,

18
                    Defendants.

19

20

21

22

23

24

25

26

27

28

Case No.  CV-12-04529 DMG (SHx)

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST DISH'S NEW 2013 SERVICES**

Hearing Date:      April 19, 2013
Hearing Time:      2:00 p.m.
Courtroom:         7 (2nd Floor)

**[PUBLIC REDACTED]**

1

2                                    **TABLE OF CONTENTS**

3

4   I.      Introduction…. ......................................................................................1

5   II.     Dish Anywhere Breaches The License Agreement…. ...............................3

6           A.      Dish Is Prohibited From Retransmitting Fox's Signal Over The
7                   Internet ...........................................................................................3

8           B.      The Court Must Disregard Dish's Parol Evidence ...........................6
9

10          C.      Dish's Inadmissible Parol Evidence Proves The Parties Did Not
                    Intend To Exempt Sling From The No-Internet Clause ......................7
11

12          D.      Even Assuming Dish's Subscribers Are Doing the Transmitting,
                    Dish Is Still Breaching The 2002 RTC Agreement ...........................9
13

14  III.    Retransmitting Fox's Live Broadcast Signal Over The Internet With
            Dish Anywhere Is Copyright Infringement…................................... 11
15

16          A.      Sling Technology Has Never Been "Declared Lawful." ..................11

17          B.      Choosing Something To Watch Does Not Make The Viewer
18                  The Transmitter ...........................................................................13

19          C.      The Cases Dish Cites Are Irrelevant ...............................................15

20          D.      Dish's Proposed Rule Would Exempt All Unauthorized
21                  Television And Internet Transmissions From The Copyright Act .....17

22          E.      Even Under Dish's "Most Significant And Important Cause"
23                  Test, Dish Is The Transmitter ..........................................................18

24          F.      The Dish Anywhere Transmissions Are To The Public ...................20
25

26          G.      Dish Cannot Stand In Its Subscribers' Shoes To Assert Fair Use ......23

27          H.      Dish's Laches Defense Has No Merit...............................................25

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV.   Hopper Transfers Breaches The License Agreement…. .............................28

V.    Fox Has Demonstrated Irreparable Harm…. ................................30

    A.    Fox Did Not Unreasonably Delay In Bringing This Motion.............31

    B.    Injunctive Relief Is Available On Fox's Contract Claims................32

    C.    Fox's Evidence Of Irreparable Harm Is More Than Sufficient.........32

    D.    Fox's Licensing Efforts Do Not Negate Irreparable Harm ...............33

VI.   Dish Has Shown No Cognizable Hardship…. ...............................34

VII.  Injunctive Relief Would Serve The Public Interest…. ..................................35

1

2

# TABLE OF AUTHORITIES

3

4

CASES                                                                    PAGE(S)

5

*ABC, Inc. v. Aereo, Inc.,*
    874 F. Supp. 2d 373 (S.D.N.Y. 2012) ..................................................... 12, 22, 23

6

7

*Apple Computer, Inc. v. Franklin Computer Corp.,*
    714 F.2d 1240 (3d Cir. 1983) .............................................................. 35

8

9

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.,*
    99 A.D.3d 1 (N.Y. App. Div. 2012) ........................................................ 5, 6, 7, 9

10

11

*Cadence Design Sys., Inc. v. Avant! Corp.,*
    125 F.3d 824 (9th Cir. 1997) .............................................................. 34

12

13

*Capital Cities Cable Inc. v. Crisp,*
    467 U.S. 691 (1984) ..................................................................... 18, 25

14

15

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
    536 F.3d 121 (2d Cir. 2008) ............................................................. 16, 22

16

*Columbia Pictures Indus., Inc. v. Redd Horne,*
    749 F.2d 154 (3d Cir. 1984) ............................................................. 22

17

18

*Columbia Pictures Industries, Inc. v. Professional Real Estate Investors,*
    866 F.2d 278 (9th Cir. 1989) ............................................................ 17

19

20

*CoStar Grp., Inc. v. LoopNet, Inc.,*
    373 F.3d 544 (4th Cir. 2004) ............................................................ 17

21

22

*Danjaq LLC v. Sony Corp.,*
    263 F.3d 942 (9th Cir. 2001) ............................................................ 27

23

24

*Diamontiney v. Borg,*
    918 F.2d 793 (9th Cir. 1990) ............................................................ 30

25

26

*Dysal, Inc. v. Hub Props. Trust,*
    92 A.D.3d 826 (N.Y. App. Div. 2012) .................................................... 5, 8

27

*Flushing Unique Homes v. Brooklyn Fed. Bank,*
    100 A.D. 3d 956 (2012) ................................................................. 30

28

*Fortnightly Corp. v. United Artists Television, Inc.*,
    392 U.S. 390 (1968) .................................................................................... 24, 25

*Fox Television Stations, Inc. v. BarryDriller Content Systems, PLC*,
    ---F.Supp.2d---, 2012 WL 6784498 (C.D. Cal. Dec. 27, 2012) (Wu, J.) .... passim

*Gilder v. PGA Tour, Inc.*,
    936 F.2d 417 (9th Cir. 1991) ............................................................................ 30

*Guardian Life Ins. Co. v. Schaefer*,
    70 N.Y.2d 888 (1987) ......................................................................................... 7

*Haas v. Leo Feist, Inc.*,
    234 F. 105 (S.D.N.Y. 1916) ............................................................................. 26

*Huseman v. Icicle Seafoods, Inc.*,
    471 F.3d 1116 (9th Cir. 2006) .......................................................................... 27

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) ............................................................................. 24

*Jinro Am. Inc. v. Secure Investments, Inc.*,
    266 F.3d 993 (9th Cir. 2001) .............................................................................. 6

*John Goyak & Assocs. v. Terhune*,
    299 F. App'x 739 (9th Cir. 2008) ..................................................................... 32

*Kaiser Trading Co. v. Associated Metals & Minerals Corp.*,
    321 F. Supp. 923 (N.D. Cal. 1970), *appeal dismissed*, 443 F.2d 1364 (9th
    Cir. 1971) .......................................................................................................... 32

*Kemelhor v. Penthouse Int'l, Ltd.*,
    689 F. Supp. 205 (S.D.N.Y. 1988) ................................................................. 6, 7

*L.A. News Serv. v. Tullo*,
    973 F.2d 791 (9th Cir. 1992) ......................................................................... 2, 24

*McCaskill v. SCI Mgmt. Corp.*,
    298 F.3d 677 (7th Cir. 2002) ........................................................................... 12

*Namad v. Salomon Inc.*,
    74 N.Y.2d 751 (1989) .................................................................................. 4, 6, 8

*On Command Video Corp. v. Columbia Pictures Indus.*,
   777 F. Supp. 787 (N.D. Cal. 1991)......................................................................passim

*Oracle Corp. v. DrugLogic, Inc.*,
   2011 WL 5576267 (N.D. Cal. 2011)................................................................. 32

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007).......................................................................... 15

*PlayMedia Sys., Inc. v. Am. Online, Inc.*,
   171 F.Supp.2d 1094 (C.D. Cal. 2001)................................................................ 5

*Princeton Univ. Press v. Mich. Doc. Servs.*,
   99 F.3d 1381 (6th Cir. 1996)........................................................................... 24

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004)............................................................................ 32

*Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991)........................................................................... 30

*S.O.S., Inc. v. Payday, Inc.*,
   886 F.2d 1081 (9th Cir. 1989).......................................................................... 5

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
   689 F.3d 29 (1st Cir. 2012) ............................................................................ 17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001)........................................................................... 30

*Sullivan v. Vallejo City Unified Sch. Dist.*,
   731 F. Supp. 947 (E.D. Cal. 1990).................................................................. 32

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
   415 U.S. 394 (1974) ....................................................................................... 24

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
   60 F.3d 27 (2d Cir. 1995) .............................................................................. 32

*Travelers Cas. & Surety Co. v. Certain Underwriters at Lloyd's of London*,
   96 N.Y.2d 583 (2001)..................................................................................... 29

*Trustees of S. Cal. IBEW-NECA Pension Trust Fund v. Flores*,
   519 F.3d 1045 (9th Cir. 2008) .......................................................................... 6

*Twentieth Century Fox Film Corp. v. iCraveTV,*
  2000 WL 255989 (W.D. Pa. Feb. 8, 2000) ...................................................18, 22

*Uribe v. Merchants Bank,*
  91 N.Y.2d 336 (1998)................................................................................7, 10

*Wallace v. 600 Partners Co.,*
  205 A.D.2d 202 (N.Y. App. Div. 1994).............................................................10

*Warner Bros. Entm't v. WTV Sys., Inc.,*
  824 F. Supp. 2d 1003 (C.D. Cal. 2011).......................................................passim

*WGN Cont'l Broad. Co. v. United Video, Inc.,*
  693 F.2d 622 (7th Cir. 1982)...........................................................................23

*WNET Thirteen v. Aereo, Inc.,*
  ---F.3d---, 2013 WL 1285591 (2d Cir. April 1, 2013) ...........................12, 16, 23

*Zomba Enters. v. Panorama Records,*
  491 F.3d 574 (6th Cir. 2007) ...........................................................................24

