JENNER & BLOCK LLP
Richard L. Stone (Cal. Bar No. 110022)
rstone@jenner.com
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
David R. Singer (Cal. Bar No. 204699)
dsinger@jenner.com
Amy M. Gallegos (Cal. Bar No. 211379)
agallegos@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071

Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS, INC.<br><br>              Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C. and DISH NETWORK CORP.,<br><br>              Defendants. | Case No.  12-CV-04529-DMG (SH)<br><br>**DECLARATION OF DAVID SINGER IN SUPPORT OF FOX'S MOTION TO COMPEL DISH TO IMMEDIATELY PRODUCE DOCUMENTS IT ALREADY AGREED TO PRODUCE** |

**PUBLIC REDACTED VERSION**

2186306.2

## DECLARATION OF DAVID SINGER

I, David Singer, declare as follows:

1.    I am an attorney licensed to practice law in the State of California, and I am a partner at the law firm of Jenner & Block LLP, attorneys of record for plaintiffs Twentieth Century Fox Film Corporation, Fox Broadcasting Company, and Fox Television Holdings (collectively, "Fox"). I submit this declaration in support of Fox's Motion to Compel Defendants Dish Network L.L.C. and Dish Network Corporation (collectively, "Dish") to Produce Documents It Already Agreed to Produce ("Motion to Compel"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently to such facts under oath.

### Fox's Document Requests and Dish's Initial Objections

2.    On September 20, 2012, Fox served its First Set of Document Requests to Dish Network L.L.C. and its First Set of Document Requests to Dish Network Corp. A copy of the document requests served on Dish Network L.L.C. is attached as **Exhibit 1**. The requests served on Dish Network Corp. were identical (other than defendant's name).

3.    On November 8, 2012, Dish Network L.L.C. and Dish Network Corp. served their Responses to Fox's First Set of Document Requests. A copy of the responses Dish Network L.L.C. served on Fox is attached as **Exhibit 2**. The responses were identical to those served by Dish Network Corp. save for the defendant's name.

### Fox Met and Conferred Extensively With Dish
### to Reach Compromises and Narrow the Issues for this Motion

4.    On November 17, 2012, nine days after receiving Dish's responses and objections to Fox's document requests, I sent a detailed letter to Dish's counsel, William Molinski, identifying the deficiencies with Dish's responses and objections and briefly stating Fox's position on each one. In my letter, I also requested an in-

1  person meeting at my office pursuant to Local Rule 37-1 and suggested that Dish

2  provide a written response to my letter in advance of the conference.  In light of the

3  Thanksgiving holiday, I proposed meeting during the week of November 26th and

4  offered various times when I would be available.  A copy of my November 17,

5  2012 letter to Mr. Molinski is attached as **Exhibit 3**.

6      5.    On November 21, Mr. Molinski sent me a letter explaining that Dish's

7  counsel were preparing a response to my November 17 letter, as well as a separate

8  letter dealing with Fox's responses and objections to Dish's discovery requests.

9  Mr. Molinski said he would be prepared to confer about both sets of discovery

10  shortly.  A copy of Mr. Molinski's November 21 letter is attached as **Exhibit 4**.

11      6.    On November 29, Mr. Molinski set me a letter concerning documents

12  Dish is seeking from Fox, but did not respond to my November 17 letter concerning

13  Dish's deficient document production.  A copy of Mr. Molinski's November 29

14  letter is attached as **Exhibit 5**.  On December 10, 2012, I sent another letter to

15  Mr. Molinski reminding him that Fox was still waiting for a written response to my

16  November 17 letter so that the parties could have a meaningful, in-person meeting

17  under the Local Rules.  A copy of my December 10 letter to Mr. Molinski is

18  attached as **Exhibit 6**.

19      7.    On December 19, 2012, Mr. Molinski sent me a written response to

20  my November 17 letter, outlining Dish's position on Fox's document requests and

21  reiterating what Dish was willing, and not willing, to produce.  Mr. Molinski said

22  he was available to meet in person the first week of January 2013.  A copy of

23  Mr. Molinski's December 19 letter is attached as **Exhibit 7**.

24      8.    On January 8, 2013, counsel for both sides met at my office to discuss

25  both sides' document requests and responses.  The meeting lasted several hours and

26  was led by me and Mr. Molinski.  We went through every request that was in

27  dispute.  During the meeting, we reached several compromises.  For example, Fox

28

-2-

1   agreed to narrow a number of its requests by removing the word "concerning"
2   because Dish perceived it as too broad.

3        9.     We also agreed to revisit certain issues with our clients and to follow
4   up the meeting with letters discussing how each side was prepared to amend their
5   position on their own production of documents.

6        10.    On January 25, 2013, Mr. Molinski sent me a letter further discussing
7   Dish's responses and objections to Fox's document requests. As to some requests,
8   Dish continued to maintain its position. On others, Dish agreed to modify its
9   responses, albeit ambiguously. In some cases, Dish took a more restrictive view on
10  what documents it was willing to produce. Mr. Molinski also requested further
11  clarifications from Fox on the scope of some requests. A copy of Mr. Molinski's
12  January 25 letter is attached as **Exhibit 8**.

13       11.    On January 28, I replied to Mr. Molinski's letter and provided the
14  clarifications he had requested. Specifically, Fox agreed to make further
15  compromises and to narrow several of its requests even more. For example, Fox
16  agreed to limit all Sling Adapter discovery to January 2010 forward. Fox also
17  answered any questions in Mr. Molinski's previous letter. Finally, I asked
18  Mr. Molinski to clarify what Dish meant when it says that it will produce
19  documents responsive to certain requests "as narrowed." Finally, I offered to have
20  another phone call or in-person meeting in an effort to further narrow any gaps
21  between the parties and/or narrow the issues to be raised in motions to compel. I
22  also proposed that the parties agree to a joint briefing schedule for the motions to
23  compel and to discuss timing of the motions. A copy of my January 28 letter to
24  Mr. Molinski is attached as **Exhibit 9**, along with my cover email asking to set up a
25  phone call later in the week.

26       12.    Neither Mr. Molinski, nor any of the three other lawyers from his firm
27  that were copied on all correspondence, responded to my January 28 letter and
28  email requesting a phone call and/or meeting.

-3-

2186306.2

13.     On February 4, 2013, I sent another email to Mr. Molinski asking for Dish's response to the open issues addressed in my January 28, 2013 letter. A copy of my February 4 email is attached as **Exhibit 10**. Dish never responded to that email either.

14.     On February 6, 2013 (at 2:00 p.m.), I called Mr. Molinski to discuss whether any further resolution could be reached on these discovery issues. I left him a voice message, and he called me back shortly thereafter. During our call, Mr. Molinski said that Dish would send me a response by Friday, February 8.

15.     On Friday, February 8, 2013, at 8:40 p.m., I received a letter from Mr. Molinski addressing *only* Dish's perceived deficiencies with Fox's document production. The letter made no reference to Fox's document requests to Dish or Dish's refusal to produce relevant documents.

### Fox's Original Motion to Compel

16.     On February 12, 2013 – nearly five months after serving the document requests at issue, I served Dish's counsel with Fox's portion of a joint stipulation in connection with Fox's original motion to compel per Local Rule 37-2.2 ("Original Motion to Compel"). I also sent Mr. Molinski a cover letter explaining Fox's reasons for moving forward with its motion. A copy of my February 12 cover letter is attached as **Exhibit 11**.

### Dish Agreed to Produce All Responsive Documents
### and Fox Agreed to Withdraw Its Original Motion to Compel

17.     After Fox served Dish with its Original Motion to Compel, Dish finally agreed to produce all responsive documents sought by Fox's motion. On February 14, 2013, Mr. Molinski sent me a letter confirming that Dish would produce the documents responsive to Requests Nos. 2, 11, 22, 26, 27, 28, 30, 46, 55 and 62 that Fox was seeking in connection with its Original Motion to Compel. Dish proposed a compromise with respect to Request No. 94 (the only remaining request covered by the motion), but would not agree to produce all responsive

-4-

2186306.2

1   documents.  Also, Mr. Molinski did not indicate *when* Dish would produce the

2   responsive documents.  A copy of Mr. Molinski's February 14 letter is attached as

3   **Exhibit 12**.

4         18.    On February 15, 2013, I sent Mr. Molinski a letter offering to

5   withdraw Fox's Original Motion to Compel if Dish agreed to begin producing

6   responsive documents within 7 days and to complete its production within 30 days.

7   With respect to Request No. 94, I explained why Dish's proposal was insufficient.

8   A copy of my February 15, 2013 letter is attached as **Exhibit 13**.

9         19.    On February 15, 2013, Mr. Molinski sent me a letter in which Dish

10  finally agreed to produce the documents responsive to Request No. 94 that Fox was

11  seeking.  However, with respect to all of the documents Dish had agreed to

12  produce, Dish would not agree to produce them within 30 days.  Among other

13  things, Dish blamed its failure to comply with discovery in a timely manner on the

14  discovery proceedings in the Southern District of New York (SDNY) where Dish is

15  being sued by CBS and ABC for similar copyright infringement.  The SDNY action

16  (which has never been consolidated or coordinated with this action) was designated

17  to be part of a "Pilot Project Regarding Case Management."  Apparently, this

18  requires Dish, ABC and CBS to jointly coordinate minute details of electronic

19  email searches.  These rules – which are more suited to large, complex antitrust

20  cases – have caused substantial delay in the SDNY Action.  Among other things,

21  the parties in the SDNY action have agreed to exchange lists of custodians and

22  email search terms, instead of following the standard discovery procedures under

23  the FRCP.  Fox never participated in those discussions and has always maintained

24  its objection to that process.  A copy of Dish's February 15, 2013 letter is attached

25  as **Exhibit 14**.

26        20.    On February 15, 2013 I responded to Dish's letter.  I explained that the

27  SDNY "Pilot Rules" do not apply to Fox or to this lawsuit in California.  I also

28  reminded Dish that many of the documents sought by Fox (such as those relating to

- 5 -

2186306.2

1    Sling Adapter or to Fox breach of contract claim) are unique to this lawsuit, and

2    there is no reason why anything in the SDNY action should cause Dish to delay

3    searching for and producing those documents to Fox.  I told Mr. Molinski that Fox

4    would not agree to a unilateral, indefinite stay of discovery.  My February 15 letter

5    is attached as **Exhibit 15**.

6        21.   On February 17, 2013, Mr. Molinski finally agreed that Dish would

7    begin producing responsive documents within two weeks.  He also agreed to

8    provide a status of Dish's production within 30 days.  The implication of

9    Mr. Molinski's letter was that Dish would engage in a meaningful document

10   production within 30 days.  Mr. Molinski's February 17 letter is attached as

11   **Exhibit 16**.

12       22.   Based on the understanding that Dish would produce all of the

13   responsive documents it agreed to produce, I sent Mr. Molinski a letter on

14   February 19, 2013 withdrawing Fox's Original Motion to Compel.  I also notified

15   Mr. Molinski that if Dish has not made substantial progress in its document

16   production within 30 days (i.e., by March 21), Fox would renew its motion.  My

17   February 19 letter is attached as **Exhibit 17**.

18                   **Dish's Document Production To Date**

19       23.   In 2012, while this case was still pending before Judge Swain in

20   SDNY (Dish had filed a declaratory relief action against Fox that was eventually

21   dismissed), Fox obtained leave of court to serve Dish with expedited discovery

22   seeking documents sufficient to show how PrimeTime Anytime ("PTAT") and

23   AutoHop (the infringing services at issue) function.  Instead of producing the plain-

24   English functional requirements documents (*i.e.*, software specifications), Dish

25   produced only computer source code consisting of 5,588 computer folders and

26   42,820 files that would have taken a team of computer scientists hundreds of hours

27   to review.  On August 1, 2012, after Fox brought the issue to Judge Swain, Judge

28   Swain ordered Dish to produce the withheld documents (approximately 400 pages).

24.     During the meet and confer process for the Original Motion to Compel, Dish claimed it had produced "nearly 9,000 pages" of documents (*see* Exh. 5, p. 130). That is true, but misleading. ***First***, all of these documents were produced in response to document requests propounded by ABC (not Fox) in connection with ABC's preliminary injunction motion against Dish in SDNY (that motion is still pending). On November 21, 2012, Dish simply gave Fox a copy of its production to ABC. ***Second***, the bulk of Dish's production is fluff. Nearly 2,000 pages consist of News Corp.'s SEC public filings (which Fox never requested). A large chunk consists of publicly-available case law and FCC administrative proceedings, including a 482-page FCC report on the VOD industry (which Fox never requested). In fact, Dish's so-called document production includes 1,321 pages that are simply copies of the *pleadings from this lawsuit*. More than 1,700 pages of the production are articles and studies that Dish's experts relied on for the preliminary injunction motion. In short, only a small fraction of Dish's 9,000 pages of document production consists of Dish's own business records. Prior to Fox serving its Original Motion to Compel, Dish had not even produced a *single* email.

25.     After Fox agreed to withdraw its Original Motion to Compel, Dish produced documents on March 1, 2013 and March 7, 2013. Dish's March 1 production consisted of 150 documents, but most of them were duplicates of each other or of documents previously produced by Dish in August 2012. By our count, the production contained only 20 new documents and only a *single* email string. The March 1 production consisted of functional requirements specifications that were already ordered produced by Judge Swain last year. Dish's March 7

Although Fox needs these documents for its statutory damages calculation, they were not even the subject of Fox's Original Motion to Compel. Additionally, Dish never provided

- 7 -

2186306.2

1   Fox with a status report on when its production would be complete, as promised in

2   Mr. Molinski's February 17, 2013 letter.

3       26.   On April 1, 2013, I sent Mr. Molinski a letter explaining the

4   deficiencies in Dish's production and notifying him that Fox was renewing its

5   Original Motion to Compel and seeking an order compelling immediate production

6   of the documents Dish already agreed to produce.  A copy of my April 1 letter is

7   attached as **Exhibit 18**.

8       27.   In stark contrast to Dish's document production, Fox began this case

9   by *voluntarily* producing documents to Dish without a court order and before

10  discovery commenced.  And, beginning on August 13, 2012, Fox has engaged in a

11  rolling production of responsive documents (August 16, August 21, November 7,

12  November 8, and December 10, 2012 and January 23, January 29, February 5,

13  February 8, March 6, and March 14, 2013).  To date, Fox has produced 14,888

14  pages, including internal emails, external emails, financial statements, the parties'

15  negotiations, studies, Nielsen data, and more.  And Fox is still searching for and

16  reviewing more documents for production on a rolling basis.

17          **Other Evidence in Support of Fox's Motion**

18          **to Compel Further Document Production by Dish**

19      28.   Attached as **Exhibit 19** is a copy of Fox's complaint dated May 24,

20  2012.

21      29.   Attached as **Exhibit 20** is a copy of Dish's answer to Fox's complaint

22  dated July 30, 2012.

23      30.   Attached as **Exhibit 21** are excerpts from the deposition transcript of

24  Dish's FRCP 30(b)(6) witness, Dan Minnick, dated August 7, 2012.

25      31.   Attached as **Exhibit 22** is a copy of relevant excerpts of the

26  Declaration of Michael Biard filed under seal in support of Fox's motion for a

27  preliminary injunction and dated August 17, 2012.

28

- 8 -

2186306.2

32.    Attached as **Exhibit 23** are excerpts from Dish's opposition brief to Fox's request for a preliminary injunction (filed under seal), dated August 31, 2012.

33.    Attached as **Exhibit 24** are relevant excerpts from the Declaration of David Shull filed under seal in support of Dish's opposition to Fox's request for a preliminary injunction, dated August 30, 2012.

34.    Attached as **Exhibit 25** are relevant excerpts from the Declaration of Dan Minnick filed under seal in support of Dish's opposition to Fox's request for a preliminary injunction, dated August 31, 2012.

35.    Attached as **Exhibit 26** is a copy of The Honorable Dolly M. Gee's under seal order denying Fox's request for a preliminary injunction, dated November 7, 2012.

36.    Attached as **Exhibit 27** is a copy of the relevant excerpts from Dish's brief in opposition to Fox's appeal of the district court's order denying Fox's request for a preliminary injunction, dated January 17, 2013.

37.    Attached as **Exhibit 28** is a copy of the Retransmission Consent Agreement entered into between Fox and Dish, dated July 1, 2002.

38.    Attached as **Exhibit 29** is a copy of the letter agreement between Fox and Dish, dated October 29, 2010.

39.    Attached as **Exhibit 30** is a copy of Dish's press release, dated November 18, 2010, announcing the Sling Adapter and titled "Dish Network Introduces America's First True TV Everywhere Offering."

40.    Available at http://www.youtube.com/watch?v=Ch-QyoNDwys is a video in which Vivek Khemka, Dish's Vice President, says, at the 5 minute, 10 second mark of this video, that "I don't think you'd ever need Hulu Plus or Hulu after this," referring to Dish's PrimeTime Anytime ("PTAT") service (last visited March 27, 2013).

2186306.2

41.     Attached as **Exhibit 31** is a copy of Dish's press release, dated
March 15, 2012, announcing Dish's PTAT service and titled "Hopper Whole-Home
HD DVR System Now Available from Dish".

42.     Attached as **Exhibit 32** is a copy of Dish's press release, dated
May 10, 2012, announcing Dish's AutoHop feature available with PTAT and titled
"Dish Introduces Commercial-Free TV With 'Auto Hop.'"

43.     Attached as **Exhibits 33, 34 & 35** are true and correct copies of
articles explaining that Dish's true purpose behind AutoHop was to gain leverage in
retransmission negotiations.  **Exhibit 33** is a copy of a *Los Angeles Times* article,
dated November 8, 2012, and titled "Dish's AutoHop is about leverage as much as
it's about skipping ads."  **Exhibit 34** is a copy of an *All Things D* article , dated
May 25, 2012, and titled "Dish Network Doesn't Want to Blow Up TV.  It Wants
to Pay Less for It."  **Exhibit 35** is a copy of a *Wall Street Journal* article, dated June
7, 2012, and titled "Dish Chief:  TV Needs to Change."

