1   WILLIAM A. MOLINSKI (SBN 145186)
    wmolinski@orrick.com
2   ORRICK, HERRINGTON & SUTCLIFFE LLP
    777 South Figueroa Street, Suite 3200
3   Los Angeles, California 90017
    Tel: +1-213-629-2020 / Fax: +1-213-612-2499
4
    ANNETTE L. HURST (SBN 148738)
5   ahurst@orrick.com
    ORRICK, HERRINGTON & SUTCLIFFE LLP
6   405 Howard Street
    San Francisco, California 94105-2669
7   Tel: +1-415-773-5700 / Fax: +1-415-773-5759

8   E. JOSHUA ROSENKRANZ (*pro hac vice*)
    jrosenkranz@orrick.com
9   PETER A. BICKS (*pro hac vice*)
    pbicks@orrick.com
10  ELYSE D. ECHTMAN (*pro hac vice*)
    eechtman@orrick.com
11  LISA T. SIMPSON (*pro hac vice*)
    lsimpson@orrick.com
12  ORRICK, HERRINGTON & SUTCLIFFE LLP
    51 West 52nd Street
13  New York, New York 10019-6142
    Tel: +1-212-506-5000 / Fax: +1-212-506-5151

14  MARK A. LEMLEY (SBN 155830)
    mlemley@durietangri.com
15  MICHAEL PAGE (SBN 154913)
    mpage@durietangri.com
16  DURIE TANGRI LLP
    217 Leidesdorff Street
17  San Francisco, California 94111
    Tel: +1-415-362-6666

18  Attorneys for Defendants DISH Network L.L.C.,
    DISH Network Corp., and EchoStar Technologies
19  L.L.C.

20              UNITED STATES DISTRICT COURT

21              CENTRAL DISTRICT OF CALIFORNIA

22  FOX BROADCASTING COMPANY,          Case No. CV12-04529 DMG (SHx)
    *et al.*,
23                                      **DISH'S SUPPLEMENTAL
                    Plaintiffs,         EVIDENCE IN OPPOSITION TO
24                                      FOX MOTION FOR
            v.                          PRELIMINARY INJUNCTION
25                                      ON "NEW 2013 SERVICES"
    DISH NETWORK L.L.C., *et al.*,
26
                    Defendants.
27

28

**INTRODUCTION**

DISH Network L.L.C. and DISH Network Corp. ("DISH"), and EchoStar Technologies, L.L.C. ("EchoStar", collectively "Defendants"), respectfully submit the Petition for Rehearing En Banc filed on April 15, 2013 with the United States Court of Appeals for the Second Circuit in *WNET, et. al. v. Aereo, Inc.*, Case No. 12-2786-cv.  This petition was drafted and submitted by the same law firm and lawyers that represent Plaintiffs Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc. ("Fox") in this litigation, including attorneys Richard L. Stone, Amy Gallegos, and Paul M. Smith. Moreover, Twentieth Century Fox Film Corp. is one of the named Plaintiffs-Counter-Defendants-Appellants in the Second Circuit *Aereo* litigation.

**RELEVANT EVIDENCE**

In the Petition for Rehearing En Banc, Fox's attorneys argue as follows:

- "The answer is to focus on who transmits and who receives a given performance.  A subscriber who records a program in his den and watches it in his bedroom is not transmitting the program to *the public*; he is transmitting it *to himself*.  That is a private performance.  That a different entity may also have transmitted the same program publicly does not make all retransmissions public."  Exh. 1 at 18-19 (emphasis in original).

- "[F]unctionally the RS-DVR [remote storage DVR] and Aereo are far apart. One service allows an individual cable subscriber to designate licensed programming for copying and have it played back later just to her.  The other retransmits broadcast shows, live, to thousands of subscribers.  Reading the Transmit Clause to allow unlicensed RS-DVR retransmissions does not dictate a result that allows Aereo's unlicensed retransmissions of broadcast programming."  *Id.* at 21.

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

The complete Petition for Rehearing En Banc is attached hereto for the Court's reference.

Dated:        April 17, 2013                    Orrick, Herrington & Sutcliffe LLP


                                                By:   /s/ William A. Molinski
                                                      WILLIAM A. MOLINSKI
                                                      Attorneys for Defendants
                                                      DISH Network L.L.C., DISH
                                                      Network Corp. and EchoStar
                                                      Technologies L.L.C.

# 12-2786-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

———————

WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM
CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK
LIMITED PARTNERSHIP, AND PUBLIC BROADCASTING SERVICE,
*Plaintiffs-Counter-Defendants-Appellants*,

v.

AEREO, INCORPORATED, F/K/A BAMBOOM LABS, INCORPORATED,
*Defendant-Counter-Claimant-Appellee*,

———————

*On Appeal from the United States District Court
for the Southern District of New York (Nathan, J.)*

———————

## PETITION FOR REHEARING EN BANC

———————

Richard L. Stone                     Paul M. Smith
Amy Gallegos                         Steven B. Fabrizio
JENNER & BLOCK LLP                   Scott B. Wilkens
633 West 5th Street                  Matthew E. Price
Suite 3600                           JENNER & BLOCK LLP
Los Angeles, CA 90071-2054           1099 New York Ave. NW Suite 900
(213) 239-5100                       Washington, DC 20001
                                     (202) 639-6000

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

**Exhibit 1, Page 3**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................ii

INTRODUCTION ............................................................................ 1

STATEMENT OF THE CASE .......................................................... 5

REASONS TO GRANT REHEARING EN BANC .............................. 8

I.    The *Aereo* Majority's Guideposts Conflict With The Plain Language Of The Transmit Clause. ................................................................. 8

II.   *Cablevision*'s Reasoning Is Based On A False Premise. ............... 12

III.  *Aereo* Compounded The Problem With Its Attempt To "Reconcile" *Cablevision* With The Statute. ................................................... 13

IV.   A Ruling Enjoining Aereo Need Not Overrule *Cablevision*. .......... 15

CONCLUSION ............................................................................. 15

i

# TABLE OF AUTHORITIES

**CASES**

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984)......................................2, 9

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d
    Cir. 2008)...............................................................................................1, 10, 12

*Fox Television Stations, Inc. v. BarryDriller Content Systems*, PLC,
    No. CV 12-6921-GW JCX, ---F. Supp. 2d ---, 2012 WL 6784498
    (C.D. Cal. Dec. 27, 2012) ....................................................3, 9, 11, 13

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ........................4

*United States v. ASCAP*, 627 F.3d 64 (2d Cir. 2010), *cert. denied*, 132
    S. Ct. 366 (2011)................................................................................4

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), *cert. denied*, No.
    12-798, --- S. Ct. ---, 2013 WL 1091891 (U.S. Mar. 18, 2013)...................... 3-4

**STATUTES**

17 U.S.C. § 101 ..................................................................................5, 9, 10

**LEGISLATIVE MATERIALS**

H.R. Rep. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659.......................6, 9

**OTHER AUTHORITIES**

Joe Flint, *Fox Could Become Cable Channel, News Corp. COO Chase
    Carey Says*, L.A. Times, Apr. 8, 2013, http://www.latimes.com/
    entertainment/envelope/cotown/la-et-ct-fox-cable-aereo-
    20130408,0,4681713.story ....................................................................3

Eriq Gardner, *Univision Says Aereo Could Force It To Go 'Pay-
    Only,'* Hollywood Reporter, Apr. 8, 2013,
    http://www.hollywoodreporter.com/ news/univision-says-aereo-
    could-force-434888#comments ............................................................3

**Exhibit 1, Page 5**

Jane C. Ginsburg, *Recent Developments in US Copyright Law – Part II, Caselaw: Exclusive Rights on the Ebb?* (Colum. Pub. L. & Legal Theory Working Papers, No. 08158, 2008), *available at* http://lsr.nellco.org/ columbia_pllt/08158 ...........................................................12

2 Paul Goldstein, *Goldstein on Copyright*, § 7.7.2.2 (3d ed. 2013) ........................11

Jeffrey Malkan, *The Public Performance Problem In* Cartoon Network LP v. CSC Holdings, Inc., 89 Or. L. Rev 505 (2010) .........................11

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3] (2013).................................................................................................14

Janko Roettgers, *Does Dish Want To Buy Aereo? Broadcasters Would Love To Know*, Paid Content (April 4, 2013, 7:51 p.m.), http://paidcontent.org/ 2013/04/04/does-dish-want-to-buy-aereo-broadcasters-would-love-to-know/.......................................................................3

Christopher S. Stewart & William Launder, *Diller Wins A Broadcast-TV Clash*, Wall St. J., July 12, 2012, at B1, http://online.wsj.com/article/ SB10001424052702303644004577521362073162108.html..............................3

iii

**Exhibit 1, Page 6**

## INTRODUCTION

A recent split decision of this Court raises a question of exceptional importance; it effectively overturns a congressional mandate that is the foundation for much of the current system for delivery of television programming.  The majority opinion in *WNET v. Aereo, Inc.*, ---F.3d---, 2013 WL 1285591 (2d Cir. Apr. 1, 2013) ("*Aereo*"), Ex. A, guts Congress's decision in 1976 to treat all services that retransmit broadcast programming to the public as being engaged in "public performances" and thus needing licenses from the copyright owners of the shows.  Unless reversed, that decision will wreak commercial havoc by allowing new and existing distributors to design around this license requirement and profit from the delivery of copyrighted programming while paying nothing for it.

Aereo is a subscription retransmission service.  For a monthly fee, it will send a subscriber any show being broadcast in the New York area to be viewed over an Internet-enabled device.  The *Aereo* majority has now authorized Aereo to operate without any copyright license, relying on this Court's decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*").  Even though *Cablevision* involved a completely different type of service – used by subscribers of a licensed cable company to record and play back programs stored on the company's

1

remote server – the *Aereo* majority felt bound by *Cablevision*'s reasoning to bless an entirely unlicensed retransmitter and cable competitor.

That ruling requires reconsideration. One of the express purposes of the Copyright Act in 1976 was to establish that *any* service engaged in retransmission of copyrighted television programming to the public is "publicly performing" the programming and therefore must pay copyright royalties. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 709-10 (1984). Even though this mandate is expressly technology-neutral – applying to "any device or process" whether "now known or later developed" – the *Aereo* majority held that a commercial retransmitter can avoid all copyright obligations simply by designing its system to make a separate copy of the programming for each subscriber during the retransmission process. *Aereo* at *8. The majority based this ruling on "four guideposts" for designing around copyright liability derived not from the Act but from this Court's decision in *Cablevision*. But as Judge Chin pointed out in dissent, these guideposts cannot be squared with the Act because they accord significance to technological features of the Aereo system that are no more than a "sham" and are expressly irrelevant under the Act. *Aereo* at *15 - *16.

The Court needs to rectify this ruling now. Otherwise, the loophole it creates will swallow the entire retransmission licensing regime. Cable and

2

satellite companies like Time Warner Cable and Dish Network are already threatening to partner with Aereo or use Aereo-like set-ups.[1]  Copycat companies have sprung up, such as one that recently was enjoined in California.  *See Fox Television Stations, Inc. v. BarryDriller Content Sys.*, --- F. Supp. ---, 2012 WL 6784498, at *5 (C.D. Cal. Dec. 27, 2012).  And broadcasters, faced with losing a revenue stream critical to supporting free, over-the-air television, have been forced to consider converting their broadcast networks to subscription-based cable channels.[2]

Indeed, this Court has already recognized the devastating impact of allowing unlicensed retransmission of broadcast television.  In *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), *cert. denied*, No. 12-798, --- S. Ct. ---,

---

[1] Time Warner Cable's CEO has said publicly that if Aereo is legal, his company should do the same thing to avoid paying license fees, and Dish Network is in talks with Aereo.  Christopher S. Stewart & William Launder, *Diller Wins A Broadcast-TV Clash*, Wall St. J., July 12, 2012, at B1,http://online.wsj.com/article/SB10001424052702303644004577521362073162108.html; Janko Roettgers, *Does Dish Want To Buy Aereo? Broadcasters Would Love To Know*, Paid Content (April 4, 2013, 7:51 p.m.), http://paidcontent.org/2013/04/04/does-dish-want-to-buy-aereo-broadcasters-would-love-to-know/.

[2] *See* Joe Flint, *Fox Could Become Cable Channel, News Corp. COO Chase Carey Says*, L.A. Times, Apr. 8, 2013, http://www.latimes.com/entertainment/envelope/cotown/la-et-ct-fox-cable-aereo-20130408,0,4681713.story; Eriq Gardner, *Univision Says Aereo Could Force It To Go 'Pay-Only*,' Hollywood Reporter, Apr. 8, 2013, http://www.hollywoodreporter.com/news/univision-says-aereo-could-force-434888#comments.

**Exhibit 1, Page 9**

2013 WL 1091891 (U.S. Mar. 18, 2013), the Court affirmed an injunction barring a service functionally identical to Aereo. It noted that if such services were allowed to take hold, the economic impact would adversely affect the "quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules." *Id.* at 286. The Court concluded that "[c]ontinued live retransmissions of copyrighted television programming over the Internet without consent would . . . threaten to destabilize the entire industry." *Id.*

But the *Aereo* majority has now *authorized* unlicensed retransmission of broadcast television – including "live" retransmissions – as long as a service programs its computers to make a copy for each subscriber as part of the process of retransmitting to that subscriber. The majority theorized that this feature somehow creates a multitude of separate private performances (to thousands of paying subscribers). As Judge Chin noted, this decision not only defies the statute but also creates tension with *United States v. ASCAP*, 627 F.3d 64 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 366 (2011), where it was uncontested that streaming a song, "like a television or radio broadcast," is a public performance. *Id.* at 74. *Accord Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 106-07, 111-12 (2d Cir. 1998).

