UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY INC., TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>DISH NETWORK, L.C.C. and DISH NETWORK CORP.,<br><br>Defendants. | Case No. CV 12-04529 DMG (SHx)<br><br>**ORDER RE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RE DISH'S NEW 2013 SERVICES**<br><br>**[REDACTED VERSION]** |

    This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction re Dish's New 2013 Services [Doc. #129]. The Court has duly considered the parties' arguments and submissions in support of and in opposition to the Motion. For the reasons set forth below, Plaintiff's Motion is **DENIED**.

# I.
# FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc. ("Fox"), initiated this action against Defendants, Dish Network, LLC, Dish Network Corp., and EchoStar Technologies, LLC ("Dish") on May 24, 2012 [Doc. # 1]. On November 7, 2012, the Court denied Fox's first motion for a preliminary injunction, which sought to enjoin Dish's new 2012 services, "PrimeTime Anytime" ("PTAT") and "AutoHop." *See Fox Broad. Co., Inc. v. Dish Network, LLC*, 905 F. Supp. 2d 1088 (C.D. Cal. 2012) [Doc. # 118]. A description of the parties and their long-standing business relationship is set forth in detail in that order, and the Court need not repeat it here. On February 21, 2013, Fox filed a First Amended Complaint [Doc. ## 135, 138] and this second Motion for Preliminary Injunction. Dish filed an Answer on March 12, 2013 [Doc. ## 151, 152].

## A.   Dish's 2013 Services

Fox filed the instant motion on February 21, 2013, after Dish publicly announced its new services on January 10, 2013. (Decl. of David Singer ¶ 2 [Doc. # 130-2].) The new services, "Dish Anywhere" and "Hopper Transfers" (together, the "2013 Services"), use Dish's "Sling Technology" to allow subscribers to view live and recorded television, including the Fox programs, on Internet-enabled remote devices such as smart phones and tablets.[1] This type of service, which allows viewers to watch live broadcast streams on multiple platforms, is often referred to as "Multiscreen Live Linear Platform" or "MLLP." (Decl. of Richard Rapp ¶ 27 [Doc. # 167].) The services are available on Dish's "second generation" Hopper DVR set-top box, "Hopper with Sling," which has all of the capabilities of the original Hopper as well as Sling technology built into the box itself. (Singer Decl. ¶ 3.) Like the original Hopper, Hopper with Sling receives the Fox

---

[1] A laptop can access content from a Sling-enabled DVR via the "SlingPlayer" browser plugin. (Horowitz Decl. ¶ 9.)

broadcast via satellite signal from an external dish antenna. (Decl. of Paul Horowitz ¶ 7 [Doc. # 157-1].)

### 1. Sling Technology

Sling technology was introduced in 2005 by Sling Media, which Dish later bought in 2007. (Decl. of David Kummer ¶¶ 8, 10 [Doc. # 166].) Sling can connect to most audiovisual equipment, including televisions, set-top boxes, DVRs, and DVD players. (*Id.* ¶ 8.) Today, Sling allows users to watch live or recorded content remotely when they load the Sling software onto their remote devices. (*Id.* ¶ 17.) Using a combination of local hardware and remote software, Sling technology "transcodes" video content from its source—the DVR set-top box—and transmits it to remote devices over the Internet. (*Id.*) The first Sling product was the "Slingbox placeshifter," which is still on the market. (*Id.* ¶ 8.) This product, a standalone "box," can be purchased in many retail outlets and connects to most audiovisual equipment. (*Id.*) It allows users to remotely activate and watch live or recorded content from their television on remote devices via wireless Internet connection. (*Id.*) Dish has released several models of the Slingbox since 2005. (*Id.* ¶ 14.)

