1   MARK A. LEMLEY (SBN 155830)
    mlemley@durietangri.com
2   MICHAEL PAGE (SBN 154913)
    mpage@durietangri.com
3   DURIE TANGRI LLP
    217 Leidesdorff Street
4   San Francisco, California  94111
    Tel:  +1-415-362-6666
5
    Attorneys for Defendants DISH Network L.L.C.,
6   DISH Network Corp., and EchoStar Technologies
    L.L.C.
7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  FOX BROADCASTING COMPANY,            Case No. CV12-04529 DMG (SHx)
    *et al.*,
                                         **DISCOVERY MATTER**
12            Plaintiffs,
                                         **DECLARATION OF MICHAEL
13       v.                              H. PAGE IN SUPPORT OF JOINT
                                         STIPULATION FOR
14  DISH NETWORK L.L.C. *et al.*,        DEFENDANT'S MOTION TO
                                         COMPEL PRODUCTION OF
15            Defendants.                DOCUMENTS IN RESPONSE TO
                                         REQUEST FOR PRODUCTION
16                                       NO. 3 (SET ONE)

17                                       **[LOCAL RULE 37-2.1]**

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF MICHAEL H. PAGE

I, Michael H. Page, declare and state as follows:

1. I am a member of the bar of the State of California, admitted to appear before this Court, and an attorney with the law firm of Durie Tangri LLP, attorneys of record for DISH Network L.L.C. and DISH Network Corp. (collectively, "DISH"), and EchoStar Technologies L.L.C. ("EchoStar", collectively "Defendants"). I am familiar with the events, pleadings and discovery in this action and, if called upon as a witness, I could and would testify competently to the matters stated herein of my own personal knowledge.

2. I submit this declaration in support of the Joint Stipulation for Defendant's Motion to Compel Production of Documents in Response to Request for Production No. 3 (Set One).

3. For the affiliate and retransmission consent agreements responsive to Request No. 3, which are the subject of Defendants' motion to compel, Fox has not indicated that it is withholding responsive documents because it cannot secure the approval from the other parties to these agreements.

4. Attached hereto as **Exhibit 1** is a true and correct copy of a letter from William Molinski to David Singer, dated November 29, 2012.

5. Attached hereto as **Exhibit 2** is a true and correct copy of a letter from David Singer to William Molinski, dated December 10, 2012.

6. Attached hereto as **Exhibit 3** is a true and correct copy of a letter from David Singer to William Molinski, dated January 22, 2013.

7. Attached hereto as **Exhibit 4** is a true and correct copy of a letter from Michael Page to David Singer, dated June 18, 2013.

8. Attached hereto as **Exhibit 5** is a true and correct copy of a letter from David Singer to Michael Page, dated June 21, 2013.

9. Attached hereto as **Exhibit 6** is a true and correct copy of a letter from David Singer to William Molinski, dated July 5, 2013.

1        10.    Attached hereto as **Exhibit 7** is a true and correct copy of a letter from

2    Michael Page to David Singer, dated October 30, 2013.

3        11.    Attached hereto as **Exhibit 8** is a true and correct copy of a letter from

4    David Singer to Michael Page, dated November 11, 2013.

5        12.    Attached hereto as **Exhibit 9** is a true and correct copy of a letter from

6    David Singer to William Molinski, dated February 10, 2014.

7        13.    Attached hereto as **Exhibit 10** is a true and correct copy of a letter

8    from William Molinski to David Singer, dated February 20, 2014.

9        14.    Attached hereto as **Exhibit 11** is a true and correct copy of a letter

10   from David Singer to William Molinski, dated March 6, 2014.

11       15.    Attached hereto as **Exhibit 12** is a true and correct copy of a letter

12   from William Molinski to David Singer, dated March 7, 2014.

13       16.    Attached hereto as **Exhibit 13** is a true and correct copy of Plaintiffs'

14   Initial Disclosures, served on September 21, 2012.

15       17.    Attached hereto as **Exhibit 14** is a true and correct copy of Plaintiffs'

16   First Supplemental Initial Disclosures, served on October 10, 2012.

17       18.    Attached hereto as **Exhibit 15** is a true and correct copy of Plaintiffs'

18   Second Supplemental Initial Disclosures, served on January 22, 2013.

19       19.    Attached hereto as **Exhibit 16** is a true and correct copy of an excerpt

20   of the Reporter's Transcript of Proceedings Motion Hearing, dated April 19, 2013.

21       20.    Attached hereto as **Exhibit 17** is a true and correct copy of

22   Defendants' First Set of Interrogatories to Fox Broadcasting Company, Inc., served

23   October 21, 2013.

24       21.    Attached hereto as **Exhibit 18** is a true and correct copy of Plaintiffs'

25   Fox Broadcasting Company's Objections and Responses to Dish's First Set of

26   Interrogatories, served November 25, 2013.

27       22.    Attached hereto as **Exhibit 19** is a true and correct copy of a GenieGO

28   Manual.

1    I declare under penalty of perjury under the laws of the United States that the

2    foregoing is true and correct.

3    Executed this 15th day of May, 2014, at San Francisco, California.

4

5

6    _____

Michael H. Page

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1



ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

November 29, 2012

William A. Molinski
(213) 612-2556
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
663 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:   *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et anno*, Case No. CV 12-04529 DMG (SHx)

Dear David:

This letter concerns Plaintiffs Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings' (collectively "Fox") objections and responses to DISH's first set of requests for production.

In stark contrast to the 100+ requests for production propounded by Fox to date, DISH propounded a discrete 16 requests on Fox. Given the expansive volume and categories of documents requested by Fox, not to mention that Fox has already had the benefit of document production from DISH, the stonewalling in Fox's responses is surprising. Fox claims that it made a production with its responses, but that production consists of a mere few hundred pages. Fox unilaterally limited more than half of DISH's requests, including Request Nos. 1, 2, 4-8, 11, 12 and 15, and refused to produce documents in response to a quarter of DISH's requests, specifically Request Nos. 3, 9, 10 and 14. Fox has no legitimate basis for its refusal to produce documents. Fox must abide by its responsibilities as a litigant by participating in good faith in the discovery process. As we have stated multiple times before, discovery is not a one-way street. Now that we are past the preliminary injunction phase, Fox must begin complying with its obligations under the Federal Rules.

## Fox's Refusal to Provide Relevant Documents In Response to Request Nos. 3, 9, 10 and 14

Request No. 3 seeks the terms of Fox's affiliate and retransmission agreements. This bears directly on Fox's claimed damages and the issue of fair use. Fox claims that the AutoHop and PrimeTime Anytime DVR features undermine its entire business model and adversely impact markets for its copyrighted works under factor four of the fair use analysis. DISH is entitled to discovery on that business model and Fox's markets. Accordingly, DISH should be

Exhibit 1 - Page 4



ORRICK

David R. Singer, Esq.
November 29, 2012
Page 2

permitted to examine the terms on which Fox allows other MVPDs to retransmit its television signals. Fox cannot shield such directly relevant information on the markets for its copyrighted works from production by boilerplate assertions of privilege, confidentiality, and burden. These agreements with third-parties are not privileged. Any confidentiality objections are addressed by the protective order in place in this case. As to burden, Fox cannot reasonably contend that the production of such a specific set of documents is unduly burdensome. Please confirm that Fox will produce documents responsive to Request No. 3.

Request No. 9 seeks documents sufficient to identify those devices that Fox is aware of that permit consumers to record and play back Fox's primetime television programming, the features of those devices, and when and how Fox became aware of those devices. Relatedly, Request No. 10 seeks Fox's responses to such devices, including business agreements or legal actions. Documents responsive to these two requests are plainly relevant to the dispute. They will demonstrate that Fox's concerns of copyright infringement and its claimed damages are not genuine in light of the other similar devices available to consumers that Fox has not attempted to legally challenge in any way. For example, at her deposition, Ms. Brennan admitted that Fox was aware of DVRs by both DirecTV and TiVo that have similar capabilities as the Hopper. Fox's knowledge of these alternative devices and its failure to challenge or assert copyright infringement claims with respect to those devices are relevant to the liability and damages issues in this action. Fox cannot justify its refusal to produce these documents on the basis of privilege, burden, or confidentiality. DISH is not seeking the production of privileged documents and, to the extent that Fox determines that any of its responsive documents are privileged, then it can include those documents on a privilege log and not produce them. Fox's protestations of burden are unfounded. DISH is seeking a finite set of documents for a reasonable period of time. Fox has not presented any facts to demonstrate that the production of such documents would be unduly burdensome. Any confidentiality concerns are addressed by the protective order that was entered in this case. Please confirm that Fox will produce documents responsive to Requests No. 9 and 10.

Request No. 14 seeks Fox's organizational charts. Such charts are important for purposes of identifying potential witnesses and for an informed discussion of the custodians to be subject to electronic discovery. Fox's objections to this request are meritless. Organizational charts are not privileged. The production of such documents is not unduly burdensome. Moreover, such information is not confidential. Fox's complete refusal to produce organizational charts makes us doubt whether Fox intends to reasonably participate in the discovery process at all. Please confirm that Fox will produce documents responsive to Request No. 14.

Exhibit 1 - Page 5



ORRICK

David R. Singer, Esq.
November 29, 2012
Page 3

### Fox's Unilateral Narrowing of DISH's Request Nos. 1, 2, 4-8, 11, 12 and 15

Request No. 1 seeks documents showing Fox's knowledge of Sling, Hopper, PrimeTime, Anytime, or AutoHop. In response, Fox has agreed to produce only those documents that show "when Plaintiffs' first became aware of PrimeTime Anytime, AutoHop and Sling . . . ." This response is inadequate. First, Fox has not included documents relating to Hopper, the DVR device at issue, which are directly relevant to this dispute. Second, all documents demonstrating Fox's knowledge regarding the Hopper and its features, PrimeTime Anytime and AutoHop, as well as Sling, are relevant to the parties' claims here. Importantly, Fox's knowledge of the Hopper and its features likely expanded over time. For example, a document showing when Fox first became aware of the product or the features may only give the name of the product or feature. However, subsequent documents would show that Fox became aware of more than just the name, but also the relevant functionality. These further communications would contain relevant information about Fox's view of the devices and features, including but not limited to Fox's view of why the devices and features would be beneficial to Fox. Such documents are within the scope of what DISH has requested and must be produced by Fox. Fox's burden objection is unfounded given that the request is limited to four discrete products or features, three of which were released in 2012. Fox's additional objections of privilege and confidentiality are not proper bases for limiting Fox's production. Please confirm that Fox will produce all documents responsive to Request No. 1.

Request No. 2 seeks Fox's communications regarding DISH's PrimeTime Anytime or AutoHop features. Fox has placed unwarranted and inappropriate limitations on its response to the request, by which it has agreed to produce only those communications "concerning any actual or potential impact of PrimeTime Anytime and/or AutoHop on Plaintiff's advertising revenue, and or licenses for post-broadcast forms of content such as VOD or internet streaming . . . ." Fox brought this lawsuit to shut down these two DVR features that have been on the market for less than one-year's time. DISH is entitled to discovery of **all** of Fox's internal and external communications about the features, including but not limited to Fox's communications with advertisers and advertising agencies. Fox's attempt to narrow its response smacks of bad faith, and leads us to believe that Fox has relevant communications that it is trying to hide. Please confirm Fox will produce all documents responsive to Request No. 2.

Request No. 4 seeks documents sufficient to show television viewers of: (a) free over-the-air broadcast television; (b) subscription pay services; and (c) streaming or downloading via the internet or cellular transmission for the past seven years. In response, Fox claims that it has already produced responsive documents "sufficient to show the proportion and/or number of national viewers that watch free, over-the-air broadcast television." Fox further states that it will produce documents sufficient to show viewers of Fox Network via free, over-the-air broadcast

Exhibit 1 - Page 6



ORRICK

David R. Singer, Esq.
November 29, 2012
Page 4

television.  However, Fox has not agreed to produce any documents relating to (b) subscription
pay services or (c) streaming or downloading via the internet or cellular transmission.  This is a
critical omission of discoverable information directly relevant to factor four of the fair use
analysis.  Fox cannot claim that PrimeTime Anytime harm the markets for its copyrighted works
and then refuse to produce relevant information about those same markets.  The requested
documents are at the heart of the parties' dispute.  Fox's objection of burden rings hollow, given
the explicit limitation of the request to documents sufficient to show.  Further, the objection that
the information is confidential and proprietary is addressed by the protective order and is in
direct conflict with Fox's objection that the information is equally available to DISH.  Given that
Fox is willing to produce documents responsive to the first category, there is no reason why Fox
should not also produce documents responsive to the second and third categories.  Please
confirm that Fox will produce all documents responsive to Request No. 4.

    Request No. 5 seeks production of Fox's revenues from (a) network television
programming; (b) primetime network television programming; (c) network copyrighted content;
and (d) primetime network copyrighted content for the past seven years.  In response, Fox
represents that it has produced its revenues from the sale of commercial advertising, VOD
distribution, digital distribution, Fox-owned television stations, and Fox television station
affiliates for 2011 and 2012.  The request asks for seven years of such information.  In addition,
the information that Fox provided was only for primetime programming.  Fox redacted certain
information on the balance sheet that it produced and did not provide specific revenue and
expense information for non-primetime programming.  Moreover, Fox did not break down its
revenue per MVPD provider, as requested, nor did it break down the revenue for each type of
internet-based distribution.  Fox should provide more detailed information in response to
Request No. 5 and should produce the information without redaction for the last seven years,
which encompasses the time period that Sling has been on the market.  There is no basis for Fox
to redact financial information when there is a protective order in place in this action with
Attorneys Eyes Only protections.  Please confirm that Fox will produce all documents responsive
to Request No. 5.

    Request No. 6 seeks Fox's projections of expected revenues from the same four sources
included in Request No. 5:  (a) network television programming; (b) primetime network
television programming; (c) network copyrighted content; and (d) primetime network
copyrighted content for the past seven years.  Fox's response, that it will produce only those
projections that take into account PrimeTime Anytime and AutoHop, is wholly unacceptable.
DISH is entitled to documents that disprove Fox's claims as to adverse impact on the markets for
its copyrighted works.  Please confirm that Fox will produce all documents responsive to
Request No. 6.

Exhibit 1 - Page 7



ORRICK

David R. Singer, Esq.
November 29, 2012
Page 5

Request Nos. 7 and 8 seeks documents relating to Fox's distribution of content through VOD and internet streaming, respectively. Fox's claim that DISH's PrimeTime Anytime and AutoHop features compete with Fox's VOD and internet distribution channels is at the crux of Fox's copyright and contract allegations. Indeed, Fox has repeatedly called PrimeTime Anytime, in court filings and the media, "bootleg VOD." DISH is entitled to full discovery on the nature and terms of Fox's VOD offerings and its internet distribution of copyrighted content. Fox may not limit its production to those documents that "discuss or concern any impact of PrimeTime Anytime, AutoHop, and/or Sling on Plaintiff's [VOD or digital distribution] business." Such a limitation is patently inappropriate. DISH is entitled to more than a production of cherry-picked self-serving documents. Please confirm that Fox will produce all documents responsive to Request Nos. 7 and 8.

Request No. 11 seeks studies and reports regarding the effectiveness of commercial advertising in primetime programming and Fox's communications with advertisers regarding them. Fox has agreed to produce only those studies that relate to commercial skipping-technology. Yet, Fox's claims that the Hopper, with its PrimeTime Anytime and AutoHop features, will demolish the commercial based model of primetime television entitle DISH to discovery beyond just studies relating to commercial skipping technology. Studies that show that commercial advertising is not as effective today because, for example, people turn their attention to mobile devices during advertising segments is just as relevant as studies that discuss commercial skipping technology. Additionally, by way of example, studies regarding strategies for making advertising more effective would also relevant to Fox's claims in this case. To address Fox's objection of burden, DISH is willing to limit this request to reports and communications in the past seven years. Please confirm that Fox will produce all documents responsive to Request No. 11 for the past seven years.

Request No. 12 seeks third-party data regarding consumer viewing habits and device usage. Such data is critical to the evaluation of Fox's claim of impact to its advertising based business model, as well as its VOD and internet-distribution channels. Yet, Fox has only agreed to produce studies regarding DVR usage, such as its DVR impact reports (which have not yet been produced). Such a limitation prevents DISH from obtaining data regarding consumer viewing habits outside of this single segment, including but not limited to live viewing, VOD viewing, and internet viewing. This data is relevant to the claims at issue in this case and must be produced by Fox. To address Fox's objection of burden, DISH is willing to limit this request to data regarding consumer viewing of primetime programming, through any distribution channel, for the past seven years. Please confirm that Fox will produce documents responsive to Request No. 12 for the past seven years.

Exhibit 1 - Page 8



ORRICK

David R. Singer, Esq.
November 29, 2012
Page 6

Finally, Request No. 15 seeks documents and communications relating to the parties'
retransmission agreements. Fox has limited its response to a production of those documents that
"relate to the specific contract provisions at issue in this lawsuit." Such a limitation is too
narrow. DISH is willing to limit its request to those retransmission agreements at issue in this
lawsuit. However, any communication regarding those agreements and how the parties have
interpreted and performed their obligations in those agreements are relevant to the parties'
instant dispute. Please confirm that Fox will produce responsive documents relating to the
retransmission agreements at issue here.

**Fox's Meager Production To Date**

This case has been pending for six months, but to date Fox has produced a mere 373
pages of documents. This is contrasted with the nearly 9,000 pages of documents that have been
produced by DISH (DISH 000001-513, DISHvABC0000001-8142). While DISH is cognizant
of the complications of coordinating discovery between the various actions and is eager to work
with Fox on issues relating to e-discovery, these issues place far less of a burden on Fox than
they do on DISH. We look forward to continued receipt of documents from your rolling
production.

* * *

We would welcome the opportunity to discuss these issues with you at the conference of
counsel that you had initially proposed for this week. Please let us know what times you are
available during the week of December 3, 2012.

Very truly yours,

William A. Molinski

Exhibit 1 - Page 9

# Exhibit 2

**JENNER&BLOCK**

December 10, 2012

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel 213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel 213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinsky, Esq.
ORRICK, HERRINGTON &
 SUTCLIFF LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

Re:    ***Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al***
       **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Bill:

        This responds to your November 29, 2012 letter.  It is disingenuous for Dish to complain that Fox has somehow "stonewalled" Dish by producing only 373 pages of documents thus far in a case that has been "pending for six months."  To begin with, Fox *voluntarily* produced documents to Dish before filing its preliminary injunction motion (unlike Dish which was required to produce expedited discovery and then ordered to produce additional documents that had been withheld).  Dish served its first document requests four months into the case and, by agreement, Fox's written objections were only due on November 8.  Fox responded *early*, on November 7, produced additional documents, and has agreed to produce more documents on a rolling basis (2,233 additional pages are being produced today).  This is hardly "stonewalling." Moreover, this is *not* a case where discovery is going to be "symmetrical."  Dish is the one being accused of massive, willful copyright infringement on a nightly basis.  Dish's conduct – not Fox's conduct – is the focus of this lawsuit.  By contrast, Fox is the victim, seeking statutory damages, injunctive relief and disgorgement.

<u>**Dish's Document Requests to Fox**</u>

**Request Nos. 1 and 2:**

        Fox has considered Dish's position and will revise its response.  Fox will agree to produce all non-privileged documents showing its knowledge of the PTAT, AutoHop, Sling, and Hopper features at issue in this case including, but not limited to, internal and external communications discussing those features.

Exhibit 2 - Page 10

December 10, 2012
Page 2

**Request No. 3:**

Dish is only entitled to documents that are relevant to a claim or defense in the case, i.e., that have a tendency to prove or disprove a fact that is of consequence to the action. Fox alleges that PrimeTime Anytime and AutoHop threaten to irreparably harm its business by undermining the value of commercials on broadcast TV; disrupting Fox's own advertising; decreasing MVPD interest in future VOD deals; and making it harder for Fox to distribute and market its programs for non-linear distribution such as Internet streaming. Nothing in your letter articulates how the "economic terms" of Fox's retransmission consent agreements with hundreds of MVPDs over the past seven years are even remotely relevant to Fox's claims. Your blanket statement that Dish is "entitled to discovery on that business model and Fox's markets" doesn't quite cut it.

For one thing, this case has nothing to do with retransmission consent; Fox is suing Dish for breaching contractual restrictions against VOD or similar services and for unlawfully copying the Fox programming. Dish's retransmission of Fox television stations' signals is not at issue, nor is the retransmission of Fox's signal by any other MVPD.

Furthermore, the request covers several hundred agreements, each of which is subject to confidentiality and non-disclosure restrictions. Putting aside the lack of relevance, it would take an enormous amount of time to gather and review these agreements and to address hundreds of confidentiality objections by third parties. Moreover, these are among the most highly-confidential documents in Fox's business. They contain trade secrets and other business information that would severely damage Fox – and unfairly advantage Fox's competitors – if disclosed. The stipulated protective order does not adequately address these concerns because, among other things, it was never agreed to, and is not enforceable by, third parties with whom Fox contracts; it allows dozens of in-house counsel at Dish, ABC, CBS, and NBC, as well as their outside counsel and their outside counsel's employees and contractors to view highly confidential documents; and it provides no guarantee that highly confidential information will remain sealed if filed by a party.

**Request No. 4:**

I think we may be able to reach a compromise regarding this request. I understand that Fox gathers certain information on viewing sources for its programming, describing the number of viewers that watch Fox programs (e.g., live, VOD, internet streaming). Let's discuss this when we meet in person.

**Request No. 5:**

As explained in Fox's written responses and objections, we have already produced non-privileged documents sufficient to show Fox Network's revenues and expenses related to primetime programming. The purpose of this information, and the only conceivable relevance for it, was to back-up Fox's assertion that the lion's share of Fox Network's revenues comes from the sale of commercial advertising on primetime programming. And, even though the

2159642.1

Exhibit 2 - Page 11

December 10, 2012
Page 3

parties do not seriously dispute the existence of secondary markets for this programming such as VOD and Internet distribution, Fox's financial information confirms their existence.

Dish has not even attempted to show why it needs detailed financial information going back seven years, or why it needs to know exactly how much money Fox earns from each of Dish's direct competitors. Fox is not suing Dish for lost revenues; it seeks to enjoin Dish's conduct to prevent *future* harm to Fox's business model, goodwill, and reputation. The financial details sought by Dish have nothing to do with this case and Dish's request is wholly improper.

With respect to certain redactions (two line items for ad sales, and three line items for expenses), it is not clear why Dish would need to know these details because Fox Network's total expenses and revenues related to primetime programming have already been provided. With respect to revenues and expenses related to non-primetime programming, some of that information (like Late Night programming) has been redacted. Other information, like revenues and expenses related to sporting events, is treated separately from Fox's primetime programming – the content at issue in this lawsuit – and is not reflected in the financial documents that have been produced. Please explain the relevance of Fox's financial information related to programming that is not part of PTAT or AutoHop.

