JENNER & BLOCK LLP
Richard L. Stone (Bar No. 110022)
Andrew J. Thomas (Bar No. 159533)
David R. Singer (Bar No. 204699)
Amy M. Gallegos (Bar No. 211379)
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
rstone@jenner.com
ajthomas@jenner.com
dsinger@jenner.com
agallegos@jenner.com

Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C., DISH NETWORK CORP., and ECHOSTAR TECHNOLOGIES L.L.C.<br><br>Defendants. | Case No.  12-CV-04529-DMG (SH)<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS** |

## I.     Introduction

Dish's motion to compel is meritless and should be denied.  Dish's claim that it needs to review millions of documents generated by Fox's advertising sales department – including five years' worth of emails, internal correspondence, draft agreements, back-and-forth with advertisers, and the like – in order to prove that Dish's commercial-free VOD service, PrimeTime Anytime ("PTAT") did not "destroy" Fox's advertising business is absurd.  There are many less burdensome and intrusive ways of proving the existence of an ongoing business.  Moreover, Dish's suggestion that showing that Fox still has an advertising business will somehow bolster its fair-use argument is just wrong.  Although market harm is a factor in the fair-use analysis, proof of damages is not required, nor is proof that the copyright owner's business was "destroyed" prior to trial.  Rather, fair-use market harm looks at how the market will be impacted if the defendant's copying is not stopped and therefore becomes widespread.  Moreover, Fox is already producing its advertising revenues and communications with advertisers that mention PTAT or PTAT's commercial-erasing feature AutoHop.  Dish sells television advertising and directly competes with Fox for advertising dollars.  Dish refused to compromise or narrow this request because it is not actually looking for anything in particular – it just wants to rifle through a competitor's confidential business documents.

The rest of Dish's requests fare no better.  Dish cannot explain how Fox's outdated financial projections – made long before PTAT launched – are relevant to any claim or defense in this case.  Dish's claim that it needs documents discussing alternative advertising models like product placement to show Fox could make money in other ways notwithstanding Dish's infringement is a non-starter since that isn't a defense.  And there is no reason Dish needs to know how many people streamed or downloaded particular episodes of *The Simpsons*, *Glee*¸ and other Fox programs from each and every distributor website because Fox is not seeking damages based on lost streams or downloads.

## II. **Dish Is Not Entitled To Virtually Every Scrap Of Paper Produced By Fox's Advertising Sales Department Within The Last Five Years.**

As explained in Fox's portion of the joint stipulation, Dish's request for documents relating to upfront advertising will require Fox to gather, review, and produce literally millions of documents – a project that will cost hundreds of thousands of dollars and take months to complete. A production of this magnitude is unduly burdensome on its face, harassing, and wholly unjustified here given that the documents Dish seeks are only marginally if at all relevant to the claims and defenses in this case. *See* Fed. R. Civ. P. 26(b)(2)(C) (court may limit discovery where the burden and expense outweigh the likely benefit).

Asserting a fair-use defense does not automatically entitle Dish to copies of the majority of the work product generated by Fox's advertising sales department during the past five years. Dish claims these documents could help show that its unauthorized services did not negatively impact Fox's advertising business, but that is not how the fair-use market harm analysis works. Fair-use market harm does not focus on the copyright owner's financial losses during the litigation. It is a *forward-looking* analysis that asks what the impact on the market would be if the defendant's conduct became widespread. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 568 (1985) (to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work"); *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012) (same, and finding market harm factor met because "[u]nrestricted and widespread reproduction of [defendant's] conduct would not only undermine the ability of celebrities to market images of themselves, but would also create incentives to pirate intellectual property"); *Soc'y of the Holy Transfiguration Monastery, Inc v. Gregory,* 689 F.3d 29, 64 (1st Cir. 2012) (rejecting argument that defendant's copying was fair use because copyright owner could not show specific lost sales or lost profits caused by the infringement, and

1   holding that if the court were to find that defendant's copying was fair use, it

2   "unquestionably would affect the market for translations of ancient religious texts,

3   likely discouraging other institutions from investing in and expending the time,

4   effort, and resources necessary for producing works . . . ."); *see also* 4 MELVILLE B.

5   NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.05[A][4] at 13-198.4.4(1)

6   (REV. ED. 2013) (fair-use market harm factor does not merely raise the question of

7   damages but rather "the issue of whether unrestricted and widespread conduct of

8   the sort engaged in by the defendant . . . would result in a substantially adverse

9   impact on the potential market, or value of, the plaintiff's present work").

