JENNER & BLOCK LLP
Richard L. Stone (Cal. Bar No. 110022)
rstone@jenner.com
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
David R. Singer (Cal. Bar No. 204699)
dsinger@jenner.com
Amy M. Gallegos (Cal. Bar No. 211379)
agallegos@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071

Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, et al.<br><br>       Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C., et al.,<br><br>       Defendants. | Case No. 12-CV-04529-DMG (SH)<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF DAVID SINGER IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE  TO DOCUMENT REQUEST NOS. 42, 53, 62, 63, 167, 173, 174, 175, 178, 180, 181, 182, AND 183**<br><br>Discovery Cutoff:  August 5, 2014<br>Pretrial Conference:  December 16, 2014<br>Trial Date: January 13, 2015<br>Hearing Date: July 28, 2014<br>Hearing Time:  2:00 p.m.<br>Hearing Location:  Courtroom 550<br><br>**PUBLIC REDACTED VERSION** |

## DECLARATION OF DAVID SINGER

I, David Singer, declare as follows:

  1. I am an attorney licensed to practice law in the State of California, and I am a partner at the law firm of Jenner & Block LLP, attorneys of record for plaintiffs Twentieth Century Fox Film Corporation, Fox Broadcasting Company, and Fox Television Holdings (collectively, "Fox").  I submit this declaration in support of Fox's Motion to Compel Defendants DISH Network L.L.C., DISH Network Corp., and Echostar Technologies, L.L.C. (collectively, "Dish") to Produce Documents Responsive to Request Nos. 42, 53, 62, 63, 167, 173, 174, 175, 178, 180, 181, 182, and 183.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently to such facts under oath.

### Fox's Requests and Dish's Objections

  2. The requests at issue are contained in various sets of requests for production that Fox has propounded on Dish, including its first, third, fifth, and sixth sets.  Attached as **Exhibits 1, 2, 3,** and **4** are true and correct copies of Dish's responses to Fox's first, third, fifth, and sixth sets of requests for production, respectively.

### Fox Met and Conferred Extensively with Dish to Reach Compromises and Narrow the Issues for this Motion

  3. Attached as **Exhibit 5** is a true and correct copy of a letter I sent to William Molinski, dated February 12, 2014.

  4. Attached as **Exhibit 6** is a true and correct copy of a letter William Molinski sent to me, dated on February 27, 2014.

  5. Attached as **Exhibit 7** is a true and correct copy of a letter I sent to William Molinski, dated on April 16, 2014.

DECLARATION OF DAVID SINGER

6.    Attached as **Exhibit 8** is a true and correct copy of a letter I sent to William Molinski, dated on May 5, 2014.

7.    Attached as **Exhibit 9** is a true and correct copy of a letter William Molinski sent to me, dated on May 12, 2014.

8.    Attached as **Exhibit 10** is a true and correct copy of a letter I sent to William Molinski, dated on June 5, 2014.

9.    Attached as **Exhibit 11** is a true and correct copy of a letter William Molinski sent to me, dated on June 17, 2014.

10.    In addition to the correspondence cited above, counsel for Fox and Dish have met and conferred in-person extensively over the requests at issue in Fox's motion, including on January 8, 2013, April 24, 2013, August 21, 2013, January 23, 2014, June 9, 2014.

## Additional Evidence in Support of Fox's Motion to Compel

11.    Attached as **Exhibit 12** is a true and correct copy of Fox's Memorandum of Points and Authorities in Support of Motion for a Preliminary Injunction, filed on August 22, 2012.

12.    Attached as **Exhibit 13** is a true and correct copy of Dish's opposition to Fox's motion for a preliminary injunction, filed on August 31, 2012.

13.    Attached as **Exhibit 14** is a true and correct copy of excerpts of the Declaration of Richard Rapp, submitted in support of Dish's opposition to Fox's motion for a preliminary injunction.

14.    Attached as **Exhibit 15** is a true and correct copy of excerpts of the Declaration of David Shull, submitted in support of Dish's opposition to Fox's motion for a preliminary injunction.

15.    Attached hereto as **Exhibit 16** is a true and correct copy of excerpts of the Declaration of John Hauser, submitted in support of Dish's opposition to Fox's motion for a preliminary injunction.

DECLARATION OF DAVID SINGER

16.     Attached as **Exhibit 17** is a true and correct copy of Fox's Reply Brief in support of its motion for a preliminary injunction, filed on September 7, 2012.

17.     Attached as **Exhibit 18** is a true and correct copy of a video entitled "The Hopper: PrimeTime Anytime," captured by my firm's technical support team at my direction, from Dish's website's "Video Gallery."  *See* first 15 seconds of video.

18.     Attached as **Exhibit 19** is a true and correct copy of Dish's May 10, 2012 press release regarding AutoHop.

19.     Attached as **Exhibit 20** are true and correct copies of screenshots from Dish's website, www.dish.com.

20.     Attached as **Exhibit 21** is a true and correct copy of a document Dish produced and bates-numbered DISHvABC00007943-44.

21.     Attached as **Exhibit 22** is a true and correct copy of a document Dish produced and bates-numbered DISH0005431.

22.     Attached as **Exhibit 23** is a true and correct copy of a document Dish produced and bates-numbered DISH0030490-501.

23.     Attached as **Exhibit 24** is a true and correct copy of Fox's First Amended Complaint, filed February 22, 2013.

24.     Attached as **Exhibit 25** is a true and correct copy of an August 14, 2012 Sinclair Broadcasting Group press release, bates-numbered Fox042985-87.

25.     Attached as **Exhibit 26** is a true and correct copy of a Dish press release regarding Gannett Broadcasting and dated October 5, 2012.

26.     Attached as **Exhibit 27** is a true and correct copy of an article from the Los Angeles Times, dated August 14, 2012, and entitled "Blame Drew Brees and 'Modern Family' for spat between Dish, Sinclair."

27.     Attached as **Exhibit 28** is a true and correct copy of excerpts from the deposition transcript of David Shull, taken on February 21, 2014.

3

28. Attached as **Exhibit 29** is a true and correct copy of an article from the Los Angeles Times, dated May 24, 2012, and entitled "Dish says Hulu is an issue too."

29. Attached as **Exhibit 30** is a true and correct copy of a document Dish produced and bates-numbered DISH0052989.

30. Attached as **Exhibit 31** is a true and correct copy of a document Dish produced and bates-numbered DISH0053042-43.

31. Attached as **Exhibit 32** is a true and correct copy of excerpts from Dish Network Corporation's 10-K for the year 2012, filed February 20, 2013.

32. Attached as **Exhibit 33** is a true and correct copy of a document Dish produced and bates-numbered DISH0018700-06.

33. Attached as **Exhibit 34** is a true and correct copy of excerpts of the deposition transcript of Vivek Khemka, taken on May 28, 2014.


I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.


Executed this 19th day of June, 2014 at Los Angeles, California.


David Singer

4

# Exhibit 1
# Filed Under Seal

# Exhibit 2
# Filed Under Seal

**Exhibit 3**

1   WILLIAM A. MOLINSKI (SBN 145186)
    wmolinski@orrick.com
2   ORRICK, HERRINGTON & SUTCLIFFE LLP
    777 South Figueroa Street, Suite 3200
3   Los Angeles, California 90017
    Tel: +1-213-629-2020 / Fax: +1-213-612-2499
4   ANNETTE L. HURST (SBN 148738)
    ahurst@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
    405 Howard Street
6   San Francisco, California 94105-2669
    Tel: +1-415-773-5700 / Fax: +1-415-773-5759
7
    E. JOSHUA ROSENKRANZ (pro hac vice)
8   jrosenkranz@orrick.com
    PETER A. BICKS (pro hac vice)
9   pbicks@orrick.com
    ELYSE D. ECHTMAN (pro hac vice)
10  eechtman@orrick.com
    LISA T. SIMPSON (pro hac vice)
11  lsimpson@orrick.com
    ORRICK, HERRINGTON & SUTCLIFFE LLP
12  51 West 52nd Street
    New York, New York 10019-6142
13  Tel: +1-212-506-5000 / Fax: +1-212-506-5151

14  MARK A. LEMLEY (SBN 155830)
    mlemley@durietangri.com
15  MICHAEL PAGE (SBN 154913)
    mpage@durietangri.com
16  DURIE TANGRI LLP
    217 Leidesdorff Street
17  San Francisco, California 94111
    Tel: +1-415-362-6666
18  Attorneys for Defendants DISH Network L.L.C.,
    DISH Network Corp., and EchoStar Technologies
19  L.L.C.

20                UNITED STATES DISTRICT COURT

21                CENTRAL DISTRICT OF CALIFORNIA

22  FOX BROADCASTING COMPANY,        Case No. CV12-04529 DMG (SHx)
    et al.,
23                                   **DEFENDANT DISH NETWORK
                 Plaintiffs,         L.L.C.'S RESPONSES TO
24                                   PLAINTIFFS' FIFTH SET OF
          v.                         DOCUMENT REQUESTS**
25
    DISH NETWORK L.L.C., et al.,
26
                 Defendants.
27

28
                                     DEFENDANT DISH NETWORK L.L.C.'S RESPONSES
                                     TO PLAINTIFFS' FIFTH SET OF RFPS
                                     CASE NO. CV12-04529 DMG (SHx)

1   PROPOUNDING PARTY:          Fox Broadcasting Company

2   RESPONDING PARTY:           DISH Network L.L.C.

3   SET NUMBER:                 Fifth

4

5       DISH Network L.L.C. ("DISH") hereby responds to Plaintiffs' Fifth Set of

6   Document Requests.

7                          **GENERAL RESPONSE**

8       The General Response set forth herein applies to all responses that DISH is

9   providing in response to this Document Request (the "Request") or may in the in

10  the future provide in response to any discovery request in this action.  Each

11  response is made without waiving, or intending to waive, any of DISH's rights.  On

12  the contrary, each response is made while expressly reserving: (a) the right to

13  object, on the grounds of competency, privilege, relevancy or materiality, or any

14  other proper grounds, to the use of any response, for any purpose in whole or in

15  part, in any subsequent step or proceeding in this action or any other action; (b) the

16  right to object on any and all grounds, at any time, to other requests for production

17  or other discovery procedures; and (c) the right at any time to revise, correct, add

18  to, or clarify any responses included below.

19      The responses below reflect only the present state of DISH's discovery

20  regarding the information that Plaintiffs seek.  Discovery and other investigation or

21  research concerning this litigation is continuing.  It is anticipated that further

22  discovery, independent investigation, and legal research and analysis will supply

23  additional facts and meaning to the known facts, as well as establish entirely new

24  factual conclusions, all of which may lead DISH to discover other information

25  responsive to this Request.  DISH therefore reserves the right to amend or

26  supplement any response at any time in light of future investigation, research or

27  analysis, and also expressly reserves the right to rely on, at any time, including trial,

28  subsequently discovered information omitted from any responses as a result of

-1-

1   mistake, error, oversight or inadvertence.  DISH does not hereby admit, adopt or

2   acquiesce in any factual or legal contention, assertion, or characterization contained

3   in the Request or any particular request therein, even where DISH has not otherwise

4   objected to a particular request, or has agreed to provide information responsive to

5   a particular request.  No incidental or implied admissions are intended by these

6   responses.  These responses should not be taken as an admission that DISH accepts

7   or admits the existence of any facts set forth or assumed by any definition or

8   request.

9        In addition, DISH intends to coordinate the discovery process in this case

10   (including document production) with the discovery in the action, *In re AutoHop*

11   *Litigation*, 12 Civ. 4155 (S.D.N.Y.)(LTS)(KNF), so as to avoid duplication and

12   inefficiency, as ordered by Judge Swain in the Memorandum Opinion and Order

13   entered in that case on July 9, 2012, and to which Fox was a party, and indicated by

14   Judge Gee at the December 6, 2013 scheduling conference.

15        DISH reserves all objections to the admissibility at trial of any information or

16   document provided pursuant to the Request, including without limitation, all

17   objections on the grounds that such documents are not authentic or that the

18   information contained therein is not relevant or material to this action.  All

19   documents and information produced in response to the Request are provided solely

20   for use in this litigation, and for use in the related actions pending in the Central

21   District of California with Case No. CV-12-4536-DMG (SHx) and in the Southern

22   District of New York with Master File Case No. 12 Civ. 4155 (LTS) (KNF), and

23   for no other purpose.

24                  **GENERAL OBJECTIONS**

25        DISH responds to this Request subject to the following general objections

26   and limitations, each of which is incorporated into each and every response as

27   though fully set forth therein:

28          1.   DISH objects to the Request insofar as it seeks documents that are

-2-

DEFENDANT DISH NETWORK L.L.C.'S RESPONSES
TO PLAINTIFFS' FIFTH SET OF RFPS
CASE No. CV12-04529 DMG (SHx)

1  protected from disclosure under any applicable privilege, doctrine or immunity,

2  including without limitation the attorney-client privilege, the attorney work product

3  doctrine, the right of privacy, and all other privileges recognized under the

4  constitutional, statutory or decisional law of the United States of America, the State

5  of California or any other applicable jurisdiction.  DISH shall not produce such

6  documents in response to Plaintiffs' Request.  Any production of such protected or

7  privileged material is inadvertent and shall not be construed as a waiver of those

8  privileges or protections.

9        2.     DISH objects to the Request to the extent it seeks information not

10 relevant to the claims or defenses of any party to this action and not reasonably

11 calculated to lead to the discovery of admissible evidence.

12       3.     DISH objects to the Request to the extent it seeks information which

13 by reason of public filing or otherwise is already in Plaintiffs' possession or is

14 readily accessible to Plaintiffs.

15       4.     DISH objects to the Request to the extent it seeks the disclosure of

16 information (1) not currently within its possession, custody or control; (2) that

17 DISH cannot locate after a reasonable inquiry; or (3) that refer to persons, entities,

18 or events not known to DISH.  Such instructions, definitions, or requests are

19 objectionable where they subject DISH to unreasonable and undue annoyance,

20 oppression, burden, and expense; and/or seek to impose upon DISH an obligation to

21 produce documents from sources equally accessible to Plaintiffs.  To the extent

22 DISH agrees to produce documents in response to the Request, DISH will make a

23 reasonable inquiry for responsive documents within its possession, custody or

24 control, and located at DISH offices.

25       5.     DISH objects to the Request to the extent it is overbroad and unduly

26 burdensome.

27       6.     In responding to Plaintiffs' Request, DISH has not and will not comply

28 with any definitions that seek to impose requirements in addition to those imposed

-3-

DEFENDANT DISH NETWORK L.L.C.'S RESPONSES
TO PLAINTIFFS' FIFTH SET OF RFPS
CASE NO. CV 12-04529 DMG (SHx)

1    by the applicable Federal Rules of Civil Procedure and Local Rules of the Central
2    District of California.

3          7.    DISH objects to each and every Request including but not limited to
4    those that seek "all documents" responsive to a certain broad category on the
5    grounds that such requests are overbroad and unduly burdensome and oppressive.
6    DISH will not respond to duplicative or cumulative requests and will not reproduce
7    documents it has already produced or produce documents that it has received from
8    Plaintiffs or others in the course of discovery in this matter.

9          8.    DISH objects to the Request insofar as it seeks production of
10    confidential, proprietary, or trade-secret information, the disclosure of which would
11    be inimical to the business interests of DISH.

12          9.    DISH objects to each Request to the extent it seeks information or
13    documents that may be obtained from other sources through other means of
14    discovery that are more convenient, more efficient, more practical, less burdensome
15    and/or less expensive.

16          10.   DISH objects to each Request to the extent it seeks information
17    relating to the activities or conduct of other entities or non-parties.

18          11.   DISH objects to each Request to the extent it seeks information
19    relating to activities or conduct in foreign countries.

20          12.   DISH objects to the definitions to the extent such definitions purport to
21    enlarge, expand or alter in any way the plain meaning and scope of any specific
22    term or specific requests on the ground that such enlargement, expansion, or
23    alteration renders such a term or request vague, ambiguous, unintelligible, overly
24    broad, unduly burdensome or uncertain.

25          13.   DISH objects to each Request to the extent that it seeks information
26    that will be the subject of expert witness testimony and that is therefore premature.

27          14.   DISH objects to the Request to the extent that it may unfairly seek to
28    restrict the facts on which DISH may rely at trial.  Discovery has not been

DEFENDANT DISH NETWORK L.L.C.'S RESPONSES
TO PLAINTIFFS' FIFTH SET OF RFPS
CASE NO. CV12-04529 DMG (SHx)

1   completed and DISH is not yet necessarily in possession of all the facts and

2   documents upon which DISH intends to rely.  All of the responses submitted

3   herewith are tendered to Plaintiffs with the reservation that the responses are

4   submitted without limiting the evidence on which DISH may rely to support the

5   contentions and defenses that DISH may assert at the trial of this action and to rebut

6   or impeach the contentions, assertions and evidence that Plaintiffs may present.

7   DISH reserves the right to supplement or amend this response at a future date.

8       15.   DISH reserves the right to object on any ground at any time to such

9   other and supplemental discovery requests as Plaintiffs may propound involving or

10  relating to the same subject matter of this Request.

11      16.   The responses below shall not be construed as an admission as to the

12  relevance or admissibility of any statement or characterization contained in any

13  Request.  DISH reserves all objections, including without limitation objections as to

14  competency, relevance, materiality, privilege, authenticity, or admissibility.

15      17.   DISH objects to the Request to the extent it seeks the production of

16  documents in their native format where the burden of such production outweighs

17  the likelihood of discovering information that is relevant to the subject matter of the

18  claims or defenses in this action or calculated to lead to the discovery of admissible

19  evidence.

20      18.   DISH objects to each Request to the extent that it calls for a legal

21  conclusion.

22  ## RESPONSES TO FIFTH SET OF DOCUMENT REQUESTS

23      Without waiving its General Response and General Objections, and

24  incorporating both by reference into each response below, DISH further responds to

25  the Request below.

26  ///

27  ///

28  ///

DEFENDANT DISH NETWORK L.L.C.'S RESPONSES
TO PLAINTIFFS' FIFTH SET OF RFPS
CASE NO. CV12-04529 DMG (SHx)

**DOCUMENT REQUEST 180:**

All agreements granting you the right to offer live television network programming over the Internet to DISH subscribers including, but not limited to, the live television network programming that is currently available on DishAnywhere.com.

**RESPONSE TO DOCUMENT REQUEST 180:**

DISH incorporates by reference its General Response and General Objections.  DISH objects to this Request to the extent that it seeks documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, trade secrets doctrine, or any other privilege or protection recognized by law.  DISH further objects to this Request on the grounds that it is vague and ambiguous as to the phrase "live television network programming."  DISH further objects to this Request on the grounds that it is overly broad and unduly burdensome in its temporal scope and subject matter.  DISH further objects to this Request on the grounds that it calls for a legal conclusion.  DISH further objects to this Request on the grounds that it seeks documents that are not relevant to any claim, defense, or allegation in this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.  DISH further objects to this Request on the grounds that it seeks production of confidential, proprietary, or trade-secret information, the disclosure of which would be inimical to the business interests of DISH.

Dated:        March 31, 2014              Orrick, Herrington & Sutcliffe LLP

By: _____
              WILLIAM A. MOLINSKI
              Attorneys for Defendants
              DISH Network L.L.C., DISH
              Network Corp. and EchoStar
              Technologies L.L.C.

DEFENDANT DISH NETWORK L.L.C.'S RESPONSES
TO PLAINTIFFS' FIFTH SET OF RFPS
CASE NO. CV12-04529 DMG (SHx)

D. Singer Decl Ex 3
Page 119

**PROOF OF SERVICE**

I am more than eighteen years old and not a party to this action.  My business address is Orrick Herrington & Sutcliffe LLP, 777 S. Figueroa Street, Suite 3200, Los Angeles, California  90017.  On March 31, 2014, I served the following document(s):

**DEFENDANT DISH NETWORK L.L.C.'S RESPONSE TO PLAINTIFFS' FIFTH SET OF DOCUMENT REQUESTS**

on the interested parties in this action as follows:

☒    By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California

☒    I caused such document(s) listed above to be transmitted by electronic mail to the offices of the addressee(s) listed below.

☐    On the date indicated above, I deposited the sealed package(s) in a box or other facility regularly maintained by Federal Express for delivery of documents, with the delivery fees paid or provided for by the sender.

Richard L. Stone, Esq.
David R. Singer, Esq.
Andrew Thomas, Esq.
Amy Gallegos, Esq.
JENNER & BLOCK
633 West 5th Street, Suite 3600
Los Angeles, California  90071
Tel: (213) 239-5100
Fax: (213) 239-5199
rstone@jenner.com
athomas@jenner.com
dsinger@jenner.com
agallegos@jenner.com

Attorneys for Plaintiff
FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM CORP. and FOX TELEVISION HOLDINGS, INC.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on March 31, 2014 at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Maria Mercado-Navarro

OHSUSA:751798731.1

# Exhibit 4

WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California  90017
Tel: +1-213-629-2020 / Fax:  +1-213-612-2499

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105-2669
Tel:  +1-415-773-5700 / Fax:  +1-415-773-5759

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
ELYSE D. ECHTMAN (*pro hac vice*)
eechtman@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York  10019-6142
Tel: +1-212-506-5000 / Fax: +1-212-506-5151

MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL PAGE (SBN 154913)
mpage@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California  94111
Tel:  +1-415-362-6666

Attorneys for Defendants DISH Network L.L.C.,
DISH Network Corp., and EchoStar Technologies
L.L.C.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C., *et al.*,<br><br>Defendants. | Case No. CV12-04529 DMG (SHx)<br><br>**DEFENDANT DISH NETWORK L.L.C.'S RESPONSES TO PLAINTIFFS' SIXTH SET OF DOCUMENT REQUESTS** |

1   PROPOUNDING PARTY:        Plaintiffs

2   RESPONDING PARTY:         DISH Network L.L.C.

3   SET NUMBER:               Six

4

5        DISH Network L.L.C. ("DISH") hereby responds to Plaintiffs' Sixth Set of

6   Document Requests.

7                            **<u>GENERAL RESPONSE</u>**

8        The General Response set forth herein applies to all responses that DISH is

9   providing in response to these Document Requests (the "Requests") or may in the

10  in the future provide in response to any discovery request in this action.  Each

11  response is made without waiving, or intending to waive, any of DISH's rights.  On

12  the contrary, each response is made while expressly reserving: (a) the right to

13  object, on the grounds of competency, privilege, relevancy or materiality, or any

14  other proper grounds, to the use of any response, for any purpose in whole or in

15  part, in any subsequent step or proceeding in this action or any other action; (b) the

16  right to object on any and all grounds, at any time, to other requests for production

17  or other discovery procedures; and (c) the right at any time to revise, correct, add

18  to, or clarify any responses included below.

19       The responses below reflect only the present state of DISH's discovery

20  regarding the information that Plaintiffs seek.  Discovery and other investigation or

21  research concerning this litigation is continuing.  It is anticipated that further

22  discovery, independent investigation, and legal research and analysis will supply

23  additional facts and meaning to the known facts, as well as establish entirely new

24  factual conclusions, all of which may lead DISH to discover other information

25  responsive to these Requests.  DISH therefore reserves the right to amend or

26  supplement any response at any time in light of future investigation, research or

27  analysis, and also expressly reserves the right to rely on, at any time, including trial,

28  subsequently discovered information omitted from any responses as a result of

-1-

1   mistake, error, oversight or inadvertence.  DISH does not hereby admit, adopt or

2   acquiesce in any factual or legal contention, assertion, or characterization contained

3   in the Requests or any particular request therein, even where DISH has not

4   otherwise objected to a particular request, or has agreed to provide information

5   responsive to a particular request.  No incidental or implied admissions are intended

6   by these responses.  These responses should not be taken as an admission that

7   DISH accepts or admits the existence of any facts set forth or assumed by any

8   definition or request.

9           In addition, DISH intends to coordinate the discovery process in this case

10  (including document production) with the discovery in the action, *In re AutoHop

11  Litigation*, 12 Civ. 4155 (S.D.N.Y.)(LTS)(KNF), so as to avoid duplication and

12  inefficiency, as ordered by Judge Swain in the Memorandum Opinion and Order

13  entered in that case on July 9, 2012, and to which Fox was a party, and indicated by

14  Judge Gee at the December 6, 2013 scheduling conference.

15          DISH reserves all objections to the admissibility at trial of any information or

16  document provided pursuant to the Requests, including without limitation, all

17  objections on the grounds that such documents are not authentic or that the

18  information contained therein is not relevant or material to this action.  All

19  documents and information produced in response to the Requests are provided

20  solely for use in this litigation, and for use in the related actions pending in the

21  Central District of California with Case No. CV-12-4536-DMG (SHx) and in the

22  Southern District of New York with Master File Case No. 12 Civ. 4155 (LTS)

23  (KNF), and for no other purpose.

24                          **GENERAL OBJECTIONS**

25          DISH responds to these Requests subject to the following general objections

26  and limitations, each of which is incorporated into each and every response as

27  though fully set forth therein:

28          1.   DISH objects to the Requests insofar as they seek documents that are

- 2 -

1  protected from disclosure under any applicable privilege, doctrine or immunity,

2  including without limitation the attorney-client privilege, the attorney work product

3  doctrine, the right of privacy, and all other privileges recognized under the

4  constitutional, statutory or decisional law of the United States of America, the State

5  of California or any other applicable jurisdiction.  DISH shall not produce such

6  documents in response to Plaintiffs' Requests.  Any production of such protected or

7  privileged material is inadvertent and shall not be construed as a waiver of those

8  privileges or protections.

9        2.    DISH objects to the Requests to the extent they seek information not

10  relevant to the claims or defenses of any party to this action and not reasonably

11  calculated to lead to the discovery of admissible evidence.

12        3.    DISH objects to the Requests to the extent they seek information

13  which by reason of public filing or otherwise is already in Plaintiffs' possession or

14  is readily accessible to Plaintiffs.

15        4.    DISH objects to the Requests to the extent they seek the disclosure of

16  information (1) not currently within its possession, custody or control; (2) that

17  DISH cannot locate after a reasonable inquiry; or (3) that refer to persons, entities,

18  or events not known to DISH.  Such instructions, definitions, or Requests are

19  objectionable where they subject DISH to unreasonable and undue annoyance,

20  oppression, burden, and expense; and/or seek to impose upon DISH an obligation to

21  produce documents from sources equally accessible to Plaintiffs.  To the extent

22  DISH agrees to produce documents in response to the Requests, DISH will make a

23  reasonable inquiry for responsive documents within its possession, custody or

24  control, and located at DISH offices.

25        5.    DISH objects to the Requests to the extent they are overbroad and

26  unduly burdensome.

27        6.    In responding to Plaintiffs' Requests, DISH has not and will not

28  comply with any definitions that seek to impose requirements in addition to those

DEFENDANT'S RESPONSE TO PLAINTIFF'S SIXTH
SET OF DOCUMENT REQUESTS
CASE NO. CV1204529 DMG (SHx)

1  imposed by the applicable Federal Rules of Civil Procedure and Local Rules of the

2  Central District of California.

3      7.    DISH objects to each and every Request including but not limited to

4  those that seek "all documents" responsive to a certain broad category on the

5  grounds that such Requests are overbroad and unduly burdensome and oppressive.

6  DISH will not respond to duplicative or cumulative Requests and will not

7  reproduce documents it has already produced or produce documents that it has

8  received from Plaintiffs or others in the course of discovery in this matter.

9      8.    DISH objects to the Requests insofar as they seek production of

10  confidential, proprietary, or trade-secret information, the disclosure of which would

11  be inimical to the business interests of DISH.

12      9.    DISH objects to each Request to the extent it seeks information or

13  documents that may be obtained from other sources through other means of

14  discovery that are more convenient, more efficient, more practical, less burdensome

15  and/or less expensive.

16      10.  DISH objects to each Request to the extent it seeks information

17  relating to the activities or conduct of other entities or non-parties.

18      11.  DISH objects to each Request to the extent it seeks information

19  relating to activities or conduct in foreign countries.

20      12.  DISH objects to the definitions to the extent such definitions purport to

21  enlarge, expand or alter in any way the plain meaning and scope of any specific

22  term or specific Requests on the ground that such enlargement, expansion, or

23  alteration renders such a term or request vague, ambiguous, unintelligible, overly

24  broad, unduly burdensome or uncertain.

25      13.  DISH objects to each Request to the extent that it seeks information

26  that will be the subject of expert witness testimony and that is therefore premature.

27      14.  DISH objects to these Requests to the extent that they may unfairly

28  seek to restrict the facts on which DISH may rely at trial.  Discovery has not been

DEFENDANT'S RESPONSE TO PLAINTIFF'S SIXTH
SET OF DOCUMENT REQUESTS
CASE NO. CV1204529 DMG (SHx)

1   completed and DISH is not yet necessarily in possession of all the facts and

2   documents upon which DISH intends to rely.  All of the responses submitted

3   herewith are tendered to Plaintiffs with the reservation that the responses are

4   submitted without limiting the evidence on which DISH may rely to support the

5   contentions and defenses that DISH may assert at the trial of this action and to rebut

6   or impeach the contentions, assertions and evidence that Plaintiffs may present.

7   DISH reserves the right to supplement or amend these responses at a future date.

8          15.  DISH reserves the right to object on any ground at any time to such

9   other and supplemental discovery requests as Plaintiffs may propound involving or

10  relating to the same subject matter of these Requests.

11         16.  The responses below shall not be construed as an admission as to the

12  relevance or admissibility of any statement or characterization contained in any

13  Request.  DISH reserves all objections, including without limitation objections as to

14  competency, relevance, materiality, privilege, authenticity, or admissibility.

15         17.  DISH objects to the Requests to the extent they seek the production of

16  documents in their native format where the burden of such production outweighs

17  the likelihood of discovering information that is relevant to the subject matter of the

18  claims or defenses in this action or calculated to lead to the discovery of admissible

19  evidence.

20         18.  DISH objects to each Request to the extent that it calls for a legal

21  conclusion.

22         **RESPONSES TO SIXTH SET OF DOCUMENT REQUESTS**

23         Without waiving its General Response and General Objections, and

24  incorporating both by reference into each response below, DISH further responds to

25  the Requests below.

26  ///

27  ///

28  ///

- 5 -

DEFENDANT'S RESPONSE TO PLAINTIFF'S SIXTH
SET OF DOCUMENT REQUESTS
CASE No. CV1204529 DMG (SHx)

1   **DOCUMENT REQUEST NO. 181:**

2       All DOCUMENTS discussing DISH's plan to build a new nationwide TV

3   service that would be offered over the Internet as described by DISH Executive

4   Vice President Dave Shull in the March 5, 2014 Los Angeles Times article,

5   attached as "Exhibit A."

6   **RESPONSE TO DOCUMENT REQUEST NO. 181:**

7       DISH incorporates by reference its General Response and General

8   Objections.  DISH objects to this Request to the extent that it seeks documents

9   protected from disclosure by the attorney-client privilege, attorney work product

10  doctrine, trade secrets doctrine, or any other privilege or protection recognized by

11  law.  DISH further objects to the Request on the grounds that it is vague and

12  ambiguous as to the phrases "nationwide TV service" and "offered over the

13  Internet."  DISH further objects to the Request on the grounds that it is overly broad

14  and unduly burdensome in its temporal scope and subject matter.  DISH further

15  objects to the Request on the grounds that it seeks documents that are not relevant

16  to any claim, defense, or allegation in this litigation, and is not reasonably

17  calculated to lead to the discovery of admissible evidence.  DISH further objects to

18  the Request on the grounds that it seeks production of confidential, proprietary, or

19  trade-secret information, the disclosure of which would be inimical to the business

20  interests of DISH.

21  **DOCUMENT REQUEST NO. 182:**

22      All DOCUMENTS discussing DISH's acquisition of wireless spectrum for

23  purposes of building a new nationwide TV service that would be offered over the

24  Internet.

25  **RESPONSE TO DOCUMENT REQUEST NO. 182:**

26      DISH incorporates by reference its General Response and General

27  Objections.  DISH objects to this Request to the extent that it seeks documents

28  protected from disclosure by the attorney-client privilege, attorney work product

- 6 -

D. Singer Decl Ex 4
Page 127

1  doctrine, trade secrets doctrine, or any other privilege or protection recognized by

2  law.  DISH further objects to the Request on the grounds that it is vague and

3  ambiguous as to the phrases "wireless spectrum," "nationwide TV service," and

4  "offered over the Internet."  DISH further objects to the Request on the grounds that

5  it is overly broad and unduly burdensome in its temporal scope and subject matter.

6  DISH further objects to the Request on the grounds that it seeks documents that are

7  not relevant to any claim, defense, or allegation in this litigation, and is not

8  reasonably calculated to lead to the discovery of admissible evidence.  DISH further

9  objects to the Request on the grounds that it seeks production of confidential,

10  proprietary, or trade-secret information, the disclosure of which would be inimical

11  to the business interests of DISH.

12  **DOCUMENT REQUEST NO. 183:**

13      All DOCUMENTS discussing the use of Sling technology as leverage for

14  obtaining licenses to build a new nationwide TV service that would be offered over

15  the Internet.

16  **RESPONSE TO DOCUMENT REQUEST NO. 183:**

17      DISH incorporates by reference its General Response and General

18  Objections.  DISH objects to this Request to the extent that it seeks documents

19  protected from disclosure by the attorney-client privilege, attorney work product

20  doctrine, trade secrets doctrine, or any other privilege or protection recognized by

21  law.  DISH further objects to the Request on the grounds that it is vague and

22  ambiguous as to the phrases "leverage," "Sling technology," "licenses,"

23  "nationwide TV service," and "offered over the Internet."  DISH further objects to

24  the Request on the grounds that it is overly broad and unduly burdensome in its

25  temporal scope and subject matter.  DISH further objects to the Request on the

26  grounds that it seeks documents that are not relevant to any claim, defense, or

27  allegation in this litigation, and is not reasonably calculated to lead to the discovery

28  of admissible evidence.  DISH further objects to the Request on the grounds that it

DEFENDANT'S RESPONSE TO PLAINTIFF'S SIXTH
SET OF DOCUMENT REQUESTS
CASE No. CV1204529 DMG (SHx)

D. Singer Decl Ex 4
Page 128

1  seeks production of confidential, proprietary, or trade-secret information, the

2  disclosure of which would be inimical to the business interests of DISH.

3  Dated:          April 7, 2014                    Orrick, Herrington & Sutcliffe LLP

4

5                                                   By: _____

6                                                        WILLIAM A. MOLINSKI
                                                          Attorneys for Defendants
7                                                         DISH Network L.L.C., DISH
                                                          Network Corp. and EchoStar
8                                                         Technologies L.L.C.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 8 -

## PROOF OF SERVICE

I am more than eighteen years old and not a party to this action.  My business address is Orrick Herrington & Sutcliffe LLP, 777 S. Figueroa Street, Suite 3200, Los Angeles, California 90017.  On April 7, 2014, I served the following document(s):

**DEFENDANT DISH NETWORK L.L.C.'S RESPONSES TO PLAINTIFFS' SIXTH SET OF DOCUMENT REQUESTS**

on the interested parties in this action as follows:

☒　By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California

☒　I caused such document(s) listed above to be transmitted by electronic mail to the offices of the addressee(s) listed below.

☐　On the date indicated above, I deposited the sealed package(s) in a box or other facility regularly maintained by Federal Express for delivery of documents, with the delivery fees paid or provided for by the sender.

Richard L. Stone, Esq.
David R. Singer, Esq.
Andrew Thomas, Esq.
Amy Gallegos, Esq.
JENNER & BLOCK
633 West 5th Street, Suite 3600
Los Angeles, California 90071
Tel: (213) 239-5100
Fax: (213) 239-5199
rstone@jenner.com
athomas@jenner.com
dsinger@jenner.com
agallegos@jenner.com

Attorneys for Plaintiff
FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM CORP. and FOX TELEVISION HOLDINGS, INC.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on April 7, 2014 at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Maria Mercado-Navarro

PROOF OF SERVICE
CASE NO. CV1204529 DMG (SHx)

OHSUSA:751798731.1

# Exhibit 5

# JENNER&BLOCK

February 12, 2014

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel  213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL AND U.S. MAIL

David R. Singer
Tel  213 239-2206
Fax 213 239-2216
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

Re: **_Fox Broadcasting Company, et al. v. Dish Network, L.L.C., et al_**
    **_C.D. Cal. Case No. 12-cv-04529-DMG (SH)_**

Dear Bill:

This responds to your February 5, 2014 letter regarding Fox's First, Second, Third and Fourth Sets of Document Requests and First Set of Interrogatories.

## Fox's First and Second Sets of Document Requests

**Request Nos. 42 and 117.** These requests seek documents discussing the marketing and advertising of PTAT, AutoHop, Sling Adapter, Hopper with Sling, and Hopper Transfers. Dish refuses to produce responsive documents. You asked us to identify specific categories of responsive documents that are relevant and not covered by other requests. Here are some examples:

- Emails discussing Dish's plans to specifically market the PTAT and/or AutoHop features of Hopper as a way to drive new subscriptions. These documents would show how Dish would benefit from its infringement of Fox's copyrighted works.
- Emails discussing Dish's plans to market the Dish Anywhere feature of Hopper with Sling as a way to drive new subscriptions. These documents would show how Dish would benefit from its infringement of Fox's copyrighted works.
- Emails discussing Dish's plans to market the Hopper Transfers feature of Hopper with Sling as a way to drive new subscriptions. These documents would show how Dish would benefit from its infringement of Fox's copyrighted works.
- Emails and documents discussing the importance of marketing the commercial-free aspect of PTAT. These documents will show that the purpose of making the PTAT copies is to offer commercial-free TV (even though they don't expressly discuss the "purpose" of PTAT). This is relevant to the first fair use factor.

2258176.1

February 12, 2014
Page 2

- Emails and documents discussing the importance of promoting the librarying capabilities of PTAT. This is relevant to the first fair use factor.
- Emails and documents discussing the importance of marketing Hopper with Sling and Dish Anywhere as compared to the marketing of ViP 922 or Dish Remote Access. These documents will show that Dish did not aggressively market its earlier Sling-enabled DVR service, and it was reasonable for Fox to not sue right away.
- Documents discussing the importance of marketing Hopper Transfers as compared to the marketing of PocketDISH. These documents will show that Dish did not aggressively market PocketDISH, and it was reasonable for Fox to not sue right away.
- Emails and documents expressing reluctance or reservations about highlighting the commercial-free aspect of PTAT and AutoHop. These documents could be used to show that Dish engaged in knowing infringement or, at a minimum, knew that its new services were harmful to broadcasters.
- Emails and documents discussing the importance of using television advertising to market and promote the products and services at issue. These will show that Dish – as an advertiser – recognizes the importance of television advertising. This will refute Dish's oft-repeated argument that nobody is watching TV ads.
- Emails and documents discussing Dish's concerns over the broadcast networks' and television stations' refusal to allow Dish to advertise Hopper during their broadcasts. This will show that advertisers such as Dish are harmed when TV ads are not seen on broadcast television.
- Emails and documents discussing the timing of Dish's decision to begin marketing AutoHop – immediately before the 2012/2013 upfronts. These documents would show that Dish intended for its new service to have a maximum negative impact on Fox and other broadcasters.
- Emails and documents discussing concerns over marketing materials or advertisements that suggest Dish (not the user) is the one making the PTAT copies. This is relevant to Fox's unauthorized reproduction claim.
- Emails and documents discussing concerns over marketing materials or advertisements that suggest Dish (not the user) is the one transmitting programming over the Internet via Dish Anywhere. This is relevant to Fox's unauthorized public performance claim.
- Emails and documents discussing the marketing of PTAT and AutoHop as features that allow subscribers to "save time." These documents tend to show that PTAT and AutoHop will lead to an increase in commercial-skipping which supports Fox's irreparable harm claim.
- Emails and documents discussing advertising or marketing that compares or contrasts AutoHop with fast-forward or timed-skip features. These documents are relevant to Dish's claim that AutoHop is just like fast-forward.
- Emails and documents discussing the importance of marketing Hopper and/or the services at issue as new and unprecedented. These documents will refute Dish's claim that the products and services at issue have been around for a long time or are simply "souped up" DVR features.

2258176.1

February 12, 2014
Page 3

We have repeatedly assured Dish that we are not seeking irrelevant documents that would be burdensome to gather. We have previously identified specific categories of documents that can be excluded from Dish's electronic search. We have also invited Dish to identify any other categories of irrelevant documents that should be excluded from the search but Dish has never responded. Please let us know no later than next week whether Dish is going to produce responsive documents, including those described above. Otherwise, Fox will seek the court's assistance.

**Request Nos. 136-138, 140, 143, 147-152 (Concerning Disgorgement).** We have been asking for Dish's written position on each request and a date certain when we can expect to receive the documents you are agreeing to produce. You say that we should review Dish's financial documents before demanding additional documents, but you refuse to tell us when we can expect to receive them. We need an answer no later than Monday.

**Fox's Third Set of Document Requests**

**Request No. 157** seeks all documents discussing whether Dish could, should, or would use Fox's licensed VOD under the parties' agreement. Dish has now agreed to produce documents discussing whether or not to implement Fox's VOD under the 2010 agreement, which is acceptable to Fox.

**Request Nos. 158 and 159** seek all documents that support, refute, or relate to Mr. Shull's sworn statements about Dish's technological inability to launch Fox's authorized VOD service. Fox is suing Dish for frustrating the purpose of the parties' VOD license and attempting to circumvent Fox's contractual protections. Mr. Shull swore under oath that the reason Dish has not implemented Fox's licensed VOD is because Dish is unable to comply with the VOD license requirements. Fox will attempt to disprove these assertions at trial. But Dish will only agree to produce documents "sufficient" to show its inability to overcome these technological impediments. In order for Fox to disprove Mr. Shull's testimony, Fox must be allowed to see all documents discussing whether Dish is, in fact, able to overcome the technological barriers identified by Mr. Shull and the efforts that were made to do so. We understand that Dish refuses to produce these documents.

**Request No. 160** seeks all documents discussing why Hopper Transfers is not available for certain programs. In your February 5 letter, you say that Dish will produce documents discussing whether Hopper Transfers is unavailable for certain content based on "contractual restrictions." But this excludes documents discussing Dish's decision to not make Hopper Transfers available for certain programs based on non-contractual business reasons. For example, emails discussing Dish's decision to treat HBO or Pay-Per-View programming differently with respect to Hopper Transfers would be relevant to showing that Dish recognized the harm caused by Hopper Transfers. If Dish entered into agreements that permit or restrict Hopper Transfers, those agreements must also be produced. Unless we hear otherwise, we will assume that Dish is refusing to produce any responsive documents other than what was identified in your February 5 letter.

2258176.1

February 12, 2014
Page 4

**Request No. 167** seeks all documents that discuss any harm incurred by Dish from Internet-based VOD or similar services (also known as "over the top" or "OTT") such as Hulu, Amazon, Netflix, and Apple iTunes. Dish has repeatedly tried to argue that Internet-based distribution of television programs is either a non-existent market or one that merely "complements" but does not "substitute" linear television broadcasts. Yet, in Dish's February 2012 filing with the U.S. Securities and Exchange Commission, Dish said just the opposite, telling the government and investors that "Competition from digital media companies that provide or facilitate the delivery of video content via the Internet may reduce our gross new subscriber activations and may cause our subscribers to purchase less services from us or to cancel our services altogether, resulting in less revenue to us." Fox is entitled to any documents discussing how Dish may be threatened by OTT services because they refute Dish's claims about the potential Internet-based markets for Fox's works under the fair use test. Documents responsive to this request would also be relevant to Dish's state of mind and motivation for launching the services at issue. Dish's refusal to produce all responsive documents is remarkable considering Dish has demanded that Fox produce every single study and analysis of the OTT market, as well as documents concerning dozens of products and services that are not at issue. Despite all of its foot-dragging, Dish has not even articulated any specific burden in responding to this request. Your request that we identify "subsets of documents" within this request that are not covered by other requests is merely a stall tactic. Fox has not propounded any other request for documents discussing how Internet-based services such as Netflix and Hulu threaten Dish's satellite television business. Therefore, we can only assume that Dish will not agree to produce responsive documents.

**Request Nos. 168-78.** Dish's Chairman, Charlie Ergen, and CEO, Joe Clayton, made multiple statements during earnings calls, subject to federal regulations governing truthful and accurate statements to investors. As set forth in my prior letters, each of these statements is relevant to this lawsuit. Fox requested all documents that Mr. Ergen and Mr. Clayton relied on or referred to when making these statements. Dish claims Mr. Ergen and Mr. Clayton are unable to identify which documents they relied on or referred to. Accepting Dish's representation as true, Fox is still entitled to the documents that directly support relevant statements by Dish's top two executives. But to avoid any claim of undue burden, Fox is willing to accept documents *sufficient* to support each statement. Specifically, here is what we will accept in connection with each request:

- **Request No. 168**: Documents sufficient to show that "In the second quarter, we [Dish] made solid progress toward our 2012 goals of growing high-value subscribers, increasing revenue and investing for long-term growth."
- **Request No. 169**: Documents sufficient to show that "In the second quarter, we [Dish] increased our mix of DVR and IP-connected activations. This growth was primarily driven by the launch of our award-winning Hopper."
- **Request No. 170**: Documents sufficient to show that "Hopper is just a better operating DVR in the sense that people watch more of their shows and they don't all skip. About half of them skip commercials. So if you get more people watching, then you still have –

2258176.1

February 12, 2014
Page 5

half people – the dirty secret is half the people skip commercials whether it's the Hopper or somebody else's."

- **Request No. 171**: Documents sufficient to show "the DVR is actually a positive form in terms of more viewership that maybe is not being measured today and the fact that only about half the people actually skip commercials, and net-net, they come in [sic] ahead."
- **Request No. 172**: Documents sufficient to show that "Last year we [Dish] added 89,000 new customers for a year-over-year improvement of 255,000. Now a large part of this growth was driven by our award-winning Whole-Home HD DVR, the Hopper."
- **Request No. 173**: Documents sufficient to show that "Dish's top-of-mind visibility is up to 70%, an all time high for us."
- **Request No. 174**: Documents sufficient to show that "we [Dish] are leveraging this heightened awareness to grow high-value subscribers and to increase revenue in 2013."
- **Request No. 175**: Documents sufficient to show that "credit scores are better" for customers that have Hopper or Hopper with Sling.
- **Request No. 176**: Documents sufficient to show that Hopper and Hopper with Sling customers "buy more of our services and additional packages."
- **Request No. 177**: Documents sufficient to show that "the success of the Hopper with Sling has been confirmed by the increased Hopper attachment rate in the quarter, which drove higher SAC investment."
- **Request No. 178**: Documents sufficient to show that "we're [Dish] also seeing a higher referral rate from our Hopper subscribers."

Please let us know by the end of next week whether Dish will produce these documents.

### Fox's Fourth Set of Document Requests

**Request No. 179** seeks copies of the documents cited or relied on by Dish's expert, Richard Rapp, in his March 15, 2013 declaration. You claim to have already provided these documents to us without bates numbers. We claim to have never received them. At our in-person meeting on January 23, you promised to produce them with bates numbers. It has now been nearly three weeks and we still don't have the documents. Please produce them without any further delay.

### Fox's First Set of Interrogatories

At Dish's FRCP 30(b)(6) deposition in August 2012, Dish admitted that defendants make three copies of each Fox program in order to quality check its AutoHop service. The Court found that these quality assurance copies infringe Fox's copyrights (and breach the parties' contract). On appeal, Dish represented to the Ninth Circuit that it had temporarily ceased making the quality assurance copies.

**Interrogatory No. 1** asks Dish to identify the dates when it made quality control copies of any Fox program in connection with AutoHop, PTAT, Hopper Transfers and/or Dish Anywhere. Dish spends four pages discussing various types of testing that it and EchoStar

February 12, 2014
Page 6

supposedly perform. Dish's response culminates with the statement that "DISH beta testers began testing of the PTAT feature on or about December 2011 and "both beta testing and post-release monitoring and testing have continued until the present. By its nature, proper testing of PTAT requires the recording of primetime broadcast network episodes. DISH testers have made DVR recordings of Fox program episodes throughout the period." Dish also states that "DISH beta testers began beta testing of the AutoHop feature in the form launched by DISH in or about April 2012, and both beta and post-release testing of that feature have continued from April 2012 to the present. . . . DISH testers of AutoHop have therefore made DVR recordings of Fox program episodes throughout the PTAT testing and monitoring period from April 2012 to the present."

It is not clear from Dish's response whether it is ignoring the infringing quality assurance copies; whether Dish has started making the AutoHop quality assurance copies again; whether Dish is trying to evade giving a response by distinguishing between copies made by *Dish* or by its agents at *EchoStar*; or whether Dish is referring to an entirely different set of unauthorized copies of Fox programs. If EchoStar made copies of Fox's programs at Dish's direction, or acting as an agent of Dish, Dish's response to Interrogatory No. 1 must also address the AutoHop quality assurance copies.

**Interrogatory No. 7** asks Dish to identify which of its documents produced in this action identify the Fox programs that have been copied in connection with Dish's monitoring or testing of the products/services at issue. At first, you told us that Fox could answer this interrogatory by simply adding up the total number of Fox-owned copyrighted works that aired on Fox from the time Dish began testing and monitoring PTAT (December 2011) and AutoHop (April 2012) to the present. We asked you to confirm this in writing so we can avoid any dispute at trial. But your February 5 letter merely states that "Fox should know full well which primetime programming it aired each day." This sort of ambiguity invites, rather than avoids, a dispute.

**Interrogatory No. 9** states: "With respect to those PTAT users that play back a recording where AUTOHOP is available, identify the percentage of users who select 'Yes' (to enable AUTOHOP) versus those who select 'No Thanks' for the years 2012 and 2013." In response, Dish answered ███████

February 12, 2014
Page 7


     Based on the foregoing, it appears that Dish is being purposefully evasive and withholding responsive information in response to these interrogatories. Fox is entitled to straightforward answers to these straightforward questions. Please confirm whether Dish will agree to amend and supplement its responses to these interrogatories. We expect a response by the end of next week. Otherwise, Fox will seek assistance from the Court.


Sincerely,

David R. Singer
Partner

# Exhibit 6



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

February 27, 2014

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:     *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et al,* Case No. CV 12-04529 DMG (SHx)

Dear David:

This letter responds to your February 12, 2014 letter regarding Fox's first, second, third, and fourth sets of document requests and first set of interrogatories.

## I.     Requests At Issue for Fox's First and Second Set of Requests for Production

As written, **Request Nos. 42 and 117** seek *all* communications discussing, concerning or evidencing the marketing, advertising, or promotion of PTAT, AutoHop, Sling Adapter, Hopper Transfers, or the Hopper with Sling.  In my February 5, 2014 letter, I carefully detailed the parties meet and confer history on these requests.  I explained that DISH understood that Fox had narrowed these requests to communications with outside advertising agencies regarding Sling Adapter, Hopper Transfers and the Sling functionality of the Hopper with Sling (and that DISH had agreed to produce those documents), which is a readily ascertainable universe of documents.  Fox's February 12, 2014 letter simply ignores this two page discussion and again further broadens these requests by adding internal communications regarding advertising, marketing and promotion of PTAT and AutoHop back into the discussion for the first time since April 2013.  Fox's continued disregard of the status of the parties' meet and confer efforts is not conducive to resolving DISH's legitimate concerns about the breadth and burden of these requests.  Fox's latest letter lists **16** broad categories of internal documents that are only tangentially related to advertising, marketing or promotion that DISH would have to scour through its files to find.  Fox's proposal does not do anything to reduce the burden that these requests pose.  Instead, it exacerbates the burden exponentially.  For example, Fox claims that, in response to this request with respect to DISH's advertising of the features, it wants all documents that discuss "the importance of television advertising to market and promote the services at issue," and all documents that discuss "the timing of DISH's decision to begin marketing AutoHop."  The documents are not focused on the content of the advertising, which is what Fox has long claimed was the focus of these requests.  *See, e.g.,* January 28, 2013 letter (limiting the requests to documents discussing the "purpose, goals, content, and/or impact" of advertising).  Post-compromise, Fox should not be expanding the scope of its



ORRICK

David R. Singer, Esq.
February 27, 2014
Page 2

requests beyond their original breadth and beyond the breadth of any reasonable and ordinary reading. Fox effectively asks that DISH produce every marketing-related document that it possesses, or otherwise scroll through every internal email on marketing to find the minutiae that Fox seeks. Fox's requests are unduly burdensome and the burden far outweighs the potential tangential relevance.

Other categories of internal advertising-related communications that Fox requests are being amply addressed by DISH's production in other areas. For example, Fox does not need internal advertising communications on the issue of which party is making the PTAT recordings or making programming available for remote viewing via Sling. DISH has produced technical documents on these points which show how the features actually work. Those are the most probative and relevant documents. In addition, Fox wants DISH to produce all internal advertising-related emails on obtaining new subscribers with PTAT, AutoHop, DISH Anywhere, and Hopper Transfers. However, DISH has already agreed to produce documents discussing its reasons for introducing the features at issue, in response to Request Nos. 2, 97, 98. Additionally, DISH has agreed to produce information regarding its number of subscribers. And, DISH is producing its communications with advertisers, which will provide sufficient information on its primary advertising goals. All of these types of documents are more directly responsive to the issues that Fox claims to be interested in than *every* internal communication tangentially related to advertising.

## II.   Requests At Issue for Fox's Third Set of Requests for Production

**Request Nos. 154 and 156** seek *all* documents discussing why the PocketDISH and the ViP922 were, or should be, discontinued. DISH offered, in my February 5, 2014 letter to expand its offer of production on these request to include documents specifically discussing actual or potential discontinuation, including sales or leasing, of either the PocketDISH or ViP922 to the extent any such documents exist and can be located pursuant to a reasonable search. Your February 12, 2014 letter does not discuss these requests. As a result, we presume that this proposal was acceptable to Fox.

**Request Nos. 158 and 159**, Fox seeks the production of all documents that support or refute statements by Dave Shull in his August 31, 2012 declaration that DISH has been unable to implement two different Fox VOD requirements. DISH has already agreed to produce documents sufficient to show DISH's inability to implement the two different contractual requirements of the Fox VOD clause. DISH has also agreed to produce documents discussing whether or not to implement Fox's VOD, as set forth in the parties' 2010 agreement. However, Fox contends that it is still entitled to *all* documents that discuss whether DISH is able to overcome the technological barriers to implementing Fox VOD "to disprove Mr. Shull's testimony." This is simply not a reasonable position. Given that DISH has agreed to produce documents that show DISH's technical inability to implement two contractual requirements and documents discussing whether or



ORRICK

David R. Singer, Esq.
February 27, 2014
Page 3

not to implement Fox VOD, DISH has already agreed to produce documents that will address this issue. At the very least, Fox can look at those documents prior to demanding a broader review by DISH. To locate all documents responsive to these requests would require the review of a substantial number of development documents that are not relevant to this dispute. By way of example, DISH, as Fox is aware, tracks the development of various DVR features. DISH would have to review all such development documents relating to VOD to see if they relate to the specific technological issues referenced in the Fox VOD requirements. This is simply too burdensome a task where DISH has already agreed to produce a relevant subset of responsive documents that address Fox's stated concern. Fox should review DISH's production before insisting on further documents responsive to these broad and unwieldy requests.

Additionally, this is another example of requests where Fox has changed its position, once DISH has agreed to compromise. In your January 7, 2014 letter, Fox grouped Request Nos. 158 and 159 with Request No. 157. With respect to these three requests, Fox claimed that it "must be able to review all emails and documents discussing whether DISH could, should, or would use Fox's licensed VOD under the parties' agreement." After explaining to you our concerns regarding "could, should, or would" at our in-person meet and confer conference, DISH agreed to produce documents discussing whether or not to implement Fox's VOD, as set forth in the parties' 2010 agreement, in response to Request Nos. 157-159. Your February 12 letter admits that these documents are sufficient to answer its query regarding whether DISH "could, should, or would" implement Fox VOD. But now you have separated Request No. 157 from Request Nos. 158 and 159 and argue that for Request Nos. 158 and 159 you seek something more than whether DISH "could, should, or would" implement Fox's VOD. This is directly contrary to your previous representations. Fox's continually changing positions makes it hard for DISH to continue to offer to compromises on Fox's requests for production.

**Request No. 160,** which seeks *all* documents discussing why Hopper Transfers is not available for "certain television programs," is also an example of where Fox has unfairly changed its position in response to DISH's offer to compromise. In your January 7, 2014 letter, you contended that Fox was entitled to all documents responsive to this request because Fox believes that DISH is disabling transfers based upon some license agreements, but not Fox's. In response to that proffer of relevance, DISH identified a reasonable subset of documents that it could produce in response to this overbroad and unduly burdensome request: documents discussing whether Hopper Transfers is unavailable for certain content based upon contractual restrictions. In response to that offer, Fox has now changed its relevance theory, and argues that it must be provided with documents that discuss "non-contractual business reasons." However, Fox does not explain how such documents would be relevant to its case, other than to say that they would show that "DISH recognized the harm caused by Hopper Transfers." This does not support Fox's insistence that it be provided with *all* documents on this broad topic. Nevertheless, in the spirit of compromise, DISH offers to produce documents sufficient to show the reasons why Hopper Transfers is unavailable for certain



ORRICK

David R. Singer, Esq.
February 27, 2014
Page 4

content, based either on contractual or non-contractual business reasons, to the extent any such documents exist and can be located pursuant to a reasonable search.

**Request No. 167** demands *all* documents that discuss *any* harm incurred by DISH from "over-the-top services." Your February 12, 2014 letter claims that this broad request is relevant because: (1) DISH contends that the internet market does not exist or merely complements linear television; (2) DISH's 2012 U.S. Securities and Exchange Commission filing references internet distribution; and (3) responsive documents would support Fox's claim that DISH developed PrimeTime Anytime and AutoHop in response to OTT services. These three arguments, similar to the three arguments in your January 7, 2014 letter, do not justify the breadth of this request. DISH has already agreed to produce documents discussing its reasons for developing PrimeTime Anytime and AutoHop. In addition, DISH has agreed to produce documents discussing competition between the features at issue in this case and other features or services. Additionally, DISH has offered to produce any cord-cutting studies, which would respond to Fox's desire for documents that relate to internet distribution and whether it complements linear television, as well as DISH's SEC filing. Thus, in my last letter, DISH reasonably asked Fox to identify what additional documents, responsive to this request, but falling outside of what DISH has already agreed to produce are sought. Fox refuses to do so and stubbornly demands that DISH simply search for *all* documents that discuss *any* harm. At this stage of discovery and the parties' meet and confer efforts, this is simply not productive. There is no feasible way to search through DISH document collections for concepts as broad as "internet" or "OTT" and "harm." Please let us know what specifically Fox does not believe DISH has already agreed to produce.

**Request Nos. 168–178** each seek documents "relied on or referred to" by either Joe Clayton, DISH's CEO, or Charlie Ergen, DISH's Chairman in connection with statements made during DISH's earnings calls. Fox has now narrowed these requests to documents sufficient to show single statements. DISH agrees to produce the following responsive documents to the extent any such documents exist and can be located pursuant to a reasonable search:

Request No. 169: Documents sufficient to show that "In the second quarter, we increased our mix of DVR and IP-connected activations, this growth was primarily driven by the launch of our award winning Hopper.";

Request No. 170: Documents sufficient to show that "Hopper is just a better operating DVR in the sense that people watch more of their shows and they don't all skip. About half of them skip commercials.";

Request No. 171: Documents sufficient to show that "the [Hopper] DVR is actually a positive form in terms of more viewership that maybe is not being measured today and the fact that only about half the people actually skip commercials, and net-net, they come in [sic] ahead.";



ORRICK

David R. Singer, Esq.
February 27, 2014
Page 5

 Request No. 172: Documents sufficient to show that "Last year we added 89,000 new customers for a year-over-year improvement of 255,000. Now a large part of this growth was driven by our award winning Whole-Home HD DVR, the Hopper."; and

 Request No. 177: Documents sufficient to show that "the success of the Hopper with Sling has been confirmed by the increased Hopper attachment rate in the quarter, which drove higher SAC investment."

 Request Nos. 173, 174, and 175 go too far afield and do not relate to the features at issue in this action. Request No. 168 and 176 will be addressed by DISH's production of documents responsive to Fox's disgorgement requests.

## III. Requests At Issue for Fox's Fourth Set of Requests for Production

 **Request No. 179** seeks all of the documents cited or relied on by Richard Rapp in his March 15, 2013 declaration. Excluding pleadings, DISH has previously provided these documents to Fox on a thumb-drive as part of its opposition to Fox's second preliminary injunction motion. DISH formally re-produced the documents with bates numbers, pursuant to its original written response to these requests, in its February 24, 2014 document production.

## IV. Fox's First Set of Interrogatories

 **Interrogatory No. 1** asks for the dates on which DISH made quality control copies of any Fox network television programs in support of AutoHop, PTAT, Hopper Transfers, or DISH Anywhere. DISH provided a detailed four and one half page response to a vague and compound interrogatory. As Fox points out in its meet and confer letter, DISH's response explained exactly what type of testing or monitoring has gone on at various points in time. Apparently unhappy with the way that it worded its own interrogatory, Fox now insists that DISH must explain its response further, including specifically discussing the quality assurance process that was at issue in Fox's first preliminary injunction, as well as distinguishing between EchoStar and DISH's conduct. As to the former demand, Fox did not define "quality control" in its interrogatory and DISH responded appropriately. As to the latter portion of Fox's complaint, DISH is under no obligation to answer the interrogatory on behalf of EchoStar, a party to which the interrogatories were not directed. This portion of the dispute is moot given that Fox recently served EchoStar with interrogatories and EchoStar will respond to those interrogatories in due course.

 **Interrogatory No. 7** asks DISH to identify which documents produced in this action identify Fox programming that has been copied in connection with DISH's monitoring or testing of the features at issue in this lawsuit. DISH has repeatedly explained that this interrogatory is burdensome, given DISH's voluminous production in this matter. DISH has provided Fox with the



ORRICK

David R. Singer, Esq.
February 27, 2014
Page 6

dates when DISH began testing the various features. Fox has information regarding what primetime
programming it aired on those dates. Accordingly, Fox knows what Fox programming was part of
DISH's testing or monitoring of the features at issue.

Interrogatory No. 9 specifically asks for the *percentage* of PTAT users who select "Yes"
(to enable AutoHop) versus those who select "No Thanks" for the years 2012 and 2013. As I have
explained multiple times now, DISH does not track the percentage of PTAT users who select "Yes"
(to enable AutoHop) versus those who select "No Thanks." Accordingly, DISH cannot answer the
interrogatory that Fox has propounded. This is not inconsistent with the statement in my last letter
that DISH does have the ability to track AutoHop usage ██████████████████████████
████████████████████████████████████████████████████ This data does not, however, allow
DISH to answer the question that Fox has propounded. DISH does not track the data in the
manner sought by Fox and thus cannot answer this interrogatory.

Yours very truly,

William A. Molinski

# Exhibit 7
# Filed Under Seal

# Exhibit 8

**JENNER&BLOCK**

May 5, 2014

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel  213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL

David R. Singer
Tel  213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

     Re:    *Fox Broadcasting Company, et al. v. DISH Network, L.L.C., et al*
               *C.D. Cal. Case No. 12-cv-04529-DMG (SH)*

Dear Bill:

     This responds to your April 22 letter, as well as recent correspondence from Annette
Hurst regarding depositions and other discovery.

### Fox's Document Requests to DISH

     **Request No. 42.**  Since the request was served in September 2012, we have narrowed it
substantially to address DISH's unsupported burden objections, but we never agreed to exclude
DISH's internal emails discussing how DISH plans to market and promote the infringing
services at issue.  You ignored our latest proposal to further narrow this request to just four
custodians.  I assume this is your final position.

     **Request Nos. 53, 62, and 63.**  DISH agreed to produce responsive documents more than
a year ago after Fox served DISH with a motion to compel (which was withdrawn based on
DISH's representation that it would produce the documents).  Now, in your April 22 letter, you
refuse to say when these documents will be produced, explaining that "DISH is actively working
to obtain consent from the various third parties and will produce the communications as soon as
it is able to obtain the necessary consents."  We appreciate the difficulties associated with
producing third-party agreements.  However, please bear in mind that these documents are
relevant to Dave Shull's deposition, which is scheduled for May 21.  We need them sufficiently
in advance of his deposition so that we have time to review them in a meaningful way.

May 5, 2014
Page 2

    **Request Nos. 158 and 159.**  This confirms DISH's agreement to produce documents sufficient to show whether it can implement Fox's contractual VOD requirements (in addition to the other categories of documents DISH previously agreed to produce).  This resolves our dispute over these requests, but we need to know when we will be receiving the responsive documents.

    **Request No. 167.**  Thank you for conducting our requested word searches.  We are disappointed that you neglected to provide any feedback or explanation as to why our proposed word searches yielded so many results.  As you may recall, DISH insisted that Fox provide the same feedback when it conducted word searches for DISH a few months ago.  We are prepared to narrow this search once more as follows:

> "OTT" OR "over-the-top" OR "over the top" OR (Internet /5 distrib*) OR Hulu OR Netflix ~~OR Amazon~~
>
> [within 25 ~~50~~ words of]
>
> harm* hurt* destroy* damage* injur* bad loss lose undermine detriment* threat*

Please let us know the results of that search.  If DISH continues to assert an undue burden objection, please provide an explanation of which search terms are causing the large number of hits.

    **Request Nos. 180-182.  Request No. 180** seeks all agreements granting DISH the right to stream live TV programming over the Internet.  **Request No. 181** seeks documents that discuss DISH's publicly-disclosed plan to offer an Internet TV service.  **Request No. 182** seeks documents discussing DISH's plans to acquire spectrum so that its Internet TV service can be offered via wireless devices.  The documents sought by these requests are directly relevant to proving the existence of a market for the licensing of live streaming television programs via the Internet.

    Agreements granting DISH the right to stream TV programming on DISH's website are also relevant to Fox's claim of willful infringement.  DISH subscribers using the Hopper with Sling can watch Fox's programs live on the "Sling" section of the DISH Anywhere website.  DISH never sought a license from Fox.  At the same time, DISH allows subscribers to watch live TV on another section of the same website.  We believe that DISH streams those networks pursuant to a license.  The fact that DISH streams some programs on its website pursuant to a license, but streams Fox's programs on the same website *without* a license is evidence of DISH's willful infringement of Fox's copyrights.

    Will DISH stipulate that a market exists for the licensing of live streaming television programs on the Internet, and that DISH participates in that market by live-streaming television

May 5, 2014
Page 3

programs on its DISH Anywhere website?  If yes, Fox is prepared to withdraw this request.  If
no, we will move to compel.  Please let us know by Friday.

      **Request No. 183** seeks documents discussing how DISH used its Sling technology as
leverage for obtaining licenses to build a new nationwide Internet TV service.  This is a very
narrow request.  We are interested in any communications where DISH told a programmer that it
might as well license streaming rights to DISH because DISH was already offering a similar
streaming service with its Sling technology.  These communications would show how DISH
benefited commercially from Sling, which is relevant to fair use and DISH's willful
infringement.  DISH could easily determine whether such documents exist, and where they are
located, by asking Dave Shull or others in his group.

## Fox's Interrogatories to DISH and EchoStar

      **Interrogatory No. 7.**  Fox needs to know how it will calculate statutory damages based
on DISH's unauthorized copying of Fox programs in connection with the monitoring and testing
of PTAT and AutoHop.  The interrogatory asks DISH to identify which of its documents
produced in this action identify those programs.  You refused to do so and explained that Fox
could answer this interrogatory by simply adding up the total number of Fox-owned copyrighted
works that aired on Fox from the time DISH began testing and monitoring PTAT (December
2011) and AutoHop (April 2012) to the present.  To avoid any dispute at trial, we have tried to
reduce this to a written stipulation.  You rejected our proposed stipulation.  Before we seek the
Court's assistance, we ask that you please provide us with an acceptable proposed stipulation
that addresses the agreed-upon manner in which these statutory infringements will be calculated
at trial.  Please send us your proposed stipulation by Friday.

      **Interrogatory Nos. 11-17 to DISH** and **Interrogatory Nos. 4-10 to EchoStar** seek
information about PTAT and AutoHop usage by DISH subscribers.  You claim defendants have
produced the requested information to the extent they have access to it.  Defendants continue to
maintain that the vast majority of PTAT and AutoHop usage data is not in a reasonably
accessible format.  But, as you know, DISH has already relied on PTAT and AutoHop usage data
in its opposition to Fox's preliminary injunction motion.  Obviously DISH cannot expect to
affirmatively rely on PTAT and AutoHop usage data in support of its defenses, while blocking
Fox's access to the rest of the usage data.  You ignored my April 16 request for a stipulation that
DISH will not use, cite to, or rely on any usage data in this case.  We construe this to mean that
DISH will not agree to any such stipulation and will seek the Court's assistance.

## Fox's Production of Internet-Based Distribution Agreements

      Annette Hurst requested a date certain when Fox intends to produce its license
agreements for Fox primetime programming with Internet-based distributors.  As I previously
explained, the process requires us to obtain third-party consent and determine appropriate
redactions.  We plan to have these agreements produced by the end of this month.

May 5, 2014
Page 4

## **Depositions of Fox Witnesses**

I apologize for not getting back to you with proposed deposition dates for the individuals
identified in your April 18 letter.  I was hoping to have an answer by Friday, but, as you may
know, this is an extremely busy time of year for Fox; the NCTA "Cable Show" was this past
week, and the 2014 upfronts are just around the corner.  I should have some proposed dates for
you by the end of the week.

Please note that Mike Hopkins and Julie Simon no longer work at Fox.  We will reach out
to them regarding DISH's request for their depositions.  With respect to Chase Carey, the Chief
Operating Officer of Fox's parent company, we trust that DISH will exhaust all other depositions
to determine whether Mr. Carey has any unique knowledge that warrants a deposition.  Unlike
Charlie Ergen and Joe Clayton, who were extensively involved with PTAT, AutoHop and the
other products/services at issue, we are not aware of Mr. Carey having any unique knowledge
relevant to this case.  If DISH intends to notice Mr. Carey's deposition before exhausting less
intrusive discovery and identifying Mr. Carey's unique, first-hand knowledge of the facts at
issue, please let us know before serving the notice so that we can arrange for an in-person
meeting under Local Rule 37-1 and, if needed, seek the Court's assistance.

In response to your question about David Haslingden, Fox will not be calling him as a
witness at trial.

Sincerely,

David R. Singer
Partner

# Exhibit 9



ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

May 12, 2014

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:     *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et al*, Case No. CV 12-04529 DMG (SHx)

Dear David:

     This letter responds to your May 5, 2014 letter regarding Fox's first, third, fifth and sixth sets of document requests and Fox's first and second sets of interrogatories.

     Notably, Fox imposed a unilateral deadline for a response from DISH, demanding to hear back in four business days on the many issues raised in this letter. This is somewhat baffling, given that Fox itself took nearly two full weeks to respond to DISH's last communications regarding these Fox requests. Moreover, there are a number of issues relating to DISH's discovery requests for which DISH is still waiting on a response from Fox. DISH requested a meet and confer conference on April 18, 2014, pursuant to Local Rule 37-1, regarding a single interrogatory response from Fox. Nearly three weeks later, Fox has still not responded in any way to that request. Additionally, Fox told DISH back in early March 2014 that it was formulating searches relating to several of DISH's document requests and would update DISH with those results. It has been more than two months and Fox has not provided DISH with any updates regarding those requests. Suffice to say, Fox has no basis for demanding that DISH respond to its meet and confer letters within four business days, when Fox does not afford DISH the same courtesy with respect to DISH's discovery requests and meet and confer letters.

## I.   Requests At Issue for Fox's First Set of Requests for Production

     DISH has explained repeatedly that **Request No. 42** is overbroad in its demand for *all* communications discussing, concerning or evidencing the marketing, advertising, or promotion of PTAT, AutoHop, or Sling Adapter. DISH has already agreed to produce many documents responsive to this request, including communications with outside advertising agencies, its advertising briefs and exemplars of its advertisements. This production is sufficient to show DISH's advertising strategy and the contents of its advertisements. As I explained to you in my April 22 letter, Fox's proposal to limit the request to four custodians does not lessen DISH's concerns regarding the burden and overbreadth of the request. Even limited to four custodians, reviewing



ORRICK

David R. Singer, Esq.
May 12, 2014
Page 2

documents responsive to this request would require approximately 30 hours of additional review time. Notably, your May 5, 2014 letter does not to try to justify this additional burden of nearly a week of attorney review time. Nor could you, given that advertising has little (if anything) to do with this case and the multiple categories of documents that DISH has already agreed to produce relating to this request. Given what DISH has already agreed to produce and the burden of the request, even as narrowed by Fox, the request is unreasonable.

Fox does not have much of a leg to stand on with its complaint regarding **Request Nos. 53, 62, and 63**, which seek documents related to negotiations with third parties regarding income or other consideration for the disabling of PTAT or AutoHop. Fox itself has indicated that it will not be able to complete its production of agreements with third parties, for which it is seeking consent for production, until the end of May 2014, at the earliest. However, Fox demands that DISH complete its production of responsive documents "sufficiently in advance" of a deposition that Fox demanded, which is scheduled for May 21, 2014. As Fox has been well aware, DISH is actively working to obtain consent for the production of these documents. DISH will continue to include responsive documents in its rolling productions as it obtains consent from additional third parties. DISH will endeavor to include as many documents responsive to these requests in its productions prior to May 21, 2014. In fact, DISH anticipates that a large portion of these documents, to the extent they have not already been produced, will be included in a production this week. However, DISH cannot and will not guarantee that all responsive documents will be produced prior to May 21, 2014.

## II.   Requests At Issue for Fox's Third Set of Requests for Production

For **Request Nos. 158 and 159**, DISH has agreed to produce:  (1) documents sufficient to show that DISH has been unable to implement the contractual requirements of Fox's VOD clause; (2) documents discussing whether or not to implement Fox's VOD, as set forth in the parties' 2010 agreement; and (3) documents sufficient to show whether DISH can implement Fox's contractual VOD requirements. DISH's production of these documents is substantially complete.

**Request No. 167** demands *all* documents that discuss *any* harm incurred by DISH from "over-the-top services." This is a patently overbroad request. DISH has explained that there is no reasonable way to search for these documents. Fox has now proposed four different search queries, but still has not presented a search that is workable. Fox's first proposal yielded more than 51,000 reviewable documents, the second more than 21,000, and the third more than 14,300. Fox's fourth proposal, contained in your May 5, 2014 letter, yields more than 11,000 reviewable documents. Thus, even Fox's narrowest proposed search terms would require 180 hours of review time to complete. Further, DISH has repeatedly explained that this search returned wholly non-responsive documents, such as industry newsletters. However, Fox's revisions to its proposed search do not address this issue.



ORRICK

David R. Singer, Esq.
May 12, 2014
Page 3

DISH is unwilling to parse out every single potential combination of Fox's broad search terms to determine precisely "which search terms are causing the large number of hits," as requested by Fox. Trying to do so, based on Fox's proposed search terms, would require DISH to run 66 different searches and then analyze the results for each of them. Without taking on that burdensome endeavor, we have run some searches that explain just how broad and unwieldy Fox's proposed search is. The first portion of Fox's search string returns more than 109,000 reviewable documents. The second portion of Fox's search string returns more than 113,000 reviewable documents. There are almost 50,000 reviewable documents that contain both the first string and second string. Moreover, it does not appear that one singular term is creating the problem within either string. For example, running only the three OTT terms within 25 of the second string returns over 9,000 reviewable documents. Even if we limit the first string search to Netflix alone, the search returns 2,000 reviewable documents. For the second string, if we run only the first five terms, the search still returns more than 4,000 reviewable documents. The next three terms alone return over 6,500 reviewable documents.

Fox's repeated, unsuccessful proposed search terms only serves to demonstrate how difficult it is to locate documents responsive to such a nebulous and burdensome document request. The burden of an additional 180 hours outweighs the marginal incremental relevance any responsive documents to the case. Thus, the search request is unreasonable and fails the test of proportionality.

Fox apparently is unwilling to address the fact that DISH has already agreed to produce subsets of documents that could fall within this request, including: (1) documents discussing its reasons for developing PrimeTime Anytime and AutoHop, which would discuss harm from over-the-top services if this was a reason for developing these features; (2) documents discussing competition between the features at issue in this case and other features or services; and (3) any cord-cutting studies. Given that substantial production agreement, there simply is no basis for Fox to continue to insist upon further searches for responsive documents for this single request.

## III.   Fox's Fifth and Sixth Sets of Document Requests

As explained in my April 22, 2014 letter, these two sets of requests, as a whole, are directed toward what Fox claims to be DISH's contemplated internet streaming service for television content. These requests are simply too far afield from the issues in this case to warrant production of responsive documents. Fox's latest attempt, in its May 5, 2014 letter, to tie these requests to the instant case is far-fetched and ignores Fox's actual pleadings. This case is about various features relating to DISH's Hopper and Hopper with Sling DVRs and Sling Adapter. This case is not about internet viewing via the DISHAnywhere.com website or future DISH internet offerings.



ORRICK

David R. Singer, Esq.
May 12, 2014
Page 4

**Request No. 180** seeks *all* agreements that grant DISH the right to stream live TV programming over the Internet, specifically targeting live television programming available directly from DISH on the DISHAnywhere.com website. Fox's meet and confer letter simply ignores the fact that the streaming of Fox content available on the DISHAnywhere.com website is not at issue in Fox's case against DISH, as that content is not live and it links to Hulu. DISH does not claim to have the right to stream live Fox television content on its website and does not do so. Fox's May 5, 2014 meet and confer letter claims that its complaint with the DISHAnywhere.com website relates to Sling and specifically, the use of Sling technology in connection with a Hopper DVR. We understand that Fox seeks to equate DISH customers' usage of Sling functionality, which involves remote viewing by a DISH customer of content available on the customer's Hopper DVR, with live TV programming streamed by DISH. DISH's licenses with other television content providers have no relationship to this technical claim about how Sling works and who controls the remote-viewing with Sling. This request goes too far afield. There is no reason for DISH to produce any agreements in response to this request.

**Request Nos. 181, 182, and 183** all explicitly reference documents relating to DISH's potential internet-based television service. Fox previously attempted to justify all three of these requests, which do not reference PTAT or AutoHop at all, by claiming that the recent contract negotiations between DISH and ABC resulted in ABC granting broad streaming rights to DISH because of PTAT and AutoHop. Recognizing that this rationale fails to justify these requests, Fox now claims that this is relevant to existence of a market for licensing of live streaming television programming, which Fox asserts is relevant to its claim that DISH needs a license for its current conduct. Whether or not DISH needs a license for its current Hopper features is wholly separate from DISH's future plans with respect to an internet based TV service and whether a license is required for such a service. DISH is under no obligation to stipulate with Fox regarding the broad issue of a market for internet streaming of television content in general instead of producing documents in response to unreasonable and irrelevant requests for production regarding a potential internet-based television service. DISH declines Fox's invitation to provide such a stipulation.

## IV.    Fox's First Set of Interrogatories

As was explained in my April 22, 2014 letter, Fox request for a stipulation is inappropriate for **Interrogatory No. 7**. This interrogatory asks DISH to identify *all documents* produced in this action that identify Fox programming that has been copied in connection with DISH's monitoring or testing of the features at issue in this lawsuit. Fox now claims that it is entitled to a stipulation regarding *what Fox programming* was copied. What Fox programming was copied is plainly a different question than what documents identify Fox programming. DISH is not obligated to provide Fox with a stipulation on a different topic as an alternative to responding to this overly broad and unduly burdensome interrogatory. Moreover, DISH has responded to numerous other interrogatories regarding the timing of the creation, testing, and availability of the features at issue in this action.



ORRICK

David R. Singer, Esq.
May 12, 2014
Page 5

Thus, DISH has provided Fox with the information that it claims to be seeking in various ways in response to various discovery requests. DISH is not obligated to provide Fox with any stipulation.

**V.    Fox's Second Set of Interrogatories to DISH and EchoStar**

**Interrogatory No 11-17** (DISH) and **Interrogatory Nos. 4-10** (EchoStar) seek information that is not related to this action. Fox has not addressed that these requests, which ask for the *total* number of PTAT playbacks, starts and resumes, with and without AutoHop, as well as the *total* number of times the AutoHop screen has appeared for all PTAT users, go well beyond Fox programming or Fox's copyrighted works. Apparently unconcerned by the fact that its interrogatory is overly broad and the fact that DISH responded to Fox's interrogatory with the numbers requested, Fox now insists upon a stipulation from DISH that "DISH will not use, cite to, or rely upon any usage data in this case." Such a request is inappropriate for a number of reasons. First, DISH has provided Fox with information regarding available usage data in response to its discovery requests. Second, DISH has already produced usage data information in this case. In other words, DISH has met its discovery obligations with respect to usage data. Accordingly, DISH is under no obligation to stipulate with Fox that it will not use usage data information at all in the present case and will not do so.

\* \* \*

DISH remains hopeful that, along with DISH's continued and voluminous production in this matter and substantive interrogatory responses, the parties can resolve any remaining issues without court intervention. Please let us know when you would like to discuss these requests further.

Yours very truly,

*for*

William A. Molinski

# Exhibit 10

**JENNER & BLOCK**

June 5, 2014

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel  213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

VIA EMAIL

David R. Singer
Tel  213 239-2206
Fax 213 239-2218
dsinger@jenner.com

William A. Molinski, Esq.
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017

Re:   ***Fox Broadcasting Company, et al. v. DISH Network, L.L.C., et al***
      **C.D. Cal. Case No. 12-cv-04529-DMG (SH)**

Dear Bill:

This addresses various outstanding discovery issues.

### Dish Discovery Requests to Fox

**Document Request No. 19 (Set 2) and Interrogatory No. 9.**  Fox has already produced more than half of its Internet-based distribution agreements.  We are working diligently to obtain the necessary consents for the remaining agreements and hope to complete the process soon.  If any of the contracting parties refuse to provide consent, we will let you know.

**Document Request Nos. 8, 9, 12 and 13 (Set 2).**  These four overbroad requests seek every document discussing various functionalities of Dish and non-Dish devices and services. Initially, Fox agreed to produce documents regarding certain capabilities of the Dish products and services at issue, as well as the ViP 922 Sling-enabled DVR and the PocketDish.  And, despite Dish's inability to articulate the relevance of the remaining documents sought by these requests, Fox has continued to work diligently with Dish to formulate an agreed-upon set of search terms that appropriately narrow Dish's requests. ·

In my March 6, 2014 letter, I provided a detailed history of Fox's efforts to address, and appropriately narrow, the unreasonable search terms Dish initially provided.  I identified new search terms Fox was willing to test against a reasonable set of custodians.  Therefore, the statement in your May 16 letter that "[Dish is] still waiting for Fox's proposed search terms" is wrong.  In any event, Fox has conducted the search and has been reviewing the documents for responsiveness.

2281619.1

June 5, 2014
Page 2

**Request No. 14 (Set 2).**  Fox agreed to search for and produce cease and desist letters to
and complaints filed against MVPDs or DVR providers regarding any DVR's storage, recording,
time-shifting, fast-forwarding, commercial skipping, or place-shifting capability where Fox
contended the features posed an actual or potential copyright violation.  Fox produced all
responsive, non-privileged documents that it agreed to produce.

**Request Nos. 10 and 15 (Set 2).**  Fox conducted a reasonable search as part of a
compromise between the parties.  This is well documented by our correspondence.  If the search
yields any non-privileged, responsive technology reports, Fox will produce them.

## Fox Document Requests to Dish

**Request No. 167.**  In response to your May 12, 2014 letter, Fox is willing to further
narrow this request, which seeks all documents discussing any harm incurred by Dish from over-
the-top services such as Hulu, Amazon, Netflix, iTunes, etc.  In my May 5 letter, we agreed to
narrow the search as follows:

"OTT" OR "over-the-top" OR "over the top" OR (Internet /5 distrib*) OR Hulu OR
Netflix

**[within 25 words of]**

harm* hurt* destroy* damage* injur* bad loss lose undermine detriment* threat*

You claim this search yielded 11,000 documents.  To address Dish's continuing undue burden
objections, we are prepared to limit this search to the following four custodians: Charlie Ergen,
Joe Clayton, David Shull, and Vivek Khemka.  This should address any conceivable objections
based on undue burden.  Please let us know whether Dish will comply by the end of next week.

**PTAT/AutoHop Usage Data.**  Document Request Nos. 17 and 18 seek all documents
discussing or evidencing Dish subscriber usage data for PrimeTime Anytime and AutoHop.  In
November 2012, Dish agreed to produce all available measurement data.  We have reviewed
CBS's pending motion to compel similar usage data, and Dish's opposition to that motion.  We
believe Dish is withholding responsive usage data and likely failed to preserve information that it
previously agreed to produce.  We expect Dish to fully comply with its discovery obligations and
will seek assistance from the Court if needed.

In connection with CBS's motion to compel, Dish proffered Eric Moore as the person
most knowledgeable of Dish's PTAT and AutoHop usage data.  Dish's abrupt cancellation of
Eric Moore's deposition two weeks ago and its failure to offer new dates for Mr. Moore's

June 5, 2014
Page 3


deposition raises many unanswered questions.  Please let us know where and when Mr. Moore will be available for deposition.


Sincerely,

David R. Singer
Partner

# Exhibit 11



## ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA  90017-5855

tel  +1-213-629-2020
fax  +1-213-612-2499

WWW.ORRICK.COM

June 17, 2014

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

*VIA EMAIL AND US MAIL*

David R. Singer, Esq.
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071

Re:    *Fox Broadcasting Co., et al. v. DISH Network L.L.C., et al*, Case No. CV 12-04529 DMG (SHx)

Dear David:

This letter follows up on our in-person meet and confer conference of June 9, 2014 and furthers the parties' written meet and confer correspondence regarding Fox's Request for Production Nos. 180-183. Additionally, this letter responds to your June 5, 2014 letter[1] regarding Fox's Request for Production No. 167.

In **Request No. 167** Fox seeks the production of *all* documents that discuss *any* harm incurred by DISH from "over-the-top services." DISH has already agreed to produce: (1) documents discussing its reasons for developing PTAT and AutoHop, which would discuss harm from over-the-top services if this was a reason for developing these features; (2) documents discussing competition between the features at issue in this case and other features or services; and (3) any cord-cutting studies. DISH will not, however, agree to produce all documents responsive to this patently overbroad request. DISH has already agreed to produce a reasonable subset of responsive documents and there is no basis for Fox to continue to pursue this request.

**Request No. 180** seeks *all* agreements that grant DISH the right to stream live TV programming over the Internet, specifically targeting live television programming available from the dishanywhere.com website. At our in-person meet and confer conference, you explained, for the first time, that Fox is seeking information regarding viewing of Fox content via the "Live TV" portion of dishanywhere.com. You represented that in this section of the website a DISH subscriber could "live stream" Fox content over the internet, the same way it can for other channels, like MSNBC, and thus the contracts for the other channels are relevant. We investigated your representations and determined that your argument misrepresents how Fox's content is accessed by DISH subscribers on the "Live TV" section of the dishanywhere.com website. For Fox content, DISH subscribers access content via the Sling functionality (or by selecting specific shows from

---

[1] Given Andrew Thomas' June 13, 2014 email, Request for Production Nos. 17 and 18, which were included in your June 5, 2014 letter, will be addressed separately.



ORRICK

David R. Singer, Esq.
June 17, 2014
Page 2

Hulu), not live streaming.  DISH's contracts with live-streaming channels are not relevant here.  As
we have explained before, there is no reason for DISH to produce any agreements in response to
this request.

   **Request Nos. 181, 182, and 183** all explicitly reference documents relating to DISH's
potential internet based television service.  Fox did not have any new information regarding these
requests at our meet and confer conference.  As we have explained several times, these requests are
not related to the features at issue in this action and are irrelevant.  Nevertheless, we attempted to
run searches for these broadly phrased requests, which seek "all documents" on each topic.  The test
searches returned more than 68,000 documents.  While we appreciate that burden does not
categorically excuse a party from production, it does excuse DISH from production here for two
reasons.  First, the requests as written are overbroad and Fox has not made any attempts to narrow
them in any meaningful manner.  Second, these documents are simply not relevant to the instant
action.  Accordingly, the burden substantially outweighs Fox's need for the documents sought by
these requests.  Finally, based on Fox's recent statements to the media that Fox is interested in
participating in DISH's potential internet-based television service, this request appears to be nothing
more than an attempt to gain competitive intelligence to aid Fox in negotiating such an agreement
with DISH.  This is obviously an improper use of the discovery process in this litigation, which
again, does not involve DISH's potential internet-based television service.

   We look forward to further discussion between the parties regarding these requests.

Yours very truly,

William A. Molinski

# Exhibit 12

1  JENNER & BLOCK LLP
   Richard L. Stone (Bar No. 110022)
2  Andrew J. Thomas (Bar No. 159533)
   David R. Singer (Bar No. 204699)
3  Amy M. Gallegos (Bar No. 211379)
   633 West 5th Street, Suite 3600
4  Los Angeles, CA 90071
   rstone@jenner.com
5  ajthomas@jenner.com
   dsinger@jenner.com
6  agallegos@jenner.com

7  Attorneys for Plaintiffs
   Fox Broadcasting Company, Twentieth
8  Century Fox Film Corp., and
   Fox Television Holdings, Inc.

9

10

11            **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13                **WESTERN DIVISION**

14

| | |
|---|---|
| 15  FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM 16  CORP., and FOX TELEVISION HOLDINGS, INC. | Case No.  CV-12-04529 DMG (SHx) |
| 17 | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| 18                        Plaintiffs, | |
| 19        v. | Hearing Date:      Sept. 21, 2012 Hearing Time:      9:30 a.m. |
| 20  DISH NETWORK L.L.C. and DISH NETWORK CORP., | Courtroom:      7 (2nd Floor) |
| 21                        Defendants. | [Notice of Motion and Motion; Supporting Declarations with Exhibits; Notice of Lodging; and |
| 22 | Proposed Order filed concurrently] |
| 23 | **PUBLIC REDACTED VERSION** |

24        Plaintiffs Fox Broadcasting Company, Inc., Twentieth Century Fox Film

25  Corp., and Fox Television Holdings, Inc. (collectively, "Fox") respectfully submit

26  the following Memorandum of Points and Authorities in support of their Motion

27  for Preliminary Injunction against defendants DISH Network L.L.C. and DISH

28  Network Corp. (collectively, "Dish").

D. Singer Decl Ex 12
Page 163

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................... 1

II.     FACTUAL BACKGROUND ...................................................................... 2

        A.    Fox Distributes Its Programs To Consumers In Numerous
              Ways ................................................................................................ 2

        B.    Fox's Limited And Conditional Grant Of Rights To Dish...................... 4

        C.    Dish's PrimeTime Anytime Video On Demand Service ........................ 4

        D.    In Violation Of Dish's License, PrimeTime Anytime Strips
              Commercials From Fox's Programs And Delivers The
              Programs To Mobile Devices .............................................................. 7

IIII.   ARGUMENT .......................................................................................... 8

        A.    Fox Is Likely To Succeed On Its Breach Of Contract Claim................. 8

        B.    Fox Is Likely To Succeed On Its Direct Infringement Claim ................ 9

              1.   Dish's PrimeTime Anytime And AutoHop Exceed The
                   Scope Of Dish's Retransmission License And Constitute
                   Copyright Infringement ......................................................... 9

              2.   PrimeTime Anytime Infringes Fox's Copyrights ........................ 10

                   a.   Dish infringes the Section 106(1) reproduction right.............. 10

                   b.   Dish also infringes the Section 106(3) distribution
                        right ................................................................... 13

              3.   The AutoHop Service Unlawfully Copies Fox's Programs. ........... 14

        C.    Alternatively, Fox Is Likely To Prove Secondary
              Infringement By Dish ...................................................................... 15

              1.   Dish Is Liable For Inducing Copyright Infringement .................... 15

              2.   Dish Is Liable For Vicarious Infringement .................................. 16

              3.   Dish's Is Liable for Contributory Infringement ............................ 17

              4.   Dish's Conduct Is Not Protected By The Fair Use Doctrine........... 17

        D.    Fox Will Suffer Irreparable Harm In The Absence Of An
              Injunction ...................................................................................... 19

              1.   Dish's Conduct Harms Fox's Right To Exclusive Control............. 20

              2.   Dish's Conduct Disrupts Fox's Ability To Distribute Its
                   Programs ............................................................................ 22

i

3.  Dish's Conduct Threatens Fox's Ad-Supported Business
Model...................................................................................... 23

E.   The Balance Of Hardships Weighs Decidedly In Favor Of
Fox ........................................................................................... 24

F.   Public Policy Favors The Issuance Of An Injunction Against
Dish .......................................................................................... 25

IV.   CONCLUSION ........................................................................... 25

ii

1

## TABLE OF AUTHORITIES

2

3

**Cases**

4

*A&M Records, Inc. v. Napster, Inc.*,

5

    239 F.3d 1004 (9th Cir. 2001)............................................................passim

*Alliance for the Wild Rockies v. Cottrell*,

6

    632 F.3d 1127 (9th Cir. 2011)..................................................................8

7

*Arista Records LLC v. Lime Group LLC*,

8

    784 F. Supp. 2d 398 (S.D.N.Y. 2011) .............................................16, 17

9

*Arista Records LLC v. Myxer Inc.*,

    Case No. CV 08–3935–GAF (JCx),

10

    2011 U.S. Dist. LEXIS 109668 (C.D. Cal. April 1, 2011) ...................11

11

*Arista Records LLC v. Usenet.com, Inc.*,

12

    633 F. Supp. 2d 124 (S.D.N.Y. 2009)................................................13, 17

13

*Atlantic Rec'g Corp. v. XM Satellite Radio, Inc.*,

    2007 WL 136186 (S.D.N.Y. Jan. 19, 2007).......................................13, 14

14

*Berster Tech, LLC v. Christmas*,

15

    2012 WL 33031 (E.D. Cal. Jan. 6, 2012)................................................20

16

*Cadence Design Sys., Inc. v. Avant! Corp.*,

17

    125 F.3d 824 (9th Cir. 1997)...................................................................24

*California v. Tahoe Regional Planning Comm'n*,

18

    766 F.2d 1319 (9th Cir. 1985).................................................................25

19

*Campbell v. Acuff-Rose Music, Inc.*,

    510 U.S. 569 (1994) ................................................................................19

20

*Capitol Records, Inc. v. MP3Tunes, LLC*,

21

    821 F. Supp. 2d 627 (S.D.N.Y. 2011)....................................................17

22

*Cartoon Network LP v. CSC Holdings, Inc.*,

    536 F.3d 121 (2d Cir. 2008)...................................................................11

23

*Columbia Pictures Indus., Inc. v. Fung*,

24

    2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) .....................................16

25

*Dielsi v. Falk*,

    916 F. Supp. 985 (C.D. Cal. 1996) ........................................................11

26

*eBay, Inc. v. Bidder's Edge, Inc.*,

27

    100 F. Supp. 2d 1058 (N.D. Cal. 2000) ................................................20

28

iii

1
2
*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ................................................................... 19

3
*Eldred v. Ashcroft,*
   537 U.S. 186 (2005) ................................................................... 25

4
5
*Elvis Presley Enter., Inc. v. Passport Video,*
   349 F.3d 622 (9th Cir. 2003) ..................................................... 19

6
*Fonovisa, Inc. v. Cherry Auction, Inc.,*
   76 F.3d 259 (9th Cir. 1996) ....................................................... 17

7
8
*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,*
   772 F.2d 505 (9th Cir. 1985) ..................................................... 10

9
10
*Harper & Row Publishers, Inc. v. Nation Enters.,*
   471 U.S. 539 (1985) ................................................................... 19

11
*John Goyak & Assocs. v. Terhune,*
   299 Fed. App'x 739 (9th Cir. 2008) ............................................. 8

12
13
*LGS Architects, Inc. v. Concordia Homes of Nev.,*
   434 F.3d 1150 (9th Cir. 2006) ................................................... 10

14
*Los Angeles News Serv. v. CBS Broad., Inc.,*
   305 F.3d 924 (9th Cir. 2002) ..................................................... 19

15
16
*Los Angeles New Service v. Tullo,*
   973 F.2d 791 (9th Cir. 1992) ..................................................... 15

17
18
*MDY Indus., LLC v. Blizzard Entm't, Inc.,*
   629 F.3d 928 (9th Cir. 2010) ..................................................... 10

19
*MGM Studios, Inc. v. Grokster, Ltd.,*
   518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................... 19, 20

20
21
*MGM Studios, Inc. v. Grokster, Ltd.,*
   545 U.S. 913 (2005) ........................................................... passim

22
*Monge v. Maya Magazines, Inc.,*
   – F.3d –, 2012 WL 3290014 (9th Cir. Aug. 14, 2012) .......... 19

23
24
*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.,*
   16 F.3d 1032 (9th Cir. 1994) ..................................................... 25

25
26
*Perfect 10, Inc. v. Megaupload, Ltd.,*
   2011 WL 3203117 (S.D. Cal. July 27, 2011) ................. 11, 13, 18

27
*Playboy Enters. v. Russ Hardenburgh, Inc.,*
   982 F. Supp. 503 (N.D. Ohio 1997) .......................................... 13

28

iv

*Princeton Univ. Press v. Michigan Document Servs., Inc.,*
    99 F.3d 1381 (6th Cir. 1996)............................................................13, 15

*RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.,*
    845 F.2d 773 (8th Cir. 1988) ..............................................................13

*RCA Records v. All-Fast Sys., Inc.,*
    594 F. Supp. 335 (S.D.N.Y. 1984)........................................................13

*Religious Technol. Center v. Netcom On-Line Commc'n Servs., Inc.,*
    907 F. Supp. 1361 (N.D. Cal. 1995) ...................................................11

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
    944 F.2d 597 (9th Cir. 1991)...............................................................20

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) ..................................................................19

*Satellite Broad. Commc'ns Ass'n v. FCC,*
    275 F.3d 337 (4th Cir. 2001)...............................................................25

*Sony Corp. of America v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ............................................................................17

*Stewart v. Wachowski,*
    574 F. Supp. 2d 1074 (C.D. Cal. 2005)...............................................11

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
    240 F.3d 832 (9th Cir. 2001)...............................................................20

*Sun Microsystems, Inc. v. Microsoft Corp.,*
    188 F.3d 1115 (9th Cir. 1999).............................................................10

*Triad Sys. Corp. v. Southeast Express Co.,*
    64 F.3d 1330 (9th Cir. 1995)...............................................................24

*Warner Bros. Entm't v. WTV Systems, Inc.,*
    824 F. Supp. 2d 1003 (C.D. Cal. 2011)..........................................passim

*Winter v. Natural Res. Defense Council,*
    555 U.S. 7 (2008) ..................................................................................8

*WPIX, Inc. v. ivi, Inc.,*
    765 F. Supp. 2d 594 (S.D.N.Y. 2011)............................................20, 23

*Zomba Enters. v. Panorama Records, Inc.,*
    491 F.3d 574 (6th Cir. 2007)...............................................................15

v

**Statutes**

17 U.S.C. § 106...........................................................................................9, 13

17 U.S.C. § 107...............................................................................................19

17 U.S.C. § 119...............................................................................................10

47 U.S.C. § 325(b)(1)(A) and (b)(3)(C) .............................................................3

Fed. R. Civ. P. 65(c) .......................................................................................25

**Treatise**

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A] (2012) .........10

vi

# I.  INTRODUCTION

In March 2012, Dish launched an unauthorized video on demand service for primetime broadcast television called PrimeTime Anytime in violation of the express terms and conditions of its contracts with Fox and federal copyright law. Dish's service makes an unauthorized copy of the entire primetime schedule for all four major broadcast networks every night, and then makes this nearly 100-hour library of programs available to subscribers for up to eight days.  Dish touts its new service as providing "unprecedented" "on demand access" to primetime television.

In May 2012, Dish began making these bootleg copies of the networks' primetime programs (including Fox's copyrighted programs) available to Dish subscribers with "AutoHop," a feature that strips out all of the networks' commercials from the PrimeTime Anytime copies of broadcast programs using a process that makes even further unauthorized copies of the programs.  In marketing its new video on demand service, Dish boasts to consumers that it has "created commercial-free TV."  Dish's conduct infringes Fox's exclusive copyrights and breaches the parties' contracts that *expressly prohibit* Dish from copying Fox's programs or providing a commercial-free video on demand service.

Last month, ███████████████, Dish forced on its subscribers a software update that made cosmetic changes to the PrimeTime Anytime settings in an attempt to camouflage the copyright infringement that Dish commits every night with its service.  While the software update effectively concedes that PrimeTime Anytime as originally distributed and operated by Dish was infringing, it does not solve the problem: PrimeTime Anytime still breaches the parties' contracts and infringes Fox's copyrights on a massive scale, night after night.

The need for a preliminary injunction could not be greater.  PrimeTime Anytime and AutoHop cut the legs out from under the advertiser-supported broadcast television business model, devalue Fox's commercial air time in the eyes of advertisers, usurp Fox's control over the timing and manner in which Fox has

1

1    chosen to exploit its copyrighted works, and threaten to disrupt Fox's ability to

2    license its programs and recoup its massive investment.  Dish's chairman admitted,

3    in an interview after this lawsuit began, that PrimeTime Anytime and AutoHop are

4    "not good" for broadcasters and put the entire television "ecosystem" in jeopardy.[1]

5    A major credit rating agency agrees.  In May 2012, Moody's issued an independent

6    report warning that if AutoHop were deployed and widely used, it "will have broad

7    negative credit implications across the entire television industry" and "could

8    destabilize the entire television eco-system."  Haslingden Decl. ¶¶ 23-24, Ex. D.

9         The Court should preliminarily enjoin Dish from offering or operating both

10   the original and current iterations of PrimeTime Anytime and AutoHop.

## II.  FACTUAL BACKGROUND

**A.    Fox Distributes Its Programs To Consumers In Numerous Ways.**

13        Fox owns the copyrights in numerous broadcast television programs,

14   including popular and critically-acclaimed primetime series such as *Glee*, *The*

15   *Simpsons*, *Family Guy*, *Touch*, and *Bones* (the "Fox Programs").  Brennan Decl.

16   ¶¶ 2-3, Ex. A.  The Fox Programs cost hundreds of millions of dollars to produce

17   and acquire.  Haslingden Decl.  ¶ 6.

18        The main distribution channel for the Fox Programs is the Fox Network, a

19   national broadcast television network.  The Fox Network has more than 200

20   television station affiliates (some of which are owned by Fox) which broadcast

21   television programming over the airwaves, free of charge, to virtually anyone with

22   a working antenna and a television.  Approximately 54 million Americans receive

23   broadcast television over the air.  Under this business model, Fox's programming

24   costs are borne largely by advertisers who pay for the right to show advertisements

25   during commercial breaks in the programs.  Brennan Decl. ¶¶ 4-10.

26        Fox also makes its broadcast programming, including the commercials,

27   available to consumers who receive their television through paid subscriptions to

28   [1] Singer Decl., Ex. I, "Dish Chief: TV Needs to Change," *Wall St. Journal*, 6/8/12.

2

1   cable, telco and satellite television distributors like Dish.  Brennan Decl. ¶ 12.  Fox

2   grants these distributors the right to retransmit Fox's over-the-air broadcast signal

3   to their subscribers.  In exchange for this "retransmission consent," Fox is entitled

4   by federal law to charge cable and satellite distributors a retransmission consent

5   fee or seek other consideration.  *Id.*; 47 U.S.C. § 325(b)(1)(A) and (b)(3)(C).

6   These fees, however, cover only a small fraction of Fox's programming costs as

7   compared to commercial advertising revenues.  Haslingden Decl. ¶¶ 7-10.

8          After Fox Programs first air on primetime television, Fox makes them

9   available to consumers through a variety of formats and media, with and without

10  commercials, at different price points.  For example, eight days after a Fox

11  Program first airs on television, users with a computer and high-speed Internet

12  access can watch it "on demand" (*i.e.*, whenever they want) for free on websites

13  licensed by Fox, such as fox.com and hulu.com.  Brennan Decl. ¶ 14(c).  Fox

14  Programs distributed for free online contain fewer commercials than the television

15  broadcast, but the ability to fast-forward through commercials is disabled.  *Id.*

16         Paying subscribers of certain cable and satellite providers have the added

17  benefit of next-day video on demand ("VOD") access to the Fox Programs on

18  television or via the Internet.  These versions also have commercials that cannot be

19  skipped.  *Id.* ¶ 14(a-b).  Consumers who pay an additional $7.99 per month can

20  subscribe to Hulu Plus, a premium online streaming service that provides next-day

21  on-demand access to the Fox Programs, plus the ability to watch the programs on

22  mobile devices such as iPhones, iPads and other smart phones and tablets.  *Id.*

23  ¶ 14(b & d).  These versions also contain commercials that cannot be skipped.  *Id.*

24         Finally, consumers can pay for and download ultra-premium versions of the

25  Fox Programs in a commercial-free format from online vendors such as the Apple

26  iTunes Store and Amazon.com.  These versions are typically available the day

27  after a Fox Program is initially broadcast, and they can be viewed, commercial-

28  free, on mobile devices.  Brennan Decl. ¶ 14(e).

D. Singer Decl Ex 12
Page 172

**B.      Fox's Limited And Conditional Grant Of Rights To Dish.**

Fox and Dish are parties to a July 1, 2002 license agreement (the "Retransmission Consent" or "RTC" Agreement).  Biard Decl. ¶ 14.  Pursuant to the RTC Agreement, Fox, on behalf of its owned and operated stations, has granted Dish the limited right to retransmit the Fox Network broadcast signal to Dish's satellite television subscribers.  *Id.* Ex. A, p. 18 (RTC Agreement § 2).  The RTC Agreement also imposes several restrictions and conditions on Dish's retransmission rights.  Significantly, it prohibits Dish from recording, copying or duplicating any portion of the Fox Network transmission (including the Fox Programs) without Fox's written permission.  *Id.* Ex. A, p. 22 (RTC Agreement § 9(a)).  It also requires that Dish retransmit Fox's broadcast "███████████ ██████████████████████████████████" *Id.*, p. 19 (RTC Agreement § 3(d)).

Between 2002 and 2010, the RTC Agreement strictly prohibited Dish from offering any Fox Programs to subscribers on a "████████████████████████ ██████████" *Id.* (RTC Agreement § 3(d)).  In a 2010 amendment, however, Fox agreed to a narrow exception for its authorized VOD service as long as Dish agreed to "████████████████████████████████ ████████████████████████████████████ ████████████████████████" *Id.* Ex. B, p. 60 (emphases added).

**C.      Dish's PrimeTime Anytime Video On Demand Service.**

Instead of exercising its rights under the narrow VOD Clause that restricts commercial-skipping, Dish created and launched its own unlicensed, commercial-free VOD service in the form of PrimeTime Anytime.  Brennan Decl. ¶¶ 17-18.  In March 2012, Dish began leasing to its subscribers a set-top box called the Hopper Whole-Home HD DVR System (the "Hopper"), described by Dish as "the most advanced set-top box in the industry."  Singer Decl. ¶ 5, Ex. A at 14.[2]  The Hopper

---

[2] Some 275,000 Dish customers currently have the Hopper with PrimeTime Anytime, and Dish projects the number will increase to 1.3 million customers by the end of 2013.  Singer Decl., ███████████████, Ex. M (8/9/12 article).

4

is no ordinary digital video recorder ("DVR").  The Hopper contains a "massive" 2-terabyte hard drive that, until Dish updated its software a few weeks ago, was "partitioned" into two recording systems.  *Id.* ¶ 6, Ex. A at 15.  Part of the hard drive functioned like a traditional DVR, allowing users to select and record television programs for playback at a later time.  *Id.* ¶ 6.  Dish has described this portion of the Hopper as the "personal DVR."  *Id.* ¶ 6, Ex. A at 16-18.

The other part of the Hopper was "reserved" for PrimeTime Anytime, Dish's "New Must-Have Feature" that distinguishes the Hopper from a traditional DVR. *Id.* ¶ 7, Ex. E.  Dish has characterized PrimeTime Anytime as a "video on demand service" that gives subscribers "On Demand access for 8 days to all HD programming that airs during primetime hours on ABC, CBS, FOX, and NBC without needing to schedule individual recordings."  *Id.* ¶¶ 12 Ex. A at 22, Ex. F at 212.  Once the user turns on PrimeTime Anytime, all of the primetime programs from each network – including the Fox Programs – are "delivered to" and copied every night on the Hopper hard drive, and until a few weeks ago, did not even take up any of the "personal DVR" hard drive space  *Id.* ¶ 7, Ex. E, Ex. A at 18.

To implement PrimeTime Anytime, Dish changed the architecture of its satellite system by assigning the local broadcasts of the four major networks to the same satellite transponder, and it engineered the Hopper software to allow the four major broadcast networks to be captured by a single tuner and recorded simultaneously.  ███████████████████████████████████

██████████████████████████████████████████████

As Dish stated under oath when it registered the PrimeTime Anytime service mark with the U.S. Trademark Office, PrimeTime Anytime is "a video on demand service."  Singer Decl. ¶ 28, Ex. F at 212.  All significant aspects of this "service" are controlled by Dish, not the user.  Dish decides which channels are available for PrimeTime Anytime (currently FOX, ABC, CBS, and NBC); which programs to record each evening; where the programs are saved (*i.e.*, the portion of the Hopper

5

1   "reserved" for PrimeTime Anytime); what time to begin recording each network;

2   what time to stop recording each network; the minimum and maximum length of

3   time recordings are stored (currently two to eight days); and to record each

4   program in high definition (which uses more hard drive space) instead of standard

5   definition.  *Id.* ¶¶ 12-26, Exs. A and ██████████████████.

6          Unlike when a subscriber uses the Hopper's "personal DVR" function, users

7   of the PrimeTime Anytime service do not select, schedule, or record the particular

8   programs they want to watch.  In fact, once PrimeTime Anytime is enabled, users

9   do not have the ability to *stop* the service from recording all primetime television

10  broadcasts from that network or delete any PrimeTime Anytime program until after

11  the recording is finished.  *Id.* Exs. A and ███████████████.  In short,

12  PrimeTime Anytime takes the decision-making away from the user and, as Dish

13  touts in an online promotional video, the Hopper with PrimeTime Anytime "does

14  the work for you" providing on demand access to all primetime television

15  programs "without needing to schedule individual recordings."  *Id.* ¶ 13.

16         On July 20, 2012, Dish distributed a software update (denominated S217) to

17  all Hopper subscribers.  The update altered the PrimeTime Anytime settings so that

18  the user can now de-select individual broadcast networks from inclusion in

19  PrimeTime Anytime.[3]  The default settings, however, still record all four networks

20  every night of the week.

21

22

23

24

25
   _____
26  [3]

27

28

                                           6

1

2

3          The recent software update –

4                          – proves Dish can modify the operation of PrimeTime Anytime at will.

5    **D.      In Violation Of Dish's License, PrimeTime Anytime Strips Commercials**

6             **From Fox's Programs And Delivers The Programs To Mobile Devices.**

7          On May 10, 2012, Dish "activated" the AutoHop feature of its PrimeTime

8    Anytime service.  In its press release, Dish explained that "AutoHop is an

9    extension of the Hopper's PrimeTime Anytime capability" and allows Dish

10   subscribers to "watch many of those shows commercial-free."  Dish advertises its

11   PrimeTime Anytime service as "commercial-free" and promotes itself as having

12   "created commercial free TV."  Singer Decl. ¶¶ 35-37, Exs. G-H.

13

14                                          Dish decides which programs to offer in a

15   commercial-free format and when to make them available to subscribers.  *Id.*;

16

17         Dish's Senior Vice President, David Shull, has complained publicly that,

18   prior to launching PrimeTime Anytime, Dish was "frustrated" at having to

19   compete with "digital platforms such as Hulu and iTunes" that are licensed by Fox

20   to distribute broadcast television programs online, in commercial-free formats

21   (iTunes) and to mobile devices (Hulu, iTunes).  *Id.* ¶ 34, Ex. G.  When combined

22   with AutoHop and Dish's Sling Adapter (a device that transmits the Hopper's

23   contents over the Internet), Dish's unlicensed, infringing PrimeTime Anytime

24   service achieves Dish's goal of adding "value" to its satellite television service by

25   reaping the benefits of a broad license for which it never paid.  Dish's Vice

26   President, Mr. Khemka, revealingly boasted in a recent interview: "I don't think

27   you'd ever need Hulu Plus or Hulu after this."  *Id.* ¶ 33.

28

7

# III.  ARGUMENT

Fox may obtain a preliminary injunction by establishing that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, *Inc.* 555 U.S. 7, 20 (2008).  Alternatively, an injunction also should issue if Fox can show "serious questions going to the merits" and a "balance of hardships that tips sharply towards the plaintiff," so long as Fox "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). These standards apply to injunction motions based on copyright or breach of contract claims. *See*, *e.g.*, *Warner Bros. Entm't v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003, 1008 (C.D. Cal. 2011) (copyright); *John Goyak & Assocs. v. Terhune*, 299 Fed. App'x 739, 740 (9th Cir. 2008) (contract).

## A.  Fox Is Likely To Succeed On Its Breach Of Contract Claim.

PrimeTime Anytime and AutoHop violate the RTC Agreement in multiple ways, and none of these breaches is affected, let alone cured, by Dish's recent software updates. ***First***, by copying Fox's entire primetime schedule every night, both PrimeTime Anytime and AutoHop violate Section 9(a) of the RTC Agreement stating that Dish "███████████████████████████" any portion of the Fox broadcast television signal.  Biard Decl. Ex. A, p. 22.

***Second***, by allowing subscribers to use PrimeTime Anytime with AutoHop to watch the Fox Programs "on demand" without any commercials, Dish violates a key restriction of the VOD Clause.  The VOD Clause requires that Dish "███ ███████████████████████████████" and confirms that such fast-forward disabling "████████████████████████████████████ ██████████████" *Id.* Ex. B, p. 60 (VOD Clause § 4) (emphases added).[4]  Despite

─────────────

[4] Even if PrimeTime Anytime somehow were not subject to the restrictions of the

8

1  these express conditions, Dish has made its breaches the centerpiece of its

2  marketing campaign.  It boasts that PrimeTime Anytime "creates an on-demand

3  library of approximately 100 hours of primetime TV shows."  Singer Decl. Ex. E.

4  Dish further brags PrimeTime Anytime with AutoHop provides the subscriber with

5  "commercial-free TV" and uses large billboards urging users to "Watch Shows Not

6  Commercials."  *Id.* Exs. A at 36-38 and J.

7       ***Third***, when the parties amended the RTC Agreement in 2010 to add the

8  VOD Clause, they included a provision expressly prohibiting Dish from taking or

9  attempting to take "███████████████████████████████████████████████

10  ████████████████████" to Fox under the VOD Clause.  Biard Decl. Ex. B, p. 34

11  (2010 Amendment § 5).  By providing its subscribers with a "████████████████

12  ████████████████████████████" Dish is breaching this provision.

**B.     Fox Is Likely To Succeed On Its Direct Infringement Claim.**

14      To establish copyright infringement, a plaintiff must show (1) ownership of

15  a valid copyright and (2) violation by the defendant "of at least one of the

16  exclusive rights granted to copyright owners" under 17 U.S.C. § 106.  *A&M*

17  *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001); *WTV Systems*,

18  824 F. Supp. 2d at 1008.  Fox meets both of these requirements.  *First*, Fox owns

19  valid copyrights in the programs at issue.  Brennan Decl. ¶¶ 2-3, Ex. A

20  (registration certificates).  *Second*, Dish's conduct violates Fox's exclusive rights.

21      **1.     PrimeTime Anytime And Autohop Exceed The Scope Of Dish's**

22           **Retransmission License And Constitute Copyright Infringement.**

23      Where a licensee exceeds the scope of its license in a manner that implicates

24  one of the licensor's rights under copyright law – here, the reproduction and

25  distribution rights in the Fox Programs – the licensee is liable for copyright

26  _____

27  VOD Clause, it still would breach Section 3(d) of the RTC Agreement which
   prohibits Dish from distributing the Fox Programs on any "████████████████████

28  ████████████████████████ Biard Decl. Ex. A, p. 19.  PrimeTime Anytime
   is, at the very least, a "██████████████████████████████████████████

9

1    infringement.  *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121

2    (9th Cir. 1999)  ("[i]f ... a license is limited in scope and the licensee acts outside

3    the scope, the licensor can bring an action for copyright infringement"); 3 M.

4    Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A] (2012) (same); *MDY*

5    *Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939- 41 (9th Cir. 2010) (breach

6    of contractual conditions that limit scope of license is copyright infringement).

7        As described above, the RTC Agreement and 2010 amendment expressly

8    limit the scope of Dish's license to retransmit Fox's broadcast signal.[5]  The

9    agreement prohibits Dish from copying the Fox Programs; and while it permits

10   Dish to offer VOD to its subscribers, the VOD rights are expressly conditioned on

11   Dish disabling any fast-forwarding of commercials during VOD playback.  By

12   ignoring these conditions and restrictions, Dish has committed both a breach of

13   contract and copyright infringement.  *See*, *e.g.*, *LGS Architects, Inc. v. Concordia*

14   *Homes of Nev.*, 434 F.3d 1150, 1154-57 (9th Cir. 2006) (preliminary injunction

15   granted where licensee reproduced and displayed architectural plans for a project

16   outside scope of license); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772

17   F.2d 505, 511 (9th Cir. 1985) (hotel infringed copyright by publicly performing

18   music with representations of movie scenes, where its license expressly prohibited

19   the use of accompanying visual representations with the licensed music).

20          **2.    PrimeTime Anytime Infringes Fox's Copyrights.**

21             **a.    Dish infringes the Section 106(1) reproduction right.**

22        Fox has never authorized Dish to make copies of the Fox Programs.  To the

23   contrary, the RTC Agreement forbids it.  *See* Section II.C, *supra*.  Accordingly,

24   Dish's operation of its PrimeTime Anytime service to make unauthorized copies of

25   all Fox primetime broadcast programs, on an eight-day rolling basis, manifestly

26   _____
     [5] Once a satellite television provider obtains retransmission consent to carry a
27   broadcaster's signal under federal communications law, the Copyright Act
     provides a narrow statutory license to publicly perform the underlying copyrighted
28   programs contained in the retransmission.  17 U.S.C. § 119.  This statutory public
     performance license is *not* a license to *reproduce* or *distribute* the works.

10

1    violates the reproduction right.

2         Because there is no state of mind or harm requirement, copyright

3    infringement is widely recognized as a "strict liability tort." *E.g.*, *Stewart v.*

4    *Wachowski*, 574 F. Supp. 2d 1074, 1092 n.78 (C.D. Cal. 2005); *accord Dielsi v.*

5    *Falk*, 916 F. Supp. 985, 992 (C.D. Cal. 1996) ("a general claim for copyright

6    infringement is fundamentally one founded on strict liability").[6]

7         Dish engineered its PrimeTime Anytime service to accomplish the

8    wholesale, unauthorized recording of primetime programs en masse. █████

9    ████████████████████████████████████████████████████

10   ████████████████████████   By its own admission, Dish

11   participates in and controls all relevant aspects of the copying process.  Singer

12   Decl., Ex. A at 1-4, ██████████████████████████   The

13   customer does not select the particular programs PrimeTime Anytime records, nor

14   when those programs can be accessed.  Dish chooses which networks are

15   recordable by PrimeTime Anytime; Dish picks the recording start times and stop

16   times for each network; it controls when the copied programs are available in a

17   commercial-free format; and it controls the minimum and maximum lengths of

18   time they are available for viewing (currently two and eight days).  *Id.*  Once

19   PrimeTime Anytime starts recording a program, users cannot stop the copying

20   ───────────────
     [6] Although some courts have held that a defendant nonetheless must engage in
21   some "volitional" conduct to be liable for direct infringement, *e.g.*, *Cartoon
     Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), those decisions do
22   not help Dish for three reasons.  ***First***, two courts in this District recently declined
     to adopt this additional requirement because the Ninth Circuit has not adopted it
23   and because "copyright infringement is a strict liability offense."  *WTV Systems*,
     824 F. Supp. 2d at 1011; *Arista Records LLC v. Myxer Inc.*, 2011 U.S. Dist. LEXIS
24   109668 (C.D. Cal. April 1, 2011) (Feess, J.) (same).  ***Second***, courts in this Circuit
     that have recognized a volition requirement have deemed it clearly satisfied where
25   the defendant participates in the copying as more than a mere "passive conduit" or
     "storage" service.  *Perfect 10, Inc. v. Megaupload, Ltd.*, 2011 WL 3203117, at * 4
26   (S.D. Cal. July 27, 2011); *see also Religious Technol. Center v. Netcom On-Line
     Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1369 & n.12 (N.D. Cal. 1995) (equating
27   "volition" with "causation" and declining to find direct infringement where
     operator of an Internet service "merely acts as a passive conduit for information,"
28   akin to the "phone company").  ***Third***, Dish's ongoing and pervasive control over
     the PrimeTime Anytime service easily satisfies any volition requirement.

11

D. Singer Decl Ex 12
Page 180

1   process – even if they have no desire to watch a particular program.  Singer Decl.,

2   Exs. B at 109-110 and

3

4

5                                        Although Dish has tried to obscure its role in the copying

6   by updating its software to have the user check off a few more settings at the

7   outset, the updates do not alter the infringement analysis and only underscore

8   Dish's pervasive control over all aspects of PrimeTime Anytime.

9

10

11        Even if copyright infringement were not strict liability and Fox were

12   required to show that Dish engaged in some volitional conduct to be liable for

13   infringement of the reproduction right, Dish is so actively and extensively involved

14   in copying copyrighted works that any such requirement is easily met.

15

16

17             Indeed, the only act of supposed volition by the user was the mere one-

18   time act of turning on the service.

19

20

21                                                                          Once

22   enabled, the user need never touch the remote control's record button again:

23   PrimeTime Anytime copies the entire primetime schedule every night – regardless

24   of whether the user intends to watch all or any of the programs – and stores it on

25   the portion of the Hopper hard drive allocated to PrimeTime Anytime for a period

26   of time delimited by Dish.  From the moment the switch is flipped, Dish – as its

27   website assures visitors – "do[es] the work for you."  *Id.* ¶ 13.

28        Dish's extensive and ongoing control over the copying process leaves no

1   doubt that it is liable for direct infringement.  *See Princeton Univ. Press v.*

2   *Michigan Document Servs., Inc.,* 99 F.3d 1381, 1389 (6th Cir. 1996) (business that

3   copied and assembled materials into coursepacks and sold them to students was

4   liable for direct infringement, even though business did so at the request of

5   professors); *see also Perfect 10, Inc. v. Megaupload Ltd.*, 2011 WL 3203117, at *4

6   (S.D. Cal. July 27, 2011) (holding that direct infringement can be shown where a

7   website operator encourages infringement by its users, is aware of widespread

8   infringement taking place through its service, and acts to "streamline users' access

9   to different types of media").[7]

10          **b.      Dish also infringes the Section 106(3) distribution right.**

11          Because Dish is actively and directly involved in the unauthorized

12   distribution of digital copies of Fox's works, it is also liable for direct infringement

13   of the distribution right under 17 U.S.C. 106(3).  *See Arista Records LLC v.*

14   *Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009) (internet service

15   operator was liable for direct infringement of distribution right where it "actively

16   participated" in copying songs for use by its subscribers); *Atlantic Rec'g Corp. v.*

17   *XM Satellite Radio, Inc.*, 2007 WL 136186, at *5-*7 (S.D.N.Y. Jan. 19, 2007).[8]

18          In *XM Satellite*, the court considered a satellite radio broadcaster's "XM +

19   MP3" service, which automatically generated a copy of every broadcast song in the

20   memory of the user's radio receiver, which the user could save and use

21   interchangeably with other MP3 files.  *Id.* at *2-*3.  The court held XM was not

22   immune from liability as the seller of a digital audio recording device, because XM

23   _____

24   [7] *See generally RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 781 (8th Cir. 1988) (retailers who assisted customers in making copies on an audio tape recording machine were liable for direct infringement); *RCA Records v. All-*

25   *Fast Sys., Inc.*, 594 F. Supp. 335, 338 (S.D.N.Y. 1984) (retail copy service that operated audio cassette copying machine was liable for direct infringement, even though copies were made at the request of customers).

26
27   [8] *See also Playboy Enters. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997) (Internet bulletin board service was liable as direct infringer where it encouraged users to upload copyrighted images and caused copies to be moved to

28   an area where they could be downloaded by others).

D. Singer Decl Ex 12
Page 182

1   controlled the copying and playback functions and thereby acted as a "music

2   distributor" to its subscribers."  "*By broadcasting and storing this copyrighted*

3   *music on [users' devices] for later recording by the consumer,* XM is both a

4   broadcaster *and a distributor*, but is only paying to be a broadcaster."  *Id.* at *6.[9]

5       **3.       The AutoHop Service Unlawfully Copies Fox's Programs.**

6           In May 2012, Dish rolled out its AutoHop feature, which eliminates with the

7   click of a button all commercials during playback of a program recorded by

8   PrimeTime Anytime.



24                          These unauthorized copies – made directly by Dish every night as

25   [9]

26                                                                              *see A&M*

27   *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1011-14 (9th Cir. 2001) (Napster
    users who uploaded files to a central search index "for others to copy" violated the
28   copyright owners' distribution rights).

14

1   part of its commercial service – are plainly infringing.[10]

2                                    * * * * *

3          If the Court finds that Dish is directly infringing Fox's copyrights with its

4   PrimeTime Anytime and AutoHop services, Dish cannot assert a fair use defense

5   that might be asserted by one of its subscribers.  "[C]ourts have … properly

6   rejected attempts by for-profit users to stand in the shoes of their customers making

7   non-profit or noncommercial uses."  *Michigan Document Servs.*, 99 F.3d at 1389;

8   *accord Los Angeles News Service v. Tullo*, 973 F.2d 791, 797-98 (9th Cir. 1992)

9   (same); *see also Zomba Enters. v. Panorama Records, Inc.*, 491 F.3d 574, 582-83

10  (6th Cir. 2007) (for-profit, commercial maker of karaoke CDs could not stand in

11  the shoes of its customers or benefit from fair use arguments they might have).

12  **C.      Alternatively, Fox Is Likely To Prove Secondary Infringement By Dish.**

13         Even if the Court were to accept Dish's attempt to shift responsibility to its

14  customers – by claiming that the subscribers, and not Dish, make the PrimeTime

15  Anytime copies – Dish nevertheless would be secondarily liable for its subscribers'

16  unauthorized copying of the Fox Programs because (1) Dish actively encourages

17  and induces massive infringement, (2) Dish derives a direct financial benefit from

18  offering the PrimeTime Anytime service which it controls, and (3) Dish knows

19  about and materially contributes to its subscribers' unauthorized copying.[11]

20         **1.      Dish Is Liable For Inducing Copyright Infringement.**

21         Dish is liable for inducement because it has actively encouraged and assisted

22  its subscribers to infringe Fox's copyrights by using PrimeTime Anytime to copy

23  _____

24  [10]



25

26

27

28  [11] Of course, Dish cannot blame its customers for Dish's own contract breaches or its admitted, unauthorized copying of Fox's programs during the AutoHop process.

                                      15

1    the entire nightly schedule of primetime broadcast television.  In *Grokster*, the

2    Supreme Court held that inducement of copyright infringement constitutes a

3    distinct cause of action.  It is established where the defendant (1) engaged in

4    purposeful conduct that encouraged copyright infringement, with (2) the intent to

5    encourage such infringement.  *See MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S.

6    913, 936-37 (2005) ("one who distributes a device with the object of promoting its

7    use to infringe copyright, as shown by clear expression or other affirmative steps

8    taken to foster infringement, is liable for the resulting act of infringement by third

9    parties"); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 422

10   (S.D.N.Y. 2011) (same); *Columbia Pictures Indus., Inc. v. Fung*, 2009 WL

11   6355911, at *6 (C.D. Cal. Dec. 21, 2009) (inducement shown by "purposeful acts

12   aimed at assisting and encouraging others to infringe copyrights").

13        Through its nationwide advertising blitz to promote PrimeTime Anytime and

14   AutoHop, Dish clearly "intended and encouraged" that its services be used to

15   infringe.  *Grokster*, 545 U.S. at 940 n.13.  Dish promotes PrimeTime Anytime and

16   AutoHop by emphasizing those features' ability to copy every primetime program

17   of the four major broadcast networks every single night, and then make those

18   programs available commercial-free to subscribers on demand.  *See* Section II.D,

19   *supra*; Singer Decl., Ex. A at 14-15, 36-38.  As the Supreme Court explained in

20   *Grokster*, "advertisement or solicitation that broadcasts a message designed to

21   stimulate others to commit violations [of copyright]" constitutes "[t]he classic

22   instance of inducement." *Id.* at 937.

23        **2.     Dish Is Liable For Vicarious Infringement.**

24        A defendant is liable for vicarious copyright infringement if it (1) has the

25   right and ability to control its subscribers' infringing activity and (2) derives a

26   direct financial benefit from their activity – regardless of the defendant's

27   knowledge or state of mind regarding the infringement.  *Grokster*, 545 U.S. at 930;

28   *Fonovisa*, 76 F.3d at 262.  Here, Dish admittedly has launched its PrimeTime

1    Anytime service to obtain a competitive advantage over its competitors – to draw

2    new customers to its satellite television service by offering an alternative to the

3    licensed video on demand services available through Fox, Hulu, iTunes and

4    Amazon.com.  Singer Decl. ¶¶ 33-34.  Furthermore, Dish's pervasive control over

5    the operation of PrimeTime Anytime makes clear that it has the ability to stop all

6    of the unauthorized copying at issue.  *See* Section II.C, *supra*.

7    **3.    Dish Is Liable For Contributory Infringement.**

8          A defendant is liable for contributory copyright infringement if it "knows or

9    has reason to know" of direct infringement of another and "materially contributes

10   to the infringing conduct."  *Napster*, 239 F.3d at 1019-20; *accord Lime Group*, 784

11   F. Supp. 2d at 432.  Dish plainly has "actual or constructive knowledge" that, once

12   enabled for a broadcast network, PrimeTime Anytime copies the network's entire

13   primetime broadcast television schedule every night – indeed, that is the very

14   purpose for which Dish advertises the service.  Dish plainly makes a substantial

15   contribution to the copying accomplished by PrimeTime Anytime because – by

16   providing the Hopper with PrimeTime Anytime and enabling it to copy the entire

17   primetime lineup of all four major broadcast networks every night – Dish provides

18   the "site and facility" for infringing activity.  *Napster*, 239 F.3d at 1022.[12]

19   **4.    Dish's Conduct Is Not Protected By The Fair Use Doctrine.**

20         To the extent the Court finds that Dish's subscribers are responsible for

21   some of the unauthorized copying at issue, Fox expects Dish will argue, in reliance

22   on the Supreme Court's 1984 decision in *Sony Corp. of Am. v. Universal City*

23   *Studios*, 464 U.S. 417 (1984) ("*Sony-Betamax*"), that its subscribers have not

24   engaged in direct copyright infringement by enabling the PrimeTime Anytime and

25   _____

26   [12] *See also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996)
     (material contribution shown where operators of a swap meet provided essential
     support services); *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp. 2d 627,

27   648 (S.D.N.Y. 2011) (contributory liability established where defendants' system
     was "the sole instrumentality of their subscribers' infringement"); *Usenet*, 633 F.

28   Supp. 2d at 155 (same); *Lime Group*, 784 F. Supp. 2d at 434 (same).

17

AutoHop features on the ground that any copying of television programs on a DVR automatically qualifies as a fair use.  Because this argument radically misreads *Sony-Betamax* and ignores the factual context of that decision, Dish cannot meet its burden to defeat a preliminary injunction under the fair use doctrine.[13]

In *Sony-Betamax*, the Supreme Court held 5-4 that the particular type of "time-shifting" at issue – user copying of individual television programs to view later and then erase – was a fair use because such conduct in the early 1980s did not harm existing or potential markets for the copyrighted works.  464 U.S. at 421.  The Court relied on the fact that many copyright owners – including professional sports leagues and PBS – did not object to the recording of their programs and that, because of the cumbersome nature of the technology, very few consumers actually used VCRs to fast-forward through commercials.  *See id.* at 424, 453 n.36.

Here, by contrast, recording all Fox Programs every night, and eliminating all commercials on playback – thus creating a commercial-free VOD service that competes directly with other services licensed by Fox – is a fundamentally different use of copyrighted programming than *Sony-Betamax* considered, and compels a much different fair use analysis.  ***First***, PrimeTime Anytime facilitates the copying of a nightly library of programs *regardless* of whether the user desires to watch a particular program at a later time.  For programs the user has no intention of watching later, there is no time-shifting at all.  ***Second***, to the extent Dish subscribers follow Dish's encouragement that PrimeTime Anytime and AutoHop be used in tandem, the PrimeTime Anytime copies are *not* made solely for the purpose of time-shifting.  Instead, they are made for the purpose of viewing the programs later *without commercials* – a qualitatively different purpose that changes the analysis of the fourth fair use factor, market harm.  ***Third***, all four of

---

[13] To the extent Dish asserts fair use or any other affirmative defense, it bears the burden of proof on a motion for preliminary injunction, just as it would bear the burden of proof at trial.  *E.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).

D. Singer Decl Ex 12
Page 187

1   the major broadcast networks – 100% of those affected by PrimeTime Anytime

2   and AutoHop – clearly object to Dish's service and have sued Dish.

3       *Finally*, as explained in Section III.D below, PrimeTime Anytime and

4   AutoHop threaten existing and potential markets for the licensed distribution of

5   Fox's copyrighted works, especially if such conduct becomes widespread.

6   Potential market harm – which the Ninth Circuit and Supreme Court have

7   recognized as a critical and often determinative factor – compels the conclusion

8   that using PrimeTime Anytime and AutoHop is not a fair use.[14]   *See Monge v.*

9   *Maya Magazines, Inc.*, – F.3d –, 2012 WL 3290014 (9th Cir. Aug. 14, 2012) ("to

10  negate fair use one need only show that if the challenged use should become

11  widespread, it would adversely affect the *potential* market for the copyrighted

12  work") (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539,

13  568 (1985)); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587-89 (1994).

14  **D.      Fox Will Suffer Irreparable Harm In The Absence Of An Injunction.**

15      Injunctive relief "has nearly always" been issued upon a finding of

16  likelihood of success on the merits in a copyright case.  *Salinger v. Colting*, 607

17  F.3d 68, 76 (2d Cir. 2010).  That is because the factual circumstances of a violation

18  of a "right to *exclude*" plainly render monetary remedies inadequate in a wide

19  range of circumstances.  *Id.* at 82 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547

20  U.S. 388, 395 (2006)); *accord MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp.

21  2d 1197, 1214-20 (C.D. Cal. 2007) (*Grokster II*).  Accordingly, irreparable harm is

---

[14] The remaining fair use factors are not addressed because they necessarily weigh against Dish.  **First**, the wholesale copying of a complete library of primetime programs cannot seriously be characterized as a "transformative" use.  *See Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938 (9th Cir. 2002) (rebroadcast of copyrighted news footage was not transformative); *Elvis Presley Enter., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (uses that "serve the same intrinsic entertainment value" as the copied work are not transformative).  **Second**, the nature of the copyrighted works at issue – creative comedies and dramas that are "within the core of copyright's protective purposes" – weighs decidedly in favor of Fox.  *Campbell*, 510 U.S. at 586.  **Third**, the amount and substantiality of copying clearly favors Fox since PrimeTime Anytime copies primetime programs in their entirety.  *See generally* 17 U.S.C. § 107.

19

established where an infringing defendant's activities threaten to impair a
copyright owner's control over its copyrighted works, threaten the goodwill and
business reputation of the plaintiff, or threaten to cause loss of business, loss of
business opportunities, or consumer confusion.  *See, e.g.*, *Warner Bros. Entm't v.
WTV Systems*, 824 F. Supp. 2d at 1012 (irreparable harm shown where defendant's
DVD "rental" business that streamed movies over the Internet without
authorization interfered with plaintiffs' ability to negotiate licenses for legitimate
video on demand services); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617-20
(S.D.N.Y. 2011) (finding irreparable harm where defendant's unauthorized
retransmission of broadcast television threatened to cause "destruction" of the
"value of licensed programming" through unauthorized dissemination, to disrupt
"advertising models," and to interfere with "plaintiffs' licensing of their own and
other websites to perform their content").[15]  Dish's recent conduct threatens to visit
all of these harms upon Fox.

### 1.   Dish's Conduct Harms Fox's Right To Exclusive Control.

The Copyright Act grants the copyright owner the exclusive right to control
how, when, where, to whom, and for what price (if any) it will disseminate its
copyrighted works.  *See WTV Systems*, 824 F. Supp. 2d at 1012; *Grokster II*, 518 F.
Supp. 2d at 1218.  Fox's control over the timing and manner in which its programs
are distributed is an essential and valuable right because it maximizes Fox's ability
to recoup the enormous, risky investment needed to produce high-quality,

---

[15] *See also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841
(9th Cir. 2001) (threatened loss of prospective customers or goodwill supports a
finding of irreparable harm); *Rent-A-Center, Inc. v. Canyon Television &
Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries,
such as damages to … goodwill qualify as irreparable harm"); *Berster Tech, LLC
v. Christmas*, 2012 WL 33031, at *10 (E.D. Cal. Jan. 6, 2012) (plaintiff's "inability
to use its intellectual property completely" rises to the level of irreparable harm,
which is also established by "intangible injuries" such as "damage to … goodwill
… lost business opportunities, the loss of opportunities to negotiate other license
agreements … and consumer confusion"); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.
Supp. 2d 1058, 1066 (N.D. Cal. 2000) (lost customer goodwill is irreparable
because it is "neither easily calculable nor easily compensable").

D. Singer Decl Ex 12
Page 189

1    primetime programming.  Brennan Decl. ¶¶ 19-25.  It allows Fox to generate

2    multiple revenue streams from different sets of advertisers (initial broadcast, VOD

3    distribution, and Internet streaming).  *Id.*  It also allows Fox to provide advertising-

4    supported versions of the programs to price-sensitive consumers, while giving

5    other consumers a choice to pay a premium for commercial-free versions, thereby

6    maximizing Fox's overall audience.  *Id.*; Biard Decl. ¶ 36.  Dish's PrimeTime

7    Anytime and AutoHop services wrest this control away from Fox.

8        In *WTV,* the defendants operated an unauthorized website and service that

9    transmitted plaintiffs' copyrighted motion pictures over the Internet.  824 F. Supp.

10   2d at 1005-1008.  The court observed that "[e]ach of the Plaintiffs has its own

11   strategy for structuring their respective distribution windows" for when their

12   motion pictures are released in theaters, on cable or satellite television, on VOD,

13   online, or on DVD, and held that the defendants, by prematurely making plaintiffs'

14   works available on the Internet without authorization, "interfere[d] with Plaintiffs'

15   *ability to control the use and transmission of their Copyrighted Works*, thereby

16   causing irreparable injury to Plaintiffs."  *Id.* at 1006, 1012 (emphasis added).

17       Here, Fox's loss of control over its programs is even more troubling because

18   Dish's infringing service will likely be adopted by Dish's competitors if Dish is not

19   enjoined.  Haslingden Decl. ¶¶ 14-16.[16]  This proliferation will amplify and

20   accelerate Fox's loss of control over its copyrighted works.  Brennan Decl. ¶ 30.[17]

21       And, like the plaintiff film studios in *WTV Systems*, Fox's loss of control

22   over how its programs are distributed creates confusion in the marketplace and

23   changes consumer attitudes toward the cost and availability of high quality

24

25   [16]  ████████████████████████████████████████████████

26   ███████████████████████████████████████

27   [17] DirecTV – the largest satellite television provider in the United States with
     nearly 20 million subscribers – already "has access to technology that could allow
     millions of subscribers to automatically skip commercials" and is "waiting to see
28   the outcome" of this lawsuit in deciding whether to use it.  Haslingden Decl. ¶ 15.

21

1  television programming.  Dish's services threaten "to confuse consumers about

2  video on demand products, and to create incorrect but lasting impressions with

3  consumers about what constitutes lawful video on demand exploitation" of Fox's

4  copyrighted works, "including confusion or doubt regarding whether payment is

5  required" for access to those works.  *WTV*, 824 F. Supp. 2d at 1013.  If Dish

6  continues to provide its subscribers with PrimeTime Anytime and AutoHop, Dish

7  subscribers will become accustomed to having free access to commercial-free on

8  demand programming.  Brennan Decl. ¶¶ 39-40.  This will give consumers false

9  impressions and expectations about what constitutes lawful exploitation of the Fox

10  Programs.  *See Grokster*, 545 U.S. at 929 (holding that "the indications are that the

11  ease of copying songs or movies using software like Grokster's and Napster's is

12  fostering disdain for copyright protection").

13    **2.    Dish's Conduct Disrupts Fox's Ability To Distribute Its Programs.**

14    Dish's conduct encroaches directly and ominously on existing licensed

15  services for the digital streaming or download of the Fox Programs – with reduced

16  commercials or no commercials – thereby undermining Fox's ability to distribute

17  its copyrighted works through authorized, legitimate channels.

18    In *WTV*, this District found that defendants' unauthorized distribution of

19  plaintiffs' motion pictures over the Internet – during a window of time when the

20  films were not available online – irreparably harmed the plaintiff studios (1) by

21  interfering with the studios' "grants of exclusivity to their licensees"; (2) by

22  impairing the studios' "ability to negotiate similar agreements in the future"; (3) by

23  injuring the studios' "relationships, including the goodwill developed with their

24  licensees"; and (4) by depriving the studios of revenue and "jeopardiz[ing] the

25  continued existence" of their licensees' businesses.  824 F. Supp. 2d at 1012-13.

26    The same is true here.  By making its bootleg, on-demand library of

27  primetime programming available in a commercial-free format, Dish threatens to

28  diminish the perceived value of Fox's legitimate VOD and digital licenses and the

22

1   appeal of VOD advertising.  Brennan Decl. ¶¶ 26-29.  Dish's infringement also

2   threatens to disrupt Fox's ability to negotiate with third party licensees and

3   advertisers.  Biard Decl. ¶¶ 40-41; *WPIX*, 765 F. Supp. 2d at 620 (defendants'

4   unsanctioned service that allowed viewers to watch plaintiffs' television program

5   online caused irreparable harm because "the ability of plaintiffs to profit from

6   sanctioned sources would inevitably drop").[18]  In a video posted on Dish's website,

7   Dish Vice President Vivek Khemka publicly predicts, "*I don't think you'd ever*

8   *need Hulu Plus or Hulu after this*."  Singer Decl. ¶ 33.  Intentionally diverting

9   customers in this manner will disrupt Fox's licensing relationships and devalue the

10  licenses Fox grants.  Biard Decl. ¶¶ 40-41; *see, supra,* Section II.D.

11        **3.      Dish's Conduct Threatens Fox's Ad-Supported Business Model**

12        In a *Wall Street Journal* interview after this lawsuit was filed, Dish chairman

13  Charlie Ergen admitted that the PrimeTime Anytime and AutoHop services were

14  "not good" for broadcasters and threatened to harm the entire television

15  "ecosystem."  Singer Decl. Ex. I.  If Dish's PrimeTime Anytime and AutoHop

16  services are not enjoined, fewer viewers will see the commercials during Fox

17  Programs, and the amount advertisers will be willing to pay for commercials

18  inevitably will fall.  Brennan Decl. ¶¶ 31-35; *WPIX*, 765 F. Supp. 2d at 618 (noting

19  that fewer viewers means advertisers will pay less for commercials and that the

20  resulting harm is difficult to calculate and thus irreparable).  The Association of

21  National Advertisers agrees that AutoHop will harm advertisers and affect what

22  they are willing to pay for advertisements.  Liodice Decl. ¶¶ 5-8. If Dish is not

23  enjoined, and its competitors begin offering services similar to PrimeTime

24  ───────────────

25  [18] In *WPIX v. ivi,* the defendant captured over-the-air broadcasts of television
    programming and, without the copyright owners' consent, streamed those

26  broadcasts to subscribers over the Internet.  The court found that because
    defendant's service allowed viewers to watch stations from other cities, "the

27  amount local advertisers would be willing to pay to advertise during plaintiffs'
    broadcasts would fall."  *Id.* at 617.  Holding these losses were irreparable because

28  they were "notoriously difficult to prove and nearly impossible to quantify," the
    court issued an injunction.  *Id.*

23

Anytime and AutoHop, millions of television viewers will stop seeing commercials. *Id.*; Brennan Decl. ¶¶ 31-35. A massive reduction in viewer impressions would lead advertisers to pay less for or stop purchasing broadcast television commercials altogether, threatening incalculable harm to Fox. *Id.* Ultimately, if advertisers are no longer willing to finance broadcast programming, it will become economically infeasible to sustain the broadcast television business model that now exists in the United States. *Id.*

Journal Communications, owner of 13 broadcast television stations (and affiliates of the major broadcast networks) faces many of the same threatened injuries if Dish's conduct is not enjoined. Smith Decl. ¶¶ 4-8. And, because Dish sells its own local television advertising for cable channels that are not subject to commercial skipping, Dish now competes unfairly with Journal in those markets. *Id.* Even worse, Mr. Ergen recently revealed that Dish is implementing a new technology on the Hopper that would not only block the networks' commercials, but replace them with Dish's own advertising. Singer Decl. Ex. N. Thus, Dish plans to divert Fox's commercial advertising revenue into its own pockets.

These looming injuries are not mere speculation. In May, 2012, Moody's Investor Service issued an independent report warning that if Dish's new AutoHop service were deployed and widely used, it "*will have broad negative credit implications across the entire television industry*" and "*could destabilize the entire television eco-system.*" Haslingden Decl. ¶¶ 23-24, Ex. D (emphasis added).

**E.     The Balance Of Hardships Weighs Decidedly In Favor Of Fox.**

Dish "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Triad Sys. Corp. v. Southeast Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995); *see also Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration").

24

1 Moreover, the narrow injunction requested by Fox does not threaten to cause

2 significant hardship to Dish's lawful business activities.

3

4

5

6

**F.      Public Policy Favors The Issuance Of An Injunction Against Dish.**

7          The Supreme Court has made clear that upholding copyright protection is in

8 the public interest. *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2005); *Nintendo of*

9 *Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994) ("public

10 policy favors the issuance of injunctions in intellectual property infringement

11 lawsuits").  The viability of advertising-supported television is also a matter of

12 public interest. *See Satellite Broad. Comm. Ass'n v. FCC*, 275 F.3d 337, 343 (4th

13 Cir. 2001) (upholding the importance of "free television for those not served by

14 satellite or cable").  By blocking television commercials, PrimeTime Anytime and

15 AutoHop will cause fewer advertisers to buy commercials and erode the main

16 source of financing for broadcast television.  Haslingden Decl. ¶ 17-22.

### IV.  CONCLUSION

18          Fox respectfully requests that the Court enter the proposed injunction.

19

20 DATED:  August 22, 2012                    JENNER & BLOCK LLP

21

22                                           By:                /s/

23                                                    Richard L. Stone
                                             Attorneys for Plaintiffs

24

25

26

27

28

# Exhibit 13

1  WILLIAM A. MOLINSKI (SBN 145186)
   wmolinski@orrick.com
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street, Suite 3200
3  Los Angeles, California  90017
   Tel:  +1-213-629-2020 / Fax:  +1-213-612-2499
4
   ANNETTE L. HURST (SBN 148738)
5  ahurst@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
6  405 Howard Street
   San Francisco, California 94105-2669
7  Tel:  +1-415-773-5700 / Fax:  +1-415-773-5759

8  E. JOSHUA ROSENKRANZ (*pro hac vice*)
   jrosenkranz@orrick.com
9  PETER A. BICKS (*pro hac vice*)
   pbicks@orrick.com
10 ELYSE D. ECHTMAN (*pro hac vice*)
   eechtman@orrick.com
11 LISA T. SIMPSON (*pro hac vice*)
   lsimpson@orrick.com
12 ORRICK, HERRINGTON & SUTCLIFFE LLP
   51 West 52nd Street
13 New York, New York  10019-6142
   Tel:  +1-212-506-5000 / Fax:  +1-212-506-5151

14 MARK A. LEMLEY (SBN 155830)
   mlemley@durietangri.com
15 MICHAEL PAGE (SBN 154913)
   mpage@durietangri.com
16 DURIE TANGRI LLP
   217 Leidesdorff Street
17 San Francisco, California  94111
   Tel:  +1-415-362-6666

18 Attorneys for Defendants DISH Network L.L.C. and
   DISH Network Corp.

19
                    UNITED STATES DISTRICT COURT
20
                   CENTRAL DISTRICT OF CALIFORNIA
21

22 FOX BROADCASTING COMPANY,          Case No. CV12-04529-DMG (SHx)
   INC., TWENTIETH CENTURY FOX
23 FILM CORP., and FOX TELEVISION     **DISH'S OPPOSITION TO MOTION
   HOLDINGS, INC.,                    FOR PRELIMINARY INJUNCTION**
24
                    Plaintiffs,         **[CORRECTED PUBLIC VERSION]**
25
             v.
26
   DISH NETWORK L.L.C. and DISH
27 NETWORK CORP.,

28                  Defendants.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................. I

STATEMENT OF FACTS ............................................... 2

    A.    DISH Pays For Content Watched By Its Subscribers. ......................... 2

    B.    History Of Time-Shifting And Ad Skipping Devices. ....................... 3

    C.    Consumer Viewing Patterns. ...................................................... 4

    D.    The Accused Devices:  The Hopper Whole Home DVR, PrimeTime Anytime And AutoHop. ...................................... 5

          1.    The Hopper, PrimeTime Anytime, And AutoHop. .................... 5

          2.    How PTAT And AutoHop Work. ........................................ 7

ARGUMENT ................................................................ 8

I.    FOX IS NOT LIKELY TO SUCCEED ON ITS CONTRACT CLAIM. ....... 8

    A.    DISH Is Not Breaching The 2002 Agreement. ................................... 9

    B.    DISH Is Not Breaching The 2010 Letter Agreement. ....................... 10

          1.    DISH Is Not Expressly Required To Market *FOX* VOD. ......... 10

          2.    No Obligation To Exploit Can Be Implied. ............................ 11

          3.    DISH Is Not Breaching The Anti-Circumvention Provision. ...... 12

II.    FOX IS NOT LIKELY TO SUCCEED ON ITS SECONDARY INFRINGEMENT CLAIM. ............................................................ 14

    A.    Time-Shifting By Consumers Remains Fair. ................................... 15

          1.    Time-Shifting Is Functionally Transformative. ...................... 16

          2.    Fox Cannot Take Away The Consumer's Right To Time Shift By Offering Video On Demand Programming. .............. 17

    B.    Ad Skipping By Consumers During Time-Shifting Remains Fair. ................................................................................... 20

          1.    Ad Skipping, By Itself, Implicates No Copyright Interest. ...... 20

          2.    Ad Skipping As Part Of Time-Shifting Is Fair. ...................... 20

    C.    Ad Skipping Is Privileged Under The Family Movie Act. ................. 22

    D.    Distribution Of A Dual-Use Device With Substantial Noninfringing Uses Is Lawful. ..................................................... 22

    E.    Advertising Commercial Skipping Is Not Unlawful "Inducement." ........................................................................ 23

III.    FOX IS NOT LIKELY TO SUCCEED ON ITS DIRECT INFRINGEMENT CLAIM. ............................................................ 24

    A.    Consumers Are Making The PTAT Copies, Not DISH. .................... 24

    B.    DISH Is Not Infringing The Distribution Right. ............................... 25

D. Singer Decl Ex 13
Page 196

     C.    The Quality Control Copies Are Fair. ................................27

IV.   FOX HAS NOT DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM BETWEEN NOW AND TRIAL........................27

     A.    There Is No Irreparable Harm On The Contract Claim.....................27

     B.    Fox Has Not Shown Likely Irreparable Harm On Its Copyright Claim. .....................................................................28

     C.    Any Assertion Of Irreparable Harm Has Been Rebutted. .................31

     D.    Fox's Delay Undercuts Any Claim of Irreparable Harm. .................33

V.    THE OTHER FACTORS ALSO FAVOR DISH. .......................................34

     A.    DISH Will Suffer Far More Hardship Than Fox. .............................34

     B.    The Public Interest Will Be Disserved By An Injunction. ................35

VI.   THE OLD PTAT/AUTOHOP SYSTEM IS MOOT. .................................35

CONCLUSION .................................................................................................35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- ii -

Case 2:12-cv-04529-DMG-SH   Document 254-2   Filed 07/07/14   Page 99 of 243   Page ID
#:10126
Case 2:12-cv-04529-DMG-SH   Document 71   Filed 09/04/12   Page 4 of 46   Page ID #:2683

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### FEDERAL CASES

4

*ABC, Inc. v. Aereo, Inc.,*

5
    No. 12 Civ. 1540, 2012 WL 2848158 (S.D.N.Y. July 11, 2012)...........................16

6

*ABC v. AEREO, Inc.,*

7
    2012 U.S. Dist. LEXIS 96309 (S.D.N.Y. July 11, 2012) ..........................................7

8

*ActiveVideo Networks, Inc. v. Verizon Comms., Inc.,*
    No. 2011-1538, 2012 WL 3636908 (Fed. Cir. Aug. 24, 2012) ......................29, 33

9

*Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.,*

10
    579 F. Supp. 2d 554 (D. Del. 2008) ............................................................................30

11

*Atari Games Corp. v. Nintendo of Am., Inc.,*

12
    975 F.2d 832 (Fed. Cir. 1992)......................................................................................27

13

*Atlantic Recording Corp. v. Howell,*

14
    554 F. Supp. 2d 976 (D. Ariz. 2008)...........................................................................26

15

*BP W. Coast Prods. LLC v. Takhar Bros. Inc.,*

16
    No. CV-07-1807, 2007 U.S. Dist. LEXIS 86006 (D. Ariz. Nov. 8, 2007)..........35

17

*Campbell v. Acuff-Rose Music, Inc.,*

18
    510 U.S. 569 (1994) ......................................................................................................17

19

*Caribbean Marine Servs. Co. v. Baldrige,*

20
    844 F.2d 668 (9th Cir. 1988)........................................................................................30

21

*Cartoon Network LP v. CSC Holdings, Inc.,*
    536 F.3d 121 (2d Cir. 2008) (hereafter "*Cablevision*") .....................................15, 24

22

*Castle Rock Entertainment v. Carol Publishing Group,*

23
    150 F.3d 132 (2d Cir. 1998) ........................................................................................19

24

*Christopher Phelps & Assocs. LLC v. Galloway,*

25
    492 F.3d 532 (4th Cir. 2007) .......................................................................................30

26

*ConWest Resources, Inc. v. Playtime Novelties, Inc.,*

27
    No. C 06-5304, 2006 WL 3346226 (N.D. Cal. Nov. 17, 2006) .............................28

28

D. Singer Decl Ex 13
Page 198

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.,*
   606 F.3d 612 (9th Cir. 2010) ................................................................ 14

*CoStar Group, Inc. v. LoopNet, Inc.,*
   373 F.3d 544 (4th Cir. 2004) ................................................................ 25

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
   356 F.3d 1256 (10th Cir. 2004) ............................................................ 27

*Dotster, Inc. v. Internet Corp. for Assigned Names and Numbers,*
   296 F. Supp. 2d 1159 (C.D. Cal. 2003) ............................................... 30

*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006) ................................................................. 8, 27, 29

*Ellison v. Robertson,*
   189 F. Supp. 2d 1051 (C.D. Cal. 2002) ............................................... 25

*Elvis Presley Enter., Inc. v. Passport Video,*
   349 F.3d 622 (9th Cir. 2003) ................................................................ 17

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991) ............................................................................ 14

*Field v. Google, Inc.,*
   412 F. Supp. 2d 1106 (D. Nev. 2006) ................................................. 25

*Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.,*
   654 F.3d 989 (9th Cir. 2011) ...................................................... 27, 30, 34

*Flynt Distrib. Co v. Harvey,*
   734 F.2d 1389 (9th Cir. 1984) .............................................................. 28

*Freedom Holdings, Inc. v. Spitzer,*
   408 F.3d 112 (2d Cir. 2005) ................................................................ 27

*Fromson v. Western Litho Plate & Supply Co.,*
   853 F.2d 1568 (Fed. Cir. 1988) ........................................................... 35

*FTC v. Evans Prods. Co.,*
   775 F.2d 1084 (9th Cir. 1985) .............................................................. 35

*Givemepower Corp. v. Pace Compumetrics, Inc.,*
   No. 07cv157, 2007 U.S. Dist. LEXIS 20886 (S.D. Cal. Mar. 23, 2007) ............ 34

*GMC v. Harry Brown's, LLC,*
   563 F.3d 312 (8th Cir. 2009)........................................................................ 35

*Hansen Beverage Co. v. N2G Distrib., Inc.,*
   No. 08-CV-1613, 2008 U.S. Dist. LEXIS 105442 (S.D. Cal. Dec. 30,
   2008)........................................................................................................ 34

*Huntsman v. Soderbergh,*
   2005 WL 1993421 (D. Colo. Aug. 17, 2005) ............................................ 22

*Hustler Magazine Inc. v. Moral Majority Inc.,*
   796 F.2d 1148 (9th Cir. 1986)...................................................................... 17

*Johnson & Johnson Vision Care v. CIBA Vision Corp.,*
   712 F. Supp. 2d 1285 (M.D. Fla. 2010)........................................................ 30

*Kardios Sys. Corp. v. Perkin-Elmer Corp.,*
   645 F. Supp. 506 (D. Md. 1986).................................................................... 12

*Keep A Breast Foundation v. Seven Group,*
   No.11-cv-00570, 2011 U.S. Dist. LEXIS 78373 (S.D. Cal. July 19, 2011)........ 35

*Kelly v. Arriba Soft Corp.,*
   336 F.3d 811 (9th Cir. 2003)........................................................................ 17

*Kerr Corp. v. North Am. Dental Wholesalers, Inc.,*
   No. SACV 11-0313, 2011 U.S. Dist. LEXIS 61779 (C.D. Cal. June 9,
   2011)........................................................................................................ 34

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.,*
   964 F.2d 965 (9th Cir. 1992)................................................................ 15, 27

*Los Angeles News Serv. v. CBS Broad., Inc.,*
   305 F.3d 924 (9th Cir. 2002)........................................................................ 17

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir. 2009)........................................................................ 34

*Matthew Bender & Co., Inc. v. West Pub. Co.,*
   158 F.3d 693 (2d Cir. 1998) ........................................................................ 15

*MercExchange, LLC v. eBay, Inc.,*
   500 F. Supp. 2d 556 (E.D. Va. 2007)........................................................... 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- v -

Case 2:12-cv-04529-DMG-SH   Document 254-2   Filed 07/07/14   Page 102 of 243   Page ID
#:10129
Case 2:12-cv-04529-DMG-SH   Document 71   Filed 09/04/12   Page 7 of 46   Page ID #:2686

*MGM Studios, Inc. v. Grokster,*
    545 U.S. 913 (2005) ("*Grokster*") ............................................................. 15, 22, 23, 24

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.,*
    16 F.3d 1032 (9th Cir. 1994)........................................................................ 35

*Oakland Tribune, Inc. v. Chronicle Pub. Co.,*
    762 F.2d 1374 (9th Cir. 1985)...................................................................... 33

*Perfect 10, Inc. v. Google, Inc.,*
    653 F.3d 976 (9th Cir. 2011)........................................................................ 34

*Perfect 10, Inc. v. Megaupload Ltd.,*
    2011 U.S. Dist LEXIS 81931 (S.D. Cal. July 27, 2011)............................... 25

*Perfect 10 v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007)........................................................ 14, 17, 26

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.,*
    55 F. Supp. 2d 1070 (S.D. Cal. 1999).......................................................... 34

*Polymer Technologies, Inc. v. Bridwell,*
    103 F.3d 970 (Fed. Cir. 1996)...................................................................... 29

*Praxair, Inc. v. ATMI, Inc.,*
    479 F. Supp. 2d 440 (D. Del. 2007) ............................................................. 30

*Programmed Tax Sys., Inc. v. Raytheon Co.,*
    419 F. Supp. 1251 (S.D.N.Y. 1976) ............................................................. 34

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.,*
    180 F.3d 1072 (9th Cir. 1999)......................................................... 7, 15, 27

*Religious Tech. Ctr. v. Netcom Online Comms. Servs.,*
    907 F. Supp. 1361 (N.D. Cal. 1995)...................................................... 24, 25

*Righthaven LLC v. Democratic Underground, LLC,*
    2012 U.S. Dist LEXIS 31605 (D. Nev. Mar. 9, 2012)................................... 25

*Rosen v. Hosting Servs., Inc.,*
    771 F. Supp. 2d 1219 (C.D. Cal. 2010) ........................................................ 25

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010)........................................................................... 30

- vi -

*Sega Enters. Ltd v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1993).................................................................... 27

*Sony Computer Enter., Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000)..................................................................... 27

*Sony Pictures, Inc. v. Universal Studios, Inc.*,
    464 U.S. 417 (1984) ...................................................................... passim

*T.J.Smith and Nephew Ltd. v. Consolidated Med. Equip, Inc.*,
    821 F.2d 646 (Fed. Cir. 1987)................................................................... 29

*Telephia Inc. v. Cuppy*,
    No. C 04-03508, 2005 WL 588441 (N.D. Cal. Mar. 11, 2005)............................ 28

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
    No. 99CV7654, 2000 WL 1887522 (C.D. Cal. Aug. 10, 2000).......................... 28

*Todd v. Chase Manhattan Mortg. Corp.*,
    No CV 12-00129, 2012 WL 1906505 (D. Ariz. May 25, 2012) ........................... 28

*Ty, Inc. v. Publications Int'l Ltd.*,
    292 F.3d 512 (7th Cir. 2002)..................................................................... 19

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    667 F.3d 1022 (9th Cir. 2011)................................................................... 25

*Vacuum Concrete Corp. v. Am. Mach. & Fdry. Co.*,
    321 F. Supp. 771 (S.D.N.Y. 1971)......................................................... 11, 12

*Valeo Intellectual Prop., Inc. v. Data Depth Corp.*,
    368 F. Supp. 2d 1121 (W.D. Wash. 2005).................................................. 34

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988)..................................................................... 15

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*
    No. CV-92-4698, 1993 U.S. Dist. LEXIS 15075 (C.D. Cal. June 29,
    1993).............................................................................................. 34

*Warner Bros. Entertainment Inc. v. WTV Systems, Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) .............................................. 29, 30

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2006)................................................................................... 27

- vii -

*Winter v. NRDC, Inc.,*
    129 S.Ct. 365 (2008) ........................................................................ 8, 29

## STATE CASES

*2632 Realty Dev. Corp. v. 299 Main St., LLC,*
    94 A.D.3d 743, 941 N.Y.S.2d 252 (N.Y. App. Div. 2d Dep't 2012) ................... 11

*Contacare, Inc. v. Ciba-Geigy Corp.,*
    49 a.D.3d 1215, 853 N.Y.S.2d 783 (N.Y. App.Div 2d Dep't 2008) .................... 12

*E-Z Eating 41 Corp. v. H.E. Newport LLC,*
    84 A.D.3d 401, 922 N.Y.S.2d 329 (N.Y. App. Div. 1st Dep't 2011) ................... 13

*Goldman v. Metro. Life Ins. Co.,*
    5 N.Y.3d 561, 841 N.E.2d 742 (2005) .............................................. 10

*Israel v. Chabra,*
    12 N.Y.3d 158, 906 N.E.2d 374 (N.Y. 2009) ........................................ 13

*Kaplan v. Lippman,*
    75 N.Y.2d 320, 552 N.E.2d 151 (1990) ............................................. 11

*Neumann. v. Metro Med. Group, P.C.,*
    161 A.D.2d 1106, 557 N.Y.S.2d 663 (N.Y. App. Div. 3d Dep't 1990) .............. 14

## FEDERAL STATUTES

17 U.S.C. § 101 ...................................................................... 26

17 U.S.C. § 106 ...................................................................... 20

17 U.S.C. § 106(3) ................................................................... 26

17 U.S.C. § 107 ...................................................................... 17

17 U.S.C. § 107(1) ................................................................... 16

17 U.S.C. § 110(11) .................................................................. 22

17 U.S.C. § 119 ....................................................................... 2

17 U.S.C. § 122 ....................................................................... 2

17 U.S.C. § 411 ..................................................................... 14

D. Singer Decl Ex 13
Page 203

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### OTHER AUTHORITIES

Ethan O. Notken, *Television Remixed: The Controversy over Commercial-Skipping* ................................................................................................................ 21

SHVERA Section 109 Report at 188 (2008), available at
http://www.copyright.gov/reports/section109-final-report.pdf. ............................ 7

**INTRODUCTION**

For nearly thirty years, the American consumer has had the right in the privacy of her home to record over-the-air television broadcasts and watch them at a time that suited her family.  The Supreme Court vindicated that right in *Sony Pictures, Inc. v. Universal Studios, Inc.*, 464 U.S. 417 (1984), when it held that "time-shifting" is a fair use recording of copyrighted broadcast content.  The Court recognized that the copyright clause in the Constitution exists not for the lucre of the motion picture industry, but to serve the goal of the broadest possible access to free expression for all American citizens.  And, despite the entertainment industry's predictions of doom and gloom, this holding proved to be an enormous boon to that industry and everyone else and had exactly the result that the copyright clause contemplated—promotion of greater access to expression (and not incidentally, privacy) while at the same time offering greater rewards to authors for their works.

The broadcast networks want to take this all away.  They once again attack any degree of consumer freedom they fear *might* impede their profits.  In this case Fox is seeking in effect to abrogate *Sony*, thus eliminating time-shifting in favor of a new distribution channel called "video on demand."  The vehicle for this agenda is (again) the claim that the sky is falling on their advertising-supported business model.  And (again) there is *no evidence whatsoever* that any such harm has occurred or will occur, and in fact all economic evidence is to the contrary.  Despite decades of increasing use of home recording devices to time-shift *and skip commercials*, and decades of declining consumer viewing of advertising, the networks continue to enjoy their most lucrative advertising sales ever.

DISH's introduction of its latest home recording device is not going to change this pattern of three decades for the worse, and Fox has presented no evidence that it has, or will.  Fox has not shown that DISH consumers will skip more advertisements, and the evidence is to the contrary.  Consumers are not infringing copyrights by using the DISH Hopper Whole Home DVR to record

-1-

1   primetime programming and skip commercials.  They are watching *more* television.

2   DISH is not infringing copyrights by selling or leasing the Hopper to them.  This

3   case has already been decided once, and Fox has given neither *evidence* nor good

4   reason to defy the Supreme Court.  Instead, all Fox has provided is unsubstantiated

5   fear-mongering.  That is not enough to abrogate Supreme Court precedent,

6   especially with the privacy and freedom of the nation's entire television viewing

7   audience at stake.  The motion for preliminary injunction should be denied.

8   **STATEMENT OF FACTS[1]**

9   **A.   DISH Pays For Content Watched By Its Subscribers.**

10   DISH is the nation's third-largest pay television service provider delivering

11   satellite services to millions of families nationwide.  Declaration of David Shull in

12   Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction

13   ("Shull Decl.") ¶2.  As of June 30, 2012, DISH had more than 14 million

14   subscribers in the United States.  *Id.*  DISH competes with other pay television

15   service providers delivering multiple channels of video programming services,

16   including all cable television and direct broadcast satellite entertainment providers,

17   such as Comcast, TimeWarner Cable, Cox Cable, and DirecTV, as well as some

18   internet-based delivery systems such as AT&T U-verse and Verizon FiOS.  *Id.* ¶3.

19   In order to retransmit content from over-the-air broadcasts of the major

20   television networks, DISH enters into retransmission consent agreements pursuant

21   to statutory licenses in the Copyright Act.  *See* 17 U.S.C. §§119, 122.  DISH

22   negotiates these consents with both the networks and their affiliates in order to

23   serve the various local television markets throughout the United States.[2]  If DISH

24   does not have an agreement with a local affiliate, then the viewing audience in that

25   area cannot obtain their local stations over the DISH satellite service.  Shull Decl.

26

27   [1] Fox's facts in its brief contain numerous inaccuracies.  Although space constraints prevent pointing them out in this brief, they are fully addressed in the declarations supplied by DISH herewith.

28   [2] The Declaration of David Kummer, filed herewith, describes the technical aspects of the satellite television process.

- 2 -

1   ¶5.  DISH is currently a party to retransmission agreements with each of the four

2   major commercial broadcast television networks, ABC, CBS, NBC and Fox.  *Id.*

3   ¶6.  In the past several years, DISH has paid ███████████dollars to Fox and

4   its affiliates to retransmit the signals of the network owned and operated Fox

5   affiliates.  *Id.*  2011 fees were more than ████████.  *Id.*  They are projected to be

6   more than ██████████ in 2012.  *Id.*

7   　　　The Fox retransmission agreements acknowledge DISH's right to offer its

8   subscribers digital video recorders ("DVRs").  *Id.* ¶12.  Fox expressly

9   acknowledged that DISH (then EchoStar) subscribers would connect "video replay

10  equipment."  *Id.* Ex. C at 31.  Fox further agreed that DISH could authorize its

11  subscribers to record content for private home use:

12  

13  

14  

15  (emphasis added).

16  *Id.* Ex. C at 34.

17  　　　**B.　　History Of Time-Shifting And Ad Skipping Devices.**

18  　　　The first consumer DVRs were publicly introduced in 1999.  Minnick Decl.

19  ¶7.  DISH first began offering DVRs to its subscribers that year, with an early

20  combined satellite receiver set-top-box ("STB") and DVR known as the

21  DISHPlayer.  *Id.* ¶5.  The first DISHPlayer gave DISH subscribers the ability to

22  pause live television, but did not have sufficient memory recording television

23  shows.  *Id.* ¶5.  In mid-1999 DISH was offering improved versions of the

24  DISHPlayer with greater storage capacity and full VCR-type functionality.  *Id.* ¶8.

25  The DISHPlayer was a huge success.  *Id.* ¶9.

26  　　　Over time, the storage capacity and features of DVRs have steadily

27  increased.  The original DISHPlayer had an 8 gigabyte hard drive.  *Id.* ¶6.  The

28  newest DVRs on the market have hard drive storage many times greater, in the

1   range of two terabytes. *Id.* ¶6. More memory is needed to store high definition

2   format shows. *Id.* ¶19. DVRs also have ad skipping capability, giving users the

3   power to fast-forward past commercials. *Id.* ¶8. This includes a thirty-second skip

4   option, which allows viewers to skip ahead by the same amount of time as a typical

5   television commercial. *Id.* ¶6. Today, the thirty-second skip feature is available on

6   most DVRs, including those from DISH, TiVo, DirecTV, Comcast, and Verizon

7   FiOS, among others. *Id.*

8   **C.   Consumer Viewing Patterns.**

9          In the early 1980s, the motion picture industry first objected that home

10   recording technology would decimate the industry. Rapp Decl. ¶¶37-45. During

11   Congressional hearings in 1982, MPAA President Jack Valenti famously claimed

12   that relationship of the VCR to entertainment industry was as the "Boston Strangler

13   to a woman at home alone." *Id.* ¶49. This was wrong in so many respects. One

14   was that widespread adoption of the VCR turned out to be a huge boon for the

15   entertainment industry, providing it with a new and lucrative distribution channel

16   for content in the form of videocassette rentals and sales. The VCR remains in 57%

17   of American households still today. Hauser Decl. ¶14.

18          A decade ago, the networks similarly labeled the next generation of home

19   recording technology, the digital video recorder, or DVR, a threat to the

20   underpinnings of free television. Rapp Decl. ¶¶46-47. Yet, the advertising revenue

21   of the four major television networks has substantially increased over that time

22   period. *Id.* ¶52. Even while storage capacity and functionality of DVRs has

23   steadily increased, commercial advertising revenue has also increased. *Id.* ¶54.

24          Thus, there has been no harm to the networks from DVR usage. The

25   American love affair with television remains strong. Rapp Decl. ¶50. The average

26   Nielsen household watches almost 8-1/2 hours of television per day, up from 6-1/2

27   hours in 1980. Rapp Decl. ¶50. And, the overwhelming majority of television

28   viewing (90%) is done live on traditional television sets. Rapp Decl. ¶95; Hauser

D. Singer Decl Ex 13
Page 208

1    Decl. ¶12, 21.  For sports, 95% percent is viewed live.  Hauser Decl. ¶22.  These

2    statistics hold even though 41-43% of households with televisions have DVRs, 23.3

3    % have two DVRs, and 5.7% have three or more DVRs.  Rapp Decl. ¶¶72, 101;

4    Hauser ¶14.  Studies show that households with DVRs *consume more television*

5    than households without DVRs.  Like other households, DVR households continue

6    to watch most television live, not recorded, or they watch later the same day.  Rapp

7    Decl. ¶¶74, 89; Hauser Decl. ¶12, 21.  In DVR households, 76% of primetime

8    viewing by individuals aged 18 to 49 occurs live.  Rapp Decl. ¶74.

9        From the dawn of television, viewers have skipped ads.  Hauser Decl. ¶22.

10   Even while watching *live* television, they would change the channel, leave the room

11   or direct their attention elsewhere the moment an ad came on the screen.  *Id.*  With

12   recorded programming, viewers who prefer to avoid commercials have had the

13   option, since the introduction of the VCR, to skip by fast-forwarding.  With the

14   DVR, people can do the same.  And, the networks' business model has flourished.

15   
16       **D.    The Accused Devices:  The Hopper Whole Home DVR, PrimeTime Anytime And AutoHop.**

17       Against this backdrop, DISH announced in January 2012 that it would carry

18   EchoStar's latest, greatest DVR called the "Hopper."  Khemka ¶3.

19           **1.    The Hopper, PrimeTime Anytime, And AutoHop.**

20       **The Hopper:**  The Hopper "Whole Home" High Definition DVR is currently

21   the most technologically advanced STB/DVR that DISH offers to its subscribers.

22   Minnick Decl. ¶13.  The Hopper was announced on January 9, 2012 at the

23   International Consumer Electronics Show ("CES") and is an award-winning DVR.

24   *Id.*  Among other awards, the Hopper won the "Best in Show" award at the CES

25   Line Shows in New York.  *Id.*; Khemka Decl. ¶7.  The primary distinguishing

26   feature of the Hopper is its "Whole Home" capability.  Khemka Decl. ¶3; Minnick

27   Decl. ¶14.  The Hopper can provide satellite television service, as well as DVR

28   functionality, to as many as four televisions in one home.  Minnick Decl. ¶14.  No

1  matter which television the subscriber may want to use at a particular time, the

2  subscriber's DVR recordings will be readily available.  *Id.* ¶15.

3      **PrimeTime Anytime**:  On January 9, 2012, PrimeTime Anytime ("PTAT")

4  was announced as a Hopper feature that allows a user, at his or her election, to

5  create a single timer on the Hopper to record all of the primetime programming

6  shown in high definition on any of the four major broadcast networks each or every

7  night of the week.  Minnick Decl. ¶20.  PTAT must be turned on by the user.  *Id.*

8  DISH and EchoStar *do not* activate the PTAT feature for the user.  *Id.*

9  ████████████████████████████████████████████████████████████

10 ████████████████[3]  When enabling PTAT, the user has the choice to select

11 between 1 and 4 networks to record, and may select which days of the week to

12 make the recordings.  Minnick Decl. ¶24.  The user also selects how many days she

13 wants to save the recordings before they are automatically deleted, with the option

14 of storage from 2 to 8 days.  *Id.*  A specific recording can be saved for a longer

15 period of time.  *Id.* ¶34.  The recordings made with the PTAT features are

16 accessible for playback in a PTAT "folder" on the Hopper, and can also be removed

17 by the user.  *Id.* ¶28, 35.

18     **AutoHop:**  AutoHop is an ad skipping feature that works with the PTAT

19 feature, and permits Hopper users to choose to automatically skip commercials

20 while playing back certain recorded shows.  Minnick Decl. ¶53.  If AutoHop is

21 available for a particular show, a red kangaroo icon will appear and the Hopper will

22 query the viewer whether to "Enable AutoHop."  *Id.*  The default is "No, Thanks."

23 *Id.*  If the user selects "Yes" as the answer, she can put down the remote control and

24 watch the entire show without ads.  *Id.* ¶54.  At the end of each segment the DVR

25 software will automatically skip ahead to the beginning of the next segment.  *Id.*

26     AutoHop functions like a souped-up version of the 30-second skip feature

27 ──────────────────────

28 ████████████████████████████████████████████████████████

1   available on most DVRs.  Minnick Decl. ¶55.  With a succession of quick 30-

2   second skips, most DVR users cans already skip over an entire two and one-half

3   minute commercial break.  *Id.*  AutoHop has automated that process.  *Id.*  AutoHop

4   is not immediately available for use with a recording that is in progress or even for

5   same-day viewing of the recorded show; rather, it becomes active the following

6   day.  *Id.* ¶56.[4]

7           **2.**     **How PTAT And AutoHop Work.**

8        **How PTAT Works:**  When the Hopper user configures the multitude of

9   PTAT customization options to suit her individual tastes, a set of timers are set to

10  record all primetime shows on each of the selected networks on each selected night.

11  Minnick Decl. ¶30.  The recordings are done in approximately three-hour blocks

12  (four hours on Sunday).  *Id.*  The process is similar to using manual timers available

13  on most DVRs, which allow a user to select a time period to record on a particular

14  channel.  *Id.*  Basically, PTAT is a simplified set of timers.  ███████████████

15  ████████████████████████████████████████  *Id.* ¶62.

16      **How AutoHop Works:** ███████████████████████████

17  ██████████████████████████████████████████████████

18  ███████████████████████████████████████████

19  ██████████████████████████████████████████████████

20  ████████████████████████████████████████████

---

21  [4] It is unclear whether Fox is attacking Sling with its motion. Sling is a completely separate product that allows

22  individuals to place-shift their personal television viewing through use of the internet. Minnick Decl. ¶83. Place-shifting means watching in a different location than the room in which your fixed television set is located—such as

23  on a personal computer in the home office, on your mobile phone while riding on the bus, or on an iPad in a hotel room. Sling technology is not new—it has been out since at least 2005. Molinski Decl. Ex. 9. "Space-shifting," *i.e.*,

24  allowing content to be accessed on a device separate from where the original content is stored, is also recognized as a fair use. *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1029 (9th Cir. 1999)

25  (holding that the portable MP3 player at issue "merely makes copies in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive . . . Such copying is paradigmatic noncommercial personal

26  use . . . .") (internal citation omitted); *ABC v. AEREO, Inc.*, 2012 U.S. Dist. LEXIS 96309, at *37 (S.D.N.Y. July 11, 2012) (identifying Sling technology as fair use).  Indeed, the Register of Copyrights has stated that, for Sling

27  technology, "there is no need for an additional license."  SHVERA Section 109 Report at 188 (2008), available at http://www.copyright.gov/reports/section109-final-report.pdf.  There is no basis for finding copyright infringement

28  based upon a subscriber's "paradigmatic noncommercial personal use" of Sling, and no basis for a preliminary injunction against a product on the market for seven years.

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

D. Singer Decl Ex 13
Page 211



**ARGUMENT**

Preliminary injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to seek such relief," and is "never awarded as of right." *Winter v. NRDC, Inc.*, 129 S.Ct. 365, 375-76 (2008). A plaintiff seeking a preliminary injunction must establish all of the following: (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury, (4) that the balance of hardships tips favors plaintiff, and (5) that an injunction is in the public interest. *Id.* at 374; *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Irreparable injury must be *likely* in the absence of an injunction. *Winter*, 129 S.Ct. at 375. These traditional equitable considerations must be satisfied; an injunction does *not* follow "automatically [from] a determination that a copyright has been infringed." *eBay*, 547 U.S. at 392-93. As set forth below, Fox has not and cannot satisfy these requisites for preliminary injunctive relief.

**I.     FOX IS NOT LIKELY TO SUCCEED ON ITS CONTRACT CLAIM.**

Fox identifies three contractual provisions allegedly breached by PTAT and AutoHop: (1) Section 9(a) of the 2002 Agreement; (2) the Video-on-Demand

1  ("VOD") provisions in Attachment A to the 2010 Letter Agreement; and (3)

2  Section 5 of the 2010 Letter Agreement.  Fox's arguments depend upon blatant

3  misquotation; they are incorrect as a matter of law and fact and should be rejected.

4      **A.**   **<u>DISH Is Not Breaching The 2002 Agreement</u>.**

5       As with any other home recording device, consumers, not DISH, are the ones

6  using the Hopper and PTAT.  Consumers, not DISH, are recording the content of

7  the retransmitted Fox broadcast television signal.  Fox argues that PTAT is a breach

8  of Section 9(a) of the 2002 Agreement, quoting it as follows:  "

9  

10  MPA at 8.  Fox also argues breach of another provision of that agreement, Section

11  3(d).  MPA at 8 n.4.  Remarkably, Fox omits the key contractual language in both

12  instances:



| Fox's Quotation | Full Relevant Provision |
|---|---|
| **Section 9(a) of the 2002 Agreement** ||
| . MPA at 8:18-21. | Shull Decl. Ex. 3 at 34. |
| **Section 3(d) of the 2002 Agreement** ||
| MPA at 4:13-15. | Shull Decl. Ex. 3 at 31. |

Case No. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

D. Singer Decl Ex 13
Page 213

1  As the highlighted language demonstrates, Fox expressly acknowledged and agreed

2  that DISH would authorize consumers to connect video replay equipment and make

3  recordings for private home use—precisely what is at issue here.

4       Plainly DISH is not breaching provisions in a contract (governed by New

5  York law) that expressly contemplate its authorization of consumer DVR usage.

6  *See Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 571, 841 N.E.2d 742, 746

7  (2005) ("Mere assertion by one that contract language means something to him,

8  where it is otherwise clear, unequivocal and understandable when read in

9  connection with the whole contract, is [insufficient]").

10      **B.**    **DISH Is Not Breaching The 2010 Letter Agreement.**

11          **1.**    **DISH Is Not Expressly Required To Market *FOX* VOD.**

12       The 2010 Letter Agreement includes Attachment A which amends the

13  Agreement and pertains to a wide variety of matters concerning the parties'

14  relationship.  Section 9 of Attachment A is the "VOD" provision.  ▓▓▓▓▓▓

15  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

19  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  This content is completely separate from

23  an over-the-air broadcast signal.

24       Fox argues that DISH has breached clause 4 requiring ▓▓▓▓▓▓▓▓

25  ▓▓▓▓▓▓▓▓▓▓  because PTAT and AutoHop are the "equivalent" of VOD

26  without ads.  But DISH did not agree to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓  independent

27  of any exploitation of the VOD content.  Section 9 merely *allows* for VOD for the

28  *FOX* network—it does not *require* DISH to market *FOX* VOD.  Shull Decl. Ex. 5 at

D. Singer Decl Ex 13
Page 214

1   124.

2   ████████████████████████████████████████

3   ████████████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████████

7   ███████████████████████████████████

8   Nowhere does this "make available" provision state that DISH shall, must, or will

9   distribute the VOD content—there is no such affirmative obligation.  *Id.*  For

10   reasons that had nothing to do with the Hopper and PTAT, Fox never provided that

11   content and this provision never became operable.  Shull Decl. ¶22-25.

12       The 2010 VOD provision is an option for DISH to distribute the *FOX* VOD

13   on a nonexclusive basis on a set of minimum terms, which included the term that

14   fast-forwarding of ads be disabled.  Options generally are not required to be

15   exercised—that is the whole point.  *Kaplan v. Lippman*, 75 N.Y.2d 320, 325, 552

16   N.E.2d 151, 153 (1990).  Because DISH did not in fact ask for, receive, or

17   distribute the *FOX* VOD content, it cannot have breached any of the conditions

18   attached to that content.

19       **2.**    <u>**No Obligation To Exploit Can Be Implied.**</u>

20       Nor can any obligation to exploit this nonexclusive VOD content be implied

21   in order to trigger the ██████████████ on the VOD content or otherwise.

22   New York law, which governs this contract, strongly disfavors the implication of

23   contractual obligations.  *2632 Realty Dev. Corp. v. 299 Main St., LLC*, 94 A.D.3d

24   743, 745, 941 N.Y.S.2d 252, 255 (N.Y. App. Div. 2d Dep't 2012) ("A court should

25   not imply a term which the parties themselves failed to include").  Obligations

26   cannot be implied when inconsistent with other terms.  *Vacuum Concrete Corp. v.*

27   *Am. Mach. & Fdry. Co.*, 321 F. Supp. 771, 774 (S.D.N.Y. 1971).  Here, there is an

28   integration clause.  2010 Letter Agreement ¶13 ("entire understanding concerning

1    the subject matter").  To imply an obligation to exploit the VOD content where

2    none was expressly stated would be inconsistent with the parties' recitation that the

3    agreement constituted the parties' "entire understanding."  *Vacuum Concrete*, 321

4    F. Supp. at 774.  Nor is it necessary here to imply an obligation.  There was much

5    other consideration flowing from DISH to Fox in these agreements.

6         New York law will not imply an obligation to exploit in a non-exclusive

7    license with no running royalty and an integration clause.  *Id.* (rejecting implied

8    obligation to exploit as a matter of law) (emphasis added).[5]  Courts generally only

9    imply such obligations when the license is exclusive and royalty-bearing—when

10   the licensor would be left with a worthless property.  *See id.* at 773.  That is

11   obviously not the case here.  Fox has numerous other means of distributing its

12   content, including its VOD content, and in fact is being paid for its primetime

13   broadcast content by DISH and its subscribers.  *Vacuum Concrete* is on point:

14   under New York law, ██████████████ applicable to PTAT can be implied.

15        **3.    DISH Is Not Breaching The Anti-Circumvention Provision.**

16        Finally, Fox argues that DISH is breaching paragraph 5 of the 2010 Letter

17   Agreement by circumventing the ██████████████ on VOD.  There are

18   multiple problems with this argument.  The first is fundamental:  DISH is not

19   circumventing an obligation that it never had because it never chose to exploit the

20   *FOX* VOD license.  Nor could it have frustrated this obligation by allowing fast

21   forwarding as to anything other than VOD content.

22        Nor are PTAT and *FOX* VOD "equivalent" as Fox would have it.  Fox never

23   supplied VOD content to DISH, and DISH never offered it.  Consumers enabling

24   PTAT to record retransmitted over-the-air broadcasts are paying the retransmission

25   license fee.  Thus, they are paying a subscription fee for the content (unlike the

26   VOD license which is "free").  Moreover, the Hopper is a DVR that involves only

27

28
_____

[5] *See also Contacare, Inc. v. Ciba-Geigy Corp.*, 49 a.D.3d 1215, 1216, 853 N.Y.S.2d 783, 784 (N.Y. App.Div 2d Dep't 2008) (non-exclusive license created no duty to exploit); *Kardios Sys. Corp. v. Perkin-Elmer Corp.*, 645 F. Supp. 506, 509-10 (D. Md. 1986) (same) (applying NY law).

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

D. Singer Decl Ex 13
Page 216

1  copying by the consumer in the home.  Only those particular subscribers who have

2  purchased a Hopper can select to enable PTAT (as well as AutoHop).  Once the

3  multitude of options are configured, PTAT records a defined period of primetime

4  programming (in contrast to VOD, where the subscriber selects one specific show

5  for playback from a remote location).  Simply stated, PTAT is a DVR feature that

6  simplifies timers for the recording of statutorily retransmitted over-the-air broadcast

7  content.  VOD is a completely different kettle of fish.[6]

8          This leads to the third problem with Fox's argument, which is that it proves

9  far too much.  *All* of DISH's DVRs are capable of allowing consumers to record

10 Fox's entire primetime schedule every night and then fast-forward through ads

11 during playback, as are numerous other DVRs on the market.  Shull Decl. ¶30;

12 Minnick Decl. ¶¶41-42.  PTAT and AutoHop just simplify the process.  Under

13 Fox's interpretation, *all* of DISH's existing DVRs were suddenly prohibited as of

14 the October 2010 Letter Agreement.  Plainly DISH never agreed to such a term,

15 would not have done so (Shull Decl. ¶15), and Fox has never asserted otherwise.

16 To the contrary, as described above, the agreements expressly contemplate the

17 distribution by DISH of DVR recording and playback devices for private consumer

18 home use.  The general "anti-circumvention" term cannot be interpreted to prohibit

19 a specific practice that is elsewhere expressly allowed.  *Israel v. Chabra*, 12 N.Y.3d

20 158, 168, 906 N.E.2d 374, 380 (N.Y. 2009) ("[T]he more specific clause controls

21 the more general"); *E-Z Eating 41 Corp. v. H.E. Newport LLC*, 84 A.D.3d 401,

22 408, 922 N.Y.S.2d 329, 335 (N.Y. App. Div. 1st Dep't 2011) ("[I]n the event of a

23 conflict between two provisions, the specific should control over the general").

---

[6] Fox argues that DISH "admitted" that PTAT is VOD because it used the phrase "on demand" in PTAT advertising and a trademark application.  MPA at 5, 8-9.  Not so.  The term "on demand" is frequently used in many contexts to indicate that the consumer controls the *timing* of the viewing.  Shull ¶20.  DISH has used it for DVRs other than the Hopper, and other DVR manufacturers also use it.  Minnick Decl. ¶52.  As for the "video-on-demand" language in the PTAT trademark application, it is common for intent-to-use applications to contain as many potential uses as possible when filed, and this was a common term used in other DISH applications.  It has now been dropped from this application in recognition of the fact that it is a term that can hold a particular meaning in the industry not applicable to PTAT.  Saffer Decl. Exs. 2-3.

- 13 -

1     New York law allows no claim for frustration of purpose when the contract

2     specifically contemplates the behavior at issue.  *Neumann. v. Metro Med. Group,*

3     *P.C.*, 161 A.D.2d 1106, 1107, 557 N.Y.S.2d 663, 664 (N.Y. App. Div. 3d Dep't

4     1990).  Since these agreements specifically contemplated DISH distribution of

5     DVRs, and everyone knows people are using DVRs to record primetime

6     programming and then play it back at a later time while skipping commercials, it is

7     plain that no breach of paragraph 5 can be found here.

8     **II.     FOX IS NOT LIKELY TO SUCCEED ON ITS SECONDARY**
      **INFRINGEMENT CLAIM.**
9

10     Fox argues that DISH is liable for vicarious and contributory copyright

11     infringement, including inducement to infringe, but it skips over two very important

12     steps.  As a threshold matter, Fox bears the burden of establishing copyright

13     infringement, by demonstrating "(1) ownership of a valid copyright, and (2)

14     copying of constituent elements of the work that are original."  *Feist Pubs., Inc. v.*

15     *Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Proof of registration of the work at

16     issue is also required.  17 U.S.C. §411; *see Cosmetic Ideas, Inc. v.*

17     *IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010).  Fox's motion does not identify

18     any specific registered works that it contends have been unlawfully copied by

19     anyone.  And the only evidence of registration Fox offers is a handful of

20     registrations—not for the audiovisual works it generally contends have been

21     copied—but rather for *teleplays* (*i.e.* scripts).  Brennan Decl. Ex. A.  There is no

22     allegation that anyone has copied scripts, and no evidence that any of the allegedly

23     copied works (shows) have been registered.

24     And, in order for DISH to be found liable for secondary infringement, the

25     Court first must find that there is a direct infringer of the unspecified, apparently

26     unregistered audiovisual works.  This is also a requirement for each and every type

27     of secondary infringement.  *See Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146,

28     1169 (9th Cir. 2007) ("As a threshold matter . . . Perfect 10 must establish that there

1   has been direct infringement by third parties" before we consider claims for

2   secondary infringement).  Fox barely addresses this point, because it is unwilling to

3   point the finger—as it must—at the American television viewer.

4           **A.**    **Time-Shifting By Consumers Remains Fair.**

5        In 1984, the Supreme Court held that the distribution of the so-called

6   "Betamax" home video recording and playback device did not render Sony

7   secondarily liable for contributing to the infringement of the networks' copyrights.

8   Consumers had the right, the Court held, to make recordings of over-the-air

9   network broadcasts for the purpose of watching at another time in the privacy of

10   their own homes; such right meant that there were substantial noninfringing uses

11   for the device.  *Sony*, 464 U.S. at 456.  The Court observed that "[o]ne may search

12   the Copyright Act in vain for any sign that the elected representatives of the

13   millions of people who watch television every day have made it unlawful to copy a

14   program for later viewing at home, or have enacted a flat prohibition against the

15   sale of machines that make such copying possible."  *Id.*

16        In the nearly three decades since, Congress has not altered this principle as it

17   applies to claims of contributory copyright infringement.  The pertinent principles

18   of *Sony* have been repeatedly recited and upheld by the Ninth Circuit and other

19   courts.  *See, e.g., Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*,

20   180 F.3d 1072, 1079 (9th Cir. 1999) (characterizing Sony as "holding that "time-

21   shifting' of copyrighted television shows with VCR's constitutes fair use under the

22   Copyright Act, and thus is not an infringement"); *Matthew Bender & Co., Inc. v.*

23   *West Pub. Co.*, 158 F.3d 693 (2d Cir. 1998); *Lewis Galoob Toys, Inc. v. Nintendo of*

24   *Am., Inc.*, 964 F.2d 965 (9th Cir. 1992); *Vault Corp. v. Quaid Software Ltd.*, 847

25   F.2d 255, 264 (5th Cir. 1988).  And, the Supreme Court recently reaffirmed *Sony* in

26   *MGM Studios, Inc. v. Grokster*, 545 U.S. 913 (2005) ("*Grokster*").

27        In short, home video recording equipment is legal.  *Sony*, 464 U.S. at 456;

28   *see Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)

1 (hereafter "*Cablevision*"); *see also ABC, Inc. v. Aereo, Inc.*, No. 12 Civ. 1540, 2012

2 WL 2848158 (S.D.N.Y. July 11, 2012).  Consumers using Hopper DVRs to record

3 primetime programming for later viewing cannot be distinguished from the

4 Supreme Court's holding in *Sony*.  Furthermore, even cursory examination of

5 subsequent precedent and evidence pertaining to the first and fourth factors of the

6 fair use test (the two most important factors) makes clear that *Sony*'s analysis holds

7 with respect to DVRs.[7]

8                            1.    **Time-Shifting Is Functionally Transformative.**

9         The first fair use factor is the "purpose and character of the use."  17 U.S.C.

10 §107(1).  This single factor has two components:  the purpose and the character of

11 the use.  The purpose of consumers here remains, as it was in *Sony*, a private

12 noncommercial one—indeed, here the consumer is even paying a subscription fee

13 for satellite retransmission.  Fox does not even attempt to show that the time-shifted

14 recordings created by a DISH subscriber using PTAT are for commercial or for-

15 profit activity.  Accordingly, this key component weighs wholly in favor of DISH.

16        As for the character of the use, it remains transformative.  A home video

17 recording machine allows users to record television programs to "time shift."  The

18 Supreme Court stated unequivocally that "time-shifting for private home use **must**

19 **be** characterized as noncommercial, non-profit activity."  *Id.* at 449 (emphasis

20 added).  The Court went on to emphasize that "time-shifting merely enables a

21 viewer to see a work which he has been invited to witness in its entirety free of

22 charge . . . ."  *Id.* at 449-50.  In other words, the Betamax served a transformative

23 purpose by allowing the user to record broadcast television programming and watch

24 it  at a later time even though the program content was not changed at all.

25        Fox argues summarily, in a footnote, that PTAT cannot be characterized as a

26 transformative use.  MPA at 19 n.14.  But subsequent precedent confirms

27 
─────────────────────
28 [7] DISH does not concede the other two factors, but they are less pertinent and given space constraints are not
discussed herein.  The discussion in *Sony* is equally applicable to the second and third factors here.

- 16 -

D. Singer Decl Ex 13
Page 220

1  application of *Sony*'s analysis here.  PrimeTime Anytime on the Hopper DVR is an

2  advance of time shifting technology, a less cumbersome vehicle for recording and

3  playing back broadcast works that the subscriber is invited to see free of charge.

4  Minnick Decl. ¶¶20, 38-42; Shull Decl. ¶30.  This argument was expressly rejected

5  in *Sony* and since.  Not only did the Court find the Betamax's "wholesale copying"

6  transformative, the Ninth Circuit has repeatedly found "wholesale copying" to be

7  transformative.  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003); *Perfect*

8  *10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).[8]

9        **2.**    **Fox Cannot Take Away The Consumer's Right To Time**

10            **Shift By Offering Video On Demand Programming.**

11        The fourth factor requires consideration of "the effect of the [defendant's]

12  use upon the potential market for or value of the copyrighted work."  17 U.S.C. §

13  107; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994).  Because the

14  consumer's use is noncommercial, *Fox* bears the burden to show "by a

15  preponderance of the evidence that some meaningful likelihood of future harm

16  exists."  *Sony*, 464 U.S. at 451; *Hustler Magazine Inc. v. Moral Majority Inc*.,  796

17  F.2d 1148, 1155 (9th Cir. 1986) ("when the use is noncommercial, the copyright

18  owner must demonstrate by a preponderance of the evidence that there is 'some

19  meaningful likelihood of future harm'").[9]

20        Just as in *Sony*, however, Fox "fail[s] to carry [its] burden . . ."  464 U.S. at

21  451.  In *Sony*, the content owners argued, in much the same vein as Fox here, that

22  their economic advertising model was in severe danger and that a huge threat

23  existed that, if the VCR were permitted, there would be an end to all television

24  programming as we know it.  As set forth in the Rapp Declaration, the

---

[8] The two cases cited by Fox, *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938 (9th Cir. 2002) and *Elvis Presley Enter., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003), are wholly inapposite.  Both were cases of use with commercial purposes by commercial entities, with the character of the use being exactly the same as the original.

[9] It is particularly appropriate that Fox bear the burden to negate fair use on this motion, since it refused any meaningful discovery on the fair use issue.

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

D. Singer Decl Ex 13
Page 221

1    entertainment industry has a habit of claiming that the sky is falling when new

2    technology is introduced.  Rapp Decl. ¶¶41-57.  As history now shows, the frantic

3    claims ("Boston Strangler") of doom were wrong.  The Court in *Sony* considered all

4    such arguments and concluded that Universal had failed to carry its burden.  It

5    endorsed the district court's view that Universal's evidence of harm in that case was

6    "speculative" and/or "minimal."  464 U.S. at 454.

7          The same is true here.  Fox recites all of the same arguments and none has

8    any more support than it did at the time of *Sony*.  Fox argues not only that its live

9    TV market will be harmed, but also that two developing markets will be harmed:

10   (1) VOD distribution and (2) internet streaming.  MPA at 22-23.  As set forth in

11   detail in the Declarations of Richard Rapp and John Hauser filed herewith, these

12   claims of harm are at best speculative and at worst demonstrably false.  Indeed, Fox

13   provides no evidence of actual harm in any of these categories.

14         *Sony* itself takes care of Fox's live TV market concern—there the Court

15   concluded that time-shifting by VCR would have no effect on advertising revenue,

16   and its prediction was quite correct.  In fact, the networks' advertising revenue has

17   risen over time since *Sony* and the widespread adoption of home recording

18   technology.  Rapp Decl. ¶54.  There is no reason to think that PTAT, which merely

19   allows a consumer to time-shift more efficiently, will cause harm where it has not

20   previously occurred.  As economist Rapp and consumer behavior expert Hauser

21   point out, most TV watching remains live and those who own a DVR, such as the

22   Hopper, often watch more television.  Rapp Decl. ¶76, 81; Hauser Decl. ¶12, 21.

23   Regardless, given the relatively small number of Hopper users, and particularly

24   those that activate PTAT, there is no expectation that their viewing behavior will be

25   included or reflected in the Nielsen ratings, which are what Fox and the rest of the

26   industry use to set advertising prices.  Rapp Decl. ¶88-90.

27         As for Fox's claims with respect to VOD, they are very similar to the claim

28   rejected by the Court in *Sony*.  There, Universal claimed that it had established a

D. Singer Decl Ex 13
Page 222

1   new market for videotape cassettes; it provided evidence that it had begun

2   marketing motion pictures on tape.  The district court, whose findings were

3   embraced by the Supreme Court, concluded that this alleged market harm was too

4   speculative to prevent a finding of fair use.  Here, Fox's VOD market is virtually

5   nonexistent.  Hauser ¶¶ 28-29.  More importantly, there are no *FOX* VOD offerings

6   on DISH, so there is no opportunity that a DISH customer will use PTAT instead of

7   watching a *FOX* VOD program.  *Id.*  Fox simply provides no evidence that this

8   market exists and will be harmed.  Indeed, Fox offered its VOD to DISH for free,

9   strongly suggesting that the sole purpose of VOD is to try to abrogate *Sony* with

10  these types of arguments.  Similarly, Fox provides no evidence whatsoever that

11  PTAT has any effect on its alleged internet market.  Rather, evidence strongly

12  suggests that the relatively small internet market serves as a complement, not a

13  replacement, for TV viewing.  Rapp Decl. ¶105.  Complementary use does not

14  harm the market for the work and is fair.  *See Ty, Inc. v. Publications Int'l Ltd.*, 292

15  F.3d 512, 517 (7th Cir. 2002) ("Generalizing from this example in economic

16  terminology that has become orthodox in fair-use case law, we may say that

17  copying that is complementary to the copyrighted work . . . is fair use . . .").

18        Fox relies upon what it says are new markets in internet streaming and VOD

19  content in an effort to convert a fair use into foul—or perhaps it is fowl, since Fox's

20  claims certainly have the ring of Chicken Little.  Squawking the sky is falling, Fox

21  seeks to take away from consumers the right to do something they have been doing

22  for nearly three decades.  These two so-called markets cannot carry that kind of

23  burden.  Factually, there is no evidence of harm as outlined in the Rapp and Hauser

24  declarations.  And legally, courts and commentators alike have cautioned against

25  permitting a copyright owner to usurp a market that was previously considered fair.

26  *See Castle Rock Entertainment v. Carol Publishing Group*, 150 F.3d 132, 145 n.11

27  (2d Cir. 1998) (copyright owners may not preempt exploitation of transformative

28  markets, which they would not in general develop or license others to develop, by

- 19 -

1  actually developing or licensing others to develop those markets.).  *See also* 4

2  Nimmer § 13.05[A][4], at 13-181-13-182 (recognizing "danger of circularity"

3  where original copyright owner redefines "potential market" by developing or

4  licensing others to develop that market).  Fox's effort to undo almost 30 years of

5  consumer freedom and privacy using VOD and Hulu must be rejected.

6      **B.    Ad Skipping By Consumers During Time-Shifting Remains Fair.**

7      Implicitly recognizing that PTAT and the time-shifting it offers is fair, Fox

8  focuses on the commercial skipping enabled by AutoHop, as though this were some

9  brand new ability.  Commercial avoidance has been around since the dawn of the

10  broadcast television era; the very first remote control was advertised as an aid to

11  commercial skipping.  Hauser ¶22.  Current reports indicate that the ability to ad

12  skip by fast forwarding, 30-second skip and other methods, such as Verizon FiOS's

13  option for 30 second, 1 minute or 5 minute skip options, is a standard feature on

14  most home recording devices now in use for many years.  Minnick Decl. ¶6.  Fox

15  provides no evidence to establish that this common practice, exercised by millions

16  of DISH consumers in the privacy of their homes, in order to watch programs for

17  which they paid a fee, is no longer fair.

18      **1.    Ad Skipping, By Itself, Implicates No Copyright Interest.**

19      No copy of anything is made by a consumer when using the AutoHop

20  automatic ad skipping feature.  Skipping without copying does not implicate any of

21  the protected rights in the bundle of copyright—there is no reproduction, no

22  distribution, and no public performance by the consumer.  *See* 17 U.S.C. §106.

23  Moreover, Fox has no copyright interest in the commercials, which are owned by

24  the advertisers or ad agencies.  When users enable AutoHop to skip commercials,

25  they are not skipping or altering the programming content owned and asserted by

26  Fox.  Fox's claim as to AutoHop must fail for this reason alone.

27      **2.    Ad Skipping As Part Of Time-Shifting Is Fair.**

28      Fox therefore must attack PTAT, and argue that time shifting is unfair if done

D. Singer Decl Ex 13
Page 224

1    for the purpose of commercial skipping.  This argument fails as well, because Fox

2    cannot demonstrate that consumers are time shifting for the *sole* purpose of

3    purportedly unfair commercial skipping, or that even if they are, doing so would be

4    unfair.

5    > [I]t could be argued that time-shifting implies a broad swath of
6    > intentions for shifting prerecorded blocks of programming, both large
     > and small.  Bathroom breaks must be taken, popcorn popped, and
     > nudity skipped through – especially when young children watch an R
7    > rated movie with their parents.  All of these varied intentions fall under
     > the umbrella of time-shifting, and it seems arbitrary to extract
8    > commercial-skipping from the umbrella and expose it to the cold rain
     > of infringement.
9

10   Ethan O. Notken, *Television Remixed: The Controversy over Commercial-Skipping*,

11   16 FORDHAM INTEL. PROP. MEDIA & ENT. L.J. 899, 929.  AutoHop is

12   available only on time-shifted programs the next day.  There is no evidence that

13   consumers are using time-shifting solely for the purpose of ad skipping.  To the

14   extent Fox locates the unfairness in skipping over an ad entirely rather than seeing a

15   snippet, numbers strongly suggest that the vast majority of Hopper users are using

16   the standard 30-second skip on playback instead of AutoHop.  Rapp Decl. ¶87.

17        While Fox would have the Court believe that the issue of ad skipping in the

18   context of time-shifting is new, that is not the case.  This exact issue was presented

19   squarely to the Court in *Sony*.  The parties in their briefs each argued about the

20   effect of ad skipping, with Universal claiming that up to 85% of VCR playback was

21   without commercials and that such deletion would affect the market for its works,

22   and Sony arguing that 69% of playbacks actually included commercials.  *Compare*

23   Molinski Decl. Ex. 5 (Brief for Pet.) at 27 n.19 *with id.* Ex. 7 (Brief for Resp.) at 23

24   n.14.  And the Court considered the issue.  It acknowledged that there was ad

25   skipping, yet it found that the primary use was time-shifting, and the use was

26   therefore fair.  *Sony*, 464. U.S. at 432.

27        Now, here we are again, nearly thirty years later.  And while the technology

28   has evolved, the ad skipping is more efficient, the arguments and the evidence are

- 21 -

1    the same.  The outcome should be too.

2         **C.    Ad Skipping Is Privileged Under The Family Movie Act.**

3         Finally, even if commercial skipping could be considered unfair, Congress

4    has expressly privileged it.  The Family Movie Act ("FMA"), enacted in 2005, was

5    a response to directors' complaints that DVD players designed to edit out adult or

6    offensive content were creating infringing derivative works.  *See Huntsman v.*

7    *Soderbergh*, 2005 WL 1993421, at *2 (D. Colo. Aug. 17, 2005).  Under the FMA,

8    it is not copyright infringement for a family to "make imperceptible" "limited

9    portions of audio or video content of a motion picture" in the home for private use.

10   17 U.S.C. §110(11).  It also is not unlawful to sell devices that help them do so.  *Id.*

11   This is exactly how AutoHop functions.

12        **D.    Distribution Of A Dual-Use Device With Substantial**
          **Noninfringing Uses Is Lawful.**

13

14        In *Sony*, the Supreme Court set forth the standards for proving contributory

15   infringement.  A defendant contributes to infringement only if it knowingly makes

16   a substantial contribution to an act of direct infringement.  For liability to be

17   established, where the alleged contribution is the sale of a product, that product

18   must not have, or even be capable of, substantial noninfringing uses.  *Sony*, 464

19   U.S. at 442.  This limitation on contributory infringement doctrine serves an

20   important purpose.  It "absolves the equivocal conduct of selling an item with

21   substantial lawful as well as unlawful uses, and limits liability to instances of more

22   acute fault than the mere understanding that some of one's products will be

23   misused.  It leaves breathing room for innovation and a vigorous commerce."

24   *Grokster*, 545 U.S. at 933.

25        Because time-shifting with commercial skipping is fair, the Court cannot

26   enjoin PTAT or AutoHop.  Even were this Court to conclude that time shifting for

27   the *sole* purpose of skipping commercials is unfair, it still could not enjoin

28   AutoHop because it does not follow that Fox has demonstrated a lack of substantial

D. Singer Decl Ex 13
Page 226

1   noninfringing uses.  Rather, Hopper usage evidence suggests that only a very small

2   portion of PTAT users are using AutoHop at all, let alone for a singularly unfair

3   purpose.  Fox has presented no survey or other evidence of Hopper users

4   demonstrating that any single one of them, let alone a predominant number, is time-

5   shifting for the *sole* allegedly unfair purpose of commercial skipping.  *Compare*

6   *Sony*, 484 U.S. at 442 (suggesting that a use engaged in by less than 10% of the

7   market might suffice to immunize the VCR from liability), *with id.* at 443 (rejecting

8   dissent's standard that would have required a majority of uses to be legal).

9       **E.   Advertising Commercial Skipping Is Not Unlawful "Inducement."**

10          In its final effort to persuade this Court to ignore *Sony*, Fox argues that DISH

11   is independently liable for "inducing" infringement.  Inducement is a judicially-

12   created offshoot of contributory infringement.  *Grokster*, 545 U.S.at 935-36.  To

13   induce infringement, a party must act to encourage direct infringement by another

14   with a specific intent to cause infringement.  *Id.* at 936.

15          But there is no evidence that anyone has purchased the Hopper for an

16   improper purpose.  The only evidence Fox cites in support of its inducement theory

17   is that DISH truthfully advertised the fact that consumers can use PTAT to record

18   network shows and use AutoHop to skip commercials in those shows.  This is not

19   sufficient to show inducement to infringe.  Rather, as the Supreme Court

20   recognized in *Grokster*, Sony advertised the same benefits of its VCR: "Sony's

21   advertisements urged consumers to buy the VCR to 'record favorite shows' or

22   'build a library' of recorded programs."  *Id.* at 931.  *Grokster*, like *Sony*, viewed

23   this as "no evidence" of unlawful intent to induce infringement, because neither of

24   those uses was "*necessarily infringing.*"  *Id.* (emphasis added).  "On those facts,"

25   the *Grokster* Court explained, "the only conceivable basis for imposing liability

26   was on a theory of contributory infringement"—one that depended on proving that

27   the VCR had no substantial noninfringing use.  Just as in *Sony*, evidence that DISH

28   advertised the features of its DVR could not give rise to liability for inducement

- 23 -

1  absent evidence that those features were "necessarily infringing."[10]

2  **III.   FOX IS NOT LIKELY TO SUCCEED ON ITS DIRECT
3         INFRINGEMENT CLAIM.**

4        **A.    <u>Consumers Are Making The PTAT Copies, Not DISH</u>.**

5        As set out above, PTAT is a DVR feature whereby the user views a setup

6  screen, selects (among other things) which networks and nights to record, and then

7  enables the recording.  Minnick Decl. ¶¶20, 21, 23-24.  This functionality exists in

8  more complex form as "timers" on numerous other DVRs sold by DISH and others.

9  *Id.* ¶38.  All DISH has done is to create the software for a simplified set of timers

10 and a user interface.  *Id.* ¶¶20-35.  ████████████████████████████

11 █████████████████████████████████████████████████████

12 ███████████████████████████████████████████████

13       The Court in *Sony* cautioned that it was especially important in cases

14 involving consumer welfare to make the correct distinctions between theories of

15 primary liability (direct infringement), and secondary liability (indirect

16 infringement).  464 U.S. at 441-42; *see also Cablevision*, 536 F.3d at 133 ("The

17 Supreme Court's desire to maintain a meaningful distinction between direct and

18 contributory copyright infringement is consistent with congressional intent").  In

19 *Cablevision*, the Second Circuit, relying on early district court precedent from

20 within the Ninth Circuit (*Religious Tech. Ctr. v. Netcom Online Comms. Servs.*, 907

21 F. Supp. 1361, 1368-69 (N.D. Cal. 1995)), adopted what has come to be termed the

22 "volitional conduct requirement"; that is, whoever exercises their volition to make

23

24 ─────────────────────
    [10] Finally, even if advertising the features of DISH's product were thought to induce acts of actual infringement by
    consumers, Fox offers no evidence whatsoever suggesting that DISH's purpose in advertising its DVR was to
25  intentionally encourage infringement.  Not only does Fox offer no direct evidence of unlawful purpose, it cannot
    even offer indirect evidence of such a purpose.  The only evidence Fox offered is that DISH is selling a product that
26  contained features recognized by the Supreme Court as lawful nearly thirty years ago.  *Grokster* specifically rejected
    reliance on such sales as evidence of unlawful intent:  "*Sony*'s rule limits imputing culpable intent as a matter of law
    from the characteristics or uses of a distributed product."  Grokster, 545 U.S.at 788-89.  In all events, testimony from
27  DISH executives makes it clear that DISH respects copyrights and has no wish to encourage infringement.  Shull
    Decl. ¶35.  Far from pirating content, DISH has signed contracts with each of the TV networks and pays many
28  millions of dollars a year in royalties to those networks for content they broadcast over the air for free.

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

D. Singer Decl Ex 13
Page 228

1   the copy is the party in the position to be considered a direct infringer:

2           In determining who actually 'makes' a copy, a significant difference
3       exists between making a request to a human employee, who then
        volitionally operates the copying system to make the copy, and issuing
4       a command directly to the system, which automatically obeys
        commands and engages in no volitional conduct. (*Id.* at 131)

5   Accordingly, enabling the exercise of a choice through technical means is not the

6   same as making a copy yourself.  *Id.*; *see also CoStar Group, Inc. v. LoopNet, Inc.*,

7   373 F.3d 544 (4th Cir. 2004).  In fact, this is the only analysis consistent with *Sony*.

8           Fox incorrectly argues that the volitional conduct requirement has not been

9   adopted by the Ninth Circuit.  MPA at 11 n.6.  The Ninth Circuit's decisions in

10  cases interpreting the safe harbor provisions of the Digital Millennium Copyright

11  Act ("DMCA") make clear that the court *does* recognize a volitional conduct

12  requirement.  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d

13  1022, 1035-36 (9th Cir. 2011).  In that case, the court held as follows:

14          Veoh does not actively participate in or supervise file uploading . . . .
15      Rather this 'automated process' for making files accessible 'is initiated
        entirely at the volition of Veoh's users.'  We therefore hold that Veoh
16      has satisfied the threshold requirement that the infringement be 'by
        reason of the storage at the direction of a user of material' residing on
17      Veoh's system.  (*Id.* at 1035.)

18  The question of *who was responsible* for placing the copies on the system under the

19  DMCA safe harbor is exactly the same question as *who was responsible* for making

20  the copies more generally in assessing the question of direct versus contributory

21  infringement.  The Ninth Circuit requires volitional conduct the same way as every

22  other circuit that has addressed this issue, and it is error to conclude otherwise.[11]

23          **B.     DISH Is Not Infringing The Distribution Right.**

24          Nor is DISH a direct infringer of the distribution right.  Fox argues that the

25  *same* PTAT copy purportedly violating the reproduction right also violates Fox's

---

[11] *See also Righthaven LLC v. Democratic Underground, LLC*, 2012 U.S. Dist LEXIS 31605 (D. Nev. Mar. 9, 2012) (volitional requirement for direct infringement); *Perfect 10, Inc. v. Megaupload Ltd.*, 2011 U.S. Dist LEXIS 81931 (S.D. Cal. July 27, 2011) (same); *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219 (C.D. Cal. 2010) (same); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) (same); *Ellison v. Robertson*, 189 F. Supp. 2d 1051 (C.D. Cal. 2002) (same).

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

D. Singer Decl Ex 13
Page 229

1   exclusive right to *distribute* copies of its works under 17 U.S.C. § 106(3).  This

2   argument likewise fails for two reasons; (1) there is no distribution at all when no

3   physical copy changes hands; and (2) even if there were, there is no dispute that

4   DISH is licensed (both statutorily and via the Retransmission Agreement) to deliver

5   (i.e., *distribute*) Fox's content to its users.

6        Section 106(3) is quite specific as to what is—and is not—a "distribution" of

7   a copyrighted work.  Under that section, a copyright holder has the exclusive right

8   "to distribute copies or phonorecords of the copyrighted work to the public by sale

9   or other transfer of ownership, or by rental, lease or lending."  "Copies" are in turn

10   defined as "material objects . . . in which a work is fixed . . . ."  17 U.S.C. §101.

11   While courts in other circuits have occasionally misunderstood this section, as

12   evidenced by Fox's citations at MPA 6-7, "[t]he general rule, supported by the great

13   weight of authority, is that 'infringement of [the distribution right] requires an

14   actual dissemination of either copies or phonorecords."  *Atlantic Recording Corp. v.*

15   *Howell*, 554 F. Supp. 2d 976 (D. Ariz. 2008) (quoting *Nat'l Car Rental Sys. V.*

16   *Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993)); *see also Perfect*

17   *10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007) ("distribution requires

18   an 'actual dissemination' of a copy").

19        Moreover, even were this Court to accept the incorrect legal proposition that

20   all DISH has to do to violate the distribution right is to make the content available

21   for copying by the consumer, then the only distribution here cannot be the basis of a

22   claim because it is expressly *authorized*.  Fox does not contend—nor could it—that

23   DISH's delivery of Fox's broadcast content to DISH's customers is unauthorized.

24   To the contrary, that transmission is indisputably licensed under the agreement at

25   issue here, and subject to statutory license as well.  And, the agreements expressly

26   contemplate that DISH will authorize its subscribers to use video replay equipment

27   and to make recordings for private home use.  Fox does not challenge DISH's right

28   to make, or its users' right to receive, the retransmitted broadcasts.  Even if that

- 26 -

D. Singer Decl Ex 13
Page 230

1  "dissemination" could be stretched to fit the statutory definition of "distribution," it

2  is authorized and paid for.  It is the user's *recording* of the broadcast that Fox

3  attacks:  but that is actionable, if at all, only under Section 106(1).

4      **C.    The Quality Control Copies Are Fair.**

5      The only copies of broadcast content that DISH is making in the entire PTAT

6  and AutoHop process are copies created for purposes of ███████████████████

7  ██████████████████████████████████████████████████████████████████████

8  Minnick Decl. ¶¶73-76.  Because these copies are made solely for the purpose of

9  assisting consumers to exercise their fair use rights, they are intermediate copies

10  made for ultimately noninfringing purposes and are thus fair.  *See Sony Computer*

11  *Enter., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000); *Sega Enters. Ltd v.*

12  *Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993); *Atari Games Corp. v. Nintendo of*

13  *Am., Inc.*, 975 F.2d 832 (Fed. Cir. 1992); *see also Lewis Galoob Toys, Inc. .v*

14  *Nintendo of Am., Inc.*, 964 F.2d 965 (9th Cir. 1992).

15  **IV.    FOX HAS NOT DEMONSTRATED A LIKELIHOOD OF**
16  **IRREPARABLE HARM BETWEEN NOW AND TRIAL.**

17      Fox must "demonstrate that irreparable injury is *likely* in the absence of an

18  injunction."  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2006).

19  The mere "possibility" of irreparable harm will not suffice.  *Id.*  Thus, "irreparable

20  harm is the single most important prerequisite for the issuance of a preliminary

21  injunction."  *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d

22  1256, 1258 (10th Cir. 2004) (collecting cases); *Freedom Holdings, Inc. v. Spitzer*,

23  408 F.3d 112, 114 (2d Cir. 2005) (same).  Irreparable harm must be proven with

24  actual evidence; it may not be presumed.  *eBay, Inc. v. MercExchange LLC*, 547

25  U.S. 388 (2006); *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989

26  (9th Cir. 2011).  Fox has not proven it, and in all events DISH has disproven it.

27      **A.    There Is No Irreparable Harm On The Contract Claim.**

28      Fox claims that it is entitled to an injunction in part because DISH has

- 27 -

1  breached the retransmission agreement.  Historically, there is no irreparable harm

2  associated with a breach of contract claim.  As this Court has observed, "a

3  preliminary injunction to prevent a breach of contract is an almost unheard of thing,

4  being the equivalent of specific enforcement by preliminary injunction."

5  *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. 99CV7654, 2000 WL 1887522, at *5

6  (C.D. Cal. Aug. 10, 2000).[12]  And, it is plain that money damages can be calculated

7  here, where Fox has a widespread licensing program.  ████████████████

8  ████████████████████████████████████

9  █████████████████████████████████████

10  ████████████████████████████████████

11  ███████████████████████████████████

12  ███████████████████████████████████

13  ██████████████████████████████████████

14  █████████████████████████████████████

15  ██████████████████████████████████████

16  ████████████████████████████

17  **B.    Fox Has Not Shown Likely Irreparable Harm On Its Copyright Claim.**

19  In the face of Fox's admissions in its papers that its primetime programming

20  is extensively published and marketed in almost every imaginable venue, Fox

21  cannot be heard to claim that it faces potential irreparable harm from a "loss of

22  control" over its content.  MPA at 20-22.  Fox has already ceded control by

23  licensing its content on such a widespread nonexclusive basis.  Moreover, Fox

24  claims loss of control in markets to which the content has already been licensed—

25  ────────────────────────────────

[12] *See ConWest Resources, Inc. v. Playtime Novelties, Inc.*, No. C 06-5304, 2006 WL 3346226, at *8 (N.D. Cal. Nov. 17, 2006) ( "[A] preliminary injunction will not issue based on a breach of contract claim"); *Telephia Inc. v. Cuppy*, No. C 04-03508, 2005 WL 588441, at *3 (N.D. Cal. Mar. 11, 2005) (same).  Breach of contract claims do not support preliminary injunctions because "the relief available for a breach of contract—money damages—is an adequate remedy at law. *Todd v. Chase Manhattan Mortg. Corp.*, No CV 12-00129, 2012 WL 1906505, at *2 (D. Ariz. May 25, 2012); *see Flynt Distrib. Co v. Harvey*, 734 F.2d 1389, 1395-96 (9th Cir. 1984) (error to issue injunction based on breach of contract because "money damages" provide adequate remedy).

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

D. Singer Decl Ex 13
Page 232

1  VOD and IPTV.  When an intellectual property holder readily licenses its content to

2  all takers, there is no irreparable harm from supposed "loss of control."  Under such

3  circumstances, the mantra "loss of control" is no more than a return to the

4  presumption and lowered standard of proof discredited in *eBay* and *Winter*.

5         In post-*eBay* jurisprudence, a plaintiff with an established licensing program

6  does not get a *permanent* injunction, let alone a preliminary one.  Such plaintiffs

7  may get damages (if they have a claim), but not an injunction.  *MercExchange, LLC*

8  *v. eBay, Inc.*, 500 F. Supp. 2d 556, 560 (E.D. Va. 2007) ("willingness to license"

9  undercuts irreparable harm) (denying permanent injunction on remand).[13]  Thus, the

10  Federal Circuit recently held that the structure of the video-on-demand market

11  would not support a showing of irreparable harm in a patent case.  *ActiveVideo*

12  *Networks, Inc. v. Verizon Comms., Inc.*, No. 2011-1538, 2012 WL 3636908 (Fed.

13  Cir. Aug. 24, 2012).  The Court denied an injunction because damages were readily

14  quantifiable:

15         ActiveVideo sells VoD hardware and software to providers of video
       services; Verizon markets and sells video services to end users. . .
16       ActiveVideo does not lose market share when Cablevision loses a
       subscriber to Verizon, it loses the Cablevision licensing fee. . . The
17       harm to ActiveVideo due to Verizon's infringement is readily
       quantifiable. When Verizon pays ActiveVideo a per month royalty for
18       each FiOS–TV subscriber, then ActiveVideo is adequately
       compensated. . . The losses to ActiveVideo due to Verizon's
19       infringement are clearly quantifiable. Moreover, ActiveVideo sought
       to broadly and extensively license this technology (Cablevision,
20       Grande, and TV Guide) including a campaign to secure a license from
       Verizon itself.  (*Id.* at *22-23.)
21

22  Here, it is the copyrighted content that is the relevant intellectual property, but it is

23  operating in exactly the same market structure.  The outcome can be no different.

24  The injunction should be denied.[14]

25  ───────────────────────
[13] *See also Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996) (pre-*eBay* case recognizing
26  that plaintiffs "have engaged in a pattern of granting licenses" as evidence of lack of irreparable harm); *T.J.Smith and
   Nephew Ltd. v. Consolidated Med. Equip, Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (an established history of granting
27  licenses is "incompatible with . . . the right to exclude").

[14] Fox relies heavily on *Warner Bros. Entertainment Inc. v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal.
28  2011).  That case, however, found the presence of an *exclusive* licensing program established irreparable harm.
   There was specific evidence of exclusive licensing windows for major movies harmed by the DVD streaming

                                                    - 29 -

1    Fox tries to revive a presumption of irreparable harm by citing *Salinger v.*
2    *Colting*, 607 F.3d 68 (2d Cir. 2010) for the proposition that an injunction "has
3    nearly always" issued when a likelihood of success on the merits has been shown in
4    a copyright case.  MPA at 19.  Fox has not shown a likelihood of success on the
5    merits, but even if it had, *Salinger* says that post-*eBay* irreparable harm must be
6    proven and that there is no presumption.  *Salinger*, 607 F.3d at 76-80; *accord*
7    *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir.
8    2011) ("even in a copyright infringement case, the plaintiff must demonstrate a
9    likelihood of irreparable harm as a prerequisite for injunctive relief."); *see also*
10   *Christopher Phelps & Assocs. LLC v. Galloway*, 492 F.3d 532 (4th Cir. 2007)
11   (affirming denial of permanent injunction in copyright case).

12   The irreparable harm that the "plaintiff must *demonstrate*" must be
13   "immediate" and "imminent" and not remote or speculative.  *Caribbean Marine*
14   *Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Dotster, Inc. v.*
15   *Internet Corp. for Assigned Names and Numbers*, 296 F. Supp. 2d 1159, 1162 (C.D.
16   Cal. 2003) ("Irreparable injury is an injury that is not remote or speculative, but
17   actual and imminent").  Fox presents no reliable evidence of actual imminent
18   consequences from PTAT or AutoHop, and the declarations that it offers contain no
19   specifics, only speculation.  *See Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440,
20   443 (D. Del. 2007) ("Praxair has not provided or described any specific sales or
21   market data to assist the court, nor has it identified precisely what market share,
22   revenues, and customers Praxair has lost to ATMI") (denying injunction).[15]

23   Fox does not present any proof, such as a survey, that there is even any

---

business proposed by the defendant in that case.  *Id.* at 1006-1013.  No such evidence is present here.  Fox also cites *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011), which was recently affirmed, No. 11-788, 2012 WL 3645304 (2d Cir. Aug. 27, 2012).  The defendant in *WPIX* was, however, streaming network programming over the internet without paying retransmission fees, and the defendant's subscribers were not counted by Nielsen. 765 F. Supp. 2d at 598-99, 619.  Those are two important facts not present here.  Shull Decl. ¶6.

[15] *See also Johnson & Johnson Vision Care v. CIBA Vision Corp.*, 712 F. Supp. 2d 1285, 1289 (M.D. Fla. 2010) (denying permanent injunction); *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 560 (D. Del. 2008) (denying permanent injunction).

- 30 -

1   incremental increase in ad skipping because of the AutoHop feature.  It merely

2   makes that assumption, and offers overblown predictions of dire consequences to

3   advertising revenues.  But, the only qualitative distinction between the longstanding

4   30-second skip feature and AutoHop is whether someone at home watching

5   television is holding a remote control in his or hand.[16]

6           **C.     Any Assertion Of Irreparable Harm Has Been Rebutted.**

7           Fox has failed to present any competent evidence of any incremental increase

8   in ad-skipping with AutoHop.  That is because there is no such evidence.  As set

9   forth in the opinions of DISH's two highly qualified experts Richard T. Rapp, an

10  economist who is the former Chairman of the international economics consulting

11  firm NERA, and John Hauser, a professor of marketing at MIT's Sloan School of

12  Management, there is no reason to believe that the AutoHop feature will cause any

13  meaningful increase in commercial-skipping behavior among the television-

14  viewing public during the pendency of this litigation.  Moreover, as shown in the

15  Rapp Declaration, financial analysts who follow and report on the networks have

16  opined that the PTAT and AutoHop features on the Hopper will have no real

17  impact.  For example, Doug Mitchelson of Deutsche Bank stated "We see minimal

18  risk from Aereo or the Hopper cases."  Rapp Decl. ¶23.  Brian Weiser, Senior Vice

19  President and Global Forecasting Director of MagnaGlobal, stated "DVRs have

20  never been a meaningful threat because the bulk of television consumption occurs

21  live (even in homes with DVRs)."  *Id.*  Ian Olgirson of SNL Kagan stated "the

22  actual impact of AutoHop on television advertising likely will be limited, even if

23  DISH weathers potential legal challenges."  *Id.* n.31.  Tony Wilbe of Janney Capital

24  Markets stated that "ad-skipping risks [are] overstated."  *Id.* ¶24.

25          Other financial metrics support this conclusion, such as the lack of reaction

26  in the marketplace to the introduction of these DVR features.  There were no

27  ─────────────
    [16] Fox also asserts, based on hearsay in a newspaper article, that other MVPDs might adopt ad skipping technology
28  while this case is pending.  But, the article that Fox relies upon contradicts the claim.  It reports that  DirecTV intends
    to  await the outcome of this litigation before adding any new ad skipping features.  Haslingden Decl. Ex. B.

D. Singer Decl Ex 13
Page 235

1  changes in credit ratings for the senior unsecured debt of News Corp. or CBS. [17]

2  There was no stock price reaction.  The collective opinion is that the Hopper poses

3  no material risk to network television.  Indeed, the up-front ad sales that

4  immediately followed the announcement of AutoHop were a noted success for Fox.

5  Notwithstanding that the networks are losing audience to pay-television channels,

6  network advertising prices continue to rise.  The networks do not stand to lose any

7  audience as a result of PTAT and AutoHop.  Instead, those features are likely to

8  increase viewership of the networks' primetime shows.  It is only incremental ad

9  views lost to the networks as a result of these features that might matter, and there

10  is no evidence that there will be any extra lost impressions.  Rapp Decl. ¶82, 92.

11      There are close to 115 million television-viewing households in the United

12  States.  Rapp Decl. ¶66.  Approximately 57% of those households have VCRs, and

13  43% have DVRs.  Hauser Decl. ¶14.  Only 275,000 or so currently have a Hopper,

14  which translates to 0.2% of households with television sets.  ███████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ███████████████████████████████████.  Gerhards Decl. ¶10.

18  At the same time, the overwhelming majority of television viewing occurs live or

19  same-day.  Fox has presented no evidence whatsoever that consumers will deviate

20  from their preexisting viewing patterns *because of* AutoHop.

21      Moreover, any existing VCR or DVR household already has the ability to

22  fast-forward through or 30-second skip over commercials.  █████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████  AutoHop is not creating ad skippers.  It is

25  a simplification of existing behavior for a minority of users.  Even taking into

26  account projected new Hopper sales during the litigation, there is no reasonable

[17] Fox places near exclusive reliance for its irreparable harm argument on a Moody's Investor Service Issuer Comment.  As Rapp explains, the Issuer Comment provides no assessment of materiality and no Moody's credit rating revision has resulted from the launch of the AutoHop feature.  Rapp at ¶29.  *See also id.* at ¶¶19, 27-36, 54, 67.

1   basis to find that there will be any meaningful increase in ad skipping behavior.

2       Fox's claim that PTAT and AutoHop will impact its ability to license its

3   programming to VOD distributors stands up no better to the facts.  MPA at 22-24.

4   MVPD's VOD offerings are only accessible by their unique subscribers.  This

5   means that the value of a VOD service carried by another pay-television provider

6   will not be diminished by the availability of PTAT and AutoHop to DISH

7   subscribers—and Fox's ability to negotiate VOD licenses will not be affected.  *See*

8   *ActiveVideo*, 2012 WL 3636908, at *21-23.  Since DISH does not offer any

9   broadcast television network programming on a VOD basis, PTAT and AutoHop

10  cannot have an impact on Fox's VOD efforts.

11      Nor is there any merit to Fox's *ipse dixit* that its effort to exploit the internet

12  streaming market will be harmed.  MPA at 20-24.  Very little television is viewed

13  via the internet.  And internet streaming services do not directly compete with

14  television viewing; they are complementary of television viewing.  Hauser Decl.

15  ¶31; Rapp Decl. ¶105.  Indeed, at the same time DVRs have become more widely

16  available, and their recording capacity has improved, there has been growth in

17  internet streaming services.  Rapp Decl. ¶105.

18      **D.    Fox's Delay Undercuts Any Claim of Irreparable Harm.**

19      The Hopper with PrimeTime Anytime was publicly announced with great

20  fanfare on January 9, 2012 at CES, and Fox was there.  Khemka Decl. ¶3; Shull

21  Decl. ¶9.  In fact, Fox knew about it beforehand.  Molinski Decl. Ex. 4.  Despite

22  meeting regularly with DISH after January 9, no one at Fox or any of the other

23  networks objected in any way to PTAT.  Shull Decl. ¶9.  AutoHop was announced

24  on May 10, 2012, with advance notice to the networks.  *Id.* Ex. 2.  Only then did

25  Fox (and the other networks) file suit claiming PTAT and AutoHop would destroy

26  advertiser-supported television.  Fox's delay and lack of objection during the entire

27  first, and more than half of the second, quarters of 2012 precludes an injunction

28  against PTAT.  *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377

- 33 -

1  (9th Cir. 1985) (delay "implies a lack of urgency and irreparable harm").[18]

2  **V.     THE OTHER FACTORS ALSO FAVOR DISH.**

3           Fox must also establish that the balance of hardships favors it, *Perfect 10,*

4  *Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011), and "that an injunction is in

5  the public interest."  *Flexible Lifeline*, 654 F.3d at 994.  Neither is true.

6           **A.     DISH Will Suffer Far More Hardship Than Fox.**

7           As detailed above, there is no likelihood that Fox will suffer harm during the

8  litigation.  If, on the other hand, DISH is required to disable PTAT and AutoHop

9  for existing customers (akin to a recall),[19] or is enjoined from providing those

10  features to future subscribers, DISH will suffer severe, immediate hardship in the

11  form of damaged customer relations, lost goodwill, and other costs.  *See Hansen*

12  *Beverage Co. v. N2G Distrib., Inc.*, No. 08-CV-1613, 2008 U.S. Dist. LEXIS

13  105442, at *17 (S.D. Cal. Dec. 30, 2008) (damage to goodwill weighs against

14  injunction); *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.* No. CV-92-4698, 1993

15  U.S. Dist. LEXIS 15075, at *52 (C.D. Cal. June 29, 1993) (potential loss of

16  "valuable customer relations" tips balance of hardships to defendant).

17           An order to turn off PTAT and/or AutoHop would require a massive

18  campaign to notify subscribers that those features are no longer available, and

19  numerous attendant steps resulting in disruption, consumer confusion, and loss of

20  goodwill to DISH.  Khemka Decl. ¶10, 11.  DISH has invested time, effort, and

---

21  [18] *See Kerr Corp. v. North Am. Dental Wholesalers, Inc.*, No. SACV 11-0313, 2011 U.S. Dist. LEXIS 61779, at *7
22  (C.D. Cal. June 9, 2011) (five month delay shows lack of irreparable harm); *Givemepower Corp. v. Pace
    Compumetrics, Inc.*, No. 07cv157, 2007 U.S. Dist. LEXIS 20886, at *22 (S.D. Cal. Mar. 23, 2007) (two month delay
23  shows lack of irreparable harm); *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128
    (W.D. Wash. 2005) ("A three month delay in seeking injunctive relief is inconsistent with [plaintiff's] insistence that
24  it faces irreparable harm."); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1180, 1089
    (S.D. Cal. 1999) (five month delay in seeking injunction after retaining expert shows lack of irreparable harm);
25  *Programmed Tax Sys., Inc. v. Raytheon Co.*, 419 F. Supp. 1251, 1255 (S.D.N.Y. 1976) (collecting cases where
    irreparable harm denied with between two and six month delay).

26  [19] Customers have been enabling PTAT since March and AutoHop since May.  Approximately 275,000 customers
    have purchased the Hopper and obtained these features; Fox's proposed injunction would deprive them of what they
27  have already purchased and activated.  Fox has not acknowledged—let alone attempted to meet—the higher burden
    associated with a product recall.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879
28  (9th Cir. 2009).  A recall order is akin to a mandatory injunction and "particularly disfavored."  571 F.3d at 879.

CASE NO. CV12-04529-DMG-(SHx)
DEFENDANTS' OPP. TO MOT. FOR
PRELIMINARY INJUNCTION

D. Singer Decl Ex 13
Page 238

millions of dollars conceiving of and developing the Hopper, PTAT and AutoHop. DISH launched—at similarly great expense—a marketing campaign devoted to promoting the Hopper, along with its PTAT and AutoHop features.  If DISH is enjoined from offering them during the course of this litigation, its marketing investment will be lost.  *Id.* ¶¶10, 11.

### B.   The Public Interest Will Be Disserved By An Injunction.

Fox relies on boilerplate here, reciting the public's interest in "upholding copyright protections" and in "advertising-supported television."  MPA at 25.  "Public policy does not advocate the liberal issuance of *preliminary* injunctions in copyright infringement actions."  *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994).  In this case those boilerplate recitations are not *public* interests, but rather the private commercial interests of Fox.  In contrast, the real public interests at stake here are privacy, consumer autonomy and technological innovation.  *See Sony*, 464 U.S. at 783.  Enjoining PTAT and/or AutoHop will disserve the public interest.  *See GMC v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (public has an interest in "consumer choice"); *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1576 (Fed. Cir. 1988) (recognizing "the public interest in technological advancement").

## VI.   THE OLD PTAT/AUTOHOP SYSTEM IS MOOT.

Fox seeks to enjoin both the "current iterations" of PTAT and AutoHop and the "original" iterations.  MPA at 2.  The system has been changed, users are using the new system, DISH has no intention of going back.  Minnick Decl. ¶47, 82.  The old system is irrelevant to a request for injunctive relief.  *See FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1088 (9th Cir. 1985).[20]

### CONCLUSION

For all of the foregoing reasons, Fox's motion should be denied.

---

[20] *See also Keep A Breast Foundation v. Seven Group*, No.11-cv-00570, 2011 U.S. Dist. LEXIS 78373, at *8 (S.D. Cal. July 19, 2011); *BP W. Coast Prods. LLC v. Takhar Bros. Inc.*, No. CV-07-1807, 2007 U.S. Dist. LEXIS 86006, at *3-4 (D. Ariz. Nov. 8, 2007)

- 35 -

1    Dated:  August 31, 2012                    Orrick, Herrington & Sutcliffe LLP

2

3                                               By:  _/S/ William A. Molinski_____
                                                        WILLIAM A. MOLINSKI
4                                                      Attorneys for Defendants
                                                    DISH Network L.L.C. and DISH
5                                                          Network Corp.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                - 36 -

# Exhibit 14

WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California  90017
Tel: +1-213-629-2020 / Fax: +1-213-612-2499

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105-2669
Tel: +1-415-773-5700 / Fax: +1-415-773-5759

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
ELYSE D. ECHTMAN (*pro hac vice*)
eechtman@orrick.com
LISA T. SIMPSON (*pro hac vice filed*)
lsimpson@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York  10019-6142
Tel: +1-212-506-5000 / Fax: +1-212-506-5151

MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL PAGE (SBN 154913)
mpage@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California  94111
Tel: +1-415-362-6666

Attorneys for Defendants DISH Network
Corporation and DISH Network L.L.C.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS. INC., <br><br> Plaintiffs, <br><br> v. <br><br> DISH NETWORK L.L.C. and DISH NETWORK CORP., <br><br> Defendants. | Case No. CV12-04529 DMG (SHx) <br><br> **PUBLIC VERSION** <br><br> **DECLARATION OF RICHARD RAPP IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:      September 21, 2012 <br> Time:      9:30 a.m. <br> Ctrm:      7 (2nd Floor) |

DECLARATION OF RICHARD RAPP
CASE NO. CV12-04529 DMG (SHx)

that the number of episodes available for a particular show ranges from five to ten.[102]  Fox.com is little visited.  In July 2012, Fox.com only received 0.7 percent of unique visitors to internet video sites.[103]

104.   Online video services for all DISH Network subscribers, including those provided by Fox or Hulu, are not competitive with the DVR, including the Hopper with PTAT.  Most DVR viewing is typically done within three days of broadcast.  Hulu Plus, iTunes, Amazon, and Netflix stream their libraries, which consist mainly of movies and prior-season TV.  The online streaming services, have a wide variety of program materials, of which TV programming is only a part.

105.   Industry commentators speak of the streaming OVD services as complements or supplements to TV viewing, not as competitors.  Comcast says as follows:

> Right now, NBC Universal is distributing a lot of their broadcast
> content on Hulu, and they have been quite careful not to put too
> much of their paid-for-cable content out for free over the Internet.
> We think both those strategies are smart and appropriate … and
> we would see after the [Comcast-NBC Universal] deal closing,
> lots of broadcast content going to Hulu and being available for
> free, and cable content that cable customers pay for, that cable
> companies and satellite companies and telcos pay for, being on
> TV Everywhere. So really I think in a way Hulu and TV
> Everywhere are complementary products, and I think right now,
> the way NBC Universal are managing those two ways of

---

[102]  The shows American Dad, Family Guy, Glee, and House have five episodes available, while Kitchen Nightmares and Take Me Out have 8 to 10 episodes available. (Fox.com (http://www.fox.com/watchnewepisodes/, visited August 25, 2012.))

[103]  SNL Kagan, Economics of Internet Media, CBS.com shines among broadcast sites, August 20, 2012, and comScore, comScore Releases July 2012 U.S. Online Video Rankings, August 17, 2012.

-53-

D. Singer Decl Ex 14
Page 242

1   distributing are very similar to the way we would want to do it
2   when the two companies come together.[104]

3   The FCC agreed with this.  In its most recent report on the Status of Competition

4   in the Market for the Delivery of Video, it stated:  "In the Comcast-NBCU

5   Order, the Commission found that, while the amount of online viewing is

6   growing, cord-cutting of traditional video programming service is relatively

7   infrequent, and most consumers consider OVD service to be a complement to,

8   rather than a substitute for, their MVPD service."[105]

9       Given the minimal and supplemental nature of the use of OVD services, I

10      conclude that there will be no impact or minimal impact for the following

11      reasons:

12          a.  American households do not spend much time with online video --
13              only about 2.7 percent of total video viewing.

14          b.  Fox puts strict limits on access to current content; streaming access
15              is only available through Fox.com or Hulu Plus subscribers.

16          c.  Almost nobody watches Fox.com, and those who pay Hulu Plus's
17              $7.99 subscription fee are not doing so to watch what they can
                watch on DVR'd television or on Fox.com for free.

18          d.  Hulu, Netflix and other streaming sources have no overlap with the
19              PTAT's eight days of current primetime programming.

20          e.  A majority of DISH Network subscribers (over 60 percent) already
21              leased a DVR prior to the introduction of the Hopper.  A viewer
22              population already having the fundamental capacity to record and

---

[104]  Comcast Investor Call Transcript, at 21, December 3, 2009, in Federal Communications Commission, In the Matter of Applications for Consent to the Transfer of Control of Licenses General Electric Company, Transferor, To Comcast Corporation, Transferee, Applications And Public Interest Statement, January 28, 2010, p. 97.

[105]  Federal Communications Commission, In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, Fourteenth Report, MB Docket No. 07-269, July 20, 2012, ¶ 240.

-54-

DECLARATION OF RICHARD T. RAPP
CASE NO. CV1204529 DMG (SHX)

manually ad-skip implies that any impact of the Hopper plus PTAT is attributable only to the convenience of automation.

f.  Hopper users comprise about 0.2 percent of national TV households currently, and those who have activated PTAT comprise about 0.1 percent of national TV households. By the time of trial these numbers are expected to rise to about 1.8 percent and 0.8 percent.

g.  The impact on advertising, if any, could only come from DISH Network subscribers who in the past missed or failed to record a show and had previously caught up with it using Hulu Plus or accessed it through a mobile device via Fox.com.

-55-

DECLARATION OF RICHARD T. RAPP
CASE NO. CV1204529 DMG (SHX)

D. Singer Decl Ex 14
Page 244

# Exhibit 15

1  WILLIAM A. MOLINSKI (SBN 145186)
   wmolinski@orrick.com
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street, Suite 3200
3  Los Angeles, California  90017
   Tel:  +1-213-629-2020 / Fax:  +1-213-612-2499
4
   ANNETTE L. HURST (SBN 148738)
5  ahurst@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
6  405 Howard Street
   San Francisco, California 94105-2669
7  Tel:  +1-415-773-5700 / Fax:  +1-415-773-5759

8  E. JOSHUA ROSENKRANZ (*pro hac vice*)
   jrosenkranz@orrick.com
9  PETER A. BICKS (*pro hac vice*)
   pbicks@orrick.com
10 ELYSE D. ECHTMAN (*pro hac vice*)
   eechtman@orrick.com
11 LISA T. SIMPSON (*pro hac vice filed*)
   lsimpson@orrick.com
12 ORRICK, HERRINGTON & SUTCLIFFE LLP
   51 West 52nd Street
13 New York, New York  10019-6142
   Tel:  +1-212-506-5000 / Fax:  +1-212-506-5151

14 MARK A. LEMLEY (SBN 155830)
   mlemley@durietangri.com
15 MICHAEL PAGE (SBN 154913)
   mpage@durietangri.com
16 DURIE TANGRI LLP
   217 Leidesdorff Street
17 San Francisco, California  94111
   Tel:  +1-415-362-6666

18 Attorneys for Defendants DISH Network
   Corporation and DISH Network L.L.C.
19
                   UNITED STATES DISTRICT COURT
20
                  CENTRAL DISTRICT OF CALIFORNIA
21

| | |
|---|---|
| FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS. INC., | Case No. CV12-04529 DMG (SHx) |
| | **PUBLIC VERSION** |
| Plaintiffs, | **DECLARATION OF DAVID SHULL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DISH NETWORK L.L.C. and DISH NETWORK CORP., | Date:      September 21, 2012 |
| | Time:     9:30 a.m. |
| Defendants. | Ctrm:     7 (2nd Floor) |

DECLARATION OF DAVID SHULL
CASE NO. CV1204529 DMG (SHx)

1   still simultaneously record four additional programs).  So, the PTAT function on

2   the Hopper enables DISH subscribers to do what can be done on other DVRs—

3   record and store, for time-shifted viewing, the networks' primetime programming—

4   but with a few fewer clicks of the remote control.  Indeed, if—as Fox claims—the

5   PTAT feature creates a "bootleg" VOD service, then whenever a DVR user sets her

6   DVR to record any of Fox's primetime programs, a "bootleg" VOD service is

7   created.

8                   **Any Alleged Damage From AutoHop Is Readily Quantifiable**



DECLARATION OF DAVID SHULL
CASE NO. CV1204529 DMG (SHx)

D. Singer Decl Ex 15
Page 246

1       34.    The General Counsel of one affiliate has even made a public statement

2    that DISH should expect broadcasters to expect additional compensation for

3    subscribers using AutoHop. Attached hereto as **Exhibit 6** is a true and correct copy

4    of the article containing those comments.

5    **DISH Respects Copyrights And Depends on Technological Innovation**

6       35.    DISH respects copyrights and would not knowingly encourage anyone

7    to do anything illegal in the infringement of copyright. As an MVPD, we depend

8    on copyrighted content. Consumer recording for in-home private viewing at a later

9    time is an accepted business practice and has been for at least thirty years, as have

10    been the various mechanisms that consumers use to skip commercials during any

11    broadcast or later viewing of network content. Innovation in DVRs is critical to our

12    ability to compete with other MVPDs, such as Comcast and Verizon, who also

13    offer DVRs with commercial fast-forwarding or 30-second skipping capability. We

14    have always understood that copyright law and our contracts authorize us to market

15    this type of technology. In marketing the Hopper, PTAT and AutoHop, we

16    believed we were following commercially reasonable practices that allow us to

17    serve our consumers who are paying the networks for their content and to compete

18    more effectively with other MVPDs.

19    I declare under penalty of perjury under the laws of the United States that the

20    foregoing is true and correct.

21    Executed this 31ˢᵗ day of August, 2012, at Englewood, CO.

22

23

24                        David Shull

25

26

27

28

- 13 -            DECLARATION OF DAVID SHULL
                                         CASE NO. CV1204529 DMG (SHx)

D. Singer Decl Ex 15
Page 247

# Exhibit 16

WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California 90017
Tel: +1-213-629-2020 / Fax: +1-213-612-2499

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105-2669
Tel: +1-415-773-5700 / Fax: +1-415-773-5759

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
ELYSE D. ECHTMAN (*pro hac vice*)
eechtman@orrick.com
LISA T. SIMPSON (*pro hac vice filed*)
lsimpson@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019-6142
Tel: +1-212-506-5000 / Fax: +1-212-506-5151

MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL PAGE (SBN 154913)
mpage@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California 94111
Tel: +1-415-362-6666

Attorneys for Defendants DISH Network
Corporation and DISH Network L.L.C.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM CORP., and FOX TELEVISION HOLDINGS. INC., <br><br> Plaintiffs, <br><br> v. <br><br> DISH NETWORK L.L.C. and DISH NETWORK CORP., <br><br> Defendants. | Case No. CV12-04529 DMG (SHx) <br><br> **PUBLIC VERSION** <br><br> **DECLARATION OF JOHN HAUSER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: September 21, 2012 <br> Time: 9:30 a.m. <br> Ctrm: 7 (2nd Floor) |

1    twenty percent will be dedicated to sports programming (three of 15.5 hours), with

2    another twenty percent dedicated to reality television, and 16 percent (2.5 of 15.5

3    hours) dedicated to animation, two other categories with a higher share of live

4    viewing.[25]

5        25.    In fact, I understand that the AutoHop feature is not available for

6    sports programming or local news.  Therefore, no impact on commercial skipping

7    behavior is even possible for these programs, which represent more than 10 percent

8    (2.5 hours, plus any time dedicated to local news) of the total 22-hour Fox

9    primetime block.  Finally, to the extent that delayed viewing occurs within the same

10   day of the original broadcast, the potential effect of AutoHop, which cannot be used

11   when viewing before 3:00 am the next day, is even further limited.[26]

12       26.    As a result of all of these factors, evidence suggests that any customer

13   using the AutoHop feature is likely to have skipped advertisements in primetime

14   programming even if AutoHop had not been available to them. Thus, the Hopper

15   features at issue are unlikely to facilitate a significant change in the commercial-

16   skipping behavior of viewers.

17   **Consumer Behavior and the Secondary Market for Distribution of Fox
     Programming**

18

19       27.    The Hopper is also unlikely to negatively impact Fox's secondary (or

20   "non-linear") methods for distributing Fox programming, such as Video on

21   Demand, Next-Day Internet Streaming, Free Internet Streaming, Mobile Streaming,

22   Digital Sales, and DVD and Blu-ray. Given that these technologies are in their

23   formative stage, any conclusion about the nature or extent of an effect of the

24   Hopper on Fox for secondary distribution is at best speculative.

25

26   [25] "FOX Schedule Grids_combo_2012-13_2.pdf." Fox's fall schedule includes three primetime hours dedicated to a
         reality/variety program called "The X Factor," three primetime hours dedicated to sports programming, and 2.5
         primetime hours to several animated programs.

27   [26] For example, a 2010 Nielsen study found that overall, 49 percent of time-shifted primetime broadcast
         programming is played back the same day it was recorded. See "State of the Media: DVR Use in the U.S.,"
28       *Nielsen*, December 2010, p. 3.

- 12 -

# Exhibit 17



1   JENNER & BLOCK LLP
    Richard L. Stone (Bar No. 110022)
2   Andrew J. Thomas (Bar No. 159533)
    David R. Singer (Bar No. 204699)
3   Amy M. Gallegos (Bar No. 211379)
    633 West 5th Street, Suite 3600
4   Los Angeles, CA 90071
    rstone@jenner.com
5   ajthomas@jenner.com
    dsinger@jenner.com
6   agallegos@jenner.com

7   Attorneys for Plaintiffs
    Fox Broadcasting Company,
8   Twentieth Century Fox Film Corp., and
    Fox Television Holdings, Inc.

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13   FOX BROADCASTING COMPANY,          Case No.  12-CV-04529-DMG (SH)
     INC., TWENTIETH CENTURY FOX
14   FILM CORP., and FOX TELEVISION
     HOLDINGS, INC.
15                                      PLAINTIFFS' REPLY IN SUPPORT
                  Plaintiffs,           OF MOTION FOR PRELIMINARY
16                                      INJUNCTION
     v.
17                                      [PUBLIC REDACTED VERSION]
     DISH NETWORK L.L.C. and
18   DISH NETWORK CORP.,
                                        Hearing Date:    Sept. 21, 2012
19                Defendants.           Hearing Time:    9:30 a.m.
                                        Courtroom:       7 (2nd Floor)
20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

D. Singer Decl Ex 17
Page 250

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

II.   THE AUTOHOP SERVICE INFRINGES FOX'S COPYRIGHT.............2

      A.   Dish Makes Illegal Copies ..........................................................2

      B.   Dish Miscites The Family Movie Act Which Does Not Apply........2

III.  THE RTC AGREEMENT PROHIBITS PRIMETIME ANYTIME
      WITH AUTOHOP........................................................................................3

IV.   FOX HAS ESTABLISHED LIKELY SUCCESS ON ITS DIRECT
      INFRINGEMENT CLAIMS ......................................................................7

      A.   The PTAT Copies Infringe The Reproduction Right ......................8

      B.   The PTAT Copies Infringe The Distribution Right.........................10

      C.   Dish Ignores That Its Activities Exceed the Scope
           Of Its License .................................................................................11

V.    FOX IS LIKELY TO SUCCEED ON ITS SECONDARY
      INFRINGEMENT CLAIMS ......................................................................11

      A.   PTAT Copying Is Not Protected Under The Fair Use Doctrine.......11

           (1)   PTAT Copying Is Not Transformative ...................................12

           (2)   The Second And Third Factors Indisputably Favor Fox ........12

           (3)   The Fourth Factor, Market Harm, Decidedly Favors Fox......13

      B.   Dish is Liable For Vicarious Infringement .......................................17

      C.   Dish Is Liable For Inducing Copyright Infringement.......................17

      D.   Dish Is Liable For Contributory Infringement..................................17

VI.   DISH FAILS TO REBUT THE LIKELIHOOD OF
      IRREPARABLE HARM..............................................................................19

      A.   Fox Has Shown Likely Harm To Its Ad-Supported Business..........19

      B.   Fox Has Shown Likely Harm To Its Non-Broadcast Businesses .....20

      C.   Fox Is Not Required To Prove Actual Damages ...............................21

      D.   Dish's Experts Confuse And Conceal The Obvious
           Threat of Harm ................................................................................22

      E.   Fox Did Not Unreasonably Delay.....................................................25

VII.  Dish Faces No Cognizable Harm From A Preliminary Injunction .............25

i

# TABLE OF AUTHORITIES

**Cases**

*A&M Records v. Abdallah,*
    948 F. Supp. 1449 (C.D. Cal. 1996)..................................................18

*A&M Records, Inc. v. Napster, Inc.,*
    239 F.3d 1004 (9th Cir. 2001).................................................passim

*Aimster Copyright Litig.,* 334 F.3d 643 (7th Cir. 2003).....................15

*American Geophysical Union v. Texaco Inc.,*
    60 F.3d 913 (2d Cir. 1994).........................................2, 14, 15

*Atari Games Corp. v. Nintendo of Am., Inc.,*
    975 F.2d 832 (Fed. Cir. 1992)..............................................2

*Arista Records LLC v. Usenet.com, Inc.,*
    633 F. Supp. 2d 124 (S.D.N.Y. 2009).................................9, 18

*Basic Books v. Kinko's Graphics Corp.,*
    758 F. Supp. 1522 (S.D.N.Y. 1991)....................................8

*Blackwell Publ'g, Inc. v. Excel Research Group, LLC,*
    661 F. Supp. 2d 786 (E.D. Mich. 2009)..............................8

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) ...............................................12, 16

*Capitol Records v. MP3Tunes,*
    821 F. Supp. 2d 627 (S.D.N.Y. 2011)................................18

*Cartoon Network, LP v. CSC Holdings, Inc.,*
    536 F.3d 121 (2d Cir. 2008)............................................8

*Castle Rock Entm't v. Carol Pub. Group,*
    150 F.3d 132 (2d Cir. 1998)..........................................15

*Columbia Pictures Television v. Krypton Broadcasting,*
    259 F.3d 1186 (9th Cir. 2001).......................................10

*Diamontiney v. Borg,*
    918 F.2d 793 (9th Cir. 1990).........................................21

*Elvis Presley Enters. v. Passport Video,*
    349 F.3d 622 (9th Cir. 2003) ......................................12, 25

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
    76 F.3d 259 (9th Cir. 1996)..........................................17

*Gilder v. PGA Tour, Inc.,*
    936 F.2d 417 (9th Cir. 1991) .....................................22, 25

*Harper & Row Publishers, Inc. v. Nation Enters.,*

D. Singer Decl Ex 17
Page 252

471 U.S. 539 (1985) .................................................................................16

*Kaiser Trading Co. v. Associated Metals & Minerals Corp.,*
321 F. Supp. 923 (N.D. Cal. 1970)...............................................7

*Kelly v. Arriba Soft Corp.,*
336 F.3d 811 (9th Cir. 2003)........................................................13

*LGS Architects, Inc. v. Concordia Homes of Nev.,*
434 F.3d 1150 (9th Cir. 2006) ..............................................11, 25

*London Sire Records, Inc. v. Doe 1,*
542 F. Supp. 2d 153 (D. Mass. 2008) ..........................................11

*Los Angeles News Service v. Tullo,*
973 F.2d 791 (9th Cir. 1992).........................................................8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
545 U.S. 913 (2005) ...................................................................

*Muze, Inc. v. Digital On-Demand, Inc.,*
123 F. Supp. 2d 118 (S.D.N.Y. 2000)............................................7

*Neumann. v. Metro Med. Group, P.C.,*
557 N.Y.S.2d 663 (N.Y. App. Div. 3d Dep't 1990) ......................6

*New York Times Co. v. Tasini,*
533 U.S. 483 (2001) ....................................................................10

*Oracle America v. Google,*
2012 WL 1189898 (N.D. Cal. Jan. 4, 2012) ................................10

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007).........................................11, 12, 13

*Perfect 10, Inc. v. Megaupload, Ltd.,*
2011 WL 3203117 (S.D. Cal. July 27, 2011),................................9

*Princeton Univ. Press v. Michigan Document Servs.,*
99 F.3d 1381 (6th Cir. 1996).........................................................8

*Register.com, Inc. v. Verio, Inc.,*
356 F.3d 393 (2d Cir. 2004)...........................................................7

*RCA Records v. All-Fast Sys., Inc.,*
594 F. Supp. 335 (S.D.N.Y. 1984)...............................................18

*Richlin v. MGM Pictures, Inc.,*
531 F.3d 962 (9th Cir. 2008) .........................................................3

*Sega Enters. Ltd. v. Accolade, Inc.,*
977 F.2d 1510 (9th Cir. 1992)........................................................2

*Sony Computer Enters., Inc. v. Connectix Corp.,*
203 F.3d 596(9th Cir. 2000)...........................................................2

iii

*Sony Corp. of Am. v. Universal City Studios*,
    464 U.S. 417 (1984). ....................................................... 1, 16, 18

*Twin Peaks Prod'ns, Inc. v. Publications Int'l*,
    996 F.2d 1366 (2d Cir. 1993) ...................................................7

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    667 F.3d 1022 (9th Cir. 2011) .................................................8

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) .................................................. 18

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.*,
    447 F.3d 769 (9th Cir. 2006) ............................................ 12, 13

*Walt Disney Prod'ns v. Filmation Assocs.*,
    628 F. Supp. 871 (C.D. Cal. 1986) ...........................................2

*Warner Bros. Entm't v. WTV Systems*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ................................... 21

*WPIX, Inc. v. ivi, Inc.*,
    -- F.3d --, 2012 WL 3645304 (2nd Cir. Aug. 27, 2012) ..................... passim

**Statutes**

17 U.S.C. § 101 ............................................................................3

17 U.S.C. § 110(11) ....................................................................2, 3

17 U.S.C. § 119 ...........................................................................11

D. Singer Decl Ex 17
Page 254

## I.    Introduction

Dish's opposition is a study in populist hyperbole and misdirection. Fox is not seeking to take anything away from consumers, or to overturn the consumer time shifting allowed by *Sony*.[1] Dish admits its PrimeTime Anytime ("PTAT") and AutoHop services can be shut down with a routine software update that will have no effect on its subscribers' personal DVR use.

Fox is only trying to stop Dish from making and distributing unauthorized copies of its programs to create, in Dish's words, "[a]n on demand library of approximately 100 hours of primetime shows" that in conjunction with AutoHop becomes, again in Dish's words, "commercial-free TV" in violation of Dish's license and copyright laws. This case is not about a "souped-up" personal DVR. These are commercial services created by Dish to give it a competitive advantage that meet all of the elements of a video-on-demand ("VOD") service as defined by Dish's own expert and executive, which is why Dish represented under oath to the Trademark Office that PTAT was indeed a VOD service. Dish would not have spent tens of millions of dollars marketing itself as the creator of "commercial-free TV" – which its president refers to as the "Holy Grail of television" – for an allegedly improved personal DVR timer setting. Nor would Dish's Vice President claim a simple, improved DVR scheduler would displace Hulu, nor would its Chairman admit a mere timer was harmful to the entire television "ecosystem."

Dish uses two experts to try to convince the Court that, contrary to all of Dish's statements and marketing, a commercial-skipping, commercial-free, on demand library of shows will somehow lead to *more* commercial watching. Dish then claims Fox is stifling "innovation," but misappropriating programming, breaching contracts and violating copyright laws to supplant licensed services, like Hulu, is not "innovation" – it is tantamount to piracy. Dish should be enjoined.

---

[1] *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984).

1

II. **The AutoHop Service Infringes Fox's Copyrights**

    A. **Dish Makes Illegal Copies.**

These copies are plainly infringing. Dish does not deny making these copies for a commercial purpose, and offers no legal analysis to justify its copying. Instead, it misdirects with a string cite to computer software reverse engineering cases that plainly do not apply to Dish's copying.

In *Sega*, the Ninth Circuit actually held that "intermediate" copies generally *are* infringing, regardless of their purpose. *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992) ("[o]n its face, [the Copyright Act] unambiguously encompasses and proscribes intermediate copying"); *accord American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 921 (2d Cir. 1994); *Walt Disney Prod'ns v. Filmation Assocs.*, 628 F. Supp. 871, 876 (C.D. Cal. 1986) (intermediate copies in the form of storyboards were infringing). *Sega* only recognized a narrow, fact-specific exception for "reverse engineering" of computer software, where the copying was necessary to read the software itself and examine embedded unprotected ideas and functional concepts. 977 F.2d at 1520-26.[2] Dish is doing no such thing with the Fox Programs ▮▮▮▮▮▮▮▮, and can cite no case that has excused the making of "intermediate" copies of creative, expressive works for commercial purposes.

    B. **Dish Miscites The Family Movie Act Which Does Not Apply.**

Dish's assertion that Congress "expressly privileged" commercial-skipping in the Family Movie Act ("FMA"), 17 U.S.C. § 110(11), is demonstrably false.

---

[2] Similarly, the *Sony Computer* and *Atari* cases cited by Dish involved copying that was an essential step in the reverse engineering process because it was necessary to enable the defendant to actually *read* the copyrighted work to gain access to the uncopyrightable ideas. *See Sony Computer Enters., Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000); *Atari Games Corp. v. Nintendo of Am., Inc.*, 975 F.2d 832, 843 (Fed. Cir. 1992).

2

1   The statute says nothing about commercial-skipping and, indeed, Congress

2   expressly designed the statute *not to apply* to commercial-skipping technologies.

3   Senator Orrin Hatch, the original sponsor of the legislation, noted in his statement

4   introducing the bill that "a product or service that enables the skipping of an entire

5   advertisement, in any media, would be beyond the scope of the exemption."  151

6   Cong. Rec. S495 (daily ed. Jan. 25, 2005) (statement of Sen. Hatch).

7        The FMA provides an exemption to copyright infringement for "the making

8   imperceptible ... of *limited portions* of audio or video content of a motion picture

9   ...."  17 U.S.C. § 110(11) (emphasis added).  "Motion pictures" are "audiovisual

10  works consisting of a series of related images which, when shown in succession,

11  impart an impression of motion, together with accompanying sounds, if any."  17

12  U.S.C. § 101.  Under this broad definition, each commercial is a "motion picture."

13  The Copyright Register explained to the House Judiciary Committee that the FMA

14  "*would not exempt from liability* a technology that skips past an entire commercial"

15  because the exemption "extends only to skipping past 'limited portions' of a motion

16  picture."  The Committee "concur[red] with the Register's determination that this

17  Act has *no bearing* on either the legality or illegality" of "automated television

18  commercial-skipping devices."  *See* H.R. Rep. 109-33(I) (emphasis added).[3]

19  **III.   The RTC Agreement Prohibits PrimeTime Anytime With AutoHop**

20        The RTC Agreement states that Dish "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  In 2010, Fox agreed to a narrow

23  exception allowing Dish to distribute Fox Programs via video on demand ("VOD")

24  as long as it "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26        To circumvent those limitations on the distribution of Fox Programs, Dish

27  _____

28  [3] *See Richlin v. MGM Pictures, Inc.*, 531 F.3d 962, 973 (9th Cir. 2008) (courts generally should defer to Register of Copyright's interpretation of copyright laws).

3

1   relies on Fox's unremarkable acknowledgement that the contract does not " ███████
2   ████████████████████████████████████████████████████████████████████
3   ███████. This is a straw man argument.  Fox is not trying to restrict Dish employees
4   from installing customer DVRs, nor is it claiming these home installations have
5   anything to do with Dish's infringement in this case.  Instead, Fox seeks to enjoin
6   two discrete Dish services: the PrimeTime Anytime VOD service ("PTAT") and the
7   AutoHop feature that eliminates commercials on playback.  Dkt. 41-16.
8          Next, Dish tries to escape liability by relying on Section 9(a) of the RTC
9   Agreement: ██████████████████████████████████████████████████████
10  ███████████████████████████████████████████████████████████████████
11  ██████████████████████████████████████████████████████.  As
12  discussed below and in Fox's motion, Dish is the one making the nightly,
13  unauthorized copies of every Fox Program as part of its PTAT and AutoHop
14  services – a clear violation of Section 9(a)'s prohibition on direct copying.  Dish
15  claims the "██████████████" (italicized above) permits Dish to authorize
16  "████████████████." Opp. 10.  But Fox is *not* suing Dish for authorizing
17  consumers to use their personal DVRs.  Fox is suing Dish for operating the
18  commercial-free VOD services known as PTAT and AutoHop.
19         Next, to evade the RTC Agreement's prohibition on VOD or similar services,
20  Dish takes the untenable position that PTAT is not even similar to VOD, claiming it
21  is merely a "DVR feature that simplifies timers" for recording programs.  Opp. 13.
22  Dish's characterization of PTAT as just another DVR "timer" is completely at odds
23  with its multi-million dollar PTAT marketing campaign, its own Hopper user guide,
24  admissions by its senior management, and its under-oath submission to the U.S.
25  government.  Dish's argument that all personal DVR recordings are "on demand"
26  also contradicts its prior admissions and its own definition of VOD.
27         According to Dish's expert, VOD is a "████████████████████████
28  ████████████████████████████████████████████████████████

4

1 ███████████████████████████████████████████████

2 ████. PTAT squarely fits that definition because it provides Dish subscribers

3 with a library of pre-recorded, primetime content that the user can select from and

4 watch on demand.[4]  Indeed, before this motion was filed, that is exactly how Dish

5 described the service.  Dish's press release touted that PTAT "creates an *on-*

6 *demand library of approximately 100 hours primetime TV shows.*"  Singer, Ex. E at

7 199 (emphasis added).  Dish spent tens of millions of dollars advertising that PTAT

8 was "new," "only" available from Dish, and different than a traditional DVR

9 because it "gives you instant On Demand access to your favorite primetime shows

10 … and doesn't take up any of your personal DVR space."  *Id.*, Ex. E at 199, Ex. A

11 at 18.  Dish's message to consumers is that PTAT is *not* a DVR scheduling feature;

12 instead, it "gives you *On Demand* access for 8 days to all HD programming that

13 airs during primetime hours on ABC, CBS, FOX and NBC, *without* needing to

14 schedule individual recordings."  *Id.*, Ex. A at 22-23 (emphasis added).

15      The Hopper User Guide discusses PTAT separately from personal DVR

16 timers and refers to PTAT as "*on-demand* access" to all primetime programs

17 broadcast on ABC, CBS, FOX and NBC.  Singer, Ex. B at 109 (emphasis added).

18 By contrast, the User Guide separately explains that "[a] timer is your instruction

19 telling the satellite TV receiver the programs you want to watch in the future … you

20 select a specific program on a specific channel, and tell the receiver how often you

21 want to record that program."  *Id.* at 111.

---

22

23 [4] Dish's Senior Vice President David Shull similarly defines VOD as a service
that "provides subscribers with 'on demand' access to a catalog of content that is

24 determined not by the subscribers, but by the MVPDs and content providers such as
Fox.  Additionally, the particular programs in the VOD service are available to

25 subscribers for 'on demand' access for a period of time determined by the MVPD
and content provider, not by the subscriber."  Shull ¶ 27.  That is precisely how

26 PTAT works:  Dish selects the particular programs to be recorded as well as the
networks that are available with the service (the current networks are ABC, CBS,

27 NBC, and Fox), Dish unilaterally decides which programs are available
commercial-free, and Dish controls the parameters for how long the PrimeTime

28 Anytime library is available for on demand viewing (the default is 8 days).  Singer,
Ex. A at 14-17, ██████████████████.

5

1      In its trademark application to the U.S. Trademark Office, Dish – under oath

2 – repeatedly referred to PTAT as a "video-on-demand service." Singer, Ex. F at

3 207, 210, 212, 224, 226. Last week, after being caught red handed with this sworn

4 admission, Dish responded with yet another cosmetic cover-up by asking the

5 Trademark Office to amend its application and delete the description of PrimeTime

6 as a VOD service. Saffer ¶ 4.[5]

7      In short, no matter how many pages of excuses, amendments and

8 qualifications Dish now comes up with, it cannot credibly deny that PTAT is a

9 VOD or similar on demand service. Therefore, PTAT is either (1) prohibited by the

10 RTC Agreement (which prohibits such services generally), or (2) subject to the

11 VOD Clause (which narrowly permits VOD on the condition of no commercial-

12 skipping). Either way, Dish is breaching the contract.

13      At the very least, Dish's PTAT and AutoHop services violate Section 5 of the

14 2010 amendment to the RTC Agreement, which states that Dish ████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████ Yet PTAT and AutoHop render the VOD Clause pointless and completely

18 frustrates the "█████████████" of no commercial-skipping during VOD

19 playback. Dish claims it did nothing wrong because the contract "contemplated"

20 Dish distributing DVRs and "everyone knows" DVRs can record primetime

21 programs and skip commercials. Opp. 14. But Fox is *not* challenging Dish's

22 distribution of DVRs to customers, nor is it challenging the traditional functions of

23 a DVR; it is challenging PTAT and AutoHop.[6]

24  

---

25    [5] The sworn statements that PrimeTime Anytime is a VOD service were made by Max Gratton, a Dish employee. Singer, Ex. F at 226. Curiously, to explain its

26 about face, Dish submits the declaration of outside counsel Ian Saffer (who has no personal knowledge of Gratton's original statements or intentions). Saffer ¶¶ 2-3.

27    [6] *Neumann. v. Metro Med. Group, P.C.*, 557 N.Y.S.2d 663, 664 (N.Y. App. Div. 3d Dep't 1990), cited by Dish (Opp. at 14) is far off point. That case dealt with the

28 separate legal doctrine of "frustration of purpose," not the express breach of a contract restriction like the one at issue here.

D. Singer Decl Ex 17
Page 260

1         Dish sets up another straw man argument by spending three pages arguing it

2    is not "required" to market the Fox Programs under the parties' VOD Clause.  Opp.

3    10-12.  Fox has never claimed Dish has an affirmative obligation to implement the

4    VOD service agreed upon by the parties.  Fox is suing Dish because, instead of

5    implementing the authorized VOD service with no commercial-skipping, Dish

6    developed a competing, *unauthorized* VOD service that eliminates commercials.  If

7    Dish turned off PTAT and AutoHop, it would not be in breach of the VOD Clause.

8         Finally, Dish's claim that injunctive relief for a contract claim is "unheard

9    of" under California law (Opp. 28) can be rejected out of hand.  Courts in this

10   Circuit "look to state law to determine if a preliminary injunction is permissible."

11   *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F. Supp. 923, 931

12   n.14 (N.D. Cal. 1970), *aff'd*, 443 F.2d 1364 (9th Cir. 1971).  Dish admits the RTC

13   Agreement is governed by New York law (Opp. 10), which permits injunctive relief

14   for breach of contract claims.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393,

15   404 (2d Cir. 2004); *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118,

16   131-32 (S.D.N.Y. 2000).

17   **IV.    Fox Has Established Likely Success On Its Direct Infringement Claims**

18        Fox's motion attached the Copyright Office registration certificates for all the

19   works at issue, establishing a presumption of valid copyright ownership.  *See* 17

20   U.S.C. § 410(c).[7]  Such registration provides a sufficient basis to assert claims for

21   copyright infringement based on copying the broadcast programs.  *See Twin Peaks*

22   *Prod'ns, Inc. v. Publications Int'l*, 996 F.2d 1366, 1371 (2d Cir. 1993).

23        Dish offers only a token response to Fox's direct infringement claims based

24   on the copies Dish makes every night in operating the PTAT service.  While Dish

25   makes fair use and the *Sony* decision the centerpiece of its Opposition, those

26   arguments are relevant *only* as defenses to Fox's claims for *secondary* copyright

27

28   [7] Because Fox could not register the episodes of its programs as audiovisual works
     until after the programs aired, it initially registered the scripts.

D. Singer Decl Ex 17
Page 261

1   infringement.[8]  They do not provide Dish with any defense to Fox's direct

2   infringement claims – all of which are based on Dish's own copying as part of its

3   commercial business operations.  Accordingly, if the Court finds that Fox has

4   shown a likelihood of success on its direct infringement claims, it need not even

5   address secondary infringement, fair use, or *Sony*.

6       **A.**  **The PTAT Copies Infringe The Reproduction Right.**

7       Dish contends that, because its customers must press a button to turn on the

8   PTAT service, it cannot be liable for direct infringement based on the PTAT

9   copying that ensues on a nightly basis (Opp. at 24).  Dish's formalistic view of

10   direct infringement finds no support in the case law.[9]

11       Dish seeks refuge in the "volitional conduct" requirement adopted by some

12   courts, including the Second Circuit in *Cartoon Network, LP v. CSC Holdings, Inc.*,

13   536 F.3d 121 (2d Cir. 2008) ("*Cablevision*").  This argument fails for two reasons.

14   ***First***, contrary to Dish's suggestion, the Ninth Circuit has not adopted this

15   requirement, and the *Shelter Capital* ("*Veoh*") case on which it relies did not once

16   mention *Cablevision* or the standard for proving direct infringement.[10]

17       ***Second***, even if such a requirement did apply, courts in this circuit and

18   elsewhere that have adopted the "volitional conduct" test have made clear that the

19   

20       [8] As Fox demonstrated in its opening brief – citing a number of decisions that Dish makes no effort to address – a commercial business may not justify its unauthorized copying by attempting to assert fair use claims on behalf of its downstream customers.  *See, e.g.*, *Los Angeles News Service v. Tullo*, 973 F.2d 791, 797-98 (9th Cir. 1992); *see also* Motion at 15.

22       [9] It is well established that a business that makes unauthorized copies of copyrighted works is liable for direct infringement, even if it does so at the request of a customer.  *See Princeton Univ. Press v. Michigan Document Servs.*, 99 F.3d 1381, 1389 (6th Cir. 1996); *Blackwell Publ'g, Inc. v. Excel Research Group, LLC*, 661 F. Supp. 2d 786, 791-92 (E.D. Mich. 2009); *Basic Books v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1531-32 (S.D.N.Y. 1991); Motion at 13 n.7.

25       [10] Instead, the *Veoh* case addressed an entirely separate question – namely, the meaning of statutory language in the DMCA regarding an Internet service provider's storage of user-uploaded content "at the direction" of the user.  *See UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1035 (9th Cir. 2011).  For purposes of direct infringement, even assuming a volitional conduct requirement applied, the question is who actively participates in the copying, not who directs or requests it.

D. Singer Decl Ex 17
Page 262

1   standard is not difficult to meet, and that Dish's conduct in operating the PTAT

2   service would easily satisfy any court's volition requirement.  In *Perfect 10, Inc. v.*

3   *Megaupload, Ltd.*, 2011 WL 3203117 (S.D. Cal. July 27, 2011), for example, the

4   court found the volition requirement clearly satisfied where the defendant

5   participated in the copying as more than a mere "passive conduit" or "storage"

6   service.  *Id.* at *4.  Volition also has been found satisfied where the defendants were

7   shown to be "*active participants* in *the process* of copyright infringement."  *Arista*

8   *Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009)

9   (emphasis added) (citations omitted).

10          Dish says nothing in response to the numerous examples cited by Fox of

11   Dish's participation in and control over the copying performed by the PTAT

12   service.  Dish's own user guides, promotional materials, and deposition witness

13   confirm that Dish's participation in the PTAT copying is active and ongoing, and

14   that Dish exerts extensive control over the process.  Dish (not the customer) selects

15   the particular programs PTAT records; Dish (not the customer) determines when

16   those programs can be accessed; Dish (not the customer) chooses which networks

17   are recordable by PTAT; Dish (not the customer) selects the recording start times

18   and stop times for each network; Dish (not the customer) controls when the copied

19   programs are available in a commercial-free format; Dish (not the customer)

20   controls the minimum and maximum lengths of time they are available for viewing

21   (currently 2 to 8 days); and, beginning 15 minutes before the start of primetime,

22   Dish *locks the customer out* of PTAT completely so that none of the settings can be

23   changed.  *See* Motion at 11-12.  The only act of "volition" by the user is to activate

24   the service.  That trivial "flip of the switch" does not absolve Dish of its pervasive,

25   ongoing role in the PTAT service's nightly copying of Fox's primetime programs.[11]

26

27   [11] At least one court has explicitly rejected Dish's view.  In *Blackwell*, *supra*, the
     court held a business liable for direct infringement where it made copyrighted
28   materials available to students to copy on its premises using machines under its

D. Singer Decl Ex 17
Page 263

1    Dish attempts to buttress its argument by citing to cosmetic changes that it

2    made to the PTAT service (Opp. 24) ████████████████████████████

3    ████████████████[12] Dish's own declarant, however, confirms

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████

9    **B.     The PTAT Copies Infringe The Distribution Right.**

10   Dish asserts – without citing any authority – that there can be no distribution

11   "when no physical copy changes hands."  This antiquated view was rejected by the

12   Supreme Court in *New York Times Co. v. Tasini*, 533 U.S. 483 (2001), which

13   squarely held that distribution of copies may be accomplished through the transfer

14   of electronic files. *Id.* at 498; *see also A&M Records, Inc. v. Napster, Inc.*, 239

15   F.3d 1004, 1013-14 (9th Cir. 2001).

16   Dish also seeks to hide behind the illusion that its subscribers are the ones

17   making the nightly, automatic PTAT copies, when in fact Dish is directly and

18   actively participating in that process.  Contrary to Dish's suggestion (Opp. 26), Fox

19   is not claiming Dish violates the distribution right merely by making content

20   "available for copying by the consumer."  Instead, Fox claims that Dish, through its

21   operation of the PTAT service, is *causing* copies of the Fox Programs to be made

22

23   control.  It rejected the argument that the business had no liability merely because

24   students actually "press[ed] the start button."  *See* 661 F. Supp. 2d at 791-92.
     [12] ████████████████████████████████████████

25   ████████████████████████████████████████████████

26   ████████████████████████████████████████████████

27   ████████████████████████████████████████████

28   Dish's explanation for these changes in its Opposition should be disregarded.

10

1   on the Hopper DVRs of its subscribers.[13]  And contrary to Dish's unsupported

2   assertions, it plainly is *not* authorized – either by its RTC Agreement with Fox or

3   the statutory compulsory license under 17 U.S.C. § 119 – to disseminate *copies* of

4   the Fox Programs.  *See* Motion 4, 8, 10 n.5.  Perhaps the best evidence that Dish is

5   responsible for the PTAT copies of the Fox Programs is that when

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████ [14]

8        **C.    Dish Ignores That Its Activities Exceed The Scope Of Its License.**

9        Dish ignores Fox's authorities establishing that, by exceeding the scope of its

10  license in the RTC Agreement, Dish has engaged in copyright infringement.  *See*,

11  *e.g.*, *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1154-57 (9th

12  Cir. 2006) (granting preliminary injunction).  *See generally* Motion 9-10.  This

13  concession alone supports a finding of likelihood of success on the merits.

14  **V.    Fox Is Likely To Succeed On Its Secondary Infringement Claims**

15       Even if the Court were to accept Dish's attempt to shift to its subscribers the

16  responsibility for the massive copying accomplished by the PTAT service, Dish

17  still would be secondarily liable for copyright infringement.

18       **A.    PTAT Copying Is Not Protected Under The Fair Use Doctrine.**

19       Dish's primary response to secondary infringement is that copying by its

20  subscribers using PTAT and AutoHop constitutes "time shifting" that is protected

21  under the fair use doctrine – an affirmative defense on which Dish bears the burden

22  of proof at the preliminary injunction stage.  *See Perfect 10, Inc. v. Amazon.com,*

23  *Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).  Because the copying done by Dish's

24  _____

25  [13] This also violates Fox's reproduction right.  *See London Sire Records, Inc. v.
    Doe 1*, 542 F. Supp. 2d 153, 174 n. 28 (D. Mass. 2008) ("[a] single action can
    infringe more than one right held under § 106").

26  [14] Under the RTC Agreement, Fox granted Dish only a limited license to
    retransmit public performances of the Fox Programs embodied Fox's broadcast

27  signal. ████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

11

1   PTAT service is nothing like the "time-shifting" of individual programs addressed

2   by the Supreme Court in *Sony*, Dish cannot establish a likelihood of success on a

3   fair use defense.

4           **(1)    PTAT Copying Is Not Transformative.**

5        Dish's claim that *Sony* held "the Betamax served a transformative purpose"

6   (Opp. 16) is preposterous.  Contrary to what Dish says, in its 1984 *Sony* decision,

7   the Supreme Court had no occasion to analyze whether time-shifting was

8   transformative because it did not adopt the "transformative use" analysis *until 9*

9   *years later* in *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994).  Indeed, the

10  *Campbell* Court cited *Sony* as an example of fair use that did *not* involve a

11  transformative use of the copyrighted work.  *Id.* at 579.[15]  A use is transformative if

12  the new work "adds something new, with a further purpose or different character,"

13  thereby "altering" the original work "with new expression, meaning or message."

14  *Id.*  Where, as here, the copier is using the entire work for the same entertainment

15  purpose as originally intended, the use is not transformative.  *E.g., Elvis Presley*

16  *Enters. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (uses that "serve the

17  same intrinsic entertainment value" as the copied work are not transformative).

18          **(2)    The Second And Third Factors Indisputably Favor Fox.**

19       Dish ignores and thus concedes the second and third fair use factors.  The

20  second factor – the nature of the copyrighted works at issue – plainly favors Fox.

21  Creative comedies and dramas like the Fox Programs are "within the core of

22  copyright's protective purposes." *Campbell*, 510 U.S. at 586.  The third factor –

23  the amount and substantiality of the portion copied – also favors Fox because

24  PTAT copies primetime programs in their entirety.  *See Wall Data Inc. v. Los*

25  *Angeles County Sheriff's Dept.*, 447 F.3d 769, 780 (9th Cir. 2006) ("verbatim

26

27      [15] *Sony* also made clear that the "time-shifting" activity at issue did *not* qualify as a "productive" use (a precursor to the transformative test).  *See* 464 U.S. at 455 n.40;

28  *see also* Molinski, Ex. 5 at 31 (Sony brief arguing that time-shifting involved "making exactly the use of the work which the copyright owner intended").

D. Singer Decl Ex 17
Page 266

1  copying of the entire copyrighted work …weighs against" fair use).[16]

2      (3)    **The Fourth Factor, Market Harm, Decidedly Favors Fox.**

3         Contrary to Dish's suggestion, *Sony* did not hold that all personal or in-home

4  use of a VCR or DVR is *per se* legal or fair, nor did it recognize an inherent "right"

5  to eliminate commercials from the playback of recorded programs.  Rather, the

6  Supreme Court found the film studio plaintiffs had not established a likelihood of

7  market harm under the fourth fair use factor based on the Court's consideration of

8  narrowly defined conduct involving a specific product with limited capabilities.[17]

9         Specifically, the Court considered "time-shifting" of individual television

10  programs, which it defined as "the practice of recording a program *to view it once*

11  *at a later time, and thereafter erasing it*."  464 U.S. at 423 (emphasis added).  The

12  Court did not endorse the creation of libraries of copyrighted content, and certainly

13  did not approve the copying effected by PTAT – the recording each night of four

14  networks' entire primetime lineups.  To the contrary, *Sony* implied that such

15  "library-building" would not constitute a fair use.  *Id.* at 423-24 & nn. 3-4.

16         PTAT is not necessary for true "time-shifting" by consumers.  Without

17  PTAT, Dish subscribers still can record individual programs to view later – a

18  practice Fox *does not challenge* here.[18]  But under its default settings, PTAT copies

19  12-24 shows per night (easily more than 100 per week) – regardless of whether the

20  user ever intends to watch a particular program.  PTAT thus creates a storehouse of

21  
22     [16] The "wholesale copying" cases Dish cites (Opp. 17) are distinguishable in that both involved (i) reproduction of "thumbnail" images that did not substitute for the original works and (ii) copying for a purpose – namely, facilitating the operation of
23  an Internet search engine – that was wholly distinct from the purpose for which the works were created.  *See Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1165 (9th
24  Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-21 (9th Cir. 2003).
   [17] The other basis for the *Sony* decision was that the plaintiffs' works were only "a
25  small portion of the total use" of VCRs.  *Id.* at 434, 456.  Here, PTAT and AutoHop operate *only* on the primetime programs of the four broadcast networks, and all four
26  networks – 100% of those affected – have sued Dish.
   [18] The only claim in this case that the sky is falling is found in Dish's constant
27  mantra that Fox is seeking to "attack" *Sony* and to "take away" consumers' ability to engage in time-shifting (Opp. at 1, 17, 19).  As its motion makes clear, Fox only
28  seeks to enjoin PTAT and AutoHop, not any other function of the Hopper.

D. Singer Decl Ex 17
Page 267

1   recorded programs for the user to browse and choose from another day. By

2   creating a library of shows available for on-demand viewing, PTAT far exceeds the

3   time-shifting activity at issue in *Sony*.[19]

4          The *Sony* Court also had no occasion to consider the effect of consumer

5   copying on other markets for the licensed distribution of television programs to

6   consumers – both with and without commercials – through VOD or Internet

7   transmissions, since no such competing markets (and no Internet) existed in 1984.

8   Here, by contrast, it is undisputed that these markets now exist, and Fox has shown

9   they will be negatively affected if Dish is allowed to offer the Fox primetime

10   programs on a commercial-free on-demand basis. *See* Motion at 20-24. Dish's

11   argument that the growing market for Internet distribution of television programs is

12   a "complement, not a replacement, for TV viewing" contradicts admissions by

13   Dish's Chairman that PTAT and AutoHop will harm the advertising-supported TV

14   "ecosystem" and by Dish's Vice President that with PTAT and AutoHop the

15   consumer would not "ever need Hulu or Hulu Plus after this." Motion 2, 7.

16          That these markets are relatively new does not justify discounting them. As

17   the Ninth Circuit has explained, lack of present harm to an established market

18   "cannot deprive the copyright holder of the right to develop alternative markets" for

19   its works. *See Napster*, 239 F.3d at 1017 (the availability of free downloads on

20   Napster's system "necessarily harms" the record labels' efforts to develop markets

21   for Internet sales and licensing of digital downloads of the same songs); *Am.*

22   *Geophysical*, 60 F.3d at 929 ("indisputable" that "the impact on potential licensing

23

24   ───────────────────

25   [19] Dish also distorts the *Sony* district court's findings (Opp. 19) regarding the VCR's effect on studio sales of movies on videocassette. The court discounted the
26   harm based on a finding that consumers were unlikely to build a library of recorded shows because it "will be very expensive" to do so (each Betamax tape cost $20)
      and few Betamax owners "will have … the income to maintain a library." 480 F.
27   Supp. 429, 467 (C.D. Cal. 1979). These constraints obviously are not present when PTAT automatically creates a VOD library by copying a hundred shows a week at
28   no additional cost to the user.

14

1  revenues is a proper subject for consideration in assessing the fourth factor").[20]

2  Furthermore, to the extent Dish subscribers follow Dish's encouragement to

3  use PTAT and AutoHop together, the copies are *not* being made solely for the

4  purpose of time-shifting.  Instead, they are made for the purpose of watching

5  programs *without commercials* – a qualitatively different purpose that was not

6  present to any significant degree in *Sony*, and which threatens to seriously harm the

7  market for broadcast television advertising.  In discounting the potential harm

8  associated with the skipping of commercials by Betamax users, the *Sony* Court

9  explicitly tied its analysis to the "tedious" and cumbersome nature of the extant

10  1980s technology:

11  It must be remembered, however, that to omit commercials, Betamax
   owners must view the program, including the commercials, while
12  recording.  To avoid commercials during playback, *the viewer must
   fast-forward and, for the most part, guess as to when the commercial
13  has passed.*  For most recordings, either practice may be too tedious.

14  464 U.S. at 453 n.36 (emphasis added).

15  Here, by contrast, Dish subscribers who use PTAT with AutoHop do not

16  need to fast-forward at all, and AutoHop automatically eliminates entire

17  commercial breaks without any guesswork.  AutoHop is designed and marketed so

18  that 100% of AutoHop users see no commercials.  This is qualitatively different

19  from the blind fast-forwarding Betamax users experienced in the late 1970s and

20  early 1980s, a difference that necessarily alters the fair use calculus.  *E.g.*, *In re*

21  *Aimster Copyright Litig.*, 334 F.3d 643, 647 (7th Cir. 2003) (Posner, J.) (copying

22  _____

23  [20] Dish's claim that Fox is trying to "preempt" a "transformative market" (Opp.
   19-20) is untenable.  Dish's authorities refer to theoretical situations where a
24  plaintiff attempts to develop or license a market for inherently transformative uses
   like parody, news reporting or criticism.  *Castle Rock Entm't v. Carol Pub. Group*,
25  150 F.3d 132 (2d Cir. 1998), cited by Dish, recognized that "secondary users may
   not exploit markets that original copyright owners would in general develop or
26  license others to develop, even if those owners had not actually done so."  *Id.* at 146
   n.11.  Here, the market harm relates entirely to natural, legitimate markets for the
27  exploitation of the Fox Programs – all of which *predate* Dish's introduction of
   PTAT and AutoHop.  Indeed, the VOD market has existed at least *since 2002*.  *See*
28  Biard Ex. A.  Even Dish's economist recognizes ███████████████████████

15

1    with commercial-skipping is "unquestionably infringing").[21]

2         Dish boasts about this difference in its public relations and marketing

3    materials, characterizing AutoHop as an unprecedented development – "the Holy

4    Grail of television" (Rapp, Ex. 3 at 80-81) – far beyond the mere incremental

5    improvement in fast-forwarding that Dish attempts to portray in its Opposition.

6    Dish's instruction manual confirms that AutoHop is "not like fast-forwarding"

7    because "[o]nce you have chosen AutoHop for your show, you can put the remote

8    control down; you've enabled AutoHop's patented technology to skip the

9    commercials during your show automatically."  Singer  Ex. D.  Dish further

10   highlights the differences between AutoHop and fast-forwarding in its frequent

11   claims that it has "created commercial-free TV."  *Id.*, Exs. G, H.

12        Finally, Dish's strained argument and "evidence" purporting to show that

13   Fox has not suffered crippling harm to date ignores the relevant standard under the

14   fourth factor.  Market harm is established merely by showing that "some

15   meaningful likelihood of future harm exists."  *Sony*, 464 U.S. at 451.  Fox need

16   only show that "*if the challenged use should become widespread*, it would

17   adversely affect the *potential* market for the copyrighted work."  *E.g.*, *Campbell*,

18   510 U.S. at 587-89 (emphasis added).[22]

19

20

21

22   ───────────────
     [21] Dish fails to offer any meaningful data on how frequently its subscribers
23   actually use AutoHop to skip commercials during PTAT recordings – the only
     situation in which AutoHop functions – let alone how frequently subscribers use
     AutoHop with the primetime Fox Programs. *See infra* at p. 23-24.
24   [22] Dish argues (Opp. at 17) that PTAT copying is "noncommercial" and that Fox
     therefore bears the burden of establishing a threat of market harm.  Dish cannot cite
25   any authority for the proposition that copying an entire slate of television programs
     for the purpose of watching them without advertisements is "noncommercial."
26   Because such copying substitutes for consumption that the user otherwise would
     have to pay for – by paying a fee to Amazon or iTunes or by watching commercials
27   – it in fact is a commercial use. *See Harper & Row Publishers, Inc. v. Nation
     Enters.*, 471 U.S. 539, 561-562 (1985) (exploitation of a copyrighted work "without
28   paying the customary price" is commercial use).

16

1

**B.    Dish Is Liable For Vicarious Infringement.**

2     Aside from its misplaced reliance on the fair use defense, Dish offers no

3   response whatsoever to Fox's vicarious infringement argument (Motion at 16-17),

4   thereby conceding the elements of vicarious liability are satisfied.  Moreover,

5   Dish's self-serving statements that it respects copyrights and did not intend to

6   infringe (Opp. at 24 n.10) are irrelevant to this claim, as the defendant's knowledge

7   or state of mind have no bearing on the question of vicarious liability.  *E.g.,*

8   *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996).

9

**C.    Dish Is Liable For Inducing Copyright Infringement.**

10     Dish's reliance on the Supreme Court's *Grokster* decision, in response to

11   Fox's inducement argument, grossly misreads that ruling.  *Grokster* held that a

12   defendant could be liable for inducing copyright infringement where it intended and

13   encouraged customers to use its services for infringement.  *Metro-Goldwyn-Mayer*

14   *Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005).  That is precisely what

15   Dish has done through its nationwide advertising campaign urging consumers to

16   use PTAT to copy all networks primetime programming every night and watch

17   those programs commercial-free – to "watch shows, not commercials," as its

18   billboards beckon.  The Supreme Court has found such advertisements to be "[t]he

19   classic instance of inducement." *Id.* at 937.

20

**D.    Dish Is Liable For Contributory Infringement.**

21     Dish does not deny that the elements of contributory infringement are

22   satisfied here.  It does not dispute that it "knows or has reason to know" of the

23   unauthorized copying of its subscribers or that it "materially contributes" to that

24   copying by providing essential equipment and services.  *Napster*, 239 F.3d at 1019-

25   20; *Fonovisa*, 76 F.3d at 264.  Dish plainly knows that its customers are using

26   PTAT and AutoHop in the manner Dish designed them to be used.[23]

27   ────────────

28   [black redaction]

17

1      Instead, Dish attempts to invoke the "staple article of commerce doctrine"

2   applied to copyright law in the *Sony* case, by arguing that its distribution of a "dual-

3   use" device is "lawful."  Once again, Dish ignores controlling case law and grossly

4   exaggerates the sweep of this rule.  As an initial matter, the doctrine could

5   potentially apply *only* to Fox's claim for contributory infringement.  It provides no

6   defense whatsoever to claims for inducement or vicarious infringement.  *See*

7   *Grokster*, 545 U.S. at 934 (inducement liability not affected by *Sony* doctrine);

8   *Napster*, 239 F.3d at 1022 (*Sony* doctrine does not apply to vicarious infringement

9   claim); *Lime Group*, 784 F. Supp. 2d at 435 (same).[24]

10      Furthermore, Dish's PTAT service is not shielded even from contributory

11   infringement liability by the *Sony* "staple article" doctrine for two independent

12   reasons.  ***First***, the doctrine does not apply where, as here, the challenged conduct

13   is not the sale of a physical product but rather the defendant's provision of a *service*

14   (*i.e.*, PTAT) as part of an ongoing relationship with its customers.  *See Capitol*

15   *Records v. MP3Tunes*, 821 F. Supp. 2d 627, 649 (S.D.N.Y. 2011); *Usenet*, 633 F.

16   Supp. 2d at 155.  In *Sony* the Court emphasized that Sony's *only* contact with VCR

17   users "occurred at the moment of sale."  464 U.S. at 438.  ***Second***, the doctrine does

18   not apply where, as here, the defendant exercises control over the copying process.

19   *See A&M Records v. Abdallah*, 948 F. Supp. 1449, 1457 (C.D. Cal. 1996); *RCA*

20   *Records v. All-Fast Sys., Inc.*, 594 F. Supp. 335, 339 (S.D.N.Y. 1984).

21      Thus, Dish's assertion (Opp. 23) that Fox must demonstrate a "lack of

22   substantial noninfringing uses" is exactly backwards:  because the staple article of

23   commerce doctrine does not apply, contributory infringement may be established

24   based on *any* infringing uses by Dish's subscribers.

25

26   [24] Even if the doctrine applied, the question would be whether PTAT and AutoHop
     have significant noninfringing uses, not whether the Hopper DVR overall may have
27   noninfringing uses.  *See Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 263-64
     (5th Cir. 1988) (analyzing particular feature of computer program in applying *Sony*
28   "substantial noninfringing use" test).

18

D. Singer Decl Ex 17
Page 272

## VI.   <u>Dish Fails To Rebut The Likelihood of Irreparable Harm</u>

### A.   **Fox Has Shown Likely Harm To Its Ad-Supported Business.**

The threat to Fox's broadcast television business is simple: because PTAT with AutoHop completely eliminates commercials upon playback – unlike any prior form of fast-forwarding – the value of Fox's commercial air time is diminished, threatening the main source of financing for the Fox Programs. Indeed, less than two weeks ago, the Second Circuit analyzed a near-identical threat in *WPIX* where the defendant, without authorization, streamed the broadcasters' copyrighted programming over the Internet to paying subscribers. *WPIX, Inc. v. ivi, Inc.*, -- F.3d --, 2012 WL 3645304, *1 (2nd Cir. Aug. 27, 2012). This resulted in local viewers watching television broadcasts from other cities, causing local ads to be seen by the wrong audiences. *Id.* at *9. Finding a threat of irreparable harm, the court held that "[b]roadcast television stations and networks earn most of their revenues from advertising" and when ads are not seen by the intended audience, this would "weaken plaintiffs' negotiating position with advertisers and reduce the value of [plaintiffs'] local advertisements." *Id. at* *9. These threats "would be difficult to measure and monetary damages would be insufficient to remedy the harms," further supporting the need for a preliminary injunction. *Id.* at *10 (also, recognizing that "because the harms affect the operation and stability of the entire industry, monetary damages could not adequately remedy plaintiffs' injuries").

Here, the harm faced by Fox is far more pronounced than in *WPIX* because the commercials are not being viewed by the wrong audience, they are being *eliminated altogether*. To prove this, Fox submitted the following unrebutted evidence: **First**, Dish's own Chairman, Charlie Ergen, admitted that AutoHop was "not necessarily good for the broadcaster" or the broadcast television "ecosystem." Singer, Ex. I at 235. **Second**, Fox executives with decades of experience in the broadcast television business have explained that Dish's unauthorized, commercial-free VOD service will reduce the value of Fox's product (*i.e.*, commercial

19

1    advertising on the Fox Network) in the eyes of advertisers and threaten Fox's

2    primary source of financing for primetime programs.  Haslingden ¶¶ 7-9, 17-22;

3    Brennan ¶¶ 34-35.[25]  *Third*, the Association of National Advertisers – which

4    represents "400 companies and 10,000 brands that collectively spend over $250

5    billion in marketing and advertising" – confirms that "[i]f Dish's AutoHop service

6    is not stopped, it will impact advertisers' buying decisions and negotiating positions

7    during the next year" and will impact what advertisers are willing to pay for air

8    time on broadcast television networks.  Liodice ¶¶ 7-8.  *Fourth*, Journal

9    Communications, an independent owner of 13 broadcast television stations in eight

10   states, agrees that PTAT and AutoHop "pose a serious threat to Journal's broadcast

11   television stations and the entire ad-supported business model of broadcast

12   television."  Smith ¶ 6.  *Fifth*, Starcom, one of the largest advertising agencies, has

13   publicly blasted Dish's AutoHop service, saying that Dish is "trashing the ad

14   model."  Haslingden ¶ 19.  *Sixth*, Moody's – a "Big Three" credit rating agency –

15   warned that if AutoHop is widely adopted, it "will have broad negative credit

16   implications across the entire television industry," could destabilize the entire

17   television eco-system," and would result in "serious disruptions and negative credit

18   implications for all stakeholders."  *Id.*, Ex. D at 17.

19           **B.      Fox Has Shown Likely Harm To Its Non-Broadcast Businesses.**

20           In addition to threatening the ad-supported business model of broadcast

21   television, Dish's unauthorized, commercial-free VOD service also threatens to

22   disrupt and harm Fox's non-linear (*i.e.*, non-television) distribution of its primetime

23   programs.

24

25

26

27   ───────────────
     [25] AutoHop also harms Fox because it eliminates Fox's own advertisements that
28   are used to promote and inform consumers about new programs.  Biard ¶ 42.

D. Singer Decl Ex 17
Page 274

1  ███████████████████████████████. At the same time, Dish's Vice

2  President of Product Management, Vivek Khemka – the person in charge of

3  marketing PTAT and AutoHop – publicly confirmed that Dish's services compete

4  directly with Fox's existing digital distribution business when he said: "*I don't

5  think you'd ever need Hulu Plus or Hulu after this.*" Notice of Lodging (Hopper

6  Demo Video at 5 min. 10 sec.). Khemka does not deny this admission.

7       Dish's unauthorized distribution of commercial-free Fox Programs will

8  disrupt Fox's business relations and negotiations with legitimate digital licensees

9  (*e.g.*, Apple, Amazon) who typically pay for the right to distribute commercial-free

10  Fox Programs. Biard ¶ 41. Fox's VOD licensing business is also threatened. If

11  Dish is allowed to continue with its *unauthorized*, commercial-free VOD service,

12  other cable and satellite television providers will perceive Fox's *authorized* VOD

13  license as less valuable or adopt their own competing services, hurting Fox's

14  negotiation leverage. *Id.* Biard ¶¶ 39-40; Haslingden ¶¶ 14-15; Brennan ¶ 26.

15  None of this evidence has been rebutted.

16       Like the defendant in *WPIX*, Dish's unauthorized exploitation of the Fox

17  Programs "dilute[s]" Fox's "control over [its] product," and encourages competitors

18  to "follow" Dish's lead. *Id.* at *10. As a result, "[t]he strength of plaintiffs'

19  negotiating platform and business model would decline." *Id.* Absent an injunction,

20  this would "drastically change" and "destabilize" the entire industry. *Id.*; *see also*

21  *Warner Bros. Entm't v. WTV Systems*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011)

22  (irreparable harm where unauthorized DVD "rental" business that streamed movies

23  over the Internet interfered with plaintiffs' ability to negotiate VOD licenses).

24       **C.   Fox Is Not Required To Prove An Actual Damages Case.**

25       Contrary to what Dish claims, Fox is *not* required to prove that it already has

26  suffered "actual injury" in the form of measurable harm. *Diamontiney v. Borg*, 918

27  F.2d 793, 795 (9th Cir. 1990). "Requiring a showing of actual injury would defeat

28  the purpose of the preliminary injunction, which is to prevent an injury from

21

1    occurring." *Id.* at 795. "[T]he injury need not have been inflicted when application

2    is made or be certain to occur; a strong threat of irreparable injury before trial is an

3    adequate basis." *Id.* (citation omitted). Nor is Fox required to "precisely" prove a

4    damages case at this stage. Opp. 30; *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423

5    (9th Cir. 1991) (difficulty in quantifying injuries does not make them speculative).

6    As the district court in *WPIX, Inc. v. ivi, Inc.* found "obvious," the absence of

7    quantifiable injuries is precisely what makes them irreparable. 765 F. Supp. 2d

8    594, 620 (S.D.N.Y. 2011).

9            **D.    Dish's Experts Confuse And Conceal The Clear Threat Of Harm.**

10           In response to Fox's straightforward evidence, Dish submits more than 142

11   eye-glazing paragraphs of expert *ipse dixit* and 168 pages of exhibits from

12   economist Richard Rapp and marketing professor John Hauser, neither of whom

13   has ever worked a day in the television business. It is telling that Dish resorts to

14   hundreds of pages replete with a modern history of television, an unqualified

15   analysis of copyright law, stock market event studies, figures, pie charts, graphs,

16   and algebraic equations to supposedly demonstrate that *eliminating* commercials

17   results in *more* commercials being viewed, even though Dish, Fox, and other

18   executives who actually work in the business (not to mention common sense), say

19   the opposite is true.

20           Most of Dish's expert materials have nothing to do with this lawsuit. Rapp

21   spends many pages discussing general economics, the history of television and

22   DVRs, his irrelevant opinion that networks have stalled technology in America, and

23   his non-lawyer analysis of copyright cases. Rapp ¶¶ 37-58. He wastes time trying

24   to rebut claims of "actual" harm to network revenues, stock price, and credit ratings

25   that Fox never asserted (*id.* ¶¶ 19-2, 30-35) and needlessly tries to reconstruct Fox's

26   revenues and expenses from public sources, even though Fox provided the *actual*

27   data in this case and it is undisputed that the sale of commercial advertising

28   accounts for "90 percent of Fox's revenues" (*id.* ¶¶ 59-64; Haslingden ¶ 7). Rapp

D. Singer Decl Ex 17
Page 276

1    goes on and on about DVR usage trends (not at issue), the effectiveness of

2    television advertising (not at issue), and commercial-watching behavior over the

3    past three decades (not at issue), all of which culminates with the ridiculous

4    proposition that Dish's heavily-promoted, commercial-skipping service somehow

5    causes people to watch *more* commercials.  Rapp ¶¶ 65-85.[26]

6          Similarly, after spending most of his time opining on traditional DVR usage

7    and fast-forward technologies *not* at issue, Hauser concludes that AutoHop – which

8    Dish CEO Joe Clayton refers to as "the Holy Grail of television" –

9    ███████████████████████████████████████████████████████████

10   ██████.  Hauser further opines that Fox's legitimate VOD and digital distribution

11   businesses are not threatened because ██████████████████████████████████

12   ████████████████████████████████████

13         Dish's experts are detached from reality.  Dish would not have spent

14   and "███████████████████" developing and marketing PTAT and AutoHop if

15   Dish did not expect them to be used by its subscribers.  Khemka ¶ 11; ██████████

16   ████████.  Nor would Dish be crowning itself as the creator of "commercial-free

17   TV," plastering billboards that shout "WATCH SHOWS NOT COMMERCIALS,"

18   and complaining (falsely) that an injunction against those services would cause

19   "massive" disruptions if the new services were duds.  Singer ¶¶ 37, 42; Opp. 34.

20         Rapp concludes that AutoHop is not a threat to Fox's ad-supported business

21   because it is ████████████████████████████████████████████████

22   ██████████████.[27]  However, his entire premise ████████████████████

23

24   [26] Rapp's analysis is particularly absurd because he fails to compare a world with
     AutoHop to a world where Dish subscribers use a VOD service that disables fast-
25   forwarding through commercials.  All things being equal, it does not take an
     economist to understand that subscribers who watch VOD *with* commercials are
26   going to see more commercials than those who watch VOD *without* commercials.
     [27] Rapp's supporting materials tell another story.  *See, e.g.,* Rapp, Ex. 3 at 81
27   (*Wall Street Journal* 5/11/2012) ("The notion that viewers [with AutoHop] won't
     see even a whirr of fast-forwarded ads threatens billions of dollars in broadcast
28   television advertising").

D. Singer Decl Ex 17
Page 277

1  ██████████████████████████████████████████ is meaningless.

2  Taking AutoHop usage as a percentage of *all* recorded programs is misleading and

3  irrelevant because "all recorded programs" include all sorts of non-primetime and

4  non-broadcast recordings for which AutoHop is not available.  (Dish – for now –

5  only offers the commercial-free service with select primetime programs on Fox,

6  ABC, NBC, and CBS.)  Dish is silent about the more informative (and no doubt

7  larger) percentage of people using AutoHop when AutoHop is actually available.[28]

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  █████████████████████████████  And, finally, given that DirecTV –

11  with 20 million subscribers –also plans to launch a competing commercial-free TV

12  service depending on what happens here, many millions of subscribers will soon

13  have access to these infringing services if Dish is not enjoined.  Haslingden ¶ 15.

14         In any event, to the extent PTAT and AutoHop are not yet widespread, that is

15  grounds for *granting* the preliminary injunction, not denying it because the whole

16  point of a preliminary injunction is to prevent the harm before it occurs.  In *WPIX*,

17  the defendant made the same argument as Dish, claiming "ivi is far too small" to

18  destroy the value of broadcast television content.  *WPIX*, 765 F. Supp. 2d at 619.

19  The court rejected this "faulty" argument, holding that being "small" does not allow

20  a plaintiff to "steal plaintiffs' programming for personal gain until a resolution of

21  this case on the merits.  Such a result leads to an unacceptable slippery slope."  *Id.*[29]

22  ────────────────────

23  [28] In addition, this conclusion is based only on data from a subset of subscribers who connect their Hopper to the Internet, ████████████████████████████████

24  ████████████████████████████████████████████████████████████████.

25  [29] Dish claims Fox's damages are calculable because it licenses to third parties the rights Dish now exploits without permission.  Opp. 29.  Dish is wrong for

26  numerous reasons.  *First*, Fox does not have a so-called "licensing program" that allows for commercial-free VOD by cable and satellite distributors.  Brennan ¶ 14.

27  *Second*, in the two cases cited by Dish (Opp. 29), the copyright owner demonstrated a willingness to grant the license to defendant, which never happened

28  here.  *Third*, as explained in *WPIX*, "[d]efendants cannot seriously argue that the existence of thousands of companies who legitimately use plaintiffs' programming

24

### E. Fox Did Not Unreasonably Delay.

Dish concedes Fox timely sued over AutoHop, which was introduced for the first time on May 10, 2012, a mere two weeks before Fox filed this lawsuit. Singer, Ex. H at 232. Dish claims unreasonable delay only with respect to PTAT – which hit the market two months earlier than AutoHop. *Id.*, Ex. E at 199. On a preliminary injunction, courts are "loath to withhold relief solely on [the] ground" of unreasonable delay. *Gilder*, 936 F.2d at 423. Importantly, the clock does not start ticking when a plaintiff "learns" of possible copyright infringement where the plaintiff cannot assess whether defendant's use is a fair use until the work is publicly released. *Elvis Presley Enters.*, 349 F. 3d at 626. Dish announced PTAT in January 2012, but only released it on March 15, 2012. Singer, Ex. E at 199. This action was filed two and a half months later.[30]

### VII.  Dish Faces No Cognizable Harm From A Preliminary Injunction

Dish's "product recall" analogy and its claim that a "massive campaign" and "numerous attendant steps" are required to turn off PTAT and AutoHop are false. Dish already testified ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Finally, Dish's complaint about the difficulty of notifying PTAT and AutoHop users not only contradicts Dish's argument that no one is using them, it could easily be solved with a bill-stuffer, letter or email, or on-screen message, to all affected customers.[31]

---

and pay full freight means that ivi's illegal and uncompensated use does not irreparably harm plaintiffs." 765 F. Supp. 2d at 619.

[30] Even if Dish had begun offering PrimeTime Anytime in January 2012, Fox filed its complaint only four and a half months later. That hardly constitutes an unreasonable delay. *See Gilder*, 936 F.2d at 423 (7 months not unreasonable).

[31] All past iterations of PTAT and AutoHop should also be enjoined. ████████ ██████████████████████ A defendant's mere claim it has changed its conduct does not "moot" a preliminary injunction request. *See LGS*, 434 F.3d at 1553-54.

D. Singer Decl Ex 17
Page 279

1

Dated:   September 7, 2012       JENNER & BLOCK LLP

2

By: _____ /s/ _____

3

Richard L. Stone

4

Attorneys for Plaintiffs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

# Exhibit 18
# Video File
# Lodged Concurrently

# Exhibit 19

Case 2:12-cv-04529-DMG-SH   Document 41-8   Filed 06/22/12   Page ID #:1248

DISH   MyDISH   DISH ONLINE   DISH REMOTE ACCESS   BLOCKBUSTER @HOME™                ORDER NOW: 1-800-823-4929        **CURRENT CUSTOMER**

WHY DISH          ENTERTAINMENT          TECHNOLOGY          SUPPORT          SEARCH

About us

**Corporate Info**
Company Overview
Philosophy
Milestones
Innovation
**Culture**
At a Glance
Press Center
News from DISH
DISH in the News
Management Team
Awards
Photo & Video Library
Products & Technology
Product Information
Investor Relations
Jobs @ DISH

## DISH Introduces Commercial-Free TV With "Auto Hop"

**Exclusive User-Enabled Feature Allows Viewers to Automatically Skip All Commercials on Favorite Primetime TV Shows**

ENGLEWOOD, CO--(Marketwire - May 10, 2012) - DISH (NASDAQ: DISH) satellite subscribers will now get the feature viewers have been waiting for since the beginning of television -- the choice to automatically skip over commercials. The new "Auto Hop" capability for the Hopper whole-home HD DVR system is being activated today, and it allows customers to skip all commercials for most recorded primetime HD programs shown on ABC, CBS, FOX and NBC when viewed the day after airing.

"Viewers love to skip commercials," said Vivek Khemka, vice president of DISH Product Management. "With the Auto Hop capability of the Hopper, watching your favorite shows commercial-free is easier than ever before. It's a revolutionary development that no other company offers and it's something that sets Hopper above the competition."

DISH is the nation's third-largest pay-TV provider, delivering TV service to millions of families nationwide. DISH launched the Hopper whole-home HD DVR system in mid-March, giving viewers the ability to record up to six shows at once while playing back HD content in up to four rooms.

"Auto Hop" is an extension of the Hopper's PrimeTime Anytime™ capability, the exclusive feature that allows viewers, with one click, to record all of the primetime TV programming on ABC, CBS, FOX and NBC in HD -- the networks that deliver some of the most popular shows during primetime.

The Hopper automatically stores these shows for eight days after they have aired, creating an on-demand library of approximately 100 hours of primetime TV shows, and making it easy to access episodes from last night, or last week.

"The magic of PrimeTime Anytime is that it allows DISH subscribers to catch up on all primetime shows, including episodes recorded over the past week and recommended by friends, family, and co-workers after they've already been broadcast," said Khemka. "With Hopper, you have access to all primetime HD programs broadcast by the four major networks. Now you can watch many of those shows commercial-free, with Auto Hop."

Auto Hop, using patented technology, works with most shows recorded using PrimeTime Anytime (patent pending). A viewer can watch a show with the Auto Hop option commercial-free starting at 1 a.m. ET, after a show has been recorded to the Hopper's PrimeTime Anytime library. Prior to that, The Hoppur's 30-second "hop forward" feature continues to work for same-day viewing.

Auto Hop does not work on live broadcasts.

Lauded by reviewers as the best whole-home DVR for its intuitive user interface, never-before-seen features and reasonable pricing, the Hopper whole-home HD DVR system makes it easy to enjoy HD programs in multiple rooms. *PCMagazine* named the Hopper an "Editor's Choice" among DVR products and calls the award-winning and innovative Hopper "one of the best DVRs we've ever seen."

*ENGADGET* has similar praise for the Hopper and the PrimeTime Anytime feature "because it allows us to discover shows anytime after they first aired, so if you learn of a great new show while wasting time at the water cooler, it isn't too late to go home and watch it or choose to save it for a later viewing. It's a step towards a future where we can watch whatever we want without having to plan in advance or consult a list to make sure our shows will be recorded. What else can we say? It just works."

For more information about the award-winning Hopper and Joey by DISH, including technical specifications, please visit www.dish.com/hopper.

Hopper and Joey images are available at http://press.dishnetwork.com/Press-Center/Photo-Library.

**Contacts**

**Corporate Communications,**
press@dish.com or 720-514-5351
Customer Service,
executivecustomerservice@dish.com
Employment Verification,
voe@dish.com

**Latest News**

June 01, 2012
DISH Submits Reply Comments to FCC on Wireless Rules

May 25, 2012
DISH First to File in Wave of Lawsuits Over Consumer-Friendly Commercial-Skipping Feature

May 24, 2012
DISH Sues Networks in Federal Court

Singer Decl Ex H
Page 232

D. Singer Decl Ex 19
Page 281

DISH Network - DISH Introduces Commercial-Free TV With "Auto Hop"    Page 6 of 29    Page 2 of 2

**About DISH Network**

DISH Network Corporation (NASDAQ: DISH), through its subsidiary DISH Network L.L.C., provides more than 14 million satellite TV customers with the highest quality programming and technology with the most choices at the best value, including HD Free for Life. Subscribers enjoy the largest high definition line-up with more than 200 national HD channels, the most international channels, and award -winning HD and DVR technology. DISH Network Corporation's subsidiary, Blockbuster L.L.C., delivers family entertainment to millions of customers around the world. DISH Network Corporation is a Fortune 200 company. Visit www.dish.com.

**CORPORATE**

Our Company

Career Opportunities

Press Center

Investor Relations

Legal

**RESOURCES**

Find A Retailer

DishLATINO

Business Owners

DISH Media Sales

**CONNECT**

Send Feedback

Newsletter

Contact Us



© 2012, DISH Network L.L.C. All rights reserved.

Singer Decl Ex H
Page 233

D. Singer Decl Ex 19
Page 282

# Exhibit 20



Source: http://www.dish.com/technology/receivers-dvrs/

Singer Decl Ex A
Page 22

D. Singer Decl Ex 20
Page 283



Source: http://www.dish.com/technology/hopper/#ytplayer

# Exhibit 21
# Filed Under Seal

# Exhibit 22

DISH0005431

Exhibit No.: 89
Deponent: Khemka
Date/RPR: 5-28-14
Hunter + Geist, Inc.

# Exhibit 23
# Filed Under Seal

# Exhibit 24

1
2
3
4
5
6
7
8
9
10

JENNER & BLOCK LLP
Richard L. Stone (Bar No. 110022)
Andrew J. Thomas (Bar No. 159533)
David R. Singer (Bar No. 204699)
Amy M. Gallegos (Bar No. 211379)
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
rstone@jenner.com
dsinger@jenner.com
ajthomas@jenner.com
agallegos@jenner.com
(213) 239-5100

Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| FOX BROADCASTING COMPANY, *et al.*, | Case No.  CV-12-04529 DMG (SHx) |
|---|---|
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST DISH'S NEW 2013 SERVICES** |
| v. | |
| DISH NETWORK L.L.C. *et al.*, | |
| Defendants. | |

Hearing Date:     March 22, 2013
Hearing Time:     2:00 p.m.
Courtroom:        7 (2nd Floor)

**[PUBLICLY REDACTED]**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.    FACTUAL BACKGROUND ............................................... 5

    A.    Fox's License Agreement With Dish Prohibits Internet Retransmission. ............................................... 5

    B.    Dish Is Openly Retransmitting Fox's Signal Over The Internet ......................................................... 5

    C.    The RTC Agreement Bars Dish From Authorizing The Copying Of Fox Programs For Viewing Outside The Home. .............. 8

    D.    With Hopper Transfers, Dish Is Authorizing Its Subscribers To Copy Programs For Use Outside The Home. ................................ 9

III.    FOX IS ENTITLED TO A PRELIMINARY INJUNCTION ........................ 9

    A.    Fox Will Succeed On Its Breach Of Contract Claims ...................... 10

        1.    Dish Is Obviously Breaching The No-Internet Clause ............ 10

        2.    Dish Is Obviously Breaching The No-Copying Clause ........... 11

    B.    Fox Will Succeed On Its Copyright Infringement Claim ................. 12

        1.    Dish Is Infringing The Public Performance Right ................... 12

        2.    Dish Cannot Claim Its Subscribers Are "Doing" The Transmitting ................................................ 13

        3.    Dish Cannot Claim Its Internet Retransmissions Are Private .................................................... 14

        4.    Dish Is Exceeding The Scope Of Its License ......................... 15

        5.    Fox Was Not Obligated To Sue In 2005 In Order To Prevent Dish From Trampling On Its Rights In 2013 ............. 16

    C.    Fox Will Suffer Irreparable Harm Absent An Injunction .................. 17

    D.    The Balance Of Harms Decidedly Favors An Injunction ................. 21

    E.    The Public Interest Favors An Injunction ................................... 21

IV.    CONCLUSION ................................................................ 22

i

D. Singer Decl Ex 24
Page 301

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.C. Aukerman Co. v. R.I. Chaides Constr. Co.,*
 960 F.2d 1020 (Fed. Cir. 1992) ........................................................16

*Alliance for the Wild Rockies v. Cottrell,*
 632 F.3d 1127 (9th Cir. 2011) .........................................................10

*Cadence Design Sys., Inc. v. Avant! Corp.,*
 125 F.3d 824 (9th Cir. 1997) ..........................................................21

*Eldred v. Ashcroft,*
 537 U.S. 186 (2003).......................................................................21

*Fox Television Stations, Inc. v. BarryDriller Content Systems,*
 *PLC,* --- F. Supp. 2d ---, 2012 WL 6784498 (C.D. Cal. 2012) ..................passim

*John Goyak & Assocs. v. Terhune,*
 299 F. App'x 739 (9th Cir. 2008).....................................................10

*Lotus Dev. Corp. v. Borland Int'l, Inc.,*
 831 F. Supp. 202 (D. Mass. 1993).....................................................17

*MDY Indus., LLC v. Blizzard Entm't, Inc.,*
 629 F.3d 928 (9th Cir. 2010) ..........................................................10

*Novell, Inc. v. Unicom Sales, Inc.,*
 2004 WL 1839117 (N.D. Cal. 2004).....................................................16

*On Command Video Corporation v. Columbia Pictures Indus.,*
 777 F. Supp. 787 (N.D. Cal. 1991).....................................................14

*Rent-a-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,*
 944 F.2d 597 (9th Cir. 1991) ..........................................................10

*Sun Microsystems, Inc. v. Microsoft Corp.,*
 188 F.3d 1115 (9th Cir. 1999) .........................................................15

*Triad Sys. Corp. v. Se. Express Co.,*
 64 F.3d 1330 (9th Cir. 1995) ..........................................................21

ii

*Warner Bros. Entm't v. WTV Systems, Inc.*,
   824 F. Supp. 2d 1003 (C.D. Cal. 2011)........................................................passim

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008)..............................................................................................10

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co. Ltd.*,
   339 F.3d 101 (2d Cir. 2003) ...........................................................................10

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012) .....................................................................passim

**STATUTES**

17 U.S.C. § 101 ......................................................................................................12

17 U.S.C. § 106(4) .................................................................................................12

**OTHER AUTHORITIES**

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A] (2012) ................15

iii

## I. Introduction

This motion asks the Court to issue a preliminary injunction enjoining Dish from retransmitting Fox's live broadcast signal over the Internet to its subscribers' PCs and mobile devices via its brand new, second-generation Hopper set-top box. It also asks the Court to issue a preliminary injunction enjoining Dish from offering its Hopper Transfers feature, which allows subscribers to copy recorded programs from their DVRs to iPads, so that they can be viewed "on the go." Both of these services breach Dish's license agreement with Fox, and Dish's Internet retransmission service also independently infringes Fox's copyrights.

As acknowledged in the RTC Agreement, Fox has not conveyed any ownership interest in its programming to Dish. Rather, Dish's license agreement with Fox gives Dish only the limited right to retransmit Fox's live broadcast signal over Dish's satellite television distribution system. It explicitly prohibits Dish from retransmitting or authorizing anyone to retransmit Fox's signal over the Internet. It also explicitly prohibits Dish from authorizing anyone to copy Fox's programming other than for private, *in-home use*. Paying Dish for a satellite television subscription does not buy anyone the right to receive Fox's live broadcast signal over the Internet or to make copies of Fox programs to watch "on the go," because Dish does not have the right to offer these services to its subscribers in the first place. Thus, any attempt by Dish to pitch this motion as an attack on consumers' purported "fair use rights" to watch content they paid for anywhere must fail.

Dish's license agreement with Fox could not be clearer that: ███████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████[1]   Yet

Dish is apparently now emboldened to ignore any terms in its license agreement

---

[1] Declaration of Michael Biard ("Biard Decl.") ¶ 20 and Ex. B.

I

1  that it finds inconvenient.  Just last month, amidst much fanfare at the Consumer

2  Electronics Show ("CES"), Dish unveiled "Dish Anywhere," a revamped mobile

3  access application that, according to Dish, allows subscribers with Dish's second-

4  generation Hopper set-top box to *"watch live and recorded television anywhere on*

5  *Internet-connected tablets, smartphones and PCs at no additional charge."*[2]  Dish's

6  press release admits Dish is retransmitting live broadcast television signals over the

7  Internet.  It states that the new Hopper set-top box uses what Dish refers to as

8  "Sling technology" to *"encod[e] and redirect[] . . . [the] live . . . TV signal from the*

9  *Hopper to Internet-connected . . . tablets and smartphones."*[3]

10      Moreover, the license agreement not only prohibits Dish from retransmitting

11  Fox's signal over the Internet, it *also* prohibits Dish from *"authoriz[ing] . . . the*

12  *. . . retransmission" of Fox's signal."*[4]  So even if, contrary to the facts and

13  controlling law, Dish's subscribers were deemed to be retransmitting Fox's signal

14  to themselves, then Dish is plainly authorizing them to do it.  No matter how one

15  examines this issue, Dish is violating the express terms of its license agreement

16  with Fox.

17      In addition to being a breach of the license agreement, this is also copyright

18  infringement.  Two weeks before Dish announced its new service, another court in

19  this district confirmed in a published decision that retransmitting copyrighted

20  broadcast television over the Internet without permission is copyright infringement,

21  and enjoined another service from doing almost exactly what Dish is doing now.

22  *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, --- F. Supp. 2d ---,

23  2012 WL 6784498 at *2-5 (C.D. Cal. 2012) (Wu, J.).  Retransmitting copyrighted

24  broadcast television over the Internet without permission is copyright infringement

25  because it violates the copyright owner's exclusive right to publicly perform the

26  ――――――――――――――

27  [2] Declaration of David Singer ("Singer Decl.") ¶ 3 and Ex. A.
   [3] *Id.* (emphasis added).

28  [4] Biard Decl. ¶ 16, Ex. A .

2

1    programs, which are copyrighted works. *Id.* The company that provides the

2    service that retransmits live broadcast signals is publicly performing the

3    copyrighted works because it is transmitting the same work (i.e., an episode of a

4    television program such as *Glee* or *Bones*) to members of the public (i.e., people

5    who subscribe to the service). *Id.*

6        As in *BarryDriller*, this case is not about a product consumers are using; it is

7    about an Internet streaming service being provided by Dish to subscribers who pay

8    a monthly fee. The set-top box is just an instrumentality used to provide the

9    service. If a subscriber stops paying monthly subscription fees to Dish, she will no

10    longer be able to watch live television over the Internet on Dish Anywhere

11    regardless of how many Hopper set-top boxes she owns. Any purported right that

12    Dish believes consumers have to "place shift" live broadcast programming does not

13    apply here because Dish is not a consumer. It is not "consumer place-shifting"

14    when Dish retransmits Fox's signal over the Internet, in violation of its license

15    agreement, to get more people to subscribe to Dish Network. It is piracy.

16        This isn't Dish's only recent breach of the license agreement. At the same

17    time it announced its new Internet streaming service, Dish also launched a feature

18    called Hopper Transfers, which allows Dish subscribers to take programs they

19    recorded on their DVRs and copy those programs onto iPads. Once a program is

20    copied to an iPad, the subscriber can watch it on the iPad without being connected

21    to the Internet. Dish advertises Hopper Transfers as a way for subscribers to take

22    copies of programs "on the go" and watch them in places with no Internet

23    connection, such as an airplane.[5] Dish's license agreement with Fox prohibits Dish

24    from authorizing the copying of Fox programs "other than by consumers for private

25    home use."[6] Because the express, advertised purpose of Hopper Transfers is to

26    copy programs for use "on the go," such as on airplanes, which are necessarily uses

27

28

[5] Singer Decl. ¶ 4, Ex. B.
[6] Biard Decl. ¶ 16, Ex. A.

3

Case 2:12-cv-04529-DMG-SH   Document 254-2   Filed 07/07/14   Page 205 of 243   Page ID
#:10232
Case 2:12-cv-04529-DMG-SH   Document 130   Filed 02/21/13   Page 8 of 27   Page ID #:3625

1   *outside the home*, the Hopper Transfers copies are not for "private home use."

2   Thus, Dish is breaching its license agreement by authorizing subscribers to copy the

3   programs for a use that is not a private home use.

4       Dish will argue that subscribers with Dish subscriptions have the "right" to

5   watch "their" programs anywhere.  But Dish does not have an ownership right in

6   the Fox programs, and so obviously it cannot convey any ownership right in the

7   programs to its subscribers.  Moreover, Dish's residential service agreement warns

8   subscribers that "DISH Network provides Services to you solely for viewing, use,

9   and enjoyment *in your private home*."[7]   Fox granted Dish a limited right to

10   retransmit Fox's signal over its satellite system, and Dish grants its subscribers the

11   limited right to watch the programs retransmitted by Dish in their private homes.

12   That is all.  There is no tenable argument that by paying Dish for satellite television

13   service, Dish subscribers somehow acquired the additional right to copy Fox

14   Programs onto iPads in order to view them outside the home.

15       Fox will be irreparably harmed if Dish is not enjoined.   Courts have

16   repeatedly held that streaming live broadcast television over the Internet without

17   authorization – what Dish is doing here – irreparably harms the broadcaster.  For

18   example, in *BarryDriller*, Judge Wu found that the defendants' illegal streaming

19   service would irreparably harm Fox's relationships and negotiations with

20   advertisers, and with licensees who have to compete with the unauthorized

21   streaming service, and would compete with Fox's own Internet distribution

22   channels.  2012 WL 6784498 at *6.  And Hopper Transfers will, among other

23   things, irreparably harm Fox's relationships with authorized digital download

24   services that now must compete with Hopper Transfers.   Fox is entitled to a

25   preliminary injunction.

26

27

----

28   [7] Singer Decl. ¶ 18, Ex. H.

4

## II. Factual Background

### A.   Fox's License Agreement With Dish Prohibits Internet Retransmission.

As the Court is aware, Fox and Dish are parties to a July 1, 2002 license agreement (the "Retransmission Consent" or "RTC" Agreement).  Biard Decl. ¶ 14, Ex. A.  In a 2010 Amendment to the RTC Agreement, Dish unequivocally agreed not to retransmit or distribute Fox's signal over the Internet.  The 2010 Amendment states:



*Id.* ¶ 20, Ex. B (emphasis added) (the "No-Internet Clause").

Dish also unequivocally agreed not to authorize *others* to retransmit Fox's signal.  The RTC Agreement states that Dish "shall not, for pay or otherwise, . . . *authorize* the recording, copying, duplication (other than by consumers for private *home* use) or *retransmission* of any portion any [Fox-owned] Station's Analog Signal without prior written permission."  Biard Decl. ¶¶ 14, 16, Ex. A.

### B.   Dish Is Openly Retransmitting Fox's Signal Over The Internet.

On January 7, 2013 at CES in Las Vegas, Dish announced its new service for streaming live broadcast television over the Internet, which it refers to as the "Dish Anywhere Experience."   The centerpiece of Dish Anywhere is the second generation Hopper set-top box, called "Hopper with Sling."  Singer Decl. ¶ 3, Ex. A.  Dish's January 7, 2013 press release says that subscribers will now be able to "[w]atch live and recorded television anywhere on Internet-connected tablets,

D. Singer Decl Ex 24
Page 308

1    smartphones and PCs at no additional charge using the Hopper's built-in Sling

2    capabilities and the new Dish Anywhere app." *Id.* Ex. A.  According to Dish, the

3    technology works by "encoding and redirecting . . . a live or recorded TV signal

4    from the Hopper to Internet-connected iOS and Android tablets and smartphones."

5    *Id.*  This means Dish is retransmitting Fox's live broadcast signal over the Internet.

6         Television over the Internet or on a mobile device is not new and was not

7    innovated by Dish.  Fox and its licensees offer a wide array of options for people

8    who prefer to watch television programs online or on mobile devices.  Declaration

9    of Sherry Brennan ("Brennan Decl.") ¶ 10. The percentage of people who watch

10   television on PCs or mobile devices has historically been small.  Dish believes that

11   because many people now have smartphones and/or tablets, demand for television

12   "on the go" is on the verge of exploding – and Dish is not going to let its

13   contractual obligations or copyright law prevent it from cashing in.  Rather than

14   even attempt to negotiate a license for additional uses of Fox's programming, Dish

15   has once again decided to misappropriate Fox's programming, use it to compete

16   unfairly against Fox and legitimate licensees, and ask for forgiveness, not

17   permission.

18        In a slew of over-the-top videos promoting Dish Anywhere, Dish executives

19   patted themselves on the back for jumping on this hot new trend.  *E.g.*, Singer Decl.

20   ¶¶ 10-17, Lodged DVD, Videos 1-6.  For example, Dish CEO Joe Clayton opened

21   one video by highlighting these recent changes in the marketplace:

22             The average American family today – husband, wife, two

23             kids – is rapidly moving beyond two or three televisions

24             in the home to a household with TVs, plus four

25             smartphones, four tablets, four PCs.  The consumer is

26             demanding their video content anywhere.

27   *Id.* ¶ 11, Lodged DVD, Video 1.

28

1    In another video, Mr. Clayton emphasized: "the consumer is not making a
2    gradual shift to mobile – it's a full-blown sprint." Singer Decl. ¶ 17, Lodged DVD,
3    Video 6.   In yet another video, Dish's Vice-President of Product Management
4    Vivek Khemka bragged that Dish "s[aw] the trend to mobile and tablets" and
5    "wanted to take that experience from in your home and take it outside your home."
6    *Id.* ¶ 12, Lodged DVD, Video 2.

7        Though Dish had offered streaming devices before (including the standalone
8    Sling Adapter and a discontinued Sling-enabled DVR), they were niche products
9    that Mr. Clayton admitted Dish "really didn't tell a lot of people about." Singer
10   Decl. ¶ 16, Lodged DVD, Video 5.  Now, Mr. Clayton explained, Dish is "trying to
11   commercialize our technology at a much higher level than we've done in the past."
12   *Id.*

13       In video after video, Dish emphasized that its new service was not the same
14   as previous streaming devices.  Instead, according to Dish, the second-generation
15   Hopper is "an amazing new product." Singer Decl. ¶ 13, Lodged DVD, Video 2.
16   Mr. Clayton bragged that "this new Dish Anywhere capability is now much easier
17   to use" than Dish's earlier Sling devices.  *Id.* ¶ 11, Lodged DVD, Video 1.  Mr.
18   Khemka differentiated Dish's new service from other streaming services that
19   require "extra hardware," "separate apps," or are limited to "in-home viewing
20   only." *Id.* ¶ 15, Lodged DVD Video 4.  According to Mr. Khemka, Dish Anywhere
21   is better because it is "one app and very simple." *Id.*

22       Dish also intends to spend millions of dollars on nationwide advertising
23   hyping its new live-television-over-the-Internet offering.   At CES, Dish's Chief
24   Marketing Officer promised to "kick off a massive marketing campaign promoting
25   how the incredible platform continues to redefine the in-home, and the out-of-home
26   entertainment experience." Singer Decl. ¶ 13, Lodged DVD, Video 2.  And in a
27   February 2013 press release announcing "the nationwide consumer availability of
28   its all-new Hopper with Sling," Dish confirmed that consumers "will be introduced

1   to the latest Hopper via a new multimillion-dollar national marketing campaign"

2   including "a series of television, radio, print and digital advertisements"

3   highlighting "the Hopper's new built-in Sling capabilities and the new Dish

4   Anywhere app." *Id.* ¶ 9, Ex. G.

5       **C.**    **The RTC Agreement Bars Dish From Authorizing The Copying**

6             **Of Fox Programs For Viewing Outside The Home.**

7       The RTC Agreement bars Dish from *authorizing* the recording of Fox

8   programs, other than by consumers for private *home* use:

9           EchoStar shall not, for pay or otherwise, record, copy,

10           duplicate and/or *authorize* the recording, copying,

11           duplication (other than by consumers for private *home*

12           use) or retransmission of any portion of any Station's

13           Analog Signal without prior written permission.

14   Biard Decl. ¶¶ 14, 16, Ex. A (the "No-Copying Clause") (emphasis added).

15       Consistent with its agreement with Fox, Dish's Residential Subscriber

16   Agreement makes clear that subscribers do not have the right to copy programs for

17   use outside their homes:

18           <u>Private Home Viewing Only</u>.  DISH Network provides

19           Services to you *solely for viewing, use and enjoyment in*

20           *your private home*.  You agree that no Services provided

21           to you will be viewed in areas open to the public,

22           commercial establishments or other residential locations.

23           Services may not be rebroadcast or performed, and

24           admission may not be charged for listening to or viewing

25           any Services.  *If your Services are viewed in an area open*

26           *to the public, a commercial establishment or another*

27           *residential location, we may disconnect your Services . . .*

28   Singer Decl. Ex. H (emphasis added).

D. Singer Decl Ex 24
Page 311

**D.    With Hopper Transfers, Dish Is Authorizing Its Subscribers To Copy Programs For Use Outside The Home.**

At CES, Dish also announced the launch of Hopper Transfers.  Hopper Transfers is a feature that allows subscribers to copy recordings that are saved on their DVRs to their iPads.  Singer Decl. Ex. B.  Once a new copy of a program is saved locally to the subscriber's iPad, the subscriber can watch it even if she is someplace there is no Internet connection, like an airplane.  In Dish's press release, Mr. Khemka is quoted saying:

> Hopper Transfers completes the TV Everywhere equation by giving DISH customers the ability to *take their recorded television programs and watch them even when no Internet connection is available, such as on a plane* . . . .  For the first time, customers can truly enjoy their DISH service anytime, *anywhere*.

*Id.* (emphasis added).

Likewise, Dish's website advertises that with Hopper Transfers you can "simply transfer your recorded TV programs to your iPad with our free app *before you leave the house* and *you can enjoy your favorite movies or shows on flights or keep your kids entertained during a long road trip*."  *Id.* Ex. C (emphasis added).  A person who has left the house and is watching a copy of a Fox program on an airplane or on a long road trip is, by definition, *not at home*.  Thus, the copy Dish is authorizing that person to make with Hopper Transfers is not limited to "private home use," as the No-Copying Clause requires.

**III. Fox is Entitled To A Preliminary Injunction**

Fox is entitled to a preliminary injunction if it establishes that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555

D. Singer Decl Ex 24
Page 312

1  U.S. 7, 20 (2008).   Alternatively, an injunction should issue if Fox can show

2  "serious questions going to the merits" and a "balance of hardships that tips sharply

3  towards the plaintiff," so long as Fox "also shows that there is a likelihood of

4  irreparable injury and that the injunction is in the public interest." *See Alliance for*

5  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

6     These standards apply to injunction motions based on copyright or breach of

7  contract claims.  *See, e.g., Warner Bros. Entm't v. WTV Sys., Inc.*,  824 F. Supp. 2d

8  1003, 1008 (C.D. Cal. 2011) (copyright); *John Goyak & Assocs. v. Terhune*, 299 F.

9  App'x 739, 740 (9th Cir. 2008) (contract).   There is no blanket rule against

10  enjoining a breach of contract.   To the contrary, a preliminary injunction is an

11  appropriate remedy where, as here, the breach will cause irreparable harm.  *Rent-a-*

12  *Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th

13  Cir. 1991).   Moreover, the contract that Dish is breaching is governed by New York

14  law, which permits injunctive relief for breach-of-contract claims.  *Wisdom Import*

15  *Sales Co., L.L.C. v. Labatt Brewing Co. Ltd.*, 339 F.3d 101, 107-08, 115 (2d Cir.

16  2003).

17     **A.    Fox Will Succeed On Its Breach Of Contract Claims.**

18        **1.    Dish Is Obviously Breaching The No-Internet Clause.**

19     As noted above, the No-Internet Clause bars Dish from ███████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ██████████████████████████████████" Biard Decl. ¶ 20, Ex. B.

23     Dish admits it is retransmitting Fox's signal over the Internet and by means

24  of wireless or cellular technology to cell phones and tablets.  *See* Singer Decl.

25  Ex. A (Dish admitting that its technology works by "encoding and redirecting . . . a

26  live or recorded TV signal from the Hopper to Internet-connected iOS and Android

27  tablets and smartphones.").

28

1   Dish cannot take refuge in the part of the No-Internet Clause stating that

2   ███████████████████████████████████████████████████████████

3   Biard Decl. Ex: B. Dish has no "right" to retransmit Fox's signal over the Internet

4   without authorization from Fox.   *BarryDriller*, 2012 WL 6784498 at *2-5

5   (enjoining service that streamed live broadcast television signals over the Internet

6   without authorization); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278-79 (2d

7   Cir. 2012) (same).   Nor can Dish excuse its infringement by claiming that its

8   subscribers are really the ones doing the retransmitting from their set top boxes.

9   Although wrong as a matter of law, even if that were accepted arguendo, then it just

10  means that Dish is breaching the provision of the license agreement that bars Dish

11  from authorizing others to retransmit Fox's signal. Biard Decl. Ex. A.

12        **2.     Dish Is Obviously Breaching The No-Copying Clause.**

13        The No-Copying Clause bars Dish from *authorizing* subscribers to copy Fox

14  Programs, except for private home use. Biard Decl. Ex. A. Dish is authorizing

15  subscribers to copy Fox programs to their iPads using Hopper Transfers. *See*

16  Singer Decl. Ex. F (explaining how Hopper Transfers copies programs). As noted

17  above, the express, advertised purpose of Hopper Transfers is to allow subscribers

18  to make copies for use *outside the home*. Accordingly, Dish is breaching the No-

19  Copying Clause.

20        Dish has suggested in the media that consumers who pay for Dish

21  subscriptions own the programs they receive, and therefore have the right to copy

22  them onto mobile devices to watch outside the home. This is wrong. The license

23  agreement between Fox and Dish makes clear that Dish does not have any

24  ownership right in the programming.   Biard Decl. ¶ 15, Ex. A ███████

25  ███████████████████████████████████████████████████████████

26  ███████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████   (emphasis

28  added).   Therefore, legally, Dish cannot convey any ownership right to its

11

1   subscribers. And Dish's Residential Customer Agreement, which warns subscribers

2   that Dish's satellite service provides programming *"solely for viewing, use and*

3   *enjoyment in your private home,"* shows that Dish knows perfectly well that the

4   only thing it can offer its subscribers with respect to Fox's signal is the right to

5   watch Fox programming at home.  *See* Singer Decl. Ex. H (emphasis added).

6   Regardless of what Dish is claiming in the media or saying in its advertisements,

7   paying Dish for a subscription does not buy consumers copies of Fox programs that

8   they can take "on the go" and watch "anywhere."

9        **B.    Fox Will Succeed On Its Copyright Infringement Claim.**

10             **1.    Dish Is Infringing The Public Performance Right.**

11       As a copyright owner, Fox has the exclusive right to perform its copyrighted

12   work publicly.[8]  17 U.S.C. § 106(4).  In the case of an audiovisual work like a

13   television show, to "perform" the work means "to show its images in any sequence

14   or to make the sounds accompanying it audible."  17 U.S.C. § 101.  As is relevant

15   here, to perform a work "publicly" means to "transmit or otherwise communicate a

16   performance of the work . . . to the public, by means of any device or process."  *Id.*

17       A service that retransmits live broadcast television signals to subscribers over

18   the Internet is publicly performing the programs contained in the signal.  *ivi*, 691

19   F.3d at 278; *BarryDriller*, 2012 WL 6784498 at *2-5; *see also WTV Sys.*, 824 F.

20   Supp. 2d at 1008-09 (streaming movies to subscribers over the Internet is a public

21   performance).  In *BarryDriller*, Judge Wu explained why this is.  The Copyright

22   Act protects copyrighted works, such as episodes of copyrighted television

23   programs.  *BarryDriller*, 2012 WL 6784498 at *4.  When a broadcast signal is

24   retransmitted over the Internet so that the programs contained in that signal can be

25   viewed by members of the public, this is a public performance.  *Id.*; *see also WTV*

26   *Sys.*, 824 F. Supp. 2d at 1010.  Thus, if a service streams live broadcast

27   _____

   [8] Fox owns valid copyrights in the programs at issue.  *See* Brennan Decl. ¶¶ 2-3,

28   Ex. A.

1    programming over the Internet into homes or to mobile devices without permission

2    from the company that owns the copyrights to the programs, the service is

3    infringing the copyright owner's exclusive right to perform its works publicly.

4    *E.g.*, *ivi*, 691 F.3d at 278-79; *BarryDriller*, 2012 WL 6784498 at *2; *see also WTV*

5    *Sys.*, 824 F. Supp. 2d at 1009.

6         Because Dish is undisputedly retransmitting Fox's live broadcast signal over

7    the Internet without Fox's permission, it is committing copyright infringement. *See*

8    Singer Decl. Ex. A (Dish admitting it is offering live broadcast programming over

9    the Internet); *BarryDriller*, 2012 WL 6784498 at *2-4 (holding that retransmitting

10    live broadcast programming over the Internet without permission is copyright

11    infringement, and enjoining the defendant's Internet television service).

12        **2.**     **Dish Cannot Claim Its Subscribers Are "Doing" The**

13              **Transmitting.**

14         Dish will argue that, under *Cartoon Network LP, LLLP v. CSC Holdings,*

15    *Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), it cannot be a direct infringer

16    because its subscribers are actually the ones who "do" the retransmitting when they

17    log onto Dish Anywhere and select programs to view live.   Dish will claim that

18    under *Cablevision*'s "volitional conduct" rule, the subscriber who presses the

19    button to watch a Fox program live over the Internet is the one who is

20    retransmitting Fox's broadcast signal.  This argument fails.

21         It is well-settled in this circuit that when the issue is the public performance

22    right, it does not matter who presses the button.   Multiple courts have held that

23    when a service delivers video content over a wire (such as the Internet) that

24    consumers can access by turning on a device (such as a computer) and selecting

25    something to watch, the service – not the consumer – is doing the transmitting.  Just

26    because a consumer must press a button to turn on the device and/or select

27    something to watch does not mean that she is transmitting the program to herself.

28    *See WTV Sys.*, 824 F. Supp. 2d at 1009-1010 (service that streamed movies over the

1  Internet to subscribers' computers was transmitting the movies, and the fact that its

2  customers "initiate the transmission by turning on their computers and choosing

3  which of plaintiffs' [c]opyrighted [w]orks they want to watch is immaterial");

4  *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 789-90

5  (N.D. Cal. 1991) (system that transmitted movies from a central VCR to hotel room

6  televisions was transmitting the movies, and "the fact that hotel guests initiate this

7  transmission by turning on the television and choosing a video is immaterial"); *see*

8  *also BarryDriller*, 2012 WL 6784498 at *1-2 (where defendants retransmitted

9  broadcast programming via miniature antennas individually assigned to subscribers,

10  court gave no credence to defendants' characterization of the system as merely

11  offering "user-directed private viewing[s]").  The Court should reject out of hand

12  any attempt by Dish to claim that it cannot be directly liable for violating Fox's

13  exclusive public performance rights because its subscribers are allegedly doing the

14  transmitting.[9]

15     **3.     Dish Cannot Claim Its Internet Retransmissions Are "Private."**

16     Dish will also argue that it is not publicly performing the Fox programs

17  because its Internet retransmissions must be viewed as separate, private streams

18  from each user's set-top box to her computer or mobile device.   This is the

19  argument Judge Wu rejected in *BarryDriller*.

20     In *BarryDriller*, the defendants, like Dish here, offered a service that allowed

21  customers to watch live broadcast television over the Internet.  2012 WL 674498 at

22  *1-3.  The *BarryDriller* defendants argued that there was no public performance

23  because each customer watching television over the Internet was receiving a signal

24  streamed from her personal miniature antenna-and-DVR setup.  *Id.*  The only

25  difference between this case and *BarryDriller* is that the *BarryDriller* defendants

---

26

27  [9]  In any event, as discussed above, authorizing others to retransmit Fox's

28  programming over the Internet would still constitute a breach of the license
   agreement.

14

1   used personal antennas, and Dish is using set-top boxes it leases to its subscribers.

2   In a carefully-reasoned published opinion, Judge Wu analyzed the language and

3   history of the Copyright Act and concluded that it did not matter how many

4   separate transmissions were involved or whether the transmissions came from

5   separate sources – if the service is transmitting a single copyrighted work (i.e., a

6   television program) to members of the public, then it is publicly performing that

7   work. *Id.* at *4.

8       Importantly, Judge Wu's analysis comports with the plain language of the

9   Copyright Act, which states that to perform a work publicly is to "transmit or

10   otherwise communicate a performance of the work . . . to the public, *by means of*

11   *any device or process.*"  17 U.S.C. § 101 (emphasis added).  Here, Dish is offering

12   a service where, for a monthly subscription fee, subscribers receive broadcast

13   television signals over the Internet.  The "device or process" Dish uses to transmit

14   those signals consists of Dish-provided set-top boxes that encode the television

15   signals and send them over the Internet.  By means of this "device or process," Dish

16   is transmitting copyrighted Fox programs to its subscribers, who are members of

17   the public.  And, as Judge Wu explained, "[t]he statute provides that the right to

18   transmit is exclusive 'whether the members of the public capable of receiving the

19   performance or display receive it in the same place or in separate places and at the

20   same time or at different times.'" *Id.* at *4 (quoting 17 U.S.C. § 101).  Accordingly,

21   Dish is publicly performing the programs.

22       **4.   Dish Is Exceeding The Scope Of Its License.**

23       Because Dish's license agreement prohibits Internet retransmission, and

24   prohibits Dish from authorizing others to retransmit Fox's signal, Dish is infringing

25   Fox's copyrights by exceeding the scope of its license.  *Sun Microsystems, Inc. v.*

26   *Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) ("[i]f . . . a license is limited

27   in scope and the licensee acts outside the scope, the licensor can bring an action for

28   copyright infringement"); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*

15

1 § 10.15[A] (2012) (same); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928,

2 939-41 (9th Cir. 2010) (breach of contractual conditions that limit scope of license

3 is copyright infringement).

### 5. Fox Was Not Obligated To Sue In 2005 In Order To Prevent Dish From Trampling On Its Rights In 2013.

6      Finally, Dish previously has suggested that Fox is not entitled to enforce its

7 right to prevent Dish from streaming Fox programs because "Sling technology" has

8 existed since 2005. *See* Dkt. 71, p. 7 n.4 (Dish Opp. to Fox's Motion for a

9 Preliminary Injunction). But until Dish unveiled Dish Anywhere last month, and

10 announced a national, multimillion-dollar marketing blitz directed at putting its new

11 Sling-enabled Hopper in millions of homes, Sling was a niche product that Dish

12 admits it barely marketed. *See, e.g.*, Singer Decl. ¶ 16, Lodged DVD, Video 5 (Mr.

13 Clayton, Dish's CEO, publicly conceding that Dish "really didn't tell a lot of

14 people" about Sling, and explaining that, with Dish Anywhere, "we're trying to

15 commercialize our technology at a much higher level than we've done in the past").

16 As of late 2012, less than ███ of Dish subscribers were using Dish's earlier (now

17 apparently discontinued) version of a Sling-enabled DVR. *Id.* ¶ 21, Ex. K.

18      The fact that Fox did not race to court to stop a product that was not in

19 widespread use, was not catching on, and was not being aggressively marketed does

20 not mean that Fox now must sit helpless as Dish blankets the country with ads for

21 its new and improved unauthorized Internet streaming service. *See, e.g., A.C.*

22 *Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992)

23 (patent owner who initially opted not to sue infringer because infringer was a small

24 business with limited resources was not barred from suing later when the infringer

25 because successful due to its continued infringement); *Novell, Inc. v. Unicom Sales,*

26 *Inc.*, No. 03-2785, 2004 WL 1839117, *5-6 (N.D. Cal. Aug. 17, 2004) (finding it

27 reasonable for the plaintiff "to defer bringing a lawsuit against Unicom until it

28 learned that the infringement was of a scope sufficient to justify the cost of the

D. Singer Decl Ex 24
Page 319

1 litigation"); *Lotus Dev. Corp. v. Borland Int'l., Inc.*, 831 F. Supp. 202 (D. Mass.

2 1993), *rev'd on other grounds*, 49 F.3d 807 (1st Cir. 1995) ("delay to determine

3 whether the scope of proposed infringement will justify the cost of litigation may

4 be permissible.").

5 **B.   Fox Will Suffer Irreparable Harm Absent An Injunction.**

6     In the past two years, at least three separate courts – including two courts in

7 this district and the Second Circuit Court of Appeals – have considered the question

8 of whether a copyright owner is irreparably harmed when a service provider

9 streams its video content over the Internet without authorization.  All three said yes.

10 *See ivi*, 691 F.3d at 285-86 (broadcast networks would be irreparably harmed by

11 unauthorized Internet streaming service); *BarryDriller*, 2012 WL 6784498 at *6

12 (same); *WTV Sys.*, 824 F. Supp. 2d at 1012 (movie studio plaintiffs would be

13 irreparably harmed by unauthorized service that streamed movies over the Internet).

14 This case is no different.

15     In copyright cases, irreparable harm is established where an infringing

16 defendant's activities threaten to impair a copyright owner's control over its

17 copyrighted works, threaten the goodwill and business reputation of the plaintiff, or

18 threaten to cause loss of business or business opportunities.  *See, e.g.*, *ivi*, 691 F.3d

19 at 285-87; *BarryDriller*, 2012 WL 6784498 at *6; *WTV Sys.*, 824 F. Supp. 2d at

20 1012-13.  As further detailed in the accompanying declaration of Sherry Brennan,

21 Dish's unauthorized Internet streaming of the Fox programs threatens to irreparably

22 harm Fox in at least the following ways, all of which have been recognized by

23 multiple courts to constitute irreparable harm.

24     ***First***, Dish's unauthorized streaming service will irreparably harm Fox's

25 relationships with other cable, satellite and telecommunications providers that

26 distribute Fox's signal, since these companies will now have to compete with Dish,

27 which is offering its subscribers an unlicensed streaming service.  *See BarryDriller*,

28 2012 WL 6784498 at *6 (citing Sherry Brennan declaration and holding that Fox's

17

1  ability to negotiate favorable retransmission consent agreements will be irreparably
2  harmed by unauthorized Internet streaming service, because "existing and
3  prospective licensees will demand concessions to make up the loss of
4  viewership."); *ivi*, 691 F.3d at 285 (unauthorized streaming service would
5  irreparably harm broadcasters by devaluing the live programming and thereby
6  "undermining existing and prospective retransmission fees, negotiations and
7  agreements); *see also* Brennan Decl. ¶¶ 21-22.

8      *Second*, Dish's unauthorized streaming service retransmits a large volume of
9  programming that Fox makes available (for next-day and later viewing) on its own
10  websites and through other Internet and mobile television offerings. Brennan Decl.
11  ¶ 10. In addition, Fox and NBC Universal have, as part of a joint venture (with
12  others) called Dyle.tv, launched their own mobile television application which
13  allows viewers to watch live broadcast programming on their mobile devices,
14  including iPads. Brennan Decl. ¶ 23. Fox has invested substantial financial
15  resources, marketing, demographic research, and goodwill into this emerging
16  market, all of which will be harmed by Dish's unauthorized, competing service.
17  *Id.*; *see also BarryDriller*, 2012 WL 6784498 at *6 (citing Sherry Brennan
18  Declaration and holding that Fox will be irreparably harmed by unauthorized
19  streaming service that unfairly competes with Fox's "proprietary internet
20  distribution websites and mobile applications"); *WTV Sys.*, 824 F. Supp. 2d at 1013
21  ("if customers watch the Copyrighted Works through Defendants' service instead
22  of the services of authorized licensees, it significantly decreases the amount of
23  revenue received by Plaintiffs and their licensees").

24      *Third*, Hopper Transfers will cause unique injuries to Fox's relationships and
25  negotiations with companies like Amazon and iTunes that license the right to offer
26  digital downloads of Fox programs, which consumers can view on their mobile
27  devices without an Internet connection. Brennan Decl. ¶ 24. By offering a
28  competing service to its subscribers for free, Dish is devaluing the rights to Fox's

D. Singer Decl Ex 24
Page 321

1    programming, which will negatively impact Fox's future negotiations with potential

2    licensees.  *Id.*; *see also BarryDriller*, 2012 WL 6784498 at *6 (offering an

3    unauthorized service that is directly substitutable for the services offered by Fox's

4    legitimate licensees puts "pressure on those licensing relationships").

5         **Fourth**, as the copyright owner, Fox has "the exclusive right to decide when,

6    where, to whom, and for how much [it] will authorize transmission of [its]

7    copyrighted works to the public." *WTV Sys.*, 824 F. Supp. 2d at 1013.   Fox

8    carefully orchestrates where and when its programs can be viewed, streamed,

9    downloaded and purchased in order to maximize consumer choice, broaden

10   exposure to the Fox Programs, and increase the size of each separate audience.

11   Brennan Decl. ¶¶ 9-11, 25-29.  Broadcast television is not analogous to a piece of

12   technology where a patent owner might license the same rights to all comers for a

13   set price.  The ability of a broadcaster to control the timing and manner in which its

14   programs are distributed is essential to the broadcast television business model,

15   because it is the way in which broadcasters generate multiple revenue streams from

16   their content.  *Id.* ¶¶ 25-29.  This maximizes the broadcaster's potential to recoup

17   the enormous, risky investment needed to produce high-quality television

18   programming. *Id.*; *see also WTV Sys.*, 824 F. Supp. 2d at 1012 (finding irreparable

19   harm because unauthorized streaming service interfered with copyright owner's

20   right to control access to its content by granting licensees exclusive rights for

21   limited time periods, and explaining that unlawful service would harm plaintiffs'

22   relationships with its licensees, goodwill, and "overall ability to control the use and

23   transmission of their Copyrighted Works").

24        **Fifth**, by retransmitting Fox's signal over the Internet and providing a service

25   that copies Fox programs to iPads, Dish is exposing Fox to increased piracy risks

26   (over and above the piracy already being committed by Dish).  Brennan Decl. ¶ 30.

27   Since Dish does not have the right to stream live Fox programming over the

28   Internet or create copies for iPads, Dish's contracts with Fox do not contain any

D. Singer Decl Ex 24
Page 322

1    procedures or standards to protect Fox content from piracy when it is streamed or

2    copied in this fashion.  *Id.*  The increased risk of piracy caused by unauthorized

3    Internet streaming is yet another irreparable harm.  *WTV Sys.*, 824 F. Supp. 2d at

4    1013.

5        ***Sixth***, Dish's unauthorized streaming service will undermine Fox's positions

6    in negotiations with television advertisers by siphoning viewers from traditional

7    distribution channels measured by Nielsen's "C3" ratings metric, which is the

8    measurement relied upon by advertisers in determining what to pay for advertising.

9    *See* Brennan Decl. ¶ 17.  This loss of measured viewers impacts both the value of

10   network advertising, and the willingness of major advertisers to invest in it.  *Id.*

11   ¶¶ 17-18.   Advertising is critical to Plaintiffs' ability to develop and acquire

12   programming.  *Id.* ¶ 19.  Indeed, "[b]roadcast television stations and networks earn

13   most of their revenues from advertising."  *ivi*, 691 F.3d at 285.   Given the

14   significance of advertising to network business models, the harm that unauthorized

15   streaming causes to broadcasters' ability to negotiate with advertisers has been

16   consistently recognized as irreparable.  *Id.*; *BarryDriller*, 2012 WL 6784498 at *6.

17       In *ivi*, the Second Circuit concluded, based on the multiple, irreparable harms

18   outlined above, that unauthorized Internet streaming of network broadcasts "would

19   drastically change the industry, to plaintiffs' detriment."  *ivi*, 691 F.3d at 286.  The

20   Court explained:

21           The absence of a preliminary injunction would encourage

22           current and prospective retransmission rights holders, as

23           well as other Internet services, to follow ivi's lead in

24           retransmitting  plaintiffs'  copyrighted  programming

25           without their consent.   The  strength of plaintiffs'

26           negotiating platform and business model would decline.

27           The quantity and quality of efforts put into creating

28           television programming, retransmission and advertising

D. Singer Decl Ex 24
Page 323

1               revenues, distribution models and schedules – all would

2               be adversely affected.   These harms would extend to

3               other copyright holders of television programming.

4               Continued live retransmission of copyrighted television

5               programming over the Internet without consent would

6               thus threaten to destabilize the entire industry.

7  *Id.*

8      All of this is true here too.  Dish's unauthorized streaming service threatens

9  Fox's intellectual property and its distribution and advertising models with

10  irreparable harm that is not compensable in damages, and it should be enjoined.

11      **D.**    **The Balance Of Harms Decidedly Favors An Injunction.**

12      Any claim by Dish that it will be harmed if it cannot continue retransmitting

13  Fox's live broadcast programming over the Internet should be disregarded.  Dish is

14  not supposed to be offering these services or offering Hopper Transfers in the first

15  place.  Not only that, Dish obviously assumed the risk that it would be enjoined

16  when it chose to launch an unauthorized Internet streaming service, and promote its

17  illegal service with a multimillion-dollar marketing blitz, *while it was already in*

18  *copyright litigation with Fox.*   The balance of harms weighs in favor of an

19  injunction. *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995)

20  (defendant "cannot complain of the harm that will befall it when properly forced to

21  desist from its infringing activities"); *see also Cadence Design Sys., Inc. v. Avant!*

22  *Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) (quoting *Triad Sys. Corp.*, 64 F.3d at

23  1338) ("[w]here the only hardship that the defendant will suffer is lost profits from

24  an activity which has been shown likely to be infringing, such an argument in

25  defense merits little equitable consideration").

26      **E.**    **The Public Interest Favors An Injunction**

27      The Supreme Court has made clear that upholding copyright protection is in

28  the public interest. *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003).  The *ivi*

D. Singer Decl Ex 24
Page 324

1  court recently reaffirmed the strong public interest in protecting a copyright

2  holder's exclusive interests and a "public interest in rewarding and incentivizing

3  creative efforts." 691 F.3d at 287. The "public has a compelling interest in

4  protecting copyright owners' marketable rights . . . and the economic incentive to

5  continue creating television programming" because, without these protections, the

6  "store of knowledge" may be diminished, and "encouraging the production of

7  creative work . . . ultimately serves the public's interest in promoting the

8  accessibility of such works." *Id.*

9        In a holding directly applicable to this case, the *ivi* court concluded that

10  "Plaintiffs are copyright owners of some of the world's most recognized and

11  valuable television programming," concluded plaintiffs' works "provide[] a

12  valuable service to the public, including, *inter alia*, educational, historic and

13  cultural programming, entertainment, an important source of local news critical for

14  an informed electorate, and exposure to the arts," and cautioned that if their works

15  could be copied and streamed over the Internet against their will, their "desire to

16  create original television programming surely would be dampened." *Id.* at 288.

17  Here, as in *ivi* and the other cases cited above where infringement has been

18  enjoined, the public interest strongly favors an injunction and protecting the

19  Plaintiffs' rights in their valuable television programming.

20  **IV.   Conclusion**

21        Fox respectfully requests that the Court grant its request for a preliminary

22  injunction, and enjoin Dish from (i) retransmitting, or authorizing its subscribers

23  to retransmit, Fox's live broadcast signal over the Internet; and (ii) authorizing its

24

25

26

27

28

D. Singer Decl Ex 24
Page 325

1  subscribers to make copies of Fox programs for use outside the home through its

2  Hopper Transfers feature.

3  DATED: February 21, 2013                    JENNER & BLOCK LLP

4

5                                              By:   /s/

6                                                    Richard L. Stone

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 25

http://www.sbgi.net/site_ngr/temp/Dish Release-3_drt2v9js.shtml

# SBG

**SINCLAIR BROADCAST GROUP**

Home  About Us  Our Business  Investor Info  Employment  News Releases  Digital TV  Corp Governance  Contact Us

News Release

News Release

Contact: Barry Faber, EVP & General Counsel, Sinclair

(410) 568-1500

*SINCLAIR BROADCAST GROUP RESPONDS TO DISH STATEMENT REGARDING RETRANSMISSION CONSENT NEGOTIATIONS*

BALTIMORE (August 14, 2012) -- Sinclair Broadcast Group, Inc. (Nasdaq: SBGI), the "Company" or "Sinclair," announced yesterday that its retransmission consent agreement with Dish Network, pursuant to which Dish carries 70 stations Sinclair owns or provides services to, is scheduled to terminate at midnight tomorrow, Wednesday, August 15, 2012.

Although Sinclair released this announcement simply to provide the public with advance notice of a potential disruption in video service, Dish chose to put out an announcement attempting to blame Sinclair for the failure of the parties to reach agreement on a renewal. Although Sinclair does not believe it is helpful to negotiate private business matters in public, Sinclair felt compelled to respond to Dish's public attack and set the record straight. Sinclair notes that the prices it is requesting for its extremely popular stations are substantially lower than the amounts Dish is paying for other far less popular channels it carries as a result of Dish's flawed economic model that on a relative basis compensates channels with little to no audience share more than the broadcast channels. In addition, Sinclair notes that its negotiations with Dish, a company which is currently being sued by the ABC, CBS, FOX and NBC networks as a result of Dish providing its customers with technology that allows its subscribers to delete commercials, involve matters other than pricing.

Sinclair would also like to remind its viewers who are Dish subscribers that the Sinclair

D. Singer Decl Ex 25
Page 327

stations that may be dropped by Dish remain available from a variety of other sources. These sources include DirecTV, at least one cable company in each market, Verizon's FiOS or AT&T's U-Verse in many markets, and completely for free over-the-air. While Sinclair is sorry for any inconvenience to its viewers from having to switch providers, rather than taking Dish's suggestion to blame one party or another in these negotiations, Sinclair suggests its viewers would be better served by simply switching its video service to a provider of Dish that values Sinclair stations enough to carry them.

*Forward-Looking Statements:*

Sinclair Broadcast Group, Inc., the largest and one of the most diversified, independent television broadcasting companies, owns and operates, programs or provides sales services to 74 television stations in 45 markets. Sinclair's television group reaches approximately 26.3% of U.S. television households and is affiliated with all major networks. Pro forma for the recently announced Newport acquisition, Sinclair will own and operate, program or provide sales services to 82 television stations in 47 markets, reaching 27.3% of the U.S. television households. Sinclair's television portfolio will include 21 FOX, 19 MNT, 15 CW, 11 ABC, 11 CBS, 3 NBC, 1 independent and 1 Azteca station. Sinclair owns equity interests in various non-broadcast related companies. The Company regularly uses its website as a key source of Company information and can be accessed at www.sbgi.net.

The matters discussed in this news release, include forward-looking statements regarding, among other things, future operating results. When used in this news release, the words "outlook," "intends to," "believes," "anticipates," "expects," "achieves," and similar expressions are intended to identify forward-looking statements. Such statements are subject to a number of risks and uncertainties. Actual results in the future could differ materially and adversely from those described in the forward-looking statements as a result of various important factors, including and in addition to the assumptions identified in this release, but not limited to, our ability to satisfy the closing conditions for the Newport acquisition discussed in this release, including obtaining required governmental approvals, our ability to obtain financing to fund such acquisition, our ability to consummate the transaction involving Deerfield Media discussed in this release, our ability to maximize our operating synergies in connection with the acquisitions, the impact of changes in national and regional economies, the volatility in the U.S. and global economies and financial credit markets, successful execution of outsourcing agreements, pricing and demand fluctuations in local and national advertising, volatility in programming costs, the market acceptance of new programming, the CW Television Network and MyNetworkTV programming, our news share strategy, our local sales

initiatives, the execution of retransmission consent agreements, our ability to identify and consummate investments in attractive non-television assets and to achieve anticipated returns on those investments once consummated, and any other risk factors set forth in the Company's most recent reports on Form 10-Q, Form 10-K and Form 8-K, as filed with the Securities and Exchange Commission. There can be no assurances that the assumptions and other factors referred to in this release will occur. The Company undertakes no obligation to publicly release the result of any revisions to these forward-looking statements except as required by law.

###

Back

© , Sinclair Broadcast Group     Site Map

Fox042987

# Exhibit 26



Published on *About DISH* (http://about.dish.com) on October 5, 2012

# Statement From DISH Regarding Dispute With Gannett Broadcasting

**Release Date:**
Friday, October 5, 2012 7:17 pm MDT

## Terms:

Programming    Corporate

## Dateline City:
ENGLEWOOD, Colo.

DISH Network Corporation (NASDAQ: DISH) issued the following statements attributable to Dave Shull, DISH senior vice president of Programming:

"DISH has been unable to reach an agreement with Gannett Broadcasting because Gannett has made it clear in documented proposals that it wants DISH to pay a significant penalty for allowing our customers access to AutoHop, a commercial-skipping technology available on our Hopper Whole-Home DVR. Consumers have had the right to skip commercials since the advent of the remote control. We are simply providing consumers with the choice to watch what they want, when they want.

"We have agreed to pay a significant increase in fees to continue to carry Gannett's local stations, more than 200 percent, the same as our closest direct competitor. But Gannett wants money on top of that for the expressed reason that our customers have access to AutoHop. We will continue to take a stand for customer choice and control.

"On this issue, we are standing shoulder to shoulder with viewers. We invite Gannett to join us."

### About AutoHop

DISH's "AutoHop" feature is an extension of the Hopper's exclusive PrimeTime Anytime™ capability, which allows viewers, with one click, to record all of the primetime TV programming on ABC, CBS, FOX and NBC -- the networks that deliver some of the most popular shows during primetime.

Once the viewer enables the PrimeTime Anytime feature, the Hopper stores these shows for up to eight days after they have aired making it easy to access episodes from last night, or last week.

The AutoHop commercial-skipping feature, using patented technology, works with most shows recorded using PrimeTime Anytime.

A viewer can watch a show with the AutoHop option commercial-free starting the day after a show has been recorded with the Hopper's PrimeTime Anytime capability. Prior to that, the Hopper's 30-second "hop forward" feature continues to work for same-day viewing of recorded shows.

### About DISH

DISH Network Corporation (NASDAQ: DISH), through its subsidiary DISH Network L.L.C., provides approximately 14.061 million satellite TV customers, as of June 30, 2012, with the highest quality programming and technology with the most choices at the best value, including HD Free for Life. Subscribers enjoy the largest high definition line-up with more than 200 national HD channels, the most international channels, and award-winning HD and DVR technology. DISH Network Corporation's subsidiary, Blockbuster L.L.C., delivers family entertainment to millions of customers around the world. DISH Network Corporation is a Fortune 200 company. Visit www.dish.com.

**Language:**
English

**Ticker Slug:**
*Ticker:* DISH
*Exchange:* NASDAQ

**Source URL:** http://about.dish.com/press-release/programming/statement-dish-regarding-dispute-gannett-broadcasting

1

# Exhibit 27

Blame Drew Brees and 'Modern Family' for spat between Dish, Sinclair -...        http://articles.latimes.com/print/2012/aug/14/entertainment/la-et-ct-dishsb...

**Los Angeles Times** | ARTICLE COLLECTIONS

← Back to Original Article

## Blame Drew Brees and 'Modern Family' for spat between Dish, Sinclair

August 14, 2012 | By Joe Flint

Unable to come to terms on a new distribution deal, it is very likely that Sinclair Broadcast Group, the largest owner of TV stations in the United States, will pull its signals from satellite broadcaster Dish Network on Wednesday.

That means Dish subscribers in the almost 50 markets where Sinclair owns stations will be without programming from Fox, ABC, CBS, NBC and the CW Network.

Both sides are already spinning the media and their subscribers. Dish says Sinclair wants a "massive price increase" and accuses the Baltimore-based broadcaster of being greedy and adds that "higher costs will translate into higher fees for customers."

Sinclair countered that "the prices it is requesting for its extremely popular stations are substantially lower than the amounts Dish is paying for other far less popular channels."

But while the two are taking shots at each other, in an interview, Sinclair Executive Vice President and General Counsel Barry Faber named a few other culprits -- Saints quarterback Drew Brees and the cast of ABC's hit comedy "Modern Family."

Noting that Brees recently signed a five-year, $100 million contract that will pay him $40 million just for the upcoming season and that key cast members of the ABC hit show "Modern Family" just got big pay raises, Faber said, "we buy our programming and our costs have gone up."

That observation often gets lost in these stories because the focus is always on the broadcaster and the distributor, but there are other factors at play. When CBS, Fox and NBC agree to pay more for the NFL, they then turn to their affiliates to kick in money to help pay for it. The networks not only take most of the commercial inventory from their affiliates but also now get a big chunk of the distribution fees that pay TV operators like Dish pay to get their signals.

The solution, says Faber, is for Dish and other distributors to stop paying so much for channels that don't get the ratings that Sinclair stations pull in. He thinks Dish's decision recently to drop AMC and its sister channels including WE and IFC is a step in the right direction.

"It seems to us there is a big difference between AMC and its ratings and our ratings," Faber said. While noting that AMC has some critically acclaimed shows ("Mad Men,""Breaking Bad"), Faber said if a broadcast station got the ratings AMC gets on its most popular shows, it would be grounds for cancellation on broadcast TV.

"We're not asking for outrageous amounts of money," Faber said. "We're asking for rates that continue to be a bargain when you consider what they pay for other stuff."

Not helping the talks is Dish's new AutoHop commercial skipping device. Sinclair's Faber notes that if Dish wants to market a device that zaps commercials from its stations, it should expect the broadcaster to want some additional compensation.

Although the deadline for a new deal is still several hours away, neither side is optimistic. Viewers in Southern California will not be impacted by this spat. Most of Sinclair's stations are in the Midwest and Northeast.

**ALSO:**

CBS, NBC and Fox head to court over Dish's AutoHop

Cast of Modern Family strikes new deal

Olympic success lets NBC feel like winner again

**Los Angeles Times**   Copyright 2014 Los Angeles Times          Index by Keyword | Index by Date | Privacy Policy | Terms of Service

6/19/2014 4:33 PM

# Exhibit 28
# Filed Under Seal

# Exhibit 29

latimes.com/entertainment/envelope/cotown/la-et-ct-dishinterview-20120524,0,1889101.story

# latimes.com

## Dish says Hulu is an issue too

By Joe Flint

4:51 PM PDT, May 24, 2012

The legal battle between Dish Communications and the
broadcast networks over the satellite broadcaster's new
feature that makes it easier for its subscribers to skip
commercials may be the biggest issue between the two
sides -- but it isn't the only one.

In an interview, David Shull, Dish's senior vice president
of programming, expressed frustration over the
networks' growing willingness to offer their content on
digital platforms such as Hulu and iTunes. That makes
the programming that Dish is paying for less valuable,
Shull said, and was one of the reasons that it pushed its
AutoHop device.



"It devalues the live value of that content to my
customers," Shull said, referring to how programs or
even clips from shows go up on websites such as Hulu, or on sites owned by the networks themselves.

Given how available a lot of content is on other platforms, Shull sees offering viewers a chance to watch
those shows without commercials as something of a perk.

"This gives them a little bit more control," Shull said, adding, "We wanted to make sure they had a
better experience."

Earlier this month, Dish said it was dropping the AMC cable channel, home to "Mad Men,""The
Walking Dead" and"Breaking Bad," and mentioned that one concern about the channel was that the
cable network's programming can be found on other platforms soon after its initial airing.

Shull said he reached out to executives of ABC, CBS, NBC and Fox over the last two weeks to have a
sit-down at Dish headquarters about the AutoHop but the invites have so far been rebuffed. He said
lawsuits charging the feature violates copyright law -- filed Thursday afternoon by Fox, CBS and NBC -
- are an "overreaction" to the technology. Shull said he understands that advertising is core to their
business, but thinks the next-day delay and the fact that most programming is still watched live should
ease their concerns.

Some broadcast network executives have suggest that more money from Dish in the form of
subscription fees for their channels would be more likely to ease their concerns about the AutoHop.
Shull's not buying.

Singer Decl Ex G<br>Page 230

http://www.latimes.com/entertainment/envelope/cotown/la-et-ct-dishinterview-20120524,0...   6/11/2012

Dish says Hulu is an issue too - latimes.com

"I've already paid them quite a bit," Shull said.

**RELATED:**

Fox sues Dish over AutoHop; Dish fires back

Networks not fans of Dish's ad-skipping feature

Dish says it will drop AMC

Copyright © 2012, Los Angeles Times

Singer Decl Ex G
Page 231

D. Singer Decl Ex 29
Page 339

# Exhibit 30
# Filed Under Seal

# Exhibit 31
# Filed Under Seal

# Exhibit 32

https://www.sec.gov/Archives/edgar/data/1001082/000110465913011196...

10-K 1 a13-1215_110k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C.  20549**

# Form 10-K

**(Mark One)**

x  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2012**

**OR**

o  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM                    TO                    .**

**Commission file number: 0-26176**

# DISH Network Corporation

(Exact name of registrant as specified in its charter)

| **Nevada** | **88-0336997** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **9601 South Meridian Boulevard** | |
| **Englewood, Colorado** | **80112** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(303) 723-1000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A common stock, $0.01 par value | The Nasdaq Stock Market L.L.C. |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes T  No £

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes £ No T

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes x  No o

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes x No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter)  is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer x | Accelerated filer o |
|---|---|
| Non-accelerated filer o | Smaller reporting company o |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes o No x

As of June 30, 2012, the aggregate market value of Class A common stock held by non-affiliates of the registrant was $5.9 billion based upon the closing price of the Class A common stock as reported on the Nasdaq Global Select Market as of the close of business on that date.

D. Singer Decl Ex 32
Page 343

Table of Contents

**Item 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following management's discussion and analysis of our financial condition and results of operations together with the audited consolidated financial statements and notes to our financial statements included elsewhere in this Annual Report.  This management's discussion and analysis is intended to help provide an understanding of our financial condition, changes in financial condition and results of our operations and contains forward-looking statements that involve risks and uncertainties.  The forward-looking statements are not historical facts, but rather are based on current expectations, estimates, assumptions and projections about our industry, business and future financial results.  Our actual results could differ materially from the results contemplated by these forward-looking statements due to a number of factors, including those discussed in this report, including under the caption "Item 1A.  Risk Factors" in this Annual Report on Form 10-K.*

**EXECUTIVE SUMMARY**

**Overview**

DISH added approximately 89,000 net Pay-TV subscribers during the year ended December 31, 2012, compared to a loss of approximately 166,000 net Pay-TV subscribers during the same period in 2011.  The increase versus the same period in 2011 primarily resulted from a decrease in our average monthly Pay-TV subscriber churn rate and higher gross new Pay-TV subscriber activations due primarily to increased advertising associated with our Hopper set-top box.  During the year ended December 31, 2012, DISH added approximately 2.739 million gross new Pay-TV subscribers compared to approximately 2.576 million gross new Pay-TV subscribers during the same period in 2011, an increase of 6.3%.

Our gross new Pay-TV subscriber activations continue to be negatively impacted by increased competitive pressures, including aggressive marketing and discounted promotional offers.  In addition, our gross new Pay-TV subscriber activations continue to be adversely affected by sustained economic weakness and uncertainty.

Our average monthly Pay-TV subscriber churn rate for the year ended December 31, 2012 was 1.57% compared to 1.63% for the same period in 2011.  Our Pay-TV subscriber churn rate was positively impacted in part because we did not have a programming package price increase in the first quarter 2012, but did during the same period in 2011.  While Pay-TV subscriber churn improved compared to the same period in 2011, churn continues to be adversely affected by the increased competitive pressures discussed above.  Our Pay-TV subscriber churn rate is also impacted by, among other things, the credit quality of previously acquired subscribers, our ability to consistently provide outstanding customer service, the aggressiveness of competitor subscriber acquisition efforts, and our ability to control piracy and other forms of fraud.

On September 27, 2012, we began marketing our satellite broadband service under the dishNET brand.  This service leverages advanced technology and high-powered satellites launched by Hughes and ViaSat to provide broadband coverage nationwide.  This service primarily targets approximately 15 million rural residents that are underserved, or unserved, by wireline broadband, and provides download speeds of up to 10 Mbps.  We lease the customer premise equipment to subscribers and generally pay Hughes and ViaSat a wholesale rate per subscriber on a monthly basis.  Currently, we generally utilize our existing DISH distribution channels under similar incentive arrangements as our pay-TV business to acquire new broadband subscribers.

In addition to the dishNET branded satellite broadband service, we also offer wireline voice and broadband services under the dishNET brand as a competitive local exchange carrier to consumers living in a 14-state region (Arizona, Colorado, Idaho, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington and Wyoming).  Our dishNET branded wireline broadband service provides download speeds of up to 20 Mbps.

We primarily bundle our dishNET branded services with our DISH branded pay-TV service, to offer customers a single bill, payment and customer service option, which includes a discount for bundled services.  In addition, we market and sell our dishNET branded services on a stand-alone basis.

55

D. Singer Decl Ex 32
Page 344

# Exhibit 33
# Filed Under Seal

# Exhibit 34
# Filed Under Seal