WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California  90017
Tel:  +1-213-629-2020 / Fax:  +1-213-612-2499

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105-2669
Tel:  +1-415-773-5700 / Fax:  +1-415-773-5759

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
ELYSE D. ECHTMAN (*pro hac vice*)
eechtman@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York  10019-6142
Tel:  +1-212-506-5000 / Fax:  +1-212-506-5151

MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL PAGE (SBN 154913)
mpage@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California  94111
Tel:  +1-415-362-6666

Attorneys for Defendants DISH Network L.L.C.,
DISH Network Corp., and EchoStar Technologies
L.L.C.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C., *et al.*,<br><br>Defendants. | Case No. CV12-04529 DMG (SHx)<br><br>**JOINT STIPULATION FOR DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS IN RESPONSE TO REQUEST FOR PRODUCTION NO. 19 (SET TWO) AND RESPONSE TO INTERROGATORY NO. 9 [LOCAL RULE 37-2.1] – PUBLIC VERSION** |

# TABLE OF CONTENTS

**Page**

1

2

INTRODUCTORY STATEMENTS ........................................................ 1

3      A.    DISH's Introductory Statement ........................... 1

4      B.    Fox's Preliminary Statement ................................ 4

5   II.   REQUESTS FOR PRODUCTION AND INTERROGATORY AT
         ISSUE REGARDING FOX'S INTERNET LICENSES ................. 5

6      A.    DISH's Contentions ................................................. 7

7            1.    Fox's Internet Licensing Agreements Are Directly
                   Relevant to Fox's Allegations and the Claims and
8                  Defenses in this Action ........................................ 7

9            2.    Fox Must Provide DISH With the Information Sought
                   Regarding Its Licensing Agreements ...................... 12

10                 a.    Fox Must Immediately Produce All Internet
                         Licensing Agreements ..................................... 12

11                 b.    Fox Must Produce Unredacted Copies of Its
                         Internet Licensing Agreements ........................ 14

12
                   c.    Fox Must Respond to DISH's Interrogatory
13                       Seeking Information Regarding Fox's Licensing of
                         Its Content ...................................................... 15

14     B.    Fox's Contentions ................................................... 18

15           1.    The Actual Documents In Dispute. ....................... 18

16           2.    Terms Relating To ███████████
                   ███████████ Are Irrelevant. ...................... 22

17           3.    Terms Relating To ███████████
                   ███████████ Are Highly Confidential And
18                 Commercially-Sensitive. ..................................... 24

19           4.    Fox Has Redacted Other Information From The
                   Agreements It Has Produced To Date █████████
20                 ███████████████████████. ......................... 26

21           5.    The ██████ Terms Of Fox's SVOD Agreements Are
                   Not Direct Comparables For Purposes Of A Reasonable
21                 Royalty Analysis. .............................................. 27

22           6.    Fox Has Worked Diligently To Produce The Agreements
                   In A Timely Manner. .......................................... 28

23           7.    Interrogatory No. 9 Is Moot. ................................ 29

24

25

26

27

28

# I.     INTRODUCTORY STATEMENTS

## A.     DISH's Introductory Statement

Fox is the plaintiff in this copyright and breach of contract action and has repeatedly made broad allegations that features on DISH's Hopper and Hopper with Sling DVRs are damaging Fox's ability to enter into favorable licensing agreements for its broadcast television content, including specifically its internet licenses. Fox's First Amended Complaint is awash with references to Fox's relationships with third parties, including Hulu and Netflix and claims of how these licensing relationships are in danger because of the DVR features at issue.  Dkt. 138 (First Amended Complaint for Copyright Infringement and Breach of Contract ("First Amended Complaint")), ¶¶5, 6, 28.  For example, Fox claims that DISH is intentionally "interfer[ing] with Fox's legitimate markets and services," including Hulu and Hulu Plus.  *Id.* at ¶5.  Fox asserts that offering its subscribers Sling technology "allows the DISH Parties to compete unfairly with licensed providers . . . ."  *Id.* at ¶6; *see also id.* at ¶52 (By offering DISH subscribers Sling technology "the DISH parties are usurping rights it never negotiated for and does not possess, in order to compete unfairly with authorized providers such as Hulu . . . .").

Fox repeated these specific claims regarding its internet licenses, among others, in seeking a preliminary injunction relating to DISH's Hopper with Sling DVR.  Fox bemoaned to the Court that "Hopper Transfers will cause unique injuries to Fox's relationships and negotiations with companies like Amazon and iTunes that license the right to offer digital downloads of Fox programs, which consumers can view on their mobile devices without an Internet connection."  Dkt. 130 (Plaintiffs' Memorandum of Points and Authorities ISO Motion for Preliminary Injunction Against DISH's New 2013 Services ("Second PI Memo.")), p. 18-19.  A Fox executive declared that "Hopper Transfers will cause unique injuries to Fox's relationships and negotiations with companies such as iTunes and Amazon that license the right to offer digital downloads of Fox programs."

Dkt. 130-8 (Declaration of Sherry Brennan ISO Plaintiffs' Motion for Preliminary Injunction Against DISH's New 2013 Services ("Second Brennan Decl.")), ¶24.

To test Fox's assertions regarding potential harm to its internet licensing relationships, DISH, naturally, asked Fox to produce its internet licensing agreements. A year ago, in June 2013, Fox indicated that it would produce these agreements. DISH has patiently waited for Fox to complete that promised production, but, a year later, Fox has still not completed its production of its internet licenses. Fox's failure to produce relevant and promised licenses includes its non-production of its agreement with ████. This is of obvious importance, given ██████ position in the market, as well as the fact that Fox specifically identifies ████ in its complaint, as well its preliminary injunction papers.

Moreover, for many of the licenses that Fox has produced, Fox has redacted out material terms of the agreements that relate to the internet licensing directly at issue here. A quick review of Fox's heavily redacted agreements with ███, a third party that is mentioned repeatedly in Fox's complaint, demonstrates that one cannot determine ████████████████████████████████████████ ████████████████████████████████ ████████ The production of such heavily redacted agreements is tantamount to no production at all. With the August 5, 2014 close of fact discovery now closing in on the parties, DISH must ask the Court to compel Fox to do what it promised to do a year ago – produce *all* of its internet licenses and produce them without any redactions relating to internet licensing.

