1

2

3

4

5

6

7

8

9           UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

11

12

13

14

15  FOX BROADCASTING COMPANY,        ) CV 12-04529-DMG (SHx)
    Inc., et al.,                    )
16                                   ) ORDER
                    Plaintiffs,      )
17                                   )
    v.                               )
18                                   )
    DISH NETWORK, L.L.C., et al.,    )
19  DISTRIBUTION et al.,             )
                                     )
20                  Defendants.      )
                                     )
21
          This matter is before the Court to determine DISH's Motion to Compel

22
    Production of Documents in Response to Request for Production No. 3 (Set

23
    One), DISH's Motion to Compel Production of Documents in Response to

24
    Request for Production No. 6 (Set One), Nos. 28-30 (Set Two), Nos. 24, 31, 32,

25
    35-41 (Set Three), and Non-Parties Netflix, Inc.'s and Amazon.com Inc.'s

26
    Motion for Protective Order. Oral argument was held on July 25, 2014.

27

28

1

## I. **BACKGROUND**

2        On June 2, 2014, Defendants DISH Network L.L.C. (DISH), et al. filed a

3   Motion to Compel Production of Documents and a Joint Stipulation regarding

4   Defendant's Motion to Compel Production of Documents in Response to

5   Request for Production No. 3 (Set One), seeking production of all of Plaintiff

6   Fox Broadcasting Company's (Fox) retransmission consent (RTC) agreements

7   with other multichannel video programming distributors (MVPDs) and Local TV

8   Station Affiliate Agreements. Supplemental Memoranda were filed on June 9,

9   2014. Additionally, Defendants filed the Declarations of Richard Rapp and Julie

10   Shepard, and an Appendix of Previously Submitted Documents. Plaintiffs also

11   filed Declarations of Michael Baird, Amy Gallegos, and Michael H. Page, and an

12   Objection to the Declaration of Richard Rapp.

13        On June 16, 2014, Defendants filed a Motion to Compel Production of

14   Documents regarding Request for Production No. 6 (Set One), Nos. 28-30 (Set

15   Two), Nos. 24, 31, 32, 35-41 (Set Three), and a Supplemental Memorandum in

16   Support of Defendant's Motion. Defendants sought the production of Fox's

17   forecasts, projections, and budget comparisons for the past seven years,

18   documents discussing or evidencing product placement advertising, embedded

19   advertising, and alternative advertisement models, upfront presentations and

20   agreements, documents sufficient to show scatter market advertising rates,

21   documents showing program views of Fox's primetime programming, and views

22   of Fox's primetime programming on Hulu, Netflix, TV.com, Amazon Prime,

23   Vudu, Apple iTunes, and Cinema Now.  Plaintiffs filed a Supplemental Brief in

24   Opposition to Defendant's Motion to Compel Production of Documents on June

25   16, 2014. Additionally, Defendants filed an Appendix of Previously Filed

26   Documents in Support of Defendant's Motion to Compel on June 16, 2014. On

27   June 17, 2014, Defendants filed a Joint Stipulation for Defendant's Motion to

28   Compel Production of Documents.

On July 7, 2014, Non-Parties Netflix, Inc. (Netflix) and Amazon.com Inc. (Amazon) filed a Motion for Protective Order, seeking to prevent the disclosure of documents showing program views of Fox's primetime programming on Netflix and Amazon Prime to DISH. On July 7, 2014, Netflix and Amazon also filed Non-Parties' Letter to Hon. Judge Stephen J. Hillman and Declarations of Bobbie J. Wilson, Christopher Carrier, and Brad Beale. On July 15, 2014, Defendants filed an Opposition to Non-Parties Netflix and Amazon's Motion for Protective Order.

### III. STATEMENT OF FACTS

Defendant DISH is an MVPD, providing video programming services to customers for a subscription fee (Joint Stipulation 6). DISH is a party to a retransmission agreement with Fox, a major broadcast network, authorizing DISH to retransmit television signals for local TV stations owned and operated by Fox (*Id.*). DISH and other MVPDs also enter into separate RTC agreements with independently owned local Fox stations, or affiliates, who pay to broadcast Fox content and sell advertising time (*Id.* at 6-7).

