JENNER & BLOCK LLP
Richard L. Stone (Cal. Bar No. 110022)
rstone@jenner.com
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
David R. Singer (Cal. Bar No. 204699)
dsinger@jenner.com
Amy M. Gallegos (Cal. Bar No. 211379)
agallegos@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, California 90071
Telephone: (213) 239-5100
Fax: (213) 239-5199

Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

## UNITED STATES DISTRICT COURT FOR THE

## CENTRAL DISTRICT OF CALIFORNIA

| FOX BROADCASTING COMPANY, et al. | Case No. 12-CV-04529-DMG (SH) |
|---|---|
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| DISH NETWORK L.L.C., et al., Defendants. | Hearing Date:    October 17, 2014<br>Hearing Time:    2:00 p.m.<br>Hearing Location:  Courtroom 7 |
| | **[PUBLIC REDACTED VERSION]** |

2300024.8

# **TABLE OF CONTENTS**

I.    Introduction ..................................................................................... 1

II.   Dish Is Infringing Fox's Copyrights And Breaching The RTC Agreement
      By Streaming Fox Programs Over The Internet............................................ 6

      A.    Dish Is Distributing Fox's Programming Over The Internet ............... 8

      B.    Dish Is Infringing Fox's Exclusive Public-Performance Right. ........ 11

      C.    The Fact That Dish Has A Retransmission License Does Not
            Distinguish It From Aereo Or Otherwise Excuse Its Conduct .......... 14

      D.    Dish Cannot Distinguish Itself From Aereo by Claiming To Be An
            Equipment Provider .......................................................... 15

      E.    Dish Is Breaching The No-Internet Clause ...................................... 19

            1.   The RTC Agreement Prohibits Internet Distribution .............. 19

            2.   Dish Is Breaching The RTC Agreement.................................. 19

            3.   At Bare Minimum, Dish Is Authorizing Its Subscribers To
                 Retransmit Fox's Programming.................................... 21

III.  Dish Is Breaching The No-VOD Clause By Offering PTAT, Which It
      Admits  Is Similar To VOD.................................................................... 22

      A.    The RTC Agreement Bars Dish From Distributing Fox's Programs
            22On A Basis Similar To VOD ........................................................ 22

      B.    Dish Offers Subscribers On-Demand Access To Fox Programs
            Through Its Primetime Anytime Service ............................................ 22

      C.    Dish Is Distributing Fox's Programs On A VOD Or Similar Basis ... 23

            1.   PTAT Is Similar To VOD....................................................... 23

            2.   Any Claim By Dish That It Is Not "Distributing" Fox's
                 Signal On A Basis Similar To VOD Is Meritless..................... 31

i

3.      "Distribute" As Used In The No-VOD Clause Does Not
        Require Copies To Change Hands.............................................33

IV.   Dish Is Breaching The RTC Agreement By Authorizing Its Subscribers
      To Use Hopper Transfers To Copy Fox Programs To View Outside The
      Home ...................................................................................................34

      A.      Dish Authorizes Subscribers To Use Hopper Transfers To Copy
              Programs To Watch Outside The Home.............................................34

      B.      Dish Is Breaching The RTC Agreement .............................................35

V.    Dish Infringed Fox's Copyrights And Breached The RTC Agreement By
      Copying Fox Programs As Part Of The AutoHop Service ...........................37

      A.      Dish Admits that It Repeatedly Copied Fox Programs As Part Of
              Its AutoHop Service ..................................................................37

      B.      Dish Is Infringing Fox's Copyrights And Breaching The No-
              Copying Clause .......................................................................38

VI.   Conclusion .............................................................................................39

# TABLE OF AUTHORITIES

CASES                                                                                PAGE(S)

*American Broadcasting Cos. v. Aereo, Inc.*,
    134 S. Ct. 2498 (2014) ......................................................................*passim*

*Am. Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994) ....................................................................39

*Cmty. Television of Utah, LLC v. Aereo, Inc.*,
    — F. Supp. 2d —, 2014 WL 642828 (D. Utah 2014) ...........................7

*Fox Broad. Co. v. Dish Network, L.L.C.*,
    747 F.3d 1060 (9th Cir. 2014) ..........................................................5, 31

*Fox Broadcasting Co. v. Dish Network, L.L.C.*,
    905 F. Supp. 2d 1088 (C.D. Cal. 2012) ...............................................39

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
    915 F. Supp. 2d 1138 (C.D. Cal. 2012) ...........................................7, 21

*Helmsley-Spear, Inc. v. N.Y. Blood Ctr., Inc.*,
    687 N.Y.S.2d 353 (N.Y. App. Div. 1999) ...........................................20

*Kopelman v. Sigel*,
    297 N.Y.S.2d 793 (N.Y. App. Div. 1969) ...........................................20

*Petracca v. Petracca*,
    756 N.Y.S.2d 587 (N.Y. App. Div. 2003) ...........................................20

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) .............................................................39

*Silvers v. Sony Pictures Entm't, Inc.*,
    402 F.3d 881 (9th Cir. 2005) ...............................................................15

*S.O.S., Inc. v. Payday, Inc.*,
    886 F.2d 1081 (9th Cir. 1989) .............................................................15

*United States v. Aleynikov*,
    737 F. Supp. 2d 173 (S.D.N.Y. 2010) .................................................21

*Walt Disney Prods. v. Filmation Assocs.*,
   628 F. Supp. 871 (C.D. Cal. 1986) .................................................................. 39

**OTHER AUTHORITIES**

2 PATRY ON COPYRIGHT ................................................................................. 3

17 U.S.C. § 101 ................................................................................. 7, 13

17 U.S.C. § 106 ................................................................................. 6, 38

17 U.S.C. § 201 ................................................................................. 15

FED. R. CIV. P. 56 ................................................................................. 11

FED. R. EVID. 801 ................................................................................. 30

H.R. Rep. No. 94-1476 (1976) ................................................................... 12

11 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 32.6 (4TH ED.) ..................... 34

# I.     __Introduction.__

Throughout this case, Dish has argued it is beyond the reach of copyright and contract law when it offers Fox programs to paying subscribers over the Internet and through video-on-demand ("VOD") without a license because the subscribers must press a button on a remote control or website to initiate the process.  In *Aereo*,[1] the Supreme Court held that a service provider who makes copyrighted programming available to paying subscribers *cannot* avoid liability by claiming that its subscribers are culpable because of technological gimmicks that require the customer to press buttons to access the copyrighted material.  This case is even stronger than *Aereo* because the parties' license agreement expressly prohibits Dish's unauthorized exploitation of Fox's programs.  Both *Aereo* and the contract compel partial summary judgment in Fox's favor.

