WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California  90017
Tel:  +1-213-629-2020 / Fax:  +1-213-612-2499

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105-2669
Tel:  +1-415-773-5700 / Fax:  +1-415-773-5759

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
ELYSE D. ECHTMAN (*pro hac vice*)
eechtman@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York  10019-6142
Tel:  +1-212-506-5000 / Fax:  +1-212-506-5151

MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL PAGE (SBN 154913)
mpage@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California  94111
Tel:  +1-415-362-6666

Attorneys for Defendants DISH Network L.L.C.,
DISH Network Corp., and EchoStar Technologies
L.L.C.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISH NETWORK L.L.C., *et al.*,<br><br>Defendants. | Case No. CV12-04529 DMG (SHx)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  October 17, 2014<br>Time:  2:00 p.m.<br>Ctrm:  7 |

**PUBLICLY FILED**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................1

STATEMENT OF FACTS ....................................................................................3

     A.    The Agreements...........................................................................3

     B.    The Accused Features .................................................................5

ARGUMENT .........................................................................................................9

I.     THE UNDISPUTED FACTS DEMONSTRATE AS A MATTER OF LAW THAT DISH IS NOT INFRINGING FOX'S COPYRIGHTS BY OFFERING PTAT OR AUTOHOP TO ITS SUBSCRIBERS.............10

     A.    AutoHop Cannot Support A Copyright Claim..................................10

     B.    DISH Does Not Directly Infringe Fox Copyrights By Offering The PTAT Feature ...................................................................11

     C.    DISH Is Not Secondarily Liable For Copyright Infringement When Customers Make PTAT Recordings ...................................12

           1.    Subscriber PTAT Recordings Are Fair Use ...........................12

           2.    Fox Cannot Establish Other Required Elements Of Secondary Liability...............................................................18

II.    "EXCEEDING THE SCOPE OF LICENSE" IS NOT A CLAIM FOR COPYRIGHT INFRINGEMENT .............................................................19

III.   DISH IS NOT BREACHING ITS AGREEMENTS WITH FOX BY OFFERING THE PTAT AND AUTOHOP FEATURES...........................19

     A.    DISH Is Not Breaching Section 9(a) Of The 2002 Agreement..........20

     B.    DISH Is Not Breaching Section 3(d) Of The 2002 Agreement..........20

     C.    DISH Is Not Breaching the 2010 Letter Agreement .........................22

IV.   THE UNDISPUTED FACTS DEMONSTRATE THAT DISH IS NOT VIOLATING ANY OBLIGATION IN OFFERING SLING ......................25

     A.    DISH Does Not Directly Infringe Fox's Copyrights When Its Customers Use Sling.................................................................26

           1.    Sling Is Not Any Kind Of Performance by DISH ...................26

           2.    Sling Is Not Public...............................................................28

     B.    Nothing In The Parties' Contractual Agreements Prohibits Sling......30

           1.    The 2010 Letter Agreement Does Not Restrict Sling ..............30

           2.    The 2002 Agreement Does Not Prohibit Sling ........................34

V.    THE UNDISPUTED MATERIAL FACTS SHOW THAT DISH DOES NOT INCUR COPYRIGHT OR CONTRACT LIABILITY BY OFFERING ITS CUSTOMERS THE HOPPER TRANSFERS FEATURE .................................................................................................36

     A.    DISH Does Not Infringe Fox's Reproduction Right By Offering Its Customers Hopper Transfers.....................................................36

     B.    The 2002 RTC Agreement Does Not Prohibit Hopper Transfers ......37

1

2

**TABLE OF CONTENTS**
(continued)

**Page**

3

VI.    THE QUALITY ASSURANCE COPIES ARE A FAIR USE AND
       CANNOT SUPPORT A BREACH OF CONTRACT CLAIM ...................38

4

5

       A.    Quality Assurance Copies Do Not Compete With Fox's
             Distribution Licenses .......................................................................39

6

       B.    Fox's Contract Claim Fails Because Fox Is Not Harmed By The
             Quality Assurance Copies And Cannot Prove It Is Entitled To
             Any Contract Remedy.......................................................................40

7

8

VII.   DISH IS ENTITLED TO SUMMARY JUDGMENT ON ALL
       CONTRACT DAMAGES CLAIMS............................................................40

9

       A.    "Reasonable Royalties" Are Not Available Under A New York
             Contract ............................................................................................41

10

       B.    Fox Expressly Waived Recovery Of Reasonable Royalties...............42

11

VIII.  FOX'S COPYRIGHT REMEDIES ARE LIKEWISE BARRED...............42

       A.    "Reasonable Royalties" Are Not A Copyright Remedy ...................43

12

13

       B.    Fox's Claim For Disgorgement Should Be Dismissed Because It
             Cannot Show A Causal Nexus Between Any Purported
             Infringement And DISH's Subscriber Revenues ...............................45

14

       CONCLUSION ……………………………………………………………45

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2632 Realty Dev. Corp. v. 299 Main St., LLC,*
 (App. Div. 2d Dep't 2012) ................................................................24

*ABN AMRO Bank, N.V. v. MBIA, Inc.,*
 17 N.Y.3d 208 (2011) .....................................................................25

*Action Nissan, Inc. v. Nissan N. Am.,*
 454 F. Supp. 2d 108 (S.D.N.Y. 2006) ............................................40

*American Broadcasting Companies, Inc. v. Aereo,*
 134 S. Ct. 2498 (2014) ............................................................*passim*

*Applied Energetics, Inc. v. NewOak Capital Markets, LLC,*
 645 F.3d 522 (2d Cir. 2011) ...........................................................21

*In re AutoHop Litig.,*
 12 CIV. 4155 LTS KNF, 2013 WL 5477495 (S.D.N.Y. Oct. 1,
 2013) ................................................................................................22

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
 448 F.3d 605 (2d Cir. 2006) ...........................................................17

*Cartoon Network LP, LLP v. CSC Holdings Inc.,*
 536 F.3d 121 (2d Cir. 2008) ...........................................................12

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ..........................................................................9

*Cipriano v. Glen Cove Lodge,*
 1 N.Y.3d 53 (2003) ..........................................................................40

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill
 Lynch, Pierce, Fenner & Smith Inc.,*
 232 F.3d 153 (2d Cir. 2000) ...........................................................20

*CoStar Group, Inc. v. Loopnet, Inc.,*
 373 F.3d 544 (4th Cir. 2004) ................................................9, 11, 12

*Deakins Holding PTE Ltd. v. Newnet Investment Group LLC*,
    2014 WL 3101446 (C.D. Cal. July 7, 2014)................................................19, 20

*Fed Ins. Co. v. Am. Home Assurance Co.*,
    639 F.3d 557 (2d Cir. 2011)...............................................................38

*Fed. Ins. Co. v. Americas Ins. Co.*,
    691 N.Y.S.2d 508 (App. Div. 1st Dep't 1999) .....................................35

*Fischer & Mandell, LLP v. Citibank, N.A.*,
    632 F.3d 793 (2d Cir. 2011)................................................................9

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986)............................................................13

*Fox Broadcasting Co. v. DISH Network L.L.C.*,
    747 F.3d 1060 (9th Cir. 2014)....................................................*passim*

*Fox Broadcasting Co. v. DISH Network L.L.C.*,
    905 F. Supp. 2d 1088 (C.D. Cal. 2012).......................................*passim*

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
    915 F. Supp. 2d 1138 (C.D. Cal. 2012)............................................28

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)....................................................................15, 39

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
    796 F.2d 1148 (9th Cir. 1986)..........................................................13

*Indep. Energy Corp. v. Trigen Energy Corp.*,
    944 F. Supp. 1184 (S.D.N.Y. 1996)..................................................32

*Israel v. Chabra*,
    12 N.Y.3d 158 (2009)......................................................................24

*Jarvis v. K2, Inc.*,
    486 F.3d 526 (9th Cir. 2007)...........................................................43

*Jill Stuart (Asia) LLC v. Sanei Int'l Co., Ltd.*,
    12 CIV. 3699 KBF, 2013 WL 3203893 (S.D.N.Y. June 17, 2013)..............41, 42

*Jim Beam v. Tequila Cuervo La Rojena S.A. De C.V.*,
    No. 600122/2008, (Sup. Ct. N.Y. Cty. July 12, 2011)........................41

CASE No. CV1204529 DMG (SHx)

*Kaplan v. Lippman*,
  75 N.Y.2d 320 (1990) ....................................................................................23

*Mackie v. Rieser*,
  296 F.3d 909 (9th Cir. 2002)...............................................................10, 45

*Mattel Inc. v. Walking Mountain Prods.*,
  353 F.3d 792 (9th Cir. 2003)...............................................................13

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
  545 U.S. 913 (2005).............................................................................18, 28

*In re MobiTV, Inc.*,
  712 F.Supp. 2d 206 (S.D.N.Y. 2010) ..............................................43

*Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*,
  930 F. Supp. 2d 532 (S.D.N.Y. 2013) ..............................................42

*Nationwide Mut. Ins. Co. v. Erie & Niagara Ins. Ass'n*,
  672 N.Y.S.2d 596 (App. Div. 4th Dep't1998)..................................35

*Nau v. Vulcan Rail & Constr. Co.*,
  286 N.Y. 188 (1941) ............................................................................21

*Neumann v. Metro Med. Group, P.C.*,
  557 N.Y.S.2d 663 (App. Div. 3d Dep't 1990)..................................24

*Nunez v. Caribbean Int'l News Corp.*,
  235 F.3d 18 (1st Cir. 2000) ................................................................39

*Perfect 10, Inc. v. Amazon, Inc.*,
  508 F.3d 1146 (9th Cir. 2007)................................................12, 21, 37

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
  494 F.3d 788 (9th Cir. 2007)..............................................................18

*Polar Bear Prods, Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004)..............................................................45

*Proper v. State Farm Mut. Auto. Ins. Co.*,
  882 N.Y.S.2d 340 (App. Div. 3d Dep't 2009)..................................40

*Recording Industry Assoc. of Am. v. Diamond Multimedia Sys. Inc.*,
  180 F.3d 1072 (9th Cir. 1999)................................................30, 32, 37

*Righthaven LLC v. Hoehn*,
 716 F.3d 1166 (9th Cir. 2013)..............................................................................9

*S.O.S., Inc. v. Payday, Inc.*,
 886 F.2d 1081 (9th Cir. 1989)............................................................................19

*Schonfeld v. Hilliard*,
 218 F.3d 164 (2d Cir. 2000)...............................................................................42

*Sega Enterps. v. Accolade, Inc.*,
 977 F.2d 1510 (9th Cir. 1992)............................................................................40

*Seltzer v. Green Day, Inc.*,
 725 F.3d 1170 (9th Cir. 2013)..............................................................................9

*Sofa Entm't, Inc. v. Dodger Prods., Inc.*,
 782 F. Supp. 2d 898 (C.D. Cal. 2010) (Gee, J.)................................................17

*Sony Computer Enter., Inc. v. Connectix Corp.*,
 203 F.3d 596 (9th Cir. 2000)..............................................................................40

*Sony Computer Entm't Am. v. Bleem*,
 214 F.3d 1022 (9th Cir. 2000)......................................................................17, 39

*Sony Corp. v. Universal City Studios, Inc.*,
 464 U.S. 417 (1984).....................................................................................*passim*

*Spence v. Superintendent, Great Meadow Corr. Facility*,
 219 F.3d 162 (2d Cir. 2000)...............................................................................34

*Stern v. Does*,
 978 F. Supp. 2d 1031 (C.D. Cal. 2011) ......................................................14, 18

*Sun Microsystems, Inc. v. Microsoft Corp.*,
 188 F.3d 1115 (9th Cir. 1999)............................................................................19

*United States v. Stuart*,
 489 U.S. 353 (1989)............................................................................................34

*Universal City Studios, Inc. v. Sony Corp. of Am.*,
 480 F. Supp. 429 (C.D. Cal. 1979)....................................................................39

*Vacuum Concrete Corp. v. Am. Mach. & Fdry. Co.*,
 321 F. Supp. 771 (S.D.N.Y. 1971).....................................................................24

CASE NO. CV1204529 DMG (SHX)

*Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*,
    919 N.Y.S.2d 151 (App. Div. 1st Dep't 2011) ...................................................41

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ...........................................................28

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ........................................................................19

**Statutes**

17 U.S.C. § 101 ......................................................................................... 12, 28

17 U.S.C. §106 ................................................................................................11

17 U.S.C. § 106 ................................................................................ 10, 21, 27

17 U.S.C. § 106(1) ..........................................................................................36

17 U.S.C. § 107 ........................................................................................ 32, 38

17 U.S.C. §119 ................................................................................................27

17 U.S.C. § 122 ...............................................................................................27

17 U.S.C. §501 ................................................................................................11

17 U.S.C. §504(b) ...........................................................................................45

Cal. Civ. Code § 3426.3(b) .............................................................................43

Copyright Act ..........................................................................................*passim*

Section 504 of the Copyright Act ...................................................................44

Patent Act, 35 U.S.C. § 284 ............................................................................43

Uniform Trade Secrets Act. ............................................................................43

UTSA, §504(a) ................................................................................................43

**Other Authorities**

Fed. Rule Civ. P. 26 ........................................................................................14

Fed R. Civ. P. 56(a) ..........................................................................................9

Oxford English Dictionary (3d ed. 2014) ...............................................................38

United States Copyright Office, SHVERA Report 188 (June 2008).......................30

Websters II New College Dictionary 76 (2001) .....................................................38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In 1999, DISH offered one of the earliest DVRs on the market. Fox did nothing. In 2005, DISH marketed PocketDISH portable viewing devices for recorded content on-the-go. Fox did nothing. In 2007, DISH spent $380 million to acquire Sling technology and market it to DISH subscribers. Fox did nothing. And in January 2012, when DISH announced PTAT, Fox still did nothing. It was not until May 2012, within days of the launch of AutoHop, that Fox finally filed this lawsuit accusing a decade-worth of DISH technology of infringing its copyrights and breaching its agreements.

Fox's course in this litigation has been predictably bumpy. At the preliminary injunction stage, this Court denied all equitable relief, holding that Fox had failed to demonstrate a likelihood of success on its PTAT and AutoHop claims. The Court reasoned that because DISH subscribers—and not DISH—are making the copies on their Hopper DVRs, DISH is neither a direct infringer under the Copyright Act nor in breach of the copying restriction in the RTC Agreement. And Fox's secondary liability theory fell flat to three decades of fair use law under *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). The Court further reasoned that commercial-skipping had no copyright significance and, because PTAT is not "FOX Video On Demand," DISH had no contractual obligation to disable fast-forward during PTAT playback. The Ninth Circuit affirmed these holdings on appeal. And the Southern District of New York, considering nearly identical claims by ABC, reached the same conclusions.

Undeterred, Fox sought a second preliminary injunction addressing the Sling and Hopper Transfer features. This Court again denied relief, holding that Fox had failed to demonstrate that it had been or would be irreparably harmed by the challenged technology. Indeed, this Court questioned whether Fox's theories of harm even made sense in light of evidence that mobile-viewing technology increased viewership, with the likely effect of increasing viewer loyalty and

1   revenue.  Again the Ninth Circuit affirmed.

2   Months of discovery, thousands of documents, and dozens of hours of

3   testimony later, the Court's initial conclusions are now backed by a full factual

4   record.  Commercials still are not part of the protected works nor does avoiding

5   them invade any of the protected rights of copyright; ad-skipping thus has no place

6   in a discussion of Fox's programming copyrights.  Part I.A, *infra*.  DISH is still not

7   making the copies and thus is not a direct infringer.  PTAT copies are indisputably

8   made by DISH subscribers.  Part I.B, *infra*.  Nor is DISH secondarily liable for its

9   subscribers' conduct, which is shielded by the three-decade-old rule from *Sony* that

10  time-shifting is a fair use under the Copyright Act.  Part I.C, *infra*.  And Fox cannot

11  get around these deficiencies by merely alleging that DISH has exceeded the scope

12  of a license:  Fox must come forward with evidence that establishes the elements of

13  a *copyright* claim. Part II, *infra*.  Fox's PTAT and AutoHop contract claims fail

14  alongside its copyright claims:  DISH does not "copy" or "distribute" Fox's signal

15  when its subscribers use Hopper features.  Parts III.A & B, *infra*.  And even Fox

16  executives agree that PTAT's DVR copies are not "Video on Demand" within the

17  meaning of the parties' Agreements.  Part III.C, *infra*.

18  Fox's claims against the Sling Adapter, Hopper with Sling and Hopper

19  Transfers fare no better.  Sling functionality is indisputably used by DISH

20  subscribers, not DISH.  Part IV.A.1, *infra*.  And the Supreme Court's recent *Aereo*

21  decision makes clear that place-shifting a user's content to that same user's mobile

22  device is not a "public performance" under the Copyright Act.  Part IV.A.2, *infra*.

23  Nor is it credible—or supported by any shred of plausible evidence—that DISH

24  signed a contract to pay Fox ██████████████████ while at the same time

25  foreswearing use of Sling after acquiring the technology for $380 million.  Part

26  IV.B, *infra*.  These same reasons doom Fox's Hopper Transfers claims:  Hopper

27  Transfers copies are made exclusively by DISH subscribers, barring both Fox's

28  copyright claim and liability under the contractual restriction on copying.  Part V.A

& B, *infra*.  Fox's copyright claim as to the Quality Assurance copies made by DISH to test its AutoHop features similarly fails as those intermediate copies are indisputably fair.  Part VI, *infra*.

Finally, this Court's conclusion a year ago that Fox failed to establish irreparable harm was prescient.  On a full record, Fox has failed to establish *any actual harm* resulting from DISH's supposedly catastrophic technology.  Indeed, the networks' ominous predictions of fleeing advertisers and the collapse of network television have not borne out.  To the contrary, and notwithstanding the increased use of time-shifting, Fox has reported that "the last three years have been the most profitable in [network] history."  Molinski Decl. Ex. 39.  The networks have called the post-DVR world "a new golden era" in television, Rapp Decl. ¶ 38, and Fox has reported "doubling of retransmission consent revenue" for the past three years in a row, *id.* ¶ 29.  Undoubtedly this is why Fox has admitted it has *no actual damages*, and then tried to backfill with substitutes as an economic penalty against DISH, claiming a "reasonable royalty" and disgorgement of profits.  Neither theory is legally available.  Parts VII and VIII, *infra*.  With these further defects established, *all* of Fox's claims can be dismissed.

For the reasons set forth herein, the undisputed material facts show that DISH is entitled judgment as a matter of law.

## STATEMENT OF FACTS

### A.    The Agreements.

DISH, as the nation's third largest pay television service provider, pays Fox and its affiliates ▮▮▮▮▮▮▮▮▮▮▮ every year for the right to distribute Fox programming via a satellite signal to DISH subscribers.  DISH Statement of Undisputed Material Facts (hereinafter "SUF") ¶ 5; Shull Decl. ¶4.  In 2013, these ▮▮▮▮▮▮▮▮▮▮▮▮▮.  Shull Decl. ¶10.  They are projected to be ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.*

There are two agreements that Fox claims were breached in this dispute.  The

- 3 -



1   first is a Retransmission Consent Agreement entered into on July 1, 2002 (the

2   "2002 Agreement").  SUF ¶ 127.   The 2002 Agreement governs the terms under

3   which DISH (then EchoStar) retransmits the signals of Fox-owned broadcast

4   network stations to DISH subscribers.  *Id*. ███████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████ § 3(d).  SUF ¶ 132.

8        The second agreement is a 2010 Letter Agreement, which includes an Exhibit

9   A that amends the 2002 Agreement.  Shull Decl. Ex. 3.  There are three operative

10   provisions of the 2010 Agreement for purposes of this case. ████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ████████████ SUF ¶ 144. ████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████ SUF ¶ 150.

16        Second, the 2010 Letter Agreement ████████████████████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ██████████████████████████████████. SUF ¶ 151. ████████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████.

22        Finally, the 2010 Agreement ██████████████████████████

23   ████████████████████████████████████████████████[1] ████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████████ SUF ¶ 179.

27   [1] █████████████████████████████████████████████████

28   ████████████████████████████ Shull Decl. ¶ 15.  The
    2004 amendment is referred to herein as the EchoStar Affiliation Agreement.

- 4 -

**B.     The Accused Features.**

Fox complains about four features DISH offers with its Hopper and Hopper with Sling Whole Home DVRs.  *See generally* Supplemental First Amended Complaint  (No. 12-cv-04529) (hereinafter "FAC").

**The Hopper**:  On January 9, 2012, at the International Consumer Electronics Show ("CES") in Las Vegas, Nevada, DISH introduced the Hopper Whole Home HD DVR, its latest and greatest set-top box receiver (STB) and DVR.  SUF ¶ 1.  When paired with client boxes known as "Joeys," it can service up to four televisions in one home.  SUF ¶ 4.  The Hopper has three tuners and a two-terabyte hard-drive.  Minnick Decl. ¶ 17.

**PrimeTime Anytime:**  At the same time that DISH announced the Hopper, it announced the PrimeTime Anytime ("PTAT") feature available on the Hopper.  SUF ¶ 6.  PTAT is a DVR block-recording feature that provides Hopper customers the capability to more easily program the DVR to record primetime programming shown on the four major broadcast networks in the customer's local television market.  SUF ¶ 7.  The customer must enable this feature.  SUF ¶ 9.  The Hopper arrives with the feature disabled and it remains diabled unless and until the customer decides to turn it on.  SUF ¶ 8.

Once she turns PTAT on, the customer navigates to the set-up screen and is presented with a menu of choices of which local networks to record (ABC, CBS, Fox and/or NBC), which nights of the week to make the recordings, and the default number of days she wants to save those recordings (from 2 to 8 days).  SUF ¶¶ 12-14.  The customer can turn PTAT on or off on any day, and can change the PTAT menu settings.  *Id.*  After PTAT is configured by the user, the algorithm in the PTAT software relies upon the program guide data in order to determine which shows fall within industry-defined "primetime."  SUF ¶¶ 17-18.  The PTAT feature will then record the selected networks during the time-block of 8 p.m. to 11 p.m. from Monday through Saturday and 7 p.m. to 11 p.m. on Sunday.  SUF ¶ 20.  The

1  software also captures any program that is scheduled to air partially in this time

2  block, so long as 50% or more of the program airs during primetime.  SUF ¶ 21.

3        PTAT recordings are unique to each customer.  SUF ¶ 10.  They are made

4  from the local television signals received by that individual customer over the

5  DISH satellite television system.  SUF ¶ 11.  If a network primetime program is

6  interrupted by local breaking news or is otherwise preempted, the DVR will record

7  precisely what was aired.  SUF ¶ 22.  Similarly, if the customer loses power or a

8  satellite signal, the programs will not record.   SUF ¶ 23.  The PTAT recordings are

9  made in the customer's home and retained on the hard drive of the customer's

10 Hopper.  SUF ¶ 10.  ████████████████████████████████

11 ███████████████████████.  SUF ¶ 24.

12        While the PTAT block-recording feature makes it easier for Hopper

13 customers to record Fox's primetime network shows, owners of non-Hopper DVRs

14 can accomplish the exact same result.  Other DVRs are capable of being set to

15 record all of Fox's primetime programs every night of the week (as are the many

16 VCRs still in people's homes).  SUF ¶¶ 27-32.

17       **AutoHop:**  On May 10, 2012, DISH added the AutoHop commercial-

18 skipping feature to the suite of features on the Hopper DVR.  SUF ¶ 46.  The

19 AutoHop feature works only for certain "Big 4" local network programs when the

20 PTAT feature is turned on, and it is not available until the day after a primetime

21 network show initially airs (or later).  SUF ¶¶ 47-48.  With AutoHop, PTAT users

22 are presented with the option to skip over all commercials on playback of each

23 particular recording.  SUF ¶¶ 49, 50.  If AutoHop is available for a show, the

24 viewer will be presented with a pop-up screen querying whether she wants to

25 "Enable AutoHop."  SUF ¶ 49.  If the viewer selects "Yes," she can put down her

26 remote control and watch the entire show without pressing fast-forward or the 30-

27 second skip button to avoid the commercial breaks.  SUF ¶ 51.  DISH offers the

28 feature for most primetime network shows, with the exception of sports and local

1  news.  SUF ¶ 52.

