WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California  90017
Tel: +1-213-629-2020 / Fax: +1-213-612-2499

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105-2669
Tel: +1-415-773-5700 / Fax: +1-415-773-5759

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
ELYSE D. ECHTMAN (*pro hac vice*)
eechtman@orrick.com
LISA T. SIMPSON *(pro hac vice filed)*
lsimpson@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York  10019-6142
Tel:  +1-212-506-5000 / Fax:  +1-212-506-5151

MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL PAGE (SBN 154913)
mpage@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California  94111
Tel: +1-415-362-6666

Attorneys for Defendants DISH Network Corporation,
DISH Network L.L.C. and EchoStar Technologies L.L.C.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, INC., *et al.*,<br><br>       Plaintiffs,<br><br>       v.<br><br>DISH NETWORK L.L.C., *et al.*,<br><br>       Defendants. | Case No. CV12-04529 DMG (SHx)<br><br>**DEFENDANTS' CORRECTED STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     October 17, 2014<br>Time:    2:00 p.m.<br>Ctrm:   7 |

**PUBLICLY FILED**

Pursuant to Local Rule 56-1, Defendants DISH Network L.L.C., DISH Network Corp. and EchoStar Technologies L.L.C. (collectively "Defendants"), hereby submit the following Separate Statement of Uncontroverted Facts and Conclusions of Law in Support of their Motion for Summary Judgment.

The parties met and conferred as required by Local Rule 7-3 prior to the filing of their respective Rule 56 motions.  As a result, each side had an understanding of the claims and defenses on which the other side would be making a simultaneous motion.  In preparing depositions and excerpts of testimony, Defendants have included material not only in support of their Motion, but also material that Defendants reasonably anticipated may be needed for and is relevant solely to dispute Plaintiffs' Rule 56 motion, or to rebut contentions that Defendants expect will be made by Plaintiffs in response to Defendants' Motion.

Accordingly, the entire contents of all of the evidence submitted by Defendants is not expected to be and should not be taken as undisputed.  Rather the material facts for which there is no genuine dispute, and which entitle Defendants to judgment as a matter of law on all claims, are set forth below.

| Undisputed Fact | Supporting Evidence |
|---|---|
| **The Accused Features** ||
| **Hopper** ||
| 1.      DISH announced a DVR called the Hopper Whole Home HD DVR ("Hopper") on January 9, 2012 at the International Consumer Electronics Show ("CES") in Las Vegas, Nevada. | Khemka Decl. ¶3.<br><br>Minnick Decl. ¶12<br><br>Shull Decl. ¶13 |
| 2.      The Hopper is an integrated set-top-box with satellite tuner and digital | Minnick Decl. ¶¶12, 15. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| video recorder ("DVR") functionality. | |
| 3. The Hopper became available to DISH customers on March 15, 2012. | Minnick Decl. ¶30.<br><br>Shull Decl. ¶13.<br><br>Molinski Decl. Exs. 27 (Khemka Dep. Vol. 2 74:14–21), 67 (Khemka Dep. Ex. 69). |
| 4. Each Hopper can be associated with up to three Joeys; a Joey is a companion box that connects to a television to provide access to the Hopper's DVR and STB capabilities in another room. | Minnick Decl. ¶15. |
| 5. DISH is authorized to use its direct broadcast satellite ("DBS") system to retransmit the Fox broadcast network signal to a satellite tuner in DISH residential subscribers' Hopper set top boxes. | Shull Decl. Ex. 3 (2010 Letter Agreement, Ex. A, § 1). |
| **PTAT** | |
| 6. On January 9, 2012, PrimeTime Anytime ("PTAT") was announced by DISH as a feature to be offered on the Hopper. | Minnick Decl. ¶24.<br><br>Khemka Decl. ¶3.<br><br>Shull Decl. ¶13. |
| 7. The PTAT feature offers the capability for a subscriber to create a single timer to block-record all of the primetime programming shown on all or any combination of the four major broadcast networks each or every night | Minnick Decl. ¶¶24, 37. |

| Undisputed Fact | Supporting Evidence |
| --- | --- |
| of the week. | |
| 8. The PTAT block-recording feature is turned off when the Hopper set-top-box is distributed to DISH subscribers. | Minnick Decl. ¶25.<br><br>Molinski Decl. Ex. 19 (Casagrande Dep. 92:1–4). |
| 9. In order to use the PTAT block-recording feature, a subscriber must first enable it. | Minnick Decl. ¶¶25–28, 37. |
| 10. Each PTAT recording is made and resides on the Hopper hard drive in the subscriber's home | Minnick Decl. ¶37. |
| 11. Each PTAT recording is made from the local broadcast signal received by a subscriber with her Hopper tuner. | Minnick Decl. ¶37. |
| 12. Since July 20, 2012, the DISH subscriber enabling the PTAT feature could choose to select between one and four networks to record in any combination (ABC, CBS, Fox and/or NBC). | Minnick Decl. ¶¶28, 29; *see also* Minnick Decl. Ex. 10 at 60.<br><br>Molinski Decl. Ex. 29 (Minnick Dep. 199:17–202:1). |
| 13. Since July 20, 2012, the DISH subscriber enabling the PTAT feature could choose which nights of the week to make the recordings (Sunday through Saturday) in any combination. | Minnick Decl. ¶¶28, 29; *see also* Minnick Decl. Ex. 10 at 60.<br><br>Molinski Decl. Ex. 29 (Minnick Dep. 199:17–202:1). |
| 14. Since July 20, 2012, the DISH subscriber enabling the PTAT feature could select how many days she wants to save the recordings before they are automatically deleted (2 to 8 days). | Minnick Decl. ¶¶28, 29; *see also* Minnick Decl. Ex. 10 at 60.<br><br>Molinski Decl. Ex. 29 (Minnick Dep. 199:17–202:1). |
| 15. After a subscriber turns it on, the PTAT feature operates using software and electronic program guide data on the | Minnick Decl. ¶¶32, 37. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| Hopper DVR in the DISH subscriber's home. | |
| 16.     The programs aired during "primetime" are determined by the broadcast networks and their affiliates. | Minnick Decl. ¶33. |
| 17.     The Fox broadcast network programs aired during primetime are determined by Fox and its affiliates. | Minnick Decl. ¶33. |
| 18.     An algorithm for determining which broadcast network primetime programs PTAT will record is run at EchoStar and used to encode the electronic program guide sent to Hopper devices. | Minnick Decl. ¶37. |
| 19.     The PTAT software on the Hopper as configured by the user then interacts with the local copy of the program guide on the Hopper to automatically designate the shows aired by the selected networks and nights for recording. | Minnick Decl. ¶37. |
| 20.     PTAT recordings are made in approximately three-hour blocks (four hours on Sunday). | Minnick Decl. ¶¶33, 37. |
| 21.     PTAT also captures any program that is scheduled by a network to air partially in the primetime-block, so long as 50% or more of the program airs during primetime. | Minnick Decl. ¶38. |
| 22.     If a network primetime program is interrupted by local breaking news or is otherwise preempted, that is what will be recorded on the subscriber's hard drive, and displayed on playback. | Minnick Decl. ¶37. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 23.     If a subscriber loses power or a satellite signal, PTAT does not record. | *See* Minnick Decl. ¶37. |
| 24.     On any given day, ███████ ███ of Hopper customers have the PTAT feature turned on. | Moore Decl. ¶29, Ex. 1.<br><br>Hauser Decl. ¶16. |
| 25.     The PTAT feature provides in-home time-shifting of primetime programming. | Minnick Decl. ¶¶5, 44. |
| 26.     When DISH subscribers use PTAT to watch programs in their homes after the time they originally aired ("time-shifting"), that is a private noncommercial use. | Molinski Decl. Ex. 15 (Biard Dep. 189:25–190:9). |
| 27.     Other DVRs are capable of being set to record all of Fox's primetime programs every night of the week. | Minnick Decl. ¶53. |
| 28.     Other DVRs have block recording capabilities. | Hauser Decl. ¶21.<br><br>Molinski Decl. Ex. 17 (Brennan Dep. Vol. 2 152:5–18). |
| 29.     Other DVRs have automated recording features such as the season pass, which automatically records all episodes of a particular program after being configured once by the user. | Hauser Decl. ¶21.<br><br>Horowitz Decl. ¶10.<br><br>Molinski Decl. Exs. 17 (Brennan Dep. Vol. 2 151:10–152:12), 15 (Biard Dep. 129:1–16), 18 (Byrne Dep. 50:6–13). |
| 30.     Other DVRs have multiple tuners for recording multiple programs at the same time. | Minnick Decl. ¶¶9, 19–22, 48, 50. |
| 31.     Other DVRs have built-in storage capacity comparable to or greater than | Minnick Decl. ¶¶11, 21. |

| Undisputed Fact | Supporting Evidence |
| --- | --- |
| the Hopper. | |
| 32.   VCRs have long been capable of block recording using timers. | *See* Minnick Decl. ¶37. |
| 33.   VCRs have been used on a widespread basis for unauthorized time-shifting since the Supreme Court's decision in *Sony*. | *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). *See* Rapp Decl. ¶¶81–82, 94, 177. |
| 34.   Time-shifting by broadcast network television viewers is widespread. | Hauser Decl. ¶20. |
| 35.   Fox admits that time-shifting is lawful. | Molinski Decl. Ex. 15 (Biard Dep. 129:1–16). |
| 36.   Fox admits that PTAT is lawful. | Molinski Decl. Exs. 17 (Brennan Dep. Vol. 2 166:15–167:15), 15 (Biard Dep. 129:1–130:10, 339:18–340:12, 340:23–341:4). |
| 37.   Users of DVRs do not treat them as substitutes for VOD. | *See* Rapp Decl. ¶138. Molinski Decl. Ex. 90 (VOD Research – Fox016606). |
| 38.   DISH Hopper users do not use internet-based distribution platforms for network primetime programming any differently than non-Hopper DVR users. | Hauser Decl. ¶¶40–45. |
| 39.   DISH subscribers pay for their right to receive programming. | Molinski Decl. Ex. 26 (Khemka Dep. Vol. 1 56:10–58:10). |
| 40.   The content that DISH subscribers can record using PTAT is included as part of their DISH subscription. | *See* Minnick Decl. ¶37. Shull Decl. Ex. 3 (2010 Letter Agreement, Ex. A, § 1). |
| 41.   ████████████████████████ | Molinski Decl. Ex. 25 (Hopkins Dep. 164:24–166:7), 65 (Hopkins Dep. Ex. |



