# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FOX BROADCASTING COMPANY, et al., | ) ) | Case No. CV 12-4529 DMG (SHx) |
| Plaintiffs, | ) ) ) | **ORDER RE: PLAINTIFF FOX BROADCASTING COMPANY'S** |
| v. | ) ) ) | **MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT DISH** |
| DISH NETWORK LLC, et al., | ) ) | **NETWORK LLC'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) ) | **[372, 383]** |
| | ) | **[UNDER SEAL]** |

This matter is before the Court on the parties' motions for summary judgment. The parties appeared for a hearing on their motions on October 17, 2014. The Court has duly considered the parties' written submissions presented in support of and in opposition to the motions, as well as oral argument. For the reasons discussed below, Plaintiffs' motion for partial summary judgment is **GRANTED** in part and **DENIED** in part and Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.

# I.
## PROCEDURAL BACKGROUND

On May 24, 2012, Plaintiffs Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc. ("Fox") filed a Complaint against Defendants DISH Network LLC, DISH Network Corporation, and EchoStar Technologies LLC ("DISH") alleging copyright infringement and breach of contract. [Doc. # 1.]  Specifically, Fox alleged that DISH's PrimeTime Anytime ("PTAT") service and the AutoHop Sling Adapter feature copied and streamed Fox's programming over the Internet in violation of copyright law and DISH's contractual agreements with Fox. [Doc. # 1 at 3-4.]

On August 22, 2012, Fox filed a Motion for a Preliminary Injunction requesting that the Court enjoin DISH from offering, operating, distributing, or selling both the original and current iterations of PTAT and AutoHop.  [Doc. # 41.]  On November 7, 2012, this Court denied the motion.  [Doc. # 109.]  Fox appealed the ruling to the Ninth Circuit Court of Appeals.  [Doc. # 110.]  On February 21, 2013, Fox filed a First Amended Complaint ("FAC") adding DISH's new 2013 services (DISH Anywhere with Sling technology and Hopper Transfers) to the list of offending services.  [Doc. # 135.]  On February 22, 2013, Fox filed another Motion for Preliminary Injunction seeking to enjoin DISH from offering those additional services.  [Doc. # 129.]  On September 23, 2013, this Court also denied that motion.  [Doc. # 196.]  Fox again appealed the decision to the Ninth Circuit.  [Doc. # 205.]  The Ninth Circuit affirmed both of the District Court's decisions.  [Doc. ## 218, 356.]

On August 22, 2014, Fox moved for partial summary judgment on its claims that DISH (1) is infringing Fox's exclusive right to publicly perform its copyright works by streaming them over the Internet using DISH Anywhere; (2) is breaching the 2010 Letter Agreement by retransmitting Fox's programming over the Internet using DISH Anywhere; (3) is breaching the parties' 2002 Retransmission Consent Agreement ("2002

-2-

RTC Agreement") by distributing Fox's programming on a "video-on-demand or similar basis" using PTAT; (4) is breaching the parties' 2002 RTC Agreement by authorizing DISH's subscribers to copy Fox's programming for viewing outside their homes with its Hopper Transfers service; (5) breached the 2002 RTC Agreement by making copies of Fox's programming in connection with the operation of the AutoHop service; and (6) infringed Fox's exclusive right to reproduce its copyrighted works by making copies of Fox's programming in connection with the operation of the AutoHop service.   [Doc. ## 383, 439, 479.]   DISH moves for summary judgment on all of Fox's copyright and contract claims.  [Doc. ## 372, 373, 495.]

## II.
## FACTUAL BACKGROUND[1]

### A.    The Parties and Affiliates

Fox is one of the four major commercial networks that broadcast television over the airwaves in the United States.  Declaration of Michael Biard in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Biard Opp. Decl.") at ¶ 4. [Doc. # 535.]  In addition to broadcasting the Fox programs over the airwaves, Fox enters into retransmission consent ("RTC") agreements with various cable television systems, satellite television services, and other multichannel video programming distributors ("MVPDs") such as DISH, which retransmit Fox's broadcast signal and the Fox programs to their subscribers.  Declaration of Sherry Brennan in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Brennan Decl.") at ¶ 11.

---

[1] The Court sets forth the material facts and views all reasonable inferences to be drawn from them in the light most favorable to the non-moving party.  The facts presented are materially uncontroverted, unless otherwise indicated.  In addition, both sides make numerous evidentiary objections.  The Court addresses the objections only where it relies on the evidence as to which objections have been interposed.

[Doc. # 537.]   Fox separately licenses to cable, satellite, and other MVPD service providers the right to air video-on-demand ("VOD").   *Id*. at ¶ 17(a).   Fox also enters into agreements with companies like Hulu, Netflix, Amazon, and Apple to offer the right to stream Fox programming to subscribers over the Internet on their computers and mobile devices, with or without commercials, depending on the nature of the licensing agreement and the user's subscription.   *Id*. at ¶ 17(b)-(g).   Fox also licenses older seasons of its programming to subscription VOD services such as Netflix and Amazon Prime. Defendants' Reply to Plaintiffs' Statement of Additional Facts ("DISH Reply SAMF") at ¶ 25.   [Doc. # 522].

Fox holds the copyright for many of the programs broadcast on the Fox Network, including *American Dad*, *Bob's Burgers*, *Family Guy*, *Glee*, *King of the Hill*, *New Girl*, *The Simpsons*, and *Sleepy Hollow*, among others.[2]   Defendants' Statement of Genuine Disputes and Undisputed Facts in Support of Opposition to Plaintiffs' Partial Motion for Summary Judgment ("DISH GDMF") at ¶ 1 [Doc. # 456.]; Declaration of Mary McGuire in Support of Plaintiffs' Motion for Partial Summary Judgment at ¶¶ 2, 7-8, Ex. A.   [Doc. # 387.]

The majority of Fox's revenues come from advertising sales.   DISH Reply SAMF at ¶ 27.   To maintain ratings and launch new programs, Fox engages in substantial self-promotion and advertising for its own programs.   *Id*. at ¶ 36.   Over the past fiscal year, 14% of the total commercial spots that appeared during Fox Network programming were Fox Network's own advertisements.   *Id*. at ¶¶ 40-41.   Fox itself is, in fact, the single

---

[2] DISH disputes this fact, stating that "Fox has never claimed to own the copyrights in all programs broadcast on its network, and the McGuire Declaration does not provide evidence that it does own copyrights in all such programs (or even direct evidence of ownership of any of them)."   DISH GDMF at ¶ 1.   Exhibit A to the McGuire Declaration includes numerous copyright registrations for Fox shows owned by Fox.   There is no genuine dispute as to the fact that Fox holds the copyright for many of the programs shown on the Fox Network.

largest advertiser on the Fox network. *Id*. Fox owns the copyrights for the clips from Fox programs used in these promotional advertisements. *Id*. at ¶ 39; Declaration of Mary McGuire in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at ¶¶ 8-9. [Doc. # 437-1.]

DISH is the nation's third-largest pay television provider, delivering satellite services to millions of households nationwide. Defendants' Reply to Plaintiffs' Statement of Genuine Disputes of Material Fact in Support of Motion for Summary Judgment ("DISH Reply GDMF") at ¶ 120. [Doc. # 521]. DISH is currently a party to RTC Agreements with each of the four major broadcast television networks, including Fox, which allows it to retransmit the content shown on the local affiliate stations that are owned and operated by those networks. Declaration of David Shull in Support of Defendants' Motion for Summary Judgment ("Shull Decl.") at ¶ 10. [Doc. # 499.] DISH pays ██████████ dollars each year for those rights. *Id*. DISH has offered its subscribers Digital Video Recording ("DVR") since May of 1999. Declaration of Dan Minnick in Support of Defendants' Motion for Summary Judgment ("Minnick Decl.") at ¶ 5. [Doc. # 501.]

EchoStar Technologies LLC ("EchoStar") is a technology vendor closely affiliated with DISH that, among other things, supplies DISH with satellite television and retransmission services, the set-top boxes ("STBs") and DVRs that DISH sells and leases to its customers, and technology support service. Minnick Decl. at ¶ 1. EchoStar is not the same entity as EchoStar Satellite Corporation, DISH's predecessor. *See* n. 3, *infra*. DISH has a "SlingService Services Agreement" with Sling Media, Inc., which is owned by EchoStar. DISH GDMF at ¶ 34.

## B. The Agreements

Under Fox and DISH's agreements, DISH has the right to retransmit Fox programming to its subscribers via satellite. DISH Reply GDMF at ¶ 129. DISH's right to broadcast Fox programming by satellite is governed by an RTC Agreement entered

into by the parties[3] on July 1, 2002 (the "2002 RTC Agreement") that has subsequently been amended and extended numerous times (in 2004, 2005, 2006, 2007, 2009, and 2010). Shull Decl, Ex. 1 [Doc. # 499-1]; Biard Opp. Decl. ¶ 11, Ex. 15.

### 1. The 2002 RTC Agreement

The relevant provisions of the 2002 RTC Agreement are:

2. Retransmission Consent. . . .

3(d). Carriage of Stations . . . [DISH] acknowledges that it shall have no right to distribute all or any portion of the programming contained in any Analog signal on an interactive, time-delayed, video-on-demand or similar basis; provided that Fox acknowledges that the foregoing shall not restrict [DISH's] practice of connecting its Subscribers' video replay equipment.

9(a). Copyright and Trademark Licenses . . . "[DISH] shall not, for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of any Station's Analog Signal without prior written permission of the Station, except as is specifically permitted by this Agreement."

### 2. The 2004 Agreement

On October 1, 2004, the parties entered into another agreement (the "2004 Agreement"). Shull Decl. ¶ 17, Exh. 2. The relevant provision of that Agreement is:

29. Limitation of Liability . . .

---

[3] The 2002 RTC Agreement is between Fox Television Holdings, Inc., Fox/UTV Holdings, Inc., and EchoStar Satellite Corporation. Shull Decl, Ex. 1. DISH is the successor to EchoStar for the 2002 Agreement to the extent that the Agreement remains in effect. Fox GDMF at ¶ 131.

-6-

### 3.    The 2010 Letter Agreement

The 2002 RTC Agreement was amended most recently in a Letter Agreement in 2010 (the "2010 Letter Agreement").  Dish Reply GDMF at ¶ 141; Shull Decl., Ex. 3. The relevant provisions of the 2010 Letter Agreement are as follows:

**Other Technologies.**



\*                      \*                      \*

3 a).  **FOX Video ON Demand (SD and HD)** . . .



\*                      \*                      \*

4.  DISH will disable fast forward functionality during all advertisements; [Fox] and DISH may include a pre-roll announcement prior to each show regarding the fast-forward disabling.  DISH and [Fox] will discuss in good faith the timing of DISH's implementation of such fast-forward disabling and messaging to consumers; provided that DISH acknowledges and agrees that such fast-forward disabling is a necessary condition to distribution of the Fox broadcast content via VOD.[4]

\*                      \*                      \*

---

[4] According to David Shull, DISH's Chief Commercial Officer and Executive Vice President, DISH has not taken advantage of this option to offer Fox VOD because of technical difficulties in implementing the disabling of fast-forwarding functionality.  Shull Decl. at ¶ 20.

5.  At no time during the Term may any of the Fox Parties or DISH take any action whatsoever intended to frustrate or circumvent, or attempt to frustrate or circumvent, the protections granted to the other Party pursuant to any provision in this Letter Agreement.

The 2010 Letter Agreement contains a merger clause stating that the Letter Agreement "constitutes the entire understanding between the Parties concerning the subject matter of this Letter Agreement."  2010 Letter Agreement at ¶ 13.  It also states that "this Letter Agreement sets forth the complete understanding among the Parties with respect to Retransmission Consent and DISH's distribution of the Services" and that "[t]his Letter Agreement will not operate as a modification, limitation or waiver of any provision of the Continuing Agreements." *Id.* at ¶¶ 10-11.

### 4.    Choice of Law

All of the agreements at issue have choice-of-law provisions.  The 2002 RTC Agreement states that "[t]his Agreement shall be governed by and construed under and in accordance with the laws of that State of Colorado."  2002 RTC Agreement at ¶ 18.  The 2004 Agreement states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York."  2004 Agreement at ¶ 30.  The 2010 Letter Agreement incorporates the New York choice-of-law provision of the 2004 Agreement.  2010 Letter Agreement at ¶ 11.

Although the 2002 RTC Agreement states that Colorado law shall apply—and no choice-of-law principle contravenes that express designation—both sides have briefed the issues at all stages of the proceedings on the assumption that New York law applies to each of the agreements.  Because Colorado law is substantively different from New York law, particularly with respect to the types of damages available for a breach of contract, it would be prejudicial to the parties to apply Colorado law without any briefing on Colorado law.  The Court therefore applies New York law to construe the 2002 RTC Agreement because, through their course of conduct, the parties appear to have waived the provision of the 2002 RTC Agreement that specifies that Colorado law shall apply.