STATUTES

17 U.S.C. § 101.................................................................................................3, 20

17 U.S.C. § 507(b) ..............................................................................................26

OTHER AUTHORITIES

Daniel Adam Birnhak, *Online Shareholder Meetings:  Corporate Law
Anomalies or the Future of Governance?* 29 Rutgers Computer & Tech. L.J.
  423, 432 (2003)....................................................................................................22

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659..................25

Jane C. Ginsburg, *Recent Developments in US Copyright Law – Part II,
  Caselaw: Exclusive Rights on the Ebb?*, at 26 ..................................................21

2 Goldstein on Copyright §7.7.2.2 (3d ed.) .............................................................21

**I.      Introduction**

This is not a hard case.  Fox's license agreement with Dish says that Dish cannot retransmit Fox's live broadcast signal over the Internet, and cannot authorize anyone else to do so.  Dish has blanketed the universe with advertisements and press releases announcing it is now offering Dish subscribers live broadcast television over the Internet through the Dish Anywhere website and mobile application.  Dish's request that the Court "interpret" the license agreement as somehow allowing Internet retransmission using "Sling technology" must be rejected.  As a matter of law, a contract that expressly prohibits Internet retransmission cannot be "interpreted" to allow Internet retransmission.  Moreover, Dish's "interpretation" is also conclusively rebutted by Dish's own evidence, which shows that Dish tried to insert language expressly allowing Sling technology into an early draft, Fox struck it out, and Dish signed the contract anyway.  Multiple courts have held, based on the same facts, that retransmitting broadcast programming over the Internet without authorization is illegal and irreparably harms the copyright owner.  Dish should be enjoined.

Clearly recognizing it has no defense to the actual claim asserted in this case, Dish changes the subject to the irrelevant question of whether consumers can legally use a separate device called "Slingbox."  Dish is not a consumer.  Dish is a for-profit service provider trying to attract more subscribers by offering live programming over the Internet.  Dish Anywhere is not a Slingbox.  Dish Anywhere is a service that allows people who subscribe to Dish Network to watch live broadcast programming on Dish's website or by using Dish's mobile application. A Slingbox is a standalone piece of equipment, owned by less than ███ percent of the 289 million Americans who own televisions, that does not require an ongoing monthly subscription with Dish or any other service provider.

Dish argues that Dish Anywhere is just an easier way for consumers to receive programming over the Internet than with a standalone Slingbox.  That does

1

not make it legal.  Copyright law distinguishes between what consumers can lawfully do on their own and what businesses can do for large numbers of consumers for profit.  This is why a consumer can use an antenna to receive over-the-air broadcasts, but a business needs a license before it can use antennas to capture over-the-air broadcasts and retransmit them to subscribers.  *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, ---F.Supp.2d---, 2012 WL 6784498 at *5 (C.D. Cal. Dec. 27, 2012) (Wu, J.).  And it is why a consumer can use a VCR to record a movie to watch later, but a business cannot use a VCR to make thousands of copies of a movie and sell them.  *See L.A. News Serv. v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992).

Dish's attempt to convince the Court that all "Sling" technology has somehow been declared "lawful for use without a license" is a cynical misstatement of copyright law.  Sling technology is just Dish's way of processing a video signal so it can be transmitted over the Internet.  It is not a magical new invention that allows service providers to deliver live broadcast television over the Internet without a license.  Moreover, Dish's argument is wrong conceptually because there is no such thing as declaring a technology lawful under copyright law.  The relevant question in a copyright infringement case is whether the defendant is violating one of the copyright owner's exclusive rights – here, the right to publicly perform the copyrighted works.

Dish also urges the Court to reject settled law and rule that when one million Dish subscribers log onto Dish Anywhere Thursday night at 8:00 pm to watch Fox's live broadcast of *Glee* in real time over the Internet, there is no transmission to the public by Dish – just one million subscribers paying subscription fees to Dish for the privilege of privately transmitting *Glee* to themselves.  Dish's claim that choosing a show to watch makes the viewer the transmitter of the show is false.  Multiple courts have expressly held that the service provider who *delivers the content* is the transmitter, and whether the viewer initiates the transmission by

selecting something to watch is "immaterial."  *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1009-10 (C.D. Cal. 2011); *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 789-90 (N.D. Cal. 1991). Dish's proposed rule would eviscerate the public performance right because *every method* of watching video content on a television, computer, or mobile device requires the viewer to select something to watch – for example, by using a remote control to select a television program, by using a mouse to select a program to watch on a PC, or by using a touchscreen to select a program to watch on a smartphone or tablet.

The fact that every Dish subscriber simultaneously watching *Glee* live on Dish Anywhere receives a stream that Dish first sent through a leased Hopper set-top box does not change the analysis.  There is no viable argument that the subscribers are "using" the set-top box to "send" the transmissions, since Dish's own evidence shows that the subscriber does not have to do anything with the set-top box to receive live programming over the Internet other than have it physically present in her home.  The location of any particular piece of equipment is irrelevant to whether a performance is public because, under the plain language of the Copyright Act, to perform a work "publicly" means to "transmit or otherwise communicate a performance of the work . . . to the public, by means of *any device or process*."  17 U.S.C. § 101.  Dish's system for delivering its satellite signal to subscribers over the Internet by having it first pass through a set-top box to be encoded is a device or process.  Dish cannot use technological gimmickry to circumvent copyright law and the clear ban on Internet retransmission in its license agreement with Fox.  *See BarryDriller*, 2012 WL 6784498 at *5.

**II.    Dish Anywhere Breaches The License Agreement.**

      **A.    Dish Is Prohibited From Retransmitting Fox's Signal Over The Internet.**

In the 2010 Amendment to the parties' RTC Agreement, Dish broadly agreed

1   it would not distribute Fox's broadcast signal to Dish subscribers via the *Internet* or

2   *any other online technology*:

3

4

5

6

7   Biard Decl. ¶ 20, Ex. B (emphasis added) (the "No-Internet Clause").  Dish

8   Anywhere is a subscription-based, Internet streaming service that allows

9   subscribers to watch Fox network in real time on computers or mobile devices.

10   Singer Decl., Ex. A.   Therefore, Dish is breaching the agreement by

11   █████████████████████████████ Fox's signal over the Internet.

12       The phrase "██████████████████████████████████████

13   ██████████" cannot be read to mean Internet retransmission with Sling

14   technology is allowed because such a reading would make the rest of the No-

15   Internet Clause a nullity.  The first sentence of the No-Internet Clause broadly

16   prohibits Dish from retransmitting or otherwise distributing the Fox network over

17   the Internet regardless of what technology is used.  Sling technology is the sole way

18   Dish retransmits live programming over the Internet.  If the second sentence of the

19   No-Internet Clause means that Dish is *allowed* to use Sling technology, then the

20   first sentence is a nullity.  *See Namad v. Salomon Inc.*, 74 N.Y.2d 751, 752-53

21   (1989) (where employment contract said bonuses were "at the discretion of the

22   management" and also "[s]uch bonuses as are awarded will be consistent with the

23   customary policy of the company," plaintiff could not proffer parol evidence to

24   prove the second sentence meant he was entitled to a fixed bonus amount based on

25   customary bonuses awarded to other employees, since that reading would render

26   the first sentence a nullity).

27       Dish claims that the phrase "████████████████████████████

28   ████████████████████████" somehow "mak[es] clear that Sling was not

4

prohibited." Dish Br. at 25. But that makes no sense. That phrase is nothing more than the typical assurance that the agreed-upon contract restriction will not inadvertently curb any rights that fall outside the restriction. A provision making it clear that Sling was not prohibited would say "nothing contained herein shall be deemed to prohibit Sling." It would *not* say "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" because Dish has no "▮▮▮▮▮▮▮▮▮▮▮▮▮▮" to retransmit Fox's signal over the Internet using Sling technology. *See BarryDriller*, 2012 WL 6784498 at *4-5.

Moreover, because the parties knew about the existence of Sling products yet *did not include* language exempting Sling technology from the No-Internet clause, the Court cannot hold that Sling technology is exempt from the prohibition on Internet retransmission. When the parties "must have foreseen the contingency at issue" but failed to include the necessary language in the final contract, a court cannot impose contract terms that the parties conspicuously omitted from final agreement. *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 8 (N.Y. App. Div. 2012) (where party to an airport concession agreement for "Terminal 6" knew that Jet Blue would be moving to Terminal 5 but failed to include a specific reference to any terminal other than Terminal 6, court would not interpret revenue sharing clause as applying to anywhere other than Terminal 6); *Dysal, Inc. v. Hub Props. Trust*, 92 A.D.3d 826, 827 (N.Y. App. Div. 2012) (court will not imply a term where the circumstances surrounding the formation of the contract show that the parties must have foreseen the contingency at issue).

Finally, it is well settled that copyright licenses must be construed narrowly and "are assumed to prohibit any use not authorized." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989); *PlayMedia Sys., Inc. v. Am. Online, Inc.*, 171 F.Supp.2d 1094, 1099 (C.D. Cal. 2001) ("A copyright license must be interpreted narrowly"). Dish is asking the Court to turn this rule on its head and create a presumption that any use not specifically mentioned is authorized by virtue of the

contract's silence.