44.     Attached as **Exhibits 36 & 37** are copies of two Denver Post articles.
**Exhibit 36** is titled "Ergen:  Dish's Hopper protects kids from ads for junk food,
booze" and dated June 26, 2012, and **Exhibit 37** is titled "Charlie Ergen envisions
better phone service, targeted commercials" and dated August 19, 2012.

45.     Attached as **Exhibit 38** are copies of documents produced by Dish and
bates numbered DishvABC00007943-44.

46.     Attached as **Exhibit 39** is a document containing excerpts of the
Supreme Court of the State of New York's order imposing sanctions on defendant
EchoStar Satellite L.L.C. for spoliation in *Voom HD Holdings LLC v. EchoStar
Satellite L.L.C.*, No. 600292/08, Dkt. No. 128, dated November 3, 2010.

- 10 -

2186306.2

47.    I have not attached an order establishing the initial case schedule to my declaration, as required by Local Rule 37-2.1, because the Court has not yet issued one.  Currently, there is no discovery cut-off, pretrial conference, or trial date on calendar.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 1st day of April, 2013 at Los Angeles, California.

David R. Singer

- 11 -

# EXHIBIT 1

**FILED UNDER SEAL**

**EXHIBIT 2**

**FILED UNDER SEAL**

**EXHIBIT 3**

**JENNER&BLOCK**

November 17, 2012

Jenner & Block LLP          Chicago
633 West 5th Street          Los Angeles
Suite 3600                   New York
Los Angeles, CA 90071        Washington, DC
Tel 213-239-5100
www.jenner.com

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel  213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinsky, Esq.
ORRICK, HERRINGTON &
   SUTCLIFF LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

Re:   *Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al*
      **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Bill:

Pursuant to Local Rule 37-1, I am writing to arrange an in-person meeting at my office so that we can discuss Dish Network, L.L.C.'s and Dish Network Corp.'s ("DISH") objections and responses to Fox's first set of document requests.

First, DISH has not yet produced the documents it agreed to produce.  As I explained in my November 14th email, We were expecting DISH to begin producing responsive documents last week when DISH's responses and objections were due.

Second, we have a number of concerns with DISH's refusal to produce numerous categories of relevant documents, as well DISH's unilaterally-imposed limitations on the scope and content of Fox's requests.  To assist with our conference, the following is a summary of Fox's position on the relevance of the requested documents that DISH is refusing to search for and produce.  Of course, given the number of disputes, this is not meant to be an exhaustive list of Fox's concerns.  Rather, this can serve as a useful starting point for our upcoming conference.

**<u>DISH's General Responses and General Objections</u>**

At the outset, I'm not sure what to make of DISH's "General Responses" and "General Objections, a five-plus page litany of reserved rights, interpretations of federal discovery rules and rules of evidence, and blanket objections some of which I have never seen before (such as DISH's objection to producing information to the extent it relates to DISH's activities or conduct that occurred in a foreign country; DISH's objection to producing any information that will be the subject of expert testimony; or DISH's objection to all requests that "may unfairly seek to restrict the facts on which DISH may rely at trial").

2153348.1

Decl of D. Singer
Exhibit 3, Page 115

November 17, 2012
Page 2

     Rather than addressing each and every one of DISH's General Responses and Objections, we can save a lot of time if DISH will confirm that it has not withheld any responsive documents based on any of these General Responses and Objections.

     Additionally, it is not clear whether DISH is agreeing to search for responsive documents that are in the custody of DISH's agent and sister company, EchoStar Technologies, L.L.C. Please confirm DISH's position.

## DISH's Objections and Responses to Specific Document Requests

### Request No. 2

     DISH cannot simply limit its production to documents that are "sufficient" to show DISH's reasons for developing the products and services at issue in this lawsuit. Nor can DISH ignore Fox's copyright infringement and breach of contract claims directed at the Sling Adapter. Fox is entitled to *all* documents discussing the reasons why DISH developed PTAT, AutoHop and Sling Adapter. These documents will show DISH's understanding of the existing and potential markets for the challenged services. The effect of PTAT, AutoHop and Sling Adapter on these markets is a critical part of the fair use analysis. Moreover, to the extent DISH developed these services to compete with or undermine Fox's legitimate exploitation of its copyrighted programs, any documents discussing those reasons would also be directly relevant to Fox's damages claim. DISH must produce all responsive documents.

### Request No. 6

     The court has already found that DISH's quality assurance process for AutoHop likely infringes Fox's copyrights and breaches the parties' contract. Therefore, this request goes to the heart of Fox's case. Every document discussing this infringement and breach is necessarily relevant. Therefore, DISH cannot simply agree to produce only those documents that DISH deems "sufficient to show the quality assurance process" at issue. DISH must produce all responsive documents.

### Request Nos. 7-9

     Fox is entitled to know how the Sling Adapter works. We are willing to accept documents sufficient to show its functionality, but DISH appears to be limiting this request to documents that were created after January 2012 (once the product was already developed). DISH can not impose a self-serving time limitation for the purpose of avoiding producing relevant documents.

     Similarly, because DISH was beta testing PTAT and AutoHop long before January 2012 (and thus making unauthorized copies of Fox Programs), Fox is entitled to know which of its programs were copied as far back as three years from the filing date of the complaint (the relevant limitations period).

2153348.1

Decl of D. Singer
Exhibit 3, Page 116

November 17, 2012
Page 3

## Requests Nos. 10-11

DISH cannot limit its production of relevant documents to those "sufficient to show the basis on which [DISH] decided the networks to include in the PTAT feature" (Request 10). DISH's decision-making process for which networks to include in PTAT is relevant to proving that DISH controls the process of copying Fox's primetime programming. Additionally, DISH's decision to exclude cable channels from PTAT is relevant to Fox's claim for statutory damages under the Copyright Act because it evidences DISH's willfulness. Fox intends to show that DISH – which profits from ad sales on cable channels – would benefit if the commercials shown on broadcast networks could be eliminated by DISH's ad-skipping service. Therefore, *all* documents responsive to this request should be produced.

Similarly, all documents discussing or concerning the times that each network would be recorded as part of PTAT (Request 11) relates directly to DISH's control over the copying process. DISH cannot limit this request for relevant documents to those that are "sufficient" to show DISH's "general guidelines" about how DISH exercised its control over the copying process.

## Request No. 12

Documents discussing or concerning which programs have or will be made available with the AutoHop service are relevant because they will shed light on the competitive and economic advantages DISH believed it would enjoy by making certain programs or types of programs available on a commercial-free basis. DISH's rationale for making certain programs (such as *The Simpsons*) available commercial-free but not others (such as sporting events) is relevant to understanding the competitive marketplace for a fair use analysis. DISH's decision to not include certain programs in the AutoHop service that are owned by non-network third parties (such as Major League Baseball) may also be relevant to establishing willfulness to the extent DISH was concerned about being sued by those third parties.

## Requests Nos. 14-15

We understand that the AutoHop feature is not currently available via the Sling Adapter. However, DISH has testified that it plans to make it available. If DISH's Sling Adapter and TV Everywhere service began offering commercial-free versions of Fox's programs over the Internet and on mobile devices, this would cause Fox to suffer even greater harm than the current version of Sling Adapter. Documents discussing DISH's reasons for blocking the AutoHop feature on the TV Everywhere services are likely to reveal DISH's concerns (or lack of concern) about copyright infringement and contractual restrictions. Any such documents would be highly relevant to Fox's claims against DISH.

2153348.1

November 17, 2012
Page 4

## Request No. 16

This request seeks studies, analyses, predictions, reports, or surveys about commercial-skipping. DISH has requested similar documents from Fox. While we are willing to discuss reasonable limits on the temporal scope of this request, it is improper for DISH to limit its production of responsive documents to those created *after* January 1, 2011. DISH's limitation is especially troubling given that DISH's document production to ABC contains numerous studies on DVR usage and commercial skipping that predate January 2011. DISH's own expert, Richard Rapp, submitted a voluminous declaration discussing ad-skipping behavior dating back to the 1950's. DISH cannot proffer self-serving documents dating back 60 years while limiting Fox's discovery of possible harmful evidence to the past year. Fox also rejects DISH's attempt to limit this request to relevant "studies" while refusing to search for relevant analyses, predictions, reports, or surveys. DISH agreed to produce those categories of documents in response to Request No. 30 and clearly understands those terms.

## Request No. 19

This request seeks usage data for all Sling Adapters – not just the number of Sling Adapters that have been sold. DISH's Sling Adapter service (also known as TV Everywhere) violates the parties' contract as well as Fox's exclusive copyrights each time a Fox program is retransmitted via the Sling Adapter over the internet. Therefore, specific usage data for Sling Adapter is directly relevant to the number of infringements and contract breaches that have taken place. Furthermore, we anticipate that DISH will attempt to argue that low usage rates for Sling Adapter support DISH's fair use and irreparable harm defenses (as it has done with respect to PTAT and AutoHop). Therefore, all Sling Usage data is plainly at issue and must be produced.

## Request No. 20

Although DISH agreed to produce documents sufficient to show how many DISH users "have" the Hopper, it refuses to produce documents showing how many of these devices are leased and how many are owned by users. DISH's continued ownership and control of the Hopper boxes is relevant to Fox's claim that DISH controls virtually all aspects of the copying at issue here. Information about leased versus owned Hopper boxes is also relevant to Fox's claim of disgorgement because DISH's revenues and/or profits derived from PTAT and AutoHop likely vary depending on whether Hopper boxes are sold or leased.

## Request No. 21

Although DISH has agreed to produce all of its usage data for PTAT and AutoHop (in response to Requests Nos. 17 and 18), this request seeks all documents concerning *how* DISH collects the usage data. DISH has squarely placed this methodology at issue with the Declaration of Keith Gerhards in opposition to Fox's preliminary injunction motion. Mr. Gerhards' declaration describes the "stbHealth" data collection system, as well as the specific steps DISH has already taken to gather usage data. Accordingly, *all* documents that discuss or concern this

Decl of D. Singer
Exhibit 3, Page 118

November 17, 2012
Page 5

methodology are relevant.  DISH cannot expect to rely on usage data as part of its defense while blocking Fox from conducting discovery on the collection methodology underlying that data.

**Request Nos. 22-24**

      DISH is agreeing to produce customer usage projections for PTAT and AutoHop, but not Sling Adapter.  There is no rational basis for refusing to produce otherwise relevant documents that concern Sling Adapter.  Also, to the extent DISH has done any usage or sales projections for PTAT, AutoHop, or Sling Adapter, Fox is equally entitled to all documents that discuss or concern those projections.  Similarly, it is not enough for DISH to produce Hopper and Sling Adapter sales and/or lease projections but to refuse to produce any documents discussing those projections (Requests Nos. 23-24).  Documents commenting on whether the projections are realistic or accurate, as well as documents analyzing those projections, relate to Fox's claim of irreparable harm and may contain useful admissions relevant to Fox's damages.  Indeed, much of DISH's defense to the irreparable harm claimed by Fox in its preliminary injunction motion was the argument that PTAT and AutoHop have been, and will remain, relatively unpopular with users.  Any documents that bolster or undermine those claims are highly relevant.

**Request No. 26-28**

      Fox seeks all documents discussing or concerning the products and services with which PTAT, AutoHop and Sling Adapter compete.  This is directly relevant to DISH's fair use defense to copyright infringement.  Although DISH has agreed to produce responsive documents concerning competitive VOD services, Hulu, Amazon and/or iTunes, DISH must produce documents discussing *all* competing products services.  This includes any documents that compare PrimeTime Anytime, AutoHop, and Sling Adapter to products and services offered by MVPDs who compete with DISH for subscribers.

**Request No. 29**

      DISH claims that this request is duplicative of Request No. 26.  Although Request No. 26 seeks all documents discussing any products and services with which PTAT competes, Request No. 29 seeks all documents discussing how PTAT might affect consumer demand for, or revenue generated from those products.  Please confirm that DISH understands these to be entirely overlapping.  If so, then Fox's only concerns are the same as those raised above.

**Request No. 30**

      Fox seeks all document discussing how PTAT, AutoHop and/or Sling Adapter may financially impact broadcast television and/or cable networks.  Fox is suing for damages and a permanent injunction against each of these services.  Obviously this request seeks relevant information concerning these damages and harms.  DISH agreed to produce responsive studies analyses, predictions, reports, surveys, or projections, but it refuses to produce any other documents discussing these damages/harms such as emails and internal memos that contain

2153348.1

November 17, 2012
Page 6

relevant information or admissions. DISH also refuses to produce relevant documents concerning Sling Adapter, one of the three services at issue. DISH's position is not tenable.

**Request No. 32**

DISH is refusing to produce any documents concerning legal advice it solicited or obtained before making PTAT, AutoHop and Sling Adapter available to its subscribers. Accordingly, because DISH has not pled its reliance on advice of counsel as an affirmative defense, and because DISH is refusing to produce responsive documents concerning any such defense, we assume DISH is waiving the defense entirely and, Fox will rely on that waiver going forward. If we are mistaken, DISH should promptly produce all documents responsive to this request.

**Request No. 33-36**

Fox is entitled to all documents discussing any changes that have been made to the PTAT and AutoHop services after Fox filed its lawsuit. It is inadequate for DISH to only produce source code and technical specifications documenting these changes. Emails and memos discussing and commenting on the changes will shed light on the amount of control DISH exercises over the copying at issue. More importantly, documents discussing the *reasons* why these changes were made are relevant to the issues of contract interpretation and damages because they will demonstrate whether DISH knew it was breaching the parties' contract and infringing Fox's copyrights.

**Requests Nos. 37 and 38**

These requests seeks communications between DISH and EchoStar concerning the development and operation of PTAT, AutoHop, and Sling Adapter. DISH's response is limited to "technical specifications" and also ignores the Sling Adapter. But Fox is entitled to *all* relevant communications concerning *all* the infringing products and services at issue. For example, communications discussing concerns about copyright infringement or breaching the Fox contract are highly relevant. Also, the scope of DISH's communications and business relationship with EchoStar is relevant to determining EchoStar's potential liability as well as determining to scope of Federal Rule of Evidence 801(d) (e.g., statements by a party's agent that are not hearsay).

**Request No. 42**

Although DISH has agreed to produce "exemplars" of its advertising and marketing materials for AutoHop and PTAT, as well as communications with its ad agencies about these products (some of which were produced to ABC), DISH refuses to produce any internal or other third party communications discussing or concerning the marketing and advertising of the products and services at issue. These documents are relevant to DISH's fair use defense because they will highlight the relevant competitive markets and products. They are also relevant to

2153348.1

November 17, 2012
Page 7

Fox's damage claim because they will show whether Fox's business and licensees are the targets of DISH's competitive efforts. DISH's marketing effort and related discussions are also relevant to willfulness to the extent they evidence the competitive benefits DISH expected to receive as a result of its infringing conduct.

**Request No. 43**

DISH agreed to produce all communications with its ad agencies concerning PTAT and AutoHop, but ignores that this request also covers Sling Adapter. The manner in which DISH sought to market Sling Adapter is just as relevant to this case as the manner in which DISH sought to market PTAT and AutoHop. Additionally, the request also seeks similar communications with marketing and advertising consultants, as well as public relations firms – not just ad agencies. Those documents should be produced too.

**Request No. 45**

Upon further review, we agree that all documents sought by this request are covered by Request No. 25.

**Request No. 46**

Fox is entitled to all of DISH's internal, non-privileged communications concerning the contract provisions at issue in this lawsuit. Those documents will shed light on DISH's understanding of the parties' contract, including the meaning of certain terms that are in dispute (e.g., the meaning of "VOD"). Some of the most useful communications will likely be those that were written in 2002 and 2010 when these contracts were negotiated. Therefore, it is puzzling why DISH is attempting to limit its production to January 1, 2011 forward. Hopefully, this was merely a drafting error.

**Requests Nos. 53, 54, 55, 56, 62**

Fox seeks all documents discussing any consideration DISH has been offered by any TV station or network for disabling PTAT, AutoHop or Sling Adapter (Request No. 53). Fox also seeks documents discussing whether PTAT, AutoHop, or Sling Adapter could give DISH leverage in its negotiations with TV stations and networks (Request No. 55) or help DISH reduce the amount of retransmission consent fees that it pays to these entities (Request No. 56). These documents are relevant to DISH's willfulness because they help to explain DISH's incentive to knowingly infringe Fox's copyrights. They are also relevant because they show that TV stations and networks are harmed by PTAT, AutoHop and Sling Adapter and are willing to pay for DISH to stop them. Documents responsive to this request are also relevant to proving DISH's willfulness and could explain why DISH was willing to engage in knowing copyright infringement. Indeed, given the obvious threat that PTAT, AutoHop, or Sling Adapter pose to TV stations and networks, every communication between DISH and the TV networks/stations concerning PTAT, AutoHop, or Sling Adapter are relevant to Fox's claims. By agreeing to

2153348.1

Decl of D. Singer
Exhibit 3, Page 121

November 17, 2012
Page 8

produce only those documents "sufficient" to show any offers of compensation, and also refusing to produce any documents concerning Sling Adapter, DISH is blocking Fox's access to plainly relevant documents.

**Requests Nos. 60, 61, 64**

DISH agreed to produce relevant communications with MVPDs and broadcast networks concerning PTAT and AutoHop, but it refuses to produce the same relevant documents relating to Sling Adapter. For example, although DISH appropriately agreed to produce all of its communications with ad agencies concerning PTAT and AutoHop, it is refusing to produce the same documents concerning Sling Adapter. As you know, Sling Adapter is as much a part of this case as DISH's other infringing services. Accordingly, DISH must produce *all* responsive documents, not just those that relate to two of the three services being challenged here.

**Request No. 89, 90**

For the reasons discussed above, there is no basis for DISH to limit its production of employee and authorized retailer training materials to PTAT and AutoHop while excluding those related to Sling Adapter.

**Request No. 91**

DISH's "Business Rules" are referred to throughout DISH's functional requirements specifications for its PTAT and AutoHop software. The business rules are relevant to showing DISH's understanding of its contractual obligations and restrictions, as well as other restrictions imposed by law. All of DISH's documents that discuss any known restrictions or legal impediments to PTAT, AutoHop *and* Sling Adapter are relevant not only to the interpretation of the contract provisions at issue, but to proving that DISH knowingly infringed Fox's copyrights.