4

## STATEMENT OF THE CASE

In what is known as the Transmit Clause, Congress in 1976 provided that "to perform . . . a work 'publicly'" means, among other things, "to transmit or otherwise communicate a performance or display of the work . . . to the public, *by means of any device or process*, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101 (emphasis added).  The definition of "device or process" includes those "now known or later developed."  *Id.*

The statute thus tells us two things.  First, it does not matter what technology is used to retransmit the performance to the public – it can be "any device or process."  17 U.S.C. § 101.  Second, it does not matter if members of the public receive the performance in separate places (*e.g.*, on televisions in their separate homes) or at different times (*e.g.*, through on-demand transmissions of the same movie or television program).

The legislative history confirms Congress's intent to cover *all* future technologies:

> The definition of 'transmit' . . . is ***broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them.***  Each and every method by which the images and sounds comprising a performance . . . are picked up and conveyed is a

5

'transmission,' and **if the transmission reaches the public in [any] form** the case comes within the scope of . . . section 106.

H.R. Rep. No. 94-1476, at 64 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5678 (emphasis added).

Thus, all retransmitters, such as cable and satellite services, require licenses to carry broadcast stations. Aereo does the same thing – retransmitting to subscribers for a monthly fee – without any license, claiming it does not need one because it has designed its system to conform to this Court's circumscribed analysis of the Transmit Clause in *Cablevision*. *Cablevision*, however, involved a service offered by a cable company. That service, dubbed a "remote storage DVR" or "RS-DVR," mimicked the record-and-playback functions of a set-top DVR but stored each customer's copies of programs on a centralized server and played them back from there. The *Cablevision* Court concluded that these playback transmissions were *private* performances not requiring an additional copyright license.

Aereo is entirely different. For her monthly fee, when a subscriber watches a live broadcast on Aereo, Aereo captures the broadcast signal, converts it to a digital format, starts to make a separate copy, and then immediately streams the programming over the Internet to the subscriber's device from that copy. *Aereo* at *2. Aereo acknowledged that it designed

6

its system this way and confined its operations to the Second Circuit because it believed *Cablevision* would immunize it from copyright liability.[3]

In dissent, Judge Chin rightly characterized Aereo's system as "a Rube Goldberg-like contrivance, over-engineered in an attempt to avoid the reach of the Copyright Act and to take advantage of a perceived loophole in the law." *Id.* at *15. The majority, however, blessed Aereo's effort to design around the Transmit Clause. It took the limited holding of *Cablevision* and derived "four guideposts" for designing a system to avoid copyright liability – even though, under the plain language of the Transmit Clause, the design of the system is not supposed to matter. *Id.* at *8.

Applying these guideposts, the majority held that Aereo's unique copy set-up made the transmissions it streams to its subscribers "private." *Id.* at *9. In so doing, the majority allowed an unlicensed service that functions just like a licensed retransmitter to profit from delivering copyrighted works owned by others, just because each transmission originates from a separate copy of programming on the server. The majority implicitly acknowledged that this outcome made no functional sense, stating that "[p]erhaps the

---

[3] Aereo uses individually assigned mini-antennas rather than a master antenna to capture broadcast programming. The *Aereo* majority suggested that this aspect of the system might also itself allow Aereo to evade licensure, *Aereo* at *12 – thus paving the way for another method of designing around a congressional mandate that is technology neutral.

7

application of the Transmit Clause should focus less on the technical details of a particular system and more on its functionality," but it concluded that such an approach was precluded by *Cablevision*. *Id*. at *12.

### REASONS TO GRANT REHEARING EN BANC

Whatever one thinks of the outcome in *Cablevision*, it should be clear that the outcome reached here is flatly inconsistent with the Transmit Clause and congressional intent. Congress could not have been clearer that any service that captures broadcast programs and retransmits them to subscribers must be licensed, regardless of how it is designed. The root of the problem is the *reasoning* the *Cablevision* panel used to arrive at its conclusions. That erroneous analysis has now spawned an obviously incorrect decision that threatens to cause massive disruption to the television industry, and will adversely impact the public's access to the quality and diversity of programming available through broadcast television.

**I.    The *Aereo* Majority's Guideposts Conflict With The Plain Language Of The Transmit Clause.**

When interpreting a statute, the Court must begin with the plain language, giving any undefined terms their ordinary meaning. *Aereo* at *16 (Chin, J. dissenting) (citing *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1356 (2012)). Where Congress has expressed its intent in "reasonably

8

plain terms, that language must ordinarily be regarded as conclusive." *Id.* (quoting *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993)).

Here, the very concept of establishing "guideposts" for how to deliver copyrighted programming to the public without a license is antithetical to the statute. It covers "*any* device or process" including those "now known or later developed," 17 U.S.C. § 101, because Congress wanted to ensure that *all* services retransmitting programming to the public would be licensed, *see Capital Cities*, 467 U.S. at 709-10; H.R. Rep. 94-1476, at 88-89, *reprinted in* 1976 U.S.C.C.A.N. at 5703-04 (stating that "commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material" must obtain authorization and pay "copyright royalties . . . to the creators of such programs"); *BarryDriller*, 2012 WL 6784498, at *5.

Nevertheless, the *Aereo* majority held that it was duty-bound to allow Aereo to operate license-free because its system creates individual copies and then transmits from those copies to individual subscribers. The majority wrote: "Congress may not have anticipated that later technology would make it possible to mimic the functionality of early cable TV by means of private transmissions, but that unexpected result does not change the language of the statute." *Aereo* at *12 n.16. That is wrong. Congress

9

anticipated that new retransmission technologies would develop, and intended the use of these new technologies to count as *public* performances.

The basic mistake that sent this Circuit's Transmit Clause jurisprudence off course was the *Cablevision* Court's reading of the statutory terms "transmission" and "performance" as being synonymous. 536 F.3d at 135 - 36. That error led the Court to view each transmission as a separate performance, instead of viewing all transmissions of the same performance of a work by the same transmitter collectively as a public performance. *Id*. Because the Court thought it had to view each transmission in isolation, it concluded that the use of transmissions could *only* result in a public performance if a *single* transmission could be received by *multiple* people. *Id*. The *Aereo* majority followed this reasoning to hold that even though Aereo retransmitted programming to its subscribers, there was no public performance because Aereo sent each subscriber a separate transmission (albeit of the same broadcast of the same program).

*Cablevision*'s statutory analysis was plainly wrong. Under the Transmit Clause, "transmissions" and "performances" are not the same thing. The Act states that "[t]o 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. This

means that the "performance" is *the thing that is communicated* and the transmission is *the means of communicating* it. As the *BarryDriller* court emphasized, copyright law protects the performance of the work – here, the television program. 2012 WL 6784498, at *4. Copyright law does not protect transmissions, which are not copyrighted and have no entertainment value. *Id*. ("Very few people gather around their oscilloscopes to admire the sinusoidal waves of a television broadcast *transmission*. People are interested in watching the *performance* of the *work*." (emphasis in original)).

Commentators agree. *E.g.*, 2 Paul Goldstein, *Goldstein on Copyright*, § 7.7.2.2, at 7:168 (3d ed. 2013) ("The error in the Second Circuit's construction of the transmit clause was to treat 'transmissions' and 'performance' as synonymous, where the Act clearly treats them as distinct– and different–operative terms."); Jeffrey Malkan, *The Public Performance Problem In* Cartoon Network LP v. CSC Holdings, Inc., 89 Or. L. Rev 505, 536 (2010) ("[A] transmission and a performance remain, technically and legally, two distinct things. The difference between them is that a transmission is the medium through which a performance is delivered 'to the public.' This is why there may be more than one transmission of the same performance, that is, why members of the public may receive a public performance at 'different times.'" (footnote omitted)); Jane C. Ginsburg,

11

*Recent Developments in US Copyright Law – Part II, Caselaw: Exclusive Rights on the Ebb?* 26 (Colum. Pub. L. & Legal Theory Working Papers, No. 08158, 2008), *available at* http://lsr.nellco.org/columbia_pllt/08158 (*Cablevision* confused "performance" and "transmission.").

## II.  *Cablevision*'s Reasoning Is Based On A False Premise.

The *Cablevision* court rejected the argument that it should focus on whether the same underlying performance of a work was being transmitted to the public, as opposed to focusing on individual transmissions in isolation.  It did so because it believed the former approach would mean there could never be a private performance:  "a hapless customer who records a program in his den and later transmits the recording to a television in his bedroom would be liable for publicly performing the work simply because some other party had once transmitted the same underlying performance to the public." 536 F.3d at 136.

It is not necessary to misread the statute and focus on individual transmissions in isolation to avoid this result.  The answer is to focus on who transmits and who receives a given performance.  A subscriber who records a program in his den and watches it in his bedroom is not transmitting the program to *the public*; he is transmitting it *to himself*.  That is a private

12

performance. That a different entity may also have transmitted the same program publicly does not make all retransmissions public.

### III. *Aereo* Compounded The Problem With Its Attempt To "Reconcile" *Cablevision* With The Statute.

*Cablevision*'s interpretation of the Transmit Clause created another problem: it read the "different times" language out of the statute. The Transmit Clause necessarily presupposes a public performance consisting of separate transmissions because a single transmission cannot be received at different times. *Aereo* at *8 n.11. Recognizing this, the *Aereo* majority's solution was to "reconcile" *Cablevision*'s flawed interpretation of the statute with the statute's actual language by holding that individual transmissions of the same programs could be aggregated and treated as public performance, but *only* if the transmissions were generated from the same master copy. *Id.*

The *Aereo* majority's solution creates an even more tortured reading of the statute. The Transmit Clause does not say anything about master copies. Nothing in the language of the statute or the legislative history supports the majority's view that only devices that transmit programming to the public from a master copy fall within the Transmit Clause. As the district court in *BarryDriller* explained, "the concern is with the performance of the copyrighted work, *irrespective of which copy of the work the transmission is made from*. 2012 WL 6784498, at *4 (emphasis added).

13

The master copy requirement is based on a statement in the Nimmer copyright treatise in which the author editorializes that the "different times" language in the statute was probably meant to cover situations where the same copy of a work is used for multiple performances to different members of the public over time. *Aereo* at *8 n.11. *See* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3], at 8-192.8(3)-(4) (2013) (musing that a person who watches a rented video at home would be "publicly performing" if others rented the same copy). Professor Nimmer acknowledges that defining public performances in this way produces absurd results. Indeed, under that reading, if four people happen to rent the same DVD copy of *Braveheart* from Blockbuster, that would result in a public performance, but if a retransmitter like Aereo makes a separate copy for each viewer, it can retransmit the Super Bowl to thousands of subscribers and that would be deemed "private" performances. Aereo can do this even though the plain language of the Transmit Clause provides that the device or process used to transmit the program to the public is irrelevant.

A far better reading of the Transmit Clause would aggregate all transmissions of the *same performance of a work* by the *same transmitter* to members of the public, treating them collectively as a public performance regardless of whether the source is one or many copies. That common-sense

14

approach is consistent with the Act, produces logical results and does *not* eliminate the possibility of private performances. Under it, Aereo, ivi, and cable and satellite retransmitters all publicly perform copyrighted works and all require a license, just as Congress intended. The *Aereo* approach, however, effectively eliminates any public performance for retransmissions.

## IV.    A Ruling Enjoining Aereo Need Not Overrule *Cablevision*.

The *Aereo* majority seemed to think a ruling against Aereo would also render illegal an RS-DVR service like the one in *Cablevision* and other services mentioned by *amici*. *Aereo* at \*12-\*13. But that confuses reasoning with outcomes. While the reasoning of *Cablevision* – now turned into guideposts for designing around copyright law – needs to be rejected, that does not mean there cannot be private performances. For example, functionally the RS-DVR and Aereo are far apart. One service allows an individual cable subscriber to designate licensed programming for copying and have it played back later just to her. The other retransmits broadcast shows, live, to thousands of subscribers. Reading the Transmit Clause to allow unlicensed RS-DVR retransmissions does not dictate a result that allows Aereo's unlicensed retransmissions of broadcast programming.

## CONCLUSION

The Court should grant rehearing en banc.

15

April 15, 2013                                    Respectfully Submitted,

                                                  /s/ Paul M. Smith_____
     Richard L. Stone                             Paul M. Smith
     Amy Gallegos                                 Steven B. Fabrizio
     JENNER & BLOCK LLP                            Scott B. Wilkens
     633 West 5th Street                           Matthew E. Price
     Suite 3600                                    JENNER & BLOCK LLP
     Los Angeles, CA 90071-2054                    1099 New York Ave. NW
     (213) 239-5100                                Suite 900
                                                  Washington, DC 20001
                                                  (202) 639-6000


     *Attorneys for Plaintiffs-Counter-Defendants-Appellants*

                                16

# EXHIBIT A

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

**H**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
WNET, THIRTEEN, Fox Television Stations, Inc.,
Twentieth Century Fox Film Corporation, Wpix,
Inc., Univision Television Group, Inc., The Univi-
sion Network Limited Partnership, and Public
Broadcasting Service,
Plaintiffs–Counter–Defendants–Appellants,
v.
AEREO, INC., f/k/a Bamboom Labs, Inc., Defend-
ant–Counter–Claimant–Appellee,
American Broadcasting Companies, Inc., Disney
Enterprises, Inc., CBS Broadcasting Inc., CBS Stu-
dios Inc., NBCUniversal Media, LLC, NBC Studi-
os, LLC, Universal Network Television, LLC,
Telemundo Network Group LLC, and WNJU–TV
Broadcasting LLC, Plaintiffs–Counter–Defendants
-Appellants,
v.
Aereo, Inc., Defend-
ant–Counter–Claimant–Appellee.

Docket Nos. 12–2786–cv, 12–2807–cv.
Argued: Nov. 30, 2012.
Decided: April 1, 2013.

**Background:** Holders of copyrights to broadcast
television programs sued a provider of "live" Inter-
net broadcasts, alleging, inter alia, copyright in-
fringement. The United States District Court for the
Southern District of New York, Nathan, J., 874
F.Supp.2d 373, denied plaintiffs' motion for prelim-
inary injunction barring defendant from transmit-
ting recorded broadcast television programs to its
subscribers while programs were airing on broad-
cast television. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Droney, Circuit
Judge, held that:
(1) transmissions of "live" Internet broadcasts by
provider likely were not public performances;

(2) holders did not demonstrate sufficiently serious
questions going to merits of claim of infringement;
and
(3) balance of hardships did not tip decidedly in fa-
vor of the copyright holders.