In 2009, Dish began to incorporate Sling technology into its DVRs. (Kummer Decl. ¶ 11.) In January 2009, Dish released the first DVR with built-in Sling hardware, the ViP922 SlingLoaded DVR.[2] (*Id.*) The SlingLoaded DVR allowed users to "watch

---

[2] Fox presents evidence that, on average, between October 15 and November 30, 2012, ▇▇ ViP922 DVRs were in use each day. (Singer Decl. ¶ 21, Ex. K.) Dish submitted copious objections to nearly every piece of evidence filed by Fox [Doc. #65]. "[I]n the preliminary injunction context, the Court is not strictly bound by all rules of evidence." *Ticketmaster L.L.C. v. RMG Techn.*, 507 F. Supp. 2d 1096, 1103 n.2 (C.D. Cal. 2007) (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). The Court has considered Dish's evidentiary objections and will address them where necessary. *See also Rosen Entm't Sys., LP v. Icon Enters, Inc.*, 359 F. Supp. 2d 902, 905 (C.D. Cal. 2005) (exercising discretion to consider inadmissible but reliable evidence in the context of a preliminary injunction). Dish objects to the VIP922 evidence on the basis that Fox's characterization of this evidence is misleading and vague, lacks foundation, and is improper lay opinion. The spreadsheet was apparently provided by Dish in opposition to a preliminary injunction motion brought in a different case. The Court does not find this evidence is conclusive of the prevalence of VIP 922 DVRs in the

and control" television programming "from anywhere in the world via a broadband Internet connection on their laptop or mobile phone." (*Id.*, Ex. 3.) In November 2010, Dish introduced the "Sling Adapter," a standalone product that connects by USB port to certain Dish DVRs to provide Sling functionality. (*Id.* ¶ 12.) The Sling Adapter is fully compatible with the original Hopper and an earlier Dish DVR box, the ViP722 DVR. (*Id.* ¶ 13.) The Hopper with Sling, however, has eliminated the need for a separate device by placing the Sling technology directly inside the set-top box. (*Id.* ¶ 6.)

### 2. Dish Anywhere

"Dish Anywhere" is a mobile access application that uses Sling technology to allow subscribers to watch live and recorded television from any location on remote devices, as long as the device is connected to the Internet. (Kummer Decl. ¶ 6.) Users can also use Dish Anywhere to manage their recordings on the Hopper with Sling, including watching, deleting, or ordering the creation of recordings as they normally would with a remote control in their living room. (*Id.* ¶ 7.) Dish Anywhere is free to Dish subscribers who purchase the Hopper with Sling. To activate Dish Anywhere, the user must download the software onto her remote device and launch the application on that device. (Horowitz Decl. ¶ 9.)

Once Dish Anywhere is activated, the user can watch live broadcast television on her remote device. She can watch the same channel as someone watching on the main television at home, or she can tune into another station if one of the four Hopper tuners is available. (Kummer Decl. ¶ 24.) In addition, the user can watch DVR-recorded content that is stored on the Hopper, or select content to be recorded on the Hopper in the future. (*Id.*) No copies are made to facilitate the remote viewing via Dish Anywhere. (*Id.* ¶ 20.) The content is transferred via Internet directly from the Hopper with Sling to the remote device—it is not stored in and does not pass through any central server. (*Id.* ¶¶ 16-19.)

---

market in late 2012, but it merely considers it as some evidence that use of the ViP922 DVR ▮▮▮▮ ▮▮▮▮ as of late 2012.

AutoHop, one of the features at issue in Fox's last preliminary injunction motion, does not function on Dish Anywhere. (*Id.* ¶ 13.)