**Request No. 6:**

Your letter fails to articulate why Fox's financial projections – going back seven years – have anything to do with this case. You say these documents will help Dish "disprove Fox's claims as to adverse impact on the markets for its copyrighted works," but you don't explain how or why. Dish's infringing PTAT and AutoHop services are brand new. How could Fox's financial estimates from 2005 have any bearing whatsoever on the future threats that Fox will face as a result of these new services?

**Requests Nos. 7 and 8:**

These requests have many sub-parts and cover a broad swath of information. They are also confusing. For example, what do you mean by "VOD Schedules"? Is Dish seriously interested in gathering the dates, times, and titles of each Fox program that has ever been made available for viewing on VOD or the Internet? I agree that some of this information is not confidential, and we are open to discussing the burden involved with gathering the data. But it would be helpful if you could identify what claim or defense this information would tend to prove or disprove.

Also, please explain why Dish needs access to the specific license fees that other MVPDs (Dish's direct competitors) pay for VOD licenses, as well as license fees paid by other third party distributors. Fox has already produced financial documentation showing that VOD and Internet distribution are legitimate markets that generate millions of dollars for Fox. Dish's own expert acknowledges the existence of these markets. Without some understanding of why Dish needs

2159642.1

Exhibit 2 - Page 12

December 10, 2012
Page 4

this highly-confidential competitive business information, we can only conclude that the requests
are designed to further disrupt Fox's third-party relationships.

The requests also seeks documents concerning the "decision-making process, and the
factors You take into account, in determining which of Your shows to make available on a VOD
basis." Candidly, we have no idea what this request is getting at. Fox's choices regarding VOD
programming are not at issue (unlike PTAT, where Dish's control over the content included in
that service is directly relevant to proving that Dish is the one making the PTAT copies).
Hopefully you can explain it when we meet in person.

### Requests Nos. 9 and 10:

Fox is not suing Dish over a DVR. Fox is suing Dish over its PTAT and AutoHop
services that provide Dish subscribers with an unauthorized, commercial-free VOD service.
Dish's own marketing materials describe PTAT and AutoHop as new and groundbreaking.
Asking Fox to search for and produce all documents that discuss any device which permits
recording and playback of television programs is downright silly. If Dish is aware of any service
that provides unauthorized, commercial-free VOD to subscribers, let us know. We can then
discuss whether Fox has any documents concerning those services that could arguably be
relevant to disproving Fox's claim of irreparable harm here.

### Request No. 11:

We still don't understand why studies related to the effectiveness of TV commercials are
relevant here. Fox is alleging that a commercial-skipping service will harm Fox because
advertisers will perceive Fox's commercial air time as less valuable due to ads being eliminated
upon playback. Whether TV ads ultimately cause people to buy products is besides the point.
The issue is not whether TV ads work; the issue is how much advertisers are willing to pay for
TV ads, regardless of whether they are actually effective.

That said, early indications are that Fox does not gather or conduct studies on the
effectiveness of commercials. So, while we are interested in hearing Dish's theory of relevance,
this disagreement may be much ado about nothing.

### Request No. 12:

As set forth above, Fox has actual data regarding how Fox Network programs are viewed.
Some of this data goes back only two years. In addition to producing actual data, Fox has also
agreed to search for any DVR usage studies over the past two years. We are also prepared to
discuss the production of other data concerning viewing sources (e.g., Internet streaming, VOD).
However, Dish's blanket request that Fox search all of its employee emails and records for any
document discussing "consumer viewing habits" over the past seven years is absurd. While we
are prepared to be reasonable in order to avoid unnecessary discovery disputes, this request, as
phrased, simply goes too far.

2159642.1

Exhibit 2 - Page 13

December 10, 2012
Page 5

**Request No. 14:**

As a matter of practice, Fox does not generate any non-privileged organizational charts. Even if it did, they would not be relevant. If Dish wants to have an informed discussion about potential witnesses, you can send me a letter or call me with your questions. I would be happy to meet and confer on this topic. Alternatively, Dish has other discovery tools at its disposal that can be used to identify relevant witnesses in this lawsuit.

**Request No. 15:**

Fox will produce all communications between Fox and Dish concerning the negotiations of the agreements at issue. With respect to internal communications between and among Fox employees, Fox will produce all communications that discuss any contract provision at issue in this lawsuit. We expect Dish to do the same. However, internal discussions about contract provisions that have nothing to with this lawsuit are not relevant, and your letter provides no argument to the contrary.

## Fox's Document Requests to Dish

We reject the claim that Dish has somehow been more cooperative in discovery because it propounded only 16 "discrete" document requests compared to Fox's 96 requests, and has produced "nearly 9,000 pages" of documents. Taking into account the various sub-categories of Dish's requests, they easily exceed 30. And, with respect to Dish's document production – which was produced in response to ABC's document requests, not Fox's – most of it is fluff. Nearly 2,000 pages consist of News Corp.'s SEC public filings (which Fox never requested). A large chunk consists of case law and FCC administrative proceedings, including a 482-page FCC report on the VOD industry. In fact, Dish's so-called document production includes 1,321 pages that are simply copies of the pleadings *from this lawsuit*. More than 1,700 pages of the production are articles and studies that Dish's experts relied on for the preliminary injunction motion. In short, only a small fraction of Dish's 9,000 document production consists of Dish's own business records. To date, Dish has not even produced a *single* email.

In any event, we are still waiting for Dish to produce the documents it agreed to produce in its November 8, 2012 responses to Fox's document requests. We are also waiting for your written response to my November 17 letter. Once we have your response, we will be ready to meet and confer in person and to engage in substantive discussions on how we can avoid or otherwise narrow any discovery disputes.

* * * * *

2159642.1

Exhibit 2 - Page 14

December 10, 2012
Page 6


    Finally, as noted above, we will be emailing you a link for downloading the next batch of Fox's document production bates numbered be FOX000374-FOX002607.  If you have any questions, please do not hesitate to call me.


Regards,

David R. Singer
Partner

2159642.1

Exhibit 2 - Page 15

# Exhibit 3

**JENNER&BLOCK**

January 22, 2013

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel  213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel  213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

     Re:    ***Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al***
           **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Bill:

     Enclosed please find Fox's Amended Objections and Responses to Dish's first set of document requests.  As you will see from some of our amended responses, Fox has agreed to a number of compromises following our January 8 in-person meeting.  With respect to other requests, we believe that further discussions are appropriate.  A summary of our latest positions are set forth below:

**Request No. 3:**

     We are still struggling to understand the relevance of this request.  Dish does not need to review the "economic terms" of every retransmission contract between Fox and Dish's direct competitors, and every contract between Fox and its television station affiliates, in order to defend against Fox's contract and copyright claims.  This is not a tortious interference case.  Instead, Fox simply alleges that if Dish is allowed to operate an unauthorized VOD service in the form of PrimeTime Anytime, Fox's authorized VOD service will be less attractive to other cable and satellite TV distributors in the future.  This theory of irreparable harm has nothing to do with third party retransmission licenses and does not put at issue all of Fox's highly confidential contracts with Dish's competitors.  With respect to Fox's TV station affiliates, Fox is merely claiming that their ad-supported broadcast businesses will also be harmed by an illegal, commercial-free VOD service.

     At our January 8 meeting, you noted that Fox was also seeking actual damages and lost revenues.  To clarify Fox's position, and to obviate the need for any economic discovery into Fox's relationships with Dish's competitors, Fox stipulates that it is not seeking any actual damages as part of this lawsuit.  Instead, Fox is limiting its claim to statutory damages,

2169980.1

Exhibit 3 - Page 16

January 22, 2013
Page 2

disgorgement, injunctive relief and specific performance of the contract.  A supplemental Rule 26 disclosure statement is enclosed.

Finally, as I mentioned in our meeting, Request No. 3 would impose a massive, unreasonable burden on Fox.  Even if this request were limited to the two most recent agreements for each distributor and affiliate (a limitation you suggested at our meeting), it would still require Fox to gather and review several hundred agreements.  These agreements also contain non-disclosure provisions, further requiring Fox to notify and involve hundreds of third parties that have an interest in protecting against the disclosure of their highly confidential business information.

Accordingly, please let us know whether Dish will withdraw Request No. 3 or if you can propose another way to resolve or narrow this issue short of motion practice.

**Request No. 4:**

As discussed at our meeting and in our amended response to this request, we are producing responsive documents and can revisit this request once you have had a chance to review them.

**Request Nos. 5:**

Now that Fox has stipulated it is not seeking actual damages, Dish's request for detailed financial records going back seven years is moot.  As set forth in Fox's written responses and our prior correspondence, Fox has already produced non-privileged documents sufficient to show Fox Network's revenues and expenses related to primetime programming.  Fox has also agreed to produce documents sufficient to show the size and scope of the Internet streaming and digital download market for Fox's primetime programs, an issue that is relevant to Dish's fair use defense.  At our January 8 meeting, you said that Dish's expert needed access to more financial information, but we still don't understand how Fox's historical financial information is relevant to the claims at issue, especially given Fox's stipulation that it is not seeking actual damages. We renew our request that you please provide a concise, written explanation of relevance so that we can consider it in an informed manner.

**Request No. 6:**

As you know, Fox has already agreed to produce any documents discussing whether PrimeTime Anytime, AutoHop, or Sling Adapter will positively or negatively impact Fox's projected revenues.  Of course, one of the reasons Fox is seeking injunctive relief is because the harm threatened by PrimeTime Anytime, AutoHop and Sling Adapter are *not* calculable in money damages.  Therefore, Fox's financial projections, budgets, and forecasts having nothing to do with the PrimeTime Anytime, AutoHop, or Sling Adapter, are completely irrelevant.  If you disagree, please provide a written explanation of relevance so that we can consider it in an informed manner.

2169980.1

Exhibit 3 - Page 17

January 22, 2013
Page 3

**Requests Nos. 7 and 8:**

Following our January 8 meeting, Fox has agreed to compromise on a number of issues with respect to these requests, even though much of the information sought is marginally relevant at best. Our hope is that we can avoid unnecessary motions to compel or, at a minimum, narrow the issues as much as possible. Fox's amended responses are enclosed.

**Requests Nos. 9 and 10:**

At our meeting, you said Dish would consider narrowing these requests. We have not heard back yet.

**Requests Nos. 11 and 12:**

As discussed at our January 8 meeting, Fox is willing to expand its search for studies that discuss DVR usage and commercial-skipping behavior beyond 2010 to the present. However, as I explained, Fox does not maintain these studies in a single location. We are in the process of assessing the burden that would be involved in an expanded search. With respect to Request No. 11, Dish has not yet explained why studies concerning the effectiveness of TV ads are relevant here. The issue is whether Dish's ad-stripping service will result in less ads being seen by consumers. This case has nothing to do with whether TV ads cause people to buy the products that are advertised. We welcome any further explanation of relevance.

Regards,

David R. Singer
Partner

Exhibit 3 - Page 18

# Exhibit 4

# DurieTangri

Michael H. Page
415-362-6666 (main)
mpage@durietangri.com

June 18, 2013

**VIA EMAIL**

David R. Singer
Jenner & Block
633 West 5th Street
Los Angeles, CA  90071-2054
DSinger@jenner.com

*Re:    Fox Broadcasting Company, et al v. Dish Network L.L.C., et al*
        C.D. Cal. Case No. 12-cv-04529-DMG (SH)

Dear David:

I am writing in response to your May 10, 2013, meet and confer letter regarding DISH's First Set of Requests for Production, Nos. 3 and 7.  Specifically, I write to explain why Fox's proposed compromise is insufficient and to again explain DISH's position in hopes of avoiding motion practice with respect to these requests.

## I.       REQUEST 3

Request 3 asks Fox to produce "documents sufficient to show the economic terms of all of Your affiliate and retransmission agreements covering each of the past seven years . . . ."  Fox initially objected and refused to produce any documents.  Now, Fox's compromise is to produce its publicly available standard form station affiliate agreement from the past 2 years, but not any of the economic terms of any affiliate agreements.  Furthermore, Fox continues to refuse to produce any retransmission consent agreements with MVPDs.  This is less a compromise and more a re-worded refusal to produce documents.

The focus of Request 3 is the *economic terms* of these agreements.  Any agreement to produce responsive documents that does not include economic terms is by definition insufficient.  In its First Amended Complaint, Fox continues to seek permanent injunctive relief, claiming that DISH's DVR features "will ultimately destroy the advertising-supported ecosystem" that underlies Fox's business.  *See, e.g.*, First Amended Complaint, ¶ 3.  Fox's employees also continue to claim that they expect DISH's DVR features to cause a negative impact on Fox's ability to negotiate contracts licensing Fox's programming.  *See, e.g.*, February 21, 2012, Declaration of Michael Biard, ¶¶ 25–26.  DISH must be able to test these claims by comparing the economic terms of Fox's agreements before and after the

David R. Singer
June 18, 2013
Page 2

features at issue arrived in the market.  Unless Fox agrees to produce documents that include the economic terms, DISH will be hampered in its ability to rebut Fox's claims.

In addition, Fox claims that it is irreparably harmed by the Hopper Transfers feature and the Sling functionality of the Sling Adapter and the Hopper with Sling.  DISH has pointed out that other MVPDs offer similar features, such as the Nomad/Genie Go feature available from DIRECTV.  DISH is entitled to see the terms of the DIRECTV retransmission consent agreement to ascertain whether DIRECTV licenses rights related to the feature from Fox and whether Fox receives a defined licensing fee, or for other evidence of compensability by money damages or lack of harm.  For example, if DIRECTV offers the Nomad functionality without a license from Fox, that would tend to show that Fox is not harmed and that no license is necessary.

## II.   REQUEST 7

Request 7 asks Fox to produce five categories of documents about Fox's VOD offerings and the agreements related to those offerings.  In its compromise, Fox agrees to produce certain agreements with MVPDs, subject to redactions.  Specifically, Fox proposes to redact: (1) terms and conditions related to Fox cable channels not related to this lawsuit from Television and Internet VOD License Agreements with MVPDs; and (2) any terms and conditions not related to VOD or Authentication from Global Carriage Agreements.  I will address each of these proposed redactions in turn.

DISH is open to the first set of redactions, subject to clarification.  Does Fox agree to leave as unredacted the economic terms of its Television and Internet VOD License Agreements for Fox's broadcast content?  If not, DISH cannot agree to this redaction.  The second set of redactions is also non-starter, as it includes the economic terms of any Global Carriage Agreements.

As with Request 3, the economics of the agreements responsive to Request 7 are important to this litigation.  Purporting to compromise by producing partial agreements that do not include the economics is a hollow gesture.  As explained above, DISH needs to be able to evaluate Fox's claims that it has suffered or will suffer irreparable harm warranting permanent injunctive relief.  Fox claims that as a result of DISH's actions, its VOD licenses will be perceived as "less valuable, negatively impacting Fox's negotiation leverage" and ultimately resulting in Fox giving more concessions, including pricing concessions.  August 22, 2012, Declaration of Michael Biard, ¶¶ 40–41.  Fox also suggested, in argument before the Ninth Circuit, that DISH's actions threaten to negatively impact Fox's VOD and digital distribution strategy.  The documents DISH seeks regarding Fox's VOD offerings will assist in analyzing whether the DVR features at issue have had any impact on Fox's VOD license agreements.  They will also permit DISH to assess Fox's claim that it always required that fast-forward functionality be disabled for VOD.  These documents are directly relevant.  Fox must produce these documents.

## III.   AMENDING THE PROTECTIVE ORDER

Your letter also suggests that any non-public documents produced should be for outside counsel's eyes only, which would require modification of the protective order.  We are agreeable to this suggestion, but

Exhibit 4 - Page 20

David R. Singer
June 18, 2013
Page 3

only if it is limited to the retransmission consent and VOD license agreements between Fox and non-parties to this lawsuit that are the subject of Request Nos. 3 and 7.  To the extent your addition of an "outside counsel's only" designation is so limited, please provide a draft amended protective order, including a redline, for our review.

* * *

As set forth above, Fox has put its retransmission consent agreements and VOD agreements squarely at issue in this litigation.  Fox cannot make these claims and then refuse to produce relevant documents.  While DISH is willing to compromise, Fox's proposal is not sufficient.

Very truly yours,

Michael H. Page

MHP:jp

Exhibit 4 - Page 21

# Exhibit 5

# JENNER&BLOCK

June 21, 2013

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel 213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

**VIA EMAIL AND U.S. MAIL**

David R. Singer
Tel 213 239-2206
Fax 213 239-2216
dsinger@jenner.com

Michael Page, Esq.
DURIE TANGRI LLP
217 Leidesdorff St.
San Francisco, CA 94111

Re:   *Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al*
      **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Michael:

This responds to your June 18, 2013 letter in a continuing effort to reach a compromise and avoid the need for motion practice.

For purposes of our discussion (i.e., matters that the Orrick firm cannot address due to a possible conflict of interest), the only requests at issue are Dish's First Set of Document Requests, Requests Nos. 3 and 7(b).  (*See* May 9, 2013 letter from W. Molinski, page 4).

**Request No. 7(b)** seeks the following: "With regard to Your VOD services, documents sufficient to show each of the following: . . . (c) all documents reflecting the terms and conditions of all VOD agreements with MVPDs."  As part of the proposed compromise set forth in my May 10, 2013 letter, I confirmed that Fox would agree to produce the documents responsive to this request.  This would include disclosure of VOD license fees.  I explained that Fox was required to obtain consent from its MVPD licensees and would work in good faith to obtain such consent.

With respect to **Request No. 3**, we may be having a miscommunication.  When I refer to "retransmission consent agreements" between Fox and MVPDs, I am referring *only* to those agreements where Fox, on behalf of its owned and operated television stations, consents to an MVPD's retransmission of the broadcast signals pursuant to Section 325 of the Communications Act.  Fox has entered into hundreds of retransmission consent agreements in the past two years alone.

Fox is not claiming that Dish's copyright infringement or breaches of contract are impacting retransmission consent fees.  Therefore, the retransmission consent agreements are not relevant.  The February 21, 2012 Declaration of Michael Biard cited in your letter discusses how

2195789.1

Exhibit 5 - Page 22

June 21, 2013
Page 2

Dish's conduct will interfere with Fox's ability to grant *internet* retransmission to MVPDs – not retransmission consent for standard television under Section 325 of the Act. The other declarations submitted by Fox in connection with its preliminary injunction motions also allege harm to VOD, Internet streaming, and mobile distribution markets – not retransmission consent. To the extent Fox has agreements with MVPDs for VOD, Internet streaming, or mobile distribution rights, the terms of those licenses (including any license fees) would be covered by Fox's proposed compromise.

Dish has never once provided an explanation as to how Fox's retransmission consent agreements with other MVPDs that *do not address* VOD, Internet streaming, or mobile distribution rights could possibly be relevant to the claims or defenses in this lawsuit. Your June 18 letter is silent on this point.

Request No. 3 also seeks the financial terms of Fox's affiliation agreements with independently-owned TV stations. But Fox has never put these agreements at issue in its complaint, declarations, or other pleadings. Dish has never articulated how the financial terms of Fox's agreements with hundreds of local TV station affiliates tend to prove or disprove any claim or defense in this lawsuit.

If Dish intends to bring a motion to compel production of Fox's retransmission consent agreements with other MVPDs, as well as the financial terms of every Fox TV station affiliate agreement, Fox is entitled to know Dish's legal position in advance of that motion. (*See* Local Rule 37-1). Specifically, Dish needs to articulate the relevance of these agreements separate and apart from the VOD and Internet licenses that Fox is willing to produce as part of its proposed compromise.

Fox has made substantial concessions in connection with Dish's requests, and we remain hopeful that Dish will begin to move towards a compromise. If you have any questions, please do not hesitate to call me.

Sincerely,

David R. Singer
Partner

Exhibit 5 - Page 23

# Exhibit 6

# JENNER&BLOCK

July 5, 2013

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel 213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel  213 239-2206
Fax 213 239-2216
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

Re:   ***Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al***
      ***C.D. Cal. Case No. 12-cv-04529-DMG (SH)***

Dear Bill:

Following our in-person meeting on June 27th, here is where things stand on discovery.

## Fox's First Set of Document Requests to Dish

**Request No. 14**

This request seeks documents discussing the availability of the AutoHop feature when a subscriber watches recorded programs with Sling Adapter.  Dish said that it will not conduct separate searches for responsive documents, but will produce responsive documents that are produced in response to other document requests.

**Request No. 21**

This request seeks all documents discussing the collection of PTAT and AutoHop usage data.  Dish asserts that any documents responsive to this request are privileged because the collection of PTAT and AutoHop usage data was done at the direction of counsel.  You agreed to confirm this position in writing.

**Request Nos. 42–43**

These requests seek all documents discussing the marketing and advertising of PTAT, AutoHop, and Sling Adapter.  Dish has already agreed to produce all of its communications with advertising agencies regarding the marketing for PTAT and AutoHop, as well as exemplars of all final advertisements for PTAT and AutoHop.  Fox further confirmed that it is not seeking

2214486.2

Exhibit 6 - Page 24

July 5, 2013
Page 2

communications that relate solely to typesetting, font, or colors to be used in advertisements. You agreed to get back to us on whether Dish will also produce its communications with ad agencies that discuss Sling Adapter.

### Fox's Second Set of Document Requests

**Request Nos. 97-98**

In response to Request No. 2, Dish already agreed to produce all documents discussing the reasons why Dish developed PTAT, AutoHop, and/or Sling Adapter (*see* your 2/14/2013 letter). Request Nos. 97-98 seek the same documents with respect to Hopper Transfers and the Sling functionality of Dish's new Hopper with Sling. You said you were having difficulty figuring out how to conduct this search. I suggested that Dish begin by speaking with the executives most likely to have discussed the reasons for developing these services. If Dish is able to gather documents responsive to Request No. 2, it should be able to do the same for Request Nos. 97-98. You agreed to get back to us.

**Request Nos. 106-108**

Fox is seeking all documents discussing whether AutoHop works with Sling, as well as any plans to enable AutoHop when a subscriber is watching recorded programs using the Sling functionality on the new Hopper. I explained that any such plans are relevant to Fox's claim of irreparable harm because making Fox's programs available commercial-free over the internet would exacerbate the harms already being caused by AutoHop and Sling. Documents discussing Dish's business reasons for withholding the AutoHop feature from its Dish Anywhere service would also shed light on whether Dish knew that commercial-free internet streaming of Fox's programs would be harmful to Fox's business interests (such documents would not be captured by Requests 31 and 46 which are limited to documents discussing whether Dish's conduct breaches the Fox agreement or infringes Fox's copyrights). If Dish has documents admitting that commercial-free versions of Fox's programs on the internet are harmful to Fox, these same documents can also be used to show that commercial-free versions of Fox's programs on VOD are also harmful to Fox. However, you said that Dish would not produce any documents concerning "future plans." We assume that Dish is standing by its position.

**Request No. 110**

We have already explained the relevance of documents discussing whether Dish plans to make AutoHop available for cable network programming where Dish sells its own commercials. Emails discussing how AutoHop might harm Dish's ad sales are relevant to Fox's claim of irreparable harm. Documents showing how Dish is given a competitive advantage by making AutoHop available on broadcast networks (where Fox sells ads) but not cable networks (where Dish sells ads) are relevant to willful infringement, disgorgement, and fair use because they reflect Dish's profit motive, ill-gotten gains, and the commercial nature of PTAT and AutoHop. You agreed that Dish would consider producing responsive documents.