10   **III.    Fox's Outdated Financial Projections Are Irrelevant.**

11          Fox's outdated, historical financial projections are irrelevant.  The examples

12   Dish uses in its portion of the joint stipulation to illustrate relevance do not

13   withstand serious scrutiny.   Dish asserts that one way to "test" whether its

14   unauthorized services have harmed Fox's business is to "compare the financial

15   projections that Fox made for 2012 and 2013 against Fox's actual revenues for

16   those same years."  Joint Stip. at 17.  This is wrong analytically.   To ascertain

17   whether Dish's services might have already impacted Fox's revenues (assuming

18   that were relevant), one would compare Fox's *actual financial results* from before

19   and after Dish's services entered the market.  One would not compare Fox's actual

20   results to Fox's historical projections, since that comparison would not reveal

21   anything about the impact Dish's services had on Fox's business.

22          Dish also argues that "it will be difficult for Fox to claim these features [i.e.,

23   Dish's unauthorized commercial-free VOD and streaming services] destroyed

24   Fox's ad-based ecosystem if it met or exceeded its financial projections."  Joint

25   Stip. at 17.  This is also wrong.  Projections are just estimates.  Projections made

26   before Fox learned that Dish would start infringing are not proof of how Fox would

27   have done in the absence of infringement. Here is an example that illustrates this

28   point.  Suppose Dish projected back in 2009 that in 2014 it would lose 10% of its

1  subscribers due to cord-cutting (i.e., consumers cancelling their cable/satellite

2  subscriptions).  Now suppose cord-cutting did not turn out to be a big issue, but

3  instead a power outage at Dish's facilities disrupted service and caused Dish to lose

4  2% of its subscribers.  Does the fact that Dish exceeded its 2009 projection mean

5  that the power outage did not impact Dish's business?  Of course not.

6  **IV.   Granular Viewing Statistics Are Not Relevant To Fox's Reasonable**

7  **Royalty Claim.**

8  Dish does not need statistics about how many people streamed or

9  downloaded particular episodes of each Fox program using various Internet

10  platforms such as Hulu, Netflix, Amazon, and iTunes because  Fox is *not* seeking

11  actual damages for lost sales, lost revenues, lost streams, or lost downloads, as it

12  has told Dish multiple times.  In its portion of the joint stipulation, Dish implies that

13  Fox's reasonable-royalty claim is just another way of seeking these damages.  *See*

14  Joint Stip. at 45. It isn't.  Fox's reasonable-royalty claim seeks, as a remedy for

15  Dish's infringement, the amount that Fox would charge *Dish* if forced to license

16  *Dish* the rights it is currently exploiting without permission – specifically, the right

17  to stream Fox's live programming over the Internet, and the right to copy Fox's

18  programs in order to create a commercial-free VOD service.  *See Fox Broad. Co. v.*

19  *Dish Network LLC*, 747 F.3d 1060, 1073 (9th Cir. 2014); Order re Plaintiffs'

20  Motion for Preliminary Injunction re Dish's New 2013 Services (Sept. 23, 2013),

21  ECF No. 196, at 9-10.  The reasonable royalty is the royalty rate that *Dish* should

22  have been paying Fox; it has nothing to do with total lost revenues from third

23  parties like Amazon, which Fox is not seeking to recover.

24  **V.   Dish Has Failed To Submit An Expert Declaration.**

25  Dish contends that it needs outdated projections, granular viewing statistics,

26  every communication generated by Fox's 100-person advertising sales department,

27  and the various other documents sought in its motion in order to analyze fair-use

28  market harm, irreparable injury, and lost profits damages (which Dish knows Fox is

4

not seeking). This analysis is supposedly being conducted by Dish's expert, Richard Rapp. Yet, tellingly, Mr. Rapp has not submitted a declaration stating that these documents are necessary for his analysis. This omission is particularly noteworthy since just last week Dish filed a declaration from Mr. Rapp claiming that he needed *other* documents sought by a different motion. That declaration was not served with Dish's portion of the joint stipulation, was filed at the last minute in an apparent attempt to ambush Fox, and wholly failed to demonstrate that the documents sought were relevant. But setting those defects aside, the important point is that Mr. Rapp did not say anything in that declaration about needing outdated projections, viewing statistics, or millions of advertising-related documents to conduct his analysis. This proves that Dish's claimed need for these documents is completely fabricated.

Dated: June 16, 2014                    Jenner & Block LLP


By:   /s/ David Singer
      DAVID R. SINGER
      Attorneys for Plaintiffs
      Fox Broadcasting Company,
      Twentieth Century Fox Film Corp.,
      and Fox Television Holdings, Inc.