Additionally, DISH has asked Fox, via interrogatory, to provide the details of its non-linear (i.e., non-live) licensing agreements for the content at issue in this case. Fox initially responded with solely objections to the request. During the meet and confer process, however, Fox has conceded that it is a proper request and indicated that Fox will supplement its response. Yet, Fox has refused to do so in a timely manner. Again, with the close of discovery only weeks away, DISH must

1    ask the Court to compel Fox to do what it has promised to do – provide a

2    substantive response to Interrogatory No. 9.

3        **B.    Fox's Preliminary Statement**

4        Fox sued Dish for copyright infringement and breach of contract because

5    Dish is copying all of the copyrighted primetime programming broadcast on the

6    Fox Network every night to create a bootleg commercial-free video-on-demand

7    ("VOD") service called PrimeTime Anytime ("PTAT") – even though Dish's

8    license agreement prohibits *both* copying *and* commercial-free VOD.  Dish is also

9    offering an unauthorized Internet streaming service, even though its license

10   agreement bars Dish from distributing Fox's signal over the Internet.  And Dish's

11   "Hopper Transfers" service allows Dish subscribers to copy Fox programs onto

12   iPads for viewing outside the home, even though the license agreement bars Dish

13   from authorizing subscribers to copy Fox's programs for viewing outside the home.

14       This motion to compel is yet another attempt by Dish to mislead the Court

15   into ordering the wholesale disclosure of Fox's confidential agreements with Dish's

16   competitors.  This motion involves license agreements between Fox and authorized

17   Internet distributors.  Although one would not know it from Dish's portion of the

18   joint stipulation, Fox has produced *all* of its license agreements with Internet

19   distributors – totaling over 100 agreements – with the sole exception of its

20   agreements with ███████████████████████████████████████████.

21   Many of the agreements were produced with *no* redactions.   However, in

22   accordance with the parties' practice in this litigation to date, Fox redacted certain

23   confidential, competitively-sensitive information that has no relevance to any claim

24   or defense in this case.[1]  For example, some of these agreements contain licenses

---

25   [1]Unlike Fox, Dish has taken a scorched-earth approach to redactions in its

26   productions of agreements.  In many agreements and draft agreements produced by

27   Dish, Dish redacts page after page without even providing the heading or general
     terms of the redacted sections.  *See, e.g.,* Declaration of David Singer ("Singer

28   Decl."), Exs. 2 and 3 (███████████████████████████████).

1  relating to programs distributed by █████████████████████████

2  ████████████████████████████████████████████████████

3  Some also contain licenses relating to ████████████████████████

4  ████████.   This lawsuit involves Dish's copying and streaming of programs

5  broadcast over the Fox Network, like *Glee* and *The Simpsons*. ████████████

6  ████████████████████████████████ are not at issue in this case.

7  Nowhere in its portion of the joint stipulation does Dish explain how these

8  provisions could conceivably be relevant, nor can it.

9      Fox also redacted provisions that would reveal ████████████

10 ███████████████████████████████████████████████.

11 ████████████████████████████ are not relevant to this case, and Dish does

12 not claim that they are.   Finally, Fox redacted ████████████████████

13 █████████████. ██████████████ is not an issue in this case and, again, Dish's

14 motion does not even attempt to explain how these provisions could be relevant.

15 Instead of addressing the specific provisions that were redacted and explaining their

16 relevance, Dish dishonestly insinuates that Fox redacted key financial and licensing

17 terms from all of its agreements, presumably hoping that the Court will issue a

18 broad order requiring Fox to give Dish completely unredacted versions of all of its

19 agreements, which are highly confidential.   Dish's motion should be denied to the

20 extent that it seeks the disclosure of provisions regarding ████████████

21 ████████████████████████████.

22      Any other terms that were redacted from Fox's Internet distribution

23 agreements ████████████████████████████████████████████.

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████████. For example, many of the agreements Fox produced are known as

1  Electronic Sell-Through, or "EST" agreements.   These agreements allow the

2  licensee to sell electronic, commercial-free versions of Fox programs on a per-

3  episode basis within days after the programs air on television. ████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ██████████████████████████

8       In other cases, however, redacted terms are only marginally relevant, if at all.

9  In particular, Dish is demanding the financial terms of Fox's license agreements for

10  subscription video-on-demand (known as "SVOD").   SVOD agreements allow the

11  licensee to stream programming that aired a long time ago – for example, past

12  seasons of broadcast programming, but not the current season – to subscribers over

13  the Internet. ████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████   SVOD agreements are not direct comparables for the

17  purpose of a reasonable royalty analysis since these services are not the same as

18  Dish's unauthorized services.   Whereas SVOD involves past-season content, Dish

19  is copying current season programs as they are broadcast and offering them to

20  subscribers on-demand and commercial-free within hours after they air.

21  **II.**   **REQUESTS FOR PRODUCTION AND INTERROGATORY AT**

22  **ISSUE REGARDING FOX'S INTERNET LICENSES**

23      REQUEST FOR PRODUCTION SET 2, NO. 19:  Your license agreements

24  with Internet-based distribution services, including but not limited to TV

25  Everywhere, Hulu, Hulu Plus, Apple Store, Netflix, Vudu, or Amazon, as well as

26  any summaries of such agreements.

27      RESPONSE:  [Fox] objects to this request on the grounds that it (a) seeks

28  information protected by the attorney-client privilege, common interest privilege,

and/or attorney work product doctrine; (b) it seeks irrelevant information beyond the scope of discovery; (c) it is overly broad and unduly burdensome; (d) it seeks confidential and/or proprietary information protected by Plaintiffs' and/or third party privacy and/or non-disclosure rights; and (e) it is vague, ambiguous and unintelligible as phrased.

INTERROGATORY NO. 9: For each copyrighted work that You claim to be infringed, state whether You have licensed the work to any non-linear content distributor and identify all such distributors to which You have licensed the work, state the scope and terms of the licenses and state the time period for which and conditions under which the work is or was licensed to each distributor.

RESPONSE: FBC objects to this interrogatory to the extent it seeks disclosure of any information protected by the attorney-client privilege and/or work product doctrine.  FBC further objects to this interrogatory on the grounds that it is unduly burdensome and duplicative of DISH's document requests seeking the same information.  Specifically, the requested information is covered by DISH's Document Request No. 19.  Because the agreements are covered by strict nondisclosure provisions, FBC's counsel indicated that it would need to work with its licensees to obtain their consent for disclosure.  As of July 16, 2013, DISH's counsel indicated that it was in discussions with some of these third party licensees regarding possible redactions to the agreements.  FBC remains ready and willing to continue meeting and conferring with DISH so the parties may agree on mutually acceptable redactions of irrelevant, but highly sensitive, information.  Because DISH has not yet produced all relevant documents or interrogatory responses, FBC also objects on the grounds that it does not yet have enough information about the scope of DISH's infringement to identify all of the infringed works.