Fox filed this lawsuit for breach of contract and copyright infringement against DISH on May 24, 2012, asserting that DISH DVR features including PrimeTime Anytime (PTAT), AutoHop, Hopper Transfers, and Sling Adapter breach the parties' retransmission agreements and violate copyright laws (*Id.* at 7). Fox seeks preliminary and permanent injunctive relief, reasonable royalties, and disgorgement (*Id.* at 8, 16). Fox's August 2012 and February 2013 motions for injunctive relief were denied (*Id.* at 8).

On September 21, 2012, DISH served Request for Production of Documents No. 3, seeking all of Fox's affiliate and RTC agreements for the past seven years. Fox objected on the grounds that the information sought is protected by attorney-client privilege or attorney work product doctrine, is irrelevant and outside the scope of discovery, is overly broad and unduly burdensome, and

1  includes confidential or proprietary information (*Id.* at 5, 9). During meet and

2  confer, Fox disagreed with DISH that affiliate and RTC agreements are relevant

3  to defendants' fair-use market harm defense, reasonable royalty claim, and

4  irreparable harm assertions (*Id.* at 10). Furthermore, Fox asserted that producing

5  these documents would be too burdensome as it would require the production of

6  1900 agreements, consuming hundreds of hours and costing tens to hundreds of

7  thousands of dollars (*Id.* at 33).

8        DISH seeks affiliate and RTC agreements to conduct a market analysis of

9  Fox's copyrighted work to demonstrate lack of harm from DISH's conduct

10  disputing that the agreements are privileged, unduly burdensome, and irrelevant

11  (*Id.* at 11). Additionally, DISH is amenable to a protective order that makes the

12  agreements accessible only to its outside counsel in order to acquire evidence

13  that can rebut any of Fox's generalized assertions of market harm in regard to the

14  likelihood of future damages (*Id.* at 13, 22).

15        Fox also objected to DISH's Request for Production No. 6 (Set One)

16  served on September 21, 2012, Nos. 28-30 (Set Two) served on April 9, 2013,

17  and Nos. 24, 31, 32, 35-41 (Set Three) served on July 23, 2013 on the grounds

18  that the requests are overly broad and unduly burdensome, seek information

19  protected by attorney-client privilege, common interest privilege, or attorney

20  work-product doctrine, seek irrelevant information, and seek confidential or

21  proprietary information protected by privacy and non-disclosure rights.

22        Fox estimated that it would cost between $520,000 and $1.04 million to

23  house, prepare, and produce the 600 GB to 2 TB of data sought by Request Nos.

24  24 and 31 (Set Three) alone, excluding costs associated with having attorneys

25  review 4.4 million to 15 million documents for relevance and privilege, which

26  Fox estimates would consume thousands of person-hours and cost hundreds of

27  thousands of dollars (*Id.* at 19; Declaration of Amy Gallegos ¶ 3-4).

28

1    Fox has already produced its financial information for 2007-2010

2  (Molinski Decl. Ex. 13, at 76). Fox has additionally produced its total revenue

3  from digital distribution as well as detailed viewing information for Hulu and

4  Hulu Plus (Molinski Decl. Ex 17, at 106). Moreover, Fox has produced "its

5  profit and loss statements showing the proportion of its revenues that come from

6  ad sales on the Fox network versus other revenue sources" (Molinski Decl. Ex.

7  16, at 101). Fox has also provided DISH with its total advertising sales revenues

8  for 2007-2013 and its average CPM (cost per 1,000 impressions) advertising

9  rates for 2012-2013 and 2013-2014 seasons (Molinski Decl. Ex. 17, at 104; Joint

10  Stipulation 21). In addition to its advertising sales numbers, Fox has produced all

11  negotiation communications that mention DISH's services and all of its VOD

12  and streaming license agreements with DISH's competitor MVPDs, the only

13  agreements Fox asserts are relevant to its market-harm claims (Joint Stipulation

14  3; Joint Stipulation 23). Fox has also agreed to produce documents showing

15  Fox's total revenues from its affiliates on an annual basis for the past seven years

16  (Page Decl. Ex. 8, at 41).