Fearful of losing subscribers to Internet-based services like Hulu and Netflix, Dish has been scrambling to capitalize on consumer demand for television content "on demand" and "on the go."  But it faced a problem:  Dish receives Fox's live broadcast signal pursuant to a very narrow license agreement (the "Retransmission Consent" or "RTC Agreement") that *only* allows Dish to retransmit Fox's live signal over ████ ████████████████████████████████████████████████████████████ ███████████████████████████  To get around this, Dish borrowed a page from the playbook of the now-enjoined Aereo service, and tried to evade copyright law by creating technological workarounds that require the subscriber to click a button on a website to "send" a broadcast program over the Internet, or press a button on a remote control to "enable" VOD.  Then, when Fox sued, Dish held its customers up as a shield and said it was not responsible for their choices.  Under *Aereo*, this ruse no longer works.

---

[1] *American Broadcasting Cos. v. Aereo, Inc*., 134 S. Ct. 2498 (2014) ("*Aereo*").

Fox is entitled to summary judgment in its favor on its claim that Dish infringed its copyrights by streaming live Fox programming over the Internet on the Dish Anywhere website and mobile application without permission.  This is the central holding of *Aereo*:  A service provider who offers copyrighted broadcast programming over the Internet without authorization from the copyright owner is publicly performing the programs and therefore infringing copyright – regardless of the "device or process" used.  *Aereo*, 134 S. Ct. at 2506-10.  It is undisputed that ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ SUF 8.

None of Dish's defenses survive *Aereo*.  Dish cannot claim that its subscribers are the ones sending Fox's programs over the Internet.  *Aereo* holds that the service provider is still liable even if the subscriber has to "click on a website" to "activate machinery" that reroutes the signal to her computer or mobile device.  134 S. Ct. at 2507.  And Dish cannot distinguish *Aereo* by arguing that its technology is different.  Aereo holds that the Copyright Act expressly covers transmissions to the public made by means of "*any device or process*."  *Id*. at 2509.  To be sure, Dish routes its transmissions through the "Hopper with Sling" set-top boxes that it leases to consumers and installs in their homes, whereas Aereo routed its transmissions through mini-antennas it assigned to its subscribers.  *See id*. at 2503.  But as the Supreme Court put it, "Why would a subscriber who wants to watch a television show care" whether the signal is routed through his set-top box or not before being displayed on his computer screen?  *See id*. at 2509.

2

Dish likewise cannot claim that the Hopper with Sling is just a standalone "place-shifting" product.  Last March when Fox sought a preliminary injunction, Dish assured the Court that any streaming to Dish Anywhere was done ████████████

██████████████████████████████████████████████████████████████

███████████████████████████████     ████████████████████████

████████████████████████████    ██████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████    *See* SUF 38-46.  Moreover, *Aereo* defeats the notion that retransmitting broadcast programming over the Internet is somehow non-actionable "place shifting."

The Court should reject any suggestion by Dish that its conduct is supposedly less egregious than Aereo's because Dish at least has a license to retransmit Fox's signal over its satellite system while Aereo had no license of any kind.   Under copyright law, a service provider has no right to distribute copyrighted works over a particular medium, such as the Internet, unless the copyright owner expressly grants it that right.  *See* 2 PATRY ON COPYRIGHT §§ 5:121, 5:126.  A license granting Dish the right to transmit over a satellite television system is not the same as a license granting a right to transmit over the Internet.  Dish therefore has no greater right to stream Fox's programs over the Internet than Aereo did.  In fact, Dish's conduct is worse than Aereo's because Dish's license agreement ████████████████████████████

██████████████████████████

Out of sheer desperation, Dish will resort to raising a populist cry about the right of consumers to do whatever they want with the television programming they have purchased – but that isn't the issue.  Dish subscribers do not own the programming

Dish retransmits to them.   The RTC Agreement makes clear ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████   Because Dish does not have any ownership rights, it cannot convey ownership rights to its subscribers – regardless of what it tells them when it takes their money.

*Aereo* also compels judgment in Fox's favor on its claim that Dish is breaching ███████████████ by streaming Fox's programming over the Internet.   Dish can no longer claim that its streaming service is permitted under the contract language stating that ████████████████████████████████████████ Although it was always the law that streaming copyrighted programming over the Internet without authorization is copyright infringement and therefore not a "right" under applicable law," *Aereo* erased any possible doubt.   *See* 134 S. Ct. at 2511.

Dish Anywhere was not Dish's first attempt to avoid its contractual obligations with a technological workaround.   Dish wanted to compete with licensed VOD services like Hulu Plus by offering network primetime programs on VOD.   But the RTC Agreement ████████████████████████████████████ ████████████████████   To get around the contract, Dish began making Fox's programs available through Primetime Anytime ("PTAT"), a service that is virtually identical to VOD in that it allows subscribers to watch all of the primetime television programs broadcast by the four major networks "on demand" without having to schedule recordings of them.   *See* SUF 57, 99.   A PTAT feature called AutoHop renders the PTAT recordings commercial-free on playback, allowing Dish to advertise that it "created commercial-free TV."   The only difference between PTAT and traditional VOD is that with PTAT, the subscriber must press a button on her remote control to "enable" the system.   Once that button is pressed, PTAT

automatically records all primetime programming every night on all four broadcast networks and saves it on the subscriber's set-top box for eight days in a rolling on-demand library.   As in *Aereo*, Dish cannot magically cloak its unauthorized VOD service from liability because it put a button on a TV screen that subscribers must press to enable the service.

Dish is breaching the █████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████   Perhaps most damning, when Mr. Khemka unveiled PTAT at the 2012 Consumer Electronics Show, he told the crowd that PTAT users would not need the licensed VOD service Hulu any more, boasting: "*I don't think you'd ever need Hulu Plus or Hulu after this*."   SUF 124. Dish stated under oath to the Patent and Trademark Office that PTAT is VOD.   SUF 120.   PTAT looks like VOD, is marketed as VOD, and is obviously like VOD in that it is a library of programs viewers can access on demand and without having to schedule recordings.   SUF 101-18.   The Ninth Circuit didn't mince words when it characterized Dish's contract argument as "dubious."   *Fox Broad. Co. v. Dish Network, L.L.C.*, 747 F.3d 1060, 1071 (9th Cir. 2014) (also observing that "Fox has a good argument that PrimeTime Anytime is 'similar,' even though not exactly the same, as time-delayed or video-on-demand programming").   Dish could try to argue that it does not "distribute" PTAT because the subscriber must press a button to enable it, but that argument fails under *Aereo*.   134 S. Ct. at 2507.   It also fails because ████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████   Fox is entitled to summary judgment on its breach of contract claim against Dish.