2  ███████████████████████████████████████████████

3  ██ SUF ¶ 53. ██████████████████████████████████████

4  █████████████████████████████████████████████████

5  ███████████████████████ SUF ¶¶ 54-55.  AutoHop is not, at its core, a new

6  concept.  Every DVR remote control has a fast-forward button.  SUF ¶ 59.  In

7  addition, most DVR remote controls have 30-second skip functionality that enable

8  the viewer to skip forward in 30-second increments, the same length of time as the

9  typical commercial.  SUF ¶ 60.  AutoHop just makes these ordinary, widely

10 adopted features more efficient.

11 ██████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ███████████████████████████████ SUF ¶ 65. ██████████████

14 ██████████████████████████████████████████

15 ██████████████████████████████████████████████████

16 ████████████████████████. SUF ¶ 66. ███████████████

17 █████████████████████████████████████████. SUF ¶ 68.

18   **The Hopper with Sling:**  At the January 2013 International CES, DISH

19 introduced its second-generation Hopper known as the "Hopper with Sling."  SUF

20 ¶76.  The Hopper with Sling has a faster processor and additional features not

21 found on the original Hopper, including built-in WiFi capability to use with

22 wireless Joeys.  SUF ¶ 70.  The Hopper with Sling offers two place-shifting

23 features—Sling and Hopper Transfers.

24   **Sling:**  Sling technology provides consumers with the ability to place-shift

25 their television viewing.  SUF ¶ 85.  With Sling, a consumer can use an Internet-

26 connected computer, tablet or smartphone to remotely access either live or recorded

27 content available on their home STB/DVR.  *Id.*  For Hopper with Sling, the

28 consumer fires up the DISH Anywhere software on her iPad to remotely connect

- 7 -

with her living room STB/DVR and send the program to herself for viewing at another location, either inside or outside of her home.  *Id.*  The content is sent directly from the customer's home to herself over the Internet, on a point-to-point basis.  SUF ¶ 92.  No copies are made in the Sling remote-viewing process (although Sling might use an existing DVR recording).  SUF ¶ 95.  And, only one Sling remote-viewing session can take place at a time.  SUF ¶ 96.

The Sling technology is not new.  Sling Media, Inc. ("Sling Media") was formed in 2004 for the purpose of commercializing Sling technology, and in 2005 Sling Media started selling the first retail Slingbox place-shifting devices to consumers.  SUF ¶ 99.  DISH bought Sling Media for $380 million in 2007.  SUF ¶ 156.  In 2008, DISH announced its plans to integrate Sling technology into DISH consumer technology products.  SUF ¶ 157.  In January 2009, DISH announced the ViP 922 SlingLoaded DVR at the International CES.  SUF ¶ 158.  This was the first integrated set-top-box with satellite tuner, DVR and Sling functionality built inside. SUF ¶ 76.  In November 2010, DISH began selling the Sling Adapter, which could be attached via USB port to DISH's ViP 722 DVR to add Sling place-shifting capability.  SUF ¶ 73-74.  The Sling Adapter also works with the original Hopper. SUF ¶ 75.  The latest Hopper model—Hopper with Sling—has the Sling functionality built inside.  SUF ¶ 97.

Sling works through a combination of hardware and software.  SUF ¶ 86. The hardware is a computer chip that transcodes the audiovisual data (either live or prerecorded) into a format that can be sent over the Internet.  SUF ¶ 87.  The related software is provided through a website or a mobile application ("app").  SUF ¶ 88. A DISH customer starts her DISH Anywhere app on her iPad, logs in with her unique ID and password, and then selects "Live TV" or a DVR recording of the show she wants to watch from the menu.  SUF ¶¶ 879, 194.  Her selected content is then sent to her remote location by her Hopper with Sling.  SUF ¶¶ 91-93.

**Hopper Transfers:**  Using Hopper Transfers, a subscriber can transfer DVR

recordings from his Hopper with Sling DVR onto a tablet or smartphone for later viewing without an Internet connection.  SUF ¶ 107.  Hopper Transfers currently works with Apple or Android mobile devices.  SUF ¶ 108.  The feature works through the DISH Anywhere mobile application.  Horowitz Decl.  ¶¶ 18, 122 n.59 .  The transfer to the mobile device is done over the home WiFi network, connecting it to the Hopper DVR.  *Id.* ¶ 123.

Like Sling, this transfer-and-take-with-you process is not new.  In 2005, DISH introduced the PocketDISH product, which could be connected to a DISH DVR via the USB port for the transfer of DVR recordings for portable viewing.  SUF ¶ 138.  There are other such products available on the market for transferring DVR recordings to mobile devices as well.  DirecTV's Nomad provides the same functionality, as does the TiVo Roamio and TiVo Desktop.  SUF ¶ 112.  In any event, home recordings have always been portable.  With the original Betamax, the tapes could be ejected and taken to a friend's house.  SUF ¶ 113.

## ARGUMENT

Rule 56 authorizes summary judgment on all or part of a claim or defense where, as here, it is apparent either (1) that plaintiff cannot prove an element of its case, or (2) that the undisputed material facts entitle defendant to judgment as a matter of law.  Fed R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The matters at issue in this case are well suited to and regularly decided on summary judgment:  the question who is making recordings (*see CoStar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544 (4th Cir. 2004) (affirming summary judgment for defendant)); the question whether such recordings are fair (*Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175 (9th Cir. 2013) (same)); the scope of the Copyright Act in the first instance (*Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013) (affirming dismissal as a matter of law)); the interpretation and application of contract terms under New York law (*Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (affirming summary judgment for

1  defendant)); and whether Fox can meet the legal requirements for monetary relief in

2  this case (*Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002) (affirming summary

3  judgment denying copyright disgorgement)).  Each of these is a legal question

4  properly susceptible to pretrial resolution based on the undisputed record in this

5  case and should now be decided in favor of DISH on the grounds set forth below.

6  **I.    THE UNDISPUTED FACTS DEMONSTRATE AS A MATTER OF**
7  **LAW THAT DISH IS NOT INFRINGING FOX'S COPYRIGHTS BY OFFERING PTAT OR AUTOHOP TO ITS SUBSCRIBERS.**

8  **A.    AutoHop Cannot Support A Copyright Claim.**

9  This Court aptly said of AutoHop at the preliminary injunction stage that it

10  "standing alone, does not infringe."  *Fox Broadcasting Co. v. DISH Network*

11  *L.L.C.*, 905 F. Supp. 2d 1088, 1105 (C.D. Cal. 2012).  That remains correct.  It is

12  black-letter law that "[t]o be actionable as infringement, the conduct must implicate

13  one of the copyright owner's enumerated rights."  3 Nimmer on Copyright §

14  10.15[A][2] n.10 (2013); *see* 2 Patry on Copyright § 5:118 (2013) (same).  But

15  here, the undisputed facts show that AutoHop does not involve an invasion of any

16  of the Section 106 rights.  The reason is simple:  The AutoHop feature is not a

17  reproduction of any Fox content.  SUF ¶ 56.  Rather, when a subscriber activates

18  AutoHop, ███████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████.

20  SUF ¶ 65.

21  Moreover, Fox is claiming no copyright ownership in the skipped

22  advertisements, SUF ¶ 57, ██████████████████████████████████

23  ████████████  SUF ¶ 53.  Accordingly, as the Ninth Circuit held in this case, "ad-

24  skipping does not implicate Fox's copyright interests."  *Fox Broadcasting Co. v.*

25  *DISH Network L.L.C.*, 747 F.3d 1060, 1069 (9th Cir. 2014).  The facts have not

26  changed in the fully developed record, so the Ninth Circuit's conclusion of law

27  controls.  Any copyright claim premised upon subscriber operation of AutoHop

28  (FAC ¶¶67, 68) must be dismissed.

**B.      DISH Does Not Directly Infringe Fox Copyrights By Offering The PTAT Feature.**

The next question is whether DISH and/or EchoStar have violated any of the exclusive rights set forth in the Act in connection with the PTAT feature. 17 U.S.C. §§106, 501.  Fox complains that DISH and EchoStar are reproducing and distributing its programs in violation of §106(1) and §106(3).  FAC ¶65.  But in order to be directly liable, the defendant must "do" the thing complained of by the plaintiff.  *Id.*§106.  The undisputed material facts show that neither DISH nor EchoStar makes or distributes PTAT recordings by offering that DVR feature as part of the Hopper.  SUF ¶¶ 8-10.  As a result, DISH and EchoStar cannot be direct infringers, and Fox's First Claim for Relief must be dismissed as to PTAT.

As both this Court and the Ninth Circuit have observed in this case, direct infringement requires a finding of "copying *by* the defendant." *Fox*, 747 F.3d at 1067 (quotation omitted).  Such copying includes "a requirement that the defendant cause the copying." *Id.*  A defendant does not "cause the copying" when it merely supplies a technological feature that "creates the copy only in response to the user's command." *Id.*  Here, the facts have not changed since this Court and the Ninth Circuit considered the question.  It is undisputed that the PTAT feature records nothing unless and until a DISH user enables and configures it.  SUF ¶ 8-9.  ██████

████████████████████████████████████████████████████

████████████████████████              *See* SUF ¶ 24.  Thus, in the Ninth Circuit's words, "DISH's program creates the copy only in response to the user's command," *i.e.*, "the user, not DISH, makes the copy."  747 F.3d at 1067.  Or, as Fox itself puts it, PTAT only operates "[o]nce enabled."  FAC ¶2.

The fact that DISH sets certain default parameters for this DVR software feature does not change the outcome.  It is the law of this case that DISH's choices about the scope of the PTAT DVR block-recording software feature "do not establish that DISH made the copies." *Fox*, 747 F.3d at 1068; *see also CoStar*

- 11 -

1   *Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (direct infringement

2   "requires *conduct* by a person who causes in some meaningful way an

3   infringement").

4           While Fox may try to argue that the intervening decision in *American*

5   *Broadcasting Companies, Inc. v. Aereo*, 134 S. Ct. 2498 (2014), has some bearing

6   on this Court's assessment of PTAT, that case involved not only the specialized

7   history and language of the Transmit Clause and its definition of the term "perform

8   publicly," 17 U.S.C. § 101, but also that Clause's application to a system of

9   "equipment housed in a centralized warehouse, outside its user's homes," *Aereo*,

10  134 S. Ct. at 2506, that showed "an overwhelming likeness to [a] cable compan[y],"

11  *id.* at 2507.  The Court's "limited holding," *id.* at 2510, did not purport to, and did

12  not, overrule *Sony*, nor any of the published opinions of the circuit courts of appeals

13  requiring a showing of some kind of volitional conduct to demonstrate direct

14  infringement of the reproduction and distribution rights.  *See generally Fox*, 747

15  F.3d at 1068; *Cartoon Network LP, LLP v. CSC Holdings Inc.*, 536 F.3d 121, 131-

16  32 (2d Cir. 2008) ("volitional conduct is an important element of direct liability");

17  *Perfect 10, Inc. v. Amazon*, *Inc.*, 508 F.3d 1146, 1161-62 (9th Cir. 2007); *CoStar*,

18  373 F.3d at 549.  Moreover, *Sony*'s requirement to distinguish between direct and

19  secondary infringement in the context of offering general purpose technological

20  devices remains intact.  464 U.S. at 438-39.

21          **C.      DISH Is Not Secondarily Liable For Copyright Infringement**
            **When Customers Make PTAT Recordings.**
22

23                   **1.      Subscriber PTAT Recordings Are Fair Use.**

24          Nor is DISH secondarily liable for PTAT recordings made by its subscribers,

25  because those are fair use.  "[S]econdary liability for copyright infringement does

26  not exist in the absence of direct infringement by a third party."  *Fox*, 747 F.3d at

27  1068.  Because DISH subscribers are not infringing Fox's copyrights when they use

28  their DVRs to record the network primetime lineup, DISH cannot be secondarily

CASE NO. CV1204529 DMG (SHx)

liable for infringement.  "Where [as here] material facts are not in dispute, fair use is appropriately decided on summary judgment."  *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003); *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986).  Indeed, if there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law that the challenged use qualifies as a fair use of the copyrighted work.  *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986).