| Undisputed Fact | Supporting Evidence |
|---|---|
| ███████████████████████ | 510). |
| 42. ██████████████████ ██████████████████████ ███████████████████. | Molinski Decl. Exs. 21 (Elias Dep. 136:15–137:7), 25 (Hopkins Dep. 99:9–25), 63 (Hopkins Dep. Ex. 505) at 3 █████████████████ 109 (Fox030429 ██████████ ███████████████████ 92 (Fox019957 ████████████). |
| 43.   Since it was founded in 2007, Hulu ██████████████████████ ████████████████. | Molinski Decl. Exs. 25 (Hopkins Dep. 59:6–16, 65:21–66:7), 116 (HULU (DISH) 0000292), 117 (HULU (DISH) 0000295), 118 (HULU (DISH) 0000317), 119 (HULU (DISH) 0000345), 120 (HULU (DISH) 0000373), 121 (HULU (DISH) 0000405), 122 (HULU (DISH) 0000438). |
| 44. ██████████████████ █████████████████████. | Molinski Decl. Ex. 21 (Elias Dep. 63:14–17). |
| 45. ██████████████████ █████████████████████ ████████████████. | Molinski Decl. Exs. 17 (Brennan Dep. Vol. 2 95:25–96:3), 21 (Elias Dep. 64:16–20). |
| **AutoHop** | |
| 46.   On May 10, 2012, AutoHop was announced and became available to | Shull Decl. ¶14. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| subscribers as a Hopper feature. | |
| 47.     The AutoHop feature works only if PTAT is enabled. | Minnick Decl. ¶67. |
| 48.     The AutoHop feature is available no sooner than 3:00 a.m. Eastern the day after a primetime broadcast network program has aired. | Minnick Decl. ¶69. |
| 49.     If AutoHop is available for a particular program recording, the DISH subscriber who has PTAT enabled will be presented with a pop-up screen asking whether to "Enable AutoHop." | Minnick Decl. ¶61; *see also* Minnick Decl. Ex. 10 at 67. |
| 50.     The default answer presented to the subscriber is "No, Thanks." | Minnick Decl. ¶61; *see also* Minnick Decl. Ex. 10 at 67. |
| 51.     If the DISH subscriber moves the cursor to and selects "Yes" as the answer, she can avoid watching the commercial advertisement breaks while watching the program recording without pressing fast-forward or the 30-second skip buttons on her remote control. | Minnick Decl. ¶¶62, 63. |
| 52.     The AutoHop feature is available for most primetime network shows, with the exception of sports and local news. | Minnick Decl. ¶68. |
| 53.     The AutoHop feature does not delete commercials or otherwise alter a DISH subscriber's DVR recordings stored on the Hopper. | Minnick Decl. ¶66. |
| 54.     Even when AutoHop is enabled, the commercials remain present in the recordings made by the DISH subscriber. | Minnick Decl. ¶66. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 55.    Even when AutoHop is enabled, the ads can be viewed by use of the fast-forward or rewind functions. | Minnick Decl. ¶66. |
| 56.    The AutoHop feature is not a reproduction of any Fox content. | *See* Minnick Decl. ¶¶69–84. |
| 57.    Fox is claiming no copyright in the skipped advertisements. | Appendix Dkt # 135 (First Amended Complaint), Dkt #308 (Supplement to First Amended Complaint). |
| 58.    Fast-forward is a universal feature of VCRs. | Hauser Decl. ¶50. |
| 59.    Fast-forward is a universal feature of DVRs. | Hauser Decl. ¶50. <br><br> Shull Decl. ¶25 ("Fast forwarding or 30-second skip during playback is a basic DVR capability that has been around for many years"). |
| 60.    30-second skip functionality is a common feature of DVRs. | Minnick Decl. ¶6. <br><br> Hauser Decl. ¶50. <br><br> Shull Decl. ¶25. |
| 61.    1, 2 and 5-minute skip features are also offered by DVR device manufacturers and programming services providers. | Minnick Decl. ¶6. <br><br> Hauser Decl. ¶50. <br><br> Rapp Decl. ¶116. <br><br> Horowitz Decl. ¶¶130–133. |
| 62.    Commercial skipping is widespread consumer behavior. | Hauser Decl. ¶¶47, 49–52. |
| 63.    Fox executives agree that there is nothing unlawful about consumers' time- | Molinski Decl. Exs. 17 (Brennan Dep. Vol. 2 166:15–167:21), 15 (Biard Dep. 52:1–4, 127:22–128:17, 129:1–20), 21 |

| Undisputed Fact | Supporting Evidence |
|---|---|
| shifting and skipping commercials. | (Elias Dep. 28:23–29:15). |
| 64.     The Hopper has not altered consumer commercial skipping behavior. | Hauser Decl. ¶¶46–52, 57–74. |
| 65.     AutoHop works when ███████████ | Minnick Decl. ¶¶61, 62, 67, 69–84. |
| 66. ███████████ | Minnick Decl. ¶¶85–87. |
| 67. ███████████ | Minnick Decl. ¶85. |
| 68.     The QA copies were used exclusively for testing the AutoHop announcement files and never distributed to any consumer. | Minnick Decl. ¶87.<br><br>Molinski Decl. Ex. 29 (Minnick Dep. 38:13–17). |
| 69. ███████████ | Molinski Decl. Ex. 15 (Biard Dep. |

- 10 -

| Undisputed Fact | Supporting Evidence |
|---|---|
|  | 204:22–205:8, 206:2–4, 206:18–22). |
| 70. | Molinski Decl. Ex. 15 (Biard Dep. 204:22–205:8). |
| 71. | Molinski Decl. Ex. 15 (Biard Dep. 206:2–4, 206:18–22). |
| 72. | Rapp Decl. ¶¶129–130, 132, 137, 139–150.<br><br>Hauser Decl. ¶¶30–45. |
| **Sling Adapter & Hopper with Sling** ||
| 73.  In November 2010, DISH began selling the Sling Adapter. | Kummer Decl. ¶21, Ex. 5.<br><br>Molinski Decl., Exs. 15 (Biard Depo. 314:13-23), 53 (Biard Ex. 35).<br><br>Shull Decl., Ex. 16. |
| 74.  In November 2010, the Sling Adapter could be attached via USB port to DISH's ViP 722 DVR to add Sling placeshifting capability. | Kummer Decl. ¶¶21–22, Ex. 6.<br><br>Molinski Decl., Exs. 29 (Minnick Dep. 108:9-12), 93 (Fox020858), 114 (Fox044925 at 39).<br><br>Khemka Decl. ¶12. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | Shull Decl., Ex. 16. |
| 75.     The Sling Adapter also works as a plug-in to the Hopper in order to provide DISH subscribers with Sling functionality. | Kummer Decl. ¶¶21, 22. |
| 76.     At the January 2013 International CES, DISH introduced its second-generation Hopper Whole Home DVR known as the "Hopper with Sling." | Molinski Decl., Exs. 22 (Ergen Dep. 130:10-19), 62 (Ergen Ex. 166), 99 (Fox025544), 113 (Fox031862). Kummer Decl. ¶14. Minnick Decl. ¶13. Khemka Decl. ¶9. |
| 77.     On January 6, 2014, DISH announced a new "wireless Joey" receiver that can use an in-home WIFI network to connect to with a Hopper with Sling to display programming on a television in a room other than the one in which the Hopper with Sling is found. | Khemka Decl. ¶15. |
| 78.     The Hopper with Sling is an integrated set-top-box with satellite tuner, DVR and built-in Sling capability, as well as WIFI capability. | Molinski Decl., Exs. 22 (Ergen Dep. 130:10-19), 62 (Ergen Ex. 166). Khemka Decl. ¶10. Kummer Decl. ¶14. Minnick Decl. ¶¶13, 15. |
| 79.     Fox has never objected to the wireless Joey. | Appendix Dkt #135 (Fox First Am. Compl.). |
| 80.     Fox has no objection to those portions of program content delivered through the DISH Anywhere website that rely upon authorized authenticated | Appendix Dkt #135 (Fox First Am. Compl.). |

| Undisputed Fact | Supporting Evidence |
|---|---|
| websites. | |
| 81.    Fox's only objection to DISH Anywhere are those portions of the website or application that operate using Sling or Hopper Transfers functionality. | Appendix Dkt #135 (Fox First Am. Compl. ¶¶6, 52, 61), 148 (Biard Decl. ISO Fox Mot. for Prelim. Inj. Against DISH's New 2013 Services ¶24).<br><br>Molinski Decl., Ex 17 (Brennan Dep. Vol. 2 167:22-25). |
| 82.    On any given day, ███████████████ report having used the Sling functionality. | Moore Decl. ¶30, Ex. 3.<br><br>Hauser Decl. ¶16. |
| 83.  ███████████████ ███████████████ ███████████████ ███████████████ | Appendix Dkt# 226 (Joint Stipulation for Defendants' Motion to Compel Production of Documents in Response to Requests for Production No. 6 (Set One), Nos. 28–30 (Set Two), Nos. 24, 31, 32, 35–51 (Set Three dated June 9, 2014 at 49–50), Dkt# 233 (Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Compel Production of Documents, dated June 16, 2014, at 4).<br><br>Molinski Decl., Exs. 9 (Plaintiffs' Second Supplemental Initial Disclosures, dated January 22, 2013, "Plaintiffs hereby stipulate that they are not seeking to recover any actual damages suffered as a result of defendants' copyright infringement and/or breach of contract."), 10 (Plaintiffs' Third Supplemental Disclosures, dated October 10, 2013, "Plaintiffs are not seeking to recover any actual damages in the form of lost profits or lost revenues suffered as a result of defendants' copyright |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | infringement and/or breach of contract."), 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013, at 2–3, 9), 13 (Fox Broadcasting Company's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, 2014, at 2–6), 14 (Fox Television Holdings, Inc.'s Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, 2014, at 2–6), 12 (Twentieth Century Fox Film Corporation's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, 2014, at 2–6). |
| 84. ████████████████ ████████████████ ████████████████ ████████████████ | Appendix Dkt# 226 (Joint Stipulation for Defendants' Motion to Compel Production of Documents in Response to Requests for Production No. 6 (Set One), Nos. 28–30 (Set Two), Nos. 24, 31, 32, 35–51 (Set Three), dated June 9, 2014 at 49–50), Dkt# 233 (Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Compel Production of Documents, dated June 16, 2014, at 4). Molinski Decl., Exs. 9 (Plaintiffs' Second Supplemental Initial Disclosures, dated January 22, 2013, "Plaintiffs hereby stipulate that they are not seeking to recover any actual damages suffered as a result of defendants' copyright infringement and/or breach of contract."), 10 |

- 14 -

| Undisputed Fact | Supporting Evidence |
|---|---|
| | (Plaintiffs' Third Supplemental Disclosures, dated October 10, 2013, "Plaintiffs are not seeking to recover any actual damages in the form of lost profits or lost revenues suffered as a result of defendants' copyright infringement and/or breach of contract."), 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013, at 2–3, 9), 13 (Fox Broadcasting Company's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, 2014, at 2–6), 14 (Fox Television Holdings, Inc.'s Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, 2014, at 2–6), 12 (Twentieth Century Fox Film Corporation's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, 2014, at 2–6). Rapp Decl. ¶¶102–113 (place shifting has been around for a long time), 156–160. Hauser Decl. ¶¶30–45. |
| **Sling Functionality** | |
| 85.     A residential DISH subscriber may, at her election, use Sling capability to remotely access the live or recorded content available on her home STB/DVR by use of a device that communicates using internet protocols, such as a laptop, | Kummer Decl. ¶¶15–16, 25–27, 29. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| tablet or smartphone. | |
| 86.     Remote viewing via Sling technology involves a combination of hardware and software. | Kummer Decl. ¶24. |
| 87.     The Sling hardware is a computer chip that rapidly "transcodes" small packets of audiovisual data from either the live satellite signal coming off of the Hopper tuner or from a pre-existing Hopper DVR recording; ██████████ ██████████████████████████ ████████████████████████████ ██████████████ | Kummer Decl. ¶24. |
| 88.     The Sling-associated software is provided through a website or mobile application. | Kummer Decl. ¶31. |
| 89.     When activated by the subscriber, the Sling-associated software establishes a connection to the Sling hardware to request the live or pre-recorded content desired by the subscriber. | Kummer Decl. ¶¶15, 17, 25–26. |
| 90.     Sling can only be used by a subscriber to access her own home STB/DVR and the content on that box, either live or recorded. | Kummer Decl. ¶¶15, 17, 32. |
| 91. ███████████████████ ███████████████████████████ █████████████████████████ ███████████████ | Kummer Decl. ¶¶24–25, 28. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| ███████████████ | |
| 92.    When a subscriber who is not connected to her home WiFi activates and requests television content using the Sling-associated software, absent a failure of the internet connection, the television content travels point-to-point over the internet from the Sling chip in the subscriber's home to the consumer's internet-connected device. | Kummer Decl. ¶¶26–28. |
| 93. ██████████████ | Kummer Decl. ¶¶26, 28–29. |
| 94. ███████████ | Kummer Decl. ¶¶28, 32. |
| 95.    The Sling chip does not make a recording on the hard drive as part of the remote-viewing process. | Kummer Decl. ¶33. |