*See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1267 (9th Cir. 2006) (California law applied in spite of a Massachusetts choice-of-law clause provision because "the parties through their course of conduct have waived the provision of the agreement that specifies the application of Massachusetts law.").

### C.   The Challenged Products and Features

#### 1.   The Hopper and the Hopper with Sling

In January of 2012, DISH announced the Hopper "Whole Home" High Definition DVR to its subscribers. Minnick Decl. at ¶ 12. One year later, in January of 2013, DISH debuted the "Hopper with Sling," which is DISH's next-generation Hopper. Minnick Decl. at ¶ 13; Fox GDMF at ¶ 76. The new Hopper includes a faster processor, built-in wireless capability, built-in Sling functionality, PTAT with AutoHop, and Hopper Transfers. Fox GDMF at ¶ 78. Sling and Hopper Transfers were new features first introduced at that time. Declaration of David Kummer In Support of Defendants' Motion for Summary Judgment ("Kummer Decl.") at ¶ 14. [Doc. # 500.]

#### 2.   Sling Technology

DISH offers various products, including the "Hopper with Sling," that make use of "Sling" technology. DISH Reply GDMF at ¶ 157; Kummer Decl. at ¶ 5. Sling technology allows consumers to view television content from their home STBs over the Internet by use of a device that communicates using Internet protocols, such as a laptop, tablet, or smartphone. DISH Reply GDMF at ¶ 85.

Sling technology involves the use of both hardware and software. DISH Reply GDMF at ¶ 86. The Sling hardware is a computer chip that rapidly "transcodes" small packets of audiovisual data from either the live satellite signal coming off of the Hopper tuner or from a pre-existing Hopper DVR recording. *Id.* at ¶ 87. Using the Sling hardware together with the Sling software loaded on a tablet, smartphone, laptop, or personal computer, the subscriber can send the television content to herself to watch in another location. *Id.* at ¶ 85. Sling can only be used by a subscriber to gain access to her

own home STB/DVR and the content on that box, either live or recorded.  DISH Reply Fox GDMF at ¶ 90.  The programming content to which DISH subscribers have access using Sling is that which they have already received via their DISH subscription.  *Id.* at ¶ 105.

DISH has a "SlingService Services Agreement" with Sling Media, Inc., which is owned by EchoStar.  DISH Reply SAMF at ¶ 141. ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ *Id.* at ¶ 143. █████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*Id.* at ¶ 146. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ *Id.* at ¶ 147. ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* at ¶ 148.

It is undisputed that the Sling process or architecture that enables DISH subscribers to watch live TV on DISH Anywhere requires the operation of various servers and equipment located outside the home.  *Id.* at ¶ 149.  The parties dispute whether, when a subscriber requests television content using DISH Anywhere, the programming travels entirely "point-to-point" over the Internet or home WiFi from the subscriber's STB to her Internet-connected device without any assistance from DISH's, EchoStar's, or Sling Media's external equipment and technicians, or whether that external equipment and those technicians are necessary for DISH Anywhere to function.  *See* DISH Reply GDMF at ¶¶ 88-89, 91-92; DISH GDMF at ¶¶ 35-55.  For example, in his August 15, 2014

Deposition, David Kummer, EchoStar's Chief Technology Officer and Rule 30(b)(6) witness, agreed that █████████████████████████████████████████████ ████████████████████████████████ Declaration of Amy M. Gallegos in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Gallegos Opp. Decl."), Ex. 28, Transcript of August 15, 2014 Deposition of David Kummer ("Kummer Tr.") at 49:24-50:2.  [536-1.] ████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████████████  Kummer also stated that ██ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████  *Id*. at 114:17-22.  In his October 17, 2014 Declaration, however, Kummer stated that ██████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████  Kummer Decl. at ¶ 30.  He also stated that, "[t]he audio/video content on the STB travels point-to-point from the source to the consumer's Internet-connected device using standard TCP/IP and UDP/IP communication point-to-point protocol, through whichever Internet service provider (or providers) the consumer is using in each location."  *Id*. at ¶ 28.  "Directions from the customer for channel changes and fast-forward or rewind functionality also travel point-to-point, without any interaction from Sling."  *Id*. ███████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████  *Id*.

-11-

It is undisputed that ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████[5]   DISH Reply

GDMF at ¶ 93; Kummer Decl. at ¶¶ 26, 28-29 ██████████████████

████████████████████████████████████████████████

### 3.     DISH Anywhere

DISH Anywhere refers to Sling technology that enables subscribers who have either a Hopper with Sling or a Sling Adapter to access live and recorded programming from their STBs remotely on computers and mobile devices.  DISH Reply SAMF at ¶¶ 121, 133; Fox GDMF at ¶ 85; Shull Decl. at ¶ 32.  In its quick-start features guide for the Hopper with Sling, DISH states that "[o]nly Dish Anywhere lets you access all of your live TV channels . . . while on the go via your Internet-connected smartphone, computer, or tablet."  DISH Reply SAMF at ¶ 121.

To use DISH Anywhere, a subscriber must either log in to DISHAnywhere.com on a personal computer and download a browser extension called SlingPlayer or download the free DISH Anywhere app for a tablet or smartphone.  DISH Reply SAMF at ¶ 135.  The subscriber may then send herself live or recorded television on her computer or mobile device.  *Id.* at ¶ 135.  When a DISH subscriber logs into the DISH Anywhere website and clicks "Live TV," she will see a progress bar that shows the process of

-----

[5] DISH disputes this fact stating that the "characterization of a 'Dish Anywhere video stream' is disputed, because the video comes from the subscriber's Sling-enabled home STB, not DISH Anywhere, and is initiated by the subscriber, at the subscriber's direction."  DISH GDMF at ¶ 44.  This does not create a genuine dispute as to the fact that ████████████████████████████████ ████████████████████████████████████

sending the video to the transcoder, starting to transcode, sending the information to the client, buffering it, and then starting to display it to the end user. *Id.* at ¶ 133.

A subscriber need only create an online ID and download the SlingPlayer once. *Id.* at ¶ 137. A subscriber who is not in good standing with DISH because she has not paid her bill (or multiple bills) cannot use the Hopper with Sling to activate DISH Anywhere. DISH GDMF at ¶ 20.

DISH subscribers can *stream* certain live programming (as opposed to viewing via a Sling-enabled STB, as described above) of certain cable television networks—but *not* Fox programming—on the DISHAnywhere.com website under the "Shows" tab. DISH GDMF at ¶ 198; DISH Reply SAMF at ¶ 140. The networks available for live streaming include USA, MSNBC and others, but not Fox. *Id.* at ¶ 139. This programming stream does originate from centralized servers, but does not involve Sling technology or require a Sling-enabled STB. Kummer Opp. Decl. at ¶ 24.

### 4. Hopper Transfers

The Hopper with Sling incorporates a feature originally called Hopper Transfers, now incorporated within the DISH Anywhere mobile application ("app"). Declaration of Paul Horowitz in Support of Defendants' Motion for Summary Judgment ("Horowitz Decl.") at ¶ 122. [Doc. # 504.] Hopper Transfers is a feature that allows DISH subscribers, using the DISH Anywhere app, to copy recordings that are saved on their Hopper DVRs to their mobile devices and play them back at any location, even if the mobile device is not connected to the Internet. DISH Reply GDMF at ¶ 107. Copies on the mobile device will not play if the device has not contacted the DISH Anywhere site for 30 days. *Id.* at ¶ 111. █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ DISH Reply SAMF at ¶ 315. There are some types of DVR recordings that

-13-

can only be transferred once (*i.e.*, HBO content), after which the original recording will be deleted from the Hopper.  *Id.* at ¶ 313.

### 5.     PTAT with AutoHop

#### a.     PTAT

The Hopper with PTAT was first announced on January 9, 2012, and first became available to subscribers on March 15, 2012.  FOX GDMF at ¶ 6.  A subscriber may use PTAT to set a single timer on the Hopper to record all of the primetime programming shown on any or all of the four major broadcast networks any or all nights of the week.  DISH Reply GDMF at ¶ 13;[6] Minnick Decl. at ¶ 24.

The PTAT recordings are made in approximately three-hour blocks, depending on the night, and not on a show-by-show basis.  DISH Reply GDMF at ¶ 20.[7]  If a primetime show is preempted by local breaking news or a Presidential address, the Hopper will record exactly what is aired during primetime in that local television market.  DISH Reply GDMF at ¶ 22.

Recordings made with the PTAT feature will be saved for up to eight days and will be deleted after that time, unless the subscriber decides to save the PTAT recording for a longer period of time in her "My Recordings" folder.  DISH GDMF at ¶¶ 63-64; DISH Reply GDMF at ¶ 14.   The PTAT recording settings cannot be changed while the

---

[6] Fox disputes this fact stating that, "[b]y default, every day of the week is selected to be recorded.  PTAT users only have the ability to de-select which nights of the week to record within the parameters set by Dish, ██████████████████████████████," DISH Reply GDMF at ¶ 13.  This does not create a genuine dispute as to the fact that subscribers can choose which nights of the week to record on any or all of the four major broadcast networks.

[7] Fox disputes this fact, stating that "EchoStar designed the PTAT software to identify as 'Prime Time' any program that is fifty percent within the 'PrimeTime Anytime Window.'  If a primetime show on any one of the big four networks is marked as a PTAT recording but extends beyond the primetime window, PTAT will continue to record all four networks until the end of the last event."  DISH Reply GDMF at ¶ 20.  This does not create a genuine dispute as to the fact that recordings are made in *approximately* three-hour blocks, or that they are not on a show-by-show basis.

-14-

recordings are in progress, or fifteen minutes before the PTAT recordings are scheduled to begin.  DISH Reply SAMF at ¶ 203.

### b.  AutoHop

The AutoHop feature of PTAT was announced and first provided to DISH subscribers on May 10, 2012.  Fox GDMF at ¶ 46.  Using AutoHop, users can choose to automatically skip commercials while playing back certain recorded shows.  *Id*. at ¶ 65.

AutoHop works when an announcement file is sent from DISH to the user's STB with a timestamp for the end of each program segment and the beginning of the next. DISH Reply GDMF at ¶ 65.

If AutoHop is available for a recorded program, an "Enable AutoHop" pop-up screen appears that states, "You can automatically hop over this event's commercial breaks.  Would you like to enable AutoHop for this event?"  Fox GDMF at ¶ 49.  If the user clicks "yes," she can watch the recorded show without the commercials.  *Id*. at ¶ 51. At the end of each segment of a show, when a viewer would ordinarily see a commercial break, the recording will automatically skip ahead to the beginning of the next show segment.  *Id*.  The commercials are not removed from the recordings viewed with AutoHop, and the recorded files are not altered in any way.  *Id*. at ¶¶ 53-54.[8]

### c.  The Quality Assurance Copies

Until November 14, 2012,[9] EchoStar employees performed Quality Assurance ("QA") testing on DISH's AutoHop feature before delivering the announcement files to

---

[8] Fox disputes this fact, stating that "AutoHop only works with PTAT, and Dish causes the PTAT copies to be made."  Fox GDMF at ¶¶ 53-54.  This does not create a genuine dispute as to whether the commercials remain present in the recordings.

[9] EchoStar used two different types of copies to test and develop AutoHop:  copies made using ███████ and copies of primetime programming broadcast from Kentucky, Pittsburgh, and Jacksonville, Florida ("Kentucky-Pittsburgh-Jacksonville copies") to test the effectiveness of the AutoHop marking process.  DISH GDMF at ¶¶ 145-152.  It is undisputed that EchoStar ██████████████████

-15-

the DISH subscribers' Hoppers to manually confirm the time-stamps in the announcement files.  Fox GDMF at ¶ 66; DISH GDMF at ¶ 152; Declaration of Steven M. Casagrande in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Casagrande Opp. Decl.") at ¶¶ 34-35.  [Doc. # 457.]  EchoStar began testing AutoHop with primetime programming in December of 2008, and by March 17, 2011, EchoStar was testing AutoHop on all primetime events on the four major networks, including Fox.  DISH GDMF at ¶¶ 146-47.

The QA Hopper DVRs recorded the full primetime schedule on each major network, including Fox.  Minnick Decl. at ¶ 87.  The QA copies were used to mark the start and stop time of the show's segments, in order to allow users to skip commercials, and to quality-test the functionality of AutoHop.  *Id.*  The copies were used exclusively for testing the AutoHop announcement files and never distributed to any customer.  Fox GDMF at ¶ 68.[10]

---

█████████ stopped making the Kentucky-Pittsburgh-Jacksonville copies on November 14, 2012.  *Id*. at ¶¶ 149, 152.

[10] Fox disputes this fact, stating that "[t]he copies made during the quality-assurance process were necessary to ensure the overall function of AutoHop, which is distributed to Dish's subscribers every day."  Fox GDMF at ¶ 68.  This does not create a genuine dispute as to the fact that the QA copies themselves were not distributed to customers.