## B.   The Court Must Disregard Dish's Parol Evidence.

Dish asks the Court to find that the No-Internet provision actually allows Internet retransmission using Sling technology, even though the contract does not say that, based on supposed oral discussions between the parties during their early negotiations, draft agreements, and the undisclosed, subjective intent of Dish's chief negotiator.  Dish Br. at 25-26; ███████████.  But extrinsic testimony and documents cannot be used to change the meaning of an unambiguous, integrated contract.  "Parol evidence is inadmissible if a contract is clear on its face and sufficient alone to divine the intent of the parties."  *Namad*, 74 N.Y.2d at 753; *see also Trustees of S. Cal. IBEW-NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1048 (9th Cir. 2008) (reversing district court for considering parol evidence that contradicted the unambiguous contract).[1]

A contract is unambiguous if, on the face of the contract, it "is reasonably susceptible of only one interpretation."  *Kemelhor v. Penthouse Int'l, Ltd.*, 689 F. Supp. 205, 212-213 (S.D.N.Y. 1988).  Here, the No-Internet Clause is reasonably susceptible to only one interpretation:   Dish cannot retransmit or otherwise distribute Fox's broadcast signal over the Internet.

Because ambiguity is determined by looking at the contract language only, Dish cannot create an ambiguity by introducing parol evidence that it claims supports the argument that the second sentence of the No-Internet Clause was really a veiled reference to Sling technology.  *Ashwood*, 99 A.D.3d at 9 (the court does not consider parol evidence in determining whether agreement is ambiguous).  Likewise, Dish cannot create an ambiguity merely by arguing that the contract

---

[1] The parol evidence rule is a substantive issue of state contract law, not a rule of evidence governed by federal law.  *See, e.g.*, *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 999 (9th Cir. 2001).  The license agreement is expressly governed by New York law.

means something other than what it says.  *Kemelhor*, 689 F. Supp. at 212-13 (A contract term is not ambiguous "merely because the parties ascribe varying meanings to a specific provision.").

Furthermore, both the RTC Agreement and the 2010 Amendment contain broad merger and no-oral-modification clauses confirming that the parties' signed contract "████████████████████████████████████████████████████████████████████████████████████████████████████████." Biard Decl., Ex. B at 31; Ex. A at 19.  This "as a matter of law bars any claim based on an alleged intent that the parties failed to express in writing." *Ashwood*, 99 A.D.3d at 9.

### C.     Dish's Inadmissible Parol Evidence Proves The Parties Did Not Intend To Exempt Sling From The No-Internet Clause.

Even if the Court were to find the No-Internet Clause ambiguous, Fox is still likely to prevail on its contract claim.  To begin with, "ambiguities in contracts must be construed against the drafter." *Guardian Life Ins. Co. v. Schaefer*, 70 N.Y.2d 888, 890 (1987); *Uribe v. Merchants Bank*, 91 N.Y.2d 336, 397 (1998). Here, because Dish admits drafting the second sentence of the No-Internet Clause, which it now claims should be read as allowing Sling technology, Shull Decl. ¶ 16, any questions about the meaning of the language must be resolved in Fox's favor.

In any event, the parol evidence submitted by Dish confirms that the contract prohibits Dish Anywhere.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Shull Decl. ¶¶ 22-23.   The written correspondence and draft agreements exchanged between the parties conclusively rebut Mr. Shull's testimony.  On October 28, 2010, Dish sought to include the following language in the contract: "█████████████████████████████████████████████████████████

7

1     ███████████████████████████████████████.”  Shull Decl., Ex. 7 at 198.

2     In other words, Dish wanted to add the exact language it now asks the Court to read

3     into the agreement. ████████████████████████████████████████████████

4

5

6     ████████████████████████████████  In the end, the final agreement did *not*

7     contain Dish's requested language permitting Internet retransmissions via Sling.

8     *Id.*, Ex. 2 at 58.  Therefore, based on this evidence alone, the parties clearly

9     manifested that Sling was *not* authorized by the 2010 Amendment to the RTC

10     Agreement.  *See Dysal*, 92 A.D.3d at 827; *Namad*, 74 N.Y.2d at 753.

11         Dish's reliance on the parties' joint press release announcing the 2010

12     Amendment is also misleading and irrelevant.  First, the actual "joint" statement

13     says nothing about Dish Anywhere or Dish's Sling-enabled set top box.  The

14     reference to Dish's DVR with built-in Sling technology appears in the *endnote* after

15     the parties' joint statement under the header "About DISH Network." ████████

16     ██████.  Second, Dish's decision to promote a Sling-enabled DVR in a press

17     release does not change the fact that the parties' contract prohibits Dish from

18     offering the Fox network over the Internet.  To the extent Dish wanted to promote

19     its Internet streaming services for *non*-Fox networks, Fox was not in a position to

20     prevent Dish from making those statements.

21         Likewise, the internal Fox email Dish trumpets (Hurst Decl., Ex. 29) is

22     irrelevant both because it is merely commentary between executives who are not

23     lawyers, and because the email *predates* the 2010 Amendment so therefore

24     obviously cannot be an admission that the 2010 Amendment allows Internet

25     retransmission.  The email also makes clear that Fox intended to address Sling in

26     "████████" – i.e., the 2010 Amendment – which it did by banning Internet

27     retransmission.  *See id*.

28         Finally, it is irrelevant that Mr. Shull now claims the parties' 2010

Amendment was █████████████████████████████████

███████████████ " or that Dish would never have agreed to it " ████████

███████████████████████ " Shull Decl. ¶ 22.  In determining the parties' intent,

the court "looks to the objective meaning of contract language, not the parties'

individual subjective understanding of it."  *Ashwood*, 99 A.D.3d at 6.

### D.  Even Assuming Dish's Subscribers Are Doing the Transmitting, Dish Is Still Breaching The 2002 RTC Agreement.

Dish's claim that its subscribers are really the ones retransmitting Fox's signal over the Internet is a contrivance to circumvent the clear ban on Internet retransmission in the 2010 Amendment.  But even if the Court accepted this argument, Dish still loses because it is also contractually prohibited from authorizing its subscribers to retransmit Fox's signal.

The 2002 RTC Agreement states that Dish "shall not, for pay or otherwise, . . . *authorize* the . . . retransmission of any portion of any [Fox] Station's Analog Signal without prior written permission."  Biard Decl., Ex. A at 16.  Dish does not deny that it leases the Hopper with Sling to its subscribers and that it offers live Internet streaming of the Fox network only to current, paying subscribers.  Singer Decl., Ex. G at 27.  Dish also admits it provides the software and other services that are needed each time a Dish subscriber uses the Internet to watch Fox network.  Horowitz Decl. ¶ 9 (noting that Sling Media [owned by Dish] provides the routing information each time a subscriber uses Dish Anywhere to watch Fox network online).  Dish has been heavily marketing and promoting Dish Anywhere to current and prospective Dish Network subscribers.  Motion at 5-8.  Therefore, to the extent Dish Anywhere somehow involves subscribers transmitting Fox's signal to themselves, Dish is obviously "authorizing" these activities.

Dish tries to escape the clear restrictions of the RTC Agreement by inventing peculiar, tortured definitions for the words "authorize" and "retransmission."  Dish Br. at 24.  Dish claims the word "authorize" requires a formal, legal approval with

9

an express grant of rights.  *Id.*  That is nonsense.  "It is incumbent on the court, when interpreting a contract, to give the words and phrases contained therein their ordinary, plain meaning."  *Wallace v. 600 Partners Co.*, 205 A.D.2d 202, 208 (N.Y. App. Div. 1994); *Uribe*, 91 N.Y.2d at 341 (intent of contract language should be based on "common speech").  Here, the parties used the word "authorize" throughout the contract to mean "allow," plain and simple.  For example, the RTC Agreement gives Dish the right to "█████████████████████████████████████████████████████████████████████████████████."  Biard Decl., Ex. B at 28 (italics added).  Dish also defined a Fox Station Subscriber as someone who is "███████████████████████" the Fox Network on TV.  Biard Decl., Ex. B at 36 (italics added).  Dish "███████████" its subscribers to receive Fox television signals on their TV sets is no different than Dish "████████" its subscribers to watch those programs over the Internet.  Neither involves a formal, express grant of rights to subscribers.

Dish also claims the word "retransmission" can only mean the retransmission of Fox's TV signal from a satellite to a subscriber's set-top box in their home.  Dish Br. at 24.  But the language Dish cites is not a *definition* of retransmission – it is a description of the only way Dish is allowed to retransmit.  Shull Decl., Ex. 1, p. 12.  The contract shows the parties understood that "retransmission" can occur through *other* means, including the Internet.  Section 3(f) of the RTC Agreement states "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Biard Decl., Ex. A at 14 (emphasis added).  Therefore, in 2002, the parties clearly understood that retransmission can occur through numerous other "████████████████."

Then, in the 2010 Amendment to the contract, the parties expressly

acknowledged that "retransmission" can occur over the Internet because the contract states that " ███████████████████████████████████████

███████████████████████████████████████

███████████ ."  Biard Decl., Ex. B at 37.  Accordingly, even if Dish claims that its subscribers are the ones putting Fox's signals on the Internet, this conduct is a " ███████████ " that has been " ███████ " – even encouraged – by Dish.  As such, it breaches the contract and should be enjoined.  Biard Decl., Ex. A at 16.