**Request No. 92-96**

In a recent interview with the *Denver Post*, DISH Chairman, Charlie Ergen revealed that AutoHop was the first step of a larger plan. Apparently, DISH's plan involves stripping the networks' advertisements from their programs and then substituting DISH's own set of addressable, i.e., "targeted" ads. According to the news report, the "court battle over whether Dish's ad-zapper is legal needs to be settled before Dish can bring targeted-commercial technology to broadcasters. Ergen said he thinks both features can work because viewers will choose to watch commercials that are relevant to them and skip through those that aren't." Therefore, DISH's future plans for delivering targeted advertising (and the potential financial benefits that will flow from that business) show DISH's profit motive for engaging in copyright infringement. Therefore, documents concerning these plans are relevant to the issue of DISH's willfulness for purposes of statutory damages under the Copyright Act.

\* \* \* \* \*

2153348.1

Decl of D. Singer
Exhibit 3, Page 122

November 17, 2012
Page 9


     Given the number of issues to be discussed, I propose that you provide a short written response to each of the disputes noted above.  This may help to narrow the parties' disputes in advance of our in-person meeting.  To give you enough time to prepare a response, and in light of Thanksgiving, I suggest that we meet during the week of November 26th.  As of now, I am available from 9:30 a.m. – 5:00 p.m. on November 27, November 28, and November 29.


     Sincerely,


     David R. Singer

Decl of D. Singer
Exhibit 3, Page 123

**EXHIBIT 4**



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

*tel* +1-213-629-2020
*fax* +1-213-612-2499

WWW.ORRICK.COM

November 21, 2012

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

**VIA MESSENGER**

David Singer
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:    *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et al.,*
        Case No. CV 12-04529 DMG (SHx)

Dear David:

Enclosed please find an encrypted DVD of documents produced in the above-referenced matter.
The documents bear Bates numbers DISHvABC00000001-8142.  The DVD contains a combination
of "Highly Confidential," "Confidential" and other documents.

We are preparing a detailed response to your letter dated November 17, 2012, as well as
correspondence detailing Fox's deficient responses to DISH's first set of document requests.  We
will be happy to meet and confer with you regarding both sets of discovery requests shortly.

Very truly yours,

William A. Molinski

WAM/
Enclosure

Decl of D. Singer
Exhibit 4, Page 124

**EXHIBIT 5**



## ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

November 29, 2012

William A. Molinski
(213) 612-2556
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
663 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:     *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et anno*, Case No. CV 12-04529 DMG (SHx)

Dear David:

This letter concerns Plaintiffs Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings' (collectively "Fox") objections and responses to DISH's first set of requests for production.

In stark contrast to the 100+ requests for production propounded by Fox to date, DISH propounded a discrete 16 requests on Fox.  Given the expansive volume and categories of documents requested by Fox, not to mention that Fox has already had the benefit of document production from DISH, the stonewalling in Fox's responses is surprising. Fox claims that it made a production with its responses, but that production consists of a mere few hundred pages.  Fox unilaterally limited more than half of DISH's requests, including Request Nos. 1, 2, 4-8, 11, 12 and 15, and refused to produce documents in response to a quarter of DISH's requests, specifically Request Nos. 3, 9, 10 and 14.  Fox has no legitimate basis for its refusal to produce documents.  Fox must abide by its responsibilities as a litigant by participating in good faith in the discovery process.  As we have stated multiple times before, discovery is not a one-way street.  Now that we are past the preliminary injunction phase, Fox must begin complying with its obligations under the Federal Rules.

### Fox's Refusal to Provide Relevant Documents In Response to Request Nos. 3, 9, 10 and 14

Request No. 3 seeks the terms of Fox's affiliate and retransmission agreements.  This bears directly on Fox's claimed damages and the issue of fair use.  Fox claims that the AutoHop and PrimeTime Anytime DVR features undermine its entire business model and adversely impact markets for its copyrighted works under factor four of the fair use analysis.  DISH is entitled to discovery on that business model and Fox's markets.  Accordingly, DISH should be



**O R R I C K**

David R. Singer, Esq.
November 29, 2012
Page 2

permitted to examine the terms on which Fox allows other MVPDs to retransmit its television signals. Fox cannot shield such directly relevant information on the markets for its copyrighted works from production by boilerplate assertions of privilege, confidentiality, and burden. These agreements with third-parties are not privileged. Any confidentiality objections are addressed by the protective order in place in this case. As to burden, Fox cannot reasonably contend that the production of such a specific set of documents is unduly burdensome. Please confirm that Fox will produce documents responsive to Request No. 3.

Request No. 9 seeks documents sufficient to identify those devices that Fox is aware of that permit consumers to record and play back Fox's primetime television programming, the features of those devices, and when and how Fox became aware of those devices. Relatedly, Request No. 10 seeks Fox's responses to such devices, including business agreements or legal actions. Documents responsive to these two requests are plainly relevant to the dispute. They will demonstrate that Fox's concerns of copyright infringement and its claimed damages are not genuine in light of the other similar devices available to consumers that Fox has not attempted to legally challenge in any way. For example, at her deposition, Ms. Brennan admitted that Fox was aware of DVRs by both DirecTV and TiVo that have similar capabilities as the Hopper. Fox's knowledge of these alternative devices and its failure to challenge or assert copyright infringement claims with respect to those devices are relevant to the liability and damages issues in this action. Fox cannot justify its refusal to produce these documents on the basis of privilege, burden, or confidentiality. DISH is not seeking the production of privileged documents and, to the extent that Fox determines that any of its responsive documents are privileged, then it can include those documents on a privilege log and not produce them. Fox's protestations of burden are unfounded. DISH is seeking a finite set of documents for a reasonable period of time. Fox has not presented any facts to demonstrate that the production of such documents would be unduly burdensome. Any confidentiality concerns are addressed by the protective order that was entered in this case. Please confirm that Fox will produce documents responsive to Requests No. 9 and 10.

Request No. 14 seeks Fox's organizational charts. Such charts are important for purposes of identifying potential witnesses and for an informed discussion of the custodians to be subject to electronic discovery. Fox's objections to this request are meritless. Organizational charts are not privileged. The production of such documents is not unduly burdensome. Moreover, such information is not confidential. Fox's complete refusal to produce organizational charts makes us doubt whether Fox intends to reasonably participate in the discovery process at all. Please confirm that Fox will produce documents responsive to Request No. 14.



**O R R I C K**

David R. Singer, Esq.
November 29, 2012
Page 3

## Fox's Unilateral Narrowing of DISH's Request Nos. 1, 2, 4-8, 11, 12 and 15

Request No. 1 seeks documents showing Fox's knowledge of Sling, Hopper, PrimeTime, Anytime, or AutoHop. In response, Fox has agreed to produce only those documents that show "when Plaintiffs' first became aware of PrimeTime Anytime, AutoHop and Sling . . . ." This response is inadequate. First, Fox has not included documents relating to Hopper, the DVR device at issue, which are directly relevant to this dispute. Second, all documents demonstrating Fox's knowledge regarding the Hopper and its features, PrimeTime Anytime and AutoHop, as well as Sling, are relevant to the parties' claims here. Importantly, Fox's knowledge of the Hopper and its features likely expanded over time. For example, a document showing when Fox first became aware of the product or the features may only give the name of the product or feature. However, subsequent documents would show that Fox became aware of more than just the name, but also the relevant functionality. These further communications would contain relevant information about Fox's view of the devices and features, including but not limited to Fox's view of why the devices and features would be beneficial to Fox. Such documents are within the scope of what DISH has requested and must be produced by Fox. Fox's burden objection is unfounded given that the request is limited to four discrete products or features, three of which were released in 2012. Fox's additional objections of privilege and confidentiality are not proper bases for limiting Fox's production. Please confirm that Fox will produce all documents responsive to Request No. 1.

Request No. 2 seeks Fox's communications regarding DISH's PrimeTime Anytime or AutoHop features. Fox has placed unwarranted and inappropriate limitations on its response to the request, by which it has agreed to produce only those communications "concerning any actual or potential impact of PrimeTime Anytime and/or AutoHop on Plaintiff's advertising revenue, and or licenses for post-broadcast forms of content such as VOD or internet streaming . . . ." Fox brought this lawsuit to shut down these two DVR features that have been on the market for less than one-year's time. DISH is entitled to discovery of **all** of Fox's internal and external communications about the features, including but not limited to Fox's communications with advertisers and advertising agencies. Fox's attempt to narrow its response smacks of bad faith, and leads us to believe that Fox has relevant communications that it is trying to hide. Please confirm Fox will produce all documents responsive to Request No. 2.

Request No. 4 seeks documents sufficient to show television viewers of: (a) free over-the-air broadcast television; (b) subscription pay services; and (c) streaming or downloading via the internet or cellular transmission for the past seven years. In response, Fox claims that it has already produced responsive documents "sufficient to show the proportion and/or number of national viewers that watch free, over-the-air broadcast television." Fox further states that it will produce documents sufficient to show viewers of Fox Network via free, over-the-air broadcast



ORRICK

David R. Singer, Esq.
November 29, 2012
Page 4

television. However, Fox has not agreed to produce any documents relating to (b) subscription pay services or (c) streaming or downloading via the internet or cellular transmission. This is a critical omission of discoverable information directly relevant to factor four of the fair use analysis. Fox cannot claim that PrimeTime Anytime harm the markets for its copyrighted works and then refuse to produce relevant information about those same markets. The requested documents are at the heart of the parties' dispute. Fox's objection of burden rings hollow, given the explicit limitation of the request to documents sufficient to show. Further, the objection that the information is confidential and proprietary is addressed by the protective order and is in direct conflict with Fox's objection that the information is equally available to DISH. Given that Fox is willing to produce documents responsive to the first category, there is no reason why Fox should not also produce documents responsive to the second and third categories. Please confirm that Fox will produce all documents responsive to Request No. 4.

Request No. 5 seeks production of Fox's revenues from (a) network television programming; (b) primetime network television programming; (c) network copyrighted content; and (d) primetime network copyrighted content for the past seven years. In response, Fox represents that it has produced its revenues from the sale of commercial advertising, VOD distribution, digital distribution, Fox-owned television stations, and Fox television station affiliates for 2011 and 2012. The request asks for seven years of such information. In addition, the information that Fox provided was only for primetime programming. Fox redacted certain information on the balance sheet that it produced and did not provide specific revenue and expense information for non-primetime programming. Moreover, Fox did not break down its revenue per MVPD provider, as requested, nor did it break down the revenue for each type of internet-based distribution. Fox should provide more detailed information in response to Request No. 5 and should produce the information without redaction for the last seven years, which encompasses the time period that Sling has been on the market. There is no basis for Fox to redact financial information when there is a protective order in place in this action with Attorneys Eyes Only protections. Please confirm that Fox will produce all documents responsive to Request No. 5.

Request No. 6 seeks Fox's projections of expected revenues from the same four sources included in Request No. 5: (a) network television programming; (b) primetime network television programming; (c) network copyrighted content; and (d) primetime network copyrighted content for the past seven years. Fox's response, that it will produce only those projections that take into account PrimeTime Anytime and AutoHop, is wholly unacceptable. DISH is entitled to documents that disprove Fox's claims as to adverse impact on the markets for its copyrighted works. Please confirm that Fox will produce all documents responsive to Request No. 6.



ORRICK

David R. Singer, Esq.
November 29, 2012
Page 5

Request Nos. 7 and 8 seeks documents relating to Fox's distribution of content through VOD and internet streaming, respectively. Fox's claim that DISH's PrimeTime Anytime and AutoHop features compete with Fox's VOD and internet distribution channels is at the crux of Fox's copyright and contract allegations. Indeed, Fox has repeatedly called PrimeTime Anytime, in court filings and the media, "bootleg VOD." DISH is entitled to full discovery on the nature and terms of Fox's VOD offerings and its internet distribution of copyrighted content. Fox may not limit its production to those documents that "discuss or concern any impact of PrimeTime Anytime, AutoHop, and/or Sling on Plaintiff's [VOD or digital distribution] business." Such a limitation is patently inappropriate. DISH is entitled to more than a production of cherry-picked self-serving documents. Please confirm that Fox will produce all documents responsive to Request Nos. 7 and 8.

Request No. 11 seeks studies and reports regarding the effectiveness of commercial advertising in primetime programming and Fox's communications with advertisers regarding them. Fox has agreed to produce only those studies that relate to commercial skipping-technology. Yet, Fox's claims that the Hopper, with its PrimeTime Anytime and AutoHop features, will demolish the commercial based model of primetime television entitle DISH to discovery beyond just studies relating to commercial skipping technology. Studies that show that commercial advertising is not as effective today because, for example, people turn their attention to mobile devices during advertising segments is just as relevant as studies that discuss commercial skipping technology. Additionally, by way of example, studies regarding strategies for making advertising more effective would also relevant to Fox's claims in this case. To address Fox's objection of burden, DISH is willing to limit this request to reports and communications in the past seven years. Please confirm that Fox will produce all documents responsive to Request No. 11 for the past seven years.

Request No. 12 seeks third-party data regarding consumer viewing habits and device usage. Such data is critical to the evaluation of Fox's claim of impact to its advertising based business model, as well as its VOD and internet-distribution channels. Yet, Fox has only agreed to produce studies regarding DVR usage, such as its DVR impact reports (which have not yet been produced). Such a limitation prevents DISH from obtaining data regarding consumer viewing habits outside of this single segment, including but not limited to live viewing, VOD viewing, and internet viewing. This data is relevant to the claims at issue in this case and must be produced by Fox. To address Fox's objection of burden, DISH is willing to limit this request to data regarding consumer viewing of primetime programming, through any distribution channel, for the past seven years. Please confirm that Fox will produce documents responsive to Request No. 12 for the past seven years.



# ORRICK

David R. Singer, Esq.
November 29, 2012
Page 6

Finally, Request No. 15 seeks documents and communications relating to the parties' retransmission agreements. Fox has limited its response to a production of those documents that "relate to the specific contract provisions at issue in this lawsuit." Such a limitation is too narrow. DISH is willing to limit its request to those retransmission agreements at issue in this lawsuit. However, any communication regarding those agreements and how the parties have interpreted and performed their obligations in those agreements are relevant to the parties' instant dispute. Please confirm that Fox will produce responsive documents relating to the retransmission agreements at issue here.

## Fox's Meager Production To Date

This case has been pending for six months, but to date Fox has produced a mere 373 pages of documents. This is contrasted with the nearly 9,000 pages of documents that have been produced by DISH (DISH 000001-513, DISHvABC0000001-8142). While DISH is cognizant of the complications of coordinating discovery between the various actions and is eager to work with Fox on issues relating to e-discovery, these issues place far less of a burden on Fox than they do on DISH. We look forward to continued receipt of documents from your rolling production.

\* \* \*

We would welcome the opportunity to discuss these issues with you at the conference of counsel that you had initially proposed for this week. Please let us know what times you are available during the week of December 3, 2012.

Very truly yours,

William A. Molinski

Decl of D. Singer
Exhibit 5, Page 130

# EXHIBIT 6

JENNER&BLOCK

December 10, 2012

Jenner & Block LLP          Chicago
633 West 5th Street         Los Angeles
Suite 3600                  New York
Los Angeles, CA 90071       Washington, DC
Tel  213-239-5100
www.jenner.com

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel  213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinsky, Esq.
ORRICK, HERRINGTON &
   SUTCLIFF LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

Re:  *Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al*
     *C.D. Cal. Case No. 12-cv-04529-DMG (SH)*

Dear Bill:

          This responds to your November 29, 2012 letter.  It is disingenuous for Dish to complain that Fox has somehow "stonewalled" Dish by producing only 373 pages of documents thus far in a case that has been "pending for six months."  To begin with, Fox *voluntarily* produced documents to Dish before filing its preliminary injunction motion (unlike Dish which was required to produce expedited discovery and then ordered to produce additional documents that had been withheld).  Dish served its first document requests four months into the case and, by agreement, Fox's written objections were only due on November 8.  Fox responded *early*, on November 7, produced additional documents, and has agreed to produce more documents on a rolling basis (2,233 additional pages are being produced today).  This is hardly "stonewalling." Moreover, this is *not* a case where discovery is going to be "symmetrical."  Dish is the one being accused of massive, willful copyright infringement on a nightly basis.  Dish's conduct – not Fox's conduct – is the focus of this lawsuit.  By contrast, Fox is the victim, seeking statutory damages, injunctive relief and disgorgement.

<u>**Dish's Document Requests to Fox**</u>

**Request Nos. 1 and 2:**

          Fox has considered Dish's position and will revise its response.  Fox will agree to produce all non-privileged documents showing its knowledge of the PTAT, AutoHop, Sling, and Hopper features at issue in this case including, but not limited to, internal and external communications discussing those features.

2159642 1

Decl of D. Singer
Exhibit 6, Page 131

December 10, 2012
Page 2

**Request No. 3:**

Dish is only entitled to documents that are relevant to a claim or defense in the case, i.e., that have a tendency to prove or disprove a fact that is of consequence to the action. Fox alleges that PrimeTime Anytime and AutoHop threaten to irreparably harm its business by undermining the value of commercials on broadcast TV; disrupting Fox's own advertising; decreasing MVPD interest in future VOD deals; and making it harder for Fox to distribute and market its programs for non-linear distribution such as Internet streaming. Nothing in your letter articulates how the "economic terms" of Fox's retransmission consent agreements with hundreds of MVPDs over the past seven years are even remotely relevant to Fox's claims. Your blanket statement that Dish is "entitled to discovery on that business model and Fox's markets" doesn't quite cut it.

For one thing, this case has nothing to do with retransmission consent; Fox is suing Dish for breaching contractual restrictions against VOD or similar services and for unlawfully copying the Fox programming. Dish's retransmission of Fox television stations' signals is not at issue, nor is the retransmission of Fox's signal by any other MVPD.