Affirmed.

Chin, Circuit Judge, filed dissenting opinion.

West Headnotes

**[1] Federal Courts 170B ☞815**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk814 Injunction
          170Bk815 k. Preliminary Injunc-
tion; Temporary Restraining Order. Most Cited
Cases
   A district court's denial of a preliminary injunc-
tion is reviewed for abuse of discretion.

**[2] Federal Courts 170B ☞812**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk812 k. Abuse of Discretion.
Most Cited Cases
   A district court abuses its discretion when its
decision rests on legal error or a clearly erroneous
factual finding, or when its decision, though not the
product of legal error or a clearly erroneous factual
finding, cannot be located within the range of per-
missible decisions.

**[3] Copyrights and Intellectual Property 99 ☞
85**

99 Copyrights and Intellectual Property

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringement
99k85 k. Preliminary Injunction.

Most Cited Cases

A district court may issue a preliminary injunction for copyright infringement only if the plaintiff has demonstrated either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor.

**[4] Copyrights and Intellectual Property 99 ☜ 85**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringement
99k85 k. Preliminary Injunction.

Most Cited Cases

A plaintiff seeking a preliminary injunction for copyright infringement must demonstrate that he is likely to suffer irreparable injury in the absence of an injunction; a court may not presume irreparable injury in the copyright context; rather the plaintiff must demonstrate actual harm that cannot be remedied later by damages should the plaintiff prevail on the merits.

**[5] Copyrights and Intellectual Property 99 ☜ 85**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringement
99k85 k. Preliminary Injunction.

Most Cited Cases

When a plaintiff seeks a preliminary injunction for copyright infringement, a district court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.

**[6] Copyrights and Intellectual Property 99 ☜ 85**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringement
99k85 k. Preliminary Injunction.

Most Cited Cases

When a plaintiff seeks a preliminary injunction for copyright infringement, a court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction.

**[7] Copyrights and Intellectual Property 99 ☜ 67.1**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)1 What Constitutes Infringement
99k67.1 k. Motion Pictures and Other Audiovisual Works. Most Cited Cases

The Transmit Clause in the Copyright Act directs courts to consider the potential audience of the individual transmission; if that transmission is "capable of being received by the public," the transmission is a public performance. 17 U.S.C.A. § 101.

**[8] Copyrights and Intellectual Property 99 ☜ 67.1**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)1 What Constitutes Infringement
99k67.1 k. Motion Pictures and Other Audiovisual Works. Most Cited Cases

The public capability of receiving the same underlying work or original performance of the work

**Exhibit 1, Page 25**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

by means of many transmissions is irrelevant to an analysis under the Transmit Clause of the Copyright Act. 17 U.S.C.A. § 101.

**[9] Copyrights and Intellectual Property 99 🗝 67.1**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)1 What Constitutes Infringement
                99k67.1 k. Motion Pictures and Other Audiovisual Works. Most Cited Cases

If the potential audience of the transmission is only one subscriber, the transmission is not considered a public performance under the Transmit Clause of the Copyright Act; however, when private transmissions are generated from the same copy of the work, these private transmissions should be aggregated, and if these aggregated transmissions from a single copy enable the public to view that copy, the transmissions are public performances. 17 U.S.C.A. § 101.

**[10] Copyrights and Intellectual Property 99 🗝67.1**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)1 What Constitutes Infringement
                99k67.1 k. Motion Pictures and Other Audiovisual Works. Most Cited Cases

Any factor that limits the potential audience of a transmission is relevant to the analysis under the Transmit Clause of the Copyright Act. 17 U.S.C.A. § 101.

**[11] Copyrights and Intellectual Property 99 🗝85**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement

                    99k85 k. Preliminary Injunction. Most Cited Cases

Transmissions of "live" Internet broadcasts by provider likely were not public performances, weighing against issuing preliminary injunction against provider on infringement claim of holders of copyrights to broadcast television programs, since provider's system created unique copy of each program for each subscriber who requested it and saved it to unique directory on provider's hard disks assigned to that user, each transmission to subscriber was from that unique copy, and transmission of unique copy was made solely to requesting subscriber. 17 U.S.C.A. §§ 101, 106(4).

**[12] Courts 106 🗝90(2)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling or as Precedents
                106k90 Decisions of Same Court or Co-Ordinate Court
                    106k90(2) k. Number of Judges Concurring in Opinion, and Opinion by Divided Court. Most Cited Cases

One panel of the Court of Appeals cannot overrule a prior decision of another panel; the panel is bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of the Court of Appeals or by the Supreme Court.

**[13] Courts 106 🗝90(2)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling or as Precedents
                106k90 Decisions of Same Court or Co-Ordinate Court
                    106k90(2) k. Number of Judges Concurring in Opinion, and Opinion by Divided

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

Court. Most Cited Cases

A panel of the Court of Appeals is not bound by a prior decision of another panel when an intervening Supreme Court decision casts doubt on controlling precedent.

**[14] Copyrights and Intellectual Property 99**
**⟜85**

99 Copyrights and Intellectual Property
　99I Copyrights
　　99I(J) Infringement
　　　99I(J)2 Remedies
　　　　99k72 Actions for Infringement
　　　　　99k85 k. Preliminary Injunction.
Most Cited Cases

Holders of copyrights to broadcast television programs did not demonstrate sufficiently serious questions going to merits of claim of infringement based on transmission of program still airing on broadcast television to make it fair ground for litigation, weighing against issuing preliminary injunction, since provider's service likely did not infringe holders' public performance right. 17 U.S.C.A. § 101.

**[15] Copyrights and Intellectual Property 99**
**⟜85**

99 Copyrights and Intellectual Property
　99I Copyrights
　　99I(J) Infringement
　　　99I(J)2 Remedies
　　　　99k72 Actions for Infringement
　　　　　99k85 k. Preliminary Injunction.
Most Cited Cases

For purposes of a motion for preliminary injunctive relief on a copyright infringement claim asserted by holders of copyrights to broadcast television programs against a provider of "live" internet broadcasts, the balance of hardships did not tip decidedly in favor of the copyright holders; while the provider's activities could damage the copyright holders' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels and could damage the holders' ability to nego-

tiate retransmission agreements, there was evidence that an injunction might quickly mean the end of the provider as a business. 17 U.S.C.A. § 101.

Appeal from an order of the United States District Court for the Southern District of New York (Nathan, J.) denying Plaintiffs' motion for a preliminary injunction barring Defendant Aereo from transmitting recorded broadcast television programs to its subscribers while the programs are airing on broadcast television. The district court correctly concluded that Aereo's system is not materially distinguishable from the system upheld in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir.2008). We therefore AFFIRM the order of the district court.Paul M. Smith, Steven B. Fabrizio, Scott B. Wilkens, Matthew E. Price, Jenner & Block LLP, Washington, DC; Richard L. Stone, Amy M. Gallegos, Jenner & Block LLP, Los Angeles, CA, for Plaintiffs–Appellants WNET, Thirteen, et al.

Bruce P. Keller, Jeffrey P. Cunard, Michael R. Potenza, Debevoise & Plimpton LLP, New York, NY, for Plaintiffs–Appellants Am. Broad. Cos., Inc., et al.

R. David Hosp, John C. Englander, Mark S. Puzella, Yvonne W. Chan, Erin M. Michael, Goodwin Procter LLP, Boston, MA; Michael S. Elkin, Thomas P. Lane, Winston & Strawn LLP, New York, NY; Seth D. Greenstein, Constantine Cannon LLP, Washington, DC; Jennifer A. Golinveaux, Winston & Strawn LLP, San Francisco, CA, for Defendant–Appellee.

Robert Alan Garrett, Lisa S. Blatt, Stephen M. Marsh, R. Stanton Jones, Arnold & Porter LLP, Washington, DC, for amici curiae National Basketball Association, NBA Media Ventures, LLC, NBA Properties, Inc., National Football League, National Hockey League, Office of the Commissioner of Baseball, and MLB Advanced Media, L.P. in support of Plaintiffs–Appellants.

**Exhibit 1, Page 27**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

Kelly M. Klaus, Munger, Tolles & Olson LLP, Los Angeles, CA; Samantha Dulaney, I.A.T.S.E. In House Counsel, New York, NY; Duncan W. Crabtree–Ireland, Chief Administrative Officer & General Counsel, SAGAFTRA, Los Angeles, CA; Anthony R. Segall, Rothner, Segall & Greenstone, Pasadena, CA; Susan Cleary, Vice President & General Counsel, Independent Film & Television Alliance, Los Angeles, CA, for amici curiae Paramount Pictures Corporation, Warner Bros. Entertainment Inc., Directors Guild of America, Inc., Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada, AFL–CIO, CLC, Screen Actors Guild–American Federation of Television and Radio Artists, Writers Guild of America, West, Inc., Independent Film & Television Alliance, Lions Gate Entertainment, Inc., and Metro–Goldwyn–Mayer Studios Inc. in support of Plaintiffs–Appellants.

Robert A. Long, Matthew S. DelNero, Daniel Kahn, Covington & Burling LLP, Washington, DC, for amici curiae The National Association of Broadcasters, The ABC Television Affiliates Association, The CBS Television Network Affiliates Association, The NBC Television Affiliates, and The Fox Television Affiliates Association in support of Plaintiffs–Appellants.

Jeffrey A. Lamken, Robert K. Kry, MoloLamken LLP, Washington, DC, for amicus curiae Cablevision Systems Corporation in support of Plaintiffs–Appellants.

Steven J. Metalitz, Eric J. Schwartz, J. Matthew Williams, Mitchell Silberberg & Knupp LLP, Washington, DC; Paul V. LiCalsi, Mitchell Silberberg & Knupp LLP, New York, NY, for amici curiae The American Society of Composers, Authors and Publishers, Broadcast Music, Inc., The National Music Publishers Association, The Association of Independent Music Publishers, The Church Music Publishers Association, The Nashville Songwriters Association International, The Recording Industry Association of America, the Recording

Academy, SESAC, Inc., The Society of Composers & Lyriciters, The Songwriters Guild of America, Inc., and Soundexchange, Inc., in support of Plaintiffs–Appellants.

Ralph Oman, The George Washington University Law School, Washington, DC, for amicus curiae Ralph Oman, Former Register of Copyrights of the United States in support of Plaintiffs–Appellants.

Jonathan Band, Jonathan Band PLLC, Washington, DC, for amici curiae The Computer & Communications Industry Association and The Internet Association in support of Defendant–Appellee.

Michael C. Rakower, Law Office of Michael C. Rakower, P.C., New York, NY, for amici curiae Intellectual Property and Copyright Law Professors in support of Defendant–Appellee.

Mitchell L. Stoltz, Electronic Frontier Foundation, San Francisco, CA; Sherin Siy, John Bergmayer, Public Knowledge, Washington, DC; Michael Petricone, Consumer Electronics Association, Arlington, VA, for amici curiae The Electronic Frontier Foundation, Public Knowledge, and The Consumer Electronics Association in support of Defendant–Appellee.

Peter Jaszi, Kate Collins, Seth O. Dennis, Sarah K. Leggin, Bijan Madhani, American University Washington College of Law, Washington, DC, for amici curiae The Consumer Federation of America and Consumers Union in support of Defendant–Appellee.

Before CHIN and DRONEY, Circuit Judges, GLEESON, District Judge.[FN*]

DRONEY, Circuit Judge:

**\*1** Aereo, Inc. ("Aereo") enables its subscribers to watch broadcast television programs over the internet for a monthly fee. Two groups of plaintiffs, holders of copyrights in programs broadcast on network television, filed copyright infringe-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Exhibit 1, Page 28**

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

ment actions against Aereo in the United States District Court for the Southern District of New York. They moved for a preliminary injunction barring Aereo from transmitting programs to its subscribers while the programs are still airing, claiming that those transmissions infringe their exclusive right to publicly perform their works. The district court (Nathan, *J.*) denied the motion, concluding that the plaintiffs were unlikely to prevail on the merits in light of our prior decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir.2008) ("*Cablevision* "). We agree and affirm the order of the district court denying the motion for a preliminary injunction.[FN1]

**BACKGROUND**

The parties below agreed on all but one of the relevant facts of Aereo's system, namely whether Aereo's antennas operate independently or as a unit. The district court resolved that issue, finding that Aereo's antennas operate independently. The Plaintiffs do not appeal that factual finding. Thus the following facts are undisputed.

**I. Aereo's System**

Aereo transmits to its subscribers broadcast television programs over the internet for a monthly subscription fee. Aereo is currently limited to subscribers living in New York City and offers only New York area channels. It does not have any license from copyright holders to record or transmit their programs.

The details of Aereo's system are best explained from two perspectives. From its subscribers' perspective, Aereo functions much like a television with a remote Digital Video Recorder ("DVR") and Slingbox.[FN2] Behind the scenes, Aereo's system uses antennas and a remote hard drive to create individual copies of the programs Aereo users wish to watch while they are being broadcast or at a later time. These copies are used to transmit the programs to the Aereo subscriber.

*A. The Subscriber's Perspective*

Aereo subscribers begin by logging on to their

account on Aereo's website using a computer or other internet-connected device. They are then presented with a programming guide listing broadcast television programs now airing or that will air in the future. If a user selects a program that is currently airing, he is presented with two options: "Watch" and "Record." If the user selects "Watch," the program he selected begins playing, but the transmission is briefly delayed relative to the live television broadcast.[FN3] Thus the user can watch the program nearly live, that is, almost contemporaneously with the over-the-air broadcast. While the user is watching the program with the "Watch" function, he can pause or rewind it as far back as the point when the user first began watching the program.[FN4] This may result in the user watching the program with the "Watch" feature after the over-the-air broadcast has ended. At any point while watching the program with the "Watch" feature, the user can select the "Record" button, which will cause Aereo's system to save a copy of the program for later viewing. The recorded copy of the program will begin from the point when the user first began watching the program, not from the time when the user first pressed the "Record" button.[FN5] If a user in "Watch" mode does not press "Record" before the conclusion of the program, the user is not able to watch that program again later.