### 3. Hopper Transfers

"Hopper Transfers" allows Dish customers to copy pre-recorded programs from their DVRs to Apple iPad tablets so they can be viewed "on the go." (Kummer Decl. ¶ 26.) Like Dish Anywhere, Hopper Transfers is free to those who subscribe to Dish and purchase the Hopper with Sling. (*Id.*) To activate Hopper Transfers, the Dish customer must download a free Hopper Transfers application ("app") from the Apple Online Store. (*Id.*) The app "pairs" the iPad with the customer's Hopper with Sling using the home wireless network. The customer can then use his or her home wireless network to copy recordings from the Hopper with Sling onto the iPad. Multiple iPads can be paired with a single Hopper with Sling. (*Id.* ¶ 28.) AutoHop does not function with recordings viewed remotely via Hopper Transfers or other Sling products. (*Id.* ¶ 25.) A Hopper Transfers-enabled iPad must reconnect via wireless Internet with the Hopper with Sling at least once every 30 days to verify the user's Dish subscription—if the iPad stays disconnected for too long, the recordings stored on it are deleted. (*Id.* ¶ 28.)

### B. The RTC Agreement and 2010 Letter Agreement

Dish's right to retransmit the Fox broadcast is governed by the Retransmission Consent ("RTC") Agreement, which Fox entered into in 2002 with EchoStar Satellite Corporation, Dish's former parent company and current technology provider. (Decl. of Michael Biard ¶ 14, Ex. A [Doc. # 130-7].) For a substantial fee, the RTC Agreement grants Dish a non-exclusive right to retransmit the Fox broadcast to its subscribers over its local satellite service. (*Id.* ¶ 2.) Dish's rights under the RTC Agreement are limited in several ways. First, the retransmission consent clause states that Dish [REDACTED] ("Ownership Clause.")

(*Id.*) The RTC Agreement also contains a prohibition on authorizing others to retransmit the Fox broadcast except as specifically permitted by the contract:

> EchoStar shall not, for pay or otherwise, record, copy, duplicate, and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of any Station's Analog Signal without prior written permission of the Station, except as is specifically permitted by this Agreement. ["No Copying Clause."]

(*Id.* ¶ 9(a).

The parties have amended the RTC Agreement several times, most recently in 2010 ("2010 Letter Agreement"). (Biard Decl. ¶ 19, Ex. B.) The 2010 Letter Agreement Supplements the RTC Agreement with, among other things, a clause on "Other Technologies":



(*Id.* at 37.) Fox argues that the 2013 Services are in violation of these clauses.

In support of its motion, Fox submits the declaration of Sherry Brennan, Fox Cable Network Services, LLC Senior Vice President, Distribution & Strategy, in support of its assertion that irreparable harm to Fox will result in the absence of an injunction. (*See generally* Decl. of Sherry Brennan [Doc. # 130-8].) Brennan identifies several categories of harm that, based on her 24 years of experience working in the broadcast television industry, she asserts will befall Fox in the absence of an injunction. (*See id.* ¶ 22.) In response, Dish submits the declaration of Richard Rapp, an economist and special consultant at NERA Economic Consulting, an international consulting firm. (Decl. of Richard Rapp ¶ 3 [ Doc. ## 157-5, 167].) In the last decade, Rapp has written and spoken extensively on technology, innovation, and economics. (*See id.* ¶ 3, Ex. 1.)

## II.
## LEGAL STANDARD

The Court articulated the legal standard governing the issuance of preliminary injunctions in its previous order denying Fox's initial motion for preliminary injunction. [Doc. # 118 at 9-10.] In deciding the present motion, the Court applies the same standard.

## III.
## DISCUSSION

Although historically a showing of a reasonable likelihood of success on a copyright infringement claim raised a presumption of irreparable harm, that presumption no longer exists. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) (rejecting the rule that "an injunction automatically follows a determination that a copyright has been infringed" and finding that the circuit court's application of that "categorical rule" to grant an injunction was improper); *see also Winter*, 555 U.S. at 22 (emphasizing that a party seeking a preliminary injunction must demonstrate that irreparable injury is *likely*); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995-996 (9th Cir. 2011) ("presuming irreparable harm in a copyright infringement case is inconsistent with, and disapproved by, the Supreme Court's opinions in *eBay* and *Winter*"). Thus, a plaintiff must establish "a significant threat of irreparable injury" to obtain preliminary injunctive relief. *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985). If a plaintiff fails to establish that a significant threat of irreparable harm exists, the Court need not reach the likelihood that he would be successful on the merits of his claims. *Id.*; *see also Siegel v. Le Pore*, 234 F.3d 1163, 1176 (11th Cir.2000) ("The absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."); *Jumbo Bright Trading Ltd. v. Gap, Inc.*, Case No. CV 12-08932, 2012 WL 5289784 at *2 (C.D. Cal. Oct. 25, 2012) (denying