2214486.2

Exhibit 6 - Page 25

July 5, 2013
Page 3

**Request Nos. 115-116**

We agreed that Dish does not need to respond to this request based on the understanding that Dish would not pursue similar document requests and that all Dish employees with relevant knowledge in the case will be identified in Dish's document production.

**Requests Nos. 117-118**

These requests seek all documents discussing the marketing, advertising, or promotion of Hopper Transfers and Hopper with Sling. So far, Dish has only agreed to produce exemplars of its Hopper Transfers and Hopper with Sling advertisements, but no documents discussing those ads. We agreed that Dish could produce all direct communications with advertising or marketing agencies that discuss Hopper Transfers and/or Hopper with Sling. Fox is not seeking communications that relate solely to typesetting, font, or colors to be used in advertisements. We further agreed that Dish would not need to produce all internal emails discussing communications with advertising or marketing agencies, unless those documents were otherwise responsive to another request. This tracks Dish's agreement to produce similar documents for PTAT and AutoHop. You said would discuss this request with Dish.

**Request No. 119**

Dish already agreed to produce documents discussing or evidencing whether Hopper Transfer and/or the Sling feature of the Hopper with Sling could assist or benefit Dish in its negotiations with Fox or any group of broadcast networks that includes Fox. I explained that Dish's proposed compromise would be acceptable as long as it included communications with all Fox-affiliated TV stations. You agreed to this modification, but noted there may be confidentiality agreements between Dish and those stations that would need to be addressed (presumably by the protective order in this action).

**Request No. 121**

We confirmed that Dish's proposed compromise was acceptable.

**Request No. 122**

This request seeks all documents constituting or discussing communications with any TV network concerning Hopper Transfers and/or the Sling function of the Hopper with Sling. Dish asked whether this request can be limited to ABC, NBC, CBS, and/or Fox (instead of all networks). In effort to compromise, and without waiver or prejudice, Fox will accept Dish's proposed limitation.

July 5, 2013
Page 4

**Request No. 123**

Dish agreed to produce all communications in which a television station has expressed concerns with Hopper Transfers and/or the Sling functionality of Hopper with Sling, with the exception of those communications made in the course of ongoing, confidential negotiations. I asked for confirmation that, once those negotiations were completed, Dish would supplement its production with those communications (similar to Dish's response to Request No. 62 as set forth in your 2/14/2013 letter). You agreed to consider following the form of Dish's response to Request No. 62.

**Request Nos. 126-127, 134**

Dish agreed to produce all documents constituting projections for Hopper Transfers downloads/usage, Sling usage for Hopper with Sling, and Hopper with Sling usage/sales. However, Dish will not produce all discussing those projections (unless, of course, those documents are otherwise responsive to another request). We agreed to consider Dish's position.

**Request Nos. 128-129**

These requests seek all documents that discuss, support, or refute recent statements by Charlie Ergen that most Sling usage occurs inside the home. You agreed to look into whether Dish has any responsive documents.

**Request No. 136**

This request seeks documents sufficient to show Dish's monthly revenues from subscriber fees from 2007 to the present. Under 17 U.S.C. Section 504, Fox is entitled to seek disgorgement. Once Fox establishes Dish's "gross revenues," the burden is on Dish to prove "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." In order to determine which of Dish's purported expenses and profits are *not* attributable to Dish's alleged copyright infringement (i.e., PTAT/AutoHop, Hopper Transfers, Dish Anywhere), Fox's economist intends to do a trend analysis in which financial performance before, during, and/or after the alleged wrongful conduct is compared.

To be clear, Fox is only seeking total monthly subscriber revenues, not the fees paid by any individual subscribers. We understand that Dish tracks this information on a monthly basis. Absent any particularized showing of undue burden, we expect Dish to produce the requested documents.

**Request No. 137**

This request seeks documents sufficient to show Dish's gross revenues, on a monthly basis, from 2007 to the present. For the same reasons discussed in connection with Request No. 136, this information is relevant to a trend analysis of Dish's revenues and relevant to

July 5, 2013
Page 5

establishing the portion of Dish's gross revenue that is attributable to the Dish's alleged wrongful
conduct.

**Request No. 138**

This request seeks documents sufficient to show Dish's subscriber acquisition costs from
2007 to the present. Only variable costs are deductible in a disgorgement analysis. Historical
cost data is useful in distinguishing fixed versus variable costs. We assume Dish has one or
more spreadsheets identifying Dish's subscriber acquisition costs from 2007 to the present.
Please confirm whether Dish will comply.

**Request No. 140**

This request seeks documents sufficient to show each element of Dish's gross revenues
attributable to something other than the alleged copyright infringement at issue. This goes to the
heart of the statutory disgorgement analysis and seeks to identify revenues attributable to
copyright infringement and revenues attributable to other sources. Fox agreed that it could limit
this request to revenues earned *after* Dish first introduced any of the services or features at issue
in this lawsuit. Please confirm whether Dish will comply given that limitation.

**Request No. 143**

This request seeks all documents discussing the allocation of Dish's development costs
between and among AutoHop, PTAT, Sling Adapter, Hopper Transfers, and/or the Sling
functionality of Hopper with Sling. Under Section 504 of the Copyright Act, expenses and
profits attributable to factors other than infringement are relevant to disgorgement. If Dish plans
to argue that its development costs for the services at issue are deductible expenses, then Fox is
entitled to all documents discussing the manner in which Dish has allocated these development
costs between and among the infringing services at issue. This is especially true if Fox prevails
on some, but not all of its claims. If Dish stipulates that its development costs are *not* deductible
expenses, then Fox would agree to withdraw this request.

**Request Nos. 144, 147, 148 and 149**

These documents are relevant to proving the revenues attributable to the infringing
services and features at issue. They include Dish's own revenue projections for the services at
issue, subscriber surveys, and other documents discussing why subscribers began using those
services. Dish's own Chief Executive Officer recently stated that a "large portion" of Dish
Network's subscriber growth in 2012 "was driven by our award-winning Whole-Home HD
DVR, the Hopper." Documents discussing, supporting, or refuting this pronouncement are
directly relevant to Fox's disgorgement claim.

2214486.2

Exhibit 6 - Page 28

July 5, 2013
Page 6

**Request Nos. 145 and 146**

Request No. 145 seeks documents sufficient to show the number of people who became new Dish subscribers from March 15, 2012 to the present *and* who leased or purchased a Hopper when they started their service.  Request No. 146 seeks documents sufficient to show the number of existing subscribers who switched to a Hopper.  Documents responsive to this request are relevant to demonstrating whether the services at issue are driving subscriber growth and/or subscriber retention.  They are plainly relevant to disgorgement.

**Request No. 150**

This request seeks Dish's "chart of accounts," as that term is commonly understood by trained accountants, from the date Dish began developing the products/services at issue until the present.  Dish's chart of accounts is relevant to the disgorgement cost analysis.  This document would show the level of cost detail that Dish records in the ordinary course of its business.  Understanding how Dish records costs will aid in the Fox's analysis of fixed costs versus variable costs and, thus, in determining which costs are deductible for purposes of a disgorgement analysis.

**Request Nos. 151-152**

Request No. 151 seeks Dish's Trial Balance, as that term is commonly understood by trained accountants, from the date Dish began developing the products/services at issue until the present.  Request No. 152 seeks detailed financial statements used for internal reporting that relate to any expenses in connection with the products/services at issue.  These documents are relevant to analyzing deductible expenses.

<u>**Dish's First Set of Document Requests**</u>

**Request No. 4**

Fox is investigating whether it has reports that are similar to the All in One reports pre-dating 2011.

**Request Nos. 5 and 6**

To resolve this request, Fox offered to produce financial information (in the same format as the information already produced) dating back to 2009.  You conveyed Dish's position that Fox must produce information dating back to 2007 or that Dish will move to compel.  Similarly, Dish seeks Fox's financial projections for the past seven years.  Dish claims that Fox's financial information and projections are relevant to Fox's claim of irreparable harm.  Fox disagrees.  Fox's claim of irreparable harm is not based on past revenues and Fox has stipulated that it is not seeking actual monetary damages.  Fox's projections are also irrelevant, unless they discuss or otherwise take into account the conduct at issue in this lawsuit (which Fox has already agreed to

Exhibit 6 - Page 29

July 5, 2013
Page 7

produce). In any event, I agreed to revisit these requests one last time to see whether a motion can be avoided.

**Request No. 7**

Dish agreed that Fox's amended response was acceptable.

**Request No. 8**

Dish agreed that Fox's amended response was acceptable. I agreed to let you know whether Fox has documents showing all of its internet offerings as far back as 2007.

**Request No. 15**

Fox reiterated its position as set forth in my April 29, 2013 letter, inviting Dish to identify any contract provisions at issue in this lawsuit that are not covered by this request. You also confirmed that the parties' scope of production for internal emails discussing any such contract negotiations would be mutual.

## Dish's Second Set of Document Requests

**Request Nos. 1-6**

Without waiving its relevance and other objections, Fox agreed to investigate the burden of responding to this request.

**Request No. 8**

This request seeks every document discussing the functionality of every Dish DVR, going back to 1999. Fox has already agreed to produce documents discussing the functionality of all products and services at issue, plus the PocketDISH and ViP 922 sling-loaded DVR. Fox has already stipulated that it is not challenging the legality of Dish DVRs. There is no legitimate basis for Fox to review millions of employee emails over a 15 year period for documents discussing basic DVR functions like fast-forward just to prove the obvious fact that Fox has known about fast-forward for a really long time. Nonetheless, I said that Fox was open to a reasonable compromise if Dish could submit a proposed word search, narrowly focused on a particular Dish device or technology and particular time frame (for example, emails discussing the first time Dish introduced a DVR with 30-second skip).

Exhibit 6 - Page 30

July 5, 2013
Page 8

### Request Nos. 9, 12-13

In my June 20, 2013 letter, I explained why Fox's knowledge about third party conduct in the marketplace was irrelevant to Dish's claims of laches, waiver, and estoppel.  I also provided supporting case law.  I further explained that Fox is not required to sue every infringer, and the failure to sue a third party is not relevant to whether Dish's copyright infringement and contract breaches are causing irreparable harm to Fox.  Dish has not yet responded.  I asked you to provide any case law or authority in support of these requests for information about third party products and services and how Fox may have reacted to that third-party conduct.  You agreed to send us your position in writing.  You also said that Dish would review these requests to see whether they can be narrowed.

### Request Nos. 10, 15

You agreed to review these requests to see if they can be narrowed.  We discussed narrowing the requests to cover only studies done by Fox.  You agreed to clarify the term "playback capabilities."

### Request No. 14

This request seeks every communication between Fox and any MVPD discussing any sort of copyright infringement.  You agreed to consider how to narrow this request.

### Request No. 16

You agreed to further clarify this request, but indicated that Dish is seeking documents discussing whether any Fox employees use Sling-type technologies to do their work.  You argued that Fox's business use of "place shifting" technology is somehow relevant to the fair use analysis in this lawsuit.  In your letter, you may want to explain this further because we do not understand what you mean.

### Request No. 17

We agreed to produce documents "evidencing" Fox's business reasons for restricting online access to new episodes on Fox.com as we understand the term "evidencing" and consistent with our use of the term "evidencing" in document requests to Dish.

### Request No. 18

Subject to your clarification that this request is limited to analyses of the Internet-distribution market for Fox's primetime broadcast programs, Fox will produce all documents analyzing the internet-distribution market for Fox's primetime broadcast programs.

Exhibit 6 - Page 31

July 5, 2013
Page 9

**Request No. 19**

I understand that Annette Hurst of your office is working with counsel for some of Fox's
internet-based distributors. Assuming we are able to reach agreement on the production of
responsive agreements, please confirm that plaintiffs are withdrawing their redundant request for
"summaries" of all agreements (all or most of which are privileged).

**Request No. 20**

The agreements sought by this request are covered by our discussions with your co-
counsel (at your request).

**Request Nos. 21, 23, 24**

Dish agreed to Fox's proposed compromise set forth in my June 20, 2013 letter.

**Request No. 22**

Fox is investigating the burden of this request.

**Request Nos. 28-30**

These requests seek all documents discussing or evidencing the markets for product
placement and/or embedded advertising. As explained in my June 20 letter, we know of no case
law supporting a defense to copyright infringement on the grounds that the copyright owner
might be able to change its business model to lessen the harm caused by an infringer. We again
asked Dish to provide any legal support for this request. In the meantime, we also agreed to look
into the burden of responding to this request if it were limited to studies done by or
commissioned by Fox. For Request No. 30, you agreed to provide a definition of "alternative
advertising models."

\* \* \* \* \*

As we both commented at the end of our recent meeting, both sides have shown an
interest in compromising to avoid unnecessary motion practice. I am available to discuss any of
these issues further by phone or in person.

Sincerely,

David R. Singer
Partner

2214486.2

Exhibit 6 - Page 32

# Exhibit 7

# DurieTangri

Michael H. Page
415-362-6666 (main)
mpage@durietangri.com

October 30, 2013

**VIA EMAIL**

David R. Singer
Jenner & Block
633 West 5th Street
Los Angeles, CA  90071-2054
DSinger@jenner.com

Re:   *Fox Broadcasting Company, et al v. Dish Network L.L.C., et al*
      C.D. Cal. Case No. 12-cv-04529-DMG (SH)

Dear David:

I am writing in response to your June 21, 2013 letter to further meet and confer on DISH's First Set of Requests for Production, Nos. 3 and 7.

**Request 3**

Fox continues to resist producing retransmission consent agreements between Fox and other MVPDs even though Fox claims DISH's actions threaten its very business model.  To justify this, you write that "Fox is not claiming that DISH's copyright infringement or breaches of contract are impacting retransmission consent fees" and are therefore are not relevant.  This attempt to narrowly define what is at issue (and discoverable) simply doesn't make sense given Fox's allegations.  Fox has placed its entire business model in issue, and DISH is entitled to discovery on that full model, in order to defend against Fox's claims that its business model is somehow threatened by a few DVR features.

Fox alleges that it invests heavily in its copyrighted programming and that it recoups this investment through a number of revenue streams, including advertising, retransmission consent fees, licensing fees (VOD, Internet, and mobile), and DVD sales.  Fox further alleges that DISH has and continues to cause irreparable—and incalculable—harm to Fox and its business model.  Based on these allegations, the agreements requested are directly relevant to DISH's fair use defense.  They will allow DISH to define the markets for Fox's copyrighted works, to understand how those markets work, and to prove that the markets for Fox's copyrighted works have not been harmed by the DISH DVR features at issue in this lawsuit.  In addition, DISH is entitled to take discovery to support its theories that Fox has suffered no damages attributable to DISH and that injunctive relief is inappropriate because any harm is readily calculable.  These documents are also relevant to Fox's alleged damages and to the appropriateness of the injunctive relief Fox seeks.

217 Leidesdorff Street
San Francisco, California 94111
P (415) 362-6666  F (415) 236-6300
www.durietangri.com

Exhibit 7 - Page 33

David R. Singer
October 30, 2013
Page 2

DISH is not obligated to take Fox at its word that its retransmission consent agreements have no bearing on this case. These agreements do not exist in a vacuum, and we expect that some may, for example, show the types of offerings that Fox has sanctioned for other MVPDs and confirm that the DVR features offered by DISH cause Fox no harm. Fox must produce the requested retransmission agreements.

Request No. 3 also seeks Fox's affiliate agreements. Like the retransmission agreements discussed above, the affiliate agreements are also relevant to DISH's fair use defense, as they will give DISH further information about the markets and distribution outlets for the Fox copyrighted programming at issue in this lawsuit. Fox must produce these affiliate agreements. These affiliate agreements are also relevant to Fox's alleged damages and the appropriateness of injunctive relief. Fees paid by affiliates are another revenue stream that Fox uses to recoup its investment in programming. For affiliate stations (*i.e.* those Fox does not own and operate), DISH negotiates retransmission consent fees directly with the stations. The stations, in turn, pay Fox fees. Fox executives have described the retransmission consent deals with its affiliates as "groundbreaking" and the fees Fox receives from its affiliates as having "transform[ed] the economics of the broadcast business, which was dependent on advertising alone." *See*, *e.g.*, August 31, 2012 Declaration of David Shull, Ex. 1 (interview with David Haslingden published by WorldScreen.com on February 16, 2012). These agreements will allow DISH to reconcile Fox's claims that DISH is threatening Fox's business model with Fox's statements that retransmission fees from affiliates have given Fox another meaningful revenue stream.

In order for DISH to adequately prepare its fair use defense, DISH's experts must be allowed to examine documents related to the markets for Fox's copyrighted works. These documents, which include Fox's agreements with MVPDs and affiliates, must be produced.

**Request 7**

On Request No. 7, it appears that the parties are in agreement. To date, I am unaware of Fox producing any responsive documents. You previously advised that Fox needed to obtain consent from the counterparties to those agreements before producing them. What is the status of this? Please let me know when you expect to produce the agreements and the progress of your efforts to obtain consent from the counterparties to those agreements. In the event that Fox will not or cannot obtain consent to produce these agreements, DISH will be forced to move to compel.

* * *

Exhibit 7 - Page 34

David R. Singer
October 30, 2013
Page 3

**<u>Protective Order</u>**

Finally, your letter was silent on the preparation of a draft amended protective order.  Fox conditioned production of certain documents on creating an "outside counsel" designation under the protective order. Attached is the amendment that was entered in the New York action, which requires prior consent before any documents are designated as outside counsel's eyes only.  DISH is willing to enter into an amendment with the same terms in this case.

Very truly yours,

Michael H. Page

MHP:jp

Enclosure

Exhibit 7 - Page 35



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN RE AUTOHOP LITIGATION | MASTER FILE<br>12 Civ. 4155 (LTS)(KNF) |
|---|---|
| This Document Relates To:<br><br>All Actions | |



## AMENDMENT TO STIPULATED PROTECTIVE ORDER AND [PROPOSED] ORDER

Having met-and-conferred and having reached agreement, Plaintiff/Counterclaim

Defendant DISH Network L.L.C., Counterclaim Defendant DISH Network Corporation,

Counterclaim Defendant EchoStar Technologies, L.L.C. (together, "DISH Parties"),

Defendant/Counterclaimant American Broadcasting Companies, Inc.,

Defendant/Counterclaimant ABC, Inc., Defendant/Counterclaimant Disney Enterprises, Inc.

(together, "ABC Parties"), Defendant/Counterclaimant CBS Corporation, Counterclaimant CBS

Broadcasting Inc., Counterclaimant CBS Studios Inc., and Counterclaimant Survivor

Productions L.L.C. (together, "CBS Parties") hereby submit this amendment to the Stipulated

Protective Order (ECF No. 96) to add Paragraph 25, to read as follows:

During the course of the litigation, the parties may designate, upon prior written

consent of the requesting party, certain Litigation Materials as "Outside Litigation Counsel

Only." To the extent Paragraphs 3, 4, 6, 8, 13, 14, 15, 18 and 20 of the Protective Order refer to

"Confidential" and "Highly Confidential" materials, they shall also cross-reference and include

Exhibit 7 - Page 36

"Outside Litigation Counsel Only" materials. Litigation Material designated as "Outside Litigation Counsel Only," including copies or extracts therefrom, may be disclosed, given, shown, made available, or communicated to only the following (and then only for purposes of the prosecution, defense or appeal of this litigation):

a. outside counsel retained by the parties to assist in the prosecution, defense or appeal of this litigation, including employees of such counsel's firms, and any companies, independent contractors or other litigation support service personnel with whom such counsel works in connection with this litigation ("Outside Litigation Counsel"), subject to any further restrictions on Outside Litigation Counsel access agreed upon by the parties that may provide, for example, that there is a particular class of Outside Litigation Counsel to whom the Litigation Materials shall not be disclosed;

b. consultants and/or experts retained by outside counsel in connection with this litigation to whom it is necessary that "Outside Litigation Counsel Only" Litigation Materials be shown for the sole purpose of assisting in, or consulting with respect to, this litigation, and only upon their agreement to be bound by this Protective Order evidenced by execution of the attached Schedule A ("Outside Litigation Consultants/Experts"), subject to any further restrictions agreed upon by the parties that may provide that there is a particular class of Outside Litigation Consultants/Experts to whom the Litigation Materials shall not be disclosed;

c. the Court, and any members of its staff to whom it is necessary to disclose "Outside Litigation Counsel Only" Litigation Materials for the purpose of assisting the Court in this litigation;

2

Exhibit 7 - Page 37

    d.     stenographers, videographers and court reports recording or transcribing testimony relating to this litigation who have executed the attached Schedule A;

    e.     other persons only upon written consent of the producing person (which agreement may be recorded in a deposition or other transcript) or upon order of the Court after affording the producing person due notice and an opportunity to be heard.

Respectfully submitted,

_Thomas G. Hentoff_

Thomas G. Hentoff
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005
*Counsel for the ABC Parties*

_Elyse D. Echtman_

Elyse D. Echtman
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
*Counsel for the DISH Parties*

_Hamish Hume_

Hamish P.M. Hume
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue N.W.
Washington, DC 20015

Dated: September 11, 2013

*Counsel for the CBS Parties*

**SO ORDERED:**

_Kevin Nathaniel Fox_

Honorable Kevin Nathaniel Fox
United States Magistrate Judge
Southern District of New York

Dated: 9/17/13

3

Exhibit 7 - Page 38

## Schedule A

By my signature, I hereby acknowledge that I have read the Stipulated Protective Order, dated July ___, 2012 (the "Protective Order") entered in *DISH Network L.L.C. v. American Broadcasting Companies, Inc., CBS Corporation, Fox Entertainment Group, Inc., Fox Television Holdings, Inc., Fox Cable Network Services, L.L.C., and NBC Universal Media, L.L.C.*, Case No. 12-cv-4155 LTS (KNF), pending in the United States District Court for the Southern District of New York and hereby agree to be bound by the terms thereof. I further agree that to the extent that my employees are provided with "Confidential" and/or "Highly Confidential" Litigation Materials, I will instruct such employees regarding the terms of the Protective Order. I further agree to subject myself to the jurisdiction of the United States District Court for the Southern District of New York with respect to all matters relating to compliance of the Protective Order.

Dated:_____

City and State: _____

Signature: _____

Title:_____

Address:_____

_____

_____

Exhibit 7 - Page 39

# Exhibit 8

# JENNER&BLOCK

November 11, 2013

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel  213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

**VIA EMAIL AND U.S. MAIL**

David R. Singer
Tel  213 239-2206
Fax 213 239-2216
dsinger@jenner.com

Michael Page, Esq.
DURIE TANGRI LLP
217 Leidesdorff St.
San Francisco, CA 94111

Re:    ***Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al***
       **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Michael:

This responds to your October 30, 2013 letter concerning **Request Nos. 3 and 7** from DISH's first set of document requests.