///

///

///

A.    **DISH's Contentions**

1.    **Fox's Internet Licensing Agreements Are Directly Relevant to Fox's Allegations and the Claims and Defenses in this Action**

This case originated from DISH's introduction in 2012 of a ground-breaking and award winning DVR, the Hopper, which included new and innovative software features known as PrimeTime Anytime ("PTAT") and AutoHop. Dkt. 61 (Declaration of David Shull ISO Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction), ¶¶2, 9. With PTAT, DISH customers can easily set the Hopper to record all of the primetime programming on ABC, CBS, Fox, and/or NBC on any nights of the week. Dkt. 62 (Declaration of Vivek Khemka ISO Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction), ¶5. With AutoHop, DISH customers can efficiently skip past the commercials when playing back recordings of certain broadcast network primetime shows. *Id.* Shortly after AutoHop was announced, Fox filed this case against DISH, alleging that PTAT, AutoHop, and a previously introduced DISH DVR accessory, Sling Adapter, breach the parties' retransmission consent agreements and violate copyright laws. Dkt. 1 (Complaint for Copyright Infringement and Breach of Contract).[2] In August 2012, Fox moved for a preliminary injunction, claiming that PTAT and AutoHop were an imminent threat to Fox's entire business model, including internet distribution channels, and had to be stopped immediately. Dkt. 41 (Plaintiffs' Notice of Motion and Motion for Preliminary Injunction). The District Court disagreed, rejected Fox's argument and denied Fox's request for a preliminary injunction. Dkt. 118 (Order Re Plaintiffs' Motion for Preliminary Injunction). Fox appealed the District Court's decision to the Ninth Circuit, but the Ninth Circuit

---

[2]Earlier that same day, DISH filed a declaratory judgment complaint against ABC, CBS, NBC, and Fox in the Southern District of New York seeking a declaration that PTAT and AutoHop neither (1) breach any agreement between DISH and the networks, nor (2) infringe the networks' copyrights. The Southern District of New York dismissed the case as to Fox in favor of this case.

1  affirmed the District Court's denial of Fox's request for a preliminary injunction,

2  finding that Fox was unlikely to succeed on the merits of its copyright claim.  *Fox*

3  *Broad. Co., Inc. v. Dish Network L.L.C.*, 12-57048, __ F.3d __, 2014 WL 260572,

4  at *10, 11, 13 (9th Cir. Jan. 24, 2014).

5         When DISH introduced a new Hopper DVR, called the Hopper with Sling,

6  which incorporated Sling technology, in 2013, Fox filed an amended complaint.

7  The amended complaint alleged that DISH breached its agreements with Fox and

8  infringed Fox's copyrights by providing customers additional features, including

9  Hopper Transfers and the Sling functionality of the Hopper with Sling.  Dkt. 138

10  (First Amended Complaint).  Fox's first amended complaint is replete with

11  references to Fox's relationships with third-party licensees, including Hulu and

12  Netflix.  *Id.*, ¶¶5, 6, 28, 30, 52.  Fox's complaint specifically alleges that by

13  offering the features at issue, DISH is "undercutting" and "interfering" with Fox's

14  relationships with these third-party licensees.  *Id.*, ¶¶3, 5, 6, 52.  Fox's prayer for

15  relief includes requests for preliminary and permanent injunctive relief.  *Id.*, Prayer

16  for Relief ¶1.

17         Fox again moved for a preliminary injunction in February 2013, this time

18  claiming, *inter alia*, that Hopper Transfers and the Sling functionality of the Hopper

19  with Sling were an imminent threat to Fox's relationships with third-party licensees

20  and would affect negotiations with them.  Dkt. 129 (Plaintiffs' Notice of Motion

21  and Motion for Preliminary Injunction Against Dish's New 2013 Services), Dkt.

22  130 (Second PI Memo.), p. 4, 6, 18.  Again, the District Court disagreed, rejecting

23  Fox's claims of irreparable harm and denying Fox's request for a preliminary

24  injunction.  Dkt. 201 (Order Re Plaintiffs' Motion for Preliminary Injunction

25  Against Dish's New 2013 Services).

26         In its various filings in this case, Fox has repeatedly emphasized specific

27  threats to its relationships with its internet licensees:

28  • "Hopper Transfers will cause unique injuries to Fox's relationships and

- 8 -

negotiations with companies like Amazon and iTunes that license the right to offer digital downloads of Fox programs, which consumers can view on their mobile devices without an Internet connection."  Dkt. 130 (Second PI Memo.), p. 18-19.

- "Hopper Transfers will cause unique injuries to Fox's relationships and negotiations with companies such as iTunes and Amazon that license the right to offer digital downloads of Fox programs."  Dkt. 130-8 (Second Brennan Decl.), ¶24.

- ". . . Hopper Transfers will likely have a negative impact on Fox's relationships and future negotiations with authorized providers of digital downloads, and these providers will likely reduce the amount they are willing to pay for digital download rights."  *Id.*

- "If DISH's conduct is not stopped during the pendency of this litigation, third parties who are licensed to distribute copies of Fox programs that can be viewed on mobile devices will perceive their rights as less valuable . . . . This will devalue Fox's license in the eyes of those third parties and negatively impact Fox's ability to negotiate favorable agreements for Fox. At a minimum, Fox could be forced to make any number of concessions that it would not have otherwise made."  Dkt. 130-7 (Declaration of Michael Biard ISO Plaintiffs' Motion for Preliminary Injunction Against DISH's New 2013 Services) ("Biard Decl.")), ¶26.

Fox's internet licenses are relevant to the issues of fair use, damages and irreparable injury.  First, for fair use, under Section 107 of the Copyright Act, "the fair use of a copyrighted work . . . is not an infringement of copyright."  17 U.S.C. § 107; *Perfect 10, Inc. v. Google, Inc.*, 487 F.3d 701, 719 (9th Cir 2007) ("The fair use defense permits the use of copyrighted works without the copyright owner's consent under certain situations.").  Courts employ a four-factor analysis to determine if a particular use of copyrighted work is in fact "fair use."  17 U.S.C. §

1   107; *Perfect 10, Inc.*, 487 F.3d at 719–25.  The fourth factor examines "the effect of

2   the [defendant's] use upon the potential market for or value of the copyrighted

3   work."  17 U.S.C. § 107; *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 590

4   (1994).  Fox's internet agreements will give information regarding this segment of

5   the market for Fox's works at issue in this litigation.  While internet licenses are

6   only a portion of the market for Fox's works, these agreements will be central to

7   Fox's argument that it has suffered fourth-factor harm to the value of its works, as

8   Fox bears the burden of showing "by a preponderance of the evidence that some

9   meaningful likelihood of future harm exists."  *Sony Corp. of Am., Inc. v. Universal*

10  *City Studios, Inc.*, 464 U.S. 417, 451 (1984); *Hustler Magazine Inc. v. Moral*

11  *Majority Inc*., 796 F.2d 1148, 1155 (9th Cir. 1986) ("[W]hen the use is

12  noncommercial, the copyright owner must demonstrate by a preponderance of the

13  evidence that there is 'some meaningful likelihood of future harm'").