## IV. DISCUSSION

18  **A.    Fox is not required to produce its RTC agreements with other**

19  **MVPDs and affiliate agreements with local TV stations which**

20  **Defendants seek in their Request for Production No. 3 (Set One)**

21    In order to assess actual harm resulting from DISH's features to Fox's

22  business, DISH seeks to analyze the market value of the copyrighted works and

23  its effect on statutory damages (Joint Stipulation 17). DISH filed a Declaration of

24  Richard Rapp in support of its Motion to Compel, which opines that all affiliate

25  and RTC agreements to which Fox is a party are relevant to an economic

26  analysis of potential harm to Fox as well as DISH's defenses of fair use, damages

27  or royalties, and injunctive relief (Rapp Dec. ¶ 5).

28

1    Mr. Rapp, an economist, asserts that no economist could assess the impact

2 of DISH features on Fox's retransmission revenues without reviewing all

3 available agreements to determine the differences between the affiliate and RTC

4 agreements before and after the DVR features took effect (Rapp Dec. ¶ 8).

5 Because Fox indicated that RTC agreements have become increasingly more

6 important as a revenue stream, Mr. Rapp concluded that it is necessary to

7 examine all agreements relating to Fox's revenue streams to understand the

8 impact of DISH's features on the value of Fox's copyrighted works at issue

9 (Rapp Dec. ¶ 10).

10    However, Mr. Rapp makes conclusory statements regarding the need for

11 these documents. Mr. Rapp does not persuade the court that RTC and affiliate

12 agreements are necessary (in addition to Fox's financial records and revenue data

13 reflecting income from various revenue streams) to conduct market harm,

14 reasonable royalty, and irreparable harm analyses. While Mr. Rapp asserts that

15 DISH needs all RTC and affiliate agreements in Fox's possession to understand

16 the bundles of rights stemming from these agreements, he fails to sufficiently

17 address why Fox's financial records do not provide adequate data for market

18 analysis or to demonstrate whether DISH's unique features caused Fox's

19 revenues to decrease. He also does not address how other fluctuating factors that

20 may influence the terms of Fox's future revenues, such as Nielson ratings, the

21 economy, seasonal changes, venues, unpredictable consumer and competitor

22 behavior, and many other factors, could be discounted by analyzing RTC and

23 affiliate agreements instead of aggregate revenue data.  Additionally, Mr. Rapp's

24 Declaration should have been filed with the joint stipulation.

25    At oral argument, DISH asserted that the standard way for it to show a

26 lack of damages would be to cite a lack of material change in the terms of Fox's

27 agreements, which would indicate that DISH did not adversely affect Fox's

28 business. However, any changes in Fox's agreements since the implementation

6

1  of DISH's services do not eliminate the potential effects of other factors on the

2  market for Fox's copyrighted works and revenues.

3      Furthermore, RTC and affiliate agreements do not establish affirmative

4  evidence of fair use because they do not account for the effect of any future

5  "unrestricted and widespread conduct of the sort engaged in by" DISH on the

6  potential market. *See* Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590

7  (1994). Unlike the market for parodies of a song in Campbell and the market for

8  discrete screen shots of a video game, DISH's services concern the market for

9  Fox's entire copyrighted primetime programming as originally produced. *See*

10  Sony v. Bleem, 214 F.3d 1022, 1029 (9th Cir. 2000). Hence, the definition of the

11  market for Fox's primetime programming is far broader than the market

12  definitions in Campbell and Bleem. Therefore, DISH cannot contest the

13  existence of a market, and lack of impairment to the market, for Fox's primetime

14  programming based on these precedents, where the allegedly infringing works

15  occupy a significantly smaller or different market than the copyrighted works.