These are not Dish's only breaches of the RTC Agreement.  In the RTC Agreement, Dish agreed ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Dish thumbed its nose at this provision as well, launching a feature called Hopper Transfers.  Hopper Transfers allows Dish subscribers to copy programs from their DVRs to their iPads.  Once a program is copied to an iPad, the subscriber can watch it on the iPad without being connected to the Internet.  Dish authorizes its subscribers to copy Fox programs with Hopper Transfers, and it advertises Hopper Transfers as a way for subscribers to take copies of programs "on the go" and watch them in places with no Internet connection, such as an airplane.  SUF 156.  People watching their copies of Fox programs "on the go" and on  airplanes are by definition not at home.  Dish is therefore breaching ████████████████████████ by authorizing its subscribers to use Hopper Transfers to copy programs for viewing outside the home.  *See* SUF 7.

Finally, it was revealed early in this case that Dish made ████████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Fox is entitled to summary adjudication in its favor on its copyright and contract claims based on the AutoHop copying.

## II.  Dish Is Infringing Fox's Copyrights And Breaching The RTC Agreement By Streaming Fox Programs Over The Internet.

Fox owns the copyrights in numerous programs broadcast on the Fox Network, including during primetime.  SUF 1, 153.  As a copyright owner, Fox has the exclusive right to perform its copyrighted works publicly.  17 U.S.C. § 106(4); *Aereo*, 134 S. Ct. at 2502.  In the case of an audiovisual work like a television show, to "perform" the work means "to show its images in any sequence or to make the sounds

accompanying it audible."  17 U.S.C. § 101; *Aereo*, 134 S. Ct. at 2508.  As is relevant here, to perform a work "publicly" means to "transmit or otherwise communicate a performance of the work . . . to the public, by means of *any device or process*, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101 (emphasis added); *Aereo*, 134 S. Ct. at 2502, 2509.

Streaming copyrighted programming over the Internet is a public performance, and is therefore copyright infringement if done without the copyright owner's permission.  *Aereo*, 134 S. Ct. at 2508; *see also WPIX, Inc. v. ivi, Inc*., 691 F.3d 275, 278-79 (2d Cir. 2012).  There has recently been a trend of service providers attempting to offer subscription access to live broadcast programming over the Internet without paying for a license, using what they claim are "innovative" technologies, but which are really convoluted workarounds aimed at evading copyright law.  These providers typically argued that they did not "perform" the programs because their subscribers caused the Internet transmissions by pressing buttons on a website or mobile application to start the streaming.  *E.g.*, *Cmty. Television of Utah, LLC v. Aereo, Inc.*, — F. Supp. 2d —, 2014 WL 642828, at *5-8 (D. Utah 2014);  *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1145-46 (C.D. Cal. 2012); *see also* Dkt. 163 at 14-18 (Dish making the same argument in opposing Fox's motion for preliminary injunction).  These providers would also design technology that would send each subscriber a separate transmission, and then argue that these transmissions were "private" because they were one-to-one.  *Cmty. Television*, 2014 WL 642828, at *3; *BarryDriller*, 915 F. Supp. 2d at 1141; *see also* Dkt. 163 at 14-18 (Dish making the same argument in opposing Fox's motion for preliminary injunction).  These arguments usually did not work.  *Cmty. Television*, 2014 WL 642828, at *10; *BarryDriller*, 915 F. Supp. 2d at 1149.

MEMORANDUM OF POINTS AND AUTHORITIES

The Supreme Court has now spoken on this precise issue in *Aereo*, and it has conclusively rejected these arguments.  *Aereo* holds that when a viewer watches a program over the Internet, *both* the viewer *and* the service provider perform. 134 S. Ct. at 2505-06.  It further holds that the service provider is still liable for a public performance even if viewers must initiate the transmissions by checking a button to select a program to watch on a website.  *Id*. at 2507.  And it holds that the Copyright Act applies to transmissions to the public made by means of "any device or process," including, specifically, one-to-one transmissions.  *Id*. at 2508-09.  *Aereo* therefore made clear that the Copyright Act is not vulnerable to technological workarounds.

### A.    Dish Is Distributing Fox's Programming Over The Internet.

In a splash of glitz and fanfare at the January 2013 Consumer Electronics Show ("CES") in Las Vegas, Dish announced that it was launching a new Internet streaming service exclusively for Dish subscribers, which would allow its subscribers to *"[w]atch live and recorded television anywhere on Internet-connected tablets, smartphones and PCs at no additional charge using the Hopper's built-in Sling capabilities and the new Dish Anywhere app."*  SUF 12.  In a presentation at CES, Dish Senior Vice President Vivek Khemka bragged that Dish's new service was different from other streaming services that require "extra hardware," "separate apps," or are limited to "in-home viewing only."  SUF 13.

Although Dish bragged that it had invented "an amazing new product," *see* SUF 14, Dish Anywhere is for all practical purposes the same as any other streaming service.  To watch live broadcast television on Dish Anywhere, the subscriber simply logs into Dish's website, www.dishanywhere.com, and clicks the "Live TV" button at the top of the page to start the streaming.  SUF 18.  Subscribers can also watch live broadcast programming on mobile devices such as iPads using the Dish Anywhere mobile application.   SUF 22.  ███████████████████████████

███████████████████████████████████████  SUF

8

19.  This screenshot shows  the Dish Anywhere website streaming live programming from the local Los Angeles Fox network affiliate, KTTV Channel 11:



SUF 60.

The only thing "innovative" about Dish Anywhere is that it involves an under-the-hood technological workaround, similar to the one used in *Aereo*, that Dish wrongly believes insulates it from copyright liability.  One of the set-top boxes Dish leases to its subscribers is called "Hopper with Sling." SUF 23.  ██████████████████
████████████████████████████████████████████████████████ *Id.*
When a Dish subscriber who has leased a Hopper with Sling logs onto the Dish Anywhere website and clicks "Live TV," ██████████████████████████████
████████████████████████████████████████████████████████████
SUF 25.  Thus, when ten thousand Dish subscribers log onto Dish Anywhere Saturday night at 9:00 p.m. to watch the live broadcast of Fox's program *Glee*, each subscriber is ███████████████████████████████████████████████████████
████████████████████████

9

To watch live broadcast television on Dish Anywhere, subscribers must have either a Hopper with Sling in their home or an accessory called a Sling Adapter, ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. SUF 23-25.[2] Watching live broadcast television on Dish Anywhere also requires the subscriber to create an online ID by entering information t█████████████████████████████████ ████████████████████ and to download a browser extension called SlingPlayer.[3]  SUF 27-28. ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████  SUF 30. ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████  SUF 31.  A screenshot of the Dish website streaming the USA Network pursuant to a license is shown below:

---

[2]  Sling Adapter use ██████████████████████████████████████████████████
SUF 26.  The few viewers who still have Dish's discounted Vip922 set-top box may also be able to watch live broadcast programming on Dish Anywhere.