As this Court already rightly observed, this case is nothing more than a "fast-forward [of] *Sony*."  *Fox*, 905 F. Supp. 2d at 1092.  PTAT is a feature that gives subscribers the capability to record for later viewing primetime programs *for which they have already paid to gain access*.  SUF ¶¶ 39-40.  DISH is Sony, the Hopper is the Betamax, PTAT is a simplified version of a VCR's timer-based recording, and this dispute is déjà vu.  The Ninth Circuit agreed: *Sony* ends this inquiry.  *Fox*, 747 F.3d at 1068.

**Factor 1 (Purpose and Character of Use).**  "As for the first factor, … *Sony* … held that 'time-shifting for private home use' was a 'noncommercial, nonprofit activity.'"  *Fox,* 747 F.3d at 1069 (quoting *Sony*, 464 U.S. at 449).  That is, the first factor favors the defendant if the technology "is used for time-shifting" and "is available only to private consumers."  *Id.*  To be sure, consumers more efficiently block-record with PTAT than with a VCR.  But there is no material dispute that consumer use of PTAT is noncommercial.  SUF ¶ 26; Biard Tr. 190:6-9 ("Q: [D]o you have any information to suggest that some individual in their home is using [PTAT] for commercial purposes? A: No.").

Moreover, "time-shifting expands public access to freely broadcast television programs" which "yields societal benefits."  *Sony*, 464 U.S. at 454.  When viewers can organize their entertainment in the manner that bests suits their needs, everyone benefits.  *See* Rapp Decl. ¶¶217-18.  Consumer research confirms that time-shifting

1   —the ability to watch "what I want, when I want"—is the single greatest benefit of

2   DVR ownership.  *Id.* at ¶ 218.  That benefit increases as the power and ease of

3   time-shifting technology increases.  *Id.*  As in *Sony*, the first factor favors fair use as

4   to PTAT copies because they advance the "public interest in making television

5   broadcasting more available."  *Sony*, 464 U.S. at 454.

6      **Factors 2 (Nature of Work) and 3 (Amount and Substantiality of Use).**  If

7   enabled and configured by the subscriber to select the Fox network, PTAT records

8   the entire Fox primetime lineup for the selected days.  But that fact does not defeat

9   a holding of fair use.  To the contrary, *Sony* held that the recording of full works by

10   the public where they had been invited to witness the entirety free of charge "does

11   not have its ordinary effect of militating against a finding of fair use."  *Sony*, 464

12   U.S. at 449-50; *see also Stern v. Does*, 978 F. Supp. 2d 1031, 1047 (C.D. Cal.

13   2011) ("several courts have accepted fair use defenses where the defendant copied

14   all or most of the plaintiff's work").  According to the Ninth Circuit, "[t]he same

15   analysis applies here:" "the fact that DISH users copy Fox's entire copyrighted

16   broadcasts does not have its ordinary effect of militating against a finding of fair

17   use."  *Fox*, 747 F.3d at 1069.

18      **Factor 4 (Effect of Use Upon the Potential Market for or Value of the**

19   **Work).**  The value of Fox's works has not been harmed in any way by PTAT.

20   Indeed, the Court can search the FAC in vain for any allegation that PTAT

21   recordings harm the value of any of its works—there is no such claim.  Fox

22   stipulated that its seeks no actual damages in its Rule 26 disclosures (SUF ¶182),

23   and furthermore admitted that it seeks to prove no "compensatory" damages other

24   than a hypothetically negotiated "reasonable royalty" (SUF ¶ 187) which is not

25   even available under the Copyright Act, *see* Part VII.A, *infra*.  In resisting

26   discovery of the viewership and economics of its licensees, Fox repeatedly asserted

27   that it had lost no consideration in the form of royalties from third parties.  *See* Dkt.

28   226 at 49-50; Dkt. 233 at 4.  In short, Fox has no claim of actual fourth-factor harm

1    to the value of its works.  SUF ¶ 183.

2         And, *the burden was on Fox to come forward with such evidence*.  *Sony*, 464

3    U.S. at 451; *Fox*, 747 F.3d at 1069-70.  Because it has no evidence of actual harm,

4    Fox has argued that it might suffer future harm "if the challenged use should

5    become widespread."  Dkt. 226 at 50 (quoting *Harper & Row Publishers, Inc. v.*

6    *Nation Enters.*, 471 U.S. 539, 568 (1985)).  This "likelihood of future market harm

7    *is not presumed but 'must be demonstrated*.'"  *Fox*, 747 F.3d at 1069 (quoting *Sony*,

8    464 U.S. at 451) (emphasis added).  But Fox has no evidence demonstrating that

9    widespread use of time-shifting block-recording devices like the Hopper with

10   PTAT will harm a potential market for its works, because such use *is already*

11   *widespread and Fox has not been harmed*.[2]  *See* Hauser Decl.¶¶ 8, 21-29; Rapp

12   Decl. ¶¶ 35-39.

13        Fox dramatically asserts that PTAT is a "bootleg video-on-demand service"

14   (FAC ¶3), and that it might substitute and thus harm Fox's VOD or its distribution

15   on secondary platforms such as Hulu, Amazon or iTunes (*id.* ¶5), which serve as

16   outlets for time-delayed first-run Fox content.  Fox has provided no support for this

17   claim.  SUF ¶¶ 37,42.  As an initial matter, PTAT is no different from a basic DVR.

18   SUF ¶¶ 27-31.  What PTAT provides is something that any DVR can (and does)

19   provide.  *Id.*  Indeed, the current DVRs on the market all tout their ability to record

20   and time-shift vast quantities of material based on their very large storage capacity

21   and their multiple tuner capabilities.  SUF ¶ 30-31.  ███████████████████

22   ████████████████████████████████████████████████████████████

23

24   ───────────────────
     [2] Recognizing that there is no harm from PTAT, Fox has asserted that it is the
25   commercial skipping that causes it harm.  But the Ninth Circuit has clearly stated
     that commercial skipping is not relevant to market harm: "commercial-skipping
26   does not implicate Fox's copyright interest because Fox owns the copyrights to the
     television programs, not to the ads aired in the commercial breaks. . . . Indeed, a
     recording made with PrimeTime Anytime still includes commercials; AutoHop
27   simply skips those commercials unless a viewer manually rewinds or fast-forwards
     into a commercial break.  Thus, **any analysis of the market harm should exclude**
28   **consideration of AutoHop** because ad-skipping does not implicate Fox's copyright
     interests."  *Fox I*, 747 F.3d at 1069 (emphasis added).

- 15 -

1   ███████████████████████████████████████████████

2   ██████████████████████ SUF ¶¶ 35-36; *see* Brennan Tr. 167:14-21 (████████

3   ██████████████████████████████████████████); Biard Tr.

4   340:23-341:4 (█████████████████████████████████████

5   ██████████████████████████████████). ████████████

6   █████████████████████████████ (Brennan Tr. 156:22-

7   157:6; Hopkins Tr. 85:2-86:12; Molinski Decl. Ex. 111(███████████

8   ██████████)),

9   ████████████. DVRs (and VCRs before them) have been available on a

10  widespread basis for years.  SUF ¶ 33.  Yet, there is no evidence that they harm

11  Fox's copyrighted programs.  SUF ¶¶ 37, 42, 183.

12          To the contrary, consumers do not use DVRs and services like Hulu or

13  iTunes interchangeably to any meaningful degree.  SUF ¶ 37.  Nor do DISH

14  Hopper users use them any more or less than non-Hopper users.  SUF ¶ 38.

15  I███████████████████████████████████████

16  ██████████████████████████████████████

17  ███████████████████████████████████. SUF ¶ 42.  Online

18  providers might appeal to cord-cutters, but by definition such individuals are not

19  MVPD subscribers; i█████████████████████████████████

20  ████████████████████████████████████

21  Elias Tr. 136:23-137:7.

22          More specifically here, PTAT cannot be a substitute for Fox VOD for DISH

23  subscribers, because *DISH does not offer Fox VOD*.  ████████████████

24  ██████

25          ████████████████████████████████████

26          ██████████████████████████████████

27          ████████████████████.

28  Elias Tr. 64:16-20 (emphasis added).  ██████████████████████

CASE NO. CV1204529 DMG (SHx)

1 ███████████████████████████████████████████████████

2 ██████████████ Brennan Tr. 95:25-96:3.

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████ SUF ¶ 43. █████████████████████████████ SUF ¶ 44; Elias

7 Tr. 63:14-17 (████████████████████████████████████

8 ████████). Nonexistent markets cannot be harmed. *See, e.g., Sony Computer*

9 *Entm't Am. v. Bleem*, 214 F.3d 1022, 1029 (9th Cir. 2000) (discussing disputed

10 existence of screen shot market); *Sofa Entm't, Inc. v. Dodger Prods., Inc.*, 782 F.

11 Supp. 2d 898, 910 (C.D. Cal. 2010) (granting summary judgment where "the notion

12 that any such market could ever materialize is speculative at best").

13    Fox seems to accept that *Sony* held that the market for time-shifted

14 recordings is a fair use market, but argues that it now has a market that can be

15 harmed where *Sony* found there was not one before. But if that theory is accepted,

16 then no fair-use market is safe. Under the copyright law as interpreted by Fox, a

17 copyright holder in such a market could one day start licensing such content and

18 (under the law as Fox would have it) thereby render the market unfair the next.

19 That is not the law. "[A] copyright holder cannot prevent others from entering fair-

20 use markets merely by developing or licensing [competing uses]." *Bill Graham*

21 *Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006) (internal

22 quotation marks omitted). Put another way, "a [market participant's] willingness to

23 pay license fees for reproduction of [content] does not establish that [any other

24 market participant] may not, in the alternative, make fair use of th[at] [content]."

25 *Id.* at 615. Condemning PTAT on the bases that Fox has advanced in its

26 (unpersuasive) effort to distance this case from *Sony* would imperil every modern

27 DVR. Every modern DVR has the same advantages over Betamax recording as

28 PTAT. They all have significant storage space. SUF ¶ 31. They all can record an

1  entire night of Fox primetime programming with little effort.  SUF ¶¶ 27-29.  They

2  all provide consumers with the convenience to watch first-run broadcast content

3  *later*. *Id.*

4        A reasonable jury could only reach one conclusion in this case.  Fox has

5  failed in its burden to show a meaningful likelihood of substantial harm from

6  PTAT.  Where the "alleged infringement has no effect on the value of [the work],

7  this [fourth] factor strongly favors a fair use finding." *Stern*, 978 F. Supp. 2d at

8  1048-49.  This Court should conclude now, as it did before, that there is "no

9  specific theory under which individual PTAT users could themselves be liable for

10  copyright infringement without circumventing *Sony*." *Fox*, 905 F. Supp. 2d at

11  1098.

12        **2.    Fox Cannot Establish Other Required Elements Of Secondary Liability.**

13

14        Suppose, contrary to the foregoing, Fox argues that there is some small

15  pocket of users for whom some PTAT copies are not a fair use.  Even then, DISH

16  would not be secondarily liable for offering the Hopper to its subscribers because

17  there are significant noninfringing uses for the technology.  This single undisputed

18  fact precludes all forms of secondary liability.  DISH is not contributorily liable

19  where "'the [technology] [i]s capable of commercially significant noninfringing

20  uses.'" *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 545 U.S. 913, 931-32

21  (2005) (quoting *Sony*, 464 U.S. at 442).  Similarly, with these significant

22  noninfringing uses, it is not possible for DISH to police, and therefore weed out and

23  "supervise," the specific infringing activity, as needed for vicarious liability.  *See*

24  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007).  All that

25  DISH has done here is truthfully advertise the capabilities of a product it has always

26  with good reason believed (and court after court has found) to be legally no more

27  "contraband" than a Betamax VCR or a run-of-the-mill DVR player.  That is not

28  sufficient for a finding of infringement by inducement.  *See Grokster*, 545 U.S. at

- 18 -

1   937 (requiring "purposeful, culpable expression and conduct" to establish

2   inducement).