- 17 -

| Undisputed Fact | Supporting Evidence |
|---|---|
| 96. Only one Sling point-to-point remote-viewing session may take place at a time from any single Sling chip. | Kummer Decl. ¶34. |
| 97. The Hopper with Sling has the Sling hardware built inside. | Kummer Decl. ¶¶15, 24. Khemka Decl. ¶10. |
| 98. ████████████████████ | Kummer Decl. ¶30. |
| 99. Sling technology was first introduced to the market in 2005, by Sling Media Technologies, in a product called Slingbox. | Kummer Decl. ¶17. |
| 100. Slingbox, which is still sold today in retail outlets such as Best Buy and Amazon, connects to any audiovisual equipment, including TVs, set-top boxes, DVRs and DVD players. | Kummer Decl. ¶17. Molinski Decl., Ex. 18 (Byrne Dep. 183:21–184:8). |
| 101. Fox does not object to Slingbox. | See Appendix Dkt# 135 (Fox First Am. Compl.); Molinski Decl., Ex. 25 (Hopkins Dep. 108:15–109:2). |
| 102. Vulkano from Monsoon Media, DirecTV GenieGo, TiVo Stream, Sony's "LocationFree," and Elgato's "EyeTV" have all provided devices for the remote viewing of content. | Molinski Decl., Exs. 21 (Elias Dep. 199:8–14), 80 (Fox000374 at 3), 104 (Fox028669 at 1). Rapp Decl. ¶¶109–113. Horowitz ¶¶17, 137–142. |
| 103. Ordinary TV viewers place-shift using Sling for private noncommercial purposes. | Molinski Decl. Exs. 123 (June 2008 Report of the Register of Copyrights titled "Satellite Home Viewer Extension and Reauthorization Act Section 109 Report," available at |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | http://www.copyright.gov/reports/section109-final-report.pdf), 124 (Reporter's Transcript of Proceeding for Aereo Appeal Oral Argument Hearing Vol. 1, dated November 30, 2012), 138 (Fox News Newsletter entitled "Tip of the Week: Can you Watch Football for Free Online?," dated September 12, 2011), 128 (Geoffrey A. Fowler, Getting Rid of Cable TV: The Smartest Ways to Cut the Cord, Wall St. J., July 15, 2014, *available at* http://online.wsj.com/news/article_email/getting-rid-of-cable-tv-the-smartest-ways-to-cut-the-cord-1405472757-lMyQjAxMTA0MDEwNzExNDcyWj#printMode).<br><br>Rapp Decl. ¶¶24, 102.<br><br>*See* Minnick Decl. ¶14.<br><br>Horowitz Decl. ¶¶ 119–120.<br><br>Kummer Decl. ¶¶28, 34. |
| 104.   DISH subscribers pay for their right to receive programming. | Molinski Decl. Ex. 26 (Khemka Dep. Vol. 1 56:10–58:10). |
| 105.   The programming content that DISH customers can request using Sling is content that they have already received via their subscription with DISH. | *See* Kummer Decl. ¶15, 32. |
| 106. ██████████████████████ | Molinski Decl. Ex. 25 (Hopkins Dep. 164:24–166:7), 65 (Hopkins Dep. Ex. 510). |

| Undisputed Fact | Supporting Evidence |
| --- | --- |
| **Hopper Transfers** | |
| 107.   A DISH subscriber with a Hopper with Sling DVR can, at her election, use the Hopper Transfer feature to transfer DVR recordings from the Hopper with Sling to a tablet or smartphone for later viewing, including viewing without an internet connection. | Kummer ¶35. |
| 108.   Hopper Transfers currently works with Apple iOS, Android and Kindle Fire devices. | Kummer ¶35. |
| 109.   Hopper Transfers can only make a copy onto an Apple or Android device while that device is in the home and authenticated to the same home WIFI network as the Hopper with Sling. | Kummer ¶¶35, 37. |
| 110.   A DVR recording copied to a mobile device via Hopper Transfers cannot be duplicated or exported – it can only be watched or deleted. | Kummer Decl. ¶40. |
| 111.   If a DISH subscriber's mobile device has not communicated with the DISH Anywhere App server for thirty days, then all of that mobile device's Hopper Transfers copies will expire and no longer be viewable. | Kummer Decl. ¶40. |
| 112.   DirecTV's Nomad, TiVo Stream and TiVo Roamio and TiVo Desktop all provide portable recording capability. | Molinski Decl., Exs. 21 (Elias Dep. 199:8–14), 28 (Lieber 146:6–16), 104 (Fox028669 at 1).  Rapp Decl. ¶¶109–110.  Horowitz ¶¶154–155. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 113.   Recordings have been portable since the BetaMax and VCRs were released, as the tapes could be ejected and taken to a BetaMax or VCR in another location for playback. | Horowitz Decl. ¶19. |
| 114.   When ordinary TV viewers place-shift using portable recordings they are engaging in private noncommercial use. | *See* Molinski Decl., Ex. 34 (Wachter 42:11–43:2), 142 (http://web.archive.org/web/200512171 65836/http://www.fox.com/community /askfox/answer8.htm), 143 (http://www.fox.com/askfox.php). |
| 115.   DISH subscribers pay for the right to receive programming. | Molinski Decl. Ex. 26 (Khemka Dep. Vol. 1 56:10–58:10). |
| 116. ████████████████████ ████████████████████ ████████████████████ ████████████████████ | Molinski Decl. Ex. 25 (Hopkins Dep. 164:24–166:7), 65 (Hopkins Dep. Ex. 510). |
| 117.   Subscribers do not view personal recording devices as substitutes for internet-based streaming services. | Molinski Decl. Ex. 21 (Elias Dep. 136:23–137:7), 101 (Fox026390), 86 (Fox009954), 133 (Q2 2009 Earnings Call Transcript, The Walt Disney Company, May 5, 2009), 91 (Fox017158). |
| 118.   Even after the pendency of this lawsuit, Fox on its website encouraged its viewers to make recordings of its broadcast network programs and take them to other private locations outside the home for viewing. | Molinski Decl. Exs. 140 (screen shot of Internet Archive Wayback Machine, Ask FOX, dated March 13, 2013), 142 (screen shot of Frequently Asked Questions/FOX Links website). |
| 119. ████████████████████ ████████████████████ ████████████████████ | Appendix Dkt #226 (Joint Stipulation for Defendants' Motion to Compel Production of Documents in Response to Requests for Production No. 6 (Set |

| Undisputed Fact | Supporting Evidence |
|---|---|
| ████████ | One), Nos. 28–30 (Set Two), Nos. 24, 31, 32, 35–51 (Set Three), dated June 9, 2014 at 49–50), Dkt# 233 (Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Compel Production of Documents, dated June 16, 2014, at 4).<br><br>Molinski Decl., Exs. 9 (Plaintiffs' Second Supplemental Initial Disclosures, dated January 22, 2013, "Plaintiffs hereby stipulate that they are not seeking to recover any actual damages suffered as a result of defendants' copyright infringement and/or breach of contract."), 10 (Plaintiffs' Third Supplemental Disclosures, dated October 10, 2013, "Plaintiffs are not seeking to recover any actual damages in the form of lost profits or lost revenues suffered as a result of defendants' copyright infringement and/or breach of contract."), 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013, at 2–3, 9), 13 (Fox Broadcasting Company's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, 2014, at 2–6), 14 (Fox Television Holdings, Inc.'s Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, 2014, at 2–6), 12 (Twentieth Century Fox Film Corporation's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 22, |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | 2014, at 2–6).<br><br>Rapp Decl. ¶¶102–113 (place shifting has been around for a long time), 156–160.<br><br>Hauser Decl. ¶¶30–45. |
| **The Parties' Agreements** | |
| 120. DISH is the nation's third-largest pay television service provider delivering direct broadcast satellite services to millions of families nationwide. | Shull Decl. ¶4. |
| 121. As of June 30, 2014, DISH had more than 14 million subscribers in the United States. | Shull Decl. ¶4. |
| 122. In order to broadcast by satellite the channels created by others, DISH enters into a variety of agreements. | Shull Decl. ¶8. |
| 123. The broadcast television networks and their affiliates who air programming on public spectrum licensed by the FCC are subject to statutory compulsory copyright licenses for the retransmission of their content by cable and satellite. | Shull Decl. ¶9.<br><br>17 U.S.C. §§119, 122. |
| 124. When DISH broadcasts by satellite the over-the-air signal of broadcast television networks subject to statutory compulsory licenses, it does so pursuant to statutorily authorized agreements that are commonly called "retransmission consent agreements." | Shull Decl. ¶¶8–9.<br><br>*See* Molinski Decl., Ex. 32 (Shull Dep. Vol. 1 173:23–174:1).<br><br>17 U.S.C. §§119, 122. |
| 125. DISH enters into retransmission consent agreements with both the | Shull Decl. ¶¶8–9.<br><br>*See* Molinski Decl., Ex. 32 (Shull Dep. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| broadcast networks and their affiliates in order to serve the various local television markets throughout the United States. | Vol. 1 174:2–24). |
| 126.   DISH's satellite broadcast of network and affiliate signals to subscribers pursuant to retransmission consent agreements is commonly referred to in the industry as "retransmission." | Shull Decl. ¶6. |
| 127.   DISH's satellite broadcast or other delivery to subscribers of channels not subject to statutory compulsory licenses is commonly referred to in the industry as "distribution." | Shull Decl. ¶7. |
| 128. ███████████████████ | *See, e.g.*, Shull Decl. ¶¶33, 35–39, Exs. 4–6, 8–13; Molinski Decl. Exs. 25 (Hopkins Dep. 175:15–177:3), 66 (Hopkins Ex. 512), 15 (Biard Dep. 297:10–298:12; 299:19–301:23). |
| 129. ███████████████████ | Shull Decl. ¶15, Ex. 1 (2002 RTC Agreement). |
| 130. ███████████████████ | Shull Decl. Ex. 3 (2010 Letter Agreement at Fox006446). |
| 131. ███████████ | Shull Decl. Ex. 1 (2002 RTC |