-16-

### D.     The Market for Fox's Programming[11]

Fox has licensed the right to livestream Fox Network programing over the Internet to certain other MVPDs, including ██████████████████████████. DISH Reply SAMF at ¶ 436.  Brennan Decl. at ¶ 16; Declaration of Benjamin (B.J.) Elias in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Elias Opp. Decl.") at ¶ 13.  [Doc. # 437-18].  There is a genuine dispute as to ████ ████████████████████████████████████████████████████████████████ ████████████████████.[12]  *See* DISH Reply SAMF at ¶ 436.

Fox also licenses third parties (such as Apple, Amazon, Vudu, and Microsoft) the right to distribute its programs in a commercial-free, downloadable format, which is typically available the day after a program airs on television and viewable on mobile devices, personal computers, or certain Internet-connected TVs.  DISH Reply SAMF at ¶ 23.[13]  Fox makes its programs available for free, with commercials, eight days after they

---

[11] DISH makes a variety of objections to Fox's market harm evidence on the basis that Fox failed to properly disclose this evidence during the discovery period.  *See* Defendants' Evidentiary Objections to Declarations and Exhibits Offered by Plaintiffs in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("DISH Obj. to Evid.") [Doc. # 527]; Defendants' Statement of Correction re: Defendants' Evidentiary Objections to Declarations and Exhibits Offered by Plaintiffs in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Statement of Correction") [Doc. # 556].  On the basis of Fox's responses to evidentiary objections [Doc. ## 529, 553] and Fox's Response to the Court's Order Seeking Clarification re: Defendants' Motion for Review of Magistrate Judge's Order [Doc. # 546], the Court is satisfied that Fox produced adequate evidence related to market harm during the discovery period to permit it to rely on that evidence now.

[12] DISH points to media license agreements between Fox and MVPDs that include the right to livestream Fox programming over the Internet █████████████████  DISH Reply SAMF at ¶ 436; Elias Opp. Decl. ¶¶ 13-14; Biard Opp. Decl., Ex. 20 at 457 ¶ 10 ██████████████ ██████████████████████████████████████████████████████████████  ██████████████████████████████████████████████████████████████ "  DISH Reply SAMF at ¶ 436.

[13] DISH asserts that Fox has failed to respond to relevant interrogatories, denying DISH the opportunity to more fully analyze Fox's purported fact, but does not dispute that Fox licenses the right to distribute certain programs to third parties in a commercial-free, downloadable format.  DISH Reply SAMF at ¶ 23.

air, on approved Internet-streaming websites such as fox.com and hulu.com. *Id.* at ¶ 24. Viewing is limited to personal computers and the fast forward functionality is disabled during commercials. *Id.* Fox sells advertising for online VOD services where consumers are able to watch a library of previously-aired Fox Programs over the Internet or on mobile devices. *Id.* at ¶ 25.

### III.
### LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he

---

Fox does not specify whether the programs it distributes in a commercial-free downloadable format are primetime shows, but the Court assumes that they are that they are unless the parties state otherwise. *See* Brennan Decl. at ¶¶ 2, 17(d).

inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## IV.
## DISCUSSION

Viewing the evidence in the light most favorable to the non-moving party, the Court addresses whether summary judgment is appropriate as to any of Fox's claims below.

### A.     DISH Anywhere

#### 1.     Copyright Claim:  Right of Public Performance

Fox contends that DISH has publicly performed Fox's copyrighted works by streaming them over the Internet to DISH subscribers using DISH Anywhere with Sling. The Copyright Act grants the owner of a copyright the "exclusive right" to "perform the copyrighted work publicly."   17 U.S.C. § 106(4).   Section 101 of the Copyright Act defines the relevant terms:

> To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.  17 U.S.C. § 101.

> To "transmit" a performance is to communicate [a work] by any device or process whereby images or sounds are received beyond the place from which they are sent.  *Id.*

> To perform a work "publicly" is to transmit or otherwise communicate a performance or display of the work to . . . the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times [the "Transmit Clause"].  *Id.*

For the Transmit Clause to apply, there must be (1) a transmission or other communication; (2) of a performance of a work; (3) to the public.  Not all transmissions

-19-

are performances, and not all performances are transmissions. *See United States v. Am. Soc. of Composers, Authors, Publishers*, 627 F.3d 64, 74 (2d Cir. 2010) ("transmittal without a performance does not constitute a 'public performance.'").

It is undisputed that, under the 2002 RTC Agreement, DISH has the right to retransmit Fox programming to its subscribers via satellite.  DISH Reply GDMF at ¶ 129.  This initial transmission clearly constitutes a public performance under the Copyright Act in that DISH (1) shows images and sounds from an audiovisual work; (2) beyond the place from which they are sent; (3) to a large number of people outside of a normal circle of family and friends.  *See id.* at ¶ 120 (DISH delivers satellite service to millions of subscribers).  DISH has a valid license for this initial public performance.  *Id.* at ¶ 129.  The salient question is whether any of the additional products or features that DISH offers to its subscribers—DISH Anywhere with Sling Technology, in particular—constitute a public performance that infringes on Fox's exclusive copyrights.

### a.   DISH Anywhere Does Not "Publicly Perform" Fox's Copyrighted Works

Fox contends that the Supreme Court's recent decision in *American Broadcasting Companies, Inc. v. Aereo, Inc.* is a game-changer that governs the outcome of its copyright claims in this case.  The Court disagrees.

In *Aereo*, the Supreme Court held that Aereo, a service which streamed broadcast television programming to subscribers over the Internet, "publicly performed" the programming as defined by the Transmit Clause.  __ U.S. __, 134 S. Ct. 2498, 2503, 189 L. Ed. 2d 476 (2014).  Aereo neither owned the copyright to the broadcast works nor held a license from the copyright owners to perform those works publicly.  *Id.*

The Court described Aereo's service as follows:

> When a subscriber wants to watch a show that is currently airing, he selects a show from a menu on Aereo's website.  Aereo's system, which consists of thousands of small antennas and other equipment housed in a centralized warehouse, responds roughly as follows:  A

server tunes an antenna, which is dedicated to the use of one subscriber alone, to the broadcast carrying the selected show. A transcoder translates the signals received by the antenna into data that can be transmitted over the Internet. A server saves the data in the subscriber-specific folder on Aereo's hard drive and begins streaming the show to the subscribers' screen once several seconds of programming have been saved. The streaming continues, a few seconds behind the over-the-air broadcast, until the subscriber has received the entire show.

*Aereo*, 134 S. Ct. at 2500.

The Supreme Court determined that Aereo "performed" the copyrighted material. *Id*. at 2501. It noted that, "[c]onsidered alone, the language of the Act does not clearly indicate when an entity 'performs' (or 'transmits') and when it merely supplies equipment that allows others to do so." *Id*. at 2504. The *Aereo* Court, therefore, looked to the history of the Copyright Act and, in particular, to the 1976 amendment intended to clarify that "community antenna television" ("CATV") providers are covered by the Act. *Id*. This amendment "ma[de] clear that an entity that *acts like* a CATV system itself performs, even when it simply enhances viewers' ability to receive broadcast television signals." *Id*. (emphasis added).

Unlike traditional cable services, "Aereo's system remained inert until a subscriber indicate[d] that she want[ed] to watch a program." *Id*. at 2507. This fact did not alter the Court's conclusion that Aereo performed, "given Aereo's overwhelming likeness to the cable companies." *Id*. at 2507. The Court noted that "[i]n other cases involving different kinds of service or technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act." *Id*. In an effort to cabin the potential overreach of its decision, however, the Court specifically cautioned that its "limited holding" should not be construed to "discourage or to control the emergence or use of different kinds of technologies." *Id*. at 2510. The Court specifically reserved

-21-

"questions involving cloud computing, remote storage DVRs, and other novel issues not before the Court, as to which Congress has not plainly marked the course," as not before the Court. *Id.* at 2510 (internal quotation marks omitted).

The Supreme Court did not expressly address the general volitional conduct requirement for direct liability under the Copyright Act. The volitional conduct doctrine is a significant and long-standing rule, adopted by all Courts of Appeal to have considered it, and it would be folly to presume that *Aereo* categorically jettisoned it by implication. *See Fox Broadcasting Co. v. Dish Network, LLC*, 723 F.3d 1067, 1073-1074 (9th Cir. 2013) (infringement requires "copying *by* the defendant"); *Cartoon Network LP, LLP v. CSC Holdings*, *Inc. ("Cablevision")*, 536 F.3d 121, 131 (2d Cir. 2008) ("volitional conduct is an important element of direct liability"); *Parker v. Google*, 242 Fed. App'x 833, 837 (3d Cir. 2007) (plaintiff does not state a claim of direct copyright infringement because plaintiff "failed to assert any volitional conduct"); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) ("The Copyright Act . . . describ[es] only the party who *actually engages* in infringing conduct—the one who directly violates the prohibitions") (emphasis in original).

The *Aereo* majority's analysis can be reconciled with the volitional-conduct requirement for direct infringement. The *Aereo* Court distinguishes between an entity that "engages in activities like Aereo's" and one that "merely supplies equipment that allows others to do so." *Id.* at 2504. The Court held that a sufficient likeness to a cable company amounts to a presumption of direct performance, but the distinction between active and passive participation remains a central part of the analysis of an alleged infringement.

The *Aereo* Court cited three points of comparison that established Aereo's "overwhelming likeness" to traditional cable providers: (1) Aereo sold a service that allowed subscribers to watch television programs almost as they were being broadcast; (2) Aereo used its own equipment, housed in a centralized warehouse, outside of its

-22-

users' homes; and (3) by means of its technology (antennas, transcoders, and servers), Aereo's system received programs that had been released to the public and carried them by private channels to the additional viewers.  134 S. Ct. at 2506.

DISH Anywhere also allows subscribers to watch television programs almost as they are being broadcast.  *See* DISH Reply SAMF at ¶ 130 (subscribers can watch live broadcast programming using DISH Anywhere).   DISH Anywhere depends on equipment and technology both inside and outside of the user's home.  DISH Reply SAMF at ¶ 149 (DISH Anywhere requires the operation of various servers and equipment located outside the subscriber's home); ¶ 133 (a DISH subscriber must have either a Hopper with Sling or a Sling Adapter in her home in order to use DISH Anywhere).

DISH does not, however, receive programs that have been released to the public and then carry them by private channels to additional viewers in the same sense that Aereo did.   DISH has a *license* for the analogous initial retransmission of the programming to users via satellite.  DISH Reply GDMF at ¶ 129.  Aereo streamed a subscriber-specific copy of its programing *from Aereo's hard drive* to the subscriber's screen via individual satellite when the subscriber requested it, whereas DISH Anywhere can only be used by a subscriber to gain access to *her own home STB/DVR* and the authorized recorded content on that box.  *Aereo*, 134 S. Ct. at 2500; DISH Reply Fox GDMF at ¶¶ 90, 105 (emphasis added).  Any subsequent transfer of the programming by DISH Anywhere takes place after the subscriber has validly received it, whereas Aereo transmitted its programming to subscribers directly, without a license to do so.

Once the DISH subscribers receive the authorized programming, DISH Anywhere facilitates the transfer of those recordings in the STB/DVR to other devices owned by the subscriber.   While the parties dispute the extent to which external equipment and employees are involved in this transfer process, there is no material dispute that— █████ ████████████████████████████████████████████████████████ █████████████████████████████████████ the programming does not *originate* from

-23-

the external servers.   The ultimate function of DISH Anywhere is to transmit programming that is already legitimately on a user's in-home hardware to a user's Internet-connected mobile device.   Relying on external servers and equipment to ensure that content travels between those devices properly does not transform that service into a traditional cable company.   *Aereo*'s holding that entities bearing an "overwhelming likeness" to cable companies publicly perform within the meaning of the Transmit Clause does not extend to DISH Anywhere.

### b.   Direct Infringement:   DISH Does Not Engage in Volitional Conduct to Infringe

As discussed above, volitional conduct remains the touchstone of direct infringement.   If any public performance occurs when subscribers use DISH Anywhere, DISH may be directly liable if it engages in sufficient volitional conduct enabling that performance.   As the Ninth Circuit noted at the preliminary injunction stage in this case, direct infringement turns on *who* commits the infringement.   *Fox Broadcasting*, 723 F.3d at 1074.   "[O]perating a system . . . at the user's command does not mean that the system operator, rather than the user, caused the [infringement]."   *Id.*; *see also Cablevision*, 536 F.3d at 131 ("a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct."); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1168 (C.D. Cal. 2002) (defendants must *actively engage* in one of the activities recognized in the Copyright Act) (emphasis in original).