**III.    Retransmitting Fox's Live Broadcast Signal Over The Internet With Dish Anywhere Is Copyright Infringement.**

    **A.    Sling Technology Has Never Been "Declared Lawful."**

Even if it were not expressly prohibited by the license agreement, Dish Anywhere would still be illegal because it is an unauthorized public performance that infringes Fox's copyrights in its programming.   All of Dish's copyright defenses rely on misstatements about the law and are therefore meritless.

Dish claims that "courts and the U.S. Copyright Office have declared Sling technology lawful for use without a license."  Dish Br. at 10.  This is not true, and nothing cited by Dish says that.  The *Diamond Multimedia* case does not "declare Sling technology lawful for use without a license."  That case had nothing to do with Sling technology or copyright infringement.  Instead, it involved the question of whether a portable music player marketed in the late 1990s violated a different statute not at issue here which required certain types of recording equipment to employ an electronic copyright management system.  180 F.3d 1072, 1075 (9th Cir. 1999).  The language Dish relies on is dicta, not involving Sling, in which the Court indicated that copying a music file to render it portable – what the Court referred to as "space-shift[ing] – was a noncommercial, personal use.  *Id.* at 1079.  Sling technology does not involve copying files to make them portable.  Dish Br. at 4 ("DISH Anywhere/Sling does not make or store copies of broadcast shows.").

The *Aereo* case similarly did not "declare Sling technology lawful for use

without a license." *Aereo* involved a service that retransmitted broadcast television over the Internet using miniaturized antennas.  The district court assumed in dicta, without any analysis, that a consumer could use a standalone Slingbox to view free over-the-air broadcasts over the Internet. *ABC, Inc. v. Aereo, Inc*., 874 F. Supp. 2d 373, 386 (S.D.N.Y. 2012).  Likewise, the hypothetical question the Second Circuit asked Fox's counsel in the *Aereo* case was obviously directed to a standalone Slingbox, not the subscription-based Dish Anywhere service.  This is beyond dispute because Dish Anywhere had not even been announced yet when the *Aereo* appeal was argued in November 2012, and the Second Circuit's opinion plainly references "Slingboxes" not Dish Anywhere.[2]  *WNET Thirteen   v. Aereo, Inc*., --- F.3d---, 2013 WL 1285591 at *1 n.2 (2d Cir. April 1, 2013).

Finally, the Copyright Office did not "declare Sling technology lawful for use without a license."   The section of the SHVERA Report quoted by Dish explains why the Copyright Office opposes a compulsory statutory license for Internet retransmissions.  Hurst Decl., Ex. 2, pp. 218-220.  A statutory license is an exception to copyright law wherein a third party can use copyrighted works without the owner's consent in exchange for paying a royalty set by law.  *Id*., Ex. 2, p. 33. The Report used the Slingbox as an example of a way that consumers receive television over the Internet without the need for an additional *statutory* license.  *Id*. Moreover, it is clear from the report that the Copyright Office was referring specifically to a standalone Slingbox, not a subscription-based Internet retransmission service powered by "Sling technology."  *Id*., Ex. 2, p. 60.

---

[2]  Contrary to Dish's insinuation, a response to a hypothetical question during argument in a different lawsuit about a topic that is not at issue in that lawsuit  is not a judicial admission.  *See McCaskill v. SCI Mgmt. Corp*., 298 F.3d 677, 682-83 (7th Cir. 2002) (attorney's brief response to a hypothetical question at oral argument was not a judicial admission because it did not involve a "deliberate, clear, and unambiguous statement evincing an intentional waiver" of the "arguments made in [the party's] brief").

If anything, the SHVERA Report actually rebuts Dish's argument because the Copyright Office found that "forcing content owners to make their works available for Internet transmission through a compulsory statutory license would effectively wrest control away from program producers who make significant investments in content and who power the creative engine in the U.S. economy." Hurst Decl., Ex. 2, p. 220. Dish's reading of the Report as "endorsing" Sling technology as a way for service providers to offer subscription-based access to television over the Internet without having to pay for a copyright license is wrong.

**B.     Choosing Something To Watch Does Not Make The Viewer The Transmitter.**

Dish claims it is not retransmitting Fox's signal over the Internet, asserting that "[s]ince the end-user decides whether to access any particular program, it is only that individual user who is in a position to be the direct infringer of the public performance right." Dish Br. at 13. This is wrong. No court has ever held that choosing a program to watch makes the viewer the transmitter under copyright law. To the contrary, every court that has considered this issue has squarely held that the service provider that delivers the content is the transmitter.

*On Command Video Corporation v. Columbia Pictures Indus.*, 777 F. Supp. 787 (N.D. Cal. 1991) is on point. *On Command* involved a system in which a bank of VCRs, each containing a videotape of a different movie, was  connected by wire to hotel guest rooms. *Id.* at 788. When a hotel guest turned her television on, she would see a list of available movies on the screen and could use her remote control to select one to watch. *Id.* When a guest selected a movie, the VCR containing that movie would start playing, and the video would be transmitted over the wire to the guest's television set. *Id.*

Like Dish here, On Command argued that its system was not transmitting the movies. It claimed the hotel guests were simply renting the movies electronically. *On Command*, 777 F. Supp.  at 789. The court found this argument to be "without

merit," holding that:

> On Command transmits movie performances directly under the language of the definition. The system 'communicates' the motion picture 'images and sounds' by a 'device or process' – the equipment and wiring network – from a central console in the hotel to individual guest rooms, where the images and sounds are received 'beyond the place from which they are sent.' . . . *The fact that the hotel guests initiate this transmission by turning on the television and choosing a video is immaterial*.

*Id*. at 789-90 (emphasis added).

*Warner Bros. Entm't v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011) is also directly on point. *WTV* involved an Internet service called Zediva that allowed customers to watch movies streamed over the Internet. Like Dish here, Zediva argued that its system was not transmitting the movies. *Id*. at 1009. Judge Walter rejected this argument, holding that the "Zediva service transmits performances of Plaintiffs' Copyrighted Works under the language of the statute . . . . As in *On Command*, *the fact that Zediva's customers initiate the transmission by turning on their computers and choosing which of Plaintiffs' Copyrighted Works they wish to view is immaterial*.'" *Id*. at 1009-10 (emphasis added).

As in *On Command* and *WTV*, Dish is transmitting performances of Fox's copyrighted programs under the plain language of the statute. Dish communicates the images and sounds of Fox's copyrighted programs through the use of a "device or process" – Dish's satellite service, the Sling encoder chip it placed in the set-top boxes it leased to its subscribers, Dish's Sling Media server, and Dish's website and/or mobile applications. The images and sounds are received beyond the place from which they were sent  – they are sent from Dish and received on subscribers' computers or mobile devices. As in *On Command* and *WTV*, it is immaterial that subscribers must choose a show to watch.

Dish argues that *On Command* and *WTV* are distinguishable because in those

cases the defendant "controlled either the transmission or the copy that was transmitted." Dish Br. at 14. Dish is wrong. First, neither *On Command* nor *WTV* turned on the issue of who controlled the transmission. Both courts acknowledged that the *viewer* initiated the transmission (see quotations above), but still found that the service provider who delivered the content at the viewer's request was transmitting it under the plain language of the statute. Second, just as the transmissions in *On Command* and *WTV* involved a common source (copies controlled by the service provider), the transmissions of live broadcasts that Dish subscribers receive on Dish Anywhere all have a common, centralized source (Dish's satellite signal, which is controlled by Dish).

### C.      The Cases Dish Cites Are Irrelevant.

Dish's citations are baffling and provide no support whatsoever for the proposition that selecting a program to watch makes the viewer the transmitter. For example, Dish cites *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) for the proposition that if "the end user decides whether to access a particular program, it is only that individual user who is in a position to be the direct infringer of the public performance right." Dish Br. at 13. *Perfect 10* does not say anything like that at all. *Perfect 10* involved a claim that Google infringed the display right by providing links to websites containing the plaintiff's copyrighted photographs. Infringement of the display right requires the defendant to possess and show to the public a fixed copy of the copyrighted work. *Id.* at 1160. A link is just a line of text giving the user's computer directions to another computer where the image is stored. *Id.* Because Google was only providing links to computers that stored the images, and Google undisputedly did not have copies of the images on its own computers, the Ninth Circuit held that the display right was not infringed because Google did not have, and therefore could not be displaying, fixed copies of the plaintiff's photographs. *Id.* at 1161. *Perfect 10* had nothing to do with the performance right or the question of whether watching a program online makes the

viewer the transmitter of the program.