Furthermore, the request covers several hundred agreements, each of which is subject to confidentiality and non-disclosure restrictions. Putting aside the lack of relevance, it would take an enormous amount of time to gather and review these agreements and to address hundreds of confidentiality objections by third parties. Moreover, these are among the most highly-confidential documents in Fox's business. They contain trade secrets and other business information that would severely damage Fox – and unfairly advantage Fox's competitors – if disclosed. The stipulated protective order does not adequately address these concerns because, among other things, it was never agreed to, and is not enforceable by, third parties with whom Fox contracts; it allows dozens of in-house counsel at Dish, ABC, CBS, and NBC, as well as their outside counsel and their outside counsel's employees and contractors to view highly confidential documents; and it provides no guarantee that highly confidential information will remain sealed if filed by a party.

**Request No. 4:**

I think we may be able to reach a compromise regarding this request. I understand that Fox gathers certain information on viewing sources for its programming, describing the number of viewers that watch Fox programs (e.g., live, VOD, internet streaming). Let's discuss this when we meet in person.

**Request No. 5:**

As explained in Fox's written responses and objections, we have already produced non-privileged documents sufficient to show Fox Network's revenues and expenses related to primetime programming. The purpose of this information, and the only conceivable relevance for it, was to back-up Fox's assertion that the lion's share of Fox Network's revenues comes from the sale of commercial advertising on primetime programming. And, even though the

2159642.1

December 10, 2012
Page 3

parties do not seriously dispute the existence of secondary markets for this programming such as
VOD and Internet distribution, Fox's financial information confirms their existence.

Dish has not even attempted to show why it needs detailed financial information going
back seven years, or why it needs to know exactly how much money Fox earns from each of
Dish's direct competitors. Fox is not suing Dish for lost revenues; it seeks to enjoin Dish's
conduct to prevent *future* harm to Fox's business model, goodwill, and reputation. The financial
details sought by Dish have nothing to do with this case and Dish's request is wholly improper.

With respect to certain redactions (two line items for ad sales, and three line items for
expenses), it is not clear why Dish would need to know these details because Fox Network's
total expenses and revenues related to primetime programming have already been provided.
With respect to revenues and expenses related to non-primetime programming, some of that
information (like Late Night programming) has been redacted. Other information, like revenues
and expenses related to sporting events, is treated separately from Fox's primetime programming
– the content at issue in this lawsuit – and is not reflected in the financial documents that have
been produced. Please explain the relevance of Fox's financial information related to
programming that is not part of PTAT or AutoHop.

**Request No. 6:**

Your letter fails to articulate why Fox's financial projections – going back seven years –
have anything to do with this case. You say these documents will help Dish "disprove Fox's
claims as to adverse impact on the markets for its copyrighted works," but you don't explain how
or why. Dish's infringing PTAT and AutoHop services are brand new. How could Fox's
financial estimates from 2005 have any bearing whatsoever on the future threats that Fox will
face as a result of these new services?

**Requests Nos. 7 and 8:**

These requests have many sub-parts and cover a broad swath of information. They are
also confusing. For example, what do you mean by "VOD Schedules"? Is Dish seriously
interested in gathering the dates, times, and titles of each Fox program that has ever been made
available for viewing on VOD or the Internet? I agree that some of this information is not
confidential, and we are open to discussing the burden involved with gathering the data. But it
would be helpful if you could identify what claim or defense this information would tend to
prove or disprove.

Also, please explain why Dish needs access to the specific license fees that other MVPDs
(Dish's direct competitors) pay for VOD licenses, as well as license fees paid by other third party
distributors. Fox has already produced financial documentation showing that VOD and Internet
distribution are legitimate markets that generate millions of dollars for Fox. Dish's own expert
acknowledges the existence of these markets. Without some understanding of why Dish needs

Decl of D. Singer
Exhibit 6, Page 133

December 10, 2012
Page 4

this highly-confidential competitive business information, we can only conclude that the requests are designed to further disrupt Fox's third-party relationships.

The requests also seeks documents concerning the "decision-making process, and the factors You take into account, in determining which of Your shows to make available on a VOD basis." Candidly, we have no idea what this request is getting at. Fox's choices regarding VOD programming are not at issue (unlike PTAT, where Dish's control over the content included in that service is directly relevant to proving that Dish is the one making the PTAT copies). Hopefully you can explain it when we meet in person.

**Requests Nos. 9 and 10:**

Fox is not suing Dish over a DVR. Fox is suing Dish over its PTAT and AutoHop services that provide Dish subscribers with an unauthorized, commercial-free VOD service. Dish's own marketing materials describe PTAT and AutoHop as new and groundbreaking. Asking Fox to search for and produce all documents that discuss any device which permits recording and playback of television programs is downright silly. If Dish is aware of any service that provides unauthorized, commercial-free VOD to subscribers, let us know. We can then discuss whether Fox has any documents concerning those services that could arguably be relevant to disproving Fox's claim of irreparable harm here.

**Request No. 11:**

We still don't understand why studies related to the effectiveness of TV commercials are relevant here. Fox is alleging that a commercial-skipping service will harm Fox because advertisers will perceive Fox's commercial air time as less valuable due to ads being eliminated upon playback. Whether TV ads ultimately cause people to buy products is besides the point. The issue is not whether TV ads work; the issue is how much advertisers are willing to pay for TV ads, regardless of whether they are actually effective.

That said, early indications are that Fox does not gather or conduct studies on the effectiveness of commercials. So, while we are interested in hearing Dish's theory of relevance, this disagreement may be much ado about nothing.

**Request No. 12:**

As set forth above, Fox has actual data regarding how Fox Network programs are viewed. Some of this data goes back only two years. In addition to producing actual data, Fox has also agreed to search for any DVR usage studies over the past two years. We are also prepared to discuss the production of other data concerning viewing sources (e.g., Internet streaming, VOD). However, Dish's blanket request that Fox search all of its employee emails and records for any document discussing "consumer viewing habits" over the past seven years is absurd. While we are prepared to be reasonable in order to avoid unnecessary discovery disputes, this request, as phrased, simply goes too far.

2159642.1

December 10, 2012
Page 5

**Request No. 14:**

As a matter of practice, Fox does not generate any non-privileged organizational charts. Even if it did, they would not be relevant. If Dish wants to have an informed discussion about potential witnesses, you can send me a letter or call me with your questions. I would be happy to meet and confer on this topic. Alternatively, Dish has other discovery tools at its disposal that can be used to identify relevant witnesses in this lawsuit.

**Request No. 15:**

Fox will produce all communications between Fox and Dish concerning the negotiations of the agreements at issue. With respect to internal communications between and among Fox employees, Fox will produce all communications that discuss any contract provision at issue in this lawsuit. We expect Dish to do the same. However, internal discussions about contract provisions that have nothing to with this lawsuit are not relevant, and your letter provides no argument to the contrary.

### Fox's Document Requests to Dish

We reject the claim that Dish has somehow been more cooperative in discovery because it propounded only 16 "discrete" document requests compared to Fox's 96 requests, and has produced "nearly 9,000 pages" of documents. Taking into account the various sub-categories of Dish's requests, they easily exceed 30. And, with respect to Dish's document production – which was produced in response to ABC's document requests, not Fox's – most of it is fluff. Nearly 2,000 pages consist of News Corp.'s SEC public filings (which Fox never requested). A large chunk consists of case law and FCC administrative proceedings, including a 482-page FCC report on the VOD industry. In fact, Dish's so-called document production includes 1,321 pages that are simply copies of the pleadings *from this lawsuit*. More than 1,700 pages of the production are articles and studies that Dish's experts relied on for the preliminary injunction motion. In short, only a small fraction of Dish's 9,000 document production consists of Dish's own business records. To date, Dish has not even produced a *single* email.

In any event, we are still waiting for Dish to produce the documents it agreed to produce in its November 8, 2012 responses to Fox's document requests. We are also waiting for your written response to my November 17 letter. Once we have your response, we will be ready to meet and confer in person and to engage in substantive discussions on how we can avoid or otherwise narrow any discovery disputes.

\* \* \* \* \*

2159642.1

Decl of D. Singer
Exhibit 6, Page 135

December 10, 2012
Page 6


   Finally, as noted above, we will be emailing you a link for downloading the next batch of Fox's document production bates numbered be FOX000374-FOX002607.  If you have any questions, please do not hesitate to call me.


Regards,


David R. Singer
Partner


2159642.1

**EXHIBIT 7**



ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

*tel* +1-213-629-2020
*fax* +1-213-612-2499

WWW.ORRICK.COM

ORRICK

December 19, 2012

William A. Molinski
(213) 612-2556
wmolinski@orrick.com

**VIA EMAIL AND US MAIL**

David R. Singer, Esq.
Jenner & Block LLP
663 West 5th Street
Suite 3600
Los Angeles, CA 90071

          Re:    *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et anno*, Case No. CV 12-04529 DMG (SHx)

Dear David:

      This letter addresses your letter dated November 17, 2012, regarding DISH Network L.L.C.'s and DISH Network Corp.'s (collectively "DISH") responses to Fox's first set of document requests, as well as your letter dated December 10, 2012, responding to DISH's meet and confer letter of November 29, 2012.

      We find the stridency of your December 10 letter remarkable. Your assertion that discovery will not be "symmetrical" because Fox believes itself to be a "victim" of a "massive, willful copyright infringement on a nightly basis" is fundamentally flawed. Judge Gee found that Fox is not likely to succeed on the merits of its copyright infringement and contract claims concerning PrimeTime Anytime and AutoHop, effectively rejecting Fox's claim that it is a "victim . . . of a massive willful copyright infringement. . . ."[1] Fox may very well be accusing DISH of "nightly" "massive" and "willful" copyright infringement, but those claims have already been found to be weak and unwarranted. Fox may not use those overblown claims, on which it is unlikely to succeed at trial, as a basis for demanding overly invasive, burdensome and expensive discovery of DISH. Similarly, Fox may not use its blind conviction in the rightness of its position to deny DISH discovery necessary to its defenses which test and challenge Fox's assertions of harm, as well as Fox's claims of infringement and breach. We look forward to

---

[1] Judge Gee found that Fox has a likelihood of success on the merits only with respect to its complaint about the internal Quality Assurance recordings used to test the AutoHop software after that software has been created (notwithstanding that those recordings cause Fox no harm). Please be advised that EchoStar has ceased that Quality Assurance process. DISH maintains its position that the PTAT recordings used to test the AutoHop software after that commercial-skipping software has been created represent a fair use under the copyright laws, but nonetheless has directed EchoStar to stop making PTAT recordings in order to test the AutoHop software.



**ORRICK**

David R. Singer, Esq.
December 19, 2012
Page 2

discussing the particulars of the positions that Fox has taken in your December 10 letter at our in-person meeting on discovery.

There is nothing to be gained from quibbling over which party has been more cooperative in discovery. However, the fact that Fox refused to accept and respond to expedited document requests from DISH prior to pressing forward with its preliminary injunction motion, and terms its initial production of a smattering of documents that it intended to use on that motion as "voluntary," shows that Fox has been decidedly uncooperative and engaged in a past pattern of stonewalling that appears to be continuing. In contrast, DISH has shared its document production from the related litigation in New York with Fox, without regard to whether the documents are directly responsive to any pending document requests from Fox. DISH has also permitted Fox to have its counsel participate at a Rule 30(b)(6) deposition of a DISH executive in the New York litigation, which took place after Fox was dismissed from the New York case.

### DISH's General Responses and General Objections

We appreciate your bringing to our attention that you have never previously encountered some of DISH's General Objections and Responses. However, the validity of those General Objections and Responses is not measured by your familiarity, or lack of familiarity, with them. DISH stands by the positions that are laid out in its written responses. Should you have any specific questions regarding DISH's General Responses and General Objections, we can respond at our in-person meeting.

In response to the one specific question contained in your letter, DISH is prepared to request that EchoStar Technologies L.L.C. search for documents responsive to Fox's requests, to the extent that DISH has represented that it is willing to produce responsive documents. At the same time, EchoStar's documents are not within DISH's control and DISH cannot guarantee that EchoStar will be willing to produce any and all responsive documents that are within its possession, custody and control. To the extent that EchoStar separately objects to producing any documents, DISH will agree to notify Fox as to the objection. Nonetheless, DISH is not willing to agree that it will conduct a search for documents from EchoStar in response to each and every one of Fox's more than 95 requests in its First Set of Requests for Production.

In addition, it is DISH's position that the parties should, in cooperation with the parties involved in the related litigations involving ABC, CBS and NBC, jointly agree upon a list of custodians and search terms to be used to collect responsive documents for all matters.

Decl of D. Singer
Exhibit 7, Page 138



ORRICK

David R. Singer, Esq.
December 19, 2012
Page 3

### DISH's Objections and Responses to Specific Document Requests

**Request No. 2** asks that DISH produce *all* documents *discussing or concerning* the reason why DISH developed PTAT, AutoHop and Sling Adapter, including *but not limited to*, internal memos and business plans. This request is overbroad on its face. *All* documents *discussing or concerning* the reason for developing any of these products could easily include many documents that only tangentially relate to the reason for development. In fact, Fox itself recognized the overbreadth of its question and identified the information that Fox is seeking in this request as DISH's reasons for developing these three products. While DISH would have been more than justified in simply objecting on the grounds of relevance and overbreadth, DISH has agreed to provide Fox with internal memos and business plans sufficient to show DISH' reasoning for developing PTAT and AutoHop. Your letter claims that *all* documents that "discuss" DISH's reasons for developing PTAT and AutoHop must also be produced because they may discuss existing markets or DISH's desire to compete with Fox's distribution channels. If these were the motivations behind DISH's actions, DISH will produce documents sufficient to show that motivation. However, DISH is not required to produce every document that relates to such a broad topic based upon Fox's hope that it may be tangentially related to another issue. Further, Fox has specifically asked for documents discussing the various distribution channels, including, for example, Request Nos. 26-28, 29, 30.

**Request No. 6** seeks *all* documents *concerning* the quality assurance process used by DISH . . . in connection with AutoHop at any point in time. This request is facially overbroad and requests documents with no potential relevance to Fox's claim that the recordings made for Quality Assurance purposes are infringing. There simply is no basis for DISH to be obligated to produce *all* documents that *concern* the quality assurance process—whatever that means. This could include, for example, schedules regarding which employee is responsible for supervising portions of the quality assurance process on specific days and the like. Such documents are obviously not relevant to this litigation, but fall within the request as propounded by Fox. Even in your letter, Fox has not identified any specific documents outside of those sufficient to show how the process works that are relevant and necessary to discovery in this action.

**Request Nos. 8 and 9** ask for *all* documents *concerning* the testing of PTAT or AutoHop, respectively, before the features were commercially available. As written, the request is facially overbroad. For example, this could include discussions of who would be responsible for testing, or could discuss details of design, such as color scheme or font, that are obviously not relevant to this dispute. In your meet and confer letter, you have specified that the information you seek is whether the testing involved any Fox programming. DISH is willing to produce documents sufficient to show what, if any, Fox programming was involved in testing of PTAT or



ORRICK

David R. Singer, Esq.
December 19, 2012
Page 4

AutoHop, prior to when those features became commercially available, to the extent any such documents exist or can be located after a reasonable search.

**Request No. 10** seeks the production of *all* documents *discussing, concerning or evidencing* how DISH decided which television networks to include in its PTAT feature. DISH has agreed to produce those documents sufficient to show the basis of DISH's decision of which network would be included in the PTAT feature. Fox objects to this offer, claiming that *all* documents responsive to the request, which includes *all* documents *discussing, concerning, or evidencing* how DISH made this decision, must be produced. The overbreadth and unnecessary burden of such a request is obvious from its face. All documents "concerning" this decision could arguably include all documents that reflect the decision that was made and would include all documents at DISH showing network programming during primetime. Moreover, Fox's proffer of relevance, that the information is relevant to willfulness, undermines its demand for *all* documents. Fox's willfulness claim is speculative at best as to PTAT. Judge Gee has already found that Fox is unlikely to succeed on the merits of its copyright infringement claims related to PTAT. It is difficult to fathom how that same claim might involve "willfulness." DISH has agreed to produce documents that will show the reasons behind its decision. Accordingly, there is no reason for Fox to continue to insist that all documents responsive to this request be produced.

The same is true for **Request No. 11**, which seeks *all* documents *discussing or concerning* what times to start and stop one or more networks as part of the PTAT feature. DISH has agreed to produce documents sufficient to show any determination about start and stop times for the PTAT feature. Fox has objected to this, claiming that such a limitation is invalid. However, Fox has not presented any reason why documents sufficient to show are not enough to respond to this request. As written, the request is overbroad and unduly burdensome.

**Request No. 12** calls for *all* documents *discussing, concerning or evidencing* which television programs are, have been, or will be made available to subscribers with AutoHop. This request is facially overbroad and unduly burdensome, as well as vague and ambiguous. For example, any document containing television listings could be considered a document "concerning" or "evidencing" which television programming are or were going to be made available to subscribers with AutoHop. Additionally, as written, this request seeks *all* documents concerning any television program available to subscribers that have access to the AutoHop feature, not just those documents showing which programs are available for viewing with the AutoHop feature. Certainly, DISH need not produce all documents within its possession, custody, or control that show television programming available each and every hour of each and every day for the past year. Indeed, it is Fox that determines what programs it airs at what times.



**O R R I C K**

David R. Singer, Esq.
December 19, 2012
Page 5

DISH has responded to this request reasonably, agreeing to produce those documents sufficient to show Fox programming for which the AutoHop feature has been available.

**Request No. 16** seeks *all* documents *discussing, concerning or evidencing any* studies, analyses, predictions, reports, or surveys about commercial skipping features. DISH has agreed to produce studies from January 1, 2011 onward, more than a full year prior to when the features at issue here were introduced. DISH is willing to expand its production to include studies from January 1, 2005 onward.

**Request No. 20** asks DISH to produce documents sufficient to show DISH subscribers who have bought or leased the Hopper. DISH has already agreed to produce documents regarding the number of its subscribers who have the Hopper DVR. DISH is willing to expand its production to include documents sufficient to show the number of Hoppers that have been sold.