**\*2** An Aereo user can also select a program that is currently airing and press the "Record" button. In that case, a copy of the program will be saved for later viewing. However, the "Record" function can also be used to watch a program nearly live, because the user can begin playback of the program being recorded while the recording is being made. Thus the difference between selecting the "Watch" and the "Record" features for a program currently airing is that the "Watch" feature begins playback and a copy of the program is not retained for later viewing, while the "Record" feature saves a copy for later viewing but does not begin playback without further action by the user.

If an Aereo user selects a program that will air

**Exhibit 1, Page 29**

in the future, the user's only option is the "Record" function. When the user selects that function, Aereo's system will record the program when it airs, saving a copy for the user to watch later. An Aereo user cannot, however, choose either to "Record" or "Watch" a program that has already finished airing if he did not previously elect to record the program.

The final notable feature of Aereo's system is that users can watch Aereo programing on a variety of devices. Aereo's primary means of transmitting a program to a user is via an internet browser, which users can access on their computers. Aereo users can also watch programs on mobile devices such as tablets or smart phones using mobile applications. Finally, Aereo subscribers can watch Aereo on an internet-connected TV or use a stand-alone device to connect their non-internet TVs to Aereo.

Aereo's system thus provides the functionality of three devices: a standard TV antenna, a DVR, and a Slingbox-like device. These devices allow one to watch live television with the antenna; pause and record live television and watch recorded programing using the DVR; and use the Slingbox to watch both live and recorded programs on internet-connected mobile devices.

### B. The Technical Aspects of Aereo's System

Aereo has large antenna boards at its facility in Brooklyn, New York. Each of these boards contains approximately eighty antennas, which consist of two metal loops roughly the size of a dime. These boards are installed parallel to each other in a large metal housing such that the antennas extend out of the housing and can receive broadcast TV signals. Aereo's facility thus uses thousands of individual antennas to receive broadcast television channels. FN6

When an Aereo user selects a program to watch or record, a signal is sent to Aereo's antenna server. The antenna server assigns one of the individual antennas and a transcoder to the user. The antenna server tunes that antenna to the broadcast frequency of the channel showing the program the user wishes to watch or record. The server transcodes the data received by this antenna, buffers it, and sends it to another Aereo server, where a copy of the program is saved to a large hard drive in a directory reserved for that Aereo user. If the user has chosen to "Record" the program, the Aereo system will create a complete copy of the program for that user to watch later. When the user chooses to view that program, Aereo's servers will stream the program to the user from the copy of the program saved in the user's directory on the Aereo server. If the user instead has chosen to "Watch" the program, the same operations occur, except that once six or seven seconds of programming have been saved in the hard drive copy of the program in the user's directory on the Aereo server, the Aereo system begins streaming the program to the user from this copy. Thus even when an Aereo user is watching a program using the "Watch" feature, he is not watching the feed directly or immediately from the antenna assigned to him. Rather the feed from that antenna is used to create a copy of the program on the Aereo server, and that copy is then transmitted to the user. If at any point before the program ends, the user in "Watch" mode selects "Record," the copy of the program is retained for later viewing. If the user does not press "Record" before the program ends, the copy of the program created for and used to transmit the program to the user is automatically deleted when it has finished playing.

**\*3** Three technical details of Aereo's system merit further elaboration. First, Aereo assigns an individual antenna to each user. No two users share the same antenna at the same time, even if they are watching or recording the same program. FN7 Second, the signal received by each antenna is used to create an individual copy of the program in the user's personal directory. Even when two users are watching or recording the same program, a separate copy of the program is created for each. Finally, when a user watches a program, whether nearly live or previously recorded, he sees his individual copy on his TV, computer, or mobile-device screen. Each

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Exhibit 1, Page 30**

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

copy of a program is only accessible to the user who requested that the copy be made, whether that copy is used to watch the program nearly live or hours after it has finished airing; no other Aereo user can ever view that particular copy.

**II. The Present Suits**

Two groups of plaintiffs (the "Plaintiffs") filed separate copyright infringement actions against Aereo in the Southern District of New York. They asserted multiple theories, including infringement of the public performance right, infringement of the right of reproduction, and contributory infringement. ABC and its co-plaintiffs moved for a preliminary injunction barring Aereo from transmitting television programs to its subscribers while the programs were still being broadcast. The two sets of plaintiffs agreed to proceed before the district court in tandem, and the motion for preliminary injunction was pursued in both actions simultaneously.

Following expedited briefing and discovery and an evidentiary hearing, the district court denied the Plaintiffs' motion. *Am. Broad. Cos., Inc. v. Aereo,* 874 F.Supp.2d 373, 405 (S.D.N.Y.2012). The district court began its analysis with the first factor relevant to granting a preliminary injunction: whether the Plaintiffs have demonstrated a likelihood of success on the merits. *Id.* at 381 (citing *Salinger v. Colting,* 607 F.3d 68, 80 (2d Cir.2010)). The district court found that this factor was determined by our prior decision in *Cablevision,* 536 F.3d 121. *Aereo,* 874 F.Supp.2d at 381–82. After a lengthy discussion of the facts and analysis of that decision, the district court concluded that Aereo's system was not materially distinguishable from Cablevision's Remote Storage Digital Video Recorder system, which we held did not infringe copyright holders' public performance right. *Id.* at 385–86. The district court found unpersuasive each of the Plaintiffs' arguments attempting to distinguish *Cablevision. See id.* at 386–96. Thus the court concluded that the Plaintiffs were unlikely to prevail on the merits. *Id.* at 396.

The district court then considered the other three preliminary injunction factors. First, the court concluded that the Plaintiffs had demonstrated a likelihood that they would suffer irreparable harm in the absence of a preliminary injunction. *Id.* at 396–402. But second, the district court found that an injunction would severely harm Aereo, likely ending its business. *Id.* at 402–03. As such, the balance of hardships did not tip "decidedly" in favor of the Plaintiffs. *Id.* at 403. Finally, the district court concluded that an injunction "would not disserve the public interest." *Id.* at 403–04. Because the Plaintiffs had not demonstrated a likelihood of success on the merits or a balance of hardship tipping decidedly in their favor, the district court denied their motion for a preliminary injunction. *Id.* at 405. The Plaintiffs promptly filed an interlocutory appeal, and this case was briefed on an expedited schedule.

**DISCUSSION**

**\*4** [1][2] We review a district court's denial of a preliminary injunction for abuse of discretion. *WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 278 (2d Cir.2012). A district court abuses its discretion when its decision rests on legal error or a clearly erroneous factual finding, or when its decision, though not the product of legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions. *Id.*

[3][4][5][6] Our decisions identify four factors relevant to granting a preliminary injunction for copyright infringement. First, a district court may issue a preliminary injunction "only if the plaintiff has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor." *Salinger v. Colting,* 607 F.3d 68, 79 (2d Cir.2010) (internal citation and quotation marks omitted). Second, a plaintiff seeking a preliminary injunction must demonstrate " 'that he is likely to suffer irreparable injury in the absence of' " an injunction. *Id.* at 79–80 (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 20,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). A court may not presume irreparable injury in the copyright context; rather the plaintiff must demonstrate actual harm that cannot be remedied later by damages should the plaintiff prevail on the merits. *Id.* at 80 (citing *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)). Third, a district court "must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Id.* Fourth and finally, "the court must ensure that 'the public interest would not be disserved' by the issuance of a preliminary injunction." *Id.* (quoting *eBay,* 547 U.S. at 391).

The outcome of this appeal turns on whether Aereo's service infringes the Plaintiffs' public performance right under the Copyright Act. The district court denied the injunction, concluding, as mentioned above, that (1) Plaintiffs were not likely to prevail on the merits given our prior decision in *Cablevision* and (2) the balance of hardships did not tip "decidedly" in the Plaintiffs' favor. *Aereo,* 874 F.Supp.2d at 405. Plaintiffs' likelihood of success on the merits depends on whether Aereo's service infringes Plaintiffs' copyrights. And, as we discuss further below, the balance of hardships is largely a function of whether the harm Aereo would suffer from the issuance of an injunction is legally cognizable, which in turn depends on whether Aereo is infringing the Plaintiffs' copyrights. *See ivi,* 691 F.3d at 287. As a result, a preliminary injunction can only be granted if Plaintiffs can show that Aereo infringes their public performance right. We now turn to that issue.

## I. The Public Performance Right

The 1976 Copyright Act (the "Act") gives copyright owners several exclusive rights and then carves out a number of exceptions. The fourth of these rights, at issue in this appeal, is the copyright owner's exclusive right "in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual

works, to perform the copyrighted work publicly." 17 U.S.C. § 106(4). The Act defines "perform" as "to recite, render, play, dance, or act [a work], either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101. The Act also states:

**\*5** To perform or display a work "publicly" means—

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101. This appeal turns on the second clause of this definition (the "Transmit Clause" or "Clause").

The relevant history of the Transmit Clause begins with two decisions of the Supreme Court, *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974). These decisions held that under the then-current 1909 Copyright Act, which lacked any analog to the Transmit Clause, a cable television system that received broadcast television signals via antenna and retransmitted these signals to its subscribers via coaxial cable did not "perform" the copyrighted works and therefore did not infringe copyright holders' public performance right. *Teleprompter,* 415 U.S. at 408; *Fortnightly,* 392 U.S. at 399–401. Even before these cases were

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

decided, Congress had begun drafting a new copy-right act to respond to changes in technology, most notably, cable television.

These efforts resulted in the 1976 Copyright Act. The Act responded to the emergence of cable television systems in two ways. First, it added the Transmit Clause. The legislative history shows that the Transmit Clause was intended in part to abrogate *Fortnightly* and *Teleprompter* and bring a cable television system's retransmission of broadcast tele-vision programming within the scope of the public performance right. H.R. Rep. 94–1476, 1976 U.S.C.C.A.N. 5659, at 63 (1976) ("House Report") ("[A] sing[er] is performing when he or she sings a song; a broadcasting network is performing when it transmits his or her performance (whether simultan-eously or from records); a local broadcaster is per-forming when it transmits the network broadcast; a cable television system is performing when it re-transmits the broadcast to its subscribers; and any individual is performing when he or she plays a phonorecord embodying the performance or com-municates it by turning on a receiving set."). Second, Congress recognized that requiring cable television systems to obtain a negotiated license from individual copyright holders may deter further investment in cable systems, so it created a com-pulsory license for retransmissions by cable sys-tems .FN8 *See* 17 U.S.C. § 111(d).

Plaintiffs claim that Aereo's transmissions of broadcast television programs while the programs are airing on broadcast television fall within the plain language of the Transmit Clause and are ana-logous to the retransmissions of network program-ing made by cable systems, which the drafters of the 1976 Copyright Act viewed as public perform-ances. They therefore believe that Aereo is publicly performing their copyrighted works without a li-cense.FN9 In evaluating their claims, we do not work from a blank slate. Rather, this Court in *Cablevision,* 536 F.3d 121, closely analyzed and construed the Transmit Clause in a similar factual context. Thus the question of whether Aereo's

transmissions are public performances under the Transmit Clause must begin with a discussion of *Cablevision.*

**II. *Cablevision's* Interpretation of the Transmit Clause**

**\*6** In *Cablevision,* 536 F.3d 121, we con-sidered whether Cablevision's Remote Storage Di-gital Video Recorder ("RS–DVR") infringed copy-right holders' reproduction and public performance rights. Cablevision, a cable television system, wished to offer its customers its newly designed RS–DVR system, which would give them the func-tionality of a stand-alone DVR via their cable set-top box. 536 F.3d at 124–25. Before the develop-ment of the RS–DVR system, Cablevision would receive programming from various content pro-viders, such as ESPN or a local affiliate of a nation-al broadcast network, process it, and transmit it to its subscribers through coaxial cable in real time. *Id.* With the RS–DVR system, Cablevision split this stream into two. One stream went out to customers live as before. The second stream was routed to a server, which determined whether any Cablevision customers had requested to record a program in the live stream with their RS–DVR. If so, the data for that program was buffered, and a copy of that pro-gram was created for that Cablevision customer on a portion of a Cablevision remote hard drive as-signed solely to that customer. Thus if 10,000 Cablevision customers wished to record the Super Bowl, Cablevision would create 10,000 copies of the broadcast, one for each customer. A customer who requested that the program be recorded could later play back the program using his cable remote, and Cablevision would transmit the customer's saved copy of that program to the customer. Only the customer who requested that the RS–DVR re-cord the copy created for him; no other Cablevision customer could view this particular copy.FN10 *See* 536 F.3d at 124–25.

Copyright holders in movies and television programs sued, arguing that Cablevision's RS–DVR system infringed their reproduction right by creat-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

ing unauthorized copies of their programs and their public performance right by transmitting these copies to Cablevision customers who previously requested to record the programs using their RS–DVRs. The district court granted the plaintiffs' motion for summary judgment and issued an injunction against Cablevision. *See Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.,* 478 F.Supp.2d 607 (S.D.N.Y.2007). The court found that the RS–DVR infringed the plaintiffs' reproduction right in two ways: (1) by creating temporary buffer copies of programs in order to create a permanent copy for each of its customers on its hard drives and (2) by creating a permanent copy of the program for each customer. *Id* . at 617–22. The court also found that Cablevision's transmission of a recorded program to the customer who had requested to record the program was a public performance under the Transmit Clause and therefore was infringing on that basis as well. *Id.* at 622–23.