temporary restraining order in a trademark case based where the plaintiff failed to establish irreparable harm).

Economic injury alone will not support a finding of irreparable harm because it can generally be remedied by money damages. *See Pyro Speculators North, Inc. v Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal, 2012) (citing *Rent-A-Center, Inc. v. Canyon Telev. and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). Because breach of contract is generally compensable by money damages, a preliminary injunction will rarely arise out of contract absent evidence of specific intangible injuries that are likely to stem from that breach. *See Rent-A-Center*, 944 F.2d at 603. Although "intangible injuries, such as damages to reputation, ongoing recruitment efforts and goodwill, qualify as irreparable harm," *id.*, it must be likely that the harms will actually befall the plaintiff in the absence of injunction. *See Winter*, 555 U.S. at 19; *Oakland Tribune*, 762 F.2d at 1376. District courts in this circuit have recognized that harms such as loss to advertising revenue, harm to existing licensing agreements, and loss of control over the dissemination of copyrighted works can, under certain circumstances, constitute irreparable harm. *See Fox Television Stations, Inc., et al. v. BarryDriller Content Sys., PLC, et al.*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012); *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011). The Second Circuit has also found that similar intangible injuries can support the issuance of a preliminary injunction. *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285-86 (2d Cir. 2012).

As noted above, Fox submits the declaration of Sherry Brennan, Senior Vice President for Distribution Strategy & Development, as evidence of the irreparable harms it claims are likely in the absence of an injunction.[3] (Brennan Decl. ¶ 1.) Brennan

---

[3] Dish objects to much of the Brennan Declaration on the basis that her assertions lack foundation, are speculative and/or irrelevant, or constitute improper lay opinion. First, given Brennan's background and position with Fox, she is qualified to discuss the nature of Fox's business, its contractual relationships with other companies in the television market, and the market for Fox's programs. Second, to the extent any of Brennan's assertions are irrelevant or speculative, the Court addresses them in this Order or has not relied on those assertions in reaching its conclusions.

identifies four major types of harm that, according to Fox, are likely to befall Fox in the absence of an injunction: (1) harm to Fox's ability to negotiate RTC agreements and licensing agreements with other providers; (2) loss of revenue from providers of remote viewing and digital downloads; (3) loss of control over its copyrighted works; (4) increased risk of piracy and security threats; and (5) substantial loss of advertising revenue and harm to Fox's negotiating power with advertising partners. (*See generally* Brennan Decl.)

In opposition, Dish submits the declaration of Richard Rapp, an economic and consultant to NERA Economic Consulting, an international economic consulting firm. (Rapp Decl. ¶ 3.) The thrust of Rapp's declaration is that the harms Fox fears are either unlikely to come to fruition prior to trial or can be compensated by money damages. The Court addresses each alleged harm, and Dish's response, in turn.

### A.  Harm to Fox's Existing Business Relationships

Fox first asserts that if Dish is allowed to offer the 2013 Services without its consent, other multi-channel video programming distributors ("MVPDs") that compete with Dish and with whom Fox also has RTC agreements will demand the same rights or other concessions to mitigate the risk of losing subscribers to Dish. (Brennan ¶ 22.)