## Request No. 3

## Retransmission Consent Agreements with MVPDs that Do *Not* Have VOD / Internet Rights

Fox has never put its "entire business model in issue" as you contend in your letter. Instead, Fox alleges that DISH's infringement and contractual breaches threaten to irreparably harm specific aspects of Fox's business. For example, PrimeTime Anytime and AutoHop threaten to reduce the number of commercial advertisements that are seen on the Fox Network. Once a critical mass of DISH subscribers have access to these services, it will negatively impact the C3 ratings for Fox programs, the metric relied on by advertisers when deciding how much to pay for ads. These services, along with DISH Anywhere, also threaten to disrupt or negatively impact Fox's negotiations with MVPDs for authorized VOD and Internet streaming rights.

In prior letters, we have already explained the difference between standard retransmission consent agreements and separate VOD or Internet streaming licenses. Fox has hundreds of agreements with MVPDs that do *not* involve VOD or Internet rights. As such, those agreements could not possibly shed light on the existence of the VOD or Internet markets and are not relevant to the fourth fair use factor. Fox has not put its relationship with those MVPDs at issue, nor has it claimed that those relationships have been impacted. Therefore, Fox's standard retransmission consent agreements with MVPDs that do *not* have VOD or Internet rights are *not* relevant to Fox's claim of irreparable harm.

Exhibit 8 - Page 40

November 11, 2013
Page 2

None of your letters explain how hundreds of contracts between Fox and DISH's competitors for retransmission consent on standard television (i.e., agreements that do *not* license any VOD or Internet rights) would tend to prove or disprove any particular claim or defense in this case. Instead, you broadly assert that DISH is somehow entitled to discovery on all aspects of Fox's business model. That is clearly beyond the permissible scope of discovery. Fed. R. Civ. P. 26(b)(1).

## Agreements Between Fox and Its Television Station Affiliates

Fox has already agreed to produce its standard form agreements with local TV broadcast affiliates for the past two years. The only remaining dispute is whether the separate, highly confidential financial term sheets that are individually negotiated with each non-party Fox affiliate are relevant to any claims or defenses in this case.

DISH claims these financial terms are relevant to fair use because they would supposedly show the relevant markets for distribution of Fox's copyrighted works. This makes no sense because the market for local television broadcasts is not at issue. Fox alleges that DISH is unlawfully exploiting Fox's programming in the *VOD and Internet streaming markets*; Fox is *not* alleging that DISH is unlawfully exploiting Fox's works in the *broadcast television market*. Therefore, the financial terms of each contract between Fox and its local TV broadcast affiliates have nothing to do with DISH's claim that its commercial-free VOD and Internet streaming services are fair use.

You also claim that the financial terms of Fox's TV station affiliate agreements are relevant to Fox's "alleged damages and the appropriateness of injunctive relief." But Fox is not seeking any damages in the form of lost revenues from its broadcast television affiliates. You claim that Fox's agreements with each of its affiliates would show how much money Fox earns from affiliates. But Fox is not claiming that DISH's conduct has reduced those fees. Even if Fox were making such a claim, DISH does not need to see hundreds of agreements between Fox and its affiliates because Fox has already agreed to produce documents showing the total amount of money that Fox earns from its affiliates on an annual basis for the past seven years. DISH has never explained why it needs any more detailed financial information.

### Request No. 7

On May 10, 2013, Fox proposed a compromise whereby Fox would produce redacted versions of its VOD and Internet distribution licenses with MVPDs, but not its retransmission consent agreements. Fox also indicated that it would need to give notice and an opportunity to object to each non-party MVPD. DISH rejected Fox's proposal on June 18, and Fox sought further clarification from DISH on June 21. We did not hear back from you until October 30, at which time you asked about the status of Fox obtaining consent from the MVPDs. Candidly, although Fox has already reached out to most of its MVPD partners with VOD and/or Internet rights, we were waiting for DISH to respond to my June 21 letter to complete the process. A number of MVPDs wanted to know whether DISH would accept certain redactions; many

Exhibit 8 - Page 41

November 11, 2013
Page 3

objected to the production of irrelevant retransmission consent agreements; and others requested a copy of a revised protective order before consenting to the production of any agreements.

As you can imagine, it is time consuming and expensive to negotiate with a large number of non-parties concerning discovery, especially when there is uncertainty over the scope of discovery. We have been ready and willing to resolve all of these issues since June 2013, and honestly believed that your four-month delay was an indication that DISH was reconsidering its position. Fox is prepared to obtain consent and engage in negotiations with each MVPD that licenses VOD and Internet rights, but first we need to know DISH's final position.

I suggest we have a phone call to discuss whether DISH will accept Fox's latest compromise on Request No. 3 and the timing of DISH's motion to compel if no compromise can be reached. This will make it easier for Fox communicate with its non-party business partners in connection with DISH's document requests.

Finally, Fox will agree to amend the existing protective on the same terms as the amendment that was entered in the SDNY action. Since DISH negotiated the SDNY protective order, and Fox does not have a Word version of the document, we request that you please email a copy to us for review and signature.

Sincerely,

David R. Singer
Partner

Exhibit 8 - Page 42

# Exhibit 9

**JENNER&BLOCK**

February 10, 2014

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel 213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel 213 239-2206
Fax 213 239-2216
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

> Re:   *Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al*
>        **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Bill:

This responds to your January 22, 2014 letter, some of which was also discussed at our January 23, 2014 in-person meeting. As set forth below, we are still considering some of Dish's proposals and analyzing the burden associated with certain responses. However, given your repeated insistence on a prompt reply to your letter, I have done my best to respond below.

### Dish's First Set of Document Requests

#### Request No. 3

At our meeting, we discussed Dish's request that Fox produce all of its retransmission consent ("RTC") agreements with MVPDs, and Fox's relevance and burden objections. Subject to and without waiving Fox's objections, we have been authorized to propose the following compromise. To the extent Fox plans to argue that its RTC negotiations with an MVPD have been impacted by any of Dish's services at issue in this lawsuit, Fox will agree to produce (for "outside counsel only," and subject to the consent of the relevant MVPD) the RTC agreements that resulted from those negotiations. With respect to all other RTC agreements, Fox will stipulate that its RTC negotiations with those MVPDs were not impacted any of by Dish's services at issue. We think this is a reasonable compromise for both sides and are hopeful that Dish will give it serious consideration. If you prefer that we discuss this further with the Durie Tangri firm, please let me know.

2257410.1

Exhibit 9 - Page 43

February 10, 2014
Page 2

### Request No. 4

As I previously explained Fox does not track "the proportion of the nationwide television viewing audience, and/or the number of television viewers, consuming television" via "free over-the-air broadcast television." You asked me to confirm whether Fox has this data, even though it does not "track" it. I have confirmed that Fox does not have this data.

### Dish's Second Set of Document Requests

### Request Nos. 8, 9, 12, and 13

Without waiving our relevance objections, we will agree to provide you with a list of acceptable search terms that do not impose an undue burden on Fox. We are actively working on this with our client and will get back to you soon.

### Request No. 14

At our in-person meeting, Annette suggested that Dish might be willing to narrow this request to cease-and-desist letters to, and complaints filed against, MVPDs or DVR providers alleging copyright infringement. Please confirm whether this is a formal proposal as Fox is willing to consider this compromise.

### Request Nos. 10, 15

Request No. 10 seeks "all documents reflecting any study or analysis by You of DVR or VCR storage and playback capabilities." Request No. 15 seeks "All documents reflecting any study or analysis by You of products or devices with place-shifting functionality, including but not limited to Sling Adapter, Hopper with Sling, DISH Anywhere, and/or Hopper Transfers." As memorialized in my prior correspondence, Fox has already agreed to produce responsive studies. Fox also agreed to produce emails analyzing the capabilities of the products and services at issue, as well as PocketDISH and ViP 922. The only remaining issue is whether Fox must also search for all informal "analyses" – which includes all emails – concerning products and services not at issue.

On October 21, we offered to conduct some word searches if Dish provided a discrete set of devices to search for and an explanation for why each device is relevant. Although you provided us with a list of devices, you refused to explain how each of the non-Dish devices is relevant.

Nonetheless, in a good faith effort to move things along, Fox agreed to assess the burden of searching its emails for any analyses of how the following devices would affect Fox's primetime ratings or ad revenues: Monsoon Media's Vulkano products, Sony's LocationFree products, Archos AV700, DirectTV Nomad, Tivo Stream, TiVo To Go, TiVo Desktop, Elgato's

Exhibit 9 - Page 44

February 10, 2014
Page 3

EyeTV, Elgato's Video Capture, Belkin's @TV, and K2B's tv2me. We are working on various electronic word searches to gather these documents. Based on the word searches we have tried so far, Fox would still need to review between 2,000-5,000 documents, which could easily include more than 10,000 pages. Given that none of the devices above are even at issue in the lawsuit, and that Dish has not even proffered a description of each device and why it is relevant, we believe this is still unduly burdensome. We are trying some additional word searches in order to bring this number down and will share those results with you shortly.

At our in-person meeting, Annette and Elyse proposed that Fox could further limit its response to monthly (or other regular) reports regarding new technology that were referenced by Sherry Brenan at her deposition. We are not aware of any such reports and could not find any reference to them in her deposition. If we are mistaken, please let us know.

### Request No. 19

As discussed at our in-person meeting, Fox has agreed to produce its licensing agreements with Internet-based distribution services (redacting irrelevant information) and is working with those distributors to obtain their consent. Once Dish receives the redacted agreements, we will work in good faith to address any concerns over the redactions. If Fox is unable to obtain the necessary consent from a third party, we will let you know.

### Dish's Third Set of Document Requests

### Request No. 8

As discussed, we will let you know if Fox is unable to obtain the necessary consents for the production of VOD and/or Internet distribution licenses.

### Request Nos. 11 and 12

As set forth in my prior letters, Fox will not engage in the burdensome exercise of reviewing ad sales records for every Fox television station (most of which are not even operated by Fox). However, without waiving Fox's relevance and burden objects set forth in my prior correspondence, and as a compromise to fully resolve these requests and avoid motion practice, Fox would agree to produce any Slingbox television advertisements that appeared on the Fox Network where Slingbox purchased the ad time from plaintiff Fox Broadcasting Company. To the extent any such ads exist, Fox would also produce any documents discussing its sale of advertising time to Sling Media (if they exist). Please let us know whether Dish will accept this proposed compromise.

### Request Nos. 13-23

As explained my prior correspondence, none of the Fox plaintiffs in this action have an ownership interest in Hulu. Hulu is partly owned by Fox-Hulu Holdings, Inc, a separate

Exhibit 9 - Page 45

February 10, 2014
Page 4

corporate entity. Therefore, Fox has no documents responsive to Request Nos. 13, 14, 16, 17, 18, 21, and 22, which are directed to plaintiff Fox Broadcasting Company and seek information about Fox Broadcasting Company's supposed investment and/or ownership interest in Hulu. Furthermore, documents discussing Fox-Hulu Holdings, Inc.'s investment in Hulu are completely irrelevant because the ownership structure of Hulu has nothing to do with this case. The reasons why non-party Fox-Hulu Holdings, Inc. invested in Hulu, and Hulu's "allocation of profits and losses" are equally irrelevant.

Request No. 15 seeks documents related to the corporate formation of Hulu. Dish has never once articulated why Hulu's "articles of incorporation" or "operating agreements" tend to support or refute any claim or defense in this lawsuit.

With respect to Request No. 19, Fox has already produced its All-in-One reports dating back to 2011. As previously explained, Fox has not located any similar reports or data from before 2011. If additional reports are discovered, we will produce them.

Request Nos. 20 and 23 seek documents concerning non-party Hulu's internal management decisions and financial statements. At our in-person meeting Annette argued that Hulu's financial performance and internal business decisions are somehow relevant because they shed light on Hulu's financial success and viability. So what? The financial performance of Hulu – or Amazon, Apple, Netflix, or any other distributor – has nothing to do with the undisputed fact that a market exists for Internet distribution of TV shows.

Lastly, at our in-person meeting, you asked whether Jenner & Block was authorized to accept a subpoena on behalf of Fox-Hulu Holdings, Inc. We do not represent that company and are not authorized to accept a subpoena on its behalf.

### Request No. 28-31

These requests seek every document discussing or evidencing all of Fox's ad sales results, average CPMs, pricing and volume for every deal that was struck over the past two years. In my November 6, 2013 letter, I explained why these requests seek irrelevant information that goes far beyond the scope of discovery. I will not repeat those arguments here.

Your January 22 letter asserts that "Fox has not articulated what undue burden exists" in responding to these requests. That is not true. In my November 6 letter, I explained:

> More than 100 people work in Fox's ad sales department. Fox
> typically negotiates more than 150 deals during the upfront sales
> weeks alone. Each of these deals involves extensive
> communications back and forth. During the upfront sales period,
> Fox's sales executives work late into the evening, sending emails
> around the clock. The sheer breadth of documents covered by
> these requests is enormous.

Exhibit 9 - Page 46

February 10, 2014
Page 5

In short, Requests Nos. 28-31 would require Fox to gather and review all of its emails and
internal documents concerning the vast majority of its advertising sales business for the past two
years. There is no reason why either party needs to sift through this mountain of emails and
documents, especially since Fox is not seeking a penny in lost advertising revenue as part of its
damages claim. Fox has already agreed to produce all communications with advertisers or ad
agencies that mention PrimeTime Anytime or AutoHop, as well as its total ad sales revenues for
the past seven years.

In my November 6 letter, and again at our in-person meeting, I asked whether Dish
would be willing to discuss a compromise whereby Fox would produce documents sufficient to
show its advertising sales results and average CPMs that advertisers agreed to pay at the 2013
and 2014 upfronts. Dish never responded to that portion of my letter in writing, and at our
meeting, Elyse said Dish would not agree to any such compromise. Is that still Dish's position?

### Request Nos. 35-41

Dish seeks detailed information about the number of times particular Fox programs and
episodes were viewed or downloaded on Hulu and Hulu Plus, Netflix, TV.com, Amazon Prime,
Vudu and Apple iTunes. Dish also seeks specific revenues earned by Fox from each of these
third party licensees. Dish seeks this information for the past five years.

As set forth in my November 6 letter, Dish cannot demonstrate why it needs to know the
number of times particular television episodes were downloaded or streamed by consumers. The
amount of money Fox earned from each of these individual distributors for the past five years is
especially irrelevant given that Fox is not seeking any damages in the form of lost sales or
revenues.

Without waiving its objections, Fox is evaluating whether a compromise can be reached
on these requests.

### Request No. 42

This request seeks "All studies and analyses of Internet television-viewing habits,
including but not limited to: (a) advertisement-viewing tolerance in relation to advertisement-
placement, timing, frequency and duration during online and/or Fox mobile application viewing,
and the effect of advertising on viewer retention; (b) cord-cutting or the risk of cord-cutting from
Internet television-viewing; and (c) distribution of advertising-avoidance behavior and viewing
preferences across any population of viewers."

Candidly, we do not understand your relevance arguments. At our in-person meeting,
Annette said that if studies show that viewers have a high tolerance for ads on the Internet, then
PTAT and AutoHop (which are non-Internet services) will be less appealing to those Internet
users. Somehow, this will help Dish prove that Fox is not really being harmed by PTAT and
AutoHop. Is that Dish's position? If not, can you please explain further? Also, please explain

2257410.1

Exhibit 9 - Page 47

February 10, 2014
Page 6

the relevance of cord-cutting studies to this case, as well as studies about "distribution of advertising-avoidance behavior and viewing preferences across any population of viewers."

We are still willing to discuss Request No. 42, but we need a better and more clear explanation of their relevance to the specific claims and defenses in this case.

* * * * *

As always. we are available to discuss any of the issues above in greater detail.  We will supplement this letter once we have completed our analysis and investigation of the issues discussed above and raised by your January 22 letter.

Sincerely,

David R. Singer
Partner

Exhibit 9 - Page 48

# Exhibit 10



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

February 20, 2014

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

*VIA EMAIL AND U.S. MAIL*

David R. Singer, Esq.
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071

      Re:    *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et al*, Case No. CV 12-04529 DMG (SHx)

Dear David:

This letter responds to your letter dated February 10, 2014, concerning Plaintiff Fox Broadcasting Company's ("Fox") responses to DISH Network L.L.C.'s ("DISH") first, second and third set of requests for production of documents. We understand that Fox is still considering some of DISH's proposals, set forth in my January 22, 2014 letter and discussed at our January 23, 2014 conference. The text below details DISH's response to Fox's current proposed compromises. DISH is still waiting for proposal from Fox on a number of requests and looks forward to receiving those. DISH remains optimistic that Fox, as the plaintiff in this manner, will agree to produce the relevant documents requested on the matters that Fox has placed at issue.

## I.    FIRST SET OF REQUESTS FOR PRODUCTION

### A.    Request No. 3

Served in September 2012, Request No. 3 seeks Fox's affiliate and retransmission agreements. After more than a year of meet and confer efforts, Fox makes a highly conditional and potentially illusory proposal for a compromise: it says that, to the extent it "plans to argue" that its RTC negotiations with an MVPD have been impacted by DISH's features at issue in this case, Fox will agree to produce the resulting RTC agreements, subject to the consent of the MVPD and for outside litigation counsel's eyes only. To the extent that Fox proposes to produce any RTC agreements to DISH now, DISH asks that any such production be made as soon as possible. Otherwise, the plain fact is that Fox has *already argued* that its RTC negotiations with MVPDs *have been and will be* impacted by DISH's features. *E.g.*, Memorandum in Support of Fox's Motion for Preliminary Injunction at pp. 21-23; Declaration of Michael Biard in Support of Fox's Motion for Preliminary Injunction at pp. 14-16; Memorandum in Support of Fox's Second Motion for Preliminary Injunction at pp. 17-19; Declaration of Michael Biard in Support of Fox's Second

Exhibit 10 - Page 49



**ORRICK**

David R. Singer, Esq.
February 20, 2014
Page 2

Motion for Preliminary Injunction at pp. 9-10. For that reason, and others, DISH is entitled to production of all of the RTC agreements that it requested, in order to test Fox's assertions about that alleged impact. Fox may not now hedge on the arguments that it has already made, and make its offer of production contingent on its potential future arguments in this litigation.

In addition, Fox has argued that it is irreparably harmed by certain features offered by DISH to its customers that other MVPDs offer as well. Fox has not pursued those other MVPDs and has told the district court that it has no plans to do so. DISH is entitled to know whether Fox has purported to license these rights to those other MVPDs, and charged a royalty fee, or whether Fox has simply determined to selectively enforce its alleged copyright rights here.

In addition, DISH needs all of Fox's agreements, because the actual impact that the features at issue may have had on some of Fox's agreements can only be measured through comparison with the allegedly unaffected agreements. Moreover, the market for Fox's copyrighted materials at issue here is properly evaluated based upon all affiliate and retransmission agreements. This is especially true given Fox's belated disclosure that it is seeking "reasonable royalties" as damages. Fox must produce its affiliate and retransmission agreements that relate to the content at issue. Please confirm that you will produce all of Fox's affiliate and retransmission agreements. Otherwise, DISH will seek assistance from the court.

> **B.**      **Request No. 4**

Request No. 4 seeks documents sufficient to show Fox's television viewing audience for the past seven years. Fox has agreed to produce some reports for the previous five years. Fox has indicated that it does not have possession, custody, or control of the remaining data sought by this request.

## II.      SECOND SET OF REQUESTS FOR PRODUCTION

> **A.**      **Request No. 8**

Request No. 8 seeks documents discussing the specific capabilities of DISH technology at issue in this action (storage, recording, time-shifting, fast-forwarding, commercial skipping and place-shifting). Fox has agreed to produce documents relating to place-shifting capabilities. For the remaining capabilities, DISH has narrowed its request and proposed specific search terms in response to Fox's burden objection. Nearly one month ago, DISH agreed in principle to Fox's proposal that DISH's proposed search terms be further limited to target Fox's technology tracking and evaluation of each capability in terms of whether it stands to benefit or harm Fox. We are still waiting for Fox's proposed search terms.

Exhibit 10 - Page 50



ORRICK

David R. Singer, Esq.
February 20, 2014
Page 3

**B.    Request No. 9**

Request No. 9 seeks documents reflecting Fox's knowledge of fast-forwarding capabilities
on DVRs.  Responding to Fox's burden claim, DISH has proposed two different versions of search
terms.  Nearly one month ago, DISH agreed in principle to Fox's proposal that DISH's proposed
search terms be further limited to target Fox's technology tracking and evaluation of whether
various fast-forwarding DVR capabilities benefit or harm Fox.  We are still waiting for Fox's
proposed search terms.

**C.    Request Nos. 12 and 13**

Request Nos. 12 and 13 seek documents reflecting Fox's knowledge of place-shifting
technologies.  Responding to Fox's burden claim, DISH has proposed two different versions of
search terms.  Nearly one month ago, DISH agreed in principle to Fox's proposal that DISH's
proposed search terms be further limited to target Fox's technology tracking and evaluation of
whether various place-shifting capabilities or products benefit or harm Fox.  We are still waiting on
Fox's proposed search terms.

**D.    Request No. 14**

Request No. 14 seeks Fox's communications with MVPDs or DVR providers regarding any
DVR capability that Fox has contended was a copyright violation.  Your February 10, 2014 letter
ignored DISH's written proposed compromise from my January 22, 2014 letter, in which DISH
offered to narrow its request to communications with MVPDs or other DVR providers regarding
any DVR's storage, recording, time-shifting, fast-forwarding, commercial skipping, or place-shifting
capability where Fox contended the features posed an actual or potential copyright violation,
including any cease and desist letters.  DISH is willing to further narrow the request to cease and
desist letters to and complaints filed against MVPDs or DVR providers regarding any DVR's
storage, recording, time-shifting, fast-forwarding, commercial skipping, or place-shifting capability
where Fox contended the features posed an actual or potential copyright violation.  Please confirm
that Fox will produce documents responsive to the request as narrowed.  If not, DISH will seek the
court's assistance.

**E.    Request Nos. 10 and 15**

Request Nos. 10 and 15 seek Fox's studies or analyses of DVR storage or playback
capabilities or devices with place-shifting capabilities.  Fox has agreed to provide studies, so the
continuing meet and confer relates solely to Fox's "analysis" of these features.  DISH has already
provided Fox with a finite list of devices to be included in any further search for responsive
documents.  However, Fox has indicated that it believes that the current search terms based on
these devices is too burdensome.  This is belied by Fox's statement that the searches resulted in only

Exhibit 10 - Page 51



ORRICK

David R. Singer, Esq.
February 20, 2014
Page 4

2,000-5,000 documents. This is not an unduly burdensome number of documents to review, given that these DVR devices are directly relevant to this case, as they have comparable functionality to the features that DISH is providing to its customers.

Additionally, you asked that we provide you with examples of Fox's internal reports that comment on new technology. From Fox's production to date, we have located the following types of reports: Emerging Technologies – Monthly Update, New Technologies Report, Advanced Services Newsletter, and The Download. Please confirm that Fox will produce *all* such new technology reports.