14          With respect to damages, Fox's internet licenses are directly pertinent to any

15  claim for economic remedies that Fox might make on either its copyright or breach

16  of contract claims.  Fox's ever-changing damages theories include claims for

17  statutory damages for copyright infringement, compensatory damages for its breach

18  of contract claims, disgorgement of profits attributable to defendants' alleged

19  copyright infringement, and "royalties" for both alleged copyright infringement and

20  breach of contract.  Declaration of Melanie D. Phillips in Support of Defendant's

21  Motion to Compel Production of Internet Licensing Agreements and Response to

22  Interrogatory No. 9 ("Phillips Decl."), Exs 27-31 (Fox's initial disclosures), Ex. 32

23  (Fox's Responses to DISH's First Set of Interrogatories, dated Nov. 25, 2013).

24  Additionally, despite Fox's numerous assertions that it is not seeking actual

25  damages, when DISH served a request for admission to memorialize this position,

26  Fox ***denied*** that it was not claiming any form of actual damages.  *Id.*, Ex. 33 (Fox's

27  Responses to DISH's First Set of Requests for Admission).  Instead of an

28  admission, Fox hedged and claimed that it "not seeking to recover any actual

DEFT MOTION TO COMPEL PRODUCTION AND
INTERROGATORY RESPONSE
CASE NO. CV1204529 DMG (SHx)

1  damages in the form of lost profits or lost revenues" *other than* the injunctive

2  relief, statutory damages, attorneys' fees and costs, disgorgement, and reasonable

3  royalties.  *Id.*

4      DISH disagrees that there is any such thing as a hypothetically negotiated

5  "reasonable royalty" under the Copyright Act (as opposed to the Patent Act or

6  Uniform Trade Secrets Act); such a claim can only be a claim for actual damages in

7  the form of lost royalties.  *Compare* 17 U.S.C. §504 *with* 17 U.S.C. §284, Cal. Civ.

8  Code §§3426.2, 3426.3; *see Jarvis v. K2 Inc.*, 486 F.3d 526, 533–34 (9th Cir. 2007)

9  ("[W]here the infringer could have bargained with the copyright owner to purchase

10  the right to use the work, actual damages are what a willing buyer would have been

11  reasonably required to pay to a willing seller for plaintiffs' work." (citation and

12  internal quotation marks omitted)).  For purposes of discovery, the legal

13  characterization of Fox's damages claims is not relevant.  Royalties have been

14  placed at issue by Fox, including Fox's internet revenues, accordingly the

15  corresponding licenses must be produced.  Additionally, the market value of the

16  copyrighted works could influence the calculation of statutory damages, which

17  takes into account the alleged revenue lost by the copyright holder.  *Bryant v.*

18  *Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010).

19      Finally, Fox's internet licenses are relevant to Fox's demand for a permanent

20  injunction.  To obtain a permanent injunction, Fox bears the burden of establishing

21  that: "(1) it has suffered an irreparable injury; (2) remedies available at law, such as

22  monetary damages, are inadequate to compensate for that injury; (3) considering

23  the balance of hardships between the plaintiff and defendant, a remedy in equity is

24  warranted; and (4) the public interest would not be dis-served by a permanent

25  injunction."  *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, SACV 12-00144,

26  2013 WL 5511596, at *8 (C.D. Cal. Sept. 23, 2013) (citing *eBay, Inc. v.*

27  *MercExchange, LLC*, 547 U.S. 388, 391 (2006)).  Fox's internet licensing

28  agreements are relevant to the first two elements.  Fox has already previewed the

fact that part of its irreparable injury argument will center on its internet licensing relationships.  *E.g.*, Dkt. 130 (Second PI Memo.), p. 18-19; Dkt. 130-8 (Second Brennan Decl.), ¶24; Dkt. 130-7 (Biard Decl.), ¶26.

Against that background, it is not surprising that Fox has conceded that its internet licenses are of critical importance in this case.  Fox has admitted that "its licensing agreements in these markets, including any . . . [internet] streaming agreements Fox may have with DISH's competitor MVPDs" are included among the "numerous documents relevant to its argument that DISH's unauthorized services harm Fox's ability to license its programs for television VOD, Internet streaming, on-demand viewing over the Internet (e.g., Hulu), and premium commercial-free digital downloads that can be viewed on demand, such as those offered by Amazon and iTunes."  Dkt. 223 (Joint Stipulation for Defendant's Motion to Compel Production of Documents in Response to Request for Production No. 3 (Set One) ("Joint Stipulation ISO Motion to Compel")), p. 3.  Fox admits that "all [of Fox's] licenses for on-demand and Internet streaming services" are "relevant to" the issue of fair use.  *Id.* at p. 27.  Fox admits that its internet licenses are relevant to its "royalty" claim.  *Id.* at p. 5, 29.

**2.      Fox Must Provide DISH With the Information Sought Regarding Its Licensing Agreements**

**a.      Fox Must Immediately Produce All Internet Licensing Agreements**

Nearly a year ago, Fox indicated that it would be producing its internet licensing agreements relating to the content at issue.  Phillips Decl. Ex. 3 (Fox June 21, 2013 letter), Ex. 4 (Fox July 5, 2013 letter).  Indeed, in opposition to a separate motion to compel filed by DISH in this action, Fox repeatedly touted that it had already agreed to produce its internet licensing agreements.  Dkt. 223 (Joint Stipulation ISO Motion to Compel), p. 3 (". . . Fox is in the process of producing . . . . any . . . [internet] streaming agreements . . . ."), p. 5 (" . . . *Fox is producing* [its licenses for Internet distribution]."), p. 22 ("[Fox] has either already produced or

agreed to produce all . . . Internet streaming licenses, licenses with services that offer Fox programming on demand over the Internet such as Hulu, and licenses with services that sell premium commercial-free versions of Fox programs for digital download, such as iTunes and Amazon."), p. 27 ("As noted above, Fox is producing all licenses for . . . Internet streaming services."), p. 29 ("And again, Fox has agreed to produce all . . . digital download agreements, and all agreements for distribution of its programming over the Internet.").