16      Fox seeks to produce only RTC agreements it contends were affected by

17  DISH's infringement, and is willing to stipulate that those agreements not

18  produced were not affected (Joint Stipulation 3, 25). Fox asserts that RTC and

19  affiliate agreements DISH seeks in Request for Production No. 3 are not relevant

20  to the damages Fox claims, or to a fair use analysis (*Id.* at 3-4). Fox asserts that

21  DISH is not entitled to all of its confidential agreements with MVPDs and

22  affiliate TV stations, but only agreements relevant to specific markets DISH is

23  allegedly harming, and not the entirety of its financial records relating to the

24  value of its copyrighted works (*Id.*).

25      Fox argues that its RTC and affiliate agreements are not relevant to the

26  calculation of a reasonable royalty because they do not address rights analogous

27  to VOD and streaming rights (*Id.* at 5, 28). Fox also asserts that the highly

28  sensitive economic terms of its affiliate agreements with local TV stations are

1   irrelevant to the fair use analysis since Fox does not argue that DISH's features

2   harm the affiliate agreement market and DISH cannot prove fair use by

3   analyzing the value of the copyrighted works in the affiliate market (*Id.* at 27).

4        Fox additionally asserts that RTC agreements are "highly confidential and

5   subject to nondisclosure agreements," and that DISH seeks these documents to

6   acquire the terms of its competitors' agreements regarding retransmission rights,

7   which Fox claims are irrelevant to this matter (*Id.* at 24). While DISH asserts that

8   "Fox has not indicated that it is withholding responsive documents because it

9   cannot secure the approval from the other parties to these agreements," Fox

10   states that DirecTV, one of DISH's MVPD competitors, objects to disclosure of

11   its RTC agreement with Fox to DISH (*Id.* at 22, 25).

12        Fox claims that obtaining consent from hundreds of third parties prior to

13   disclosure and production of 300 RTC agreements as well as 1,600 affiliate

14   agreements, renewals, or amendments is unduly burdensome compared to the

15   benefit of the information to be obtained to DISH (*Id.* at 32-33). Fox estimates

16   that producing these documents would require hundreds of hours and cost tens to

17   hundreds of thousands of dollars (*Id.* at 33). Fox has already produced its

18   financial records and license agreements relevant to this matter, and the

19   additional benefit of financial data from RTC and affiliate agreements does not

20   outweigh the burden of producing them.

21        Furthermore, Fox asserts that it is not seeking actual damages since

22   "harms caused by Dish's infringement are irreparable and unquantifiable," but

23   Fox is seeking a reasonable royalty based on the value of the rights on which

24   DISH is infringing if Fox was compelled to license those rights to DISH (*Id.* at

25   28). Since a reasonable royalty is calculated by determining the value of similar

26   rights on the open market, licenses dissimilar in subject matter or scope to those

27   at issue are irrelevant to the assessment of a reasonable royalty (*Id.* at 29-30).

28   Fox asserts that affiliate and RTC agreements sought are not discoverable

1  because they do not address the specific rights Fox claims are infringed by

2  DISH's features (*Id.* at 30). Fox also asserts that "courts within this circuit have

3  held that a plaintiff seeking statutory damages under the Copyright Act is not

4  required to produce evidence of its profits from the works being infringed" (*Id.*).

5       The court concludes that DISH is not entitled to Fox's RTC agreements

6  with other MVPDs and affiliate agreements with local TV stations to prepare its

7  defenses, as there is insufficient relevance to justify the burden of production.

8

9       **B.    Fox is not required to produce the following documents which**

10           **Defendants seek in their Request for Production Nos. 6 (Set**

11           **One), 28-30 (Set Two), 24, 31 (Set Three): its forecasts,**

12           **projections, or budget comparisons; documents discussing or**

13           **evidencing product placement, embedded advertising, or**

14           **alternative advertising models; and upfront presentations and**

15           **agreements and documents showing scatter market advertising**

16           **rates**

17       DISH seeks Fox's forecasts, projections, and budget comparisons for the

18  past seven years to disprove Fox's assertions of adverse impact on its advertising

19  sales and negotiations (Joint Stipulation 10). Fox asserts that these documents are

20  irrelevant to the claims and defenses in this case and would be unduly

21  burdensome to produce (*Id.* at 25). Fox asserts that estimates of its future

22  financial performance will not serve to prove or disprove fair-use market harm to

23  its copyrighted works if products similar to DISH's services become widespread

24  and that Fox's financial records and advertising revenues already provided can

25  demonstrate whether Fox's works have been adversely impacted by DISH

26  products.