[3]  A browser extension is software that adds a specific feature to a web browser, for example, the ability to stream certain types of video available on websites.  Common browser extensions (or "plugins") include Adobe's FlashPlayer and Apple's Quicktime.

MEMORANDUM OF POINTS AND AUTHORITIES



SUF 32.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████  This is the same

argument the Supreme Court rejected in *Aereo*.

**B.      Dish Is Infringing Fox's Exclusive Public-Performance Right.**

There is no issue remaining for trial on Fox's performance-right claim against

Dish because Dish's liability is clear under *Aereo*.  *See* FED. R. CIV. P. 56(a) ("The

court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law.").

A service that offers live broadcast television signals to subscribers over the

Internet for viewing on computers and mobile devices is publicly performing the

programs contained in the signal, regardless of the "device or process" used.  *Aereo*,

134 S. Ct. at 2508-10.  This is a public performance because the service is transmitting

MEMORANDUM OF POINTS AND AUTHORITIES

1  a performance of the same work (i.e., an episode of a television program such as *Glee*

2  or *Bones*) to members of the public (i.e., people who subscribe to the service).  *Id.*

3           As explained above, Dish offers live broadcast television signals to subscribers

4  over the Internet.  *See* SUF 12, 18.  Because multiple Dish subscribers can watch the

5  same live programs (i.e., an episode of *Glee* or *Bones*) on Dish Anywhere, Dish is

6  publicly performing those programs by transmitting them to members of the public

7  over the Internet.  *See Aereo*, 134 S. Ct. at 2508-10.  ████████████████████

8  ████████████████████████████████████████████████████████████████

9  ████████████████████████████           SUF 8.   Accordingly, Dish is

10  infringing Fox's exclusive public-performance right.

11          It does not matter that Dish subscribers have to click buttons on Dish's website

12  to initiate the transmissions to their computers and mobile devices.  The same was true

13  in *Aereo*:  Aereo's system (a collection of mini-antennas and computer servers) was

14  inert and streamed nothing unless a subscriber initiated a transmission by choosing

15  something to watch on Aereo's website.  134 S. Ct. at 2505-07.  Aereo argued to the

16  Supreme Court that its subscribers were the ones "doing" the performing because they

17  sent the commands that activated the antennas.  *Id*. at 2506.  The Supreme Court

18  rejected the very notion that it had to choose who, as between the subscriber and

19  Aereo, was the "performer."   Instead, the Supreme Court explained that when a

20  viewer watches a live television program, ***both*** the viewer ***and*** the service provider are

21  performing because they both "show the program's images and make audible the

22  programs sounds."  *Id*. at 2505-06; *see also* H.R. Rep. No. 94-1476 at 63 (1976) ("[A]

23  broadcasting network is performing when it transmits [a singer's performance of a

24  song]; a local broadcaster is performing when it transmits the network broadcast; a

25  cable television system is performing when it retransmits the broadcast to its

26  subscribers; and any individual is performing whenever he or she . . . communicates

27  the performance by turning on a receiving set.").

28

Thus, in the Supreme Court's eyes, the relevant question was not whether the viewer of a streaming service performs (because he always does), but rather whether the fact that Aereo's system is inert until the subscriber commands it to stream a program means that Aereo is the equivalent of an equipment provider and not a performer.  134 S. Ct. at 2505-07.  The Court recognized that Aereo was unlike a typical cable provider, who sends "continuous programming to each subscriber's television set." *Id*. at 2507.  It nonetheless held that this under-the-hood difference did not transform Aereo from a service provider into a mere equipment provider or, as the dissent put it, the equivalent of a "copy shop." *Id*.  Emphasizing that service providers cannot avoid copyright liability with technological workarounds, the Supreme Court wrote:

> Of course, in *Fortnightly* [a case about an early cable system], the television signals in a sense lurked behind the screen, ready to emerge when the subscriber turned the knob.  Here, the signals pursue their ordinary course of travel through the universe until today's "turn of the knob" – a click on a website – activates machinery that intercepts and reroutes them to Aereo's subscribers over the Internet.  *But this difference means nothing to the subscriber.  It means nothing to the broadcaster.  We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system that is for all practical purposes a traditional cable system into "a copy shop that provides its patrons with a library card*."

*Id*. (emphasis added).

It likewise does not matter that subscribers watching live broadcast television on Dish Anywhere ███████████████████████████████████████████ ███   Aereo similarly argued that its transmissions were private because they were sent one-to-one from subscribers' personal copies.  *Aereo*, 134 S. Ct. at 2508.  The Supreme Court held that the behind-the-scenes technology used to stream the programs is irrelevant, because the statute covers "*any device or process*." *Id*. at 2508-09 (citing 17 U.S.C. § 101).  And it conclusively rejected the notion that it was even possible to

13

use a technological workaround to avoid public-performance liability. "Why," the Court wrote, "would a subscriber who wants to watch a television show care much whether the images and sounds are delivered to his screen via a large multi-subscriber antenna or a small dedicated antenna, whether they arrive instantaneously or after a few seconds' delay, or whether they are transmitted directly or after a personal copy is made?" *Id.* at 2508-09.

Aereo and Dish differ only in the sense that they attempted slightly different technological workarounds – and of, course, ██████████████████ ███████████████████████████████████████████ ██████████████████████████████████████ *see* Section II(D), *infra*. Aereo designed its system to send each viewer an individualized stream from a dedicated antenna and personal copy of the program in order to claim that the transmissions were "private" and user-made. Dish designed its system ██████ ███████████████████████████████████████████ ██████████████████████████████████ The Supreme Court held that the precise technology does not matter because the statute covers "any device or process." *Aereo*, 134 S. Ct. at 2508. This means that this case cannot be distinguished from Aereo on the basis that Dish uses "Sling Technology," or on the basis that ████████████████████████████████████ or on the basis of any other technological distinction. *Aereo* conclusively resolves Fox's public-performance claim, and Fox is entitled to summary judgment.