3   **II.   "EXCEEDING THE SCOPE OF LICENSE" IS NOT A CLAIM FOR**

4       **COPYRIGHT INFRINGEMENT.**

5   Fox independently alleges that DISH and EchoStar have "exceeded the scope

6   of DISH's license from FOX" and that "[t]his constitutes copyright infringement . .

7   . ." FAC ¶74.  There is no such claim.  To be actionable as infringement, the

8   defendant's conduct must violate one of the copyright owner's enumerated rights.

9   17 U.S.C. §§106, 501; *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361

10  (1991); 3 Nimmer on Copyright § 10.15[A][2] n.10 (2013); see 2 Patry on

11  Copyright § 5:118 (2013).  A plaintiff cannot bypass the elements of copyright

12  infringement simply by proving breach of contract.  "[B]efore [the plaintiff] can

13  gain the benefits of copyright enforcement, *it must definitively establish that the*

14  *rights it claims were violated are copyright, not contractual, rights*." *Sun*

15  *Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1122 (9th Cir. 1999)

16  (emphasis added); *see also S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1089 & n.11

17  (9th Cir. 1989); *Worldwide Church of God v. Philadelphia Church of God, Inc.*,

18  227 F.3d 1110, 1114 (9th Cir. 2000).  Fox's "exceeding the license" theory is not a

19  separate theory of infringement and should be dismissed as a matter of law.

20  **III.   DISH IS NOT BREACHING ITS AGREEMENTS WITH FOX BY**

21      **OFFERING THE PTAT AND AUTOHOP FEATURES.**

22  Fox alleges that DISH is breaching the 2002 and 2010 Agreements by

23  offering PTAT and AutoHop.  FAC ¶93.  Under New York law, the Court's

24  primary objective in interpreting a contract is to give effect to the intent of the

25  parties as revealed by the language they chose to use.  *Deakins Holding PTE Ltd. v.*

26  *Newnet Investment Group LLC*, 2014 WL 3101446, at *3 (C.D. Cal. July 7, 2014)

27

28

- 19 -

1   (Snyder, J.).[3]  Summary judgment is proper in a New York contract dispute if the

2   language is wholly unambiguous, or even if it is ambiguous and the extrinsic

3   evidence leads to only one reasonable outcome.  *Id.* at \*4; *see also Compagnie*

4   *Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner &*

5   *Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000).  In short, summary judgment on a

6   contract claim is appropriate unless the contract is ambiguous *and* there is a

7   material conflict in the extrinsic evidence.

8         **A.**    **DISH Is Not Breaching Section 9(a) Of The 2002 Agreement.**

9         Section 9(a) of the 2002 Agreement provides:

10

11

12

13

14   Shull Decl. Ex. 1 (2002 RTC § 9(a)). ▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  But as this Court

16   already held (and as explained above), DISH does not "copy" Fox programs when

17   its subscribers use PTAT, the subscribers do.  *Fox*, 905 F. Supp. 2d at 1101-02.

18   And AutoHop is not copying at all.  *Id*. at 1105, 1110 &n.8.  Fox has identified no

19   ambiguity in this provision, nor any reason why the ordinary understanding of what

20   it means to make a copy would not apply.  Thus, "[f]or the same reasons that DISH

21   does not make the copies under copyright standards, DISH does not make the

22   PTAT copies within the meaning of [§ 9(a)] of the RTA Agreement."  *Id*. at 1107.

23         **B.**    **DISH Is Not Breaching Section 3(d) Of The 2002 Agreement.**

24         Section 3(d) of the 2002 Agreement states:

25

26

27   [3] The parties agree that New York law governs the agreements at issue.  *See*

28   Molinski Decl. Ex. 11 (FOX's Response to DISH's Interrogatory No. 4, dated Nov. 25, 2013).

- 20 -

1

2

3

4   Shull Decl. Ex. 1 (2002 RTC § 3(d)).  There are at least three reasons why DISH

5   does not breach this provision by virtue of offering PTAT and AutoHop.

6   **Section 3(d) Was Superseded.**

7

8

9   "Under New York law, [i]t

10   is well established that a subsequent contract regarding the same matter will

11   supersede the prior contract." *Applied Energetics, Inc. v. NewOak Capital Markets,*

12   *LLC*, 645 F.3d 522, 526 (2d Cir. 2011) (quotations omitted).

13   **DISH Does Not "Distribute."**

14   "Distribute" means "to give

15   or deliver (something) to people."  SUF ¶ 132.  This definition is consistent with

16   the use of the term in the Copyright Act, which protects the "distribut[ion of] copies

17   . . . of works to the public by sale or other transfer of ownership," 17 U.S.C. § 106,

18   and which "requires 'actual dissemination of a copy'. . . " *Fox*, 905 F. Supp. 2d at

19   1106 (quoting *Perfect 10, Inc.*, 508 F.3d at 1162 ).[4]

20

21   .  SUF ¶ 155.

22        It goes without saying that you can neither "give or deliver" nor

23   "disseminate" something that you do not have in the first place.  The undisputed

24   evidence now confirms that PTAT copies are made by users.  SUF ¶¶ 8-10.

25

26   _____

27   [4] Under New York law, the use and meaning of a term within an applicable body of law can guide the Court in determining a contract term's unambiguous meaning. *See Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 198 (1941) (construing "infringement" in a contract consistent with its "definite, technical and well-understood meaning" under patent law).

28

- 21 -

1      █████████████████████████████████████████████

2      SUF ¶ 10. ████████████████████████ SUF ¶ 56.  Thus, as this Court

3      rightly held, DISH does not "engage[] in any distribution because the PTAT copies

4      are made by users, remain in private homes, and do not change hands."  *Fox*, 905 F.

5      Supp. 2d at 1107.

6      █████████████████████████████████████

7      ████████████  Moreover, if still in effect, ███████████████████████████

8      ██████████████████████  As the Southern District of New York held in interpreting a

9      similar allowance in DISH's agreement with ABC, permitting the connection of

10     video replay equipment necessarily includes permitting the use of that equipment to

11     make copies of programs.  Any interpretation to the contrary "is absurd, as it would

12     put DISH in violation of the retransmission agreement whenever a customer used a

13     digital recorder to record a[] [Fox] program."  *In re AutoHop Litig.*, 12 CIV. 4155

14     LTS KNF, 2013 WL 5477495, at *9 n.12 (S.D.N.Y. Oct. 1, 2013).  As that court

15     also observed, PTAT and AutoHop are just features of a DVR.  *Id.* at *9.  ███████

16     ████████████████████████████████████████████.

17            **C.**     **DISH Is Not Breaching the 2010 Letter Agreement.**

18            ***DISH Does Not Breach the "FOX Video on Demand" Provision.***  Fox next

19     alleges that PTAT and AutoHop breach the agreements "by copying Fox programs

20     and providing to its subscribers commercial-free FOX Programs on demand . . . ."

21     FAC ¶93.

22      ████████████████████████████████████████████

23     ██████████████████████████████████████████

24     ███████████████████████████████████████████

25     ███████████████████████████████████████████████

26     ███████████████████████████████████████████.

27     Shull Decl. Ex. 3 at 1.

28          In Section 9 of Exhibit A, █████████████████████████████████



1

2 *Id.* at

3 23 ¶3(a) (emphasis added).

4

5

6 *Id.* ¶3(b) (emphasis added).

7

8 Hopkins Tr.

9 39:22-40:6

10 *see also* Elias Tr. 106:19-107:10

11 Shull Decl. ¶ 20; SUF ¶ 146.

12

13

14

15 Shull Decl. Ex. 3 at 23 ¶4.  It is undisputed

16 that DISH never activated this provision and never distributed the FOX VOD (SUF

17 ¶ 147; Shull Decl. ¶ 21), and further it is undisputed that PTAT is *not* FOX VOD.

18 SUF ¶ 148; Brennan Vol. 1 Tr. 132:8-11 ("Q. You are not actually saying that

19 PrimeTime Anytime is your Video On Demand, are you? A. It is not our Video On

20 Demand. It's Dish's Video On Demand."); Elias Tr. 64:16-17 ("DISH does not offer

21 Fox On Demand").

22

23

24 Options generally are not required to be

25 exercised—that is the whole point. *Kaplan v. Lippman*, 75 N.Y.2d 320, 325

26 (1990).

27

28 **DISH Does Not Breach the Anti-Circumvention Provision.**  Fox also

alleges that in offering PTAT and AutoHop, DISH is "distribut[ing] commercial-free FOX Programs on demand" ████████████████████████████████████, and thus has breached the provision of the 2010 Letter Agreement that █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ FAC ¶93.

But to allow Fox to hold DISH liable for not following the condition of the FOX VOD Clause through the anti-circumvention provision would be to imply an obligation into the agreement that the parties explicitly did not include and made optional. New York law strongly disfavors the implication of contractual obligations. *2632 Realty Dev. Corp. v. 299 Main St., LLC*, 941 N.Y.S.2d 252, 255 (App. Div. 2d Dep't 2012). Moreover, obligations cannot be implied when inconsistent with other terms. *Vacuum Concrete Corp. v. Am. Mach. & Fdry. Co.*, 321 F. Supp. 771, 774 (S.D.N.Y. 1971). ████████████████████████████ Shull Decl. Ex. 3 (2010 Letter Agreement ¶13) (██████████████████████████████████ ██████████). ████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████New York law allows no claim for frustration of purpose when the contract specifically contemplates the behavior at issue. *Neumann v. Metro Med. Group, P.C.*, 557 N.Y.S.2d 663, 664 (App. Div. 3d Dep't 1990); *see also Israel v. Chabra*, 12 N.Y.3d 158, 168 n.3 (2009) ("[T]he more specific clause controls the more general").

Finally, Fox has no cause of action against DISH for breach of any implied covenant of good faith. *See* FAC ¶98. The limited good faith covenant under New York law is identical to the existing anti-circumvention provision: "[T]he implied

covenant of good faith and fair dealing embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *ABN AMRO Bank, N.V. v. MBIA, Inc.*, 17 N.Y.3d 208, 228 (2011). Because, as explained above, DISH has not breached the anti-circumvention provision, it cannot have breached the implied covenant.

## IV.   THE UNDISPUTED FACTS DEMONSTRATE THAT DISH IS NOT VIOLATING ANY OBLIGATION IN OFFERING SLING.

At the time Fox filed its lawsuit in May 2012, Sling technology had been on the market for close to eight years, and DISH or EchoStar had owned Sling Media, Inc. for five years without legal challenge. ████████████████████ ████████████████████████████████████████████████ Lieber Tr. 48:19-57:1 & Molinski Decl. Ex. 71 (████████████████ ████████████████); *see also* Molinski Decl. Ex. 69 (████████ ████████████████████████) & Molinski Decl. Ex. 70 (████████████████████████████████). ████ ████████ Shull Decl. ¶ 22.

Yet now Fox challenges two products in which DISH did exactly what it said it would do in 2008: Sling Adapter and Hopper with Sling. Fox does not attack other Sling devices that DISH and Echostar offer, such as the ViP 922 DVR and the stand-alone Slingbox, which Fox presumably believes are perfectly legal under both the copyright law and the parties' agreements. *See* FAC ¶¶48-50. This makes no sense; a theme that carries over to Fox's claims. Neither Sling Adapter nor the Sling functionality built into the Hopper with Sling infringes Fox's copyrights. Part A, *infra*. And the parties' contracts neither impose limitations on DISH's ability to offer Sling to its customers, nor require it to limit its customers' use of such functionality. Part B, *infra*. This Court should grant summary judgment on Fox's claims against Sling.

### A.    DISH Does Not Directly Infringe Fox's Copyrights When Its Customers Use Sling.

Fox alleges only that DISH commits *direct* infringement of § 106(4)'s public performance right in offering Sling Adapter and Hopper with Sling. FAC ¶72; *compare* FAC ¶¶80-90.[5] This claim is doubly flawed. First, it fails because when a DISH customer uses Sling, it is the customer that is doing the performing, not DISH. This means that DISH cannot be a direct infringer. And second, because Sling does nothing more than send a customer's programming to that same customer, the performances are quintessentially private. The Supreme Court went out of its way to say so in *American Broadcasting Companies, Inc. v. Aereo, Inc.*, mirroring the position taken by the U.S. Copyright Office, the U.S. Solicitor General, and even Fox.