| Undisputed Fact | Supporting Evidence |
|---|---|
| ██████████████████████ | Agreement at Fox000726). |
| 132. ████████████ ██████ | Shull Decl. ¶16, Ex. 1 (2002 RTC Agreement at Fox000726). |
| 133. ████████████ ██████ | Shull Decl. ¶16, Ex. 1 (2002 RTC Agreement at Fox000729). |
| 134.   "Distribute" means "to give or deliver (something) to people." | Molinski Decl. Ex. 132 (Merriam-Webster Dictionary - Distribute, http://www.merriam-webster.com/dictionary/distribute). |
| 135.   The ordinary use by the parties of the term retransmit means a broadcast to the public. | Molinski Decl. Ex. 31 (Schwimmer Dep. 106:11–107:3). |



| Undisputed Fact | Supporting Evidence |
|---|---|
| 136.   To "authorize" means "[t]o give legal authority," or "to approve or permit," or "[t]o give (a person or agent) legal or formal authority (to do something); to give formal permission to; to empower." | Molinski Decl. Exs. 129 (Black's Law Dictionary 129 (7th ed. 1999)), 131 (Houghton Mifflin Co.,Webster's II New College Dictionary 76 (1995)), 132 (Oxford English Dictionary (3d ed. 2014)). |
| 137.   §106(3) of the Copyright Act grants copyright owners the exclusive right to distribute copies of their works. The ordinary understanding of distribution for purposes of this right is the actual dissemination of copies to the public by sale or other transfer of ownership, or by rental, lease or lending of such copies. | 17 U.S.C. §106(3); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007); *Fox Broadcasting Co. v. DISH Network L.L.C.*, 905 F. Supo'mp. 2d 1088 (C.D. Cal. 2012); *Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 982–83 (D. Ariz. 2012). |
| 138.   Starting in 2005, DISH offered the PocketDISH, which provided its subscribers with the capability to make portable recordings of programs, including Fox broadcast network programs. | Kummer Decl. ¶¶41–43, Ex. 9. |
| 139. ████████████████ | Molinski Decl. Exs. 17 (Brennan Dep. Vol. 2 16:10–20:2); 57 (Brennan Ex. 531), 15 (Biard Dep. 210:16–212:16), 42 (Biard Ex. 20), 102 (Fox026823), 100 (Fox026107). |
| 140. ████████████████ | Molinski Decl. Ex. 15 (Biard Dep. 212:19–214:7; 217:11–21). |
| 141. ████████████████ | Shull Decl. ¶¶17–18, Ex. 3 (2010 Letter Agreement). |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 142. ████████████████ ████████████████ ████████ | *Compare* Shull Decl. Ex. 3 (2010 Letter Agreement at Fox000690–69) *with* Ex. 1 at (2002 RTC Agreement at Fox000724–728). |
| 143. ████████████████ ████████████████ ████████ | Shull Decl. ¶20, Ex. 3 (2010 Letter Agreement at Fox000710–713). |
| 144. ████████████████ ████████ | Shull Decl. ¶20, Ex. 3 (2010 Letter Agreement at Fox000712). |
| 145. ████████████████ ████████████████ ████████████████ ████████████████ ████████ | Shull Decl. Ex. 3 (2010 Letter Agreement at Fox000712), 1 (2002 Agreement at Fox000726). |
| 146. ████████████████ ████████████████ ████████████ ████████ | Shull Decl. ¶20, Ex. 3 (2010 Letter Agreement at Fox000712).<br><br>Molinski Decl. Ex. 21 (Elias Dep. 106:19–107:10)<br><br>Molinski Decl. Ex. 25 (Hopkins Dep. 39:22–40:6 (████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ |



| Undisputed Fact | Supporting Evidence |
|---|---|
| | ██████████████ )). |
| 147.   DISH has not distributed *FOX* VOD. | Shull Decl. ¶¶21, 22, 25.<br><br>Khemka Decl. ¶20.<br><br>Minnick Decl. ¶58 ("DISH does not carry the Video on Demand offerings from Fox").<br><br>Molinski Decl. Ex. 21 (Elias Dep. 64:16–20) ("DISH does not offer Fox on Demand, so PrimeTime Anytime *would not have increased or decreased or affected consuming of Fox on Demand* through the TV because they don't offer that service.") (emphasis added)). |
| 148.   PTAT is not *FOX* VOD. | Molinski Decl. Ex. 16 (Brennan Dep. Vol. 1 132:8–11 ("Q. You are not actually saying that PrimeTime Anytime is your Video On Demand, are you? A. It is not our Video On Demand. It's Dish's Video On Demand.")).<br><br>Khemka Decl. ¶21.<br><br>Shull Decl.¶¶26–30. |
| 149.   ██████████████████████████████████. | Shull Decl. ¶¶25–29, Ex 3 (2010 Letter Agreement at Fox000712).<br><br>Molinski Decl. Ex. 16 (Brennan Dep. Vol. 1 132:8–11 ████████████████████████████████████████ |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | █████ )). |
| 150. ████████████████████████ ████████████████████████ ██████████████████ | Shull Decl. Ex. 3 (2010 Letter Agreement at Fox000712). |
| 151. ████████████████████ ████████████████████████ ███████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████ | Shull Decl. Ex. 3 (2010 Letter Agreement at Fox000691). |
| 152. ████████████████████████ ████████████████████ ████████████ | Molinski Decl. Ex. 25 (Hopkins Dep. 129:19–130:18); 15 (Biard Dep. 317:5–16), 54 (Biard Ex. 36). Shull Decl. ¶34, Ex. 3 (2010 Letter Agreement at Fox000691, Fox000715). |
| 153.   Using the internet to distribute a broadcast network programming signal is commonly referred to in the industry as "over-the-top" rights ("OTT"). | Molinski Decl. Ex. 32 (Shull Dep. 15:23–16:16). Shull Decl. ¶34. |
| 154. ████████████████████ ██████████████████ | Shull Decl. ¶ 34, Ex. 3 (2010 Letter Agreement at Fox000691). |

- 29 -

| Undisputed Fact | Supporting Evidence |
|---|---|
|  | |
| 156.   DISH purchased Sling Media in October 2007 for $380 million. | Shull Decl. ¶40.<br><br>Kummer Decl. ¶¶4, 19, Exs. 1–2.<br><br>Khemka Decl. ¶12.<br><br>Molinski Decl., Exs. 17 (Brennan Dep. Vol. 2 23:11–14), 28 (Lieber Dep. 44:22 – 45:1; 46:21 – 48:18), 68 (Lieber Ex. 518), 15 (Biard Dep. 217:22 – 219:9), 43 (Biard Ex. 21). |
| 157.   In 2008, DISH announced its plans to integrate Sling technology into DISH consumer technology products. | Molinski Decl. Exs. 28 (Lieber Dep. 48:19–57:1), 71 (Lieber Ex. 521, "Sling will be built into these higher-end boxes no matter what"); 69 (Lieber Ex. 519, Fox 2008 report noting DISH plans to "[i]ntegrate Sling into overall Dish media"), 70 (Lieber Ex. 520, Fox 2008 report noting "Sling integration |

| Undisputed Fact | Supporting Evidence |
|---|---|
|  | with Echo set top boxes."). |
| 158.   DISH announced the ViP 922 in January 2009 at CES, which was the first DVR with Sling hardware built inside. | Molinski Decl., Exs. 93 (Fox020858), 88 (Fox014455), 95 (Fox023508), 108 (Fox029151), 115 (Fox045340).

Kummer Decl. ¶20, Exs. 3, 4.

Khemka Decl. ¶12. |
| 159.   The ViP 922 became available to DISH subscribers in April 2010. | Shull Decl. ¶40.

Molinski Decl. Ex. 105 (Fox029102) |
| 160.   ████████████████ | Molinski Decl., Exs. 88 (Fox014455), 95 (Fox023508), 144 (Fox030015) |
| 161.   ████████████████ | Molinski Decl. Ex. 15 (Biard Dep. 218:6–220:7), Ex. 43 (Biard Ex. 21 at 1–2)

Molinski Decl., Exs. 17 (Brennan Dep. Vol. 2 23:11–14), 28 (Lieber Dep. 44:22 – 45:1; 46:21–48:18), 68 (Lieber Ex. 518), 15 (Biard Dep. 217:22 – 219:9), 43 (Biard Ex. 21) |
| 162.   ████████████████ | Molinski Decl. Exs. 28 (Lieber Dep. 50:5–51:20), 69 (Lieber Ex. 519), 28 (Lieber Dep. 54:7–57:1]]

████████████████

70 (Lieber Ex. 520), 15 (Biard Dep. 222:16–17; 223:12–225:16; 226:5–228:13), 44 (Biard Ex. 22 at 1), 45 (Biard Ex. 23). |



| Undisputed Fact | Supporting Evidence |
| --- | --- |
| 163. ███████████████████ | Molinski Decl., Exs. 88 (Fox014455), 95 (Fox023508), 144 (Fox030015), 93 (Fox020858), 108 (Fox029151), 115 (Fox045340). |
| 164. ███████████████████ | Molinski Decl. Exs. 15 (Biard Dep. 245:6-246:13), 28 (Lieber Dep. 112:20–114:25, 124:2–14) ███████████████ 47 (Biard Ex. 28) ████ 145 (Biard Ex. 27). *See also* Molinski Decl. Ex. 72 (Lieber Ex. 522) ████████ |
| 165. ███████████████████ | Molinski Decl. Exs. 28 (Lieber Dep. 115:4–117:1), 74 (Lieber Ex. 525). Shull Decl. ¶33. |



| Undisputed Fact | Supporting Evidence |
|---|---|
| 166. | Shull Decl., ¶5, Ex. 5, 6. |
| 167. | Shull Decl. ¶40, Ex. 3 |
| 168. | Molinski Decl. Ex. 15 (Biard Dep. 297:10–298:12; 299:19–301:23) |
| 169. | Shull Decl. Ex. 3 Molinski Decl. Ex. 15 (Biard Dep. 299:19–301:23). |
| 170. | *Compare* Shull Decl. Ex. 14 (Fox028068 at Fox028070) *with* Molinski Decl. Ex. 103 (Fox028437–38). |
| 171. | Molinski Decl., Exs. 28 (Lieber Dep. 205:12–210:25), 76 (Lieber Ex. 530), |

| Undisputed Fact | Supporting Evidence |
| --- | --- |
| ███████████████████████ | 15 (Biard Dep. 323:7–328:16), 55–56 (Biard Exs. 37–38), 25 (Hopkins Dep. 115:5–116:23), 64 (Hopkins Ex. 509), 17 (Brennan Dep. Vol. 2 64:5–14, 64:20–65:3). |
| 172.   DISH shipped ████████ ViP 922 DVRs with built-in Sling functionality to DISH subscribers. | Appendix Dkt# 155 (Under Seal Version of the Declaration of David Kummer In Support of DISH's Opposition to Fox's Motion for Preliminary Injunction on "DISH's New 2013 Services filed on March 15, 2014 ¶15) |
| 173. ████████████████████ | Shull Decl. Ex. 3 ███████████<br><br>Molinski Decl. Ex. 25 (Hopkins Dep. 132:14–133:9). |
| 174. ████████████████████ | Molinski Decl., Exs. 15 (Biard Dep. 314:1–23), 53 (Biard Ex. 35), 28 (Lieber Dep. 205:12–206:4). |
| 175. ████████████████████ | Molinski Decl., Exs. 15 (Biard Dep. 314:13–315:6, 316:11–317:25, 318:24–319:5, 320:18–321:14, 323:13–324:13, 325:5–326:1), 53 –56 (Biard Exs. 35–38), 25 (Hopkins Dep. 115:5–116:23), 64 (Hopkins Ex. 509), 28 (Lieber Dep. 202:14–203:14, 205:12–210:25), 17 (Brennan Dep. Vol 2 64:5–14; 64:20–65:3). |
| 176. ████████████ Slingboxes and Sling Adapters have been sold in North America ████████ ███████████████████████ | Kummer Decl. ¶23. |



| Undisputed Fact | Supporting Evidence |
|---|---|
| 177. ███████████████████ | Shull Decl. ¶17, Ex. 2 ████ |
| 178. ███████████████████ | Shull Decl. ¶17, Ex. 2 ████ |
| 179. ███████████████████ | Shull Decl. ¶17, Ex. 2 ████ |
| 180. ███████████████████ | Shull Decl. ¶17, Ex. 3 ████ |