To use DISH Anywhere, a subscriber must create an online ID and download the SlingPlayer.   DISH's system verifies the subscriber's log-in information, and verifies that the subscriber is in good standing and has paid her bills.   The subscriber logs in to DISH Anywhere or opens the DISH Anywhere app, selects the television program she would like to watch, and requests that the live or recorded television programming be sent from

the STB in her home to her computer or mobile device.  The programming either travels "point-to-point" between the STB and the mobile device ███████████████ ████████████████████████████████████████████████.  This process depends to some extent on external equipment and services provided by DISH, but it is the user who initiates the process, selects the content, and receives the transmission.  No DISH employee actively responds to the user's specific request or directly intervenes in the process of sending the programming between the devices.  *See, e.g.*, DISH Reply SAMF at ¶ 143 (EchoStar employees provide user interface, software infrastructure, and server support and maintenance).  DISH subscribers, not DISH, engage in the volitional conduct necessary for any direct infringement.

### c. Secondary Infringement: DISH Subscribers do not "Publicly" Perform by using DISH Anywhere

DISH may still be liable for secondary liability if its users are engaging in direct infringement by using DISH Anywhere.  "One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d 781 (2005); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007).  There can be no secondary infringement without primary infringement.  *Grokster*, 545 U.S. at 930, 940; *Perfect 10*, 508 F.3d at 1169 ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.") (internal citation and quotation marks omitted).

DISH Anywhere users "transmit" a "performance" within the meaning of Section 101 of the Copyright Act, in that they use a device or process to transmit images and sounds from audiovisual work beyond the place from which they are sent.  The remaining question is whether they perform a copyrighted work "publicly."

In rejecting Aereo's argument that it did not transmit a performance "to the public," the *Aereo* Court noted that nothing in the record before it suggested that the subscribers received the performances "in their capacities as owners or possessors of the underlying works," and that this factor could affect whether or not the subscribers constituted "the public."  134 S. Ct. at 2510.

DISH subscribers are not "owners" of the copyrighted programming.  DISH has expressly disclaimed any ownership rights in the underlying programming, and agreed to various restrictions on its use of the material as a condition of the license.  DISH is a licensee, and therefore cannot transfer title or ownership to its subscribers.

DISH subscribers are, however, valid "possessors" of the copyrighted works that are stored in the STB in their home.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 456, 104 S. Ct. 774, 795, 78 L. Ed. 2d 574 (1984); *see also Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1112 (9th Cir. 2010) (noting that some users "rightfully possess, but do not own, a copy of copyrighted [material].").  DISH has a valid license and is permitted to transmit Fox programming to subscribers accordingly.

When an individual DISH subscriber transmits programming *rightfully in her possession* to another device, that transmission does not travel to "a large number of people who are unknown to each other."  The transmission travels either to the subscriber herself or to someone in her household using an authenticated device.  This is simply not a "public" performance within the meaning of the Transmit Clause.  Because DISH Anywhere subscribers do not directly infringe the public performance right, DISH cannot be liable for secondary infringement.

The Court **GRANTS** DISH's motion for summary judgment as to the claim for copyright infringement by DISH Anywhere with Sling and **DENIES** Fox's motion for partial summary judgment as to the same.

-26-

### 2. Contract Claims

#### a. DISH Anywhere Does Not Breach the Other Technologies Provision of the 2010 Letter Agreement

The 2010 Letter Agreement states that ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████ [hereinafter "Other Technologies Provision"]. Fox contends that DISH is "distributing" Fox's programming over the Internet in breach of the Other Technologies Provision of the 2010 Letter by providing subscribers with DISH Anywhere with Sling. Fox MSJ at 8, 19.

Under New York law, courts determine the meaning of a contract by "looking within the four corners of the document, not to outside sources." *Kass v. Kass*, 91 N.Y.2d 554, 566, 696 N.E.2d 174, 180-81 (1998). "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, No. 156, 2014 WL 5365605, at *2 (N.Y. Oct. 23, 2014). Clear and unambiguous terms should be understood in their plain, ordinary, and non-technical meaning. *DDS Partners, LLC v. Celenza*, 775 N.Y.S.2d 319, 321, 6 A.D.3d 347, 348 (App. Div. 2004). "[E]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *Golden Gate Yacht Club v. Societe Nautique De Geneve*, 12 N.Y.3d 248, 256, 907 N.E.2d 276, 281 (2009).

"Where a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436, 986 N.E.2d 430, 433-34 (2013) (internal citations and quotation marks omitted); *see also Schron v. Grunstein*, 917 N.Y.S.2d 820, 825, 32 Misc. 3d 231, 236

(Sup. Ct. 2011), *aff'd sub nom. Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 986 N.E.2d 430 (2013) (agreements containing merger provision evidence an intent of the parties that full application of the parol evidence rule is appropriate to bar the introduction of extrinsic evidence to vary, contradict, or add to the terms of the writing).

Under the parol evidence rule, "conversations, negotiations, and agreements made by the parties either prior to or contemporaneously with the execution of a written lease are considered as having been merged in the final written instrument, and . . . therefore, parol or extrinsic evidence in relation to such conversations, negotiations, and antecedent or contemporaneous agreements cannot be admitted in evidence for the purpose of attempting to vary or contradict an unambiguous written [agreement]." *Deutsche Bank Nat. Trust Co. v. Debonis*, 22 Misc. 3d 1128(A), 880 N.Y.S.2d 872 (2009) (internal citations and quotation marks omitted); *see also N. Fork Bank & Trust Co. v. Bernstein & Gershman*, 607 N.Y.S.2d 135, 136, 201 A.D.2d 472, 472-73 (App. Div. 1994) ("[t]o the extent that the defendants relied upon prior or contemporaneous negotiations with the plaintiff at the time of the execution of the notes and guarantees in order to vary the terms of those documents, such assertions violated the parol evidence rule"); *Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 533, 992 N.Y.S.2d 178, 181 (2014) (emails between the parties and earlier drafts of the agreement considered parol evidence).

Both sides offer extensive and much-disputed parol evidence regarding the negotiations of the Other Technologies Provision, and, in particular, whether the provision was intended to permit or prohibit the use of Sling technology. *See, e.g.*, DISH Reply GDMF at ¶¶ 161-170; DISH Reply SAMF at ¶¶ 52-68. Because the 2010 Letter Agreement has a merger clause [*see* ¶ 13], the parol evidence rule must be strictly applied. Therefore, no evidence of conversations, negotiations, and agreements made by the parties either prior to or contemporaneously with the execution of the Agreement are admissible to vary, add to, or contradict the terms of the Agreement.

Here, the only terms genuinely at issue are ███████████████

███████ and ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████.[14]   The Court must

therefore look to the four corners and the plain meaning of the words of the Agreement to

determine its meaning.

It is undisputed that DISH Anywhere with Sling makes use of the Internet.  DISH

Reply SAMF at ¶ 53.   The remaining questions are therefore (1) whether DISH

Anywhere "distributes" or "retransmits" Fox's programming, (2) whether DISH or

DISH's subscribers do the retransmitting or distributing, and (3) what it means that

████████████████████████████████████████

["Applicable Law Clause"].

### i.      DISH      Anywhere      Users      Retransmit      Fox's Programming

Merriam-Webster defines "transmit" as:  "to send (information, sound, etc.) in the

form of electrical signals to a radio, television, computer, etc." or "to give or pass

(information, values, etc.) from one person to another."      http://www.merriam-

webster.com/dictionary/transmit (last visited January 7, 2015).  Black's Law Dictionary

defines "transmit" as "to send or transfer (a thing) from one person or place to another."

Black's Law Dictionary (9th ed. 2009).  Macmillan Dictionary defines "re-" as a prefix

meaning "again" that is "used with many verbs, nouns, or adjectives."

---

[14] The parties dispute whether the press release attached to the 2010 Letter is part of the Agreement.  DISH Reply Fox's GDMF at ¶ 167.  Whether the press release may be considered part of the Agreement or not, the Court is not persuaded that the mere mention of the existence of Sling technology in the fine print of the description of DISH at the very end of the press release is relevant to the interpretation of the disputed terms in the Other Technologies Provision and whether the contract permits DISH to use Sling with Fox's programming specifically.

-29-

http://www.macmillandictionary.com/us/dictionary/american/re_9 (last visited January 7, 2015).

As discussed above, under the Copyright Act, "transmit" means to "communicate [a work] by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. While statutory definitions do not definitively govern the interpretation of terms in a private agreement, the meaning of a term within an applicable body of law can guide a court in determining a contract term's unambiguous meaning. *See Madison Ave. Leasehold, LLC v. Madison Bentley Associates LLC*, 811 N.Y.S.2d 47, 53, 30 A.D.3d 1, 8 (App. Div. 2006), *aff'd*, 8 N.Y.3d 59 (2006) (in interpreting a contract term, the reasonable expectations of parties to an agreement will be interpreted with reference to existing law at the time the agreement was made); *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 265 (S.D.N.Y. 2004) (New York law presumes that contracts, especially those drawn by attorneys, are concluded with reference to applicable law); *see also Mayo v. Royal Ins. Co. of Am.*, 662 N.Y.S.2d 654, 655 (App. Div. 1997) ("unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in the light of such law."); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 198, 36 N.E.2d 106 (1941) (the sense in which words were used in a contract is to be determined by the applicable law).

DISH argues that "retransmission" is used in the agreement to mean a "DBS-based multicast," and "Sling is not a DBS multicast." DISH GDMF at 158, DISH's Responses to Fox's Conclusions of Law ("DISH Response COL") at ¶ 4. Nothing in the Agreement, however, expressly limits "retransmit" to the context of a DBS-based multicast. Indeed, the Other Technologies Provision at issue here ███████████████████ ███████████████████████████████████ It is not logical to interpret

retransmission as applying only to DBS-based satellite transmission (which is permitted by the Agreement[15]) in the context of language that ██████████████████ ████████████████████████████████████

Applying the plain and ordinary meaning of the term "retransmit," DISH Anywhere "retransmits" Fox's programming. The fundamental purpose of DISH Anywhere is to transfer programming from one device to another device in a different location, communicating sounds and images by sending electrical signals to a computer or mobile device.

The remaining question, however, is whether it is DISH or the DISH subscriber who is doing the retransmission. It is undisputed that to use DISH Anywhere, a subscriber must log in to DISH Anywhere or open the DISH Anywhere app, select the television program she would like to watch, and send herself the live or recorded television programming on her computer or mobile device. DISH Reply SAMF at ¶¶ 133-135. This process depends to some extent on external equipment and services provided by DISH, but it is the user who initiates the process, makes her selection, and receives the selected transmission. DISH provides a system allowing the user to send a transmission to herself and provides support for that system, but it does not otherwise dictate the user's conduct. On this record, even when viewing the evidence in the light most favorable to Fox, the Court concludes that it is the DISH user, not DISH, who does the retransmitting.

ii.      **DISH Anywhere Does Not Distribute Fox Programming**

---

[15] *See* 2002 RTC Agreement at 1: "WHEREAS, [DISH] and Fox desire to have such broadcast stations' signals retransmitted over the Satellite Service; as used herein, 'Satellite Service' shall mean the direct broadcast satellite ('DBS') television distribution system. . . ."

-31-

Merriam-Webster defines "distribute" as "to give or deliver (something) to people," "to deliver (something) to a store or business," or "to divide (something) among the members of a group."   http://www.merriam-webster.com/dictionary/distribute (last visited January 7, 2015).   Black's Law Dictionary defines "distribute" as "1. To apportion; to divide among several.  2. To arrange by class or order.  3. To deliver.  4. To spread out; to disperse."  Black's Law Dictionary (9th ed. 2009).  Under the Copyright Act, distribution is defined as "actual dissemination of a copy" that "changes hands." *Fox Broadcasting Co., Inc. v. Dish Network, LCC,* 905 F. Supp.  2d 1088, 1106 (C.D. Cal. 2012), *aff'd,* 723 F.3d 1067 (9th Cir. 2013) (citing *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d at 1162).

According to any of the above-quoted dictionary or statutory definitions, the plain meaning of "distribute" is (1) to deliver (2) to multiple people or a group of people. While DISH Anywhere may facilitate delivery of programming to another device owned by the subscriber, it does not disseminate programming to a group of people.   The subscriber transmits the programming to herself or other members of her household who use the same authenticated device.  This does not constitute "distribution" under the plain meaning of the term.

### iii.        The Applicable Law Clause

DISH contends that the Applicable Law Clause means rights under the Copyright Act, "the 'applicable law' for so much of the parties' relationship."   DISH MSJ at 31. Fox does not appear to dispute this interpretation.  *See* Fox MSJ at 4 (asserting that because *Aereo* establishes that DISH Anywhere is a public performance in violation of the Copyright Act, DISH "cannot take refuge" in the "rights under applicable law" clause); Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Fox MSJ Opp.") at 12 [Doc. # 531.]   DISH contends that because "[a]pplicable law in 2010 recognized the fair use right of DISH's customers to place-shift for non-commercial purposes . . . [w]hether DISH or the subscriber uses Sling, *Sony* provides a fair use safe

harbor." DISH Response COL at ¶ 4. *See Sony*, 464 U.S. at 449-450; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001); *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999).