Dish cites *Cablevision* for the proposition that deciding what to watch makes the viewer a transmitter.  But in *Cablevision*, the Second Circuit *expressly declined* to hold that selecting a program to watch makes the viewer the transmitter.  *See Cartoon Network LP, LLLP v. CSC Holdings, Inc*., 536 F.3d 121, 134 (2d Cir. 2008).  *Cablevision* involved both reproduction and performance right claims.  As the Court knows, in analyzing the reproduction right claim, the *Cablevision* court held that the viewer who pressed the button to record a show "made" that copy, not Cablevision.  Cablevision tried the same argument with respect to the performance right, claiming the remote DVR user who pressed the button to play back the recordings made the transmissions from the remote DVR server to the user's television.  *Id*.  The Court declined to extend its volitional conduct analysis to the plaintiffs' performance right claim.  *Id*. ("[O]ur conclusion   . . . that the customer, not Cablevision 'does' the copying does *not* dictate a parallel conclusion that the customer . . . 'performs' the copyrighted work.") (emphasis added).

*UMG Recordings, Inc. v. Veoh Networks*, ---F.3d---, 2013 WL 1092793 (9th Cir. 2013) is also inapposite.  *UMG* is about whether the defendant's service fell within the DMCA's safe harbor provision (not applicable here).  It was not about whether watching a program online makes the viewer the transmitter of the program.  To the extent it is relevant at all, *UMG* rebuts Dish's argument that selecting something to watch makes the viewer the transmitter because the *UMG* court assumed that when a person clicks a link to select a website to view, the web hosting service – *not* the person who clicked the link – transmits the content of the website to the person's computer.  *Id*. at *8 ("when [an] Internet user wants to access the website by clicking a link or entering the URL, all the website's relevant content is transmitted to the user's computer . . . .  To carry out their function of making websites available to Internet users, web hosting services thus routinely copy content and transmit it to Internet users.").

Dish's citation to *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors*, 866 F.2d 278 (9th Cir. 1989) is equally confounding. That case held renting videos to hotel guests was not a public performance under the Transmit Clause, because there was no performance being received beyond the place from which it was sent. *Id.* at 282. Here, there obviously is a performance being received beyond the place from which it was sent: Fox's live broadcast signal is sent from Dish's satellite system to its subscribers' computers and mobile devices.

Finally, *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) holds that to be directly liable, a defendant must be an active participant in the infringement and not merely a passive conduit like a website where people post pictures or a copy machine that is used by others to infringe.[3] Dish is obviously not a passive conduit here since it provides the signal that is transmitted and has specifically designed websites and mobile applications the whole purpose of which is to allow viewers to access Dish's signal over the Internet and no others. *See Capitol Records, LLC v. ReDigi Inc.*, ---F. Supp. 2d---, 2013 WL 1286134 at *12 (S.D.N.Y. March 30, 2013) (digital music resale service that automatically copied and distributed copyrighted music was directly liable because it was not merely a passive provider of space in which infringing activities happened to occur.)

### D.   Dish's Proposed Rule Would Exempt All Unauthorized Television And Internet Transmissions From The Copyright Act.

*All* television and Internet viewing requires the viewer to select something to watch. With television, the viewer typically selects the program from an on-screen program guide using a remote control. Under Dish's proposed rule, the viewer who selects the program would be the transmitter, not the cable or satellite service that delivers the programming. Thus, no public performance would occur when a cable

---

[3] Later decisions confirm that *CoStar*'s rule is limited to Internet service providers, which are services that provide access to the Internet. *E.g.*, *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 58 n. 19 (1st Cir. 2012).

or satellite company retransmits a broadcast signal – the viewers would simply be privately transmitting the programs to themselves.  This is exactly the opposite of what Congress intended when it enacted the Copyright Act in 1976.  As recognized by the Supreme Court, one of Congress's express goals was to make clear that retransmitting television programs without a license is copyright infringement. *Capital Cities Cable Inc. v. Crisp*, 467 U.S. 691, 709-710 (1984) ("In revising the Copyright Act . . . Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement.").

It does not help Dish to say that this is different because the subscriber also has to install Dish's mobile application and Dish's video player, and/or log into Dish's website.  Every Internet streaming service requires the customer to navigate to a website or click open a mobile application, download video player software if it is not already installed, and select something to watch.  If performing these tasks makes the viewer the transmitter, then Internet retransmissions are always private performances and are exempt from copyright law.  Yet it is beyond dispute that streaming broadcast television to members of the public over the Internet is a public performance.  *E.g.*, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 277-78 (2d Cir. 2012) (undisputed that ivi was publicly performing copyrighted television programs when it streamed those programs over the Internet to subscribers who had downloaded ivi's "TV Player" on their computer and paid a monthly subscription fee); *Twentieth Century Fox Film Corp. v. iCraveTV,* 2000 WL 255989, at *7 (W.D. Pa. Feb. 8, 2000) (undisputed that iCrave was publicly performing copyrighted television programs when it streamed them over the Internet to subscribers).

### E.    Even Under Dish's "Most Significant And Important Cause" Test, Dish Is The Transmitter.

Even if the Court were to view the question as being whether the subscriber or Dish is "the most significant and important cause" of the Dish Anywhere

transmissions, the facts here lead unequivocally to the conclusion that Dish is "the most significant and important cause" of the Dish Anywhere transmissions.

First, Dish is the source of the Dish Anywhere transmissions.  When a subscriber watches live broadcast television over the Internet on Dish Anywhere, she is receiving programming from Dish that Dish has routed through her set-top box.  *See* Kummer Decl., ¶¶ 18-20; *see also* Singer Decl., Ex A.  Although Dish characterizes the stream from the set-top box to the subscriber's PC or mobile device as a second transmission made by the user, no facts support that.  None of the declarations submitted by Dish say that when live programming is transmitted over the Internet the signal is somehow broken into two separate transmissions.  Rather, they say that the "Sling hardware" (i.e., a computer chip in the set-top box) receives the video signal, encodes it, and sends it over the Internet.  Kummer Decl., ¶¶ 17-18.  Moreover, even if there were two transmissions, the subscriber does not have to do anything to the set-top box to "send" the second transmission; her entire role is to pick a show and watch it.  Supp. Singer Decl., Ex. A; Horowitz Decl., ¶ 32.  And as explained above, selecting something to watch does not make the subscriber the transmitter.

Second, although Dish's jargon-filled expert declaration appears designed to try to trick the Court into believing there is a complicated, subscriber-driven activation process, Dish's Quick Start Guide makes clear that the subscriber need only download Dish's mobile application or log onto www.dishanywhere.com, and then she can watch live television over the Internet "with one click."  Supp. Singer Decl., Ex. A.  Dish does everything else.  Third, Dish's own expert admits Dish, not the consumer, initiates the Internet connection between the Hopper and the subscriber's computer.  Horowitz Decl., ¶ 9 ("When the subscriber launches the application on the remote device, *Sling Media provides the routing information (IP address) to initiate an Internet connection directly between the home Hopper and the remote client*.") (emphasis added).  Because Dish is the source of the Dish

1    Anywhere transmissions, the transmissions can only be viewed on Dish's website
2    or mobile application, the subscriber does nothing to "send" the transmissions, and
3    the transmissions cannot be sent without Dish initiating the Internet connection,
4    Dish is "the most significant and important cause" of the transmissions.

5         **F.     The Dish Anywhere Transmissions Are To The Public.**

6         Dish's argument that under the Transmit Clause, a performance can only be
7    public "if the technology can make a multi-party transmission,"  Dish Br. at 15, is
8    wrong for a whole laundry list of reasons.  First, the Transmit Clause does not say
9    that a performance can only be to the public if it is made with a technology that can
10   make multi-party transmissions.  The Transmit Clause says that to perform a work
11   publicly is "to transmit or otherwise communicate a performance or display of the
12   work . . . to the public, *by means of any device or process*, whether the members of
13   the public capable of receiving the performance . . . receive it in the same place or
14   in separate places and at the same time or at different times."  17 U.S.C. § 101
15   (emphasis added).  A "device or process" is "one now known or later developed."
16   *Id.*  If Congress meant to limit the definition of public performance to performances
17   made via a "technology that can make multi-party transmissions," then the statute
18   would say that – but it doesn't.  *See Columbia Pictures*, 866 F.2d at 200 n.4
19   ("Unless otherwise indicated, we assume that the legislative will is expressed by the
20   ordinary meaning of the words used in the statute. . . . Consequently, the plain
21   language is regarded as conclusive.").

22        Second, limiting public performances to those where a single transmission
23   reaches multiple recipients would require ignoring the Transmit Clause's
24   instruction that a performance can be to the public even if it is received in separate
25   places or at different times.  *See* 17 U.S.C. § 101.  There is no such thing as two
26   people receiving the same transmission at different times.  When two people
27   receive a transmission at different times, they are necessarily receiving *different*
28   transmissions.  *See* Jane C. Ginsburg, *Recent Developments in US Copyright Law –*

*Part II, Caselaw: Exclusive Rights on the Ebb?*, at 26, Revue Internationale du Droit d'Auteur (Jan. 2009) ("[I]t is not possible to transmit a performance 'created by *the* act of transmission' to members of the public 'at different times.' While such a 'performance' could be transmitted simultaneously to differently located recipients, *recipients differently situated in time cannot receive the same transmission*.") (second emphasis added)).[4]   The fact that the statute says a performance can be to the public even if the people capable of receiving the performance receive it at different times confirms that Congress envisioned multiple transmissions of the same work as being a public performance.  *See id.*

Third, Dish's argument is the same one Judge Wu rejected just three months ago in *BarryDriller*.  In that case, the defendant claimed its unauthorized Internet retransmission service was not publicly performing any programming when retransmitting it live over the Internet because each subscriber received a unique stream that went only to her private computer or mobile device.  Judge Wu held that this argument was based on a misreading of the Copyright Act, explaining that "the statute provides an exclusive right to transmit a performance publicly, *but does not by its express terms require that two members of the public receive the performance from the same transmission*."   2012 WL 6784498 at *4 (emphasis added).   To the extent Dish is relying on *Cablevision*'s interpretation of the Transmit Clause, Judge Wu's opinion in *BarryDriller* contains a thoughtful explanation of why *Cablevision*'s analysis was incorrect.  Numerous commentators agree with Judge Wu that the *Cablevision* court misread the Transmit Clause.  *See, e.g.,* Ginsburg, *supra*, at 26-27; 2 Goldstein on Copyright §7.7.2.2 (3d ed.).