**Request No. 21** seeks *all* documents *concerning* collection of data regarding usage of PTAT and AutoHop. DISH respectfully disagrees that *all* documents *concerning* how DISH collects data regarding PTAT and AutoHop is relevant to this action. DISH has agreed to produce non-privileged documents constituting PTAT and AutoHop measurement data currently available to DISH. DISH has also described the data collection process in Mr. Gerhards's declaration. This does not then require DISH to produce each and every single document within its possession "concerning" the collection of data to Fox. As Fox knows from the Gerhards declaration, data is collected from set top boxes to improve operation of the system. Fox's requests would arguably call for information related to system maintenance and operation that would have no relevance to this suit.

**Requests No. 22-24** all seek DISH projections regarding the Hopper technology, the PTAT and AutoHop features, and Sling Adapter. However, they do not just seek the projections themselves, but again seek *all* documents *discussing, concerning, or evidencing* such projections. Specifically, **Request No. 22** calls for "*all* documents *discussing, concerning or evidencing* projections of PTAT, AutoHop, or Sling Adapter." **Request No. 23** asks for the production of *all* documents *discussing, concerning or evidencing* projections of Hopper sales or leases. **Request No. 24** seeks "*all* documents *discussing, concerning or evidencing* projections of Sling Adapter sales or leases." These requests are overbroad and unduly burdensome on their face. DISH has agreed to produce any actual projections regarding the Hopper, its features PTAT and AutoHop, and complementary sales of Sling Adapters. Fox's relentless insistence that *all* documents *concerning* or *discussing* such projections must be produced as well simply ignores the obvious overbreadth and burden that these expansive requests impose.



# O R R I C K

David R. Singer, Esq.
December 19, 2012
Page 6

**Request Nos. 26 -28** look for *all* documents *discussing, concerning or evidencing* other
products or services that may complete with the PTAT or AutoHop features or Sling Adapter.
**Request No. 29** similarly seeks *all* documents *discussing, concerning or evidencing* how PTAT
may affect revenue of VOD services. Fox has loudly contended that PTAT competes with VOD
services. Thus, a VOD service is clearly contemplated by Fox as a "service" that may compete
with PTAT. Accordingly, Request No. 29 falls within Request No. 26, under Fox's claimed
theory of the case. As with Fox's other similarly worded requests, these requests are overbroad
and unduly burdensome. Nevertheless, DISH has agreed to produce those documents that
discuss any competition by PTAT and AutoHop with those VOD distributors specifically
identified by Fox in its requests. To the extent any such documents exist or can be located after a
reasonable search, DISH is willing to expand its production to include documents that discuss
competition with respect to MVPDs that Fox provides with VOD content to the extend such
documents discuss Fox VOD. Please provide us with a list of such MVPDs.

**Request No. 30** seeks the production of "*all* documents *discussing, concerning or
evidencing* the impact that AutoHop, PTAT, or Sling Adapter may have on broadcast television
or cable networks." As worded, Fox's request is overly broad and unduly burdensome. Each
and every document that "concerns" the impact of AutoHop, PTAT, or Sling Adapter on
broadcast television or cable networks goes well beyond the issues raised in Fox's complaint.
DISH has reasonably agreed to produce "studies, analyses, predictions, reports, surveys, or
projections" and the impact of PTAT or AutoHop on broadcast television.

**Request No. 32** seeks *all* documents concerning legal opinions regarding the legality of
PTAT, AutoHop, or Sling Adapter. Such materials are obviously privileged.

**Request Nos. 33-36** asks for *all* documents *discussing, concerning or evidencing* any
changes after May 24, 2012 to: (33) PTAT; (34) the AutoHop announcement files; (35) the
AutoHop quality control procedure; and (36) CommSkip software. As written, these requests are
overbroad and unduly burdensome. DISH has already produced the source code and technical
specifications regarding these changes. Fox has disclaimed any interest in reviewing source
code, and inconsistently demands documents evidencing changes to code. While Fox insists that
all documents concerning or discussing these changes must still be produced, Fox's cited
examples regarding discussions of potential liability, are obviously going to be privileged.
Further, in response to Request No. 31, DISH has already agreed to produce documents
discussing whether PTAT, AutoHop, or Sling Adapter potentially infringe Fox's copyright or
breach the RTC agreement, to the extent any such documents exist and are not privileged.

**Request Nos. 37 and 38** seek *all* communications, or documents that discuss
communications, between DISH and EchoStar that discuss the development or operation,
respectively, of PTAT, AutoHop, or Sling Adapter. As with Fox's other requests, these are



**ORRICK**

David R. Singer, Esq.
December 19, 2012
Page 7

facially overbroad and unduly burdensome. The idea that DISH is required produce all documents that discuss the development or operation of PTAT, AutoHop, or Sling Adapter, is simply unreasonable. This could include communications concerning the technical minutia of the development and implementation that would have no relevance to this action. DISH has agreed to produce communications regarding the technical specifications of PTAT or AutoHop, as DISH understands this to be the core of Fox's complaint. Fox's insistence that all communications about development and operation must be produced because there may be some mention of copyright or contract is far-fetched at best.

Request Nos. 42 and 43 ask for DISH to produce documents relating to DISH's advertisements of PTAT, AutoHop, and Sling Adapter. Request No. 42 asks for *all* documents *discussing, concerning or evidencing* the marketing, advertising, or promotion of PTAT, AutoHop, and/or Sling Adapter." Request No. 43 requests the production of *all* documents *discussing, concerning or evidencing any* communications with marketing or advertising consultants, public relations firms, and/or advertising agencies concerning the marketing, advertising or promotion of PTAT, AutoHop, and/or Sling Adapter. These request are overbroad on their face and unduly burdensome. All documents concerning the marketing of PTAT, AutoHop, and/or Sling, as well as all communications on that subject, would surely encompass thousands (if not hundreds of thousands) of documents, on topics ranging from pricing of advertisements, to coloring, to font-type, etc. Such documents have no relevance to this case. The requests also call for a massive volume of duplicative documents that are largely publicly available. DISH has agreed to produce exemplars of its final advertisements for PTAT and AutoHop and has agreed to produce communications with advertising agencies regarding the marketing for PTAT and AutoHop. Moreover, DISH has already agreed to produce documents discussing PTAT and AutoHop's competitive position vis-à-vis other distribution companies. (*See* Response to Request Nos. 26-29.)

Request No. 46 seeks internal communications regarding four different provisions of the parties Retransmission Consent Agreement. DISH has agreed to produce responsive documents from January 1, 2012 to the present. Fox has responded with a concern that this might not capture all responsive documents because some of the contract provisions were negotiated back in 2002. There is an obvious burden in requesting that DISH collect and review 10 years worth of correspondence about the Retransmission Consent Agreement provisions. However, especially because Fox is obligated to provide reciprocal discovery, DISH is willing to meet and confer with Fox regarding proper custodians and relevant time periods for which this search may be targeted. There is a possibility that electronic communications from some of the relevant periods may not be accessible and DISH will raise those issues with Fox, as part of the more global electronic document production discussion at the appropriate time.



ORRICK

David R. Singer, Esq.
December 19, 2012
Page 8

**Request Nos. 53 and 62** ask for documents regarding DISH communications with television stations or networks about PTAT, AutoHop or Sling Adapter. **Request No. 53**[2] seeks *all* documents *discussing, concerning or evidencing* revenue, income, or other consideration DISH has been offered by any television station or television network in exchange for disabling PTAT, AutoHop, or Sling Adapter. DISH has agreed to provide Fox with documents sufficient to show the offers that it has received from television networks or stations regarding the operation of PTAT or AutoHop. Fox's proffered relevance to support its demand for all responsive communications falls short. For example, the offers themselves would be sufficient to show any alleged harm to TV stations or networks. **Request No. 62** is even broader and seeks *all* documents that *constitute or discuss your* communications with *any* television station *concerning* PTAT, AutoHop, or Sling Adapter. Fox's best attempt to defend this obviously overbroad request is to just superficially claim that "every communication between DISH and the TV networks/stations concerning PTAT, AutoHop, or Sling Adapter are relevant to Fox's claims." Fox's decision to not even try to justify its own vague and overbroad request is telling.

**Request No. 55 and 56** ask for production of *all* documents *discussing, concerning or evidencing* whether PTAT, AutoHop or Sling Adapter could assist DISH with negotiations with any television network or station, or reduce retransmission consent fees. These requests which are vague and ambiguous, are simply not relevant to this dispute. Moreover, even if somehow relevant, the inclusion of the language "discussing, concerning or evidencing" makes these requests overbroad and burdensome. DISH has already agreed to produce documents specific to the Retransmission Consent Agreements involving the parties. (*E.g.*, Response to Request No. 46.)

**Request Nos. 92-96** relate to alleged future plans of DISH regarding addressable advertising and contain the usual broad language of seeking *all* documents that *discuss, concern, or evidence* this possible future business plan. Addressable advertising is not at issue with PTAT or AutoHop, as used by DISH subscribers at present. Accordingly, this issue is not relevant to this litigation. Fox's claim that DISH's plans for addressable advertising demonstrate a profit motive for copyright infringement is both tenuous and speculative. Moreover, Fox's claim that these documents relate to DISH's willfulness for purposes of statutory damages under the Copyright Act makes no sense. Whether or not DISH has future plans for addressable advertisements to be shown on the networks for which DISH sells advertisements (which does not include the Fox broadcast network) is wholly separate from Fox's current claim that PTAT and AutoHop, as currently implemented, are copyright violations. What DISH may or may not do with this technology in the future is not relevant to the claims as they exist.

---

[2] Fox included Request No. 54 in a heading in its letter, but does not specifically discuss it in the text. DISH's response to Request No. 54 indicates that it has not made any offers to any television stations or networks for consideration in exchange for operating PTAT, AutoHop, or Sling Adapter. Accordingly, no such documents exist.



**O R R I C K**

David R. Singer, Esq.
December 19, 2012
Page 9

### Requests Regarding Sling Adapter

Fox has sought expansive discovery regarding Sling Adapter. In fact, many of Fox's requests discussed above, including **Request Nos. 2, 22-24, 26-28, 30, 37, 38, 43, 53, 55, 56, 60, 61, 64, 89, 90, 91,** seek documents regarding PTAT, AutoHop, *and* Sling Adapter. Fox repeatedly states that DISH must agree to produce the same type of documents for Sling Adapter that it has agreed to produce for PTAT and AutoHop. However, Sling Adapter is a much different issue. The first "Slingbox" was introduced in 2005, by Sling Media, Inc. Sling Adapter was first introduced by DISH in 2010, two years before the Hopper, and its PTAT and AutoHop features. Fox said nothing about Sling Adapter in 2010. And Fox remained mum about Sling Adapter in 2011. Only in May 2012, almost 2 years after Sling Adapter was introduced, did Fox take issue with Sling Adapter as part of the instant case. Yet even in doing so, Fox has not taken issue with Sling Adapter in the same way that it has with PTAT and AutoHop. Fox's own complaint, not to mention the litigation to date, demonstrates that Fox's complaints regarding the Sling Adapter are merely related to PTAT and AutoHop. For example, in paragraph 6 of the complaint, Fox claims that DISH's conduct does not stop with PTAT and AutoHop, but is compounded by Sling Adapter and allows DISH to compete unfairly with other internet distributors. Fox sets forth its specific complaint with the Sling Adapter in paragraph 44, where it complaint that "DISH subscribers using the Sling Adapter can view PrimeTime Anytime programming without commercials using the AutoHop feature." While factually false, this demonstrates that Fox's complaints lie with PTAT and AutoHop, not Sling Adapter. This is further reinforced by the fact that Sling Adapter was mentioned exactly *once* in Fox's preliminary injunction motion and even then *only* in conjunction with PTAT and AutoHop. Against this background, and in light of Fox's generally overbroad requests, DISH made the determination that an agreement to produce documents that relate to PTAT and AutoHop would include discussion of Sling Adapter, to the extent Sling Adapter is implicated.

**Request No. 7** seeks "*all* documents *concerning* the functionality of Sling Adapter, at any point in time . . . including but not limited to functional requirement specifications, design documents, and other technical specifications." DISH has agreed to produce documents sufficient to show the Sling Adapter's functionality from January 1, 2012. DISH is willing to expand its production to include such documents from January 1, 2010, the year that the Sling Adapter was introduced, to the present.

**Request No. 14** seeks "*all* documents *discussing, concerning or evidencing* the availability of the AutoHop feature via the Sling Adapter." Given that the AutoHop feature is not available via the Sling Adapter, there are no such documents. The follow-up request, **Request No. 15,** calls for the production of "*all* documents *discussing, concerning or evidencing* the reasons why the AutoHop feature is not available via the Sling Adapter." This is again an



**ORRICK**

David R. Singer, Esq.
December 19, 2012
Page 10

objectionable request, as it is overbroad and unduly burdensome. Moreover, Fox's claim that these documents may demonstrate DISH's development process is an insufficient basis to justify this request. DISH has already agreed to produce documents sufficient to show DISH's reasoning in developing PTAT and AutoHop. (Response to Request No. 2.)

    **Request No. 19** seeks "*all* documents *discussing, concerning or evidencing* usage of Sling Adapter." This request is facially overbroad and unduly burdensome. DISH has millions of subscribers. Each subscriber who has a Sling Adapter would have some reflection of that in his or her account, as well as on his or her bill. This request would require that DISH produce all such billing documents to Fox, as they would be documents "evidencing" usage of Sling Adapter. However, such documents are obviously not relevant to the instant dispute. Thus, it simply is not true that "all Sling data is plainly at issue and must be produced." DISH has placed a reasonable limitation on this request by agreeing to produce documents sufficient to show DISH's sale of Sling Adapters to DISH subscribers.

* * *

    We would welcome the opportunity to discuss these issues with you at the conference of counsel that you proposed. Please let us know what times you are available tomorrow or Friday morning or January 2, 3 or 4, 2013.

Very truly yours,

William A. Molinski

**EXHIBIT 8**



# ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017

tel  +1-213-629-2020
fax  +1-213-612-2499
WWW.ORRICK.COM

January 25, 2013

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
663 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:     *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et anno,* Case No. CV 12-04529 DMG (SHx)

Dear David:

This letter summarizes the agreements reached at our in person meet and confer on January 8, 2013 regarding Fox's First Set of Requests for Production.

## DISH's General Responses and General Objections

As discussed, DISH stands by the positions that are laid out in its written responses and reserves all its rights and privileges. Where DISH has agreed to produce certain responsive, non-privileged documents, DISH is making the production subject to and without waiving its objections, and is not withholding any documents based on those objections.

To the extent that any of Fox's requests call for documents that are in the possession of EchoStar Technologies, L.L.C., and DISH has agreed to produce responsive documents, DISH will seek to obtain and produce those documents subject to EchoStar's voluntary cooperation. However, EchoStar and its documents are not within DISH's control. Accordingly, DISH cannot guarantee that EchoStar will be willing to produce responsive documents that are within its possession, custody and control. DISH will notify Fox if EchoStar specifically objects to producing any documents.

Further, DISH maintains its position that the parties should, in cooperation with the parties involved in the related litigations involving ABC, CBS and NBC, jointly agree upon a list of custodians and search terms to be used to collect responsive documents for all matters. This would not change a party's request – it would provide some clarity as to the minimum search parameters. This ensures a streamlined process and helps eliminate ambiguities and disputes down the line. DISH is surprised at Fox's staunch objection to attempting to reach an agreement on custodians and search terms. You took the position that agreement on search terms and custodians is not required



**O R R I C K**

David R. Singer, Esq.
January 15, 2013
Page 2

in federal district courts in California. We found that, in fact, those courts agree that "in the era of electronic discovery, it is critical for parties to meet and confer regarding a list of custodians, search terms, and other methods of reducing the volume of ESI [electronically stored information] to be searched and produced." *Park v. Korean Air Lines Co.*, 2009 U.S. Dist. LEXIS 107647, at *9-10 (C.D. Cal. Nov. 18, 2009) (ordering parties to meet and confer regarding custodian lists and search terms).[1] We hope that Fox will reconsider its position.

### Removal of "Concerning"

You agreed to strike the word "concerning" from your requests on the grounds that this term unduly broadens the requests in which that term was used. With that limitation, DISH agrees to produce documents responsive to various requests, as further set forth below.

### DISH's Position on Discovery Regarding Sling Adapter

We began our conference with a discussion of Fox's claims and document requests about the Sling Adapter. As you know, Fox has sought expansive discovery regarding Sling Adapter. In fact, many of Fox's requests discussed above, including **Request Nos. 2, 22-24, 26-28, 30, 37, 38, 43, 53, 55, 56, 60, 61, 64, 89, 90, 91,** seek documents regarding PTAT, AutoHop, *and* the Sling Adapter. At our conference, Fox stated its intention was to state claims about the Sling Adapter separate and apart from PTAT and AutoHop. However, this assertion is undercut by a number of facts. Sling has been on the market since 2005 and is not limited to DISH. Anyone can walk into a BestBuy, purchase a Slingbox, and use it with any DVR. Yet Fox has not objected to that technology and has only recently sued DISH alone.

Moreover, Fox's allegations in the complaint appear to take issue with the Sling Adapter insofar as it may be used in conjunction with PTAT or AutoHop. DISH has reasonably agreed to produce documents about the Sling Adapter in connection with PTAT or AutoHop, but it is not willing to participate in extensive, overbroad, and unduly burdensome discovery regarding the Sling Adapter alone. Fox did not even include the Sling Adapter in its preliminary injunction papers, likely because Fox knew that DISH could successfully argue that the Sling Adapter had been on the market for too long. At our conference, Fox agreed that "some time constraints would be reasonable" on the requests about Sling Adapter but did not specify any limitations. DISH will seek

---

[1] *See also Heller v. Cepia L.L.C.*, 2012 U.S. Dist. LEXIS 6452, at *8 (N.D. Cal. Jan. 20, 2012) (ordering parties to agree on search terms because "in this age of electronic discovery, this Court, like others, finds that the use of keyword searches is appropriate under certain circumstances to reduce the number of potentially responsive documents"); *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 542, 543 (N.D. Cal. 2009) (noting that the "scope and complexity" of a sizeable copyright infringement case "required cooperation in prioritizing discovery and in being mindful of the proportionality requirement" of Rule 26); *id.* at 543-44 (citing The Sedona Conference Cooperation Proclamation and noting that counsel must cooperate "to identify and fulfill legitimate discovery needs, yet avoid seeking discovery the cost and burden of which is disproportionally large to what is at stake in the litigation").