This Court reversed on all three issues. *Cablevision,* 536 F.3d at 140. Because the Plaintiffs in the present cases did not pursue their claim that Aereo infringes their reproduction right in the injunction application before the district court, we need not discuss the two reproduction right holdings of *Cablevision* except where relevant to the public performance issue. Instead, we will focus on *Cablevision's* interpretation of the public performance right and the Transmit Clause, which the court below found determinative of the injunction application.

**\*7** The *Cablevision* court began by discussing the language and legislative history of the Transmit Clause. 536 F.3d at 134–35. Based on language in the Clause specifying that a transmission may be "to the public ... whether the members of the public capable of receiving the performance ... receive it in the same place or in separate places and at the same time or at different times," 17 U.S.C. § 101, this Court concluded that "it is of no moment that the potential recipients of the transmission are in different places, or that they may receive the trans-

mission at different times ." 536 F.3d at 134. As the language makes plain, in determining whether a transmission is to the public it is important "to discern who is 'capable of receiving' the performance being transmitted." *Id.* (quoting 17 U.S.C. § 101). *Cablevision* then decided that "capable of receiving the performance" refers not to the performance of the underlying work being transmitted but rather to the transmission itself, since the "transmission of a performance is itself a performance." *Id.* The Court therefore concluded that "the transmit clause directs us to examine who precisely is 'capable of receiving' *a particular transmission of a performance."* 536 F.3d at 135 (emphasis added).

In adopting this interpretation of the Transmit Clause, *Cablevision* rejected two alternative readings. First, it considered the interpretation accepted by the district court in that case. According to that view, a transmission is "to the public," not based on the "potential audience of a particular transmission" but rather based on the "potential audience of the underlying work (i.e., 'the program') whose content is being transmitted." *Id.* at 135. The *Cablevision* court rejected this interpretation of the Transmit Clause. Given that "the *potential* audience for every copyrighted audiovisual work is the general public," this interpretation would render the "to the public" language of the Clause superfluous and contradict the Clause's obvious contemplation of non-public transmissions. *Id.* at 135–36.

Second, the *Cablevision* court considered "a slight variation of this interpretation" offered by the plaintiffs. *Id.* Plaintiffs argued that "both in its real-time cablecast and via the RS–DVR playback, Cablevision is in fact transmitting the 'same performance' of a given work: the performance that occurs when the programming service supplying Cablevision's content transmits that content to Cablevision and the service's other licensees." *Id.* In this view, the Transmit Clause requires courts to consider "not only the potential audience [of a particular] transmission, but also the potential audience of any transmission of the same underlying

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

'original' performance." *Id.* This interpretation of the Transmit Clause would aggregate all transmissions of the same underlying performance, and if these transmissions enabled the performance to reach the public, each transmission, regardless of its potential audience, should be deemed a public performance. *Cablevision* rejected this view because it would make a seemingly private transmission public by virtue of actions taken by third parties. *Id.* For example, if a person records a program and then transmits that recording to a television in another room, he would be publicly performing the work because some other party, namely the original broadcaster, had once transmitted the same performance to the public. *Id.* The *Cablevision* court concluded that Congress could not have intended "such odd results"; instead, the Transmit Clause directed courts to consider only the potential audience of the "performance created by the act of transmission." *Id.* The *Cablevision* court found this interpretation consistent with prior opinions of this Court construing the Clause. *Id.; see Nat'l Football League v. PrimeTime 24 Joint Venture,* 211 F.3d 10 (2d Cir.2000).

**\*8** Finally, the *Cablevision* court considered *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.,* 749 F.2d 154 (3d Cir.1984). In *Redd Horne,* the defendant operated a video rental store that utilized private booths containing individual televisions. Customers would select a movie from the store's catalog and enter a booth. A store employee would then load a copy of the movie into a VCR hard-wired to the TV in the customer's booth and transmit the content of the tape to the television in the booth. *See* 749 F.2d at 156–57. The Third Circuit, following an interpretation of the Transmit Clause first advanced by Professor Nimmer, held that this was a public performance because the same copy of the work, namely the individual video cassette, was repeatedly "performed" to different members of the public at different times. *Id.* at 159 (quoting 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3], at 8.192.8(1) (Matthew Bender rev. ed.)). The *Cable-*

*vision* court endorsed this conclusion [FN11]; whether a transmission originates from a distinct or shared copy is relevant to the Transmit Clause analysis because "the use of a unique copy may limit the potential audience of a transmission and is therefore relevant to whether that transmission is made 'to the public.' " 536 F.3d at 138.

Applying this interpretation of the Transmit Clause to the facts of the RS–DVR, the *Cablevision* court concluded that Cablevision's transmission of a recorded program to an individual subscriber was not a public performance. *Id.* Each transmission of a program could be received by only one Cablevision customer, namely the customer who requested that the copy be created. No other Cablevision customer could receive a transmission generated from that particular copy. The "universe of people capable of receiving an RS–DVR transmission is the single subscriber whose self-made copy is used to create that transmission." *Id.* at 137. The transmission was therefore not made "to the public" within the meaning of the Transmit Clause and did not infringe the plaintiffs' public performance right. *Id.* at 138.

[7][8][9][10] We discuss *Cablevision's* interpretation of the Transmit Clause in such detail because that decision establishes four guideposts that determine the outcome of this appeal. First and most important, the Transmit Clause directs courts to consider the potential audience of the individual transmission. *See id.* at 135. If that transmission is "capable of being received by the public" the transmission is a public performance; if the potential audience of the transmission is only one subscriber, the transmission is not a public performance, except as discussed below. Second and following from the first, private transmissions-that is those not capable of being received by the public-should not be aggregated. It is therefore irrelevant to the Transmit Clause analysis whether the public is capable of receiving the same underlying work or original performance of the work by means of many transmissions. *See id.* at 135–37. Third, there is an excep-

**Exhibit 1, Page 35**

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

tion to this no-aggregation rule when private transmissions are generated from the same copy of the work. In such cases, these private transmissions *should* be aggregated, and if these aggregated transmissions from a single copy enable the public to view that copy, the transmissions are public performances. *See id.* at 137–38. Fourth and finally, "any factor that limits the *potential* audience of a transmission is relevant" to the Transmit Clause analysis. *Id.* at 137.

### III. *Cablevision's* Application to Aereo's System

*\*9* [11] As discussed above, *Cablevision's* holding that Cablevision's transmissions of programs recorded with its RS–DVR system were not public performances rested on two essential facts. First, the RS–DVR system created unique copies of every program a Cablevision customer wished to record. 536 F.3d at 137. Second, the RS–DVR's transmission of the recorded program to a particular customer was generated from that unique copy; no other customer could view a transmission created by that copy. *Id.* Given these two features, the potential audience of every RS–DVR transmission was only a single Cablevision subscriber, namely the subscriber who created the copy.[FN12] And because the potential audience of the transmission was only one Cablevision subscriber, the transmission was not made "to the public."

The same two features are present in Aereo's system. When an Aereo customer elects to watch or record a program using either the "Watch" or "Record" features, Aereo's system creates a unique copy of that program on a portion of a hard drive assigned only to that Aereo user. And when an Aereo user chooses to watch the recorded program, whether (nearly) live or days after the program has aired, the transmission sent by Aereo and received by that user is generated from that unique copy. No other Aereo user can ever receive a transmission from that copy. Thus, just as in *Cablevision,* the potential audience of each Aereo transmission is the single user who requested that a program be recorded.

Plaintiffs offer various arguments attempting to distinguish *Cablevision* from the Aereo system. First, they argue that *Cablevision* is distinguishable because Cablevision had a license to transmit programming in the first instance, namely when it first aired the programs; thus the question was whether Cablevision needed an additional license to retransmit the programs recorded by its RS–DVR system. Aereo, by contrast, has no license. This argument fails, as the question is whether Aereo's transmissions are public performances of the Plaintiffs' copyrighted works. If so, Aereo needs a license to make such public performances; if they are not public performances, it needs no such license. Thus whether Aereo has a license is not relevant to whether its transmissions are public and therefore must be licensed. This argument by the Plaintiffs also finds no support in the *Cablevision* opinion. *Cablevision* did not hold that Cablevision's RS–DVR transmissions were *licensed* public performances; rather it held they were not public performances. It does not appear that the *Cablevision* court based its decision that Cablevision's RS–DVR transmissions were non-public transmissions on Cablevision's license to broadcast the programs live. Indeed, such a conclusion would have been erroneous, because having a license to publicly perform a work in a particular instance, such as to broadcast a television program live, does not give the licensee the right to perform the work again. That Cablevision had a license to transmit copyrighted works when they first aired thus should have no bearing on whether it needed a license to retransmit these programs as part of its RS–DVR system. Indeed, if this interpretation of *Cablevision* were correct, Cablevision would not need a license to retransmit programs using video-on-demand and there would have been no reason for Cablevision to construct an RS–DVR system employing individual copies.

*\*10* Second, Plaintiffs argue that discrete transmissions should be aggregated to determine whether they are public performances. This argument has two aspects. Plaintiffs first argue that because

**Exhibit 1, Page 36**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Aereo's discrete transmissions enable members of the public to receive "the same performance (i.e., Aereo's retransmission of a program)" they are transmissions made "to the public." Br. of Pls .-Appellants Am. Broad. Cos., et al. at 19. But this is nothing more than the *Cablevision* plaintiffs' interpretation of the Transmit Clause, as it equates Aereo's transmissions with the original broadcast made by the over-the-air network rather than treating Aereo's transmissions as independent performances. *See* 536 F.3d at 136. This approach was explicitly rejected by the *Cablevision* court. *See id.*

Plaintiffs also argue that the Copyright Act requires that all of Aereo's discrete transmissions "be aggregated and viewed collectively as constituting a public performance." Br. of Pls.-Appellants WNET, Thirteen, et al. at 34. This is not contrary to *Cablevision,* they argue, because *Cablevision* only held that transmissions of the same performance or work made by different entities should not be aggregated. On their view, discrete transmissions of the same performance or work made by the same entity should be aggregated to determine whether a public performance has occurred. This argument is also foreclosed by *Cablevision.* First, *Cablevision* made clear that the relevant inquiry under the Transmit Clause is the potential audience of a particular transmission, not the potential audience for the underlying work or the particular performance of that work being transmitted. *See* 536 F.3d at 135. But the only reason to aggregate Aereo's discrete transmissions along the lines suggested by Plaintiffs is that they are discrete transmissions *of the same performance or work.* Thus Plaintiffs are asking us to adopt a reading of the Transmit Clause that is contrary to that adopted by *Cablevision* because it focuses on the potential audience of the performance or work being transmitted, not the potential audience of the particular transmission. Second, Plaintiffs provide no reason why Aereo's multiple, audience-of-one transmissions of unique copies of the same underlying program should be aggregated but not Cablevision's multiple, audience-of-one transmissions of unique copies of the

same underlying program. Both Aereo and Cablevision are making multiple private transmissions of the same work, so adopting the Plaintiffs' approach and aggregating all transmissions made by the same entity would require us to find that both are public performances. While it does not appear that *Cablevision* explicitly rejected this view, interpreting the Transmit Clause as the Plaintiffs urge so as to aggregate Aereo's transmissions would, if fairly applied to the facts of *Cablevision,* require us to aggregate Cablevision's distinct RS–DVR transmissions. For these reasons, we cannot accept Plaintiffs' arguments that Aereo's transmissions to a single Aereo user, generated from a unique copy created at the user's request and only accessible to that user, should be aggregated for the purposes of determining whether they are public performances.

*11 Plaintiffs' third argument for distinguishing *Cablevision* is that *Cablevision* was decided based on an analogy to a typical VCR, with the RS–DVR simply an upstream version, but Aereo's system is more analogous to a cable television provider. While it is true that the *Cablevision* court did compare the RS–DVR system to the stand-alone VCR, these comparisons occur in the section of that opinion discussing Cablevision's potential liability for infringing the plaintiffs' reproduction right. *See* 536 F.3d at 131. No part of *Cablevision's* analysis of the public performance right appears to have been influenced by any analogy to the stand-alone VCR. Moreover, this Court has followed *Cablevision's* interpretation of the Transmit Clause in the context of internet music downloads. *See United States v. Am. Soc'y of Composers, Authors & Publishers,* 627 F.3d 64, 73–76 (2d Cir.2010) ("ASCAP"); *see also United States v. Am. Soc'y of Composers, Authors & Publishers ( Application of Cellco P'Ship),* 663 F.Supp.2d 363, 371–74 (S.D.N.Y.2009) (following *Cablevision's* analysis of the Transmit Clause in the context of cellphone ringtones). Thus we see no support in *Cablevision* or in this Court's subsequent decisions for the Plaintiffs' argument that *Cablevision's* interpretation of the Transmit Clause is confined to technologies similar to the VCR.[FN13]

**Exhibit 1, Page 37**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

Plaintiffs' fourth argument for distinguishing *Cablevision* is that Cablevision's RS–DVR copies "broke the continuous chain of retransmission to the public" in a way that Aereo's copies do not. Br. of Pls.-Appellants Am. Broad. Cos., et al. at 39. Specifically, they argue that Aereo's copies are merely a device by which Aereo enables its users to watch nearly live TV, while Cablevision's copies, by contrast, could only serve as the source for a transmission of a program after the original transmission, that is the live broadcast of the program, had finished. As a result, Aereo's copies lack the legal significance of Cablevision's RS–DVR copies and are no different from the temporary buffer copies created by internet streaming, a process that this Court has assumed produces public performances. *See, e.g., ivi,* 691 F.3d at 278; *ASCAP,* 627 F.3d at 74.