In response, Dish argues that, because many MLLP services are already on the market, any possible loss in bargaining power is either unlikely or can be easily measured. Dish points out that Time Warner Cable, another MVPD, introduced a MLLP service in 2009 that continues to offer certain cable channels via Internet streaming today. (Rapp ¶ 27.) According to Rapp, "[m]ost major MVPDs launched [MLLPs] for tablets and phones in 2010 and 2011 making it possible to access channel lineups using alternative devices," and that functionality was extended to computers in 2012. (*Id.* ¶ 28.) Although Time Warner's announcement initially prompted a lawsuit by Viacom, the parties evidently settled their dispute. (*Id.* ¶ 28 n.58; *see* "Time Warner Cable, Viacom Settle Multiscreen Spat," http://www.multichannel.com/content/time-warner-cable-viacom-settle-multiscreen-spat (May 21, 2012).) Many of the MLLP services on the

market offer only cable stations, not broadcast like Fox's stations, but their presence on the market suggests that the value of the 2013 Services—and any alleged damage they cause between now and trial—can be calculated in a sum certain for damages purposes.

Fox contends that Dish's competitor MVPDs will only "demand the same rights or other concessions" if the 2013 Services are found to be unlawful. (Brennan Decl. ¶ 22.) In the interim, Fox presents no compelling evidence that other MVPDs will demand rights that are yet to be established rather than wait to see the result of this litigation before altering their contracts with Fox.

Fox made a similar argument about harm to business relationships in *BarryDriller*, arguing that its existing RTC Agreements with authorized MVPDs would be threatened by the defendants' unlawful streaming of the Fox broadcast over the Internet. 915 F. Supp. 2d at 1147. Similarly, in *WPIX*, the court found that the defendant's unlawful retransmission of copyrighted programming could reduce the value of "live" viewing and harm the plaintiff's relationships with legitimate retransmittors. 691 F.3d at 285. In those cases, however, the defendants had no preexisting business relationship with Fox, and therefore their services were available to anyone with access to the Internet, not merely their already paying subscribers. *See* 915 F Supp. 2d at 1147. Here, the 2013 Services, while free, are available only to paying Dish subscribers, and Dish's relationship with Fox is already defined and monetized under the RTC Agreement. Thus, because the 2013 Services are available only as an add-on to paid satellite television subscriptions, they do not threaten to "diminish[] the value" of the Fox programs as did the services offered in *BarryDriller* and *WPIX*. *WPIX*, 691 F.3d at 285. If Fox prevails on its claims, damages are calculable.

**B.  Loss of Revenue From Remote Viewing and Digital Downloads**

Next, Fox asserts that it is likely to lose revenue from digital download services like Amazon.com and Apple iTunes, which are similar to the offerings of Hopper Transfers. (Brennan Decl. ¶ 24.) These companies sell to consumers copies of programs that can be downloaded onto mobile devices and watched outside the home, an offering

which, according to Brennan, Hopper Transfers threatens to completely supersede. (*Id.*) Fox also fears that the 2013 Services will threaten the success of Fox.com and dyle.tv, a service currently offered jointly by Fox and NBC that provides free online streaming of the two stations' programming. (*Id.* ¶ 23.)

Dish points out that products similar to the 2013 Services have been widely available for several years, and therefore the 2013 Services can be valued by comparison to preexisting contracts and market prices. (Rapp Decl. ¶ 45.) For example, the company TiVo has allowed users to download programs from their DVRs onto computers for remote viewing since 2005 (*Id.* ¶ 15), and DirecTV's Nomad has allowed similar downloading to remote devices since October 2011 (*Id.* ¶ 17.) Fox does not explain why its own Digital Download contracts with companies like Apple could not serve as benchmarks in calculating any damages caused by the 2013 Services. Moreover, because dyle.tv is free for viewers, it is unclear how a shift away from that service would harm Fox's revenue, especially because viewers using the 2013 Services are exposed to the same advertisements that they are shown on television or via dyle.tv. To the extent Fox's investment of resources and marketing into dyle.tv might suffer, it is unclear that this harm would be uniquely caused by the 2013 Services in light of the many remote viewing services already on the market. (*See* Rapp Decl. ¶¶ 15, 17.) Moreover, Fox does not refute that MLLP viewing increases viewership, and that historically, increased viewership can enhance viewer loyalty and increase revenue. (Rapp Decl. ¶¶ 72-73.)