### F.   Request No. 19

Request No. 19 seeks Fox's license agreements with Internet-based distribution services. Fox has agreed to produce its licensing agreements with Internet-based distribution services, with redactions of what it considers to be irrelevant information. Fox has indicated that it is still working to obtain consent from third parties for the production of the agreements. Please let us know when we might expect to receive production of these agreements.

## III.   THIRD SET OF REQUESTS FOR PRODUCTION

### A.   Request No. 8

Request No. 8 seeks documents sufficient to identify any new licensees of Fox's broadcast network programming from January 1, 2012 to the present. Fox has agreed to produce its VOD and Internet distribution licenses. However, Fox is still working to obtain consent from third parties for the production of these documents. Please let us know when we might expect to receive production of these agreements.

### B.   Request Nos. 11 & 12

Request Nos. 11 and 12 seek documents relating to Fox's active promotion of Slingbox products. In your February 10, 2014 letter, Fox has agreed to produce any Slingbox television advertisements that appeared on the Fox Network where Slingbox purchased the ad time from Fox Broadcasting Company, as well as documents discussing sale of advertising time to Sling Media. DISH is willing to compromise as well. Please confirm that by "television advertisements," Fox intends to capture both traditional and non-traditional advertisements, including but not limited to product placements or promotional mentions during the course of a Fox television program. Additionally, please agree to produce information regarding both paid and unpaid advertising and promotions, including documents discussing any of these forms of advertising for Slingbox. Please let us know whether Fox is willing to agree to produce these documents, which would capture all advertising or promotion relating to Slingbox.

Exhibit 10 - Page 52



**ORRICK**

David R. Singer, Esq.
February 20, 2014
Page 5

### C.   Request Nos. 13–23

Request Nos. 13–18 and 20–23 seek documents regarding Fox's relationship with Hulu. Fox asserts that Fox Broadcasting Company does not "have" any responsive documents for Request Nos. 13, 14, 16, 17, 18, 21 and 22. As you know, there is an obligation to produce documents that may not be in a party's possession, but nonetheless are within its custody or control. Even if the plaintiffs in this action do not "have" documents responsive to Request Nos. 13, 14, 16, 17, 18, 21 and 22 in their possession, they still must produce if they are within their custody or control.

Furthermore, Fox has presented no valid reason for its refusal to produce the responsive documents that it does "have" in its possession for Request Nos. 15, 19, 20, 23. Request No. 15 seeks documents regarding the formation of Hulu, including operating agreements or articles of incorporation and any amendments. Fox claims not to understand how this information relates to any claims or defenses in this action. Yet Fox is the one who has put internet distribution at issue, claiming that its internet distribution channels will be harmed by the DISH's DVR features. Memorandum in Support of Fox's Second Motion for Preliminary Injunction at pp. 17-19; Declaration of Michael Biard in Support of Fox's Second Motion for Preliminary Injunction at pp. 9-10. DISH is entitled to discovery regarding the internet distribution entity that Fox partially owns to understand how Hulu figures into Fox's internet distribution strategy. Request No. 20 seeks documents regarding Hulu's decision to offer original programming, which would tend to show that Hulu is not sustainable simply as a distribution outlet for broadcast television, undermining Fox's self-serving assertion that "a market exists for internet distribution of [network broadcast] TV shows" on Hulu. Request No. 23 seeks Hulu's financial documents, which again relate to whether Hulu is a viable internet distribution strategy for the networks. Fox has put this squarely at issue and must produce documents within its possession, custody or control that are responsive to these requests.

For Request No. 19, please confirm that Fox has produced all responsive measurement data regarding the viewing of its network programming via Hulu within its possession, custody, or control.

### D.   Request No. 24

Request No. 24 seeks documents regarding Fox's upfront presentations and agreements, identifying ratings, advertising rates (including CPMs) commitments and/or guarantees for the last five television seasons. Fox objects on relevance, burden, and confidentiality grounds, yet none of these objections withstand scrutiny. The requested documents are relevant to the claims and defenses at issue in this litigation. For example, responsive documents will test Fox's claims that DISH's AutoHop and PTAT features will impact Fox's relationships with advertisers, including its advertising rates and revenue. Indeed, Fox claims that the features impact its economic ecosystem and undermine its ability to offer over-the-air broadcast television. Memorandum in Support of

Exhibit 10 - Page 53



**ORRICK**

David R. Singer, Esq.
February 20, 2014
Page 6

Fox's Motion for Preliminary Injunction at pp. 23-24; Declaration of Sherry Brennan in Support of Fox's Motion for Preliminary Injunction at pp. 14-15. Fox's burden objection is unsubstantiated and without merit given the specific subset of documents being sought by this request. Fox's upfront presentations, agreements, and CPMs can be located by speaking with Fox custodians, rather than through search terms. Any confidentiality concerns are addressed by the Protective Order, which allows for Attorneys' Eyes Only treatment of Fox's Highly Confidential documents. Please confirm that Fox will produce its upfront presentations and agreements and advertising rates for the past five seasons.

    E.    **Request Nos. 28–31**

    Request Nos. 28–31 seek documents regarding Fox's advertising sales for the 2013-2014 season. Fox's agreements to produce only some responsive documents are too narrow.

    For Request No. 28, which seeks documents discussing advertising sales results in connection with the 2013 upfronts, Fox proposes producing only those communications with advertisers or ad agencies that mention PrimeTime Anytime or AutoHop. However, DISH is also entitled to those documents that show that none of the features at issue in this litigation were of any concern to advertisers or ad agencies. This would only be shown through communications that make no mention of PrimeTime Anytime or AutoHop. In an effort to compromise, DISH proposes that Fox produce its communications with its top 10 advertisers or ad agencies for the 2013 upfronts. Please let us know your position on this compromise.

    Request Nos. 29 and 30 seeks documents discussing or evidencing the average CPM, and any increase, for primetime programming for the 2013-2014 season. In response, Fox proposes to produce documents showing the average CPMs advertisers agreed to pay at the 2013, 2014 upfronts. This clearly precludes DISH from seeing any of Fox's internal communications that admit that DISH's features at issue in this suit have had no effect on Fox's CPM rates. DISH proposes that Fox also produce: (i) its average CPMs for 2013-2014 season; and (ii) its communications that discuss its 2013, 2014 advertising rates and DISH or any of the DISH features at issue in this litigation. Please let us know your position on this compromise.

    Request No. 31 seeks very specific information regarding Fox's scatter market advertising. Fox does not appear to specifically address this data in any of its previous communications. Please let us know if Fox will produce the data sought. If not, please give us Fox's basis for refusing to do so.

    F.    **Request No. 32**

    Request No. 32 seeks documents sufficient to show program views of Fox primetime programming, including but not limited to CPMs and counts of unique users, and advertising

Exhibit 10 - Page 54



ORRICK

David R. Singer, Esq.
February 20, 2014
Page 7

revenue earned by Fox from the Fox website for each of the last five television seasons. Fox objects to this request on relevance, confidentiality, and burden grounds. None of these objections justify Fox's refusal to produce responsive documents.

As we have explained with respect to Request Nos. 28-31, which also seek documents regarding Fox's advertising revenues, DISH is entitled to the requested documents to counter Fox's claims of irreparable harm and market harm. Fox has put this discovery at issue by repeatedly arguing to the Court that DISH's DVR features would reduce Fox's ad revenue and would destroy Fox's business model and that their ill effects would be felt during the past year. This discovery is relevant to Fox's claims that DISH's features "threaten existing and potential markets for the licensed distributions of Fox's copyright works," as Fox argued in its motion for a preliminary injunction. Fox's burden objection is meritless because the requests seek only documents sufficient to show the requested information. Moreover, any confidentiality concerns are addressed by the Protective Order, which allows for Attorneys' Eyes Only treatment of Fox's Highly Confidential documents.

Fox also claims that it met its discovery obligations by producing it's All in One reports from 2011 to 2013 and its advertising revenue for the same period. This is insufficient. First, DISH is entitled to responsive documents for each of the last five television seasons, and that is not covered by what Fox has previously agreed to produce. Second, DISH is entitled to documents showing the advertising information specific to the Fox.com application (and any predecessor applications). Please confirm that Fox will produce documents sufficient to show program views of Fox primetime programming from the Fox website in response to Request No. 32.

### G.    Request Nos. 35–41

Request Nos. 35–41 seek documents sufficient to show how much of Fox's copyrighted programming was viewed via certain online services and specific revenue earned by Fox from these licensees. The fact that Fox claims that it is not seeking actual damages does not mean that this information is not relevant. As we have repeatedly explained, Fox cannot cut off areas of inquiry based upon an assertion that it is not seeking actual damages, for several reasons. First, Fox has not conclusively disaffirmed any actual damages claims. Second, Fox purports to assert a claim for reasonable royalties, which DISH disputes, but which is a form of actual damages. Third, DISH is entitled to make a showing that Fox's alleged harm is compensable in actual damages in order to counter Fox's claims of irreparable harm. In any event, DISH is entitled to discovery regarding Fox's argument that DISH's DVR features harm Fox by interfering with its ability to distribute its copyrighted programming through non-linear channels. Viewership data for Fox's various internet distributors will help DISH evaluate and ultimately disprove Fox's claim. We look forward to hearing from you regarding the production of this information, as you suggested in your February 10, 2014 letter.

Exhibit 10 - Page 55



ORRICK

David R. Singer, Esq.
February 20, 2014
Page 8

H.    **Request No. 42**

Fox's insistence that it does not understand Request No. 42, which seeks studies and analyses of Internet television-viewing habits, is not reasonable. We have now explained our position in writing on October 17, 2013 and January 22, 2014 and discussed these requests in-person on January 23, 2014. The relevance of studies regarding Internet television viewing is straightforward. Fox has asserted that DISH's DVR features at issue in this litigation will interfere with Fox's distribution of its copyrighted content through an Internet-based distribution channel. Information within Fox's possession, custody or control regarding this specific viewing venue – Internet distribution – is relevant to analyze the nature of the alleged market, including how these viewing options are used in practice, as well as the alleged harm to it. By way of example, these studies could show that a significant population of potential Internet consumers are very advertisement-averse, and will not use services that force ad-viewing, such as Hulu, which would be relevant to Fox's claim of harm from the features at issue. Alternatively, these studies of viewing habits could show that Internet television distribution is not a viable long term distribution channel, demonstrating that Fox's claim that the features at issue here are harming the distribution channel is not true. Please let us know whether Fox will produce studies within its possession, custody, or control regarding Internet television-viewing habits. If not, DISH will seek court assistance to obtain these relevant and easily produced documents.

\* \* \*

DISH remains open to productive meet and confer efforts on Requests discussed above.

Very truly yours,

William A. Molinski

Exhibit 10 - Page 56

# Exhibit 11

**JENNER&BLOCK**

March 6, 2014

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel 213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel 213 239-2206
Fax 213 239-2216
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

Re:   ***Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al***
         ***C.D. Cal. Case No. 12-cv-04529-DMG (SH)***

Dear Bill:

This responds to your February 20, 2014 letter regarding Dish's document requests.

### Dish's First Set of Document Requests

### Request No. 3

I'm surprised by your confusion over our proposed compromise. I thought my letter was clear. I will try again:

1. With respect to retransmission consent negotiations that Fox claims were impacted by Dish's infringement, Fox will produce the resulting retransmission consent agreements. Because some of these negotiations are ongoing, we would need to wait until the agreement is actually signed. Fox is not hedging or being illusory at all. As part of this proposed compromise, Fox would agree to provide Dish with a list of MVPD negotiations that have been impacted.

2. Pursuant to its contractual non-disclosure obligations, Fox must seek consent from the affected third parties before producing the agreements.

3. With respect to all other retransmission consent agreements, Fox will enter into a formal stipulation that its retransmission consent negotiations with those MVPDs were not impacted by any of Dish's services at issue. Dish can use that stipulation at trial. This will alleviate the burdens of Fox having to gather and review several hundred agreements

2260764.1

Exhibit 11 - Page 57

March 6, 2014
Page 2

and amendments, and having to obtain consent from each MVPD to produce materials that have no relevance to this case.

4.  In exchange for the foregoing, Dish will not bring a motion to compel and will deem this request to be satisfied.

Based on your letter, we understand that Dish rejects Fox's proposed compromise.  If we are mistaken, please let us know.

## Dish's Second Set of Document Requests

### Request No. 8, 9, 12 and 13

Requests 8, 9, 12 and 13 seek documents regarding the functionalities of various devices and services (e.g., fast-forwarding, storage, and/or place-shifting functionalities of DVRs, VCRs, and TiVos).  While the parties have reached an agreement with respect to documents discussing functionalities of the Dish services at issue (the Hopper, Hopper with Sling, PTAT, AutoHop, Hopper Transfers, and Sling Adapter), as well as PocketDish and the ViP 922 Sling-enabled DVR, Dish still wants all documents discussing the functionalities of every other service or device encompassed by these four requests.

When we met on August 21, 2013, Fox asked Dish to propose word searches to narrow these requests.  On September 25, 2013, Dish proposed word searches for Requests 8, 9, 12 and 13.  These word searches were not crafted to narrow the requests, but rather contained overly broad terms that would capture every conceivable document that might be responsive to the four requests.  Nonetheless, in an effort to meet and confer in good faith, Fox ran these word searches.  Not surprisingly, they yielded over 400,000 reviewable documents.

After Fox reported these results, Dish provided revised word searches that were still too broad.  Again, Fox asked Dish to narrow the search terms to issues that are arguably relevant to this case.  For example, Fox suggested that Dish limit the request to documents showing how functionalities of the various services and devices *harm* or *benefit* Fox.  *See* Fox 12/23/13 letter. Dish agreed this could be a good compromise, and asked Fox to devise search terms targeting how these functionalities stand to benefit or harm Fox.  *See* Dish 1/22/14 letter.

Since then, Fox has been actively assessing the burden of search terms that take into account the functionalities of devices not at issue and how they might benefit or harm Fox.  Fox ran the following searches:

Exhibit 11 - Page 58

March 6, 2014
Page 3

### Revised Search 1 (for RFP 8, Set 2, limiting to harm/benefit documents)

(XiP OR ViP* OR DuoDVR* OR SoloDVR* OR "DISH Anywhere" OR DishAnywhere
OR Sling* OR PocketDISH OR (Pocket /3 DISH) OR Hopper* OR (DISH /2 receiver*)
OR (DISH /2 DVR*) OR (DISH /2 stb*) OR (DISH /2 "set top") OR (DISH /2 settop*))
AND
((commercial* OR ad*) /10 (ff OR (fast /2 forward*) OR fastforward* OR skip* OR
jump* OR zap* OR avoid* OR hop* OR block)
w/200
(Harm* or benefit* or hurt* or infring* or help* or destroy* or damag* or injur* or
advantag*)

### Revised Search 2 (for RFP 8, Set 2, limiting to harm/benefit documents)

(XiP* OR ViP* OR DuoDVR* OR SoloDVR* OR "DISH Anywhere" OR
DishAnywhere OR Sling* OR PocketDISH OR (Pocket /3 DISH) OR Hopper* OR
(DISH /2 receiver*) OR (DISH /2 DVR*) OR (DISH /2 stb*) OR (DISH /2 "set top") OR
(DISH /2 set-top*))
AND
(timeshift* OR (time /2 shift*) OR (place /2 shift*) OR placeshift* OR (space /2 shift*)
OR spaceshift* OR transfer* OR transmit* OR stream*)
w/200
(Harm* or benefit* or hurt* or infring* or help* or destroy* or damag* or injur* or
advantag*)

### Revised Search 3 (for RFP 9, Set 2, limiting to harm/benefit documents)

(("digital video recorder*" OR DVR* OR receiver* OR "set top*" OR "set top" OR
STB* OR TIVO* OR (record* /2 device*) OR (record* /2 tech*) OR PVR* OR
"personal video recorder*" OR RePlayTV*)
AND
((commercial* OR ad*) /10 (ff OR (fast /2 forward*) OR fastforward* OR skip* OR
jump* OR zap* OR avoid* OR block*)))
w/200
(Harm* or benefit* or hurt* or infring* or help* or destroy* or damag* or injur* or
advantag*)

### Revised Search 4 (for RFP 9, Set 2, limiting to harm/benefit documents)

((report* OR study* OR studies OR analy* OR data OR project* OR predict* OR
survey* OR plan* OR memo*)
w/25
((commercial* OR ad*) /10 (ff OR (fast /2 forward*) OR fastforward* OR skip* OR
jump* OR zap* OR avoid* OR block*)))

Exhibit 11 - Page 59

March 6, 2014
Page 4

w/200
(Harm* or benefit* or hurt* or infring* or help* or destroy* or damag* or injur* or advantag*)

### Revised Search 5 (for RFPs 12/13, Set 2, limiting to harm/benefit documents)

("Sling Adapter" OR SlingBox OR "Sling Box" OR Monsoon OR Elgato OR Vulkano OR Blast OR Lava OR Flow OR Hava OR LocationFree OR EyeTV OR Nomad  OR Stream OR PocketDISH OR (Pocket /3 DISH) OR (TiVo* /2 "To Go") OR (TiVo* /2 Desktop*) OR "turbo.264HD" or Handbrake OR "Video Capture" OR TV2ME OR Plex OR Pogoplug OR "@TV" OR Betamax OR DMR-E80H OR AV700 OR MDR537H OR HLTD7 OR "PB9001/37" OR "BDP-SX1000" OR "AVH-P2400BT" OR "PKG-RSE2" OR WinTV* OR HDHR3 OR USB OR VideoRecorder
AND
(placeshift* OR (place /2 shift*) OR (space /2 shift*) OR spaceshift* OR transfer* OR transmit* OR stream*))
w/200
(Harm* or benefit* or hurt* or infring* or help* or destroy* or damag* or injur* or advantag*)

### Revised Search 6 (for RFPs 12/13, Set 2, limiting to harm/benefit documents)

((device* OR tech* OR Sony OR K2B OR DirecTV OR TiVo OR Sling OR DISH OR EchoStar OR Belkin OR Panasonic OR Archos   OR Magnavox OR Haier OR Philips OR Pioneer OR Alpine OR Hauppauge OR SiliconDust OR "Blackmagic Design")
AND
(placeshift* OR (place /2 shift*) OR (space /2 shift*) OR spaceshift* OR transfer* OR transmit* OR stream*))
w/200
(Harm* or benefit* or hurt* or infring* or help* or destroy* or damag* or injur* or advantag*)

### Revised Search 7 (for RFPs 12/13, Set 2, limiting to harm/benefit documents)

((report* OR study* OR studies OR analy* OR data OR project* OR predict* OR survey* OR plan* OR memo*)
w/25
(placeshift* OR (place /2 shift*) OR (space /2 shift*) OR spaceshift* OR transfer* OR transmit* OR stream*))
w/50
(Harm* or benefit* or hurt* or infring* or help* or destroy* or damag* or injur* or advantag*)

Exhibit 11 - Page 60

March 6, 2014
Page 5

These searches generated over 20,000 reviewable documents.  We believe it would be unduly burdensome to review that many documents for responsive information given Dish's weak claim of relevance.

Fox is now investigating the burden of running more limited searches (e.g., limiting the proximity between relevant search terms) as to those custodians whose job duties include monitoring and/or reviewing new technologies.  The further revised searches are as follows:

### Further Revised Search 1 (for RFP 8, Set 2, limiting to harm/benefit documents)

(XiP* OR ViP* OR DuoDVR* OR SoloDVR* OR (DISH /2 receiver*) OR (DISH /2 DVR*) OR (DISH /2 stb*) OR (DISH /2 "set top") OR (DISH /2 settop*))
w/25
((commercial* OR ad*) /10 (ff OR (fast /2 forward*) OR fastforward* OR skip* OR jump* OR zap* OR avoid* OR hop* OR block)
w/25
(Harm* or benefit* or hurt* or infring* or destroy* or damag* or injur* or advantag*)

### Further Revised Search 2 (for RFP 8, Set 2, limiting to harm/benefit documents)

(XiP* OR ViP* OR DuoDVR* OR SoloDVR* OR (DISH /2 receiver*) OR (DISH /2 DVR*) OR (DISH /2 stb*) OR (DISH /2 "set top") OR (DISH /2 set-top*))
w/25
(timeshift* OR (time /2 shift*) OR (place /2 shift*) OR placeshift* OR (space /2 shift*) OR spaceshift* OR transfer* OR transmit* OR stream*)
w/25
(Harm* or benefit* or hurt* or infring* or destroy* or damag* or injur* or advantag*)

### Further Revised Search 3 (for RFP 9, Set 2, limiting to harm/benefit documents)

(("digital video recorder*" OR DVR* OR receiver* OR "set top*" OR "set top" OR STB* OR TIVO* OR (record* /2 device*) OR (record* /2 tech*) OR PVR* OR "personal video recorder*" OR RePlayTV*)
w/25
((commercial* OR ad*) /10 (ff OR (fast /2 forward*) OR fastforward* OR skip* OR jump* OR zap* OR avoid* OR block*)))
w/25
(Harm* or benefit* or hurt* or infring* or destroy* or damag* or injur* or advantag*)

### Further Revised Search 4 (for RFP 9, Set 2, limiting to harm/benefit documents)

((report* OR study* OR studies OR analy* OR data OR project* OR predict* OR survey* OR plan* OR memo*)
w/25

Exhibit 11 - Page 61

March 6, 2014
Page 6

((commercial* OR ad*) /10 (ff OR (fast /2 forward*) OR fastforward* OR skip* OR jump* OR zap* OR avoid* OR block*)))
w/25
(Harm* or benefit* or hurt* or infring* or destroy* or damag* or injur* or advantag*)

**Further Revised Search 5 (for RFPs 12/13, Set 2, limiting to harm/benefit documents)**

(Monsoon OR Elgato OR Vulkano OR Blast OR Lava OR Flow OR Hava OR LocationFree OR EyeTV OR Nomad  OR Stream OR (TiVo* /2 "To Go") OR (TiVo* /2 Desktop*) OR "turbo.264HD" or Handbrake OR "Video Capture" OR TV2ME OR Plex OR Pogoplug OR Betamax OR DMR-E80H OR AV700 OR MDR537H OR HLTD7 OR "PB9001/37" OR "BDP-SX1000" OR "AVH-P2400BT" OR "PKG-RSE2" OR WinTV* OR HDHR3 OR USB OR VideoRecorder
w/25
(placeshift* OR (place /2 shift*) OR (space /2 shift*) OR spaceshift* OR transfer* OR transmit* OR stream*))
w/25
(Harm* or benefit* or hurt* or infring* or destroy* or damag* or injur* or advantag*)

**Further Revised Search 6 (for RFPs 12/13, Set 2, limiting to harm/benefit documents)**

((device* OR tech* OR Sony OR K2B OR DirecTV OR TiVo OR Belkin OR Panasonic OR Archos OR Magnavox OR Haier OR Philips OR Pioneer OR Alpine OR Hauppauge OR SiliconDust OR "Blackmagic Design")
w/25
(placeshift* OR (place /2 shift*) OR (space /2 shift*) OR spaceshift* OR transfer* OR transmit* OR stream*))
w/25
(Harm* or benefit* or hurt* or infring* or destroy* or damag* or injur* or advantag*)

**Further Revised Search 7 (for RFPs 12/13, Set 2, limiting to harm/benefit documents)**

((report* OR study* OR studies OR analy* OR data OR project* OR predict* OR survey* OR plan* OR memo*)
w/25
(placeshift* OR (place /2 shift*) OR (space /2 shift*) OR spaceshift* OR transfer* OR transmit* OR stream*))
w/25
(Harm* or benefit* or hurt* or infring* or destroy* or damag* or injur* or advantag*)

We will get back to you once we have the results.