However, Fox has not actually produced all of its internet licensing agreements.  Phillips Decl., Ex. 19 (Fox June 5, 2014 letter), Ex. 20 (DISH June 16, 2014 letter).  As the parties are now quickly approaching the close of fact discovery in this case, and as depositions are already being taken, DISH has no choice but to ask the Court for assistance in getting Fox to do what it agreed to do long ago – produce all of its internet licensing agreements.

Fox's only excuse for its failure to complete its production in a timely manner is that it claims it is ███████████████████████████████████ ████████████████████████████  This is not a sufficient basis for Fox's failure to complete its promised production.  As explained above, Fox itself has put these licensing agreements at issue.  Moreover, Fox has conceded that these agreements are directly relevant to this case.  By putting its internet agreements directly at issue, Fox imposed upon itself an obligation to produce its licensing agreements, ████████████████████████████████████████.  Absent an abandonment of its allegations regarding harm to its ability to license its content, Fox must produce all of its internet licensing agreements.

There is no basis for any objection to production of these agreements given the robust protective order that has been entered in this case.  The parties have already negotiated, in response to Fox's specific concerns regarding the production of these agreements, an "Outside Counsel's Eyes Only" provision.  Dkt. 215 (Am. Protective Order).  This provision directly addresses any concerns regarding the

- 13 -

commercially sensitive nature of these agreements.  *See Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 555–56 (C.D. Cal. 2007) (holding that "attorney's eyes only" provision provided appropriate protection). ████████

The internet licensing agreements that DISH seeks, which Fox long ago agreed to produce, are directly relevant to Fox's claims, DISH's defenses, and Fox's specific allegations of harm to its ability to enter into profitable licensing agreements.  Given Fox's failure to produce its agreements in a timely manner, and the upcoming close of discovery, DISH respectfully requests that the Court order Fox to produce all internet licensing agreements.

### b.  Fox Must Produce Unredacted Copies of Its Internet Licensing Agreements

When the parties were negotiating the production of Fox's licensing agreements, Fox indicated that it might redact some portions of the agreements at issue, but assured DISH that such redactions would be of ████████ Phillips Decl., Ex 2 (Fox June 20, 2013 Letter).  As it turns out, Fox has redacted terms and conditions in its licensing agreements that are *directly* relevant to this lawsuit.[3]

By way of example, Fox's agreements with ███ are so heavily redacted that DISH cannot determine critical details about the agreements.  Phillips Decl., Exs. 21-24.  DISH cannot ████████

---

[3] In some instances the redactions are so over inclusive that DISH cannot even determine whether the redactions relate to internet licenses, such as redaction of complete sections including their headings.



DISH is unable to determine ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Other examples of heavily redacted agreements include ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Exs. 25-26.

All of this missing information is obviously and directly relevant to Fox's claims in this case, including assertions that the DVR features at issue in this action have affected Fox's negotiations of licensing agreements for its content. Redaction of these key terms and provisions is tantamount to not producing the agreements at all. Given Fox's redaction of contract terms and conditions that are directly relevant to issues in this case, DISH seeks an order from the Court compelling Fox to produce its internet agreements without redactions. *C&C Jewelry Mfg., Inc. v. West*, No. C09-01303 JF (HRL), 2010 U.S. Dist. LEXIS 110587, at *1-6 (N.D. Cal. Oct. 7, 2010) (ordering the production of licensing agreements in unredacted form); *Diagnostics Sys. Corp. v. Symantec Corp.*, No. SA CV 06-1211 DOC (ANx), 2008 U.S. Dist. LEXIS 124160, at *35-36, 42-43 (C.D. Cal. Apr. 4, 2008) (compelling the production of licensing agreements in their entirety, including financial terms); *see also Live Nation Merchandise, Inc. v. Miller*, No. 13-cv-03936 CW (NC), 2014 U.S. Dist. LEXIS 65174, at *7-11 (N.D. Cal. May 9, 2014) (ordering production of settlement agreement, designated "Attorneys' Eyes Only," without redaction other than for privilege).

### c. <u>Fox Must Respond to DISH's Interrogatory Seeking Information Regarding Fox's Licensing of Its Content</u>

Interrogatory No. 9 seeks basic information regarding Fox's licensing of the copyrighted works that it sues upon in this case, including whether Fox has licensed each of the "copyrighted work[s] that [it] claim[s] to be infringed" to Internet-based

distributors and, if so, the terms of that licensing and to which distributors.  This information will be highly probative of Fox's claim that the Sling functionality of the Hopper with Sling "threatens to disrupt and harm Fox's non-linear (i.e., non-television) distribution of its primetime programs."  Dkt. 79 (Plaintiffs' Reply ISO Motion for Preliminary Injunction), p. 20-21.  Fox itself admits that information relating to its internet licenses is "relevant to its argument that DISH's unauthorized services harm Fox's ability to license its programs for television VOD, Internet streaming, on-demand viewing over the Internet (e.g., Hulu), and premium commercial-free digital downloads that can be viewed on demand, such as those offered by Amazon and iTunes."  Dkt. 223 (Joint Stipulation ISO Motion to Compel), p. 3.  In fact, at a recent meet and confer conference, counsel for Fox acknowledged that Fox must provide a substantive response to this interrogatory.  Phillips Decl., Ex. 20 (DISH June 16, 2014 letter).  However, Fox has not done so to date and has refused to provide a date certain for doing so, instead claiming that Fox is entitled to delay its response until after it has completed its document production.  *Id.*  Fox's failure to provide a timely response to this interrogatory, served more than nine months ago, is improper.

Contrary to Fox's claims, this interrogatory is not duplicative of DISH's document requests for licensing agreements.  *Becker v. Dahl*, No. CIV S-10-0519 FCD EFB P, 2011 U.S. Dist. LEXIS 5724, at *4 (E.D. Cal. Jan. 12, 2011) ("a request for production of documents seeks documents, while an interrogatory is a question seeking a written response. While the nature of the information sought may in some respect be 'duplicative,' the responses sought take different forms, and defendants are entitled to use both vehicles for conducting discovery.").  Fox has only agreed to produce its license agreements if ███████████ and, as pointed out above, Fox's production of those agreements has included heavy redactions.  Thus, Fox uniquely has access to the information sought by DISH through this interrogatory.  Just as importantly, while Fox agreed to produce its

license agreements in June 2013, it has not yet completed its production of these agreements.  Fox may not refuse to answer the interrogatory on the grounds that the information might be found in documents that it has not produced.  Furthermore, even had Fox produced the relevant licensing agreements, Fox's failure to identify the produced documents that provide the information sought by this interrogatory makes Fox's objection improper.