27       Additionally, DISH seeks the production of documents discussing or

28  evidencing product placement, embedded advertising, and alternative advertising

1   models. However, Fox asserts that these documents are not relevant since it is

2   not required to mitigate the effect of DISH's conduct on its business model under

3   fair use market harm or irreparable harm analysis (*Id.* at 37).

4          Moreover, DISH seeks the production of Fox's upfront presentations and

5   agreements, as well as documents sufficient to show scatter market advertising

6   rates and sales volumes in order to prepare its defenses. However, Fox is not

7   seeking compensatory damages (*Id.* at 24). DISH does not persuasively explain

8   why the financial records and aggregate advertising sales data that Fox has

9   already produced are not sufficient to allow DISH to prepare defenses

10  challenging Fox's irreparable harm and reasonable royalty claims. Financial and

11  revenue data can demonstrate the impact of DISH services on the market and

12  value of Fox's copyrighted works (*Id.* at 13).

13         Fox has indicated that producing its upfront presentations and agreements,

14  as well as documents showing scatter market advertising rates and sales volumes,

15  would be unduly burdensome. Fox estimates that DISH's requests covers most of

16  the business documents generated by its 100-person advertising sales

17  department, approximately 600 GB to 2 TB of data or fifteen million documents

18  that would take months and between $520,000 and $1.04 million dollars to

19  gather, review, and produce (*Id.* at 16, 19).

20         Moreover, Fox asserts that the burden of producing scatter market data

21  would equal or exceed that of producing documents relating to upfront

22  agreements since Fox is not in possession of documents that summarize this

23  information (Molinski Decl. Ex. 23, at 152). Despite asserting that these

24  documents are not relevant to any claim or defense in this matter, Fox has agreed

25  to provide some documents covered by these requests that will provide DISH

26  with the information it seeks, including total advertising sales revenue from the

27  years 2007 to 2013 and all communications with advertisers that mention PTAT

28  or AutoHop (Joint Stipulation 16-17, 20-21).

1      When evaluating a fair-use defense, the Court considers whether the use

2   adversely affects "the potential market for the copyrighted work." Harper & Row

3   Publishers, Inc. v. Nation Enters., 471 U.S. 539, 568 (1985) (quoting Sony Corp.

4   of Am. v. Universal City Studios, Inc., 464 U.S. 417, 451 (1984) (emphasis

5   omitted). Similarly, Fox's irreparable harm claim relates to harm that is difficult

6   to quantify as it consists of future damages Fox will allegedly suffer if DISH's

7   unique features are adopted by other MVPDs. Since Fox is not seeking

8   compensatory damages, but only a reasonable royalty under the Copyright Act,

9   Fox's documents addressing its projections, product placement, embedded

10  advertising, alternative advertising models, upfront presentations and

11  agreements, and scatter market advertising rates, are not conducive to proving or

12  disproving the claims and defenses in this matter. Moreover, at oral argument,

13  DISH conceded that documents concerning advertising are not relevant to the

14  claims and defenses in this matter.

15

16      **C.    Fox is not required to produce documents reflecting program**

17           **views of Fox's primetime programming, including program**

18           **views of Fox's primetime programming on Hulu, Netflix,**

19           **TV.com, Amazon Prime, Vudu, Apple iTunes, and Cinema Now**

20           **which Defendants seek in their Request for Production Nos. 32,**

21           **35-41 (Set Three)**

22      DISH seeks documents regarding program views of Fox's primetime

23  programming to demonstrate a lack of adverse impact on viewership of Fox

24  programming (*Id.* at 43). However, Fox already produced aggregate streaming

25  data and total advertising revenue for 2011 to 2013 (*Id.* at 38-39).