### C. The Fact That Dish Has A Retransmission License Does Not Distinguish It From Aereo Or Otherwise Excuse Its Conduct.

Dish may argue that this case is different from *Aereo* because Dish has a retransmission consent agreement with Fox, whereas Aereo had no license whatsoever. This does not help Dish. ███████████████████████ ███████████████████████████████████ SUF 3. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*See* SUF 8.

Copyright owners are allowed to grant some rights and not others.   The Copyright Act grants the copyright owner the right to license "any subdivision" of its exclusive rights.   17 U.S.C. § 201(d)(2).   These rights "may be chopped up . . . no matter how small."  *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 884, 887 (9th Cir. 2005) (en banc).   Any rights not expressly granted in a copyright license are not authorized and are reserved to the copyright owner.  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989).   There is absolutely no legal basis for this Court to somehow conclude that Dish is allowed, based on the existence of a RTC Agreement ████████████████████████ to stream Fox's programs over the Internet.   If anything, Dish's conduct is actually worse than Aereo's, because Dish is receiving Fox's broadcast signal pursuant to a contract ██████████████████████ ████████████████████████████ – yet Dish is doing it anyway.

**D.      Dish Cannot Distinguish Itself From Aereo by Claiming To Be An Equipment Provider.**

Dish cannot evade *Aereo* and create a disputed factual issue by claiming that it is a mere equipment provider.   Though the Supreme Court analyzed whether Aereo was an equipment provider as opposed to a cable MVPD, *see* 134 S. Ct. at 2506-07, Dish is undisputedly an MVPD that is offering live broadcast programming over the Internet to subscribers who pay a monthly subscription fee.  *See* SUF 18-23.   Any claim by Dish to be a mere equipment provider therefore fails out of the box.

Even though Dish is liable either way under *Aereo*, it is important to realize that no reasonable jury could conclude that Dish is a mere equipment provider on the undisputed facts unearthed during discovery.   Last spring, Dish told the Court that the Hopper with Sling was merely a standalone product that subscribers could use to send

1   programming to themselves with no ongoing involvement from Dish.  Dish wrote that

2   "DISH sells or leases the Hopper with Sling to subscribers and delivers the authorized

3   programming  to  each  of  them.  ████████████████████████████████████

4   ██████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████

12      This all turned out to be untrue.  ██████████████████████████████

13  ██████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████████

17  ████████████████████████████████████  ███████████████████████

18  ██████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████████████

23  ████████████████████████  *See id.*

24      Dish has a  ████████████████████████████████████████████████

25  ██████████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████████████

27  ███████████████████████████████████████████  ██████████  ████

28

16

MEMORANDUM OF POINTS AND AUTHORITIES

MEMORANDUM OF POINTS AND AUTHORITIES

### E.      Dish Is Breaching The No-Internet Clause.

#### 1.      The RTC Agreement Prohibits Internet Distribution.

Not only has Fox



#### 2.      Dish Is Breaching The RTC Agreement.

By streaming Fox's live programming over the Internet to subscribers' computers and mobile devices via the Dish Anywhere website and mobile application, Dish is breaching the No-Internet Clause. *See* SUF 8. Fox is therefore entitled to judgment as a matter of law on its breach-of-contract claim.

Dish cannot take refuge in the part of the No-Internet Clause stating that

The Supreme Court's ruling in *Aereo* confirmed that Dish had no "right" under the Copyright Act to retransmit Fox's signal over the Internet to its subscribers, by means of any device or process, without authorization from Fox. 134 S. Ct. at 2508-10. And Dish cannot rely on the fiction that the subscriber is "doing" the transmitting, because the Supreme Court clarified that technologies that require subscribers to press buttons to initiate Internet transmissions are no exception to this rule. *Id*. at 2505-07.

Finally, Dish cannot create a triable issue by submitting

MEMORANDUM OF POINTS AND AUTHORITIES

███████████████████████████████████████████████████████

████████████████████████  Parol evidence is not admissible to alter the terms of an unambiguous contract. *Petracca v. Petracca*, 756 N.Y.S.2d 587, 588-89 (N.Y. App. Div. 2003) (affirming summary judgment granted based on the unambiguous language of the contract, and noting that "extrinsic or parol evidence is not admissible to create an ambiguity in a written agreement that is otherwise clear and unambiguous").  And courts may not deny summary judgment when a contract is clear, merely because one party claims the parol evidence supports a different interpretation.  *See Helmsley-Spear, Inc. v. N.Y. Blood Ctr., Inc.*, 687 N.Y.S.2d 353, 356-57 (N.Y. App. Div. 1999) (reversing the trial court's denial of a motion for summary judgment and holding that an affidavit the responding party submitted to controvert a contract's plain meaning was irrelevant and could not be considered);  *Kopelman v. Sigel*, 297 N.Y.S.2d 793, 794-95 (N.Y. App. Div. 1969) (reversing denial of summary judgment because the trial court improperly considered parol evidence when presented with an unambiguous agreement, and awarding summary judgment to the plaintiffs).[4]

The phrase ████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████  There is no basis for the Court to look to parol evidence to "interpret" a provision that is this clear – and it would be even worse to "interpret" the provision to nullify what it actually says.  There is certainly no basis to submit the issue to a jury.

[4] ████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

MEMORANDUM OF POINTS AND AUTHORITIES

### 3. At Bare Minimum, Dish Is Authorizing Its Subscribers To Retransmit Fox's Programming.

Even if the Court were to accept – contrary to the Supreme Court's ruling in *Aereo* – that the subscriber and not Dish is responsible for transmitting Fox's signal over the Internet, Dish is still in breach of the RTC Agreement. The RTC Agreement bars Dish from ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ Whenever a broadcast signal is streamed live over the Internet in real time, that is a retransmission. *BarryDriller*, 915 F. Supp. 2d at 1140-41 (streaming service "retransmit[s] Plaintiffs' copyrighted broadcast programming" "through Internet and mobile device streaming").