### 1.    <u>Sling Is Not Any Kind Of Performance by DISH</u>.

When a DISH customer wants to place-shift with the Sling feature, instead of time-shift with the DVR features of her Hopper, she just uses a different microchip in the same Hopper with Sling box (or the one attached by USB in the Sling adapter) and software on her iPad or laptop. SUF ¶ 85. The operation is entirely under her control using equipment in her possession. SUF ¶¶ 87-95. That conduct must therefore be governed by the exact same rule, settled since *Sony*, and applied by this Court and the Ninth Circuit in *Fox*, discussed above. DISH is an equipment provider when it comes to Sling, so it cannot be directly liable under *Sony*.

The undisputed material facts regarding the operation of Sling technology show that nothing happens automatically, and use of Sling is entirely in the subscriber's hands. Here is the chain of events. ***First:*** DISH broadcasts a satellite retransmission of a network's signal, and if selected by a subscriber, it is captured

---

5  Fox also alleges that "The DISH Parties have made, and unless enjoined will continue to make, copies of [its] works through the operation of the Sling Adapter." FAC ¶ 69. This misunderstands how Sling works. The Sling Adapter—and Sling technology generally—does not implicate the reproduction right because it does not make copies of Fox's works. SUF ¶ 95.

by one of the Hopper's satellite tuners and can then be recorded or viewed.  SUF ¶5.  That process involves only DISH's core satellite TV service, which is authorized by the parties' agreements and covered by the Copyright Act's extensive compulsory licensing framework, 17 U.S.C. §§ 119, 122.  SUF ¶ 124.

**Second:** Once the customer has lawfully received, say, *American Idol*, the customer is left to her devices.  She can record *Idol* with her DVR to watch later.  SUF ¶ 2.  Or, the subscriber can place-shift using Sling to her bedroom, or to her laptop in her hotel room, her back porch, or the backseat of her car—anywhere she can get an Internet connection.  SUF ¶ 85.  But if any of those things are to happen, the customer has to "do" it.  17 U.S.C. § 106.

**Third:** If she chooses to use Sling, the operation of that capability is completely within her control.  SUF ¶¶ 85, 89-90, 98.  A DISH customer operates the DISH Anywhere software on her iPad or laptop—much like an electronic control—to select a program from a guide that looks just like the program guide on a DVR box.  SUF ¶¶ 88-90.  Once the program begins and she has fired up the DISH Anywhere software, she can instruct the Sling chip to transcode the content and send it securely to herself for viewing on the remote screen.[6]  SUF ¶¶ 87, 91.  DISH has no control over any of this.

This means that when a DISH customer sends herself a program on Sling, she is the one *doing* the "performing."  Sling is a customer-controlled feature built into DISH's Hopper set-top box.  *See Fox*, 747 F.3d at 1067.  ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████.  Moore Decl. ¶30.  It is really that simple:  DISH cannot be directly liable for Sling.

Fox seeks to avoid this result by citing *Aereo* and other cases that have

---

[6] Sling servers automatically "authenticate" the connection to protect against piracy.  SUF ¶ 94.

nothing to do with in-home devices.  *Aereo* involved a technological system that used "its own equipment, housed in a centralized warehouse, outside of its user's homes," *Aereo*, 134 S. Ct. at 2506, and looked just like a "traditional cable system," *id.* at 2507.  So too did the other systems upon which Fox has in the past relied to attack Sling.  *See Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1140 (C.D. Cal. 2012); *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1006-07 (C.D. Cal. 2011).  What none of the defendants in those cases could say about their technology was that it sits right in the viewer's home, along with the "VCRs, typewriters, tape recorders, photocopiers, computers, cassette players, compact disc burners, digital video recorders, MP3 players, Internet search engines, and peer-to-peer software" that "*Sony*'s rule shelters."  *Grokster*, 545 U.S. at 957(Breyer, J., concurring).

But DISH can.  It is undisputed that when DISH offers Sling functionality, it provides users only with an in-home, user-operated device.  *Sony* controls.[7]

### 2.  Sling Is Not *Public*.

Even if DISH were the one sending the signal when a customer uses Sling, Fox's theory of copyright infringement would still fail because Sling does not perform *publicly* under § 106(4).  The so-called Transmit Clause requires a transmission "to the public."  17 U.S.C. § 101.  There is nothing "public" about Sling.  It is undisputed that Sling sends a single, discrete signal to members of a single subscribing household, and it sends only programming that that household has already paid for and lawfully received.  SUF ¶¶ 88, 102-03.  Fox conceded that this cannot constitute a public performance before both the Second Circuit and the Supreme Court in *Aereo*.  The *Aereo* Court agreed, so Fox's concessions are now the law.

---

[7] Sling is a fair use even if DISH is doing the performing.  As with PTAT (*see* supra Part I.C.1), Fox's claims of market harm fall flat.  Sling is a private, place shifting tool that, like block recording, is already widespread and causing no harm.  It is complementary to traditional TV viewing.  *See* Rapp Decl. ¶¶ 156-60, 186-191.

1    A Sling performance is quintessentially private:  The signal sent using Sling

2  is available only to a single subscribing household.  SUF ¶ 90.  As the *Aereo* Court

3  observed, "[t]he [Copyright] Act suggests that 'the public' consists of a large group

4  of people outside of a family and friends."  134 S. Ct. at 2510.  So, the Court

5  reasoned, "an entity does not transmit to the public if it does not transmit to a

6  substantial number of people outside of a family and its social circle."  *Id.*  That

7  statement could *only* be a reference to Sling (or virtually identical technology),

8  which DISH brought to the Court's attention during the briefing in *Aereo*.  *See*

9  Brief of DISH Network L.L.C., et al. as Amici Curiae Supporting Respondents,

10 *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) (No. 13-461), 2014

11 WL 1348475.

12   Indeed, *Aereo* teaches a second reason that a Sling signal is not "to the

13 public."  Sling operates downstream from the viewer's lawful possession of the

14 content.  Sling users thus "receive performances in their capacities as owners or

15 possessors" of that content, not as "the public."  *Aereo*, 134 S. Ct. at 2510.  The

16 Supreme Court could not have been clearer on this point:  "[T]he term 'the

17 public' …. does not extend to those who act as owners or possessors of the relevant

18 product."  *Id.*

19   Fox can hardly claim surprise at any of this—it has taken the same position

20 as DISH does everywhere but in this case.  In 2012, Fox told the Second Circuit in

21 its *Aereo* oral argument that Sling was not a public performance.  Sling was not at

22 issue, but it came up anyway.  In discussing Sling, Judge Gleeson asked whether

23 viewing a broadcast program on his laptop would be a public performance.  Fox

24 counsel represented that it would not:

25   Mr. Smith:  The use of Slingbox may or may not involve some copyright infringement.  *It would not be a public*

26   *performance, that's correct.*

27   Judge Gleeson:  The potential audience is just me.

28   Mr. Smith:  That's correct.

- 29 -

1  Molinski Decl. Ex. 124 (*Aereo* Tr. at 12) (emphasis added).  Fox reassured the

2  Supreme Court much the same way.  It explained that "[t]here is an obvious

3  difference between a service that merely stores and provides an *individual user*

4  access to copies of copyrighted content that the user already has legally obtained,

5  and a service that offers the copyrighted content itself *to the public at large*."  Brief

6  for Petitioners at 46, *Am. Broad. Cos., Inv. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014)

7  (No. 13-461), 2014 WL 768315, at *46 (emphasis added).  The U.S. Solicitor

8  General and the U.S. Copyright Office agree.[8]

9         **B.**     **Nothing In The Parties' Contractual Agreements Prohibits Sling.**

10       Nor is Sling prohibited by the parties' Agreements.  To the contrary, ███

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ███████████████████████  *See generally Sony*, 464 U.S. 417; *Recording*

14  *Industry Assoc. of Am. v. Diamond Multimedia Sys. Inc.*, 180 F.3d 1072 (9th Cir.

15  1999).  Because Fox cannot overcome this provision—or point to any other that

16  would prohibit Sling—DISH is entitled to summary judgment on its contract claim.

17         **1.**     **The 2010 Letter Agreement Does Not Restrict Sling.**

18       Fox maintains that by providing DISH customers with devices that contain

19  Sling technology, DISH breaches the "Other Technologies" provision in the

20  Retransmission Consent paragraph of Attachment A to the 2010 Letter Agreement,

21  which provides as follows:

22                 ████████████████████████████

23                 ████████████████████████████

24                 ███████████████

25  [8] Brief of the United States as Amicus Curiae Supporting Pet'rs at 32, *Am. Broad.*

26  *Cos., Inv. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) (No. 13-461), 2014 WL 828079 ("ordinarily … a consumer's streaming of her own lawfully acquired copy to herself would effect a private performance outside the scope of the Transmit

27  Clause"); United States Copyright Office, SHVERA Report 188 (June 2008) ("uses the Internet to make existing licensed programming available to individuals for

28  personal use in a controlled fashion and without the need for an additional license").

1

2

3    Shull Decl. Ex. 3 (2010 Letter Agreement, Ex. A at p. 2).

4        Fox's argument, concocted after-the-fact by one of its executives who had no

5    role in negotiating the 2010 Letter Agreement,

6

7

8         *See* Molinski Decl. Ex. 54 (

9

10    ); *see also* FAC ¶94.  This is an unreasonable reading that

11    cannot be supported by the unambiguous "Other Technologies" provision.

12        First, the "Other Technologies" provision

13

14    For all of the reasons expressed above (*see* Part IV.A, *supra*),

15    it is DISH customers, not DISH, who are the ones place-shifting programming

16    when they use the Sling Adapter or Hopper with Sling.  Nobody thinks ordinary

17    consumers are engaging in retransmission or distribution when they send

18    themselves a signal in their bedrooms.  The "Other Technologies" provision

19

20

21    .  SUF ¶ 153.

22    Second, the clause—

23    (2010 Letter Agreement, Ex. A at 2)—

24

25    The limits

26    it imposes are broad and clear.  plainly embraces fair

27    use time- and place-shifting behavior at the core of the Copyright Act—

28    17 U.S.C. § 107.  That is

CASE NO. CV1204529 DMG (SHx)

1   exactly what Sling does.  Sling provides the customer with the ability to engage in
2   private, non commercial place-shifting.  This sort of behavior is paradigmatic fair
3   use.  *Sony*, 464 U.S. 417; *Diamond*, 180 F.3d at 1079 (place-shifting "is
4   paradigmatic noncommercial personal use entirely consistent with the purposes of
5   the Act.").
6           Third, Fox's reading is absurd (and therefore disfavored) in light of the
7   practical context of the 2010 Letter Agreement.  Fox's newly found interpretation
8   would have required DISH to alter the way then-existing and installed Sling
9   Adapters and ViP 922s worked ███████████████████████████████████
10  ███████████████  This makes no sense on a variety of levels.  ███████████
11  ████████████████████████████████████████████████████████
12  ██████   No reasonable business would have agreed—without any discussion—to
13  deprive its existing installed-base of customers of an already-existing capability.  ██
14  ████████████████████████████████████████████████████████
15  ███████████████████████████████████   *See* Hopkins Tr. 132:8-13.
16          That the parties did not read the 2010 Letter Agreement to prohibit Sling is
17  confirmed elsewhere within its four corners by the inclusion of an agreed press
18  release *lauding* DISH's DVR with Sling.  ████████████████████████
19  ████████████████████████████████████████████   SUF ¶¶
20  167-70.  ██████████████████████████████████, (Molinski
21  Decl. Ex. 110)█████████████████████████████████████████
22  ████████████   Shull Decl. Ex. 3 (2010 Letter Agreement, Ex. B).  That is no way
23  to announce a hard-won restriction.
24          Fox's reading is also contrary to the plain and unambiguous language of the
25  agreement and the parties' clear intent.  There is no need to resort to extrinsic
26  evidence for summary judgment purposes.  But should the Court find an ambiguity,
27  the undisputed evidence only confirms DISH's interpretation.  *See Indep. Energy*
28  *Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1193 (S.D.N.Y. 1996) (under

New York law, "undisputed extrinsic evidence that buttressed [movant's] interpretation of [an ambiguous] agreement . . . would constitute grounds for summary judgment").