**Monetary Remedies**

| Undisputed Fact | Supporting Evidence |
|---|---|
| 181.   Fox is not claiming breach of contract based on nonpayment by DISH of fees due under the parties' agreements. | Appendix Dkt. #138 (Fox's First Amended Complaint for Copyright Infringement and Breach of Contract, filed February 22, 2013), at ¶¶ 58–63 and 91–100; Molinski Decl. Exs. 15 (Biard Dep. 31:14–32:7, 123:11–23). Shull Decl. ¶10. |
| 182.   Fox has stipulated that it is not seeking actual damages on any of its contract or copyright claims directed to PTAT, AutoHop, Sling or Hopper Transfers. | Molinski Decl. Exs. 9 (Plaintiffs' Second Supplemental Initial Disclosures, dated January 22, 2013) ("Plaintiffs hereby stipulate that they are not seeking to recover any actual damages suffered as a result of defendants' copyright infringement and/or breach of contract.")), 10 (Plaintiffs' Third Supplemental Disclosures, dated October 10, 2013) ("Plaintiffs are not seeking to recover any actual damages in the form of lost profits or lost revenues suffered as a result of defendants' copyright infringement and/or breach of contract.")). |
| 183.  ███████████████ ███████████████ ███████████████ ████ | Molinski Decl. Exs. 16 (Brennan Dep. Vol. 1 77:23–79:12 ███████ █████████████ , 113:15–18 ████ █████); 114:10–19 (████ █████████), 17 (Brennan Dep. Vol. 2 126:24–130:4 (████ |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | ), 170:10–171:6 ■ )), 15 (Biard Dep. 118:2–11 ( )). |
| 184. ■ | Molinski Decl. Exs. 17 (Brennan Dep. Vol. 2 111:9–11), 15 (Biard Dep. 206:2–4, 18–22), 21 (Elias Dep. 38:23–40:18). |
| 185. ■ | Molinski Decl. Exs. 17 (Brennan Dep. Vol. 2 111:9–11), 21 (Elias Dep. 38:23–40:18). |
| 186. ■ | Molinski Decl. Exs. 15 (Biard Dep. 206:2–4, 206:18–22, 338:18–339:17), 21 (Elias Dep. 38:23–40:18), 17 (Brennan Dep. Vol. 2 111:9–11). |
| 187.  Fox seek to prove "compensatory" damages for its contract and copyright claims based on a so-called "reasonable royalty." | Molinski Decl. Ex. 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013, at 2, 3, and 9), 13 (Fox Broadcasting Company's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 27, 2014, at 2–6)), 14 (FTHI's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 27, 2014, at 2–6)), 12 (TCFFC's Objections and Responses to Defendants' First Set of Requests for Admission, dated May 27, |

- 37 -

| Undisputed Fact | Supporting Evidence |
|---|---|
| | 2014, at 2–6)) |
| | Appendix, Dkt #226 (Joint Stipulation For Defendant's Motion to Compel Production of Documents in Response to Requests for Production No. 6 (Set One), Nos. 28–30 (Set Two), Nos. 24, 31, 32, 35–51 (Set Three), dated June 9, 2014 at 49–50), Dkt. #233 (Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Compel Production of Documents, dated June 16, 2014, at 4), Dkt. #281 (Fox's Supplemental Memorandum in Opposition to Dish's Motion to Compel Responses to Document Requests), Dkt. #281, dated July 14, 2014, at 2) |
| | Appendix, Dkt #226 (Joint Stipulation For Defendant's Motion to Compel Production of Documents in Response to Requests for Production No. 6 (Set One), Nos. 28–30 (Set Two), Nos. 24, 31, 32, 35–51 (Set Three), dated June 9, 2014 at 49–50), Dkt. #233 (Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Compel Production of Documents, dated June 16, 2014, at 4), Dkt. #281 (Fox's Supplemental Memorandum in Opposition to Dish's Motion to Compel Responses to Document Requests) , Dkt. #281, dated July 14, 2014, at 2). |
| 188. ████████████ | Molinski Decl. Ex. 127 (Hearing Tr. (7/25/2014, before Magistrate Judge Hillman) at 41:5–8) (Fox's counsel explaining ████████ |

- 38 -

| Undisputed Fact | Supporting Evidence |
|---|---|
| | ███████████████████████ Appendix, Dkt #226 (Joint Stipulation For Defendant's Motion to Compel Production of Documents in Response to Requests for Production No. 6 (Set One), Nos. 28–30 (Set Two), Nos. 24, 31, 32, 35–51 (Set Three), dated June 9, 2014 at 49–50), Dkt. #233 (Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Compel Production of Documents, dated June 16, 2014, at 4), Dkt. #281 (Fox's Supplemental Memorandum in Opposition to Dish's Motion to Compel Responses to Document Requests) , Dkt. #281, dated July 14, 2014, at 2). |
| 189. ████████████████ | Molinski Decl. Ex. 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013 at 1–3 and 9 (Fox's Responses to Interrogatory Nos. 1, 2, and 7)). |
| 190. ████████████████ | Molinski Decl. Ex. 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013 at 1–3 and 9 (Fox's Responses to Interrogatory Nos. 1, 2, and 7)). |
| 191. ████████████████ | Molinski Decl. Ex. 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013 at 8 (Fox's Responses to Interrogatory Nos. 6)). |

| Undisputed Fact | Supporting Evidence |
|---|---|
| ■■■■■■■ | |
| 192.   Fox cannot establish that DISH's offering of all or any of the PTAT, AutoHop, Sling or Hopper Transfers features caused DISH subscribers to pay all or any of their fees to DISH. | Molinski Decl., Ex. 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013 at 8 (Fox's Response to Interrogatory No. 6)("Presently, [Fox] contends that all revenues earned from any DISH subscriber using the products or services at issue are causally related to DISH's infringement.")).

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798–99 (9th Cir. 2010) (citing to *Celotex* and holding that Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial); *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004)("Thus, a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement."). |

- 40 -

| Undisputed Fact | Supporting Evidence |
|---|---|
| 193.   Fox cannot establish that DISH's offering of all or any of the PTAT, AutoHop, Sling or Hopper Transfers features caused advertisers to pay all or any of their fees to DISH. | Molinski Decl., Ex. 11 (Plaintiff Fox Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013 at 8 (Fox's Response to Interrogatory No. 6)("Presently, [Fox] contends that all revenues earned from any DISH subscriber using the products or services at issue are causally related to DISH's infringement.")). |
| | *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798–99 (9th Cir. 2010) (citing to *Celotex* and holding that Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial); *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004)("Thus, a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement."). |
| 194.   Fox cannot apportion among all or | Molinski Decl., Ex. 11 (Plaintiff Fox |

| Undisputed Fact | Supporting Evidence |
|---|---|
| any of the PTAT, AutoHop, Sling or Hopper Transfers features in order to explain how DISH's offering of any of them caused some number of DISH subscribers to pay some amount of fees to DISH. | Broadcasting Company's Objections and Responses to Dish's First Set of Interrogatories, dated November 25, 2013 at 8 (Fox's Response to Interrogatory No. 6)("Presently, [Fox] contends that all revenues earned from any DISH subscriber using the products or services at issue are causally related to DISH's infringement.")).<br><br>*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798–99 (9th Cir. 2010) (citing to *Celotex* and holding that Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial); *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004)("Thus, a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement."). |
| 195. Fox cannot apportion among any of the accused features and the | Molinski Decl., Ex. 11 (Plaintiff Fox Broadcasting Company's Objections |

| Undisputed Fact | Supporting Evidence |
|---|---|
| remaining features on the Hopper (including Hopper with Sling) in order to explain how DISH's offering of any of the accused features caused some number of DISH subscribers to lease or purchase Hopper devices, or otherwise pay some amount of fees to DISH. | and Responses to Dish's First Set of Interrogatories, dated November 25, 2013 at 8 (Fox's Response to Interrogatory No. 6)("Presently, [Fox] contends that all revenues earned from any DISH subscriber using the products or services at issue are causally related to DISH's infringement.")).<br><br>*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798–99 (9th Cir. 2010) (citing to *Celotex* and holding that Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial); *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004)("Thus, a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement."). |

## CONCLUSIONS OF LAW

1.      Rule 56 authorizes summary judgment on all or part of a claim or defense where, as here, it is apparent either (1) that plaintiff cannot prove an element of its case, or (2) that the undisputed material facts entitle defendant to judgment as a matter of law.  Fed R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

2.      The question of who is making recordings is appropriately resolved on summary judgment.  *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004).

3.      The question of whether recordings are a fair use under the Copyright act is appropriately resolved on summary judgment.  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175 (9th Cir. 2013).

4.      The scope of the Copyright Act in the first instance is appropriately resolved on summary judgment.  *See generally Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013).

5.      The interpretation and application of unambiguous contract terms under New York law is appropriately resolved on summary judgment.  *Fischer & Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir. 2011).  Summary judgment is also proper in a New York contract dispute if the language is ambiguous and the extrinsic evidence leads to only one reasonable outcome. *Compagnie Financeiere de DIC det de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000); *William & Sons Erectors, Inc. v. South Caroline Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993); *Antilles Steamship Co. v. Am. Hull Ins. Syndicate*, 733 F.2d 195, 204 (2d Cir. 1984) (Newman, J. concurring).

6.      The question of whether Fox can meet the legal requirements for monetary relief in this case is appropriately resolved on summary judgment.  *See generally Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002).

## I.    COPYRIGHT INFRINGEMENT CLAIMS

7.    To be actionable as infringement, the defendant's conduct must violate one of the copyright owner's enumerated rights.  17 U.S.C. §§ 106, 501; *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); 3 Nimmer on Copyright § 10.15[A][2] n.10 (2013); *see* 2 Patry on Copyright § 5:118 (2013).

### A.    AutoHop Infringement Claim

8.    Ad-skipping does not implicate Fox's copyright interests in its programs.  *Fox Broad. Co. v. DISH Network L.L.C.*, 747 F.3d 1060, 1069 (9th Cir. 2014).

9.    Nor does ad-skipping invade any of the potentially relevant §106 rights because it is not a reproduction, derivative work, distribution, or public performance of the skipped audiovisual work (the advertising).

10.    DISH is not infringing any Fox copyright, either directly or indirectly, by offering the AutoHop feature on its Hopper and Hopper with Sling DVRs.

### B.    PTAT Infringement Claim

11.    Direct infringement requires a finding of "copying *by* the defendant." *Id.* at 1067 (quotation marks omitted) (emphasis original).  For direct infringement, copying includes "a requirement that the defendant cause the copying."  *Id.*

12.    A defendant does not "cause the copying" when it merely supplies a technological feature that "creates the copy only in response to the user's command, "[o]nce enabled."  *Id.*  Primetime Anytime ("PTAT") creates a copy only in response to a user's command.