The Applicable Law Clause, however, refers to the clause directly preceding it, which prohibits *DISH* from retransmitting or distributing Fox programming over the Internet. It would be a *non sequitur* in this context to interpret the Applicable Law Clause to refer to the rights of DISH *subscribers* to time- and place-shift. The parties have not argued that place-shifting *by DISH* would be fair use, given that such conduct would be unlikely to be characterized as a "non-commercial" use. Neither party has offered a plausible interpretation regarding what legal rights of DISH, as opposed to those of the DISH subscriber, are reserved under the Applicable Law Clause that would not deprive the preceding clause of full force and meaning. *See Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 133 N.E.2d 688, 690 (1956) (rules of contract construction require courts, if possible, to adopt an interpretation that gives meaning to every provision of the contract and leaves no provision of a contract without force and effect).

In any event, as discussed above, the uncontroverted material facts show that DISH subscribers, rather than DISH itself, "retransmit" Fox's programming using DISH Anywhere, and that DISH Anywhere does not "distribute" Fox's programming. Therefore, even assuming the Applicable Law Clause preserves *subscribers'* rights to time- and place- shift from the effect of the preceding clause, it does not change the conclusion that DISH subscribers' use of DISH Anywhere does not breach the Other Technologies Provision.

DISH's motion for summary judgment as to this issue is **GRANTED** and Fox's motion for summary judgment as to this issue is **DENIED**.

-33-

### b.   DISH Anywhere Breaches The No Copying Provision of the 2002 RTC Agreement.

Section 9(a) of the 2002 RTC Agreement states that "[Dish] shall not, for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of the Stations' analog signal without prior written permission of the Station, except as is specifically permitted by this Agreement."   2002 Agreement at ¶ 9(a) ["No Copying Provision"].   Fox contends that DISH "authorizes" its subscribers to "retransmit" Fox's programming[16] when DISH's subscribers use DISH Anywhere.   Fox MSJ at 21.   Fox argues that, given the fact that only DISH subscribers who have paid DISH a subscription fee and logged into DISH's website can watch Fox programs using DISH Anywhere, DISH is "authorizing" them to do so.   Fox MSJ at 21.   As discussed above, DISH Anywhere users clearly "retransmit" Fox programming.   The Court finds that DISH also "authorizes" them to do so.

Black's Law Dictionary defines "authorize" as "to give legal authority; to empower" or "to formally approve; to sanction."   Black's Law Dictionary (9th ed. 2009). Merriam-Webster defines "authorize" as: "to give power or permission to (someone or something)" or "to give legal or official approval to or for (something)." http://www.merriam-webster.com/dictionary/authorize (last visited January 7, 2015).

DISH subscribers agree to a contract with DISH in which DISH provides them with equipment and services, and the subscribers make use of those features and products.   DISH Reply SAMF at ¶ 133; Fox GDMF at ¶ 85 (DISH Anywhere is a service available to DISH subscribers who have a Hopper with Sling or Sling Adapter).   DISH

---

[16]   Neither side argues that there is a distinction between "the Station's analog signal" and the programming contained therein, and the parties often use the terms interchangeably.   The Court assumes that when subscribers retransmit Fox's programming over DISH Anywhere, they are considered to be retransmitting Fox's "analog signal" in the sense it is used in the 2002 RTC Agreement.

"authorizes" its subscribers to use its products in their intended manner because it gives them the power to do so (by providing the equipment and services) and the permission to do so (by granting them status as subscribers for payment).  Conversely, non-DISH subscribers would not be "authorized" to use DISH Anywhere to retransmit Fox programming to their electronic devices.

The No Copying Provision includes a carve-out for "private home use" by consumers.  Thus, DISH subscribers may time- and place-shift Fox programming within the confines of their home.  DISH argues that the word "home" in the phrase "private home use" does not literally mean "inside the home," but rather "private noncommercial use of the sort done at home."  DISH MSJ Opp. at 30 (internal quotation marks omitted). The ordinary and unambiguous meaning of the words "private home use" belies this definition.  Use outside of the home may be "private noncommercial use," but it is not "home use."  The parties could have used the words "private noncommercial use," but chose to insert the words "home use."

Given our knowledge of current technologies, it may seem absurd that a contract would allow subscribers to use DISH Anywhere on their mobile devices inside the home, but not the moment they step outside the home.  Those are the terms, however, to which the parties agreed.   Courts must interpret a contract to give effect to the parties' reasonable expectations.  *Greater New York Mut. Ins. Co. v. Mut. Marine Office, Inc.*, 769 N.Y.S.2d 234, 239 (App. Div. 2003).  Nothing in the record suggests that, at the time the parties entered into the 2002 RTC Agreement, DISH possessed the technology allowing subscribers to make portable recordings of programming on mobile devices. *See,e.g.*, DISH Reply Fox GDMF (DISH first offered subscribers the ability to make portable recordings of programs in 2005).   The narrow exception to the general prohibition on copying was made with reference to the then-existing technologies, such as DVRs, which were used exclusively in the home.  *Evans v. Famous Music Corp*, 1 N.Y.3d 452, 458, 807 N.E.2d 869, 872 (2004) ("It is well settled that our role in

interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract.").  Had the parties wished to define the exception more broadly to include any private, non-commercial use, including future technologies not then contemplated, they could have explicitly done so.  The Court does not find that any subsequent amendments stripped out the explicit home use limitation in the No Copying Provision.

The plain language of the 2002 RTC Agreement prohibits all copying of Fox programming for any use other than private use in the home, *absent Fox's written permission*.  It is not genuinely disputed that DISH Anywhere permits users to retransmit Fox content to electronic devices for use outside of the home.  DISH Reply SAMF at ¶ 121 ("Only Dish Anywhere lets you access all of your live TV channels . . . while on the go via your Internet-connected smartphone, computer, or tablet.").  Devices like tablets, iPads, laptops, and smartphones are frequently used outside the home, and users are encouraged to "access" their live TV channels "on the go."  *Id*.  Fox did not give DISH its consent to offer this service to subscribers for use outside the home.

To the extent DISH authorizes its users to retransmit Fox programming for use outside of the home without Fox's consent, it has violated the No Copying Provision. New York law requires, however, a showing that there are damages flowing from a breach in order to state a claim for a breach of contract.  *J.P. Morgan Chase v. J.H. Elec. of New York, Inc.*, 893 N.Y.S.2d 237, 239 (App. Div. 2010).  Fox has adduced evidence to show that it charges third parties a licensing fee in a variety of contexts, including those that permit viewers to watch Fox programming on mobile devices at their own time and place of choice.  While DISH contests the validity of such analogies, there is certainly a triable issue of fact as to whether a reasonable royalty would have been charged for the exercise of such a right where the contract restricts it.

Fox's motion for partial summary judgment for DISH Anywhere's breach of the No Copying Provision is **DENIED** because there is a triable issue of fact as to the

-36-

damages flowing from the breach.  DISH's motion for summary judgment on the DISH Anywhere contract claim is also **DENIED**.

### B.   PTAT

#### 1.   Copyright Claims

A copyright holder has the exclusive right "to reproduce the copyrighted work in copies" or authorize the same ("Right of Reproduction").  17 U.S.C. § 106(1).  "Copies . . . are material objects, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 101. A copyright holder also has the exclusive right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 106(3).

##### a.   Direct Liability:   DISH Does Not Engage in Volitional Conduct Giving Rise to Liability for Direct Copyright Infringement.

PTAT makes recordings of the primetime programming on the four major networks automatically if a subscriber sets a timer assigning it to do so.  As the Ninth Circuit noted at the preliminary injunction phase, infringement of the reproduction right requires "copying *by* the defendant."  *Fox Broadcasting*, 747 F.3d at 1060.

The Ninth Circuit upheld this Court's earlier finding that the user, not DISH, makes the PTAT copies:

> Here, Dish's program creates the copy only in response to the user's command.  Therefore, the district court did not err in concluding that the user, not Dish, makes the copy.  That Dish decides how long copies are available for viewing, modifies the start and end times of the primetime block, and prevents a user from stopping a recording might be relevant to a secondary or perhaps even a direct infringement claim.  *Cf. Cablevision,* 536 F.3d at 132–33 (finding that factors evidencing Cablevision's control over copying process seemed "more relevant to the question of contributory liability" but reserving the question "whether one's contribution to the creation of an infringing copy may be so great

-37-

that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy"). But these facts do not establish that Dish made the copies.

*Fox Broadcasting,* 723 F.3d at 1067-68.

The current record reflects essentially the same facts about how PTAT works and how much control DISH has over the process as it did at the preliminary injunction stage. DISH subscribers can choose to enable PTAT, after which PTAT will automatically record the entire portion of the evening broadcast designated as "primetime" by DISH. Subscribers need not schedule individual recordings on a show-by-show basis, because PTAT defaults to record all four broadcast networks every night of the week for the entire primetime broadcasting block.[17] Subscribers may choose to designate fewer nights of the week or record only certain networks, but DISH establishes the default settings. The recordings will be saved for up to eight days and then automatically deleted unless a subscriber moves them to a separate folder to save. Subscribers cannot change the PTAT recording settings while the recordings are in progress, or fifteen minutes before the recordings are scheduled to begin.

Fox contends that *Aereo* has altered the test for direct infringement by rejecting the argument that only the subscriber who pushes the button initiating the infringing process is liable for direct infringement. Fox MSJ Opp. at 16. As discussed above, *Aereo* did not fundamentally alter the volitional conduct requirement for direct infringement. More than one actor may be liable for direct infringement, but there must still be some volitional conduct for direct liability. A system that operates automatically at a user's

---

[17] Fox argues that because DISH advertises that PTAT "does the work for you," that it provides "on demand access to all primetime television programs," and that subscribers will no longer have to "spend time finding your shows [and] setting recordings," DISH admits to having made the copies. DISH Reply SAMF at ¶¶ 205-206. The undisputed facts already establish how PTAT works. The language DISH uses to advertise the product is not dispositive, or even particularly probative, of how the technology actually functions or should be classified.

command to make a recording does not in itself render the system's provider a volitional actor for purposes of direct copyright infringement. *Fox Broadcasting*, 723 F.3d at 1074; *Cablevision*, 536 F.3d at 131. While DISH has set certain parameters and controls for PTAT, PTAT is essentially a more targeted version of a DVR that is set to make block recordings or recordings of an entire season of a show. The ability to set a DVR and then leave it to automatically record without having to select individual programs or set it repeatedly for each recording occasion is not unique to PTAT, and is not enough to show direct infringement by the service provider.

The analysis regarding the fact that DISH does not engage in volitional conduct in making the PTAT recordings applies equally to any direct infringement claim based upon "distribution." PTAT does not "distribute" Fox's programming or "transmit" any public performance under the meaning of the Copyright Act. Distribution under the Copyright Act requires "actual dissemination of a copy" that "changes hands." *Fox Broadcasting Co., Inc.*, 905 F. Supp. 2d at 1106. As discussed above regarding DISH Anywhere, transmission means "to communicate [a work] by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. PTAT is a system for automatically recording programming as it is being received by a subscriber's STB, inside the subscriber's home. Those recordings are not distributed, delivered, or transmitted to any other location or person using PTAT alone.

On appeal of this Court's denial of its request for a preliminary injunction, Fox argued (in the contract breach context) that "distribute" simply means to "make available." *Fox Broadcasting,* 723 F.3d at 1070. While neither the Ninth Circuit nor any other circuit court has addressed the "make available" theory of distribution under the Copyright Act, it has been considered by a number of courts, and "[t]he great majority of courts that have considered the question . . . have stopped short of fully endorsing the 'make available' right." *Elektra Entm't Grp., Inc. v. Barker*, 551 F. Supp. 2d 234, 243 (S.D.N.Y. 2008) (collecting cases); *see also Atl. Recording Corp. v. Howell*, 554 F. Supp.

2d 976, 983 (D. Ariz. 2008) ("The majority of district courts have rejected the recording companies' 'making available' theory"); *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1218-19 (D. Minn. 2008) ("The Court's examination of the use of the term 'distribution' in other provisions of the Copyright Act, as well as the evolution of liability for offers to sell in the analogous Patent Act, lead to the conclusion that the plain meaning of the term 'distribution' does not include making available and, instead, requires actual dissemination."). This Court finds these cases persuasive and concludes that DISH's act of merely "making available" copyrighted programming to its subscribers through PTAT does not amount to distribution without actual dissemination.

### b. Secondary Liability:  PTAT Use by DISH Subscribers is Fair Use.

As discussed above, there can be no secondary infringement without primary infringement. *Grokster*, 545 U.S. at 930, 940. Fox must demonstrate that DISH subscribers' use of PTAT constitutes direct infringement to show secondary infringement by DISH.

The "fair use" of a copyrighted work is not an infringement of copyright. 17 U.S.C. § 107. "[I]t is well established that a court can resolve the issue of fair use on a motion for summary judgment." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) (although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues).