Fourth, in numerous cases, courts have found a public performance even though the work was delivered to members of the public via separate transmissions. *See, e.g.*, *BarryDriller*, 2012 WL 6784498 at *3-5 (separate transmissions of live

---

[4] http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1305270

21

broadcast programming captured by separate antennas and sent over the Internet in separate streams was a public performance); *Columbia Pictures Indus., Inc. v. Redd Horne*, 749 F.2d 154, 159 (3d Cir. 1984) (separate transmissions of movies to private viewing booths was a public performance); *WTV*, 824 F. Supp. 2d at 1009-1010 (separate transmissions of movies over the Internet to viewers' computers was a public performance); *On Command*, 777 F. Supp. at 789-90 (separate transmissions of movies to separate hotel rooms was a public performance).

Fifth, it cannot be the law that performances of the same work delivered the public via unicast transmissions can never be public performances because that would mean no public performance could ever occur over the Internet. Whenever video is streamed over the Internet, the transmission is unicast. Even when multiple people watch the same video content over the Internet at the same time, each viewers' device receives a *separate* unicast stream. 29 Rutgers Computer & Tech. L.J. 423, 432 (2003) ("For instance, unicast streaming, the most common method of streaming media, requires 'streaming server[s] [to] establish[] . . . separate unicast streams for each client requesting access to the media.''). Yet it is beyond dispute that delivering video content to members of the public over the Internet is a public performance. *E.g.*, *ivi*, 691 F.3d at 278; *BarryDriller*, 2012 WL 6784498 at *3-5; *WTV*, 824 F. Supp. 2d at 1009-10; *iCraveTV*, 2000 WL 255989, at *7.

Sixth, to the extent Dish is relying on *Cablevision*'s interpretation of the Transmit Clause, Dish's argument fails on its own terms because *Cablevision*'s holding that the remote DVR transmissions were private turned on the fact that the separate transmissions were each made from unique, subscriber-made copies. 536 F.3d at 139. Dish admits that Dish Anywhere does not make any copies. Dish Br. at 4 ("Dish Anywhere/Sling does not make or store copies of broadcast shows"). In *Aereo*, the Second Circuit again confirmed that its analysis turned on the existence of unique copies, and held that when a service provider makes multiple transmissions of a program from the same copy, that is a public performance.

*Aereo*, 2013 WL 1285591 at *8. Here, unlike in *Cablevision* and *Aereo*, when Dish subscribers watch live television over the Internet on Dish Anywhere, they are not watching transmissions from separate copies.  They are watching transmissions from a common source, i.e., the satellite signal from Dish.

Finally, Dish wrongly suggests that the Dish Anywhere transmissions are not to the public because they are available only to Dish subscribers and not "the entire entertainment consuming public."  Dish Br. at 15.  Dish subscribers are members of the public under the Transmit Clause.  *WGN Cont'l Broad. Co. v. United Video, Inc*., 693 F.2d 622, 625 (7th Cir. 1982); *BarryDriller*, 2012 WL 6784498 at *4.

### G.    Dish Cannot Stand In Its Subscribers' Shoes To Assert Fair Use.

Dish argues that if it is legal for consumers to use Slingboxes, it must also be legal for Dish to retransmit Fox's programming over the Internet to its subscribers using "Sling technology."   As Dish pitches it, Dish Anywhere merely provides people who cannot figure out how to use a Slingbox a convenient way to enjoy "the same fair use rights" as the "technologically gifted."  Dish Br. at 19.  The "ease" and "convenience" of Dish Anywhere compared to a Slingbox is not relevant.  It is also easier and more convenient to buy a pirated videotape than it is to wait for a movie to be shown on television and record it with a VCR.  That does not make pirating movies legal.

Moreover, Dish has cited no cases holding that using a Slingbox or watching television on a computer or mobile device is fair use.  But even setting that aside, Dish's fair use argument fails out of the box because it is entirely premised on the argument that the subscriber's ultimate use – as opposed to Dish's commercial use – of the program is fair.  Dish Br. at 18.  This is wrong as a matter of settled Ninth Circuit law.  A commercial service provider is not entitled to insert itself as a middleman and make a profit selling access to copyrighted works without paying royalties to the copyright owner.  Whether or not the customer's ultimate use of the work would be fair is irrelevant.  This principle has been affirmed over and over

again in numerous cases.  For example, in *Tullo*, the defendant was a business that made unauthorized videotape copies of copyrighted news footage and sold the tapes to clients.  973 F.2d at 792.  The defendant argued that the tapes were fair use because his clients' ultimate uses of the tapes were fair, i.e., research, scholarship, and private study.  *Id.* at 797.  The Ninth Circuit squarely rejected this argument, explaining that because the lawsuit accused the defendant of direct infringement, the ultimate uses to which the customers put the tapes were irrelevant.  *Id.  See also Zomba Enters. v. Panorama Records*, 491 F.3d 574, 582-83 (6th Cir. 2007) (commercial CD maker could not benefit from fair use arguments its customers might have); *accord Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 112 (2d Cir. 1998) ("[C]ourts have rejected attempts by for-profit users to stand in the shoes of their customers[.]"); *Princeton Univ. Press v. Mich. Doc. Servs.*, 99 F.3d 1381, 1389 (6th Cir. 1996) (same).

Dish's position is not only contrary to settled law, it is antithetical to the concerns that motivated Congress to pass the 1976 Copyright Act in the first place.  When Congress passed the 1976 Act, it overturned two Supreme Court cases: *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 398-99 (1968), and *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394, 413-14 (1974).  These cases had held that a cable company did not need a license to capture over-the-air broadcasts and retransmit them to subscribers because it was simply doing what viewers could have done for themselves.  In *Fortnightly*, the Supreme Court reasoned that the cable system in that case accomplished nothing more than individuals were entitled to accomplish on their own:  "If an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set . . . .  The only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur."  392 U.S. at 400.

Congress rejected that equivalency, reasoning that unlike individual viewers,

"cable systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and . . . copyright royalties should be paid by cable operators to the creators of such programs." *See* H.R. Rep. No. 94-1476, at 88-89 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5703-04. Thus, in the 1976 Act, Congress enacted the Transmit Clause and clarified that a retransmission service engages in a public performance, requiring a copyright license, when it retransmits broadcast programming to subscribers. *See Capital Cities*, 467 U.S. at 709-10 ("Prior to the 1976 revision, the [Supreme] Court had determined that the retransmission of distant broadcast signals by cable systems did not subject cable operators to copyright infringement liability because such retransmissions were not 'performances' within the meaning of the 1909 Act. In revising the Copyright Act, however, Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement.").

Notably, Dish is making the same argument as the unauthorized Internet retransmission service in *BarryDriller*, which was squarely rejected by Judge Wu for the same reasons explained above. The defendant in that case argued that because individual consumers could use a Slingbox to view over-the-air broadcasts on computers and mobile devices, the defendants' service must also be legal because it was simply providing a service equivalent to what individuals could lawfully do for themselves. *BarryDriller*, 2012 WL 6784498 at *5. Judge Wu followed the exact analysis detailed above and concluded correctly that Congress "rejected that mode of reasoning" when it enacted the 1976 Copyright Act in response to the *Fortnightly* case. *Id.*

### H. Dish's Laches Defense Has No Merit.

Fox has not unreasonably delayed. Dish announced that it would stream live broadcast programming over the Internet on Dish Anywhere via Hopper with Sling in January of this year, and Fox filed suit and sought a preliminary injunction just

weeks later.  Dish cannot assert a laches defense based on the fact that standalone Slingboxes have been on the market for years.  Dish Anywhere is not a standalone Slingbox, as Dish's own marketing makes abundantly clear.  *E.g*., Singer Decl., ¶ 11, Lodged DVD, Video 1 (Dish CEO bragging that "this new Dish Anywhere capability is now much easier to use" than Dish's earlier Sling devices); *Id*., ¶ 15, Lodged DVD, Video 4 (Dish Vice-President explaining that Dish's new service is better than other streaming services that require "extra hardware," "separate apps," or are limited to "in-home viewing only.").