Decl of D. Singer
Exhibit 8, Page 148



**ORRICK**

David R. Singer, Esq.
January 15, 2013
Page 3

relief from the Court if Fox does not narrow its requests relating to the Sling Adapter on the basis that the expansive discovery sought is unduly burdensome. We remain willing to hear proposals from Fox about how to narrow this discovery while reserving DISH's rights to stand on its objections for the reasons described above.

**Request No. 7** seeks "*all* documents *concerning* the functionality of Sling Adapter, at any point in time . . . including but not limited to functional requirement specifications, design documents, and other technical specifications." DISH has agreed to produce documents sufficient to show the Sling Adapter's functionality from January 1, 2010, the year that the Sling Adapter was introduced, to the present. Fox agreed that this time frame is sufficient and sought to confirm that the production will include the functionality of how Sling Adapter works in connection with smart phone applications and websites. This is a perfect example of why we have separated Sling Adapter and noted we are agreeing to produce documents about its technical specifications with the hope of avoiding invasive discovery after Fox sees for itself that Sling on its own is perfectly legal. With respect to the desired information on its functionality with applications and web browsers, please provide the exact language you are looking for and we will discuss it with our client.

**Request No. 14** seeks "*all* documents *discussing, concerning or evidencing* the availability of the AutoHop feature via the Sling Adapter." Given that the AutoHop feature is not available via the Sling Adapter, there are no such documents. The follow-up request, **Request No. 15,** calls for the production of "*all* documents *discussing, concerning or evidencing* the reasons why the AutoHop feature is not available via the Sling Adapter." This is again an objectionable request, as it is overbroad and unduly burdensome. You noted that Fox wants documents explaining why AutoHop is not available with Sling Adapter, such as whether it was a technical issue, a business decision, or some other reason. We will produce any existing documents, located pursuant to a reasonable search, discussing the reasons why AutoHop does not function with the Sling Adapter. DISH will not produce documents on whether it might include that functionality in the future, which has no relevance to this dispute.

**Request No. 19** seeks "*all* documents *discussing, concerning or evidencing* usage of Sling Adapter." This request is facially overbroad and unduly burdensome. You agreed to strike the "concerning" language and accept documents sufficient to show the number of Sling Adapters that have been sold, but also insisted on having all of the usage data. We are working with our client to find out whether it maintains usage data. If the data is available, we will provide a proposal about what DISH would be willing to produce.

<u>**DISH's Objections and Responses to Specific Document Requests**</u>

**Request No. 6** seeks *all* documents *concerning* the quality assurance process used by DISH . . . in connection with AutoHop at any point in time. Fox narrowed this request to "documents sufficient to show the quality assurance process in connection with AutoHop from inception to



# ORRICK

David R. Singer, Esq.
January 15, 2013
Page 4

date." Fox states that it wants to know how that process worked over time and is only interested in relevant aspects of the process and not, for example, the minutia of employee activities. DISH will produce non-privileged documents responsive to the request as narrowed.

**Request Nos. 8 and 9** ask for *all* documents *concerning* the testing of PTAT or AutoHop, respectively, before the features were commercially available. Fox agreed to strike the phrase "concerning." Fox states that it wants enough information to show the number of Fox programs being copied during testing or quality assurance. If DISH has documents showing which Fox programs, if any, were copied during the QA process, it will produce them.

**Request No. 10** seeks the production of *all* documents *discussing, concerning or evidencing* how DISH decided which television networks to include in its PTAT feature. DISH has agreed to produce those documents sufficient to show the basis for DISH's decision as to which networks would be included in the PTAT feature. Fox agreed to strike the phrase "concerning." DISH will produce non-privileged documents responsive to this request as narrowed.

**Request No. 11** also seeks *all* documents *discussing or concerning* what times to start and stop one or more networks as part of the PTAT feature. DISH has agreed to produce documents sufficient to show any determination about start and stop times for the PTAT feature. Fox agreed to strike the phrase "concerning." DISH will produce non-privileged documents responsive to this request as narrowed.

**Request No. 12** calls for *all* documents *discussing, concerning or evidencing* which television programs are, have been, or will be made available to subscribers with AutoHop. DISH has responded to this request reasonably, agreeing to produce documents sufficient to show Fox programming for which the AutoHop feature has been available. At our conference, Fox agreed to strike the phrase "concerning" and rephrase the request in light of its other issues.

**Request No. 16** seeks *all* documents *discussing, concerning or evidencing any* studies, analyses, predictions, reports, or surveys about commercial skipping features. This request also raises the issue of mutuality – DISH is willing to expand its production to include studies from January 1, 2005 onward if Fox agrees to do the same on DISH's requests about studies and reports. The timing is relevant because it goes back to a time when DVRs were not as prevalent and allows our experts to analyze various trends that are highly relevant to our arguments. Fox claimed that going back 7 years is burdensome because the studies are not all in one location. When pressed, Fox admitted that it has employees solely involved in such research, but claimed that they do not gather studies in one location. Fox further asserted that it is not "in the practice of" commissioning its own internal studies. DISH proposed a compromise with a shorter time for public studies (3 years) but a longer time for anything discussing a study or commissioning it (7 years). Fox's discussion of these documents is particularly relevant because it would show whether Fox was aware of various studies and what it thought about them. Agreeing that this may be relevant, Fox agreed to reconsider its



**O R R I C K**

David R. Singer, Esq.
January 15, 2013
Page 5

position, but its amended responses to DISH Request Nos. 11 and 12 fall far short of our proposed compromise. Accordingly, we have no choice but to stand by our original response.

**Request No. 20** asks DISH to produce documents sufficient to show DISH subscribers who have bought or leased the Hopper. DISH has already agreed to produce documents showing the number of its subscribers who have the Hopper DVR. DISH is willing to expand its production to include documents sufficient to show the number of Hoppers that have been sold. Fox agreed to this compromise.

**Request No. 21** seeks *all* documents *concerning* collection of data regarding usage of PTAT and AutoHop. DISH respectfully disagrees that *all* documents *concerning* how DISH collects data regarding PTAT and AutoHop are relevant to this action. Fox agreed to strike the phrase "concerning." Fox further indicated that it is looking for information on what has been done for the purposes of litigation – what DISH does now that it did not do before this litigation – and not every stbHealth diagnostic that has been performed. We propose that Fox describe its request with more specificity and we will consider that narrowed request.

**Request Nos. 22-24** all seek DISH projections. However, they are not limited to the projections themselves, but again seek *all* documents *discussing, concerning, or evidencing* such projections. Specifically, **Request No. 22** calls for "*all* documents *discussing, concerning or evidencing* projections of PTAT, AutoHop, or Sling Adapter." **Request No. 23** asks for the production of *all* documents *discussing, concerning or evidencing* projections of Hopper sales or leases. **Request No. 24** seeks "*all* documents *discussing, concerning or evidencing* projections of Sling Adapter sales or leases." These requests are overbroad and unduly burdensome on their face. DISH has agreed to produce actual projections regarding the Hopper, the PTAT and AutoHop features, and sales of the Sling Adapter. Fox agreed to strike the phrase "concerning." Mutuality is important with respect to this request. Specifically, Request No. 6 in DISH's First Set of Requests for Production to Fox asks for documents showing any forecasts, projections, or budget comparisons regarding Fox's television programming and copyrighted content. We are willing to discuss this request further with you in an effort to arrive at a mutually agreed scope of production on this subject for both parties.

**Request Nos. 26-28** seek *all* documents *discussing, concerning or evidencing* other products or services that may compete with the PTAT or AutoHop features or Sling Adapter. DISH has agreed to produce those documents that discuss any competition by PTAT and AutoHop with those VOD distributors specifically identified by Fox in its requests. DISH is willing to expand its production to include documents that discuss competition with respect to MVPDs that Fox provides with VOD content to the extent such documents discuss Fox VOD (and to the extent any such documents exist or can be located after a reasonable search). Fox stated that it wants any competing service that was discussed, not just those identified in the request. As worded, the requests call for any documents mentioning the potentially competing services, and are not limited to potential competition with the PTAT feature. Fox clarified that it only seeks documents *discussing* competition



**ORRICK**

David R. Singer, Esq.
January 15, 2013
Page 6

between the PTAT feature and content-provider services.  DISH explained that this is a good example of where a list of agreed upon search terms could help the parties reach agreement about the scope of a request and help eliminate future disputes.  Yet Fox resists providing such terms. DISH will produce non-privileged documents responsive to this request as narrowed.  However, DISH believes that an agreed upon list of search terms is the most efficient, accurate, and fair way to proceed for all parties.

　　　　**Request No. 29** similarly seeks *all* documents *discussing, concerning or evidencing* how PTAT may affect revenue of VOD services.  Fox agreed with DISH that Request No. 29 falls within Request No. 26.

　　　　**Request No. 30** seeks the production of "*all* documents *discussing, concerning or evidencing* the impact that AutoHop, PTAT, or Sling Adapter may have on broadcast television or cable networks."  This request is overly broad and unduly burdensome.  DISH has reasonably agreed to produce "studies, analyses, predictions, reports, surveys, or projections" discussing or evidencing the impact of PTAT or AutoHop on broadcast television.  DISH stands by its response as sufficient.

　　　　**Request No. 32** seeks *all* documents concerning legal opinions regarding the legality of PTAT, AutoHop, or Sling Adapter.  DISH is not asserting an advice of counsel defense at this time, but reserves all rights.

　　　　**Request Nos. 33-36** asks for *all* documents *discussing, concerning or evidencing* any changes after May 24, 2012 to:  (33) PTAT; (34) the AutoHop announcement files; (35) the AutoHop quality control procedure; and (36) CommSkip software.  DISH has already produced responsive source code and technical specifications documents.  DISH will supplement its production with non-privileged responsive documents discussing or evidencing material changes after August 1, 2012.

　　　　**Request Nos. 37 and 38** seek *all* communications, or documents that discuss communications, between DISH and EchoStar that discuss the development or operation, respectively, of PTAT, AutoHop, or Sling Adapter.  As with Fox's other requests, these are facially overbroad and unduly burdensome.  Fox stated it is not interested in technical minutiae and only wants business communications regarding potential changes to technical items.  DISH needs more specificity here.  Fox agreed to provide a narrowed request.  We look forward to receiving it.

　　　　**Request Nos. 42 and 43** ask for DISH to produce documents relating to DISH's advertisements of PTAT, AutoHop, and Sling Adapter.  **Request No. 42** asks for *all* documents *discussing, concerning or evidencing* the marketing, advertising, or promotion of PTAT, AutoHop, and/or Sling Adapter."  **Request No. 43** requests the production of *all* documents *discussing, concerning or evidencing any* communications with marketing or advertising consultants, public relations firms, and/or advertising agencies concerning the marketing, advertising or promotion of PTAT, AutoHop, and/or Sling Adapter.  These request are overbroad on their face and unduly



**O R R I C K**

David R. Singer, Esq.
January 15, 2013
Page 7

burdensome. Fox confirmed that it is not seeking multiple copies of the same advertisement. DISH needs more specificity here because the current wording calls for a lot of irrelevant documents. Fox agreed to provide a narrowed request. We look forward to receiving it.

Request No. 46 seeks internal communications regarding four different provisions of the parties' Retransmission Consent Agreement. DISH agreed to produce responsive documents from January 1, 2012 to the present and expressed a willingness to meet and confer with Fox regarding proper custodians and relevant time periods for which this search may be targeted with the expectation that Fox would coordinate a reciprocal search and production. During our conference, Fox noted that while some of the contract provisions were negotiated back in 2002, it is not requesting documents over a 10 year period. Rather, Fox only expects a search of a few months in 2002 and 2010 around when those provisions where negotiated. DISH is not willing to accept a production on just the provisions that Fox claims are at issue. As we explained, various agreements were negotiated together, they cross-reference each other, and the law of contract interpretation requires consideration of the contract *as a whole.* Fox agreed that both sides should provide everything they have with respect to communications between the parties, but maintained that the internal communications should be limited to the specified provisions. When pressed, however, Fox admitted that common sense dictates a broader contextual search for the relevant topics rather than specific contract provisions, as business people would likely discuss a contract broadly rather than specify particular provisions. As a compromise, DISH proposes that the parties agree upon time frames and general topics for these searches. Please let us know if Fox is amenable to this approach.

Request Nos. 53 and 62 ask for documents regarding DISH's communications with television stations or networks about PTAT, AutoHop or Sling Adapter. Request No. 53 seeks *all* documents *discussing, concerning or evidencing* revenue, income, or other consideration DISH has been offered by any television station or television network in exchange for disabling PTAT, AutoHop, or Sling Adapter. DISH has agreed to provide Fox with documents sufficient to show the offers that it has received from television networks or stations regarding the operation of PTAT or AutoHop. Fox posits that DISH raised the issue of how the existence of PTAT and AutoHop has affected negotiations with other TV stations in its declarations and so all the documents here are relevant. However, the context of the discussion in the declarations is about irreparable harm and the ability to put a price on these features. Accordingly, DISH stands by its proposed production for this request. Request No. 62 is even broader and seeks *all* documents that *constitute or discuss* your communications with *any* television station *concerning* PTAT, AutoHop, or Sling Adapter. This request is overbroad and the narrow information that Fox seeks regarding communications about PTAT and AutoHop in the background of contract negotiations is covered by Request No. 53. Please either withdraw this request or provide a specific, narrowed request.

Request Nos. 55 and 56 ask for production of *all* documents *discussing, concerning or evidencing* whether PTAT, AutoHop or Sling Adapter could assist DISH with negotiations with any television

Decl of D. Singer
Exhibit 8, Page 153



**ORRICK**

David R. Singer, Esq.
January 15, 2013
Page 8

network or station, or reduce retransmission consent fees. The parties agreed that these requests are covered by the discussion of Requests 53 and 62 above.

**Request No. 91** asks for *all* documents that *constitute or discuss* "Business Rules" *concerning* the development and implementation of PTAT, AutoHop, or Sling Adapter. DISH has agreed to produce documents sufficient to show this information. You objected that because you do not know what a "Business Rule" is, you cannot agree to a production that is sufficient to show. We both agreed to get further clarification of what is meant by "Business Rule" and to then discuss this request further.

**Request Nos. 92-96** relate to alleged future plans of DISH regarding addressable advertising and contain Fox's usual broad language seeking *all* documents that *discuss, concern, or evidence* this possible future business plan. Addressable advertising is not relevant to this litigation because it is not at issue with PTAT or AutoHop, as used by DISH subscribers at present. Fox's interest in these topics relates to a Denver Post article that attributed certain statements about potential future plans for addressable advertising to Mr. Ergen. Any future plans are speculative and irrelevant. Fox's claim that these documents relate to DISH's willfulness for purposes of statutory damages under the Copyright Act makes no sense. Whether or not DISH has future plans for addressable advertisements to be shown on the networks for which DISH sells advertisements (which does not include the Fox broadcast network) is wholly separate from Fox's current claim that the PTAT and AutoHop features, as currently implemented, are copyright violations. What DISH may or may not do with this technology in the future is not relevant to the claims as they exist. DISH stands by its objections.

* * *

We look forward to receiving narrower versions of the requests that Fox agreed to revise and will get back to you about those requests. We also look forward to receiving Fox's updated responses to DISH's First Set of Requests for Production. We welcome the opportunity to have further discussions with you about any open items should there be additional room for agreement on them.

Very truly yours,

William A. Molinski

**EXHIBIT 9**

**Wagman, Jennifer L.**

| | |
|---|---|
| **From:** | Singer, David R. |
| **Sent:** | Monday, January 28, 2013 6:14 PM |
| **To:** | Molinski, William A.; Echtman, Elyse D.; Phillips, Melanie D. |
| **Cc:** | Stone, Richard L.; Thomas, Andrew J.; Gallegos, Amy M.; Wagman, Jennifer L. |
| **Subject:** | Fox v. DISH |
| **Attachments:** | 1-28-13 ltr.pdf |

Bill,

Please see attached letter regarding discovery.  Let's try to set up a call later this week.  As set forth in my letter, I think there are still a number of gaps we can close.

Regards,

David

**David R. Singer**
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel (213) 239-2206
Fax (213) 239-2216
DSinger@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

David R. Singer
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071-2091
Tel:  213.239.2206
Fax:  213.239.2216
DSinger@jenner.com
www.jenner.com

1

Decl of D. Singer
Exhibit 9, Page 155

JENNER&BLOCK

January 28, 2013

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel 213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel 213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
    SUTCLIFF LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

> Re:   *Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al*
>        **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Bill:

This responds to your January 25 letter.

### Documents Regarding Sling Adapter (Request Nos. 2, 22-24, 26-28, 30, 37, 38, 43, 53, 55, 60, 61, 64, 89, 90, 91)

Dish cannot properly object to producing documents concerning Sling Adapter on the grounds that Fox supposedly waited too long to sue Dish. Fox's complaint unequivocally alleges separate breach of contract and copyright infringement claims based on Sling Adapter. Fox's allegations concerning Sling Adapter are not, as your letter asserts, limited to the use of Sling Adapter in connection with PTAT and AutoHop. The Sling Adapter claims are within the four corners of the complaint and are as much at issue in this lawsuit as the PTAT and AutoHop claims. "Laches" is not a valid objection to a document request. Even if it were, it does not apply here. Dish only began selling Sling Adapter in late 2010, shortly after Dish signed a contract with Fox promising not to retransmit Fox's TV signal over the internet. Fox's claims are well within the applicable statutes of limitations.

Dish's objections based on undue burden are also unfounded; you have not offered any specifics to demonstrate burden. Regardless, Fox agrees to limit its Sling Adapter discovery to January 2010 forward. This should eliminate any undue burden.