This argument fails for two reasons. First, Aereo's copies do have the legal significance ascribed to the RS–DVR copies in *Cablevision* because the user exercises the same control over their playback. The Aereo user watching a copy of a recorded program that he requested be created, whether using the "Watch" feature or the "Record" feature, chooses when and how that copy will be played back. The user may begin watching it nearly live, but then pause or rewind it, resulting in playback that is no longer concurrent with the program's over-the-air broadcast. Or the user may elect not to begin watching the program at all until long after it began airing. This volitional control over how the copy is played makes Aereo's copies unlike the temporary buffer copies generated incident to internet streaming. A person watching an internet stream chooses the program he wishes to watch and a temporary buffer copy of that program is then created, which serves as the basis of the images seen by the person watching the stream. But that person cannot exercise any control over the manner in which that copy is played-it cannot be paused, rewound, or rewatched later. As a result, the imposition of a temporary buffer copy between the outgoing stream and the image seen by the person watch-

ing it is of no significance, because the person only exercises control *before* the copy is created in choosing to watch the program in the first place. By contrast, the Aereo user selects what program he wishes a copy to be made of and then controls when and how that copy is played.[FN14] This second layer of control, exercised *after* the copy has been created, means that Aereo's transmissions from the recorded copies cannot be regarded as simply one link in a chain of transmission, giving Aereo's copies the same legal significance as the RS–DVR copies in *Cablevision*.[FN15]

**\*12** Second, Plaintiffs' argument fails to account for Aereo's user-specific antennas. Each user-associated copy of a program created by Aereo's system is generated from a unique antenna assigned only to the user who requested that the copy be made. The feed from that antenna is not used to generate multiple copies of each program for different Aereo users but rather only one copy: the copy that can be watched by the user to whom that antenna is assigned. Thus even if we were to disregard Aereo's copies, it would still be true that the potential audience of each of Aereo's transmissions was the single user to whom each antenna was assigned. It is beyond dispute that the transmission of a broadcast TV program received by an individual's rooftop antenna to the TV in his living room is private, because only that individual can receive the transmission from that antenna, ensuring that the potential audience of that transmission is only one person. Plaintiffs have presented no reason why the result should be any different when that rooftop antenna is rented from Aereo and its signals transmitted over the internet: it remains the case that only one person can receive that antenna's transmissions.[FN16] Thus even without the creation of user-associated copies, which under *Cablevision* means that Aereo's transmissions are not public, there is significant reason to believe that Aereo's system would not be creating public performances, since the entire chain of transmission from the time a signal is first received by Aereo to the time it generates an image the Aereo user sees has a potential

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Exhibit 1, Page 38**

audience of only one Aereo customer. FN17

Finally, Plaintiffs argue that holding that Aereo's transmissions are not public performances exalts form over substance, because the Aereo system is functionally equivalent to a cable television provider. Plaintiffs also make much of the undisputed fact that Aereo's system was designed around the *Cablevision* holding, because it creates essentially identical copies of the same program for every user who wishes to watch it in order to avoid copyright liability, instead of using a perhaps more efficient design employing shared copies. However, that Aereo was able to design a system based on *Cablevision's* holding to provide its users with nearly live television over the internet is an argument that *Cablevision* was wrongly decided; it does not provide a basis for distinguishing *Cablevision.* Moreover, Aereo is not the first to design systems to avoid copyright liability. The same is likely true of Cablevision, which created separate user-associated copies of each recorded program for its RS–DVR system instead of using more efficient shared copies because transmissions generated from the latter would likely be found to infringe copyright holders' public performance right under the rationale of *Redd Horne,* 749 F.2d 154. Nor is Aereo alone in designing its system around *Cablevision,* as many cloud computing services, such as internet music lockers, discussed further below, appear to have done the same. *See* Br. of the Computer & Commc'ns Indus. Ass'n & the Internet Ass'n as Amicus Curiae at 5–8. Perhaps the application of the Transmit Clause should focus less on the technical details of a particular system and more on its functionality, but this Court's decisions in *Cablevision* and *NFL,* 211 F.3d 10, held that technical architecture matters.

## IV. The Legislative Intent Behind the 1976 Copyright Act

*13 Plaintiffs also contend that the legislative history of the 1976 Copyright Act shows that Aereo's transmissions should be deemed public performances of the Plaintiffs' copyrighted works.

They argue that cable retransmissions are public performances under the Transmit Clause and Aereo is functionally equivalent to a cable system. However, this reading of the legislative history is simply incompatible with the conclusions of the *Cablevision* court.

This view of the legislative history also ignores a contrary strand of the history behind the 1976 Copyright Act. Congress recognized when it drafted the 1976 Act that its broad definition of "performance" could create unintended results. The House Report states that under this definition, "any individual is performing whenever he or she plays a phonorecord embodying the performance or communicates the performance by turning on a receiving set." House Report at 63. But because Congress did not wish to require everyone to obtain a license from copyright holders before they could "perform" the copyrighted works played by their television, Congress was careful to note that a performance "would not be actionable as an infringement unless it were done 'publicly,' as defined in section 101." *id.* "Private" performances are exempted from copyright liability. *Id.* This limitation also applies to performances created by a "transmission," since, as the *Cablevision* court noted, if Congress intended all transmissions to be public performances, the Transmit Clause would not have contained the phrase "to the public." FN18 *Cablevision,* 536 F.3d at 135–36.

In the technological environment of 1976, distinguishing between public and private transmissions was simpler than today. New devices such as RS–DVRs and Slingboxes complicate our analysis, as the transmissions generated by these devices can be analogized to the paradigmatic example of a "private" transmission: that from a personal rooftop antenna to a television set in a living room. As much as Aereo's service may resemble a cable system, it also generates transmissions that closely resemble the private transmissions from these devices. Thus unanticipated technological developments have created tension between Congress's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

view that retransmissions of network programs by cable television systems should be deemed public performances and its intent that some transmissions be classified as private. Although Aereo may in some respects resemble a cable television system, we cannot disregard the contrary concerns expressed by Congress in drafting the 1976 Copyright Act. And we certainly cannot disregard the express language Congress selected in doing so. That language and its legislative history, as interpreted by this Court in *Cablevision,* compels the conclusion that Aereo's transmissions are not public performances.

**V. Stare Decisis**

[12][13] Though presented as efforts to distinguish *Cablevision,* many of Plaintiffs' arguments really urge us to overrule *Cablevision.* One panel of this Court, however, "cannot overrule a prior decision of another panel." *Union of Needletrades, Indus. & Textile Employees, AFL–CIO, CLC v. U.S. I.N.S.,* 336 F.3d 200, 210 (2d Cir.2003). We are "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *United States v. Wilkerson,* 361 F.3d 717, 732 (2d Cir.2004). There is an exception when an intervening Supreme Court decision "casts doubt on our controlling precedent," *Union of Needletrades,* 336 F.3d at 210, but we are unaware of any such decisions that implicate *Cablevision.* Plaintiffs have provided us with no adequate basis to distinguish *Cablevision* from the Aereo system.[FN19] We therefore see no error in the district court's conclusion that Plaintiffs are unlikely to prevail on the merits.

**VI. The Other Preliminary Injunction Factors**

**\*14** [14] We now turn to the remaining preliminary injunction factors. *See Salinger,* 607 F.3d at 79–80. Because the Plaintiffs are not likely to prevail on the merits, we consider whether the Plaintiffs have demonstrated "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor." *Id.* at 79.

Given our conclusion that Aereo's service does not infringe Plaintiffs' public performance right when it transmits a program still airing on broadcast television, we do not believe the Plaintiffs have demonstrated "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Id.*

[15] Moreover, we find no abuse of discretion in the district court's determination that the balance of hardships does not tip decidedly in the Plaintiffs' favor. The district court reached this decision based on its conclusions (1) that the Plaintiffs were likely to suffer irreparable harm in the absence of an injunction and (2) that Aereo would suffer significant hardship if an injunction should issue, since this would likely be the end of its business. *See Am. Broad. Cos., Inc. v. Aereo,* 874 F.Supp.2d at 397–403. The parties do not appear to contest the district court's factual determinations supporting these conclusions and we see no clear error in them. Plaintiffs do argue that any harm suffered by Aereo should be disregarded in the balance of hardships analysis because Aereo's business is illegal and "[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." *ivi,* 691 F.3d at 287. But this argument hinges on the conclusion that Aereo's business infringes the Plaintiffs' copyrights. Because we conclude that it does not—at least on the limited question before us of whether Aereo's transmissions of unique copies of recorded programs to the Aereo users who directed that they be created are public performances—the harms Aereo would suffer from an injunction are legally cognizable and significant. There is thus no reason to disturb the district court's conclusion that the balance of hardships does not tip "decidedly" in the Plaintiffs' favor.

**CONCLUSION**

We conclude that Aereo's transmissions of unique copies of broadcast television programs created at its users' requests and transmitted while the programs are still airing on broadcast television are not "public performances" of the Plaintiffs' copy-

**Exhibit 1, Page 40**

righted works under *Cablevision.* As such, Plaintiffs have not demonstrated that they are likely to prevail on the merits on this claim in their copyright infringement action. Nor have they demonstrated serious questions as to the merits and a balance of hardships that tips decidedly in their favor. We therefore affirm the order of the district court denying the Plaintiffs' motion.

Judge CHIN dissents in a separate opinion.

CHIN, Circuit Judge:

**\*15** I respectfully dissent.

Defendant-appellee Aereo, Inc. ("Aereo") captures over-the-air broadcasts of television programs and retransmits them to subscribers by streaming them over the Internet. For a monthly fee, Aereo's customers may "Watch" the programming "live" (that is, with a seven-second delay) on their computers and other electronic devices, or they may "Record" the programs for later viewing. Aereo retransmits the programming without the authorization of the copyright holders and without paying a fee.

The Copyright Act confers upon owners of copyrights in audiovisual works the exclusive right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4). This exclusive right includes the right "to transmit or otherwise communicate a performance ... to the public, by means of any device or process." *Id.* § 101. In my view, by transmitting (or retransmitting) copyrighted programming to the public without authorization, Aereo is engaging in copyright infringement in clear violation of the Copyright Act.

Aereo argues that it is not violating the law because its transmissions are not "public" performances; instead, the argument goes, its transmissions are "private" performances, and a "private performance is not copyright infringement." It contends that it is merely providing a "technology platform that enables consumers to use remotely-located equipment ... to create, access and view their own unique recorded copies of free over-the-air broad-

cast television programming."

Aereo's "technology platform" is, however, a sham. The system employs thousands of individual dime-sized antennas, but there is no technologically sound reason to use a multitude of tiny individual antennas rather than one central antenna; indeed, the system is a Rube Goldberg-like contrivance, over-engineered in an attempt to avoid the reach of the Copyright Act and to take advantage of a perceived loophole in the law. After capturing the broadcast signal, Aereo makes a copy of the selected program for each viewer, whether the user chooses to "Watch" now or "Record" for later. Under Aereo's theory, by using these individual antennas and copies, it may retransmit, for example, the Super Bowl "live" to 50,000 subscribers and yet, because each subscriber has an individual antenna and a "unique recorded cop[y]" of the broadcast, these are "private" performances. Of course, the argument makes no sense. These are very much *public* performances.

Aereo purports to draw its infringement-avoidance scheme from this Court's decision in *Cartoon Network LP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir.2008), cert. denied, —— U.S. ——, 129 S.Ct. 2890, 174 L.Ed.2d 595 (2009) ("Cablevision"). But, as discussed below, there are critical differences between Cablevision and this case. Most significantly, Cablevision involved a cable company that paid statutory licensing and retransmission consent fees for the content it retransmitted, while Aereo pays no such fees. Moreover, the subscribers in *Cablevision* already had the ability to view television programs in real-time through their *authorized* cable subscriptions, and the remote digital video recording service at issue there was a supplemental service that allowed subscribers to store that authorized content for later viewing. In contrast, no part of Aereo's system is authorized. Instead, its storage and time-shifting functions are an integral part of an unlicensed retransmission service that captures broadcast television programs and streams them over the Internet.

*16 Aereo is doing precisely what cable companies, satellite television companies, and authorized Internet streaming companies do—they capture over-the-air broadcasts and retransmit them to customers—except that those entities are doing it legally, pursuant to statutory or negotiated licenses, for a fee. By accepting Aereo's argument that it may do so without authorization and without paying a fee, the majority elevates form over substance. Its decision, in my view, conflicts with the text of the Copyright Act, its legislative history, and our case law.

For these and other reasons discussed more fully below, I would reverse the district court's order denying plaintiffs-appellants' motion for a preliminary injunction.

### DISCUSSION

When interpreting a statute, we must begin with the plain language, giving any undefined terms their ordinary meaning. *See Roberts v. Sea–Land Servs., Inc.,* —— U.S. ——, ——, 132 S.Ct. 1350, 1356, 182 L.Ed.2d 341 (2012); *United States v. Desposito,* 704 F.3d 221, 226 (2d Cir.2013). We must "attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Pettus v. Morgenthau,* 554 F.3d 293, 297 (2d Cir.2009). Where Congress has expressed its intent in "reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) (internal quotation marks and citation omitted); *see Devine v. United States,* 202 F.3d 547, 551 (2d Cir.2000). If we conclude that the text is ambiguous, however, we will look to legislative history and other tools of statutory interpretation to "dispel this ambiguity." *In re Air Cargo Shipping Servs. Antitrust Litig.,* 697 F.3d 154, 159 (2d Cir.2012).

I begin, then, by considering the text of the relevant sections of the Copyright Act. To the extent there is any arguable ambiguity in the statutory language, I next turn to its legislative history. Finally, I conclude with a discussion of *Cablevision* as well

as other relevant precedents.

### A. The Statutory Text

Section 106 of the Copyright Act sets out six exclusive rights held by a copyright owner; these include the right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4).

As defined in section 101, "[t]o perform ... a work 'publicly' means," among other things:

> to transmit or otherwise communicate a performance or display of the work ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* § 101. "To 'transmit' a performance" is "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." *Id.* Hence, the use of a device or process to transmit or communicate copyrighted images or sounds to the public constitutes a public performance, whether members of the public receive the performance in the same place or in different places, whether at the same time or at different times.