C. <u>Loss of Control</u>

Fox next asserts that its "most important and valuable right" is its ability to control "the timing and manner in which its copyrighted programs are distributed." (Brennan Decl. ¶ 25.) Fox argues that the 2013 Services have "wrested control away from Fox" and threaten "the carefully managed and tightly controlled distribution ecosystem that is central to Fox's business model." (*Id.* ¶ 29.) Although the court in *WTV Sys.* recognized the loss of control as a potentially irreparable harm, that case is distinguishable from the present case. *See* 824 F. Supp. 3d at 1012. First, as in *BarryDriller*, the defendants in

*WTV Sys.* had no preexisting contractual relationship with the plaintiffs, so their services operated entirely "without the normal licensing restrictions" imposed on licensed partners. *Id.* Thus, their service was available to anyone with Internet access who could pay the service's low fee, unlike here, where only paying Dish subscribers can access the services. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) (finding irreparable harm from loss of control where the defendant was inducing "far more infringement than it could ever possibly redress with damages"). Here, that Fox and Dish already have an RTC Agreement suggests that any loss of control can be more readily remedied because the number of users is limited and ascertainable. In addition, as noted above, the wide variety of similar services available to consumers will facilitate the calculation of any damages, if necessary.

**D.      Increased Piracy and Security Risks**

Fox also asserts that, because the 2013 Services are not authorized by Fox, they are not sufficiently protected from piracy and other online security risks that could threaten the Fox content. (Brennan Decl. ¶ 30.) This claim is somewhat similar to the harm to quality recognized in *WTV Sys.*, where the defendant's low-quality offering threatened to tarnish customers' perception of the video-on-demand service it imitated. *See WTV Sys.*, 824 F. Supp. 2d at 1014. In *WTV Sys.*, the plaintiffs identified specific substandard attributes of the defendants' product that threatened to confuse consumers as to the nature and quality of video-on-demand content. *Id.*

According to Dish, the 2013 Services can only be accessed by customers with verified Dish accounts, and that the Hopper with Sling periodically verifies this information to ensure access to the particular Hopper in use. (Kummer Decl. ¶ 24.) Sling hardware encrypts content to protect against piracy, and neither of the new services allows users to make copies that can be duplicated or transferred beyond what is immediately authorized. (*Id.*) Moreover, even authorized viewers can use Sling only in a limited manner—a maximum of four tuners limits the number of devices, including televisions, which can be streaming content at any given time. (*Id.*) Although Brennan

points to security "procedures and technical standards" that Fox normally imposes upon properly licensed services, she does not identify any specific procedures or standards that Dish has not already implemented. (Brennan Decl. ¶ 30.) Without more detailed facts as to why the 2013 Services present a threat to security or piracy, Fox's conclusory assertions are insufficient to establish that this fear is anything more than speculation.

E.  **Loss of Advertising Revenue**

Finally, Fox asserts that the 2013 Services are certain to impair Fox's ability to negotiate favorable sales agreements with television advertisers. (Brennan Decl. ¶ 16.) Fox explains that advertising time is valued based on the "C3" metric generated by Nielsen, which does not currently include out-of-home viewing such as Internet streaming. (*Id.* ¶ 17.) According to Fox, because the 2013 Services will divert viewers from traditional viewing to Internet-based viewing, they will inhibit Fox's efforts to ascertain an accurate demographic profile of its audience, which will further erode advertising value. (*Id.* ¶ 18.) Without a consistent flow of advertising revenue, Fox claims that, ultimately, it would be forced to offer its original programming exclusively through cable, which would harm the many "broadcast-only households" that rely on broadcast television. (*Id.* ¶¶ 19-20.)