Exhibit 11 - Page 62

March 6, 2014
Page 7

### Request No. 14

Fox will agree to respond to this request as narrowed by your February 20 letter; it will search for and produce "cease and desist letters to and complaints filed against MVPDs or DVR providers regarding any DVR's storage, recording, time-shifting, fast-forwarding, commercial-skipping, or place-shifting capability where Fox contended the features posed an actual or potential copyright violation."

### Request Nos. 10 and 15

Request No. 10 seeks "all documents reflecting any study or analysis by You of DVR or VCR storage and playback capabilities."  Request No. 15 seeks "All documents reflecting any study or analysis by You of products or devices with place-shifting functionality, including but not limited to Sling Adapter, Hopper with Sling, DISH Anywhere, and/or Hopper Transfers." In addition to the responsive documents Fox has already agreed to produce, and in an effort to resolve these two requests, Fox has been actively assessing the burden of the search terms proposed by Dish, as well as testing reasonable limitations that might decrease the number of documents Fox has to review in responding to these requests.

Initially, Fox ran the following broad search, looking for studies or analyses of certain devices Dish claims are relevant to the issues in this case:

Stud* or analys* or analyz* or research*
w/25
monsoon* or vulkano* or hava or lava or flow or blast or locationfree* or "archos av700" or nomad* or "tivo stream" or "tivo to go" or "tivo desktop" or (elgato* w/2 (eyetv or "video capture")) or (belkin w/2 @TV) or (K2B w/2 tv2me) or tv2me

We understand the results of this search would require Fox to review between 2,000 and 5,000 documents (which could easily exceed 10,000 pages).

As promised in my February 10, 2014 letter, we attempted to narrow this search to documents discussing whether any of these devices impact Fox's primetime ratings and/or advertising revenues.  Fox ran the following search:

Stud* or analys* or analyz* or research*
AND
monsoon* or vulkano* or hava or lava or flow or blast or locationfree* or "archos av700" or nomad* or "tivo stream" or "tivo to go" or "tivo desktop" or (elgato* w/2 (eyetv or "video capture")) or (belkin w/2 TV) or (K2B w/2 tv2me) or tv2me
AND
"primetime rating" or "primetime ratings" or "prime time rating" or "prime time ratings" or "ad revenue" or "ad revenues" or "advertising revenue" or "advertising revenues"

Exhibit 11 - Page 63

March 6, 2014
Page 8

This yielded approximately 4,000 documents.  After further investigation, Fox ascertained that approximately 95 percent of the documents generated by this search contained the terms "blast" or "flow."

As a result, Fox ran the following revised search, which removed the two problematic terms:

> Stud* or analys* or analyz* or research*
> AND
> monsoon* or vulkano* or hava or lava or locationfree* or "archos av700" or nomad* or "tivo stream" or "tivo to go" or "tivo desktop" or (elgato* w/2 (eyetv or "video capture")) or (belkin w/2 TV) or (K2B w/2 tv2me) or tv2me
> AND
> "primetime rating" or "primetime ratings" or "prime time rating" or "prime time ratings" or "ad revenue" or "ad revenues" or "advertising revenue" or "advertising revenues"

This search yielded a reasonable amount of reviewable documents.  We reviewed the documents and determined none of them were responsive to Requests 10 or 15.

While Fox has already fulfilled its obligation to respond to these requests by crafting a reasonable search that yielded a reasonable amount of documents and reviewing those documents, Fox is willing to investigate the burden of expanding the final search outlined above, and is now seeking hit counts for the following:

> Stud* or analys* or analyz* or research*
> AND
> monsoon* or vulkano* or hava or lava or locationfree* or "archos av700" or nomad* or "tivo stream" or "tivo to go" or "tivo desktop" or (elgato* w/2 (eyetv or "video capture")) or (belkin w/2 TV) or (K2B w/2 tv2me) or tv2me
> AND
> Rating* or revenue* or viewers or viewership* or ad or ads or advertis*

At our in-person meeting, Annette and Elyse proposed that Fox could further limit its response to monthly (or other regular) reports regarding new technology that were referenced by Sherry Brennan at her deposition.  As noted in my prior letter, Ms. Brennan never referenced such reports at her deposition.  In your February 20 letter, you are now asking Fox to produce *all* "technology reports" including reports labeled "Emerging Technologies – Monthly Update," New Technologies Report, Advanced Services Newsletter, and The Download.  We never agreed to *expand* Request Nos. 10 and 15 in such a way.  Dish's attempt to *broaden* these requests is disappointing given that we have already spent substantial time and resources trying to reach a compromise and narrow them.  The whole point of the meet and confer process is to compromise, not make greater demands.

Exhibit 11 - Page 64

March 6, 2014
Page 9

### Request No. 19

We have reached out to all of Fox's licensees that distribute Fox's primetime programming over the Internet. We are in the process of preparing proposed redactions of irrelevant information and soliciting comments and/or objections from these non-parties.

## Dish's Third Set of Document Requests

### Request No. 8

We are continuing to obtain consent from our MVPD licensees and have additional VOD and Internet distribution licenses that will be produced shortly.

### Request Nos. 11 and 12

As stated in my February 10 letter, Fox would agree to resolve this request by searching for and producing any Slingbox television advertisements that appeared on the Fox Network where Slingbox purchased the ad time from plaintiff Fox Broadcasting Company. You asked me to confirm that this would include product placement or promotional mentions (which I assume refers to some sort of paid promotion) during the course of a Fox television program. Yes, it would.

### Request Nos. 13-23

Documents discussing non-party Fox-Hulu Holdings, Inc.'s investment in Hulu, Hulu's financial performance, and Hulu's internal business decisions are totally irrelevant. Fox never put any of these things at issue. Just because Fox has identified the existence of an Internet-based distribution market for television programs does not mean that everything about each company involved in that market becomes discoverable. Fox will produce its license agreement with Hulu and other distributors once it obtains their consent to do so. Nothing more is required to show the existence of an Internet streaming market. People watch television programs online every day. Dish's own SEC filings discuss the threat of competition from Internet distribution of TV programming. These discovery requests are irrelevant and harassing. Fox will not be responding to them further.

As for Request No. 19, which seeks documents evidencing any measurement of viewing of Fox programs on Hulu, we will produce any compilations of viewing metrics similar to the All In One reports that we have already produced, to the extent they exist. We will not be searching through every internal email for documents that discuss any measurement of any Fox program on Hulu. Also, as discussed below, Fox is proposing a compromise that would likely render this request moot.

Exhibit 11 - Page 65

March 6, 2014
Page 10

### Request No. 24

This is the first time you have addressed this request in the meet and confer process. It seeks "all documents discussing, evidencing, or reflecting Your Upfront presentations and agreements, including but not limited to the presentations and agreements themselves, identifying ratings, advertising rates (including CPMs) commitments and/or guarantees for the last five television seasons." On its face, this would include the majority of emails and business information for Fox's entire ad sales department for the last five years.

As we've explained in response to similar requests, Fox has not put its entire advertising business at issue. The scope of discovery is *not* anything that relates to the *subject matter* of litigation; it is limited to matters that are *relevant to a claim or defense*. Fed. R. Civ. P. 26(b)(1). Fox's *claim* is that because Dish's PrimeTime Anytime and AutoHop eliminate all advertising on Fox Network programming, viewers will watch fewer ads. Once Dish's unauthorized service reaches a critical mass of subscribers, it threatens to reduce Nielsen's C3 rating which advertisers rely on when deciding how much to pay for advertising. While this is an existential threat to Fox's advertising revenue stream, Fox is *not* seeking any damages in the form of lost advertising sales. Nor is Fox claiming that it lost money on any particular ad sales deal. Therefore, Dish is not entitled to each and every negotiation and advertising agreement that has taken place over the past five years.

This request is also unduly burdensome. As we have already explained, more than 100 people work in Fox's ad sales department. Fox typically negotiates more than 150 deals during the upfront sales weeks alone. That's more than 750 sets of negotiations and agreements over a five-year period. Each of these deals involves extensive communications back and forth. During the upfront sales period, Fox's sales executives work late into the evening, sending emails around the clock. Additionally, many of these deals are further updated and revised throughout the entire year. This request alone could easily include many hundreds of thousands of emails and other documents.

### Request Nos. 28-30

Request No. 28 seeks every document discussing or evidencing Fox's ad sales results in connection with the 2013 upfronts, as well as any deals or contracts that were struck. Request No. 29 seeks all documents discussing or evidencing the average CPM that advertisers agreed to pay for spots on primetime programs in 2013-2014. Request No. 30 seeks all documents discussing or evidencing any increase in average CPM from the 2013 upfronts compare to the 2012 upfronts.

Together, these requests seek every document discussing or evidencing all of Fox's ad sales results, average CPMs, pricing and volume for every deal that was struck over the past two years. We have already explained why the requested documents are irrelevant and the undue burden imposed by these requests.

Exhibit 11 - Page 66

March 6, 2014
Page 11

Fox has agreed to produce all responsive communications with advertisers that mention Dish's unauthorized services at issue. Dish now claims it needs to see all communications with ad agencies that *do not* mention the services at issue so it can prove that ad agencies were not concerned about PrimeTime Anytime or AutoHop. That is absurd. It is hard to imagine anything more burdensome and harassing than asking Fox to search for, gather, review and produce hundreds of thousands of admittedly irrelevant emails so that Dish can "prove" that none of those emails say anything about the services at issue. Your proposed compromise that Fox limit this request to its "top 10" advertisers or ad agencies is no compromise at all. As Dish knows, the advertising purchasing market is highly concentrated. Communications with the "top 10" ad agencies cover the vast majority of Fox's entire ad sales business.

To resolve all of these overlapping requests, we proposed a compromise whereby Fox would produce documents sufficient to show its total advertising sales results and average CPM that advertisers agreed to pay at the 2013 and 2014 upfronts.

In your February 20 letter, you say that Fox's proposed compromise "clearly precludes Dish from seeing any of Fox's internal communications that admit that Dish's features at issue in this suit have had no effect on Fox's CPM rates." You also propose that Fox produce (i) its average CPMs for 2013-2014 season; and (ii) its communications that discuss its 2013, 2014 advertising rates and Dish or any of the Dish features at issue in this litigation. However, your proposal is limited to Request Nos. 29 and 30 and would still require Fox to respond to Request Nos. 24 and 28, which essentially cover everything sought by Request Nos. 29 and 30. That is not a compromise.

To resolve Request Nos. 24, 28, 29, and 30, Fox will agree to the terms of your proposed compromise for Request Nos. 29 and 30, in addition to the other documents Fox has already agreed to produce. However, to clarify, Fox will not be producing average sales results or CPM information on an advertiser-by-advertiser basis. Dish has not demonstrated why it needs to see detailed purchasing and CPM information for each and every separate advertiser. Please let us know if Dish will agree.

### Request No. 31

This seeks documents sufficient to show Fox's scatter market advertising rates (including CPMs), scatter market sales volumes (including number of commercials sold on the scatter market), and revenues earned for scatter market advertising for the last five television seasons. As phrased, this request would require Fox to search for, review, and gather an enormous amount of information. The so-called "scatter market" refers to ad-sales that are done throughout the entire year, on a daily basis. The burden of responding to this request would equal or exceed the burden of responding to the requests related to the upfronts. Also, Fox does not have any documents that summarize all of this information and would need to compile it.

Exhibit 11 - Page 67

March 6, 2014
Page 12

### Request Nos. 32 and 35-41

Dish seek detailed information about the number of times particular Fox programs and episodes were viewed or downloaded on Fox.com, Hulu, Netflix, TV.com, Amazon Prime, Vudu and Apple iTunes. Dish also seeks specific revenues earned by Fox from each of these third party licensees. Dish seeks this information for the past five years. We have carefully considered Dish's relevance arguments and determined they are inadequate.

Fox has already agreed to produce its license agreements with its Internet distributers; total revenues from its digital distribution of Fox programs; the All In One Reports which are responsive to other requests and contain details about episode and program stream on Hulu, Hulu Plus, and Fox.com from 2011 forward; documents discussing its Internet distribution strategy; and studies about Internet distribution. Fox has been very liberal in its production of documents concerning the distribution of its programs over the Internet. But this set of requests simply goes too far and seeks information that is plainly irrelevant.

As set forth in Fox's declarations and various briefs, Fox is being irreparably harmed because Dish's unauthorized VOD, streaming, and sideloading services usurp Fox's control over its copyrighted works and negatively impact Fox's relationships with its distributors. Fox is not seeking damages for lost sales, lost revenues, lost streams, or lost downloads. Dish is merely fabricating these claims as a way to propound irrelevant discovery.

We recognize that Ms. Brennan's August 15, 2012 declaration discusses the negative impact of Dish's conduct on Hulu and Fox.com. For that reason, Fox agreed to produce its detailed All In One reports that identify the number of times each Fox episode has been streamed on Hulu or Fox.com. However, Fox has never put at issue the number of times particular Fox programs or episodes have been streamed or downloaded on iTunes, Amazon, Netflix, or any other service. Therefore, the requested information is not relevant.

With respect to streaming activity on Hulu and Fox.com, Fox does not maintain regular reports of streaming activity prior to 2011. We understand that some of the requested information may exist in various emails, but the information is not uniform and would require Fox to scour huge volumes of email to locate partially responsive documents, if they exist at all. However, we understand that Fox would be able to research and gather streaming information for Hulu and Fox.com prior to 2011 and create a responsive data report. This would be substantially less burdensome. Therefore, as a compromise, we propose that Dish propound an interrogatory requesting the program view and streaming information for Hulu and Fox.com, and Fox would agree to provide a verified, written response. Also, to avoid delay, Fox would agree to answer the interrogatories sooner than the statutory 30 days. Is this a compromise Dish would be willing to accept? I am prepared to discuss this further by phone.

Exhibit 11 - Page 68

March 6, 2014
Page 13

### Request No. 42

This request seeks "All studies and analyses of Internet television-viewing habits, including but not limited to: (a) advertisement-viewing tolerance in relation to advertisement-placement, timing, frequency and duration during online and/or Fox mobile application viewing, and the effect of advertising on viewer retention; (b) cord-cutting or the risk of cord-cutting from Internet television-viewing; and (c) distribution of advertising-avoidance behavior and viewing preferences across any population of viewers."

We do not agree with you claim of relevance.  However, to avoid a dispute, we will search for responsive studies.  If we encounter any undue burdens, we will let you know.

\* \* \* \* \*

As always, we are available to discuss any of the issues above in greater detail.

Sincerely,

David R. Singer
Partner

Exhibit 11 - Page 69

# Exhibit 12



ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

March 7, 2014

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:   *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et al,* Case No. CV 12-04529 DMG (SHx)

Dear David:

     This letter responds to your March 3, 2014 letter regarding Fox's third motion to compel.

     This letter is being served in conjunction with DISH's production today of voluminous financial information that DISH previously agreed to produce but is nonetheless now sought by Fox in its unnecessary motion. The nearly 6,500 pages of documents present detailed information regarding DISH's finances from 2007 through 2013. The information produced should be more than sufficient to allow Fox to do the expert analysis it contends is necessary. DISH renews its request for Fox to review the data DISH has already produced before moving forward with its motion to compel production of additional detailed financial data from DISH. The contrast between what DISH has been willing to do, produce nearly 6,500 pages of detailed financial records on a monthly basis, and what Fox has been willing to do, produce *only seven* pages of summary financial records on a yearly basis, is stark to say the least.

     As Fox has done with its seven pages of financial data that it has produced to date in this action, DISH has redacted information that is unrelated to this dispute. In addition to what DISH has previously agreed to produce, DISH further agrees as follows, and believes the following should resolve any remaining concerns on Fox's part as to the requests at issue in the motion to compel.

     For Request No. 143, DISH agrees to produce documents sufficient to show DISH's purchases of Sling Adapter. DISH is currently working to compile this information and it should be included DISH's productions within the next two weeks.

     For Request Nos. 147, 148 and 149, DISH additionally agrees to produce any responsive, non-privileged survey, poll, or study that DISH locates after a reasonable investigation, where such document was created in the ordinary course of business since the Hopper was introduced and , discusses any reason why new subscribers to DISH have become new subscribers during that period of time. Combined with DISH's previous production of surveys, polls, or studies regarding the

Exhibit 12 - Page 70



ORRICK

David R. Singer, Esq.
March 7, 2014
Page 2

specific features at issue, DISH has now agreed to produce all of its consumer research that relates to why subscribers have purchased or leased Hoppers or Hoppers with Sling and why subscribers have signed up for DISH at all since the Hopper and Hopper with Sling have been available to customers. This will provide Fox with information that can be used to determine "whether subscribers who purchased or leased a Hopper or Hopper with Sling did so because of the [allegedly] infringing [features]," which is what Fox claims it is seeking in response to all three of these requests.

Fox's assertion that DISH has not yet agreed to produce any documents responsive to Request No. 149 plainly ignores the connection between the survey data that has been and will be produced and the request itself. Between the survey information detailed above and the subscriber data that DISH has already produced, DISH will have produced documents showing its subscriber growth in 2012 and all of its consumer research relating to whether that subscriber growth is related to the Hopper. This is directly responsive to Request No. 149.

For Request No. 150, DISH's production today included a copy of its chart of accounts.

Given the above, Fox should withdraw its motion to compel.

Yours very truly,

William A. Molinski

Exhibit 12 - Page 71

# Exhibit 13

1  JENNER & BLOCK LLP
   Richard L. Stone (Bar No. 110022)
2  Andrew J. Thomas (Bar No. 159533)
   David R. Singer (Bar No. 204699)
3  Amy M. Gallegos (Bar No. 211379)
   633 West 5th Street, Suite 3600
4  Los Angeles, CA 90071
   rstone@jenner.com
5  ajthomas@jenner.com
   dsinger@jenner.com
6  agallegos@jenner.com

7

8  Attorneys for Plaintiffs
   Fox Broadcasting Company, Twentieth Century
   Fox Film Corp., and Fox Television Holdings, Inc.
9

10              **UNITED STATES DISTRICT COURT**

11             **CENTRAL DISTRICT OF CALIFORNIA**

12

13  FOX BROADCASTING COMPANY,        Case No.  12-CV-04529-DMG (SH)
    INC., TWENTIETH CENTURY FOX
14  FILM CORP., and FOX TELEVISION   Complaint Filed:  May 24, 2012
    HOLDINGS, INC.
15                                   **PLAINTIFFS' INITIAL**
                 Plaintiffs,         **DISCLOSURES [FRCP 26(a)(1)]**
16
    v.
17
    DISH NETWORK L.L.C. and
18  DISH NETWORK CORP.,

19               Defendants.

20

21

22

23

24

25

26

27

28

PLAINTIFFS' INITIAL DISCLOSURES

Exhibit 13 - Page 72

Plaintiffs Fox Broadcasting Company, Twentieth Century Fox Film Corporation, and Fox Television Holdings, Inc. (collectively, "Fox") make the following initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure to defendants DISH Network, L.L.C. and DISH Network Corp. (collectively, "DISH"):

## 1.   **Individuals and Subject Matter**

Pursuant to Rule 26(a)(1)(A)(i), the following persons are likely to have discoverable information that Fox may use to support its claims in this action. Fox does not give consent to DISH or its counsel to contact any current or former employee of Fox listed below. Current and/or former Fox employees can be reached though Fox's counsel, Jenner & Block LLP.

| Name | Contact Information | Subjects |
|---|---|---|
| Michael Biard | c/o Jenner & Block LLP<br>633 W. 5th Street<br>36th Floor<br>Los Angeles, CA 90071<br>(213) 239-2206 | Fox's copyrighted works; the relevant contracts between the parties and DISH's breaches of those contracts; Fox's linear and non-linear exploitation of its copyrighted primetime broadcast television programs; DISH's copyright infringement; harm and threat of irreparable harm caused by DISH's copyright infringement and contractual breaches. |
| Sherry Brennan | c/o Jenner & Block LLP<br>633 W. 5th Street<br>36th Floor<br>Los Angeles, CA 90071<br>(213) 239-2206 | Fox's copyrighted works; the relevant contracts between the parties and DISH's breaches of those contracts; Fox's linear and non-linear exploitation of its copyrighted primetime broadcast television programs; DISH's copyright infringement; harm and threat of irreparable harm caused by DISH's copyright infringement and contractual breaches. |

- 2 -

| Name | Contact Information | Subjects |
|---|---|---|
| David Haslingden | c/o Jenner & Block LLP<br>633 W. 5th Street<br>36th Floor<br>Los Angeles, CA 90071<br>(213) 239-2206 | The financing and acquisition of primetime television programs owned by Fox and broadcast on the Fox Network; harm and threat of irreparable harm caused by DISH's copyright infringement and contractual breaches. |
| Toby Byrne | c/o Jenner & Block LLP<br>633 W. 5th Street<br>36th Floor<br>Los Angeles, CA 90071<br>(213) 239-2206 | Fox's sale of commercial advertising; advertisers' and advertising agencies' perception and valuation of such advertising. |
| Mary McGuire | c/o Jenner & Block LLP<br>633 W. 5th Street<br>36th Floor<br>Los Angeles, CA 90071<br>(213) 239-2206 | Copyright registrations for Fox's copyrighted works. |
| Steven J. Smith | Journal Communications<br>c/o Mary Leahy, Esq.<br>333 W. State St.<br>P.O. Box 661<br>Milwaukee, WI 53201<br>(414) 224-2000 | The threat of irreparable harm to independent broadcasters and the broadcast television industry caused by DISH's conduct. |
| Robert D. Liodice | Association of National Advertisers<br>c/o Douglas J. Wood, Esq.<br>ReedSmith LLP<br>599 Lexington Avenue<br>22nd Floor<br>New York, NY 10022<br>(212) 549-0377 | Threat of irreparable harm to advertisers and the broadcast television industry caused by DISH's conduct. |
| Dan Minnick | EchoStar Technologies, L.L.C. | Development and functionality of PrimeTime Anytime and AutoHop; statements made during his deposition; declaration in opposition to preliminary injunction motion. |
| Steve Casagrande | EchoStar Technologies, L.L.C. | Development and functionality of PrimeTime Anytime and AutoHop. |
| Bill Rusler | EchoStar Technologies, L.L.C. | Beta testing development and functionality of PrimeTime Anytime and AutoHop. |

- 3 -

PLAINTIFFS' INITIAL DISCLOSURES

2132365.1

Exhibit 13 - Page 74

| Name | Contact Information | Subjects |
|---|---|---|
| Vivek Khemka | Dish Network, L.L.C. | Marketing, development, sales, distribution, functionality of PrimeTime Anytime, AutoHop and Sling Adapter; statements made in the media about these products and services; declaration in opposition to preliminary injunction motion. |
| David Shull | Dish Network, L.L.C. | Marketing, development, sales, distribution, functionality of PrimeTime Anytime, AutoHop and Sling Adapter; statements made in the media about these products and services; the parties' contract negotiations; declaration in opposition to preliminary injunction motion. |
| Charlie Ergen | Dish Network, L.L.C. | Marketing, development, sales, distribution, functionality of PrimeTime Anytime, AutoHop and Sling Adapter; statements made in the media about these products and services; the parties' contract negotiations; declaration in opposition to preliminary injunction motion. |

## 2.   **Documents and Things**

Pursuant to Rule 26(a)(1)(A)(ii), Fox identifies the following categories of non-privileged documents and things in its possession, custody or control that Fox may use to support its claims.

(a)    All documents that have already been produced by Fox, bates-numbered FOX 000001-000105.

(b)    All exhibits filed in support of Fox's motion for preliminary injunction in this action.

(c)    The July 1, 2002 Retransmission Consent Agreement between Fox and DISH including the October 29, 2010 amendment thereto.

- 4 -

1   (d)   Registration certificates and other records from the Copyright Office
2   concerning primetime broadcast television programs owned by Fox that have been
3   televised on the Fox Network from approximately 2007 to the date of trial in this
4   action.

5   (e)   Materials and information from websites owned and/or operated by
6   DISH and/or its authorized distributors.

7   (f)   DISH's advertising, promotion, and marketing materials related to the
8   Hopper set-top box, PrimeTime Anytime, AutoHop, TV Everywhere, and Sling
9   Adapter.

10   (g)   News articles containing statements and admissions by DISH.

11   (h)   Documents and information already produced by DISH in this action.

12

13   **3.   <u>Categories of Damages</u>**

14   Fox is seeking statutory damages under the Copyright Act, injunctive relief,
15   compensatory damages, and attorneys' fees and costs.

16   Plaintiffs' statutory damages for Copyright infringement will be calculated
17   pursuant to the statute based on the number of infringed works and the extent of the
18   infringement, and the deliberate nature of DISH's conduct.  Plaintiffs will seek the
19   maximum amount of statutory damages and will demonstrate that DISH acted
20   willfully.  If Fox is the prevailing party, it will seek an award of attorneys' fees and
21   costs.

22   Fox's claim for injunctive relief will be based on the irreparable harm already
23   articulated by Fox in connection with its motion for preliminary injunction, to be
24   supplemented with additional evidence and argument that is uncovered or which
25   develops as this case proceeds.

26   Fox's compensatory damages will be based on damages suffered by Fox as a
27   result of DISH's breach of the parties' contract.  Defendants will also demonstrate,
28   *inter alia*, that they would not have agreed to the terms and consideration set forth

- 5 -

1    in the retransmission consent agreement (as amended) had they known DISH would

2    be providing the PrimeTime Anytime, AutoHop and Sling Adapter features and

3    services to DISH subscribers.

4

5    Dated:     September 21, 2012       JENNER & BLOCK LLP

6

7                                 By: _____

8                                  David R. Singer

9                                  Attorneys for
Fox Broadcasting Company,

10                               Twentieth Century Fox Film Corp.,
and Fox Television Holdings, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2132365.1

Exhibit 13 - Page 77

## PROOF OF SERVICE

I am a citizen of the United States and resident of the State of California.  I am employed in Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction the service was made.  I am over the age of eighteen years and not a party to the within action.

On **September 21, 2012**, I served the following documents in the manner described below:

### PLAINTIFFS' INITIAL DISCLOSURE [FRCP 26(a)(1)]

☑ **(BY U.S. MAIL)**  I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ **(BY MESSENGER SERVICE)** by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐ **(BY FACSIMILE)**  I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ **(BY OVERNIGHT MAIL)**  I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by UPS for overnight delivery.

☑ **BY ELECTRONIC SERVICE:**  By electronically mailing a true and correct copy through Jenner & Block LLP's electronic mail system from dvalencia@jenner.com to the email addresses set forth below.

☐ **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand to the offices of each addressee below.

### SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on **September 21, 2012**, at 633 West 5th Street, Suite 3600, Los Angeles, CA 90071:

Dolores Valencia

2138629.3

Exhibit 13 - Page 78

1

## SERVICE LIST

2

| | |
|---|---|
| William A. Molinski<br>**Orrick Herrington and Sutcliffe LLP**<br>777 South Figueroa Street<br>Suite 3200<br>Los Angeles, CA  90017<br>wmolinski@orrick.com | Attorneys for DISH Network L.L.C. and DISH Network Corporation<br><br>**\*VIA US MAIL AND ELECTRONIC<br>    SERVICE.** |
| Peter A. Bicks<br>Elyse D. Echtman<br>**Orrick Herrington and Sutcliffe LLP**<br>666 Fifth Avenue<br>New York, NY  10103<br>pbicks@orrick.com<br>eechtman@orrick.com | **\*VIA U.S. MAIL AND ELECTRONIC<br>    SERVICE.** |
| Annette L. Hurst<br>**Orrick Herrington and Sutcliffe LLP**<br>405 Howard Street<br>San Francisco, CA  94105<br>ahurst@orrick.com | **\*VIA U.S MAIL AND ELECTRONIC<br>    SERVICE.** |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2138629.3

Exhibit 13 - Page 79

# Exhibit 14

1   JENNER & BLOCK LLP
    Richard L. Stone (Bar No. 110022)
2   Andrew J. Thomas (Bar No. 159533)
    David R. Singer (Bar No. 204699)
3   Amy M. Gallegos (Bar No. 211379)
    633 West 5th Street, Suite 3600
4   Los Angeles, CA 90071
    rstone@jenner.com
5   ajthomas@jenner.com
    dsinger@jenner.com
6   agallegos@jenner.com

7
    Attorneys for Plaintiffs
8   Fox Broadcasting Company, Twentieth Century
    Fox Film Corp., and Fox Television Holdings, Inc.
9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  | FOX BROADCASTING COMPANY, | Case No.  12-CV-04529-DMG (SH) |
    | INC., TWENTIETH CENTURY FOX | |
14  | FILM CORP., and FOX TELEVISION | Complaint Filed: May 24, 2012 |
    | HOLDINGS, INC. | |
15  | | **PLAINTIFFS' FIRST** |
    | Plaintiffs, | **SUPPLEMENTAL INITIAL** |
16  | | **DISCLOSURES** |
    | v. | **[FRCP 26(a)(1) and (e)]** |
17  | | |
    | DISH NETWORK L.L.C. and | |
18  | DISH NETWORK CORP., | |
19  | Defendants. | |

20

21

22

23

24

25

26

27

28

Exhibit 14 - Page 80

1    Pursuant to Rules 26(a)(1) and (e) of the Federal Rules of Civil Procedure,

2   plaintiffs Fox Broadcasting Company, Twentieth Century Fox Film Corporation,

3   and Fox Television Holdings, Inc. supplement their initial disclosures to defendants

4   DISH Network, L.L.C. and DISH Network Corp. as follows:

5

6   **1.    Categories of Damages**

7    In addition to the categories of damages set forth in plaintiffs' initial

8   disclosures, plaintiffs are also seeking disgorgement of defendants' profits

9   attributable to their copyright infringement.  Plaintiffs' claim of disgorgement is

10   made pursuant to Section 504 of the Copyright Act and will be calculated pursuant

11   to the statutory guidelines therein.

12

13

14   Dated:    October 10, 2012          JENNER & BLOCK LLP

15

16                                By:  _____

17                                     David R. Singer
                                       Attorneys for
18                                     Fox Broadcasting Company,
                                       Twentieth Century Fox Film Corp.,
19                                     and Fox Television Holdings, Inc.

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FIRST SUPP. INITIAL DISCLOSURES

2143537.1

Exhibit 14 - Page 81

**PROOF OF SERVICE**

I am a citizen of the United States and resident of the State of California.  I am employed in Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction the service was made.  I am over the age of eighteen years and not a party to the within action.

On **October 10, 2012**, I served the following documents in the manner described below:

**PLAINTIFFS' FIRST SUPPLEMENTAL INITIAL DISCLOSURES
[FRCP 26(a)(1) and (e)]**

☑  **(BY U.S. MAIL)** I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐  **(BY MESSENGER SERVICE)** by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐  **(BY FACSIMILE)** I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐  **(BY OVERNIGHT MAIL)** I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by UPS for overnight delivery.

☐  **BY ELECTRONIC SERVICE:**  By electronically mailing a true and correct copy through Jenner & Block LLP's electronic mail system from dvalencia@jenner.com to the email addresses set forth below.

☐  **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand to the offices of each addressee below.

**SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on **October 10, 2012**, at 633 West 5th Street, Suite 3600, Los Angeles, CA 90071:

Dolores Valencia

2138629.4

Exhibit 14 - Page 82

**SERVICE LIST**

| | |
|---|---|
| William A. Molinski<br>**Orrick Herrington and Sutcliffe LLP**<br>777 South Figueroa Street<br>Suite 3200<br>Los Angeles, CA 90017<br>wmolinski@orrick.com | Attorneys for DISH Network L.L.C. and DISH Network Corporation<br><br>**\*VIA US MAIL** |
| Peter A. Bicks<br>Elyse D. Echtman<br>**Orrick Herrington and Sutcliffe LLP**<br>666 Fifth Avenue<br>New York, NY 10103<br>pbicks@orrick.com<br>eechtman@orrick.com | **\*VIA U.S. MAIL** |
| Annette L. Hurst<br>**Orrick Herrington and Sutcliffe LLP**<br>405 Howard Street<br>San Francisco, CA 94105<br>ahurst@orrick.com | **\*VIA U.S MAIL** |

2138629.4

Exhibit 14 - Page 83

# Exhibit 15

JENNER & BLOCK LLP
Richard L. Stone (Bar No. 110022)
Andrew J. Thomas (Bar No. 159533)
David R. Singer (Bar No. 204699)
Amy M. Gallegos (Bar No. 211379)
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
rstone@jenner.com
ajthomas@jenner.com
dsinger@jenner.com
agallegos@jenner.com

Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C. and DISH NETWORK CORP.,<br><br>Defendants. | Case No.  12-CV-04529-DMG (SH)<br><br>Complaint Filed:  May 24, 2012<br><br>**PLAINTIFFS' SECOND SUPPLEMENTAL INITIAL DISCLOSURES [FRCP 26(a)(1) and (e)]** |

2169780.1

Exhibit 15 - Page 84

Pursuant to Rules 26(a)(1) and (e) of the Federal Rules of Civil Procedure, plaintiffs Fox Broadcasting Company, Twentieth Century Fox Film Corporation, and Fox Television Holdings, Inc. supplement their initial disclosures to defendants DISH Network, L.L.C. and DISH Network Corp. as follows:

## 1.   **Categories of Damages**

Plaintiffs hereby stipulate that they are not seeking to recover any actual damages suffered as a result of defendants' copyright infringement and/or breach of contract.  Plaintiffs continue to seek statutory damages and disgorgement under the Copyright Act, as well as specific performance of the parties' contract, as set forth in plaintiffs' prior disclosures.

Dated:     January 22, 2012

JENNER & BLOCK LLP

By: _____

David R. Singer
Attorneys for
Fox Broadcasting Company,
Twentieth Century Fox Film Corp.,
and Fox Television Holdings, Inc.

- 1 -

2169780.1

Exhibit 15 - Page 85

**PROOF OF SERVICE**

I am a citizen of the United States and resident of the State of California. I am employed in Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction the service was made. I am over the age of eighteen years and not a party to the within action.

On **January 22, 2013**, I served the following documents in the manner described below:

**PLAINTIFFS' SECOND SUPPLEMENTAL INITIAL DISCLOSURES
[FRCP 26(a)(1) and (e)]**

☑    **(BY U.S. MAIL)** I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐    **(BY MESSENGER SERVICE)** by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐    **(BY FACSIMILE)** I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐    **(BY OVERNIGHT MAIL)** I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by UPS for overnight delivery.

☑    **BY ELECTRONIC SERVICE:** By electronically mailing a true and correct copy through Jenner & Block LLP's electronic mail system from dvalencia@jenner.com to the email addresses set forth below.

☐    **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand to the offices of each addressee below.

**SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on **January 22, 2013**, at 633 West 5th Street, Suite 3600, Los Angeles, CA 90071:

_____
Dolores Valencia

2138629.10

Exhibit 15 - Page 86

1

2

**SERVICE LIST**

3

4

5

6

7

8

William A. Molinski
**Orrick Herrington and Sutcliffe LLP**
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017
wmolinski@orrick.com
mphillips@orrick.com
gtajmiri@orrick.com

Attorneys for DISH Network L.L.C. and DISH
Network Corporation

*****VIA EMAIL AND U.S. MAIL.**

9

10

11

12

Elyse D. Echtman
**Orrick Herrington and Sutcliffe LLP**
666 Fifth Avenue
New York, NY  10103
eechtman@orrick.com

*****VIA EMAIL.**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2138629.11

Exhibit 15 - Page 87

# Exhibit 16

```
 1                    UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3                              ---

 4            HONORABLE DOLLY M. GEE, JUDGE PRESIDING

 5                              ---

 6

 7

 8   FOX BROADCASTING COMPANY, et al,           )
                                                )
 9                                              )
                                                )
10                              Plaintiffs,     )
                                                )No. 12-4529DMG
11              VS                              )
                                                )
12   DISH NETWORK LLC, et al,                   )
                                                )
13                                              )
                                Defendants.     )
14   _____)

15

16                  Reporter's Transcript of Proceedings
                              Motion Hearing
17                       Los Angeles, California
                         FRIDAY, APRIL 19, 2013
18

19

20

21

22
                     Anne Kielwasser, CSR, RPR, CRR
23                   Federal Official Court Reporter
                     312 North Spring Street, Room 432
24                   Los Angeles, California 90012
                          Phone: (213) 894-2969
25                      anne.kielwasser@gmail.com
                             AKtranscripts.com
```

UNITED STATES DISTRICT COURT

Exhibit 16 - Page 88

1    that case the antenna technology and what a commercial

2    service provider like Dish or in that case the AereoKiller,

3    Barry Driller Service can provide.

4           **THE COURT:**  For that matter, how does this current

5    service differ from the Slingbox or the earlier versions that

6    existed separately, not in the same device but Sling adapter

7    and Slingbox?

8           **MR. STONE:**  Well, Slingbox was consumer equipment,

9    a standalone box that anyone, any consumer could purchase and

10   use, although very few actually did.

11          This is a service.  You cannot use the Dish

12   Anywhere service to retransmit over the Internet without a

13   subscription to Dish, and Dish supplies services that go

14   along with that service, such as a software application for

15   your desktop or a mobile app for your iPhone.

16          **THE COURT:**  Are you saying they didn't have to

17   have a subscription when they use the Slingbox or Sling

18   adapter?

19          **MR. STONE:**  That's correct.  I mean, that was the

20   equivalent of a standalone VCR where it wasn't up to the

21   consumer to find a way to get content and sling it, whether

22   using an antenna, cable subscription or some other way.

23          Here, this is a service in which Fox's

24   programming is used in the Dish Anywhere services; and Dish

25   takes that programming that we provide under a very narrow

1  license, may redirect it or retransmit it over the Internet

2  and not only not authorized by our license but expressly

3  prohibited by our license with Dish, which says Dish is

4  prohibited from retransmitting or otherwise distributing

5  Fox's signal to subscribers by means of the Internet or any

6  other online technology or wireless technology.

7         **THE COURT:**  As with our round one of this case,

8  doesn't it sort of center around who was doing the

9  transmitting?

10         **MR. STONE:**  No, no, it doesn't for a couple of

11  reasons, if I might.  I mean, first there is case law that

12  has settled that issue that I will discuss in a minute; but

13  setting that case law aside, the agreement itself

14  contemplated that situation.

15         So, to briefly describe the structure of the

16  license, and again, it's our programming that's being used in

17  this service.  We provided programming under a license.  Dish

18  does not own that programming.  They get a very narrow

19  license that says:  You can transmit our programming over a

20  direct broadcast satellite system.  And that is it.

21         So, the normal presumption in a copyright

22  license is:  That which is not expressly authorized is

23  prohibited.

24         Here we kind of went a belt and suspenders of

25  step beyond that and said:  And, oh, by the way, you, Dish,

```
 1              MS. HURST:  Thank you, Your Honor.

 2              (Court adjourned.)

 3

 4

 5              C E R T I F I C A T E

 6    I hereby certify that the foregoing is a true and correct

 7    transcript of the stenographically recorded proceedings in

 8    the above matter.

 9    Fees charged for this transcript, less any circuit fee

10    reduction and/or deposit, are in conformance with the

11    regulations of the judicial conference of the united states.

12

13    /S/ANNE KIELWASSER
                                          05/01/2013
14    Anne Kielwasser, CSR, RPR          Date
      Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit 17

1  WILLIAM A. MOLINSKI (SBN 145186)
   wmolinski@orrick.com
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street, Suite 3200
3  Los Angeles, California  90017
   Tel: +1-213-629-2020 / Fax: +1-213-612-2499
4
   ANNETTE L. HURST (SBN 148738)
5  ahurst@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
6  405 Howard Street
   San Francisco, California 94105-2669
7  Tel: +1-415-773-5700 / Fax: +1-415-773-5759

8  E. JOSHUA ROSENKRANZ (*pro hac vice*)
   jrosenkranz@orrick.com
   PETER A. BICKS (*pro hac vice*)
9  pbicks@orrick.com
   ELYSE D. ECHTMAN (*pro hac vice*)
10 eechtman@orrick.com
   LISA T. SIMPSON (*pro hac vice*)
11 lsimpson@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
12 51 West 52nd Street
   New York, New York  10019-6142
13 Tel: +1-212-506-5000 / Fax: +1-212-506-5151

14 MARK A. LEMLEY (SBN 155830)
   mlemley@durietangri.com
15 MICHAEL PAGE (SBN 154913)
   mpage@durietangri.com
16 DURIE TANGRI LLP
   217 Leidesdorff Street
17 San Francisco, California  94111
   Tel: +1-415-362-6666

18 Attorneys for Defendants DISH Network L.L.C.,
   DISH Network Corp., and EchoStar Technologies
19 L.L.C.

20              UNITED STATES DISTRICT COURT

21            CENTRAL DISTRICT OF CALIFORNIA

22 | FOX BROADCASTING COMPANY, | Case No. CV12-04529 DMG (SHx) |
   | *et al.*, | |
23 | | **DEFENDANTS' FIRST SET OF** |
   | Plaintiffs, | **INTERROGATORIES TO FOX** |
24 | | **BROADCASTING COMPANY,** |
   | | **INC.** |
25 | v. | |
   | | |
26 | DISH NETWORK L.L.C., *et al.*, | |
   | | |
27 | Defendants. | |

28

| | |
|---|---|
| PROPOUNDING PARTY: | Defendants DISH Network L.L.C., DISH Network Corp., and EchoStar Technologies L.L.C. |
| RESPONDING PARTY: | Fox Broadcasting Company, Inc. |
| SET NUMBER: | One |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants DISH Network L.L.C., DISH Network Corp. and EchoStar Technologies L.L.C. ("EchoStar") (collectively "Defendants") hereby request that Plaintiffs Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc. (collectively, "Fox") each answer the following Interrogatories fully, in writing and under oath within thirty (30) days from the date of service hereof.

### DEFINITIONS & INSTRUCTIONS

1.     The terms "You," "Your," "Yourself" and "Plaintiffs" shall mean Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc., all predecessors, affiliated entities, all divisions and subsidiaries, and the officers, directors, employees, agents, attorneys, accountants, and representatives of each of the foregoing, including all other persons acting or purporting to act on behalf of one or more of them.

2.     The term "identify" with respect to documents shall mean to provide the title, date, custodian(s), author(s), recipient(s), subject matter and document type.

3.     "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the Interrogatory inclusive rather than exclusive; and "any" as used herein means "each and every" as well as "anyone." The use of the words "include(s)" and "including" shall be construed to mean "without limitation." The term "all" shall be construed as "all and such." Use of the singular form of any word includes the plural and vice versa.

1    4.    When documents, data, knowledge or information in possession of a

2    party is requested, such request includes documents, data, knowledge or

3    information of the party's agents, representatives, predecessors-in-interest,

4    successors, subsidiaries, parents, experts, persons consulted concerning any factual

5    matters or matters of opinion relating to any of the facts or issues involved in this

6    case, and, unless privileged, the party's attorney(s).

7    5.    Each Interrogatory listed herein shall be continuing in nature and shall

8    be modified and supplemented by You to include any additional information,

9    knowledge, or data responsive to these Interrogatories which is later discovered by

10   You or Your agents.

11                          **INTERROGATORIES**

12   **INTERROGATORY NO. 1:**

13   State whether You have suffered any actual monetary damages as a result of

14   any of the alleged acts of direct or indirect copyright infringement pleaded in the

15   Your First Amended Complaint, state whether any of those actual monetary

16   damages are measurable or quantifiable, and provide a computation of each

17   category of quantifiable actual monetary damages that You have suffered as a result

18   of each alleged act of copyright infringement.

19   **INTERROGATORY NO. 2:**

20   State whether You have suffered any actual monetary damages as a result of

21   any of the alleged acts in breach of contract or breach of the implied covenant of

22   good faith and fair dealing pleaded in Your First Amended Complaint, state

23   whether any of those actual monetary damages are measurable or quantifiable, and

24   provide a computation of each category of quantifiable actual monetary damages

25   that You have suffered as a result of each alleged act in breach of contract or breach

26   of the implied covenant of good faith and fair dealing.

27   **INTERROGATORY NO. 3:**

28   If You contend that You are entitled to specific performance as a remedy for

- 2 -

1  Your breach of contract and breach of the implied covenant of good faith and fair

2  dealing claims, state the factual bases for Your contention and the precise specific

3  performance remedy that you seek.

4  **INTERROGATORY NO. 4:**

5       If You seek nominal damages as a remedy for any of Your claims alleged in

6  Your First Amended Complaint, state the factual bases for Your claim for nominal

7  damages.

8  **INTERROGATORY NO. 5:**

9       If You seek statutory damages in connection with Your copyright

10  infringement claims, provide a computation of the statutory damages that You seek.

11  **INTERROGATORY NO. 6:**

12      If You intend to seek disgorgement of profits in connection with Your

13  copyright infringement claims, specify the categories of revenues that You contend

14  have a causal nexus to the alleged infringement.

15  **INTERROGATORY NO. 7:**

16      State the factual basis for Your claim for "reasonable royalties", as set forth

17  in Your Third Supplemental Disclosures dated October 10, 2013, identify the

18  claims for which You seek "reasonable royalties" as a remedy, and provide a

19  computation of the reasonable royalties that You seek.

20  **INTERROGATORY NO. 8:**

21      State all categories of non-monetary damages or non-quantifiable damages

22  that You claim to have suffered on any of Your claims alleged in the First Amended

23  Complaint.

24  **INTERROGATORY NO. 9:**

25      For each copyrighted work that You claim to be infringed, state whether You

26  have licensed the work to any non-linear content distributor and identify all such

27  distributors to which You have licensed the work, state the scope and terms of the

28  licenses and state the time period for which and conditions under which the work is

Exhibit 17 - Page 95

1  or was licensed to each distributor.

2

3  Dated:        October 21, 2013            Orrick, Herrington & Sutcliffe LLP

4

5                                           By: _____

6                                              WILLIAM A. MOLINSKI
                                               Attorneys for Defendants
7                                              DISH Network L.L.C., DISH
                                               Network Corp. and EchoStar
8                                              Technologies L.L.C.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFTS' FIRST SET OF INTERROGATORIES TO FOX
BROADCASTING COMPANY, INC.
CASE No. CV1204529 DMG (SHx)

Exhibit 17 - Page 96

# PROOF OF SERVICE

I am more than eighteen years old and not a party to this action.  My business address is Orrick Herrington & Sutcliffe LLP, 777 S. Figueroa Street, Suite 3200, Los Angeles, California  90017.  On October 21, 2013, I served the following document(s):

### DEFENDANTS' FIRST SET OF INTERROGATORIES TO FOX BROADCASTING COMPANY, INC.

on the interested parties in this action as follows:

☐    By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California

☒    I caused such document(s) listed above to be transmitted by electronic mail to the offices of the addressee(s) listed below.

☒    On the date indicated above, I deposited the sealed package(s) in a box or other facility regularly maintained by Federal Express for delivery of documents, with the delivery fees paid or provided for by the sender.

Richard L. Stone, Esq.
David R. Singer, Esq.
Andrew Thomas, Esq.
Amy Gallegos, Esq.
JENNER & BLOCK
633 West 5th Street, Suite 3600
Los Angeles, California  90071
Tel:  (213) 239-5100
Fax: (213) 239-5199
rstone@jenner.com
athomas@jenner.com
dsinger@jenner.com
agallegos@jenner.com

Attorneys for Plaintiff
FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM CORP. and FOX TELEVISION HOLDINGS, INC.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on October 21, 2013 at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Maria Mercado-Navarro

PROOF OF SERVICE
CASE NO. CV1204529 DMG (SHx)

Exhibit 17 - Page 97

# Exhibit 18

JENNER & BLOCK LLP
Richard L. Stone (Bar No. 110022)
Andrew J. Thomas (Bar No. 159533)
David R. Singer (Bar No. 204699)
Amy M. Gallegos (Bar No. 211379)
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
rstone@jenner.com
ajthomas@jenner.com
dsinger@jenner.com
agallegos@jenner.com

Attorneys for Plaintiffs
Fox Broadcasting Company,
Twentieth Century Fox Film Corp., and
Fox Television Holdings, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS, INC. | Case No.  CV-12-04529 DMG (SHx) |
| Plaintiffs, | **PLAINTIFF FOX BROADCASTING COMPANY'S OBJECTIONS AND RESPONSES TO DISH'S FIRST SET OF INTERROGATORIES** |
| v. | |
| DISH NETWORK L.L.C., DISH NETWORK CORP., and ECHOSTAR TECHNOLOGIES L.L.C. | |
| Defendants. | |

PROPOUNDING PARTIES:   Defendants DISH Network L.L.C., DISH Network Corp., and EchoStar Technologies L.L.C.

RESPONDING PARTY:   Fox Broadcasting Company

SET NUMBER:   One

Exhibit 18 - Page 98

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, plaintiff Fox Broadcasting Company ("FBC") objects and responds to defendants' First Set of Interrogatories as set forth below.

## GENERAL OBJECTIONS
## AND OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    FBC objects to defendants' "Instructions" to the extent they seek to impose obligations beyond those required by the Federal Rules of Civil Procedure and the Local Rules of this court.

2.    FBC objects to defendants' "Definitions" to the extent they seek to impose obligations beyond those required by the Federal Rules of Civil Procedure and the Local Rules of this court. In responding to defendants' Interrogatories, FBC will provide only such information as may be required and proper under the Federal Rules of Civil Procedure and the relevant Local Rules.

3.    FBC objects to the definition of "You," "Your" and "Plaintiffs" on the grounds that it (a) is overly broad and unduly burdensome; (b) seeks to impose obligations on FBC beyond those required by the Federal Rules of Civil Procedure; and (c) includes various entities that are not related to FBC or even parties to this lawsuit. FBC responds to these Interrogatories on behalf of itself.

## OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 1:

State whether You have suffered any actual monetary damages as a result of any of the alleged acts of direct or indirect copyright infringement pleaded in the Your First Amended Complaint, state whether any of those actual monetary damages are measurable or quantifiable, and provide a computation of each

1  category of quantifiable actual monetary damages that You have suffered as a

2  result of each alleged act of copyright infringement.

3  **RESPONSE TO INTERROGATORY NO. 1:**

4      FBC objects to this interrogatory to the extent it seeks disclosure of any

5  information protected by the attorney-client privilege and/or work product

6  doctrine.  FBC further objects to this interrogatory to the extent it seeks

7  information subject to the expert witness disclosure provisions of Rule 26(a)(2)(B)

8  prior to the deadline for such disclosures.

9      Subject to and without waiving the foregoing objections, and FBC's General

10  Objections above, FBC responds that it is not seeking to recover any actual

11  damages in the form of lost profits or lost revenues suffered as a result of

12  defendants' copyright infringement and/or breach of contract.  The only damages

13  sought by FBC for copyright infringement are statutory damages, disgorgement

14  and reasonable royalties.

15

16  **INTERROGATORY NO. 2:**

17      State whether You have suffered any actual monetary damages as a result of

18  any of the alleged acts in breach of contract or breach of the implied covenant of

19  good faith and fair dealing pleaded in Your First Amended Complaint, state

20  whether any of those actual monetary damages are measurable or quantifiable, and

21  provide a computation of each category of quantifiable actual monetary damages

22  that You have suffered as a result of each alleged act in breach of contract or

23  breach of the implied covenant of good faith and fair dealing.

24  **RESPONSE TO INTERROGATORY NO. 2:**

25      FBC objects to this interrogatory to the extent it seeks disclosure of any

26  information protected by the attorney-client privilege and/or work product

27  doctrine.  FBC further objects to this interrogatory to the extent it seeks

28

2

Exhibit 18 - Page 100

FBC'S OBJECTIONS AND RESPONSES TO DISH'S FIRST SET OF INTERROGATORIES

1   information subject to the expert witness disclosure provisions of Rule 26(a)(2)(B)

2   prior to the deadline for such disclosures.

3        Subject to and without waiving the foregoing objections, and FBC's General

4   Objections above, FBC responds that it is not seeking to recover any actual

5   damages in the form of lost profits or lost revenues suffered as a result of

6   defendants' copyright infringement and/or breach of contract.  The only damages

7   sought by FBC for breach of contract are reasonable royalties and nominal

8   damages.

9

10   **INTERROGATORY NO. 3:**

11        If You contend that You are entitled to specific performance as a remedy for

12   Your breach of contract and breach of the implied covenant of good faith and fair

13   dealing claims, state the factual bases for Your contention and the precise specific

14   performance remedy that you seek.

15   **RESPONSE TO INTERROGATORY NO. 3:**

16        FBC objects to this interrogatory on the grounds that (a) it seeks information

17   protected by the attorney-client privilege, common interest privilege, and/or

18   attorney work product doctrine; (b) it is overly broad and unduly burdensome to

19   the extent it seeks a recitation of each and every fact that support FBC's claims in

20   this litigation; and (c) it seeks confidential and/or proprietary information protected

21   by plaintiffs' and/or third party privacy and/or non-disclosure rights.

22        Subject to and without waiving the foregoing objections and FBC's general

23   objections above, FBC responds as follows:  The parties' 2010 agreement narrowly

24   authorizes and licenses DISH to distribute FBC's programming via DISH's DBS

25   system.  The agreement also authorizes DISH to distribute FBC's licensed VOD

26   via standard television and online, subject to various conditions including, but not

27   limited to, the disabling of fast forward during commercials.  The parties'

28   agreement expressly prohibits any other form of VOD or similar service, and also

1  prohibits DISH from retransmitting FBC's programming over the Internet.  The

2  contract also prohibits DISH from copying, or authorizing the copying, of FBC's

3  programming for viewing by subscribers outside the home.

4       DISH's PrimeTime Anytime and AutoHop features breach the parties'

5  contract because they are an unauthorized, commercial-free VOD service.  DISH's

6  Sling Adapter, Hopper with Sling, and DISH Anywhere services breach the

7  contract because they retransmit FBC's programming over the Internet.  The

8  Hopper Transfers feature breaches the contract because it allows DISH subscribers

9  to copy and view FBC's programming on mobile and other devices outside the

10  home.  All of this conduct breaches the parties' contract.

11       Each of these unauthorized services and contractual breaches threaten to

12  irreparably harm FBC in the following ways that cannot be fully or accurately

13  measured by money damages:

14       1.    DISH's conduct interferes with FBC's right to exclusively control

15  how, when, where, to whom, and for what price (if any) it will disseminate the

16  copyrighted FBC programming.  By ignoring FBC's right to control its own works,

17  DISH undermines the value of FBC's content and interferes with FBC's ability to

18  control the exploitation (or non-exploitation) of its works.

19       2.    FBC's loss of control over how its programs are distributed also

20  creates confusion in the marketplace and changes consumers and business

21  partners' attitudes toward the cost, value, and availability of high quality television

22  programming.

23       3.    By making its bootleg, on-demand library of primetime programming

24  available in a commercial-free format, DISH's conduct threatens to diminish the

25  perceived value of FBC's legitimate VOD and digital licenses and the appeal of

26  VOD and/or targeted advertising.

27       4.    DISH's unauthorized exploitation of Internet streaming, commercial-

28  free VOD, and sideloading rights impacts and threatens to disrupt FBC's ability to

Exhibit 18 - Page 102

1  negotiate with third parties for the same rights.  DISH's unauthorized services also
2  unfairly compete with licensed services.

3      5.      If DISH continues to breach the parties' contract with its commercial-
4  free VOD service, fewer viewers will see the commercials during FBC programs.
5  Once this reaches a critical mass, it will negatively impact Nielsen's "C3" ratings
6  metric for FBC programming, which is the measurement primarily relied upon by
7  advertisers in determining what to pay for advertising.  This loss of measured
8  viewers impacts both the value of network advertising, and the willingness of
9  major advertisers to invest in it.

10      6.      C3 only measures in-home viewing on standard televisions and does
11  not include out-of-home viewing such as Internet streaming.  As a result, DISH's
12  unauthorized live streaming of the FBC programs via DISH Anywhere necessarily
13  results in an undercount of FBC's viewership, which in turn threatens to adversely
14  affect the amount advertisers will pay to FBC.

15      7.      The value of television advertising is also based on the demographic
16  profile of the audience.  Advertisers rely on Nielsen's C3 metrics for this
17  information too.  Because Nielsen does not include in its C3 metrics the
18  demographics of web-based viewing, DISH's unauthorized live streaming of
19  FBC's programs undermines FBC's efforts to ascertain an accurate demographic
20  profile of its audience.

21      8.      To the extent PrimeTime Anytime and AutoHop eliminate the
22  commercials and promotions for FBC's own programming, FBC's ability to
23  promote its network and programming will be severely undermined.

24      9.      By retransmitting FBC's programming over the Internet and providing
25  a service that copies FBC programs to iPads, DISH also exposes FBC to increased
26  piracy and security risks.

27      10.     Because DISH is retransmitting FBC's programming over the
28  Internet, there is no incentive for DISH to negotiate with FBC for legitimate

FBC'S OBJECTIONS AND RESPONSES TO DISH'S FIRST SET OF INTERROGATORIES

1  Internet retransmission rights (which are subject to numerous conditions that

2  benefit and protect FBC).  Likewise, because DISH is offering FBC's

3  programming to subscribers with PrimeTime Anytime, DISH no longer has an

4  incentive to distribute FBC's authorized VOD.  This undermines and impacts the

5  business relationship and future negotiations between FBC and DISH.

6        11.    DISH's unauthorized conduct, if not enjoined, will cause other pay

7  television providers to develop copycat services, exacerbating all of the harms

8  identified above.

9        The precise specific performance remedy sought by FBC is an order

10  requiring DISH to perform all of its obligations under its contract with FBC.

11        FBC will produce all documents that support these claims to the extent it has

12  not already done so.

13        Because FBC's investigation of the facts is still ongoing, and because DISH

14  continues to breach the parties' contract, FBC reserves the right to supplement its

15  response as new information comes to light.

16

17  **INTERROGATORY NO. 4:**

18        If You seek nominal damages as a remedy for any of Your claims alleged in

19  Your First Amended Complaint, state the factual bases for Your claim for nominal

20  damages.

21  **RESPONSE TO INTERROGATORY NO. 4:**

22        FBC objects to this interrogatory on the grounds that (a) it seeks information

23  protected by the attorney-client privilege, common interest privilege, and/or

24  attorney work product doctrine; (b) it is overly broad and unduly burdensome to

25  the extent it seeks a recitation of each and every fact that support FBC's claims in

26  this litigation; and (c) it seeks confidential and/or proprietary information protected

27  by plaintiffs' and/or third party privacy and/or non-disclosure rights.

28        Subject to and without waiving the foregoing objections and FBC's general

1   objections above, FBC responds that under New York law (which governs the

2   parties' contract), a plaintiff is entitled to nominal damages if it cannot prove an

3   amount of loss with sufficient certainty or if a breach caused no loss. *See, e.g.,*

4   *Hirsch Elec. Co., Inc. v. Cmty. Servs., Inc.*, 145 A.D.2d 603, 605 (2d Dep't 1988).

5   FBC reserves the right to seek nominal damages as remedy, and it is not required

6   to submit any factual proof of nominal damages in the event they are sought.

7

8   **INTERROGATORY NO. 5:**

9         If You seek statutory damages in connection with Your copyright

10  infringement claims, provide a computation of the statutory damages that You

11  seek.

12  **RESPONSE TO INTERROGATORY NO. 5:**

13        FBC objects to this interrogatory to the extent it seeks any information

14  protected by the attorney-client privilege, common interest privilege, and/or

15  attorney work product doctrine. FBC further objects on the grounds that DISH's

16  infringement is ongoing. As such, FBC's calculation of statutory damages changes

17  every day.

18        Subject to and without waiving the foregoing objections and FBC's general

19  objections above, FBC responds that it will be seeking maximum statutory

20  penalties under the Copyright Act for each work infringed by PrimeTime Anytime,

21  AutoHop, Sling Adapter, Hopper with Sling, DISH Anywhere, and Hopper

22  Transfers. Because DISH has not yet produced all relevant documents or

23  interrogatory responses, FBC does not yet have enough information about the

24  scope of DISH's infringement to calculate statutory damages. However, FBC

25  intends to calculate those damages by determining the number of FBC television

26  program episodes that were copied or publicly performed by any of the infringing

27  products, services, or features at issue, and multiplying that number by the

28  maximum statutory penalty ($150,000 per work). FBC will also produce all

1  copyright registrations that support its calculations to the extent it has not already
2  done so.

3

4  **INTERROGATORY NO. 6:**

5       If You intend to seek disgorgement of profits in connection with Your
6  copyright infringement claims, specify the categories of revenues that You contend
7  have a causal nexus to the alleged infringement.

8  **RESPONSE TO INTERROGATORY NO. 6:**

9       FBC objects to this interrogatory to the extent it seeks any information
10  protected by the attorney-client privilege, common interest privilege, and/or
11  attorney work product doctrine.  FBC further objects on the grounds that "[i]n
12  establishing the infringer's profits, the copyright owner is required to present proof
13  only of the infringer's gross revenue, and the infringer is required to prove his or
14  her deductible expenses and the elements of profit attributable to factors other than
15  the copyrighted work."  17 U.S.C. § 504(b).  Therefore, it is DISH's burden, not
16  FBC's burden to establish which categories of revenues are *not* caused by DISH's
17  infringement.

18       Subject to and without waiving the foregoing objections and FBC's general
19  objections above, FBC responds that it is still waiting for DISH to produce relevant
20  documents and information concerning its gross revenues.  Once DISH identifies
21  all of its revenue sources, FBC will be able to identify which categories of
22  revenues have a causal nexus to DISH's infringement.  Presently, FBC contends
23  that all revenues earned from any DISH subscriber using the products or services at
24  issue are causally related to DISH's infringement.  FBC further contends that
25  revenues from DISH's sale of commercial advertising may be causally related to
26  DISH's infringement.

27

28

8

Exhibit 18 - Page 106

FBC'S OBJECTIONS AND RESPONSES TO DISH'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 7:**

State the factual basis for Your claim for "reasonable royalties", as set forth in Your Third Supplemental Disclosures dated October 10,2013, identify the claims for which You seek "reasonable royalties" as a remedy, and provide a computation of the reasonable royalties that You seek.

**RESPONSE TO INTERROGATORY NO. 7:**

FBC objects to this interrogatory to the extent it seeks disclosure of any information protected by the attorney-client privilege and/or work product doctrine. FBC further objects to this interrogatory to the extent it seeks information subject to the expert witness disclosure provisions of Rule 26(a)(2)(B) prior to the deadline for such disclosures.

Subject to and without waiving the foregoing objections and FBC's general objections above, FBC responds that it is seeking reasonable royalties on the grounds that the district court and Ninth Circuit have identified reasonable royalties as an available remedy to compensate FBC for DISH's infringement and contractual breaches. *See* July 24, 2013 Opinion and Order affirming denial of preliminary injunction at 24; Sept. 23, 2013 Order Re Plaintiffs' Motion for Preliminary Injunction Re DISH's New 2013 Services at 11-12. FBC is seeking reasonable royalties in connection with its copyright infringement and breach of contract claims. More specifically, FBC seeks a reasonable royalty based on the value of the consideration Fox would have required if it were compelled to license Dish the rights it is currently exploiting without Fox's consent.

FBC's calculation of reasonable royalties will be subject to expert witness testimony, to be disclosed pursuant to Rule 26(a)(2)(B) and (D). FBC will produce all documents relied on by its expert in calculating reasonable royalties. FBC has also requested that DISH produce documents that may assist with the calculation.

FBC'S OBJECTIONS AND RESPONSES TO DISH'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 8:**

State all categories of non-monetary damages or non-quantifiable damages that You claim to have suffered on any of Your claims alleged in the First Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 8:**

FBC objects to this interrogatory on the grounds that the terms "non-monetary damages" and "non-quantifiable damages" are vague, ambiguous and unintelligible as phrased. FBC further objects to the extent it seeks disclosure of any information protected by the attorney-client privilege and/or work product doctrine. FBC further objects to this interrogatory to the extent it seeks information subject to the expert witness disclosure provisions of Rule 26(a)(2)(B) prior to the deadline for such disclosures.

**INTERROGATORY NO. 9:**

For each copyrighted work that You claim to be infringed, state whether You have licensed the work to any non-linear content distributor and identify all such distributors to which You have licensed the work, state the scope and terms of the licenses and state the time period for which and conditions under which the work is or was licensed to each distributor.

**RESPONSE TO INTERROGATORY NO. 9:**

FBC objects to this interrogatory to the extent it seeks disclosure of any information protected by the attorney-client privilege and/or work product doctrine. FBC further objects to this interrogatory on the grounds that it is unduly burdensome and duplicative of DISH's document requests seeking the same information. Specifically, the requested information is covered by DISH's Document Request No. 19. Because the agreements are covered by strict non-disclosure provisions, FBC's counsel indicated that it would need to work with its licensees to obtain their consent for disclosure. As of July 16, 2013, DISH's

1   counsel indicated that it was in discussions with some of these third party licensees

2   regarding possible redactions to the agreements.  FBC remains ready and willing to

3   continue meeting and conferring with DISH so the parties may agree on mutually

4   acceptable redactions of irrelevant, but highly sensitive, information.  Because

5   DISH has not yet produced all relevant documents or interrogatory responses, FBC

6   also objects on the grounds that it does not yet have enough information about the

7   scope of DISH's infringement to identify all of the infringed works.

8

9

10  Dated:     November 25, 2013            JENNER & BLOCK LLP

11

12                                          By: _____

13                                               David R. Singer

14                                          Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 18 - Page 109

FBC'S OBJECTIONS AND RESPONSES TO DISH'S FIRST SET OF INTERROGATORIES

## VERIFICATION

No individual knows all of the information requested by Defendants DISH
Network L.L.C., DISH Network Corp., and EchoStar Technologies L.L.C.'s
(collectively, "DISH") First Set of Interrogatories to Plaintiff Fox Broadcasting
Company, but I declare under penalty of perjury under the laws of the United
States of America that, to the best of my knowledge and belief, the factual portions
(i.e., not the legal objections and positions) of the foregoing responses to
Defendant DISH's First Set of Interrogatories to Fox Broadcasting Company are
true and correct. I further declare that I am authorized to sign and execute this
verification on behalf of Fox Broadcasting Company.

By:  Sherry Brennan
Senior Vice President, Distribution
Strategy & Development, Fox Cable
Network Services, LLC
For Fox Broadcasting Company

Executed on November 19, 2013

Exhibit 18 - Page 110

**PROOF OF SERVICE**

I am a citizen of the United States and resident of the State of California.  I am employed in Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction the service was made.  I am over the age of eighteen years and not a party to the within action.

On November 25, 2013, I served the following documents in the manner described below:

**PLAINTIFF FOX BROADCASTING COMPANY'S OBJECTIONS AND RESPONSES TO DISH'S FIRST SET OF INTERROGATORIES**

☑ (BY U.S. MAIL)  I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ (BY FACSIMILE)  I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Jenner & Block LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☑ BY ELECTRONIC SERVICE:  By electronically mailing a true and correct copy through Jenner & Block LLP's electronic mail system from jcarroll@jenner.com to the email addresses set forth below.

On the following part(ies) in this action:

| | |
|---|---|
| William A. Molinski<br>**Orrick Herrington and Sutcliffe LLP**<br>777 South Figueroa Street, Suite 3200<br>Los Angeles, CA 90017<br>wmolinski@orrick.com | **\*VIA EMAIL AND U.S. MAIL**<br><br>Attorneys for DISH Network L.L.C. and DISH Network Corporation |
| Elyse D. Echtman<br>**Orrick Herrin/tton and Sutcliffe LLP**<br>51 West 52nd treet<br>New York, NY 10019-6142<br>eechtman@orrick.com | **\*VIA EMAIL AND U.S. MAIL** |

2244351.1

Exhibit 18 - Page 111

| | |
|---|---|
| Annette L. Hurst<br>**Orrick Herrington and Sutcliffe LLP**<br>405 Howard Street<br>San Francisco, CA 94105-2669<br>ahurst@orrick.com | **\*VIA EMAIL AND U.S. MAIL** |
| Mark A. Lemley<br>**Durie Tangri LLP**<br>217 Leidesdorff Street<br>San Francisco, CA 94111-3007<br>mlemley@durietangri.com | **\*VIA EMAIL AND U.S. MAIL** |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 25, 2013, at 633 West 5th Street, Suite 3600, Los Angeles, CA 90071:


Jessica C. Carroll