There is nothing unduly burdensome about this interrogatory, which Fox concedes seeks relevant information.  If Fox is suing upon a work, it should provide discovery with respect to that work, and cannot be heard to complain that it simply has too many copyrights at issue to provide discovery on them.

Fox's objection on the basis of privilege equally does not justify its refusal to substantively respond to this interrogatory.  First, Fox has failed to asserted more than conclusory allegations in support of this objection.  *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289 (C.D. Cal. 1996) (granting motion to compel production despite claim of confidential information because defendant "merely made these claims as conclusory assertions"); *Kaufman v. Bd. of Trs.*, 168 F.R.D. 278, 278 (C.D. Cal. 1996) (finding defendants' "blanket" objections were "without merit" because "[f]ormally claiming a privilege should involve specifying which information and documents are privileged and for what reasons").  Second, DISH is not seeking privileged materials.  DISH seeks only business terms from agreements with third parties.

Fox's objection that it lacks sufficient knowledge to respond because it does not know which of its copyrighted works have been copied is meritless.  Fox must know which primetime programming it claims to be infringed, because it knows which shows it aired in the time period at issue, and it has identified works that it claims to be at issue.  Furthermore, lack of present information does not excuse a party's duty to reply to an interrogatory.  6 Matthew Bender & Co., *Comment on Rule 33: Summary of Rule Provisions*, in *Bender's Federal Practice Forms* (2014);

1   *Bryant v. Armstrong*, 285 F.R.D. 596, 616 (S.D. Cal. 2012) (if responding party is

2   unable to provide requested information, he may not simply refuse to answer;

3   responding party must state under oath that he is unable to provide information and

4   must describe efforts he used to obtain information); *Haworth v. Suryakant*, No.

5   1:06-cv-1373-LJO-NEW (TAG), 2007 U.S. Dist. LEXIS 48380, at *5 (E.D. Cal.

6   June 25, 2007).

7        Fox never had a proper basis for objecting to this interrogatory.  Fox has

8   agreed to provide DISH with a response to this interrogatory, but has failed to do

9   so.  With the close of discovery just ahead, DISH respectfully requests that the

10  Court order Fox to respond to Interrogatory No. 9.

11       **B.      Fox's Contentions**

12             **1.      The Actual Documents In Dispute.**

13       Once again, Dish's portion of the joint stipulation is designed to misleadingly

14  suggest to the Court that Fox has failed to make any meaningful production to date.

15  Fox has in fact produced all of its licensing agreements with Internet distributors

16  except for its agreements with ███████████████████████████████████

17  ███████████████████████████████████████████████████████████████

18  ████████████████████████████████████████. As noted above,

19  ███████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████.

21  *See* Declaration of Julie A. Shepard ("Shepard Decl."), ¶ 11, Ex. 1.

22       Dish's portion of this joint stipulation neglects to mention that Fox has

23  produced more than one hundred licensing agreements with Internet distributors –

24  many without any redactions.  Dish also deliberately fails to differentiate between

25  the various types of agreements that fall under the umbrella term "Internet

26  agreements," even though these different agreements involve different rights and

27  therefore are not all equally relevant.  And, with respect to the large majority of

28  agreements, Dish has failed to inform the Court which provisions have been

1  redacted – even though it knows, ██████████████████████
2  ████████████████████████████████████████████████████
3  ██████████████.[4] *See* Shepard Decl., ¶ 8.  Many of the redacted provisions have
4  no conceivable relevance to the claims or defenses asserted in this case.   For
5  example, Fox has redacted certain provisions relating ████████████████████
6  ████████████████████████████████████████████████, neither
7  of which are at issue here, ██████████████████████████████
8  █████████████.  Dish does not even argue that these provisions are relevant.
9  Instead, it relies on generic relevance arguments – e.g., fair-use market harm,
10  reasonable royalty – cut-and-pasted from its other briefs, apparently hoping that the
11  Court will not look too closely and will simply order the wholesale disclosure of
12  irrelevant, competitively-sensitive information.

13      The agreements at issue in Dish's motion fall into three categories:

14      • **EST (electronic-sell-through) Agreements**. These agreements allow
15  a licensee to sell electronic, commercial-free versions of Fox programs on a per
16  episode basis. ██████████████████████████████████████████
17  ████████████████████████████████████████████████████████
18  ████████████████████████████████████████████████████████
19  ████████████████████████████████████████████████████████
20  ████████████████████████  EST agreements are relevant to this case because,
21  among other reasons, they provide a baseline for a reasonable royalty analysis.  Fox
22  has EST agreements with ██████████████████████████████████████
23  ██████████████████████████████████████████████████████.  Fox
24  has produced all of these agreements to Dish.  To the extent Fox has redacted terms
25  *other than* those relating to ████████████████████████████████████

26  ─────────────────────
   [4] ██████████████████████████████████████████████████████████
27  ████████████████████████████████████████████████████████
28  █████████.  Shepard Decl., ¶ 9.



. Shepard Decl., ¶¶ 3-4.

• **SVOD (subscription video-on-demand) Agreements.** These agreements allow a licensee to stream older episodes of Fox programs to subscribers on an on-demand basis, without commercials.

. Although these agreements are relevant to prove the existence of an Internet distribution market for Fox's programs – which

Dish, bizarrely, denies – the SVOD agreements are not direct comparables for purposes of a reasonable-royalty analysis.

All of the above agreements are highly confidential.



. For example,

Phillips Decl., Ex. 23, p. 271 (               ).   Similarly,

.  *Id.* at Ex. 26, p. 538 (               ).

.”  Shepard Decl., Ex. 1 (Netflix and Amazon Mtn. for Protective Order, 3:18-4:4) (internal citations omitted).

.  *E.g.,* Netflix and Amazon's Motion for a Protective Order, 4:15-5:2, (attached to Shepard Declaration as Exhibit 1).  Dish has publicly stated that it views companies like Fox's Internet licensing partners as a potential competitive

- 21 -

threat to Dish's subscriber acquisitions, retention, and, as a result, Dish's revenue.[7] Dish has also made public statements that it intends to launch, as soon as this summer, an online pay television service.[8]   In fact, Dish's co-founder and Chairman, Charlie Ergen, has made no secret of his ambition to launch an over-the-top video service, describing the current ad-supported cable and satellite video ecosystem as a "declining business."  Singer Decl., Ex. 7.  Notably, reports and comments from Mr. Ergen and Joseph Clayton, Dish's CEO, suggest that such a service will provide the type of ubiquitous access on multiple devices to streaming content at a low price point that is aimed at capturing current or would-be subscribers of Internet content websites (e.g., Netflix).  *See* Singer Decl., Ex. 8. The agreements between Fox and Dish's competitors represent a treasure trove of competitive intelligence for Dish – which is likely why Dish has elected to gamble that this Court will give it unredacted copies of all of the agreements instead of addressing the specific provisions at issue.

### 2.   Terms Relating To ██████████████████████ ███████████ Are Irrelevant.

Contract terms relating to ████████████████████████ are not relevant to any claim or defense asserted in this case.  None of Dish's generic relevance arguments provide any basis for the Court to order Fox to disclose these highly confidential, competitively-sensitive contract terms to Dish.

*First,* although Dish claims it needs to see every single term in its competitors' agreements in order to rebut market harm and establish a fair use defense, this claim is specious.  The fair-use market harm analysis asks what the

---

[7] *See* Singer Decl., Ex. 4 (Dish Network Corp., Annual Report (Form 10-K) (Feb. 23, 2012, at p. 19) (identifying "digital media companies that provide or facilitate the delivery of video content via the internet" (*i.e.,* Fox's licensing partners) as "competition and economic risks affecting our business.").

[8] *See, e.g.,* Singer Decl., Ex. 5 (Andy Vuong, *Dish eyes launch of Netflix-like niche video service by year-end,* DenverPost.com (May 8, 2014)); Ex. 6 (Chris Morran, *Dish Network's Internet TV Service Could Be Available This Summer*, Consumerist.com (Apr. 23, 2014)).

impact on the market would be if numerous satellite and cable companies start copying programs broadcast on the Fox Network to create their own commercial-free VOD, just like Dish is currently doing. *See* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4] at 13-198.4-.4(1) (Rev. ed. 2013). Agreements involving ███████████████████████████████████████ ████████████████████████████████████████████████████ have no relevance to fair-use market harm.

   **Second,** Dish attempts to argue that all of Fox's agreements should be unredacted because they are relevant to Fox's reasonable-royalty claim. It is a mystery how provisions relating to █████████████████, which again, is not at issue here, ███████████████████████████ would assist Dish's expert in determining the amount Fox would charge if forced to license Dish commercial-free VOD and Internet streaming rights for its broadcast television content. *See Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1073 (9th Cir. 2014); Order re Plaintiffs' Motion for Preliminary Injunction re Dish's New 2013 Services (Sept. 23, 2013), ECF No. 196, at 9-10.

   **Third,** Dish argues that Fox's licensing agreements are all generally relevant to Fox's damages claims for economic remedies. But, as Fox has told Dish multiple times, Fox is *not* seeking actual damages for lost sales, lost revenues, lost streams, or lost downloads. *See, e.g.*, Phillips Decl., Ex. 13, p. 89, Ex. 15, p. 110, Ex. 29, p. 560. In any event, ████████████████████████████████ ███████████████ provisions would not be relevant to damages even if Fox were claiming damages, which it isn't.

   **Fourth,** Dish argues that the redacted portions of Fox's competitively-sensitive agreements with third-party Internet distributors are relevant to Fox's claims for irreparable harm because Fox argued that Dish's unauthorized services would negatively impact Fox's relationships with legitimate licensees. The terms Fox has redacted are not probative of this issue.



1   **Fifth,** Dish has essentially conceded that ███████████ content is irrelevant

2   to this case by failing to address or rebut Fox's statements.   *Compare*, Phillips

3   Decl., Ex. 2 (Fox 6/20/13 letter (Fox will redact "███████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████") with Ex. 5 (Dish 7/16/13 letter (████████████

6   ███████)), Ex. 7 (Dish 8/27/13 letter (same)), and Ex. 9 (Dish 9/25/13 letter

7   (same)).   And, irrespective of Dish's concession, ████████████████████

8   are plainly irrelevant as this case concerns current season television broadcast on

9   the Fox Network, ████████████████.   Therefore, any redactions Fox has

10   made to its Internet-distribution agreements dealing with ████████████

11   ███████ are appropriate and Fox should not be compelled to disclose these

12   terms.

13   **Sixth,** although Fox has argued that Dish's unauthorized services create a

14   risk of rampant piracy, ████████████████████████████████████

15   ████████████████████████ are not relevant to this lawsuit.   Dish

16   concedes as much by not challenging the redaction of ████████████.

17   **3.      Terms Relating To** ████████████████████████████

18   **                              Are   Highly   Confidential   And**
    **Commercially-Sensitive.**

19   In addition to being irrelevant, the terms Fox redacted from its Internet

20   license agreements are all highly confidential and competitively sensitive.   The

21   redacted ████████████████████████████████████████████

22   ████████████████████████████████.   Declaration of

23   Sherry Brennan ("Brennan Decl."), ¶ 2.   Fox, like other content providers, is in a

24   constant battle to combat piracy and unauthorized use of its content, which is why

25   ████████████████████████████████████████████████████████

26   ████████████████████. *See id.* ████████████████

27   ████████████████████████████████████████████████████████

28   ████████. *Id.* at ¶ 4. ███████████████████████████



. *Id.* at ¶ 3; Shepard Decl., ¶ 6.

. Brennan Decl., ¶ 5.

The provisions concerning ▮▮▮▮▮▮▮▮▮ in Fox's agreements with its licensing partners, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, are also highly confidential and commercially-sensitive.   Brennan Decl., ¶ 7.   Likewise, the ▮▮▮▮▮▮▮▮▮▮▮▮▮

are also commercially-sensitive.  *Id.* at ¶ 6.

. *Id.*

. *Id.*

Dish may contend that Fox's confidentiality concerns are adequately addressed by the protective order in this case, but that order provides little comfort as it provides no protection for documents used as exhibits at trial.  Especially given that the information Dish wants to unredact is not even arguably relevant, it is not appropriate to order Fox to disclose it anyway and risk that it will become public at trial.  *See, e.g.*, *Westwood Lumber Co., Inc. v. Weyerhaeuser Co.*, No. 03-551, 2003 WL 24892050, at *1 (D. Or. Dec. 9, 2003) (denying defendant's request to compel production of plaintiff's highly-sensitive financial data despite existence of attorneys-eyes only protective order, and holding in part that "if this information is used at trial, it may well be disclosed in open court, or in the presence of

[defendant's] designated representatives and perhaps others.   Accordingly, a protective order does not adequately ameliorate the Plaintiffs' concerns."); *Rodriguez v. W. Publ'g Corp.*, No. C06-1096L, 2006 WL 2459098, at *3 (W.D. Wash. Aug. 22, 2006) (denying production of documents containing confidential business information and explaining that "[g]iven the fact that the parties are direct competitors, the existence of a protective order in the underlying litigation would likely be insufficient to fully protect [the producing party's] interests.").   Moreover, any claim by Dish that disclosure of Fox's confidential information would be limited due to the "outside counsel's eyes only" provision in the protective order is laughable, given that no fewer than *nine partners* from various outside firms have appeared on behalf of Dish so far in this case – and there is no way to know how many associates, experts, staff, and the like would also have access to Fox's confidential information.

**4.**   **Fox Has Redacted Other Information From The Agreements It Has Produced To Date.**



To the extent provisions other than those relating to

. Shepard Decl., ¶ 6.



The protective order offers little or no comfort to third parties, since third parties have limited ability to monitor the litigation and prevent the disclosure of their confidential information at trial or at hearings.

5.   The ▮▮▮▮ Terms Of Fox's SVOD Agreements Are Not Direct Comparables For Purposes Of A Reasonable Royalty Analysis.

Unlike EST ▮▮▮▮, SVOD licensees like ▮▮▮▮ stream older content on a "season after" model to their subscribers and do not offer the *current* season television content.  The financial terms of these agreements are not direct comparables for a reasonable-royalty analysis because Dish's

. *Id.*

unauthorized services involve current-season content.   Dish's unauthorized streaming service, Dish Anywhere, streams broadcast programming that is airing live over the Internet to subscribers who can view the programs on their computers or mobile devices.  And Dish's unauthorized commercial-free VOD service, PTAT, copies broadcast programming currently airing on the Fox Network in order to create an on-demand library of programs that are saved for eight days and can be viewed without commercials.  Thus, unlike EST, SVOD is not directly comparable to Dish's unauthorized services.  *See* Order re Plaintiffs' Motion for Preliminary Injunction re Dish's New 2013 Services (Sept. 23, 2013), ECF No. 196, at 11 (suggesting that digital download contracts with companies like Apple could serve as benchmarks in calculating a reasonable royalty).

### 6.   Fox Has Worked Diligently To Produce The Agreements In A Timely Manner.

Dish accuses Fox of failing to produce its Internet license agreements in a timely manner, but that is just not true.  To date, Fox has produced more than 100 agreements with ██████████████████████████████████████ ████████████████████████.  Gathering and preparing these agreements for production and conferring with licensing partners was no small feat.  Fox's efforts have already taken hundreds of hours on the parts of partners, senior and junior associates, and paralegals and other support staff.  Shepard Decl., ¶ 7.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████  Fox has diligently worked to produce these agreements in a timely fashion.

1    Moreover, it was partially Dish's fault that the production took so long.  Dish

2    initially represented to Fox that Dish would ████████████████████

3    ████████████████████████████████████████████.  Singer

4    Decl., ¶ 3; Phillips Decl., Ex. 4, p. 32, and Ex. 5, p. 39 (████████████

5    ████████████████████████████████████████████████████

6    ████████████████████").  After Fox waited for seven months for Dish to do

7    what it said it would do, █████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ███████████████████."  Singer Decl., Ex. 1.

### 7.    Interrogatory No. 9 Is Moot

Dish's decision to move to compel on this interrogatory is incomprehensible. Interrogatory No. 9 asks Fox to identify the terms of all of its non-linear licensing agreements that grant licensees rights to Fox's broadcast primetime programming. Federal Rule of Civil Procedure 33, subpart (d), "Option to Produce Business Records," says that if the answer to an interrogatory "may be determined by examining . . . a party's business records . . . , and if the burden of delivering or ascertaining the answer will be substantially the same for either party, the responding party may answer by:  (1) specifying the records . . . in sufficient detail . . . [and] (2)  giving the interrogating party a reasonable opportunity to examine" the records.

Fox has done this.  Fox has already produced the relevant license agreements in large part.  Shepard Decl., ¶¶ 5, 10.  Before serving its portion of this Joint Stipulation, Fox served a supplemental response on Dish on June 26, 2014 that identified, by bates number, all the Internet distribution agreements and VOD and authentication agreements with MVPDs that Fox has produced to date.  Shepard Decl., ¶ 12, Ex. 2.  Because the burden of identifying the terms of the agreements is substantially the same for Dish as it is for Fox since Dish

agreements to examine, and Fox has described the agreements in "sufficient detail" – identifying them by bates number – Fox has fulfilled its discovery obligations with respect to Interrogatory 9 and the motion regarding this demand is moot.

Dated:        July 7, 2014                          Orrick, Herrington & Sutcliffe LLP


                                                    By:_____
                                                           WILLIAM A. MOLINSKI
                                                           Attorneys for Defendants
                                                           DISH Network L.L.C., DISH
                                                           Network Corp. and EchoStar
                                                           Technologies L.L.C.

Dated:        July 7, 2014                          Jenner & Block LLP



                                                    By:_____
                                                           DAVID R. SINGER
                                                           Attorneys for Plaintiffs
                                                           Fox Broadcasting Company,
                                                           Twentieth Century Fox Film Corp.,
                                                           and Fox Television Holdings, Inc.

1  agreements to examine, and Fox has described the agreements in "sufficient detail"

2  – identifying them by bates number – Fox has fulfilled its discovery obligations

3  with respect to Interrogatory 9 and the motion regarding this demand is moot.

4  Dated:       July 7, 2014                    Orrick, Herrington & Sutcliffe LLP

5

6                                                By:_____

7                                                     WILLIAM A. MOLINSKI
                                                      Attorneys for Defendants
8                                                   DISH Network L.L.C., DISH
                                                   Network Corp. and EchoStar
9                                                    Technologies L.L.C.

10  Dated:       July 7, 2014                   Jenner & Block LLP

11

12

13                                               By:_____

14                                                    DAVID R. SINGER
                                                     Attorneys for Plaintiffs
15                                                Fox Broadcasting Company,
                                                 Twentieth Century Fox Film Corp.,
16                                                and Fox Television Holdings, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

DEFT MOTION TO COMPEL PRODUCTION AND
INTERROGATORY RESPONSE
CASE NO. CV1204529 DMG (SHX)