26      Furthermore, DISH seeks documents regarding program views of Fox's

27  primetime programming via individual online services, including Hulu, Netflix,

28  TV.com, Amazon Prime, Vudu, Apple iTunes, and Cinema Now to demonstrate

1   that alternative viewing platforms may be responsible for any adverse impact on

2   Fox's diminished advertising revenues (*Id.* at 43). However, Fox asserts that

3   these documents are not relevant to any claims or defenses in this matter since it

4   is not seeking compensatory damages related to lost revenues from a decrease in

5   viewership on online platforms (*Id.* at 49).

6          Similarly, irreparable harm cannot be proven or disproven with documents

7   regarding program views, especially via individual online services, since it

8   consists of harms that are intangible or difficult to calculate (*Id.*). These

9   documents are also irrelevant to the calculation of a reasonable royalty claim,

10  which would consist of the value of a license for rights to use Fox's copyrighted

11  programming as DISH is currently utilizing it, not lost royalties (*Id.* at 50-51).

12  Moreover, a fair-use market harm defense would consist of adverse impact on

13  the potential market for Fox's copyrighted programming from widespread use of

14  Fox's copyrighted works consistent with how those works are being employed

15  by DISH's services at issue (*Id.*).

16         At oral argument, DISH asserted that viewership information is necessary

17  to ascertain existing consumer behavior to show a lack of harm from widespread

18  conduct under the fair-use market-harm analysis. However, DISH has not

19  persuaded this court that changes in viewership are relevant to showing that

20  market-wide implementation of services like those at issue will not have a

21  substantially adverse impact on the potential market for Fox's primetime

22  programming. Fox already produced aggregate streaming data, and any

23  additional benefit to DISH from production of individualized viewership data

24  does not outweigh the burden of producing many more documents irrelevant to

25  the claims and defenses in this case.

26

27

28

**D.     Fox is not required to produce Non-Parties Netflix's and Amazon's confidential subscriber viewing and download information of Fox programming**

If the movant shows that its confidential commercial information qualifies for protection and would result in harm if disclosed, the requesting party has the burden of showing that the "information is relevant to the subject matter of the lawsuit and is necessary to prepare the case for trial." Nat'l Academy of Recording Arts and Sciences, Inc. v. On Point Events, *LP*, 256 F.R.D. 678, 681 (C.D. Cal. 2009). If the requesting party shows that the information is relevant to the litigation, the court then weighs "the injury that disclosure might cause to the property against the moving party's need for the information." *Id.*

Here, Non-Parties assert that revealing the requested information to DISH would materially prejudice them because the information could be used to outbid the Non-Parties by obtaining insight into how they value specific programs, predicting what programs are likely to attract more viewers, revealing how best to market DISH services, and understanding how to best compete against Non-Parties by gaining insight into their licensing arrangements (Motion for Protective Order 6).

Non-Parties assert that an Outside Litigation Counsel Only designation will not sufficiently safeguard the confidential information, particularly considering that aggregate industry-wide data is more conducive to fair-use market harm analysis and irreparable harm (*Id.*).  Non-Parties further assert that viewership data is irrelevant to the forward-looking fair-use market harm analysis or the calculation of statutory damages and disgorgement, which depend on the value to Fox's copyrighted works as utilized by DISH's services, since changes in viewership do not establish or disprove damages to Fox from DISH's services (*Id.* at 6-8).

13

1    The Non-Parties' confidential commercial information further warrants

2    protection because they have no vested interest in the litigation and the

3    requesting party is a competitor. More to the point, DISH has not persuaded this

4    court that individual online services' viewership data is relevant to its defenses.

5                                    **V. <u>ORDER</u>**

6    For the foregoing reasons, the Court denies Defendant's Motions to

7    Compel Production of Documents, and grants Non-Parties' Motion for Protective

8    Order.

9    DATED: <u>August 11, 2014</u>

10

11

12    _____

13                    STEPHEN J. HILLMAN
                UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28