████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

████████ SUF 21. Dish tells its customers to "*Take your home TV programming with you wherever you go—including live and recorded content. With one click, you can watch your local news, live sports and favorite TV shows on your computer or mobile device.*" SUF 15. And it brags that "[o]nly Dish Anywhere *lets* you access all of your live TV channels . . . while on the go via your Internet-connected smartphone, computer, or tablet." SUF 16. (emphasis added). This is authorizing. *See United States v. Aleynikov*, 737 F. Supp. 2d 173, 191 (S.D.N.Y. 2010) ("The term 'authorize,' in turn, ordinarily means to grant authority or permission to do something."); The American Heritage Dictionary 121 (4th ed. 2000) (defining authorize as "[t]o grant

1   authority or power to; [t]o give permission for; sanction."); Merriam-Webster Online

2   Dictionary (authorize means "to give power or permission to").[5]   At bare minimum,

3   Dish is breaching this provision.

4   **III.   Dish Is Breaching The No-VOD Clause By Offering PTAT, Which It**

5      **Admits Is Similar To VOD.**

6      **A.   The RTC Agreement Bars Dish From Distributing Fox's Programs**

7         **On A Basis Similar To VOD.**

8      The RTC Agreement states ████████████████████████████████

9   ████████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████   SUF 6.

11  (emphasis added).[6]

12     **B.   Dish Offers Subscribers On-Demand Access To Fox Programs**

13        **Through Its Primetime Anytime Service.**

14     In March 2012, Dish launched PTAT.   In a multi-million dollar advertising

15  blitz, Dish announced to the world that PTAT "gives you instant On Demand access

16  to your favorite primetime shows on ABC, CBS, Fox, and NBC" and "creates an on-

17  demand library of approximately 100 hours of primetime TV shows, making it easy to

18  catch up on missed episodes." SUF 57-59.   When PTAT first launched Dish

19  subscribers who flipped to the PTAT screen on their televisions were greeted with the

20  announcement that PTAT offers "*On Demand access* for 8 days to all HD

21  programming that airs during primetime hours on ABC, CBS, FOX, and NBC *without*

22  *needing to schedule individual recordings*." SUF 59.

---

[5] http://www.merriam-webster.com/dictionary/authorize.

[6] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

MEMORANDUM OF POINTS AND AUTHORITIES

PTAT works by recording the entire primetime lineup of the four major broadcast networks every night, and saving the programs to the hard drive of the subscriber's set-top box.  SUF 63.  After Fox filed this lawsuit, Dish added a feature allowing the subscriber to deselect particular networks or nights – █████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

█████████████████████████

To enable PTAT, the subscriber uses his remote control to select a box labeled "enable" on her television screen.  SUF 64.  Once that box is checked, PTAT records the primetime programming every night in perpetuity unless the subscriber disables it.  SUF 65.  PTAT thus creates a rolling library of up to 8 days of primetime programs that Dish subscribers can watch "on  demand," and "without needing to schedule individual recordings."  *See* SUF 59.  Dish subscribers who activate PTAT's AutoHop feature can watch the PTAT recordings commercial-free.  SUF 138.

## C.    Dish Is Distributing Fox's Programs On A VOD Or Similar Basis.

### 1.    PTAT Is Similar To VOD.

To breach the No-VOD provision PTAT does not have to be identical to VOD, it only has to be similar to it.  *See* SUF 6.  "Similar" means "having characteristics in common,"[7]  "resembling  without  being  identical,"[8]  or  "having  a  likeness  or resemblance, especially in a general way."[9]

There is no triable issue as to whether PTAT is similar to VOD.  As set forth in greater  detail  below,  everyone  on  both  sides  of  this  case  agrees  on  certain  key characteristics of VOD.  Dish's Senior Vice President, Mr. Khemka, testified under

---

[7] http://www.merriam-webster.com/dictionary/similar.
[8] http://www.oxforddictionaries.com/us/definition/american_english/similar.
[9] http://dictionary.reference.com/browse/similar?s=t.

MEMORANDUM OF POINTS AND AUTHORITIES

oath ███████████████████████   Dish's expert, Mr. Rapp, submitted a declaration describing characteristics of VOD.   And Howard Homonoff, a noted media expert and Senior Fellow at Columbia Business School with 20 years of experience in the television and media industries, including holding executive positions at NBC Cable Networks, CNBC, and Continental Cablevision, has submitted a declaration explaining the history and definition of VOD – and he *agrees* with Mr. Rapp and Mr. Khemka about many of the traits that characterize a VOD service.  *See* Declaration of Howard Homonoff ("Homonoff Decl.") ¶ 9.

There is also no dispute as to whether PTAT is "similar" to VOD. ██████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████   To evaluate whether PTAT is similar to VOD, Mr. Homonoff analyzed PTAT's appearance and features and ███████████
███████████ that PTAT is at least similar to VOD – if  not identical to it.  *See* Homonoff Decl., ¶¶ 7-9, 29-41.

The  undisputed facts – in particular, Dish's own admissions – establish that PTAT and VOD have characteristics in common and resemble each other and are therefore similar:

**Both PTAT And VOD Offer A Library Of Programming.**  One characteristic of VOD is that it offers viewers access to a library of programming.  SUF 98; *see also* Homonoff Decl. ¶¶ 13, 25-26.  This is undisputed.  Mr. Khemka testified in his deposition ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████

24

It is undisputed that PTAT, like VOD, is a library of programming.  The PTAT library contains approximately 100 hours of network primetime television shows. SUF 102-103.  When PTAT launched, Dish publicly announced in a press release that PTAT "creates an on-demand library of approximately 100 hours of primetime TV shows."  *Id.* ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████

**_Both PTAT And VOD Allow Viewers To Watch The Programming On Demand._**  Another undisputed characteristic of VOD is that viewers can access the programs in the library "on demand" – *i.e.*, whenever they want.  Mr. Khemka agreed in his deposition that "video-on-demand offer[s] on-demand access to programming." SUF 105.   Dish's expert, Mr. Rapp, stated in his declaration that VOD "allows viewers to select and watch video programs whenever they request them."  SUF 106. Mr. Homonoff agrees.  Homonoff Decl. ¶ 13.

It is undisputed that viewers can access the programs in the PTAT library "on demand" – i.e., whenever they want. ████████████████████████████████
█████████████████████████ refers to PTAT as creating "an on-demand library" and states that PTAT "gives you instant On Demand access to your favorite primetime shows on ABC, CBS, Fox, and NBC."  SUF 108.  Mr. Khemka admitted in his deposition that when Dish's advertisements said that PTAT "gives you instant On Demand access to your favorite primetime shows on ABC, CBS, Fox, and NBC," they were truthful.  SUF 109.  Dish's website said that PTAT "gives you instant On Demand access to your favorite primetime shows on ABC, CBS, Fox, and NBC." SUF 110. ██████████████████████████████████████ *Id.* Dish's Hopper User Guide likewise repeats this same language.  *Id.*

***Both PTAT And VOD Allow Viewers To Access Programs Without First
Having To Schedule Individual Recordings.***   It is undisputed that with VOD, the
viewer can watch the programs available on demand without having to first schedule
individual recordings.  SUF 111.  ███████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████   SUF 99.  (Emphasis
added).

The fact that VOD allows subscribers to watch programs without having to first
schedule them to record is the crucial element that differentiates VOD from a DVR.
Homonoff Decl. ¶¶ 12, 23-26.  Unlike with VOD, a consumer using a DVR uses a
timer to instruct the DVR to schedule recordings.  SUF 112 ███████████████
███████████████████████████████████████████████████████   Hopper
User Guide telling subscribers that "[f]or most digital video recorder DVR timers, you
select a specific program on a specific channel and tell the receiver how often you
want to record that program.").

It is undisputed that PTAT gives viewers on-demand access to recorded
programs without first having to schedule individual recordings.  SUF 113.  At one
time, it said this right on the viewer's television screen:

26

SUF 60.

27

Another earlier version of this screen, from before Fox sued, explicitly tells the subscriber that PTAT provides on-demand access to programming "***without setting your DVR***":



SUF 61.

The VOD marketplace, particularly for television content, has often sought to attract a potential viewer who learns of a particular television program or series based on word-of-mouth or discussions around the "water cooler" – especially if that potential viewer didn't know or hadn't been interested in that program or series in advance and thus would not have set their DVR to record it.  Homonoff Decl. ¶¶ 23-26.  Removing the need for a busy consumer to schedule a recording in advance is the hallmark of today's VOD services.  *Id.* ¶ 23.

This also is precisely the selling point of PTAT:   A press release that ▮ ▮ quotes Mr. Khemka saying about PTAT, "The magic of PrimeTime Anytime is that it allows DISH subscribers to catch up on all primetime shows, including episodes recorded over the past week and recommended by friends, family, and coworkers after they've already been broadcast."  SUF 114. ▮

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████     SUF 115.   In other words, Dish marketed PTAT by telling consumers its main benefit was that it was like VOD in that, with PTAT, subscribers would be able to watch programs they learned about after they aired, even though they did not schedule them to record.

### *Dish Wanted To Advertise PTAT As A VOD Product, Not A DVR Product.*

████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████     SUF 116-18 (emphasis added).  This is consistent with Dish's advertising, which touts PTAT's ability to make primetime network television programs available "on demand" and "without having to schedule recordings."  *See, e.g.*, SUF 58-59.

### *Like With VOD, The Content Available On PTAT Is Determined By The Service Provider, Not The Viewer.*   Yet another undisputed characteristic of VOD is that with VOD the content available for on-demand access is determined not by the subscribers but by the MVPD and the content provider.  SUF 119; *see also* Homonoff Decl. ¶¶ 25, 31-32.

The same is undisputedly true of PTAT.  Although subscribers can elect not to have certain networks or certain nights added to the library, PTAT will only record the four major broadcast networks and no other channels.  SUF 68-70.  ████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████   ████████   █████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ .

This, of course, is fundamentally different from a DVR, which can typically record any program on any channel that the consumer receives on her television.  It is also fundamentally different than a DVR because a consumer can choose ***not*** to have her DVR record programs she does not like and never intends to watch.  Homonoff Decl. ¶¶ 31, 34.

***Dish Admitted PTAT is VOD.***

On February 7, 2011 and January 19, 2012, Dish described PrimeTime Anytime as a "video-on-demand service" under oath in Dish's trademark application to the United States Patent and Trademark Office.  SUF 120.  This is a party admission.  FED. R. EVID. 801(d)(2)(A).

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

***VOD, Like PTAT, Can Be Stored On A Set-Top Box.*** Yet another undisputed characteristic of VOD is that the recorded programs available for on-demand viewing are sometimes stored on the subscriber's in-home set-top box.  SUF 130.  Dish itself stores its VOD offerings on the subscriber's set-top box.  SUF 131.

***PTAT Looks Like VOD.***

Dish wanted PTAT's user interface to look like VOD.  SUF 101.  And, in fact, the user experience of PTAT (e.g., the manner in which a library of primetime broadcast TV programs are organized and presented to the user for on demand viewing) is the same as licensed VOD services.  *See* Homonoff Decl. ¶¶ 28, 32-33.

*     *     *

Given the obvious, admitted similarities between PTAT and VOD, it is not surprising that the Ninth Circuit found Dish's claim that the two services were not similar to be "dubious," and made a point of stating in its opinion that "Fox has a good argument that PrimeTime Anytime is 'similar,' even though not exactly the same, as time-delayed or video-on-demand programming."  *Dish*, 747 F.3d at 1071.  Dish is in breach of the No-VOD Clause.

> **2.    Any Claim By Dish That It Is Not "Distributing" Fox's Signal On A Basis Similar To VOD Is Meritless.**

███████████████████████████████████████████████████

█████████████████

MEMORANDUM OF POINTS AND AUTHORITIES

1    Dish cannot credibly deny that offering PTAT is distributing Fox's

2    programming on a basis similar to VOD.   Dish's chairman admitted that Dish

3    distributes VOD by "mak[ing] it available" to Dish's customers.   *Id*.

MEMORANDUM OF POINTS AND AUTHORITIES



Accordingly, the undisputed facts show that Dish takes numerous, active steps to make Fox's signal available to Dish subscribers on a basis that is similar to VOD. Although Dish may claim that the subscribers deliver the VOD to themselves by pressing one button one time to enable PTAT, that argument necessarily fails under *Aereo*. *See* 134 S. Ct. at 2505-07 (rejecting argument that requiring a subscriber who presses a button is distributing programming to herself).

### 3. "Distribute" As Used In The No-VOD Clause Does Not Require Copies To Change Hands.

When Fox sought a preliminary injunction to enjoin Dish's ongoing breaches of the No-VOD clause, Dish did not challenge the meaning of distribute so there was no argument on this issue. The Court looked to copyright law to interpret the term "distribute" and held that it required a copy of the copyrighted work to "change hands." Dkt. 109 at 27. But the term "distribute" in the RTC Agreement cannot possibly mean physical copies changing hands.

The words "distribute" and "distribution" are used multiple times throughout the contract in their ordinary, plain English sense, with no reference to copies of anything changing hands. For example, the contract defines Dish Network as a

MEMORANDUM OF POINTS AND AUTHORITIES

1

2

3

4

5 ▮▮ ▮ ▮▮▮

6

7

8

9

10 ▮▮▮▮▮▮ violates the

settled canon of contract interpretation that "a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons."  11 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 32.6 (4th ed.).

**IV.** **Dish Is Breaching The RTC Agreement By Authorizing Its Subscribers To Use Hopper Transfers To Copy Fox Programs To View Outside The Home.**

> **A.** **Dish Authorizes Subscribers To Use Hopper Transfers To Copy Programs To Watch Outside The Home.**

Hopper Transfers is a mobile application for iPads that allows Dish subscribers to copy recordings that are saved on their Hopper DVRs to their iPads.  Once a new copy of a program is saved locally to the subscriber's iPad, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In addition, Dish's advertisements and press releases tout the ability to copy programs for viewing outside the home as Hopper Transfers' key selling point.  For example, Dish's website advertises that with Hopper Transfers you can "simply

---

34

transfer your recorded TV programs to your iPad with our free app ***before you leave the house*** and ***you can enjoy your favorite movies or shows on flights or keep your kids entertained during a long road trip***."  SUF 156 (emphasis added).  And Dish's press release announcing Hopper Transfers' launch quotes Mr. Khemka saying:

> Hopper Transfers completes the TV Everywhere equation by giving DISH customers the ability to ***take their recorded television programs and watch them even when no Internet connection is available, such as on a plane*** . . . .  For the first time, customers can truly enjoy their DISH service anytime, ***anywhere***.

*Id.* (emphasis added).

## B.  Dish Is Breaching The RTC Agreement.

███████████████████████████████████████████████████████
███████████████████████████   ████████   ██████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████████

████████   SUF 155.  Second, as noted above, Dish advertises that with Hopper Transfers you can "simply transfer your recorded TV programs to your iPad with our free app *before you leave the house* and *you can enjoy your favorite movies or shows on flights or keep your kids entertained during a long road trip*."  SUF 156.  A person who has left the house and is watching a copy of a Fox program on an airplane or on a

long road trip is, by definition, *not at home*.  Thus, the copy Dish is authorizing that person to make with Hopper Transfers is not limited to "private home use."

Dish may try to argue that it does not "authorize" its subscribers to copy programs with Hopper Transfers but instead merely supplies equipment that its subscribers can use to make copies if they choose to.  This argument is meritless.  As explained in Section III.E.3, above, to "authorize" means "to give power or permission to."  Dish picks and chooses which programs its subscribers will be allowed to copy with Hopper Transfers.  Dish does not authorize all of the programs it transmits to be copied with Hopper Transfers – ███████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████

Moreover, anything Dish subscribers do with the programming or equipment they receive from Dish must be authorized by Dish.  To receive programming from Dish, a consumer must sign a contract with Dish and pay Dish money.  SUF 158. When Dish provides programming and equipment to its subscribers, it does so pursuant to a Residential Customer Agreement that limits what the subscribers are allowed to do with the services and equipment.  By way of example, Dish subscribers cannot alter any equipment received from Dish or move it to a different location.  SUF 159.  And they cannot view programming received from Dish in places open to the public or charge admission for viewing programming received from Dish.  SUF 160.

When Dish offers Hopper Transfers only to its authorized, paying subscribers, and tells them they can use it to "take their recorded television programs and watch them even when no Internet connection is available, such as on a plane," *see* SUF 156, Dish is not merely handing over a piece of equipment.  It is authorizing its subscribers – i.e., giving them permission – to copy the programs Dish transmits to them and view

them outside the home.  This is a breach.  Fox is therefore entitled to judgment in its favor on its claim that Hopper Transfers breaches the RTC Agreement.

**V.**   **Dish Infringed Fox's Copyrights And Breached The RTC Agreement By Copying Fox Programs As Part Of The AutoHop Service.**

    **A.**   **Dish Admits that It Repeatedly Copied Fox Programs As Part Of Its AutoHop Service.**

On May 10, 2012, Dish introduced AutoHop as an "extension" of PrimeTime Anytime.  SUF 137.  Dish touted AutoHop as a "revolutionary" development that lets Dish subscribers watch PrimeTime Anytime programs "commercial-free."  SUF 138. To make AutoHop work, ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██ ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

[10] ███████████████████
████████████████████████████████████████████████████
████████████████████

MEMORANDUM OF POINTS AND AUTHORITIES

1 █████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 █████████████████████████████████████   ██████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ███████████████████████████████

12 **B.      Dish Is Infringing Fox's Copyrights And Breaching The No-Copying**

13 **Clause.**

14 Under 17 U.S.C. § 106(1), Fox has the exclusive right to copy its copyrighted

15 works. ██████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 █████████████████████   ███████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ██████████████████████████████████   ██████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 █████████████████████████████████

26 ████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28

MEMORANDUM OF POINTS AND AUTHORITIES

███ are somehow fair-use "intermediate" copies, any such argument necessarily fails. *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992) ("On its face, [the Copyright Act] unambiguously    encompasses and proscribes 'intermediate copying.'"); *accord Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 921 (2d Cir. 1994); *Walt Disney Prods. v. Filmation Assocs.*, 628 F. Supp. 871, 875-76 (C.D. Cal. 1986) (intermediate copies in the form of storyboards were infringing). *Sega* only recognized a narrow, fact-specific exception for "reverse engineering" of computer software, where the copying was necessary to read the software itself and examine embedded unprotected ideas and functional concepts. 977 F.2d at 1520-26.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ s.  It is no wonder that this Court rejected Dish's fair-use defense as to the AutoHop copies at the preliminary-injunction stage. *Fox Broadcasting Co. v. Dish Network, L.L.C.*, 905 F. Supp. 2d 1088, 1102-06 (C.D. Cal. 2012).

## VI.   **Conclusion.**

For the foregoing reasons, Fox respectfully requests that the Court grant this motion and enter partial summary judgment in favor of Fox on the grounds that: (1) Dish is breaching the RTC Agreement and infringing Fox's copyrights by streaming Fox's live programming on Dish Anywhere, (2) Dish breached the RTC Agreement and infringed Fox's copyrights by copying Fox's programs while developing and operating AutoHop, (3) Dish is breaching the RTC Agreement by offering Hopper Transfers, and (4) Dish is breaching the RTC Agreement by offering PTAT.

DATED:  August 22, 2014                JENNER & BLOCK LLP


                                       ___/s/ Richard L. Stone_____
                                       Richard L. Stone

                                       Attorneys for Plaintiffs
                                       Fox Broadcasting Company, Twentieth
                                       Century Fox Film Corp., and Fox Television
                                       Holdings, Inc.