     As Fox knew going into the negotiation of the 2010 Letter Agreement, DISH had acquired Sling for the large sum of $380 million in 2007.  SUF ¶ 156. ████

████████████████████████████████████████ (Molinski Decl. Ex. 44), ██████████████████ ████████████████████████ Molinski Decl. Ex. 71; Lieber Tr. 59:17-21. ██████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████ SUF ¶ 164. ██████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████ Molinski Decl. Ex. 74 §VII.G.  A████

████████████████████████████████████

██████████████████████████████

██████████████████ Biard Tr. 296:25-297:9.

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Shull Decl. ¶¶ 35-39. ████████████████████████

██████████████████████ Shull Tr. 200:1. ████████

██████████████████████████████

████████████████████████████████████

████████████████████████████████ Hopkins Tr. 16:8-16. ████████████████████████

1   ██████████████████████████████████████████████████████

2   Hopkins Tr. 16:17-20, 115:18-20.

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████

6   ████████████████   Where one party to an agreement has "reason to know the meaning

7   attached by the [other] party," that meaning controls. *United States v. Stuart*, 489

8   U.S. 353, 368 n.7 (1989) (quoting Restatement (Second) of Contracts § 201(2)(b));

9   *see also Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 168

10  (2d Cir. 2000). ████████████████████████████████████████████

11  ████████████

12              **2.    The 2002 Agreement Does Not Prohibit Sling.**

13          Fox's propensity to concoct after-the-fact contract interpretations is not

14  limited to the 2010 Letter Agreement.  In its second preliminary injunction motion,

15  Fox argued that by offering to its subscribers the Hopper with Sling, DISH is

16  breaching the second sentence of paragraph 9(a) of the parties' 2002 RTC

17  Agreement, which provides as follows:

18  ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  Shull Decl. Ex. 1 (2002 RTC Agreement § 9(a)).  In that motion, Fox claimed that

23  by offering Sling, DISH is "authorizing the retransmission" of the signal of the

24  Fox-owned Stations.  Dkt. 147 at 5.

25          This was such an after-the-fact theory that Fox did not even plead it in the

26  FAC, which makes no mention of the notion that DISH, through offering Sling, ████

27  ██████████████████████████████████████   *Cf.* FAC ¶¶61, 62, 94

28  (alleging only that DISH is "distributing" signals over the Internet in violation of

- 34 -

1   the Letter Agreement when offering Sling).  Since Fox never bothered to plead it,

2   this Court should not consider it.

3        But if the Court does consider the "authorize retransmission" theory of Sling

4   contract liability, it should make short shrift of it.  Fox has repeatedly placed a

5   different interpretation on this contract than the one its litigation lawyers belatedly

6   argue now.  ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ███████████████████████████  Molinski Decl. Ex. 46; *see* Hopkins Tr.

9   16:8-20.  ██████████████████████████████████  Molinski Decl.

10  Ex. 46.  █████████████████████████████████████

11  ██████████  Biard Tr. 240:10-14.  ████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████  SUF ¶ 175; Biard Tr.

14  225:3-16, 219:23-220:10, 318:24-319:5, 321:7-14; 326:17-328:16; *see also*

15  Hopkins Tr. 176:17-24; Brennan Tr. 64:10-14.

16       "The parties to an agreement know best what they meant, and their action

17  under it is often the strongest evidence of their meaning."  *Fed. Ins. Co. v. Americas*

18  *Ins. Co.*, 691 N.Y.S.2d 508, 512 (App. Div. 1st Dep't 1999) (quoting Restatement

19  [Second] of Contracts § 202 cmt. g).  ██████████████████████████

20  ████████████████████████████████████████████████████████████

21  ██████████████  *See Nationwide Mut. Ins. Co. v. Erie & Niagara Ins. Ass'n*, 672

22  N.Y.S.2d 596, 598 (App. Div. 4th Dep't1998) (admission that accident was a

23  covered occurrence under an insurance policy was a binding interpretation).[9]  DISH

24  is not breaching the 2002 Agreement by offering the Sling Adapter and Hopper

25  _____

26  [9] In any event, the argument fails under the plain language of Section 9(a).  Nobody
    thinks that a home user's point-to-point place-shifting is a "retransmission" within

27  the meaning of an Agreement that governs *DISH*'s retransmission of Fox's signal
    via satellite.  *See supra* Part IV.B.1.  Nor does DISH "authorize" any subscriber

28  uses—place-shifting with Sling is permitted by copyright law, not DISH. *See infra*
    Part V.B.

- 35 -

1   with Sling.

2       Moreover, the parties have consistently used the term "retransmit" to mean a

3   broadcast to the public (SUF ¶ 135), and if there is one thing we know about Sling

4   it is that is it not *public*.  DISH does not "authorize retransmission" when it offers

5   Sling Adapter and Hopper with Sling.

6   **V.   THE UNDISPUTED MATERIAL FACTS SHOW THAT DISH DOES**
    **NOT INCUR COPYRIGHT OR CONTRACT LIABILITY BY**
7   **OFFERING ITS CUSTOMERS THE HOPPER TRANSFERS**
    **FEATURE.**
8

9       The last feature Fox challenges is Hopper Transfers.  FAC ¶¶71 (direct

10  copyright infringement), 84-87 (secondary copyright infringement), 95 (breach of

11  contract).  Its claims fall flat for much the same reasons its claims against PTAT

12  do—DISH does not do the copying and DISH customers' use of Hopper Transfers

13  is a fair use.  Part A, *infra*.  Fox's contract claims are likewise without merit.  Part

14  B, *infra*.  This Court should grant summary judgment as to Hopper Transfers.

15      **A.   DISH Does Not Infringe Fox's Reproduction Right By Offering Its**
          **Customers Hopper Transfers.**
16

17      Fox asserts both direct and secondary theories of copyright liability against

18  Hopper Transfers, invoking the reproduction right.  17 U.S.C. § 106(1).  This

19  copyright theory runs up against the same wall that halts its PTAT claims—DISH is

20  not a direct infringer because it does not make the Hopper Transfer copies and

21  DISH is not secondarily liable because subscriber copies are fair uses under *Sony*.

22      ***Direct Infringement.***  Hopper Transfers is a portable recording feature.  SUF

23  ¶ 107.  It gives subscribers the capability to use their tablets as a portable recording

24  medium, to tote programs somewhere else to watch at a different place and time.

25  *Id*.  It is especially useful when there is no Internet connection (and hence no

26  Sling)—say, at the cabin or on an airplane.  *Id*.  Other portable recording

27  technology includes MP3 players, thumb drives, and, of course, the VCR tape.

28  SUF ¶ 11.

1       Here are the undisputed facts about how Hopper Transfers works.  First, a
2   DISH customer downloads the DISH Anywhere App onto her mobile device.
3   Kummer Decl. ¶36.  She then follows on-screen instructions to "pair" her mobile
4   device with her Hopper set-top box via the home WiFi network.  Kummer Decl. ¶¶
5   37, 39.  Once she has done this, she can look through a list of programs recorded
6   and stored on her Hopper—the guide is virtually identical to the one she would use
7   to select a prerecorded show on her TV.  Horowitz ¶125.  The program she selects
8   is then transferred onto her device, and she can now watch it on the go.  SUF ¶ 105.
9       Fox's direct infringement claim against Hopper Transfers is a rerun of *Sony*,
10  *Fox*, *Diamond*, and every other futile attempt to impose liability on a technology
11  provider for copying done by the end-user.  A DISH customer's use of Hopper
12  Transfers is identical in every relevant respect to subscriber use of PTAT —from
13  DISH's level of involvement, to the location of the hardware and software, to the
14  degree of control exercised by the customer.  "[T]he user, not Dish, makes the
15  copy."  *Fox*, 747 F.3d at 1067.  DISH cannot be liable as a direct infringer.
16      ***Secondary Infringement.***  Fox's secondary infringement claim against
17  Hopper Transfers is just as easily dispatched.  Noncommercial time- and place-
18  shifting with Hopper Transfers is a paradigmatic fair use under *Sony*, *Fox*,
19  *Diamond*, and *Perfect 10*.  And there is no indication anywhere in the record that
20  DISH customers use Hopper Transfers for any other purpose.

21      **B.    The 2002 RTC Agreement Does Not Prohibit Hopper Transfers.**
22      Fox's contract claim against Hopper Transfers focuses exclusively on that
23  same sentence in paragraph 9(a) of the 2002 Agreement quoted above.  Fox says
24  that by providing its customers with Hopper Transfers, DISH breaches a prohibition
25  on copying, or authorizing others to do so.  FAC ¶95.  The first theory is defective
26  for the same reason Fox's others failed—DISH does not itself ███████████
27  ███████ anything when a customer uses Hopper Transfers.  *See* Part V.A, *supra*.
28  As to the second, DISH does not "authorize" anything merely by providing

- 37 -

1    customers with a device.

2         Fox apparently defines the word "authorize" as something like "provide the

3    means or ability to do."  That is not what it means.  To "authorize" means "[t]o give

4    legal authority," Bryan A. Garner, Black's Law Dictionary 129 (7th ed. 1999), or

5    "to approve or permit: SANCTION," Websters II New College Dictionary 76 (2001),

6    or "[t]o give (a person or agent) legal or formal authority (to do something); to give

7    formal permission to; to empower," Oxford English Dictionary (3d ed. 2014).  *See*

8    *Fed Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (noting

9    common practice for the courts of New York State to refer to the dictionary to

10   determine the plain and ordinary meaning of words to a contract").

11        Authorizing is not the mere providing of means, but the formal permitting of

12   ends.  DISH does not and cannot do the latter because its customers' authority (vel

13   non) to use Sling to send themselves programming derives from the Copyright

14   Act's fair use provision, 17 U.S.C. § 107, not from any right DISH conveys.  As

15   Dave Shull explained, "We don't [authorize it].  [The customers are] able to do it

16   under U.S. copyright law."  Shull Tr. 96:5-15.

17   **VI.    THE QUALITY ASSURANCE COPIES ARE A FAIR USE AND**
18   **        CANNOT SUPPORT A BREACH OF CONTRACT CLAIM.**

19        Shoehorned into to its objections to PTAT and AutoHop, Fox complains that

20   DISH's former practice of making three nightly Quality Assurance ("QA") copies

21   of Fox's primetime schedule violates both its copyrights and its agreements with

22   DISH.  While this Court found these claims tenable at the preliminary injunction

23   stage, *Fox*, 905 F. Supp. 2d at 1102-06, on a full record, ████████████████████

24   ██████████████████████████████████████ (Biard Tr.

25   204:12-205:8) ██████████████████████████████████

26   ████████████████████████████████████████ (Biard Tr.

27   206:2-4, 18-22).

28

### A.   Quality Assurance Copies Do Not Compete With Fox's Distribution Licenses.

The rule is simple:  When a copy "does not materially impair the marketability of the work which is copied," the use is fair.  *Harper & Row*, 471 U.S. at 566-67 (citation omitted).  Before *Sony* vindicated a nation of time-shifters, this Court considered whether copies made by retailers to demonstrate VCRs were a fair use.  *See Universal City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429, 457 (C.D. Cal. 1979).  The copies were never sold to consumers and only used to demonstrate the operation of an otherwise noninfringing technology, the VCR.  *Id.* This Court held that the use was fair because "[d]emonstration copying and playback *do not compete in any way* with plaintiffs' products."  *Id.* (emphasis added).  *See Sony Computer Entm't Am. v. Bleem*, 214 F.3d 1022, 1029 (9th Cir. 2000) (use of screenshots of game play to promote game system emulator did not impair marketability of games and was fair use).

The same is true here.  The QA copies were made by DISH ███████████ ████████████████████████████████████████████████████.  They are never monetized or distributed to any end user.  And they "do not compete in any way" with Fox's licenses.  ██████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████  *See* Brennan Tr. 111:9-11; Elias Tr. 38:23-40:18; Biard Tr. 206:2-4, 18-22.  The critical fourth factor favors fair use when "[t]here is no evidence . . .  that such a market ever existed."  *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000); *Sofa Entm't, Inc.*, 782 F. Supp. 2d at 910 (no proof of market harm where plaintiff produced "no evidence demonstrating that it currently licenses (or plans to license) the [work]").

Moreover, the Ninth Circuit is clear that "intermediate" copies, like the QA copies, that facilitate new, non-infringing technology and are not distributed to an

end user are a fair use.  *See Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992); *Sony Computer Enter., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000).  Fox's infringement claim as to the QA copies should be dismissed.

### B.   Fox's Contract Claim Fails Because Fox Is Not Harmed By The Quality Assurance Copies And Cannot Prove It Is Entitled To Any Contract Remedy.

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████  Biard Tr. 338:18-339:17. Indeed, it seeks no actual damages, instead seeking a hypothetical reasonable royalty.  SUF ¶¶ 187-88.  But, that claim fails for the reasons discussed in Part VII below.  And, its claim for specific performance with respect to these copies is moot – DISH ceased making the QA copies in November 2012.  Summary judgment should be granted on this claim.

## VII.   DISH IS ENTITLED TO SUMMARY JUDGMENT ON ALL CONTRACT DAMAGES CLAIMS.

This Court is not a venue to air petty grievances; it is here to remedy actual harm.  *See Cipriano v. Glen Cove Lodge*, 1 N.Y.3d 53, 62 (2003) (denying damages where there was no "appreciable injury").  For this reason, "[f]ailure to prove the essential element of damages is fatal to a cause of action for breach of contract."  *Proper v. State Farm Mut. Auto. Ins. Co.*, 882 N.Y.S.2d 340, 341 (App. Div. 3d Dep't 2009); *Action Nissan, Inc. v. Nissan N. Am.*, 454 F. Supp. 2d 108, 133 (S.D.N.Y. 2006) (damages are "an essential element of a breach of contract action" under New York law).  As set out above, months of discovery have revealed *no harm* that Fox has suffered as a result of DISH's alleged breach of the 2002 and 2010 agreements.

Thus, by Fox's own repeated admission, Fox is not seeking actual damages on any of its contract claims directed to PTAT, AutoHop, Sling or Hopper Transfers.  *See* SUF ¶ 182; Fox's Second Supplemental Initial Disclosures ¶1 ("Plaintiffs hereby stipulate that they are not seeking to recover any actual damages

suffered as a result of defendants' . . . breach of contract"); Joint Stipulation for Defendant's Motion to Compel, Dkt. 226, June 9, 2014, at 31 (Fox "is *not seeking* lost profits or lose [*sic*] revenues as damages." (emphasis in original)); FAC Prayer ¶¶3-4 (omitting any prayer for damages on its contract claims).

Without any proof of actual injury or resulting damages, and having stipulated not to seek any, Fox then attempted to salvage its claims by asserting an entitlement to "reasonable royalties."  Plaintiffs' Third Supplemental Disclosures dated October 10, 2013 ("Additionally, plaintiffs are seeking reasonable royalties"). But "reasonable royalties" are categorically not recoverable on breach of contract claims under New York law. ███████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████ EchoStar Affiliation Agreement § 29.

## A.    "Reasonable Royalties" Are Not Available Under A New York Contract.

No court has ever concluded that reasonable royalties are "available as a measure of contract damages under New York law." *Jim Beam v. Tequila Cuervo La Rojena S.A. De C.V.*, No. 600122/2008, at *10 (Sup. Ct. N.Y. Cty. July 12, 2011); *see also Jill Stuart (Asia) LLC v. Sanei Int'l Co., Ltd.*, 12 CIV. 3699 KBF, 2013 WL 3203893, at *5 (S.D.N.Y. June 17, 2013) (granting summary judgment because "[t]he reasonable royalty theory of damages cannot apply" to breach of contract claims (citing *Jim Beam v. Tequila Cuervo La Rojena S.A. De C.V.*, No. 600122/2008, at *10 (Sup. Ct. N.Y. Cty. July 12, 2011)), *aff'd* at 2014 WL 1910364 (2d Cir. 2014) (summary order).  This rule is categorical and completely forecloses Fox's only requested contract remedy.  Because Fox has "failed to present any evidence of damages resulting from the breach," its breach of contract claim "should [be] dismissed." *Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*, 919 N.Y.S.2d 151, 152  (App. Div. 1st Dep't 2011).

- 41 -

**B.**     **Fox Expressly Waived Recovery Of Reasonable Royalties.**

Even if New York law permitted reasonable royalties as a measure of contract damages, they would be consequential damages that the parties expressly disclaimed in their agreement.  The 2010 Letter Agreement between the parties incorporates by reference Section 29 of the EchoStar Affiliation Agreement, which states: ████████████████████████████████████████████████ ████████████████████████████████████████ EchoStar Affiliation Agreement § 29.  Such limitation of liability provisions "are valid and enforceable under New York law."  *Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 544 (S.D.N.Y. 2013).

Reasonable royalties are a form of consequential damages.  Contract damages are either *general* if they reflect "the value of the very performance promised" or *consequential* if they "compensate a plaintiff for additional losses" from the alleged breach.  *Schonfeld v. Hilliard*, 218 F.3d 164, 175-76 (2d Cir. 2000) (internal quotation marks omitted).  Here, the only "performance promised" under the Agreement is ████████████████████████, which are not disputed.  SUF ¶ 181.  The "reasonable royalty" Fox seeks, on the other hand, would be based on a hypothetically negotiated value for a license to offer PTAT, AutoHop, Sling and Hopper Transfers.  SUF ¶¶189-90.  This hypothetical license is entirely outside the scope of the parties' Agreement, has never been valued in negotiations between DISH and Fox, and is therefore plainly consequential in nature.  *See Jill Stuart*, 2013 WL 3203893, at *5 (reasonable royalties are "consequential damages").

In sum, Fox has failed to assert any viable contract damages theory.  Summary judgment of its contract claim is warranted for this independent reason.

**VIII.  FOX'S COPYRIGHT REMEDIES ARE LIKEWISE BARRED.**

Fox seeks two forms of monetary relief (apart from statutory damages) on its copyright claims.  Although it did not plead them (FAC Prayer ¶¶3-4), Fox purports to seek "compensatory damages" in the form of "reasonable royalties."  SUF ¶ 187.

1   Fox also seeks disgorgement of DISH's profits supposedly attributable to the

2   infringement.  SUF ¶ 191.

3        Neither of these remedies is available in this case.  First, there is no such

4   thing as a hypothetical "reasonable royalty" as a remedy under the Copyright Act.

5   Part A, *infra*.  Second, Fox cannot demonstrate the requisite causal nexus between

6   all or any of the specific features of PTAT, Sling and Hopper Transfers and DISH's

7   subscriber or other revenues.  Part B, *infra*.

8        **A.    "Reasonable Royalties" Are Not A Copyright Remedy.**

9        "Reasonable royalty" is a statutory remedy found in the Patent Act, 35

10  U.S.C. § 284, and the Uniform Trade Secrets Act.  *See* Cal. Civ. Code § 3426.3(b).

11  Reasonable royalty is a minimum guarantee that is available to plaintiffs in those

12  cases when they *cannot prove* actual damages.  35 U.S.C. § 284 ("in no event less

13  than"); Cal. Civ. Code §3426.3(b)("If neither damages nor unjust enrichment . . .

14  are provable").  In such cases, the *Georgia-Pacific* hypothetical negotiation

15  provides a mechanism for calculating the reasonable royalty.

16       In contrast, in the Copyright Act, that minimum guarantee is provided by

17  statutory damages.  Like the Patent Act and UTSA, §504(a) provides that a plaintiff

18  can seek *either* actual damages and disgorgement *or* statutory damages.  There is no

19  "reasonable royalty" provision in the Copyright Act, and none is needed because

20  the statutory damages provided in §504(c) provide a minimum guarantee.  For this

21  reason, there is no copyright case in which a court has approved the use of a

22  *Georgia-Pacific* hypothetical negotiation to calculate a reasonable royalty as a

23  copyright remedy.  *See In re MobiTV, Inc.*, 712 F.Supp. 2d 206, 243 (S.D.N.Y.

24  2010) ("ASCAP has been unable to identify any copyright case that has applied the

25  *Georgia-Pacific* factors . . . .").

26       To be sure, actual lost royalties are a form of copyright *actual* damages.

27  *Jarvis v. K2, Inc.*, 486 F.3d 526, 533-34 (9th Cir. 2007).   And in rare

28  circumstances, lost royalties can also be awarded under a hypothetical license from

- 43 -

the plaintiff to the defendant *when* the requisites of *actual damages* are met, *i.e.*, when there is proof that such a license would have in fact been granted and on what terms. *See Wall Data, Inc. v. L.A. Cty. Sheriff's Dep't*, 447 F.3d 769, 786-87 (9th Cir. 2006) (royalty based on an established license schedule between the parties); *Polar Bear Prods, Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) (royalty based on a rate quoted from the copyright owner to infringer before the dispute arose).

But Fox has repeatedly and expressly disclaimed any intention of seeking of actual damages in this case and can identify no actual harm. SUF ¶¶182-83. Fox has refused to produce its license contracts with others, arguing that it is not claiming any harm under those agreements—a position that has been sustained by Magistrate Judge Hillman. Dkt. 226 at 49-50; Dkt. 233 at 4; Dkt. 357 at 11-12. And, when asked in an interrogatory to identify all premises for its monetary remedies, it identified no evidence sufficient to establish any lost license agreement. SUF ¶¶ 189-90 (royalty based on the license "Fox *would have required* if it were compelled to license to Dish" (emphasis added)). To the contrary, Fox has repeatedly declared that it is irreparably harmed by DISH's conduct and is seeking specific enforcement to stop what DISH is doing. *A fortiori*, this means that Fox would not have granted a license. Indeed, as Fox's counsel conceded during a telephonic hearing on July 25, 2014 before Magistrate Judge Hillman, Fox's reasonable royalty theory is "really a *compelled hypothetical negotiation*." Molinski Decl. Ex. 127 (7/25/14 Hearing Tr. at 41 (emphasis added)).

Absent evidence of specific lost licensing fees, reasonable royalties are simply not available as "actual damages" under Section 504 of the Copyright Act—and in all events Fox has stipulated not to seek actual damages. Summary judgment dismissing Fox's "reasonable royalty" theory should be granted.

**B.      Fox's Claim For Disgorgement Should Be Dismissed Because It Cannot Show A Causal Nexus Between Any Purported Infringement And DISH's Subscriber Revenues.**

The Act provides for disgorgement where revenues are "attributable to the infringement."  17 U.S.C. §504(b).  Fox seeks disgorgement of "all revenues earned from any DISH subscriber using the products or services at issue" as well as "revenues from DISH's sale of commercial advertising."  SUF ¶ 191.  But Fox cannot prove a causal relationship between PTAT, Sling or Hopper Transfers, on the one hand, and DISH's subscriber or advertising revenue, on the other.

"[A] copyright owner is required to do more initially than toss up an undifferentiated gross revenue number."  *Polar Bear,* 384 F.3d at 711.  Rather, "the revenue stream must bear a legally significant relationship to the infringement."  *Id.*; *Mackie v. Rieser*, 296 F.3d 909, 915-16 (9th Cir. 2002) ("copyright holder must proffer sufficient non-speculative evidence to support a causal relationship")

Fox has claimed entitlement to nearly every penny DISH has made since the launch of the Hopper, without any effort to explain how the revenue relates to the alleged infringement.  SUF ¶¶ 192-95.  This is precisely the "undifferentiated gross revenue" that the Ninth Circuit expressly rejected in *Polar Bear*.  384 F.3d at 711.  Fox presents no evidence to meet the requisite step under Section 504(b) of showing a causal nexus between DISH's subscription and advertising revenues and the alleged infringement.  Accordingly, summary judgment as to Fox's claim for disgorgement of DISH's profits is warranted.

## CONCLUSION

For the foregoing reasons, DISH and EchoStar respectfully request that the Court grant summary judgment in favor of defendants.

1

2    Dated:        August 22, 2014              Orrick, Herrington & Sutcliffe LLP

3

4                                              By:_____/s/_____
                                                         ANNETTE L. HURST
5                                                     Attorneys for Defendants
                                                     DISH Network L.L.C., DISH
6                                                    Network Corp. and EchoStar
                                                        Technologies L.L.C.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28