13.    It is the law of this case that DISH's choices about the scope of the PTAT DVR block-recording software feature "do not establish that DISH made the copies."  *Id.* at 1068; *see also Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*") (volition requirement); *CoStar*, 373 F.3d at 549

(direct infringement "requires *conduct* by a person who causes in some meaningful way an infringement") (emphasis added); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.,* 907 F. Supp. 1361 (N.D. Cal. 1995).

14.     DISH is not directly infringing any Fox copyright by offering the PTAT feature on its Hopper and Hopper with Sling DVRs.

15.     The Supreme Court's "limited holding" in *Am. Broadcasting Cos., Inc. v. Aereo, Inc.*, 134 S.Ct. 2498, 2510 (2014), did not purport to, and did not, overrule its prior decision in *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), nor any of the published opinions of the circuit courts of appeals requiring a showing of some kind of volitional conduct to demonstrate direct infringement of the reproduction and distribution rights.  *See generally Fox*, 747 F.3d at 1068; *Cablevision*, 536 F.3d at 131-32 ("volitional conduct is an important element of direct liability"); *Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007); *CoStar*, 373 F.3d at 549; *see also Netcom*, 907 F. Supp. at 1370-71.

16.     *Sony*'s important requirement to distinguish between direct and secondary infringement in the context of offering general purpose technological devices remains intact.  464 U.S. at 438-39.

17.     "[S]econdary liability for copyright infringement does not exist in the absence of direct infringement by a third party."  *Fox*, 747 F.3d at 1068.

18.     Fair use is a mixed question of law and fact.  *Harper & Row Pubs., Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985).  Where material facts are not in dispute, fair use is appropriately decided on summary judgment.  *Seltzer*, 725 F.3d at 1175; *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003); *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986).  If, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work.  *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151 (1986).

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHx))

1       19.    The PTAT feature is a time-shifting feature that DISH subscribers use

2  for private noncommercial purposes.  Time-shifting is already a widespread

3  practice among television viewers and in general promotes social welfare.  The

4  unauthorized home time-shifting of [broadcast television] programs is legitimate

5  fair use." *Sony*, 464 U.S. at 442; *Fox*, 747 F.3d at 1069 ("As for the first factor, …

6  Sony … held that 'time-shifting for private home use' was a 'noncommercial,

7  nonprofit activity'" (quoting *Sony*, 464 U.S. at 449)).  "[T]ime-shifting expands

8  public access to freely broadcast television programs" which "yields societal

9  benefits." *Sony*, 464 U.S. at 454.

10      20.    Fox bears the burden of proof on demonstrating actual fourth-factor

11  harm to the value of its works or to the potential market for its works.  *Sony*, 464

12  U.S. at 451; *Fox*, 747 F.3d at 1069-70.

13      21.    "[A]ny analysis of the market harm should exclude consideration of

14  AutoHop because ad-skipping does not implicate Fox's copyright interests." *Fox*,

15  747 F.3d at 1069.

16      22.    Likelihood of harm is not presumed but must be demonstrated.

17  *Harper & Row*, 471 U.S. at 568.

18      23.    Where the alleged infringement has no effect on the value of the work,

19  the fourth factor strongly favors a fair use finding.  *Stern v. Does*, 978 F. Supp. 2d

20  1031, 1048-49 (C.D. Cal. 2011).

21      24.    Fox admits that the PTAT feature has not caused it any actual harm to

22  the value of its works.  Fox also has failed to identify any concrete likelihood that

23  PTAT is likely to impair any potential market for its works.

24      25.    DISH has demonstrated that the type of conduct at issue is already

25  widespread and that no actual harm has occurred.  Fox has identified no concrete

26  evidence of a potential market that is likely to be substantially impaired by PTAT.

27  "[A] copyright holder cannot prevent others from entering fair-use markets merely

28

1    by developing or licensing [competing uses]." *Bill Graham Archives v. Dorling*
2    *Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006).

3        26.    DISH's evidence demonstrates that PTAT is not meaningfully
4    different than DVRs generally, and that DVRs are not substitutes for Fox's actual
5    and potential markets for its works.  The only way the Court could conclude
6    otherwise would be to overrule *Sony*.

7        27.    Fox has failed in its burden to come forward with evidence in support
8    of its position on the fourth factor of fair use.

9        28.    Under *Sony*, the second and third factors are less important where, as
10   here, Fox has invited viewers to view its works in their entirety free of charge.
11   Indeed, DISH subscribers are even paying to receive programming.  The recording
12   of full works by the public where they had been invited to witness the entirety free
13   of charge does not have its ordinary effect of militating against a finding of fair use.
14   464 U.S. at 449-50; *see also Stern*, 978 F. Supp. 2d at 1047 ("several courts have
15   accepted fair use defenses where the defendant copied all or most of the plaintiff's
16   work").  The fact that DISH users copy Fox's entire copyrighted broadcasts does
17   not have its ordinary effect of militating against a finding of fair use.  *Fox*, 747 F.3d
18   at 1069.

19       29.    The PTAT feature cannot be meaningfully distinguished from DVRs
20   in general.  DVRs in general cannot be meaningfully distinguished from the
21   Betamax device at issue in the *Sony* case.  Indeed, Fox's witnesses have generally
22   admitted that use of PTAT, even with commercial skipping, is a lawful fair use.

23       30.    Under *Sony*, DISH subscribers using PTAT to record Fox broadcast
24   network programming are engaging in fair use and are not infringers of Fox
25   copyrights.

26       31.    Because DISH subscribers are not infringing Fox copyrights when
27   using the PTAT feature, DISH is not indirectly liable for copyright infringement for

28

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHx))

offering and promoting the PTAT feature on its Hopper and Hopper with Sling
DVRs.

32.     A manufacturer cannot be faulted solely on the basis of its distribution
where the technology is capable of commercially significant noninfringing uses.
*MGM Studios, Inc. v. Grokster*, 545 U.S. 913, 931-32 (2005); *Sony*, 464 U.S. at
442.

33.     A claim of vicarious infringement requires the plaintiff to prove that
the defendant "has … the right and ability to supervise the [allegedly] infringing
activity."  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir.
2007).  To be vicariously liable, the defendant must be able to control the infringing
activity.  *Id.* at 803.  Such control is not demonstrated by the mere capability to
disable all use of a device; rather, the defendant must be able to distinguish between
lawful and unlawful uses, and to control only those specific uses that are unlawful.
*See id.*; *cf. Sony*, 464 U.S. at 437-38.

34.     Inducement liability requires purposeful, culpable expression and
conduct.  *Grokster*, 545 U.S. at 937*; see id.* at 937-38; *see also Columbia Pictures
Indus., Inc. v. Fung*, 710 F.3d 1020, 1034-37 (9th Cir. 2013).

35.     The Hopper in general, and the PTAT feature in particular, are capable
of commercially significant noninfringing uses just like all other television time-
shifting devices.  Fox has not demonstrated any specific use of PTAT by DISH
subscribers of its works at issue that is somehow unfair.  Even if there were
arguably *some* unfair uses, moreover, the record is clear that the paradigmatic use
of PTAT by DISH subscribers is for fair use time shifting for private
noncommercial purposes.  DISH has no ability to determine in advance how its
subscribers will use PTAT, nor does the record reveal any exhortation by DISH of
its subscribers to use PTAT only in a manner that is both clearly and known by
DISH to be unlawful.  *Cf. Grokster*, 545 U.S. at 931-32.

36.     Accordingly, even if some subscribers' uses of PTAT were theoretically unfair, as a matter of law DISH is not liable under any theory of secondary infringement for such uses of PTAT by its subscribers.

### C.     Sling Adapter & Hopper with Sling Infringement Claim

37.     Sling devices such as Slingbox, Sling Adapter and Hopper with Sling provide users with the capability to remotely view the content on a single STB/DVR device from a single remote device such as a laptop, tablet or smartphone for personal use.  *See generally* U.S. Copyright Office, SHVERA Report 188 (June 2008).

38.     Direct infringement of the public performance right requires a finding of a public performance by the defendant.  17 U.S.C. §§106(4), 501.  Accordingly, to establish direct infringement of Section 106(4), a plaintiff must show that the defendant caused the public performance.  *Fox*,, 747 F.3d at 1067-68; *Perfect 10*, 508 F.3d at 1161-62; *accord CoStar*, 373 F.3d at 549.

39.     A defendant does not cause a public performance when it supplies a device to a user that operates in the possession of the user, under the control of the user, and only in response to the user's command.  *Sony*, 464 U.S. 417; *Grokster*, 545 U.S. at 931-32; *id.* at 957 (Breyer, J., concurring).

40.     DISH's distribution of Sling Adapter and Hopper with Sling devices to its residential subscribers for their personal use does not directly infringe the public performance right because the subscribers—who are lawful possessors of the content coming from their satellite tuners or from recordings on their DVRs—are themselves causing all remote viewing that occurs through the use of these Sling devices.  *Aereo*, 134 S. Ct. at 2510.  DISH is not transmitting, sending or performing anything when viewers activate Sling functionality. ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

41.     The so-called "Transmit Clause" requires a transmission "to the public."  17 U.S.C. § 101.  The public consists of a large group of people outside of a circle of family and friends.  *Aereo*, 134 S. Ct. at 2510.  An entity does not transmit to the public if it does not transmit to a substantial number of people outside of a family and its social circle.  *Id.*

42.     When a DISH subscriber uses the Sling Adapter or Hopper with Sling for the remote viewing of live or pre-recorded Fox broadcast network content from her STB/DVR on a single mobile device, there is no transmission to the public and therefore neither DISH nor the subscriber has violated Section 106(4) of the Copyright Act.  *See id.*; U.S. Copyright Office, SHVERA Report 188 (June 2008).  Indeed, as Fox itself repeatedly admitted in *Aereo*, (*see* Molinski Decl. Ex. 124 [Aereo Tr.]; Brief for Petitioners at 46, *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) (No. 13-461), 2014 WL 768315, at *46 (emphasis added)), a point-to-point connection from a subscriber to herself is not "public" and therefore not a public performance.

43.     Even when a DISH subscriber uses a Sling device for personal remote viewing of Fox content on a single mobile device in a public place, that is not a public performance both because it does not meet the requirements of the Transmit Clause and because it is subject to the "homestyle" exemption of Section 110(5) of the Copyright Act.  17 U.S.C. §110(5).

44.     Noncommercial place-shifting is a paradigmatic fair use.  *Sony*, 464 U.S. at 442 (time shifting is fair-use); *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999) (space-shifting "is paradigmatic noncommercial personal use entirely consistent with the purposes of the Act."); *Fox*, 747 F.3d at 1069 ("Dish customers' home viewing is noncommercial under *Sony*, which held that 'time-shifting for private home use' was a 'noncommercial, nonprofit activity[.]'") (citation omitted); *see also Perfect*

1  *10*, 508 F.3d at 1165 (placing work in a "new context to serve a different purpose"
2  is a fair use).

3      45.    In evaluating fair use under Section 107, the Court must assess the
4  particular use of the work at issue.  Even if DISH were somehow considered to
5  have publicly performed a Fox work by virtue of the operation by its subscribers of
6  the Sling Adapter or Hopper with Sling, there is no evidence that those particular
7  uses of Sling by subscribers benefit DISH in any way.  DISH's role with respect to
8  Sling is no different from that of *Sony* when it sold the Betamax, or of Sony and
9  other television manufacturers who sell small portable televisions with antennas.
10  And Fox's content is treated exactly the same way in each instance.

11     46.    The purpose of the actual placeshifting uses is the private
12  noncommercial use of DISH subscribers to view the work in a different way than
13  they have otherwise been invited to view it by Fox (who sends it to their
14  televisions).  The users are lawful possessors of copies of the works.  Fox has
15  conceded that it has no evidence that Sling has actually harmed the value of its
16  works.  Fox has offered no evidence that Sling will harm a potential market for its
17  works.  Sling promotes the purposes of copyright, because it enhances the lawful
18  dissemination of published works.

19     47.    Accordingly, even if Sling use were considered a public performance
20  by DISH, DISH's role in such performances is fair for the same reason that Sony's
21  sale of VCRs was fair in *Sony*.  *See also Kelly v. Arriba Soft Corp.*, 336 F.3d 811
22  (9th Cir. 2003).

23        **D.    Hopper Transfers Infringement Claim**

24
25     48.    The Hopper Transfers feature provides DISH subscribers with the
26  capability of making television DVR recordings portable, just like a VCR tape,
27  MP3 player or thumb drive.
28

49.     DISH is not making the copies when its subscribers use Hopper Transfers, so it cannot be liable as a direct infringer for offering that feature to its subscribers. *Grokster*, 545 U.S. at 931-32; *id.* at 957 (Breyer, J., concurring); *Diamond*, 180 F.3d at 1079. The subscriber, not DISH, makes the copy. *Fox*, 747 F.3d at 1067.

50.     Nor is DISH secondarily liable because it has offered the Hopper Transfers feature to its subscribers. Hopper Transfers is used for place-shifting, a private noncommercial use by DISH subscribers. The subscribers have already paid a fee to DISH for the right to receive the works. Fox admits the value of its works has not been impaired, and has not demonstrated the likelihood of harm to any potential market from the use of Hopper Transfers. Fox cannot eliminate place-shifting, an established fair use, by expanding its licensing to multiple new venues and then arguing that widespread place-shifting will harm its licensing in those venues. This kind of circular logic is not permitted in the fair use inquiry. *Bill Graham*, 448 F.3d at 614-15. Noncommercial place-shifting with Hopper Transfers is a paradigmatic fair use. *Diamond*, 180 F.3d at 1079 (place-shifting "is paradigmatic noncommercial personal use").

51.     Because DISH subscribers are not infringing Fox copyrights when using Hopper Transfers, DISH is not secondarily liable for copyright infringement for offering and promoting the Hopper Transfers feature.

## E.     QA Copies Copyright Infringement Claim

52.     Intermediate copies that facilitate new, non-infringing technology and are not distributed to an end user are a fair use. *See Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992); *Sony Computer Enter., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000).

53.     When a copy does not materially impair the marketability of the work that is copied, the use is fair. *Harper & Row*, 471 U.S. at 566-67 (citation omitted).

54.    Demonstration copies are a fair use because they do not compete in the market for the protected work.  *Universal City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429, 457 (C.D. Cal. 1979).

55.    Copies made to promote the use of the work are fair use because they do not impair the market for the protected work.  *Sony Computer Ent't Am. v. Bleem*, 214 F.3d 1022, 1029 (9th Cir. 2000).

56.    The fourth factor of a fair use analysis favors fair use when there is no evidence that a market for the work ever existed.  *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000).

57.    DISH's Quality Assurance copies are intermediate copies within the meaning of *Sony* and *Sega* because they are not distributed to any end user.  *See Sega*, 977 F.2d 1510; *Connectix*, 203 F.3d 596.

58.    Fox has conceded that it has suffered no actual harm to the value of its works and has not presented evidence that there is a market for intermediate copies or any other prospect of substantial impairment of a potential market for its works. To the contrary, Fox's executives admitted that they were aware of intermediate copying by device manufacturers and expected it in the course of development of new technologies.

59.    The QA copies are a fair use by DISH of Fox's works.

## II.    BREACH OF LICENSE THEORY OF INFRINGEMENT

60.    The breach of a license by itself cannot establish copyright infringement. *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1122 (9th Cir. 1999) ("[B]efore [the plaintiff] can gain the benefit of copyright enforcement, *it must definitively establish that the rights it claims were violated are copyright, not contractual rights.*" (emphasis added)); *see also S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1089 & n.11 (9th Cir. 1989) (concluding that the defendant "exceeded the scope of its license" and then remanding for resolution of the

"underlying question of whether [the defendant's] uses, unshielded by the contract, infringed [the plaintiff's] copyright").

61.    A license merely negates the required element of lack of authorization in a copyright infringement case; it does not allow a plaintiff to bypass the *prima facie* elements of a copyright claim.  *Worldwide Church of God v. Philadelphia Church of God*, 227 F.3d 1110, 1114 (9th Cir. 2000).

62.    Unless the elements of the *prima facie* claim of infringement are independently met, a breach of contract does not demonstrate a copyright claim.

63.    As set out above, DISH is not liable for copyright infringement for a variety of reasons that have nothing to do with a claim of authorization.  DISH is not relying upon the parties agreements to negate the element of unauthorized unlawful copying.  Nor has Fox asserted that its claims of breach of contract justify it in terminating any of the parties agreements, thus depriving DISH of its basic authorization to operate a DBS system that retransmits the Fox programming.  Accordingly, the fact that DISH may be breaching any of the parties' agreements is irrelevant to a claim of infringement, and the claim of "exceeding the scope of license infringement" should be dismissed as a matter of law.

## III.    BREACH OF CONTRACT (AND IMPLIED COVENANT) CLAIMS

64.    Under New York law, the Court's primary objective in interpreting a contract is to give effect to the intent of the parties as revealed by the language they chose to use.  *Deakins Holding PTE Ltd. v. Newnet Investment Grp. LLC*, 2014 WL 3101446, at *3 (C.D. Cal. July 7, 2014) (Snyder, J.).

65.    Summary judgment is proper in a New York contract dispute if the language is wholly unambiguous, or even if it is ambiguous and the extrinsic evidence leads to only one reasonable outcome.  *Id.* at *4; *see also Compagnie Financeiere*, 232 F.3d at 158; *William & Sons*, 983 F.2d at 1184; *Antilles Steamship*, 733 F.2d at 204 (Newman, J. concurring).

66.     Under New York law, "the threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

67.     The determination of whether terms are ambiguous must be made solely by reference to the face of the agreement. *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001).

68.     "If [] intent is discernible from the plain meaning of the language of the contract, there is no need to look further." *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004).

69.     In assessing meaning, "[a] written contract will be read as a whole, and every part will be interpreted with reference to the whole." *Empire Props. Corp. v. Mfctrs. Tr. Co.*, 43 N.E.2d 25, 28 (N.Y. 1942).  Language "must be construed in its relevant context." *McGroarty v. Great Am. Ins. Co.*, 329 N.E.2d 172, 175 (N.Y. 1979).

70.     It is "common practice for the courts of New York State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *Fed Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011).

71.     Options are not required to be exercised. *Kaplan v. Lippman*, 552 N.E.2d 151, 153 (1990).

72.     Under New York law, "undisputed extrinsic evidence that buttressed [movant's] interpretation of [an ambiguous] agreement . . . would constitute grounds for summary judgment." *See Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1193 (S.D.N.Y. 1996).

73.     "A contract should not be interpreted to produce a result that is absurd . . ., commercially unreasonable  . . . or contrary to the reasonable expectations of the parties." *Lipper Holdings, LLC v. Trident Holdings,* LLC, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003).

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHX))

74.     "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." *Fed. Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999) (quoting Restatement [Second] of Contracts § 202 cmt. g).

75.     A party's admission is a binding interpretation. *See Nationwide Mut. Ins. Co. v. Erie & Niagara Ins. Ass'n*, 249 A.D.2d 898, 899 (N.Y. App. Div. 1998) (admission that accident was a covered occurrence under an insurance policy was a binding interpretation).

76.     New York law strongly disfavors the implication of contractual obligations. *2632 Realty Dev. Corp. v. 299 Main St., LLC,* 94 A.D.3d 743, 745 (N.Y. App. Div. 2012) ("A court should not imply a term which the parties themselves failed to include").

77.     Obligations cannot be implied when inconsistent with other terms, including an integration clause. *Vacuum Concrete Corp. v. Am. Mach. & Fdry. Co.*, 321 F. Supp. 771, 774 (S.D.N.Y. 1971).

78.     New York law allows no claim for frustration of purpose when the contract specifically contemplates the behavior at issue. *Neumann v. Metro Med. Group, P.C.*, 161 A.D.2d 1106, 1107 (N.Y. App. Div. 1990); *see also Israel v. Chabra*, 906 N.E.2d 374, 380 (N.Y. 2009) ("[T]he more specific clause controls the more general"); *E-Z Eating 41 Corp. v. H.E. Newport LLC*, 84 A.D.3d 401, 408 (N.Y. App. Div. 2011) ("[I]n the event of a conflict between two provisions, the specific should control over the general").

79.     The limited good faith and fair dealing obligation under New York law is identical to ██████████████████████████████ *Compare  ABN AMRO Bank, N.V. v. MBIA, Inc.*, 952 N.E.2d 463, 475 (N.Y. 2011) ("[T]he implied covenant of good faith and fair dealing embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring

the right of the other party to receive the fruits of the contract.") *with* 2010 Letter Agreement at 3.

**A.** <u>**PTAT Breach Of Contract & Implied Covenant Claims**</u>

80. . DISH is not breaching

that provision by offering PTAT. *Fox Broad. Co. v. DISH Network, L.L.C.*, 905 F.Supp.2d 1088, 1107 (C.D. Cal. 2012).

81.

82.

83.



1  ████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  appear to have used the word distribute to mean merely making something

4  available; indeed, in one agreement the parties explained that the phrase "making

5  available" is clearly distinct from "distribute."  *See, e.g.*, Molinski Decl. Ex. 6 (Fox

6  Deportes Amendment § 1(a), (i), (j)).

7       84.   ███████████████████████████████████████

8  ██████████████████████████████████████████████

9  █████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ██████████████████████████████████████████

12 █████████████████████████████████████████

13 █████████

14      85.   █████████████████████████████████████

15 ██████████████████████████████████████████████

16 █████████████████████████████████████████████

17 ██████████  *Fox*, 905 F. Supp. 2d at 1107.

18      86.   ██████████████████████████████████████

19 ██████████████████████████████████████████████

20 █████████████████████████████████████████████

21 ███████████████████████████████████████████████

22 ███████████████.

23      87.   ██████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ██████████████████████████████████████████████

27 ███████████████████████████████

28



88. █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

89.     By offering PTAT, DISH has not breached the implied covenant of good faith and fair dealing ████████████████████████████
█████████████████████████████████████.

**B.**     **AutoHop Breach Of Contract & Implied Covenant Claims**

90. ████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

91. █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████

92. ███████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHx))



C.    **Sling Breach Of Contract & Implied Covenant Claims**

98.    ██████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████ and its

subsequent failure over a long period of time to take any action to protest DISH's

use of Sling, are a binding course of conduct.  *See Fed. Ins. Co.*, 258 A.D.2d at 44;

*Nationwide Mut. Ins. Co.*, 249 A.D.2d at 899.

99.    ███████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

100.    Fox is bound by the interpretation that it placed on the 2002

Agreement.  Fox adopted this interpretation of the agreement through its course of

conduct, made binding admissions of that interpretation, and is otherwise estopped

from claiming a different interpretation.  *Fed. Ins. Co.*, 258 A.D.2d at 44;

*Nationwide Mut. Ins. Co.*, 249 A.D.2d at 899.

101.    ███████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████



102. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

103. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Sling is not a
broadcast to the public, for the reasons described above. *Aereo*, 134 S. Ct. at 2510.

104. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
*Fox*, 747 F.3d at 1069. ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

105. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHx))



106.

107.

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHx))

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████ *Fed Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567

4 (2d Cir. 2011) ("[I]t is common practice for the courts of New York State to refer to

5 the dictionary to determine the plain and ordinary meaning of words to a contract"

6 (internal quotation marks omitted)).

7 108.  ████████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 █████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 █████████████████████.

12 **D.**    **Hopper Transfer Breach Of Contract & Implied Covenant Claims**

14 109.  ███████████████████████████████████████

15 ███████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 █████████████████████████████████████████████████████

18 ████████████████████████████████████████████

19 █████████████████████████████████████████████

20 ████████████████████████████████████████

21 ███████████████████████████████████████████

22 Rather, subscriber personal copying for time-shifting and place-shifting purposes is

23 authorized by the fair use provision of the Copyright Act.

24 **IV.**    **MONETARY REMEDIES**

25 **A.**    **Contract Damages**

26 110.    "Failure to prove the essential element of damages is fatal to a cause

27 of action for breach of contract." *Proper v. State Farm Mut. Auto. Ins. Co.*, 63

28 A.D.3d 1486, 1487 (N.Y. App. Div. 2009); *see also Action Nissan, Inc. v. Nissan*

1  *N. Am.*, 454 F. Supp. 2d 108, 133 (S.D.N.Y. 2006) ("damages are an essential
2  element of a breach of contract action" under New York law).  Dismissal is an
3  appropriate remedy when a plaintiff fails to prove damages.  *See Viacom Outdoor*
4  *Inc. v. Wixon Jewelers, Inc.*, 82 A.D.3d 604 (N.Y. App. Div. 2011).

5      111.   Fox cannot recover actual damages on its breach of contract claims
6  (whether express or implied covenant) in this case.  ████████████████
7  ████████████████████████████████   Damages require appreciable injury.
8  *See Cipriano v. Glen Cove Lodge No.*, 801 N.E.2d 388, 394 (N.Y. 2003).

9      112.   ████████████████████████████████████
10  ████████████████████████████████████████████
11  ████████████████████████████████████████████
12  ████████████████████████████   *See New Hampshire v. Maine,* 532 U.S.
13  742, 749 (2001).

14      113.   Because Fox has no actual damages on its contract claims, it has no
15  recoverable damages resulting from any of DISH's purported breaches of the
16  parties' agreements.  Under governing New York law, reasonable royalties are not
17  available as damages for a breach of contract as a matter of law.  *See Jim Beam v.*
18  *Tequila Cuervo La Rojena S.A. De C.V.*, No. 600122/2008, at *10 (Sup. Ct. N.Y.
19  Cty. July 12, 2011); *see also Jill Stuart (Asia) LLC v. Sanei Int'l Co., Ltd.*, 12 CIV.
20  3699 KBF, 2013 WL 3203893, at *5 (S.D.N.Y. June 17, 2013)  (granting summary
21  judgment because "[t]he reasonable royalty theory of damages cannot apply" to
22  breach of contract claims).

23      114.   ████████████████████████████████████
24  ████████████████████████████████████████████
25  ████████████████████████████████████████████
26  ████████████████████████████████████████████
27  ████████████████████████████████████████████
28  ████████████████████████████████████████████

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHX))

115.   Because Fox has no recoverable damages on any of its contract claims alleging breach by PTAT, AutoHop, Sling Adapter, Hopper with Sling, Hopper Transfers or the QA Copies, DISH is entitled to summary judgment dismissing Fox's contract claims in their entirety as a matter of law.

116.   Under New York law, "any damages resulting from a breach of the contract are necessarily the same as any damages resulting from a breach of [an] implied covenant." *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 653 (E.D.N.Y. 2012).  Additionally, as with breach of contract claims, damages are a required element of a claim for breach of an implied covenant under New York law. *See In re 11 E. 36th LLC*, 13-11506 (RG), 2014 WL 2903660, at *4 (Bankr. S.D.N.Y. June 26, 2014).   Accordingly, Fox's claim for breach of the implied covenant of good faith and fair dealing fails for the same reasons as its claim for breach of contract.

### B.   Copyright "Reasonable Royalty"

117.   "Reasonable royalty" is a statutory remedy found in the Patent Act (35 U.S.C. § 284) and the Uniform Trade Secrets Act.  UTSA § 3 (1985); *see* Cal. Civ. Code § 3426.3(b) (adopting Uniform Trade Secrets Act § 3).  Reasonable

- 67 -

1  royalty in patent and trade secret cases is not available unless other forms of

2  damages or unjust enrichment cannot be proven.

3      118.   When available, a reasonable royalty in patent and trade secret cases is

4  generally determined with reference to the concept of a hypothetical negotiation

5  using the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.

6  Supp. 1116 (S.D.N.Y. 1970).  *See LaserDynamics, Inc. v. Quanta Computer, Inc.*,

7  694 F.3d 51, 60 (Fed. Cir. 2012); *Ajaxo, Inc. v. E\*Trade Financial Corp.*, 187 Cal.

8  App. 4th 1295, 1308 (2010) (using "suppositious meeting" rubric and citing to

9  cases applying *Georgia-Pacific* factors).

10      119.   In the Copyright Act, the minimum guarantee of damages is provided

11  by a Congressionally mandated range of statutory damages for the infringement of

12  each work.  *See* 17 U.S.C. § 504(c).  Statutory damages, not reasonable royalties,

13  are the congressionally mandated minimum damages under the Copyright Act.

14  Reasonable royalties based upon a hypothetical negotiation simply are not available

15  as a monetary remedy under the Copyright Act.  *See In re MobiTV, Inc.*, 712 F.

16  Supp. 2d 206, 243 (S.D.N.Y. 2010) ("ASCAP has been unable to identify any

17  copyright case that has applied the *Georgia-Pacific* factors …").  As Fox has made

18  it clear that its copyright royalty theory is based upon a compelled hypothetical

19  negotiation, its claim for royalties under the Copyright Act is barred.

20      120.   Lost *actual* royalties can be awarded under a hypothetical license from

21  the plaintiff to the defendant as *actual damages* when the requisites of *actual*

22  *damages* are met—proof that the loss was "suffered as a result of the

23  infringement"—that is, where such a license would have in fact been granted by the

24  willing seller and on what terms.  *See Wall Data, Inc. v. Los Angeles Cnty. Sheriff's*

25  *Dep't*, 447 F.3d 769, 786-87 (9th Cir. 2006) (damages award based on an

26  established license fee schedule between the parties); *Polar Bear Prods, Inc. v.*

27  *Timex Corp.*, 384 F.3d 700, 708-09 (9th Cir. 2004) (royalty based on a rate quoted

28  from the copyright owner to infringer before the dispute arose); *On Davis v. The*

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHx))

1   *Gap, Inc.*, 246 F.3d 152, 161-162 (2d Cir. 2001) (awarding royalties where there

2   was evidence of an established royalty because the copyright owner had received

3   royalties for the infringed work in the past); *Mackie*, 296 F.3d at 913-16 (royalty

4   damages grounded in prior licensing practices of the plaintiff).

5       121.   ██████████████████████████████████████

6   ████████████████████████████████████████████████████

7   Therefore, Fox is not entitled to royalty damages based upon the hypothetical lost

8   license scenario.

9       122.   Finally, lost royalties under the Copyright Act under the hypothetical

10  lost license scenario are only available where the plaintiff would have actually

11  licensed the defendant for the infringement.  Here, Fox is claiming specific

12  performance and seeking injunctive relief on the ground that it is irreparably

13  harmed by the supposed infringement.  These demands for equitable relief are

14  inconsistent with the hypothetical lost license rubric of actual damages.   *See*

15  *Business Trends Analysts, Inc. v. Freedonia Grp., Inc.*, 887 F.2d 399, 404-07 (2d

16  Cir. 1989) (denying plaintiff's efforts to recover for lost value of use, holding such

17  remedy was not permitted since "the language of the [copyright] provision speaks

18  of 'actual damages suffered by' the infringed party.  That is hardly a reasonable

19  description of the entirely hypothetical sales to [defendant] lost by plaintiff."); *Nat'l*

20  *Committee of Bar Examiners v. Multistate Legal Studies, Inc.*, 458 F. Supp. 2d 252,

21  261 (E.D. Pa. 2006) (denying lost licensing fee because no evidence suggested that

22  defendants would have licensed works; thus plaintiffs not entitled to royalties);

23  *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 25 F. Supp. 2d 395, 401

24  (S.D.N.Y. 1998) (court endorsing view that damages that are "completely

25  hypothetical" or "purely abstract" are not recoverable under copyright law)

26      123.   DISH is entitled to partial summary judgment dismissing Fox's

27  demand for any form of royalty damages on its copyright infringement claim.

28

## C.   Copyright Disgorgement of Profits

124.   The Copyright Act provides for disgorgement only where revenues are "attributable to the infringement."  17 U.S.C. §504(b).  Here, Fox purports to seek all subscriber revenues from any subscriber using a Hopper or Hopper with Sling, and also all advertising revenues earned by DISH since the Hopper was released.

125.   It is the law of this case that advertising is not implicated by Fox's copyright claim.  *See Fox*, 747 F.3d at 1069.  By definition, Fox cannot claim damages for something that is not even implicated by its claim.  And, in all events, any claim that DISH earned advertising revenues by selling advertising on other channels because of its release of the AutoHop feature that provided users with the capability to skip advertisements on the Fox broadcast network channel is entirely speculative and does not meet the basic causation requirement of §504.  Fox's claim for disgorgement of advertising revenues is dismissed as a matter of law.

126.   Fox's claim for disgorgement of all subscriber revenues from any Hopper user is likewise defective.  A copyright owner is required to do more initially than toss up an undifferentiated gross revenue number.  *Polar Bear,* 384 F.3d at 711.  The revenue must bear a legally significant relationship to the infringement.  *Id.*; *Mackie*, 296 F.3d at 915-16 ("copyright holder must proffer sufficient non-speculative evidence to support a causal relationship") (affirming summary judgment dismissing disgorgement claim).

127.   ██████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

1 ██████████████████████████████████████

2 █████████████████████████████████

3 ███████████████████████████████████████

4 ████████████████████████████████████████

5 ██████████████████

6     128. ████████████████████████████████

7 ███████████████████████████████████████

8 ████████ Partial summary judgment as to Fox's claim for disgorgement should

9 be granted.

10

11 Dated:     September 2, 2014     Orrick, Herrington & Sutcliffe LLP

12

13       By:_____ */s/ Annette L. Hurst*_____

14            ANNETTE L. HURST
           Attorneys for Defendants

15            DISH Network L.L.C., DISH
           Network Corp. and EchoStar

16            Technologies L.L.C.

17

18

19

20

21

22

23

24

25

26

27

28

DEFTS' CORRECTED STMT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
CASE NO. CV1204529 DMG (SHX))