*Sony* established that it is fair use for users to make individual copies of television shows from broadcast television for purposes of noncommercial, nonprofit time-shifting. 464 U.S. at 449-50; *see also Napster, Inc.*, 239 F.3d at 1019; *Recording Indus. Ass'n of Am.*, 180 F.3d at 1079. *Sony* addressed only secondary infringement claims, and held

-40-

that the suppliers of equipment used to make such copies were not liable for derivative infringement.  464 U.S. at 454-56.

*Sony*'s holding, however, is not absolute.  The Court noted that "[a] challenge to a noncommercial use of a copyrighted work requires proof that either the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." *Id*. at 451.  "Actual present harm need not be shown . . . .  Nor is it necessary to show with certainty that future harm will result." *Id*.  "What is necessary is a showing . . . that *some meaningful* likelihood of future harm exists." *Id*. (emphasis added).  The effect of the use upon the market for or value of the copyrighted work is the "most important" element of fair use. *Fox Broadcasting*, 723 F.3d at 1069 (internal citation omitted).

The *Sony* plaintiffs' predictions of harm hinged on "speculation about audience viewing patterns and ratings, a measurement system [described as] a 'black art' because of the significant level of imprecision involved in the calculations."  464 U.S. at 451.  The Supreme Court ultimately held that there was no basis to support the plaintiffs' argument that time-shifting would reduce audiences for telecast reruns or decrease live television audiences, and affirmed the district court's finding that "[h]arm from time-shifting is speculative and, at best, minimal." *Id*. at 453-54.

As the Ninth Circuit noted at the preliminary injunction stage, "[b]ecause Fox licenses its programs to distributors such as Hulu and Apple, the market harm analysis is somewhat different than in *Sony*, where no such secondary market existed for the copyright-holders' programs."  723 F.3d at 1069.  At that time, the record established that any market harm resulted from the automatic commercial-skipping, and not simply the recording of programs through PTAT. *Id*.  The Court pointed to the fact that Fox often charges no additional license fees for providers to offer Fox's licensed video on demand, so long as providers disable fast-forwarding of commercials. *Id*.  The Court affirmed the

-41-

lower court's finding that "the ease of skipping commercials, rather than the on-demand availability of Fox programs, causes any market harm." *Id.*

At this stage, Fox has produced additional evidence of a secondary market for its programming. In addition to licensing the right to livestream its programming to certain MVPDs, Fox licenses third parties such as Apple, Amazon, Vudu, and Microsoft the right to distribute its programs in a commercial-free, downloadable format, available the day after a program airs and viewable on mobile devices, personal computers, or certain Internet-connected televisions. Fox also licenses older seasons of its programming to subscription VOD services such as Netflix and Amazon Prime. DISH asserts that Fox does not charge MVPDs for the right to stream its programming, and thus no real "market" exists. DISH Reply SAMF at ¶ 436. Fox responds that the license to stream is part of a comprehensive agreement and "in exchange for valuable consideration." *Id.*

The record now before the Court establishes that a market for Fox programming on demand exists beyond the value of the advertisements. Fox licenses its programming to at least some third parties to be distributed commercial-free. Nonetheless, the record does not create a triable issue as to the likelihood of future harm to this market.

While Fox has provided some evidence that PTAT co-exists with services like Hulu that offer streaming of Fox programming with commercials, and that PTAT may help DISH attract subscribers, it has not demonstrated that any of this is genuinely likely to cause harm to the secondary market for Fox programming that rises beyond the speculative, such that the question should be presented to a jury.[18] Only DISH subscribers have access to PTAT, and those subscribers also have access to a litany of

_____

[18] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

other services, including the ability to record primetime programming manually using more traditional DVR technology.  DISH's expert John Hauser contends that "the Hopper represents only a small fraction [of households with DVR]."  Declaration of John Hauser in Support of Defendants' Motion for Summary Judgment ("Hauser Decl.") at ¶ 19. [Doc. #498.][19]  Even limiting the potential impact to the universe of DISH subscribers, Hauser contends that, "[d]ata from DISH indicate that for the periods from January 24 to March 17, 2014, and from April 6 to May 31, 2014, the PTAT feature ████████████ ████████████████████ Hopper set-top boxes on any given day."  Hauser Decl. at ¶ 16.  [Doc. #498.]  Hauser notes that, while "the total number of Hopper set-top boxes on which this calculation is based is lower than the total number of Hopper boxes in use . . . there is no reason to expect that PTAT activation, AutoHop usage, or Sling activity is greater among non-reporting households."  *Id*.

Furthermore, PTAT recordings are only available for up to eight days, unless the subscriber makes the effort to save them in a special folder for a longer period of time. Services that offer older seasons of Fox programming cannot be in competition with recordings that are only available for up to eight days after a program airs.  Similarly, the commercial-free programming Fox licenses to third parties is only potentially in competition with PTAT for up to eight days after a show airs, and then only for the group of people who both subscribe to DISH and use PTAT.

Even in the unlikely event it were possible to demonstrate that DISH subscribers are less likely to purchase Fox programming on Amazon, or that erstwhile Microsoft or Vudu customers will eschew these services in favor of DISH (which the record here does

---

[19] Fox objects to the admissibility of the Hauser Declaration on the basis that it does not apply a valid methodology and does not "fit" the facts.  Objections to Evidence Submitted in Support of Defendants' Motion for Summary Judgment ("Fox Obj. to Evid.") at 3-4.  [Doc. # 534.]  The Court is satisfied that the Hauser Declaration meets the admissibility standard for expert testimony, and the declaration is therefore admissible.

not demonstrate beyond the level of conjecture), it would be highly speculative and likely impossible to demonstrate that PTAT in particular, as opposed to other DISH features and services, is the likely cause of market harm, or is likely to be in the future.  *See Sofa Entm't, Inc. v. Dodger Prods., Inc.*, 782 F. Supp. 2d 898, 910 (C.D. Cal. 2010), *aff'd*, 709 F.3d 1273 (9th Cir. 2013) ("the Court agrees with Defendant that the notion that any such market could ever materialize is speculative at best"); *A.V. v. iParadigms Liab. Co.*, 544 F. Supp. 2d 473, 484 (E.D. Va. 2008), *aff'd in part, rev'd in part sub nom. A.V. ex rel. Vanderhye v. iParadigms*, *LLC*, 562 F.3d 630 (4th Cir. 2009) ("Because Plaintiffs have presented no evidence of harm and the potential harm alleged is both speculative and highly unlikely, the fourth factor strongly favors a finding of fair use."); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 n. 18 (2d Cir. 1994) (even if harm to "the potential market in licensing royalties" exists, it may be considered "too insubstantial to tilt the fourth fair use factor in favor of the copyright holder.").

The potential for market harm to the secondary market for Fox's programs caused by PTAT alone is simply too speculative to defeat a finding of fair use by a time-shifting technology which enhances consumers' non-commercial private use of recorded programming.  Even when viewing the evidence in the light most favorable to Fox, this Court concludes that DISH subscribers' use of PTAT is fair use under *Sony*, and DISH is not liable for contributory infringement.

DISH does not directly or secondarily infringe Fox's right of reproduction, distribution, or public performance by offering PTAT to its subscribers.  Fox's motion for partial summary judgment as to the PTAT copyright claim is **DENIED** and DISH's cross-motion for summary judgment on this claim is **GRANTED**.

### 2.    Contract Claims

Fox contends that PTAT violates the 2002 RTC Agreement, which states that DISH "shall have no right to distribute all or any portion of the programming contained in any Analog signal on an interactive, time-delayed, video-on-demand or similar basis;

-44-

<u>provided</u> that Fox acknowledges that the foregoing shall not restrict [DISH's] practice of connecting its Subscribers' video replay equipment" ["No-Distribution Provision"].  Fox asserts that PTAT violates the No-Distribution Provision because it "distributes" Fox programming on a "VOD or similar basis."   DISH contends that the No-Distribution Provision was superseded by the 2010 Letter Agreement, because the latter contains a clause granting DISH the right (but not the obligation) to distribute Fox VOD under certain prescribed circumstances.  DISH MSJ at 21; 2010 Letter Agreement at 23.

**a.    The 2010 Letter Agreement Does Not Supersede the No-Distribution Provision.**

"Generally, under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract.  However, a subsequent contract not pertaining to precisely the same subject matter will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract.  To determine if a particular provision is superseded by a provision in a subsequent contract, the Court considers: (1) whether there is an integration and merger clause that explicitly indicates that the prior provision is superseded; (2) whether the two provisions have the same general purpose or address the same general rights; and (3) whether the two provisions can coexist or work in tandem." *A & E Television Networks, LLC v. Pivot Point Entm't, LLC*, 10-CV-09422 (AJN), 2013 WL 1245453, at *10 (S.D.N.Y. Mar. 27, 2013) (internal citations and quotation marks omitted); *see also Cont'l Stock Transfer & Trust Co. v. Sher-Del Transfer & Relocation Servs., Inc.*, 298 A.D.2d 336, 750 N.Y.S.2d 8, 9 (App. Div. 2002) (to find that proposal letter superseded former agreement "would not be consonant with the basic rule of contract law that requires a clear expression of intention, best manifest in the language of the later writing, that the subsequent agreement supersedes the prior one.").

There is no express language indicating that the 2010 Letter Agreement was intended to supersede the No-Distribution Provision of the 2002 RTC Agreement.  While

-45-

both the general prohibition on distributing "VOD-or-similar" in 2002 and the express permission to distribute FOX VOD in 2010 pertain to VOD distribution rights, they can be construed to work in tandem.  The original clause generally prohibits distribution on a VOD-or-similar basis, whereas the newer provision carves out a narrow exception to that rule only for Fox VOD, and only under the conditions specified.  Otherwise, the existence of the clause granting DISH permission to distribute Fox VOD in the 2010 Letter Agreement does not impair the general No-Distribution Provision of the 2002 RTC Agreement.

### b.    PTAT Does Not Breach the No-Distribution Provision.

According to dictionary and statutory definitions already discussed above, the plain meaning of "distribute" is (1) to deliver (2) to more than one person.  PTAT does neither of these things.  PTAT is a mechanism for automatically recording a specific sub-set of programming that has already been permissibly streamed to a subscriber, and does not disseminate those recordings beyond that subscriber's home.  PTAT does not "distribute" anything.

Fox contends that the uses of "distribute" and "distribution" elsewhere in the contract do not support the "change hands" definition of the term.  FOX MSJ at 33.  For example, the 2002 RTC Agreement defines the DISH Network as a "distribution system for video programming."  DISH GDMF at ¶ 3.  The initial, licensed transmission of the programming by DISH may be a distribution, even though no copy is transferred to the consumer, as it simultaneously delivers that content from its source to a large number of people.  This is not what PTAT does, and the use of "distribute" elsewhere in the contract largely refers to the authorized initial transmission of the programming.  Nothing about the use of the term "distribute" in other parts of the Agreement alters the fact that PTAT does not "distribute" content.

DISH's motion for summary judgment as to whether PTAT breaches the 2002 RTC Agreement is therefore **GRANTED** and Fox's motion for partial summary judgment as to this claim is **DENIED**.

### C.    AutoHop and the QA Copies

#### 1.    Copyright Claims

##### i.    Right of Reproduction

Until July 20, 2012, EchoStar employees made QA copies of primetime programming to ensure that AutoHop functioned properly on PTAT recordings made by DISH subscribers.  Fox contends that DISH infringed Fox's exclusive right to reproduce its works by having EchoStar make Quality Assurance copies ███████████ (together the "QA copies") of copyrighted Fox programming in order to offer its AutoHop service.  DISH counters that AutoHop is non-infringing, and the QA Copies are fair use, because they are intermediate copies that allow for testing and development of new, non-infringing technology without affecting any licensing market in which Fox participates or reasonably would participate.  *See Sega Enterprises v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), *as amended* (Jan. 6, 1993), and *Sony Computer Enterprises, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000).

At the preliminary injunction stage, this Court found that "AutoHop . . . standing alone, does not infringe."  *Fox Broadcasting,* 905 F. Supp. 2d at 1105.  The Ninth Circuit upheld the ruling, stating that "[i]f recording an entire copyrighted program is a fair use, the fact that viewers do not watch the ads not copyrighted by Fox cannot transform the recording into a copyright violation."  723 F.3d at 1075.  At this stage of the proceedings, Fox has presented uncontroverted evidence that it airs a significant number of commercials advertising its own programming, and that it owns copyrights for the clips used in those commercials.  Fox argues that this fact changes the analysis regarding whether AutoHop is non-infringing.  In the Court's view, it does not.  Although at the preliminary injunction stage, both this Court and the Ninth Circuit noted that the

advertisements themselves were not copyrighted by Fox, it was merely as a point of emphasis to show how unlikely it would be for Fox to prevail on its claim that AutoHop infringes its copyrights.  In other words, if *Sony* permits a consumer *to record* an entire copyrighted program under the fair use doctrine, there could not be less protection for a consumer who declines to watch an ad that is not even copyrighted by Fox.  The linchpin in the copyright infringement analysis is whether DISH has infringed Fox's exclusive rights of reproduction and distribution.  AutoHop neither copies nor distributes anything – it *skips* ads.  Absent unauthorized copying or distribution, it is immaterial for purposes of the copyright infringement claim that the ads being skipped are Fox's own commercials.

This Court found at the preliminary injunction stage that the QA Copies did not constitute fair use and that Fox would likely prevail on its copyright infringement claim as to the QA copies.  *Fox Broadcasting*, 905 F. Supp. 2d at 1102-06.  Having revisited the fair use analysis with the benefit of the current factual record, the Court sees no reason to deviate from its prior conclusion.  The four factors used to determine whether not the use of a copyrighted work is fair use include:  (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590, 114 S. Ct. 1164, 1171-77, 127 L. Ed. 2d 500, 578-92 (1994).  While all fair use factors should be considered, the fourth factor is "undoubtedly the most important element of fair use."  *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566, 105 S. Ct. 2218, 2234, 85 L. Ed. 2d 588 (1985).  Generally, "[t]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."  *Monge*

*v. Maya Magazines, Inc.*, 688 F.3d 1164, 1174 (9th Cir. 2012), *citing Campbell*, 510 U.S. at 579.

The QA copies are not transformative. *Sega* held that intermediate copying of computer code to prepare derivative works based on copyrighted work is fair use where such disassembly and copying is the only way to gain access to the functional elements embodied in a copyrighted work, and where there is a legitimate reason for seeking such access. *Sega*, 977 F.2d at 1527. At the preliminary injunction stage, this Court noted that "Dish makes the QA copies for a purpose fundamentally different than did the plaintiff in Sega." *Fox Broadcasting*, 905 F. Supp. 2d at 1103. The intermediate copies in *Sega* were used for the transformative purpose of developing new computer games. 977 F. 2d at 1523 ("It is precisely this growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote."). The QA copies are simply used to allow users to automatically skip commercials in the copyrighted programming rather than to create original programming or content. These copies in no way alter their originals "with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. The Court's assessment that the QA copies are not transformative remains unchanged.

The commercial purpose of the QA copies weighs against a finding of fair use, and the creative nature of the copyrighted works entitle them to heightened protection. *Fox Broadcasting,* 905 F. Supp. 2d at 1104. The fact that the QA copies reproduce an entire work weighs against fair use, but is of "very little weight" compared with other factors due to the limited nature of the ultimate use. *Id.*; *see also Authors Guild, Inc. v. Hathi Trust*, 755 F.3d 87, 96 (2d Cir. 2014) ("[T]he third factor asks whether the copying was excessive in relation to any valid purpose asserted under the first factor.").

The likelihood of an adverse impact on the market for the original work—the most heavily weighted factor—weighs against fair use. "By making an unauthorized copy for which it has not paid and using it for AutoHop, Dish harms Fox's opportunity to

negotiate a value for those copies and also inhibits Fox's ability to enter into similar licensing agreements with others in the future by making the copies less valuable." *Fox Broadcasting*, 905 F. Supp. 2d at 1105.

The record reflects that there is a market for the right to copy and use Fox programs, given that Fox licenses copies of its programming to third-party companies like Hulu, Netflix, and Amazon. There is no demonstrable existing market for the intermediate copies themselves, but there is no material issue of disputed fact that Fox, as a normal course of business, monetizes the right to copy its programming, whether directly (charging for the direct use of copies) or indirectly (allowing the use of copies as a part of a comprehensive licensing agreement). The fact that DISH's use of the QA copies is *sui generis* and has never been attempted before by any other entity does not mean that it has no intrinsic value. *See Campbell,* 510 U.S. at 592 ("the market for potential derivative uses includes . . . those that creators of original works would in general develop or license others to develop"); *Harper & Row Publishers, Inc.*, 471 U.S. at 568 (the fourth factor "must take account not only of harm to the original but also of harm to the market for derivative works").

Fox has adduced uncontroverted evidence to show that it would normally negotiate a licensing agreement or royalty payment for the right to copy Fox programming in any manner. DISH's unauthorized use of QA copies would impair Fox's ability to monetize that use not only as to DISH but also as to any other future technology creator that makes analogous use of such copies.

### ii.        Section 119 of the Compulsory Licensing Framework

Fox also contends that AutoHop violates the Copyright Act's compulsory licensing framework for secondary transmission of network stations by satellite providers. 17 U.S.C. §§ 119, 122. Section 119(a)(5) states that "the secondary transmission to the public by a satellite carrier of a performance or display of a work embodied in a primary transmission made by a . . . network station is actionable as an act of infringement . . . if

-50-

the content of the particular program in which the performance or display is embodied, or any commercial advertising or station announcement transmitted by the primary transmitter during, or immediately before or after, the transmission of such program, is in any way willfully altered by the satellite carrier through changes, deletions, or additions." AutoHop does not change, delete, or add anything to the commercials at issue. AutoHop provides a mechanism for automatically skipping commercials by marking when the commercial breaks begin and end, but does not delete or otherwise alter the commercials from the PTAT recordings. Thus, AutoHop does not violate the Copyright Act's compulsory licensing framework.

Inasmuch as the Court finds that AutoHop does not infringe Fox's copyrights and the QA copies are not a fair use as a matter of law, DISH's motion for summary judgment on the copyright infringement claim is **GRANTED** as to the AutoHop feature, but **DENIED** as to the use of the QA copies. Fox's motion for partial summary judgment as to DISH's liability for copyright infringement for the AutoHop feature is **DENIED**, but its motion as to DISH's liability for direct infringement for using the QA copies is **GRANTED**.

### 2.    Contract Claim

Fox contends that the QA copies breach the No-Copying Provision of the 2002 RTC Agreement: "[DISH] shall not, for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of any Station's Analog Signal without prior written permission of the Station, except as is specifically permitted by this Agreement."

EchoStar in its current incarnation is not a party to the 2002 RTC Agreement. DISH contends that EchoStar is DISH's "technology vendor" and made the QA copies as an "independent contractor for DISH," and that "[t]his fact alone disposes of Fox's contract claim." DISH MSJ Opp. at 38. The No-Copying Provision, however, prohibits the *authorization* of copying of any portion of Fox's programming without permission. It

-51-

is undisputed that EchoStar made the QA Copies on behalf of DISH in order to provide a service to DISH's subscribers.  The QA Copies constitute a breach of the No-Copying Provision of the 2002 RTC Agreement.

Under New York law, in order to recover on a claim for breach of contract, a plaintiff must show:  (1) the existence of a contract; (2) plaintiff's performance under the contract; (3) defendant's breach of the contract; and (4) the resulting damages to the plaintiff.  *J.P. Morgan Chase v. J.H. Elec. of New York, Inc.*, 893 N.Y.S.2d 237, 239 (App. Div. 2010).  Fox has established the existence of a contract and failure to perform the contract by defendant.  No party has suggested nonperformance by Fox.

Fox seeks only reasonable royalties for its contract claims, and does not seek any actual damages.  Joint Stipulation for Defendant's Motion to Compel, June 9, 2014 ("Joint Stipulation") at 31 [Doc. # 226]; FAC at 24, Prayer For Relief at ¶¶ 3-4 [Doc. # 135].  DISH argues that reasonable royalties are not available in a breach-of-contract claim under New York law, and that Fox is therefore unable to show an essential element of the claim, because it cannot show damages as a result of the breach.  DISH MSJ at 41.

As discussed below in section IV.E.1 (Breach of Contract Damages), reasonable royalties are available to plaintiffs under New York law as a remedy for breach of contract.  The Court finds no genuine material dispute that Fox would have charged for copies of its programming, and therefore that some amount of damages resulted from DISH's breach of the Agreement.  Although Fox has established all essential elements of its claim that the QA copies breached the No Copying Provision, the question of what amount of royalties would be reasonable during the limited period that DISH used the QA copies presents a triable issue of fact.  Fox's motion for partial summary judgment as to DISH's liability for breach of contract in using the QA copies is **GRANTED** and DISH's motion for summary judgment as to this claim is **DENIED**.

### D.    Hopper Transfers

Hopper Transfers allows DISH subscribers to transfer copies of recordings from a DVR to a tablet or smartphone for later viewing at any location with or without an Internet connection.   Copies will not play if the device has not contacted the DISH Anywhere site for 30 days, and DISH has restrictions on certain programming regarding the number of devices to which copies can be transferred and the length of time that programs can reside on a mobile device before they expire.   Some programming cannot be copied at all.   Fox alleges that DISH is liable for primary and secondary infringement of both the reproduction right and the distribution right for offering Hopper Transfers to its subscribers.    Fox also contends the Hopper Transfers violates the No-Copying Provision of the 2002 RTC Agreement.

### 1.    Copyright Claims

#### a.    DISH Does Not Engage in Volitional Conduct Giving Rise to Direct Infringement.

DISH's control over the Hopper Transfers process is significantly less than its control over the PTAT process, which the Court has already found is not sufficient volitional conduct to amount to liability for direct infringement.   DISH subscribers, not DISH, make and transfer the Hopper Transfers copies using DISH's equipment.   Any potential distribution or performance is also by DISH subscribers, not DISH.   DISH is not liable for direct infringement by offering Hopper Transfers.

#### b.    DISH Subscribers' Use of Hopper Transfers is Fair Use.

Hopper Transfers is a technology that permits non-commercial time- and place-shifting of recordings already validly possessed by subscribers, which is paradigmatic fair use under existing law.   *See Recording Indus. Ass'n of Am.*, 180 F.3d at 1079 (making copies "in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive . . . is paradigmatic noncommercial use.").   As with PTAT, where the subscriber engaged in the volitional conduct of copying, Fox has not demonstrated that

-53-

DISH subscribers' use of Hopper Transfers standing alone is likely to cause harm to the secondary market for Fox programming that rises beyond the speculative, such that the question should be presented to a jury.  (*See* Section IV.B.1.b., *supra*, re speculative nature of market harm.)  Subscribers' activation of Hopper Transfers is fair use, and DISH is not liable for secondary infringement.

DISH's motion for summary judgment as to copyright infringement by Hopper Transfers is **GRANTED** as a matter of law.

### 2.     Contract Claim

Fox maintains that DISH violates section 9(a) of the 2002 RTC Agreement (the No-Copying Provision) by authorizing DISH subscribers to make copies of Fox programming for use outside the home using Hopper Transfers.  DISH argues that copyright law itself, not DISH, "authorizes" subscribers to make the copies, because their use of Hopper Transfers is fair use.  DISH MSJ at 38.

Fair use is not a defense to a breach of contract claim.  *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004), *opinion amended on denial of reh'g,* 400 F.3d 658 (9th Cir. 2005) (claim for breach of contract not preempted by the Copyright Act because it alleged additional element); *see also eScholar, LLC v. Otis Educ. Sys., Inc.*, 387 F. Supp. 2d 329, 333 (S.D.N.Y. 2005) ("the existence of explicit contractual rights makes a breach of contract claim qualitatively different from a claim for copyright infringement."); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 186 F. Supp. 2d 592, 594-95 (D. Md. 2002) (parties' express contract establishes "private law" governing fair use of the copyrighted works).  Copyright law will not preempt a contractual agreement unless the elements of the claims are identical.

The No-Copying Provision differs from the copyright infringement claim in that, among other things, it includes carve-outs for "private home use" by subscribers and for specific permission under the Agreement, and is therefore not preempted by the Copyright Act.   Congress's general "authorization" of activity permitted under the

-54-

Copyright Act has no bearing on contract claims.  Parties are free to bargain away their rights to make fair use of copyrighted material under the "private law" of contractual agreements.  Fair use is an affirmative defense to copyright infringement, not a catch-all permission to make use of copyrighted material in contravention of the terms of a contract.  DISH—not Congress—has authorized its subscribers to make copies of Fox Programming under certain prescribed circumstances.

In using Hopper Transfers, DISH subscribers are unquestionably making copies for use outside the home.  *See* DISH Reply GDMF at ¶ 107 (Hopper Transfers allows subscribers to play back recordings *at any location* even if the mobile device is not connected to the Internet).  As discussed above, "authorize" means, among other things, to empower, to formally approve, to sanction, or to give power or permission to do something.  Only DISH subscribers in good standing, whose devices have contacted the DISH Anywhere site within the past 30 days, may use Hopper Transfers.  DISH gives both the means and permission to users to make copies for use outside the home, which amounts to "authorization" in violation of the No-Copying Provision.

The Court **GRANTS** Fox's motion for partial summary judgment as to DISH's liability for breach of the No-Copying Provision by implementing Hopper Transfers, and **DENIES** DISH's motion for summary judgment as to the same claim.

### E.  Damages

Fox's motion for partial summary judgment is granted as to the contentions that DISH Anywhere, the QA copies, and Hopper Transfers violate the No-Copying Provision of the 2002 RTC Agreement.

#### 1.  Breach of Contract Damages

DISH argues that "[m]onths of discovery have revealed *no harm* that Fox has suffered as a result of Dish's alleged breach of the 2002 and 2010 agreements."  DISH MSJ at 40.  Fox stipulates that it is not seeking to recover any actual damages suffered as a result of Defendants' breaches of contract, but instead seeks reasonable royalties.  Joint

Stipulation at 31 ("Fox has confirmed repeatedly [that] it is not seeking lost profits or los[t] revenues as damages.").

DISH contends that reasonable royalties are not available for a breach of contract under New York law.  DISH MSJ at 41.  To the contrary, a New York Court of Appeals case from 1951 approves reasonable royalties as a measure of damages for a breach of contract which "furnishes a sufficiently definite standard as a practical means that will be just to the parties."  *Spitz v. Lesser*, 302 N.Y. 490, 494, 99 N.E.2d 540 (N.Y. 1951).

DISH cites some more recent unpublished cases which suggest that reasonable royalties *may* not be available in a breach-of-contract action, but which do not cite any controlling authority for that proposition.  *See, e.g.*, *Jill Stuart (Asia) LLC v. Sanei Intern Co., Ltd.*, 12 CIV. 3699 KBF, 2013 WL 3203893, at *5 (S.D.N.Y. June 17, 2013), *aff'd* 556 Fed. Appx. 29, 2014 WL 1910364 (2d Cir. 2014) (reasonable royalty theory of damages "cannot apply," citing an unpublished order granting motion to exclude expert testimony on royalties); *see also Jill Stuart (Asia) LLC v. Sanei Intern Co. Ltd.*, 556 Fed. App'x 29, 2014 WL 1910364, at * 32 (2d. Cir. 2014) (reasonable royalty theory fails, even if hypothetically available under New York law, because plaintiff fails to show reasonable certainty).

Fox cites two relatively recent cases approving reasonable royalties as damages in breach-of contract cases decided under New York law.  *See Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 664 (S.D.N.Y. 2013); *Inside Out Prods. v. Scholastic Inc.*, No. 90-7233, 1995 WL 375927, at *6 (S.D.N.Y. June 23, 1995).

Because no controlling law holds that reasonable royalties are *not* available as a remedy for a breach-of-contract claim, this Court concludes that reasonable royalties are potentially available under New York law as a remedy for the contract breach claims regarding the QA copies, DISH Anywhere, and Hopper Transfers.  There is a triable

-56-

issue of fact, however, as to whether Fox can establish the calculation of such royalties with reasonable certainty and, if so, what the amount would be.[20]

DISH argues that, even if reasonable royalties are available as a remedy for contract breach under New York law, Fox waived any such right because of the applicable agreements' express disclaimer for any liability for "incidental or consequential damages." DISH MSJ at 41; 2004 Agreement ¶ 29. The parties' 2004 Agreement waives incidental or consequential damages only as to "THIS AGREEMENT." 2004 Agreement ¶ 29 (capitalization in original). The 2002 RTC Agreement, which is the applicable agreement for the remaining claims, does not include a disclaimer of liability for incidental or consequential damages.[21]

---

[20] Reasonable royalties are a calculation of the hypothetical license which would have been paid but for the conduct giving rise to the claim. *Georgia-Pac. Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971); *see also Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 314 N.E.2d 419 (1974) (assessing "reasonable estimate of royalties [plaintiff] would have earned had [defendant] not breached its promise to publish."). An award of reasonable royalties must generally be supported by showing with "reasonable certainty" both that royalties were lost and the amount of that loss. *Trovan, Ltd. v. Pfizer, Inc.*, No. CV-98-00094, 2000 WL 709149, *17 (C.D. Cal. May 24, 2000).

"If there is no established royalty, the amount of a reasonable royalty may be determined with reference to a hypothetical negotiation." *Funai Elec. Co. v. Daewoo Electronics Corp.*, 593 F. Supp. 2d 1088, 1107 (N.D. Cal. 2009) *aff'd*, 616 F.3d 1357 (Fed. Cir. 2010). "Even in cases without [a prior licensing agreement between the parties] . . . courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to calculate them." *Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250, 253-54 (S.D.N.Y. 2012). Courts have upheld awards of reasonable royalties that are consistent with royalties between the parties, between a plaintiff and third parties, or even comparable royalties entirely between third parties. *See QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12-CV-0451, 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013). Records of business negotiations between parties or between the parties and third parties may provide an adequate level of "reasonable certainty" regarding reasonable royalties. *Id.* at *5.

[21] Paragraph 26 of the 2004 RTC Agreement states that "[t]his Agreement supersedes any and all other prior and contemporaneous agreements, whether oral or written, pertaining to the distribution of any Service by Affiliate." Neither party has suggested that the 2004 Agreement supersedes the 2002 RTC Agreement as a whole, and it has instead been described as an "amendment" to that agreement. *See* DISH MSJ at 4, n.1. Although it is difficult to fathom an issue that has not been briefed by the

### 2. Copyright Infringement Remedies

Fox has demonstrated that the QA copies infringe its copyrights.  Fox seeks statutory damages, compensatory damages in the form of reasonable royalties, and disgorgement of profits.  DISH argues that there is no reasonable royalties remedy under the Copyright Act.  DISH MSJ at 43.

Statutory damages, hypothetical or lost license fees, and disgorgement of profits are all available under the Copyright Act and potentially available if Fox prevails at trial as to damages.  *See Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994) (statutory damages may be appropriate when lost profits would be an inadequate measure); *see also Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087-88 (9th Cir. 2014) (hypothetical-license damages are an appropriate form of damages in copyright case); *Polar Bear Productions, Inc. v. Timex Corporation*, 384 F.3d 700, 710 (9th Cir. 2004) (upholding hypothetical lost license fee damages); *Fahmy v. Jay-Z*, 835 F. Supp. 2d 783, 794 (C.D. Cal. 2011) (infringer's revenues available as damages if the result of copyright infringement).  Thus, Fox is entitled to seek these potential remedies for the copyright infringement claim as to the QA copies.

DISH contends that it is entitled to judgment on Fox's claim for disgorgement of profits because there is no causal nexus between the copyright infringement and DISH's subscriber revenues.  *Mackie v. Rieser*, 296 F.3d 909, 915-16 (9th Cir. 2002) (copyright holder "must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement.").  The QA copies facilitated one of the services that DISH offers its subscribers in order to convince them to subscribe.  Fox has not demonstrated, however,

---

parties in their voluminous filings, this issue has not been specifically briefed and therefore the Court does not address it *sua sponte*.  The Court assumes, without deciding, that the provisions of the 2002 RTC Agreement pertinent to this dispute remain in effect and that the 2004 RTC Agreement did not supersede it in toto.

that it can separate out DISH's profits that flow from the use of the AutoHop feature, let alone those that emanate solely from the limited-time use of the QA copies.  In the absence of a triable issue as to disgorgement of profits, the Court **GRANTS** DISH's motion for summary adjudication as to this particular remedy.

### F.  Exceeding the Scope of a License

DISH seeks summary adjudication of the issue that exceeding the scope of a license is not a copyright claim, as "a plaintiff cannot bypass the elements of a copyright infringement simply by proving breach of contract."  DISH MSJ at 19.

In acknowledging the close relationship between the contract claims and the copyright claims at issue in this case, this Court noted at the preliminary injunction stage that "[a] licensee infringes the owner's copyright if its use exceeds the scope of its license."  *Fox Broadcasting*, 905 F. Supp. 2d. at 1097 (internal citations and quotation marks omitted).  While this statement remains true in the proper context, DISH is correct that a plaintiff must nonetheless establish that the defendant's conduct has violated one of the copyright owner's statutory rights, and not merely that the defendant is in breach of contract, in order to gain the benefits of copyright protection.  *See Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1122 (9th Cir. 1999).  This determination, however, does not alter the outcome of either the contract claims or the copyright claims at issue here, except to clarify that a finding of contract breach does not perforce give rise to liability for copyright infringement unless the fundamental elements of a statutory violation also have been established.

### G.  Implied Covenant of Good Faith and Fair Dealing

Fox has alleged that DISH's conduct generally constitutes a breach of the implied covenant of good faith and fair dealing.  FAC at ¶¶ 97-100.  Every contact includes an implied covenant of good faith and fair dealing in the course of performance.  *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 68, 385 N.E.2d 566, 569 (1978).  The duties of good faith and fair dealing encompass "any promises which a reasonable person in the

-59-

position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 501 (2002) (internal citation and quotation marks omitted).

"[A] party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." *Rowe* at 69. "Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." *Id*. "The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel." *D & L Holdings, LLC v. RCG Goldman Co., LLC*, 734 N.Y.S.2d 25, 31, 287 A.D.2d 65, 73 (App. Div. 2001).

Here, the 2010 Letter Agreement contains a merger provision and thus the Court cannot consider any implied promises which explain, add to, or contradict the express terms of that agreement. In any event, Fox has not specified what covenants might be implicit in either the 2002 RTC Agreement or the 2010 Letter Agreement that DISH has breached, and therefore has not demonstrated that there are any triable issues of fact as to the implied covenant claims. The Court therefore GRANTS DISH's motion for summary judgment as to the claims for breach of the implied covenant of good faith and fair dealing.

### F.    Anti-Circumvention Provision

The 2010 Letter Agreement states that "[a]t no time during the Term may any of the Fox Parties or DISH take any action whatsoever intended to frustrate or circumvent, or attempt to frustrate or circumvent, the protections granted to the other Party pursuant to any provision in this Letter Agreement" ["Anti-Circumvention Provision"]. 2010 Letter Agreement at ¶ 5. Fox alleges that DISH breached the Anti-Circumvention

Provision.  FAC at ¶ 93.  DISH moves for summary judgment as to this alleged contract breach.

Fox contends that DISH circumvented and frustrated the 2010 Letter Agreement by developing PTAT and offering it to its subscribers.  Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Fox Opp. MSJ") at 37.  [Doc. # 531.]  According to Fox, DISH circumvented and frustrated the agreement because PTAT is similar to VOD, and PTAT does not disable fast-forwarding of commercials.  *Id*.

The Court already has determined that PTAT does not violate the No-Distribution Provision of the 2002 RTC Agreement, because, even if it is similar to VOD, it does not "distribute" anything.  If DISH has not breached the No-Distribution Provision itself, DISH certainly has not breached or circumvented the protections offered by that Provision.  The Anti-Circumvention Provision does not aid Fox's cause.

DISH's motion for summary judgment is **GRANTED** as to the claim that it breached the Anti-Circumvention Provision.

# V.
## <u>CONCLUSION</u>

In light of the foregoing, the Court orders the following:

1.    Fox's motion for partial summary judgment is **DENIED** as to whether DISH:

    a.    is infringing Fox's exclusive right to publicly perform its copyrighted works by offering DISH Anywhere;

    b.    is breaching the 2010 Letter Agreement by offering DISH Anywhere; and

    c.    is breaching the 2002 RTC Agreement by offering PTAT;

2.    Fox's motion for partial summary judgment is **GRANTED** as to whether DISH:

    a.    is breaching the 2002 RTC Agreement by offering Hopper Transfers;

    b.    breached the 2002 RTC Agreement by making QA copies of Fox's programming in connection with the operation of the AutoHop service; and

    c.    infringed Fox's exclusive right of reproduction of its copyrighted works by making the QA copies.

3.    DISH's motion for summary judgment is **GRANTED** as to whether DISH:

    a.    infringed or is infringing Fox's exclusive copyrights by offering DISH Anywhere, PTAT, AutoHop, or Hopper Transfers;

    b.    violated the 2010 Letter Agreement by offering PTAT;

    c.    violated the 2002 RTC Agreement by offering PTAT or Hopper Transfers;

    d.    violated the Anti-Circumvention Provision of the 2010 Letter Agreement; and

e.     violated the implied covenant of good faith and fair dealing as to all of its conduct.

4.     DISH's motion for summary judgment is **DENIED** as to whether DISH:

    a.     infringed Fox's exclusive right of reproduction of its copyrighted works by making the QA copies;

    b.     violated the 2010 Letter Agreement by offering DISH Anywhere; and

    c.     violated the 2002 RTC Agreement by offering DISH Anywhere and making the QA copies,

5.     DISH's motion for summary judgment is **DENIED** as to whether Fox has asserted any viable contract or copyright remedies but **GRANTED** as to whether Fox is entitled to disgorgement of profits.

Because this Order quotes from the parties' confidential agreements and other proprietary documents, which have been filed under seal, within five days from the date of this Order, the parties shall meet and confer regarding which portions of this Order, if any, they propose to be redacted such that the Court may issue a redacted version of the Order.  The parties shall file a joint report by no later than January 17, 2015 regarding the proposed redacted version of the Order.

**IT IS SO ORDERED.**

DATED:  January 12, 2015

                                     DOLLY M. GEE
                       UNITED STATES DISTRICT JUDGE