This case is about whether the Internet retransmission service Dish is currently offering breaches the license agreement and infringes Fox's copyrights. It is not about whether Sling technology generally is legal.  Dish has cited zero cases supporting its argument that the laches period begins to run when the technology that will be ultimately used to infringe is invented.  If Dish were right, then any copyright infringement claim against a book publisher would be barred by the copyright owner's failure to sue to stop the printing press in the year 1450.[5]

Dish's contention that laches is presumed because Fox's claim was brought outside the statute of limitations for copyright infringement is equally untenable. As Dish acknowledges, the statute of limitations for copyright infringement is three years from when the infringement is discovered, or should have been discovered with reasonable diligence.  17 U.S.C. § 507(b).  Dish Anywhere did not exist until January 2013, so obviously Fox could not have discovered it before then.  Dish's assertion that "at least some of the purportedly unlawful conduct occurred outside

---

[5] The Learned Hand quotation Dish relies on for the proposition that a plaintiff cannot "lie back and wait for a product to become popular and then decide to attack it" is not on point.  That quote cautions against allowing a copyright owner to say nothing about an infringing act, wait and see if the infringement makes money, then sue for a share of the money.  *See Haas v. Leo Feist, Inc*., 234 F. 105, 108 (S.D.N.Y. 1916) (copyright owner who knew defendant was marketing an infringing song could not wait until the song became popular then sue to recover a share of the profits).  It is irrelevant here since Fox is not seeking a share of the profits from Dish's sale of Sling products.

1   the three year statute of limitations" makes no sense.  Inventing the technology is
2   not unlawful; what is unlawful is Dish's act of using the technology to infringe.

3       Moreover, even if the Court were to find that Dish Anywhere is the same as a
4   standalone Slingbox, Dish's laches argument would still fail because Dish has not
5   even attempted to establish prejudice.  Even the cases cited by Dish make clear that
6   laches is an affirmative defense on which the defendant bears the burden of proof.
7   *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001).   "To
8   demonstrate laches, the defendant must prove both an unreasonable delay by the
9   plaintiff *and prejudice to itself.*"  *Id.* (emphasis added, citations and quotation
10  marks omitted).  It is reversible error to find laches when there is no evidence of
11  prejudice.  *E.g.*, *Huseman v. Icicle Seafoods, Inc.*, 471 F.3d 1116, 1126-27 (9th Cir.
12  2006).

13      Courts have recognized two chief forms of prejudice in the laches context –
14  evidentiary and expectations-based.   *Danjaq*, 263 F.3d at 955.   Evidentiary
15  prejudice includes things such as lost, stale, or degraded evidence, or witnesses
16  whose memories have faded or who have died.  *Id.*  Dish does not contend there is
17  any evidentiary prejudice here, and obviously there is none since Dish Anywhere
18  only launched three months ago, so witnesses' memories should be fresh and
19  relevant documents easily accessible.

20      Expectations-based prejudice is when the defendant can show that it "took
21  actions or suffered consequences that it would not have, had the plaintiff brought
22  suit promptly."  *Danjaq*, 263 F.3d at 955.  Dish does not contend that it suffered
23  any expectations-based prejudice.  To the extent Dish attempts to argue it is
24  prejudiced because it spent money developing Dish Anywhere based on the
25  assumption that because nobody sued to stop the standalone Slingbox it must be
26  legal for Dish to retransmit over the Internet as long as it used "Sling technology,"
27  that assertion is not supported by any facts in the record and, in any event, would be
28  unreasonable since (i) a standalone Slingbox is completely different than an

27

unauthorized Internet retransmission service; (ii) the law is clear that just because one use of a particular technology is non-infringing does not mean all uses of that technology are non-infringing, *e.g.*, *Tullo*, 973 F.3d at 797; *see also Associated Press v. Meltwater*, ---F.Supp.2d---, 2013 WL 1153979, at *16 (S.D.N.Y. Mar. 21, 2013); and (iii) *BarryDriller* erased any doubt that retransmitting live broadcasts over the Internet is a public performance, yet Dish launched its unauthorized Dish Anywhere service less than a month after that decision came out.

## IV.   Hopper Transfers Breaches The License Agreement.

The RTC Agreement states that Dish "shall not, for pay or otherwise, . . . authorize the recording, copying [or] duplication (other than by consumers for private home use) . . . of any portion of any Station's Analog Signal without prior written permission." Biard Decl., Ex. A at 16. Dish does not dispute that Hopper Transfers allows Dish subscribers to make copies of Fox programs for use outside the home. Instead, Dish tries to argue that "home use" must mean something other than home use, because Los Angelinos can eat "Chicago deep dish pizza" and people can use "kitchen knives in the dining room." Dish Br. at 28.

The fact that some words mean different things in different contexts does not mean that "home use" means something other than "home use" in this context. "Private home use" must be given its plain, ordinary meaning, i.e., copies used by Dish subscribers in their private homes. Indeed, the Court need not look any further than Dish's own Residential Customer Agreement where Dish expressly defines "Private Home Viewing":

> H. <u>Private Home Viewing Only</u>. DISH Network provides Services to you solely for viewing, use and enjoyment *in your private home*. You agree that no Services provided to you will be viewed in areas open to the public, commercial establishments or other residential locations.

Singer Decl., Ex. H at 160 (italics added). When Dish uses "home" as an "adjectival attributive noun" in its own subscriber agreement, it clearly means

*inside the subscriber's own home*.  Therefore, the "private home use" restriction in the parties' contract should be given the same, common-sense meaning.

Dish's proffered definition of "private home use" also fails under a separate canon of contract interpretation.  When interpreting a contract, meaning must be given to "every sentence, clause and word."  *Travelers Cas. & Surety Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 594 (2001).  Interpretations that operate to render another word meaningless violate this principle.  *Id.*  Here, Dish argues that "private home use" "means the type of personal non-commercial use such as would occur at home," including viewing in a hotel room, in a car, or at someone else's house.  Dish Br. at 28 (italics omitted).  In other words, private viewing by a consumer *anywhere*.  But this cannot be what the parties meant by a consumer's "private home use" because it would be no different than a consumer's "private use."  Under Dish's definition, the word "home" would be mere surplusage and, therefore, must be avoided because it renders contract language a nullity.  *Travelers*, 96 N.Y.2d at 594.  Because the No-Copying Clause bars Dish from authorizing users to make copies for use outside the home, and because Dish now authorizes subscribers to copy Fox's programs onto their iPads so they can be viewed outside the home, Hopper Transfers breaches the contract.

Dish's contention that it is not "authorizing" Hopper Transfers is equally unfounded.  Dish Br. at 27.  Dish makes the Hopper Transfers service available to its subscribers, promotes Hopper Transfers in its marketing materials, controls how the service operates, and determines how many copies can be made for viewing outside the home.  Horowitz Decl. ¶ 12; Singer Decl., Ex. B at 12, Ex. C at 16, 18.  Dish's Hopper Transfers press release explains how the new service "*lets* customers move television recordings from the DVR to an iPad for viewing without an internet connection . . . .  such as on a plane."  *Id.*, Ex. B at 12 (emphasis added).  Dish isn't just authorizing subscribers to make copies of Fox programs for viewing outside the home, it is enabling and encouraging them.  Accordingly, Hopper

1    Transfers breaches the parties' contract.

2         Finally, Dish claims that Fox somehow waived its rights under the No-

3    Copying Clause because in 2005 Dish sold the PocketDISH, a portable video player

4    that allowed Dish subscribers to transfer copies of programs from their DVRs onto

5    the device for out-of-home viewing.  Dish Br. at 28.[6]  Dish's argument is a red

6    herring.  First, the PocketDISH was an obscure product and discontinued after just

7    24 months.  Kummer Decl. ¶ 31.  Second, when the parties amended and extended

8    the RTC Agreement in 2010, they included a No-Waiver Clause confirming that no

9    failure to exercise or delay in the exercise of any rights will constitute a waiver.

10   Biard Decl., Ex. B at 31.  No-waiver provisions are enforceable under New York

11   law.  *Flushing Unique Homes v. Brooklyn Fed. Bank*, 100 A.D. 3d 956, 958 (2012).

12   **V.    Fox Has Demonstrated Irreparable Harm.**

13        Irreparable harm is an injury that cannot be "remedied by a damage award"

14   alone.  *Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc.*, 944 F.2d 597,

15   603 (9th Cir. 1991).  This includes "damages [that] would be difficult to valuate."

16   *Id.*  The fact that damages are difficult to quantify makes them irreparable, not

17   unduly speculative.  *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991).

18   Accordingly, the Ninth Circuit has long held that intangible injuries, such as "lost

19   contracts and customers, and harm to [a company's] business reputation and

20   goodwill" qualify as irreparable harm.  *Stuhlbarg Int'l Sales Co. v. John D. Brush*

21   *& Co.*, 240 F.3d 832, 838 (9th Cir. 2001); *Rent-A-Center*, 944 F.2d at 603**.**  Fox is

22   not required to prove it already has suffered extensive damages – such a standard

23   "would defeat the purpose of the preliminary injunction, which is to prevent an

24   injury from occurring.  *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir. 1990).

25        **A.    Fox Did Not Unreasonably Delay In Bringing This Motion.**

26

27   [6] Dish's citation to every third-party device or technology on the market that
     supposedly allows consumers to transfer recorded programs from a DVR to a
28   mobile device is irrelevant because Fox's contract prohibiting Hopper Transfers is
     *with Dish*, not any of those third parties.

30

Dish's claim that Fox cannot be irreparably harmed because it waited "seven years" to file suit ignores the fact that Dish did not introduce the Dish Anywhere and Hopper Transfers services, or reveal its plans to promote these services on a massive scale, until *January 2013*. *See* Motion, pp. 5-8.

Moreover, Dish's brief confirms that its previous "Sling" products were barely noticed, let alone widely used, by Dish subscribers. While Dish trumpets the fact that it has "distributed over ▉▉▉" units of its ViP922 set-top box since it was introduced in April 2010 (Dish Br. at 5, 30), this statistic – when measured against the total number of Dish subscribers, which exceeds 14 million – fully confirms its status as the Edsel of set-top boxes: according to Dish's own data, less than ▉ percent of its customers ever used a ViP922.[7] ▉▉▉▉▉▉ list other similar products but fail to provide any information about how widely they have been used by consumers. *See* ▉▉▉▉▉▉▉▉▉ Likewise, Dish has provided no sales figures for PocketDish, but they were presumably very low given that the product was discontinued after just 24 months on the market.

By comparison, Dish's Hopper set-top box is in 2 million homes. Singer Decl., ¶ 16; Lodged Video 5. Moreover, Dish is in the midst of a multi-million dollar marketing campaign for Dish Anywhere and Hopper Transfers and, as its CEO admitted, has announced its intent to "commercialize its technology at a much higher level" than it did in the past. Singer Decl., ¶ 16; DVD 5; *see also* Eriq Gardner, Dish Network's Charlie Ergen Is The Most Hated Man In America (The Hollywood Reporter, April 2, 2013) (describing the Hopper's popularity).[8]

**B.   Injunctive Relief Is Available On Fox's Contract Claims.**

---

[7]  Dish claims Fox undercounted the number of ViP922's in use because its estimation was based on the number of Internet-connected boxes reporting to Dish on a daily basis. Because the set-top box must be connected to the Internet for the Sling feature to work, Horowitz Decl., ¶ 8, set-top boxes not connected to the Internet are obviously not using that feature, making them irrelevant to the analysis.

[8]  http://www.hollywoodreporter.com/news/dish-networks-charlie-ergen-is-432288.

Dish misstates the law in asserting that preliminary injunctive relief is never appropriate for a breach of contract claim.  There is no absolute bar in this Circuit.  *See John Goyak & Assocs. v. Terhune*, 299 F. App'x 739, 740 (9th Cir. 2008).  Where irreparable harm is otherwise established, courts look to the applicable state law governing whether specific performance is available to enforce the contract.  See *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F. Supp. 923, 931 (N.D. Cal. 1970), *appeal dismissed*, 443 F.2d 1364 (9th Cir. 1971); *see also Oracle Corp. v. DrugLogic, Inc.*, 2011 WL 5576267, *4 (N.D. Cal. 2011).[9]  Here, the relevant contract – the 2010 Letter Agreement – is expressly governed by New York law, and numerous courts have recognized that preliminary injunctive relief is available to prevent a breach of contract under New York law.   *See*, *e.g.*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995).

**C.    Fox's Evidence Of Irreparable Harm Is More Than Sufficient.**

Dish argues that the evidence of harm to Fox is "speculative" because it is presented in declarations from Fox executives with decades of experience, because Fox has not sued other companies, and because Fox has not suffered past harms from earlier Dish products – the ViP922 and PocketDish – that were barely noticed by consumers.  (Dish Br. at 32-33).  None of these arguments has merit.

Dish completely ignores the fact that courts considering similar services that retransmitted copyrighted works over the Internet have found irreparable harm based on almost exactly the same showing that Fox has made here – evidence of the *same* kinds of injuries, set forth in declarations from executives at the plaintiff companies with the *same* level of experience.  *See BarryDriller*, 2012 WL 6784498 at *6 (relying on Brennan declaration and holding that Internet streaming service

---

[9] The only authority cited by Dish on this point – a disability rights case – did not have any occasion to consider whether injunctive relief could be awarded with respect to a contractual claim.  *See Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947 (E.D. Cal. 1990).

irreparably harmed broadcast television networks because it would interfere with their ability to measure and sell TV ads, undermine retransmission consent negotiations and relationships, and unfairly compete with their proprietary internet distribution websites and mobile applications); *ivi,* 691 F.3d at 286 (TV network irreparably harmed by service that prevents ads from being seen by intended audience[10]); *WTV Systems*, 824 F. Supp. 2d at 1012-13 (unauthorized, online distribution of plaintiffs' movies irreparably harmed plaintiffs); *see also* Mot. at 18-20.  Furthermore, Dish's own authorities make clear that Fox need not sue all potential infringers at the same time in order to establish irreparable harm.  *See*, *e.g.*, *Polymer Technologies*, 103 F.3d at 975 ("A patentee does not have to sue all infringers at once.  Picking off one infringer at a time is not inconsistent with being irreparably harmed.").

### D.    Fox's Licensing Efforts Do Not Negate Irreparable Harm.

Dish's argument that Fox cannot establish irreparable harm because it has licensed others to provide Internet streaming or digital downloads of its programs misconstrues both Fox's argument and the cases on which Dish relies.  Fox is not arguing that Dish Anywhere and Hopper Transfers cause injury in the form of lost royalties.  Instead, Fox has shown that Dish's new services threaten actual imminent harm to its relationships and negotiations with advertisers, licensees, and other cable and satellite distributors – harms that cannot be measured or recompensed by reference to royalty rates in existing license agreements.  *See* Biard Decl. ¶¶ 25-26; Brennan Decl. ¶¶ 15-22; *see also ReDigi*, 2013 WL 1286134 at *9

---

[10] With respect to advertising harms, Dish has nothing coherent to say.  It asserts that Internet viewing is ███████████████, but the evidence it cites does not remotely establish that consumers who watch programs via Internet streaming also watch those same programs a second time using their televisions – which is the only way their viewing would by captured by Nielsen's "C3" measurement.  Dish then seeks to bolster its irrelevant "████████████████" point by quoting a hearsay statement speculating that Nielsen might start measuring Internet viewing as some unspecified time in the future – hardly proof that irreparable harm is lacking.  (Dish Br. 33; Rapp Decl. ¶ 42.)

(copyright owner "does not forfeit its right to claim copyright infringement merely because it permits certain uses of its works"). ███████████████ ████████████████████████ that agreements with other MVPDs might ████████████ for calculating damages rest on pure speculation.  If this were the rule, preliminary injunctions would not have been granted in *Ivi*, *BarryDriller* and *WTV*.

None of the cases on which Dish relies (Dish Br. at 31) addresses these kinds of threatened harms.  In *ActiveVideo*, for example, the only harm alleged was the loss of a per-subscriber license fee that occurred when the defendant, Verizon, took a subscriber away from the plaintiff's licensee, Cablevision.  *See* 694 F.3d 1312, 1338 (Fed. Cir. 2012).  Similarly, the court in *Polymer Technologies* merely observed that "*potential lost sales alone*" could not establish irreparable harm where the movant had granted a non-exclusive license to a non-party.  *See* 103 F.3d 970, 975 (Fed. Cir. 1996) (emphasis added).

## VI.   Dish Has Shown No Cognizable Hardship.

Dish grossly exaggerates the hardship that a preliminary injunction would pose for Dish's relationship with its customers.  The only "goodwill" and "customer relationships" relevant to this Motion have arisen in connection with Dish's heavy advertising and promotion of the infringing Dish Anywhere and Hopper Transfers services *since January 2013*.  But it is well settled that "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration."  *WTV Systems*, 824 F. Supp. 2d at 1015 (quoting *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997)).

Dish also misleadingly and without any evidence equates a preliminary injunction with a product "recall." To comply with an injunction Dish would merely need to cease offering, supporting and advertising Dish Anywhere and Hopper Transfers.  An injunction would not require the recall of a single set-top box or other piece of hardware.

**VII.   Injunctive Relief Would Serve The Public Interest.**

Developing the Fox programs is an enormously expensive endeavor on which the jobs of thousands of creative professionals, production personnel, and trade and guild members depend.   *See* Brennan Decl. ¶ 6.   As this District recognized in *WTV Systems*, "it is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work."   *See WTV*, 824 F. Supp. 2d at 1015 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983).

Television broadcasters, and the entertainment industry generally, represent a large and important part of the U.S. economy – one of its most vital and robust export industries – and the health of those businesses depends on the protections afforded by copyright law.   Unauthorized content distribution systems – like Dish Anywhere and Hopper Transfers – threaten the entire ecosystem for legitimate distribution of copyrighted works.   Copyright law's protections are what make it possible for producers of high-quality television programs to recoup the enormous investments required to put their shows on the air.   Without the protection that copyright law affords, the livelihoods of thousands of writers, directors, actors, technicians and crew members would be put at risk, as explained recently in the amicus brief submitted to the Ninth Circuit in this case by various film studios, record labels, music publishers, the Directors Guild of America, and the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, its Territories and Canada, AFL-CIO.   *See* Ninth Cir. Dkt. No. 24, at pp. 26-29.

1

2   DATED:  April 5, 2013                    JENNER & BLOCK LLP

3                                            By:        /s/

4                                                    Richard L. Stone

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28