### Request No. 2

Your letter fails to address Request No. 2. Fox agreed to remove the word "concerning" from the request. It seeks all documents discussing the reasons why Dish developed PTAT,

2172152.1

Decl of D. Singer
Exhibit 9, Page 156

January 28, 2013
Page 2

AutoHop and Sling Adapter.  Dish agreed to produce internal memos and business plans "sufficient" to show the reasons it developed PTAT and AutoHop (but not Sling Adapter).  As noted above, the Sling Adapter objection is improper.  Fox is also seeking all *emails* that discuss the reasons why these services were developed.  Please let us know if Dish will comply, or whether it insists on producing only those documents that Dish deems "sufficient."

### Request No. 7

Fox agrees that this request can be limited to documents sufficient to show the functionality of Sling Adapter from January 2010 to the present.  As you know, Sling Adapter requires that the subscriber also use a Dish-operated website (e.g., www.dishanywhere.com) or a mobile app (Dish Remote Access).  We have already explained that documents responsive to this request must be sufficient to show how Sling Adapter works with these websites and apps.  I don't know how we can make our request more clear.

### Requests Nos. 10, 11

Fox agreed to remove the word "concerning" from these requests.  They now seek all documents discussing how Dish decided which television networks to include in PTAT, as well as the start and stop times for PTAT recordings.  Fox never agreed to limit them to documents "sufficient" to show how Dish made these decisions.  In order to demonstrate Dish's control over the PTAT copying process, Fox is entitled to each and every email or document discussing Dish's volitional conduct.  Please let us know whether Dish will withdraw its "sufficient" limitation.

### Request No. 12

This request seeks more than documents "sufficient" to show the programs for which AutoHop is made available.  Fox wants all emails and documents discussing why Dish makes AutoHop available for some Fox programs and not others.  Please let us know whether Dish will withdraw its "sufficient" limitation.

### Request No. 21

Fox is seeking all documents discussing the collection of data on PTAT and AutoHop usage done in connection with this lawsuit.  This includes all emails between and among Dish and EchoStar employees discussing the types of PTAT and AutoHop usage data to collect and/or ignore; the purpose of collecting and/or ignoring certain PTAT and/or AutoHop usage data; the date range of data to be collected; the methodology for collecting the data; concerns about the accuracy of the data collected; any data collected but not yet disclosed to Fox; and any internal analysis of the collected data.  Please let us know whether Dish will comply with this request.

2172152 1

Decl of D. Singer
Exhibit 9, Page 157

January 28, 2013
Page 3

**Requests Nos. 22-24**

Documents discussing PTAT, AutoHop, and Sling Adapter usage projections are directly relevant because Dish has put its projections at issue. Dish argues that low adoption and usage rates for PTAT and AutoHop (and, presumably Sling Adapter) undermine Fox's claim of irreparable harm. Fox believes that Dish's projections (and emails discussing those projections) will tell a different story.

In response, Dish says it won't reveal all of these projections documents unless Fox discloses its own financial projections for the Fox broadcast television network and all of its copyrighted content. But Fox's financial projections are not at issue. Fox is not seeking actual damages in this lawsuit. To the contrary, Fox is claiming that its harms *cannot* be quantified financially. Moreover, Fox has already agreed to produce any documents discussing any effects of PTAT, AutoHop, or Sling Adapter on financial projections.

**Request Nos. 26-28**

It's not clear from your letter what Dish is agreeing to produce. As narrowed by Fox, Request No. 26 seeks all documents discussing PTAT competing with any other product or service. Request No. 27 seeks all documents discussing AutoHop competing with any other product or service. Request No. 28 seeks all documents discussing Sling Adapter competing with any other product or service. These requests are not limited to any particular MVPDs or third party services. Fox wants to see all Dish emails and documents discussing the competitive landscape for PTAT, AutoHop and Sling Adapter.

**Request No. 30**

In addition to producing studies, analyses, predictions, reports, surveys and projections, Fox is also seeking *emails* discussing how PTAT and AutoHop may impact broadcast television. Please confirm whether Dish will include emails in its response.

**Request No. 33-36**

These Requests relate to changes made to PTAT and AutoHop after May 24, 2012 (when the lawsuit was filed) and specifically include all of the changes Dish made in late July 2012. Why is Dish refusing to produce any responsive documents that predate August 1, 2012? Please confirm that Dish will produce responsive documents covering May 24, 2012 forward that have not already been produced.

**Requests Nos. 37, 38**

Fox does not intend for Request No. 37 to cover technical minutiae related to software development. Instead, Fox is seeking higher-level documents. This would include contracts between Dish and EchoStar concerning the development of PTAT, AutoHop, and Sling Adapter;

2172152.1

January 28, 2013
Page 4

emails discussing the reasons for developing PTAT, AutoHop, and Sling Adapter; and emails
discussing Dish's business goals and competitive reasons for developing these features.
Similarly, Request No. 38 is not meant to include technical minutiae. Instead, Fox is seeking
documents such as emails discussing the manner in which Dish wants PTAT, AutoHop, and/or
Sling Adapter to operate or emails discussing Dish's vision for the consumer experience of these
features.

　　　　If responding to these requests raises any undue burdens, please give us some more
details, and we will work with you to narrow them. In the meantime, Dish can produce those
documents that fit our examples above.

**Requests Nos. 42 and 43**

　　　　Fox will limit Requests Nos. 42 and 43 to all documents discussing the purpose, goals,
content, and/or impact of any advertising, marketing, and/or promotional materials for PTAT,
AutoHop, and/or Sling Adapter. This is not meant to include about typesetting, color
choice or font. It is meant to include internal and external emails discussing the messaging of
Dish's advertisements. It covers internal emails, as well as emails to ad agencies, consultants,
and public relations firms. Please confirm whether Dish will comply.

**Request No. 46**

　　　　Just because Dish believes it is entitled to something more from Fox, Dish cannot refuse
to produce documents that both sides agree are relevant. This is a straightforward request. As it
stands, Dish is refusing to produce internal emails concerning the contract provisions at issue.
Dish is also refusing to produce copies of the parties' contract negotiations.

**Requests Nos. 53-56 and 62**

　　　　Dish tries to limit Request No. 53 to documents "sufficient' to show the offers it has
received from television stations regarding the operation of PTAT and AutoHop. Dish refuses to
respond to Request No. 62. And Dish claims that Requests 55 and 56 are covered by 53, even
though Dish refuses to produce responsive documents to any of these. (To be sure, Requests
Nos. 55 and 56 include all internal Dish emails discussing whether PTAT, Auto, and Sling
Adapter could give Dish leverage in its negotiations with TV stations – these aren't covered by
Request No. 53).

　　　　Dish objects to these requests on the grounds of burden, but offers no specifics. Has Dish
had *so many* emails with TV stations concerning these features over the past year that it cannot
sort through them without undue burden? If so, this makes the request all the more relevant.
Please explain why these requests are supposedly burdensome.

2172152.1

January 28, 2013
Page 5

### Request Nos. 92-96

As explained at our January 8 meeting, Fox agreed to narrow these requests. Fox is not seeking all documents broadly relating to or discussing Dish's future plans to do addressable advertising. Fox is only seeking documents that discuss the use of addressable advertising in order to substitute and replace the broadcast networks' advertisements. As explained by Mr. Ergen, it appears that Dish's ultimate profit motive for AutoHop is to eliminate Fox's advertising in order to replace them with ones that are sold by Dish. If true, this scheme would be relevant to the commercial nature of AutoHop (for the fair use analysis) as well as the willfulness factor of Fox's statutory damages claim. Please confirm whether Dish will produce all responsive documents to these requests as narrowed.

* * * * *

After working together, I think both sides have done a good job narrowing some of the issues in dispute. I believe we can make even more progress on some of these. For others, it appears we will need to present them to the magistrate. I assume the same is true with respect to certain documents Dish is seeking from Fox.

I propose that we set up another call or meeting to discuss which of our discovery disputes will require motion practice (while reserving our rights as to other disputes that might still be resolved by the parties). It also makes sense to discuss the timing and briefing schedule for our cross-motions to compel.

Please let me know if you are available later this week. I am generally available on Thursday and Friday.

Regards,

David R. Singer
Partner

2172152.1

Decl of D. Singer
Exhibit 9, Page 160

**EXHIBIT 10**

**Wagman, Jennifer L.**

| | |
|---|---|
| **From:** | Singer, David R. |
| **Sent:** | Monday, February 04, 2013 7:52 PM |
| **To:** | Molinski, William A.; Echtman, Elyse D.; Phillips, Melanie D. |
| **Cc:** | Stone, Richard L.; Thomas, Andrew J.; Gallegos, Amy M.; Wagman, Jennifer L. |
| **Subject:** | RE: Fox v. DISH |

Bill,

We never received Dish's response to my email and letter from last Monday.  In particular, we would like responses to our requests for clarification of positions stated in your January 25 letter as well as Dish's response to the document requests Fox agreed to narrow.  Please get back to us by Thursday.

Regards,

David

**David R. Singer**
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel (213) 239-2206
Fax (213) 239-2216
DSinger@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** Singer, David R.
**Sent:** Monday, January 28, 2013 6:14 PM
**To:** Molinski, William A.; Echtman, Elyse D.; Phillips, Melanie D.
**Cc:** Stone, Richard L.; Thomas, Andrew J.; Gallegos, Amy M.; Wagman, Jennifer L.
**Subject:** Fox v. DISH

Bill,

Please see attached letter regarding discovery.  Let's try to set up a call later this week.  As set forth in my letter, I think there are still a number of gaps we can close.

Regards,

David

David R. Singer
Jenner & Block LLP

1

Decl of D. Singer
Exhibit 10, Page 161

633 West 5th Street
Suite 3600
Los Angeles, CA 90071-2091
Tel:  213.239.2206
Fax:  213.239.2216
DSinger@jenner.com
www.jenner.com

2

**EXHIBIT 11**

JENNER&BLOCK

February 12, 2013

Jenner & Block LLP          Chicago
633 West 5th Street         Los Angeles
Suite 3600                  New York
Los Angeles, CA 90071       Washington, DC
Tel 213-239-5100
www.jenner.com

VIA EMAIL AND MESSENGER

David R. Singer
Tel 213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017

Re:   ***Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al***
      **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Bill:

    With all due respect, DISH's feigned indignation reflected in your February 8, 2013 letter
is hard to swallow. For DISH to even suggest that Fox is acting in "bad faith" and with
"reticence" in refusing to produce documents is really the pot calling the kettle black. Other than
producing some court-mandated expedited discovery in August 2012 about the functionality of
PrimeTime Anytime and AutoHop (which required a court order compelling further production
because of DISH's chicanery), DISH's document production has been limited to providing Fox
with copies of the documents DISH produced to ABC in November 2012 as part of the expedited
discovery in aid of ABC's preliminary injunction in the Southern District of New York. The
ABC document production consisted of nearly 2,000 pages of News Corp.'s SEC public filings
(which Fox never requested). A large chunk consisted of case law and FCC administrative
proceedings, including a 482-page FCC report on the VOD industry (which Fox never
requested). In fact, Dish's so-called document production includes 1,321 pages that are simply
copies of the *pleadings from this lawsuit*. Obviously we didn't ask for those either. More than
1,700 pages of DISH's so-called production are articles and studies that Dish's experts relied on
for the preliminary injunction motion. To date, DISH has not produced a *single* email, letter, or
internal memo in response to any of Fox's 90-plus document requests.

    Incredibly, DISH has taken the outlandish position that it should not even have to engage
in discovery related to Fox's copyright and contract claims against Sling Adapter because DISH
thinks it's a weak claim. We both know that's not a proper discovery objection.

    When counsel met in person on January 8, 2013, and your associate told me that DISH
had essentially produced everything it had agreed to produce except for some specific technical

2175748.1

Decl of D. Singer
Exhibit 11, Page 163

February 12, 2013
Page 2

specifications documents, I nearly fell out of my chair.  Does DISH really expect us to believe
that it doesn't have a single responsive email that falls within the scope of discovery?

In stark contrast, Fox began this case by *voluntarily* producing documents to DISH
without a court order and before discovery commenced.  And, beginning on August 13, 2012,
Fox has engaged in a rolling production of responsive documents (August 16, August 21,
November 7, November 8, and December 10, 2012 and January 23, January 29, February 5, and
February 8, 2013).  To date, Fox has produced 9,081 pages, including emails, financial
statements, the parties' negotiations, studies, Nielsen data, and more.  And we are still hard at
work searching for and reviewing more documents for production.  Yet DISH won't even
produce the documents it has already agreed to produce.

On January 28, I sent you another letter concerning DISH's refusal to produce
documents.  I offered to have a phone call later that week (in my letter and in my cover email).  I
never heard back from you.  I called you to follow up on February 6, and when you returned my
call, you said DISH would respond by Friday, February 8.  Then, on Friday night, you sent me a
letter addressing *only* DISH's document requests to Fox, without any mention of Fox's requests
to DISH.

Against this backdrop, Fox has concluded that the meet and confer process cannot go on
and on while DISH refuses to budge.  Accordingly, with respect to **Fox's Document Requests
to DISH**, I am enclosing Fox's portion of the joint stipulation under L.R. 37-2 to be filed in
connection with Fox's motion to compel against DISH, as well as Fox's supporting declaration
and evidence.  A Word version of the joint stipulation is attached too.  Please complete and
return DISH's portion no later than Tuesday, February 19 as required by the local rules.

Regards,

David R. Singer
Partner

2175748.1

**EXHIBIT 12**



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

February 14, 2013

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
663 West 5th Street
Suite 3600
Los Angeles, CA 90071

    Re:  *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et anno,* Case No. CV 12-04529 DMG
       (SHx)

Dear David:

    This letter responds to your February 13 letter and to Fox's joint stipulation, served on February 12.

    Fox's joint stipulation and contemplated motion to compel includes 11 requests for production. As detailed below, DISH believes that the parties can reach agreement on the parameters of those 11 requests without burdening the Court with motion practice.

    For three of the requests included in your joint stipulation, Request Nos. 11, 26, and 27, DISH has already agreed to produce documents in response to the requests as narrowed at the parties' January 8 conference.

- As initially propounded, Request No. 11 sought all documents discussing or concerning what time to start and stop one or more networks as part of the PTAT feature. Fox agreed to strike the phrase "concerning." In my January 25 letter, I confirmed that "DISH will produce non-privileged documents responsive to this request as narrowed."

- As initially propounded, Request Nos. 26 and 27 ask for all documents discussing, concerning or evidencing other products or services that may compete with the PTAT or AutoHop features, respectively. Fox agreed to strike the phrase "concerning" from both of these requests. In my January 25 letter, I confirmed that "DISH will produce non-privileged documents responsive to this request as narrowed."

Please confirm that Fox will agree to remove Request Nos. 11, 26, and 27 from its joint stipulation and contemplated motion to compel, based upon DISH's agreement to produce documents in response to these requests as narrowed by Fox.



**O R R I C K**

David R. Singer, Esq.
February 14, 2013
Page 2

For six of the requests included in your joint stipulation, Request Nos. 2, 22, 28, 30, 46, and 55, DISH is willing to produce documents in response to the requests as they have been narrowed at the parties' January 8 conference and in Fox's January 28 correspondence.

- Request No. 2 seeks all documents discussing or concerning the reason why DISH developed PTAT, AutoHop and Sling Adapter, including but not limited to, internal memos and business plans. Fox has agreed to strike the word "concerning" and limit the request to January 1, 2010 to the present with respect to Sling Adapter. DISH is willing to produce documents in response to this request as narrowed.

- Request No. 22 seeks all documents discussing, concerning or evidencing projections of PTAT, AutoHop, or Sling Adapter. Fox agreed to strike the word "concerning" from this request and limit the request to January 1, 2010 to the present with respect to Sling Adapter. DISH is willing to produce documents responsive to this request as narrowed.

- Request No. 28 seeks all documents discussing, concerning or evidencing other products or services that may compete with the Sling Adapter (similar to Request Nos. 26 and 27, discussed above). Fox has agreed to strike the word "concerning" and limit the request to January 1, 2010 to the present. DISH is willing to produce documents in response to this request as narrowed.

- Request No. 30 seeks all documents discussing, concerning or evidencing the impact that AutoHop, PTAT, or Sling Adapter may have on broadcast television or cable networks. Fox has agreed to strike the word "concerning" and limit the request to January 1, 2010 to the present with respect to Sling Adapter. DISH is willing to produce documents in response to this request as narrowed.

- Request No. 46 seeks internal communications regarding four different provisions of the parties Retransmission Consent Agreement. DISH is willing to produce documents in response to this request.

- Request No. 55 seeks all documents discussing, concerning or evidencing whether PTAT, AutoHop or Sling Adapter could assist or benefit DISH in its negotiations with any television network or television station. Fox has agreed to strike the word "concerning" and limit the request to January 1, 2010 to the present with respect to Sling Adapter. DISH is willing to produce documents in response to this request as narrowed.

Please confirm that Fox will agree to remove Request Nos. 2, 22, 28, 30, 46, and 55 from its joint stipulation and contemplated motion to compel, based upon DISH's agreement to produce documents in response to these requests as narrowed by Fox.

Decl of D. Singer
Exhibit 12, Page 166



**ORRICK**

David R. Singer, Esq.
February 14, 2013
Page 3

For two of the requests included in your joint stipulation, Request Nos. 62 and 94, DISH believes that a compromise can be reached.

- Request No. 62 seeks all documents that constitute or discuss your communications with any television station concerning PTAT, AutoHop, or Sling Adapter. Fox has agreed to limit this request to January 1, 2010 to the present with respect to Sling Adapter. However, DISH has concerns regarding the confidential nature of ongoing, confidential negotiations. To address those concerns, but allow Fox the discovery it seeks, DISH proposes a two-part resolution. DISH is willing to produce documents constituting communications with television stations concerning PTAT, AutoHop, or Sling Adapter, with the exception of communications made in the course of ongoing confidential negotiations for licensing or retransmission agreements for which the contemplated agreements are not yet finalized. DISH will supplement its production with such communications once any such negotiations are concluded.

- Request No. 94 seeks all documents that discuss AutoHop being used in conjunction with any form of addressable advertising or ad-substitution technology. As stated before, DISH believes the request to be overbroad and unrelated to the instant dispute. Consistent with Fox's description of what it seeks to discover with this Request, DISH is willing to produce any documents that discuss any alleged plans to use AutoHop technology in order to substitute and replace the advertisements on the ABC, CBS, Fox or NBC broadcast networks, to the extent any such documents exist.

Please let me know, no later than the close of business this Friday, whether Fox is willing to withdraw its joint stipulation and motion to compel for Request Nos. 62 and 94, based upon DISH's agreement to produce documents as outlined above.

DISH remains hopeful, especially in light of our compromises above and our outstanding offer to meet and confer, that we can resolve what appears to be a dispute limited to two requests without burdening the Court with motion practice. I look forward to hearing from you.

Very truly yours,

William A. Molinski

**EXHIBIT 13**

# EXHIBIT 14



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

February 15, 2013

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
663 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:   *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et anno,* Case No. CV 12-04529 DMG (SHx)

Dear David:

This letter responds to your February 15 letter regarding the eleven document requests at issue between the parties.

With respect to ten of the eleven requests, Request Nos. 2, 11, 22, 26-28, 30, 46, 55, and 62, DISH has agreed to produce all documents responsive to these requests as narrowed. With respect to the remaining request at issue, Request No. 94, which seeks all documents that discuss AutoHop being used in conjunction with any form of addressable advertising or ad-substitution technology, DISH is willing to produce documents in response to the requests as narrowed in your February 15 letter. DISH will produce documents discussing AutoHop in connection with addressable advertising relating to Fox or any group of channels that would include Fox.

Fox is insisting, however, DISH also commit to completing it production to *all* of these requests no later than March 17, 2013. Otherwise, Fox will move to compel. This is unreasonable and unnecessary. There is no scheduling order in this case. No impending discovery cut-off. No looming trial date. In fact, Fox's appeal of Judge Gee's denial of its motion for a preliminary injunction has not even been set for hearing before the Ninth Circuit. Moreover, this is an even shorter time frame than Fox would be able to obtain if it goes forward with its contemplated motion to compel, which could not even be set for hearing before March 11, 2013. Given the volume of documents sought in conjunction with these nine requests, let alone Fox's remaining 87 requests for production, a thirty-day time frame is simply unworkable.

As Fox is aware, DISH is in the process of collecting and reviewing documents for production in this matter, as well as the related matter pending in the Southern District of New York. As DISH has repeatedly stated, discovery should be coordinated between these actions. Judge Swain in the Southern District of New York has already indicated that such coordination is



ORRICK

David R. Singer, Esq.
February 15, 2013
Page 2

appropriate.  A Joint Electronic Discovery Protocol has already been entered in the Southern
District of New York, a copy of which is attached hereto.  DISH believes that Fox should agree to
sign onto this protocol and invites Fox to do so.

In New York, the parties have already begun a discussion of custodians.  We have repeatedly
requested that Fox participate in that discussion.  Fox has steadfastly refused to participate.
Nevertheless, Fox has intimated in its separate statement, which will be submitted to the Magistrate
Judge, that it is concerned about discovery in this case based upon DISH's previous litigation
history.  Such a suggestion is nonsense.  DISH has invited you to participate in DISH's collection
and review process.  Fox cannot continue to refuse to cooperate and at the same time suggest that
DISH trying to be anything but open and collaborative about its document collection and
production process.

DISH has been more than reasonable in responding to Fox's 96 requests for production.
We strongly request that you reconsider your motion to compel, now that the parties have agreed to
the scope of production for all of the requests at issue.  DISH does not believe that motion practice
is necessary or appropriate.  Fox is seeking tens of thousands, if not hundreds of thousands, of
documents from DISH and such a production simply cannot be completed in the 30-day timeframe
proposed by Fox.  Should Fox nevertheless feel that judicial intervention is necessary, please
confirm that DISH may have until Thursday, February 21, 2013, to respond to your joint stipulation.

I look forward to hearing from you.

Very truly yours,

William A. Molinski

Decl of D. Singer
Exhibit 14, Page 170



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE AUTOHOP LITIGATION

This Document Relates To:

DISH Network L.L.C., Plaintiff

12 Civ. 4155 (LTS) (KNF)

MASTER FILE

12. Civ. 4155(LTS) (KNF)

**JOINT ELECTRONIC DISCOVERY SUBMISSION NO. 1**
**AND [PROPOSED] ORDER**

Plaintiff/Counterclaim Defendant DISH Network L.L.C., Counterclaim Defendant DISH

Network Corporation, Counterclaim Defendant EchoStar Technologies, L.L.C. (together,

"DISH"), Defendant/Counterclaimant American Broadcasting Companies, Inc.,

Defendant/Counterclaimant ABC, Inc., Defendant/Counterclaimant Disney Enterprises, Inc.

(together with American Broadcasting Companies, Inc. and ABC, Inc., "ABC"),

Defendant/Counterclaimant NBCUniversal Media, L.L.C. ("NBC"), Defendant/Counterclaimant

CBS Corporation, Counterclaimant CBS Broadcasting Inc., Counterclaimant CBS Studios Inc.,

and Counterclaimant Survivor Productions L.L.C. (together, "CBS") (ABC, NBC and CBS are

referred to as the "Networks") (DISH and the Networks are referred to as the "Parties") hereby

submit this Joint Electronic Submission No. 1 and [Proposed] Order.

To the extent relevant information is stored in electronic format, this Joint Submission

and [Proposed] Order (and any subsequent ones) and the Stipulated Protective Order (Doc. #96)

shall be the governing documents by which the Parties and the Court manage the electronic

discovery process in this consolidated action. The Parties recognize that this Joint Electronic

Discovery Submission No. 1 and [Proposed] Order are based on facts and circumstances as they

are currently known to each party, that the electronic discovery process is iterative, and that

1

Decl of D. Singer
Exhibit 14, Page 171

additions and modifications to this Submission may become necessary as more information becomes known to the Parties.

(1)     **Brief Joint Statement Describing the Action**

Lawsuits relating to PrimeTime Anytime and AutoHop.  Declaratory judgment action by DISH Network L.L.C. alleging no copyright infringement (as to ABC only) and no breach of contract (as to ABC, NBC and CBS Corporation).  Counterclaims by ABC alleging copyright infringement and breach of contract.  Counterclaims by NBC alleging breach of contract.  Counterclaims by CBS alleging copyright infringement and breach of contract.

(a)     **Estimated Amount of Plaintiff's Claims**

DISH seeks declaratory relief and costs to the extent it prevails in its action.

(b)     **Estimated Amount of Defendant's Counterclaims/Cross-Claims**

ABC seeks preliminary and permanent injunctions on its copyright and contract claims.  ABC takes the position that harm to it by DISH is irreparable, cannot be fully compensated or measured in money, and that it is currently unable to compute each category of damages claimed.  Possible categories of damages to be sought by ABC include those set forth in 17 U.S.C. § 504, including statutory damages, disgorgement of profits, and actual damages, as well as attorneys' fees and costs.  Other possible categories of damages to be sought by ABC include damage for breach of contract, including general and consequential damages.

NBC seeks a judgment declaring that DISH is in breach of contract and the implied covenant of good faith and fair dealing, and resulting damages award in an amount to be determined at trial.

CBS seeks the following relief:  (i) on the copyright claims, preliminary and permanent injunctions pursuant to 17 U.S.C. § 502, disgorgement and actual or statutory damages in

2

Case 2:12-cv-04529-DMG-SH   Document 179-2   Filed 04/15/13   Page 86 of 96   Page ID
#:6250
Case 1:12-cv-04     LTS-KNF   Document 160    Filed 12    12   Page 3 of 8

accordance with 17 U.S.C. § 504 and applicable law, and costs and reasonable attorneys' fees in
accordance with 17 U.S.C. § 505 and applicable law; and (ii) on the breach of contract claims,
preliminary and permanent injunctions and consequential damages.

    **(2)**    **Competence**

Counsel certify that they are sufficiently knowledgeable in matters relating to their
clients' technological systems to discuss competently issues relating to electronic discovery, or
have involved someone competent to address those issues on their behalf.

    **(3)**    **Meet and Confer**

Pursuant to Fed. R. Civ. P. 26(f), counsel are required to meet and confer regarding
certain matters relating to electronic discovery before the Initial Pretrial Conference (the Rule 16
Conference). Counsel hereby certify that they have met and conferred to discuss those issues.
The Parties will continue to meet and confer on electronic discovery issues.

    **(4)**    **Unresolved Issues**

The Parties have certain unresolved issues, as set forth below. The Parties intend to
continue to meet and confer regarding various discovery issues as necessary and as set forth in
more detail herein. To the extent that the parties are unable to resolve disputed issues that have
arisen in the negotiation of this e-discovery protocol through their continued meet and confer
efforts, they will submit those issues to Magistrate Judge Fox for determination.

To date, the Parties have addressed the following issues:

    **(5)**    **Preservation**

    **(a)**    The Parties have discussed the obligation to preserve potentially relevant
electronically stored information, as reflected in 6(a) below, and the Parties will continue to

3

discuss, as needed, reasonable limitations on the scope of preservation and memorializing the same.

        **(b)**    **Litigation Hold Notices:** The parties have not reached agreement on the scope of disclosure of information related to litigation hold notices. The parties are continuing to meet and confer on this issue. In the event that the parties are unable to reach agreement promptly, they will submit the dispute to the Magistrate Judge.

    **(6)**    **Production**

        **(a)**    **Sources of Electronically Stored Information**

    The Parties anticipate that discovery may occur from one or more of the following potential sources of electronically stored information: email, word processing and spreadsheet documents, and presentations. The Parties agree that data maintained solely for disaster recovery purposes, historical copies of website content, ambient data, and inactive legacy data are deemed not readily accessible and need not be preserved or collected. The Parties further agree that text messages, instant messages and voicemail messages need not be preserved or collected.

        **(b)**    **Limitations on Production**

    The Parties have discussed and are continuing to discuss factors relating to the scope of the collection, search, and production of electronically stored information, including but not limited to: (i) number of custodians; (ii) identity of custodians; (iii) date ranges for which potentially relevant data will be drawn; and (iv) use of keyword search lists. To the extent the Parties have reached agreements related to these factors, they are as follows:

    The Parties agree that reasonable limitations should be imposed on the number of custodians that should be identified for the collection of potentially responsive material. The Parties agree that they will engage in a meaningful meet and confer process on the identity of the

4

custodians whose electronic files should be subject to search. Each party will first propose a set of its own custodians, subject to review and proposed supplementation from the other Parties.

The Parties further agree to meet and confer and use their best efforts to reach agreement on the search terms to be used in connection with electronic searches.

### (c)     Form of Production

The Parties agree to continue to meet and confer concerning the technical specifications for form of production, including the extracted data fields to be produced and other technical parameters of production.

### (d)     Privileged Material

#### (1)     Identification

The Parties incorporate by reference sections II(D) ("Documents Presumptively Not to Be Logged on Privilege Log") and (E) ("Privilege Log Descriptions of Email Threads") of the Standing Order regarding the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York dated October 31, 2011. Subject to the foregoing, the Parties have agreed to the following method(s) for the identification and the redaction of privileged documents:

If a producing party identifies documents or portions of documents subject to the attorney-client privilege, work product doctrine, or other relevant privilege, protection or immunity, and withholds production of documents or redacts documents on that basis, the producing party must log individually the withheld documents and redactions (a "Privilege Log"), subject to exceptions agreed to by the Parties when the burden of individual listing outweighs any benefit. The Parties shall meet and confer to discuss what, if any, categories of

5

documents created after the filing date of this action need to be included in a privilege log.

Privilege Logs shall contain the following information:

- a sequential number associated with each Privilege Log record;
- the date of the document;
- the identity of all persons who authored and/or signed the document;
- the identity of all persons designated as addresses or copyees;
- a description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the document and the basis of the claim of privilege or immunity;
- the type or nature of the privilege asserted (*e.g.*, the attorney-client privilege); and
- the Bates numbers corresponding to the first and last page of any withheld or redacted document if the document has been assigned any such Bates numbers.

Each member of a document "family" (*e.g.*, an e-mail attaching a memorandum together constitute a document family) that is withheld or redacted on the grounds of privilege, immunity or any similar claim shall be identified, but if a family contains more than one document that is withheld or redacted on such grounds, the producing party need only include a single entry on the Privilege Log.

A producing party will produce a related Privilege Log within 30 days after substantial completion of its document production.

If a custodian of documents is scheduled to be deposed, the production of a Privilege Log for that custodian's documents shall be the time set forth in the preceding paragraph or 7 days prior to that custodian's deposition (whichever is earlier). The Parties will meet and confer regarding any affected deposition schedule to the extent additional time is needed to produce a Privilege Log prior to any deposition.

The Parties may modify deadlines and other requirements for production of Privilege Logs by agreement and without further order of the Court.

6

Decl of D. Singer
Exhibit 14, Page 176

     (2)    **Inadvertent Production/Claw-Back Agreements**

The inadvertent production of documents is governed by the Stipulated Protective Order (Doc. #96).

     (3)    **F.R.E. 502(d) Order**

Consistent with paragraph 19 of the Stipulated Protective Order, the Parties seek entry of an order as described in Fed. R. Evid. 502(d), as follows: "Pursuant to the agreement of the Parties under Fed. R. Evid. 502(e) and by Order of this Court under Fed. R. Evid. 502(d) no inadvertent disclosure, production, or exchange of documents or information in this case shall constitute a waiver of any applicable attorney-client privilege or of any applicable work product protection in this or any other federal or state proceeding. This Order applies to any documents or electronically stored information inadvertently disclosed, exchanged, produced, or discussed among the Parties, their counsel and/or any agents (such as vendors and experts) in the course of this litigation (collectively, "Produced Documents"). "

     (e)    **Cost of Production**

As a general matter, the Parties have considered cost-shifting and cost-sharing with respect to discovery of electronically stored information and do not seek to shift or share those costs at this time. The Parties reserve their rights to seek cost-shifting or sharing at a later date.

          •     •     •

The preceding constitutes the agreements reached between the Parties to certain matters concerning electronic discovery as of this date. To the extent any significant additional agreements are reached, modifications are necessary, or disputes are identified, they will be outlined in subsequent submissions or agreements and promptly presented to the Court.

Decl of D. Singer
Exhibit 14, Page 177

Dated:  November 30, 2012

Elyse D. Echtman
eechtman@orrick.com
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019

*Counsel for DISH*

Thomas G. Hentoff /EDE
thentoff@wc.com
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005

*Counsel for ABC*

Jane G. Stevens /EDE
jgs@msk.com
Mitchell Silberberg & Knupp LLP
12 East 49th Street – 30th Floor
New York, NY 10017

*Counsel for NBC*

Hamish Hume /EDE
hhume@bsfllp.com
Boies, Schiller & Flexner LLP
5301 Wisconsin Ave. NW
Washington, DC 20015

*Counsel for CBS*

Dated: New York, New York
            December 7, 2012

Kevin Nathaniel Fox
Hon. Laura K. Swain, U.S.D.J.

HON. KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

8

Decl of D. Singer
Exhibit 14, Page 178

**EXHIBIT 15**

**J E N N E R & B L O C K**

February 15, 2013

Jenner & Block LLP                    Chicago
633 West 5th Street                   Los Angeles
Suite 3600                            New York
Los Angeles, CA 90071                 Washington, DC
Tel 213-239-5100
www.jenner.com

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel 213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

Re:   *Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al*
      **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Bill:

This responds to your letter from 4:00 p.m. today.

Fox will not agree to withdraw its motion if DISH refuses to commit to even *begin* producing the documents it has already agreed to produce.  This case has been pending for nine months, and Fox served its document requests five months ago.  Yet DISH has not produced a *single* email on any topic, or *any* documents concerning Fox's Sling Adapter claims.

Meantime, Fox has been searching for, gathering and producing emails and other documents responsive to DISH's requests.  The fact that the New York litigation involving DISH was assigned to the "Pilot Project Regarding Case Management" in the Southern District of New York does not somehow excuse DISH from meaningfully participating in this case and responding to discovery.  Please confirm that DISH will at least begin to search for and produce on a rolling basis the documents it has agreed to produce within the next *two weeks* (including the Sling Adapter documents which are not even at issue in the New York action).

If DISH needs more than 30 days to respond to certain requests, then please let us know which ones and roughly how much time you need.  But Fox will not agree to DISH's unilateral, indefinite "stay" of its document production on the grounds that the agreement reached between DISH and other parties in another lawsuit is taking a long time to work out.

2177033.1

Decl of D. Singer
Exhibit 15, Page 179

# EXHIBIT 16



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

February 17, 2013

**VIA EMAIL AND US MAIL**

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

David R. Singer, Esq.
Jenner & Block LLP
663 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:     *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et anno*, Case No. CV 12-04529 DMG (SHx)

Dear David:

This letter responds to your second February 15 letter regarding Fox's contemplated motion to compel.

While your letter does not explicitly say so, it appears that Fox is willing to accept DISH's previously stated agreements to produce documents in response to the eleven requests included in Fox's joint stipulation.  (*See* my letters dated January 25, 2013, February 14, 2013, and February 15, 2013.)

Fox has not, however, agreed to withdraw its contemplated motion to compel.  The remaining hurdle appears to be for the parties to come to an understanding of a reasonable timetable for production.  Fox has proposed a thirty-day timetable.  There are two reasons why that time table is unreasonable:  (1) the magnitude of the production sought by Fox's 96 requests for production, and (2) the need to coordinate DISH's collection, review and production in this case with the related case pending in the Southern District of New York.  Both of these are reasonable considerations.  While unable to provide a date certain by which its entire production in response to Fox's First Set of Requests for Production (containing 96 separate requests) will be complete, DISH is nevertheless willing to agree to produce additional documents on a rolling basis beginning within the next two weeks.  Further, DISH is willing to provide Fox an update in 30 days regarding the status of its production.

Please let me know whether Fox still intends to move to compel despite DISH's above offer to resolve this dispute.  Should Fox contend that its motion is necessary, DISH agrees to a mutual extension of two days for responding to separate statements relating to any motions to compel for either party's first set of requests for production.

# O
# ORRICK

David R. Singer, Esq.
February 17, 2013
Page 2

Very truly yours,

William A. Molinski