*17 It is apparent that Aereo's system fits squarely within the plain meaning of the statute. *See, e.g., Fox Television Stations, Inc. v. Barry-Driller Content Sys., PLC,* No. CV 12–6921, 2012 WL 6784498, at *1–6 (C.D.Cal. Dec.27, 2012) (holding that a service "technologically analogous" to Aereo's was engaged in public performances). The statute is broadly read, as it refers to *"any* device or process." 17 U.S.C. § 101 (emphasis added); *see also id.* (defining "device" and "process" as "one now known or later developed"). Aereo's system of thousands of antennas and other equipment clearly is a "device or process." Using that "device or process," Aereo receives copyrighted images and sounds and "transmit[s] or otherwise communicate[s]" them to its subscribers "beyond

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the place from which they are sent," *id.,* that is, " 'beyond the place' of origination," *Columbia Pictures Indus., Inc. v. Prof'l Real* Estate Investors, Inc., 866 F.2d 278, 282 (9th Cir.1989). The "performance or display of the work" is then received by paying subscribers "in separate places" and "at different times." 17 U.S.C. § 101.

Even assuming Aereo's system limits the potential audience for each transmission, and even assuming each of its subscribers receives a unique recorded copy, Aereo still is transmitting the programming "to the public." *Id.* Giving the undefined term "the public" its ordinary meaning, *see Kouichi Taniguchi v. Kan Pacific Saipan, Ltd.,* ⸺ U.S. ⸺, ⸺, 132 S.Ct. 1997, 2002, 182 L.Ed.2d 903 (2012), a transmission to anyone other than oneself or an intimate relation is a communication to a "member[ ] of the public," because it is not in any sense "private." *See* Webster's II: New Riverside University Dictionary 951 (1994) (defining "public" as "[t]he community or the people as a group"); *see also id.* at 936 (defining "private" as, inter alia, "[n]ot public: intimate"). *Cf.* Cablevision, 536 F.3d at 138 ("[T]he identity of the transmitter ... [is] germane in determining whether that transmission is made 'to the public.' "); *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 299–300 (3d Cir.1991) (construing "to the public" in section 106(3) and concluding that "even one person can be the public").

What Aereo is doing is not in any sense "private," as the Super Bowl example discussed above illustrates. This understanding accords with the statute's instruction that a transmission can be "to the public" even if the "members of the public capable of receiving the performance. receive it in the same place or in separate places and at the same time or at different times." 17 U.S .C. § 101. Because Aereo is transmitting television signals to paying strangers, all of its transmissions are "to the public," even if intervening "device[s] or process[es]" limit the potential audience of each separate transmission to a single "member[ ] of the pub-

lic." *Id.*

By any reasonable construction of the statute, Aereo is engaging in public performances and, therefore, it is engaging in copyright infringement. *See id.* §§ 106(4), 501(a).

**B.** *The Legislative History*

**\*18** Even if the language of the transmit clause were ambiguous as applied to Aereo's system, *see Cablevision,* 536 F.3d at 136 ("[T]he transmit clause is not a model of clarity ...."), the legislative history reinforces the conclusion that Aereo is engaging in public performances. The legislative history makes clear that Congress intended to reach new technologies, like this one, that are designed solely to exploit someone else's copyrighted work.

Just before the passage of the 1976 Copyright Act, the Supreme Court held in *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and *Teleprompter Corp. v. Columbia Broadcast Systems, Inc.,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), that community antenna television ("CATV") systems—which captured live television broadcasts with antennas set on hills and retransmitted the signals to viewers unable to receive the original signals—did not infringe the public performance right because they were not "performing" the copyrighted work. *See Teleprompter,* 415 U.S. at 408–09; *Fortnightly,* 392 U.S. at 399–400. In reaching this conclusion, the Court reasoned that:

> If an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set.... The only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur.

*Fortnightly,* 392 U.S. at 400. This rationale is nearly identical to the justification advanced by Aereo: each subscriber could legally use his own antenna, digital video recorder ("DVR"), and Sling-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

box [FN1] to stream live television to his computer or other device, and so it makes no legal difference that the system is actually "erected and owned not by its users but by an entrepreneur ." *Id.* [FN2]

But Congress expressly rejected the outcome reached by the Supreme Court in *Fortnightly* and Teleprompter. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 709, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) ("Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement."); *see also WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 281 (2d Cir.2012); Fox Television Stations, 2012 WL 6784498, at *5. In the 1976 Copyright Act, Congress altered the definitions of "perform" and "publicly" specifically to render the CATV systems' unlicensed retransmissions illegal. *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 469 n. 17, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); H.R.Rep. No. 94–1476, at 63, reprinted in 1976 U.S.C.C.A.N. 5659, 5676–77 ("[A] cable television system is performing when it retransmits the broadcast to its subscribers ...."); *id.* at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678 ("Clause (2) of the definition of 'publicly' in section 101 makes clear that the concept[ ] of public performance ... include[s] ... acts that transmit or otherwise communicate a performance or display of the work to the public....").

**\*19** Congress was not only concerned, however, with the then newly-emerging CATV systems. Recognizing that the Fortnightly and Teleprompter decisions arose in part because of the "drastic technological change" after the 1909 Act, Fortnightly, 392 U.S. at 396, Congress broadly defined the term "transmit" to ensure that the 1976 Act anticipated future technological developments:

The definition of 'transmit' ... is broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and

every method by which the images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [any] form, the case comes within the scope of clauses (4) or (5) of section 106.

H.R.Rep. No. 94–1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678. Further anticipating that there would be changes in technology that it could not then foresee, Congress added that a public performance could be received in different places and at different times. This change was meant to clarify that:

a performance made available by transmission to the public at large is 'public' even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same principles apply whenever *the potential recipients of the transmission represent a limited segment of the public,* such as the occupants of hotel rooms or the *subscribers of a cable television service.*

*Id.* at 64–65, *reprinted at* 1976 U.S.C.C.A.N. at 5678 (emphasis added).

While Congress in 1976 might not have envisioned the precise technological innovations employed by Aereo today, this legislative history surely suggests that Congress could not have intended for such a system to fall outside the definition of a public performance. To the contrary, Congress made clear its intent to include within the transmit clause "all conceivable forms and combinations of wires and wireless communications media," and if, as here, "the transmission reaches the public in [any] form, the case comes within the scope of clauses (4) or (5) of section 106." H.R.Rep. No. 94–1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678. Aereo's streaming of television programming over the Internet is a public performance as Congress intended that concept to be defined.

**C. Cablevision**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

Aereo seeks to avoid the plain language of the Copyright Act and the clear import of its legislative history by relying on this Court's decision in *Cablevision.* That reliance, in my view, is misplaced.

Cablevision was a cable operator with a license to retransmit broadcast and cable programming to its paying subscribers. *See Cablevision,* 536 F.3d at 123–25; *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.,* 478 F.Supp.2d 607, 610 (S.D.N.Y.2007), *rev'd sub nom., Cartoon Network LP v. CSC Holdings, Inc.* (Cablevision), 536 F.3d 121 (2d Cir.2008). The content providers sought to enjoin Cablevision from introducing a new Remote Storage DVR system (the "RS–DVR") that would "allow[ ] Cablevision customers who do not have a stand-alone DVR to record cable programming" and "then receive playback of those programs through their home television sets." *Cablevision,* 536 F.3d at 124. The lawsuit challenged only whether Cablevision needed additional licenses to allow its subscribers to record shows and play them back later through the RS–DVR system. *See Twentieth Century Fox,* 478 F.Supp.2d at 609. If subscribers wanted to watch "live" television, they would watch it through Cablevision's licensed retransmission feed. See Cablevision, 536 F.3d at 124 (explaining that Cablevision split its programming data stream, sending one "immediately to customers as before"); Amicus Br. of Cablevision Sys. Corp. at 20.

**\*20** The RS–DVR worked as follows. Cablevision split its licensed data stream, and sent a stream to a remote server, where the data went through two buffers. Cablevision, 536 F.3d at 124. At the first buffer, the system made a temporary copy of 0.1 seconds of programming while it inquired whether any subscribers wanted to copy that programming. *Id.* A customer could make such a request "by selecting a program in advance from an on-screen guide, or by pressing the record button while viewing a given program." *Id.* at 125. If a request had been made, the data moved to the second buffer and then was permanently saved onto a portion of a

hard drive designated for that customer. Id. at 124. At the customer's request, the permanent copy was transmitted to the customer and played back to him. *Id.* at 125.

Cablevision held that the RS–DVR did not infringe either the reproduction or the public performance rights. *Id.* at 140. Unlike the majority here, I do not think we can view *Cablevision's* analyses of each right in isolation. *See* Majority Opin., *supra,* at 18. As *Cablevision* explained, "the right of reproduction can reinforce and protect the right of public performance." *Cablevision,* 536 F.3d at 138. "Given this interplay between the various rights in this context," *id., Cablevision's* holding that "copies produced by the RS–DVR system are 'made' by the RS–DVR customer," *id.* at 133, was critical to its holding that "each RS–DVR playback transmission ... made to a single subscriber using a single unique copy *produced by that subscriber* ... [is] not [a] performance[ ] 'to the public,' " *id.* at 139 (emphasis added); *see also* Amicus Br. of the United States at 17–19, *Cable News Network, Inc. v. CSC Holdings, Inc.,* ——— U.S. ———, 129 S.Ct. 2890, 174 L.Ed.2d 595 (2009), *denying cert., Cartoon Network LP v. CSC Holdings, Inc. (Cablevision),* 536 F.3d 121 (2d Cir.2008) [hereinafter "U.S. *Cablevision* Amicus Br."].

With this concept in mind, it is clear that Aereo's system is factually distinct from Cablevision's RS–DVR system. First, Cablevision's RS–DVR system "exist[ed] only to produce a copy" of material that it already had a license to retransmit to its subscribers, *Cablevision,* 536 F.3d at 131, but the Aereo system produces copies to *enable* it to transmit material to its subscribers. Whereas Cablevision promoted its RS–DVR as a mechanism for recording and playing back programs, Aereo promotes its service as a means for watching "live" broadcast television on the Internet and through mobile devices. Unlike Cablevision, however, Aereo has no licenses to retransmit broadcast television. If a Cablevision subscriber wanted to use her own DVR to record programming provided by

**Exhibit 1, Page 45**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cablevision, she could do so through Cablevision's licensed transmission. But an Aereo subscriber could not use her own DVR to lawfully record content received from Aereo because Aereo has no license to retransmit programming; at best, Aereo could only illegally retransmit public broadcasts from its remote antennas to the user. *See, e.g., Fortnightly Corp.,* 392 U.S. at 400, overruled by statute as recognized in, Capital Cities Cable, 467 U.S. at 709; ivi, Inc., 691 F.3d at 278–79; *see also* U.S. *Cablevision* Amicus Br., *supra,* at 21 (arguing that the legality of a hypothetical unlicensed system that only allowed subscribers to copy and playback content "would be suspect at best, because [the subscriber] would be ... copying programs that he was not otherwise entitled to view"). Aereo's use of copies is essential to its ability to retransmit broadcast television signals, while Cablevision's copies were merely an optional alternative to a set-top DVR. The core of Aereo's business is streaming broadcasts over the Internet in real-time; the addition of the record function, however, cannot legitimize the unauthorized retransmission of copyrighted content.

**\*21** Second, subscribers interact with Aereo's system differently from the way Cablevision's subscribers interacted with the RS–DVR. Cablevision subscribers were already paying for the right to watch television programs, and the RS–DVR gave them the additional option to "record" the programs. *Cablevision,* 536 F.3d at 125. In contrast, Aereo subscribers can choose *either* "Watch" or "Record." *Am. Broad. Cos. v. AEREO, Inc.,* 874 F.Supp.2d 373, 377 (S.D.N.Y.2012). Both options initiate the same process: a miniature antenna allocated to that user tunes to the channel; the television signal is transmitted to a hard drive; and a full-length, permanent copy is saved for that customer. *Id.* at 377–79. If the subscriber has opted to "Watch" the program live, the system immediately begins playing back the user's copy at the same time it is being recorded. *Id.* Aereo will then automatically delete the saved copy once the user is done watching the program, unless the subscriber

chooses to save it. *Id.* at 379.

These differences undermine the applicability of Cablevision to Aereo's system. Cablevision found that the RS–DVR was indistinguishable from a VCR or set-top DVR because Cablevision's system "exist[ed] only to produce a copy" and its subscribers provided the "volitional conduct" necessary to make a copy by "ordering that system to produce a copy of a specific program." *Cablevision,* 536 F.3d at 131; *see also* U.S. *Cablevision* Amicus Br., *supra,* at 16 (noting that *Cablevision* turned on whether RS–DVR was more analogous to set-top DVR or video-on-demand service). The RS–DVR was not designed to be a substitute for viewing live television broadcasts. Aereo's system, however, was designed to be precisely that. It does not exist only, or even primarily, to make copies; it exists to stream live television through the Internet. Its users can choose to "Watch" live television instead of "Record" a program, but the system begins to produce a full-length copy anyway because, even under its own theory, Aereo cannot legally retransmit a television signal to them without such a copy.[FN3] Aereo's system is much different than a VCR or DVR—indeed, as Aereo explains, it is an antenna, a DVR, and a Slingbox rolled into one—and for that reason *Cablevision* does not control our decision here.

I note also that in *Cablevision* this Court "emphasize[d]" that its holding "does not generally permit content delivery networks to avoid all copyright liability by making copies of each item of content and associating one unique copy with each subscriber to the network, or by giving their subscribers the capacity to make their own individual copies." 536 F.3d at 139. Likewise, when the United States opposed the grant of certiorari in Cablevision, it argued that "the Second Circuit's analysis of the public-performance issue should not be understood to reach ... other circumstances beyond those presented." U.S. *Cablevision* Amicus Br., *supra,* at 21.[FN4] *Cablevision* should not be extended to cover the circumstances presented in this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

case. Indeed, it is telling that Aereo declines to offer its subscribers channels broadcast from New Jersey, even though its antennas are capable of receiving those signals, for fear of being subject to suit outside the Second Circuit, *i.e.,* outside the reach of *Cablevision.* Cf. *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC,* No. CV 12–6921, 2012 WL 6784498, at *3–4 (C.D.Cal. Dec.27, 2012)* (declining to follow *Cablevision* and enjoining an Aereo-like system based on plain meaning of § 101).

**\*22** Finally, the majority's decision in my view runs afoul of other decisions of this Court. Although the issue was not even contested, in *ivi* we recognized that the retransmission of copyrighted television programming by streaming it live over the Internet constituted a "public performance" in violation of the Copyright Act. 691 F.3d at 278, 286, 287.FN5 Similarly, in *United States v. American Society of Composers, Authors, Publishers ("ASCAP"),* where, again, the issue was not even contested, we observed that the streaming of a song, like the streaming of a "television or radio broadcast," is a public performance. 627 F.3d 64, 74 (2d Cir.2010) (but holding in contrast that downloads of music do not constitute "public performances"); FN6 *accord Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 106–07, 111–12 (2d Cir.1998) (holding that device allowing users to access private phone line to listen to public radio broadcasts infringed right of public performance, in the absence of a defense, and was not fair use).

In *ivi,* we addressed the need for a preliminary injunction to enjoin ivi from streaming copyrighted works over the Internet without permission:

Indeed, ivi's actions—streaming copyrighted works without permission-would drastically change the industry, to plaintiffs' detriment.... The absence of a preliminary injunction would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow ivi's lead in retransmitting plaintiffs' copyrighted programming without their consent.

The strength of plaintiffs' negotiating platform and business model would decline. The quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules—all would be adversely affected. These harms would extend to other copyright holders of television programming. Continued live retransmissions of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry.

691 F.3d at 286. These concerns apply with equal force here, where Aereo is doing precisely what ivi was enjoined from doing: streaming copyrighted works over the Internet without permission of the copyright holders. Today's decision does not merely deny the broadcasters a licensing fee for Aereo's activity; it provides a blueprint for others to avoid the Copyright Act's licensing regime altogether. See Appellant ABC, Inc. Br. at 10 (citing articles reporting on the rise of copycat services). Congress could not have intended such a result.

### CONCLUSION

Based on the plain meaning of the statute, its legislative history, and our precedent, I conclude that Aereo's transmission of live public broadcasts over the Internet to paying subscribers are unlicensed transmissions "to the public." Hence, these unlicensed transmissions should be enjoined. *Cablevision* does not require a different result. Accordingly, I dissent.

FN* The Honorable John Gleeson, United States District Court for the Eastern District of New York, sitting by designation.

FN1. The two actions, although not consolidated in the district court, proceeded in tandem and the district court's order applied to both actions.

FN2. A Slingbox is a device that connects the user's cable or satellite set-top box or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Exhibit 1, Page 47**

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

DVR to the internet, allowing the user to watch live or recorded programs on an internet-connected mobile device, such as a laptop or tablet.

**FN3.** The technical operation of Aereo's system, discussed below, results in a slight delay in transmitting the program, which means that an Aereo subscriber using the "Watch" feature sees the program delayed by approximately ten seconds.

**FN4.** Thus if an Aereo user starts watching a program five minutes after it first began airing, he can rewind back to the five-minute mark, but not earlier.

**FN5.** Thus if an Aereo user starts watching a program five minutes after it first began airing and presses the "Record" button at the twenty-minute mark, the recorded copy will begin from the five-minute mark.

**FN6.** As mentioned in the text above, the lone factual dispute below was whether Aereo's antennas function independently or as one unit. The district court resolved this dispute in favor of Aereo, finding that its antennas operate independently. *Am. Broad. Cos., Inc. v. Aereo,* 874 F.Supp.2d 373, 381 (S.D.N.Y.2012). The Plaintiffs do not contest this finding on appeal.

**FN7.** Aereo's system usually assigns these antennas dynamically. Aereo users "share" antennas in the sense that one user is using a particular antenna now, and another may use the same antenna when the first is no longer using it. But at any given time, the feed from each antenna is used to create only one user's copy of the program being watched or recorded. Thus if 10,000 Aereo users are watching or recording the Super Bowl, Aereo has 10,000 antennas tuned to the channel broadcasting it.

**FN8.** Put briefly, the statute allows cable systems to retransmit copyrighted works from broadcast television stations in exchange for paying a compulsory license to the U.S. Copyright Office calculated according to a defined formula. The fees paid by cable systems are then distributed to copyright holders. *See ivi,* 691 F.3d at 281; *E. Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 128–29 (2d Cir.1982).

**FN9.** Plaintiffs assert that Aereo's transmissions of recorded programs when the original program is no longer airing on broadcast television are also public performances and that Aereo's system infringes other exclusive rights granted by the Copyright Act, such as the reproduction right. Plaintiffs did not, however, present these claims as a basis for the preliminary injunction. They are therefore not before us and we will not consider them.

**FN10.** The RS–DVR was therefore unlike a video-on-demand service because it did not enable a customer to watch a program that had already been broadcast unless that customer had previously requested that the program be recorded and because it generated user-associated copies instead of using a shared copy or copies.

**FN11.** Aggregating private transmissions generated from the same copy is in some tension with the *Cablevision* court's first conclusion that the relevant inquiry under the Transmit Clause is the potential audience of the particular transmission. This interpretation of the Transmit Clause began with Professor Nimmer. He notes that it is difficult to understand precisely what Congress intended with the language in the Clause stating that a public performance can occur when the audience receives the work "at different times." *See* 2 Melville B. Nimmer & David Nimmer,

**Exhibit 1, Page 48**

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

*Nimmer on Copyright* § 8.14[C][3], at 8.192.8 (Matthew Bender rev. ed.)). Arguing that this language on its face conflicted with other language in the statute and produced results Congress could not have intended, he proposed that by this language Congress wished to denote instances where the same copy of the work was repeatedly performed by different members of the public at different times. *See id.* at 192.8(1)–192.8(6). The *Cablevision* court's focus on the potential audience of each particular transmission would essentially read out the "different times" language, since individuals will not typically receive the same transmission at different times. But Nimmer's solution—aggregating private transmissions when those transmissions are generated from the same copy—provides a way to reconcile the "different times" language of the Clause.

FN12. The *Cablevision* court concluded in its discussion of the reproduction right that Cablevision's customers, not Cablevision, "made" the RS–DVR copies. *See* 536 F.3d at 133.

FN13. And even if such analogies were probative, Aereo's system could accurately be analogized to an upstream combination of a standard TV antenna, a DVR, and a Slingbox.

FN14. It is true that an Aereo user in "Watch" mode will often not exercise volitional control over the playback of the program, because the program will automatically begin playing when selected and he will watch it through to the end. But that is not significant because the Aereo user can exercise such control if he wishes to, which means that the copy Aereo's system generates is not merely a technical link in a process of transmission that should be deemed a unity transmission. Moreover,

the "Watch" feature's automatic playback is merely a default rule. The user can accomplish the same thing by using the "Record" feature, save that he must take the additional step of pressing "Play" once enough of the program has been recorded for playback. If this additional step were sufficient to break the chain of transmission, we see no reason why the "Watch" feature's default in favor of playback should change our analysis.

FN15. We also note that the Aereo system's use of copies gives it two features that would not be present were it simply to transmit the television programs its antennas receive directly to the user. First, it allows the Aereo user to pause and rewind seemingly live TV. This is because while the Aereo user has been watching the program "live," Aereo's system has in fact been creating a complete copy of the program. Thus if the user wishes to rewind thirty seconds or to the beginning of the program, he can easily do so. Second, if a user in "Watch" mode decides during a program he has been watching that he would like to save the program for later viewing, he can simply press the "Record" button. When the user does this, the entire program from the time he first began watching it is saved, not merely the portion beginning from the time when he pressed "Record." Were Aereo to transmit the signal from its antennas directly to each Aereo customers, neither of these features would be possible, because the image seen by the customer would be generated from a live feed, not a copy of the program. Aereo's users may well regard these two features as valuable and they provide an additional reason for regarding Aereo's copies as legally significant and not merely technical artifacts of a system to transmit live TV.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

**FN16.** This makes Aereo's system unlike the early cable TV systems at issue in *Fortnightly,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176, and *Teleprompter,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415, because the signals from those community TV antennas were shared among many users. When Congress drafted the 1976 Copyright Act, it intended that such transmissions be deemed public performances. But, as discussed below, Congress clearly believed that, under the terms of the Act, some transmissions were private. The methodology Congress proscribed for distinguishing between public and private transmissions is the size of the potential audience, and by that methodology, the feed from Aereo's antennas is a private transmission because it results in a performance viewable by only one user. The 1976 Congress may not have anticipated that later technology would make it possible to mimic the functionality of early cable TV by means of private transmissions, but that unexpected result does not change the language of the statute.

**FN17.** Because Aereo's system uses both user-associated antennas and user-associated copies, we need not decide whether a system with only one of these attributes would be publicly performing copyrighted works.

**FN18.** This is particularly appropriate given that in 1976, when cable TV was still in its infancy, many Americans used rooftop antennas. Thus Congress would have certainly wished to avoid adopting language that would make millions of Americans copyright infringers because they transmitted broadcast television programs from their personal rooftop antennas to their own television sets.

**FN19.** Stare decisis is particularly warran-

ted here in light of substantial reliance on *Cablevision.* As mentioned above, it appears that many media and technology companies have relied on *Cablevision* as an authoritative interpretation of the Transmit Clause. One example is cloud media services, which have proliferated in recent years. These services, which allow their users to store music on remote hard drives and stream it to internet-connected devices, have apparently been designed to comply with *Cablevision.* Just like Aereo's system and Cablevision's RS–DVR, they seek to avoid public performance liability by creating user-associated copies of each song rather than sharing song files among multiple users. *See* Brandon J. Trout, Note, *Infringers or Innovators? Examining Copyright Liability for Cloud–Based Music Locker Services,* 14 Vand. J. Ent. & Tech. L. 729, 746–48 (2012).

**FN1.** A "Slingbox" is a set-top box that permits consumers to shift their television programming to their portable devices. Slingbox describes its service as "placeshifting": "Placeshifting is viewing and listening to live, recorded or stored media on a remote device over the Internet or a data network. Placeshifting allows consumers to watch their TV anywhere." *See Placeshifting,* Slingbox.com, http://www.slingbox.com/get/placeshifting (last visited March 5, 2013). The Slingbox thus enables a consumer to view on a remote device content that he is already entitled to receive from a licensed cable company or other authorized source to view on his television.

**FN2.** Aereo's contention that each subscriber has an individual antenna is a fiction because the vast majority of its subscribers are "dynamic users" who are randomly assigned an antenna each time they

**Exhibit 1, Page 50**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

use the system. Although each antenna is used only by one person at a time, it will be randomly assigned to another person for the next use. In other words, this is a shared pool of antennas, not individually-designated antennas.

FN3. Aereo's web page does contain a conspicuous notice under the "Watch" button that reads, "When you press 'Watch' you will start recording this show." Users thus have no choice but to record the show if they wish to watch it live, making it unlikely that the subscribers are voluntarily "ordering that system to produce a copy ." *Cablevision,* 536 F.3d at 131.

FN4. By opposing the grant of certiorari, the government was not embracing *Cablevision's* construction of the transmit clause. To the contrary, the United States took the position that "scattered language in the Second Circuit's decision could be read to endorse overly broad, and *incorrect,* propositions about the Copyright Act." U.S. *Cablevision* Amicus Br., *supra,* at 6 (emphasis added). Specifically, the government was concerned with the suggestion "that a performance is not made available 'to the public' unless more than one person is capable of receiving a *particular* transmission" because it might "undermine copyright protection in circumstances far beyond those presented here, including with respect to ... situations in which a party streams copyrighted material on an individualized basis over the Internet." *Id.* at 20–21. Despite these "problematic" aspects, *id.* at 22, the United States considered *Cablevision* an "unsuitable vehicle" for deciding these issues, due to the absence of any conflicting circuit court decisions at the time and the limitations imposed by the parties' stipulations, *id.* at 6.

FN5. There are companies in the market that stream television programming over the Internet pursuant to licenses, such as Hulu, Netflix, Amazon, and channel-specific websites like ComedyCentral.com. *See* Appellant WNET Br. at 12, 28, 43; Amicus Br. of Paramount Pictures Corp. et al. at 29. In general, however, these "negotiated Internet retransmissions ... typically delay Internet broadcasts as not to disrupt plaintiffs' broadcast distribution models, reduce the live broadcast audience, or divert the live broadcast audience to the Internet." *WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 285 (2d Cir.2012).

FN6. In *ASCAP,* we left open "the possibility ... that a transmission could constitute both a stream and a download." *United States v. Am. Soc'y of Composers, Authors, Publishers (ASCAP),* 627 F.3d 64, 74 n. 10 (2d Cir.2010). While streaming performances over the Internet constitutes a transmission "to the public," *see ivi, Inc.,* 691 F.3d at 278–79; *ASCAP,* 627 F.3d at 74, allowing a consumer to download a copy so he can later play it back for himself does not, *see ASCAP,* 627 F.3d at 73, 75; *Cablevision,* 536 F.3d at 139. To the extent that Aereo's system immediately plays back from a copy that is still being recorded, it is clearly "both a stream and a download," *ASCAP,* 627 F.3d at 74 n. 10, and at a minimum the streaming portion constitutes an unlicensed public performance. If 50,000 Aereo subscribers choose to "Watch" the Super Bowl live, each subscriber receives a "performance or display" of the exact same broadcast on a seven-second delay, even if Aereo is also simultaneously creating a unique copy for each subscriber so that each one has the option to pause, rewind, or save the copy for later if they wish. Until the subscriber exercises that option, the existence of the copy is irrelev-

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

ant; the broadcast is streaming "live" to
each user at the same time just as it did in
*ivi.*

C.A.2 (N.Y.),2013.
WNET, Thirteen v. Aereo, Inc.
--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.))

END OF DOCUMENT

**Exhibit 1, Page 52**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.