Dish counters that, although Nielsen does not currently capture all data relevant to valuing advertising time, other entities compensate for that gap and adequately capture trends in television viewing and, by extension, advertising value. (Rapp Decl. ¶¶ 39-41.) Moreover, Nielsen has announced it will measure viewership delivered through online connections beginning in fall 2013. (*Id.* ¶ 42.) At oral argument, Fox contended that this plan is merely speculative and does not alleviate the risk that advertising values will go down as more viewers watch programming on remote devices. While this may be true, Nielsen's pledge at least demonstrates that the trend in viewing practices is not going unnoticed, and it strongly suggests that the entities that gather advertising data are ready and willing to adapt to the new landscape. Fox's prediction of falling advertising value

without the ability to accurately calculate damages is not adequately supported by the record.

### F. Other Considerations

In addition to the differences between this case and *BarryDriller*, *WTV Sys.*, and *WPIX*, several other distinctions are worth noting. First, both *WPIX* and *BarryDriller* relied, in part, on the likelihood that the defendants would ultimately be unable to satisfy a substantial damages award. *See WPIX*, 691 F.3d at 286; *BarryDriller*, 2012 WL 6784498 at *6. In contrast, here, neither party asserts that Dish would be unable to pay a money judgment if necessary, and indeed, Dish's financial health appears far more secure than that of the defendants in *BarryDriller* and *WPIX*. Moreover, unlike here, the defendants in *BarryDriller* and *WTV Sys.* presented little or no evidence to refute the plaintiffs' claims regarding irreparable harm. *See* Opp'n to Mot. for Prelim. Inj. at 19-20, *BarryDriller*, 915 F. Supp. 2d 1138, ECF No. 46; Opp'n to Mot. for Prelim. Inj. at 16-21, *WTV Sys.*, 824 F. Supp. 2d 1003, ECF No. 32. Finally, it is undisputed that Sling-enabled devices have been available on the market since 2005, albeit in various forms and perhaps limited numbers. (*See* Kummer Decl. ¶ 8.) Despite this, Fox points to no evidence that Sling has already harmed its business or, beyond the word of its own executive, that the 2013 Services are uniquely threatening. Fox criticizes the Rapp declaration as speculative, but Rapp's assessment of the facts is no more speculative than Brennan's. *See Dotster, Inc. v. Internet Corp. for Assigned Names & Nos.*, 296 F.Supp.2d 1159, 1163-64 (C.D.Cal.2003) ("Although the loss of goodwill and reputation are important considerations in determining the existence of irreparable injury, there must be credible and admissible evidence that such damage threatens Plaintiff's businesses with termination."). It is Fox, not Dish, which bears the burden of establishing a likelihood of irreparable harm. *See Winter*, 555 U.S. at 19.

The Court acknowledges that harms to goodwill, reputation, security, and control can, in some circumstances, constitute irreparable harm warranting an injunction. *See Rent-A-Center*, 944 F.2d at 603. On the present record, however, Fox has not met its

burden of showing that such harm is likely in the absence of an injunction between now and trial, even assuming that Fox is likely to succeed on the merits of its claims. Accordingly, a preliminary injunction is not appropriate. *See Oakland Tribune*, 762 F.2d at 1376.

## IV.
## CONCLUSION

In light of the foregoing, Fox's Motion for Preliminary Injunction is **DENIED**. Given that this Order quotes from the parties' confidential agreements, which have been filed under seal, within seven days from the date of this Order, the parties shall meet and confer regarding which portions of this Order, if any, they propose to be redacted such that the Court may issue a redacted version of the Order. The parties shall file a Joint Report with the Court by no later than October 3, 2013 regarding the proposed redacted version of the Order. The parties shall include in their Joint Report a status update regarding the case and whether a Scheduling Conference should be calendared.

**IT IS SO ORDERED**.

DATED: September 23, 2013

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE